## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

CarePoint Health Systems Inc. d/b/a Just Health
Foundation, et al., [1]

Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Chapter 11

Case No. 24-12534 (JKS)

(Joint Administration Requested)

**MOTION OF CAREPOINT HEALTH SYSTEMS, INC. FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTORS TO OBTAIN TEMPORARY AND PERMANENT POST-PETITION FINANCING FROM BAYONNE MEDICAL CENTER OPCO, LLC PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE; (II) GRANTING ADMINISTRATIVE PRIORITY CLAIMS TO DIP LENDER PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY TO IMPLEMENT THE TERMS OF THE DIP ORDER; AND (V) AUTHORIZING <u>DEBTORS TO USE CASH COLLATERAL</u>**

CarePoint Health Systems, Inc., *et al.*, the above-captioned debtors and debtors-in-possession (the "<u>Debtors</u>"), by undersigned proposed counsel, respectfully represent:

### **Bankruptcy Rule 4001 and Local Rule 4001-2 Concise Statement**

1.    By this motion (this "<u>Motion</u>"),[2] the Debtors[3] request (a) entry of an interim order (the "<u>Interim Order</u>") and final order (the "<u>Final Order</u>" and together with the Interim Order, the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

"DIP Orders") authorizing Debtors Carepoint Health Systems Inc., HUMC Opco LLC and Hudson Hospital Opco, LLC (collectively, the "Debtor Borrowers") to, among other things:  (i) obtain loans and advances from Bayonne Medical Center Opco, LLC (the "DIP Lender"), and other financial accommodations, in an aggregate principal amount not to exceed $25,000,000 (the "DIP Facility" or "DIP Loan"), pursuant to sections 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) enter into a Super Priority Senior Secured Debtor-in-Possession Credit and Security Agreement with DIP Lender and the agreements and instruments contemplated thereby (the "DIP Credit Agreement") and to perform such other and further acts as may be required in connection with the DIP Credit Agreement, (iii) grant administrative superpriority claims to DIP Lender in accordance with the DIP Credit Agreement and the DIP Orders to secure any and all of the DIP Obligations; (b) modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor Borrowers and DIP Lender to implement the terms of the DIP Orders; (c) authorization to use cash collateral; (d) grant adequate protection to prepetition secured parties; and (e) pursuant to Rule 4001 of the Bankruptcy Rules, that an interim hearing on the Motion (the "Interim Hearing") be held for this Court to consider entry of the Interim Order, which authorizes the Debtor Borrowers to borrow funds under the DIP Credit Agreement, on an interim basis, up to an aggregate outstanding principal loan balance not to exceed $10,000,000  (the "Interim Amount"); and (f) that this Court schedule a final hearing on the Motion (the "Final Hearing") to consider

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement (as defined below) or the First Day Declaration (as defined below).

[3] Notwithstanding anything to the contrary, IJKG Opco LLC does not seek authorization to use cash collateral or any other relief under this Motion, and the terms of the DIP Credit Agreement do not provide for use of proceeds of the DIP Facility for the operating expenses or other expenses of IJKG Opco LLC.

#124670115v3

entry of the Final Order, which authorizes the Debtor Borrowers to borrow funds under the DIP

Credit Agreement, on a final basis, up to an aggregate amount of $25,000,000, to be held within

twenty-one (21) days after the entry of the Interim Order.  A copy of the proposed Interim Order

is attached hereto as **Exhibit A**.  A copy of the DIP Credit Agreement is attached hereto as

**Exhibit B**.  A copy of the Budget for use of the proceeds of the DIP Facility is attached hereto as

**Exhibit C**.

2.    Material provisions of the DIP Credit Agreement are set forth in the following

sections of the DIP Agreement or the Interim Order.  Items marked with an asterisk* are required

to be highlighted by Local Rule 4001-2(a)(i).

a.    ***Borrowers***: CarePoint Health Systems, Inc.; HUMC Opco, LLC; and Hudson Hospital Opco, LLC [DIP Agreement, page 1].

b.    ***DIP Lender***: Bayonne Medical Center Opco, LLC [DIP Agreement, page 1].

c.    ***DIP Facility Amount***: A maximum amount of $25,000,000 which may be drawn by the Debtor Borrowers in two tranches of borrowings, unless otherwise agreed to in writing by the DIP Lender and approved by the Bankruptcy Court.  The Debtor Borrowers seek interim approval to borrow up to $10,000,000 and final approval to borrow up to $25,000,000.  [DIP Agreement, Section 2.1(a).]

d.    ***Interest Rate***: The effective non-default interest rate is 11% per annum.  Upon the occurrence and during the continuance of an Event of Default, the effective interest rate is 14% per annum.  Upon any borrowing, any interest payable for the six-month period after such borrowing may be financed by the DIP Lender and capitalized into the Obligations to reduce the amount of Borrowing disbursed. [DIP Agreement, Sections 2.1(c), 2.3, 3.5].

e.    ***Fees:*** A Facility Fee of 2% of the amount drawn is payable upon funding of any draw of the DIP Facility.  Upon satisfaction of the principal obligations of the DIP Facility, an Exit Fee of 2% of any principal amount repaid shall be charged. Reimbursement of all reasonable fees and expenses of the DIP Lender related to the documentation, bankruptcy court approval, closing process, administration, and enforcement of the DIP Facility will be funded through the initial draw on the DIP Facility, together with a $250,000 reserve for anticipated fees and expenses (which reserve shall not accrue interest until such fees are actually due and payable and unpaid), subject to the Budget.  [DIP Agreement, Sections 2.1(c), 3.1-3.3].

#124670115v3

f.  ***Repayment of Loan***: The Debtor Borrowers agree to repay in full all outstanding principal amounts of the DIP Loan on the Maturity Date which is the earliest to occur of (i) 12 months from entry of the Interim Order; (ii) any Debtor seeks or consents to conversion to a Chapter 7 proceeding; (iii) any Debtor Borrower's bankruptcy proceeding is dismissed or any Debtor seeks dismissal; (iv) the date on which the DIP Loans are accelerated upon an event of default; (v) confirmation of a plan in the Debtor Borrowers' Chapter 11 proceeding that has not been approved by DIP Lender or occurrence of the effective date of a plan that has been approved by DIP Lender; (vi) consummation of a sale of a material portion of the Debtor Borrowers' assets, or (vii) Debtor Borrowers seek or consent to appointment of a Chapter 11 trustee. The DIP Loans may be prepaid without premium or penalty [DIP Agreement, Sections 2.1(d), 2.6].

g.  **Carve-Out**: DIP Lender's and the Senior Secured Parties' claims are subject to a carve-out which is defined as: to the extent allowed by the Bankruptcy Court under sections 330 and 331 of the Bankruptcy Code and subject to the Budget: (i) all invoiced and payable allowed professional fees and expenses of the Debtor Borrowers and any Official Committee; provided that such fees and expenses incurred on or after the receipt of written notice by any of the Debtors from the DIP Lender or any Senior Agent of the occurrence of a Termination Event shall not exceed $400,000 in the aggregate; (ii) all fees payable by the Debtor Borrowers to a patient ombudsman appointed under section 333(a) of the Bankruptcy Code, (iii) all statutory fees payable by the Debtor Borrowers to the U.S. Trustee; and (iv) in the event of conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, $25,000 for the Chapter 7 trustee's fees and expenses. [DIP Agreement, page 4, Section 5.18].

h.  **\* *Use of Proceeds***: Borrowers shall use the proceeds of Loans solely for transaction fees incurred in connection with the Loan Documents and working capital needs and administrative expenses of the Debtors [but not IJKG Opco] through the Bankruptcy Cases in accordance with the Budget. Proceeds of the DIP Facility may not be used for operating or administrative expenses of IJKG Opco LLC.  [DIP Agreement, Section 6.11].

i.  ***Events of Default***: Events of Default include failure to make payments when due; breach of certain covenants including deviation from the DIP Budget in excess of 10% Permitted Variance; dissolution or cessation of business; dismissal or conversion of the bankruptcy cases; appointment of a chapter 11 trustee; DIP Order reversed, stayed or rescinded or amended without written consent of the DIP Lender; default under material postpetition indebtedness or prepetition senior security documents; invalidation or subordination of the superpriority claim status; Change of Control; Management Agreements with Management Company terminated or sought to be rejected; report filed by patient care ombudsman indicating patient care significantly declined; Final Order not entered within 45 days of the Petition Date unless otherwise agreed; confirmation of a plan that does not provide for payment in full in cash of all obligations of the Debtor Borrowers to DIP Lender. [DIP Agreement, Section 8.1].

j.  **\* *Grant of Security Interest*:**  First priority liens upon all of the Debtor Borrowers' pre-petition and post-petition assets, except certain Excluded Prepetition Collateral constituting the interests of the Debtors and their affiliates in certain litigation proceeds described on Schedule 1 to the Interim Order to the extent subject to the Senior Liens (as defined below) or Maple Liens (as defined below) as of the Petition Date; provided that the DIP Liens are *pari passu* with the Senior Liens of the Senior DIP-Consenting Parties (to the extent not successfully challenged) pursuant to the DIP Intercreditor Agreement [DIP Agreement, Section 2.9].

k.  **\* *Roll-up of Pre-petition Debt:*** There is no roll-up of pre-petition debt.

l.  ***Priority***:  All obligations to the DIP Lender are secured by a first priority security interest on the Debtor Borrowers' pre-petition and post-petition assets (which is *pari passu* with the liens of the Senior DIP-Consenting Parties' liens on such assets) and superpriority administrative expense, subject to the Carve-Out.  [DIP Agreement, Sections 2.9, 5.27].

m.  **\* *Conditions to Closing and Borrowing.*** Conditions include: the Interim Order and Final Order, as applicable, in forms acceptable to the DIP Lender shall have been entered and be in full force and effect and not subject to stay or appeal; the DIP Intercreditor Agreement shall have been executed and delivered; no Event of Default shall have occurred and be continuing; the Management Company managing the facilities of the Debtor Borrowers shall have delivered the Management Company Option to the DIP Lender and agreed to terms of an amended and restated operating agreement acceptable to the DIP Lender [DIP Agreement, Section 4.1]

n.  ***Adequate Protection:*** The Prepetition Secured Parties[4] will receive adequate protection as follows:

    **1.** *Replacement Liens.*

        **a.** The Senior DIP-Consenting Parties would be granted replacement security interests in and liens on all DIP Collateral, which security interests and liens shall be *pari passu* with the DIP Liens on such DIP Collateral in accordance with the terms of the DIP Intercreditor Agreement and senior to all other security interests and liens thereon (subject to the Carve-Out);

---

[4] Defined terms used but not otherwise defined in this Part (l) are defined in paragraph 13 of this Motion with the description of the Debtors' debt structure.

    **b.** The Senior Holdco Secured Parties would be granted replacement security interests in and liens on the assets of the Debtors (excluding for the avoidance of doubt, the Debtor Borrowers and IJKG Opco, LLC) that have granted security interests or liens to such Senior Secured Parties to secure their respective Senior Holdco Obligations, in each case subject to the Carve-Out;

    **c.** The Maple-Hudson Secured Parties would be granted replacement security interests in and liens on Debtor Hudson Hospital Opco, LLC's interest in the DIP Collateral, which Maple Adequate Protection Liens shall be subject and subordinate to the Senior Liens thereon, the Senior Adequate Protection Liens thereon, the DIP Liens thereon and the Carve-Out;

**2.** *Superpriority Claims.* Each Senior Agent and each other Senior Secured Party would be granted superpriority administrative expense claims to the extent of Diminution in Value, subordinate to the DIP Superpriority Claims;

**3.** *Fee and Expense Reimbursement.* The Debtor Borrowers would pay the reasonable fees, charges, expenses (including attorneys' fees and other expenses) of the Senior Secured Parties in connection with these Chapter 11 Cases or any subsequent cases or proceedings under the Bankruptcy Code subject to the Budget;

**4.** *Cash Interest Payments.* The Debtor Borrowers would be authorized and directed to pay to the Senior DIP-Consenting Parties, in respect of any period during which the Debtor Borrowers pay cash interest to the DIP Lender, all accrued and unpaid post-petition interest on the outstanding amounts due and payable under the Senior HUMC Loan Documents and the Senior Hudson Loan Documents at the applicable non-default rate set forth in, and at the times specified by, such Senior Loan Documents, and to pay all other accrued and unpaid reasonable and documented fees, costs and disbursements owing to the applicable Senior DIP-Consenting Parties under such Senior Loan Documents as and when such interest, fees, costs and disbursements become due and payable (but for the commencement of these Chapter 11 Cases) in accordance with the terms of such Senior Loan Documents and the Budget; provided, that default interest shall continue to accrue (but not be paid except pursuant to further order of the Bankruptcy Court), and the Senior DIP-Consenting Parties reserve the right after a Termination Event to assert a claim for the payment of such additional interest without prejudice to the rights of the Debtor Borrowers or any other party in interest to contest any such claim; and

**5.** *Reporting.* The Debtors would be authorized and directed to (a) deliver all notices and reporting required to be delivered by them under the Senior Loan Documents to which they are party; and (b) deliver to the Senior Agents, for distribution to the other Senior Secured Parties, and to the Maple-Hudson Agent, for distribution to the Maple-Hudson Secured Parties, copies of all notices and reporting delivered to the DIP Lender concurrent with the delivery of such notices and reporting to the DIP Lender.

[Interim Order Paragraph 13].

o.    **\* *Waiver of Section 506(c) Claims and "Equities of the Case" exception to Section 552:*** Subject to the entry of a Final Order, all claims under section 506(c) and the "equities of the case" exception to section 552 are waived with respect to the DIP Lenders and each Prepetition Secured Party, as applicable. [DIP Agreement, Section 7.18, Interim Order Paragraph 25].

p.    **\* *Marshaling of Assets:*** Subject to the entry of a Final Order, the marshaling of assets under Section 552 of the Bankruptcy Code is not required. [DIP Credit Agreement 9.1(b), Interim Order Paragraph 25].

q.    **\* *Remedies*:** Upon the occurrence of an Event of Default, the DIP Lender may, upon five calendar days' notice to the Debtors, Senior Agents, any Official Committee, and the U.S. Trustee, exercise default remedies without further order of the Bankruptcy Court, subject to the right of such parties to seek a determination that such Event of Default did not occur. The DIP Lender may immediately cease further borrowings pending such a determination. [DIP Agreement, Sections 8.1, 9.1; Interim Order Paragraph 18].

r.    **\* *Releases*:** The Debtor Borrowers would immediately upon entry of the Interim Order release substantially all claims they hold against the DIP Lenders and the Prepetition Secured Parties (as defined below). These releases would become binding on all third parties (including any Official Committee) within 75 days after the entry of the Interim Order.

s.    ***Provisions Prohibiting Use of Estate Funds to Investigate Liens and Claims of Prepetition Lenders.*** Neither the proceeds of the DIP Loans nor any Senior Collateral (including Cash Collateral) nor any portion of the Carve-Out would be permitted to be used to initiate, investigate, or prosecute any claims, causes of action, adversary proceedings, contested matters or other litigation or challenge against any Senior Secured Party, any Maple-Hudson Secured Party or any of their respective officers, directors, members, managers, equity holders, employees or affiliates, or object, contest or raise in any proceeding any defense to the validity, perfection, priority, extent or enforceability of the Senior Loan Documents, the Senior Liens, the Maple-Hudson Loan Documents or the Maple Liens or take any action that would be injurious to any of the Senior Secured Party's or Maple-Hudson Secured Party's interests; <u>provided</u>, proceeds from the

7

DIP Loans and/or Cash Collateral in an amount not to exceed $50,000 in the aggregate may be used on account of professional fees incurred by the Official Committee in connection with the investigation of the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code on account of the Senior Secured Obligations and Maple-Hudson Obligations, but not the prosecution of such claims and causes of action.

## **Jurisdiction**

3.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    The bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## **Background**

6.    On November 3, 2024 (the "Petition Date"), all of the Debtors except for IJKG Opco LLC filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

7.    On the Petition Date, three creditors of IJKG Opco, 29 E 29 Street Holdings, LLC, Bayonne Medical Center Opco, LLC, and Peter Wong, MD, filed an involuntary petition against IJKG Opco under Chapter 11 of the Bankruptcy Code.  On the Petition Date, IJKG Opco filed an answer consenting to the relief requested in the involuntary petition.

8.    On the Petition Date, the Debtors filed a motion seeking joint administration of all of the Debtors' Chapter 11 Cases, including IJKG Opco.

#124670115v3

9.     The Debtors have continued in possession of their properties and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, subject to that certain Collateral Surrender and Operations Transfer Agreement.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.

10.     The factual background relating to Debtors' commencement of this Chapter 11 cases is set forth in detail in the *Declaration of Shamiq Syed* (the "First Day Declaration") filed on the Petition Date and incorporated herein by reference.

11.     The Debtors operate three hospitals in Hudson County, New Jersey.

12.     The Debtors have faced significant challenges in paying operational costs due to the high number of charity care patients to which Debtors provide service.  As a result, Debtors have accrued significant amounts of unsecured debt and have experienced persistent cash flow constraints.

## **Prepetition Debt Structure**

13.     As of the Petition Date, HUMC Opco LLC and Hudson Hospital Opco, LLC have existing secured debt with liens on substantially all their assets as follows:

(a)     *Prepetition Maple Loan Documents*. Prior to the Petition Date:

(i)     Debtor Hudson Hospital Opco LLC the lenders from time to time party thereto (the "Maple-Hudson Lenders") and Maple Healthcare, LLC, as administrative agent and collateral agent for the Maple-Hudson Lenders (as successor to BRF Finance Co., LLC in such capacities) (in such capacities, the "Maple-Hudson Agent"; the Maple-Hudson Agent, together with the Maple-Hudson Lenders, the "Maple-Hudson Secured Parties") entered into that certain Amended and Restated Loan and Security Agreement, dated as of June 26, 2019 (as amended, supplemented or otherwise modified form time to time, the "Maple-Hudson Loan Agreement"; and, together with the "Loan Documents" as defined in the Maple-Hudson Loan Agreement, the "Maple-Hudson Loan Documents"), which provided for the term loan facilities in the aggregate principal amount of $17,951,721 (the "Maple-Hudson Facility" and the loans thereunder, the "Maple-Hudson Loans").  The Maple-Hudson Loans are secured by liens (the "Maple

9

Liens") on substantially all of Hudson Hospital Opco LLC's assets in accordance with the terms of the Maple-Hudson Loan Documents (the "Maple Collateral").

(b)     *Prepetition Senior Loan Documents*. Prior to the Petition Date:

(i)     Debtor HUMC Opco, LLC, as borrower, HUMC Holdco, LLC, the lenders from time to time party thereto (the "Senior HUMC Lenders") and Capitala Private Advisors, LLC, in its capacities as administrative agent and collateral agent for the Senior HUMC Lenders (in such capacities, the "Senior HUMC Agent" and, together with the Senior HUMC Lenders, the "Senior HUMC Secured Parties") entered into that certain Amended and Restated Loan and Security Agreement, dated as of August 8, 2019 (as amended, supplemented or otherwise modified from time to time, the "Senior HUMC Loan Agreement"; and, together with the "Loan Documents" as defined in the Senior HUMC Loan Agreement, the "Senior HUMC Loan Documents"), which provided for a term loan facility in the aggregate principal amount of $30,000,000 (the "Senior HUMC Facility" and the loans thereunder, the "Senior HUMC Loans").  The Senior HUMC Loans are secured by liens (the "Senior HUMC Liens") on substantially all of Debtor HUMC Opco, LLC's assets in accordance with the terms of the Senior HUMC Loan Documents and subject to customary exceptions and permitted liens as set forth therein (the "Senior HUMC Collateral").

(ii)     Debtor Hudson Hospital Opco, LLC, as borrower, the lenders from time to time party thereto (the "Senior Hudson Lenders") and Capitala Private Advisors, LLC, in its capacities as administrative agent and collateral agent for the Senior Hudson Agent (in such capacities, the "Senior Hudson Agent" and, together with the Senior Hudson Lenders, the "Senior Hudson Secured Parties") entered into that certain Loan and Security Agreement, dated as of November 4, 2022 (as amended, supplemented or otherwise modified from time to time, the "Senior Hudson Loan Agreement"; and, together with the "Loan Documents" as defined in the Senior Hudson Loan Agreement, the "Senior Hudson Loan Documents"), which provided for term loan facilities in the aggregate principal amount of $9,000,000 (the "Senior Hudson Facility" and the loans thereunder, the "Senior Hudson Loans").  The Senior Hudson Loans are secured by liens (the "Senior Hudson Liens") on substantially all of Debtor Hudson Hospital Opco, LLC's assets in accordance with the terms of the Senior Hudson Loan Documents and subject to customary exceptions and permitted liens as set forth therein (the "Senior Hudson Collateral").

(iii)     Debtors Carepoint Health Management Associates Intermediate Holdco, LLC, Bayonne Intermediate Holdco, LLC, Hoboken Intermediate Holdco, LLC, Christ Intermediate Holdco, LLC, Sequoia Healthcare Management, LLC (collectively with Carepoint Health Management Associates Intermediate Holdco, LLC, Bayonne Intermediate Holdco, LLC, Hoboken Intermediate Holdco, LLC and Christ Intermediate Holdco, LLC, the "Senior Holdco Borrowers") the lenders from time to time party thereto (the "Senior Holdco Lenders") and Capitala Specialty Lending Corp., as administrative agent and collateral agent for

10

the Senior Holdco Lenders (in such capacities, the "Senior Holdco Agent" and, together with the Senior Holdco Lenders, the "Senior Holdco Secured Parties") entered into that certain Credit Agreement, dated as of August 21, 2018 (as amended, supplemented or otherwise modified from time to time, the "Senior Holdco Loan Agreement"); and, together with the "Loan Documents" as defined in the Senior Holdco Loan Agreement, the "Senior Holdco Loan Documents"), which provided for term loan facilities in the aggregate principal amount of $50,000,000 (the "Senior Holdco Facility" and the loans thereunder, the "Senior Holdco Loans"). The Senior Holdco Loans are secured by liens (the "Senior Holdco Liens" and, collectively with the Senior Hudson Liens and the Senior HUMC Liens, the "Senior Liens") on substantially all of the Senior Holdco Borrowers' assets in accordance with the terms of the Senior Holdco Loan Documents and subject to customary exception and permitted liens as set forth therein (the "Senior Holdco Collateral").

(c)    *Prepetition Maple Subordination Agreement*. Prior to the Petition Date:

(i)    Debtor HUMC Opco, LLC, Maple Lender and the Senior HUMC Agent entered into that certain Subordination Agreement, dated as of August 8, 2019 (as amended, supplemented or otherwise modified from time to time, the "Maple-HUMC Subordination Agreement"), providing for the subordination of the Maple-HUMC Obligations and any liens securing the same to the Senior HUMC Obligations and the Senior HUMC Liens.

(ii)    Debtor Hudson Hospital Opco, LLC, certain of its affiliates, the Maple-Hudson Secured Parties and the Senior Hudson Agent entered into that certain Subordination and Intercreditor Agreement, dated as of November 4, 2022 (as amended, supplemented or otherwise modified from time to time, the "Maple-Hudson Subordination Agreement" and, together with the Maple-HUMC Subordination Agreement, the "Maple Subordination Agreements"), providing for the subordination of the Maple-Hudson Obligations (as defined in the Interim Order) and the Maple Liens on the Senior Hudson Collateral to the Senior Hudson Obligations (as defined in the Interim Order) and the Senior Hudson Liens on the Senior Hudson Collateral.

## **The DIP Facility**

14.    Under the DIP Credit Agreement[5], the Debtor Borrowers will have access to DIP Loans in an amount of up to $25,000,000, with up to $10,000,000 available upon entry of the Interim Order, subject to the terms and conditions of the DIP Credit Agreement. The DIP Lender

---

[5] The description herein of the DIP Credit Agreement is a general description. To the extent that the description of the DIP Credit Agreement set forth in this Motion differs from terms of the DIP Credit Agreement, the terms of the DIP Credit Agreement shall control.

has negotiated with the Debtors, the Prepetition Secured Parties, and other parties in interest in good faith and at arms' length in order to reach consensus on the terms set forth in the proposed DIP Credit Agreement. Debtors IJKG LLC and IJKG Opco LLC have entered into a separate DIP financing agreement with Bayonne Medical Center Opco, LLC, which is the subject of a separate motion.

15. Under the terms of the DIP Credit Agreement, as a condition to making the DIP Loans, the DIP Lender will obtain first priority security interests in all assets of the Debtor Borrowers, with priority over any and all liens and security interests on such assets existing as of the Petition Date, except that (i) the interests of the Debtors and their affiliates in certain litigation proceeds described on Schedule 1 to the Interim Order will be excluded from the DIP Lender's collateral to the extent subject to the Senior Liens or Maple Liens as of the Petition Date; and (ii) the DIP Lender, the Senior HUMC Agent, and the Senior Hudson Agent (collectively, the "Senior DIP-Consenting Agents") will share liens on a *pari passu* basis on assets of HUMC Opco LLC and Hudson Hospital Opco LLC constituting collateral of the Senior DIP-Consenting Agents as of the Petition Date. The Senior DIP-Consenting Agents have agreed to such treatment under that certain Intercreditor Agreement, dated as of even date with the DIP Credit Agreement (the "DIP Intercreditor Agreement"), by and among the Debtor Borrowers, the Senior DIP-Consenting Agents, and the DIP Lender.

16. The Senior HUMC Agent, Senior Hudson Agent, Senior Holdco Agent, and Maple-Hudson Agent have also each communicated to the Debtors their consent to the use of cash collateral in accordance with the terms of the Budget and the Interim Order.

17. As an additional material inducement to the making of the DIP Loans, it is a condition to the availability of the Debtor Borrowers to borrow funds under the DIP Credit

Agreement that the DIP Lender obtain an option (the "Insight Option") from Insight Management and Consulting Services, Inc., the entity contracted to provide management services to the Hoboken and Christ Hospital facilities operated by the Debtor Borrowers (together with its successors and assigns, the "Management Company"), for the benefit of the DIP Lender, pursuant to which  (i) the DIP Lender's designee (the "Optionee") may exercise an option to receive between nineteen percent (19%) and forty-nine percent (49%) of an entity established by the Management Company ("**Management NewCo**") to serve as the manager of the Borrowers, (ii) Management NewCo will be operated pursuant to a management agreement on terms acceptable to Optionee, and Optionee will have the right to designate between 1/7th and 3/7ths of the Management NewCo's board of directors, and (iii) the management option may be exercised at any point from issuance of the Final Order to one hundred eighty (180) days after the effective date of any Chapter 11 plan confirmed in the Bankruptcy Cases, at which time it will expire if not exercised.

18.    Further, the DIP Credit Agreement requires the Board of Trustees of CarePoint Health Systems, Inc. (the "**Board**") to (i) add three (3) members to the Board, and (ii) authorize the DIP Lender to appoint (3) such new members upon entry of the Interim Order and funding of the Interim Availability Amount.

## <u>The Interim and Final DIP Loans Should Be Authorized</u>

19.    Approval of the DIP Facility is necessary to provide the Debtor Borrowers with immediate and ongoing access to borrowing availability to pay current and ongoing operating expenses, including post-petition wages, salaries, and vendor costs.  Unless these expenses are paid, the Debtor Borrowers will be forced to cease operations, which would likely result in irreparable harm to their business and the citizens of Hudson County, New Jersey who depend upon Debtor Borrowers' hospitals for medical care.  Further, Debtor Borrowers' ceasing

operations would jeopardize the Debtors' ability to reorganize and maximize value for all interested parties.

20.    The credit provided under the proposed DIP Credit Agreement will enable Debtor Borrowers to continue to service the citizens Hudson County, New Jersey, pay vendors and employees in the ordinary course, and preserve the value of the estate while the Debtors reorganize their debts.  The availability of credit under the proposed DIP Credit Agreement will provide confidence to Debtor Borrowers' vendors and employees that will enable and encourage them to continue their relationships with the Debtor Borrowers.  Accordingly, the timely approval of the relief requested herein is imperative.

21.    Sections 364(c) and (d) of the Bankruptcy Code provide, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt:  (a) with priority over any and all administrative expenses, as specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; (c) secured by a junior lien on property of the estate that is subject to a lien; or (d) secured by a lien that is equal or senior to existing liens. 11 U.S.C. § 364.  The Debtors propose to obtain the financing set forth in the DIP Credit Agreement by providing, inter alia, security interests and liens pursuant to section 364(c) and (d) of the Bankruptcy Code.

22.    The Debtor Borrowers' liquidity needs can be satisfied only if the Debtor Borrowers are authorized to borrow the DIP Loans and to use the proceeds to fund operations.  After diligent efforts, the Debtor Borrowers have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b) or in exchange for the grant of a superpriority administrative expense claim

14

pursuant to section 364(c)(1). The Debtor Borrowers have sought such funding from multiple sources prior to initiating these cases, none of which was willing to lend funds on an unsecured basis or on terms more favorable than the terms of the DIP Credit Agreement.

23. Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444,449 (D. Colo. 1985).

24. Section 364(d) of the Bankruptcy Code does not require a debtor to seek alternative financing from every possible lender; rather, the debtor need only demonstrate that it undertook sufficient efforts to obtain financing without the need to grant a senior lien. *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 n. 44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of "reasonable effort" to obtain alternative credit with lesser security); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); *see also In re Snowshoe Co., Inc.*, 789 F.2d at 1088 (unsuccessful contact with other financial institutions in the geographic area was sufficient to demonstrate that credit was unavailable absent senior lien).

25.     The Debtors submit that the circumstances of this case require the Debtor Borrowers to obtain financing pursuant to section 364(a), (c) and (d) and, accordingly, the DIP Agreement reflects the exercise of their sound business judgment.

26.     The terms and conditions of the DIP Credit Agreement are fair and reasonable and were negotiated extensively by well-represented parties in good faith and at arms' length. Accordingly, the DIP Lender and all obligations incurred under the DIP Credit Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

**Basis for Cash Collateral Relief**

**A.  The Debtors Require the Use of the Cash Collateral.**

27.     As set forth above, the Debtor Borrowers have an urgent need for debtor-in-possession financing, which includes use of the Cash Collateral pending the final hearing on this Motion on the terms set forth in the DIP Credit Agreement.  Cash Collateral in this case consists of the Prepetition Secured Parties' interests in the Collateral which supports the debtor-in-possession financing.  Accordingly, the Debtors seek to use Cash Collateral existing on or after the Petition Date that is subject to the post-petition liens of DIP Lender, the Senior Agents and the Maple-Hudson Agent, and the Senior Agents' and Maple-Hudson Agent's pre-petition liens and security interests on the terms set forth in the DIP Credit Agreement and the Interim Order. As of the Petition Date, the Debtor Borrowers do not have sufficient unencumbered cash to fund their business operations and pay present operating expenses without the availability of the DIP Loans.

28.     Absent the ability to obtain debtor-in-possession financing and use Cash Collateral, the Debtors will not be able to pay insurance, wages, rent, utility charges, and other critical operating expenses.  Consequently, without access to Cash Collateral, the Debtors will not be able to maintain their business operations and continue their restructuring efforts, and

16

would likely be forced to cease operations and liquidate.  As such, the Debtors' estates would be immediately and irreparably harmed.

29.    If the Debtor Borrowers are unable to obtain sufficient operating liquidity to meet post-petition obligations on a timely basis, a permanent and irreplaceable loss of business will occur, causing a loss of value to the detriment of the Debtors and their creditors.  This potential loss of revenue and going concern value would be extremely harmful to the Debtor Borrowers, their estates and their creditors at this critical juncture.  The Debtor Borrowers cannot obtain funds sufficient to administer their estates and operate their businesses other than by obtaining the relief requested herein pursuant to section 363 of the Bankruptcy Code.

30.    The Debtors' management has formulated the Budget for the use of debtor-in-possession financing and Cash Collateral.  The Debtors believe that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course in connection with the operation of their businesses and their restructuring efforts for the period set forth in the Budget.  The Debtors also believe that the use of Cash Collateral in accordance with the Budget will provide the Debtors with adequate liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

**B.  The Interests of the Secured Parties Are Adequately Protected.**

31.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may only use "cash collateral" with the consent of the secured party with an interest therein or court approval.  *See* 11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in cash collateral sought to be used by a debtor, the court shall prohibit or condition such use of cash collateral as is necessary to provide adequate protection of such entity's interest.  <u>See</u> 11 U.S.C. § 363(e).

32.     Appropriate adequate protection is decided on a case-by-case basis.  *See, e.g., In re Snowshoe Co.*, 789 F.2d at 1088; *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *see also In re JKJ Chevrolet, Inc.*, 190 B.R. 542, 545 (Bankr. E.D. Va. 1995) (adequate protection is a flexible concept that is determined by considering the facts of each case) (citing *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987).  Although adequate protection is not defined in the Bankruptcy Code, section 361 of the Bankruptcy Code provides the following three (3) nonexclusive examples of what may constitute adequate protection:

> (1)     requiring the [debtor] to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section 363 . . . results in a decrease in the value of such entity's interest in such property;
>
> (2)     providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or
>
> (3)     granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.  Essentially, with the provision of adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. at 736; *see also In re Nice*, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("adequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to a Debtor's continued use of collateral").  The Debtors assert that the Prepetition Secured Parties are adequately protected by the granting of

replacement liens as set forth in the Ratification and Amendment Agreement, and the continuation of the Debtors' businesses.

*Adequate Protection Provided to Prepetition Secured Parties*

33.     As more fully described below, and as set forth in the Interim Order, the Debtors propose to provide the Senior HUMC Agent, the other Senior HUMC Secured Parties, the Senior Hudson Agent, the other Senior Hudson Secured Parties, the Senior HoldCo Agent, the other Senior Holdco Secured Parties and the Maple-Hudson Secured Parties (collectively, the "Prepetition Secured Parties"),  with certain forms of adequate protection (collectively, the "Adequate Protection Obligations") to protect against the aggregate diminution in the value of the interests of the Prepetition Secured Parties in the Senior Collateral (including any Cash Collateral) from and after the Petition Date, resulting from (among other things) the use, sale or lease by the Debtors of the Senior Collateral (including the use of Cash Collateral), the subordination of the prepetition liens of the Prepetition Secured Parties to the Carve Out, the agreement of the Senior HUMC Secured Parties and the Senior Hudson Secured Parties (collectively, the "Senior DIP-Consenting Parties") to allow their respective Senior Liens to become *pari passu* with the DIP Liens and the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code and, with respect to the Maple-Hudson Secured Parties, their agreement to allow their Liens to be subordinated to the DIP Liens (collectively, "Diminution in Value"):

    a.    *Replacement Liens*.

        1.    The Senior DIP-Consenting Parties would be granted replacement superiority security interests in and liens on all DIP Collateral, which security interests and liens shall be *pari passu* with the DIP

Liens on such DIP Collateral in accordance with the terms of the DIP Intercreditor Agreement and senior to all other security interests and liens thereon (subject to the Carve-Out) (collectively, the "Senior DIP-Consenting Adequate Protection Liens").

2.    The Senior Holdco Secured Parties would be granted replacement superiority security interests in and liens on the assets of the Debtors (excluding for the avoidance of doubt, the Debtor Borrowers and non-IJKG Opco, LLC) that have granted security interests or liens to such Senior Holdco Secured Parties (such security interests and liens, collectively with the Senior DIP-Consenting Adequate Protection Liens, the "Senior Adequate Protection Liens"), in each case subject to the Carve-Out.

3.    The Maple-Hudson Secured Parties would be granted replacement security interests and liens on (the "Maple Adequate Protection Liens" and, together with the Senior Adequate Protection Liens, the "Adequate Protection Liens") Debtor Hudson Hospital Opco, LLC's interest in the DIP Collateral, which Maple Adequate Protection Liens shall be subject and subordinate to the Senior Liens thereon, the Senior Adequate Protection Liens thereon, the DIP Liens thereon and the Carve-Out.

b.    *Superpriority Claims*. The Senior HUMC Agent, Senior Hudson Agent, and Senior Holdco Agent (collectively, the "Senior Agents") and the other Senior HUMC Secured Parties, Senior Hudson Secured Parties, and

Senior Holdco Secured Parties (together with the Senior Agents, collectively, the "<u>Senior Secured Parties</u>") would be granted a superpriority administrative expense claim, which claim shall have priority over all other administrative expense claims and unsecured claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including without limitation administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503, 507, 546, 552, 726, 113 and 114 and any other provision of the Bankruptcy Code (the "<u>Senior Adequate Protection Superpriority Claim</u>"), provided however that such Senior Adequate Protection Superpriority Claim would be junior only to the DIP Superpriority Claim (for the avoidance of doubt, any proceeds of DIP Collateral being subject to the DIP Intercreditor Agreement) and the Carve-Out and shall be entitled to all protections and benefits of section 507(b) of the Bankruptcy Code.

c.    *Fee and Expense Reimbursement.* The Debtor Borrowers would pay the reasonable fees, charges, expenses (including attorneys' fees and other expenses) of the Senior Secured Parties in connection with these Chapter 11 Cases or any subsequent cases or proceedings under the Bankruptcy Code subject to the Budget.

d.    *Cash Interest Payments.* The Debtor Borrowers would be authorized and directed to pay, as adequate protection to the Senior DIP-Consenting Parties, in respect of any period during which the Debtor Borrowers pay

cash interest to the DIP Lender, all accrued and unpaid post-petition interest on the outstanding amounts due and payable under the Senior HUMC Loan Documents and the Senior Hudson Loan Documents at the applicable non-default rate set forth in, and at the times specified by, such Senior Loan Documents, and to pay all other accrued and unpaid reasonable and documented fees, costs and disbursements owing to the applicable Senior DIP-Consenting Parties under such Senior Loan Documents as and when such interest, fees, costs and disbursements become due and payable (but for the commencement of these Chapter 11 Cases) in accordance with the terms of such Senior Loan Documents subject to the Budget; <u>provided</u>, that default interest shall continue to accrue (but not be paid except pursuant to further order of the Bankruptcy Court), and the Senior DIP-Consenting Parties reserve the right after a Termination Event to assert a claim for the payment of such additional interest without prejudice to the rights of the Debtor Borrowers or any other party in interest to contest any such claim.

e.     *Reporting*. The Debtors would be authorized and directed to (i) deliver all notices and reporting required to be delivered by them under the Senior Loan Documents to which they are party; and (ii) deliver to the Senior Agents, for distribution to the other Senior Secured Parties, and to the Maple-Hudson Agent, for distribution to the Maple-Hudson Secured Parties, copies of all notices and reporting delivered to the DIP Lender

concurrent with the delivery of such notices and reporting to the DIP Lender.

34.    The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential Diminution in Value to the Cash Collateral. Considering the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate. Thus, the Debtor Borrowers provision of Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtor Borrowers are able to continue using the Cash Collateral, subject to the terms and limitation set forth in the Interim Order, for the benefit of all parties in interest and their estates.

*Continued Operation of the Debtors' Businesses*

35.    In addition to the foregoing, the Prepetition Secured Parties are also adequately protected as a result of the continuation of the Debtors' business operations.  Without the use of the Cash Collateral requested herein, the Debtors would forego business opportunities and their operations would be irreparably harmed.  Indeed, absent use of the Cash Collateral, the Debtors will be unable to pay ordinary business expenses, including employee wages.  In that event, all operations will cease, employees will be terminated, and all assets on which Prepetition Secured Parties assert a lien will be liquidated. Those pledged assets will be worth less in a liquidation than they will be worth as a going concern reorganization.

36.    The continuation of the Debtors' operations likely presents the best opportunity for creditors including the Prepetition Secured Parties to receive the greatest recovery on account of their respective claims.  Accordingly, the Debtors submit that use of the Cash Collateral requested in this Motion will allow the Debtors to continue their operations and, thereby, protect

the Prepetition Secured Parties' interests.  Courts have recognized that the preservation of the going concern value of a secured lender's collateral constitutes adequate protection of such creditor's interest in the collateral.  *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996); *In re 499 W. Warren Street Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (where the court found a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); *In re Willowood E. Apartments of Indianapolis II, Ltd.*, 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990) (same); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (creditor's secured position would be enhanced by the continued operation of the Debtor's business); *In re Aqua Assocs.*, 124 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determining whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citation omitted).

37.    The Debtors submit that the Secured Parties are adequately protected by the proposed Replacement Liens in the Debtors' property and by maintaining the business of the Debtors as a going concern and thereby preventing or minimizing any diminution in the value of the pre-petition collateral.

**The Automatic Stay Should Be Modified on a Limited Basis**

38.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to:  (i) grant the security interests, liens and claims described above with respect to DIP Lender, the Prepetition Secured Parties and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens;

#124670115v3

(ii) implement the terms of the proposed Interim and Final Orders; and (iii) provide the relief required by the DIP Credit Agreement.

39. Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

40.    The Debtors respectfully request that the Court conduct an expedited preliminary hearing on this Motion and authorize Debtors (from and after the entry of the Interim Order and pending the final hearing) to obtain debtor-in-possession financing on the terms set forth in the DIP Credit Agreement in accordance with the Budget for, among other things, working capital purposes and the payment of certain obligations in accordance with the relief authorized by the Court.  Interim access to the debtor-in-possession financing will ensure that the Debtors maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending the Final Hearing on this Motion.

41.    The Debtors submit that, for the reasons set forth herein, immediate access to the debtor-in-possession financing on the terms set forth in the Budget, is necessary to preserve the value of the Debtors' estates for the benefit of all parties in interest.

## Request for Final Hearing

42.    Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than twenty-one (21) days following the entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

43. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h), 7062, 9014, or Local Rule 9013-1(b).

**Notice**

44.  This Motion has been served upon (a) the Office of the United States Trustee for the District of Delaware; (b) the Internal Revenue Service; (c) the thirty (30) largest unsecured creditors on a consolidated basis; (d) the New Jersey Department of Health; (e) Capitala, Maple, and Bayonne Medical Center Opco, LLC; and (f) other parties as set forth in the accompanying Certificate of Service. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

45.  WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**; and grant such other and further relief as is just and proper.

Dated:  November 3, 2024

/s/ Peter C. Hughes
**DILWORTH PAXSON LLP**
Peter C. Hughes (I.D. No. 4180)
800 N. King Street – Suite 202
Wilmington, DE 19801
Telephone: (302) 571-9800
Facsimile:  (302) 351-8735

-and-

/s/ Peter C. Hughes
**DILWORTH PAXSON LLP**
Lawrence G. McMichael (*pro hac vice admission pending*)
Peter C. Hughes
Anne M. Aaronson (*pro hac vice admission pending*)
Jack Small (*pro hac vice admission pending*)
1500 Market St., Suite 3500E

26

#124670115v3

Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:   (215) 754-4603

*Proposed Counsel for the Debtors and Debtors in Possession*

#124670115v3