**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CarePoint Health Systems, Inc. d/b/a Just Health Foundation, *et al.*, [1] | Case No. 24-12534 |
| Debtors. | *Joint Administration Requested* |

**MOTION OF IJKG OPCO, LLC AND IJKG, LLC FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING IJKG OPCO, LLC AND IJKG, LLC TO OBTAIN TEMPORARY AND PERMANENT POST-PETITION FINANCING FROM BAYONNE MEDICAL CENTER OPCO, LLC PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE; (II) GRANTING ADMINISTRATIVE PRIORITY CLAIMS TO DIP LENDER PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE; (III) MODIFYING THE AUTOMATIC STAY TO IMPLEMENT THE TERMS OF THE DIP ORDER; AND (IV) AUTHORIZING THE USE OF CASH COLLATERAL**

IJKG Opco, LLC ("IJKG Opco") and IJKG LLC ("IJKG") (together, the "Bayonne Debtors"), two of the above-captioned debtors and debtors-in-possession (the "Debtors"), by undersigned proposed counsel, respectfully represent:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

## **Bankruptcy Rule 4001 and Local Rule 4001-2 Concise Statement**

1.      By this motion (this "<u>Motion</u>"), the Bayonne Debtors request (a) entry of an interim order (the "<u>Interim Order</u>") and final order (the "<u>Final Order</u>" and together with the Interim Order, the "<u>DIP Orders</u>") authorizing the Bayonne Debtors to, among other things:  (i) obtain loans and advances from Bayonne Medical Center Opco, LLC ("<u>Bayonne DIP Lender</u>)" or the other financial accommodations, in an aggregate principal amount not to exceed $42,000,000 (the "<u>DIP Facility</u>" or "<u>DIP Loan</u>"), pursuant to sections 363 and 364 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (ii) enter into a Debtor-in-Possession Loan and Security Agreement with Bayonne DIP Lender and the agreements and instruments contemplated thereby (the "<u>Bayonne DIP Agreement</u>") and to perform such other and further acts as may be required in connection with the Bayonne DIP Agreement, (iii) grant administrative priority claims to the Bayonne DIP Lender in accordance with the Bayonne DIP Agreement and the DIP Orders to secure any and all of the DIP Obligations (as hereinafter defined); (b) modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Bayonne Debtors and Bayonne DIP Lender to implement the terms of the DIP Orders; (c) authorization to use cash collateral; (d) pursuant to Rule 4001 of the Bankruptcy Rules, that an interim hearing on the Motion (the "<u>Interim Hearing</u>") be held for this Court to consider entry of the Interim Order, which authorizes the Bayonne Debtors to borrow funds under the Bayonne DIP Agreement, on an interim basis, up to an aggregate outstanding principal loan balance not to exceed $17,280,000 (the "<u>Interim Amount</u>"); and (e) that this Court schedule a final hearing on the Motion (the "<u>Final Hearing</u>") to consider entry of the Final Order, which authorizes the Bayonne Debtors to borrow funds under the Bayonne DIP Agreement, on a final basis, up to an aggregate outstanding principal loan balance not to exceed $42,000,000 to be held within twenty-one (21) days after the entry of the Interim Order.  A copy of the proposed Interim Order is attached hereto as **Exhibit A**.  A copy

of the Bayonne DIP Agreement is attached hereto as **Exhibit B**.  A copy of the Collateral Surrender and Operations Transfer Agreement (the "Collateral Surrender Agreement"), which was executed in contemplation of the Bayonne DIP Agreement, is attached hereto as **Exhibit C**.

2.    Material provisions of the Bayonne DIP Agreement and Collateral Surrender Agreement are set forth in the following sections of the Bayonne DIP Agreement, Collateral Surrender, Agreement, or the Interim DIP Order.  Items marked with an asterisk* are required to be highlighted by Local Rule 4001-2(a)(i).

a.    ***Borrower***:  The Bayonne Debtors; [Bayonne DIP Agreement, page 1].

b.    ***DIP Lender***: Bayonne DIP Lender [Bayonne DIP Agreement, page 1].

c.    ***DIP Facility Amount***:  A maximum amount outstanding of $42,000,000 which may be drawn by the Bayonne Debtors as follows: $4,320,000 per week until approval of the Interim Order and a total of $42,000,000 upon entry of the Final Order.  The Bayonne Debtors therefore seek interim approval to borrow up to $17,280,000 and final approval to borrow up to $42,000,000.  [Bayonne DIP Agreement, Section 2.01(a).

d.    ***Interest Rate***:  The effective non-default interest rate is 18% per annum.  Upon the occurrence and during the continuance of an event of default, the effective interest rate is 23% per annum.  [Bayonne DIP Agreement, Sections 2.03, 2.04].

e.    ***Fees:***  Borrowers shall pay Bayonne DIP Lender a services fee equal to $1,300,000 per month, plus the expenses of the Bayonne DIP Lender.  Borrowers shall pay an advance payment of the services fee of $7,800,000, equal to payments for the first six months of the services fee, upon the passage of the Interim Order.  A Facility Fee of 2% of the amount drawn is payable upon funding of any draw of the DIP Facility.  Upon satisfaction of the principal obligations of the DIP Facility, an Exit Fee of 2% of any principal amount repaid shall be charged.  A reserve of $250,000 to pay all fees and expenses related to the documentation, bankruptcy court approval, closing process, administration, and enforcement of the DIP Facility will be funded through any initial draw on the DIP Facility.  [Collateral Surrender Agreement, Section 2.06(e)].

f.    ***Repayment of Loan***: The Bayonne Debtors shall repay Bayonne DIP Lender in full by the Maturity Date, which is the earliest to occur of (i) the date the DIP note becomes due and payable under the DIP Financing Documents, whether by acceleration after an Event of Default or otherwise and (ii) the closing date or any other sale(s) of all or substantially all of the Bayonne Debtors' assets pursuant to section 363 of the Bankruptcy Code. [Bayonne DIP Agreement, page 11, Section 2.05].

g.    **Carve-Out**:    Bayonne DIP Lender's liens, claims and security interests in the Collateral and its Superpriority Claim shall be subject to the right of payment of the following:  (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $10,000.00; (iii)  to the extent allowed by the Bankruptcy Court under sections 330 and 331 of the Bankruptcy Code, a sum not to exceed the sums set forth in the Budget for all invoiced and payable allowed professional fees and expenses of the Bayonne Debtors and any Committee, (iv) all allowed professional fees incurred after written notice from the Bayonne DIP Lender of the occurrence of the Termination Date (as defined in the DIP Loan Agreement) (other than a Termination Date based on the failure of this Interim Order to be entered within 3 business days of the Petition Date), not to exceed $35,000 in the aggregate; and (v) all fees payable by the Bayonne Debtors to a patient ombudsman appointed under section 333(a) of the Bankruptcy Code, provided that the foregoing expenses shall not include Excluded Professional Fees (as defined below), and provided further that professional fees to be paid by Bayonne DIP Lender pursuant to this paragraph shall not at any time exceed the aggregate amount of the fees and expenses identified in the Budget for each such professional or category of professional. [Bayonne DIP Agreement Section 1, Definitions, Carve-Out (page 3)].

h.    **\* Use of Proceeds:** Borrowers shall use the proceeds solely to (a) pay fees, interest, payments, and expenses associated with the DIP Loans; (b) provide for the ongoing working capital and capital expenditure needs of the Debtor during the pendency of the Bankruptcy Proceeding; (c) fund the Carve-Out; and (d) fund the costs of the administration of the Bankruptcy Proceeding and the consummation of the restructuring.  [Bayonne DIP Agreement, Section 6.11].

i.    **Events of Default:** Customary events of default including, failure to make payments when due; breach of certain covenants; breach of warranty; other defaults under Loan Documents; dissolution or cessation of business; dismissal of the bankruptcy case or conversion to a chapter 7 case; appointment of a chapter 11 trustee; appointment of an examiner with enlarged powers relating to the operation of the business of the Bayonne Debtors; Financing Order reversed, stayed or rescinded or amended or supplemented by the Court without written consent of the Bayonne DIP Lender; attempts by the Bayonne Debtors to obtain an order of the Bankruptcy Court or other judgment, which would invalidate, reduce or otherwise impair Bayonne DIP Lender's claims or claim priority status; a material deviation from the DIP Budget; failure to adhere to the sale timeline; filing of pleadings by the Bayonne Debtors affecting the priority claim status of Bayonne DIP Lender's claims, invalidation or subordination of the priority claim status, the confirmation of a plan which does not contain a provision for payment in full in cash of all obligations of the Bayonne Debtors to Bayonne DIP Lender; filing of a motion by the Bayonne Debtors requesting, or entry of an order granting, any super-priority claim which is senior to the Bayonne DIP Lender's claims, except as expressly provided in the Agreement. [Bayonne DIP Agreement, Section 9 (pages 55-59)].

j.    **\* Grant of Security Interest:** Substantially all of the Bayonne Debtors' pre-petition and post-petition assets.  [Bayonne DIP Agreement, Section 2.10].

k.    **\* Roll-up of Pre-petition Debt:** The DIP Loan rolls up $7,000,000 of debt that the Bayonne DIP Lender acquired from Capitala and between $24,000,000 and $32,000,000 of the prepetition debt of 29 E 29 Street Holdings LLC an affiliate of Bayonne DIP Lender on a dollar-for-dollar basis. [Bayonne DIP Agreement, Page 1, Section 2.01].**\* Priority**: All obligations to the Lender are secured by a first priority security interest and superpriority administrative expense, subject to the Carve-Out.  [Bayonne DIP Agreement, Section 2.10].

m.    **\* Waiver of Section 506(c) Claims** Subject to the entry of the Final DIP order, all claims under section 506(c) are waived. [Bayonne DIP Agreement, Section 5.26].

n.    **\* Marshaling of Assets:** Subject to the entry of a permanent order, the Bayonne DIP Lender and Pre-Petition Secured Parties shall not be subject to the marshaling of assets under Section 552 of the Bankruptcy Code.  [Bayonne DIP Agreement, Section 5.26].

o.    **\* Remedies:** Upon the occurrence of an Event of Default, the Bayonne DIP Lender shall have customary remedies and may, upon five calendar days' notice to the Borrowers, exercise default remedies without further order of the Bankruptcy Court. [Bayonne DIP Agreement, Sections 8.12, 9.2].

3.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    The bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>").

#124650750v9

## **Background**

6.     On November 3, 2024 (the "Petition Date"), all Debtors except IJKG Opco, LLC ("IJKG Opco") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

7.     On the Petition Date, three creditors of IJKG Opco, 29 E 29 Street Holdings, LLC, Bayonne Medical Center Opco, LLC, and Peter Wong, MD, filed an involuntary petition against IJKG Opco under Chapter 11 of the Bankruptcy Code.  On the Petition Date, IJKG Opco filed an answer consenting to the relief requested in the involuntary petition.

7.     On the Petition Date, the Debtors filed a motion seeking joint administration of all of the Debtors' Chapter 11 Cases, including IJKG Opco.

8.     The Debtors have continued in possession of their properties and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, subject to that certain Collateral Surrender and Operations Transfer Agreement.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.

9.     The factual background relating to Debtors' commencement of this Chapter 11 cases is set forth in detail in the *Declaration of Shamiq Syed* (the "First Day Declaration") filed on the Petition Date and incorporated herein by reference.

10.   IJKG Opco operates Bayonne Medical Center in Bayonne, New Jersey.

11.   The Debtors have faced significant challenges in paying operational costs due to the high number of charity care patients to which the Debtors provide service.  As a result, the Debtors have accrued significant amounts of unsecured debt and have experienced persistent cash flow constraints.

#124650750v9

12.   The Bayonne Debtors have entered into the Bayonne DIP Agreement and Collateral Surrender Agreement to fund the Bayonne Debtors' financing needs and to facilitate the continued operation of Bayonne Medical Center.

**Prepetition Debt Structure**

13.   The following is a description of the Bayonne Debtors' prepetition debt to Capitala, the Maple Secured Parties, and affiliates of the Bayonne DIP Lender:

    a.    *Prepetition Bayonne DIP Lender Documents.*

        i.    Prior to the Petition Date, Debtor IJKG Opco and MPT of Bayonne, LLC ("MPT") entered into that certain sale-leaseback transaction (the "BMC Lease"), dated as of February 4, 2011 and Debtor IJKG Opco became "Lessee" pursuant to the BMC Lease of the property on which the Bayonne Medical Center (the "Facility") sits, 29 E 29th Street, Bayonne, New Jersey 07002 (the "Subject Property").

        ii.    To secure payment and performance of Debtor IJKG Opco's obligations under the BMC Lease, Debtor IJKG Opco and MPT entered into that certain Security Agreement dated as of February 4, 2011 (the "Senior 29 E 29 Security Agreement"), pursuant to which Debtor IJKG Opco granted MPT a first lien on certain tangible and intangible assets of Debtor IJKG Opco referenced therein, including, without limitation, licenses, participation agreements, leasehold interest, personal property, fixtures, and supplies and, further, the right to replace and designate a successor management company to oversee the operations of the Facility in the event of default.

        iii.    WTFK Bayonne Propco, LLC ("WTFK") purchased the Subject Property from MPT, and, by virtue of a duly executed Assignment Agreement, became successor "Lessor" under the BMC Lease, obtaining all of MPT's right, title and interest to the Subject Property, and assuming all of the rights and obligations prescribed under the BMC Lease, as well as those under the Senior 29 E 29 Security Agreement, executed by IJKG Opco in favor of Lessor (the BMC Lease and such other documents may hereinafter be referred to collectively as the "Lease Documents").

        iv.    On or about June 17, 2020, WTFK filed a Verified Complaint in the Delaware Court of Chancery (C.A. No. 2020-0480-KSJM) alleging breach of contract for Debtor IJKG Opco's various defaults under the BMC Lease, in connection with the Subject Property (the "Delaware Action").

7

v.        On or about August 10, 2020, 29 E 29 Street Holdings LLC ("Landlord"), an affiliate of Bayonne DIP Lender, purchased the Subject Property from WTFK, and, by virtue of a duly executed Assignment Agreement, became successor to lessor and obtained all of the right, title, and interest in the Subject Property, and assumed all of the rights and obligations prescribed under the BMC Lease and the other Lease Documents, thus becoming IJKG Opco's landlord, senior secured lender and first lienholder/secured creditor on the Pre-Petition Collateral (as defined herein) subject to the Maple Intercreditor Agreement.

vi.       On September 23, 2024, the Court of Chancery of the State of Delaware entered a default judgment against the Debtors in favor of Landlord and certain of its affiliates, as plaintiffs, with respect to the Delaware Action, regarding amounts and categories of amounts Landlord has or could have claimed or prayed for, or both, in the Delaware Action, including, without limitation, arrears/defaults in the Base Rent, Additional Charges, default, escalated or holdover rent, Impositions, insurance premiums, expenses, taxes, insurance, water, utilities, landscape, maintenance, HVAC, trash removal, fees, and other expenses, interest, penalties, and other amounts, including attorneys' fees, owed by Debtor IJKG Opco (as such terms are defined in the Lease). The Lease has been effectively terminated years prior to the Petition Date, the Lease remains terminated as of the Petition Date, and Debtor IJKG Opco remains a holdover tenant thereunder in a tenancy-at-will pursuant to Sections 19.1 and 19.3 of the Lease.  On or about October 18, 2024, the parties entered into a Consent Judgment to resolve the Delaware Action ("Consent Judgment").

vii.      In accordance with the Consent Judgment, Debtors are indebted to 29 E 29 in an amount no less than $24,000,000.00 nor greater than $32,000,000.00 (the "Pre-Petition Liabilities").  In accordance with that certain Collateral Surrender and Operations Transfer Agreement between the Debtors and 29 E 29 Street Holdings LLC ("29 E 29 Street"), an affiliate of Bayonne DIP Lender, dated October 9, 2024 (the "Surrender Agreement"), the "low end" and the "high end" of the foregoing stipulated amounts shall increase by $1.2 million on November 1, 2024 and by an additional $1.2 million on the first day of each subsequent calendar month.

viii.     As of the Petition Date, the Pre-Petition Liabilities were secured pursuant to the Senior 29 E 29 Security Agreement by security interests and liens granted by IJKG Opco to Landlord, an affiliate of Bayonne DIP Lender, upon the following, but subject to the terms of the Maple Intercreditor Agreement (collectively referenced herein as

8

the "Pre-Petition Collateral"): all of IJKG Opco's interest as lessee under the Lease, including, without limitation, any rights and options to purchase the Subject Property; all of the Lessee's rights, title and interest in all funds deposited or to be deposited (and all interest accrued thereon) in any reserve or escrow accounts described in the Lease, the Purchase Agreement, or the Post-Closing Side Letter; subject to the prior lien of any primary lender, all of IJKG Opco's machinery, equipment (including, without limitation, medical equipment whether or not affixed to the Leased Property), furniture, furnishings, tools, movable walls or partitions, computers, signage, trade fixtures, supplies, and inventory; all general intangibles (excluding IJKG Opco's Accounts), including, without limitation, all licenses, operating agreements and participation agreements, and the proceeds of any of the foregoing.

b.    _Prepetition Maple Loan Documents_.

i.    Prior to the Petition Date, Debtor IJKG Opco, certain of its affiliates, the lenders from time to time party thereto (the "Maple Lenders"), and Maple Healthcare, LLC, as administrative agent and collateral agent for the Maple Lenders (as successor to BRF Finance Co., LLC in such capacities) (in such capacities, the "Maple Agent" and, together with the Maple Lenders, the "Maple Secured Parties") entered into that certain Amended and Restated Loan and Security Agreement, dated as of June 26, 2019 (as amended, supplemented or otherwise modified from time to time, the "Maple Loan Agreement"; and, together with the "Loan Documents" as defined in the Maple Loan Agreement, the "Maple Loan Documents"), which provided for term loan facilities in the aggregate principal amount of $8,341,726 (the "Maple Facility" and the loans thereunder, the "Maple Loans"). The Maple Loans are secured by, among other things, liens (the "Maple Liens") on substantially all of IJKG Opco's assets and certain assets of IJKG in accordance with the terms of the Maple Loan Documents (the "Maple Collateral").

ii.    Debtors, the Maple Agent (as successor to BRF Finance Co., LLC), and MPT entered into that certain Second Amended and Restated Intercreditor Agreement, dated as of June 26, 2019 (as amended, supplemented or otherwise modified from time to time, the "Maple Intercreditor Agreement"), providing for the Maple Secured Parties to have a prior lien over MPT with respect to the "Working Capital Priority Collateral" (as defined in the Maple Intercreditor Agreement) to secure the Maple Obligations.

iii.    Maple Agent, the Senior Agent (as defined therein) on behalf of the Lenders (as defined therein), the Lenders, Bayonne, Garden State Healthcare Associates, LLC, New Jersey Medical and Health

Associates, LLC and IJKG, LLC entered into that certain Subordination and Intercreditor Agreement, dated as of November 4, 2022 (as amended, supplemented or otherwise modified from time to time, the "Maple-Bayonne Subordination Agreement"), providing for the subordination (to the extent set forth therein) of the Maple Obligations and the Maple Liens on the Capitala Collateral to the Capitala Prepetition Liabilities and the Capitala Liens on the Capitala Collateral.

iv.     As of the Petition Date, Debtors were liable to the Maple Secured Parties under the Maple Loan Documents for certain "Obligations" under and as defined in the Maple Loan Agreement (the "Maple Obligations").

c.      *Prepetition Capitala Loan Documents*.

i.      Prior to the Petition Date, IJKG Opco entered into (i) that certain Amended and Restated Loan and Security Agreement dated as of November 4, 2022 by and among IJKG Opco, as borrower, guarantors party thereto from time to time, and Capitala Private Advisors, LLC ("Capitala") (collectively, each as amended, restated, supplemented or otherwise modified from time to time, together with all documents ancillary thereto or executed or delivered in connection therewith, the "Capitala Loan Documents").

ii.     As of the Petition Date, an aggregate amount of approximately $6,961,937.82 was due and owing by the Debtors in respect of the Capitala Loan Documents (the "Capitala Prepetition Liabilities"). Pursuant to the Capitala Loan Documents and the Maple-Bayonne Subordination Agreement, as of the Petition Date, the Debtors' respective obligations under the Capitala Loan Documents including the Capitala Prepetition Liabilities are secured first priority security interests in and liens in favor of Capitala (the "Capitala Liens") on all accounts and related assets of IJKG Opco (collectively, as further set forth in the Capitala Loan Documents, the "Capitala Collateral"). Pursuant to the Maple-Bayonne Subordination Agreement, all obligations of the Debtors under the Maple Loan Documents and any liens on any assets of any of the Debtors in favor of Maple granted as security therefor, are subject to and subordinate to the Capitala Liens and all obligations of the Debtors under the Capitala Loan Documents to the extent set forth therein.

iii.    As of the Petition Date, the Capitala Prepetition Liabilities were secured by first priority security interests and liens granted by IJKG Opco to Bayonne DIP Lender, upon (the following collectively referenced herein as the "Capitala Collateral"): all Accounts

(including Health Care Insurance Receivables); all Other Accounts; and Deposit Accounts. Notwithstanding any other provision set forth herein, "Capitala Collateral" under the Senior 29 E 29 Security Agreement shall not include any Pre-Petition Collateral.

iv.    Pursuant to the terms of that certain Collateral Sharing Agreement, dated as of November 4, 2022 (as amended, supplemented or otherwise modified from time to time, the "Collateral Sharing Agreement"), the Debtors and certain of their affiliates granted to Capitala Private Advisors, LLC, as control agent for the benefit of the "First Lien Secured Parties" (as defined therein), each Senior Agent (as defined therein) (for the benefit of the applicable Senior Secured Parties), the Maple-Christ Agent (as defined therein) (for the benefit of the Maple-Christ Agent and the Maple-Christ Lenders (as defined therein)), the Maple-Bayonne Agent (as defined therein) (for the benefit of itself and the Maple-Bayonne Agent and the Maple-Bayonne Lenders (as defined therein)) and the Noteholders (as defined therein) a lien on the Shared Collateral (as defined in the Collateral Sharing Agreement).

## **The DIP Facility**

14.    Under the DIP Facility, the Bayonne Debtors will have access to DIP Loans in an amount of up to $42,000,000, with up to $4,320,000 available per week upon entry of the Interim Order, subject to the terms and conditions of the Bayonne DIP Agreement. The Bayonne DIP Lender has negotiated with the Debtors, the Maple Secured Parties, and other parties in interest in good faith and at arms' length in order to reach consensus on the terms set forth in the Bayonne DIP Agreement.

15.    Prior to the Petition Date, the Bayonne DIP Lender purchased the debt owed, and took assignment of the security interests in the Bayonne Debtors' assets originally granted, to Capitala. Bayonne DIP Lender, as successor in all respects to Capitala under the Capitala Loan Documents, shall be referred to as "Senior Secured Lender".

16.    Under the terms of the Bayonne DIP Agreement, as a condition to making the DIP Loans, the Bayonne DIP Lender will obtain first priority security interests in substantially all of the Bayonne Debtors' pre-petition and post-petition assets.

17.     As an additional material inducement to the making of the DIP Loans, the Bayonne Debtors and 29 E 29 Street entered into the Collateral Surrender Agreement, pursuant to which the Bayonne Debtors will pursue a sale of substantially all of their assets under section 363 of the Bankruptcy Code, subject to approval by this Court, during the administration of the Bayonne Debtors' bankruptcy cases.

18.     Pursuant to the Bayonne DIP Agreement and Collateral Surrender Agreement, the Bayonne Debtors shall pay Bayonne DIP Lender a services fee equal to $1,300,000 per month, plus the expenses of the Bayonne DIP Lender.  The Bayonne Debtors shall pay an advance payment of the services fee of $7,800,000, equal to payments for the first six months of the services fee, upon the passage of the Interim Order.  A facility fee of 2% of the amount drawn is payable upon funding of any draw of the DIP Facility.  Upon satisfaction of the principal obligations of the DIP Facility, an exit fee of 2% of any unpaid principal amount shall be charged to the Bayonne Debtors.

19.     No insider of the Bayonne Debtors is participating in the DIP Facility as of entry of the Interim Order and funding of the $17,280,000 availability amount.  To the extent any inside of the Bayonne Debtors participates in the subsequent $24,720,000 availability amount, such participation will be fully disclosed to the Court and all parties in interest prior to the Court's consideration of entry of the Final Order.

20.     The DIP Facility includes a roll-up of $7,000,000, constituting the interests Bayonne DIP Lender purchased from Capitala, and between $24,000,000 and $32,000,000, constituting the amount of the Consent Judgment owed to 29 E 29 Street.

### The Interim and Final DIP Loans Should Be Authorized

21.     Approval of the DIP Facility will provide the Bayonne Debtors with immediate and ongoing access to borrowing availability to pay current and ongoing operating expenses, including

post-petition wages, salaries, and vendor costs.  Unless these expenses are paid, the Bayonne Debtors will be forced to cease operations, which would likely result in irreparable harm to their business and the citizens of Hudson County, New Jersey who depend upon the Bayonne Debtors' hospital for medical care.  Further, the Bayonne Debtors ceasing operations would jeopardize their ability to reorganize and maximize value for all interested parties.

22.    The credit provided under the proposed Bayonne DIP Agreement will enable Debtors to continue to service the citizens of Hudson County, New Jersey, pay vendors and employees in the ordinary course, and preserve the value of the estate while the Bayonne Debtors reorganize their debts.  The availability of credit under the proposed Bayonne DIP Agreement will provide confidence to the Bayonne Debtors' vendors and employees that will enable and encourage them to continue their relationships with the Bayonne Debtors.  Accordingly, the timely approval of the relief requested herein is imperative.

23.    Sections 364(c) and (d) of the Bankruptcy Code provide, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt:  (a) with priority over any and all administrative expenses, as specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; (c) secured by a junior lien on property of the estate that is subject to a lien; or (d) secured by a lien that is equal or senior to existing liens.  11 U.S.C. § 364.  The Bayonne Debtors propose to obtain the financing set forth in the Bayonne DIP Agreement by providing, inter alia, security interests and liens pursuant to section 364(c) and (d) of the Bankruptcy Code.

24.    The Bayonne Debtors' liquidity needs can be satisfied only if the Bayonne Debtors are authorized to borrow under the DIP Loans and to use the proceeds to fund operations.  The Bayonne Debtors have been unable to procure sufficient financing in the form of unsecured credit

13

allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b) or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). The Bayonne Debtors have sought such funding from multiple sources prior to initiating these cases, none of which was willing to lend funds on an unsecured basis or on terms more favorable than the terms of the Bayonne DIP Agreement.

25.    Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444,449 (D. Colo. 1985).

26.    The Bayonne Debtors submit that the circumstances of this case require the Bayonne Debtors to obtain financing pursuant to section 364(a) and (d) and, accordingly, the Bayonne DIP Agreement reflects the exercise of their sound business judgment.

27.    The terms and conditions of the Bayonne DIP Agreement are fair and reasonable and were negotiated extensively by well-represented parties in good faith and at arms' length. Accordingly, the Bayonne DIP Lender and all obligations incurred under the Bayonne DIP Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

28.    The proceeds of the DIP Facility will be used only by, or relating to, the Bayonne Debtors.

**Basis for Cash Collateral Relief**

**A.  The Bayonne Debtors Require the Use of the Cash Collateral.**

29.    As set forth above, the Bayonne Debtors have an urgent need for debtor-in-possession financing, which includes use of the Cash Collateral pending the final hearing on this Motion on the terms set forth in the Bayonne DIP Agreement.  Cash Collateral in this case consists of the Lenders' interests in the collateral which supports the debtor-in-possession financing.  Accordingly, the Bayonne Debtors seek to use Cash Collateral existing on or after the Petition Date that is subject to the post-petition liens of Bayonne DIP Lender and Senior Secured Lender, and Senior Secured Lender and the Maple Secured Parties' pre-petition liens and security interests on the terms set forth in this Motion.  As of the Petition Date, the Bayonne Debtors do not have sufficient unencumbered cash to fund their business operations and pay present operating expenses.

30.    Absent the ability to obtain debtor-in-possession financing and use Cash Collateral, the Bayonne Debtors will not be able to pay insurance, wages, rent, utility charges, and other critical operating expenses.  Consequently, without access to Cash Collateral, the Bayonne Debtors will not be able to maintain their business operations and continue their restructuring efforts, and would likely be forced to cease operations and liquidate.  As such, the Bayonne Debtors' estates would be immediately and irreparably harmed.

31.    If the Bayonne Debtors are unable to obtain sufficient operating liquidity to meet post-petition obligations on a timely basis, a permanent and irreplaceable loss of business will occur, causing a loss of value to the detriment of the Bayonne Debtors and their creditors.  This potential loss of revenue and going concern value would be extremely harmful to the Bayonne Debtors, their estates and their creditors at this critical juncture.  The Bayonne Debtors cannot

#124650750v9

obtain funds sufficient to administer its estates and operate its business other than by obtaining the relief requested herein pursuant to section 363 of the Bankruptcy Code.

32.    The Bayonne Debtors' management has formulated the Budget for the use of debtor-in-possession financing and Cash Collateral.  The Bayonne Debtors believe that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course in connection with the operation of their businesses and their restructuring efforts for the period set forth in the Budget.  The Bayonne Debtors also believe that the use of Cash Collateral in accordance with the Budget will provide the Bayonne Debtors with adequate liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

33.    The Bayonne Debtors' right to use Cash Collateral on the terms set forth in the Bayonne DIP Agreement, as approved by the Interim Order shall commence on the date of the entry of the Interim Order and expire on the earlier of (a) the entry of a subsequent interim order, or (b) the entry of the Final Order.

**B.  The Interests of the Secured Parties Are Adequately Protected.**

34.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may only use "cash collateral" with the consent of the secured party with an interest therein or court approval.  *See* 11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in cash collateral sought to be used by a debtor, the court shall prohibit or condition such use of cash collateral as is necessary to provide adequate protection of such entity's interest.  <u>See</u> 11 U.S.C. § 363(e).

35.    Appropriate adequate protection is decided on a case-by-case basis.  *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *see also In re JKJ Chevrolet, Inc.*, 190 B.R. 542, 545 (Bankr. E.D. Va. 1995) (adequate protection is a flexible

16

concept that is determined by considering the facts of each case) (citing *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987).  Although adequate protection is not defined in the Bankruptcy Code, section 361 of the Bankruptcy Code provides the following three (3) nonexclusive examples of what may constitute adequate protection:

> (1)    requiring the [debtor] to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section 363 . . . results in a decrease in the value of such entity's interest in such property;
>
> (2)    providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or
>
> (3)    granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.  Essentially, with the provision of adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. at 736; *see also In re Nice*, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("adequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to a Debtor's continued use of collateral").  The Bayonne Debtors assert that the Lenders are adequately protected by the granting of replacement liens as set forth in the Order, and the continuation of the Bayonne Debtors' businesses.

*Replacement Liens*

36.    As    adequate    protection    for    any    diminution    in    value    of    the collateral of Senior Secured Lender, the Bayonne Debtors request that the Court grant the Senior Secured Lender security equivalent to a lien granted under section 364(c)(2) and (3) and 364(d) of the Bankruptcy Code in and upon the property of the Bayonne Debtors and the Cash Collateral,

whether such property was acquired before or after the Petition Date, to the extent provided in the Bayonne DIP Agreement.

37.    As adequate protection for any diminution in value of the Maple Secured Parties' interests with respect to the collateral of the Bayonne Debtors, the Bayonne Debtor requests that the Court grant the Maple Secured Parties security [equivalent to a lien granted under section 364(c)(2) and (3) of the Bankruptcy Code in and upon the property of the Bayonne Debtors and the Cash Collateral,][2] whether such property was acquired before or after the Petition Date, which liens shall be junior and subordinate to the liens of Bayonne DIP Lender and Senior Secured Lender.  The liens proposed to be granted in this paragraph and the foregoing paragraph are referred to collectively as the "Replacement Liens."

38.    The Bayonne Debtors note that with respect to the Bayonne Debtors, the Maple-Bayonne Subordination Agreement, among other things, prohibits Maple Agent from asserting any right to adequate protection of its interest in any collateral without the prior written consent of Senior Secured Lender (as assignee of Capitala), subject to certain exceptions set forth therein, including with respect to seeking replacement liens in the event that Senior Secured Lender is also seeking replacement liens.

*Continued Operation of the Bayonne Debtors' Businesses*

39.    In addition to the proposed Replacement Liens, Senior Secured Lender and the Maple Secured Parties are also adequately protected as a result of the continuation of the Bayonne Debtors' business operations.  Without the use of the Cash Collateral, the Bayonne Debtors would forego business opportunities and their operations would be irreparably harmed.  Indeed, absent use of the Cash Collateral, the Bayonne Debtors will be unable to pay ordinary business expenses,

---

2    Please conform to DIP Order, to the extent inconsistent.

including employee wages.  In that event, all operations will cease, employees will be terminated, and all assets on which Senior Secured Lender and the Maple Secured Parties assert a lien will be liquidated. Those pledged assets will be worth less in a liquidation than they will be worth as a going concern reorganization.

40.    The continuation of the Bayonne Debtors' operations likely presents the best opportunity for the Senior Secured Lender and the Maple Secured Parties to receive the greatest recovery on account of their respective claims.  Accordingly, the Bayonne Debtors submit that use of the Cash Collateral will allow the Bayonne Debtors to continue their operations and, thereby, protect the interests of the Senior Secured Lender and the Maple Secured Parties.  Courts have recognized that the preservation of the going concern value of a secured lender's collateral constitutes adequate protection of such creditor's interest in the collateral.  *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996); *In re 499 W. Warren Street Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (where the court found a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); *In re Willowood E. Apartments of Indianapolis II, Ltd.*, 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990) (same); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (creditor's secured position would be enhanced by the continued operation of the Debtor's business); *In re Aqua Assocs.*, 124 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determining whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citation omitted).

41.    The Bayonne Debtors submit that the Senior Secured Lender and the Maple Secured Parties are adequately protected by the proposed Replacement Liens and by maintaining the

businesses of the Bayonne Debtors as a going concern and thereby preventing or minimizing any diminution in the value of the pre-petition collateral.

### **The Roll-Up of Prepetition Debt is Appropriate**

42.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that a debtor's use of assets outside of the ordinary course of business should be approved under Section 363(b) of the Bankruptcy Code if the debtor can demonstrate a sound business justification for the proposed transaction).  Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment.  *See, e.g., In re Snowshoe Co)*, 789 F.2d at 1088 (4th Cir. 1986).

43.     Repayment of prepetition debt, also called a "roll-up," is a common feature in debtor-in-possession financing arrangements.  Courts in this jurisdiction have approved similar DIP Loans, including as a first day motion.  *See, e.g.*, *In re BurgerFi Int'l, Inc.*, Case No. 24-12017 (CTG) [D.I. 190] (Bankr. D. Del. Oct. 17, 2024); *In re Lumio Holdings, Inc.*, Case No. 24-11916 (JKS) [D.I. 194] (Bankr. D. Del. Oct. 2, 2024); *In re Vyaire Med., Inc,*, Case No. 24-11217 (BLS) [D.I. 248] (Bankr. D. Del. July 11, 2024); *In re Center City Healthcare, LLC*, Case No. 19-11466 (KG) [D.I. 557] (Bankr. D. Del. Aug. 23, 2019).

44.     The DIP Loan will roll-up approximately $7,000,000 in outstanding prepetition debt while providing the Bayonne Debtors with approximately $42,000,000 in additional liquidity. The roll-up is a material component of the structure of the DIP loan and was required by the Bayonne DIP Lender as a condition to their commitment to provide postpetition financing. Without access to the approximately $42,000,000 in liquidity to fund operations and the

administration of the Chapter 11 Cases, the Bayonne Debtors' businesses and estates would be severely impacted.

45.     The roll-up has no material impact on recovery to other creditors because the Bayonne Debtors believe that these obligations are fully secured by perfected, first security liens on substantially all of the Bayonne Debtors' assets, such that the Bayonne Debtors is merely exchanging one debt for another.

46.     After careful consideration of all available alternatives, the Bayonne Debtors have determined that the proposed roll-up of prepetition debt is necessary to obtain the liquidity necessary to preserve the value of the Bayonne Debtors' businesses and estates for the benefit of all stakeholders.  The secured claims owned by the Bayonne DIP Lender are required to be fully satisfied before recoveries to junior creditors may be provided.

47.     Given these circumstances, the proposed roll-up is reasonable, appropriate, and a sound exercise of the Bayonne Debtors' business judgment.

## The Automatic Stay Should Be Modified on a Limited Basis

48.   The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Bayonne Debtors to:  (i) grant the security interests, liens and claims described above with respect to Bayonne DIP Lender and the Maple Secured Parties and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) implement the terms of the proposed Interim and Final Orders; and (iii) provide the relief required by the Bayonne DIP Agreement.

49. Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Bayonne Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

50.    The Bayonne Debtors respectfully request that the Court conduct an expedited preliminary hearing on this Motion and authorize Bayonne Debtors (from and after the entry of the Interim Order and pending the final hearing) to obtain debtor-in-possession financing on the terms set forth in the Bayonne DIP Lender DIP Agreement in accordance with the Budget for, among other things, working capital purposes and the payment of certain obligations in accordance with the relief authorized by the Court.  Interim access to the debtor-in-possession financing will ensure that the Bayonne Debtors maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending the Final Hearing on this Motion.

51.    The Bayonne Debtors submit that, for the reasons set forth herein, immediate access to the debtor-in-possession financing on the terms set forth in the Budget, is necessary to preserve the value of the Bayonne Debtors' estate for the benefit of all parties in interest.

**Request for Final Hearing**

52.    Pursuant to Bankruptcy Rule 4001(b)(2), the Bayonne Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than twenty-one (21) days following the entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

53. To implement the foregoing successfully, the Bayonne Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h), 7062, 9014, or Local Rule 9013-1(b).

**Notice**

#124650750v9

54.   This Motion has been served upon (a) the Office of the United States Trustee for the District of Delaware; (b) the Internal Revenue Service; (c) the thirty (30) largest unsecured creditors on a consolidated basis; (d) the New Jersey Department of Health; (e) Capitala, Maple, and Bayonne Medical Center Opco, LLC; and (f) other parties as set forth in the accompanying Certificate of Service;.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, the Bayonne Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**; and grant such other and further relief as is just and proper.

Dated:  November 3, 2024

/s/ Peter C. Hughes

**DILWORTH PAXSON LLP**
Peter C. Hughes (I.D. No. 4180)
800 N. King Street – Suite 202
Wilmington, DE 19801
Telephone: (302) 571-9800
Facsimile:  (302) 351-8735

-and-

/s/ Peter C. Hughes

**DILWORTH PAXSON LLP**
Lawrence G. McMichael (*pro hac vice admission pending*)
Peter C. Hughes
Anne M. Aaronson (*pro hac vice admission pending*)
Jack Small (*pro hac vice admission pending*)
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 754-4603

*Proposed Counsel for the Bayonne Debtors, LLC*

#124650750v9

**<u>EXHIBIT A</u>**
[Interim Order]

**EXHIBIT B**
[Bayonne DIP Agreement]

#124650750v9

**<u>EXHIBIT C</u>**
[Collateral Surrender and Operations Transfer Agreement]

#124650750v9