# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                              :  Chapter 11
                                                    :
CarePoint Health Systems Inc. d/b/a Just Health     :  Case No. 24-12534 (JKS)
Foundation, et al., [1]                             :
                                                    :  (Joint Administration Requested)
                                                    :
                            Debtors.                :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION OF DEBTORS IJKG OPCO, LLC AND IKJG, LLC FOR ENTRY OF (A) AN INTERIM ORDER APPROVING COLLATERAL SURRENDER AND OPERATIONS TRANSFER AGREEMENT TO ALLOW *INTER ALIA*, INTERIM HOSPITAL OPERATIONS, (B) A FINAL ORDER APPROVING A PRIVATE SALE OF ALL OR SUBSTANTIALLY ALL ASSETS OF IJKG OPCO, LLC AND IJKG, LLC AND (C) GRANTING RELATED RELIEF**

IJKG Opco, LLC d/b/a CarePoint - Health Bayonne Medical Center ("IJKG Opco") and

IJKG, LLC ("IJKG" and collectively with IJKG Opco, the "Bayonne Debtors"), as Debtors and

Debtors-in-Possession in the above-captioned Chapter 11 case (the "Case"), as and for their motion

("Motion") pursuant to Sections 105, 363 and 365 of Title 11 of the United States Code, 11 U.S.C.

§§ 101, et seq. (the "Bankruptcy Code"), seek the entry of (a) an interim order in the form attached

hereto as **Exhibit A** (the "Interim Order") to enable, *inter alia*, interim hospital operations by

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

Hudson Regional Hospitals, LLC, (b) a final order in a form to be filed on the docket in advance of Final Hearing (the "Final Order") approving a private sale of all or substantially all assets of IJKG Opco, LLC and IJKG, LLC pursuant to that certain Collateral Surrender and Operations Transfer Agreement (the "Collateral Surrender Agreement"), in the form attached hereto as Exhibit B, and (c) granting related relief, and respectfully represent:

## PRELIMINARY STATEMENT

CarePoint Health Systems, Inc. ("CarePoint") oversees the operations and combined resources of three hospitals and related neighborhood health centers located in Hudson County, New Jersey—Bayonne Medical Center, Christ Hospital in Jersey City and Hoboken University Medical Center ("HUMC"). Christ Hospital and HUMC are "safety net" hospitals serving a large underprivileged community. All three hospitals are committed to one mission - treating patients with compassion and leading with innovation to improve the health of the communities in which they serve. The amount of free and inadequately reimbursed services provided to these underprivileged communities is the main driver of CarePoint's financial distress.

The CarePoint Hospitals have numerous significant creditors and landlords. Prior to this filing, CarePoint and its legal team spent many months negotiating a comprehensive solution to the financial issues confronting CarePoint. The purpose of these bankruptcy cases is to implement this solution and resolve CarePoint's unsustainable level of accumulated debt.

Ultimately the Debtors intend to use the bankruptcy cases for the creation of a healthcare system under the name "Hudson Health System" composed of Bayonne Medical Center (as it may be renamed by HRH), Christ Hospital, Hoboken University Medical Center, Hudson Regional Hospital and affiliated practices, and managed by a management services organization co-owned by HRH and CarePoint. To implement this strategy, CarePoint negotiated among other things

three comprehensive agreements with certain affiliates of Hudson Regional Hospital (each, "HRH"): one of which is a motion for Hudson to provide DIP financing to the Bayonne Debtors, and another of which is for an entity owned 50% by Hudson and 50% by CarePoint to provide management services to Christ and HUMC.

This Motion is another piece of the overall strategy. It seeks an interim order so that the Bayonne Debtors may immediately implement the Collateral Surrender Agreement allowing Hudson Regional Hospitals, LLC ("Hudson") (an affiliate of HRH) to operate IJKG Opco's hospital, which will stabilize operation, and allow IJKG Opco to continue to provide patient care.

Bayonne Debtors also request that the Court schedule a final hearing on the Motion to approve a private sale of all or substantially all assets of the Bayonne Debtors to Hudson. The Bayonne Debtors seek such final hearing on a date which will allow parties in interest (including an Official Committee of Unsecured Creditors) to evaluate the Collateral Surrender Agreement and the sale of all or substantially all assets to Hudson via private sale. As set forth in greater detail herein, the Collateral Surrender Agreement was negotiated at arms-length and will ensure continued operation of IJKG's hospital. Thus it is in the best interests of the estates and patients and should be approved.

### **Jurisdiction and Venue**

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(A), (M), (N), and (O).

2.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), and rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

**<u>Background</u>**

4.      On November 3, 2024 (the "<u>Petition Date</u>"), all Debtors except IJKG Opco, LLC ("<u>IJKG Opco</u>") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

5.      On the Petition Date, three creditors of IJKG Opco, 29 E 29 Street Holdings, LLC, Bayonne Medical Center Opco, LLC, and Peter Wong, MD, filed an involuntary petition against IJKG Opco under Chapter 11 of the Bankruptcy Code.  On the Petition Date, IJKG Opco filed an answer consenting to the relief requested in the involuntary petition.

6.      On the Petition Date, the Debtors filed a motion seeking joint administration of all of the Debtors' Chapter 11 Cases, including IJKG Opco.

7.      The Debtors have continued in possession of their properties and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, subject to that certain Collateral Surrender and Operations Transfer Agreement.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.

8.      A description of the Bayonne Debtors' businesses, the reasons for commencing the Chapter 11 Cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the First Day Declaration filed contemporaneously herewith.

9.      The Collateral Surrender Agreement was entered into prepetition on [October 9, 2024], by Bayonne and Hudson.

**Background of Collateral Surrender Agreement**

10.    IJKG Opco has been the owner and operator of Bayonne Medical Center, a general acute care hospital (the "Hospital"), located at 29 E 29th Street, Bayonne, New Jersey 07002 (the "Real Property"). IJKG is the 90.1% owner of IJKG Opco.

11.    29 E 29 Street Holdings, LLC, a New Jersey limited liability company (the "Landlord") and an affiliate of Hudson, is the owner of the Real Property and landlord of the Hospital pursuant to that certain lease agreement (the "Lease"), dated February 4, 2011, by and between the Landlord, as lessor, and IJKG Opco, as lessee. Due to IJKG Opco's material uncured defaults under the Lease, the Lease has terminated. IJKG Opco remains a holdover tenant of the Real Property pursuant to a tenancy-at-will.

12.    With the termination of the Lease, Hudson has executed a lease with the Landlord entitling it to use the Real Property for the operation of the Hospital upon the closing of the Collateral Surrender Agreement. This enables Hudson to comply with the site control requirements prescribed in N.J.A.C 8:33-4.4(a).

13.    On April 1, 2024, IJKG Opco and Hudson submitted a joint letter to the New Jersey Department of Health (the "NJDOH") enclosing an application for a certificate of need and related documents (CN FR # 2024-04353-09;01) (the "CN Application") for the transfer of ownership of the Hospital from IJKG Opco to Hudson pursuant to the binding term sheet (the "Term Sheet"), dated January 11, 2024, by and between CarePoint Health Systems, Inc. ("CHS") and Hudson, an affiliate of Landlord.

14.    The NJDOH has deemed the CN Application complete, which is a significant milestone in the approval process. Hudson has scheduled a public hearing in connection with CN Application pursuant to N.J.S.A. 26:2H-5.8, which will be followed by a written comment period,

staff NJDOH recommendation to the State Health Planning Board, then a vote taken by the board, which will then be forwarded to the Commissioner for a final decision.

15.    On September 23, 2024, the Court of Chancery of the State of Delaware entered a default judgment in favor of Landlord with respect to that certain civil litigation, captioned *29 E. 29 Street Holdings, LLC; NJMHMC LLC d/b/a Hudson Regional Hospital, and NJBMCH, INC. v. IJKG Opco, LLC and IJKG, LLC*, Case No. 2020-0480-KSJM, (the "Delaware Action").

16.    Thereafter, the Bayonne Debtors and Hudson entered into a Stipulation and Order Entering Judgment (the "Consent Order") to resolve the Delaware Action. This Consent Order was approved by the Delaware Chancery Court on October 18, 2024.

17.    The default judgment and consent order confirm the lease termination and require IJKG Opco to vacate the facility, surrendering possession to the landlord or its designee, pending regulatory approval from NJDOH. Consequently, the Debtor no longer has a legal possessory right to occupy or operate in the premises as an acute care hospital. Moreover, the existing NJDOH certificate of need approval is location-specific to the Bayonne property and cannot be readily transferred—even with regulatory approvals. There are no vacant hospital facilities within the Bayonne Medical Center's current catchment area that could take over the license. Establishing a new healthcare facility within this community would require years and a capital investment in the hundreds of millions of dollars. Absent HRH's intervention as proposed in this motion, the judgment will result in the facility's closure and permanent revocation of its operating license. Pursuant to N.J.A.C.8:33-3.3(i), Hudson is authorized to operate the Hospital pending final approval of the CN Application.

18.    IJKG Opco has fallen hopelessly in arrears on its obligations, including payroll obligations to its essential employees, and can no longer sustain its operations. It is currently faced

#124672260v3

with the prospect of an immediate closure, which would have the effect of depriving thousands of patients from medically underserved areas of medical care and result in the loss of its Certificate of Need, licensed as an Acute Care Hospital and its goodwill.

19.     In an effort to prevent the closure of the Hospital, the Bayonne Debtors and Hudson entered into the Collateral Surrender Agreement to provide for the orderly surrender of all of the Bayonne Debtors' assets and the transition of the operations of the Hospital from IJKG Opco to Hudson, and for Hudson to assume possession, ownership and control of the Hospital, pursuant to the terms and conditions of the Collateral Surrender Agreement.

20.     The Bayonne Debtors desire to surrender to Hudson, and Hudson desires to accept and assume, all right, title and interest of Bayonne and its bankruptcy estate in, to and under the Collateral and to assign to Hudson the Assigned Contracts, on the terms and conditions set forth in the Collateral Surrender Agreement, pursuant to sections 363 and 365 of the Bankruptcy Code.

21.     The Collateral Surrender Agreement was executed in conjunction with:

(a)   the Debtor-In-Possession Loan and Security Agreement (the "Bayonne DIP Agreement") by and among the Bayonne Debtors and Bayonne Medical Center Opco, LLC, a New Jersey limited liability company (the "Bayonne DIP Lender"), an affiliate of Hudson, through which the Bayonne DIP Lender will provide Bayonne with the liquidity necessary to continue operations, and

(b)   the Management Services Agreement (the "Management Services Agreement") by and among Hudson Regional Management, LLC (the "Hudson Manager"), Hudson, its affiliates NJBMCH, Inc., NJMHMC, LLC and Landlord, and CHS and CHS' affiliates Hudson Hospital Opco, LLC, d/b/a CarePoint Health – Christ Hospital, HUMC Opco, LLC, d/b/a Hoboken University Medical Center, McCabe Ambulance Service, Inc. and the other health care providers signatory to the Management Services Agreement, through which the Hudson Manager will provide management services to each of Hudson Regional Hospital, Bayonne Medical Center, Christ Hospital, Hoboken University Medical Center, McCabe Ambulance Services and the other service recipients signatory thereto as a new self-sustaining health care system in Hudson County, New Jersey to be named "Hudson Health System."  The Hudson Manager is co-owned equally (i.e., 50% - 50%) by Hudson and CHS.

## Summary of Collateral Surrender Agreement

22.    The Collateral Surrender Agreement allows Hudson to immediately assume the operations of the Hospital, which, in turn, would allow the Bayonne Debtors to maximize the value of their assets, avoid disrupting the provision of healthcare to the community, and preserve jobs of employees and continued business to their vendors.  The relevant terms are as follows:

(a) **Surrender**. All or substantially all assets of the Bayonne Debtors are to be surrendered to Hudson. Collateral Surrender Agreement para. 2.02.

(b) **Interim Operations**.  Hudson is exclusively entitled and authorized to operate the Hospital and provide Hospital with the management services deemed by Hudson or its designee(s) to be necessary, desirable or appropriate for the operation of the Hospital. Collateral Surrender Agreement para. 2.06(a).

(c) **Assumed Liabilities**. Hudson shall assume the Bayonne Debtors' Medicare Liability (valued at approximately $7.8 million).  Collateral Surrender Agreement para. 2.04(a).

(d) **Consideration**. Hudson shall pay IJKG Opco, at the Closing ("**Transaction Consideration**") equal to the fair market value of the Collateral as of the Effective Date,[2] as determined by a qualified appraiser selected jointly by Hudson and Bayonne Debtors (the "**Appraised Purchase Price**") (the cost of which shall be paid by Hudson through the DIP Financing), payable by way of: (i) a credit bid in the amount of: (a) the principal and interest balance of the DIP Financing then outstanding, (b) the outstanding Service Fees and expenses, due or payable thereunder, (c) the Outstanding Judgment; and (ii) the Medicare Liability and any other Liability assumed or paid by Hudson hereunder after the Effective Date, if any (i.e., Hudson shall be credited with having paid the Bayonne Debtors the amount of such Liabilities); and (iii) a cash payment equal to the the positive difference of the Appraised Purchase Price minus the value of (i) and (ii) herein. If the Appraised Purchase Price is less than the value of (i) and (ii) above, Hudson shall be entitled to retain/reserve all rights to and assert all claims for the deficiency against the Bayonne Debtors.  The Appraised Purchase Price is subject to Bankruptcy Court approval via the Sale Order.

---

[2]  The appraiser shall factor in and discount for the liabilities of the Bayonne Debtors and such other industry-standard factors, including, without limitation, discounts for non-marketability/non-transferability. Additionally, recognizing that the Lease was effectively terminated years prior to the petition date of the Bankruptcy Proceeding, the Lease remains terminated, and that the Bayonne Debtors remain a holdover tenant thereunder in a tenancy-at-will pursuant to Sections 19.1 and 19.3 of the Lease, the Appraiser shall appraise the Bayonne Debtors' leasehold interests in the Real Property based on a tenancy-at-will and shall not impute any other terms or value to the same, including salvage value or value to be transmitted to another tenant.

Notwithstanding the foregoing, the Bayonne Debtors consent to, and shall not contest, the Outstanding Judgment. Collateral Surrender Agreement para. 2.05(a).

(e) **Exclusivity**. The Bayonne Debtors are prohibited from directly or indirectly seeking or entertaining any competing transaction. Collateral Surrender Agreement para. 3.04.

(f) **Power of Attorney**. The Bayonne Debtors appoint Hudson as its attorney-in-fact, with power of substitution, to take any and all actions deemed necessary or proper by Hudson, at any time and from time to time, to carry out its obligations and enforce and effectuate its rights or exercise its authority under the Collateral Surrender Agreement, including to collect collateral and file actions, suits, or proceedings. Collateral Surrender Agreement para. 3.05(b).

23. The Bayonne Debtors provide the following further material disclosures in accordance with Local Rule 6004-1(b)(iv)):

(a) **Sale to Insider** – Not applicable.

(b) **Agreements with Management** – Not applicable.

(c) **Releases** – Not applicable.

(d) **Private Sale** – The Collateral Surrender Agreement contemplates a private sale, as set forth above. Also, it prohibits the Bayonne Debtors from seeking a competing transaction. Collateral Surrender Agreement para. 3.04.

(e) **Closing deadline**– October 9, 2025. Collateral Surrender Agreement para. 8.01(c)(i).

(f) **Good faith deposit** – Not applicable.

(g) **Interim Operation** – As set forth above, the Collateral Surrender Agreement contemplates interim operation of the Hospital by Hudson.

(h) **Use of Proceeds** – Not applicable. For avoidance of doubt, as set forth above, Hudson intends to "credit bid" for the surrender of the Hospital.

(i) **Tax Exemption** – Not applicable.

(j) **Record retention** – Hudson shall have unrestricted access to and use of (including, but not limited to, rights to review, reference, inspect, audit, copy, duplicate or memorialize, and all activities and functions ancillary or related to the foregoing) all books and records of the Bayonne Debtors and the Hospital, including access to all facilities, properties, locations and

archives (including digital, cloud-based, virtual or other computer systems) wherever such books and records may be stored, located or available, notwithstanding the designation of any such books and records by IJKG Opco as "Retained Assets".  Collateral Surrender Agreement para. 2.06(a)(x).

(k)     **Avoidance Actions** – The Collateral Surrender Agreement contemplates the sale of the Debtors' avoidance actions. See Collateral Surrender Agreement Annex A para (k).

(l)     **Requested finding as to successor liability** – Hudson seeks a finding that there is no successor liability. Final Surrender Order para __.

(m)     **Sale Free and Clear of Unexpired Leases** – Not applicable.

(n)     **Credit Bid** – The Collateral Surrender Agreement contemplates that the consideration provided by Hudson is in the form of a credit bid.  Collateral Surrender Agreement para. 2.05(a) (described above).

(o)     **Relief from 6004(h)** – As set forth below, the Debtor seeks relief from the stay imposed by Rule 6004(h), so that Hudson can immediately operate the Hospital.

## Relief Requested

24.     By this Motion, the Bayonne Debtors seek entry of the Interim Order approving the Collateral Surrender Agreement on an interim basis to enable Hudson to immediately start operating the Hospital, pending a final hearing on the Motion.

25.     The Bayonne Debtors request that a final hearing on the Collateral Surrender Agreement be scheduled for a date which will allow parties in interest such as an Official Committee of Unsecured Creditors to review and evaluate the Collateral Surrender Agreement and be heard.  At the final hearing, the Bayonne Debtors will seek entry of the Final Order: [3]

(a)     authorizing and approving the sale of the Hospital to Hudson via private sale (the "Sale");

---

[3] A copy of the Sale Order will be filed on the docket in advance of the Sale Hearing.

#124672260v3

(b)     approving the Sale of the Hospital free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Collateral Surrender Agreement;

(c)     authorizing the assumption and assignment of executory contracts and leases at closing of the Collateral Surrender Agreement; and

(d)     granting related relief.

26.     For the reasons set forth herein, the Bayonne Debtors submit that the relief requested herein is in the best interests of the Bayonne Debtors, their estates, creditors, and other parties-in-interest, and therefore, should be granted.

## The Proposed Sale

### I.     The Hospital

27.     Bayonne Medical Center is a licensed 244 bed acute care facility that provides inpatient and outpatient services.

28.     IJKG Opco is a wholly owned subsidiary of IJKG.  Upon the acquisition of Bayonne Medical Center out of bankruptcy through an asset purchase agreement by IJKG, IJKG Opco was formed to operate the hospital.  IJKG, LLC was the sole member and manager of IJKG Opco.  Effective October 27, 2020, IJKG sold a 9.9% membership interest in IJKG Opco to BMC Hospital, LLC. On May 9, 2022, the 80% majority member of Bayonne Intermediate Holdco, LLC, along with a 10% minority owner, donated their equity interests in Bayonne Intermediate Holdco, LLC to CarePoint. In December 2022, the remaining 10% equity interest in Bayonne Intermediate Holdco was donated to CarePoint.  Thus, CarePoint presently owns 90.1% of IJKG Opco.

29.      On February 4, 2011, the prior ownership of Bayonne Medical Center severed ownership of the facility's valuable real estate from IJKG Opco by entering into a sale-leaseback transaction with Medical Properties Trust.  The transaction was accomplished through a special purpose entity, MPT of Bayonne, LLC ("MPT").  The business model advanced by MPT has been

employed by that entity with struggling community hospitals across the country.  While this sale-leaseback structure had the advantage of immediately injecting a lump sum of capital into the operating entity, divestiture of the real estate from the ownership and control of the operator created a long-term debt obligation to the lessor, disincentivized necessary capital investment into the facility, and stripped away real estate equity that could have been used by the operator as leverage to fund business operations and physical plant improvements.

30.    Hospital facilities are capital intensive, special purpose facilities that routinely require modernization and significant investments to remain competitive.  For example, approximately 45 minutes from Bayonne Medical Center is the Valley Hospital in Bergen County, which is a similarly-sized acute care hospital.  Valley Hospital's facilities had dated to the 1960's and 1970's, were functionally obsolete and required modernization.  Earlier this year, Valley Hospital transferred its operating license to, and opened an all-new hospital facility in Paramus, New Jersey that cost approximately $800 million to construct.  Bayonne Medical Center did not undertake similar modernization efforts and the hospital facility has been neglected due to the disincentives for the operator to make long-term investments and the lack of leverage to fund those capital investments.

## II.    The Debtors' Marketing Process

31.    From 2011 through 2018, previous ownership of the Hospital focused on revitalizing operations of the facility.  The prior owner determined in or around 2018 that the Hospital had reached a high point in operational efficiency and decided to market the facility to potential purchasers.  At that time, CarePoint's ownership retained investment bankers at Citibank to market the sale of its hospitals to health care facilities and operators throughout the country. With that company's assistance, CarePoint vigorously advertised and solicited bids from a wide

array of health care entities, opened a data room, made due diligence materials available and gave presentations to interested investors and purchasers.

32.     As a consequence of those efforts, one major regional hospital operator expressed interest.  However, the parties did not consummate a transaction because: (1) the prospective purchaser did not believe it to be economically advantageous to purchase IJKG Opco without having underlying ownership of the real estate; and (2) concentration in the health care marketplace rendered it uncertain whether the purchaser could receive necessary federal antitrust approvals. No other hospital operators expressed serious interest in the facility.

33.     Thereafter, CarePoint continued to solicit offers for its facilities and, in late 2019/early 2020, entered into discussions with two entities, Surgicore (an operator of ambulatory surgical centers in the tri-state area) and HRH.  In anticipation of bidding for IJKG Opco's assets, HRH acquired the real estate from the successor in interest to MPT, an entity known as WTFK Bayonne Propco, LLC, for the sum of $76M.  Both HRH and Surgicore – through a special purpose entity, BMC Hospital, LLC ("BMCH") bid for IJKG Opco's assets.  CarePoint entered into a letter of intent with BMCH whereby that entity sought to acquire IJKG Opco's assets for the sum of $15M.

34.     BMCH was unable to close on the acquisition transaction because under the terms of the 2011 lease governing the facility, any successor operator was required to meet certain qualifications and obtain the lessor's consent.  BMCH was not able to obtain the lessor's consent. By that point, 29 E 29 Street Holdings, LLC ("29 E 29"), an affiliate of HRH, was the lessor and successor in interest to MPT.

35.     In every year dating back as far as 2019, IJKG Opco has been unprofitable and recorded losses from operations.  From 2019 through the end of 2023, the amount of assets

reflected on IJKG Opco's balance sheet was cut in half. As a result of IJKG Opco's financial declines, starting in 2019, the company defaulted under the Lease due to its inability to meet certain financial covenants requiring earnings before income taxes, depreciation, amortization and rent to exceed fixed charges by a stated threshold.

36.    In 2020, 29 E 29 noticed IJKG Opco major events of default based upon these covenant violations and, when those defaults remained uncured, the Lease was terminated effective December 31, 2020. Pursuant to Section 19.3 of the Lease, the termination of the lease thereby triggered a holdover rent equal to 150% of the existing base rent, plus other amounts, and created a tenancy-at-will, leading to 29 E 29's demands to turn over the premises to its designee. IJKG Opco contested the holdover rent calculations, declined to remit payment and refused to surrender possession of the facility, necessitating litigation. Additionally, IJKG Opco declined to make capital reserve contributions or otherwise demonstrate that it had made offsetting capital improvements to the physical plant of the hospital.

37.    These holdover rent payments and capital reserve contributions continued to accrue, with late fees and interest, for the duration of the litigation. Recently, that litigation resulted in a default judgment against IJKG Opco and IJKG Opco consented to damages in favor of the landlord in the range of $24 million to $32 million, plus incremental amounts as described in the Collateral Surrender Agreement

38.    Given the termination of the Lease and IJKG Opco's financially precarious position where it was unable, or unwilling to meet its leasehold obligations, no operator has expressed serious interest in acquiring Bayonne and there is no realistic chance of finding a buyer for the Hospital. In light of the accrued liabilities and rights available to the landlord, the only rational mechanism to preserve Bayonne Medical Center as an operating acute care hospital is to turn over

the facility to the existing landlord and property owner, thereby merge the real estate and the hospital operation, and stabilize its operations going forward. Thus, consistent with their fiduciary duties to maximize value and continue providing healthcare to the community, Bayonne entered into the Collateral Surrender Agreement.

39.    The Collateral Surrender Agreement is the culmination of a thorough, fair, and arms-length, prepetition process designed to maximize the value of the Hospital. The Bayonne Debtors believe that the terms of the Collateral Surrender Agreement are fair and reasonable, and represents the highest and best offer (and is the only offer) for the Bayonne Debtors' assets.

40.    The Collateral Surrender Agreement also contemplates that the purchase price be set by an impartial appraiser, which supports that the consideration provided by Hudson is fair and reasonable.

41.    The Bayonne Debtors believe that failure to consummate the Collateral Surrender Agreement will result in an immediate closure of the Hospital, which will harm all creditors, patients of the Hospital, and the community in general.

## III.    Hudson

42.    HRH is the premier hospital providing comprehensive care to Northern New Jersey. Its mission is to build a healthier community through exceptional care, sophisticated technology, and knowledgeable physicians. HRH's ownership and leadership are committed to investing in facility improvements, working with top-level physicians, and integrating advanced technologies for minimally invasive treatment options. It is a top destination for the best physicians in the Tri-State Area. It is adding new, expertly trained, and experienced physicians weekly and now have close to 800 highly-skilled doctors affiliated with HRH.

## III.    Assumption and Assignment Procedures

43.     Hudson is currently reviewing the Bayonne Debtors' contracts and may wish for some to be assumed.  To the extent the Debtor assumes and assigns any executory contracts to Hudson, the Debtor would seek authority by separate motion.

### Disclosures Under Local Rule 6004-1(b)(iv)[4]

44.     Local Rule 6004-1(b)(iv) requires, among other things, that a debtor include the "material terms of the proposed sale" in a sale motion.  Those material terms are highlighted above.

### Basis for Relief

## I.     The Collateral Surrender Agreement is Fair, Designed to Maximize the Value Received for the Bayonne Debtors' Assets, and an Exercise of the Bayonne Debtros' Reasonable Business Judgment

45.     A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.  If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding

---

[4] The following summaries of the material terms of the proposed Sale and the provisions of the Collateral Surrender Agreement are provided in accordance with Local Rule 6004-1 and are qualified in their entirety by reference to the provisions of the provisions of the Collateral Surrender Agreement and Sale Order.  In the event of any inconsistencies between these summaries and the actual provisions of the Collateral Surrender Agreement and sale order, the terms of the Collateral Surrender Agreement and Sale Order shall govern in all respects. Capitalized terms used, but not otherwise defined, in this section shall have the meanings ascribed thereto in the Collateral Surrender Agreement.

procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

46.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Adams Res. Expl. Corp.*, No. 17-10866, 2017 WL 5483156, at *12 (Bankr. D. Del. 2017) ("The relief requested in the Sale Motion is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

47.     As recognized by the court in *In re TPOP, LLC*, 2014 WL 1317559 at *2 (Bankr. D. Del. March 20, 2024), private sales are authorized under section 363(b)(1) of the Bankruptcy Code.  Here, the Collateral Surrender Agreement is represents the sound business judgment of the Debtor and is appropriate in light of the facts and circumstances surrounding the Bayonne Debtors' Chapter 11 cases.  It contemplates an appraisal of the Bayonne Debtors' assets which shall establish the Bayonne Debtors' assets are sold for fair and reasonable value.  Based upon the extensive process before the Petition Date through which its assets had been marketed, the Bayonne Debtors submit no other buyer could immediately operate the Hospital other than Hudson, and there would be no benefit to the cost and delay associated with conducting a public

auction.  The Bayonne Debtors believe there would be no better bid obtained by an auction in light

of the facts and circumstances of this chapter 11 case.  As set forth above, Hudson is ready to

operate the Hospital, has already been approved by the NJDOH, and can also provide necessary

funding for the Hospital pending closure.

**III.    The Form and Manner of the Sale Notice Should Be Approved**

48.    Pursuant to Bankruptcy Rule 2002(a), the Bayonne Debtors are required to provide

creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell

property of the estate outside the ordinary course of business.  Service of the Sale Notice, as

provided for herein, constitutes good and adequate notice of the proposed private sale under the

Collateral Surrender Agreement and the proceedings with respect thereto in compliance with, and

satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Bayonne

Debtors request that this Court approve the form and manner of the Sale Notice.

**V.    The Sale Should Be Approved as an Exercise of Sound Business Judgment**

49.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and

a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate."  11 U.S.C. § 363(b)(1).  A sale of a debtor's assets should be authorized pursuant to

section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed

transaction.  *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the

debtor in possession can sell property of the estate . . . if he has an 'articulated business

justification' . . . .");  *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of

Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In

re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

50.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").

A.      *A Sound Business Purpose Exists for the Sale*

51.     As set forth above, the Bayonne Debtors have a sound business justification for selling the Assets.  As described above, the Bayonne Debtors evaluated their options, marketed the Hospital, and concluded that the Sale will maximize the value of the Hospital by allowing the Hospital to keep operating.  Further, the Sale will enable the Hospital to continue to provide essential medical services to vulnerable patient populations in its service area, which encompasses medically underserved areas.

52.     Thus, the Bayonne Debtors submit that the Collateral Surrender Agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Bayonne Debtors' estates than would be provided by any other available alternative.

53.     The Bayonne Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Bayonne Debtors request that the Court make a finding that the

proposed sale of the Assets is a proper exercise of the Bayonne Debtors' business judgment and is rightly authorized.

        **B.**    *Adequate and Reasonable Notice of the Sale Will be Provided.*

54.      The Sale Notice: (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing; (b) otherwise includes all information relevant to parties interested in or affected by the Sale. Accordingly, the Debtors submit that the proposed notice of the Sale is adequate and reasonable.

        **C.**    *The Sale Has Been Proposed in Good Faith and Without Collusion, and Hudson is a "Good Faith" Purchaser.*

55.      The Bayonne Debtors request that the Court find Hudson is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Collateral Surrender Agreement.

56.      Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

57.      Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a

good-faith finding may not be made.  *See, e.g.*, *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

58.     The Bayonne Debtors submit that Hudson is a "good faith" purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the Collateral Surrender Agreement would be a good-faith, arms'-length agreement entitled to the protections of section 363(m) of the Bankruptcy Code.  *First*, as set forth in more detail above, the consideration to be received by the Bayonne Debtors from Hudson will be substantial, fair, and reasonable.  *Second*, the Bayonne Debtors and Hudson were represented by separate counsel and all negotiations regarding the Collateral Surrender Agreement and related agreements have been and will be conducted on an arm's-length, good-faith basis.  *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.  *Finally*, the Bayonne Debtors, in consultation with their financial advisors, have determined that the Collateral Surrender Agreement is in the best interests of the Bayonne Debtors' estates.  Accordingly, the Bayonne Debtors believe Hudson should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

   E.     *The Sale Should be Approved "Free and Clear" Under Section 363(f)*

59.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

60.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Sale free and clear of all liens, claims, and encumbrances, except with respect to any interests that may be assumed liabilities under the applicable purchase agreement.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

61.     The Bayonne Debtors submit that any Sale of the Assets will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code.  Hudson holds the senior liens on the Bayonne Debtors' assets (either through pre-petition security agreements, a subordination agreement with a junior lender, or DIP financing) and is credit bidding those liens.  In particular, all parties known to have asserted a lien or other encumbrance on the Assets will receive notice of the Sale. To the extent they have not objected by the Sale Objection Deadline, such parties will be deemed to have consented to the Sale free and clear of all liens, claims, and encumbrances pursuant to section 363(f)(2) of the Bankruptcy Code.

62.     The Bayonne Debtors accordingly request authority to convey the Hospital to Hudson free and clear of all liens, claims, and encumbrances, with any such liens, claims, or encumbrances to attach to the proceeds of the Sale.

63.     The Bayonne Debtors further submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Assets.  Such limitations on successor liability are a material part of the Collateral Surrender Agreement, as they will ensure that Hudson is protected from any claims or lawsuits premised on the theory that Hudson is a successor in interest to one or more of the Bayonne Debtors.  If such relief is not granted, the purpose of a "free and clear" sale of assets under section 363 of the Bankruptcy Code could be frustrated by the potential for claimants to thereafter use the transfer of assets as a basis to assert claims against Hudson.

64.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes such assets free and clear from successor liability relating to the debtor's business. *See, e.g., Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, No. 15-2844-BK(L), 2016 WL 3766237 (2d Cir. July 13, 2016), *12, *13 (stating that "successor liability claims can be 'interests' when they flow from a debtor's ownership of transferred assets" and holding that "a bankruptcy court may approve a § 363 sale 'free and clear' of successor liability claims if those claims flow from the debtor's ownership of the sold assets . . . [and] arise from a (1) right to payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim"); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.").

65.     For these reasons, Hudson should not be liable under any theory of successor liability.

## VI.     Hudson Should Be Allowed to Credit Bid

66.     Section 363(k) of the Bankruptcy Code states: "[a]t a sale under subsection (b) of [Section 363] of property that is subject to a lien that secures an allowed claim, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Indeed, "[i]t is beyond peradventure that a secured creditor is entitled to credit bid its allowed claim."  *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014).  Where a secured creditor's claim is allowed, it is well settled in the Third Circuit that secured creditors can bid up to the full face-value of their secured claims under section 363(k) of the Bankruptcy Code.  *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448 (3d Cir. 2006).  This proposition is supported by other district and bankruptcy courts.  *See, e.g., In re SunCruz Casinos, LLC,* 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("[T]he plain language of [Section 363(k)] makes clear that the secured creditor may credit bid its *entire claim*, including any unsecured deficiency portion thereof.") (emphasis in original); *In re Midway Invs., Ltd.*, 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof.") (citing legislative history) (alteration in original) (internal quotation marks omitted)) *see also Criimi Mae Servs. Ltd. P'ship v. WDH Howell, LLC (In re WDH Howell, LLC)*, 298 B.R. 527, 532 n. 8 (Bankr. D.N.J. 2003).

67.     Accordingly, Hudson can bid any portion, or the full face value, (through its affiliate) the outstanding DIP loan obligations and the Consent Judgment in accordance with the credit bid provisions of the Collateral Surrender Agreement (para. 2.05(a) (or otherwise) under and to the fullest extent permitted by section 363(k) of the Bankruptcy Code.

## **Relief Under Bankruptcy Rule 6004(h) and 6006(d) Is Appropriate**

68.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."    Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."    The Bayonne Debtors request that interim and final orders approving this Motion be effective immediately upon entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

69.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."    10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

70.     To minimize disruption, maintain continuity of patient care, and to help preserve value pending the Sale Hearing, the Debtor requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**<u>No Prior Request</u>**

71.     No prior request for the relief sought herein has been made to this Court or to any other court.

## Notice

72.     This Motion has been served upon (a) the Office of the United States Trustee for the District of Delaware; (b) the Internal Revenue Service; (c) the thirty (30) largest unsecured creditors on a consolidated basis; (d) the New Jersey Department of Health; and (e) Capitala, Maple, and Bayonne Medical Center Opco LLC. The Sale Notice, once approved by the Court, will be served on all creditors and parties in interest.  In light of the nature of the relief requested, the Bayonne Debtors respectfully submit that no further notice is necessary.

## Conclusion

WHEREFORE, the Bayonne Debtors respectfully request that the Court enter the Interim Order, and after holding a Final Hearing, that the Court enter the Final Order, and that the Court grant such other and further relief as is just and proper.

 Dated:  November 4, 2024

/s/ Peter C. Hughes

**DILWORTH PAXSON LLP**
Peter C. Hughes (I.D. No. 4180)
800 N. King Street – Suite 202
Wilmington, DE 19801
Telephone: (302) 571-9800
Facsimile:  (302) 351-8735

-and-

**DILWORTH PAXSON LLP**
Lawrence G. McMichael (*pro hac vice admission pending*)
Peter C. Hughes
Anne M. Aaronson (*pro hac vice admission pending*)
Jack Small (*pro hac vice admission pending*)
1500 Market St., Suite 3500E
Philadelphia, PA 19102

#124672260v3

Telephone:  (215) 575-7000
Facsimile:   (215) 754-4603

*Proposed Counsel for IJKG Opco, LLC and IJKG, LLC*