**<u>Exhibit B</u>**

[Collateral Surrender Agreement]

*Execution Version*

**COLLATERAL SURRENDER AND OPERATIONS TRANSFER AGREEMENT**

This **COLLATERAL SURRENDER AND OPERATIONS TRANSFER AGREEMENT** (this "**Agreement**"), dated this 9ᵗʰ day of October, 2024 (the "**Effective Date**"), is entered into by and among, on the one hand, **IJKG OPCO, LLC, D/B/A CAREPOINT HEALTH – BAYONNE MEDICAL CENTER**, a New Jersey limited liability company ("**IJKG Opco**") and **IJKG, LLC** ("**IJKG**" and collectively with IJKG Opco, "**Bayonne**") and, on the other hand, **HUDSON REGIONAL HOSPITALS, LLC**, **D/B/A BAYONNE MEDICAL CENTER**, a New Jersey limited liability company ("**Hudson**"). The signatories hereto may hereinafter be referred to, individually, as a "**Party**" and, collectively, as the "**Parties**."

**WHEREAS**, IJKG Opco is and has been the owner and operator of Bayonne Medical Center, a general acute care hospital (the "**Hospital**"), located at 29 E 29th Street, Bayonne, New Jersey (the "**Real Property**");

**WHEREAS**, 29 E 29 Street Holdings, LLC, a New Jersey limited liability company (the "**Landlord**") and an Affiliate of Hudson, is the owner of the Real Property and landlord of the Hospital pursuant to that certain lease agreement (the "**Lease**"), dated February 4, 2011, by and between the Landlord, as lessor, and IJKG Opco, as lessee;

**WHEREAS**, on April 1, 2024, the Parties submitted a joint letter to the New Jersey Department of Health (the "**NJDOH**") enclosing an application for a certificate of need and related documents (CN FR # 2024-04353-09;01) for the transfer of ownership of the Hospital from IJKG Opco to Hudson pursuant to the binding term sheet (the "**Term Sheet**"), dated January 11, 2024, by and between CarePoint Health Systems, INC. ("**CHS**") and Hudson, an affiliate of Landlord;

**WHEREAS**, on September 23, 2024, the Court of Chancery of the State of Delaware entered a default judgment in favor of the Plaintiffs with respect to that certain civil litigation, captioned *29 E. 29 Street Holdings, LLC; NJMHMC LLC d/b/a Hudson Regional Hospital, and NJBMCH, INC. v. IJKG Opco, LLC and IJKG, LLC*, Case No. 2020-0480-KSJM, in (the "**Delaware Action**");

**WHEREAS**, simultaneously herewith, the Parties have entered into a Stipulation and Order Entering Judgment (the "**Consent Order**") related to the Delaware Action;

**WHEREAS**, in an effort to prevent the closure of the Hospital, the Parties hereby enter into this Agreement to provide for the orderly surrender of all of IJKG Opco's assets and the transition of the operations of the Hospital from IJKG Opco to Hudson, and for Hudson to assume possession, ownership and control of the Hospital, pursuant to the terms and conditions of this Agreement; and

**WHEREAS**, Bayonne desires to surrender to Hudson, and Hudson desires to accept and assume, all right, title and interest of IJKG Opco and its bankruptcy estate in, to and under the Collateral and to assign to Hudson the Assigned Contracts, on the terms and conditions set forth in this Agreement, pursuant to sections 363 and 365 of the Bankruptcy Code;

**NOW, THEREFORE**, in consideration of the mutual covenants, agreement, promises, representations and warranties set forth herein and for such good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree to incorporate the forgoing recitals and further agree as follows:

*Execution Version*

# ARTICLE I
# DEFINITIONS

**Section 1.01    Definitions.** As used in this Agreement, the following terms shall have the meanings set forth below:

"**Action**" means claims, lawsuits, audits, legal/administrative actions, arbitrations, proceedings, disputes, controversies, notices, inquiries, audits, demands, orders, causes of action, summons, subpoena, complaints, criminal prosecutions, sanctions, governmental or other examinations or investigations, hearings, or administrative or other proceedings, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the Preamble.

"**Applicable Law**" means, as to any Person, all applicable foreign or domestic federal, state or local statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement, or rule of law of any Governmental Authority binding upon such Person or to which such a Person is subject, including, without limitation, Environmental Laws, Health Care Laws, Government Program Laws, and COVID-19 Laws, as modified from time to time.

"**Applications**" any application for any license, transfer of ownership, change of ownership, Certificate of Need, exemption from Certificate of Need review with the NJDOH or other Governmental Authority, excluding any applications by Hudson Regional Hospitals, LLC or any of its Affiliates.

"**Appraised Purchase Price**" has the meaning set forth in Section 2.05.

"**Assigned Contracts**" has the meaning set forth in **Annex A**.

"**Assumed Liabilities**" has the meaning set forth in Section 2.04.

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that either entity constituting Bayonne, their respective estates, or any other parties in interest have asserted or may assert under Chapter 5 of the Bankruptcy Code (including, without limitation, under Sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code) or under similar or related state or federal statutes and common law, including rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other direct or indirect claim of any kind whatsoever, whenever and wherever arising or asserted.

"**Bankruptcy Code**" means title 11 of the United States Code Section 101, et seq. (11 U.S.C. § 101, et seq.).

"**Bankruptcy Court**" means the United States District Court for the District of Delaware with jurisdiction over IJKG Opco's Bankruptcy Proceeding and, to the extent of any reference made pursuant to 28 U.S.C. § 157, the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Proceeding**" has the meaning set forth in Section 2.01.

"**Bayonne**" has the meaning set forth in the Preamble.

"**Bill of Sale**" has the meaning set forth in Section 2.02.

"**Business**" means the business, operations, management, affairs assets and properties of IJKG Opco, the Hospital and all other facilities/business operated by either entity comprising Bayonne or their respective Affiliates (as it relates to the Hospital) and the full range of items and services provided thereby or for which IJKG Opco or CHS (as it relates to the Hospital) is licensed or authorized to provide.

"**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks located in Newark, New Jersey are authorized or required by law to be closed for business.

"**Change of Ownership**" has the meaning set forth in Section 2.01(e).

"**CHAPA**" means the Community Health Care Asset Protection Action, N.J.S.A 26:2H-7.10 et seq. and any regulations related thereto, as amended from time to time.

"**CHAPA Approval**" means Hudson's or IJKG Opco's receipt of an order or approval from the New Jersey Superior Court approving the applicable transactions hereunder pursuant to CHAPA.

"**Charged Party**" has the meaning set forth in Section 2.07(h).

"**Charges**" has the meaning set forth in Section 2.07(f).

"**Closing**" has the meaning set forth in Section 7.01.

"**Closing Date**" has the meaning set forth in Section 7.01.

"**CMS**" means the Centers for Medicare & Medicaid Services.

"**COBRA**" has the meaning set forth in Section 4.01.

"**Collateral**" has the meaning set forth in Section 2.02.

"**Committee**" means the Official Committee of the Unsecured Creditors of IJKG Opco.

"**Conflicting Rights**" has the meaning set forth in <u>Section 9.01(f)</u>.

"**Consent Order**" has the meaning set forth in the Recitals.

"**Contracts**" means all contracts, agreements, purchase orders, leases, subleases, options and commitments, oral or written, and all assignments, amendments, schedules, exhibits and appendices thereof, affecting or relating to Bayonne, the Hospital, the Collateral, or Real Property to which either Bayonne entity is a party or by which either entity comprising Bayonne is bound or affected, including, without limitation, service contracts, management agreements and equipment leases.

"**Contradictory Transaction**" has the meaning set forth in <u>Section 3.04</u>.

"**COVID-19 Laws**" any and all laws issued or enacted by a Governmental Authority (and in effect from time to time) in order to provide assistance in response to COVID-19 and (and including any successor to any of the foregoing) and all requirements under any of the foregoing or issued in connection with any of the foregoing or in its implementation, regardless of the date enacted, adopted, issued or implemented, including, without limitation CARES Act, the Families First Coronavirus Response Act of 2020 and the Paycheck Protection Program and Health Care Enhancement Act, as modified from time to time.

"**DACA**" has the meaning set forth in <u>Section 2.07(d)</u>.

"**Debt**" of any Person at any date, without duplication, means (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services, (c) all obligations of such Person evidenced by notes, bonds, debentures, or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person to purchase, redeem, retire, defease, or otherwise make any payment in respect of any equity interests in such Person or any other Person or any warrants, rights, or options to acquire such equity interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit, or similar facilities in respect of obligations of the kind referred to in <u>subsections</u> <u>(a)</u> through <u>(e)</u> of this definition, (g) all guaranty obligations of such Person in respect of obligations of the kind referred to in <u>subsections</u> <u>(a)</u> through <u>(f)</u> above, (h) all obligations of the kind referred to in <u>subsections</u> <u>(a)</u> through <u>(g)</u> above secured by (or which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (i) all debt of any partnership, unlimited liability company, or unincorporated joint venture in which such Person is a general partner, member, or a joint venturer, respectively.

"**Delaware Action**" has the meaning set forth in the Recitals.

"**DIP Budget**" means the budget attached to the Final DIP Order as Exhibit A thereto, as updated from time-to-time hereafter.

"**DIP Financing**" has the meaning set forth in Section 2.06(c).

"**DIP Financing Documents**" has the meaning set forth in Section 2.06(c).

"**DIP Financing Lien**" shall have the meaning ascribed thereto in Section 2.06(d).

"**DIP Lender**" means the "DIP Lender" as set forth in the DIP Financing Documents.

"**DIP Period**" means the period from the Interim DIP Order Date and continuing through the earlier of the Closing or the Termination Date.

"**DOH Assessments**" means the assessments, fees and other amount prescribed pursuant to N.J.A.C. 8:31B-3.3 and N.J.S.A. 26:2H-18.57. Health Care Quality Fees pursuant to N.J.S.A. 26:2H-7.7, assessments on Ambulatory Care Facilities pursuant to N.J.S.A.26:2H-18.57, and all other assessment, fees and other amounts imposed by the NJDOH on IJKG or IJKG Opco or the Hospital.

"**Drop-Dead Date**" has the meaning set forth in Section 8.01.

"**Effective Date**" has the meaning set forth in the Preamble.

"**Employee Benefit Plan**" means each pension, benefit, retirement, employment, consulting, profit sharing, compensation, deferred compensation, incentive, bonus, stock option, restricted stock, stock appreciation right, phantom equity, change in control, retention, severance, vacation, paid time off, welfare and fringe-benefit or similar agreement, plan, policy and program in effect and covering one or more of the applicable Workers, applicable former Workers, current or former directors of the IJKG Opco or the beneficiaries or dependents of any such Persons, and is maintained, sponsored, contributed to, or required to be contributed to by IJKG Opco, or under which IJKG Opco has any material liability for premiums or benefits, and any and all amendments to each of the above, whether or not reduced to writing, whether funded or unfunded, including without limitation each "employee benefit plan" within the meaning of Section 3(3) of ERISA.

"**Encumbrance**" means any lien, mortgage, pledge, condition, encumbrance, charge, security interest, adverse claim, liability, interest, charge, preference, priority, proxy, transfer restriction (other than restrictions under the United States Securities Act of 1933, as amended, and state securities laws), encroachment, Tax, order, community property interest, equitable interest, option, warrant, right of first refusal, right of first offer, tag along, approval rights, restrictive covenant, easement, profit, license, servitude, right of way, covenant or zoning restriction, and any other restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"**Environmental Law**" means any and all federal, state, foreign, local, or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority, or other requirements of law (including common law) as now or may at any time hereafter be in effect, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree, or judgment, regulating, relating to, or imposing liability or standards of conduct concerning protection of the environment or, to the extent relating to exposure to substances that are harmful or detrimental to the environment, or human health, or safety.

4873-9901-3621, v. 1

"**EOBs**" has the meaning set forth in Section 2.07(c).

"**Excluded Liabilities**" has the meaning set forth in Section 2.05.

"**Final DIP Order**" means the Final Order, in the form and substance approved by the DIP Lender, (i) Authorizing The Debtor To Obtain DIP Financing, (ii) Authorizing The Debtor To Use Prepetition Collateral, (iii) Authorizing Assumption Of Prepetition Obligations, (iv) Granting Adequate Protection To Prepetition Lenders entered in the Bankruptcy Proceeding, including all exhibits thereto, and (v) Granting Related Relief.

"**Government Program**" means Medicare, Medicaid, TriCare, HRSA, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any other government sponsored reimbursement program, including state programs.

"**Government Program Laws**" means 42 U.S.C. §§ 1320a-7, the Civil Monetary Penalties Law, 1320a-7a, 1320a- 7b; §§ 1395 through 1395fff; §§ 1396-1396v; the FCA; the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518) and any other laws governing the Government Programs, and the corresponding reimbursement, fraud and abuse, false claims and anti-self-referral Laws of any other Governmental Authority.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, agency, commission, office or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

"**Health Care Laws**" means any and all Applicable Laws of any Governmental Authority pertaining to applicable health regulatory matters, including, but not limited to, false claims laws; false representations laws; insurance fraud laws; anti-kickback and all other provisions of the Medicare/Medicaid fraud and abuse laws (42 U.S.C. § 1320a-7 et seq.) and the regulations promulgated thereunder; the physician self-referral provisions of the Stark Law (42 U.S.C. § 1395nn) and the regulations promulgated thereunder, the Federal Controlled Substances Act (21 U.S.C. § 801, et seq.) and the regulations promulgated thereunder, the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a et seq.), the Patient Protection and Affordable Care Act (Pub. L. 111-148), as amended by the Health Care Education and Reconciliation Act (Pub. L. 111-152), and the regulations promulgated thereunder, the Emergency Medical Treatment and Labor Act, the Public Health Service Act, 42 U.S.C. § 201 et seq., and all regulations promulgated thereunder , and all other Applicable Law pertaining to the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; HIPAA; state anti-kickback, physician self-referral, COVID-19 Laws; laws pertaining to the hiring of employees or acquisition of services or products from those who have been excluded from Governmental Programs, licensure, accreditation or any other aspect of providing applicable health care services; and state and federal licensing, certificate of need, and certification requirements and related regulations (including, without limitation, N.J.A.C. 8:43G – 1.1 et. seq.), fee-splitting laws, federal and state laws governing the use, handling, control, storage, transportation, and maintenance of controlled

substances, pharmaceuticals or drugs, and any and all other laws, rules, and regulations administered or otherwise enforced by HHS, the NJDOH, CMS, Office of Inspector General, New York Office of Professional Medical Conduct, or New Jersey or New York Board of Medical Examiners, any other state board or agency governing, regulating or monitoring the conduct of the Hospital or any licensed health care professionals furnishing health care services, and with respect to each of the foregoing, "**Health Care Laws**" shall include any and all statutes, rules, regulations, position statements, declaratory statements, advisory opinions, bulletins, notifications, and other guidance relating to any of the foregoing.

"**Healthcare Program Liabilities**" means all Liabilities, including under any applicable Government Program Laws, including, but not limited to, any recoupment, offset, adjustment or obligations for refund settlement and retroactive adjustments under or in connection with the applicable Government Programs or other Payor for open periods ending at the Closing.

"**Hospital**" has the meaning set forth in the Recitals.

"**Hudson**" has the meaning set forth in the Preamble.

"**Hudson Indemnitees**" has the meaning set forth in Section 9.01.

"**IJKG Opco**" has the meaning set forth in the Preamble.

"**IJKG Opco Bank Account**" has the meaning set forth in Section 2.07(c).

"**IJKG Opco Closing Certificate**" has the meaning set forth in Section 7.01.

"**IJKG Opco's Numbers**" has the meaning set forth in Section 2.07(b).

"**Improvements**" means all buildings, structures, fixtures, building systems and equipment, and all components thereof (including the roof, foundation and structural elements), included in or on the Real Property.

"**Insight Agreement**" means that certain Hospital Facilities Management Services Agreement between CarePoint Health Systems, Inc. and its subsidiaries, on the one hand, and Insight Management and Consulting Services, Inc., on the other hand, dated March 12, 2024.

"**Intellectual Property**" means all of the following, in any jurisdiction throughout the world, whether registered or unregistered, including all rights and interests pertaining to or deriving from: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), invention disclosures, discoveries, all improvements thereto, and all issued patents, patent applications, and patent disclosures, together with all counterparts claiming priority therefrom, and all related reissuances, continuations, continuations-in-part, divisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, slogans, trade names (including social media corporate identifiers), corporate and business names, and internet domain names, and other source or business identifiers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, including without limitation, "Bayonne Medical Center" or all derivations thereof, (c) all material advertising and promotional materials and all works of authorship and other

copyrightable works, whether published or unpublished, and all applications, registrations, and renewals in connection therewith; (d) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data and information, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals) and any other information that derives economic value from not being generally known; (e) all Software; (f) all other proprietary rights; and (g) all copies and tangible embodiments thereof (in whatever form or medium), and as to all of the foregoing, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages.

"**Intellectual Property Agreements**" means all licenses, sublicenses, consents to use, and other agreements by or through which other Persons grant IJKG or IJKG Opco or IJKG or IJKG Opco grants any other Persons any exclusive or non-exclusive rights, licenses, or interests in or to any Intellectual Property.

"**Intellectual Property Assets**" means all Intellectual Property that is directly or indirectly owned by IJKG or IJKG Opco or to which IJKG or IJKG Opco directly or indirectly has any rights or in which IJKG or IJKG Opco directly or indirectly has any interest, including licensed Software.

"**Interim DIP Order**" means an order of the Bankruptcy Court, in the form and substance approved by the DIP Lender, (i) authorizing Bayonne to obtain the DIP Financing pursuant to the DIP Financing Documents, (ii) authorizing Bayonne to use cash collateral in accordance with the DIP Financing Documents, (iii) granting liens and providing superpriority administrative expense status to the DIP Lender, (iv) granting adequate protection to the DIP Lender, (v) modifying the automatic stay, (vi) scheduling the final hearing, and (vii) granting related relief.

"**Interim DIP Order Date**" means the date on which the Bankruptcy Court enters the Interim DIP Order.

"**Interim Orders Contingency**" means the Bankruptcy Court's entering the Interim DIP Order and an order approving: (i) Hudson or its designee's(s') interim operation of and provision of Interim Services to IJKG Opco pursuant to this Agreement, (ii) the form and substance of this Agreement (provided that the surrender of the Collateral hereunder shall occur upon the Closing), and (iii) CarePoint Health System, Inc. and its Affiliates', including without limitation, Hudson Hospital Opco, LLC, d/b/a CarePoint Health – Christ Hospital, HUMC Opco, LLC, D/B/A Hoboken University Medical Center execution of and entry into that certain Management Services Agreement, dated as of even date herewith, with NJMHMC LLC d/b/a Hudson Regional Hospital, Landlord and Hudson Regional Management, LLC.

"**Interim Services**" has the meaning set forth in Section 2.06.

"**IT Assets**" means computers, storage media, databases, applications, websites, Software, servers, workstations, routers, hubs, switches, circuits, networks, computer network equipment or systems, data communications lines, and all other information technology equipment including parts of any of the foregoing such as firmware, screens, terminals, disks, cabling, related infrastructure and

other peripheral and associated electronic equipment and services owned, controlled, used or held for use by or on behalf of the Hospital.

"**Knowledge**" means the actual knowledge, after reasonable inquiry, of any of the members, shareholders, officers, managers, directors, trustees and senior employees of either entity comprising Bayonne.

"**Landlord**" has the meaning set forth in the Recitals.

"**Lease**" has the meaning set forth in the Recitals.

"**Lease Documents**" means that certain Lease Agreement, the Subordination of Management Agreement, the Security Agreement, and the parent company Guaranty, executed by IJKG, LLC in favor of Landlord.

"**Liability**" means any actual or potential, now-existing or future arising, imposition, liability or obligation of any kind, character or description, whether known or unknown, absolute or contingent, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, whether or not the same is required to be accrued on the financial statements of such Person, including, without limitation, Debts, and all interest, taxes, penalties or other assessments thereon. Without limiting the generality of the foregoing, the DOH Assessments, Singh Action, the Healthcare Program Liabilities and all Liabilities arising from surveys/inspections by Governmental Authorities are each a Liability.

"**Lock-Box Agreement**" has the meaning set forth in Section 2.07(d).

"**Losses**" has the meaning set forth in Section 9.01.

"**Material Adverse Effect**" means any event, occurrence, circumstance, fact, condition, or change that, individually or in the aggregate, is, will, or could be materially adverse to (a) the business, results of operations, liabilities, prospects, value, condition (financial or otherwise), employee, customer, patient, referral source, supplier, or other business relations, or assets of IJKG or IJKG Opco and/or the Hospital, the Business, or on the Collateral, the Real Property, or the Assumed Liabilities, or (b) the ability of Hudson, IJKG or IJKG Opco to timely consummate the transactions contemplated hereby. Material Adverse Effect also includes acts of God or force majeure events.

"**Medicaid**" shall mean, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, authoritative manuals, orders, authoritative guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"**Medicaid Provider Agreements**" means the Medicaid provider number and Medicaid provider reimbursement agreements and all related rights and interests of IJKG Opco with respect to the Hospital.

"**Medicare**" shall mean, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, authoritative manuals, orders or authoritative guidelines (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time,

"**Medicare Liability**" means the amount calculated by a billing, coding or clinical expert engaged by Hudson equal to the projected total amount necessary to cover, among other things, any and all potential or actual overpayments, recoupments, penalties, interest, and attorneys' and professional and consulting fees arising from Medicare charges, claims or liabilities, in each case, related to items/services furnished by or through IJKG Opco as of the Closing.

"**Medicare Provider Agreements**" means the Medicare provider number and Medicare provider reimbursement agreements and all related rights and interests of IJKG Opco with respect to the Hospital.

"**New Jersey Action**" means that certain civil litigation pending in the Chancery Division of the New Jersey Superior Court – Hudson County (Docket No. HUD-L-805-21).

"**NJDOH Approval**" means the NJDOH's authorization, approval and consent to IJKG Opco's relinquishment of the Collateral and the transfer of ownership of the Hospital to Hudson.

"**NJDOH**" has the meaning set forth in the Recitals.

"**NPI**" has the meaning set forth in <u>Section 2.07(a)</u>.

"**OIG**" means the Office of Inspector General for the United States Department of Health and Human Services.

"**Order**" means any order, judgment, writ, injunction, award or decree of any Court or Governmental Authority.

"**Ordinary Course of Business**" means the ordinary and usual course of business of normal day-to-day operations of the Hospital, as conducted by Bayonne, with respect to the Hospital), consistent with past custom and practice (including with respect to quantity and frequency).

"**Outstanding Judgment**" means all damages, losses, costs and expenses, including without limitation, professional (legal, accounting and consultant fees) and expert fees, and other amounts that have been claimed or could have been claimed or prayed for by the Landlord from Bayonne under the Delaware Action, as determined by the Bankruptcy Court within a range between $24.0 million to $32.0 million, <u>provided</u> that, if the Interim Orders Contingency has not occurred by October 31, 2024, then the "low-end" and "high-end" of the foregoing stipulated amounts shall increase by $1.2 million on November 1, 2024 and by an additional $1.2 million on the first day of each subsequent calendar month until the Interim Orders Contingency shall have occurred. For the avoidance of any doubt, the Outstanding Judgment shall include, without limitation, all amounts and categories of amounts the Landlord has or could have claimed/prayed for in the Delaware Action, including, without limitation, arrears/defaults in the Base Rent, Additional Charges, default, escalated or holdover rent, Impositions, insurance premiums, expenses, taxes, insurance, water, utilities, landscape, maintenance, HVAC, trash

removal, fees, and other expenses, interest, penalties, and other amounts, including attorneys' fees, owed by IJKG Opco and its Affiliates under any Lease Document, as of the date on which the Interim Orders Contingency has occurred.

"**Payor**" means any and all health care service plans, health maintenance organizations, health insurers and other private and governmental third-party payors, employers, networks, independent practice associations, accountable care organizations and other intermediaries. Payor includes Government Programs.

"**Permits**" means all permits, certifications, licenses, franchises, approvals, authorizations, and consents required to be obtained from Governmental Authorities, including, without limitation, IJKG Opco's licenses, permits, certifications, and other authorizations or approvals from the NJDOH (including, without limitation, its license and certificate of need to operate a general acute care hospital), as well as NJDOH Clinical Laboratory Improvement Service and Clinical Laboratory Improvement Amendment certificates or other approvals, New Jersey Board of Pharmacy permits or other approvals, Medicare and Medicaid provider numbers and agreements, Medicare certifications and accreditations by The Joint Commission or Det Norske Veritas (DNV), f/k/a DNV G.

"**Permitted Encumbrances**" means (a) the Assumed Liabilities, (b) any exceptions, restrictions, easements, encroachments, covenants, reservations, declarations and rights of way disclosed in commitments of title insurance, surveys and other documentation described in such commitments and surveys relating to the Real Property; (c) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings, provided the same could not reasonably be expected to result in a loss of the property and an appropriate reserve is established therefor; (d) zoning, entitlement and other land use and environmental regulations or designations by any Governmental Authority provided that such regulations or designations have not been violated, which, in each case, do not materially interfere with the operation of the Business as currently conducted at the applicable site, and (e) any lien created under: (i) the Lease in favor of the Landlord or (ii) the Security Agreement or the DIP Financing Documents.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**Post-Closing Accounts Receivable**" has the meaning set forth in Section 2.07(b).

"**Post-Closing Period**" has the meaning set forth in Section 2.07(e).

"**Provider Agreements**" means the Medicaid Provider Agreements and the Medicare Provider Agreements of IJKG Opco, collectively.

"**Real Property**" has the meaning set forth in the Recitals.

"**Recapture Claims**" has the meaning set forth in Section 2.07(j).

"**Receiving Party**" has the meaning set forth in Section 2.07(g).

11

"**Reimbursements**" has the meaning set forth in <u>Section 2.07(f)</u>.

"**Reimbursing Party**" has the meaning set forth in <u>Section 2.07(h)</u>.

"**Regulatory Approvals**" means, in respect of IJKG Opco or Hudson, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of or from any Governmental Authority as shall be required to be obtained and such notifications to any Governmental Authority as shall be required to be given by such party in order for it to consummate the transactions contemplated hereby in compliance with all Applicable Law and shall include obtaining NJDOH Approval and the CHAPA Approval, if applicable, and the Parties' obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority needed for them to consummate the transactions contemplated hereby and for Hudson to operate the Hospital on and following the Closing.

"**Request for Reimbursement**" has the meaning set forth in <u>Section 2.07(h)</u>.

"**Retained Assets**" has the meaning set forth in <u>Section 2.04</u>.

"**Sale Order**" has the meaning set forth in <u>Section 7.01(s)</u>.

"**Security Agreement**" means that certain Security Agreement, dated February 4, 2011, by and between IJKG and Landlord, entered in connection with the Lease granting Landlord a first lien on substantially all of the tangible and intangile assets of IJKG Opco.

"**Security Deposit**" means the security deposit and all amounts behind held by Landlord under the Lease.

"**Services**" has the meaning set forth in <u>Section 2.07(f)</u>.

"**Singh Action**" means that certain litigation, brought under the FCA, captioned, *United States of America ex rel. Vijayant Singh, M.D. v. Hudson Hospital OPCO, LLC d/b/a Christ Hospital et. al.*, Case No. 2:21-cv-19788-MEF-AME, in the United States District Court for the District of New Jersey.

"**Software**" means computer software programs (and all enhancements, versions, releases, and updates thereto), including software compilations, software tool sets, compilers, higher level or "proprietary" languages and all related programming and user documentation, whether in source code, object code, executable code, or human readable form, or any translation or modification thereof that substantially preserves its original identity.

"**Subordination of Management Agreement**" means that certain Subordination of Management Agreement, dated February 4, 2011, by and between the Landlord and IJKG Opco, relating to the Hospital and the Lease.

"**Taxes**" means all federal, state, local, foreign, and other taxes, fees, levies or other assessments, however denominated, including any interest, penalties, or other additions to Taxes that may become payable in respect thereof, imposed by any Governmental Authority, which Taxes shall include, without limitation, all income or profits taxes (including but not limited to, federal income

taxes and state income taxes), payroll taxes, payroll and employee withholding taxes, other withholding tax obligations, unemployment insurance, social security taxes, sales and use taxes, ad valorem taxes, excise taxes, customs, duties, franchise taxes, gross receipts/operating revenues taxes/assessments, assessments, taxes and charges, including the DOH Assessments, severance, license, lease, service, service use, business license taxes, transfer taxes, workers' compensation, alternative or add-on minimum estimated, real or personal property taxes, Governmental Authority charges, or other taxes, levies or assessments or other amounts for unclaimed property under applicable escheat or unclaimed property Laws, and other obligations having the same nature or a nature similar to any of the forgoing, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"**Tax Return**" or "**Tax Returns**" means any report, return, declaration, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto and including any amendment thereof.

"**Term Sheet**" has the meaning set forth in the Recitals.

"**Termination Date**" has the meaning set forth in the Section 8.01.

"**Transaction Consideration**" has the meaning set forth in the Section 2.05.

"**Transaction Proposal**" has the meaning set forth in the Section 3.04.

"**Transferred Worker**" has the meaning set forth in the Section 4.01(c).

"**WARN Act**" shall mean the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. 23, SEC. 2101 et seq. as amended, or any similar foreign, federal, state, or local law, regulation or ordinance, including related to plant closing, relocations, mass layoffs, or employment losses, as modified from time to time.

"**WARN Laws**" has the meaning ascribed to it in Section 4.01.

"**Workers**" means those Persons employed or engaged (as independent contractors) by IJKG Opco (or the other entity comprising Bayonne who worked for or in connection with the Hospital).

Section 1.02    **Construction**. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, and the singular number includes the plural number and vice versa. All references to Annexes, Articles and Sections refer to annexes, articles and sections of this Agreement. Reference in this Agreement to "including," "includes" and "include" shall be deemed to be followed by "without limitation.

# ARTICLE II
# BANKRUPTCY PROCEEDING; SURRENDER OF COLLATERAL; TRANSFER OF OPERATIONS

*All terms, covenants, agreements and other provisions of this Agreement shall be effective and applicable as of the Effective Date, unless expressly indicated otherwise as being effective or applicable as of, during, or following another*

*trigger date, such as the Interim DIP Order Date, from and after the occurrence of the Interim Orders Contingency, the Post-Closing Period or the Closing Date, as applicable, or as the context otherwise requires.*

**Section 2.01    Bankruptcy Proceeding**. Subject to the terms of the DIP Financing Documents, IJKG Opco shall file a petition with the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, pursuant to which IJKG Opco will file motions for: (a) approval of DIP Financing to be provided by Hudson or its designee, (b) approval of Hudson or its designee's(s') interim operation of and provision of Interim Services to IJKG Opco pursuant to this Agreement, and (c) an Order authorizing the surrender of the Collateral by IJKG Opco to Hudson via private sale (the "**Bankruptcy Proceeding**").

**Section 2.02    Surrender at Closing**. Upon the Closing, and without any further execution or delivery of additional instruments or agreements between the Parties unless otherwise requested by Hudson, at the Closing, IJKG Opco shall irrevocably surrender and deliver to Hudson, and Hudson shall accept from IJKG Opco, all of IJKG Opco's right, title, and interest in, to and under all assets of IJKG Opco, other than the Retained Assets, identified in Section 2 of the Security Agreement (collectively, the "**Collateral**"), all of which are hereby incorporated herein by reference, subject to the approval of the Bankruptcy Court under 11 U.S.C. § 101, et seq. In amplification of the foregoing, the Collateral shall include, without limitation, all tangible and intangible assets, properties, and rights of IJKG and IJKG Opco, other than the Retained Assets, including without limitation, the assets described on Annex A attached hereto and made a part hereof, existing as of the Effective Date and as of the Closing Date (including assets acquired after the Effective Date), in all cases, free and clear of all Encumbrances (other than Permitted Encumbrances) pursuant to Section 363 of the Bankruptcy Code. Hudson agrees to accept the Collateral (for the avoidance of doubt, excluding the Retained Assets) upon and subject to the terms, conditions and provisions set forth herein and pursuant to the terms in the Sale Order.

In furtherance of the foregoing, at the Closing, IJKG Opco will execute and deliver to Hudson a Bill of Sale ("**Bill of Sale**") in form and substance of **Exhibit A**, attached hereto and made a part hereof.

**Section 2.03    Excluded Liabilities**. Except for the Assumed Liabilities, Bayonne agrees that Hudson is not and does not assume agree to be responsible for or to pay, honor, satisfy, discharge or perform, and will not be deemed, by virtue of the execution and delivery of this Agreement or any document delivered at the Closing, or as a result of the consummation of the transactions contemplated hereby, to have assumed, or to have agreed to pay, honor, satisfy, discharge, be responsible for, or perform, any Liability of either entity comprising Bayonne (all of which shall be the joint and several responsibility of each entity comprising Bayonne) (collectively, "**Excluded Liabilities**").

**Section 2.04    Assumed Liabilities; Retained Assets**.

(a)    Subject to the terms and conditions set forth herein, Hudson shall assume and agree to pay, perform, and discharge the Medicare Liability as well as those liabilities and obligations of Hudson under the Assigned Contracts to the extent they are for goods and services provided to Hudson solely after the Closing (the "**Assumed Liabilities**"), specifically excluding any Liabilities arising from or related to the Assigned Contracts as of the Effective Date or Closing Date.

(b)    Hudson expressly understands and agrees that, other than the Collateral being surrendered by IJKG Opco to Hudson pursuant to Section 2.01, IJKG Opco is not transferring and Hudson is not accepting or assuming any liability with respect to, any of the following assets or properties of IJKG Opco, all of which shall be excluded from the Collateral (the "**Retained Assets**"):

(i)    Liabilities of either entity comprising Bayonne except as expressly provided herein and except with respect to the prospective liabilities that are incurred by Hudson under the Assigned Contracts after the Closing; and

(ii)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of IJKG Opco, all employee-related or employee benefit-related files or records, other than personnel files of Transferred Workers, and any other books and records (other than patient medical records, financial records and employee records assumed by Hudson pursuant to Section 3.02(b)) that IJKG Opco is prohibited from disclosing or transferring to Hudson under Applicable Law and is required by Applicable Law to retain.

**Section 2.05    Transaction Consideration; Status of Lease; Certain Forbearance**.

(a)    In consideration for the Collateral, Hudson shall pay IJKG Opco, at the Closing, "**Transaction Consideration**" equal to the fair market value of the Collateral as of the Effective Date,[1] as determined by a qualified appraiser selected jointly by Hudson and Bayonne (the "**Appraised Purchase Price**") (the cost of which shall be paid by Hudson through the DIP Financing), payable by way of: (i) a "credit bid" in the amount of: (a) the principal and interest balance of the DIP Financing then outstanding, (b) the outstanding Service Fees and expenses, due or payable hereunder, (c) the Outstanding Judgment; and (ii) the Medicare Liability and any other Liability assumed or paid by Hudson hereunder after the Effective Date, if any (i.e., Hudson shall be credited with having paid Bayonne the amount of such Liabilities); and (iii) a cash payment equal to the positive difference of the Appraised Purchase Price minus the value of (i) and (ii) herein. If the Appraised Purchase Price is less than the value of (i) and (ii) above, Hudson shall be entitled to retain/reserve all rights to and assert all claims for the deficiency against the entities constituting Bayonne. For the avoidance of doubt, the Appraised Purchase Price is subject to Bankruptcy Court approval via the Sale Order. Notwithstanding the foregoing, Bayonne hereby consents to, and shall not contest, the Outstanding Judgment.

(b)    Bayonne acknowledges that, notwithstanding the Parties' execution of this Agreement or the consummation of the transactions contemplated hereunder, the Lease was effectively terminated years prior to the petition date of the Bankruptcy Proceeding, remains

---

[1] The appraiser shall factor in and discount for the liabilities of Bayonne and such other industry-standard factors, including, without limitation, discounts for non-marketability/non-transferability. Additionally, recognizing that the Lease was effectively terminated years prior to the petition date of the Bankruptcy Proceeding, the Lease remains terminated, and that Bayonne remains a holdover tenant thereunder in a tenancy-at-will pursuant to Sections 19.1 and 19.3 of the Lease, the Appraiser shall appraise Bayonne's leasehold interest in the Real Property based on a tenancy-at-will and shall not impute any other terms or value to the same, including salvage value or value to be transmitted to another tenant.

terminated and Bayonne remains a holdover tenant thereunder. Accordingly, it shall pay to Landlord, as rental each month, the amounts set for in Section 19.3 of the Lease.

Contingent on Bayonne's full and continuous compliance with the terms hereof, the Lease Documents, the DIP Financing Documents and all other agreements, instruments and documents delivered hereunder, from the Effective Date until the earliest of: (i) the Closing, (ii) the Termination Date, if such termination is pursuant to Section 8.01(c)(i), or (iii) Bayonne's breach of this Agreement, any of the Lease Documents, the DIP Financing Documents and all other agreements, instruments and documents delivered hereunder, Landlord will forbear from seeking remedies for any Event of Default (as defined in the Lease) by IJKG Opco under the Lease, other than any Event(s) of Default consisting of or relating to: (A) non-payment of base rent, property taxes or utility bills, including the holdover amounts set forth in the Lease, (B) failure to procure insurance, (C) failure to maintain the Facility in a state of good repair pursuant to the terms of the Lease, or (D) any other Event of Default for which Landlord has provided notice to IJKG Opco prior to the Effective Date (all such Events of Default in the foregoing clauses (A) through (D) are referred to herein as "**Preserved Defaults**"). If the Closing occurs pursuant to the terms hereof, all such defaults, other than any Preserved Defaults, will be discharged upon the Closing. If, and to the extent, Bayonne does not cure any Preserved Default prior to the Closing, then Landlord may: (X) draw upon the Letter of Credit (as defined in the Lease) in any amounts owed by IJKG Opco in respect of such Preserved Default as calculated by Landlord, (Y) in Landlord's sole discretion, set off any such amounts from the Transaction Consideration or any other amount(s) payable by Hudson or its designee hereunder, or (Z) any combination of the foregoing. If Landlord draws upon the Letter of Credit pursuant to clause (X) or (Z) above, Bayonne shall hereby be deemed to have affirmatively consented to the same and shall immediately fully and timely cooperate with Landlord to effectuate the preceding sentence, including, without limitation, by executing a consent order, in form and substance as determined by Landlord in its sole discretion, to vacate any injunction, order or restraint which may prevent, delay, frustrate or deny Landlord from drawing on the Letter of Credit.

(c)     Bayonne hereby affirms its obligations under the Lease Documents and agrees and acknowledges that, except as expressly set forth above, all such obligations shall remain in full force and effect, notwithstanding the termination of the Lease and the execution of this Agreement, any Lease Document, the DIP Financing Documents and the other agreements, instruments and documents delivered hereunder, including, without limitation, IJKG Opco's obligation to maintain and replenish amounts under the Letter of Credit pursuant to Section 37.14 of the Lease. This provision shall expressly survive the termination hereof for any reason and shall not be contingent on the occurrence or non-occurrence of any event, including any orders of the Bankruptcy Court, the Closing or the Termination Date.

**Section 2.06    Interim Operation of the Hospital Pending Closing; Pre-Closing Cash; DIP Financing**.

(a)     Upon the occurrence of the Interim Orders Contingency, Hudson shall, directly or through one or more designees, be exclusively entitled and authorized to operate the Hospital and provide Hospital with the management services (the "**Interim Services**") deemed by Hudson or its designee(s) to be necessary, desirable or appropriate for the operation of the Hospital. The Parties agree and acknowledge that the foregoing authorized is consistent with N.J.A.C.8:33-3.3(i). In amplification of the foregoing, Hudson or its designee(s) shall be exclusively authorized to

conduct, oversee, direct, control and supervise the overall business, policies, assets (tangible and intangible, including without limitation, cash and accounts receivable) and operations, and financial, legal and other affairs (except as expressly provided below) of the Hospital, and shall be exclusively vested with the ultimate authority regarding the powers, duties and responsibilities vested in IJKG Opco and its Affiliates and their respective governing authority(ies) or owner(s) by Applicable Law as related to the Hospital, including without limitation, all authority related to: (i) the provision of healthcare items or services at the Hospital and the coding, billing and collections therefor; (ii) the rules, regulations, resolutions and policies and procedures of the Hospital, and the adoption, amendment, revocation and enforcement of the same; (iii) subject to approval and authority of a Chief Restructuring Officer retained by IJKG Opco, all fiscal matters involving the Hospital, including approving capital and operating budgets (including the DIP Budget), negotiating, financing, securing or dictating the terms of financing, encumbering the assets of the Hospital (or IJKG Opco, as related to the Hospital) and refinancings, and negotiating, compromising on, restructuring, and paying, out of funds of IJKG Opco, including cash on hand and accounts receivable, and other sources secured by Hudson (including the DIP Financing), the expenses of IJKG Opco identified by Hudson, (iv) all employees, independent contractors, professionals, contractors, suppliers and vendors of the Hospital, including engaging, hiring, firing, transferring (including to Hudson or Affiliates of Hudson), assignment, establishing the terms and all other aspects of the employment or engagement of the same, (v) all agreements, arrangements or relationships with third parties related to the Hospital, including without limitation, Payors, Government Programs, lenders, creditors, vendors, contractors, providers or suppliers, including forming, amending, assigning (including to Hudson or Affiliates of Hudson) terminating and establishing the terms and all aspects of the same; (vi) subject to approval and authority of a Chief Restructuring Officer retained by IJKG Opco, all litigation, arbitrations and other proceedings, including instituting claims, counterclaims and crossclaims, asserting defenses, compromising or settling disputes; (vii) licensure and other approvals and third-party payor enrollments and all related matters, (viii) insurance policies, including negotiating, securing, renewing, amending (including to add Hudson or its Affiliates as additional insured thereunder) or canceling the same, (ix) the acquisition, development, renovation, repair, improvement, upgrade or replacement of premises, equipment, furniture, fixtures, supplies, mechanical and other systems of the Hospital, (x) unrestricted access to and use of (including, but not limited to, rights to review, reference, inspect, audit, copy, duplicate or memorialize, and all activities and functions ancillary or related to the foregoing) all books and records of Bayonne and the Hospital, including access to all facilities, properties, locations and archives (including digital, cloud-based, virtual or other computer systems) wherever such books and records may be stored, located or available, notwithstanding the designation of any such books and records by IJKG Opco as "Retained Assets" hereunder; or (xi) otherwise governing the Hospital. Notwithstanding the foregoing, and for the avoidance of any doubt, nothing herein shall require Hudson or its Affiliates to assume any Liabilities of either entity comprising Bayonne, and Hudson hereby disclaims the same, except as expressly provided in this Agreement.

(b)    Bayonne agrees and acknowledges that, from and after occurrence of the Interim Orders Contingency, all of Bayonne's cash and cash equivalents, bank accounts, credit cards, bank deposits, investment accounts, lockboxes, certificates of deposit, benefits of credits, marketable securities or investments in other Persons, the Letter of Credit and all cash or cash equivalents comprised therein, treasury bills and other similar items existing as of the occurrence of the Interim Orders Contingency or generated thereafter, and all accounts receivable and notes receivable existing as of the occurrence of the Interim Orders Contingency or generated thereafter, and all amounts due for items or services that were provided by IJKG Opco as of the occurrence of the Interim Orders Contingency or thereafter, both billed and unbilled (including, without limitation, amounts due from

Medicaid and Medicare and other Payors) (collectively, the "**Cash and A/R**"), will, in addition to constituting Collateral hereunder, be used by Hudson or designee(s) to operate the Hospital, pay IJKG Opco's Liabilities and expenses, including the Medicare Liability, and otherwise be used by Hudson in furtherance of its rights and obligations hereunder. From and after occurrence of the Interim Orders Contingency, neither entity comprising Bayonne nor any of it respective Affiliates or anyone acting on their behalf may access, use, consign, transfer, withdraw, withhold, encumber, hypothecate or otherwise dispose of any Cash or A/R without Hudson's prior written consent in each instance, which consent may be withheld or denied in the sole discretion of Hudson. **Exhibit B** includes a complete and accurate list of all bank accounts and post office boxes of Bayonne. The Parties shall, on the Effective Date, enter into a lock-box/sweep agreement (the "**Lock-Box Agreement**"), in the form attached hereto as **Exhibit C**, related to the disposition of the contents of all of the accounts and post office boxes of Bayonne. On the date on which the Interim Orders Contingency has occurred, Bayonne shall convert each of its bank accounts at all financial institutions to a lock-box account that is subject to the Lock-Box Agreement.

(c)      DIP Lender will make available to IJKG Opco, during the DIP Period, debtor-in-possession financing intended to preserve the value of the assets of the Hospital and continue its operations through the Closing (the "**DIP Financing**"), designed as a line of credit, on which IJKG Opco may draw, subject to Hudson's consent and such restrictions on use and conditions to be set forth in written loan agreements, security agreements and related documents in the form and substance approved by Hudson (the "**DIP Financing Documents**"), which each entity comprising Bayonne must execute and deliver to the DIP Lender on the Effective Date.

(d)      IJKG Opco's obligations under the DIP Financing shall be secured by a lien (the "**DIP Financing Lien**") upon all of IJKG Opco's now existing or hereinafter acquired tangible and intangible assets on terms and conditions acceptable to Hudson and the DIP Lender and reasonably acceptable to the Committee. The DIP Financing Lien shall be continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected, first priority senior lien and shall constitute allowed superpriority administrative expense claims, pursuant to section 364(c)(1) of the Bankruptcy Code, in the Chapter 11 Case, having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provisions of the Bankruptcy Code.

(e)      As consideration for the Interim Services rendered by Hudson or its designee(s) under this Agreement, IJKG Opco shall pay Hudson a services fee equal to $1,300,000.00 per month(the "**Service Fees**") plus the expenses of the Hudson or its applicable designee(s), payable weekly, by way of the establishment of a lockbox account and a periodic sweep of the applicable funds from Bayonne's bank accounts, pursuant to the Lock-Box Agreement, provided that, on the date on which the Interim Orders Contingency has occurred, Bayonne shall pay Hudson or its designee(s) an amount equal to $7,800,000.00, representing the advanced payment of the Service Fees for the first (1st) six (6) months from the occurrence of the Interim Orders Contingency (the "**Advance Payment**"). Hudson/the applicable Hudson designee(s) shall be entitled to withdraw the Advance Payment from the DIP Financing in satisfaction of the Advance Payment. For the avoidance of any doubt, the Service Fees are compensation to Hudson for the Interim Services only and does not cover the costs and expenses of third parties, including without limitation, vendors or suppliers of goods or services to the Hospital, including the provider of revenue cycle management to the Hospital.

(f)    NO WARRNTIES; LIMITATION OF DAMAGES. ALL INTERIM SERVICES PROVIDED BY HUDSON OR ITS DESIGNEE(S) UNDER THIS SECTION 2.06 ARE DELIVERED AND PROVIDED ON A "WHERE IS" AND "AS IS" BASIS AND SUBJECT TO ALL FLAWS. HUDSON, ON ITS BEHALF AND ON BEHALF OF ITS DESIGNEES, HEREBY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER RELATING TO THE INTERIM SERVICES, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, DESIGN, QUALITY, CAPACITY, MATERIAL OR WORKMANSHIP.

**Section 2.07    Post-Closing Billing Arrangement**.

(a)    In order to allow Hudson to bill and collect reimbursements for items or services furnished by Hudson to beneficiaries of Government Programs during the Post-Closing Period, and in compliance with Applicable Law, at Closing, IJKG Opco shall be deemed to have assigned to Hudson the Hospital's Provider Agreements (including, for the avoidance of doubt, Hospital's Medicare and Medicaid provider numbers), and hereby authorizes Hudson to use IJKG Opco's Hospital National Provider Identifier ("**NPI**") and Medicare and Medicaid contract numbers for the purpose of billing any and all claims to Government Programs for items or services rendered by or through Hudson during the Post-Closing Period.

(b)    Bayonne shall cooperate in good faith with Hudson and provide Hudson with all assistance necessary in order to allow Hudson to track, account for and collect all amounts attributable to claims billed under IJKG Opco's NPI or Medicare or Medicaid numbers for items or services furnished by or through the Hudson (the "**Post-Closing Accounts Receivable**"). Without limiting the generality of the foregoing, during the Post-Closing Period and until Hudson has notified IJKG Opco in writing that it has collected all Post-Closing Accounts Receivable, Bayonne shall preserve and maintain IJKG Opco's Hospital NPI, Medicare, and Medicaid provider agreements and numbers ("**IJKG Opco's Numbers**") and IJKG Opco Bank Account and shall not cancel, non-renew, terminate or otherwise alter the same. IJKG Opco hereby authorizes Hudson to take the following actions with respect to the Post-Closing Accounts Receivable during the Post-Closing Period and until Hudson has notified IJKG Opco in writing that it has collected all Post-Closing Accounts Receivable: (i) to bill Government Programs using IJKG Opco's Numbers; (ii) to collect Post-Closing Accounts Receivable resulting from such billing using IJKG Opco's Numbers; and (iii) to take possession of and, subsequent to receipt, to endorse in the name of IJKG Opco, any notes, checks, money orders and other instruments received in payment of Post-Closing Accounts Receivable. Hudson shall be solely authorized to dispute all disallowances or claims denials with respect to the Post-Closing Accounts Receivable.

(c)    The Parties agree and acknowledge that the Medicare and Medicaid programs will make payment on the Post-Closing Accounts Receivable directly to IJKG Opco's bank account set forth in **Exhibit B** hereto (the "**IJKG Opco Bank Account**"). Without limiting the generality of the foregoing, the Parties shall comply with the following procedure with respect to the Post-Closing Accounts Receivable. No later than the third (3rd) business day of each calendar week, IJKG Opco shall provide Hudson with a full accounting of, including any and all explanations of benefits/payments, remittance advice and all payment correspondence and forms (collectively, "**EOBs**") received by or on behalf of Bayonne during the previous calendar week that reflect payments for items or services furnished by Hudson after the Closing Date. Additionally, during the

*Execution Version*

Post-Closing Period and until Hudson has notified IJKG Opco in writing that it has collected all Post-Closing Accounts Receivable, IJKG Opco shall provide Hudson and its Representatives with unrestricted, real-time, administrative access to all Software (including billing and collection software) and databases of IJKG Opco as well as IJKG Opco's Electronic Data Interchange and Provider Transaction Access Number. Within three (3) days after the earlier of: (i) IJKG Opco's delivery to Hudson of any such EOBs or (ii) IJKG Opco's or its Representative's receipt of any collection on account of the Post-Closing Accounts Receivable, IJKG Opco shall remit to Hudson, without any offsets, withholds, defenses, counterclaims or adjustments, an amount equal to the amounts received by or on behalf of IJKG Opco. Hudson shall be solely responsible for the collection of all Post-Closing Accounts Receivable from all applicable Payors. If, prior to the expiration of the Post-Closing Period, Hudson's lender requests an intercreditor agreement with any IJKG Opco lender or creditor further securing the payment obligations under this <u>Section 2.07(c)</u>, IJKG Opco shall obtain such lender's or creditor's consent to such request. Hudson shall be entitled to audit IJKG Opco's books and records to verify IJKG Opco's compliance with this Agreement (including this <u>Section 2.07(c)</u>).

(d)     Bayonne agrees that all payments received by or on behalf of Bayonne on account of the Post-Closing Accounts Receivable shall be transferred, on a daily basis, excluding weekends and holidays, to an account designated and controlled by Hudson pursuant to the Lock-Box Agreement.

(e)     For purposes of this Agreement, "**<u>Post-Closing Period</u>**" shall mean: (i) for Medicare, the period commencing as of the Closing Date and ending upon the earlier of: (A) the date set forth in written notice from Hudson to IJKG Opco that Hudson's Medicare change of ownership application ("**<u>Change of Ownership</u>**") has been processed, (B) the CMS Regional Office has issued the tie-in notice approving the Change of Ownership, and (C) Hudson has received approval to file claims under the assigned Medicare Provider Agreement and Hudson's NPI number; and (ii) for Medicaid, the period commencing as of the Closing Date and ending upon the earlier of: (A) the date that Hudson is able to file claims under Hudson's new Medicaid contract or (B) such date that is twelve (12) months days following the Closing Date, unless such date is extended by Hudson in its sole discretion. The Parties will cooperate in good faith with one another both before and after the Closing Date to obtain approval of such Change of Ownership as expeditiously as possible after the Closing Date.

(f)     The Parties agree and acknowledge that (i) all reimbursements from Medicare or Medicaid ("**<u>Reimbursements</u>**") and all charges, settlements or setoffs applied by Medicare or Medicaid ("**<u>Charges</u>**") in respect of items or services ("**<u>Services</u>**") furnished by or through IJKG Opco to patients of the Hospital prior to the Closing Date, as reflected on the cost reports submitted by IJKG Opco to Medicare or Medicaid and as identified on a schedule to be delivered by IJKG Opco on the Closing Date, shall, subject to <u>Section 2.06(b)</u>, be for the account of IJKG Opco, and (ii) all Reimbursements and Charges in respect of Services rendered by Hudson to patients of the Hospital on and after the Closing Date shall be for the account of Hudson (except that any Charges on or after the Closing Date that are attributable to the pre-Closing Date period shall be for the account of the IJKG Opco, subject to Section 2.06(b).

(g)     Upon receipt by any Party (the "**<u>Receiving Party</u>**") of a Reimbursement that is not for its account pursuant to <u>Section 2.07(f)</u>, the Receiving Party shall remit such Reimbursement to the other party within seven (7) days of the Receiving Party's receipt of such Reimbursement,

together with all documentation necessary to identify the Services to which such Reimbursement relates.

(h)    Upon the imposition of Charges against either Hudson or IJKG Opco (the "**Charged Party**"), which Charges are not for the account of the Charged Party pursuant to Section 2.07(f), the Charged Party shall send written notice to the other Party (the "**Reimbursing Party**") requesting reimbursement for the Charges imposed (a "**Request for Reimbursement**"), together with a copy of the correspondence provided by Medicare or Medicaid that accompanied and relates to the impositions of the Charges, and such other documentation sufficient to identify the Services to which such Chagres relate. The Reimbursing Party (and the other entity comprising Bayonne, if IJKG Opco is the Reimbursing Party) shall, within seven (7) days of its receipt of the Request for Reimbursement, reimburse the Charged Party for those Charges set forth in the Request for Reimbursement that are properly for the account of the Reimbursing Party pursuant to Section 2.07(f).

(i)    As soon as practicable following the Effective Date, but in no event later than the date on which such final cost report is required to be filed by Applicable Law, IJKG Opco shall prepare and file with the appropriate Medicare and Medicaid agencies IJKG Opco's final cost reports with respect to IJKG Opco's operation of the Hospital, and IJKG Opco shall provide the appropriate Medicare and Medicaid agencies with any and all information needed to support claims for reimbursement made by IJKG Opco either in such final cost report or in any cost reports filed for prior cost reporting periods. Upon filing, IJKG Opco shall deliver a copy of any such final cost report to Hudson simultaneously therewith. At all times after occurrence of the Interim Orders Contingency, Hudson or its designee(s) shall have the sole authority with respect to all cost reports related to the Hospital.

(j)    Each entity comprising Bayonne agrees to notify Hudson within three (3) Business Days after receipt of any verbal or written notice of any claim of any inquiry, survey, inspection, audit, review, recoupment or recapture by NJDOH, CMS, OIG or any Governmental Authority with respect to an alleged Medicare or Medicaid or Payor, patient or other Payor overpayment or any alleged underpayment of any tax or assessment for the periods prior to the Closing Date (collectively, "**Recapture Claims**").  Except with respect to the Medicare Liability, IJKG Opco shall pay or cause to be paid each such Recapture Claim.

(k)    This Section 2.07 shall expressly survive the Closing.

## ARTICLE III
## FURTHER AGREEMENTS

**Section 3.01    Governmental Approvals and Consents**.

(a)    Each Party shall, as promptly as possible, use its best efforts to obtain, or cause to be obtained, all consents, authorizations, orders, and approvals from all Governmental Authorities as required by Applicable Law to be obtained by such Party (including, without limitation, any and all necessary and appropriate Regulatory Approvals), that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement. Each Party shall cooperate fully with the other Party in such other Party's efforts to promptly seek to obtain all such consents, authorizations, orders, and approvals. The Parties hereto shall not knowingly and willingly take any action that will have the effect of

delaying, impairing, or impeding the receipt of any required consents, authorizations, orders, and approvals.

(b)     On the Effective Date, IJKG Opco shall terminate, withdraw and void any and all Applications and provide Hudson with written proof of the same. Beginning on the Effective Date, but, in any event, prior to the Closing, Hudson and IJKG Opco shall, and shall cause their respective Affiliates to, use its best efforts to obtain, and to cooperate in obtaining, all material consents from third parties necessary to permit the surrender of the Collateral (to the extent such consents are transferable under Applicable Law) to, including making any necessary filings and providing any necessary notices to provide for (i) the assumption of the Provider Agreements and provider number by Hudson (each to the extent transferable under Applicable Law) and any Payor contracts, and (ii) the assumption of all Permits used in or relating to the operation or conduct of the Hospital that are transferable under Applicable Law. In the event that Hudson is unable to obtain, prior to the Closing, any Permit or Payor contract that Hudson deems necessary, and provided that Hudson elects to proceed to the Closing notwithstanding the foregoing, then, from and after the Closing, IJKG Opco shall, and shall cause its Affiliates to, assist Hudson as it may request in connection with Hudson's efforts to obtain a comparable authorization or Contract, as applicable.

(c)     Without limiting the generality of the foregoing, IJKG Opco and its Affiliates will immediately forward to Hudson and respond to each regulatory inquiry, proceeding, request for information or similar correspondence or communication with respect to the foregoing (including, without limitation, any and all necessary and appropriate Regulatory Approvals) on an immediate, first-priority basis but in no event more than five (5) Business Days after the earlier of the issuance or notice of such inquiry, proceeding, request for information or similar correspondence or communication. Each Bayonne entity and their respective Affiliates shall, in real time, copy Hudson on all e-mail and other correspondences and involve Hudson in all telephonic, in person or other communications, and shall provide Hudson with drafts of its intended communications with any Regulatory Authority, in any media, for Hudson's approval before issuing such communications to such Regulatory Authority.

**Section 3.02   Medical, Financial, Employee Records**.

(a)     From and after the date on which the Interim Orders Contingency has occurred, IJKG Opco shall cooperate with Hudson and preserve all patient data, including medical records, on the electronic health record software and systems contained on the Hospital's computer, information management or other information technology systems and grant Hudson unrestricted access such data and records. At the Closing, to the extent not otherwise transferred and delivered pursuant to Article II above, IJKG Opco shall transfer and deliver to Hudson all patient medical records, financial records and employee records relating to the Hospital.

(b)     Upon the Closing, Hudson shall assume custody and ownership of all patient medical records, financial records and employee records relating to the Hospital. All patient medical records must be provided in a digital format that meets industry standards for the conversion of data and compatibility with other electronic health record software, and any necessary conversion or transfer of the electronic patient medical records shall be done at IJKG Opco's sole expense. Each entity comprising Bayonne shall, at their cost and expense, immediately upon Closing, cause IJKG Opco's electronic medical record/practice management software vendor to provide Hudson and/or

Hudson's designee or agent with administrative access to such electronic medical record/practice management software and to migrate all data therefrom to the software selected by Hudson.

**Section 3.03    Use of Telephone Numbers; Emails**. From and after the occurrence of the Interim Orders Contingency, IJKG Opco shall allow Hudson to use and access the telephone and facsimile numbers of the Hospital and all post office box addresses associated with the Hospital. IJKG Opco shall, upon the Closing Date, transfer or cause to be transferred the telephone and facsimile numbers and post office boxes used by the Hospital to Hudson. Upon the Closing Date, IJKG Opco shall arrange for current e-mail addresses related to the Hospital and its on-site staff to be forwarded to Hudson' new e-mail addresses for a period of one hundred and eighty (180) days following Closing, and to arrange for an email auto-response with Hudson correct email address for the ninety (90) day period thereafter.

**Section 3.04    No Competing Transactions**. Beginning on the Effective Date and continuing until the later of: (i) the Termination Date or (ii) of the date that is twelve (12) months after the Termination Date if this Agreement is terminated by Hudson pursuant to Sections 8.01(b), 8.01(c)(i), 8.01(c)(ii), 8.01(c)(iii), 8.01(c)(v), or 8.01(c)(vi), neither entity comprising Bayonne or any of their respective Affiliates may, and shall cause each of their respective direct or indirectly owners, beneficial interest holders, directors, officers, managers, trustees, employees, independent contractors, agents, consultants, advisors or other representatives, including legal counsel, accountants, investment bankers, brokers and financial advisors, not to, directly or indirectly (a) solicit, initiate, seek, entertain, encourage, or support any inquiry, proposal, offer, submission of bids, or contact from any Person (other than Hudson and its Affiliates and representatives), or file or allow/acquiesce to the filing of any Applications relating to any transaction involving: (i) the sale of any stock/membership interest, securities (or portion thereof) or other ownership interest or any Conflicting Rights for the same, or any assets (other than the sale of inventory in the Ordinary Course of Business) or debt of either Bayonne entity, (ii) any surrender, acquisition, management arrangement, dissolution, liquidation, reorganization, conversion, divestiture, merger, share or unit exchange, consolidation, redemption, financing, deed in lieu of foreclosure, assignment for the benefit of creditors or similar transaction involving either Bayonne entity or any Conflicting Rights for the same, (iii) any similar transaction or business combination involving IJKG Opco or the other Bayonne entity (in each case, an "**Transaction Proposal**") or (iv) any transaction that would interfere with or delay the consummation of the transactions contemplated hereunder (a "**Contradictory Transaction**"); (b) participate in any discussion or negotiation regarding, or furnish any information with respect to, or assist or facilitate in any manner, any Transaction Proposal or Contradictory Transaction, or any attempt to make an Transaction Proposal or Contradictory Transaction; or (c) accept any Transaction Proposal or proposal regarding a Contradictory Transaction. Each Bayonne entity shall each immediately cease, and cause to be terminated, any and all contacts, discussions and negotiations with third parties regarding any of the foregoing, and each Bayonne entity will notify Hudson, in writing, immediately if any Person makes any proposal, offer, inquiry or contact related to an Transaction Proposal or Contradictory Transaction and provide Hudson with the details thereof (including the Person making such offer, inquiry or contact and a copy of all written documents, agreements communication in connection therewith) and their response thereto.

**Section 3.05    Further assurances; Power of Attorney; Cooperation**.

(a)    From and after the Effective Date, Hudson may find it necessary or desirable to negotiate, draft, and execute additional agreements to effectuate the obligations set forth herein,

however, execution of the same is, unless otherwise determined by Hudson, not a condition precedent to specific enforcement of the obligations hereunder. Each entity comprising Bayonne shall take such further actions, execute and deliver all documents, agreements, forms and instruments and to perform such additional acts as Hudson may request, or as may be necessary,

Each entity comprising Bayonne covenants and agrees that it will, at any time and from time to time, from and after the Effective Date, fully and timely cooperate with Hudson in furtherance of the transactions hereunder and in furtherance of Hudson's rights, authority and obligations hereunder and shall promptly take such further action, complete, execute, acknowledge and deliver to Hudson or its designee(s) and to file or refile with third parties selected by Hudson, or will cause to be promptly done, completed, executed, acknowledged and delivered to Hudson or its designees or filed or refiled with third parties selected by Hudson, all such further acts, deeds, assignments, forms, applications, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Hudson for to effectuate, consummate, or perform any of the terms, provisions or conditions of this Agreement or to effectuate the assignment, delivery, transfer, grant, of, or grant assurances and confirmations to Hudson with respect to, or for purposes of aiding or assisting Hudson in collecting and reducing to possession, any or all of the Collateral being surrendered, transferred and delivered to Hudson or for purposes of vesting control over the Hospital in Hudson as provided herein, including without limitation, lists, schedules, descriptions and designations of the Collateral, transfer of ownership applications, statements, copies of warehouse receipts, bills of lading/sale, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments as Hudson or its authorized designees may request in their sole discretion.  Effective on the Effective Date, each entity comprising Bayonne hereby appoints Hudson as its attorney-in-fact, with power of substitution, to take any and all actions deemed necessary or proper by Hudson, at any time and from time to time, to carry out its obligations and enforce and effectuate its rights or exercise its authority under this Agreement and all documents/agreements executed in connection herewith, including, without limitation, the right to, and each entity comprising Bayonne shall, as directed by Hudson, take any and all actions permitting or required to be taken by this Agreement:

(i) to collect, demand and receive any and all Collateral hereby transferred and/or assigned to Hudson;

(ii) to institute and prosecute any and all actions, suits or proceedings that Hudson may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Collateral hereby surrendered, transferred and/or assigned to Hudson;

(iii) to negotiate, secure, maintain, renewing, amend or cancel insurance with respect to the Collateral (including without limitation, property and casualty, cyber, business interruption, directors and officers insurance and errors and omissions), in such amounts and covering such risks as are necessary, desirable or appropriate; and

(iv) to take any and all other reasonable action designed to vest more fully in Hudson title to the Collateral hereby surrendered, transferred, assigned and/or delivered to Hudson and in order to provide for Hudson the benefit, use, enjoyment and possession of such Collateral and the Hospital as well as to enforce and secure Hudson's rights under this Agreement.

The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable. Each Bayonne entity hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof.

(b)    From and following the Effective Date, if either entity comprising Bayonne or any of its Affiliates or any of their respective direct or indirectly owners, beneficial interest holders, officers, managers, director, employees, independent contractors or representatives becomes aware, prior to Closing, of any event, fact or condition or nonoccurrence of any event, fact or condition that may constitute a breach of any representation, warranty, covenant or agreement of IJKG Opco or its Affiliates, or may constitute a breach of any representation or warranty of Bayonne or their respective Affiliates, then Bayonne shall promptly, but, in any event, within three (3) days of becoming aware of the same, provide Hudson with a written description of such fact or condition. From the Effective Date until the Closing, Bayonne shall have the continuing obligation to promptly supplement the information contained in the schedules hereto with respect to any matter hereafter arising or discovered, which, if in existence on the Effective Date and known at the Effective Date, would have been required to be set forth or described in the schedules. Neither the supplementation of the schedules nor any disclosure after the Effective Date shall operate as a cure of the failure to disclose the information, or a cure of the breach hereof; and determination of any liability for breach either as of the Effective Date or at Closing shall be made without reference to any supplements and with reference only to the schedules as it stands on the Effective Date.

(c)    Each entity comprising Bayonne shall, and shall cause their respective Affiliates to, cooperate with Hudson as contemplated by this Agreement, and shall not challenge, interfere with, circumvent, attempt to circumvent, frustrate, avoid, bypass, prevent, delay, postpone, deny or undermine Bayonne's obligations, agreements and commitments, or Hudson's rights, hereunder.

**Section 3.06    Payment of Excluded Liabilities**. If, after Closing, Hudson receives a bill for any amount that relates to an Excluded Liability for which IJKG Opco remains liable, Hudson shall forward the bill to IJKG Opco within three (3) days after Hudson's receipt of such bill, whereupon Bayonne shall promptly pay such bill and furnish Hudson with written evidence of payment.

**Section 3.07    License Fees and Taxes**. IJKG Opco shall be and remain obligated for and shall pay, on or before the date due thereof, all amounts of any license fees/taxes or other amounts payable to any other Governmental Authority with jurisdiction over the Hospital accrued through the Closing Date. IJKG Opco shall provide to Hudson, on or before the Closing Date, evidence satisfactory to Hudson of payment of all of such fees and taxes.

**Section 3.08    No Successor Liability**. The Parties intend that, to the fullest extent permitted by Applicable Law (including under Section 363 of 11 U.S.C. § 101-1532), upon Closing, Hudson shall not be deemed to: (a) be the successor of either Bayonne entity, (b) have, de facto, or otherwise, merged with or into either Bayonne entity, (c) be a mere continuation or substantial continuation of IJKG Opco or the enterprise(s) of either Bayonne entity, or (d) be liable or have any Liability for any acts or omissions of either Bayonne entity in the conduct of their businesses or arising under or related to the Collateral, the Hospital or the Business other than as expressly set forth and agreed to by Hudson in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Hudson shall have no Liability for any Encumbrances (other than the Assumed Liabilities) against either Bayonne entity or

any of their respective predecessors or Affiliates, and Hudson shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of either Bayonne entity, the Collateral or the Hospital, or any Liability of any of the entities comprising Bayonne arising prior to, or relating to any period occurring prior to, the Closing.

**ARTICLE IV**
**EMPLOYEE MATTERS**

**Section 4.01    WARN Act; Employee Matters.**

(a)    Bayonne acknowledges that the transactions contemplated by this Agreement require that it provide notice of any employment loss to any applicable Worker under the WARN Act, or the Millville Dallas Airmotive Plant Job Loss Notification Act, N.J.S.A. 34:21-1 et seq. (collectively, "**WARN Laws**"), and hereby represents and warrants that, prior to the Effective Date, it has provided all such required notices. IJKG Opco shall provide Hudson with such draft notices for Hudson's review and approval before any additional notices required by WARN Laws are provided to affected Workers, governmental agencies or other Persons. IJKG Opco shall bear any and all obligations and Liability under the WARN Laws resulting from employment losses arising in connection with the transactions contemplated in this Agreement, including without limitation the provision or failure to provide notice requirements, including any required notices to any of the applicable Workers or Transferred Workers, and make any required payments under the WARN Laws. IJKG Opco shall notify Hudson of any "employment loss" (as defined in the WARN Laws) experienced by applicable Worker during the ninety (90)-day period prior to the Closing Date.

(b)    Each entity comprising Bayonne shall jointly and severally be responsible for the payment to Workers of all salaries, wages, severance, benefits or other amounts due and payable under applicable Law, contract and/or the policies and procedures of IJKG Opco for all periods prior to 12:00 a.m. on the later of the Closing Date or the date on which the applicable Worker is terminated (including upon termination/non-renewal of their employment, as well as under Consolidated Omnibus Budget Reconciliation Act and its state analogues ("**COBRA**")s and Hudson shall have no responsibility therefor. IJKG Opco shall timely pay to all applicable governmental and regulatory authorities all employment-related taxes due with respect to Workers, including IJKG Opco's share of all FICA, state and federal unemployment taxes and workers' compensation insurance premiums. IJKG Opco represents, warrants and covenants that it has complied, and will continue to comply, with all Applicable Laws affecting the employment or other relationship between IJKG Opco and the Workers, including but not limited to the WARN Laws, COBRA and all notice and other requirements thereunder. Upon IJKG Opco's termination of any Worker, each entity comprising Bayonne shall jointly and severally hold harmless, defend (using legal counsel selected by Hudson) and indemnify Hudson and Hudson's and its Affiliates' and their respective direct or indirectly owners, beneficial interest holders, officers, managers, directors, employees, independent contractors, agents and representatives from and against any and all Losses arising from or related to or Actions brought by or on behalf of any Worker concerning salary, benefits or other terms of employment/engagement or the termination thereof for the period of their employment and after the termination thereof, including, but not limited to, any the WARN Laws, COBRA or similar state or local laws, regulations or claims as well as related to the non-renewal or termination of their employment/engagement.

*Execution Version*

(c)      Hudson may, but shall not be obligated to, directly or through an Affiliate(s), offer employment or engagement to any Worker on terms acceptable to Hudson/its Affiliate(s) in Hudson's/its Affiliate's(s') sole discretion, which employment/engagement may commence upon or at any time after the Closing, as determined solely by Hudson or its Affiliate(s), as applicable. In furtherance of the foregoing, each entity comprising Bayonne shall fully and timely cooperate with Hudson/its Affiliate(s) and their respective representatives and take any and all actions necessary to enable Hudson/its Affiliate(s) to interview and hire such Workers and to transition such Workers to Hudson/its Affiliate (any such Workers may be referred to, individually, as the "**Transferred Worker**" or, collectively, as the "**Transferred Workers**"). To the extent that applicable law requires that Hudson employ any other Worker in light of the transactions hereunder, each entity comprising Bayonne, as applicable, shall or shall cause Hudson Hospital Opco, LLC, d/b/a CarePoint Health – Christ Hospital or HUMC Opco, LLC, d/b/a Hoboken University Medical Center, in Hudson's stead, to employ such individual, at each such entity's sole cost and expense, for such period and on such terms as prescribed by such law.

(d)      Hudson and IJKG Opco intend that the transactions contemplated by this Agreement not constitute or be construed as a separation, termination, or severance of employment of any Transferred Worker who accepts a employment offer from Hudson that is consistent with the requirements of the WARN Act, including for purposes of any Employee Benefit Plan that provides for separation, termination, or severance benefits, and that each such Transferred Worker will have continuous employment immediately before and immediately after the Closing.

(e)      This Section 4.01 shall be binding upon and inure solely to the benefit of each of the Parties to this Agreement and their respective permitted successors and permitted assigns, and nothing in this Section 4.01, express or implied, shall confer upon any other Person (including any Worker) any rights or remedies of any nature whatsoever under or by reason of this Section 4.01. Nothing contained herein, express, or implied, shall be construed to establish, amend, or modify any benefit plan, program, agreement, or arrangement. The Parties acknowledge and agree that the terms set forth in this Section 4.01 shall not create any right in any Transferred Worker or any other Person to any continued employment or engagement with Hudson or any of its Affiliates or compensation or benefits of any nature or kind whatsoever and shall not be deemed to create or grant to any Transferred Worker any third-party beneficiary rights or claims or any cause of action of any kind or nature.

(f)      Each Bayonne entity's obligations hereunder shall survive the Closing or the termination of this Agreement for any reason.

**ARTICLE V**
[RESERVED]

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES OF BAYONNE**

Each Bayonne entity hereby jointly and severally makes the following representations and warranties, each of which is true and correct on the date hereof and shall be true and correct on and as of the Closing Date:

**Section 6.01    Existence and Power of IJKG Opco**. IJKG Opco is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New Jersey. Subject to the provisions of the Bankruptcy Code, IJKG Opco has the limited liability company power to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

**Section 6.02    Validity and Enforceability of Agreement**. This Agreement constitutes, and all documents executed and delivered at Closing by Bayonne hereunder or in connection herewith will each constitute, the legal, valid and binding obligations of Bayonne, enforceable against it in accordance with their respective terms, subject to general principles of equity and the Bankruptcy Code.

**Section 6.03    Consents; Waivers and Approvals**. Except for the approval of the Bankruptcy Court as required by Section 363 of the Bankruptcy Code and the NJDOH Approval and CHAPA Approval (if applicable), no consent, waiver, approval, authorization, license or order of, registration or filing with, or notice to, any Governmental Authority or any other Person is necessary to be obtained, made or given by either entity comprising Bayonne in connection with the execution and delivery of this Agreement, the performance by such entity of its obligations hereunder or the consummation by such entity of the transactions contemplated hereby, other than consents which have been, or will be obtained on or prior to the Closing.

**Section 6.04    No Conflict**. Subject to the issuance of the Sale Order, none of the execution and delivery by Bayonne of this Agreement and the other agreements, documents and instruments contemplated hereby, the consummation by Bayonne of the transactions contemplated hereby or thereby, or compliance by Bayonne with any of the provisions hereof or thereof, will:

      (a)    conflict with or result in a breach of any provision of any organizational document of either entity comprising Bayonne;

      (b)    violate (with or without the giving of notice or the lapse of time or both) any Applicable Law, Governmental Authority, or any judgment, Order, writ, injunction or decree of any court, administrative agency or Governmental body to which either entity comprising Bayonne, the Collateral or the Hospital, is or may be subject to, or would adversely affect Hudson's ability to obtain Regulatory Approvals or to consummate the transactions contemplated hereby; or

      (c)    require either entity comprising Bayonne to obtain or make any waiver, consent, approval or authorization of, or registration, declaration, notice or filing with, any private non-governmental third party or any Governmental Authority.

**Section 6.05    Rights to Acquire Assets**. There are no agreements, options or other Conflicting Rights to which IJKG Opco is a party pursuant to which a claim exists that either entity comprising Bayonne is, or may become, obligated to sell or grant any interest in any of the Collateral (excluding the Retained Assets).

**Section 6.06    Title to and Adequacy of the Collateral**. IJKG Opco owns each of the Collateral and title to the Collateral (excluding the Retained Assets) will be transferred pursuant to the Sale Order free and clear any Encumbrances or other interests by Order of the Bankruptcy Court

pursuant to Section 363 of the Bankruptcy Code, except for Permitted Encumbrances. The Collateral comprises all items necessary to operate the Hospital and the Business.

**Section 6.07    Payor Participation; Health Care Law Compliance**.

(a)    To the Knowledge of each entity comprising Bayonne, there are no anticipated, pending or threatened Actions involving IJKG Opco related to any Payor, including any Government Program, nor is there any basis for such Actions. To the Knowledge of each entity comprising Bayonne, the Cost Reports of IJKG Opco, as applicable, for the medical reimbursement programs referred to above, and for payment and reimbursement of any other cost report settlements, filed or required to be filed prior to the Closing Date, have been or will be properly filed and are or will be complete and correct in all material respects. To the Knowledge of each entity comprising Bayonne, the Cost Reports filed or required to be filed by IJKG Opco do not and will not claim, and no entity comprising Bayonne has received and will not receive any payment or reimbursement in excess of, the amount provided by Applicable Law or any applicable agreement or other requirement, except where excess reimbursement was noted on the cost report. To the Knowledge of each entity comprising Bayonne, there are no claims, actions or appeals pending or threatened before any commission, board or agency, including any Governmental Authority or its contractors or the Administrator of CMS, with respect to any medical reimbursement program Cost Reports or claims filed on behalf of IJKG Opco referred to above or any disallowances by any commission, board or agency in connection with any such Cost Reports.

(b)    To the Knowledge of each entity comprising Bayonne, the Hospital is fully accredited by The Joint Commission and Det Norske Veritas (DNV), f/k/a DNV G, and IJKG Opco has made available to Hudson by providing Hudson with access to true and complete copies of the most recent Joint Commission accreditation survey report and deficiency list for the Hospital, if any, and the Hospital's plan of correction, if any. To the Knowledge of each entity comprising Bayonne, IJKG Opco has not received any notices and there is no deficiency with respect to the Hospital's current accreditation period that require or request any action or response by IJKG Opco or the Hospital, and any such deficiencies have been corrected or otherwise remedied.

**Section 6.08    Permits; Compliance with Laws**.

(a)    To the Knowledge of each entity comprising Bayonne, IJKG Opco has all Permits that are necessary to enable it to own, lease or otherwise hold the Collateral and to enable it to operate the Hospital as currently conducted, all such permits being in full force and effect and no proceedings are pending or threatened that would have the effect of revoking, limiting or affecting the maintenance, transfer or renewal of any Permits.

(b)    To the Knowledge of each entity comprising Bayonne, each entity comprising Bayonne is and has always been in compliance, in all material respects, with all Applicable Law. To the Knowledge of each entity comprising Bayonne, there are no charges of a violation of Applicable Law pending or threatened against or involving either entity comprising Bayonne or their respective Affiliates or their respective representatives.

**Section 6.09    Further Assurances**. All of the statements and schedules filed by or on behalf of Bayonne with the Bankruptcy Court are true and correct in all material respects, including without limitation the information deposited into the online due diligence room.

Section 6.10 **Consideration of Other Bids**. Bayonne has solicited and invited other bids and offers, received no other bids or offers, and considered other options for the sale of the Hospital and determined that Hudson's bid constitutes the highest and best for the Collateral.

Section 6.11 **Brokers and Intermediaries**. Neither entity comprising Bayonne nor any of their respective Affiliates has employed any broker, finder, advisor or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to a broker's, finder's or similar fee or commission in connection therewith or upon the consummation thereof.

Section 6.12 **Disclosure; No Omissions**. Bayonne has provided or made available to Hudson, prior to the date hereof, all information concerning the Hospital and the operation of the Hospital. To the Knowledge of each entity comprising Bayonne, there is no impending change in the Hospital or the Business, relations with employees, suppliers or third party payors, that (i) has not been disclosed or made available to Hudson in writing and (ii) has resulted in or is reasonably likely to result in any Material Adverse Effect. Each Bayonne entity has made all representations and warranties herein that are material to Hudson's agreement to enter into this Agreement and to consummate the transactions hereunder and none of the representations and statements of fact set forth in this <u>Article VI</u> omits to state any material fact necessary to make any such representation or statement of fact not misleading in any material respect.

## ARTICLE VII
## THE CLOSING

Section 7.01 **Time and Place of Closing**. The actions contemplated to consummate the transactions ("**Closing**") shall be conditioned upon the satisfaction of the following conditions, unless waived, in writing, by Hudson (other than the Sale Order, NJDOH Approval or CHAPA Approval, if applicable, which are not waivable by Hudson):

(a)     The NJDOH Approval and CHAPA Approval (as applicable) shall have been obtained, unless any Party receives a written opinion from the Attorney General of the State of New Jersey that CHAPA is not applicable to the transactions hereunder or that such transactions are excepted from such CHAPA requirements;

(b)     Each entity comprising Bayonne shall have delivered to Hudson duly executed counterparts to each document, instrument and deliverable otherwise required by this Agreement, including the DIP Financing Documents;

(c)     The DIP Lender shall have received an acceptable DIP Budget from Bayonne;

(d)     Upon the entry of the Interim DIP Order, the DIP Lender shall have valid, binding, enforceable, non-avoidable, and automatically and properly perfected, first priority senior liens on the DIP Collateral to the extent set forth in the Interim DIP Order;

(e)     The form and substance of the "first day" orders permitting and effectuating the transactions in this Agreement shall have been deemed acceptable to the DIP Lender in its sole discretion;

(f)     The Interim Orders Contingency shall have occurred and the Interim DIP Order and all other orders contemplated hereunder shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse to the DIP Lender;

(g)     Bayonne shall have terminated (and provided Hudson with written proof of termination of): (i) any and all agreements with third parties, related or unrelated parties, including, without limitation, direct or indirect owners/beneficial interest holders of either entity comprising Bayonne and (ii) the applicability of the Insight Agreement to IJKG Opco and IJKG, and, in each case, provided Hudson with a release from the counterparty to each such agreement in the form and substance approved by Hudson;

(h)     Each entity comprising Bayonne shall have duly performed and complied with all agreements, covenants, and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date and shall not have been any defaults hereunder or thereunder, provided, that, with respect to agreements, covenants and conditions that are qualified by materiality, IJKG Opco shall have performed such agreements, covenants, and conditions, as so qualified, in all respects;

(i)     Hudson shall have received a certificate, dated the Closing Date, and signed by the president of IJKG Opco, that each of the conditions set forth in this Section 7.01 have been satisfied (the "**IJKG Opco Closing Certificate**");

(j)     Hudson shall have received a certificate of the president of each entity comprising Bayonne certifying that attached thereto are true and complete copies of all resolutions adopted by the president, the managers and members of each entity comprising Bayonne authorizing the execution, delivery and performance of this Agreement and the DIP Financing Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby;

(k)     Hudson shall have received a certificate of the president of each entity comprising Bayonne certifying the names and signatures of the presidents or other Persons authorized to execute on behalf of each entity comprising Bayonne on this Agreement, the DIP Financing Documents and the other documents to be delivered hereunder and thereunder;

(l)     The representations and warranties of each entity comprising Bayonne contained in Article VI shall be true and correct in all respects on and as of the Effective Date, the Interim DIP Order Date and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all material respects as of that specified date);

(m)     Hudson shall have received written confirm, reasonably satisfactory to Hudson and its legal counsel, of the dismissal of: (i) the Singh Action by way of a final, non-appealable order of the applicable court and (ii) the Delaware Action and the New Jersey Action, an order from the applicable court dismissing the respective action with prejudice and, ordering the transfer of the Collateral to Hudson free and clear of any and all Encumbrances;

(n)     During the period from December 31, 2023 through the Closing Date, there shall not have been a Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect;

(o)     No Action shall have been commenced against Hudson or either entity comprising Bayonne, which would prevent the Closing. No injunction or restraining order shall have been issued and be in effect, which restrains or prohibits any transaction contemplated hereby;

(p)     All approvals, consents, and waivers that are listed on Schedule 7.01 shall have been received, and executed counterparts thereof shall have been delivered to Hudson at or prior to the Closing;

(q)     Hudson shall have received all Permits that are necessary for it to operate the Hospital as conducted by IJKG Opco as of the Closing Date;

(r)     All Encumbrances relating to the Collateral shall have been released in full, and each entity comprising Bayonne as applicable shall have delivered to Hudson written evidence, in form satisfactory to Hudson in its sole discretion, of the release of such Encumbrances and UCC-3 documents to be filed with the applicable state agency;

(s)     The Bankruptcy Court shall have timely entered an Order in form and substance as will accomplish the intent and objectives of this Agreement and in form and substance acceptable to Hudson in its sole discretion (the "**Sale Order**"), the Sale Order shall have become final, non-appealable, or the Sale Order determines that Hudson is a "good faith" purchaser under Section 363(m), entitling Hudson to close on the transactions contemplated hereunder immediately notwithstanding any appeal;

(t)     This Agreement has been approved by (i) the board of managers, board of trustees or comparable governing body of each Bayonne entity, and (ii) the monitor appointed by the NJDOH with respect to the Hospital; and

(u)     The satisfaction of other customary terms and conditions.

The Closing shall occur at the offices of Mandelbaum Barrett, P.C., 3 Becker Farm Road, Suite 105, Roseland, New Jersey 07068 at 10:00 a.m. on the first (1st) Business Day after the date on which the conditions to Closing set forth in this Section 7.01 are either satisfied or waived in writing by Hudson, as applicable ("**Closing Date**"). Notwithstanding the actual time at which the Closing occurs, the time at which the Closing shall be deemed to be effective and the risk of loss shall pass from IJKG Opco to Hudson shall be 12:01 a.m., Eastern Standard Time on the Closing Date.

**Section 7.02   Order of the Bankruptcy Court**. From and after the Effective Date, Bayonne shall take all steps and use all efforts necessary or appropriate in order to: (a) obtain the Sale Order from the Bankruptcy Court authorizing IJKG Opco to surrender the Collateral to Hudson; (b) obtain an Order approving the DIP Financing; and (c) to consummate all others transactions contemplated by the Sale Order. In recognition of the significant investments, risks, and liabilities Hudson and its Affiliates will undertake to consummate the transactions contemplated hereunder, and the monumental losses Hudson and its Affiliates will suffer if the transactions contemplated hereunder

are not consummated, each entity comprising Bayonne agrees, jointly and severally, to pay, and shall cause any Person who acquires the Collateral or any part of the Collateral to pay, Hudson liquidated damages equal to the Outstanding Judgment (unless such amount was previously paid in full to the Landlord pursuant to Section 2.05(b)) and all amounts due, payable or owing to the DIP Lender under the DIP Financing Documents and not as a penalty, if this Agreement is terminated pursuant to Sections 8.01(b), 8.01(c)(i), 8.01(c)(ii), 8.01(c)(iii), 8.01(c)(v), or 8.01(c)(vi), or if, following the Bankruptcy Court's entry of the Sale Order, IJKG Opco for any reason fails to surrender and transfer the Collateral and consummate the transactions contemplated by the Sale Order.

# ARTICLE VIII
# TERMINATION

**Section 8.01    Termination**. This Agreement may be terminated at any time prior to the Closing as follows (the date of any such termination, the "**Termination Date**"):

(a)    by the mutual written consent of IJKG Opco and Hudson;

(b)    by Hudson, by written notice to IJKG Opco, in the event that:

(i)    there shall be any Order that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited, provided that IJKG Opco shall have failed to stay or vacate the Order or secure a waiver therefrom within sixty (60) days after IJKG Opco's receipt of the written notice from Hudson and such Order shall have become final and non-appealable; or

(ii)    any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, provided that the IJKG Opco shall have failed to stay or vacate the Governmental Order to other secure a waiver therefrom within sixty (60) days after IJKG Opco's receipt of the written notice from Hudson and such Governmental Order shall have become final and non-appealable;

(c)    By Hudson, by written notice to IJKG Opco, if:

(i)    there has been a violation, breach or failure to perform any representation, warranty, covenant, or agreement made by either entity comprising Bayonne pursuant to this Agreement, any Lease Document or any DIP Financing Document or any other agreement between the Parties, in each case as determined by the Bankruptcy Court;

(ii)    If the Closing had not occurred October 9, 2025 (the "**Drop-Dead Date**") or if any of the conditions set forth in Section 7.01 shall not have been fulfilled on or before the Drop-Dead Date;

(iii)    Material Adverse Effect has occurred or is likely to occur, as determined by Hudson;

(iv)    by Hudson if any of the conditions to the obligations of Hudson to close set forth in Section 7.01 shall have become incapable of fulfillment other than as a result of a material breach by Hudson of any covenant or agreement contained in this Agreement, as determined by the Bankruptcy Court, and such condition is not waived by Hudson;

33

        (v)      by Hudson, upon conversion or dismissal of Bankruptcy Proceeding; or

        (vi)      by Hudson, upon appointment of a Chapter 11 trustee or examiner with enlarged powers (expanded beyond Section 1106 of the Bankruptcy Code) in the Bankruptcy Proceeding.

**Section 8.02   Effect of Termination.** In the event of the termination of this Agreement in accordance with this <u>Article VIII</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

        (a)      as set forth in this <u>Article VIII</u> hereof;

        (b)      that nothing herein shall relieve any party hereto from liability for any breach of any provision hereof; and

        (c)      for each Bayonne entity's obligations hereunder that are expressly or implicitly intended to survive the termination hereof, including, without limitation, pursuant to <u>Article IX</u> and <u>Section 3.07</u>.

If either entity comprising Bayonne materially breaches this Agreement, then, following written notice to Bayonne by the Hudson and such entity's failure to cure such breach within twenty (20) days after the date of such notice, Hudson reserves all claims and defenses in all pending litigation. In such event, nothing herein should be construed to otherwise limit the exercise of all other rights and remedies under the Lease Documents, up to and including dispossession. Nothing in this <u>Section 8.02</u> shall prohibit or restrict a Party from seeking specific performance of this Agreement.

## ARTICLE IX
## INDEMNIFICATION

**Section 9.01   Indemnification By Bayonne**. Each Bayonne entity shall, on a joint and several basis, indemnify, defend (using counsel selected by Hudson), and hold harmless Hudson, it designee(s), the Landlord, and their respective Affiliates and subsidiaries, and their respective successors and assigns, and each of their respective members, shareholders, officers, managers, directors, trustees, employees, independent contractors, agents, and other representatives, including, without limitation, Yan Moshe and Nizar Kifaieh (the "**Hudson Indemnitees**") from and against the entirety of any and all direct or indirect losses, damages, restitution, sanctions, liabilities, deficiencies, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees and court, mediation, arbitration, expert, investigation, remediation, mitigation, and other costs and expenses ("**Losses**") that any Hudson Indemnitee may suffer or incur or any Action to which they are subject (including any Losses they may suffer or incur or any Action to which they may become subjects after the end of any applicable survival period, provided that an indemnification claim with respect to such Loss or Action is made pursuant to this <u>Section 9.01</u> prior to the end of any applicable survival period) resulting from, arising out of, relating to, in the nature of, or caused by:

(a)      the operations, acts, or omissions of either Bayonne entity or any of their respective Affiliates prior to, on, or after the Closing Date, or the ownership or operation or conduct of the Hospital, the ownership or use or transfer of, the Collateral, or any assets of IJKG Opco or its Affiliates and the occupancy or use of the Hospital or the Real Property prior to the Closing;

(b)      any breach or non-fulfillment of any covenant, agreement, or obligation of either Bayonne entity or their respective Affiliates contained in this Agreement or in any certificate or instrument or other document or communication delivered by or on behalf of either Bayonne entity or their respective Affiliates or anyone on their behalf pursuant or related to this Agreement;

(c)      the acts or omission of either Bayonne entity or their respective Affiliates or anyone acting on their respective behalf;

(d)      Taxes arising out of or related to: (i) the operations of IJKG Opco or its Affiliates prior to, on, or after the Closing Date, or the ownership or operation or conduct of the Hospital, the ownership or use or transfer of the Collateral, or any assets of IJKG Opco or its Affiliates, and the occupancy or use of the Real Property prior to the Closing; or (ii) any transaction or activity with regard to the activities of either Bayonne entity or their respective Affiliates that occurred/occur prior to, on, or after the Closing Date;

(e)      any and all Liabilities of each entity comprising Bayonne, including without limitation, arising from or related to the Collateral and Assigned Contracts arising prior or incurred prior to Closing, the Excluded Liabilities as well as any other liabilities, debts, expenses, payables, of either Bayonne entity or their respective Affiliates;

(f)      any actual or threatened suits or Actions regarding either Bayonne entity or their respective Affiliates, including actual or threatened Actions by any current or former, direct or indirect owner or equityholder of either Bayonne entity or their respective Affiliates or any other Person alleging any rights with respect to a right to participate in, approve, or reject, or a dispute regarding, the transactions contemplated hereunder as well as any option, warrant, right of first offer, right of first refusal, participation right, notice rights, conversion rights, approval right, negotiation right, preemptive right, or any other similar rights ("**Conflicting Rights**") for the ownership interests or assets of IJKG Opco or its Affiliates; without limiting the generality of the foregoing, each Bayonne entity's and their respective Affiliates' obligations under this Section 9.01 extends to all actual or threatened Actions arising from or related to BMC Hospital, LLC d/b/a Surgicore Surgical Centers or "Surgicore" (or any of its affiliates or subsidiaries or their respective principals) or its actual or alleged membership or other right or interest in IJKG Opco or the transactions hereunder (provided that foregoing is not and shall not be construed as an acknowledgement or admission by any Party as to the existence of any such interest or rights);

(g)      any of the matters set forth on the schedules hereto;

(h)      any violations of or obligations under any requirements of Governmental Authorities, including, without limitation, environmental and safety requirements relating to acts, omissions, circumstances or conditions to the extent existing or arising on or prior to the Closing, whether or not such acts, omissions, circumstances or conditions constituted a violation of such requirements as then in effect;

(i)       any Liabilities relating to or arising from IJKG Opco or its Affiliate's provision of (or failure to provide) healthcare or related items or services or the coding, billing, and collection of amounts arising therefrom, including any Liabilities relating to the failure, prior to or after the Closing, to adhere to or comply with any Health Care Laws;

(j)       all debts, liabilities, wages, salaries, bonuses, commissions, rebates, expenses, benefits, and other compensation or fees, including applicable taxes, of any nature accrued or payable to any of the employees, directors, officers, contractors, agents or representatives (including any Hospital Employees), including, without limitation, accrued employment-related payments, obligations, and expenses (such as accrued paid-time off for vacations, unpaid overtime, unpaid salaries, back wages, severance, and other compensation or benefits arising from or related to any individual employee) of each Bayonne entity and their respective Affiliates that relate to the period prior to, on or after the Closing Date, as well as all debts, liabilities, wages, salaries, bonuses, commissions, rebates, expenses, benefits, and other compensation or fees, including applicable taxes, fines, penalties, interest arising from Hudson's violation of any Applicable Law that requires that Hudson employ any other Hospital Employee in light of the transactions hereunder;

(k)       any claim for payment of fees or expenses as a broker or finder in connection with the origin, negotiation, execution or consummation of this Agreement based upon any alleged agreement between the claimant and either Bayonne or their respective Affiliates;

(l)       any and all Liabilities arising from or related to actual or threatened Actions by third parties, including, without limitation, private Person or Governmental Authorities, against Hudson, its designee or their respective members, officers, managers, directors or Affiliates, IJKG Opco, its Affiliates, the Collateral, the Hospital, the Real Property, including, without limitation, alleging or involving violations of Applicable Law or contracts, whether or not disclosed to Hudson, that arise from the operation of, or transactions or events involving, the Hospital prior to Closing, or either Bayonne entity or their respective Affiliates acts or omissions or operations prior to or after the Closing;

(m)       any and all malpractice claims for items or services furnished prior to the Closing, even if not identified or reported until on or after the Closing; and

(n)       any Payor (including Government Programs) recoupment, clawback, reconciliation, offset of or other adjustment to, or refund of accounts receivable or collections (including any future accounts receivable or collections of Hudson) arising from the operation of the Hospital prior to Closing, or the operations, acts, or omissions of either Bayonne entity or its Affiliates or their successors prior to or after the Closing, other than the Medicare Liability.

The Parties agree that all indemnification obligations of IJKG Opco and its Affiliates hereunder or otherwise shall be considered additional rent under the Lease.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01  Survival of Provisions**. The covenants, obligations, representations and warranties of Bayonne contained in this Agreement, any and all annexes, exhibits, schedules, recitals and footnotes hereto, and any certificate or document delivered pursuant hereto shall be deemed to

36

be material and to have been relied upon by Hudson hereto and shall survive the Closing Date or Termination Date, as applicable, for a period of ten (10) years, unless otherwise set forth herein, and shall not be merged into any deeds or other documents delivered in connection with the Effective Date, the Closing Date or the Agreement.

### Section 10.02  EXCLUSIONS; LIMITATION ON DAMAGES.

NOTWITHSTANDING ANYTHING HEREIN OR ANYWHERE TO THE CONTRARY, NONE OF HUDSON OR ANY OTHER HUDSON INDEMNITEE IS LIABLE TO EITHER ENTITY COMPRISING BAYONNE OR ANY OF THEIR REPSECTIVE AFFILIATES OR THEIR RESPECTIVE OWNERS, OFFICERS, MANAGERS, DIRECTORS, TRUSTEES, EMPLOYEES, CONTRACTORS, REPRESENTATIVES OR AGENTS FOR ANY INDIRECT (INCLUDNG, WITHOUT LIMITATION, LOST PROFITS, LOST REVENUES, LOST OPPORTUNITY), CONSEQUENTIAL, SPECIAL, EXEMPLARY, PUNITIVE DAMAGES OR OTHER SIMILAR DAMAGES OR LOSSES, INCLUDING, WITHOUT LIMITATION ATTORNEYS' FEES AND COURT OR OTHER RELATED COSTS AND EXPENSES, WHETHER ACCRUED, ABSOLUTE OR CONTINGENT, INCLUDING, WITHOUT LIMITATION, BASED UPON, ARISING OUT OF OR RESULTING FROM HUDSON'S OR ANY HUDSON INDEMNITEE'S PROVISION OF OR ANY FAILURE TO PROVIDE ANY INTERIM SERVICES OR ANY THIRD PARTIES' PROVISION OF ANY ITEMS OR SERVICES TO THE COMPANY. THE AGGREGATE LIABILITY OF HUDSON/ANY OF ITS DESIGNEES TO BAYONNE FOR ANY OTHER DAMAGES OR LOSSES SHALL BE THREE HUNDRED THOUSAND DOLLARS ($300,000.00).

### Section 10.03  Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand to the addressee (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document or comparable digital transmission (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the fifth (5th) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.03):

If to any Bayonne
Party:                              c/o CarePoint Health Systems, Inc.
                                    308 Willow Avenue
                                    Hoboken, New Jersey 07030
                                    Attention: Achintya Moulick, CEO

With a copy to (which shall not constitute notice):

                                    Lawrence G. McMichael, Esq.
                                    Dilworth Paxon LLP
                                    1500 Market Street
                                    Suite 3500E
                                    Philadelphia, PA 19102

*Execution Version*

|  |  |
|---|---|
| If to Hudson: | Hudson Regional Hospitals, LLC |
|  | d/b/a Bayonne Medical Center |
|  | c/o Hudson Regional Hospital |
|  | 55 Meadowlands Parkway |
|  | Secaucus, New Jersey 07094 |
|  | Attention: Nizar S. Kifaieh, M.D., President & CEO |

With a copy to (which shall not constitute notice):

Mandelbaum Barrett, P.C.
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
Attention: Mohamed H. Nabulsi, Esq.

or such other address, and to the attention of such other person as either Party may designate by written notice.

**Section 10.04  Governing Law. Bankruptcy Court Jurisdiction. Waiver of Jury Trial.**

(a)      **Governing Law**. This Agreement and any claim, controversy, dispute, or Action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the State of New Jersey, without regard to conflicts of laws principles.

(b)      **Venue**. THE PARTIES AGREE THAT, UNTIL THE EFFECTIVE DATE OF THE PLAN OF REORGANIZATION IN THE BANKRUPTCY PROCEEDING, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL ACTIONS AND OTHER MATTERS RELATING TO (A) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY DOCUMENT EXECUTED OR DELIVERED PURSUANT HERETO; (B) THE COLLATERAL; AND (C) EITHER OF IJKG'S OR IJKG OPCO'S OBLIGATIONS SURVIVING CLOSING, AND EACH SUCH PARTY EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION. IN THE EVENT THE BANKRUPTCY COURT RESERVES JURISDICTION TO CONSIDER DISPUTES ARISING UNDER THIS AGREEMENT POST-CONFIRMATION, THEN ALL SUCH DISPUTES SHALL BE BROUGHT BEFORE THE BANKRUPTCY COURT. THE PARTIES SHALL JOINTLY REQUEST THAT THE BANKRUPTCY COURT RESERVE SUCH JURISDICTION.

(c)      FOR ANY ACTION OR MATTER NOT COVERED BY SECTION 10.04(B), OR IF THE BANKRUPTCY COURT DOES NOT RESERVE OR DECLINES TO EXERCISE SUCH JURISDICTION, THEN EACH PARTY IRREVOCABLY CONSENT AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE SUPERIOR COURT OF THE STATE OF NEW JERSEY IN HUDSON COUNTY FOR ANY ACTION OR MATTER ARISING OUT OF OR BASED UPON THIS AGREEMENT OR ANY DOCUMENTS EXECUTED OR DOCUMENTS PURSUANT HERETO OR THE TRANSACTIONS CONTEMPLATED HEREUNDER OR THEREUNDER AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY

OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN SUCH COURT. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    **SERVICE OF PROCESS**. EACH PARTY HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 10.03</u> AND AGREES THAT NOTHING HEREIN WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

EACH PARTY AGREES THAT SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY ACTION BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURT AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY. EACH PARTY HERETO (A) CERTIFIES THAT NO AGENT, ATTORNEY, REPRESENTATIVE, OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF LITIGATION AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.04.

**Section 10.05  Stipulation of Harm.** Each entity comprising Bayonne agrees that <u>per se</u> irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that Hudson shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity. Without limiting the generality of the foregoing, in the event of a breach of any term or provision contained in this Agreement by either entity comprising Bayonne, each such Person agrees that there shall be no adequate remedy at law for Hudson or its Affiliates arising from such breach; accordingly, and in addition to any other rights, remedies or damages available to Hudson and its Affiliates at law or in equity, Hudson and its respective Affiliates shall be entitled to such temporary, preliminary and permanent injunctive relief as shall be necessary or appropriate to prevent or restrain any such breach or threatened breach, without the necessity of proving damages, without prejudice to any other remedies Hudson or its Affiliates or their respective successors or assignees may have at law or in equity, and without obligation to post any security in connection therewith. Additionally, Hudson and

*Execution Version*

its Affiliates shall be entitled to, and each entity comprising Bayonne shall pay, jointly and severally, all attorneys' fees and other legal fees, professional and expert fees, collections costs and court, arbitration or mediation costs and expenses of Hudson and its Affiliates arising from any breach of this Agreement by either entity comprising Bayonne or any of their respective Affiliates. All rights and remedies of Hudson and its Affiliates under this Agreement are cumulative and not exclusive or alternative and may be enforced simultaneously or selectively (without waiver of such rights).

**Section 10.06  Representation by Counsel**. Each of the Parties expressly represents and warrants that it has been represented by counsel who has explained the entire contents and legal consequences of this Agreement, that it has read this Agreement completely and thoroughly, and that it understands that this Agreement conclusively settles and releases all claims as more specifically provided herein. This Agreement shall not be construed against any drafter and will be considered to have been drafted in whole by all Parties jointly.

**Section 10.07  Agreement Knowingly and Voluntarily Executed/Absence of Duress**. Each of the Parties further represents it is freely and voluntarily entering into this Agreement and settlement on its own behalf, upon the advice of its attorneys of record and other counsel, in the exercise of its own free act, deed, and will, relying upon its own judgment, free of any duress or coercion; that, except as specifically contained herein, no Party is relying upon any statement or representation of the other, no representations, promises or statements made by any agent, attorney, or other representative of any other Party being released hereby have influenced it in making and executing this Agreement; that it realizes that this Agreement is final and conclusive and that it is each Party's clear intent that this Agreement conclusively resolves seriously disputed and vigorously contested claims, buying peace, and avoiding further and substantial litigation expenses.

**Section 10.08  No Assignment**. No Party shall have the right, power, or authority to assign this Agreement, without the prior written approval of the other Party. For the avoidance of doubt, in no event may either entity comprising Bayonne or any of their respective Affiliates, assign or otherwise transfer or delegate any of its rights or obligations hereunder to BMC Hospital, LLC d/b/a Surgicore Surgical Centers or "Surgicore" or any of its Affiliates or subsidiaries or their respective owners, officer, managers, directors, employees, independent contractors, agents and representatives, including, without limitation, Feliks Kogan, Wayne Hatami and Vijayant Singh, M.D. or any Person in which any of them directly or indirectly has any ownership, beneficial or other interest or with which any of them is associated or affiliated in any matter.

**Section 10.09  Waiver of Breach**. The waiver by either Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be a waiver of, any subsequent breach of the same or other provision hereof.

**Section 10.10  Legal Fees**. In the event either Party resorts to legal action to enforce the terms and provisions of this Agreement, the prevailing Party shall be entitled to recover the costs of such action incurred, including, without limitation, documented attorneys' fees.

**Section 10.11  Headings**. The headings used in this Agreement are for the purpose of reference only and will not otherwise affect the meaning or interpretation of any provision of this Agreement.

**Section 10.12  Severability**. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.

**Section 10.13  Entire Agreement; Amendments**. This Agreement (along with any and all annexes, exhibits, schedules, recitals and footnotes hereto, and any certificate or document delivered pursuant hereto) contains the entire agreement between the Parties hereto with respect to the subject matter hereof and all representations, promises and prior or contemporaneous undertakings between such Parties are integrated into and expressed in this Agreement. Nothing in this Agreement shall be deemed to supersede, amend, modify, cancel or affect the validity or enforceability of the Term Sheet. Nothing herein shall be construed as superseding, vacating, amending or altering the Delaware Court of Chancery Court's oral rulings rendered on June 21, 2024 with respect to the Term Sheet. Each entity comprising Bayonne acknowledges and agrees that, with the exception of Sections 4 and 5 of the Term Sheet as specifically related to the assets of IJKG Opco and the consideration therefor (which shall be deemed superseded by this Agreement upon Closing), nothing herein amends, supersedes or revokes the Term Sheet and the same shall expressly survive the execution or termination of this Agreement or the consummation of the transactions hereunder, including the Closing; Hudson and its Affiliates may enforce the same without any restrictions including by seeking judicial notice and enforcement of the same in any other judicial proceeding, and the execution, delivery and performance of this Agreement by the Parties is without prejudice to Hudson's and its Affiliates' rights to seek enforcement of the Term Sheet in any other judicial proceeding against any other past, present or future Affiliates, principals, officers, directors, managers or employees of CHS or its Affiliates. This Agreement shall not be amended, modified, or supplemented except by a written instrument duly executed by each Party hereto.

**Section 10.14  No Third-Party Beneficiaries.** Except as expressly provided in this Agreement, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express, or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.  This Agreement shall be binding on each entity comprising Bayonne and their respective successors, transferees or assigns.  Notwithstanding the foregoing, the rights and benefits of Hudson shall expressly inure to the benefit of Landlord.

**Section 10.15  Counterparts; Integration; Effectiveness**. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different Parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. This Agreement constitutes the entire contract among the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto. This Agreement shall become effective when it shall have been executed by Hudson and each entity comprising Bayonne. Delivery of an executed counterpart of a signature page to this Agreement by digital or electronic transmission (including, without limitation, ".pdf" or ".tif" format) shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," and words of similar import in this Agreement shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under Applicable Law, including the Electronic Signatures in Global and National Commerce Act

*Execution Version*

of 2000 (15 U.S.C. §§ 7001 to 7031), the Uniform Electronic Transactions Act (UETA), or any state law based on the UETA.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Parties, through their duly authorized officers or representatives hereby agree to all of the foregoing terms and conditions and have executed this Agreement so that it is effective on the date first written above.

**BAYONNE:**
**IJKG OPCO, LLC**

By: _____

Name:  Achintya Moulick

Title:  CEO

**Attest:**

By: _____

Name:  Lawrence G. McMichael

Title:  Counsel

**IJKG, LLC**

By: _____

Name:  Achintya Moulick

Title:  CEO

**Attest:**

By: _____

Name:  Lawrence G. McMicharl

Title:  Counsel

*[Signature Page 1 of 2 to Collateral Surrender and Operations Transfer Agreement]*

**HUDSON REGIONAL HOSPITALS/LLC**

By: _____
Name:  Yan Moshe
Title:    Manager

**Attest:**

By. _____
Name:  Mohamed H. Nabulsi, Esq.
Title:

*[Signa11re P t w 2 q / 2 to Co//c,/eml S111re11der a11d Opemtio11s Tn1114"erAgreel]le11/]*

*Execution Version*

**Annex A**

**COLLATERAL**

(a)     the Hospital;

(b)     all tangible personal property of every kind and nature owned by or used IJKG or IJKG Opco that is physically located at, on or within the Real Property or any other location in which IJKG Opco's or the Business's operations are conducted, or any other locations in which such property is used, or held for use, in connection with the Business as of the Effective Date and as of the Closing Date (collectively, the "**Tangible Personal Property**"), including, without limitation, the following:

        i.      the Improvements;

        ii.     all tangible personal property identified and scheduled on <u>Schedule 2.01(b)</u>;

        iii.    all tangible personal property acquired by or on behalf of IJKG or IJKG Opco from and after the Effective Date; and

        iv.     all other furniture, fixtures, machinery, vehicles, equipment, owned or licensed computer systems, supplies, spare parts, and tools, whether or not capitalized at the time of their purchase, and whether or not recorded on the books of IJKG Opco, that are physically located at, on or within the Property or any location in which IJKG Opco's or the Business's operations are conducted or used, or any other locations in which such property held for use, in connection with the Business;

(c)     all inventory, packaging, supplies, raw materials, food, medical supplies, linens and housekeeping supplies parts, merchandise, drugs, food, janitorial and office supplies, maintenance and shop supplies, and other disposables and consumables, and other inventories, wherever located ("**Inventory**");

(d)     all Contracts and Intellectual Property Agreements, including, without limitation, the Contract with McCabe Ambulance and any and all Payor Contracts (collectively, the "**Assigned Contracts**");

(e)     all Intellectual Property Assets and IT Assets;

(f)     IJKG Opco's leasehold interest in the Real Property;

(g)     all Permits, but only to the extent such Permits may be transferred under Applicable Law;

(h)     IJKG Opco's Medicare Provider Agreement (including its Medicare provider number set forth on <u>Schedule A(h)</u> hereto);

(i)        originals, or where not available, copies of all books and records, including books of account, ledgers and general, physician records, medical staff records (including peer review records), cost reports, personnel records, patient and customer lists, financial and accounting records, machinery and equipment maintenance files, price lists, supplier lists, vendor lists, production data, quality control records and procedures, billing and collection records, patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), architectural plans, cost records, strategic plans, sale, marketing and promotional surveys, material and research, that relate to the Business or the Collateral, other than books and records constituting Retained Assets ("**Books and Records**");

(j)        all warranties and guarantees of third parties;

(k)        all direct or indirect, potential, pending or completed, affirmative or other claims (including inchoate and contingent claims), causes of action, rights of recovery and rights of setoff, clawback, disgorgement, and recoupment of any kind (including rights to insurance proceeds and rights under and pursuant to all warranties, representations, and guaranties made by suppliers of services, products, materials, or equipment, or components thereof), accrued or unaccrued, that have arisen or may arise out of or inure to the benefit of either Bayonne entity or any of their respective Affiliates (as related to the Hospital), including under the Assigned Contracts, as well as Avoidance Actions, other than the Delaware Action and the New Jersey Action;

(l)        all insurance proceeds recoverable under insurance coverage and policies existing on the Effective Date or Closing Date in respect of, or that pertains to, the Business or any Collateral;

(m)        all prepaid expenses, credits, advance payments, deposits, charges, sums, and fees, including the Security Deposit, the Letter of Credit issued pursuant to Section 37.14 of the Lease, and all cash, cash equivalents and other amounts comprising the same;

(n)        all business phone numbers, advertising and all sales and promotional literature, samples, and catalogs;

(o)        all cash and cash equivalents, bank accounts, credit cards, bank deposits, investment accounts, lockboxes, certificates of deposit, benefits of credits, marketable securities or investments in other Persons, certificates of deposit, treasury bills and other similar items as of the Effective Date or the Closing Date;

(p)        all accounts receivable and notes receivable as of the Effective Date or the Closing Date, and all amounts due for items or services that were provided by IJKG Opco as of the Effective Date or the Closing Date, both billed and unbilled (including, without limitation, amounts due from Medicaid and Medicare);

(q)        to the extent legally transferable, all right, title, and interest in the financial, patient, medical staff, and personnel records relating to the Hospital (including, without limitation, all equipment records, medical administrative libraries, medical records, documents, catalogs, books, records, files, operating policies and procedures, manuals, current personnel records, data, and databases);

(r)      all Tax assets (including duty and Tax refunds and prepayments) of IJKG Opco;

(s)      all goodwill, going concern value and any other intangible assets generated by or related to the Hospital; and

(t)      any and all proceeds, product, offspring, rents, and profits of or from all property and assets of each Bayonne entity.

[*Remainder of page left blank intentionally*]

47

*Execution Version*

## Schedule A(h)

IJKG Opco's Medicare provider number:

*Execution Version*

**Exhibit A**

**FORM OF BILL OF SALE**

**Exhibit B**

**BANK ACCOUNTS AND POST OFFICE BOXES**

*Execution Version*

## EXHIBIT C

## FORM OF LOCK-BOX AGREEMENT

*Execution Version*

**Schedule 2.01(b)**

**ADDITIONAL TANGIBLE PERSONAL PROPERTY**

*Execution Version*

**Schedule 7.01**

**APPROVALS, CONSENTS, AND WAIVERS**