## <u>Exhibit C</u>

**(Management Services Agreement)**

*Execution Version*

## MANAGEMENT SERVICES AGREEMENT

This **MANAGEMENT SERVICES AGREEMENT** (this "**Agreement**"), dated this 9th day of October, 2024, is entered into by and among:

**HUDSON REGIONAL HOSPITALS, LLC, D/B/A BAYONNE MEDICAL CENTER**, a New Jersey limited liability company ("**BMC Opco**"); **NJMHMC, LLC D/B/A HUDSON REGIONAL HOSPITAL**, a New Jersey limited liability company ("**HRH Opco**"), ; **MCCABE AMBULANCE SERVICE, INC.**, a New Jersey corporation ("**McCabe Ambulance**") and **GARDEN STATE HEALTHCARE ASSOCIATES, LLC** and **NEW JERSEY MEDICAL AND HEALTH ASSOCIATES, LLC** (the "**Captive Practices**") (collectively, the "**HRH Service Recipients**");

**HUDSON HOSPITAL OPCO, LLC, D/B/A CAREPOINT HEALTH – CHRIST HOSPITAL**, a New Jersey limited liability company ("**Christ Opco**"); **HUMC OPCO, LLC, D/B/A HOBOKEN UNIVERSITY MEDICAL CENTER**, a New Jersey limited liability company ("**HUMC Opco**") (collectively, the "**CarePoint Service Recipients**");

**29 E 29 STREET HOLDINGS, LLC**, a New Jersey limited liability company ("**29 E 29**"), **NJBMCH, INC.**, a New Jersey corporation ("**NJBMCH**" and, collectively with 29 E 29 and HRH Opco, with "**HRH**");

**CAREPOINT HEALTH SYSTEMS, INC.**, a New Jersey not-for-profit corporation ("**CarePoint**"); and

**HUDSON REGIONAL MANAGEMENT, LLC**, a New Jersey limited liability company (the "**Manager**").

Each of the CarePoint Service Recipients and the HRH Service Recipients may hereinafter be referred to herein as a "**Service Recipient**" and, collectively, as the "**Service Recipients**." Each of the Service Recipients, HRH, CarePoint and the Manager may hereinafter be referred to herein as a "**Party**" and, collectively, as the "**Parties**."

**WHEREAS**, HRH, on the one hand, and CarePoint, Christ Opco, HUMC Opco and certain of their Affiliates, on the other hand, are parties to that certain Binding Term Sheet, executed on January 11, 2024 (the "**Term Sheet**"), whereby BMC Opco, CarePoint and the other parties thereto agreed, inter alia, to create new self-sustaining health care system in Hudson County, New Jersey, through the mutual cooperation of all relevant constituencies, to be named "Hudson Health System" and consisting of Bayonne Medical Center, Hudson Regional Hospital, Christ Hospital, and Hoboken University Medical Center, together with McCabe Ambulance, the Captive Practices and their direct and indirect subsidiaries and Affiliates;

**WHEREAS**, as of the date hereof, IJKG Opco, LLC ("**IJKG Opco**") is the owner and operator of the hospital known as Bayonne Medical Center located in Bayonne, New Jersey ("**Bayonne Medical Center**"); HRH Opco is the owner and operator of the hospital known as Hudson Regional Hospital located in Secaucus, New Jersey ("**Hudson Regional Hospital**"); Christ Opco is the owner and operator of the hospital known as Christ Hospital located in Jersey City, New Jersey ("**Christ Hospital**"); and HUMC Opco is the owner and operator of the hospital known as

Hoboken University Medical Center located in Hoboken, New Jersey ("**HUMC**" and each of the foregoing hospitals and medical centers are referred to herein as a "**Hospital**" and, collectively, as the "**Hospitals**"); the Captives Practice are managed or controlled by CarePoint or its applicable Affiliate(s);

**WHEREAS**, IJKG Opco, LLC ("**IJKG Opco**") and its affiliate and 90.1% equity owner IJKG, LLC, a New Jersey limited liability company, on the one hand, and BMC Opco, on the other hand, have entered into that certain Collateral Surrender and Operations Transfer Agreement (the "**Surrender Agreement**"), of even date herewith, to provide for the orderly surrender of all of IJKG Opco's assets and the transition of the operations of Bayonne Medical Center from IJKG Opco to BMC Opco, and for BMC Opco to assume possession, ownership and control of the Bayonne Medical Center, pursuant to the terms and conditions of the Surrender Agreement;

**WHEREAS**, pursuant to the Surrender Agreement, upon the occurrence of the Interim Orders Contingency (as such term is defined in the Surrender Agreement), BMC Opco shall, directly or through one or more designees, be exclusively entitled and authorized to operate Bayonne Medical Center and provide Bayonne Medical Center with interim services deemed by BMC Opco or its designee(s) to be necessary, desirable or appropriate for the operation of Bayonne Medical Center and that, upon the Closing (as such term is defined in the Surrender Agreement), BMC Opco will become the sole and exclusive owner and operator of Bayonne Medical Center;

**WHEREAS**, the Manager is a newly formed joint venture equally owned, 50% - 50%, by CarePoint and an entity to be designated by Yan Moshe (the "**HRH JV Partner**");

**WHEREAS**, the Manager has the resources, experience, skills and items and services necessary to provide management, development, administration and other related services to the Service Recipients;

**WHEREAS**, pursuant to the Term Sheet, the Service Recipients desire to retain Manager, and Manager desires to be retained by the Service Recipients, whereby Manager shall provide the Service Recipients with certain management services that are necessary and advisable to operate the Hospitals, McCabe Ambulance and the Captive Practices, it being agreed that the management services will not entail the right to direct, supervise, control or make decisions on behalf of the Hospitals, McCabe Ambulance and the Captive Practices;

**WHEREAS**, it is anticipated that, on or about October 29, 2024, an involuntary petition under Chapter 11 of the Bankruptcy Code will be filed in the Bankruptcy Court against IJKG Opco, and a voluntary petition under Chapter 11 of the Bankruptcy Code will be filed in the Bankruptcy by CarePoint and its debtor Affiliates (including without limitation, HUMC Opco and Christ Opco, but excluding IJKG Opco), which is being administered as _____ and *In re: CarePoint Health Systems Inc., et al.*, respectively (the "**Bankruptcy Proceeding**"); and

**WHEREAS**, the Parties, in entering into this Agreement, intend to comply with all Applicable Laws including, without limitation: (a) the Social Security Act, which prohibits the payment or receipt of any remuneration in return for the referral of service covered by federal health benefit programs (42 U.S.C. §1320a-7b(B)), and which prohibits certain health care the Manager self-referrals for certain designated health services (42 U.S.C §1395nn); (b) the New Jersey Codey Law and the implementing regulations of the New Jersey Board of Medical Examiners, which collectively prohibit a physician

from: (i) giving or receiving any remuneration in exchange for the referral of a healthcare good or service and (ii) making referrals to entities in which the physician owns an interest (N.J.S.A. § 45:9-22.4 et seq. and N.J.A.C. § 13:35-6.17), and which prescribe acceptable practice structures for licensees of the New Jersey Board of Medical Examiners (N.J.A.C. § 13:35-6.16(f)); and (c) the New Jersey Health Care Facilities Planning Act (N.J. Stat. Ann. § 26:2H-1 et seq.) and the Hospital Licensing Standards (N.J.A.C. § 8:43G-2.1 et seq).

**NOW, THEREFORE**, in consideration of the mutual promises, releases and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

*Certain capitalized terms used herein have the meanings set forth in <u>Article XIII</u> (Definitions and Interpretation).*

# ARTICLE I
# THE MANAGER

**Section 1.01    Engagement of the Manager; Exclusivity; Ownership and Management of Manager.** The Service Recipients hereby engage and appoint the Manager, and the Manager hereby agrees to be engaged and appointed by the Service Recipients to provide the management services set forth in this Agreement and in each Statement of Work (defined below) executed and delivered hereunder, in each case pursuant to the terms, and subject to the conditions, set forth in this Agreement and each Statement of Work. The CarePoint Service Recipients each acknowledges, covenants and agrees that no CarePoint Service Recipient may directly or indirectly, engage, hire, employ, contract with or otherwise allow any other Person to perform the Services or to furnish any management, administrative, consulting or other similar items/services to any of the CarePoint Service Recipients. Notwithstanding the foregoing, the foregoing exclusivity shall not apply to, and Manager's rights, authority and obligations vis-à-vis Christ Hospital and Hoboken University Medical Center shall be subordinate to, the rights of BMC Opco or its designee to operate or provide management and other services to IJKG Opco and IJKG, LLC under the Surrender Agreement, as amended from time to time, or to Christ Hospital and Hoboken University Medical Center under that certain Hospital Facilities Management Services Agreement between CarePoint and its subsidiaries, dated October 29, 2024, as amended from time to time . The Manager may perform management services or other services for other third-party hospital or healthcare providers without restriction.

At all times hereunder, Manager shall be owned, 50% - 50%, by CarePoint and an entity to be designated by Yan Moshe, and managed by a board of managers consisting of CarePoint's designee, who shall be Achintya Moulick, M.D., and Mr. Moshe or his designee, and two (2) additional managers, one of whom shall be appointed by Dr. Moulick and one of whom shall be appointed by Mr. Moshe or his designee, in each case, subject to the additional terms and conditions set forth in the MSO Operating Agreement. Upon the execution hereof by the Parties, CarePoint and Yan Moshe or his designee shall negotiate in good faith and enter into the MSO Operating Agreement.

In no event may any of the Parties appoint, employ, engage or hire any principal or Affiliate of BMC Hospital, LLC (also known as "Surgicore"), or Feliks Kogan, Wayne Hatami or Vijayant Singh, M.D. or their respective Related Parties or designees, in any position in, for or on behalf of Manager, including without limitation, as a member, officer, manager, director, employee, independent contractor, lender, consultant, advisor, representative, agent, etc.

**Section 1.02    General**.

(a)    <u>General Services</u>. The Manager shall advise the Service Recipients with respect to the development, management, and growth of each Service Recipient's Business and to arrange for the Services (defined below) to be performed at and for each Service Recipient.

(b)    <u>No Care Direction or Supervision</u>. The Manager will not have, and the Services provided hereunder and pursuant to each Statement of Work shall not entail, the right to direct, supervise, control or make decisions on behalf of the Service Recipients. Each Hospital shall operate independently of each of other Hospital.

(c)    <u>Independent Contractor</u>. In performing the Services hereunder, the Manager shall be an independent contractor and not an employee of any of the Service Recipients. The Manager shall be an agent of the Service Recipients solely to perform the Services set forth in this Agreement and each Statement of Work. The Manager shall not be a fiduciary for or of any Service Recipient. Nothing herein shall be construed so as to make any Party hereto a partner or joint venturer with any other Party. The Parties acknowledge that the Manager and Service Recipients are separate legal entities. The Parties further acknowledge that the Service Recipients, on the one hand, and the Manager, on the other hand, are not employees of the other, and no Party is responsible, vicariously or otherwise, for the actions or omissions of the other. None of the Manager nor its employees or agents shall look to the Service Recipients for vacation pay, sick leave, retirement benefits, Social Security benefits, worker's compensation, disability or unemployment insurance benefits or any other employee benefits; nor shall the Service Recipients or its employees look to the Manager for the same. The Manager does not assume or incur any liability for any of the existing obligations, liabilities or debts of the Service Recipients, and Manager shall not, by acting hereunder, assume or become liable for any of the future obligations, debts, or liabilities of the Service Recipients. Each respective Service Recipients shall retain the full legal authority and ultimate responsibility for the management and operations of each applicable Service Recipient.

(d)    <u>Supersession, Amendment of Previous Management Agreements; No Future Agreements</u>. All other previous management agreements among any of CarePoint, CarePoint Health Management Associates, LLC ("**CHMA**") or any CarePoint Service Recipient, to the extent duplicative, inconsistent, or in conflict with this Agreement, are superseded hereby and the provisions shall control and govern. The CarePoint Service Recipients shall promptly (but, in no event later than October 25, 2024), amend any previously existing management or other agreements with any Affiliates (including CHMA) or third parties to cancel, amend or subordinate any such terms or provisions in such agreements that are or may be duplicative, inconsistent, or in conflict with this Agreement and provide the Manager with written evidence thereof, it being agreed that any failure to comply with the foregoing obligations shall be deemed a material breach of this Agreement by the CarePoint Service Recipients. In the case of any ambiguity in the interpretation or application of this <u>Section 1.02(d)</u>, the provisions, covenants, agreements and other terms of this Agreement and any Statement of Work will govern and control. CarePoint and CHMA shall work in good faith with Service Recipient to transition all management services superseded or amended pursuant to this <u>Section 1.02(d)</u> to the Manager. None of the Services Recipients may enter into any management, administrative, consulting or other agreement regarding any of the items/services described hereunder or any Statement of Work or that could be provided hereunder, provided that the foregoing shall not apply to BMCO Opco or its designees

(e)    <u>Manager and Hospital Personnel</u>. The Manager may employ personnel for the Hospitals and such other staff members, and may undertake certain system-wide functions, as the Manager shall deem necessary from time to time. Each Service Recipient may continue to directly employ whatever personnel such Service Recipient chooses in each party's sole discretion.

**Section 1.03    Non-Profit Status of Certain Service Recipients**. The Manager shall not act in any manner that could reasonably jeopardize the non-profit status of any non-profit Service Recipient by either the State of New Jersey or as a charitable organization pursuant to section 501(c)(3) of the Internal Revenue Code. On the Effective Date (defined below), the Manager acknowledges and agrees that Christ Hospital and Hoboken University Medical Center are non-profit hospitals for purposes of this <u>Section 1.03</u>.

**Section 1.04    Standard of Care**.

(a)    The Manager shall provide the Services with due care consistent with standards employed by comparable hospital management companies and in compliance with Applicable Law, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. § 13201-7b(b)) and the federal Physician Self-referral Law (42 U.S.C. § 1395nn).

(b)    Manager shall provide the Services in conformity with (i) the MSO Operating Agreement, (ii) good and ethical business practices of the health care industry in the communities served by the Service Recipients, (iii) applicable standards established by the Centers for Medicare and Medicaid, The Joint Commission and other accreditation agencies, and other federal, state and local licensure requirements and standards, and (iv) all Service Recipient rules, policies and procedures.

**Section 1.05    Insurance**. The Manager will secure professional liability insurance, commercial general liability insurance, and property damage insurance; with limits of liability of no less than one million dollars ($1,000,000) per incident and three million dollars ($3,000,000) in the aggregate, with respect to the services provided by the Manager pursuant to this Agreement and any Statement of Work. The Manager shall make good faith efforts to cause the Service Recipients to be named as additional insureds and the policies shall provide that such policies cannot be canceled, terminated, or have their coverage amounts reduced without at least thirty (30) days' advance written notice to the Service Recipients. The Manager shall carry worker's compensation insurance to cover its employees, in the amounts required by law. Upon request by any Service Recipient, the Manager shall provide a certificate to such Service Recipient evidencing the insurance coverage required by this <u>Section 1.05</u>.

**Section 1.06    Facilities**. The Manager shall secure, at its own expense, all necessary and reasonable office space, utilities, communication and information technology systems, photocopiers, and other equipment necessary for the Manager's performance its duties under this Agreement and any Statement of Work.

**Section 1.07    No Exclusions**. The Manager represents and warrants for itself and any Affiliate who provides Services pursuant to this Agreement or any Statement of Work that neither it nor they is a Person that has either (i) been convicted of a crime related to health care, or (ii) been debarred, excluded, disqualified, suspended, or otherwise declared ineligible for participation in any state or federally funded programs (including without limitation, health care programs such as Medicare and Medicaid) (any such Person, an "**<u>Excluded Provider</u>**"). The Manager shall notify the

*Execution Version*

Service Recipients within three (3) days after it receives notice that any such Person is an Excluded Provider. The Service Recipients shall have the right to terminate this Agreement upon thirty (30) days' notice should the Manager fail to take corrective action to terminate such Excluded Provider within thirty (30) days' of notice of such exclusion.

## ARTICLE II
## MANAGEMENT SERVICES; STATEMENT OF WORK

### Section 2.01   Management Services.

(a)      In addition to the duties and obligations set forth in each applicable Statement of Work delivered and effective pursuant to Section 2.02 below, if any, the Manager shall provide the Servies set forth in this Section 2.01. Subject to Sections 1.02(b), 1.03 and 1.04 hereof, the provisions of this Article II and any applicable Statement of Work, if any, the Manager will coordinate its activities with each Service Recipient's senior management and operations personnel with the goal of ensuring that the Manager's performance and delivery of Services to such Service Recipient is integrated with such Service Recipient's respective departments and other patient care activities. The Manager shall provide advice related to the development and management of the Service Recipients' Business in accordance with the terms of this Agreement, the Statement(s) of Work, as applicable, and Applicable Law and shall provide such services as are necessary or proper to manage and maintain the Business. The Manager shall have the power and authority to take any and all actions necessary, advisable, or proper to develop the Business, to conduct the business affairs of the Service Recipient pursuant to this Agreement and the Statement of Work, and to arrange for the Services.

(b)      The Manager shall, on behalf of each Service Recipient:

(i)      Provide centralized business services, including front office, back office services.

(ii)      To the fullest extent permitted by Applicable Law, assist the applicable Hospital(s) in developing, supervising, managing and administering such Hospital's(s') established or to be established pharmacy programs (including but not limited to Medicare Part D, Medicaid pharmacy programs, 340B programs, patient assistance pharmacy or "PAP" programs, state prescription drug assistance or "SPAP" programs, and similar or related pharmacy programs). The Service Recipients and the Manager agree to use best efforts to negotiate in good faith all policies, procedures and protocols to make each Hospital's pharmacy programs available to applicable patients and community members in compliance with Applicable Law and allocated fairly among the Service Recipients.

(iii)      To the fullest extent permitted by Applicable Law, assist the applicable Hospital(s) in developing, supervising, managing and administering such Hospital's residency and fellowship programs.  The Service Recipients and the Manager acknowledge, covenant, and agree that all provider residency and fellowship programs, as may be in existence as of the Effective Date or that may be established thereafter, at each Service Recipient's Hospitals, will remain in place and will continue to be managed, during the Term, by the current medical directors in consultation with the Manager.  The Service Recipients and the Manager further acknowledge, covenant, and agree to: (i) create a graduate medical education consortium, or GME consortium, by 2026; (ii) include thirty (30) residency positions currently existing within the HRH Service Recipients' Hospitals; (iii) designate

HUMC as the GME consortium sponsoring institution; and (iv) allocate residency funds received with respect to such GME consortium to each specific Hospital to which each residency position is allocated. The Parties shall agree on a pre-determined formula for the allocation of the revenues and expenses of the provider residency and fellowship programs among the Hospitals.

(iv)    Negotiate and manage purchasing and fulfillment of all equipment, furnishings, and supplies necessary and appropriate for each Service Recipient, and keep and maintain such equipment, furnishings, and supplies in a clean and sightly condition in a manner mutually acceptable to Service Recipient for the proper operation of the Business;

(v)    subject to and in compliance with all Applicable Laws, negotiate Payor and payor intermediary (including, but not limited to, independent physician associations, accountable care organizations, clinically integrated networks, and other provider organizations and entities) participation and reimbursement contracts and agreements and manage Payor communications and relationships on behalf of the Service Recipients;

(vi)    Notify Service Recipient immediately of any lawsuits or actions, or any threat thereof, or any occurrence that reasonably appears likely to result in a claim that become known to the Manager that might adversely affect any interest of the Service Recipient or its Affiliates whatsoever, provided, that in the case of an occurrence or threat thereof, actual steps to enforce such occurrence or threat must become known to the Manager or in the Manager's reasonable judgment appear imminent;

(vii)    Notify Service Recipient promptly of any personal injury or property damage or other loss or damage occurring to or claimed by any party with respect to each Service Recipient's Business and forward promptly to the Service Recipient any summons, subpoena, or other like legal document served upon the Manager relating to actual or alleged potential liability of the Service Recipient. The Service Recipient shall have sole control over any investigation, claim or proceeding involving such Service Recipient;

(viii)    Provide, manage and coordinate centralized integrated health information management services for the Service Recipients and cooperate with the Service Recipients and their affiliated physicians to maintain patient records in an integrated patient record system for all healthcare or clinical services performed at or through the Service Recipient. The Manager acknowledge and agrees that all medical records and patient files shall be the property of the respective Service Recipients; provided, however, that the Manager and its Affiliates shall have reasonable access to such medical records and patient files at all times as necessary to perform the Services under this Agreement and as otherwise permitted by this Agreement, the Statement of Work and by Applicable Law;

(ix)    Under the direction, responsibility and oversight of the Service Recipient and its affiliated physicians, assist in the evaluation and administration of the Service Recipient's policies and protocols (other than those relating to the practice of medicine), including protocols regarding documentation that the Manager must provide to the Service Recipients, including, without limitation, quality indicator and utilization reports;

(x)    Under the direction, responsibility and oversight of the Service Recipient that is a Hospital and any applicable medical directors or other personnel, assist in the

*Execution Version*

establishment and implementation of procedures for performance improvement and peer review for the Hospital, in each case, as necessary, desirable or appropriate to satisfy or comply with network participation, patient care, and other Payor requirements, which shall, in all events, be performed under the performance improvement and peer review function of the Service Recipient and, in furtherance thereof, provide such information and reports as may be reasonably requested by the Service Recipient's performance improvement and peer review committees concerning patient care activities;

(xi)    Cooperate with the Service Recipient to educate and train its personnel and the communities served by the Service Recipient in the appropriate medical uses and benefits of the Program;

(xii)    Assist Service Recipient in obtaining and maintaining any necessary Permits required for the Business;

(xiii)    With respect to a Service Recipient that is a Hospital, provide a level of service that is consistent with the requirements of the Service Recipient's medical staff bylaws (a copy of which shall be provided to the Manager upon execution of this Agreement, along with any amendments thereto upon implementation), and with applicable Joint Commission, state and federal licensing, accreditations and certification standards and providing reports and information requested by such licensing, accrediting and certification standards provided such reports and information are normally and reasonably requested by such entities, and provide other reports and information as may be reasonably requested by Service Recipient in connection with the Manager's provision of Services pursuant to this Agreement and any Statement of Work;

(xiv)    Comply with the policies, rules, and regulations of the Service Recipient as may be provided in writing from time to time, provided, that such policies, rules, and regulations shall be reasonable in nature and uniformly applied. Should a policy, rule or regulation be enacted which is in conflict with current practices of the Manager or which requires a material change in such practices, the Manager shall be afforded a commercially reasonable period of time to comply with such policy, rule, and regulation;

(xv)    Subject to and in compliance with all Applicable Laws, manage and direct negotiations, contracting, and entity relationships with employee unions and collective bargaining organizations; and

(xvi)    Comply with the Service Recipient's compliance plans to the extent applicable to the Manager's provision of Services pursuant to this Agreement or any Statement of Work, copies of which the Service Recipient will provide to the Manager prior to the Effective Date.

All such services, together with any services set forth in any Statement of Work as described in Section 2.02 are collectively referred to herein as the "**Services**."

Notwithstanding the foregoing or anything to the contrary in this Agreement or any Statement of Work, the Manager may employ personnel for the Service Recipients and such other staff members and may undertake certain system-wide functions as shall be deemed necessary from time to time, in the Manager's sole judgement, and each Service Recipient may continue to directly employ whatever personnel they choose in their sole discretion (subject to Applicable Law).

**Section 2.02   Statement of Work**.

(a)    On the Effective Date and from time to time thereafter upon the mutual agreement of the Manager and each applicable Service Recipient, each Service Recipient will execute and deliver to the Manager a statement of work in substantially the form and substance acceptable and satisfactory to the Manager (each, a "**Statement of Work**"). Subject to <u>Section 2.02(b)</u> below, each Statement of Work will become effective upon acceptance and return of an executed counterpart of such Statement of Work by the Manager to such Service Recipient.

(b)    Each Statement of Work will describe: (i) the development, management, administrative, and other related services to be provided by the Manager to the Service Recipient in addition to the services set forth in this Agreement; (ii) any fees, if any, to be paid by Service Recipient to the Manager (in addition to those fees set forth in this Agreement) as compensation for the Services to be provided by the Manager under the Statement of Work; (iii) the employees of the Manager or third-party subcontractors of the Manager that will perform the Services under the Statement of Work; (iv) any engagement term, project deliverable, timeline or project calendar, termination provisions or other terms of the Services to be performed pursuant to such Statement or Work; and (v) any additional procedures, practices, specifications, warranties, indemnification obligations, or other terms and conditions with respect to the Services to be provided by the Manager under the Statement of Work.

(c)    All Services provided by the Manager to each Service Recipient, and all terms and conditions with respect to the relationship between the Manager and each Service Recipient, will be governed by this Agreement and each applicable Statement of Work. Each Statement of Work will be executed by authorized representatives of the applicable Service Recipient and the Manager and will contain a statement that the Statement of Work is executed and delivered pursuant to, and is governed by, this Agreement.

(d)    In the event of any conflict or inconsistency between the terms of this Agreement and the terms of a Statement of Work, each Party hereto agrees that the terms of the Statement of Work shall govern and control with respect to the Services covered by the Statement of Work.

**Section 2.03  NO MARKETING, REFERRALS, ETC**. NOTHING IN THIS AGREEMENT OR ANY STATEMENT OF WORK SHALL BE CONSTRUED OR INTERPRETTED AS DIRECTING OR INFLUENCING REFERRALS BY ANY PARTY HERETO. NONE OF THE ACTIVITIES CONTEMPLATED UNDER THIS AGREEMENT OR ANY STATEMENT OF WORK DELIVERED OR TO BE DELIVERED HEREUNDER, OR OTHERWISE SHALL CONSTITUTE AN OBLIGATION OF THE MANAGER TO GENERATE PATIENT FLOW OR BUSINESS TO OR FOR THE SERVICE RECIPIENTS OR ANY OTHER PARTY. THE MANAGER IS NOT IN ANY MANNER BEING COMPENSATED TO GENERATE PATIENTS TO OR FOR THE SERVICE RECIPIENTS OR ANY OTHER PERSON. THE PARTIES AGREE AND ACKNOWLEDGE THAT THE SERVICE RECIPIENTS HAVE ENGAGED THE MANAGER TO MANAGE THE BUSINESS ASPECTS OF THE SERVICE RECIPIENTS' BUSINESS.

*Execution Version*

# ARTICLE III
# LICENSING MATTERS

**Section 3.01   Grant of Sub-License**.[1] During the Term, the Manager hereby grants to each Service Recipient, severally and not jointly, a revocable, limited, non-exclusive and non-transferable, sub-license to use the Licensed IP on the terms set forth herein.  The Parties agree and acknowledge that Manager licenses the Licensed IP from an Affiliate of HRH (the "**IP Affiliate**") pursuant to a separate license agreement between the IP Affiliate and the Manager (the "**License Agreement**").

**Section 3.02   Termination of Sub-License**. The sublicense to the Licensed IP granted by this Agreement and all Service Recipients' rights to use the Licensed IP shall terminate upon the date this Agreement or the License Agreement expires or terminates for any reason, or in the event of a dissolution or liquidation of the Manager or the IP Affiliate, the termination or upon any occurrence, arrangement or event in which, or following which, all of four Hospitals cease to operate as one healthcare system.  Subject to the terms of this Agreement, upon the occurrence of any of the foregoing contingencies, the Service Recipients shall immediately cease all use of the Licensed IP either alone or in conjunction with any other name, brand, logo or comparable term or item IP Affiliate shall be entitled to retain all Intellectual Property rights, title, and interest in and to the name "Hudson Health System" and any related, ancillary or derivative Intellectual Property.  None of the Service Recipients will thereafter readopt or use any trademark, service mark, trade or corporate name or business title, or other indicium of origin, which consists of, or includes therein, any of the Licensed IP, or any portion or derivative thereof. This Section 3.02 shall survive any expiration, non-renewal or termination of this Agreement.

**Section 3.03   Use of Sub-License**. Use by the Service Recipients of the Licensed IP shall at all times conform to Applicable Law. The Service Recipients may use the Licensed IP solely to market, advertise, promote, distinguish and develop "Hudson Health System" as a multi-hospital health care system in Hudson County, New Jersey and the surrounding service areas, subject to the License Agreement and the rules and regulations of the IP Affiliate, as amended from time to time. The Service Recipients may not otherwise (i) sell, rent, lease, sub-lease, pledge, hypothecate, encumber, charge, attach a lien or other security interest, assign, or otherwise transfer any rights in the use of the Licensed IP without the express prior written consent of the Manager or (ii) use the Licensed IP for any other purpose, including, without limitation, for any other commercial, for-profit, political, illegal or prohibited purpose or conduct.

**Section 3.04   No Right or Title**. Each Service Recipient acknowledges and agrees that the Licensed IP is and will remain the sole property of the IP Affiliate,[2] which entity shall have the sole rights to seek trademark, copyright, and other Intellectual Property rights and protections for the Licensed IP and any related, ancillary or derivative name, brand or other Intellectual Property. The Service Recipients acknowledge the IP Affiliate retains, and will retain, all rights to control the manner in which such Licensed IP is used, including the manner in which such Licensed IP is presented for use by the Service Recipients and their Affiliates.

---

[1] **NTD:** A separate license agreement will document the grant from an HRH affiliate to the Manager of a license to use the "Hudson Health Systems" Intellectual Property and to sub-licenses such Intellectual Property to the Service Recipients.
[2] **NTD:** [HRH IP Entity] TBD.

*Execution Version*

**Section 3.05    Further Agreements**.

(a)    Each Service Recipient will use and operate under, and each Service Recipient will cause all Affiliated physicians and physician practices, health care clinics and service centers, ancillary healthcare programs, and related patient, professional, community and other Affiliate programs and services to use and operate under, the Licensed IP name and brand, in each case, subject to the direction and oversight of the Manager, the IP Affiliate and subject to the License Agreement.

(b)    Each Service Recipient agrees that it will do nothing inconsistent with the ownership of the Licensed IP either during the Term or after the expiration or termination hereof for any reason. Specifically, Service Recipients shall each use the Licensed IP in a manner that does not deviate from Service Recipients' rights in the Licensed IP and will take no action that will interfere with or diminish the IP Affiliate's right in the Licensed IP.  Each Service Recipient agrees that its use of the Licensed IP shall inure to the benefit of and be on behalf of the IP Affiliate. Each Service Recipient acknowledges that the Licensed IP is valid under the Applicable Law and that Service Recipients' utilization of the Licensed IP will not create any right, title or interest in said Licensed IP. Except as permitted by this Agreement, each Service Recipient agrees that it will not adopt or use as part or all of any corporate name, trade name, trademark, service mark or certification mark, the Licensed IP, either alone or in combination with other words, or any other mark based on the Licensed IP or any designation confusingly similar to the Licensed IP.

(c)    Each Service Recipient agrees not to apply or assist any third party to register the Licensed IP or a confusingly similar designation anywhere in the world. If any application for registration is or has been filed by or on behalf of Service Recipients in any country and relates to any mark, which, in the reasonable opinion of the Manager or the IP Affiliate, is confusingly similar, deceptive or misleading with respect to, or dilutes or any way damages the Licensed IP, Service Recipients shall, at the Manager's or the IP Affiliate's request, abandon all use of such mark, and any registration or application for registration thereof and shall reimburse the Manager and the IP Affiliate for all costs and expenses of any opposition or related legal proceeding, including attorneys' fees, instigation by the Manager or the IP Affiliates or its respective authorized representative

(d)    All expenses for the use, display, promotion, advertising, marketing, transmission and related permitted activities of the Licensed IP shall be borne by the Service Recipients.

(e)    Each Service Recipient will, and will cause all Affiliates to, return or destroy any and all Licensed IP upon the events described in Section 3.02 hereto.

(f)    Manager shall indemnify, defend and hold harmless each Service Recipient from any and all Losses arising from or related to the Licensed IP, as determined by a non-appealable order of a court of competent jurisdiction, other than Losses arising out of or in connection with any Service Recipient's or any of their respective Affiliates' or representatives' negligence, intentional misconduct or fraud with respect to such Licensed IP.

# ARTICLE IV
# CONDITIONS TO EFFECTIVENESS

**Section 4.01  Conditions Precedent to Effectiveness of this Agreement**. This Agreement shall become effective upon the satisfaction or the written waiver by the Manager of the following conditions precedent (such date, the "**Effective Date**"):

(a)     The Bankruptcy Court shall have entered an order, in form and substance acceptable and satisfactory to the Manager, approving the transactions contemplated hereunder;

(b)     No Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any governmental order or opinion that has or would have the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting the delivery of the Services to the Service Recipients by the Manager; and

(c)     The representations and warranties set forth in Article VII of each Service Recipient shall be true and correct in all material respects as of the Effective Date.

**Section 4.02  Conditions Precedent to Effectiveness of Statement of Work**. Following the Effective Date, as to any Service Recipient, each Statement of Work shall become effective upon the satisfaction or the written waiver by the Manager (in its sole and absolute discretion) of the following conditions precedent:

(a)     No Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any governmental order or opinion which has or would have the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining, or prohibiting the delivery of the indicated Services to Service Recipient by the Manager;

(b)     The applicable Statement of Work (i) is in such form and substance acceptable and satisfactory to the Manager (ii) contains the information required or indicated in Section 2.02(b), (iii) has been executed and delivered by a Service Recipient to the Manager, and (iv) has been accepted and executed by the Manager, pursuant to Section 2.02(c) and Section 2.02(d);

(c)     The representations and warranties set forth in Article VII of the applicable Service Recipient shall be true and correct in all material respects as of the effective date of such Statement of Work; and

(d)     No Event of Default exists or is continuing with respect to the applicable Service Recipient.

## ARTICLE V
## RESPONSIBILITIES OF SERVICE RECIPIENTS

**Section 5.01  Responsibilities of the Service Recipients**. During the Term, except as expressly provided herein or in Statements of Work, the Service Recipients shall be responsible for the ownership, operation and management of their respective business and all costs, expenses and all other incidental and customary obligations related thereto, and shall retain and not delegate to the Manager hereunder the following:

(a)     Coordinating the scheduling of patients and transporting patients to and from the Service Recipients in accordance with their documented policies and procedures;

(b)      Performing all patient care and other services for Service Recipients' patients other than services performed by independent medical providers and the Services to be provided by the Manager;

(c)      Ensure that all physicians and other clinical staff who perform and supervise any medical treatment or clinical care are credentialed and remain in good standing in accordance with Service Recipients' policies, procedures, medical staff bylaws, rules, and regulations;

(d)      Ensure that all medical treatment, clinical care or other healthcare services are provided in accordance with Service Recipients' policies, procedures, medical staff bylaws, rules, and regulations, and the requirements of any private or governmental accrediting agency, and in obtaining any Permits required pursuant to Applicable Law (including, without limitation, any Health Care Laws) and obtaining any necessary approval from the Certificate of Need Section of the NJDOH, which cooperation shall include amending the Agreement as necessary to obtain such approval from the NJDOH;

(e)      Securing all utilities to the Hospitals and each Service Recipient including, without limitation, all electrical services, gas services, water charges and other utilities, telephone, internet and other information technology infrastructure, janitorial and maintenance services, and security and safety services; and

(f)      Responding to and making resources available in response to emergencies (including weather related emergencies, natural disasters, and clinical or medical emergencies.

## ARTICLE VI
## MANAGEMENT FEES; OTHER FINANCIAL MATTERS

*This Article VI and all obligations of the Parties hereunder shall expressly survive the expiration, non-renewal or termination of this Agreement for any reason.*

**Section 6.01   Management Fee**. In consideration for the Manager's provision of the Management Services, HRH and CarePoint agree, severally and not jointly, to pay the Manager their respective share of the following:

(a)      On account of each Service Recipient that is a Hospital, the documented, direct costs of the Manager plus a reasonable overhead markup in an amount equal to TWENTY PERCENT (20.0%) of such costs in the aggregate per-Hospital of one hundred thousand dollars ($100,000.00) to one hundred and fifty thousand dollars ($150,000.00) per month, as determined by the Manager in consultation with the applicable Service Recipient; plus

(b)      TWENTY FIVE PERCENT (25%) of profits attributable to the pharmacy programs (calculated as gross revenue minus normalized ordinary direct costs and expenditures solely attributable to such pharmacy programs, in each case exclusive of general overhead, administrative, operational or other expenses of the applicable Service Recipient or system as a whole or any Affiliates thereof, unusual, extraordinary or non-recurring items or other general expenses or allocations) related to the Manager's provisions of Services with respect to such pharmacy programs pursuant to Section

*Execution Version*

8.02 hereof. Such percentage may be adjusted by the Manager in consultation with the applicable Service Recipient(s) from time to time; plus

(c)      all documented, direct costs and fees related to the Manager's provisions of Services with respect to the GME Program pursuant to Section 8.03 hereof; plus

(d)      all documented, direct costs and fees related to the Manager's provisions of Services to McCabe Ambulance and the Captive Practices; plus

(e)      all documented, direct costs and fees related to the Manager's provisions of Services to the Captive Practices; plus

(f)      any and all fees, costs, charge or other expenses incurred by one or more Service Recipients pursuant to a Statement of Work, in each case in accordance with, and subject to the terms and conditions of, such Statement of Work.

(collectively, the aggregate costs, fees and liabilities described in subsections (a) through (f) above, the "**Management Fee**").

**Section 6.02   Payment of the Management Fee; CarePoint Indebtedness to HRH**.

(a)      The Manager will calculate and separately invoice each of HRH and CarePoint the aggregate Management Fee incurred on account of each of the items set forth in Section 6.01 above on a monthly basis. The Management Fee shall be a senior priority obligation of each Service Recipient and shall be paid before any other management fee obligations of the Service Recipients. The Parties acknowledge and agree that the Management Fee will be paid as follows:

(i)      HRH will pay the Management Fee attributable to the HRH Service Recipients, provided that the Parties hereby agree and acknowledge that HRH's sole obligation vis-à-vis the Management Fee attributable to the Bayonne Medical Center from the date hereof through the Closing (as such term is defined in the Surrender Agreement) shall be to cause IJKG Opco to pay such fee pursuant to HRH's authority under the Surrender Agreement and subject to the availability of cash flow from IJKG Opco's operations from which IJKG Opco may pay such fee, it being agreed that HRH is not an obligor, guarantor or surety of such payment; additionally, until and unless the HRH Appointee acquires 100% of the ownership interests of each of the Captive Practices and McCabe Ambulance as provided for in Section 8.03, HRH will not be required to pay any Management Fee on account of the entity that the HRH Appointee has not acquired and such entity shall be deemed a CarePoint Service Recipient for which CarePoint shall pay the Management Fee pursuant to to subsection (ii) below;

(ii)      CarePoint will pay the Management Fee attributable to the CarePoint Service Recipients, including, for the avoidance of doubt, the Management Fee due on account of McCabe Ambulance and the Captive Practices);

(iii)      HRH and CarePoint will each pay the Management Fee in respect of the pharmacy programs and the GME Program, as allocated by the Manager from time to time; and

*Execution Version*

(iv)     any Management Fee or portion of the Management Fee incurred pursuant to any Statement of Work shall be paid by HRH, CarePoint, or both of them, in each case in accordance with the payment terms set forth in such Statement of Work.

(b)     CarePoint agrees and acknowledge that, as of the date hereof, CarePoint owes the Bayonne DIP Lender one million seven hundred thousand dollars ($1,700,000.00), representing amounts the Bayonne DIP Lender has paid to Capitala Private Advisors, LLC ("**Capitala**") on behalf of CarePoint in order to facilitate Capitala's consent to the pari passu first lien required by the debtor-in-possession lender to HUMC Opco and Christ Opco (the "**CarePoint Debt**").  CarePoint and the CarePoint Service Recipients hereby jointly and severally agree to pay HRH or its designee the CarePoint Debt, from and to the extent of the first dollars received or that are otherwise earmarked for or allocable or payable to CarePoint or any of its Affiliates or designees from the Cigna Action, immediately upon the disposition of the Cigna Action, whether by settlement, judgment, consent judgment, voluntary dismissal, or otherwise, and shall provide HRH with contemporaneous access to and copies of all documents and communications regarding the Cigna Action and promptly notify HRH, in writing, of any and all material developments/actions in the Cigna Action, including without limitation, settlement offers, discussions, demands, negotiations or agreements, claims, motions, judgements, etc.  The foregoing payment obligation shall be absolute and unconditional (other than the condition that Cigna actually pay the funds from which the CarePoint Debt shall be paid) and shall be made without any offsets, withholds, defenses, claims or adjustments of any kind of nature.  CarePoint shall cause Cigna to pay the CarePoint Debt to HRH or its designee consistent herewith pursuant to the settlement agreement or consent judgment, as applicable.   Notwithstanding the foregoing, if the settlement or judgment, including consent or default judgment, related to the Cigna Action does not provide for the payment of cash consideration to CarePoint or its Affiliates or designees sufficient for CarePoint to pay the CarePoint Debt to HRH or its designee in full, but CarePoint or its Affiliates or designees are entitled to receive other non-cash consideration thereunder, such as enhanced reimbursements, then CarePoint shall be deemed to have received cash consideration equal to the CarePoint Debt and shall pay the CarePoint Debt to HRH or its designee regardless of the actual cash consideration.

In addition to all interest imposed pursuant to other provisions of this Agreement, upon CarePoint's failure to timely pay the CarePoint Debt to HRH, the unpaid CarePoint Debt shall accrue interest at the rate of one-and-one-half percent (1.5%) per month until it is paid to HRH in full.

If CarePoint fails to timely pay to HRH or its designee the CarePoint Debt, HRH may, in its sole discretion, cause the Manager to (and CarePoint hereby irrevocably agrees that Manager shall) (i) credit the CarePoint Debt, plus all accrued interest thereon, plus all costs, fees and expenses (including the fees and expenses of counsel, professions and experts of HRH) incurred by HRH to collect the same, against the Management Fees owed by HRH hereunder, or (ii) notwithstanding anything in the MSO Operating Agreement to the contrary, set off the amounts described in clause (i) of this Section 6.02(b) against distributions/payments of cash flow/dividends, profits, net capital proceeds, dissolution proceeds or other amounts payable to CarePoint by Manager under the MS) Operating Agreement and redirect such amounts to HRH JV Partner.  If CarePoint violates this Section 6.02(b), CarePoint shall pay HRH all legal and other professional fees and collection costs and expenses incurred by HRH arising from such violation.  For  avoidance of doubt, the rights prescribed in this paragraph are in addition to, and not in lieu of, any other rights or remedies available to HRH or any

of its Affiliates hereunder, under any other agreement or Applicable Law.   This provision shall expressly survive the expiration, non-renewal or expiration of this Agreement for any reason.

**Section 6.03   Several Liability**. Notwithstanding anything in this Agreement or any Statement of Work to the contrary, except as related to the CarePoint Debt, which is subject to Section 6.02, the Parties acknowledge, covenant, and agree that the obligations, liabilities and agreements of HRH and its Affiliates, on the one hand, and CarePoint and its Affiliates, on the other hand, to pay the Management Fee and all related costs, expenses, fees, charges and other liabilities pursuant to this Agreement and each Statement of Work, and to reimburse or indemnify the Manager, as the case may be, are several and not joint. In no event will HRH be responsible or liable for any Management Fee, portion of any Management Fee or other liabilities or obligations (including, for the avoidance of doubt, any indemnification obligations pursuant to Article XI hereof or other liabilities hereunder) allocated, allocable or attributable to CarePoint, and in no event will CarePoint be responsible or liable for any Management Fee, portion of any Management Fee or other liabilities or obligations (including, for the avoidance of doubt, any indemnification obligations pursuant to Article XI hereof or other liabilities hereunder) allocated, allocable or attributable to HRH.

**Section 6.04    Payment Terms**.

(a)      HRH and CarePoint shall, respectively, pay the Management Fee by wire transfer in immediately available United States dollars to an account designated in writing by the Manager on the first (1ˢᵗ) Business Day of each month.

(b)      In the event HRH, on the one hand, or CarePoint, on the other hand, fails to remit full payment in full to the Manager of their respective Management Fee for any given month, or makes only a partial payment of such Management Fee, then:

(i)      Any delinquent, shortfall or past-due amounts due in respect of any Management Fee payable in any month (each, a "**Deficiency**") shall be carried over and paid during the next subsequent month hereunder. Any Deficiency shall accrue interest at the rate of two percent (2%) per month until all such Deficiencies plus accrued and unpaid interest has been paid to the Manager by CarePoint, with respect to all Deficiencies attributable to, or for the account of, any CarePoint Service Recipient, or HRH, with respect to any Deficiencies attributable to, or for the account of, any HRH Service Recipient.

(ii)      each of HRH, on the one hand, and CarePoint, on the other hand, may, but is not obligated to, pay the full Management Fee in respect of their respective Service Recipients' Management Fees for any month in which the other Party fails to remit full payment to the Manager of the Management Fee as described in this Section 6.04(b).

(c)      In the event the Manager is required to repay or refund either of HRH or CarePoint any part or all of a monthly Management Fee, then the Manager will pay each such Party a priority refund in an equal amount of such repayment or refund.

(d)    The Parties acknowledge and agree that the MSO Operating Agreement provides that,[3] in the event that either of HRH or CarePoint fails to remit payment in full of any Management Fee or any portion of any Management Fee, then, following a seven (7) day cure period (during which time, for the avoidance of doubt, the default interest in respect of such Deficiency described in <u>Section 6.04(b)(ii)</u> above will accrue), then the voting interest and rights of the designee of CarePoint or HRH, as the case may be, as a manager or member of Manager, and such designee's economic rights as a member of the Manager, including without limitation, rights to draws, distributions of cash flow, net capital proceeds, etc., shall be suspended for the duration of any such delinquency after written notice by the non-defaulting Party (and the other member of Manager shall be treated as the sole member and manager of the Manager during the period of such suspension, and further may, upon the defaulting member's payment of the delinquent management fee, share in the Manager's distributions to the members of the Manager comprising such payment, based on its pro rata share of the Manager), in addition to and not in lieu of Manager's other rights hereunder or under the law.

**Section 6.05   Arm's Length Negotiations**. At all times hereunder, the Management Fee shall be based upon the fair market value of the Services provided herein without taking into account the volume or value of any referrals generated among the Manager, the Service Recipients or any other Party.  The Parties hereto expressly acknowledge and agree that the Management Fee has resulted from arm's length negotiations among the Parties, has not been determined in a manner that takes into account the volume or value of referrals or business otherwise generated among the Parties, and is, to the best knowledge of each Party, consistent with fair market value for such services. The Management Fee shall, at all times, be consistent with fair market value. Any modification of the Management Fee shall require the mutual written consent of the Parties.

**Section 6.06   Manager Access to Locations of Service Recipients**. At all times hereunder, each Service Recipient shall allow the Manager and its representatives to access its facilities and locations in furtherance of the provision of the Services hereunder.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

**Section 7.01   Representations and Warranties**. Each Party warrants and represents that (i) it is a corporation or limited liability company, as applicable, in good standing in its jurisdiction of organization, (ii) it has full power and authority to enter into this Agreement and each Statement of Work, as applicable, to which it is a party and to undertake its obligations contained herein and therein, (iii) this Agreement and such Statement of Work, as applicable, has been duly authorized, executed and delivered by, and constitutes the valid and binding obligation of such Party, enforceable in accordance with its terms, (iv) the execution of this Agreement and any Statement of Work, as applicable, and the performance of this Agreement and such Statement of Work, as applicable, will not conflict with or cause a breach of the applicable Party's organizational documents, material contracts, or governmental orders, agreements or judgments to which it is subject, and (v) there is no pending, or to the applicable Party's knowledge, threatened claim or proceeding that may adversely and materially affect the ability of the applicable Party to perform its obligations hereunder.

---

[3] **NTD:** Operative provisions affecting MSO voting rights to be documented in the MSO Operating Agreement. .

# ARTICLE VIII
# OTHER AGREEMENTS

*This Article VIII and all obligations and rights of the Parties hereunder shall expressly survive the expiration, non-renewal or termination of this Agreement for any reason.*

**Section 8.01   Right of First Refusal Upon Certain Business Combinations.** If, during the Term or at any time after the expiration or termination of this Agreement for any reason, CarePoint or any of the CarePoint Service Recipients desires to undergo a sale or enter into any business combination constituting a ROFR Transaction (defined below), such Party shall first comply with the right-of-first-refusal provisions of this Section 8.01.

(a)      CarePoint and each CarePoint Service Recipient hereby grants HRH a continuing, perpetual and irrevocable right of first refusal (the "**ROFR**") with respect to a sale or business transaction constituting a ROFR Transaction, subject to the terms and conditions set forth in this Section 8.01. For purposes this Section 8.01, the Party seeking to consummate such a ROFR Transaction may be referred to herein as the "**Initiating Party**," and HRH may be referred to herein as the "**Receiving Party**."

(b)      For purposes of this Section 8.01, a "**ROFR Transaction**" means any sale (including a sale of an ownership interest/equity in, or sale of all or substantially all of the assets of), merger, consolidation, change of ownership, Change of Control, conversion, reorganization, recapitalization, syndication, management or similar relationship, or other disposition or business combination with any third party.

(c)      If, on or after the Effective Date, an Initiating Party or its respective permitted successors, heirs and assigns, seeks to engage in ROFR Transaction with any Person (such party, the "**ROFR Counterparty**"), the Receiving Party may elect to enter into such ROFR Transaction with the Initiating Party in the place of such ROFR Counterparty on the same terms offered by such ROFR Counterparty.

(d)      If the Initiating Party desires to consummate the ROFR Transaction, then the Initiating Party shall first deliver to the Receiving Party a written notice that outlines, with specificity, the identity of the parties to and all terms and conditions of the ROFR Transaction and attaches a copy of the proposed transaction documents, and all executed and draft term sheets, letters of intent, confidentiality agreements or similar agreements with the potential suitor and any brokers or investment bankers relevant to the ROFR Transaction, all communications between the Initiating Party or any designee and their representatives and the ROFR Counterparty or its representatives and all analyses, pro-forma projections or forecasts, executive summaries, plans and specifications, budgets, feasibility studies, demographic assessments, and similar materials regarding the ROFR Transaction (the "**ROFR Notice**").

(e)      The Receiving Party or its designee shall, for a period of forty-five (45) days from the date of receipt of the ROFR Notice (the "**ROFR Response Period**"), which period shall be tolled and extended for any period of non-compliance by the Initiating Party, its representatives or the ROFR Counterparty, have the exclusive right to exercise the ROFR with respect to the ROFR Transaction, by so notifying the Initiating Party on or before 5:00 p.m., New York City time, on the last day of the ROFR Response Period (the "**Exercise Notice**").

(f)       If the Receiving Party or its designee submits the Exercise Notice to the Initiating Party as aforesaid, then the Initiating Party or its designee shall be legally and irrevocably bound to consummate the ROFR Transaction with the Receiving Party or its designee pursuant to the terms and conditions of the ROFR Notice and the Initiating Party shall immediately terminate all negotiations, discussions or agreements with the ROFR Counterparty and provide the Receiving Party with evidence of such termination. If the Receiving Party determines that the ROFR Counterparty is affiliated or associated with the Initiating Party or the ROFR Transaction is not arm's length or bona fide or that the terms thereof are not bona fide, then, at the election of the Receiving Party, the consideration payable under the ROFR Transaction shall be determined by a national valuation firm selected by the Manager and paid for by the Initiating Party, which amount shall be payable based upon customary terms and conditions as determined by such firm.

(g)       The Receiving Party or its designee shall deliver the proposed transaction documents to the Initiating Party or its designee, whereupon the Initiating Party or its designee, shall, within fifteen (15) days from receipt such documents, execute and deliver the same and all deliverables required thereby to the Receiving Party or its designee, with TIME BEING OF THE ESSENCE.

(h)       If the Receiving Party or its designee shall either: (i) deliver written notice of rejection of the ROFR Notice to the Initiating Party; or (ii) fail to deliver the Exercise Notice to the Initiating Party within the ROFR Response Period, as extended, the ROFR shall be deemed waived with respect to the ROFR Transaction and the Initiating Party or its applicable designee shall be free to complete the ROFR Transaction with the ROFR Counterparty based strictly on the terms and conditions outlined in the ROFR Notice and attached transaction documents. If, however, either: (i) the Initiating Party or its applicable designee does not complete the ROFR Transaction with the ROFR Counterparty based strictly on the terms and conditions outlined in the ROFR Notice and attached transaction documents, or (ii) the Initiating Party or its applicable designee agrees to complete the ROFR Transaction based on terms that are materially different from the terms of the ROFR Notice and attached transaction document, then the ROFR shall, once again, apply and be valid, binding and enforceable against the Initiating Party, its designee and its successors and assigns, and the Initiating Party and its applicable designee shall not complete the ROFR Transaction without first delivering a new ROFR Notice to the Receiving Party in compliance with this <u>Section 8.01</u>.

**Section 8.02   Right of First Offer for Additional Services**. During the Term, none of the CarePoint Service Recipients may outsource or engage any outside third-party for any of its respective operations, including, without limitation, billing and collection, cash management, or revenue optimization services, or any of its healthcare delivery services or offerings, including, without limitation, surgical care, cardiac catheterization, radiology imaging, laboratory services, and anesthesia, without first granting the Manager the right to provide or arrange for the provision of such services based on substantially identical terms and conditions offered by the applicable third-party vendor, provider or any other such Person.  If the Manager elects to provide any such operations or healthcare delivery services or offerings (the "**Additional Services**") to a CarePoint Service Recipient, then (i) such Service Recipient shall be required to engage the Manager to provide such Additional Services pursuant to a Statement of Work delivered hereunder and (ii) the Manager shall provide such Additional Services identical terms and conditions offered by the applicable third-party vendor, provider or any other such Person.

**Section 8.03   Captive Practices and McCabe Ambulance.**  Upon the date on which this Agreement is executed by the Parties (the "**Execution Date**"), HRH or its designee(s) shall be entitled to appoint, and hereby does so appoint, one or more physicians (which physician may be an Affiliate of or otherwise associated with HRH) or other individual or entity (each, a "**HRH Appointee**") who will be entitled to acquire, and CarePoint shall cause the Captive Practices and McCabe Ambulance to sell to the applicable HRH Appointee, 100% of the issued and outstanding ownership interest (stock or membership interests) in each Captive Practice and McCabe Ambulance, for no additional consideration, free and clear of all liens, security interests, other encumbrances, third party rights, including options, warrants or other inchoate or approval rights, free and clear of all liens.  As of the Execution Date, the Captive Practices and McCabe Ambulance shall self-operatively be deemed owned solely by each HRH Appointee without any further action or instrument by the Parties or the Captive Practices.  Within ten (10) days following the Effective Date, CarePoint and its Affiliates, successors, appointees or assigns shall cause the Captive Practices and McCabe Ambulance, and owners thereof (other than the HRH Appointee(s)) to enter into such agreements and execute such documents as requested and in the form and substance provided by HRH, provided that such agreements shall not be a precondition to any of the HRH Appointee's or HRH's rights hereunder. Notwithstanding the foregoing, if, due to expressed language in McCabe Ambulance's certificate of incorporation, shareholders' agreement or bylaws (whichever is controlling), CarePoint is not able to deliver 100% of the ownership interest in McCabe Ambulance to the HRH Appointee, then the HRH Appointee will, with a full reservation of its rights, accept ownership of the 70% of the ownership interest in McCabe Ambulance held by CarePoint, IJKG Opco, HUMC Opco and Christ Opco and any other Affiliate of CarePoint, in partial satisfaction of its rights hereunder, provided that nothing herein shall relieve CarePoint of its obligation to deliver 100% of the ownership interest in McCabe Ambulance and to comply with the HRH Appointee to secure such interest.

**Section 8.04   RESERVED**

**Section 8.05   Restrictive Covenant**.  As a material inducement to HRH to enter into this Agreement, during the Term and for a period of five (5) years after the expiration or termination hereof for any reason, none of CarePoint or any of the CarePoint Service Recipients or their Affiliates or their successors or their respective direct or indirectly owners, beneficial interest holders, directors, officers, managers, management companies (including Insight Management and Consulting Services, Inc.), trustees, employees, independent contractors, agents, consultants, advisors or other representatives, including legal counsel, accountants, investment bankers, brokers and financial advisors directly or indirectly, (a) employ, engage, contract with, associate or affiliate with any of the Restricted Parties in any capacity whatsoever, (b) solicit, initiate, seek, entertain, encourage, or support any inquiry, proposal, offer, submission of bids, or contact from, or file or allow/acquiesce to the filing of any transfer or change of ownership applications relating to any transaction with any of the Restricted Parties involving: (i) the sale of any stock/membership interest, securities (or portion thereof) or other ownership interest or any Conflicting Rights for the same, or any assets (other than the sale of inventory in the Ordinary Course of Business) or debt of CarePoint or any of the CarePoint Receiving Parties or their Affiliates, (ii) any business transaction or arrangement, transfer, acquisition, surrender, management or similar arrangement, dissolution, liquidation, reorganization, conversion, divestiture, merger, share or unit exchange, consolidation, redemption, financing, deed in lieu of foreclosure, assignment for the benefit of creditors or similar transaction involving CarePoint or any of the CarePoint Receiving Parties or their Affiliates or any Conflicting Rights for the same, (iii) any similar transaction or business combination involving CarePoint or any of the CarePoint Receiving

Parties or their Affiliates (in each case, an "**Transaction Proposal**") or (iv) any transaction that would interfere with or delay the consummation of the transactions contemplated hereunder (a "**Contradictory Transaction**"); (c) participate in any discussion or negotiation regarding, or furnish any information with respect to, or assist or facilitate in any manner, any Transaction Proposal or Contradictory Transaction, or any attempt to make an Transaction Proposal or Contradictory Transaction; or (c) accept any Transaction Proposal or proposal regarding a Contradictory Transaction. CarePoint and each CarePoint Receiving Party shall each immediately cease, and cause to be terminated, any and all contacts, discussions and negotiations with third parties regarding any of the foregoing, and shall notify HRH, in writing, immediately if any Restricted Party makes any proposal, offer, inquiry or contact related to an Transaction Proposal or Contradictory Transaction and provide HRH with the details thereof (including the Person making such offer, inquiry or contact and a copy of all written documents, agreements communication in connection therewith) and their response thereto.

**ARTICLE IX**
[RESERVED]

**ARTICLE X**
[RESERVED]

**ARTICLE XI**
**INDEMNIFICATION**

**Section 11.01  Indemnification by the Manager**. The Manager hereby agrees to indemnify, defend, and hold harmless each Service Recipient, and each Service Recipient's respective owners, officers, managers, directors, employees, independent contractors, agents and representatives, from and against any and all claims, actions, proceedings, allegations, losses, liabilities, damages, recoupments, refunds, settlements, overpayments, subpoenas, demands, audits, investigations, inspections, interest, fines, penalties and costs and expenses (including, without limitation, reasonable attorneys' fees) (collectively, "**Losses**") suffered or incurred by such Service Recipient, arising from or related to: (i) any gross negligence or willful misconduct of the Manager or any of the Manager's owners, officers, managers, directors, employees, contractors, agents or any person providing services under this Agreement or any Statement of Work on behalf of the Manager other than any Service Recipient or any of their respective Affiliates (collectively, the "**Provider Parties**"), (ii) any professional acts or omissions of the Manager or any of Provider Party's employees; and (iii) any material breach by the Manager of its covenants or agreements hereunder or under any Statement of Work. The provisions of this <u>Section 11.01</u> shall survive the expiration, non-renewal or termination of this Agreement.

**Section 11.02  Indemnification by the HRH Service Recipients**. HRH and the HRH Service Recipients hereby agree, jointly and severally, to indemnify, defend and hold harmless the Manager, and each of the Manager's owners, managers, officers, directors, employees, independent contractors, agents and representatives from and against any and all Losses suffered or incurred by the Manager arising from or related to: (a) negligence or willful misconduct of HRH or any HRH Service Recipient; (b) any breach of this Agreement or any Statement of Work by HRH or any HRH Service Recipient, (c) the conduct of any HRH Service Recipient's Business, including, but not limited to, claims of bodily injury, death, recoupments, overpayments, audits, false or erroneous claims, prepayment reviews, or any other liability resulting from the HRH Service Recipients' operations,

coding, billing and collections of reimbursements for healthcare items or services, structure or business or other relationships with third parties, or (d) any failure by HRH or any HRH Service Recipient to comply with any applicable federal, state or local laws, regulations standards, requirements, or codes. The provisions of this <u>Section 11.02</u> shall survive the expiration, non-renewal or termination of this Agreement.

**Section 11.03 Indemnification by CarePoint and the CarePoint Service Recipients**. CarePoint and the CarePoint Service Recipients hereby agree, jointly and severally, to indemnify, defend and hold harmless the Manager, and each of the Manager's owners, managers, officers, directors, employees, independent contractors, agents and representatives from and against any and all Losses suffered or incurred by the Manager arising from or related to: (a) negligence or willful misconduct of CarePoint or any CarePoint Service Recipient; (b) any breach of this Agreement or any Statement of Work by CarePoint or any CarePoint Service Recipient, (c) the conduct of CarePoint or any CarePoint Service Recipient's Business, including, but not limited to, claims of bodily injury, death, recoupments, overpayments, audits, false or erroneous claims, prepayment reviews, or any other liability resulting from the CarePoint Service Recipients' operations, coding, billing and collections of reimbursements for healthcare items or services, structure or business or other relationships with third parties, or (d) any failure by CarePoint or any CarePoint Service Recipient to comply with any applicable federal, state or local laws, regulations standards, requirements, or codes. The provisions of this <u>Section 11.03</u> shall survive the expiration, non-renewal or termination of this Agreement.

## ARTICLE XII
## TERM AND TERMINATION

**Section 12.01  Term**.

(a)     This Agreement shall commence on the Effective Date and shall remain in effect for an initial term of ten (10) years (the "**<u>Initial Term</u>**"), unless sooner terminated in accordance with its terms.

(b)     After the expiration of the Initial Term, this Agreement shall automatically renew for successive consecutive terms of one (1) year each, unless, with respect to any Service Recipient or multiple Service Recipients, the Manager gives such Service Recipient or Service Recipients, or any Service Recipient or Service Recipients give the Manager, written notice of non-renewal at least ninety (90) days prior to the end of the applicable term. The Initial Term and each renewal term may be referred to herein as the "**<u>Term</u>**."

(c)     Upon expiration of the Initial Term or any subsequent renewal term of this Agreement with respect to an individual Service Recipient, all then outstanding Statements of Work with respect to such Service Recipient shall automatically terminate.

(d)     Termination, expiration or non-renewal of this Agreement or a Statement of Work for any reason shall not relieve or release any Party from any rights, liabilities, or obligations (including, without limitation, payment and indemnification rights, liabilities, or obligations) that have accrued under this Agreement or such Statement of Work prior to the date of such termination, expiration or non-renewal. Any rights asserted by any Party under this Agreement shall be in addition to all other rights and remedies such Party may have at law or in equity. Each Party acknowledges and agrees that no other Party shall be liable for damages (including, but not limited to, loss of market,

goodwill or anticipated profits or any expenditure incurred by such Party) by reason of the proper termination, expiration or non-renewal of this Agreement.

**Section 12.02  Termination Without Cause**.

No Party may terminate this Agreement without cause during the Initial Term. Following the Initial Term, this Agreement may be terminated by the Manager with respect any or all Service Recipients, at any time, without cause, upon sixty (60) days' prior written notice to the other Parties who are the subject of such termination.

(a)      Notwithstanding the foregoing, this Agreement may be terminated upon the mutual written consent of all of the Parties to this Agreement.

**Section 12.03  Termination For Cause by the Manager**. This Agreement or any Statement of Work may be terminated by the Manager with respect to any or all Service Recipients, immediately upon written notice to such the Service Recipients who are the subject of such termination, upon the occurrence of any of the following events of default (each, an "**Event of Default**"):

(a)      The occurrence of any of the following:

(i)      the legally mandated temporary or permanent closure of the Service Recipient or other temporary or permanent prohibition or restriction on the Service Recipient's provision of items or services attributable to a local, state or national declaration or a state of emergency or public health emergency;

(ii)      A Service Recipient fails to maintain any material Permit required to operate its Business or to provide medical and healthcare services within the State of New Jersey or a Service Recipient is excluded, restricted or suspended from providing any medical and healthcare services then being provided;

(iii)      A Service Recipient or its applicable Related Party is found by a Governmental Authority or court of competent jurisdiction to have committed an act of fraud, misappropriation, embezzlement, or felony against the Manager or any other Person or is accused of any of the foregoing by any Governmental Authority;

(iv)      A Service Recipient fails to maintain malpractice or professional liability insurance in customary and appropriate amounts, as determined by the Manager in its sole discretion;

(v)      Any material adverse change in Payor reimbursements or Payor reimbursement policies applicable to a Service Recipient;

(vi)      Any material adverse change in Applicable Law, including, without limitation, changes in any Health Care Law, or the interpretation thereof by any competent Governmental Authority;

(vii)      Any force majeure event that make it impossible, impractical or unfeasible for the Manager to continue to provide the Services hereunder; or

(viii)    A Service Recipient's Hospital's voluntary closure due to lack of or insufficient staff, supplies, vendor services, patient volume, or the imposition of operational requirements on the Service Recipient that make it impractical or financial unfeasible for the Manager to continue to provide Services hereunder;

provided, that, the Manager shall not be entitled to terminate this Agreement under this Section 12.03(a) in the event that the cause giving rise to the right of termination is solely the result of the Manager's acts or omissions;

(b)    A Service Recipient fails to perform its duties and obligations hereunder and fails to cure the same within thirty (30) days after written notice is given by the Manager to such Service Recipient specifying the nature of such failure, breach, or default;

(c)    A Service Recipient shall file a voluntary petition in bankruptcy, or shall be adjudicated as bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any Debtor Relief Law, or shall seek, consent to, or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator of such Service Recipient, or of all or any substantial part of its properties (the term "acquiesce" as used herein, being deemed to include but not to be limited to the failure to file a petition or motion to vacate or discharge any order, judgment, or decree providing for such appointment within the time specified by law); or a court of competent jurisdiction shall enter an order, judgment, or decree approving a petition filed against such Service Recipient seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future statute or law relating to bankruptcy, insolvency, or other relief for debtors, whether federal or state, and such Service Recipient shall consent to or acquiesce (as hereinabove defined) in the entry of such order, judgment, or decree, or the same shall remain unvacated and unstayed for an aggregate of sixty (60) days from the date of entry thereof, or any trustee, receiver, conservator, or liquidator of such Service Recipient or of all or any substantial part of its properties shall be appointed and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days;

(d)    Upon any Change of Control of a Service Recipient; or

(e)    Upon a Service Recipient's default or Event of Default or similar breach under any other agreement between the Manager or its Affiliates, on the one hand, and such Service Recipient, on the other hand.

**Section 12.04 Termination For Cause by a Service Recipient**. This Agreement or any Statement of Work may be terminated by any Service Recipient with respect to such Service Recipient, upon the occurrence of any of the following events of default:

(a)    Any owner, manager, director, officer, or employee of the Manager is convicted by a final, non-appealable order of a court of competent jurisdiction or pleads guilty to an act of fraud, misappropriation, embezzlement, or a felony against any Person; or

*Execution Version*

(b)     The Manager fails to perform its material duties and obligations hereunder and fails to cure the same within one hundred eighty (190) days after written notice is given by Service Recipient to the Manager specifying the nature of such failure, breach or default.

**Section 12.05  Termination For Cause By Either the Manager or any Service Recipient.** If, at any time, in the opinion of Company's legal counsel, the United States Internal Revenue Service, a court of competent jurisdiction, an administrative agency having authority to regulate either of the Manager or the Service Recipients, or that this Agreement or the obligations to be performed hereunder to be illegal or in violation of any state or federal regulations or statutes, in whole or in part, then the Parties agree to attempt to restructure this Agreement so as to eliminate the illegal or unenforceable aspects hereof, while remaining consistent with the intent of this Agreement in its original form, and the Parties shall, within thirty (30) days, negotiate, in good faith, a revised agreement to evidence their restructured relationship. If no revised agreement can be reached within thirty (30) days, despite the good faith efforts of each of the Manager and each Service Recipients, the Manager or each Service Recipients may terminate this Agreement upon providing an additional ten (10) days' notice to the other Party(ies).

**Section 12.06  Effects of Non-Renewal or Termination**. In the event this Agreement is non-renewed or terminated by the Manager or any Service Recipient for any reason, or upon the expiration or non-renewal of this Agreement, the following shall result:

(a)     If the Manager provides less than all Service Recipients with a notice of non-renewal, or if less than all Service Recipients provide the Manager with notice of non-renewal, then this Agreement shall non-renew and expire only as to the Service Recipient(s) who are identified in the Manager's non-renewal notice or who provided the notice of non-renewal to the Manager, as applicable, and shall survive and renew with respect to each other Service Recipient(s).

(b)     If the Manager terminates this Agreement as to less than all Service Recipients, or if less than all Services Recipients terminate this Agreement, then this Agreement shall terminate only as to the Service Recipients who are identified in the Manager's termination notice, or who provided the termination notice, as applicable, and shall survive with respect to each other Service Recipient.

(c)     With regard to Manager, the obligation of Manager to provide Services hereunder shall immediately cease as of the date of expiration or termination as to the terminated/non-renewed or the terminating/non-renewing Services Recipients, as applicable.

(d)     With regard to the terminated/non-renewed or the terminating/non-renewing Services Recipients, as applicable, each such Service Recipient shall continue to pay Manager the Management Fee based on Management Services rendered as of the effective date of expiration/termination, and shall reimburse Manager for all costs/liabilities, termination payments, and the like, incurred by Manager in terminating/non-renewing any and all agreements/commitments with third party vendors (e.g., landlords, employees/independent contractors, vendors/providers of equipment, software, services, supplies), which agreements/commitments may not be terminated/non-renewed without cause/for convenience, and without a payment from or liability or penalty to Manager. Additionally, such Service Recipient(s) shall return to the Manager all originals and copies of the Manager's confidential information in the possession of such Service Recipients or

any other person or entity who maintains originals or copies, and shall perform such matters as are necessary to wind up their activities under this Agreement in an orderly manner.

In recognition of the significant investments, resources, risks, and liabilities Manager and its Affiliates will undertake to perform the Services and consummate the transactions contemplated hereunder, and the losses Manager and its Affiliates will suffer if the Agreement is terminated due to a Change of Control of any of the CarePoint Service Recipients or CarePoint, the CarePoint Service Recipients shall, immediately upon such termination, jointly and severally, pay Manager liquidated damages equal to the Management Fee that would have been payable to Manager hereunder had this Agreement remained in effect for a period of ten (10) years beyond such date of termination. In calculating such amount, to the extent that any component of the Management Fee is, by its nature, a variable amount, then such component shall be calculated based on the average monthly payments of such component made to Manager hereunder over the immediately preceding twelve (12) month period. This provision shall expressly survive the expiration, non-renewal or termination of this Agreement for any reason.

## ARTICLE XIII
## DEFINITIONS AND INTERPRETATION

**Section 13.01  Definitions**.

(a)      As used in this Agreement, the following terms shall have the meanings set forth below:

"**Additional Services**" has the meaning set forth in Section 8.02.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Applicable Law**" means, as to any Person, all applicable foreign or domestic federal, state or local statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement, or rule of law of any Governmental Authority binding upon such Person or to which such a Person is subject, including, without limitation, with respect to each Service Recipients and the Manager, Environmental Laws, Health Care Laws, Government Program Laws, and COVID-19 Laws, as modified from time to time.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended from time to time, or any similar federal or state law for the relief of debtors.

"**Bankruptcy Court**" means the United States District Court for the District of New Jersey with jurisdiction over the Bankruptcy Proceeding and, to the extent of any reference made pursuant to 28 U.S.C. § 157, the United States Bankruptcy Court for the District of New Jersey.

"**Bayonne DIP Lender**" means Bayonne Medical Center OPCO LLC, an affiliate of BMC Opco.

"**Business**" means the business, operations, management, affairs assets and properties of each Service Recipient and such Service Recipient's practice or facility and all other health care and health care-related facilities and businesses operated by the Service Recipient or its Affiliates and the full range of items and services provided thereby or for which the Service Recipient or its Affiliate are licensed or authorized to provide.

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks in New York City are authorized or required by law to close.

"**Captive Practices**" means CarePoint Health Medical group and Garden State Medical Group and any other now existing or hereinafter acquired or developed medical or multi-disciplinary medical practice directly or indirectly owned or managed by CarePoint or any of its Affiliates or any physician affiliated, associated or employed or engaged by CarePoint or any of its Affiliates.

"**Change of Control**" means, as to any Person, (i) the transfer or the entering into any contract or arrangement for the transfer of ownership or Control of or any business combination involving such Person or any of its controlled Affiliates or the transfer, encumbrance or other disposition of any of such Person's ownership interests or assets to any person, entity or "group" (within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended) or other party other than HRH, (ii) at any time following the Effective Date, the board of directors or comparable governing board of such Person as of the Effective Date not holding at least a majority of the voting rights of such board of directors; or (iii) any "change in control" (or comparable term) with respect to such Person, any of their respective Affiliates shall occur as defined in any other agreement governing indebtedness for borrowed money of the such Person owing to any third party (regardless of whether such "change in control" (or comparable term) has been declared, noticed or waived by such third party or its agents). For purposes of this definition, the term "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership, possession or power of voting securities, by contract or otherwise.

"**CHMA**" has the meaning set forth in Section 1.02(d).

"**Cigna Action**" means that certain civil proceeding captioned: HUDSON HOSPITAL OPCO, LLC—d/b/a CAREPOINT HEALTH—CHRIST HOSPITAL, IJKG, LLC; IJKG PROPCO LLC and IJKG OPCO LLC d/b/a CAREPOINT HEALTH—BAYONNE MEDICAL CENTER; and HUMC OPCO LLC d/b/a CAREPOINT HEALTH— HOBOKEN UNIVERSITY MEDICAL CENTER, Plaintiffs, v. CIGNA HEALTH AND LIFE INSURANCE COMPANY and CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Defendants, Case 2:22-cv-04964, filed on August 8, 2022, with the United States District Court for the District of New Jersey.

"**Conflicting Rights**" means any option, warrant, right of first offer, right of first refusal, participation right, notice rights, conversion rights, approval right, negotiation right, preemptive right, or any other similar rights, including any inchoate or contingent rights.

"**COVID-19 Laws**" any and all Laws issued or enacted by a Governmental Authority (and in effect from time to time) in order to provide assistance in response to COVID-19 and (and including any successor to any of the foregoing) and all requirements under any of the foregoing or issued in connection with any of the foregoing or in its implementation, regardless of the date

enacted, adopted, issued or implemented, including, without limitation CARES Act, the Families First Coronavirus Response Act of 2020 and the Paycheck Protection Program and Health Care Enhancement Act, as modified from time to time.

"**Debtor Relief Law**" means the United States Bankruptcy Code and all other liquidation, bankruptcy, assignment for the benefit of creditors, conservatorship, moratorium, receivership, insolvency, rearrangement, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions in effect from time to time.

"**Deficiency**" has the meaning set forth in Section 6.04(b)(ii).

"**Effective Date**" means is as defined in Section 4.01.

"**Environmental Law**" means any and all federal, state, foreign, local, or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority, or other Requirements of Law (including common law) as now or may at any time hereafter be in effect, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree, or judgment, regulating, relating to, or imposing liability or standards of conduct concerning protection of the environment or, to the extent relating to exposure to substances that are harmful or detrimental to the environment, or human health, or safety.

"**Exercise Notice**" has the meaning set forth in Section 8.01(e).

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Government Program**" means Medicare, Medicaid, TriCare, HRSA, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any other government sponsored reimbursement program, including state programs.

"**Government Program Laws**" means 42 U.S.C. §§ 1320a-7, the Civil Monetary Penalties Law, 1320a-7a, 1320a- 7b; §§ 1395 through 1395fff; §§ 1396-1396v; the FCA; the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518) and any other laws governing the Government Programs, and the corresponding reimbursement, fraud and abuse, false claims and anti-self-referral Laws of any other Governmental Authority.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

"**Health Care Laws**" means any and all applicable Laws of any Governmental Authority pertaining to applicable health regulatory matters, including, but not limited to, false claims laws; false representations laws; insurance fraud laws; anti-kickback and all other provisions of the Medicare/Medicaid fraud and abuse laws (42 U.S.C. § 1320a-7 et seq.) and the regulations promulgated thereunder; the physician self-referral provisions of the Stark Law (42 U.S.C. § 1395nn) and the regulations promulgated thereunder, the Federal Controlled Substances Act (21 U.S.C. § 801, et seq.) and the regulations promulgated thereunder, the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a et seq.), the Patient Protection and Affordable Care Act (Pub. L. 111-148), as amended by the Health Care Education and Reconciliation Act (Pub. L. 111-152), and the regulations promulgated thereunder, the Emergency Medical Treatment and Labor Act, the Public Health Service Act, 42 U.S.C. § 201 et seq., and all regulations promulgated thereunder , and all other Applicable Law pertaining to the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; HIPAA; state anti-kickback, physician self-referral, COVID-19 Laws; laws pertaining to the hiring of employees or acquisition of services or products from those who have been excluded from Governmental Programs, licensure, accreditation or any other aspect of providing applicable health care services; and state and federal licensing, certificate of need, and certification requirements and related regulations, fee-splitting laws, federal and state laws governing the use, handling, control, storage, transportation, and maintenance of controlled substances, pharmaceuticals or drugs, and any and all other laws, rules, and regulations administered or otherwise enforced by HHS, the NJDOH, CMS, Office of Inspector General, New York Office of Professional Medical Conduct, or New Jersey or New York Board of Medical Examiners, any other state board or agency governing, regulating or monitoring the conduct of the Business or any licensed health care professionals furnishing health care services, and with respect to each of the foregoing, "**Health Care Laws**" shall include any and all statutes, rules, regulations, position statements, declaratory statements, advisory opinions, bulletins, notifications, and other guidance relating to any of the foregoing.

"**Initial Term**" has the meaning set forth in Section 12.01(a).

"**Initiating Party**" has the meaning set forth in Section 8.01(a).

"**Intellectual Property**" means any and all intellectual property, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how, and processes, all rights therein, and all rights to sue at law or in equity for any past, present, or future infringement, violation, misuse, misappropriation, or other impairment thereof, whether arising under United States, multinational, or foreign laws, or otherwise, including the right to receive injunctive relief and all proceeds and damages therefrom.

"**Licensed IP**" means the name "Hudson Health System" and any derivation thereof, as the same may be amended, supplemented or otherwise modified from time to time by IP Affiliate.

"**Management Fee**" has the meaning set forth in Section 6.01.

"**Medicaid**" shall mean, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, authoritative manuals, orders, authoritative guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"**Medicare**" shall mean, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, authoritative manuals, orders or authoritative guidelines (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time,

"**MSO Operating Agreement**" means the Limited Liability Company Operating Agreement of HUDSON REGIONAL MANAGEMENT, LLC, as the same may be amended, supplemented or otherwise modified from time to time.

"**Term Sheet**" has the meaning set forth in the Recitals.

"**NJDOH**" means the Department of Health of the State of New Jersey.

"**Payor**" means any and all health care service plans, health maintenance organizations, health insurers and other private and governmental third-party payors, employers, networks, independent practice associations, accountable care organizations and other intermediaries. Payor includes Government Programs.

"**Permits**" means, as to any Person, all permits, certifications, licenses, franchises, approvals, authorizations, and consents required to be obtained from Governmental Authorities, including, without limitation, such Person's licenses, permits, certifications, and other authorizations or approvals from the NJDOH, as well as Clinical Laboratory Improvement Service/Clinical Laboratory Improvement Amendment certificates or other approvals, New Jersey Board of Pharmacy permits or other approvals, Medicare and Medicaid provider numbers and agreements, Medicare certification, accreditations by The Joint Commission or DNV, and _____ .

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**Receiving Party**" has the meaning set forth in Section 8.01.

"**Related Party**" or "**Related Parties**") with respect to any Person, means such Person's Affiliates and the owners, directors, officers, managers, employees, partners, agents, trustees, administrators, advisors, and representatives of it and its Affiliates.

"**Representative**" with respect to any Person, means such Person's Affiliates, owners, members, managers, directors, trustees, partners, officers, employees, consultants, financial advisors, counsel, accountants independent contractors, agents, administrators, consultants, financial advisors, legal counsel, and accountants.

"**Restricted Parties**" means Feliks Kogan, Wayne Hatami and William Kogan or any Person, including physicians or other healthcare providers, in which any of them directly or indirectly has any ownership, beneficial or other interest or with which any of them is associated or affiliated in any manner or nature or with which any of them directly or indirectly has any relationship whatsoever.

"**ROFR**" has the meaning set forth in <u>Section 8.01</u>.

"**ROFR Counterparty**" has the meaning set forth in <u>Section 8.01</u>.

"**ROFR Response Period**" has the meaning set forth in <u>Section 8.01</u>.

"**ROFR Transaction**" has the meaning set forth in <u>Section 8.01</u>.

"**Services**" has the meaning set forth in <u>Section 2.01(b)</u>.

"**Statement of Work**" has the meaning set forth in <u>Section 2.02(a)</u>.

<b>Section 13.02    Interpretation</b>.

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument, or other document shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision thereof, (iv) all references in this Agreement to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time.

(b)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP as in effect from time to time, and applied on a consistent basis in a manner consistent with that used in preparing the reference Person's audited financial statements, except as otherwise specifically prescribed herein.

<b>ARTICLE XIV<br>MISCELLANEOUS</b>

**Section 14.01  Severability.** Each provision of this Agreement and the Statements of Work executed and delivered hereunder are intended to be severable. If any term or provision hereof shall be determined by a court of competent jurisdiction or Governmental Authority to be illegal or invalid for any reason whatsoever, such provision shall be severed from this Agreement or Statement of Work and shall not affect the validity of the remainder of this Agreement and the Statement of Work.

*Execution Version*

**Section 14.02  Attorneys' Fees**. In the event of any Party hereto institutes any action or proceeding against the other Party relating to this Agreement or any Statement of Work, each Party shall be responsible for their own attorneys' fees.

**Section 14.03  Waiver: Consents.** No consent or waiver, express or implied, by any Party hereto to or of any breach or default by any Party in the performance of its obligations hereunder shall be valid unless in writing and no such consent or waiver shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such Party of the same or any other obligations of such Party hereunder. Failure on the part of any Party to challenge any act or failure to act of any other Party or to declare any other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party of its rights hereunder. The granting of any consent or approval in any other instance by or on behalf of a Party shall not be construed to waiver or limit the need for such consent in any other or subsequent instance.

**Section 14.04  Governing Law; Venue; Service of Process; Waiver of Jury Trial.**

(a)      **Governing Law.** This Agreement shall be governed by the laws of the State of New Jersey without regard to choice of law provisions.

(b)      **Waiver of Venue**. Each Party irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court referred to in Section 14.04(c). Each of the Parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)      **Service of Process**. Each Party irrevocably consents to the service of process in the manner provided for notices under Section 14.09 and agrees that nothing herein will affect the right of any party hereto to serve process in any other manner permitted by Applicable Law.

ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR ANY STATEMENT OF WORK OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE INSTITUTED IN THE SUPERIOR COURT OF THE STATE OF NEW JERSEY IN HUDSON COUNTY, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURT AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO

*Execution Version*

THIS AGREEMENT OR ANY STATEMENT OF WORK OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY. EACH PARTY HERETO (A) CERTIFIES THAT NO AGENT, ATTORNEY, REPRESENTATIVE, OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF LITIGATION AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT OR THE STATEMENTS OF WORK BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 14.04.

**Section 14.05  Assignment.** No Party shall have the right, power, or authority to assign this Agreement, without the prior written approval of the other Parties. For the avoidance of doubt, in no event may the CarePoint or any CarePoint Service Recipient, or any of their respective affiliates, directly or indirectly assign or otherwise transfer or delegate any of its rights, benefits or obligations hereunder to or create any participation rights in favor of BMC Hospital, LLC d/b/a Surgicore Surgical Centers or "Surgicore" or any of its Affiliates or subsidiaries or their respective owners, officer, managers, directors, employees, independent contractors, agents and representatives, including, without limitation, Feliks Kogan, Wayne Hatami and Vijayant Singh, M.D. or any Person in which any of them directly or indirectly has any ownership, beneficial or other interest or with which any of them is associated or affiliated in any manner or nature. Notwithstanding the foregoing, the Manager may assign this Agreement and any Statement of Work to the Manager's affiliates, subsidiaries or any successor-in-interest to Manager or any person that acquires all or substantially all of the assets or membership interests in the Manager.

**Section 14.06  Entire Agreement; Amendment.** This Agreement and any and all annexes, exhibits, schedules, recitals and footnotes hereto, along with any Statements of Work delivered and executed hereunder, constitutes the entire agreement among the Parties hereto with respect to the subject matter herein contained. To be effective, any modification of this Agreement must be in writing and signed by the Party to be charged thereby.

**Section 14.07  Headings.** The headings of the Sections and Articles of this Agreement are inserted for convenience of reference only and shall not in any manner affect the construction or meaning of anything herein contained or governs the rights or liabilities of the Parties hereto.

**Section 14.08  Interpretation.** Whenever the context requires, all words used in the singular number shall be deemed to include the plural and vice versa, and each gender shall include any other gender. The use herein of the word "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation," or "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably be included within the broadest possible scope of such general statement, term, or matter.

**Section 14.09  Notices.** All notices and other communications provided for herein shall be made in writing and mailed by certified or registered mail, postage prepaid and return receipt requested, or delivered by hand or delivered by a commercial overnight courier service with packaging tracking capability and for which proof of delivery is available. Notices may be delivered or furnished

*Execution Version*

by electronic or digital transmission (including e-mail and internet or intranet websites) with hardcopies simultaneously delivered by first class mail.

If to HRH or to
any HRH Service
Recipient:

Hudson Regional Hospital
Attention:  Yan Moshe
Chairman of the Board
Attention:  Harry G. Kapralos, Esq.
Chief Legal Officer and Compliance Officer
55 Meadowlands Parkway
Secaucus, New Jersey 07094

With a copy to (which shall not constitute notice):

Mohamed H. Nabulsi, Esq.
Mandelbaum Barrett PC
3 Becker Farm Road
Suite 105
Roseland, New Jersey 07068

If to CarePoint or
to any CarePoint
Service Recipient:

CarePoint Health Systems, Inc.
308 Willow Avenue
Hoboken, New Jersey 07030
Attention: Dr. Achintya Moulick, CEO

With a copy to (which shall not constitute notice):

Dilworth Paxon LLP
1500 Market Street
Suite 3500E
Philadelphia, PA 19102
Attention:  Lawrence G. McMichael, Esq.

If to HUDSON REGIONAL MANAGEMENT, LLC:

C/o: Hudson Regional Hospital
Attention:  Yan Moshe
Chairman of the Board
Attention:  Harry G. Kapralos, Esq.
Chief Legal Officer and Compliance Officer
55 Meadowlands Parkway
Secaucus, New Jersey 07094

With a copy to (which shall not constitute notice):

*Execution Version*

> Mohamed H. Nabulsi, Esq.
> Mandelbaum Barrett PC
> 3 Becker Farm Road
> Suite 105
> Roseland, New Jersey 07068

Notices mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given upon delivery or refusal to accept delivery. Notice of a change in address of any Party shall be given in writing to the other Parties as provided above but shall be effective only upon actual receipt.

**Section 14.10  Counterparts; Binding Upon Successors.** This Agreement may be signed in counterparts and all reproductions of an executed original (with reproduced signatures) shall be deemed to be original counterparts of this Agreement. Delivery of an executed counterpart of a signature page to this Agreement or any Statement of Work by digital or electronic (including, without limitation, ".pdf" or ".tif") format shall be effective as delivery of a manually executed counterpart of this Agreement or any Statement of Work. The words "execution," "signed," "signature," and words of similar import in this Agreement or any Statement of Work shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under Applicable Law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. §§ 7001 to 7031), the Uniform Electronic Transactions Act (UETA), or any state law based on the UETA. CarePoint agrees and acknowledge that this Agreement shall be binding on each CarePoint, IJKG Opco, LLC and IJKG LLC, and the CarePoint Service Recipients and their respective successors, transferees or assigns.

**Section 14.11  Confidentiality.**

(a)     The Parties recognize that it is to their collective benefit that the terms of this Agreement be maintained as confidential at the present time. Therefore, the Manager, HRH, CarePoint and each Service Recipient hereby agrees that, without the mutual consent of the Parties, neither they nor their respective owners, directors, trustees, officers, managers, employees or agents will disclose the terms of this Agreement to any third parties, except their respective advisors and consultants and other parties who have a need to know the terms of this Agreement in order to complete the transactions contemplated herein, and as required by disclosure requirement of Applicable Law.

(b)     The Parties hereby agree to comply with all requirements applicable to the use and/or disclosure of Protected Health Information ("**PHI**") as defined in the Standards for Privacy of Individually Identifiable Health Information implementing the privacy requirements of the Administrative Simplification subtitle of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, set forth at 45 CFR Parts 160 and 164 (the "**HIPAA Privacy Standards**"). The Service Recipients shall be responsible for obtaining all patient acknowledgements for patients of the respective Service Recipients' notice of privacy practices in accordance with the HIPAA Privacy Standards. The Service Recipients shall provide the Manager with any changes in, or revocation of, permission by an individual to or disclose his or her PHI, if such changes affect the Manager's permitted or required used and disclosures. The Service Recipients shall notify the Manager of any restriction to the use or disclosure of PHI to in accordance with 45 C.F.R. 164.522.

(c)    In the event that the Manager is deemed a "**Business Associate**" of any of the Service Recipients as such term is defined in the HIPAA Privacy Standards, then the Manager and the applicable Service Recipient shall execute a business associate agreement in the form provided by the Manager.

**Section 14.12  Access to Records.**

(a)    The Manager shall make available to the Service Recipients, and the Service Recipients shall make available to the Manager, upon reasonable prior notice by either of them, during normal business hours, the books and records arising out of or relating to the Service Recipients' or the Manager 's performance of its obligations under this Agreement and any Statements of Work for the purpose of inspection, audits, and reproduction.'

(b)    Each Service Recipient and the Manager agrees to provide access to all of such Party's books and records concerning Services provided to Service Recipients or by the Manager to the extent required by Section 1861(v)(1)(1) of the Social Security Act and the regulations thereto and in order to insure that costs incurred by the Service Recipients or the Manager pursuant to this Agreement are included to the extent appropriate in determining its reasonable costs as a "provider" under the Medicare program.

(c)    Each Service Recipient and the Manager agree that:

(i)    until the expiration of four (4) years after the furnishing of Services pursuant to this Agreement, the Manager will make available, upon written request, to the Secretary of Health and Human Services, or upon request of the Comptroller General, or any of their duly appointed representatives, this Agreement and books, documents and records of the Manager that are necessary to certify the nature and extent of costs claimed to Medicare with respect to the services provided under this Agreement;

(ii)    if the Manager carries out any of the duties of this Agreement through a subcontractor with a value or cost of ten thousand dollars ($10,000) or more over a period of twelve (12) months, until the expiration of four (4) years after the furnishing of services pursuant to such subcontract, the Manager will cause the subcontractor to make available, upon written request, to the Secretary of Health and Human Services, or upon request of the Comptroller General, or any of their duly appointed representatives, the subcontract and books, documents and records of such subcontractor that are necessary to certify the nature and extent of costs claimed to Medicare with respect to the services provided under this Agreement.

(iii)    if Section 1861(v)(1)(1) of the Social Security Act is deemed inapplicable to this Agreement, then this Section 14.12(c) will be deemed inoperative.

**Section 14.13  Non-Disparagement.** Each Party agrees that they will not make, and they will prevent their respective Affiliates from making, any negative comments or disparaging remarks, in writing, orally or electronically, about any other Party hereto or any other Party's Affiliates, and all of their respective successors and assigns and their respective products and services, or speak or act in

*Execution Version*

any manner that is intended to, or does in fact, damage the goodwill, the business or the personal reputations of any such other Party.

Section 14.14 **REPRESENTATIONS; CONFLICT WAIVER.** EACH PARTY ACKNOWLEDGES THAT THE PARTY (A) HAS BEEN ADVISED THAT A CONFLICT EXISTS BETWEEN HIS, HER OR ITS INTERESTS AND THOSE OF THE OTHER PARTIES, (B) HAS BEEN ADVISED TO SEEK THE ADVICE OF INDEPENDENT COUNSEL, (C) HAS HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT COUNSEL, (D) HAS REVIEWED THIS AGREEMENT, INCLUDING THIS SECTION 14.14, AND (E) HAS CONSENTED TO THE PREPARATION OF THIS AGREEMENT BY MANDELBAUM BARRETT. EACH MEMBER HEREBY AGREES THAT MANDELBAUM BARRETT REPRESENTED HRH, AND NOT ANY OTHER PARTY, IN THE DRAFTING AND NEGOTIATION OF THIS AGREEMENT, AND MAY REPRESENT HRH IN ANY MATTER IN THE FUTURE EVEN IF THE INTERESTS OF HRH MAY BE ADVERSE TO ONE OR MORE PARTIES. EACH PARTY WAS ADVISED TO RETAIN SEPARATE LEGAL COUNSEL IN CONNECTION WITH THIS AGREEMENT.

Section 14.15  **Force Majeure.** No Party shall be deemed to be in default of this Agreement if prevented from performing any obligation hereunder for any reason beyond his, hers or its control, including but not limited to, acts of God, war, terrorism, civil commotion, fire, pandemic, epidemic, flood or casualty, organized labor strikes, governmental regulations or restrictions, or unusually severe weather. In any such case, the Parties agree to negotiate in good faith with the goal of preserving this Agreement and the respective rights and obligations of the parties hereunder, to the extent reasonably practicable. Notwithstanding the foregoing, this Section 14.15 shall not apply to CarePoint's, HRH's or any Service Recipients' financial or indemnity obligations hereunder.

Section 14.16  **Non-Discrimination.** Each Party shall comply with all applicable federal, state and local laws and regulations prohibiting discrimination against employees or patients. Without limiting the generality of the foregoing, (a) no Party shall discriminate against any patient on the basis of age, race, color, sexual orientation, marital status, religion, sex, national origin or sponsor, and (b) all Parties shall employ personnel without regard to age, race, color, sexual orientation, religion, sex or national origin and otherwise in compliance with and pursuant to Applicable Law.

*[Signature Pages follow]*

**IN WITNESS WHEREOF**, the Parties have hereunto set their hands as of the day and year first above written.

HRH Service Recipients:

**HUDSON REGIONAL HOSPITALS, LLC, D/B/A BAYONNE MEDICAL CENTER**

By: _____          ◄ SIGN HERE
  Name: Yan Moshe
  Title: Manager

**NJMHMC/LLC D/B/A HUDSON REGIONAL HOSPITAL**

By: _____          ◄ SIGN HERE
  Name: Yan Moshe
  Title: Manager

CarePoint Service Recipients:

**HUDSON HOSPITAL OPCO, LLC, D/B/A CAREPOINT HEALTH – CHRIST HOSPITAL**

By: _____
  Name:
  Title:

**HUMC OPCO, LLC, D/B/A HOBOKEN UNIVERSITY MEDICAL CENTER**

By: _____
  Name:
  Title:

*[Signature Page 1 of 2 to Management Services Agreement]*

**IN WITNESS WHEREOF**, the Parties have hereunto set their hands as of the day and year first above written.

HRH Service Recipients:

**HUDSON REGIONAL HOSPITALS, LLC, D/B/A BAYONNE MEDICAL CENTER**

By: _____
  Name:
  Title:

**NJMHMC, LLC D/B/A HUDSON REGIONAL HOSPITAL**

By: _____
  Name:
  Title:

CarePoint Service Recipients:

**HUDSON HOSPITAL OPCO, LLC, D/B/A CAREPOINT HEALTH – CHRIST HOSPITAL**



By: _____
  Name:  Achintya Moulick
  Title:  CEO

**HUMC OPCO, LLC, D/B/A HOBOKEN UNIVERSITY MEDICAL CENTER**

By: _____
  Name:  Achintya Moulick
  Title:  CEO

*[Signature Page 1 of 2 to Management :*

HRH:

**29 E 29 STREET HOLDINGS, LLC**

By: _____    ◄ SIGN HERE
  Name: Yan Moshe
  Title: Manager

**NJBMCH, INC.**

By: _____    ◄ SIGN HERE
  Name: Yan Moshe
  Title: Authorized Signatory

CarePoint:

**CAREPOINT HEALTH SYSTEMS, INC.**

By: _____
  Name:
  Title:

The Manager:
**HUDSON REGIONAL MANAGEMENT, LLC**

By: _____
  Name: Yan Moshe
  Title: Manager

*[Signature Page 2 of 2 to Management Services Agreement]*

HRH:

**29 E 29 STREET HOLDINGS, LLC**

By: _____
  Name:
  Title:

**NJBMCH, INC.**

By: _____
  Name:
  Title:

CarePoint:

**CAREPOINT HEALTH SYSTEMS, INC.**

By: _____
  Name: Achintya Moulick
  Title: CEO

The Manager:
**HUDSON REGIONAL MANAGEMENT, LLC**

By: _____
  Name:
  Title:

*[Signature Page 2 of 2 to Management Services Agreement]*

4860-0456-1897, v. 1

Execution Version

**GARDEN STATE HEALTHCARE ASSOCIATES, LLC**

By: _Amoulick_

Name: ACHINTYA MOULICK

Title: 11/2/24

CEO ≈ PRESIDENT

**NEW JERSEY MEDICAL AND HEALTH ASSOCIATES, LLC**

By: _Amoulick_

Name: ACHINTYA MOULICK

Title: 11/2/2024

CEO ≈ PRESIDENT,