## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                              : Chapter 11
                                                    :
CarePoint Health Systems Inc. d/b/a Just Health     : Case No. 24-12534 (JKS)
Foundation, et al.,[1]                              :
                                                    : (Joint Administration Requested)
                                                    :
                                    Debtors.         :

- - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF SHAMIQ SYED
## IN SUPPORT OF FIRST DAY PLEADINGS

I, Shamiq Syed, hereby declare (this "Declaration") under penalty of perjury that the

following is true to the best of my knowledge, information and belief:

1.      I am the Chief Financial Officer ("CFO") of CarePoint Health Systems, Inc.

("CarePoint") and each of the debtors as debtors in possession (collectively, the "Debtors" and,

together with their non-debtor subsidiaries, the "CarePoint Group" or the "Company") in the

above-captioned chapter 11 cases (the "Chapter 11 Cases"). I joined the Company in 2024 and,

prior to serving as CFO, I served as Senior Director at Ankura in their Turnaround & Restructuring

practice.  I have served as CFO of the Company since July 15th, 2024.  In this capacity as well as

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063).  The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030

on account of my employment at Ankura as a financial advisor to CarePoint, I am familiar with the Company's business, financial affairs, day-to-day operations and restructuring initiatives.

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition, except IJKG Opco, LLC, which is subject to an involuntary petition (collectively, the "Petitions") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (this "Court").

3.      I submit this Declaration to provide an overview of the Debtors' businesses and these Chapter 11 Cases, and to support the Debtors' applications and motions for "first day" relief, each of which is listed on the attached Exhibit A (collectively, the "First Day Pleadings").

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge; my discussions with other members of the Debtors' management team and other employees, as well as the Debtors' advisors; my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives; or my opinions, based upon my experience and knowledge. I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

5.      To familiarize the Court with the Debtors and the relief that the Debtors seek early in these Chapter 11 Cases, this Declaration is organized in four parts. Part I provides an introduction to the Debtors and information on their corporate history and business operations. Part II describes the Debtors' prepetition organizational and capital structures. Part III describes the events that led to the commencement of these Chapter 11 Cases.  Part IV briefly addresses the First Day Pleadings, and incorporates the facts set forth in each of the First Day Pleadings, as if fully set forth in this Declaration.

#124669850v6

## I.    BRIEF INTRODUCTION[2]

### A.    Overview

6.      CarePoint oversees the operations and combined resources of three hospitals and related neighborhood health centers located in Hudson County, New Jersey—Bayonne Medical Center, Christ Hospital in Jersey City and Hoboken University Medical Center.  Christ Hospital and HUMC are "safety net" hospitals serving a large underprivileged community. All three hospitals are committed to one mission - treating patients with compassion and leading with innovation to improve the health of the communities in which they serve. The amount of free and inadequately reimbursed services provided to these underprivileged communities is the main driver of CarePoint's financial distress.

7.      The CarePoint Hospitals have numerous significant creditors and landlords. Prior to this filing, CarePoint and its legal team spent many months negotiating a comprehensive solution to the financial issues confronting CarePoint. The purpose of these bankruptcy cases is to implement this solution and resolve CarePoint's unsustainable level of accumulated debt.

8.      Among other things, involuntary debtor IJKG Opco LLC ("IJKG Opco") negotiated three comprehensive agreements with Hudson Regional Hospital ("HRH") that provide for the transfer of IJKG Opco LLC's Bayonne hospital to HRH. An affiliate of HRH is the landlord at Bayonne, the lease is in default and was terminated prepetition as a result of a judgment of the Delaware Chancery Court. The HRH agreements also provide for DIP funding for Bayonne, for which approval will be sought in the event of a filing of a bankruptcy case for IJKG Opco, and for an eventual, coordinated four hospital system at the end of these cases. All of these agreements

---

[2] Capitalized terms used in this Introduction but not defined shall have the meanings ascribed to them in the remainder of this Declaration.

#124669850v6

were intended to be subject to this Court's approval. IJKG Opco is not presently part of this filing due to the lack of required consent of a 9.9% minority shareholder.

9.      In addition to the HRH agreements, CarePoint brought in a midwestern based hospital operator, Insight Management and Consulting Services, Inc. ("Insight"), to operate its hospitals. Insight has provided prepetition interim funding and has deferred management fees to assist CarePoint in its turnaround. Although Insight remains the manager of the Christ/Jersey City and Hoboken hospitals as of the petition date, HRH has also agreed to provide DIP financing for those hospitals through a $25 million DIP loan agreement. The DIP loan will allow CarePoint to operate the Christ/Jersey City and Hoboken hospital facilities during the chapter 11 cases and allow it to cure and assume the leases at Jersey City and Hoboken. Interim approval of this DIP loan will be sought as a part of the first day motions.

10.     Prior to the petition date, CarePoint briefly changed its management structure. Dr. Achintya Moulick stepped down as CEO and the CarePoint board appointed Dr. Jawad Shah as CEO. Dr. Shah is also the CEO of Insight. On October 27, 2024, Dr. Shah resigned as CEO and on October 28, 2024, the CarePoint board reappointed Dr. Moulick to that role. Dr. Moulick remains the chairman of the board of CarePoint. The CarePoint board also elected the mayors of the cities of Hoboken and Jersey City to the board to assure vigorous community representation. Other community representatives, including a representative of Bayonne, remain on the board.

11.     CarePoint is a New Jersey non-profit corporation.  It is a holding company with no employees or operations and is the direct or indirect owner of either the majority or 100% of the interests of each of the following operating companies:

(a)     HUMC Opco LLC, d/b/a CarePoint Health – Hoboken University Medical Center ("HUMC") is a licensed 348 bed acute care facility that provides inpatient and

outpatient services. This Hospital was acquired out of bankruptcy through an asset purchase agreement in 2011.  On April 1, 2022, the majority member of Hoboken Intermediate Holdco, LLC (then the direct parent of HUMC Holdco, LLC, the direct parent of HUMC), donated its equity in Hoboken Intermediate Holdco, LLC to Benego CarePoint LLC, a subsidiary of CarePoint ("Benego"). On May 4, 2022, a minority owner in Hoboken Intermediate Holdco, LLC assigned its membership interest to Evergreen Community Assets, LLC, a subsidiary of CarePoint ("Evergreen").  On December 27, 2022, the remaining minority member of Hoboken Intermediate Holdco, LLC assigned its membership interest in Hoboken Intermediate Holdco, LLC directly to CarePoint. CarePoint is now the beneficial owner of 100% of the membership interests in HUMC.

(b)    IJKG Opco LLC d/b/a CarePoint Health – Bayonne Medical Center ("Bayonne"), which is an involuntary debtor (due to lack of consent of a 9.9% minority shareholder) and is an affiliate of the Company, is a licensed 278 bed acute care facility that provides inpatient and outpatient services. Bayonne was a wholly owned subsidiary of Debtor IJKG, LLC ("IJKG").  Upon the acquisition of Bayonne Medical Center out of bankruptcy through an asset purchase agreement by IJKG, Bayonne was formed to facilitate the operations of Bayonne Medical Center.  IJKG was the sole member and manager of Bayonne.  Effective October 27, 2020, IJKG sold a 9.9% membership interest in Bayonne to BMC Hospital, LLC and, while the Debtors believe that IJKG Opco should be a debtor in these Chapter 11 Cases, the holders of the 9.9% membership interest in Bayonne will not consent to such a filing.  On April 1, 2022, the majority member of Bayonne Intermediate Holdco, LLC, the sole member of Sequoia BMC Holdco, LLC, then the majority member of IJKG, contributed its membership interest in Bayonne Intermediate

5

Holdco, LLC to Benego. On May 4, 2022, a minority member of Bayonne Intermediate Holdco, LLC assigned all of its membership interest in Bayonne Intermediate Holdco, LLC to Evergreen. On December 27, 2022, the remaining non-CarePoint minority member in Bayonne Intermediate Holdco, LLC assigned all of its membership interest in Bayonne Intermediate Holdco, LLC to CarePoint.  On October 18, 2024, the minority members of IJKG assigned all of their membership interests in IJKG to Sequoia BMC Holdco, LLC. As a result of the foregoing transactions, CarePoint is the beneficial owner of 90.1% of the membership interests in Bayonne.

(c)      Hudson Hospital Opco LLC d/b/a CarePoint Health – Christ Hospital ("Christ Hospital") is a 349-bed acute care facility that provides inpatient and outpatient services.  Christ Hospital was acquired out of bankruptcy through an asset purchase agreement in 2012.  On April 1, 2022, the majority member of Christ Intermediate Holdco, LLC, the sole member of Hudson Hospital Holdco, LLC, then the majority member of CH Hudson Holdco, LLC, the direct parent of Christ Hospital, contributed its membership interest in Christ Intermediate Holdco, LLC to Briar Hill CarePoint LLC, a subsidiary of CarePoint ("Briar Hill"). On May 4, 2022, a minority member of Christ Intermediate Holdco, LLC contributed all of its membership interests in Christ Intermediate Holdco, LLC to Evergreen.  Prior to December 27, 2022, the remaining non-CarePoint minority members of Christ Intermediate Holdco, LLC assigned all of its membership interests in Christ Intermediate Holdco, LLC to CarePoint.  On December 27, 2022, the minority member in CH Hudson Holdco, LLC, the direct parent of Christ Hospital, assigned all of its membership interests in CH Hudson Holdco, LLC to CarePoint.  As a result of the

#124669850v6

foregoing transactions, CarePoint is the beneficial owner of 100% of the membership interests in Christ Hospital.

(d)    As a result of these transactions, CarePoint, HUMC and Christ Hospital are not for profit entities under section 501(c)(3) of the Internal Revenue Code. Bayonne, because of the minority 9.9% ownership of BMC Hospital, LLC, remains a for profit entity.

12.    CarePoint now owns 100% of the ownership interests in HUMC and Christ Hospital through a series of entities and owns approximately 90.1% of the ownership interests in Bayonne.  HUMC, Bayonne and Christ Hospital are collectively referred to herein as the "Hospitals".  Christ Hospital and HUMC are presently considered "disregarded entities" for tax and nonprofit status purposes.   All three hospitals are affiliated by common ownership of the nonprofit parent.

13.    In addition to Bayonne, Christ Hospital and HUMC, the Debtors operate neighborhood health centers in their service areas. These neighborhood health centers care for more than 20,000 patients annually. Many patients are children and expecting mothers. They also train dozens of physicians annually, the majority of whom remain local following graduation to serve the community.

14.    CarePoint is led by CEO Achintya Moulick, MD, MBA. Dr. Moulick is a clinical, business, and thought leader in the healthcare industry. A neonatal cardiac surgeon by training with expertise in congenital and acquired heart disease, he has led hospitals and hospital programs for 20 years, as Executive Director, Chairman in Cardiovascular Surgery, Chief Medical Officer, and Chief Executive Officer.

15.    As explained more fully below, the CarePoint system treats a disproportionately large number of uninsured and undocumented patients who are generally admitted through the

7

emergency department. The funding received by CarePoint from the State of New Jersey is and has been woefully inadequate to sustain operations given the patient mix of the Hospitals. As a result, CarePoint has accumulated significant trade debt (approximately $165 million in the aggregate) that it has been unable to pay, resulting in one or more of the Debtors being named as a defendant in 53 pending lawsuits.

16.     These Chapter 11 cases have been filed to provide the Debtors an opportunity to accomplish a restructuring by, inter alia, (a) staying the multiple pending collection actions, (b) resolving significant Debtor claims against certain insurance carriers, (c) rejecting unfavorable contracts or leases where necessary to efficiently streamline the Debtors' operations, and (d) giving the Debtors breathing room to effectuate the prepetition restructuring arrangements that are already underway and to implement them through a plan of reorganization.

17.     The Debtors are seeking joint administration of all Chapter 11 Cases, including the involuntary bankruptcy of IJKG Opco, LLC. Accordingly, the Debtors have filed a motion for joint administration of all Chapter 11 Cases.

**B.     Corporate History and Business Operations**

18.     Originally, the Hospitals were for profit entities owned by certain entities affiliated with Vivek Garipalli, James Lawler and Jeffrey Mandler (the "Prior Owners"). CarePoint was formed and received its non-profit status in November 2021. The transfer of the for-profit ownership of the Hospitals was completed by the end of 2022 and was approved by the State of New Jersey on March 20, 2023, for Bayonne and HUMC, followed by Christ Hospital on April 17, 2023.

19.     The CarePoint Hospitals were at the forefront of providing care in Hudson County during the COVID-19 pandemic. The Hospitals continued to operate without interruption of services during CarePoint's transition to non-profit. But the continued care of the underprivileged,

many of whom are uninsured or undocumented, presented mounting financial strain on the system. The post COVID inflation in hospital expenditures, particularly drugs and staffing costs added to the issues. During this time, the Hospitals received insufficient funding from the State of New Jersey and from the federal government. CarePoint and its Hospitals continued to serve the people of Hudson County, providing excellent healthcare, at the expense of its balance sheet. The resulting accumulation of debt has become unmanageable.

## II.    CAREPOINT'S PREPETITION ORGANIZATIONAL AND CAPITAL STRUCTURE

### A.    Prepetition Organizational Structure

20.    The prepetition organizational structure is described above.  A chart depicting the CarePoint organizational structure as of the Petition Date is attached hereto as Exhibit B.

### B.    Prepetition Capital Structure

21.    The Debtors' capital structure is comprised of senior secured debt held by non-insiders Capitala Private Advisors, LLC and other lenders as well as former insider subordinated secured debt held by Maple Healthcare, LLC ("Maple"), the obligations to both of which are described in greater detail for each of the Hospitals in section III hereof.  Maple is owned by the individual owners of the Prior Owners. Together, Capitala Private Advisors, LLC and the other lenders and Maple are referred to as the "Prepetition Lenders."

## III.    PREPETITION SECURED DEBT OBLIGATIONS

### A.    Capitala Secured Debt Obligations

22.    HUMC entered into an Amended and Restated Loan and Security Agreement dated as of August 8, 2019 (as amended from time to time and most recently by that certain Fourteenth Amendment to Amended and Restated Loan and Security Agreement and Waiver dated as of November 4, 2022) (the "Hoboken/Capitala Loan Agreement"), with Capitala Private Advisors,

LLC, as administrative and collateral agent, and the other lender parties thereto (collectively, the "Hoboken/Capitala Lenders"), pursuant to which Hoboken Opco obtained a term loan facility in the aggregate principal amount of $30 million (the "Hoboken/Capitala Loan"), of which approximately $14.8 million was paid down. The maturity date of the term loan facility was November 4, 2023.  The Hoboken/Capitala Loan is secured by a first priority lien on all assets[3] of Hoboken Opco and its parent company, HUMC Holdco, LLC, in accordance with that certain Subordination Agreement dated as of August 8, 2019, with Capitala Private Advisors, LLC, and Maple.  As of the Petition Date, approximately $14,817,161 of principal remains outstanding under the Hoboken/Capitala Loan.

23.    Christ Hospital entered into a Loan and Security Agreement dated as of November 4, 2022 (the "Hudson/Capitala Loan Agreement"), with Capitala Private Advisors, LLC, as administrative and collateral agent, and the other lender parties thereto (collectively, the "Hudson/Capitala Lenders"), pursuant to which Hudson Opco obtained a term loan facility in the aggregate principal amount of $7,000,000 (the "Initial Hudson/Capitala Loan").  Hudson Opco entered into a First Amendment to Loan and Security Agreement dated as of February 8, 2023, with the Hudson/Capitala Lenders, pursuant to which Hudson Opco obtained an additional term loan facility in the aggregate principal amount of $2,180,000 (the "Additional Hudson/Capitala Loan" and together with the Initial Hudson/Capitala Loan, the "Hudson/Capitala Loan").  The maturity date of both term loan facilities under the Hudson/Capitala Loan was November 4, 2023. The Hudson/Capitala Loan is secured by a first priority lien on all assets[4] of Hudson Opco, in

---

[3]    Pursuant to an Amended and Restated Intercreditor Agreement dated as of August 8, 2019, the lessor of the property on which Hoboken University Medical Center is located has priority over the Hoboken/Capitala Lenders regarding certain collateral of Hoboken Opco specifically set forth therein.

[4]    Pursuant to (i) a Lease Agreement among Hudson Opco, CH 750 Park LLC, and CH Castle LLC dated as of December 27, 2022; and (ii) a Lease Agreement between Hudson Opco and J.C. Opco, LLC dated as of

accordance with that certain Subordination and Intercreditor Agreement dated as of November 4, 2022, with Capitala Private Advisors, LLC, and Maple.  As of the Petition Date, approximately $4,893,648 of principal remains outstanding under the Hudson/Capitala Loan.

24.    Bayonne entered into a Loan and Security Agreement dated as of November 4, 2022 (the "Bayonne/Capitala Loan Agreement"), with Capitala Private Advisors, LLC, as administrative and collateral agent, and the other lender parties thereto (collectively, the "Bayonne/Capitala Lenders"), pursuant to which Bayonne Opco obtained a term loan facility in the aggregate principal amount of $3,000,000 (the "Initial Bayonne/Capitala Loan").  Bayonne Opco entered into a First Amendment to Loan and Security Agreement dated as of February 8, 2023, with the Bayonne/Capitala Lenders, pursuant to which Bayonne Opco obtained an additional term loan facility in the aggregate principal amount of $3,120,000 (the "Additional Bayonne/Capitala Loan" and together with the Initial Bayonne/Capitala Loan, the "Bayonne/Capitala Loan").  The maturity date of both term loan facilities under the Bayonne/Capitala Loan was November 4, 2023.  The Bayonne/Capitala Loan is secured by a first priority lien[5] on all Accounts, "Other Accounts" (as defined in the Bayonne/Capitala Loan Agreement), Deposit Accounts, all books and records of the foregoing and all proceeds and products of the foregoing, of Bayonne Opco, in accordance with that certain Subordination and Intercreditor Agreement dated as of November 4, 2022, with Capitala Private Advisors, LLC, and Maple.  As of the Petition Date, approximately $6,120,000 of principal remains outstanding under

---

December 27, 2022, the landlord's lien on Hudson Opco's licenses under each lease is subordinate to the Hudson/Capitala Lenders' security interest.

[5]    Pursuant to that certain Lease Agreement between Bayonne Opco and MPT of Bayonne, LLC, dated as of February 4, 2011, the lessor of the property on which Bayonne is located has priority over the Bayonne/Capitala Lenders regarding certain collateral of Bayonne Opco.

#124669850v6

the Bayonne/Capitala Loan. The Bayonne Capitala Loan was acquired by an affiliate of Hudson Regional Hospital on October 24, 2024.

25.     In addition to these facilities, Capitala also lent money pursuant to certain loan agreements with a remote holding company owned by the individual owners of the Prior Owners and now part of the CarePoint system (the "Sequoia Loan Agreement" and, together with the Hudson/Capitala Loan Agreement, the Hoboken/Capitala Loan Agreement and the Bayonne Capitala Loan Agreement, the "Capitala Loan Agreements"). This holding company loan is known as the Sequioa loan. The outstanding principal balance is approximately $35,805,000. The proceeds of the Sequoia loan were believed to be distributed to the prior owners and re-advanced to the operating companies as described below.

### B.     Maple Secured Debt Obligations

26.     Christ Hospital entered into an Amended and Restated Loan and Security Agreement dated as of June 26, 2019 (as amended from time to time and most recently by that certain Third Amendment to Forbearance Agreement and Amendment to Amended and Restated Loan and Security Agreement dated as of November 4, 2022) (the "Hudson/Maple Loan Agreement") with Maple, pursuant to which Hudson Opco obtained a term loan facility in the aggregate principal amount of $17,951,721 (the "Hudson/Maple Loan"). The Hudson/Maple Loan has matured, and Maple agreed to forbear from exercising rights and remedies in respect of certain defaults under the Hudson/Maple Loan until November 4, 2023. Maple has continued to forbear since then. The Hudson/Maple Loan is secured by a lien on all assets of Hudson Opco, subordinate to the lien of Capitala Private Advisors, LLC. As of the Petition Date, approximately $34,751,366 remains outstanding under the Hudson/Maple Loan.

27.     Bayonne, Garden State Healthcare Associates, LLC, and New Jersey Medical and Health Associates, LLC, entered into an Amended and Restated Loan and Security Agreement

12

dated as of June 26, 2019 (as amended from time to time and most recently by a Forbearance Fifth Extension Agreement and Third Amendment to Amended and Restated Loan and Security Agreement dated as of November 4, 2022) (the "Bayonne/Maple Loan Agreement" and, together with the Hudson/Maple Loan Agreement, the "Maple Loan Agreements" and, together with the Capitala Loan Agreements, the "Prepetition Loan Agreements") with Maple, pursuant to which Bayonne Opco and the other borrower parties thereto obtained a term loan facility in the aggregate principal amount of $10,067,955 (the "Bayonne/Maple Loan").  The Bayonne/Maple Loan has matured, and Maple agreed to forbear from exercising rights and remedies in respect of certain defaults under the Bayonne/Maple Loan until November 4, 2023.  Maple has continued to forbear since then. The Bayonne/Maple Loan is secured by a lien on all assets[6] of Bayonne Opco and the other borrower parties thereto, subordinate to the lien of Capitala Private Advisors, LLC.  As of the Petition Date, approximately $13,506,773 remains outstanding under the Bayonne/Maple Loan.

C.    **Collateral Sharing Arrangement**

28.    HUMC, Christ Hospital, Bayonne, Capitala Private Advisors, LLC, and Maple, among others, entered into a Collateral Sharing Agreement dated as of November 4, 2022, as amended by that certain First Amendment to Collateral Sharing Agreement dated as of October 15, 2024 (the "CSA"), whereby the proceeds derived from certain litigation matters identified in the CSA were shared and to be distributed to the lender parties to the CSA in accordance with a recently revised distribution waterfall, notwithstanding the security and lien priority otherwise set forth in the loan documents with such lenders.  Approximately $18,500,000 was paid to Capitala

---

[6]    Pursuant to a Second Amended and Restated Intercreditor Agreement dated as of June 26, 2019, the lessor of the property on which Bayonne Medical Center is located has priority over Maple regarding certain collateral of Bayonne Opco specifically set forth therein.

last week pursuant to the CSA in partial satisfaction of its indebtedness.    This payment derived from a prepetition settlement of litigation with Aetna on which Capitala had liens and was a precondition to Capitala's consent to the pari passu first lien required by the DIP lender to HUMC and Christ Hospital. The principal debt balances set forth above reflect this payment.

### D.    Prepetition Unsecured Debt Obligations

#### (1)    Maple Unsecured Debt Obligations

29.    On June 1, 2019, HUMC entered into a Demand Promissory Note payable to Maple in the aggregate principal amount of $3,706,553.  On July 25, 2019, Hoboken Opco entered into (i) an Amended and Restated Demand Promissory Note payable to Maple in the aggregate principal amount of $646,723.50; and (ii) an Amended and Restated Demand Promissory Note payable to Maple in the aggregate principal amount of $4,353,276.50.  These three notes are subordinate to the Hoboken/Capitala Loan pursuant to that certain Subordination Agreement dated as of August 8, 2019, with Capitala Private Advisors, LLC.  As of the Petition Date, approximately $14,902,959 remains outstanding under the three notes.

#### (2)    Non-Maple Former Owners Unsecured Debt Obligations

30.    The Non-Maple Former Owners assert certain additional unsecured debt obligations owed by the Hospitals to the Prior Owners (and certain of their affiliates) pursuant to notes payable by HUMC and additional unsecured amounts due from HUMC, Christ Hospital and Bayonne pursuant to the CSA.

#### (3)    County Option Unsecured Debt Obligations

31.    The Hospitals are participants in a "County Option Program."  The County Option Program supports local hospitals and ensures that they continue to provide necessary services to low-income residents. The legislation, which limits eligibility to certain counties and delineates criteria for eligibility, (1) provides for increased financial resources through the Medicaid program,

14

and (2) provides participating counties with new fiscal resources. Eligible hospitals fund amounts determined by the legislation to the Program. CarePoint has been unable to satisfy its payment obligation over the past four quarters and currently owes the program $15,710,447.

### (4)    Other Unsecured Debt Obligations

32.    Hoboken Opco and its parent, HUMC Holdco, LLC, entered into a Promissory Note dated as of November 4, 2011, payable to District 1199J-New Jersey Health Care Employers Pension Plan in the aggregate principal amount of $750,000.  As of the Petition Date, approximately $1,038,000 remains outstanding under the note.

33.    Optum, Inc. ("Optum") is a third-party insurance payor that pays the Debtor for services provided to Optum's beneficiaries.  Optum was the victim of a cyber-attack and, after the attack, was unable to access their billing systems to receive, process, and pay claims to healthcare providers.  As such, Optum advanced the Debtors approximately $28 million, which was later subject to a reconciliation between Optum and the Debtors.  The reconciliation process is not complete as of the Petition Date.

34.    CarePoint took Merchant Advance Loans (MCA) at high interest rates starting in January 2024. Insight entered a Management Services Agreement (MSA) with CarePoint in April 2024 and in exchange for the MSA took additional MCA loans out to refinance the initial MCA loans off CarePoint's books. CarePoint is not aware of any MCA loans remaining on its books. CarePoint believes the loans have balances remaining which have been assumed by Insight and that CarePoint is not responsible for the repayment of these loans.

### (5)    CarePoint's Other Prepetition Obligations

#### (a)    Guaranty Obligations

35.    On November 4, 2022, CarePoint, HUMC,  Christ Hospital and Bayonne each entered into a Limited Non-Recourse Guaranty Agreement (collectively, the "Guaranties") in

connection with a Credit Agreement dated as of August 21, 2018 (as amended from time to time and most recently by that certain Thirteenth Amendment to Credit Agreement and Reservation of Rights dated as of November 4, 2022) with Capitala Specialty Lending Corp., as administrative and collateral agent, and the other lender parties thereto, pursuant to which indirect upstream affiliates of HUMC, Christ Hospital and Bayonne, among others, obtained a term loan facility in the aggregate principal amount of $50,000,000 (the "Intermediate Holdco Loan"). The Guaranties are limited to each guarantors' right, title and interest in the litigation matters set forth in Schedule 1 of the CSA.

36.    Additionally, on August 22, 2022, HUMC entered into a further Limited Non-Recourse Guaranty Agreement in connection with the Intermediate Holdco Loan, such guaranty being limited to $5,000,000 with sole collection recourse under HUMC's interest in that certain Services Agreement dated as of July 20, 2022 (as amended from time to time) with Bayonne.

(b)    Real Property Lease Obligations

37.    The Debtors do not own any real estate, as the real property on which each of HUMC, Bayonne and Christ Hospital operate is leased.

38.    HUMC is lessee under a Lease Agreement dated as of November 4, 2011 (as amended from time to time and most recently by that certain Third Amendment to Lease Agreement dated as of December 27, 2022) with SB Hoboken Propco, LLC as lessor (the "Hoboken Lease"), regarding the property on which HUMC operates. The term of the Hoboken Lease is for ten (10) years from December 27, 2022, subject to an extension option for HUMC for an additional ten (10) year term. The Hoboken Lease is secured by certain assets of HUMC under a Security Agreement, subject to the lien priority set forth in an Amended and Restated Intercreditor Agreement dated as of August 8, 2019, between the lessor and the Hoboken/Capitala Lenders. As of the Petition Date, the rent due under this lease is one month in arrears.

16

39.     Christ Hospital is lessee under (i) a Lease Agreement with CH 750 Park LLC and CH Castle LLC dated as of December 27, 2022; and (ii) a Lease Agreement with J.C. Opco, LLC dated as of December 27, 2022 (collectively, the "Hudson Lease"), regarding the property on which Christ Hospital operates.  The term of the Christ Hospital Lease commences on December 27, 2022, and ends on December 31, 2032, subject to an extension option for Christ Hospital for an additional ten (10) year term.  The Christ Hospital Lease is secured by a landlord's lien on Christ Hospital's licenses, which is subordinate in priority to the Hudson/Capitala Lenders' security interest in Hudson Opco's assets. As of the Petition Date, the rent due under this lease is one month in arrears.

40.     The Christ Hospital lease also contains a purchase option, described more specifically below. This option was terminated prepetition by the landlord due to prepetition defaults in the lease.

41.     Bayonne is lessee under a Lease Agreement dated as of February 4, 2011, originally with MPT of Bayonne, LLC and now with 29 E 29th St. (the "Bayonne Lease"), regarding the property on which Bayonne operates.  The term of the Bayonne Lease is for fifteen (15) years from February 4, 2011, subject to extension options for Bayonne for six (6) additional periods of five (5) years each.  The Bayonne Lease is secured by certain assets of Bayonne under a Security Agreement dated as of February 4, 2011, subject to the lien priority set forth in a Second Amended and Restated Intercreditor Agreement dated as of June 26, 2019, between the lessor and Maple. As of the Petition Date, this lease was terminated due to prepetition defaults, and as a result of a judgment entered by the Delaware Chancery Court.

## IV.    EVENTS LEADING TO CHAPTER 11

42.     As a system of two safety net hospitals and Bayonne, CarePoint and its Hospitals have struggled to meet expenses and service their debts for several years and have taken steps to best maintain operations to serve the Hudson County community.  Nevertheless, financial and liquidity challenges of the Hospitals, largely resulting from unreimbursed COVID-19 expenditures, including nurse agency costs, and the nature of the population served by the Hospitals, continue to plague the Hospitals, requiring formal restructuring in Chapter 11.  A summary of the efforts made by CarePoint and the Hospitals in the recent past to mitigate financial and liquidity challenges as well as a description of its current challenges follows:

**A.     Christ Hospital Sale-Leaseback Transaction**

43.     On December 27, 2022, Hudson Hospital Propco, LLC ("Hudson Propco"), the owner of the real estate on which Christ Hospital is located, and then lessor of the Christ Hospital real estate to Hudson Opco, entered into an Agreement of Purchase and Sale with J.C. Opco, LLC, CH 750 Park LLC and CH Castle LLC (collectively, the "Buyer") whereby Hudson Propco sold the Christ Hospital real estate to the Buyer (the "Christ Hospital Real Estate Sale").  At the closing of the Christ Hospital Real Estate Sale, the then mortgage lender on the Christ Hospital real estate, Signature Bank, whose credit facility was then in default and under lender forbearance, was paid off in full with sale proceeds from the transaction. The balance of the proceeds were used to subsidize CarePoint operations.

**B.     Christ Hospital Real Estate Sale – Equity Transfers**

44.     Prior to the closing of the Christ Hospital Real Estate Sale, CarePoint then possessed an indirect 75% majority ownership interest, and J.C. Opco, LLC possessed an indirect 25% ownership interest, respectively, in Hudson Propco and Christ Hospital.  Concurrently with the Christ Hospital Real Estate Sale, J.C. Opco, LLC donated its ownership interest to CarePoint,

18

resulting in the CarePoint Nonprofit being the one hundred percent (100%) owner of Hudson Propco and Christ Hospital.

### C.    Christ Hospital Real Estate Sale – Purchase Option

45.    Concurrently with the Christ Hospital Real Estate Sale, (i) J.C. Opco, LLC, and (ii) CH 750 Park LLC and CH Castle LLC, each entered into a Lease Agreement with Christ Hospital regarding the real estate on which Christ Hospital is located and certain adjacent parcels the "Real Property Lease Obligations"  The Lease Agreement with CH 750 Park LLC and CH Castle LLC (the "Park/Castle Lease"), which encompasses the real estate on which Christ Hospital is located and certain of the adjacent parcels, contains a purchase option in favor of Christ Hospital, to acquire the real estate that is the subject of the Park/Castle Lease, provided that (i) certain events of default have not occurred under the Park/Castle Lease, the J.C. Opco Lease or the Hoboken Lease (which is with a related party lessor to the lessors at Christ Hospital), and (ii) certain breaches under the Agreement of Purchase and Sale in connection with the Christ Hospital Real Estate Sale, have not occurred prior to the closing of the property acquisition by exercising the option (the "Purchase Option").  Because of certain prepetition defaults in the Real Property Lease Obligations, the option is no longer in effect.  HRH has advised the Debtors that on or about October 29th, 2024, it entered into an option agreement with respect to the Christ real estate land.

### D.    Charity Care and Uninsured Volumes

46.    An increasing volume of patients served by the Hospitals are charity care or uninsured patients.

47.    This cohort of patients represents patients who have not yet complied with the Medicaid or a charity application process. Moreover, charity care distributions received by the Hospitals for 2023 were based on 2019 data; however, the 2023 actual charity care expenditures

significantly increased due to higher volume of charity care patients as well as the inflationary increases in the costs and expenses for health care labor and supplies.

48.     In addition, the marginal payment the Hospitals traditionally receive from patients who are partially approved for charity care are historically not collected nor collectible considering the demographic of the population that is served by the Hospitals. The ability to collect, year-over-year, from self-pay patients was 11.60% in 2019, 16.95% in 2020, 20.20% in 2021, and 15.75% in 2022.

49.     CarePoint and its Hospitals have seen more than 57,000 uninsured patients in the Hospitals' emergency departments, 41,000 uninsured patients in CarePoint's neighborhood health centers, and more than 12,000 homeless patients in the years preceding the bankruptcy.

**E.    Other Costs and Expenses**

50.     The Hospitals are also experiencing a higher acuity of care, requiring a longer period of hospital stay, which can yield a higher reimbursement for the Hospitals; however, the cost of care is exponentially higher with more severe conditions.

51.     Expenses are rising across the board, exacerbated by inflation increases and supply chain issues. The Hospitals face increasing costs for labor, drugs, purchased services, personal protective equipment and other medical and safety supplies needed to care for the acuity of the patients. Nationally, total expenses per hospital discharge are up 15% compared to pre-pandemic levels. Drug costs have seen the largest increase - up by 24%.

52.     These costs are not unique to CarePoint and its Hospitals.  Indeed, increased costs have resulted in half of acute care hospitals in the United States ending 2022 with negative margins. According to the American Hospital Association (2022), the cost of labor, including nursing, is up by 19.1%, supplies are up by 20.6%, and drug costs sharply increased by 36.9%. To exemplify this crisis, CarePoint has spent over $40 million in agency nursing costs over the last 2

years, and more than $70 million on hard costs of charity care patients. To confound inflationary pressures, as Covid is no longer driving hospital visits or admissions, patient volumes in acute care are down year-over-year in critical revenue-producing service lines. Together, this has created a perfect storm of higher costs with diminished revenue, and CarePoint will require additional State and charitable support to maintain sustainability.

53.    The financial impact of the pandemic has negatively impacted the ability of CarePoint and its Hospitals to service its debt from 2021 to the present day.  During that time, CarePoint has sought, unsuccessfully, assistance from the State of New Jersey in the form of additional funding.  The State's denial of additional funding has stalled CarePoint's much needed expansion in population health initiatives, the replenishment of its supplies from its vendors and pharmaceutical suppliers and has left CarePoint struggling to maintain its aging infrastructure.

54.    Due to these varied issues, CarePoint and the Hospitals have been operating very leanly over the past several years, minimizing administrative teams and positions as much as possible to focus resources on the best possible patient care. CarePoint also instituted a number of cost-cutting measures at the Hospital to improve service line efficiencies in the delivery of healthcare, improve supply chain challenges and renegotiate vendor contracts. CarePoint regularly reviews its service lines to optimize revenue, rethinking its business medical plan. These initiatives, along with significant and strategic downsizing, will support the growth of the Hospitals and stabilize cash flow going forward as CarePoint and the Hospitals restructure in Chapter 11.

## V.    <u>RELIEF REQUESTED</u>

55.    As they begin to restructure with the goal of emerging a more financially and operationally stable health care system, the Debtors are seeking certain relief on an expedited basis (the "First Day Pleadings") to ensure a smooth and uninterrupted transition into Chapter 11.

#124669850v6

56.     I have reviewed each First Day Pleading (including the exhibits thereto) and, to the best of my knowledge, information and belief, the facts recited therein with respect to the Debtors are true and correct and are hereby incorporated by reference. I believe that the relief sought in each First Day Pleading is essential to the Debtors' ability to achieve a successful reorganization.

### A.     Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")

57.     In the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of these Chapter 11 Cases and the consolidation thereof for procedural purposes only. Many of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will affect most, if not all, of the Debtors jointly.

58.     The Debtors further seek entry of an order directing the Clerk of the Court to maintain one file and one docket for all of these Chapter 11 Cases under the case of CarePoint Health Systems Inc.

59.     Joint administration of these Chapter 11 Cases will ease the administrative burden on this Court and all parties in interest. Joint administration of these Chapter 11 Cases will not prejudice creditors or other parties in interest because joint administration is purely procedural and will not impact the parties' substantive rights.

60.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### B.     Debtors' Motion for Entry of an Order Approving Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Applicable Privacy Rules (the "Patient Privacy Motion")

61.     In the Patient Privacy Motion, the Debtors seek approval of certain procedures to maintain the confidentiality of patient information as required by the Health Insurance Portability

and Accountability Act of 1996 ("HIPAA"), while, at the same time, providing required disclosure in these Chapter 11 Cases.

62.    The Debtors propose procedures by which they will omit reference to patients from the creditor matrix and certificates of service in these Chapter 11 Cases, will identify patients instead by code number, and will provide the Office of the United States Trustee as well as any interested party that the Court authorizes an unredacted schedule of the patient list.  Further, the Debtors and their claims and noticing agent will maintain a Patient List that will be used for service in these Chapter 11 Cases, indicating on each applicable certificate of service that the persons on the Patient List have been served.

63.    The procedures proposed by the Debtors are intended to avoid a monetary penalty that the Debtors could incur for failing to comply with HIPAA and avoid any injury to patients that could occur through a disclosure of their personal and health related information while also providing a mechanism to best ensure proper and adequate disclosure of necessary bankruptcy related information relating to the Debtors' patients and proper and adequate service on each patient.

64.    I believe that the relief requested in the Patient Privacy Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

C.    **Debtors' Motion for Authority to File a Consolidated List of Creditors and for Approval of Patient Notice Procedures (the "Consolidation Motion")**

65.    In the Consolidation Motion, the Debtors seek to file a single, consolidated list of the top thirty unsecured creditors and establish patient notice procedures.

66.    By this Motion, the Debtors seek to avoid spending time and resources filing lists of each individual Debtor's unsecured creditors, as many creditors are shared among certain of the Debtors and certain other Debtors may have fewer than thirty separate identifiable creditors.

23

67.    In seeking to establish patient notice procedures, the Debtors request authority to serve a Notice of Commencement of Case, substantially in the form of Official Form 309F, via regular mail, on all current patients and patients of Debtors who received medical care on or after November 1, 2022.  Providing individual notice to every current and each former patient of Debtors from the past two years as a creditor or party in interest would be impractical and unnecessarily expense given that the Debtors have seen tens of thousands of patients in that period.

68.    I believe that the relief requested in the Consolidation Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**D.**    **Debtors' Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent for the Debtors (the "Epiq Retention Application")**

69.    The Epiq Corporate Restructuring, LLC Retention Application is made pursuant to 28 U.S.C. § 156(c), section 105(a) of the Bankruptcy Code, and Rule 2002-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware for an order appointing Epiq Corporate Restructuring, LLC (the "Claims Agent") as the claims and noticing agent in order to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases.

70.    Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 10,000 entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

71.    I believe that the relief requested in the Epiq Corporate Restructuring, LLC Retention Application is in the best interests of the Debtors' estates, their creditors, and all other

#124669850v6

parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

      **E.**    **Debtors' Motion for Interim and Final Orders Authorizing Debtors to Continue Using Existing Bank Accounts, Business Forms, and Cash Management System (the "Cash Management Motion")**

72.    The Debtors use a centralized cash management system to collect funds from, and to pay expenses incurred by, their operations (the "Cash Management System"). The Cash Management System includes thirty-five (35) active and thirty-eight (38) dormant bank accounts, a list of which is attached as Exhibit C to the Cash Management Motion (the "Bank Accounts"). The Debtors' Bank Accounts are held at PNC Bank, BCB Bank, Ocean First and IDB Bank (collectively, the "Banks").

73.    The Cash Management System is integral to the operation and administration of the Debtors' businesses. In this regard, the Cash Management System allows the Debtors to efficiently (a) collect outstanding receivables, (b) identify cash requirements, and (c) transfer cash as needed to respond to these requirements.

74.    The principal components of the Cash Management System and the flow of funds through that system are described in more detail win the Cash Management Motion.

75.    The Debtors seek a waiver of the U.S. Trustee operating guidelines for debtors in possession to the extent they require that the Debtors close any Bank Accounts and open new post-petition bank accounts. If enforced in these Chapter 11 Cases, such requirements would disrupt the Debtors' businesses, causing delays in payments to vendors, suppliers, subcontractors, administrative creditors, employees, and others, thereby impeding the Debtors' efforts to maximize the value of their estates.

76.    The Debtors request the authority to continue to use the Bank Accounts with the same account numbers, styles, and business forms as the Debtors used prepetition. The Debtors

also seek authority to open new accounts, whenever needed, provided that the Debtors give the U.S. Trustee and the Prepetition Lenders adequate notice of such newly opened accounts. The Debtors represent that if the relief requested in this Motion is granted, they will not pay, and will direct each of the Banks not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

77.     In connection with continuing the use of the Bank Accounts, the Debtors request the authority to pay prepetition account-related Bank fees and charges to the extent of the amount of the Debtors' cash held by such Bank. The Debtors seek authority to pay the prepetition account-related Bank fees and charges to the extent the Debtors determine, in their good faith business judgment, that the Banks have valid setoff claims pursuant to section 553 of the Bankruptcy Code (but only to the extent of such claims). This will save the Debtors the time and expense of responding to such lift stay requests and/or negotiating stipulated orders to allow the Banks to exercise setoff rights. The Debtors further submit that such relief requested would not prejudice the interests of any other creditors or other parties-in-interest.

78.     The Debtors should be granted further relief from the U.S. Trustee operating guidelines to the extent that they require the Debtors to make all disbursements by check.

79.     Preventing the Debtors from conducting transactions by debit, wire, and other similar methods would unnecessarily disrupt the Debtors' business operations and create additional and unnecessary costs.

80.     Compelling the Debtors to adopt a new cash management system would be expensive and create unnecessary administrative problems, impeding the Debtors' ability to reorganize. Consequently, the Debtors' ability to continue using its Cash Management System is essential and is in the best interests of the Debtors, their estates, and their stakeholders.

#124669850v6

81.     To minimize expenses to their estates, the Debtors also request authorization to continue using all correspondence and business forms (including, but not limited to, letterheads, purchase orders, invoices, multi-copy checks, envelopes, promotional materials, and check stock (collectively, the "Business Forms")) existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession.

82.     The Debtors seek further authority to, as needed, re-order new Business Forms without such legends during these Chapter 11 Cases because changing Business Forms in the middle of these Chapter 11 Cases would be needlessly expensive and burdensome to the Debtors' estates and disruptive to their business operations. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession due to the Debtors providing notice of the commencement of these Chapter 11 Cases and information circulating within the Debtors' industry. Accordingly, adding the required legend would have little practical effect and is inappropriate under the circumstances.

83.     Requiring the Debtors to strictly comply with the requirements of section 345(b) of the Bankruptcy Code would be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." The Debtors believe that any funds held in the Bank Accounts in excess of the amounts insured by the FDIC are secure, and obtaining bonds to immediately secure these funds, as required by section 345(b), is unnecessary in light of the facts and circumstances of these Chapter 11 Cases.

84.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

#124669850v6

**F.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service and (IV) Granting Related Relief (the "Utilities Motion")**

85.      Due to the nature of the Debtors' businesses operating hospitals and medical facilities, continuous utility service is critical to the Debtors' ongoing operations and, more importantly, to patient safety and treatment.

86.      In the normal course of their businesses, the Debtors utilize electric, natural gas, water, telecommunications, waste removal and other utility services.

87.      While the Debtors do owe prepetition amounts to their utility providers, the Debtors expect to have the funds available and to pay their post-petition utility obligations as they come due.

88.      To best assure utility providers of payment for future service and best protect the Debtors from disruption in their utility service, the Utilities Motion proposes the establishment of an adequate assurance deposit as well as procedures by which utilities may request alternate or additional assurance to the extent necessary.

89.      Unless a utility provider agrees to a lesser amount, as adequate assurance of their payment for utility services, the Debtors propose depositing $508,000 into a segregated account for the benefit of their utility providers.  This amount equals one half of the Debtors' aggregate average monthly usage for utility services over a seven-month period.  The Debtors propose to maintain this separate account until the earlier of the date on which the Bankruptcy Court orders the deposit returned to the Debtors or the effective date of a Chapter 11 plan in these Chapter 11 Cases.

90.     The Debtors propose that, if a utility provider seeks additional adequate assurance, the provider must submit a request, among other things, setting forth the amount it seeks, the type of utility service provided, whether it holds a deposit or security and why it believes the proposed adequate assurance is inadequate.

91.     Thereafter, the Debtors propose a twenty (20) day period within which to negotiate a resolution with the provider and, in the event a resolution is not achieved, a hearing at which the Bankruptcy Court will determine the appropriate level of adequate assurance for the provider.

92.     The Debtors propose that if, within twenty-one (21) days following service of the Utilities Motion, a provider does not submit a request for additional adequate assurance, the provider will be deemed to have accepted the adequate assurance proposed by the Debtors.

93.     Obtaining the relief sought in the Utilities Motion will best protect utility providers in the event of a post-petition payment default and also provide the Debtors with assurance that their utility service will continue, uninterrupted, so that they can continue to operate and treat their patients while they proceed through Chapter 11.

94.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business and provide patient care during the Chapter 11 Cases without disruption.

### G.     **Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and (II) Granting Related Relief (the "Taxes Motion")**

95.     To avoid penalties, delay, and potential personal liability if certain prepetition taxes are not timely paid, by the Taxes Motion, the Debtors seek authority to pay certain taxes that accrued prior to the Petition Date and were not paid prepetition, were not processed prepetition, or were paid in an amount that was less than is actually owed.

96.     As set forth in greater detail in the Taxes Motion, the Debtors incur various tax liabilities in the ordinary course of business.

97.     The continued payment of certain prepetition taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting a successful reorganization.

98.     If such obligations are not timely paid, the Debtors will be required to expend time and money to resolve issues related to such obligations.

99.     Further, it is likely that a majority of the taxes constitute priority claims under section 507(a)(8) of the Bankruptcy Code or secured claims under section 506(a) of the Bankruptcy Code.

100.    Accordingly, payment of the taxes through the Taxes Motion will affect only the timing of payment.

101.    I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

**H.    Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of Certain Prepetition Employee Wages, Benefits, and Related Items (the "Wage Motion")**

102.    To minimize the personal hardships the Debtors' employees (the "Employees") will suffer if prepetition employment-related obligations are not paid when due or as expected, as well as to maintain morale during this critical time, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay: (i) all prepetition wages, salaries, and other accrued compensation to employees; (ii) all reimbursable prepetition employee business expenses; (iii) all payments for which prepetition payroll deductions, withholdings or matching employer contributions were made; (iv) all contributions to prepetition employee benefit programs (and

30

authorization to continue such programs in the ordinary course of business); (v) all vacation and other paid leave benefits in the ordinary course of business; (vi) certain paid leave benefits outside of the ordinary course of business; (vii) all workers' compensation program obligations; and (viii) all processing costs and administrative expenses relating to the foregoing payments and contributions, including any payments to third-party administrators or other administrative service providers.

103.    To assist in implementing the relief requested, the Debtors further request that the Court authorize their banks and other financial institutions to receive, honor, process and pay, at the Debtors' request and to the extent of funds on deposit: (i) prepetition payroll checks or electronic transfers and (ii) all other checks or electronic transfers issued for payments approved by this Motion, regardless of whether such checks or electronic transfers were drawn or issued prior to the Petition Date. The Debtors also seek authorization to reissue prepetition checks or electronic transfers for payments approved by this Motion that are dishonored notwithstanding the foregoing direction.

### (1)    Wages, Salaries, and Other Compensation

104.    The Debtors employ almost 3,000 full-time, part-time and temporary employees as described in more detail in the Wage Motion.

105.    Hourly Employees and salaried Employees are paid on a bi-weekly schedule in arrears by the Debtors, with ADP providing tax-related payroll management and administrative services related thereto. The Debtors' payroll is funded through direct deposit and check; however, each Debtor has its own payroll schedule as described in the Wage Motion.

106.    Due to the timing of these Chapter 11 Cases, some Employees have not received compensation for time worked prior to the Petition Date. Moreover, some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the

31

banking system prior to the Petition Date and, accordingly, may not have been honored and paid as of the Petition Date.

107.    The Debtors estimate that the aggregate amount of accrued Wages and Compensation that remains unpaid to the Employees as of the Petition Date is approximately $8,777,000 ($11,314,000 if IJKG Opco becomes a debtor) (the "Unpaid Employee Compensation"). The Debtors have identified several employees whose prepetition compensation and benefits claims exceed the statutory cap. For such Employees, the Debtors seek authority to pay Prepetition Compensation claims up to the $15,150 statutory cap (the "Prepetition Compensation Cap").

### (2)    Reimbursement of Prepetition Employee Business Expenses

108.    The Debtors frequently require Employees to incur business expenses in connection with their employment. In the ordinary course of business, the Debtors reimburse Employees for certain expenses incurred in the scope of their employment on the Debtors' behalf, for professional fees, licensing, certifications, medical exams and courses, travel or other purposes as more fully described in the Wage Motion (the "Reimbursable Expenses"). The Reimbursable Expenses are generally incurred using personal funds or credit cards for which Employees may be held personally liable. The Debtors estimate that, as of the Petition Date, approximately $115,000 of Reimbursable Expenses will be submitted but unpaid and $150,000 will be accrued but not yet submitted.

109.    In the Wage Motion, the Debtors seek authorization, but not direction, to honor and pay all Reimbursable Expenses as of the Petition Date, and to continue to pay all Reimbursable Expenses as they become due in the ordinary course of business.

### (3)    Prepetition Deductions and Withholdings

110.    During each applicable pay period, the Debtors routinely deduct certain amounts from the paychecks of Employees (collectively, the "Deductions"), including, without limitation: (i) garnishments for child support and similar deductions required by law; (ii) pre-tax contributions to flexible health spending accounts; (iii) pre-tax contributions to health, dental, and vision plans, and (iv) other pre-tax and after-tax deductions payable pursuant to certain benefit plans discussed herein and other miscellaneous deductions.

111.    The Debtors also are required by law to (i) withhold from the wages of Employees amounts related to, among other things, federal, state, and local income taxes, social security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate taxing authorities and (ii) make correlated payments for social security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes").

112.    The Debtors estimate that, as of the Petition Date, approximately $2,769,000 in Deductions and Payroll Taxes (collectively, "Withholding Obligations") are outstanding with respect to Unpaid Employee Compensation.

113.    In the Wage Motion, the Debtors seek authorization, but not direction, pursuant to the Order, to honor and pay all Withholding Obligations as they otherwise become due in the ordinary course of business during these Chapter 11 Cases.

### (4)    Prepetition Employee Benefits

114.    The Debtors also offer or provide eligible Employees (and their dependents) with a variety of benefits. These benefits include, but are not limited to: (i) healthcare, dental, and other related coverage; (ii) certain leave benefits; (iii) a 401(k) plan in which eligible Employees can participate; (iv)) a flexible spending plan; and (v) other miscellaneous benefits described in the Wage Motion (all such benefits, collectively, the "Employee Benefits"). The Debtors believe that

as of the Petition Date, the total amount owed or accrued in connection with the Employee Benefits due to Employees is approximately $3,105,000.

115.    Keeping the Debtors' workforce intact is crucial to preserving the Debtors' ability to provide quality health care services to their patients. Without a compensated, intact, and motivated workforce, is it highly unlikely that the Debtors will be able to maximize the value of their remaining assets and the quality of patient care may suffer as a result of disruption.

116.    It is essential that the Debtors continue to honor their Employee Wages and Benefits obligations to ensure the continued operation of the Debtors' business and to maintain the morale of the Employees. Any depletion of the Debtors' workforce would diminish the Debtors' prospects for a successful reorganization.

117.    The Deductions and Payroll Taxes principally represent the Employees' earnings that governments (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from the Employees' paychecks. If the Debtors do not remit those amounts, the Employees may face legal action and the Debtors may be burdened by inquiries and disputes concerning their failure to submit legally required payments. Most, if not all, of the unremitted Deductions and Payroll Taxes constitute moneys held in trust and are not property of the Debtors' bankruptcy estates.

118.    The Employee Wages and Benefits represent a competitive but reasonably limited set of policies and are necessary to retain the skilled and motivated workforce necessary to operate the Debtors' business profitably.

119.    Therefore, I believe that the relief requested in the Wage Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties in interest.

I.    **Motion of CarePoint Health Systems, Inc. for Entry of Interim and Final Orders (i) Authorizing Debtors to Obtain Temporary and Permanent Post-Petition Financing from Bayonne Medical Center Opco, LLC Pursuant to Sections 363 and 364 of the Bankruptcy Code; (ii) Granting Administrative Priority Claims to DIP Lender Pursuant Section 364 of the Bankruptcy Code; (iii) Granting Adequate Protection; (iv) Modifying the Automatic Stay to Implement the Terms of the DIP order; and (v) Authorizing Debtors to Use Cash Cash Collateral**

120.    In the Christ/HUMC DIP Motion, the Debtors seek an order (a) authorizing Debtors Carepoint Health Systems Inc., HUMC OPCO LLC and Hudson Hospital Opco, LLC (collectively, the "Debtor Borrowers") to obtain post-petition financing from Bayonne Medical Center Opco, LLC ("Christ/HUMC DIP Lender") in an aggregate amount of up to $25 million, with up to $10 million available upon interim approval, on a senior secured, priming, superpriority basis; (b) authorizing the Debtors to use Cash Collateral; (c) granting adequate protection to the Prepetition Lenders for the priming of the Prepetition Liens and the Debtors' use of the Cash Collateral; and (d) scheduling a Final Hearing on the DIP Motion.

121.    The Debtors' principal prepetition secured obligations under the Prepetition Loan Agreements total approximately $107,130,000 (the "Prepetition Secured Obligations"). The Prepetition Secured Obligations are secured by liens (the "Prepetition Liens") on substantially all of the Debtors' assets (the "Prepetition Collateral"), including the Debtors' "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral") pursuant to the Prepetition Loan Documents. The Prepetition Secured Parties filed: (a) UCC-1 Financing Statements regarding the Prepetition Collateral against the Debtors in the applicable state and/or county filing offices; and (b) notices of security interest regarding the Prepetition Collateral consisting of intellectual property in the applicable filing offices, as applicable. All of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original Prepetition

Collateral or proceeds of other Prepetition Collateral, constitute the Prepetition Collateral subject to the Prepetition Liens.

122.    Without access to the Cash Collateral and the proposed secured debtor in possession financing facility (the "Christ/HUMC DIP Facility") described herein and in the Christ/HUMC DIP Motion, the Debtor Borrowers will not have sufficient liquidity to operate their businesses during these Chapter 11 Cases.

123.    Indeed, without immediate access to the Cash Collateral and the Christ/HUMC DIP Facility, the Debtor Borrowers would face imminent shut-down and liquidation, which would destroy millions of dollars of the Debtors' value as a going concern, put the Debtors' Employees out of work, and may disrupt patient care.

124.    In the Christ/HUMC DIP Motion, the Debtors request entry of interim and final orders (the "DIP Orders") authorizing the Debtor Borrowers to borrow up to $25 million, of which $10 million would be available on an interim basis, in each case pursuant to and subject to the terms and conditions of that certain Debtor-in-Possession Loan and Security Agreement, in substantially the form attached as Exhibit A to the Christ/HUMC DIP Motion (the "Christ/HUMC DIP Agreement" and, together with all related documents, the "Christ/HUMC DIP Documents"), between the Debtor Borrowers and Christ/HUMC DIP Lender, on the terms set forth in the interim DIP Order or final DIP Order, as applicable. Proceeds of the Christ/HUMC DIP Facility are to be used in accordance with the budget attached to the Christ/HUMC DIP Motion as Exhibit C for the operations and costs of administration of the Debtor Borrowers' facilities and bankruptcy cases.

125.    As further described in the interim DIP Order, as security for all obligations under the Christ/HUMC DIP Facility, Christ/HUMC DIP Lender is granted first priority liens and security interests pursuant to Sections 364(c) and (d) of the Bankruptcy Code on all assets of the

Debtor Borrowers with priority over any and all prepetition liens (the "Christ/HUMC Liens"), except that (i) the interests of the Debtors and their affiliates in certain litigation proceeds described on Schedule 1 to the interim DIP Order will be excluded from Christ/HUMC DIP Lender's collateral to the extent subject to the Prepetition Liens as of the Petition Date; and (ii) the Christ/HUMC Liens will be *pari passu* with the Prepetition Liens under the Capitala Loan Agreements (the "Senior Prepetition Liens") on assets of HUMC and Hudson Hospital Opco LLC as of the Petition Date.  The Christ/HUMC DIP Facility obligations will also constitute allowed superpriority claims against each of the Debtor Borrowers' estates, senior to all other claims and administrative expenses, including any adequate protection superpriority claims and expenses, but subject to the Care-Outs (as defined in the interim DIP Order).

126.    As adequate protection to the extent of any diminution in value of the Prepetition Liens, subject to the Carve Out, the Prepetition Secured Parties will receive replacement security interests in and liens upon all pre- and post-petition encumbered property of the Debtors as further set forth in the interim DIP Order, and the holders of the Prepetition Senior Liens will additionally receive the Senior Adequate Protection Superpriority Claim (as defined in the interim DIP Order), payment of fees and expenses subject to the budget, and post-petition interest payments during any DIP Cash Interest Period (as defined in the interim DIP Order.

127.    As a material inducement to providing the Christ/HUMC DIP Facility, it is a condition to borrowers that the Christ/HUMC DIP Lender enter into an Option Agreement with Insight and has an option to receive up to forty-nine percent (49%) membership interest in the management company managing the Christ and Hoboken facilities and the right to designate 3/7ths of the members of such management company's board of directors.

#124669850v6

128. The Christ/HUMC DIP Motion contains a concise summary of the other material terms and conditions of the Christ/HUMC DIP Facility. The Prepetition Secured Parties have each communicated to the Debtors their consent to the use of cash collateral in accordance with the terms of the Budget and the Interim Order and the Debtor Borrowers' entry into the Christ/HUMC DIP Facility.

129. The Debtor Borrowers submit that entry into the DIP Documents is an exercise of their sound business judgment. Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these Chapter 11 Cases and determined that the Debtors would require post-petition financing to support their operational and restructuring activities. Without the financing to be provided by the Christ/HUMC DIP Facility, the Debtors would almost immediately lack sufficient liquidity to continue operations, to the detriment of the Debtors, their employees, and other stakeholders.

130. Because the Prepetition Liens encumber substantially all of the Debtors' assets, there is no possibility of the Debtors being able to secure DIP financing on an unsecured basis. The Debtors have been unable to obtain DIP financing on only a junior basis or superpriority basis.

131. The Christ/HUMC DIP Facility is the product of extensive negotiations with the debtors' prepetition lenders, who have consented to the use of Cash Collateral and the priming and *pari passu* liens provided under the Christ/HUMC DIP Facility in exchange for the various forms of adequate protection described herein and in the interim DIP Order.

132. The DIP Facility is the result of arm's-length and good faith negotiations between the Debtors and Christ/HUMC DIP Lender. The Debtors submit that the terms and conditions of the Christ/HUMC DIP Documents are fair and reasonable, and the proceeds of the Christ/HUMC DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and

the Christ/HUMC DIP Credit Agreement and budget, as necessary to fund operations and costs of administration of the Debtor Borrowers' cases. Further, no consideration is being provided to any party to the Christ/HUMC DIP Documents other than as described in the Christ/HUMC DIP Motion and proposed interim Order.

133.    I believe that the relief requested in the Christ/HUMC DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtor Borrowers to continue to operate their businesses during the Chapter 11 Cases without disruption.

**J.    Motion of IJKG, LLC and IJKG Opco for Entry of Interim and Final Orders (I) Authorizing IJKG, LLC and IJKG Opco Debtors to Obtain Post-petition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "Bayonne DIP Motion")**

134.    In the Bayonne DIP Motion, the Debtors seek an order (a) authorizing Debtors IJKG OPCO LLC and IJKG, LLC (collectively, the "Bayonne Debtors") to obtain post-petition financing from Bayonne Medical Center Opco, LLC ("Bayonne DIP Lender") in an aggregate amount of up to $42 million, with up to $17,280,000 available upon interim approval, on a senior secured, priming, superpriority basis; (b) authorizing the Debtors to use Cash Collateral; (c) granting adequate protection; and (d) scheduling a Final Hearing on the DIP Motion.

135.    The Bayonne DIP Motion provides for a roll-up of approximately $7,000,000 in prepetition first lien and between $24,000,000 to $32,000,000 of debt of 29 E 29 Street Holdings, an affiliate of the Bayonne DIP Lender.

136.    Without access to the Cash Collateral and the proposed secured debtor in possession financing facility (the "Bayonne Facility") described herein and in the Bayonne DIP

Motion, the Bayonne Debtors will not have sufficient liquidity to operate their businesses during these Chapter 11 Cases.

137.    Indeed, without immediate access to the Cash Collateral and the Bayonne DIP Facility, the Bayonne Debtors would face imminent shut-down and liquidation, which would destroy millions of dollars of the Debtors' value as a going concern, put the Debtors' Employees out of work, and may disrupt patient care.

138.    In the Bayonne DIP Motion, the Bayonne Debtors request entry of interim and final orders (the "DIP Orders") authorizing the Bayonne Debtors to borrow up to $42 million, of which $17,280,000 would be available on an interim basis, in each case pursuant to and subject to the terms and conditions of that certain Debtor-in-Possession Loan and Security Agreement, in substantially the form attached as Exhibit C to the Bayonne DIP Motion (the "Bayonne DIP Agreement" and, together with all related documents, the "Bayonne DIP Documents"), between the Bayonne Debtors and Bayonne DIP Lender, on the terms set forth in the interim DIP Order or final DIP Order, as applicable. Proceeds of the Bayonne DIP Facility are to be used in accordance with the budget attached to the Bayonne DIP Motion for the operations and costs of administration of the Debtor Borrowers' facilities and bankruptcy cases.

139.    As further described in the interim DIP Order, as security for all obligations under the Bayonne DIP Facility, Bayonne DIP Lender is granted first priority liens and security interests pursuant to Sections 364(c) and (d) of the Bankruptcy Code on all assets of the Bayonne Debtors with priority over any and all prepetition liens (the "Bayonne Liens"). The Bayonne DIP Facility obligations will also constitute allowed superpriority claims against each of the Bayonne Debtor estates, senior to all other claims and administrative expenses, including any adequate protection

superpriority claims and expenses, but subject to the Carve-Out (as defined in the interim DIP Order).

140.    As adequate protection to the extent of any diminution in value of its prepetition Liens, subject to the Carve Out, the Bayonne DIP Lender will receive replacement security interests in and liens upon all pre- and post-petition encumbered property of the Bayonne Debtors as further set forth in the interim DIP Order, and the Bayonne DIP Lender will additionally receive an adequate protection superpriority claim.

141.    The Bayonne DIP Motion contains a concise summary of the other material terms and conditions of the Bayonne DIP Agreement.

142.    The Bayonne Debtors submit that entry into the Bayonne DIP Documents is an exercise of their sound business judgment. Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these Chapter 11 Cases and determined that the Debtors would require post-petition financing to support their operational and restructuring activities. Without the financing to be provided by the Bayonne DIP Facility, the Bayonne Debtors would almost immediately lack sufficient liquidity to continue operations, to the detriment of the Bayonne Debtors, their employees, and other stakeholders.

143.    Because the prepetition liens encumber substantially all of the Bayonne Debtors' assets, there is no possibility of the Bayonne Debtors being able to secure DIP financing on an unsecured basis. The Bayonne Debtors have been unable to obtain DIP financing on only a junior basis or superpriority basis.

144.    The Bayonne Debtors submit that the terms and conditions of the Bayonne DIP Documents are fair and reasonable, and the proceeds of the Bayonne DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and the Bayonne DIP Credit

41

Agreement and budget, as necessary to fund operations and costs of administration of the Bayonne Debtors cases. Further, no consideration is being provided to any party to the Bayonne DIP Documents other than as described in the Bayonne DIP Motion and proposed interim Order.

145.    I believe that the relief requested in the Bayonne DIP Motion is in the best interests of the Bayonne Debtors' estates, their creditors, and all other parties in interest, and will enable the Bayonne Debtor to continue to operate their businesses during the Chapter 11 Cases without disruption.

**K.** **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, Including Broker Fees and (B) Renew, Supplement, or Purchase Insurance Policies, (C) Honor Prepetition Insurance Premium Financing Agreement, and (D) Renew Insurance Premium Financing Agreement in the Ordinary Course of Business;(II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief (the "Insurance Motion")**

146.    In the Insurance Motion, the Debtors seek entry of the Order (a) authorizing, but not directing, the Debtors to (i) continue insurance coverage entered into prepetition (the "Insurance Policies") and satisfy prepetition obligations related thereto including broker fees (ii) renew, supplement, or purchase insurance policies in the ordinary course of business, (iii) honor prepetition insurance premium financing agreement, and (iv) renew insurance premium financing agreements in the ordinary course of business; (b) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing; and (c) granting related relief.

147.    In the ordinary course of business, the Debtors pay some Premiums through monthly payments to the Insurers or Insurance Broker, as applicable. These installment arrangements benefit the Debtors by spreading out the cost of the Premiums over the terms of the respective coverage period.

#124669850v6

148.    In connection with the Insurance Policies, the Debtors are party to certain insurance brokerage agreements (collectively, the "Brokerage Agreements") under which the Debtors obtain services from a third-party insurance broker, Willis Towers Watson, Inc. (the "Insurance Broker").

149.    The Debtors maintain approximately fifty-three (53) active Insurance Policies, which provide coverage for, among other things, general liability insurance, directors and officers liability insurance, workers' compensation liability insurance, property insurance, flood insurance, crime insurance and various other liabilities, through their Insurers (as defined below). The Debtors are required to pay insurance premiums, taxes, and fees (the "Premiums") under the Insurance Policies based on a rate established and billed by each insurance carrier (the "Insurers") as described in more detail in the Insurance Motion.

150.    As of the Petition Date, the Debtors owe their monthly payment obligation for October 2024 and the total prepetition amount outstanding on account of the Insurance Policies is approximately $1,420,000.

151.    If the Debtors were forced to obtain replacement insurance on an expedited basis, it could come at a tremendous cost to their estates.

152.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business and meet the needs of their patients during the Chapter 11 Cases without disruption.

L.    **Debtors' Motion for Entry of (I) An Interim Order Approving the Collateral Surrender and Operations Transfer Agreement to Allow, *Inter Alia*, Interim Hospital Operations and (II) A Final Order Approving a Private Sale of All or Substantially All Assets of IJKG Opco, LLC and IJKG, LLC (the "Collateral Surrender Agreement Motion")**

153.    In the Collateral Surrender Agreement, the Debtors seek entry of an interim order to enable, *inter alia*, interim hospital operations by Hudson Regional Hospitals, LLC and a final

43

order approving a private sale of all or substantially all assets of Debtors IJKG Opco, LLC and IJKG LLC pursuant to that certain Collateral Surrender and Operations Transfer Agreement (the "Collateral Surrender Agreement").

154.    IJKG Opco has fallen hopelessly in arrears on its obligations, including payroll obligations to its essential employees, and can no longer sustain its operations.  It is currently faced with the prospect of an immediate closure, which would have the effect of depriving thousands of patients from medically underserved areas of medical care and result in the loss of its Certificate of Need, licensed as an Acute Care Hospital and its goodwill.

155.    Under the Collateral Surrender Agreement, Hudson is exclusively entitled and authorized to operate the Hospital and provide Hospital with the management services deemed by Hudson or its designee(s) to be necessary, desirable or appropriate for the operation of the Hospital. Collateral Surrender Agreement para. 2.06(a).

156.    The Collateral Surrender Agreement provides for a private sale of substantially all assets of Debtors IJKG Opco, LLC and IJKG LLC.  Hudson shall pay IJKG Opco, at the Closing an amount equal to the fair market value of the Collateral as of the Effective Date, as determined by a qualified appraiser selected jointly by Hudson and Bayonne Debtors (the "Appraised Purchase Price") (the cost of which shall be paid by Hudson through the DIP Financing), payable by way of: (i) a credit bid in the amount of: (a) the principal and interest balance of the DIP Financing then outstanding, (b) the outstanding Service Fees and expenses, due or payable thereunder, (c) the Outstanding Judgment; and (ii) the Medicare Liability and any other Liability assumed or paid by Hudson hereunder after the Effective Date, if any (i.e., Hudson shall be credited with having paid the Bayonne Debtors the amount of such Liabilities); and (iii) a cash payment equal to the the positive difference of the Appraised Purchase Price minus the value of (i) and (ii) herein. If the

Appraised Purchase Price is less than the value of (i) and (ii) above, Hudson shall be entitled to retain/reserve all rights to and assert all claims for the deficiency against the Bayonne Debtors. The Appraised Purchase Price is subject to Bankruptcy Court approval via the Sale Order.

157.    I believe that the relief requested in the Collateral Surrender Agreement Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business and meet the needs of their patients during the Chapter 11 Cases without disruption.

### M.    Debtors' Motion for Entry of Interim and Final Orders Order Authorizing the Assumption of the Management Services Agreement (the "Management Services Agreement Motion")

158.    In the Management Services Agreement Motion, the Debtors seek entry of an interim and final order enabling the Debtors to obtain necessary management services of its hospitals pursuant to that certain Management Services Agreement (the "Management Services Agreement").

159.    The Management Services Agreement provides for Hudson Regional Management, LLC to provide management services to the Debtors' three hospitals.

160.    Hudson Regional Management, LLC is a newly-formed entity half-owned by CarePoint and half-owned by affiliates of Bayonne Medical Center Opco, LLC.

161.    The Management Services Agreement was executed in connection with the Debtor-in-Possession Loan and Security Agreement by and among the Bayonne Debtors and Bayonne Medical Center Opco, LLC, an affiliate of Hudson Regional Management, LLC, and the Collateral Surrender Agreement, by and among Hudson Regional Management, LLC and its affiliates and CarePoint and its affiliates.

162.    The Management Services Agreement is an integral part of the overall transaction intended to assist the Debtors in addressing their financial distress.

163.    The Management Services was negotiated in good faith and at arms-length to resolve pending litigation between the Debtors and affiliates of Bayonne Medical Center Opco, LLC while also ensuring the continuity of healthcare services within a unified health system.

164.    The Management Services Agreement will ensure that the Hospitals continue to provide necessary services to patients without interruption.

165.    I believe that the relief requested in the Management Services Agreement Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business and meet the needs of their patients during the Chapter 11 Cases without disruption.

I declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, that the foregoing is true and correct to the best of my knowledge, information, and belief. Accordingly, I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just.

Dated: November 4, 2024          /s/ Shamiq Syed
                                 By: Shamiq Syed
                                 Chief Financial Officer
                                 CarePoint Health Systems, Inc. *et al.*_____