## Exhibit B

**(Hospital Facilities Management Services Agreement)**

## HOSPITAL FACILITIES MANAGEMENT SERVICES AGREEMENT

This **MANAGEMENT SERVICES AGREEMENT** (this "**Agreement**") is made and entered into to be effective as of November 27, 2024 (the "**Effective Date**"), by and between **CAREPOINT HEALTH SYSTEMS, INC.** ("**CarePoint**") and its Subsidiaries, **HUDSON HOSPITAL OPCO LLC D/B/A CAREPOINT HEALTH – CHRIST HOSPITAL** ("**Christ Opco**") and **HUMC HOLDCO, LLC – D/B/A CAREPOINT HEALTH – HOBOKEN UNIVERSITY MEDICAL CENTER** ("**HUMC Opco**," and, collectively with CarePoint and Christ Opco, "**Company**"), and **HUDSON REGIONAL HOSPITALS, LLC** ("**Manager**"), a New Jersey limited liability company. Both Company and Manager are collectively referred to as the "**Parties**" and individually referred to as a "**Party**."

This Agreement is made and entered into with reference to the following facts:

    A.    **WHEREAS**, Company is engaged in the business of owning and operating Company Hospital Facilities (as defined below) and furnishing general hospital and related services at Company Hospital Facilities (collectively, the "**Business**");

    B.    **WHEREAS**, Manager is engaged in the business of (i) managing and consulting at hospital facilities (as defined below) and furnishing general hospital and related services; and

    C.    **WHEREAS**, Company and Manager desire to enter into this Agreement to set forth the terms and conditions upon which Manager will perform and provide, or arrange for the performance and provision of, services to and for Company for the management and administration of the Business and Company Hospital Facilities.

    D.    **WHEREAS,** the Board of Trustees of CarePoint ("Board") has determined that it is in the best interests of the Company and its charitable mission for the Company to be managed by the Manager under the general supervision of the Board and the CEO of CarePoint (the "**CEO**"), as provided hereinafter.

    **NOW, THEREFORE,** in consideration of the recitals, covenants, conditions and promises herein contained, the receipt and sufficiency of which consideration are hereby acknowledged, Company and Manager do hereby agree as follows:

## ARTICLE I.  DEFINITIONS

"**Affiliate**" means, with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agent**" means, with respect to a Person, its officers, directors, service providers, shareholders, members, partners, employees and independent contractors and agents.

"**Agreement**" has the meaning set forth in the Preamble.

"**Budget**" means, as the case may be, the Capital Budget, the Operating Budget, or both of the foregoing.

"**Anti-Kickback Statute**" has the meaning set forth in <u>Section 7.2(c)</u>.

"**Applicable Laws**" means all applicable provisions of Laws, constitutions, statutes, rules, regulations, ordinances, and orders of Governmental Bodies and all orders and decrees of courts, tribunals, and arbitrators and includes, without limitation, all Health Care Laws, each as amended from time to time.

"**Bankruptcy Cases**" means the jointly administered cases pending under Chapter 11 of Title 11 of the United States Code before the United States Bankruptcy Court for the District of Delaware administered as *In re: CarePoint Health Systems Inc., et al.*

"**Billing and Collection Services**" means Manager's billing and collection services.

"**Board**" means the governing board of Company.

"**Business**" has the meaning set forth in the Recitals.

"**Business Associate Agreement**" has the meaning set forth in <u>Section 2.9</u>.

"**Company**" has the meaning set forth in the Preamble.

"**Company Assets**" has the meaning set forth in <u>Section 5.5(b)</u>.

"**Company Books and Records**" has the meaning set forth in <u>Section 2.1(i)</u>.

"**Company Confidential Information**" means any and all information of Company relating to Company or the Business, whether or not such information is designated as being confidential or proprietary, but shall exclude any information that Manager is able to demonstrate (a) was in the public domain through no fault of Manager, its Agents or Affiliates when it was used or disclosed by Manager; (b) was known by Manager prior to the time it was first disclosed to or was first obtained by Manager or its Agents or Affiliates from Company or pursuant to this Agreement; (c) was independently developed by Manager or any of its Agents or Affiliates prior to the time Manager or such Agent or Affiliate first obtained access to such information or such information was furnished or otherwise made available to Manager or such Agent or Affiliate by Company or in connection with or pursuant to this Agreement; or (d) was disclosed to or obtained by Manager or any Agent or Affiliate thereof, from a Person that Manager or such Agent or Affiliate did not know, and did not have reason to know, was subject to a confidentiality or fiduciary obligation to Company. Without limiting the foregoing, Company Confidential Information shall include financial information related to Company and the Business.

"**Company Hospital Facilities**" means Christ Hospital and Hoboken University Medical Center.

"**Company-Owned Entity**" means any Person owned, directly or indirectly, in whole or in part, by Company.

"**Company Policies and Procedures**" means the policies and procedures of Company as adopted or amended from time to time.

"**Cure Period**" has the meaning set forth in Section 5.2.

"**Default**" has the meaning set forth in Section 5.2.

"**Disqualifying Event**" means, with respect to a Party, the occurrence of any one (1) or more of the following: (a) such Party files a petition or answer seeking for itself any liquidation, or similar relief under any statute, law or regulation or files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Party in a proceeding of such nature; (b) such Party seeks, consents to, or acquiesces in the appointment of liquidator of the Party or all or any substantial part of such Party's property; (c) such Party is unable to get dismissed, within one hundred twenty (120) days after its commencement, any proceeding against the Party seeking liquidation, dissolution or similar relief under any statute, law or regulation; (d) such Party is unable to stay or vacate, within ninety (90) days after its commencement, the appointment without such Party's consent or acquiescence of a liquidator of such Party or of all or any substantial part of the Party's property and if the appointment is stayed as hereinabove provided, the appointment is not vacated within ninety (90) days after the expiration of any such stay; or (e) such Party is excluded from participation in any Government Health Care Program pursuant to 42 U.S.C. § 1320a-7, as amended from time to time; provided that in no event shall the commencement or pendency of the Bankruptcy Cases constitute a Disqualifying Event with respect to Company.

"**Effective Date**" has the meaning set forth in the Preamble.

"**FAP Policies**" has the meaning set forth in Section 2.1(f).

"**Fraud and Abuse Statute**" has the meaning set forth in Section 7.2(c).

"**GAAP**" means generally accepted accounting principles.

"**Government Health Care Program**" means and includes the Medicare and Medicaid programs and any other federal health care program as defined in 42 U.S.C. § 1320a-7b(f), as amended from time to time.

"**Health Care Laws**" means all Applicable Laws regulating the financing, services, reimbursement, payment, acquisition, construction, operation, maintenance or management of a health care, facility, provider or payor including, without limitation, (a) the Anti-Kickback Statute; (b) the Stark Law; (c) 31 U.S.C. §§ 3729-3733, which is commonly referred to as the "Federal False Claims Act"; (d) Titles XVIII and XIX of the Social Security Act, implementing regulations and program manuals; and (e) HIPAA and any state-based laws governing the privacy and security of medical information.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended by Subtitle D of the Health Information Technology for Economic and Clinical Health Act which was part of the American Recovery and Reinvestment Act of 2009, as amended, and their respective implementing regulations.

"**Management Fee**" has the meaning set forth in Section 4.1.

"**Management Services**" has the meaning set forth in <u>Section 2.1</u>.

"**Manager**" has the meaning set forth in the Preamble.

"**Manager Confidential Information**" shall mean any and all information of Manager, whether or not such information is designated as being confidential or proprietary, but shall exclude any information that Company is able to demonstrate (a) was in the public domain through no fault of Company, its Agents or its Affiliates when it was used or disclosed by Company; (b) was known by Company prior to the time it was first disclosed to or was first obtained by Company or its Agents or Affiliates from Manager or pursuant to this Agreement; (c) was independently developed by Company or any of its Agents or Affiliates prior to the time Manager or such Agent or Affiliate first obtained access to such information or such information was furnished or otherwise made available to Company or such Agent or Affiliate by Manager or in connection with or pursuant to this Agreement; or (d) was disclosed to or obtained by Company or any Agent or Affiliate thereof, from a Person that Company or such Agent or Affiliate did not know, and did not have reason to know, was subject to a confidentiality or fiduciary obligation to Manager. Without limiting the generality of the foregoing, Manager Confidential Information shall not include financial information related to Company.

"**Manager Personnel**" has the meaning set forth in <u>Section 4.2</u>.

"**Medicaid**" means any state program pursuant to which healthcare providers are paid or reimbursed for care given or goods afforded to categorically eligible or income-eligible individuals and administered pursuant to a plan approved by Centers for Medicare & Medicaid Services (CMS) under Title XIX of the Social Security Act, as amended.

"**Medical Staff**" means physicians with staff privileges under the rules and regulations of Company's Medical Staff Bylaws.

"**Medicare**" means any medical program established under Title XVIII of the Social Security Act, as amended, and administered by CMS.

"**Notice of Default**" has the meaning set forth in <u>Section 5.2</u>.

"**Parties**" and "**Party**" have the meaning set forth in the Preamble.

"**Person**" means and includes any individual, profit or nonprofit corporation, association, partnership, joint venture, trust, estate, limited liability company or other legal entity or organization.

"**Personnel**" has the meaning set forth in <u>Section 2.1(g)</u>.

"**PHI**" has the meaning set forth in <u>Section 7.2(e)</u>.

"**Privacy and Security Policies**" has the meaning set forth in <u>Section 7.2(a)</u>.

"**Privacy and Security Standards**" has the meaning set forth in <u>Section 7.2(d)</u>.

"**Stark Law**" has the meaning set forth in <u>Section 7.2(b)</u>.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"**Term**" has the meaning set forth in Section 5.1.

"**Transition Period**" has the meaning set forth in Section 5.5(c).

"**Transition Services**" has the meaning set forth in Section 5.5(c).

## ARTICLE II.
## OBLIGATIONS OF MANAGER

**2.1     Management Services.** Subject to Section 2.3 and the oversight and direction by the Board and the Chairman of the Board of Trustees as well as Applicable Laws, Manager shall perform and provide, or arrange for the performance and provision of, the items and services described in this Article II (collectively, the "**Management Services**"), for and to Company, Company-Owned Entities, Company Hospital Facilities, as the case may be, and the Business, upon the terms and subject to the conditions set forth in this Agreement. All Management Services for and to Company and Company-Owned Entities shall be performed, provided or arranged for by the Manager.

(a)     General. Except as otherwise expressly set forth in this Agreement, Manager shall manage and supervise all day-to-day operations of Company Hospital Facilities, in accordance with Company Policies and Procedures and Bylaws. In performing the Management Services, Manager shall:

(i)     devote such time and talents to the management of the Business and Company Hospital Facilities as may be necessary and appropriate to efficiently perform the Management Services in accordance with this Agreement;

(ii)     act in good faith and with reasonable diligence in the interests of Company;

(iii)     manage and operate Company, the Business and each of Company Hospital Facilities in a manner consistent with the purposes of Company; and

(iv)     manage and operate Company, the Business and each of Company Hospital Facilities in all material respects in a manner consistent with all Applicable Laws.

(b)     Company Hospital Facilities Operations. Manager shall implement all aspects of the operation of Company Hospital Facilities and shall have the responsibility and commensurate authority for all such activities. Manager shall recommend such rule, regulation, policy or procedure as Manager deems reasonably necessary or appropriate for a particular situation. Manager shall advise Company on all material aspects of Company's Hospital Facilities operations including, without limitation, regulatory and contractual requirements, financial affairs, third party payment programs, insurance requirements, human resources issues, management information systems, marketing

activities, building and facility issues, capital improvement projects, Medical Staff appointment and relations issues, purchasing programs, and all other aspects of Company's Hospital Facilities operations. Manager shall review on an on-going basis the cost-effectiveness and quality of services rendered to patients at Company Hospital Facilities, and shall make recommendations to Company for improved utilization. Manager shall advise and assist Company in securing and retaining contracts in the name and for the account of Company with such individuals or entities necessary for the proper and efficient functioning of the Business. All such recommendations and advice contemplated by this paragraph shall be given to the CEO and where appropriate reported to the Board.

(c)     Business Services. Manager shall provide and manage all business functions and services related to the conduct of the Business during the Term. Without limiting the generality of the preceding sentence, Manager shall perform and provide, or arrange for the performance and provision of, the following items and services to and for Company, each in accordance with applicable Company Policies and Procedures:

(i)     Negotiate, administer and execute on behalf of Company any agreements for professional services of physicians, including physicians to staff the emergency departments at Company Hospital Facilities, (provided that the appointment of medical directors for Company Hospital Facilities shall be approved by the Board) and other non-physician personnel for Company Hospital Facilities;

(ii)     Be responsible for ordering and purchasing or contracting for such office equipment and supplies as are required or appropriate in the day-to-day operation of Company Hospital Facilities;

(iii)     Be responsible for ordering and purchasing or contracting for such medical supplies as are required or appropriate in the day-to-day operation of the clinical component of Company Hospital Facilities;

(iv)     Respond to credentialing information requests;

(v)     Develop, standardize, implement, operate and refine protocols, processes and infrastructure for (1) utilization management and (2) continuous quality improvement to obtain appropriate, cost-effective utilization of health resources and monitor utilization and practice patterns to identify and, as appropriate, correct inappropriate deviations from established norms;

(vi)     Obtain or develop, standardize, implement, operate and refine Company's use of a management information and accounting system that will, among other things, facilitate the Billing and Collection Services, provided that Company may contract with Manager for provider-based billing services, as appropriate;

(vii)     In coordination with Company, assist and support identifying purchasing tools and methods for use in connection with ordering clinical supplies and office equipment and supplies from third party vendors and suppliers;

(viii)     Recommend to the Board such business, legal and financial or other consultants as may be necessary or appropriate for the operation of Company;

(ix)    Obtain or subcontract with third party suppliers and vendors, at the expense of Company, for all reasonable and necessary computer, bookkeeping, dictation and transcription services, laundry, linen, janitorial and cleaning services and other services to improve efficiency and workflow systems and procedures;

(x)    Obtain or subcontract with third party suppliers and vendors, at the expense of Company, for all necessary repairs, maintenance and replacements of furniture, fixtures, equipment and other assets owned and used by Company at Company Hospital Facilities;

(xi)    Assist in, comply with, and participate in Company's regulatory and other legal compliance efforts and advise, or arrange with third party vendors to advise, Company (1) with respect to the steps necessary to obtain and maintain all necessary licenses, permits, accreditations, approvals, certificates of need and authorizations for owning and operating Company Hospital Facilities, and (2) as required to remain in material compliance with Applicable Laws for the operations at Company Hospital Facilities;

(xii)    Supervise the maintenance and physical operation of Company Hospital Facilities and any other premises of Company, at the expense of Company;

(xiii)    Supervise, control, enter into options and terminate all existing and future vendor agreements, contracts, joint ventures, leases, affiliations or any other agreement;

(xiv)    Perform all such other related duties and obligations as reasonably requested by Company and agreed upon from time to time (but, subject to additional agreed upon compensation in excess of the Management Fee for services beyond the Management Services as set forth in Section 2.2); and

(xv)    Enter into, amend, modify or terminate contracts on behalf of the Company and its subsidiaries relating to the foregoing.

(d)    Financial Operations. Manager shall be responsible for, managing all financial and operation functions related to the conduct of the Business during the Term, including the discretion over all cash flow and funds. Company hereby acknowledges that Manager shall not directly or indirectly assume any debt or liabilities of the Company of any kind under this Agreement. Functions include:

(i)    Payment from Company funds and on behalf of Company of all operating expenses and payables, including salaries and payroll taxes, to the vendors, contract parties, Personnel and creditors incurred from and after the Effective Date of this Agreement; Company shall promptly forward to Manager any applicable bills, payables, invoices or other documents received by Company relating to operations of the Business incurred during the Term of this Agreement; and

(ii)    Provide, or cause to be provided, any and all payroll processing, including processing of payroll taxes and filings as required by Applicable Laws, for the Personnel.

(e)    Preparation of Budget and Financial Reports.

(i)    Operating and Capital Budgets. Manager shall implement and modify (as applicable) all aspects of the operating Budget ("**Operating Budget**"), capital expenditures Budget

(if appropriate) ("**Capital Budget**"), and cash flow projections for of Company Hospital Facilities and shall have the responsibility and commensurate authority for all such activities. Manager shall exercise commercially reasonable efforts to operate Company and each of Company Hospital Facilities consistent with the Budget.

        (ii)    <u>Monthly Reports</u>. Manager shall provide to the CEO and where appropriate to the Board such reports as reasonably requested.

        (iii)    <u>Tax Returns</u>. Manager shall prepare all tax returns and form 990s for Christ Opco and HUMC Opco reasonably in advance of the statutory deadlines for review and approval of the Board.

        (iv)    <u>Financial Assistance Reporting</u>. Manager shall make periodic reports (at least quarterly) to the Board regarding the community benefit and financial assistance activities of Company Hospital Facilities, including, without limitation, the number of FAP-eligible individuals provided services by Company Hospital Facilities.

        (f)    <u>FAP Policies</u>. Manager shall (1) develop and implement Company's patient financial assistance and/or charity care policies and procedures, all as adopted or amended by Company from time to time ("**FAP Policies**"); (2) widely publicize the FAP Policies to patients and to the communities served by Company Hospital Facilities; and (3) make available by Company Hospital Facilities financial assistance for medically necessary care to individuals who are eligible for such assistance under the standards set forth in the FAP Policies.

        (g)    <u>Personnel</u>. Manager shall provide, subcontract for the provision of, or otherwise arrange for the employment or engagement by Company and/or any Company-Owned Entity of all personnel including, but not limited to, professional, management, clerical, secretarial, bookkeeping and collection personnel reasonably necessary for the development, operations or management of the Business and Company Hospital Facilities ("**Personnel**"). For the avoidance of doubt, Personnel shall include all employees providing services exclusively for Company or Company Hospital Facilities, but shall not include any employees of Manager, or contractors or subcontractors of Manager ("**Manager Personnel**"). All Personnel shall be qualified, appropriately licensed, not excluded or suspended from participation in Medicare or Medicaid. Manager shall advise Company with respect to, but Manager shall be solely responsible for, the salaries and fringe benefits of all such Personnel and shall provide all payroll administrative services related to same. Manager agrees not to discriminate against such Personnel on the basis of race, religion, age, sex, disability, national origin or other factor prohibited by law. The provision of Personnel, the decision whether such Personnel shall be employed by or sub-contracted with Manager, and the hiring and firing decisions with respect to such Personnel (except as set forth in the next sentence) shall be within Manager's sole discretion, subject to any allocation of Personnel between Company and Manager set forth in an applicable Budget.

        (h)    <u>Human Resources</u>. In addition to the provision of Personnel, Manager shall provide oversight to Company's human resource department and assist in implementing: (1) management training and leadership development programs, and employee service programs, all based upon standard programs or tool kits of Manager; and (2) oversight for health benefit and wage services, and employee background check support.

(i)    <u>Company Books and Records</u>. Manager shall maintain all files and records relating to the operations and activities of Company, the Business and Company Hospital Facilities including, but not limited to, customary financial records and patient files (collectively, "**Company Books and Records**"). Notwithstanding anything in this Agreement to the contrary, the preparation, maintenance and administration of all Company Books and Records shall comply with all Applicable Laws including, without limitation, HIPAA, and all Company Books and Records shall be located so that they are readily accessible as and to the extent necessary for patient care, consistent with ordinary records management practices. Company records shall also be available to Company's officers and employees.

(j)    <u>Insurance/Risk Management</u>. Manager shall retain professionals for risk Management Services relating to the types of insurance required to be maintained by Company for the operation of the Business.

(k)    <u>Medical Staff/Credentialing</u>. Manager shall assist in the sourcing of physicians to become active members of the Medical Staff of Company Hospital Facilities. Manager shall recommend (a) the specialty areas for physician sourcing based upon needs of the communities served by Company Hospital Facilities, and (b) the required criteria for potential physician targets. Any cost incurred in the physician sourcing process including, without limitation, income guarantees, signing bonuses, moving expenses, travel expenses or other similar type expenses shall be the obligation of Manager. Manager shall assist Company with primary source verification in relation to the credentialing of healthcare professionals on staff at Company Hospital Facilities in accordance with the bylaws of the Medical Staff.

(l)    <u>Corporate Services</u>. Manager shall provide the corporate, legal, accounting, bookkeeping and other administrative services set forth in more detail on <u>Exhibit A</u> hereto.

**2.2    Additional Services.** In the event that Company wishes to obtain services in addition to the Management Services, Manager shall discuss with Company the options available to Company for obtaining such services, and the related cost thereof and the applicable compensation if Manager were to perform and provide, or arrange for the performance and provision of, those items or services via Personnel. Such services include, but are not limited to, revenue cycle management, billing, radiology, lab management, materials management, etc. Such services may be provided through Manager or an affiliate of Manager.

**2.3    General Limitations on Manager's Authority.**

(a)    Manager, unless otherwise restricted by Company, shall exercise, throughout the Term, ultimate authority, supervision, direction and control over the Business, policies, operation and assets of Company, and shall, to the fullest extent permitted by Applicable Laws, retain the ultimate authority and responsibility regarding the powers, duties and responsibilities vested in Company pursuant to Applicable Laws including, without limitation, the responsibilities related to (i) the quality of care at Company and compliance by Company with all applicable federal, state and local laws including, without limitation, compliance with federal and state laws relating to "fraud and abuse" by hospitals and other healthcare providers and compliance with the Stark Law, (ii) adopting, amending from time-to-time and enforcing rules, regulations, resolutions and policies for governance of Company, (iii) approving annual Capital Budget and Operating Budget and cash flow projections for Company,

and (iv) otherwise exercising operational oversight of Company, all subject to the periodic review of the CEO and Board.

(b)     Manager shall not take any action that requires the prior approval of or is reserved to the Board or required under Applicable Laws, without first ensuring that such action has been approved by the Board (including in accordance with such Applicable Laws).

(c)     Manager shall not take any action that contravenes explicit Company Policies and Procedures or any written directives issued by the Board or the CEO. Neither the Board nor the CEO shall interfere with the Manager's day to day operation of the Company.

(d)     Manager shall not make expenditures not permitted by Applicable Law.

**2.4     Retention of Authorities Required By Law.** Nothing herein shall be deemed to assign or delegate to Manager, and Company as applicable shall retain, all authorities that by law or regulation must be retained and exercised and may not be delegated by the licensed operator, or Medicare/Medicaid provider, or Joint Commission accredited entity, of any applicable site or facility.

**2.5     Manager's Professional Standard Obligation.** In all conduct related to this Agreement, Manager shall: (a) comply with all Applicable Law, (b) perform diligently and in good faith as agent of Company and in a manner to be in the best interests of such Company, (c) perform at the higher of either (i) customary standards of competence and diligence Manager provides at other hospital facilities owned, operated or controlled by Company or (ii) the specific standards set forth herein, and (d) refrain from acting or purporting to act in a manner that reasonably may create a false or misleading impression in third parties that Manager is authorized to act as agent or service provider to Company beyond the scope of the actual duties and responsibilities set forth herein.

**2.6     Government and Public Relations.** Manager acknowledges and agrees that it will coordinate with Company in connection with any material public statement about its services or Company. This consultation obligation shall not prevent Manager from meeting its legal or regulatory obligations.

**2.7     Ownership of Revenues.** Company, and not Manager, shall own all revenues, income and monies billable or receivable or received arising from or related to its operations; _provided_ that this is not in derogation of Company's obligation to pay Manager its fees as provided herein.

**2.8     Force Majeure.** Manager shall not be liable to Company for failure to perform any of the Management Services, in the event of strikes, lockouts, calamities, acts of God, unavailability of supplies over which Manager has no control or other events over which Manager has no control for so long as such event impedes full performance; _provided_ that Manager shall promptly notify Company in writing of any such occurrence; Manager shall nevertheless be obligated to use commercially reasonable efforts to continue to perform to the extent that is practicable despite such events; and Company shall have no obligation to pay the Management Fee during any suspension of the Management Services due to any such occurrence, except for a portion of such Management Fee that fairly reflects the portion of performance that Manager does provide.

**2.9     HIPAA Compliance.** In providing the Management Services hereunder the Parties understand and agree that Manager will be a Business Associate of Company for purposes of HIPAA.

As such, Manager shall enter into and comply with the Business Associate Agreement in substantially the same form as included in Exhibit B ("**Business Associate Agreement**").

      **2.10**    **Rebates.** If Manager purchases (whether in its own name, in the name of any of its Affiliates or in the name of Company) pharmaceuticals, supplies or other similar goods for use in the operation of the Business, Company shall be entitled to all company-wide rebates and discounts received by Manager in connection with such purchases; provided that any such amounts shall be included as applicable in Net Revenue.

      **2.11**    **Clinical and Quality Issues.** Each Company Hospital Facility shall have a medical director who is jointly recruited, and unanimously approved and appointed by Company and Manager. Each such Company Hospital Facility medical director shall report primarily to the Board of Company and carry out any non-clinical acts in accordance with the direction of the Board of Company.

<h3 style="text-align:center">ARTICLE III.<br>OBLIGATIONS OF COMPANY</h3>

      **3.1**    **Exclusive Arrangement.** Company agrees that, during the Term, Manager and its subcontractors shall be the sole and exclusive provider of Management Services related to Company Hospital Facilities for and to Company or any of its Affiliates or Subsidiaries. In amplification of the foregoing, Company hereby acknowledges, covenants and agrees that none of Company nor any of its Affiliates or Subsidiaries may directly or indirectly, engage, hire, employ, contract with or otherwise allow any other Person to perform the Management Services or to furnish any management, administrative, consulting or other similar items/services to any of its Affiliates or Subsidiaries, provided that such exclusivity shall not prohibit Hudson Regional Management, LLC ("**HRM**") from providing certain services to the Company Hospital Facilities pursuant to that certain Management Services Agreement, dated as of October 9, 2024, by and among HRM, CarePoint, Christ Opco, HUMC Opco, their Affiliates IJKG Opco, LLC, McCabe Ambulance Service Inc. and their other Affiliates who may be a signatory thereto, and the Manager and certain of its Affiliates, as long as Yan Moshe or an entity owned by him owns a 50% or greater ownership interest in HRM. Nothing in this Agreement shall prevent the CEO from consulting for HRM or its affiliates regarding other hospitals owned or managed by HRM's affiliates. Notwithstanding the foregoing, Company retains the right to obtain any services, systems, equipment or other items within or outside the scope of Management Services, upon the determination by the Board that such added services may be necessary to comply with Applicable Laws or lawful obligations, or to comply with accreditation standards or the requirements of Government Health Care Program participation, or to fulfill the fiduciary obligations of the Board.

      **3.2**    **Cooperation with Manager.** Company will cooperate with Manager in the provision of Management Services to Company. Company shall provide Manager with all authorizations and documentation concerning Company operations reasonably necessary for Manager to fulfill its obligations under this Agreement.  The CEO shall be responsible to assure such cooperation.

      **3.3**    **Right to Inspection.** Company agrees that Manager shall have the right at all reasonable times to enter any Company Hospital Facility as may be necessary and advisable in order for Manager to provide the Management Services pursuant to this Agreement.

      **3.4**    **Medical and Clinical Staff; Medical and Professional Matters.** The Medical Staff shall be organized and reasonably function according to its bylaws and the laws and regulations of the

State of New Jersey as they may be amended from time to time. Company shall retain authority for approval of the bylaws of the Medical Staff. All matters requiring professional medical judgments including, without limitation, the evaluation of clinical competence, the supervision of clinical performance, the provision of clinical training and the control of the composition, qualifications and responsibilities of the Medical Staff, shall remain the responsibility of Company, the Medical Staff and allied health professionals. Manager shall have no responsibility whatsoever for such medical judgments. Company and Medical Staff shall retain such roles and responsibilities as are necessary to meet the accreditation requirements of any accrediting body which has accredited the activities of Company, and shall bear any responsibility for or any control over the clinical decisions, patient care, quality outcomes, infection control, or any other clinical or quality matter at Company.

      **3.5**    **Board of Trustees and Officers**. Bylaws will be revised to allow for one (1)  seat on the Board of Trustees, , in addition to any seats held by the Manager's Affiliates as a consequence of credit transactions, to be selected by Manager and for Officers, other than the CEO, to be nominated by Manager and approved by the Board of Trustees. Until the effective date of a plan of reorganization, Dr. Achintya Moulick shall be the CEO and Chairman of the Board. The plan of reorganization shall provide that on the effective date, Yan Moshe shall become the chairman of the Board and Dr. Nizar Kifaieh shall be the CEO. Dr. Moulick and Yan Moshe shall be co-chairs of the new MSO formed under the Management Services Agreement pursuant to a ten (10) year contract with compensation at least equal to the annual compensation arrangements presently in effect.  The plan of reorganization shall also provide that the directors and officers insurance policy of the Company, or equivalent or better coverage, shall remain in place for the protection of all officers and trustees.  HRM shall indemnify the CEO for any claims by Insight or Surgicore arising out of the transactions with HRM and its affiliates that are not covered by insurance, provided that the CEO does not asset any claims, counterclaims or cross-claims against HRH, its Affiliates, Yan Moshe or Nizar Kifaieh.

## ARTICLE IV.
## COMPENSATION; PAYMENT OF OPERATING EXPENSES; PURCHASE OPTIONS

      **4.1**    **Management Fee.** In consideration for due performance by Manager of the Management Services to be provided by Manager to Company, Company shall pay a monthly fee to the Manager (the "**Management Fee**") equal to ONE MILLION, SEVEN HUNDRED AND FIFTY-THOUSAND U.S. DOLLARS ($1,750,000.00), payable as set forth below. The Parties acknowledge that the Management Fee is consistent with and reflects the fair market value of the Management Services agreed upon through arms' length negotiations. The Parties agree that no consideration or anything else of value given or received under this Agreement is or will be paid for or related to the volume or value of any patient referrals (direct or indirect) or other business to or from Company, Manager or any of their respective Affiliates. The Management Fee may be reevaluated and increased after quarterly review by the mutual written agreement of the Parties, so long as the existing Management Fee is the minimum amount of compensation.

      **4.2**    **Method of Payment and Calculation.** Company shall pay to Manager the Management Fee no later than the fifteenth (15th) business day of the month after the month in which the Management Services were provided. Upon execution of this Agreement, Company shall take all necessary steps to initiate and authorize payment of the Management Fee through automatic withdrawal from Company's account, and wire transfer each monthly installment to Manager's account. All calculations under this Article IV shall be made on an accrual basis of accounting in accordance with GAAP. In the event Company is unable to pay the complete Management Fee,

Company may request to make partial payment, so long as 1) 115% of actual costs, as determined by Manager, are paid, and 2) such request is not made for six consecutive months. Company acknowledges that the unpaid amounts will be owed and paid to Manager as cash flow permits.

      **4.3**     **Expense Reporting and Audit Rights.** Manager shall provide such supporting documentation and receipts as reasonably requested by Company from time to time, and Company shall have a right during normal business hours to audit, examine and make copies of or extracts from the books of account of Manager and/or any Affiliate of Manager or other Person. Such inspection right may be exercised through any agent or employee of Company designated by it or by an independent certified public accountant. Company shall bear all expenses incurred in any examination made by or for it pursuant to this Section 4.3.

      **4.4**     **Purchase Options.**

      (a)     HUMC Option. In consideration for Manager's entry into this Agreement, the Manager's Affiliates' entry into the DIP Credit and Security Agreement and the HRM Management Services Agreement, and other valuable consideration, the receipt and sufficiency is hereby acknowledged, CarePoint and HUMC Opco or their successors, jointly and severally, on and as of the effective date of a plan of reorganization, unconditionally grant to Manager or its designee the exclusive and irrevocable right and option (the "**HUMC Option**") to purchase: (i) all of the rights, title and interest in all of the now-existing or hereinafter acquired or arising tangible and intangible assets owned by CarePoint, HUMC Opco and their respective Affiliates in, or to which they are entitled, or belonging to, or used in the operations or business of, Hoboken University Medical Center, including, without limitation, including without limitation, all equipment, furniture, fixtures, supplies, certificates of need, licenses, permits and other approvals, governmental and private/commercial payor agreements and providers numbers, ownership interests in other entities, accounts/accounts receivable (including healthcare receivables, trade receivables and credit card receivables), cash, goodwill, leasehold interests, options, warrants, rights of first refusal or other similar rights, insurance policies and proceeds, intellectual property, medical records, prepaids, claims, rights of recovery, operating agreements, and residency program slots, or (ii) if HUMC Opco or its successor is then a stock entity, all of the stock, membership or other ownership interests of HUMC Opco or any other entity that owns Hoboken University Medical Center, in each case free and clear of all liens, claims, pledges, security interests, charges, assessments, encumbrances or other third-party rights, of any kind or any nature, and excluding any and all liabilities or other obligations of HUMC Opco, CarePoint or any of their respective Affiliates, provided that Manager or its designee may expressly assume any contracts or liabilities of HUMC Opco in its sole discretion. The purchase transaction effectuated through the exercise of the HUMC Option shall be subject to regulatory approvals (i.e., certificate of need approvals by the New Jersey Department of Health and Community Health Care Assets Protection Act approval, if applicable). If HUMC Opco is a not for profit entity at the time that the option is exercised, then, if Manager determines, in its reasonable discretion and in consultation with the Board, that maintaining Hoboken University Medical Center as a non-profit organization after the purchase thereof by Manager/its designee is economically feasible and sustainable and in the best interests of Hoboken University Medical Center, then the ultimate purchaser shall also be a not for profit entity selected by the Manager or its designee. If the option is exercised, the purchaser may, in its reasonable discretion, elect assume the contracts of senior executives, such as the CEO and CFO, or their severance obligations, subject to their agreement on terms and conditions required by the Manager/its designee. CarePoint and HUMC Opco agree that this option shall be incorporated into any plan of reorganization in the Bankruptcy Cases.

(b)     Christ Option. In consideration for Manager's executing this Agreement, the Manager's Affiliates' entry into the DIP Credit and Security Agreement and the HRM Management Services Agreement, and other valuable consideration, the receipt and sufficiency is hereby acknowledged, CarePoint and Christ Opco or their successors, jointly and severally, on and as of the effective date of a plan of reorganization, unconditionally grant to Manager or its designee the exclusive and irrevocable right and option (the "**Christ Option**") to purchase: (i) all of the rights, title and interest in all of the now-existing or hereinafter acquired or arising tangible and intangible assets owned by CarePoint, Christ Opco and their respective Affiliates in, or to which they are entitled, or belonging to, or used in the operations or business of, Christ Hospital, including without limitation, including, without limitation, all equipment, furniture, fixtures, supplies, certificates of need, licenses, permits and other approvals, governmental and private/commercial payor agreements and providers numbers, ownership interests in other entities, accounts/accounts receivable  (including healthcare receivables, trade receivables and credit card receivables), cash, goodwill, leasehold interests, options, warrants, rights of first refusal or other similar rights, insurance policies and proceeds, intellectual property, medical records, prepaids, claims, rights of recovery, operating agreements, and residency program slots, or (ii) if Christ Opco or its successor is then a stock entity, all of the stock, membership or other ownership interests of HUMC Opco or any other entity that owns Christ Hospital, in each case free and clear of all liens, claims, pledges, security interests, charges, assessments, encumbrances or other third-party rights, of any kind or any nature, and excluding any and all liabilities or other obligations of Christ Opco, CarePoint or any of their respective Affiliates, provided that Manager or its designee may expressly assume any contracts or liabilities of Christ Opco in its sole discretion. The purchase transaction effectuated through the exercise of the Christ Option shall be subject to regulatory approvals (i.e., certificate of need approvals by the New Jersey Department of Health and Community Health Care Assets Protection Act approval, if applicable).  If Christ Opco is a not for profit entity at the time that the option is exercised, then, if Manager determines, in its reasonable discretion and in consultation with the Board, that maintaining Christ Hospital as a non-profit organization after the purchase thereof by Manager/its designee is economically feasible and sustainable and in the best interests of Christ Hospital, then the ultimate purchaser shall also be a not for profit entity selected by the Manager or its designee. If the option is exercised, the purchaser may, in its reasonable discretion, elect to assume the contracts of senior executives, such as the CEO and CFO, or their severance obligations, subject to their agreement on terms and conditions required by the Manager/its designee. CarePoint and Christ Opco agree that this option shall be incorporated into any plan of reorganization in the Bankruptcy Cases.

(c)     Exercise of Option; Closing.  Manager or its designee may exercise the HUMC Option or Christ Option or both option at any time during the Term and through the date that is twenty-four (24) months after the expiration, non-renewal or termination of this Agreement for any reason (the "**Option Period**") by delivering written notice (each, an "**Option Notice**") to CarePoint that shall specify the Option(s) Manager or its designee intends to exercise and the time and date of the applicable Closing , which date shall be not be less than ninety (90) days and not more than 120 days from the date of delivery of the Option Notice as extended as necessary for the conditions to the Closing to be met, unless Manager or its designee waives any such condition or conditions, to the extent waivable, it being agreed that regulatory approvals are not waivable by Manager (the "**Option Date**").  In the event a Closing as to either the HUMC Option or Christ Option does not occur, for any reason, within 120 days from the Option Date, as extended as aforesaid, such Option(s) shall continue in full force and effect until the successful Closing, as applicable.  Each Closing shall occur at the offices of Mandelbaum Barrett, P.C., 3 Becker Farm Road, Suite 105, Roseland, New Jersey 07068 at 10:00 a.m. on the first (1st) Business Day after the date on which the conditions to Closing,

if any, are either satisfied by the obligated party or waived by the other party. Notwithstanding the actual time at which the Closing occurs, the time at which the Closing shall be deemed to be effective, and the risk of loss shall transfer from CarePoint and HUMC Opco or Christ Opco, as applicable, to Manager or its designee, at 12:01 a.m., Eastern Standard Time on the date of the Closing.

(d)    <u>Appraised Purchase Price and Transaction Consideration</u>. At each Closing, as consideration for Manager's or its designee's purchase of Hoboken University Medical Center or Christ Hospital, as applicable, Manager or its designee shall pay to HUMC Opco, in the case of the Manager's or its designee's exercise of the HUMC Option, or Christ Opco, in the case of the Manager's or its designee's exercise of the Christ Option, transaction consideration equal to the fair market value of Hoboken University Medical Center or Christ Hospital, as applicable, as of the Option Date, as determined by a qualified appraiser selected by Manager (the "**Appraised Purchase Price**") *minus* the aggregate amount, without duplication, of: (i) all accrued and unpaid Management Fees due hereunder and all accrued and unpaid "Management Fees" and the "CarePoint Debt" (as such terms are defined in the HRM Management Services Agreement) and all other amounts due or owed under the HRM Management Services Agreement, plus late fees, interest, penalties, and fees, costs and expenses of counsel of each of Manager and HRM and all other professional fees, costs and expenses incurred by Manager or its Affiliates in enforcing its rights to payment and collection of the foregoing, (ii) the aggregate amount of any outstanding principal, accrued and unpaid interest (including default interest), premiums, charges, fees, penalties and other amounts owed or due on account of any outstanding indebtedness owed by CarePoint, HUMC Opco or Christ Opco or their respective Affiliates to Manager or its Affiliates hereunder or under any other agreement or instrument, including in connection with the financing provided under the DIP Credit and Security Agreement, (iii) the amount of any deficiency arising from the calculation of the "Transaction Consideration" pursuant to Section 2.05(a) of that certain Collateral Surrender and Operations Transfer Agreement, dated as of October 9, 2024, by and among, on the one hand, and CarePoint's Affiliates IJKG Opco, LLC and IJKG, LLC, and, on the other hand, the Manager, (iv) the amounts of the liabilities of CarePoint, HUMC Opco or Christ Opco or their Affiliates assumed or paid by the Manager or its designees or Affiliate, (v) the amount of any claims by Manager, its designee or their respective Affiliates against any of CarePoint, HUMC Opco, Christ Opco or any of their respective Affiliates, plus pre- and post-judgment interest and the attorneys' and other professional fees, costs and expenses of Manager, its designee or Affiliates, and (vi) all other fees, expenses, claims (including claims for indemnification pursuant to <u>Section 9.19</u>) or other amounts owed by the Company or its Affiliates to Manager or its Affiliates, whether pursuant to this Agreement or otherwise (including the cost of all appraisals referenced herein and all costs, fees and expenses (including costs and expenses of counsel) incurred by Manager in connection with negotiation, consummation and enforcement of this <u>Section 4.4</u>). If the Appraised Purchase Price is greater than the aggregate amount of <u>clauses</u> <u>(i)</u> through <u>(vi)</u> above, Manager shall pay the Company via wire transfer in United States dollars the difference between the Appraised Purchase Price and such amount. If the Appraised Purchase Price is less than the value of <u>clauses</u> <u>(i)</u> through <u>(vi)</u> above, Manager shall retain and reserve all rights to, and to assert, all claims for, and the Company shall remain responsible and liable to Manager and its Affiliates for, the deficiency.

(e)    <u>Power of Attorney</u>. Upon Manager's or its designee's exercise of the HUMC Option or Christ Option, each of CarePoint, HUMC Opco and Christ Opco are hereby deemed to have appointed Manager or its designee as its attorney-in-fact, with power of substitution, to take any and all actions deemed necessary or proper by Manager, at any time and from time to time, to enforce and effectuate its rights or options under this <u>Section 4.4</u>, including without limitation, to complete,

execute and deliver/file any all applications, forms, agreements or other documents in connection herewith, including without limitation, transfer of ownership applications, certificate of need applications, transaction agreements, bills of sales, assignments, to communicate and negotiate with third parties, and to take any all actions on behalf of CarePoint, HUMC Opco or Christ Opco in furtherance of their obligations and of Manager's or its designee's(s') rights and options under this Section 4.4.

The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable. Each of CarePoint, HUMC Opco and Christ Opco hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof.

(f)     Further Assurances. Each of CarePoint, HUMC Opco and Christ Opco shall take such further actions, execute and deliver all documents, agreements, forms and instruments and to perform such additional acts as Manager may request, or as may be necessary, to effectuate the transactions contemplated in this Section 4.4. Each of CarePoint, HUMC Opco, and Christ Opco covenants and agrees that it will, at any time and from time to time, from and after the Effective Date, fully and timely cooperate with Manager in furtherance of the transactions hereunder and in furtherance of Manager's rights, authority and obligations hereunder and shall promptly take such further action, complete, execute, acknowledge and deliver to Manager or its designee(s) and to file or refile with third parties selected by Manager, or will cause to be promptly done, completed, executed, acknowledged and delivered to Manager or its designees or filed or refiled with third parties selected by Manager, all such further acts, deeds, assignments, forms, applications, transfers, conveyances, powers of attorney and assurances as may be required by Manager to effectuate, consummate, or perform any of the terms, provisions or conditions of this Agreement or to effectuate the assignment, delivery, transfer, grant, of, or grant assurances and confirmations to Manager with respect to, or for purposes of aiding or assisting Manager in collecting and reducing to possession, any or all of the assets being sold, transferred and delivered to Manager or for purposes of vesting control over Hoboken University Medical Center or Christ Hospital, or both of them, as applicable, including without limitation, lists, schedules, descriptions and designations of assets or ownership interests, transfer of ownership applications, statements, copies of warehouse receipts, bills of lading/sale, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments as Manager or its authorized designees may request in their sole discretion.

(g)     Standstill. Unless approved in advance in writing by Manager, Company (and each entity comprising Company) agrees that neither it nor any of its respective Affiliates or any other Person acting on its behalf of or in concert with Company (or any of its representatives) will, at any time during the Term and for a period of twenty-four (24) months after the expiration, non-renewal or termination of this Agreement, directly or indirectly:

(i)     make any statement or proposal, or make any public announcement, proposal, or offer with respect to, or otherwise solicit, seek or offer to effect (including, for the avoidance of doubt, indirectly by means of communication with the press or media), accept, or enter into: (i) any sale, lease, acquisition, management, conversion, merger, reorganization, liquidation, exchange, or other business combination or transaction involving either of HUMC Opco or Christ Opco, or both of them, or any of their respective Subsidiaries, (ii) any restructuring, recapitalization, financing, liquidation, or similar transaction involving either of HUMC Opco or Christ Opco, or both of them,

or any of their respective Subsidiaries, (iii) any acquisition of any of HUMC Opco's or Christ Opco's loans, debt securities, equity securities or any or all or substantially all of its assets, or rights or options, warrants to acquire interests in any of their loans, debt securities, equity securities, or assets, (iv) any proposal to seek representation on the board of trustees or governing body of either of HUMC Opco or Christ Opco, or otherwise seek to control or influence the management, board of trustees or governing body, or policies of either of HUMC Opco or Christ Opco, or both of them, (v) any request or proposal to waive, terminate, or amend the provisions of this Agreement, or (vi) any proposal, arrangement, or other statement that is inconsistent with the terms of this Agreement, including this <u>Section 4.4</u>;

(ii)     instigate, encourage, negotiate with, or assist any third party (including forming, joining or participating in a "group" as defined in the Securities Exchange Act of 1934, as amended and the rules promulgated thereunder) to do, or enter into any discussions or agreements with any third party with respect to, any of the actions set forth in Section 4.4(g)(i) above;

(iii)    take any action that could be expected to require either of HUMC Opco or Christ Opco, or both of them, or any of their respective Affiliates, to do, or enter into any discussions or agreements with any third party with respect to, any of the actions set forth in Section 4.4(g)(i) above or to make a public announcement regarding any of the actions set forth in Section 4.4(g)(i);

(iv)    acquire (or propose or agree to acquire), of record or beneficially, by purchase or otherwise, any loans, debt securities, equity securities, or assets of either of HUMC Opco or Christ Opco, or both of them, or any of their respective Subsidiaries, or rights or options to acquire interests in any of the foregoing; or

(v)     enter into discussions or arrangements with any Person with respect to any of the foregoing.

(h)     This <u>Section 4.4</u> and all obligations and rights of Manager hereunder shall expressly survive the expiration, non-renewal or termination of this Agreement for any reason.

## ARTICLE V.
## TERM OF AGREEMENT

**5.1     Term.** This Agreement's initial term shall be effective as of the Effective Date until December 31, 2034 and renew for successive ten-year terms thereafter (the initial term and each successive renewal terms may be referred to herein as the "**Term**"), unless otherwise terminated as expressly permitted under this agreement.

**5.2     Termination by Company.** If Manager fails to perform any of its material obligations under this Agreement (a "**Default**"), Company shall give Manager a "**Notice of Default**." The Notice of Default shall be in writing and set forth the nature of the alleged Default with particularity. Any Notice of Default from Company must be approved or authorized by the Board. Manager shall have thirty (30) days to cure the Default, or such longer period as necessary to cure such default (the "**Cure Period**"). If Manager fails to cure such Default after during such Cure Period, despite Company's full and continuous compliance with its obligations hereunder, and Company desires to terminate this Agreement, Company shall obtain a final, non-appealable order by a court of competent jurisdiction authorizing such termination.

**5.3      Termination by Manager**. Manager may terminate this Agreement immediately upon the occurrence of any of the following: (a) the occurrence of any Disqualifying Event with respect to Company, (b) the failure of Company to pay Manager the Management Fee in accordance with <u>Article 4</u>, or (c) in accordance with <u>Section 9.8</u>.

**5.4      Termination by Mutual Agreement**. Parties may mutually agree to terminate the agreement in writing.

**5.5      Effect of Termination or Expiration.** Upon any termination or expiration without renewal of this Agreement for any reason, the following shall apply:

(a)      <u>Non-Solicitation</u>. Manager acknowledges and agrees that, upon any termination or expiration without renewal of this Agreement for any reason, Manager shall not directly or indirectly (including without limitation through any Affiliate of Manager or any other Person) encourage, induce, attempt to induce, solicit or attempt to solicit any personnel employed by or contracting with Company to leave his or her employment, consulting or independent contractor relationship with Company or any Company Affiliate. Company and each entity comprising Company acknowledges and agrees that, upon any termination or expiration without renewal of this Agreement for any reason, none of the entities comprising Company may directly or indirectly (including without limitation through any Affiliate of Company or any other Person) encourage, induce, attempt to induce, solicit or attempt to solicit any personnel employed by or contracting with Manager to leave his or her employment, consulting or independent contractor relationship with Manager or any Manager Affiliate.

(b)      <u>Return of Company Assets</u>. Upon the expiration without renewal or termination of this Agreement, Manager shall immediately return to Company any and all assets or property of Company then in possession of Manager ("**Company Assets**"); <u>provided, however</u>, that in the event that Manager provides Transition Services (as defined below) pursuant to <u>Section 5.5(c)</u> below, Manager shall not be required to return to Company any such Company Assets that are necessary for the provision of Transition Services until the end of the Transition Period (as defined below), at which time Manager shall immediately return to Company any and all remaining Company Assets of Company then held or retained by Manager.

(c)      <u>Transition Services</u>. Upon any expiration without renewal or termination of this Agreement for any reason, Manager shall, upon Company's request, for a period not to exceed one (1) year following the effective date of expiration without renewal or termination of this Agreement (the "**Transition Period**"), continue to provide some or all such Management Services as requested by Company from time to time (the "**Transition Services**"), substantially upon the terms and subject to the conditions set forth in this Agreement subject to such fair and equitable modifications as to which the Parties may agree. Notwithstanding the foregoing or any other provision of this Agreement, during the Transition Period, Company shall pay to Manager an amount equal to the fair market value of the Transition Services rendered by Manager, with fair market value for this purpose determined by reference to arms'-length arrangements between comparable health care service businesses and comparable healthcare service business management companies in the relevant market or comparable markets. If such fair market value is less than **Manager's** reasonable costs in providing such services, the Company shall pay Manager an amount equal to its reasonable costs.

(d)      Upon any expiration, non-renewal or termination hereof, in addition to Manager's other rights hereunder or under the law, Company shall pay Manager the Management Fee based on Management Services rendered as of the effective date of such expiration, non-renewal or termination, plus one month's worth of Management Fees, and shall also immediately repay Manager and its Affiliates all amounts Company or its Affiliates owes to the Manager or its Affiliates hereunder or under any other agreement or instrument, all of which shall be deemed immediately accelerated, plus other damages awarded by a court of competent jurisdiction or arbitrator.  This provision shall expressly survive the expiration, non-renewal or termination of this Agreement for any reason.

(e)      The provisions of this <u>Section 5.5</u> shall survive the expiration, non-renewal or termination of this Agreement.

## ARTICLE VI.
## INSURANCE

**6.1      Company Insurance Coverage.** Company shall maintain, throughout the Term, the minimum insurance coverages required under Applicable Law.

**6.2      Additional Insureds.** Manager (and its Affiliates) shall be named as additional insureds, with respect to services under this Agreement, under the comprehensive general, professional, directors' and officers', employment practice and umbrella/excess liability policies. Their rights to invoke the protection of such policies shall be severable from and independent of Company's rights, and these policies shall not be terminable or non-renewable except upon thirty (30) days prior written notice to Manager. If such coverage is written on a claims-made form, following termination or of this Agreement, Company (a) shall continue such coverage to survive with Manager and its Affiliates as an additional insured for the period of the applicable statute of limitations; or (b) shall provide an extended reporting endorsement (tail coverage) covering Manager and its Affiliates for claims arising during the Term, but not reported until after the termination or of this Agreement. Should Company change insurance companies during the Term, Company shall maintain coverage which includes claims incurred but not reported under the prior coverage (prior acts coverage). No later than thirty (30) days following the execution of this Agreement, and thirty (30) days following the end of each policy year, Company shall provide Manager a copy of the endorsements naming Manager and its Affiliates as additional insureds. It is the intention of the Parties that such insurance shall protect Company, Manager and Manager's Affiliates and will be the primary insurance for such Parties for any and all losses covered thereby, notwithstanding any insurance which may be maintained by Manager or its Affiliates, covering any such loss.

**6.3      Limitation of Liability.** Neither Party, their employees, agents, representatives and/or Affiliates shall have any liability to the other Party for any indirect, consequential, incidental, exemplary, special or punitive damages or costs including, without limitation, lost profits, loss of good will or loss of Company's tax-exempt status or financing, unless if such Party has been advised, knew or should have known, of the possibility thereof.

## ARTICLE VII.
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**7.1      Each Party Representations and Warranties.** Each Party represents and warrants to Company on and as of the Effective Date as follows:

(a)    Neither such Party, nor to its knowledge any member, employee, officer, director, manager, contractor, owner or Affiliate of such Party, has been (i) convicted of any offense related to health care or related to the provision of services paid for by Medicare, Medicaid or another federal health care program, or (ii) excluded from participation in Medicare or Medicaid or any other federal or state health care program.

(b)    Neither party is bound by any agreement, arrangement, covenant, obligation or restriction (i) that would be violated or breached by its execution and delivery, of or its performance of, any of its respective obligations under this Agreement or by the consummation of the transactions, matters and relationships contemplated hereby, or (ii) that requires the consent of any third party (governmental or other) for either party to enter into or perform any of its obligations under this Agreement.

(c)    The execution, delivery and performance of this Agreement by either party have been duly authorized by all requisite corporate action. This Agreement has been duly executed and delivered by both parties and is a legal, valid and binding obligation enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar law, relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether or not the issue of enforceability is decided by a court of law or in equity).

(d)    There is no civil, criminal or administrative action, suit, demand, claim, hearing, proceeding or investigation pending, or to either party's knowledge, threatened against the party that, individually or in the aggregate, would impair or delay the ability of the party to enter into this Agreement and to perform its obligations hereunder.

**7.2    Compliance with Law.** Manager shall, at all times, comply in all material respects with:

(a)    all Company Policies and Procedures, including health information privacy policies and procedures (the "**Privacy and Security Policies**"), in each case as in effect from time to time;

(b)    the disclosure requirements and self-referral prohibitions of the Federal Ethics in Patient Referrals Act, 42 U.S.C. §1395nn (the "**Stark Law**"), codified at 42 C.F.R., Part 411, Subpart J, and any applicable state self-referral laws;

(c)    the anti-fraud and abuse statute, 42 U.S.C. §1320a-7b(b) (the "**Anti-Kickback Statute**" or "**Fraud and Abuse Statute**") and any applicable state anti-kickback laws;

(d)    the privacy and security requirements set forth in HIPAA, codified at 45 C.F.R. Parts 160 and 164 (the "**Privacy and Security Standards**") and any applicable state patient privacy laws; and

(e)    any other Applicable Laws. Without limiting the foregoing, Manager acknowledges that this Agreement requires Manager to have access to or to collect or create individually identifiable health information ("**PHI**") regarding patients at Company Hospital Facilities in order to carry out the Management Services hereunder on behalf of Company, and that Manager's use and disclosure of such PHI shall be subject to the terms and conditions of the Business Associate

Agreement. Notwithstanding the delegation of specific duties to Manager hereunder, Company shall, in accordance with federal and state laws and guidelines, retain ultimate authority over the standards of, and procedures and practices for, the services provided by Company Hospital Facilities.

**7.3    Notifications.** Manager recognizes and acknowledges the importance of adequate communication and notifications to Company regarding the Management Services provided hereunder. Manager agrees that it will, in a prompt and timely fashion, bring to Company's attention, in writing, any complaint, claim or dispute or allegation of breach it may have against Company or Company Hospital Facilities, their agents, representatives, employees or contractors concerning the Management Services or subject matter of this Agreement.

**ARTICLE VIII.**
**CONFIDENTIAL INFORMATION AND ACCESS TO FACILITIES**

**8.1    Manager Confidential Information.** Unless specifically authorized in writing by Manager, Company shall, and shall cause its Agents and Affiliates to keep confidential and not disclose or make any use of, any Manager Confidential Information, except as and to the extent required to enable Company to perform its obligations hereunder, to conduct the Business, or as may otherwise be required by law. At the effective date of termination of this Agreement (or if later, the expiration date of Manager providing services), Company shall return to Manager all Manager Confidential Information in the possession of Company or any of Company's Agents or Affiliates, including any and all copies, summaries and compilations thereof, and whether in electronic or hard copy form. An executive officer of Company must also certify in writing to Manager that Company has returned (or if permitted by Manager with respect to all or any part of such Manager Confidential Information, destroyed) all Manager Confidential Information in its possession or in the possession of any of its Agents or Affiliates. Notwithstanding the foregoing, subject to ongoing confidentiality obligations, Company may retain such records and information as is required by law or to ensure patient care and safety. All medical records shall remain property of Company.

**8.2    Company Confidential Information.** Unless specifically authorized in writing by Company, Manager shall, and shall cause its Agents and Affiliates to keep confidential and not disclose or make any use of, any Company Confidential Information, except as and to the extent required to enable Manager to perform its obligations under this Agreement (or if later, the expiration date of Manager providing services), or as may otherwise be required by Applicable Laws. At the termination of this Agreement, Manager shall return to Company all Company Confidential Information in the possession of Manager or any of Manager's Agents or Affiliates, including any and all copies, summaries and compilations thereof, and whether in electronic or hard copy form. An executive officer of Manager must also certify in writing to Company that Manager has returned (or if permitted by Company with respect to all or any part of such Company Confidential Information, destroyed) all Company Confidential Information in its possession or in the possession of any of its Agents or Affiliates. Notwithstanding the foregoing, subject to ongoing confidentiality obligations, Manager may retain a copy of any records which by law it must retain.

**8.3    Government Access to Books and Records.** Insofar as 42 U.S.C. Section 1395x(v)(1)(I) is applicable to this Agreement, Manager will comply with the following statutory requirements governing the maintenance of documentation to verify the cost of the Management Services furnished under this Agreement:

(a)    Until the expiration of four (4) years after the furnishing of the Management Services under this Agreement, Manager will make available, upon written request of the Secretary of the United States Department of Health and Human Services, or upon request of the Comptroller General of the United States, or any of their duly authorized representatives, this Agreement, and books, documents, and records of Manager that are necessary to certify the nature and extent of such costs; and

(b)    If Manager carries out any of its obligations under this Agreement through a subcontract, with a value or cost of ten thousand dollars ($10,000) or more over a twelve (12) month period, with an organization related by common ownership or control, such subcontract must contain a clause to the effect that, until the expiration of four (4) years after the furnishing of the Management Services under the subcontract, the related organization must make available, upon written request of the Secretary of the United States Department of Health and Human Services, or upon request of the Comptroller General of the United States, or any of their duly authorized representatives, the subcontract, and books, documents and records of such organization that are necessary to verify the nature and extent of such costs.

(c)    Nothing in this <u>Section 8.3</u> will constitute the waiver of the attorney-client or any similar privilege under Applicable Laws.

## ARTICLE IX.
## MISCELLANEOUS

**9.1    Assignment.** This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective legal representatives, successors, and permitted assigns. Neither Party may assign this Agreement nor any rights hereunder, nor may it delegate any of its duties to be performed hereunder, without the prior written consent of the other Party.  Notwithstanding the foregoing, Manager may assign or subcontract its services or rights hereunder to affiliates, affiliates or successors, including upon the sale or other business combination involving without Company's consent.

**9.2    Confidentiality of Agreement.** The terms of this Agreement shall be maintained in confidence by both Parties except where disclosure is required by Applicable Laws or in performance hereof.

**9.3    Amendment; Waiver.** This Agreement may only be amended or modified by a written instrument executed by both Parties. Any provision of this Agreement may be waived only in a writing executed by the Party against which enforcement of such waiver is sought and no failure to exercise any remedy or other course of dealing shall be deemed to be a waiver of any provision hereof. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

**9.4    Interpretation and Headings and Exhibits.** The exhibit, section, subsection and any paragraph headings contained in this Agreement are for the purpose of convenience only and are not intended to define or limit or affect, and shall not be considered in connection with the interpretation or application of, any of the terms or provisions of this Agreement. Unless otherwise indicated elsewhere in this Agreement, (a) the term "or" shall not be exclusive, (b) the term "including" shall mean "including, without limitation," (c) the terms "hereof," "herein" and "hereunder" and terms of similar import shall refer to this Agreement as a whole and not to any particular Section or

paragraph where such term may be used, (d) the words "to the extent" shall mean "the degree by which" and not "if", and (e) the word "will" will be construed to have the same meaning and effect as the word "shall", and the words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive. The recitals to and all Schedules and Exhibits to this Agreement are fully incorporated into and are an integral part of this Agreement as if set forth in this Agreement. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

9.5    **Entire Agreement.** This Agreement, along with all annexes, exhibits, schedules, recitals and footnotes hereto, constitutes the entire agreement between the Parties pertaining to the subject matter contained in it and supersedes all prior contemporaneous agreements, representations and understandings, whether oral or written, of the Parties with respect to such subject matter. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

9.6    **Counterparts.** This Agreement may be signed in any number of counterparts and the signature or signatures of the undersigned may be delivered by electronic mail in "portable document format" (".PDF"), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document (each of which shall be deemed an original) and which shall together constitute one and the same instrument.

9.7    **Notices.** All notices, requests, consents, approvals, demands, claims, waivers and other communications under this Agreement must be in writing. Any notice, request, consent, approval, demand, claim, waiver or other communication under this Agreement shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) one (1) business day after being sent to the recipient by electronic mail so long as the electronic mail is followed by a notice given the next business day (which notice includes a copy of the electronic mail) by one (1) of the preceding methods under (a), (b) or (c); or (d) five (5) business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

|  |  |
|---|---|
| To Company: | CarePoint Health Systems, Inc. |
| | 308 Willow Avenue |
| | Hoboken, New Jersey 07030 |
| | Email: Achintya.Moulick@carepointhealth.org |
| | Attention: Achintya Moulick, M.D., Chairman and CEO |
| | |
| With a copy to: | Dilworth Paxson LLP |
| | 1500 Market Street, Suite 3500E Philadelphia, Pennsylvania |
| | 19102 Email: Lmcmichael@dilworthlaw.com Attention: |
| | Lawrence G. McMichael |

> To Manager:        Hudson Regional Hospitals, LLC
> 55 Meadowlands Parkway
> Secaucus, New Jersey 07094
> Attention:  Yan Moshe
> Chairman of the Board
> Attention:  Harry G. Kapralos, Esq.
> Chief Legal Officer and Compliance Officer

With a copy to (which shall not constitute notice):

> Mandelbaum Barrett PC
> 3 Becker Farm Road
> Suite 105
> Roseland, New Jersey 07068
> Attention: Mohamed H. Nabulsi, Esq.

Any Party may change the address to which notices, requests, consents, approvals, demands, claims, waivers and other communications under this Agreement must be delivered by giving the other Party notice in the manner set forth in this Section 9.7. Such notice shall be effective on delivery, if hand delivered, or three (3) days after dispatch in all other cases. A courtesy copy of any notice required hereunder shall also be sent to each Party's counsel at such address as may be requested, but failure to do so shall not in any way affect the rights, obligations and liabilities of the Parties hereto.

**9.8**    **Effect of Invalidity**. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Applicable Laws effective during the Term, such provision shall be fully severable. This Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement, and the remaining provisions of this Agreement that reasonably can be given effect apart from the invalid or unenforceable provision shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of each illegal, invalid or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable; provided that if the effect of such severance and substitution is to deprive a Party substantially of its benefits hereunder, such Party may seek to enforce its rights under Sections 5.2 and 5.3 of this Agreement. Each Party waives any and all claims or contests it has, based on Applicable Laws proposed or in effect as of the Effective Date, which would or could allow the Party to challenge the existence, validity or enforceability of this Agreement.

**9.9**    **No Obligation to Make Referrals.** The Parties acknowledge and agree that none of the benefits granted the Parties under this Agreement is conditioned on any requirement or expectation that the Parties make referrals to, be in a position to make or influence referrals to, or otherwise generate business for the other Party. The Parties further acknowledge that neither Party is restricted from referring any service to, or otherwise generating any business for, any other entity of its choosing.

**9.10    Specific Performance.** The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 9.11</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Party would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 9.10</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to either Party pursuant to this <u>Section 9.10</u> will be in addition to any other remedy to which such Party is entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Party from seeking to collect or collecting damages. This provision shall expressly survive the expiration, non-renewal or termination of this Agreement for any reason.

**9.11    Jurisdiction and Exclusive Venue**. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in state courts sitting in Hudson County, New Jersey and federal courts sitting in New Jersey (the "**Chosen Courts**"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 9.7</u>. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

**9.12    Governing Law; Waiver of Jury Trial**.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of New Jersey applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of New Jersey or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of New Jersey to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**9.13    Relationship of the Parties.** Except as otherwise expressly set forth in this Agreement, for purposes of this Agreement it is acknowledged and agreed that Company and Manager are at all times acting and performing hereunder as independent contractors. Each Party shall be solely responsible for compliance with all Applicable Laws pertaining to employment taxes, income withholding, unemployment compensation contributions and other employment related statutes regarding their respective employees, Agents and servants.

**9.14    Third Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**9.15    Non-Recourse**. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

**9.16    Survival.** Notwithstanding anything to the contrary contained in this Agreement, the following provisions of this Agreement shall survive and remain in full force and effect following the expiration or the termination, for any reason, of this Agreement: (a) the respective rights and remedies of each Party that may be enforced following a termination of this Agreement pursuant to the applicable provisions of Article V; Article VIII and this Article IX.

**9.17    Additional Documents and Acts.** Each Party agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be reasonably requested by any other Party in order to better evidence effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement and the transactions contemplated hereby.

**9.18    Attorneys' Fees.** In any arbitration or action at law or equity to enforce any of the provisions or rights under this Agreement, the substantially unsuccessful Party, if any, to such arbitration or litigation, as determined by the arbitrators or the court in a final judgment or decree, shall pay the substantially successful Party all costs, expenses and reasonable attorneys' fees incurred therein by such Party (including, without limitation, such costs, expenses and fees on any appeals), and if such successful Party shall recover judgment in any such arbitration, action or proceeding, such costs, expenses and attorneys' fees shall be included in and as part of such award or judgment.

**9.19    Indemnification.** Company shall defend, indemnify and hold Manager, its owners, officers, directors, managers, officials, employees, independent contractors, agents, representatives and volunteers harmless from any and all claims, injuries, damages, losses, investigations, suits or proceeding, including legal, consulting or expert fees, costs and expense, arising out of or in connection with the performance of this Agreement, except for injuries and damages caused by the sole negligence of the Manager.

**9.20    Bankruptcy Provisions.** This Agreement shall be submitted to the Bankruptcy Court having jurisdiction over the Company for approval and shall not become effective until and unless approved by the Bankruptcy Court. Any plan of reorganization proposed by the Company shall incorporate this Agreement.

*[Remainder of page intentionally left blank; signature page follows.]*

**IN WITNESS WHEREOF**, the Parties or their duly authorized representatives have executed and delivered this Agreement on and as of the Effective Date.

Company:

**CAREPOINT HEALTH SYSTEMS, INC.**

By: _____
    Name:  Achintya Moulick, M.D.
    Title:    Chief Executive Officer

**HUDSON HOSPITAL OPCO LLC D/B/A CAREPOINT HEALTH – CHRIST HOSPITAL**

By: _____
    Name:
    Title:

**HUMC HOLDCO, LLC – D/B/A CAREPOINT HEALTH – HOBOKEN UNIVERSITY MEDICAL CENTER**

By: _____
    Name:
    Title:

Manager:
**HUDSON REGIONAL HOSPITALS, LLC**

By: _____
    Name:  Yan Moshe
    Title:    Manager

#124711696v1

**Exhibit A**

**CORPORATE SERVICES**

*Fixed Assets (as applicable)*
- Maintain fixed asset system
- Reconciliation of fixed asset system to general ledger

*Governmental Affairs*
- Keep Company apprised of status on state and federal legislative actions

*Human Resources*
- Employee benefit design, including legal review, evaluation of cost and preparation of communication materials
- Employee benefits administration, including:
  - Payroll/benefit interface issues
  - Processing communication materials
  - Claims processing
  - Retirement processing
  - Retirement plan non-discrimination testing
- Employee compensation support function, including:
  - Market review
  - Merit Process
- Answering employee questions and assisting employees with benefit issues
- Provide workers compensation risk management consulting,
- Policies and procedures drafting and production
- Human Resources Customer Service support for general HR operations and policy interpretation

*Internal Audit*
- Periodic audits/site visits to ensure adherence to policies/procedures and GAAP guidelines
- Review and provide language recommendations for non-physician contracts
- Provide standard contracts for various services
- Routine legal services performed by in-house counsel but not legal services provided by outside counsel
- Develop and build internal accounting team if and where necessary
- Build and develop RFP process for external tax and audit firm

*Patient Care Operations*
- Complete outcomes assessment
- Provide quality assurance support to facility quality assurance personnel

*Accounting/Business Office*
- Development of accounting policies and procedures
- Maintenance of general ledger chart of accounts (additions, deletions, changes)

#124711696v1

- Maintenance of transaction code (posting) table
- Maintenance of appropriate Information Decision Support Systems

*Accounts Payable*
- Check printing and distribution
- Annual 1099 report preparation
- Set up of new vendors

*Business Development*
- Evaluate new business lines

*Cash Management*
- Set up new bank accounts
- Handle any wire transfers
- Sweeping of accounts to corporate concentration account
- Reconciliation of accounts payable/payroll disbursement accounts
- Management of cash flow

*Communications and Public Relations*
- In collaboration with Company, provide support through all media
- In collaboration with Company, provide support with local advertising and public relations efforts

*Construction and Design*
- Project oversight and review
- Physical plant oversight and management
- Utility management

*Payroll*
- Filing and administration of payment of all payroll taxes: FICA, federal, state, local, FUI, SUI
- Generation of W-2s annually
- Check printing and distribution

*Purchasing*
- Development and execution of corporate purchasing contracts
- Provide assistance with IMMS systems problems/issues

*Risk Management*
- Risk manager support on all risk management issues
- Review of patient and visitor incident reporting, lawsuits, etc.

*Tax*

Preparation and filing of all federal and state tax returns
- Preparation and filing of all franchise tax returns
- Handle procurement of federal tax ID numbers
- Provide tax advice and research
- Providing Company's parent with a Schedule K-1 and such other information relating to Company's operations as Company's or Company may reasonably require

*Information Services*
- Core Applications – Licensing and support for corporate clinical and financial systems

*Operations*
- Employee Surveys
- Provide support, if necessary, for clinical quality program implementation administration costs
- Provide support for compliance monitoring, investigations and reporting
- Provide support for insurance coverage identification (property, auto, earthquake and other); provided, however, insurance premiums shall be paid by Company

#124711696v1

## Exhibit B

**BUSINESS ASSOCIATE AGREEMENT**

See attached.