UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| CarePoint Health Systems Inc. d/b/a Just Health Foundation, et al. [1] | : | Case No. 24-12534 (JKS) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
---------------------------------------------------------------x   **Ref. Docket No. 412**

**OBJECTION OF SENIOR SECURED AGENTS TO
INTERIM APPROVAL OF PLAN PROPONENTS' COMBINED DISCLOSURE
STATEMENT AND JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Capitala Private Advisors, LLC and Capitala Specialty Lending Corp., in their capacities as administrative agents under certain of the Debtors' prepetition senior secured credit facilities (in such capacities, the "Senior Secured Agents"), by their undersigned counsel, hereby submit this objection (this "Objection") to interim approval of the *Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* [D.I. 412] (the "Combined DS and Plan").[2] In support of this Objection, the Senior Secured Agents respectfully state as follows:

**PRELIMINARY STATEMENT**

1. The Senior Secured Agents and other Senior Secured Parties, as long standing and committed partners to the Debtors in their mission to provide the safest and most reliable care for the Debtors' patients, are gravely concerned by the Combined DS and Plan's woeful lack of

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings provided to such terms in the Combined DS and Plan or Christ/HUMC Interim DIP Order, as applicable.

32753950.1

disclosure and inclusion of patently unconfirmable terms. In light of the glaring disclosure deficiencies and numerous plan infirmities, permitting the Plan Proponents to proceed with solicitation would drain already limited estate resources and likely result in administrative insolvency, liquidation and the closure of much needed community hospitals.

2. The Senior Secured Parties have supported the Debtors in their mission since August 2018, when Capitala Specialty Lending and the Senior Holdco Lenders advanced the senior secured Sequoia Credit Agreement to certain Debtor holding companies. Since then, the Senior Secured Parties have provided the Debtors three additional credit facilities, including two additional credit facilities when the Debtors faced a liquidity crisis in 2022, as well as numerous credit concessions. The Senior Secured Parties abstained from exercising remedies when these credit facilities matured in November 2023 in order to give the Debtors breathing room to find a path forward without affecting patient care. Additionally, to ensure the Debtors had access to critical funding for these Chapter 11 Cases, the Senior Secured Parties consented to sharing their collateral with the DIP Lender on a *pari passu* basis.

3. Despite the Senior Secured Parties' long standing support for the Debtors and their position as prepetition senior secured creditors, none of the Plan Proponents engaged with the Senior Secured Parties on plan treatment until January 5—three days prior to filing the Combined DS and Plan. Even then, none of the Plan Proponents bothered to share a draft of the Combined DS and Plan with the Senior Secured Parties prior to filing. The reason for these disappointing tactics are evident upon reviewing the Combined DS and Plan, as the proposed treatment of the Senior Secured Parties includes stripping them of collateral in order to fund other parties' recoveries, limiting the recoveries of the Senior HUMC Secured Parties and the Senior Hudson Secured Parties to a to-be-determined exit facility for which no terms are provided, and denying the Senior Holdco Secured Parties any recovery whatsoever in respect of their secured and

unsecured claims. Additionally, without any articulated basis, the Combined DS and Plan seeks to substantively consolidate the Debtors to the detriment of the Senior Secured Parties and other stakeholders and to the benefit of HRH.

4. These issues aside, the Combined DS and Plan also fails to disclose critical information on numerous fronts, including how the Reorganized Debtors will manage to operate post-bankruptcy or satisfy their obligations under the Capitala Exit Facility, as the Combined DS and Plan would encumber the Reorganized Debtors with more than $100 million in exit facilities, and more than $24 million in priority tax liabilities, in addition to their significant ongoing operating expenses.

5. The Senior Secured Agents and the other Senior Secured Parties are committed to finding a solution that provides a feasible path forward for the Debtors, maximizes stakeholder recoveries, and ensures continuity of quality care for the Debtors' patients. But the terms proposed by the Combined DS and Plan do not provide this path.

## **OBJECTION**

**I.     The Combined DS and Plan Fails to Provide Adequate Information.**

6. The Combined DS and Plan fails to disclose information necessary for creditors to make an informed judgment regarding the Plan. It therefore lacks the "adequate information" required by section 1125 of the Bankruptcy Code, which is defined as:

> "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information"

32753950.1

3

11 U.S.C. § 1125(a)(1). The standard for adequate information is a high one. As the Third Circuit has stated: "[t]he importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'" *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988). The legislative notes to section 1125 provide that "[b]oth the kind and form of information are essentially to the judicial discretion of the court, guided by the specification…that it be of a kind and insufficient detail that a reasonable and typical investor can make an informed judgment about the plan. The information required will necessarily be governed by the circumstances of the case." 11 U.S.C. § 1125 Notes of Committee on the Judiciary, S.R. No. 95-989.

7.  To comply with section 1125 of the Bankruptcy Code, the Combined DS and Plan must be amended to include clear and straightforward information that would allow creditors to make an informed decision of whether to vote to accept or reject the Plan. Information that must be disclosed or clarified includes:

   a. <u>The purported factual and legal bases for substantive consolidation, and how the extraordinary remedy of substantive consolidation would affect creditors.</u> The Plan is predicated upon substantively consolidating the Debtors' estates for voting and distribution purposes. As the only support thereof, the Combined DS and Plan summarily states that "(i) the Debtors are interrelated such that consolidating their assets and liabilities is necessary; and (ii) the benefits of consolidating the Debtors' assets and liabilities outweigh the harm to creditors, particularly given the size of the Intercompany Claims and difficulty unscrambling assets and liabilities." *Combined DS and Plan* at Art. III.E. For creditors to assess the Plan's substantive consolidation, the Plan Proponents must disclose:

      i. information sufficient to demonstrate how the Debtors are so interrelated that consolidating their assets and liabilities is necessary;

      ii. the benefits of consolidating the Debtors' assets and liabilities;

      iii. the harm to creditors resulting from such consolidation;

      iv. how such benefits of consolidating the Debtors' assets and liabilities outweighs the harm to creditors;

32753950.1

4

      v.     the size of the Intercompany Claims and how they affect the substantive consolidation analysis; and

      vi.     how and why the Debtors' assets and liabilities are so difficult to unscramble.

b. <u>The terms of the exit facilities</u>. The Combined DS and Plan fails to disclose any terms of the Capitala Exit Facility or the HRH Exit Facility, including key business terms such maturity date, interest rate, payment terms, whether the exit facilities would be secured and, if secured, by what collateral and with what lien priority. The Senior Secured Parties (and other voting creditors) cannot make an informed decision regarding voting for the Plan without this information.

c. <u>Repayment terms for the Debtors' payroll tax liabilities</u>. The *Declaration of Shamiq Syed Regarding Motion of the United States Trustee* [D.I. 397] (the "<u>Shamiq Declaration</u>") provides that the Debtors owe more than $24 million in prepetition unpaid payroll taxes, of which nearly $18 million represents employee paycheck withholdings. *See* Shamiq Declaration at ¶ 11. While the Plan states that the Debtors' prepetition payroll tax liabilities will be paid from the Reorganized Debtors' operations subsequent to the Effective Date subject to section 1129(a)(9)(C) of the Bankruptcy Code (*Combined DS and Plan* at Art. IV.B), the Combined DS and Plan fails to disclose:

      i.     the amount of the outstanding payroll tax liabilities,[3] including what portion thereof also constitutes a priority non-tax claim of employees under section 507(a)(4) of the Bankruptcy Code;

      ii.     whether and to what extent the outstanding payroll tax liabilities will be reduced as a result of the payment on the Effective Date of Priority Non-Tax claims held by employees in respect of withholding taxes that were not paid to the applicable taxing authorities;

      iii.     how the payroll tax liabilities will be repaid over five years pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; and

      iv.     whether the Reorganized Debtors can support the undisclosed payroll tax repayment terms.

d. <u>Feasibility</u>. The primary support for the feasibility of the Plan is an unsupported statement that "the Plan Proponents expect: (i) sufficient funds to exist to make all required distributions under the Plan, (ii) for those Reorganized Debtors, which are continuing in business, to be well-positioned to service their ordinary course obligations and successfully operate their business on a go-forward basis based upon, among other things, substantial management and operational changes made by HRH since the Petition Date to reduce expenses and increase

---

[3] The Senior Secured Parties are very concerned that the Combined DS and Plan omits disclosing the magnitude of the Debtors' considerable payroll tax liabilities. Creditors should not be required to sift through to docket in order to hunt down the scope of these liabilities.

32753950.1

5

revenue, and (iii) for the Litigation Trustee to have the ability to prosecute and potentially monetize Litigation Claims for the benefit of Litigation Trust Beneficiaries." *Combined DS and Plan* at Art. VI.B.5. To understand whether the Plan is feasible, the Combined DS and Plan must disclose:

    i. Information sufficient for creditors to determine whether the Reorganized Debtors will be able to satisfy their obligations under the exit facilities and prepetition payroll tax repayment terms and successfully operate their businesses on a go-forward basis while delivering quality care to patients. This information should include (x) how the Reorganized Debtors will address their significant cashflow needs following the Effective Date and (y) a description of the "substantial management and operational changes made by HRH since the Petition Date to reduce expenses and increase revenue" and why those changes are likely to lead to the necessary operational improvements. This is particularly relevant considering the Debtors' operations are losing more than $428,000 per day, $3 million per week (*see* Transcript of December 16, 2024 hearing at pg. 11, lines 6-8);

    ii. The basis for the expectation that sufficient funds will be available to make all required payments on the Effective Date, including (x) the likely sizeable superpriority administrative expense claim of the Senior Secured Parties pursuant to the Christ/HUMC Interim DIP Order arising as a result of the diminution in the Senior Secured Parties' collateral from incurrence of the DIP Facility and the Debtors' use of cash collateral, (y) the Priority Non-Tax Claims of Debtor employees in respect the Debtors' failure to pay prepetition withholding taxes to the applicable taxing authorities and (z) the contemplated payment of employee Priority Non-Tax Claims in excess of the cap under section 507(a)(4) of the Bankruptcy Code; and

    iii. The "significant and strategic downsizing" the Debtors are contemplating, and how and when it will "support the growth of the Hospitals and stabilizing cash flow going forward" (*see Combined DS and Plan* at Art. III.B.4).

e. <u>Compliance with the Best Interest of Creditors Test</u>. The Combined DS and Plan fails to disclose projected recoveries for the voting Classes or provide any liquidation analysis. Rather, the Plan Proponents summarily state their belief, without providing factual support, that each Class of Impaired Claims would receive an equal or greater recovery than under a chapter 7. *See Combined DS and Plan* at Art. VI.B.4. The Senior Secured Agents are particularly concerned with the best interest of creditors test and liquidation analysis, as the Plan proposes to strip them of their liens on certain of the Litigation Claims while likely encumbering the rest of their collateral at Christ Hospital and HUMC with nearly $90 million of debt at Bayonne with an unstated lien priority, none of which would occur under a chapter 7.

f.  <u>Information (if any) regarding the results of investigations (if any) to support the proposed release of HRH</u>. The Plan contemplates providing releases to HRH, including its affiliates, subsidiaries and designees and their respective former, present and future owners, officers, directors, managers, employees, independent contractors, attorneys, agents and representatives. In order to assess the propriety of these releases, the Combined DS and Plan should disclose whether the claims against HRH being released were investigated and, if so, detailed information regarding such investigation, including who conducted the investigation, how the investigation was conducted and the findings of the investigation. This is information is particularly important in light of the numerous hats HRH wears with respect to the Debtors, the fact that the owner and chairman of HRH sits on CarePoint's board, and the unusually HRH-favorable terms set forth in the Collateral Surrender Motion and MSA Motion, each filed within 24 hours of the Petition Date.

g.  <u>Post-Effective Date Bayonne capital structure</u>. The Plan contemplates the cancellation of the Bayonne Interests and states that, subject to an Alternative Transaction, the "assets of Bayonne (other than any Litigation Claims) shall be transferred to HRH as set forth in and pursuant to the Collateral Surrender Agreement." *See Combined DS and Plan* at Art. V.B.11, Art. IX.B. The Combined DS and Plan should explain what the Bayonne capital structure looks like post-emergence without requiring creditors to locate, review and interpret the Collateral Surrender Agreement.

h.  <u>Alternative Transaction requirements</u>. The Combined DS and Plan is ambiguous whether an Alternative Transaction must be for all hospitals or for any hospital. This should be clarified. Additionally, if an Alternative Transaction is permitted for any hospital, the Combined DS and Plan should disclose whether it is feasible for the Debtors to repay HRH in full upon the Effective Date as contemplated by the Plan.

i.  <u>Access to the County Option Program and its impact on Reorganized Debtor performance</u>. At the November 8, 2024 hearing, Debtors' counsel stated on the record that the County Option Program is very beneficial for the Debtors and that the cash requirements for participation in the program was "a problem [the Debtors] need to solve." *See* Transcript of November 8, 2024 hearing at pg. 45, line 14 through pg. 46, line 5. As of the Petition Date, CarePoint owed the County Option Program $15,710,447. In light of the Debtors' stated importance of this program and the sizeable deficiency owed by the Debtors, the Combined DS and Plan should disclose whether the Reorganized Debtors will have the ability and right to access to the County Option Program upon the Effective Date and, if not, whether that lack of access would materially affect their post-Effective Date performance.

j.  <u>Determination of who decides whether and which Allowed Administrative Expense Claims and Allowed Priority Claims may be paid in the ordinary course</u>. The Combined DS and Plan includes typical language providing that Allowed Administrative Expense Claims and Allowed Priority Claims will be paid in full in cash on the Effective Date unless such claims are allowed after

the Effective Date or the holders of such claims otherwise agree. However, the Combined DS and Plan also states that, as an alternative to this standard approach, such claims "may be assumed by the Reorganized Debtors and paid in the ordinary course." *See Combined DS and Plan* at Art. IV.A, Art. IV.B and Art. IV.C. The Combined DS and Plan should provide greater detail regarding what this means, who decides whether to assume and pay such claims in the ordinary course, and which claims would be subject to such assumption and payment.

k. <u>The description of the Capitala Claims and Capitala Specialty Lending Claims must be clarified to accurately describe the holders of such Claims and the credit facility giving rise to the Capitala Specialty Lending Claims</u>. Each of the Senior Facilities are syndicated credit facilities agented by one of the Senior Secured Agents. The definition of the Capitala Claims and Capitala Specialty Lending Claims erroneously provide that the claims are held by the Senior Secured Agents instead of the Senior Secured Parties. Additionally, the Combined DS and Plan erroneously provides that the Senior Holdco Agent advanced the Senior Holdco Facility instead of the Senior Holdco Lenders. These definitional and description errors must be fixed.

**II.  The Plan is patently unconfirmable because it blatantly discriminates against, and is not fair and equitable with respect to, the Capitala Claims and Capitala Specialty Lending Claims.**

8.  The Senior Secured Agents believe the Plan Proponents have only one shot to confirm a Plan due to the Debtors' limited resources and ongoing cash burn.[4] Although the Senior Secured Agents would usually be reluctant to raise confirmation issues at the disclosure statement stage, the Plan is patently unconfirmable under section 1129 of the Bankruptcy Code because it blatantly discriminates against, and is not fair and equitable with respect to, the Capitala Claims and the Capitala Specialty Lending Claims. Allowing the Plan Proponents to incur the significant costs of soliciting this unconfirmable Plan and seeking its confirmation would inevitably result in administrative insolvency, liquidation and the closure of hospitals much needed by the community.[5]

---

[4] As noted in ¶ 7.d.i *supra*, the Debtors' operations are losing more than $428,000 per day, $3 million per week.

[5] In addition, the Senior Secured Agents are very concerned that, because HRH is an insider, the Plan Proponents would incur these costs without having in-hand a non-insider impaired consenting class. Given the Debtors' financial condition, pursuing this Plan on a leap of faith strikes the Senior Secured Agents as unacceptably risky.

32753950.1

9. Although generally objections to the confirmability of a chapter 11 plan are not ripe at the disclosure statement stage, the Third Circuit has held that "a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable." *In re Am. Capital Equip.*, 688 F.3d 145, 154 (3d Cir. 2012). "A plan is patently unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'" *Id.* at 154-55 (Quoting *In re Monroe Well Serv.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)).

10. The Senior Secured Parties, as prepetition senior secured lenders to certain of the Debtors, hold claims and priority liens against the majority of the Debtors and their assets. *See Christ/HUMC Interim DIP Order* at ¶ F; *Combined DS and Plan* at Art. III.A.3.i, Art. III.A.3.iii, Art. III.A.3.v. These claims and liens include the claims of Capitala Specialty Lending, as Senior Holdco Agent on behalf of the Senior Holdco Secured Parties, in respect of: (a) the limited non-recourse guarantees issued by CarePoint, HUMC Opco, Christ Opco and Bayonne Opco (collectively, the "Opco Guarantors") in support of the Senior Holdco Obligations; and (b) the liens granted by the Debtors on the litigation matters identified in the Collateral Sharing Agreement. *Id.* Pursuant to section 1111(b)(1)(A) of the Bankruptcy Code, the Senior Holdco Secured Parties hold claims against each Opco Guarantor, in addition to the Debtors who are borrowers under the Senior Holdco Loan Agreement. *See* 11 U.S.C. § 1111(b)(1)(A); *In re Montgomery Ward, LLC*, 634 F.3d 732, 739 (3d Cir. 2011) ("Generally, [Section 1111(b)] provides that if a debtor elects to continue using encumbered property in its reorganization, the bankruptcy court will grant the nonrecourse creditor, whose claim is secured by an interest in that property, an allowed claim under section 502 as if its security interest had recourse.").

11. Under the cramdown provisions of section 1129(b)(1) of the Bankruptcy Code, a plan that satisfies all of the applicable requirements of section 1129(a), other than paragraph (8) thereof, may nonetheless be confirmed so long as it does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. 11 U.S.C. § 1129(b)(1); *see also In re Tribune Co.*, 972 F.3d 228, 237 (3d Cir. 2020) ("The cramdown provision in 11 U.S.C. § 1129(b)(1) waives § 1129(a)(8)'s mandate that all classes either vote to accept the plan or recover their debt in full under it. Yet [Section 1129(b)(1)] also affords unique safeguards: the fair-and-equitable and unfair-discrimination standards.").

12. Here, the Plan blatantly discriminates against, and is not fair and equitable with respect to, the Senior Secured Parties—who will ***not*** vote to accept this Plan:

A. <u>The Plan strips the Senior Secured Agents of their Liens on Litigation Claims in violation of section 1129(b)(2)(A) of the Bankruptcy Code.</u>

13. The Senior Secured Agents, on behalf of the Senior Secured Parties, hold priority liens on substantially all of certain of the Debtors' assets, including causes of action that are included within the Litigation Claims being contributed to the Litigation Trust free and clear of all Claims, Liens and other interest. *See Christ/HUMC Interim DIP Order* at ¶ F; *Combined DS and Plan* at Art. III.A.3.i, Art. III.A.3.iii, Art. III.A.3.v, Art. X.C. Under section 1129(b)(2)(A) of the Bankruptcy Code, holders of secured claims must either retain their Liens or realize the indubitable equivalent of such claims. *See* 11 U.S.C. § 1129(b)(2)(A); *In re Phila. Newspapers, LLC*, 599 F.3d 298, 305 (3d Cir. 2010). The Senior Secured Agents are not willing to consent to the release of their liens on Litigation Claims, and the Plan fails to provide the Senior Secured Agents anything in exchange for their release of such liens—let alone anything purporting to be the indubitable equivalent. As such, the Plan is not fair and equitable and violates section 1129(b)(2)(A) of the Bankruptcy Code.

      B.      <u>The Plan denies any recovery for the secured and unsecured claims of the Senior Holdco Secured Parties while providing for the recoveries of other general unsecured creditors out of the Senior Holdco Secured Parties' collateral in violation of section 1129(b).</u>

14.      The Plan provides that the Senior Holdco Secured Parties will not receive or retain any property under the Plan on account of their secured or unsecured claims while distributing certain of the Senior Holdco Secured Parties' collateral to the Litigation Trust for the benefit of other general unsecured creditors.  *See Combined DS and Plan* at Art.V.B.3; *Objection* at ¶ 15, *supra*.

15.      The claims of the Senior Holdco Secured Parties are secured by substantially all assets of Debtors Carepoint Health Management Associates Intermediate Holdco, LLC, Bayonne Intermediate Holdco, LLC, Hoboken Intermediate Holdco, LLC and Christ Intermediate Holdco, LLC (collectively, the "<u>Senior Holdco Borrowers</u>"), as well as by the litigation claims pledged by the Debtors under the Collateral Sharing Agreement.  *See Christ/HUMC Interim DIP Order* at ¶ F; *Combined DS and Plan* at Art. III.A.3.i, Art. III.A.3.iii, Art. III.A.3.v.

16.      Section 1129(b)(2)(A) of the Bankruptcy Code requires that holders of secured claims retain their Liens or realize the indubitable equivalent of such claims.  Here, the holders of Capitala Specialty Lending Claims are stripped of all of their liens and receive no distributions under the Plan.  This is discriminatory and blatantly violates the requirements of section 1129 of the Bankruptcy Code.

17.      Additionally, the holders of Capitala Specialty Lending Claims hold unsecured claims (both deficiency and not) against most of the Debtors, including the Senior Holdco Borrowers and the Opco Guarantors—not all of whom are non-profits.  The Plan contemplates denying such holders any recovery on account of their unsecured claims while granting other general unsecured creditors recoveries out of Litigation Claims, including Litigation Claims

constituting collateral securing Senior Holdco Obligations. Again, this is discriminatory and blatantly violates the requirements of section 1129 of the Bankruptcy Code.

> C. **The Plan violates the absolute priority rule of section 1129(b)(2)(B) by allowing existing equity to retain their Interests in the Debtors while denying the holders of Capitala Specialty Lending Claims any recovery.**

18. The Plan contemplates the Senior Holdco Borrowers (other than Bayonne Intermediate Holdco, LLC), all of which are for-profit entities, retaining their existing Interests in their subsidiaries while denying the holders of Capitala Specialty Lending Claims any recovery on account of their claims. *See Combined DS and Plan* at Art. V.B.3, V.B.11. This treatment violates section 1129(b)(2)(B) of the Bankruptcy Code, which prohibits holders of interests junior to the holders of Capitala Specialty Lending Claims from receiving or retaining property under the Plan. *See* 11 U.S.C. § 1129(b)(2)(B); *In re 222 Liberty Associates*, 108 B.R. 971, 983 (Bankr. E.D. Pa. 1990) ("a junior creditor may not receive any distributions under the plan until all senior creditors have been paid in full").

**III.    Reservation of Rights.**

19. The Senior Secured Agents hereby expressly reserve all rights to file additional and supplemental objections to the Combined DS and Plan, and this Objection is filed without prejudice to the Senior Secured Agents' rights (or any other Senior Secured Parties' rights) to raise any additional or further arguments in the event the Debtors amend, modify, or supplement the Combined DS and Plan. The Senior Secured Agents also note that they have identified numerous other issues with the Combined DS and Plan that are more appropriate to raise in connection with confirmation (should the Plan Proponents be permitted to solicit this Plan). Nothing herein is intended to or shall be deemed to impair, prejudice, waive, or otherwise affect any objections or arguments the Senior Secured Agents or any other Senior Secured Party may have with respect to confirmation of Combined DS and Plan.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Senior Secured Agents request that the Court (i) deny interim approval of the Combined DS and Plan and (ii) grant such other and further relief as is just and appropriate.

Dated: January 15, 2025

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ *Robert F. Poppiti, Jr.*
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Email: mlunn@ycst.com
         rpoppiti@ycst.com

-and-

**MOORE & VAN ALLEN PLLC**
Alan W. Pope (admitted *pro hac*)
Zachary H. Smith (admitted *pro hac*)
Gabriel L. Mathless (admitted *pro hac*)
Matthew K. Taylor (admitted *pro hac*)
Moore & Van Allen PLLC
100 North Tyron St, Suite 4700
Charlotte, NC 28202-4003
Telephone: (704) 331-1000
Email: alanpope@mvalaw.com
         zacharysmith@mvalaw.com
         gabrielmathless@mvalaw.com
         matthewtaylor@mvalaw.com

*Counsel to Capitala Private Advisors, LLC and Capitala Specialty Lending Corp.*