**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CarePoint Health Systems Inc. d/b/a Just Health Foundation, *et al.*, | ) ) ) | Case No. 24-12534 (JKS) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 378, 412 & 417** |

**INSIGHT MANAGEMENT AND CONSULTING SERVICES, INC.'S OBJECTION TO THE DEBTORS' MOTION (I) APPROVING THE COMBINED DISCLOSURE STATEMENT AND PLAN ON AN INTERIM BASIS FOR SOLICITATION PURPOSES ONLY; (II) ESTABLISHING SOLICITATION AND TABULATION PROCEDURES; (III) APPROVING THE FORM OF BALLOT AND SOLICITATION MATERIALS; (IV) ESTABLISHING THE VOTING RECORD DATE; (V) FIXING THE DATE, TIME, AND PLACE FOR THE COMBINED HEARING AND THE DEADLINE FOR FILING OBJECTIONS RELATED THERETO; AND (VI) GRANTING RELATED RELIEF**

Insight Management and Consulting Services, Inc. ("Insight"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the *Debtors' Motion for Entry of Orders (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Solicitation and Tabulation Procedures; (III) Approving the Form of Ballot and Solicitation Materials; (IV) Establishing the Voting Record Date; (v) Fixing the Date, Time, and Place for the Combined Hearing and the Deadline for Filing Objections Related Thereto; and (VI) Granting Related Relief* [Docket No. 417] (the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

"Conditional DS Motion"). In support of its Objection,[2] Insight respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Insight is the former manager of the Debtors' hospitals – Bayonne Medical Center ("BMC"), Christ Hospital ("Christ") and Hoboken University Medical Center ("HUMC," and together with BMC and Christ shall be referred to herein collectively as, the "CarePoint Hospitals"). Insight is the Debtors' largest creditor owed in excess of $200 million as a result of: (i) certain advances it made to, and liabilities assumed on behalf of, the Debtors pre-petition, (ii) the deferral of management fees, and (iii) the damages arising from the Debtors' pre-petition and post-petition breach and rejection of the *Hospital Facilities Management Services Agreement* by and between CarePoint Health Systems, Inc. and its subsidiaries, and Insight, dated March 12, 2024.

2. Since the Petition Date (as defined below), Insight has raised a myriad of significant issues in these cases concerning past conduct and the proposed course of action initially being pursued by the Debtors and Hudson Regional Health, LLC ("HRH").[3] From the outset, Insight's position has been that these cases are an impermissible "lockup" binding the Debtors to HRH's plan that unfairly disenfranchises other creditors, including Insight, and diminishes value that could otherwise be released in an open, value-maximizing sale process.

3. On December 15, 2024, the Debtors' Board of Trustees (the "Board") appointed the Honorable (Ret.) Judith K. Fitzgerald, the Honorable (Ret.) Kevin Gross, and Clifford A. Zucker,

---

[2] All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the Plan (as defined below).

[3] HRH is a competitor of the Debtors that owns and operates Hudson Regional Hospital (approximately 6 miles away). HRH also, directly or indirectly through affiliates, is the Debtors' pre-petition lender (including the debt acquired from Capitala Private Advisors, LLC and affiliates approximately ten days before the Petition Date), proposed DIP Lender, putative manager of the CarePoint Hospitals, purported holder of the right of first refusal upon certain business combinations, purported holder of a $32 million consent judgment against the Debtors, owner and landlord at BMC, beneficiary of the Collateral Surrender Agreement, purported holder of the option to purchase the Christ Hospital real estate, and a member of the Debtors' Board of Trustees (with three positions).

Senior Managing Director of FTI Consulting, Inc., to a special restructuring committee (the "Special Committee") of the Board.  Based on representations from the Debtors' counsel, the Special Committee has been given the authority to oversee the restructuring and potential conflict matters.  Through presumably the Special Committee's efforts, the Debtors and the Official Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the "Plan Proponents") have filed a Plan (as defined below) and proposed a "process" through the Plan that allows for multiple potential buyers or restructuring options to compete, hopefully leading to a value-maximizing outcome.

4. While Insight is generally supportive of the Plan Proponents' approach, Insight files this Objection to raise certain structural concerns that Insight believes restrains potentially favorable outcomes and "disclosure" related issues associated with the Plan.  For the sake of clarity, Insight is not asking the Court to deny the Conditional DS Motion.  Insight will address all of its objections to confirmation at the appropriate time.  Insight simply requests that the Court address the issues set forth below in order for an interested party to understand the parameters in which it may seek to bid on the Debtors' assets and so creditors may make informed judgments about the Plan.  If the below issues are adequately addressed, Insight does not oppose the Conditional DS Motion.

**FACTUAL BACKGROUND**

5. On November 3, 2024 (the "Petition Date"), the Debtors filed petitions in the United States Bankruptcy Court for the District of Delaware (the "Court") seeking relief under Chapter 11 of the Bankruptcy Code.  A description of the Debtors' recent history and reasons for commencing the Chapter 11 cases is set forth in the First Day Declaration of Shamiq Syed [Docket No. 23] (the "First Day Declaration").

6. On December 30, 2024, following several days of mediation among the parties, the Debtors filed a *Notice of Filing of Plan Term Sheet* [Docket No. 378] (the "Plan Term Sheet").

The Plan Term Sheet describes the material terms to be included in a chapter 11 plan to be supported by the Plan Proponents and in form and substance reasonably acceptable to the Proponents and HRH.

7. On January 8, 2025, the Plan Proponents filed a *Chapter 11 Combined Plan & Disclosure Statement of Reorganization Filed by CarePoint Health Systems, Inc.* [Docket No. 412] (the "Plan").

8. On January 8, 2025, the Debtors filed the Conditional DS Motion.

## **OBJECTION**

9. "A paramount requirement of bankruptcy, and particularly as to a chapter 11 debtor, is disclosure and transparency." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 n. 15 (3rd Cir. 1989). Section 1125(b) of the Bankruptcy Code implements this requirement in the plan solicitation process. Pursuant to section 1125(b), a debtor must provide creditors a disclosure statement containing "adequate information" before it may solicit votes on, and thereafter seek confirmation of, a chapter 11 plan. *See* 11 U.S.C. § 1125(b).

10. Adequate information means:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and of the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]

11 U.S.C. § 1125(a)(1).

11. Adequate information includes, at a minimum, an accurate description of a debtor's assets and the risks associated with confirmation. *See*, *e.g.*, *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) (stating, "[d]ebtors must

4

therefore identify and disclose all property of the estate including all of the debtor's legal and equitable property interests").

12. The Debtors should not receive interim approval of a disclosure statement that does not provide accurate, basic information regarding the Plan.

A. **The Alternative Transaction Concept Under the Plan Fails to Contemplate an Actual Sale of Christ and HUMC**

13. Although the Alternative Transaction concept is a step in the right direction towards allowing for multiple potential buyers or restructuring options to fairly compete, it falls far short of ensuring no single group (*e.g.*, HRH) is unfairly favored.

14. The Plan Term Sheet describes an alternative transaction concept that includes "the purchase of Bayonne Medical Center and the *long-term management of HUMC and Christ Hospital (as contemplated in the above-referenced agreements)* …" *See* Plan Term Sheet, p. 2 (emphasis added). Similarly, the Plan states that a third party may seek to overbid the proposed HRH Transactions, which are defined in the Plan to mean the transactions contemplated by the Collateral Surrender Agreement, the Hospital Facilities MSA and the MSA. *See* Plan Art. IX, § E. The Plan, however, provides that in the event that an Alternative Transaction is consummated, the Allowed HRH Claims (which are estimated in the amount of $88 million) shall be paid in full upon the closing of the Alternative Transaction. Plan Art. V, § B, 1.

15. Accordingly, the Plan is structured such that any third-party interested in one or both of Christ and/or HUMC must pay off the DIP financing – which Insight estimates will be in the amount of $25-$30 million as of confirmation – in order to submit a bid solely to *manage* Christ and HUMC with the current leadership, governance, control and Board remaining intact.[4] Insight

---

[4] On December 9, 2024, the U.S. Trustee filed a motion [D.I. 267] seeking the appointment of a Chapter 11 trustee (the "Trustee Appointment Motion") in these cases on the basis of evidence of gross mismanagement of the affairs of the Debtors by current management. The primary cause includes the failure of Debtors' management to remit trust fund taxes in excess of $20 million to the IRS and State of New Jersey that were withheld from compensation paid to the Debtors' almost 3,000 employees for several periods in 2024. *See id.*, ¶ 30. In response to the Trustee Appointment Motion, Shamiq Syed, the Debtors' CFO, filed a sworn Declaration [Docket No. 397] on

5

believes no reasonable, prudent investor would commit $30 million in capital solely for the right to *manage* Christ and HUMC under the current corporate governance structure. Therefore, the Plan, as drafted, continues the Debtors' efforts to deliver the CarePoint Hospitals exclusively to HRH via a private process.

16. Instead, the Plan should provide optionality to permit interested parties to actually submit sale bids for Christ and HUMC under section 363 of the Bankruptcy Code, as opposed to management bids. Insight believes allowing interested parties to bid on the full assets of Christ and HUMC – and not solely the management rights for those facilities – would allow for maximum value to be realized by stakeholders. The paramount goal of the estate is to maximize the proceeds received by the estate. *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), 2017 WL 5484017, at *3 (Bankr. D. Del. Sept. 20, 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets").

17. The case of *In re Innkeepers USA Tr.*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010) is instructive in this regard. There, the debtor had entered into a prepetition plan support agreement ("PSA") with its mortgagee, which provided, *inter alia*, for the mortgagee to receive, in satisfaction of its secured claims, 100% of the new shares of common stock to be issued by the

---

January 6, 2025, which stated that Insight was responsible for payment on behalf of the Debtors of all operating expenses, including payroll taxes. *See* Syed Decl., ¶¶ 8-9. Insight adamantly disputes that statement. In addition, Mr. Syed's declaration is inconsistent with his prior deposition testimony under oath on December 5, 2024 concerning the responsibility to pay payroll taxes. *See* Syed Dep. Tr. 24:8-18 (where Mr. Syed testified that the former CFO, Richard Sarli, Dr. Moulick and himself were responsible for withholding and not paying payroll taxes); *see also* Moulick Dep. Tr. 63:17-23 (the decision regarding the non-payment of payroll taxes was taken by the former CFO, Richard Sarli and replacement CFO, Shamiq Syed, with Dr. Moulick's knowledge). A true and accurate copy of the relevant portions of the Shamiq Syed Deposition Transcript is attached hereto as **Exhibit A**. A true and accurate copy of the relevant portions of the Dr. Moulick Deposition Transcript is attached hereto as **Exhibit B**.

reorganized debtor. *Id.* at 230.  The PSA included a fiduciary out allowing the debtor to take any action, including a decision to terminate the agreement, if it determined such action was necessary to fulfill its fiduciary obligations under applicable law. *Id.* at 235.  However, there was an exception, stating that the fiduciary out did not apply to any decision to "annul, modify, amend, or otherwise alter" any portion of the agreement, unless doing so in "pursuit of an alternative transaction that will provide [the mortgagee] with a higher and better recovery" than that proposed under the PSA. *Id.*  The court found that the language in the PSA "prevents the Debtors from electing to fully exercise their fiduciary duties to maximize the value of [the estate]." *Id.*  The court denied the motion for entry into the PSA finding that "without the burden of the restrictions imposed by the PSA, the Debtors will have a wide berth to fulfill their fiduciary duties to conduct a plan process which maximizes value for [the estate]." *Id.* at 236.

18. The Court should find this reasoning applicable here.  Because the Plan Proponents are bound to support the Plan in its current form,[5] the Plan should be revised to make clear that interested parties can submit sale bids for Christ and HUMC to ensure that distributable value is maximized.  Without that critical revision, the Debtors would be barred from fulfilling their fiduciary duties if another deal is proposed which would increase the value of their estates.  Simply stated, adopting the current version of the Plan would impermissibly authorize the Debtors to contract away their fiduciary obligations.  *See In re Innkeepers USA Tr.*, 442 B.R. at 235.

19. Moreover, any argument by the Debtors that bidders should be required to bid solely against the HRH Transactions, which includes *only* a long-term management contract for Christ and HUMC, is contradicted by the documents underlying the HRH Transactions.  Under the Hospital Facilities MSA, which is one of three critical documents that comprise the HRH

---

[5] *See, e.g.*, Plan Term Sheet, p. 1 (the "Committee and Debtors shall support this Plan Term Sheet and all transactions hereunder in all respects"); Plan, Art. III, § C(10) (same).

Transactions, HRH is granted two purchase options (the "<u>Purchase Options</u>") for Christ and HUMC that run through 2 years after the expiration (of 10 years) or earlier termination of the Hospital Facilities MSA. *See* Hospital Facilities MSA, § 4.4.[6] Accordingly, the Hospital Facilities MSA, which contain the Purchase Options, is the functional equivalent of a sale agreement that prospective parties should be permitted to bid against.

20. Further, any argument by the Debtors that the Board[7] desires to reorganize (as opposed to sell the hospitals) and maintain Christ and HUMC as non-profit hospitals is also not supported by the HRH Transactions. When reviewing section 4.4 of the Hospital Facilities MSA, if a Purchase Option is exercised by HRH, *it is HRH, not the Board*, that determines whether Christ and HUMC should be maintained as non-profit organizations, subject to regulatory approvals as set forth in the Hospital Facilities MSA. *See* Hospital Facilities MSA, § 4.4(a) and 4.4(b) (If the hospital "is a not for profit entity at the time that the option is exercised, *then, if Manager determines, in its reasonable discretion and in consultation with the Board*," to maintain the hospital as a non-profit organization) (emphasis added). Further, section 4.4(g) of the Hospital Facilities MSA contains a "standstill" provision that would prohibit the Debtors *for the next 12 years* from entering into any discussions concerning any sale, acquisition, management, business

---

[6] The Purchase Options are for essentially a set-off or credit of existing debt (even disputed debt) owed to HRH. Under section 4.4, HRH can acquire Christ and HUMC for the Appraised Purchase Price (as defined in the Hudson Facilities MSA), *minus* (i) all accrued and unpaid management fees, CarePoint Debt, and all other amounts due or owed under the management services agreements, plus late fees, interest, penalties, and fees, costs and expenses of counsel of HRH and all other professional fees, costs and expenses incurred, (ii) the aggregate amount of any outstanding principal, accrued and unpaid interest (including default interest), premiums, charges, fees, penalties and other amounts owed or due on account of any outstanding indebtedness owed by the Debtors under the DIP Credit Agreements (*including the $32 million Outstanding Judgment*), (iii) the amount of any deficiency arising from the Collateral Surrender Agreement, (v) the amount of any claims by HRH against the Debtors, and (vi) all other fees, expenses, and claims. *See* Hudson Facilities MSA, § 4.4(d) (emphasis added).

[7] Interestingly, in his deposition, Dr. Moulick testified that the "Board would not approve the Purchase Options" and "I was pushing back not to put purchase options based on my legal advice from my team." *See* Ex. B, Moulick Tr. 167:6-18. Further, Dr. Moulick testified that the Board is "smart" and "would not accept an option to convert into a for-profit entity." *See* Ex. B, Moulick Tr. 172:6-20. Notwithstanding that testimony, the Purchase Options are included in the Hudson Facilities MSA.

8

combination or any transaction with respect to the Debtors other than with HRH.  *See* Hospital Facilities MSA, § 4.4(g).[8]

21. Thus, any efforts or arguments to suggest that the Board is only interested in receiving "management" bids is not only inconsistent with its fiduciary duties but belied by the documents comprising the HRH Transactions, *which are sale transactions*.  If the Plan is not revised to ensure that the Plan Proponents and Special Committee will consider sale bids for all of the CarePoint Hospitals, at a minimum, the Plan should make clear that any third-party bidder for the management of Christ and HUMC will obtain an assignment of the Purchase Options under the Hospital Facilities MSA.

22. Lastly, the Debtors' failure to not pursue a dual sale and reorganization process to maximize value would conflict with the numerous community-based New Jersey hospital cases that have filed Chapter 11.  *See*, *e.g.*, *In re Saint Michael's Medical Center*, Case No. 15-24999 (Bankr. D.N.J. 2015) (approving the sale of Saint Michael's Medical Center in Newark, New Jersey under section 363 of the Bankruptcy Code); *In re East Orange General Hospital*, Case No. 15-31232 (Bankr. D.N.J. 2015) (approving the sale of East Orange General Hospital in Newark, New Jersey under section 363 of the Bankruptcy Code); *In re Christ Hospital*, Case No. 12-12906 (Bankr. D.N.J. 2012) (approving the sale of Christ Hospital in Jersey City, New Jersey under section 363 of the Bankruptcy Code); *In re Hoboken University Medical Center*, Case No. 11-33014 (Bankr. D.N.J. 2011) (approving the sale of Hoboken University Medical Center in Hoboken, New Jersey under section 363 of the Bankruptcy Code); *In re Bayonne Medical Center*, Case No. 07-15195 (Bankr. D.N.J. 2007) (approving the sale of Bayonne Medical Center in Bayonne, New Jersey under section 363 of the Bankruptcy Code).

---

[8] Similarly, section 12.06 of the MSA, which is another one of three critical documents that comprise the HRH Transactions, contains a liquidated damages provision that provides upon termination due to a Change of Control (as defined in the MSA), the Debtors "shall, immediately upon such termination, jointly and severally, pay Manager liquidated damages equal to the Management Fee that would have been payable to Manager hereunder had this Agreement remained in effect for a period of ten (10) years beyond such date of termination."

9

23. Accordingly, consistent with the Plan Proponents' fiduciary duties, the Plan should be revised to make clear that interested parties can submit sale bids for Christ and HUMC to ensure that distributable value is maximized. After all, it is "Bankruptcy 101" that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate. *See In re Innkeepers USA Tr.*, 442 B.R. at 235.

**B.** **The Perceived Restriction on Partial Bids Will Curb Competitive Bidding**

24. The Alternative Transaction section under the Plan does not expressly permit partial bids or lot bids for some or all of the CarePoint Hospitals. *See* Plan, Art. IX, § E. Further, when determining whether a bid is higher or better, the Plan provides that the Special Committee shall consider, among other things, "the ability of the bidder to continue to own/operate Bayonne, Christ Hospital, and HUMC as part of the same system." *See id.*

25. The Plan should dispense with this confusing language and permit partial or lot bids as to each of the CarePoint Hospitals. The Special Committee, at this time, cannot determine whether the sum of the parts may exceed the whole under the HRH Transactions. Partial bids do not violate the Bankruptcy Code and should be encouraged to the extent that they may result in a larger aggregate recovery for the estate. Further, in the case of partial bids, where each bidder will not know what its counterparts are bidding, flexibility and inclusion should be the rule to promote value maximization. Insight respectfully submits that the Debtors' failure to preserve optionality to combine one or more partial bids for purposes of determining highest or otherwise best is a disservice to the Debtors' estates and threatens the legitimacy of the process as a whole.

26. Accordingly, Art. IX, § E of the Plan should be revised to make clear that the Special Committee will permit partial bids for some or all of the CarePoint Hospitals where the partial bid, when combined with other additional partial bids, would yield individual assets sales amounting to a bid that would otherwise exceed the value of or be considered a better offer than, the HRH Transactions.

**C.    Clarification and Disclosures Concerning Releases and Exculpation Are Necessary and Appropriate**

27. Through the Plan, the Debtors seek to deliver Debtor related parties, including directors and officers (assuming the Special Committee so directs), HRH, and its related parties, with broad releases and exculpations free from any scrutiny that could uncover inappropriate maneuvering by related parties.

28. The releases and exculpations under the Plan include, among others:

> (a)    Debtor releases in favor of HRH, and its affiliates, subsidiaries and designees, including the landlord/owner at BMC, the DIP Lender, the newly-formed management services organization who shall administer the four-hospital system as contemplated by the MSA, and their respective former, present and future owners, officers, directors, managers, employees, independent contractors, attorneys, agents and representatives. *See* Plan, Art. XIV, § D;
>
> (b)    Debtor release of claims against the Debtors' Current D&Os if the Reorganization Committee determines such release is appropriate, *which decision shall be final*. *See* Plan, Art. IX, § D; and
>
> (c)    Exculpation in favor of the Current D&Os, which include HRH's members on the Board, solely with respect to their post-petition conduct. *See* Plan, Art. XIV, § E.

29. Although the scope and permissibility of these releases and exculpations will be addressed by Insight at the confirmation hearing, there are significant disclosure related issues that should be addressed before conditional approval of the disclosure statement.

30. First, there are no disclosures concerning the Debtors' or Special Committee's efforts to investigate, assess and value the claims and causes of action proposed to be released under the Plan, including, but not limited to, claims that are to be released against HRH. For example, the involuntary proceeding commenced against IJKG Opco LLC by 29 E 29 Street Holdings, LLC, an affiliate of HRH, and the Collateral Surrender Agreement in favor of HRH, was predicated on the Debtors consenting to a judgment on October 18, 2024 (approximately two weeks before the

11

Petition Date) in the amount of no less than $24 million and no greater than $32 million (the "<u>Outstanding Judgment</u>"). Insight believes there are meritorious claims concerning the circumstances that gave rise to the Outstanding Judgment. Moreover, the Outstanding Judgment was purportedly secured during the preference period and is an avoidable transfer under section 547 of the Bankruptcy Code. Further, the Consent Judgment is purportedly secured by a dedicated and limited pool of collateral suggesting that the Consent Judgment was substantially undersecured as of the Petition Date.

31. The treatment of the Outstanding Judgment under the Plan is questionable, at best. Under the Plan, the definition of HRH Claims includes the Outstanding Judgment. *See* Plan, Art. II, § A(1.89). Moreover, the sharing arrangement contemplated under the Plan between HRH and General Unsecured Creditors from the proceeds of Litigation Claims is premised on HRH being paid in full under the HRH Exit Facility (which includes the payment of the Outstanding Judgment). *See* Plan, Art. IX, § C. In addition, under the Plan, if there is competitive bidding, HRH has the right to seek to augment its credit bid by the Outstanding Judgment. *See* Plan, Art. IX, § E.

32. Insight respectfully submits there should be disclosures in the Plan concerning how the Plan Proponents, as fiduciaries, intend to address the avoidable Outstanding Judgment and/or the evaluation undertaken by estate fiduciaries that apparently has led them to conclude that any such claims should be released. Under any competitive bidding process, the Plan provides that the HRH Claims must be paid in full, including the Outstanding Judgment. Insight submits that is extremely problematic and unnecessarily chills bidding. Moreover, in the event the Plan Proponents are intending to release HRH from this ~$32 million claim or include same in the secured HRH Exit Facility (thus, unnecessarily encumbering the CarePoint Hospitals going forward as opposed to the Outstanding Judgment being treated for what it is - - a General

Unsecured Claim),[9] an explicit disclosure should be made in the Plan to that effect to allow parties in interest to make an informed judgment about the Plan.

33. Similarly, as set forth in the First Day Declaration, as part of the Christ Hospital Real Estate Sale (as defined in the First Day Declaration), Christ maintained a purchase option (the "Christ Purchase Option") to acquire the real estate at Christ for $58 million provided there were no pre-petition defaults in the lease. The First Day Declaration states that the rent due under the Christ Hospital lease was one month in arrears and, as a result, the Christ Purchase Option was purportedly terminated prepetition. *See* First Day Declaration, ¶¶ 39-40. Interestingly, HRH advised the Debtors that on or about October 29, 2024, HRH entered into an option agreement with respect to the Christ Hospital real estate. *See* id., ¶ 45. Through deposition testimony, HRH advised the parties that it acquired the Christ Purchase Option for $68 million from the landowner, demonstrating that immediately available value of no less than $10 million was lost by these unexplained events. *See* Dr. Kifaieh Dep. Tr. 115:4-10 (Dec. 6, 2024).[10]

34. The Debtors' purported loss of the Christ Purchase Option and subsequent acquisition of same by HRH a mere five days before the Petition Date needs to be fully investigated. There are no disclosures in the Plan concerning the purported loss of the Christ Purchase Option and the Debtors' or Special Committee's efforts to investigate, assess and value the claims and causes of action proposed to be released associated with the loss of the Christ Purchase Option, which has a tremendous impact on the Debtors' ability to maximize value for the sale of Christ.

35. Creditors should be apprised of the Debtors' investigation and pursuit of valuable claims for the benefit of the Debtors' estates. The claims highlighted above, which are significant, are not even mentioned in the Plan. Most respectfully, creditors should be afforded

---

[9] In the Plan, the Plan Proponents note the Outstanding Judgment may be greater than $32 million. *See* Plan, Art. III, § C(2), n.11.

[10] A true and accurate copy of the relevant portions of the Kifaieh Deposition Transcript is attached hereto as **Exhibit C**.

this information to make a reasonable, informed decision regarding the HRH Transactions and releases under the Plan.

36. Moreover, with respect to the Debtor release, it includes the "newly-formed management services organization who shall administer the four-hospital system as contemplated by the MSA…." Based on deposition testimony from Dr. Achintya Moulick, the "MSA . . . doesn't exist." Ex. B, Moulick Dep. Tr. 114:14-15; *see also* 130:24-131:3 ("So, the document is there, but it is not in effect, because it will depend on the bankruptcy court deciding the effectuation of the MSA."); 131:16-19 ("…waiting on the MSA to be effectuated."). Further, the "MSO Operating Agreement" governing the MSA has not been drafted. *See* Ex. B, Moulick Dep. Tr. 153:24-154:4. Accordingly, it should be disclosed to creditors that the Debtors are proposing to release an entity to-be-formed, the terms of which have not been prepared or disclosed to this Court.

37. In addition, the Debtor release includes "the former, present and future owners, officers, directors, managers" of the MSA. Based on the Debtors' disclosures and testimony from Dr. Moulick, he will be a board member and officer of the MSA, with compensation at least equal to the annual compensation arrangements presently in effect. *See* Hudson FSA, § 3.5 (stating that "Dr. Moulick and Yan Moshe shall be co-chairs of the new MSO formed under the Management Services Agreement pursuant to a ten (10) year contract with compensation *at least equal* to the annual compensation arrangements presently in effect.") (emphasis added). Accordingly, as a present or future officer and director of the MSA, the Debtor release includes a release of Dr. Moulick, which conflicts with the Plan process for the Special Committee to review claims and causes of action against the Current D&Os, including Dr. Moulick (see below).

38. Further, under the Plan, claims against the Debtors' Current D&Os shall be evaluated by the independent Reorganization Committee and such committee shall make a *final* decision as

14

to whether such claims should be pursued. Although tasking the Reorganization Committee with this investigation is a prudent decision, any ultimate recommendation must be disclosed to parties-in-interest and reviewed and *approved by the Court* under *In re Master Mortgage Invest. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994) and *In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999). Insight is aware of no authority that would empower the Special Committee to displace the Court in approving this release under the Plan.

39. Lastly, regarding the exculpation provision, it should be made clear in the Plan as to whether the Debtors are proposing to exculpate HRH members sitting on the Debtors' Board for post-petition conduct. Upon full disclosure, the permissibility of such exculpation can be addressed at confirmation.

## **RESERVATION OF RIGHTS**[11]

40. Insight reserves all rights, claims, defenses, and remedies, including without limitation, the right to supplement and amend this Objection, to introduce evidence prior to or at the hearing on the Objection, and to introduce any other relevant information in support of the positions set forth in this Objection prior to or at the hearing on this Objection.

41. If any objection, in whole or in part, contained in this Objection is considered an objection to confirmation of the Plan rather than, or besides, an objection to the adequacy of the

---

[11] Prior to the filing of this Objection, Insight advised the Plan Proponents of a procedural issue as it relates to the filing of Rule 3018(a) Motions (as defined in the Conditional DS Motion). Pursuant to the Conditional DS Motion, the Plan Proponents request that the Court fix (a) January 27, 2025 as the deadline for Rule 3018(a) Motions (as defined in the Conditional DS Motion); and (b) February 7, 2025 as the deadline for filing any objection to a Rule 3018(a) Motion. *See* Conditional DS Motion, ¶¶ 29-30. The procedures then state that a holder of a claim shall not be entitled to vote to accept or reject the Plan unless one or more of the following has occurred no later than no later than February 7, 2025 - - an order of the Bankruptcy Court is entered temporarily allowing such claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing. *See* Conditional DS Motion, ¶ 30(b). Given that the deadline for filing objections and obtaining a temporary allowance order is the same day, the procedures inappropriately restrict a creditors' right to vote on the Plan in advance of any bar date being set by the Debtors for creditors to file proofs of claim. Insight and the Plan Proponents are in discussions to address that issue. Insight, however, reserves all rights to raise that issue at the hearing on approval of the disclosure statement should a reasonably acceptable resolution not be achieved.

disclosures contained therein, Insight reserves its right to assert such objection, as well as any other objections, to confirmation of the Plan.

**CONCLUSION**

42. Based on the foregoing, Insight respectfully requests that the Court grant the Conditional DS Motion, as modified and consistent with the Objection, and grant such other relief as the Court deems just and proper.

Dated: January 15, 2025
Wilmington, Delaware

**COLE SCHOTZ P.C.**

/s/ *Jack M. Dougherty*

Jack M. Dougherty (No. 6784)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone:	(302) 652-3131
Facsimile:	(302) 652-3117
Email:	jdougherty@coleschotz.com

-and-

**COLE SCHOTZ P.C.**

Michael D. Sirota (admitted *pro hac vice*)
Ryan T. Jareck (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:	(201) 489-3000
Facsimile:	(201) 489-1536
Email: msirota@coleschotz.com
	rjareck@coleschotz.com

*Counsel to Insight Management and Consulting Services, Inc.*