## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| CarePoint Health Systems, Inc. *et al.*,[1] | : | Case No. 24-12534 (JKS) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : | Hearing Date: January 17, 2025 at 10:00 a.m. (ET) |
|  | : | Objection Deadline: January 15, 2025 at 10:00 a.m. (ET) |

**OBJECTION AND RESERVATION OF RIGHTS WITH RESPECT TO MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT ON AN INTERIM BASIS; (II) SCHEDULING A COMBINED HEARING ON FINAL APPROVAL OF THE DISCLOSURE STATEMENT, PLAN CONFIRMATION AND DEADLINES RELATED THERETO; (III) APPROVING THE SOLICITATION, NOTICE AND TABULATION PROCEDURES AND FORMS RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

Maple Healthcare, LLC ("Maple") files this objection and reservation of rights (the "Objection") with respect to: (a) *Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (the "Plan") [Docket No. 412][2] and (b) *Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Approving the Disclosure Statement*

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

[2]    Capitalized terms used but not defined herein shall have the meaning given to such term in the Plan.

*on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure*

*Statement, Plan Confirmation, and Deadlines Related Thereto; (III) Approving the Solicitation,*

*Notice and Tabulation Procedures and Forms Related Thereto; and (IV) Granting Related Relief*

(the "Motion") [Docket No. 417] filed by CarePoint Health Systems, Inc., *et al.*, the

above-captioned debtors and debtors-in-possession (the "Debtors") and the Official Committee of

Unsecured Creditors of CarePoint Health Systems, Inc. (the "Committee" and together with the

Debtors, the "Plan Proponents"). For its Objection, Maple respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1.      During the period between 2008 and 2012, the Prior Owners acquired, out of

separate bankruptcy cases, each of the CarePoint Hospitals, who collectively did business as

CarePoint Health. Bayonne Opco, HUMC Opco, and Christ Opco were each purchased as "for

profit" hospitals. By assuming significant debt at their personal expense, the Prior Owners restored

the CarePoint Hospitals to financial stability and service levels, enabling them to provide high-

quality medical care to countless patients while improving care for financially disadvantaged

Medicare, Medicaid, and uninsured patients. In 2022, the Prior Owners donated to CarePoint

Health System, Inc. ("CarePoint") the three hospitals plus their interest in 12 acres of real estate,

including the parcel on which Christ Hospital is located to enable the hospitals to access more state

and federal resources and to allow each hospital to continue to care for, sustain, and grow the

hospital system to provide equitable care in Hudson County.

2.      For the reasons stated above, Maple clearly understands, and shares as its goal, the

need for the Debtors to emerge quickly from bankruptcy to maintain the critical care they provide

for the residents of Hudson County. Given this need, a "pot" plan that strictly complies with the

---

[3]      Capitalized terms used in the Preliminary Statement shall have the meaning attributed to such terms in the Objection.

priorities of the Bankruptcy Code would have created a far smoother path to emergence. Unfortunately, the Plan is the opposite as Plan Proponents seek to disenfranchise Maple, one of the Debtors' largest creditors, by paying Maple *nothing* on account of Maple's arm's length, undisputed secured and unsecured claims in excess of $60 million.

3.     The Plan contains no explanation for this mistreatment of Maple's claims in contravention to numerous provisions of section 1129 of the Bankruptcy Code. The Plan also fails to disclose the basis for substantive consolidation, especially where certain of the Debtors held themselves out to the public as independent operating entities. Without such disclosure, the Motion must be denied.

4.     The Motion should also be denied because the Plan is patently unconfirmable. In addition to the lien stripping and improper (or lack of) classification of Maple's claims, no provision of the Bankruptcy Code permits the Plan Proponents to unfairly discriminate against Maple by paying it nothing on over $60 million of claims. It would be a waste of estate and judicial resources to allow this Plan to be distributed for any reason, let alone for voting purposes, without resolution of the treatment of Maple's undisputed claims.

5.     Lastly, the primary beneficiary of the Plan,[4] Hudson Regional Hospitals, LLC ("HRH"), is not only being released without any investigation of its claims, but also being given *de facto* control of the Litigation Trust. HRH has a veto power over certain Causes of Action being assigned to the Litigation Trust and will be an *ex officio* of member of the Litigation Trust

---

[4]     A subset of general unsecured creditors are also beneficiaries of the Plan (all such creditors except, collectively, the Debtors' largest unsecured creditors (Maple (on account of its deficiency claim and undisputed unsecured loans), Carepoint Health Captive Assurance Co. (the Debtors largest unsecured creditor according to its Consolidated List of Creditors Who Have the largest Unsecured Claims and Are Not Insiders (Docket No. 1) and the claims of the Prior Owners). The Committee is a fiduciary for all unsecured creditors. Maple is perplexed as to why the Committee, in derogation of this fiduciary duty, is proposing a plan that disenfranchises its largest constituencies.

Oversight Committee. Worse, while the amount and terms and conditions of the HRH Exit Facility are undisclosed (another reason to deny the Motion), after taking into account such facility (which will be paid from the Reorganized Debtors' future operations), under a proper waterfall, Maple would likely be the largest beneficial owner of the Litigation Trust, not HRH. Instead, Plan Proponents seek to bar Maple from even voting on the Plan. The Litigation Trust must be revised to ensure that it is for the benefit of all unsecured creditors, not just HRH.

6.      Because resolution of the foregoing issues may constitute material modifications to the Plan requiring re-solicitation, an expense the Debtors can ill afford, the Motion must be denied.

## **BACKGROUND**

### A. The CarePoint Hospitals

7.      The members or their affiliated entities of Maple are prior owners (the "Prior Owners") of HUMC Opco, LLC d/b/a CarePoint Health – Hoboken University Medical Center ("HUMC Opco") and Hudson Hospital Opco, LLC d/b/a CarePoint Health – Christ Hospital ("Hudson" or "Christ Opco"). The Prior Owners owned Christ Hospital between 2012-2022 and HUMC between 2011-2022. The Prior Owners also owned IJKG Opco LLC /d/b/a CarePoint Health – Bayonne Medical Center ("Bayonne Opco") during the period 2008-2022. HUMC Opco, Christ Hospital, and Bayonne shall be referred to collectively as the "CarePoint Hospitals."

8.      As set forth below, during the period between 2008 and 2012, the Prior Owners acquired, out of separate bankruptcy cases, each of the CarePoint Hospitals, which collectively did business as CarePoint Health. Bayonne Opco, HUMC Opco, and Christ Hospital were each purchased as for-profit hospitals. By assuming significant debt at their personal expense, the Prior Owners restored the CarePoint Hospitals to financial stability and reliable service levels, enabling

them to provide high-quality medical care to countless patients while improving care for financially disadvantaged Medicare, Medicaid, and uninsured patients.

9.      Specifically:

### i.      Bayonne Medical Center

a.      On April 16, 2007, Bayonne Medical Center ("BMC") sought protection under chapter 11 of the Bankruptcy Code[5] to address a liquidity crisis caused by "increased competition, flat or declining reimbursement rates, and rising operating costs."[6] The Prior Owners purchased BMC's assets out of bankruptcy.

### ii.      HUMC

b.      On August 1, 2011, the entity operating HUMC filed a petition for relief under chapter 11 of the Bankruptcy Code[7] to facilitate a $65 million sale to the Prior Owners in 2011. The acquisition included payment in full of the $52 million bond debt to the city of Hoboken, removing the financial burden of the previously city-owned hospital from taxpayers. As former N.J. Assemblywoman Joan Quigley wrote in NJ.com: "from the start, Hoboken Mayor Dawn Zimmer said in a statement the primary goals were to preserve the hospital as an acute care facility, receive sufficient money for the city to pay off the $52 million bond it floated to keep the hospital open, and preserve most of the 1,300 jobs at the hospital."[8]

---

[5]      In re Bayonne Medical Center, Case No. 07-15195 (Bankr. D.N.J.).

[6]      Palank, J. (2011) *After Bankruptcy, Hospital Debuts ER Wait-Time Billboards*, *The Wall Street Journal*. Available at: https://www.wsj.com/articles/BL-BANKB-17240 (Accessed: 14 January 2025).

[7]      In re Hudson Healthcare, Inc., Case No. 11-33014 (Bankr. D.N.J.).

[8]      Quigley, J. (2019) *Hudson County has been lucky with hospitals; let's hope it continues*, *NJ.com*. Available at:      https://www.nj.com/hudson/2019/11/hudson-county-has-been-lucky-with-hospitals-lets-hope-it-continues-quigley.html (Accessed: 14 January 2025).

### iii.    Christ Hospital

c.    On February 6, 2012, the entity operating Christ Hospital filed a petition for relief under chapter 11 of the Bankruptcy Code[9] and the Prior Owners purchased the hospital for $43.5 million in the bankruptcy case.

10.    Each CarePoint Hospital achieved, and exceeded, the seven-year requirement mandated by the State of New Jersey when it issued its respective certificates of need, which proved to be even more critical throughout a global pandemic — Bayonne Opco served the community for over 16 years, HUMC Opco for over 13 years, and Christ Hospital for over 12 years.

11.    The Prior Owners invested millions of dollars in the CarePoint Hospitals between 2008 and 2022 and, in 2019, made millions in unsecured and subordinated arm's length loans to the CarePoint Hospitals to facilitate a sale process. The terms and conditions of such secured loans were established by and set forth in loan documents drafted, and agreed to, by BRF Finance Co., LLC (the "Prior Senior Lender"), who was the CarePoint Hospitals' senior secured lender. Maple's rights were at all times subordinate to the Prior Senior Lender.  When the sale process was not successful, as set forth in the Plan at Article III.A.1, the Prior Owners donated the CarePoint Hospitals to the newly-formed non-profit Carepoint to enable the hospitals to access more state and federal resources. As a significant financial boost to CarePoint moving forward, Prior Owners included their interest in approximately 12 acres of real estate in northern New Jersey as part of the donation.  The donated land included the real estate where Christ is located as well as other mixed use parcels, with the entire land valued at $135 million in 2012. The foregoing transactions shall be referred to as the "Donation". The majority Prior Owner completed his donation in May

---

[9]    In re Christ Hospital, Case No. 12-12906 (Bankr. D.N.J.).

2022 providing CarePoint full control of the CarePoint Hospitals. The other Prior Owners completed their donations in September 2022 and December 2022.

12.     The announcement of the completed transition of ownership to CarePoint noted that this contribution was made so that "the newly formed non-profit would continue to care for, sustain, and grow the hospital system to provide equitable care in Hudson County for many years to come."[10] Following the Donation, the Debtors' boards of directors (which did not include any of the Prior Owners and where Prior Owners had no direct or indirect influence or control over)) had exclusive control over the CarePoint Hospitals.

13.     As more fully described below, following the Donation, at the request of the Debtors, the Prior Owners engaged and renegotiated the terms of the Maple debt facilities for the benefit of the CarePoint Hospitals.

14.     On November 3, 2024, Christ Opco and HUMC Opco filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Also on November 3, 2024, an involuntary petition for relief under chapter 11 of the Bankruptcy Code was filed against Bayonne Opco, to which Bayonne Opco consented to the requested relief.

**B.  Maple Debt**

15.     To keep the CarePoint Hospitals operating during the 2019 attempted sale process through the Donation, Maple made the following loans to the CarePoint Hospitals as set forth in the Interim DIP Orders (defined below):

---

[10]     *CarePoint health completes transition to non-profit entity* (2022) *PR Newswire*. Available at: https://www.prnewswire.com/news-releases/carepoint-health-completes-transition-to-non-profit-entity-301542712.html (Accessed: 14 January 2025).

### i.    Maple Secured Claims - Hudson (Christ Hospital)

16.    In the Hudson-HUMC Interim DIP Order, each of the Debtors have stipulated and agreed that:

a.    Christ Opco, the lenders from time to time party thereto (the "Maple-Hudson Lenders") and Maple, as administrative agent and collateral agent for the Maple-Hudson Lenders (as successor to BRF Finance Co., LLC in such capacities) (in such capacities, the "Maple-Hudson Agent"; the Maple-Hudson Agent, together with the Maple-Hudson Lenders, the "Maple-Hudson Secured Parties") entered into that certain Amended and Restated Loan and Security Agreement, dated as of June 26, 2019 (as amended, supplemented or otherwise modified form time to time, the "Maple-Hudson Loan Agreement"; and, together with the "Loan Documents" as defined in the Maple-Hudson Loan Agreement, the "Maple-Hudson Loan Documents"), which provided for the term loan facilities in the aggregate principal amount of $17,951,721 (the "Maple-Hudson Facility" and the loans thereunder, the "Maple-Hudson Loans"). [11]  The Maple-Hudson Loans are secured by liens (the "Maple-Hudson Liens") on substantially all of Christ Opco's assets in accordance with the terms of the Maple-Hudson Loan Documents (the "Maple-Hudson Collateral").

See Docket 119 (the "Hudson-HUMC Interim DIP Order") at ¶ F(a)(ii). [12]

b.    Christ Opco was indebted and liable to the Maple-Hudson Secured Parties under the Maple-Hudson Loan Documents in the aggregate principal amount of not less than $17,951,721, plus all accrued and unpaid interest and any fees, expenses, indemnification obligations, guarantee obligations, reimbursement obligations (including, without limitation, any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable to or reimbursable by Christ Opco), and all other "Obligations" under and as defined in the Maple-Hudson Loan Agreement (the "Maple-Hudson Obligations"). The Maple-Hudson Obligations are subordinate and junior in right of payment to the Senior Hudson Obligations pursuant to the Maple-Hudson Subordination Agreement.

See Hudson-HUMC Interim DIP Order at ¶ F(f)(i).

c.    The Maple-Hudson Liens on the Maple-Hudson Collateral are valid, enforceable and properly perfected and were granted to, or for the benefit

---

[11]    The BRF loan has been paid in full.

[12]    Capitalized terms used in this section B.ii and not otherwise defined shall have the meaning attributed to such terms in the Hudson-HUMC Interim DIP Order.

of, the Maple-Hudson Secured Parties for fair consideration and reasonably equivalent value; (A) subject to the Maple-Hudson Subordination Agreement, the Maple-Hudson Liens are senior in priority over any and all other liens on the Maple-Hudson Collateral, subject only to certain liens otherwise permitted by the Maple-Hudson Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Maple-Hudson Liens as of the Petition Date); and (B) the Maple-Hudson Obligations constitute legal and valid obligations of Christ Opco, enforceable in accordance with the terms of the Maple-Hudson Loan Documents (subject to the Maple-Hudson Subordination Agreement).

See Hudson-HUMC Interim DIP Order at ¶ F(d)(i).

17.    In Fall, 2022, Christ Opco required additional liquidity in order to maintain its operations. Capitala Private Advisors, LLC ("Capitala") was willing to provide such funds, but only on a senior secured basis. CarePoint then approached Maple to amend its deal terms and, after arms' length negotiations between CarePoint, Capitala and Maple, Maple agreed that certain of the Maple-Hudson Obligations are subordinate and junior in right of payment to Capitala[13] pursuant to that certain Subordination and Intercreditor Agreement (the "Maple-Hudson Subordination Agreement") dated as of November 4, 2022, by and among Maple, as subordinated agent, Capitala, as senior agent, Christ Opco, and CH Hudson Holdco, LLC.

18.    That same day, sixth months after the Donation and while CarePoint was in control of the CarePoint Hospitals, Christ Opco reaffirmed and ratified its obligations to Maple when it and the Maple-Hudson Secured Parties entered into that certain Third Amendment to Forbearance Agreement and Amendment to Amended and Restated Loan and Security Agreement dated November 4, 2022.

---

[13]    Capitala's loans to Christ Opco were documented in the Senior Hudson Loan Documents (as defined in the Hudson-HUMC Interim DIP Order at¶ F(b)(i)).

19.     Following the Petition Date, Christ Opco scheduled the Maple-Hudson Obligations

in the undisputed amount of $34,751,366.00 (the "Maple-Hudson Undisputed Secured Claim").

See Docket Nos. 353, 354; Plan at Article III.A.3(ii).

### ii.    Maple Secured Claims - Bayonne

20.     In the Maple-Bayonne Interim DIP Order, Bayonne Opco and IJKG, LLC ("IJKG"

and, collectively with Bayonne Opco, the "Bayonne Debtors"), have admitted, stipulated,

acknowledged, and agreed that:

    a.      Prior to the Petition Date, Bayonne Opco, certain of its affiliates, the lenders
            from time to time party thereto (the "Maple-Bayonne Lenders"), and Maple,
            as administrative agent and collateral agent for the Maple-Bayonne Lenders
            (as successor to BRF Finance Co., LLC in such capacities) (in such
            capacities, the "Maple-Bayonne Agent" and, together with the
            Maple-Bayonne Lenders, the "Maple-Bayonne Secured Parties") entered
            into that certain Amended and Restated Loan and Security Agreement,
            dated as of June 26, 2019 (as amended, supplemented or otherwise modified
            from time to time, the "Maple-Bayonne Loan Agreement"; and, together
            with the "Loan Documents" as defined in the Maple Loan Agreement, the
            "Maple-Bayonne Loan Documents" and the loans thereunder, the
            "Maple-Bayonne Loans"), which provided for term loan facilities in the
            aggregate principal amount of $8,341,726 (the "Maple-Bayonne Facility"
            and the loans thereunder, the "Maple-Bayonne Loans").[14] The
            Maple-Bayonne Loans are secured by, among other things, liens (the
            "Maple-Bayonne Liens" and collectively with the Maple-Hudson Liens, the
            "Maple Undisputed Liens") on substantially all of Bayonne's assets and
            certain assets of Bayonne Opco in accordance with the terms of the
            Maple-Bayonne Loan Documents (the "Maple-Bayonne Collateral").[15]

    b.      As of the Petition Date, the Bayonne Debtors were liable to the
            Maple-Bayonne Secured Parties under the Maple-Bayonne Loan
            Documents in the aggregate principal amount of not less than $8,341,726,
            plus all accrued and unpaid interest and any fees, expenses, indemnification
            obligations, guarantee obligations, reimbursement obligations (including,
            without limitation, any attorneys', accountants', consultants', appraisers'
            and financial and other advisors' fees that are chargeable to or reimbursable

---

[14]     The BRF loan has been paid in full.

[15]     IJKG also pledged its equity interest in Bayonne Opco to secure the Maple-Bayonne Liabilities pursuant to
that certain Limited Guaranty and Pledge Agreement dated June 26, 2019 by and between BRF Finance Co., LLC, as
administrative agent and collateral agent and IJKG.

by Bayonne), and all other "Obligations" under and as defined in the Maple-Bayonne Loan Agreement (the "<u>Maple-Bayonne Liabilities</u>").

c.    As of the Petition Date, (A) the Maple-Bayonne Liens on the Maple-Bayonne Collateral are valid and properly perfected and were granted to, or for the benefit of, the Maple-Bayonne Secured Parties for fair consideration and reasonably equivalent value; (B) the Maple-Bayonne Liens are senior in priority over any and all other liens on the Maple-Bayonne Collateral, subject only to the subordination contemplated by the Maple-Bayonne Subordination Agreements and certain liens explicitly permitted by the Maple-Bayonne Loan Documents to be prior to the Maple-Bayonne Liens; and (C) the Maple-Bayonne Liabilities constitute legal, valid obligations of the Bayonne Debtors, enforceable in accordance with the terms of the Maple-Bayonne Loan Documents.

d.    The Maple-Bayonne Liens are fully perfected pursuant to UCC Financing Statements filed with the State of New Jersey Department of Treasury initial financing statements file number 24599347 dated February 22, 2008, file number 53463324 dated June 27, 2019, file number 53463311 dated June 27, 2019, and file number 53463333 dated June 27, 2019 (as have been amended or continued by subsequent filings). The Bayonne Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description that would in any way affect the validity, enforceability and non-avoidability of any of the Maple-Bayonne Liens, or any claims or security interests in the Maple-Bayonne Collateral.

<u>See</u> Docket 128 (the "<u>Bayonne Interim DIP Order</u>" and collectively with the Hudson-HUMC Interim DIP Orders, the "<u>Interim Orders</u>") at ¶ E(i).[16]

21.    On or about November 4, 2022, six months after the Donation, Bayonne Opco reaffirmed and ratified its obligations to Maple in that certain Forbearance Fifth Extension Agreement and Third Amendment to Loan and Security Agreement dated November 4, 2022 by and among Maple-Bayonne Secured Parties, Bayonne Opco, Garden State Healthcare Associates, LLC ("<u>Garden State</u>"), and New Jersey Medical and Health Associates, LLC ("<u>New Jersey</u>

---

[16]    Capitalized terms used in this section B.ii and not otherwise defined shall have the meaning attributed to such terms in the Bayonne Interim DIP Order.

Medical" and collectively with (i) Garden State, the "First Lien Debtors"; and (ii) Bayonne Opco, and Garden State, the "Maple-Bayonne Borrowers"), and the Maple-Bayonne Agent.

22.     Maple's rights under the Maple-Bayonne Loan Documents are subject to that certain subject to that certain Subordination and Intercreditor Agreement (the "Maple-Bayonne Subordination Agreement") dated as of November 4, 2022, by and among Maple-Bayonne Borrowers, Maple-Bayonne Agent, as subordinated agent, and Capitala, as senior agent. HRH is the successor in interest to Capitala. See Bayonne Interim DIP Order at ¶ E(ii). Pursuant to the Maple-Bayonne Subordination Agreement, the Maple-Bayonne Obligations are subordinate and junior in right of payment to HRH. HRH, however, does not have a lien on the assets of the First Lien Debtors. Neither of the First Lien Debtors pledged their assets under the Interim DIP Orders. The Maple-Bayonne Liens on the assets of the First Lien Debtors shall be referred to collectively as the "Maple Senior Liens".

23.     Following the Petition Date, each of Garden State, Bayonne Opco, and New Jersey Medical scheduled the Maple-Bayonne Obligations in the undisputed amount of $13,506,773 (the "Maple-Bayonne Undisputed Secured Claim" and collectively with the Maple-Hudson Undisputed Secured Claim, the "Maple Undisputed Secured Claims"). See Docket Nos. 351, 358, 361; Plan at Article III.A.3(ii). The Maple-Bayonne Liens are first priority liens on the assets of the First Lien Debtors. See Docket Nos. 351, 361. To the extent that Maple is undersecured with respect to the Maple Undisputed Secured Claims, any such deficiency shall be referred to as the "Maple Deficiency Claim."

### iii.    Maple Unsecured Claims - HUMC

24.    In the Hudson-HUMC Interim DIP Order,[17] each of the Debtors have stipulated and agreed that:

> a.    HUMC Opco is obligated and indebted to Maple Healthcare, LLC (in its capacity as holder of the Maple-HUMC Demand Notes, the "Maple-HUMC Lender" and collectively with the Maple-Hudson Secured Parties and the Maple-Bayonne Lenders, the "Maple Lenders") under and pursuant to (A) that certain Demand Promissory Note, dated as of June 1, 2019 in the original principal amount of $3,706,553, (B) that certain Amended and Restated Demand Promissory Note, dated as of July 25, 2019 in the original principal amount of $646,723.50; and (c) that certain Amended and Restated Demand Promissory Note, dated as of July 25, 2019 in the original principal amount of $4,353,276.50 (such demand notes, collectively, the "Maple-HUMC Demand Notes" and the loans thereunder, the "Maple-HUMC Loans").

See Hudson-HUMC Interim DIP Order at ¶ F(a)(i). The Maple-Hudson Loans, the Maple-Bayonne Loans and Maple-HUMC Loans shall be referred to collectively as the "Maple Loans."

> b.    HUMC Opco was indebted and liable to Maple-HUMC Lender under the Maple-HUMC Demand Notes in the aggregate principal amount of not less than $8,706,553, plus all accrued and unpaid interest thereon, and all other obligations of HUMC thereunder (the "Maple-HUMC Obligations"). The Maple-HUMC Obligations are subordinate and junior in right of payment to the Senior HUMC Obligations pursuant to the Maple-HUMC Subordination Agreement (as defined below).

See Hudson-HUMC Interim DIP Order at ¶ F(d)(ii).

25.    HUMC Opco, Maple-HUMC Lender, and Capitala entered into that certain Subordination Agreement, dated as of August 8, 2019 (as amended, supplemented or otherwise modified from time to time, the "Maple-HUMC Subordination Agreement"), providing for the subordination of the Maple-HUMC Obligations and any liens securing the same to the Senior HUMC Obligations and the Senior HUMC Liens.

---

[17]    Capitalized terms used and not otherwise defined in this section B.iii shall have the meaning attributed to such terms in the Hudson-HUMC DIP Order.

26.     Following the Petition Date, HUMC Opco scheduled the Maple-HUMC Obligations in the undisputed amount of $14,902,959 (the "Maple Undisputed Unsecured Claim" and collectively with the Maple Undisputed Secured Claims, the "Maple Undisputed Claims"). See Docket No. 357; Plan at Article III.A.3(iv)(a).

**C. The Collateral Sharing Agreement**

27.     HUMC Opco, Christ Opco, Bayonne Opco, Capitala, and Maple, among others, entered into a Collateral Sharing Agreement dated as of November 4, 2022, as amended by that certain First Amendment to Collateral Sharing Agreement dated as of October 15, 2024 (the "Collateral Sharing Agreement"), whereby the proceeds derived from certain litigation matters identified in the Collateral Sharing Agreement were shared and to be distributed to the lender parties to the Collateral Sharing Agreement in accordance with the agreed upon waterfall, notwithstanding the security and lien priority otherwise set forth in the loan documents with such lenders. See Plan at Article III.A.3(iii). Again, the Prior Owners did not control the Debtors at the time of this agreement. Maple's claims under the Collateral Sharing Agreement (the "Maple CSA Claims") are in addition to the Maple Undisputed Claims.

**D. The Plan**

28.     On January 8, 2025, the Plan Proponents filed the Plan. The Plan wholly disregards the Bankruptcy Code, the Maple Undisputed Liens, the Maple Undisputed Claims, the Maple CSA Claims, and the Debtors' corporate structure by: (i) classifying the Maple Undisputed Secured Claims together in Class 4, wholly ignoring the Maple CSA Claims and the Maple Senior Liens and not setting forth a basis for not valuing the Maple Undisputed Liens on a debtor-by-debtor basis (see Plan at § 5(B)(4)); (ii) ignoring the Maple Deficiency Claim (see Plan at § 1.122 (no mention of the Maple deficiency claims)); (iii) separately classifying the Maple Undisputed

Unsecured Claims from General Unsecured Claims (see Plan at §§ 5(B)(5) and 5(B)(7); (iv) without justification, providing that Maple will receive no recovery on account of the Maple Undisputed Claims and the Maple MSA Claims (see Plan at §§ V.A and V.B); and (iv) providing for substantive consolidation of the Debtors' estates for voting and distribution purposes (though not with respect to the holders of Secured Claims (except, apparently with respect to the Maple Undisputed Secured Claims), and their collateral) without any justification or analysis of the impact of substantive consolidation (see Plan at § IX.A).

## OBJECTION

29.     Maple objects to the Motion because the Plan fails to provide adequate information regarding the classification of the Maple Undisputed Claims and the Maple MSA Claims,, including not: (i) separately classifying the Maple Undisputed Secured Claims (including those secured by the Maple Senior Liens); (ii) classifying the Maple Undisputed Unsecured Claim and the Maple Deficiency Claim with General Unsecured Claims; (iii) not classifying the Maple CSA Claims; (iv) stating a basis for (a) failing to provide a distribution for any of the Maple Undisputed Claims or the Maple CSA Claims; and (b) substantive consolidation. Moreover, the Plan violates sections 1129(a)(1), (a)(3), (a)(7), (b)(1), and (b)(2) of the Bankruptcy Code with respect to the Maple Undisputed Claims and the Maple CSA Claims; and (v) disclosing the amount and terms and conditions of the HRH Exit Facility.

30.     Notwithstanding the foregoing, the Plan Proponents seek interim approval of the disclosure portions of the combined Plan and seek to set certain dates with respect to confirmation of the Plan. The Motion should be denied as the Debtors' admitted limited resources should not be spent on seeking final approval of a disclosure statement and confirmation of a Plan that is patently unconfirmable.

**A.  The Plan does not Contain "Adequate Information"**

31.    Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125; see also In re Quigley Co., 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). The Bankruptcy Code defines "adequate information" as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan . . .

11 U.S.C. § 1125(a)(1).

32.    The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan. See Century Glove, Inc. v. First Am. Bank, 860 F.2d 94 (3d Cir. 1988). Indeed, Congress intended the disclosure statement "to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization." In re Scioto Valley Mortg. Co., 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988); see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994) ("The Code obliges a Debtor to engage in full and fair disclosure"); In re Adelphia Commc'ns Corp., 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (The Bankruptcy Code "provides that acceptances or rejections of a reorganization plan can't be solicited without first giving the creditors or others so solicited a court approved disclosure statement, which provides 'adequate information.'").

33.    The disclosure statement requirement of section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system . . . the importance of full

and honest disclosure cannot be overstated." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996) (citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.), 848 F.2d 414, 417-18 (3d Cir. 1988)). "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." Oneida, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

34.    Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code alternatives…" In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). Section 1125 of the Bankruptcy Code is biased towards more disclosure rather than less. See In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). "[T]he 'adequate information' requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors." Adelphia, 352 B.R. at 596 (citing Century Glove, Inc. v. First American Bank of New York, 860 F.2d 94, 100 (3d Cir. 1988)). "[O]nce the 'adequate disclosure' floor is satisfied, additional information can go into a disclosure statement too, at least so long as the additional information is accurate and its inclusion is not misleading." Adelphia, 352 B.R. at 596-97.

35.    The Plan fails on all accounts as Plan Proponents do not disclose any rationale for:

a.     Stripping away the Maple Undisputed Liens in contravention to section 506(a) of the Bankruptcy Code;

b.     Disenfranchising Maple notwithstanding that the Maple Undisputed Claims are undisputed;

c.     Separately classifying the Maple Unsecured Claims (and the Maple Deficiency Claim) from the General Unsecured Claims to create an accepting impaired class of creditors of general unsecured creditors;

d.     Not classifying the Maple CSA Claims;

e.      Treating the Maple Unsecured Claims (and the Maple Deficiency Claim) differently than General Unsecured Claims; and

f.      Substantive consolidation given that, at a minimum, Christ Opco and HUMC Opco, both non-profit entities, and Bayonne Opco, a for-profit entity, and are clearly separate from one another, also evidenced by the separate Interim DIP Orders for HUMC Opco and Christ Opco, on the one hand, and Bayonne Opco on the other. Further, substantive consolidation will penalize creditors of certain Debtors (the First Lien Debtors in particular)[18] and favor the creditors of others as evidenced by the following summary of intercompany receivables and payables from Schedules A/B of the Debtors' bankruptcy schedules:[19]

| Debtor | Creditor | Amount Owed to Debtor | Amount Owed By Debtor | Net owed to (by) Debtor |
|---|---|---|---|---|
| Garden State | Quality | $117.3 million | $32.8 million | $84.5 million |
| Bayonne Opco | CarePoint Health<br>Garden State<br>Quality<br>Sequoia<br>**Total** | $442,000<br>$52<br>$1.282 million<br>$390,000<br>**$2.1 million** | $8.6 million | ($6.5 million) |
| New Jersey Medical | HUMC<br>Bayonne<br>Quality<br>**Total** | $1.6 million<br>$1,743<br>$35.2 million<br>**$36.7 million** | $0 | $36.7 million |
| Christ Opco | CarePoint Health<br>Garden State<br>HUMCO<br>**Total** | $2.9 million<br>$264,000<br>$8.8 million<br>**$12 million** | $5.2 million | $6.8 million |
| HUMC Opco | CarePoint Health<br>Hudson<br>Bayonne<br>**Total** | $1.4 million<br>$3.9 million<br>$8.6 million<br>**13.9 million** | $11.4 million | $2.5 million |
| CarePoint Health Management Associates, LLC d/b/a CarePoint Health ("Carepoint Health") | HUMC<br>Quality<br>**Total** | $289,000<br>$19.3 million<br>**$19.6 million** | $32.5 million | (12.9 million) |

---

[18]       Garden State (over $7.3 million in receivables and $117 million in intercompany receivables) and New Jersey (over $5 million in receivables and $36 million in intercompany receivables) both appear to have significant assets in excess of the amounts owed to Maple on account of the Maple-Bayonne Undisputed Secured Claim.

[19]       Due to internal inconsistencies in the Debtors' schedules, this chart does not reflect any intercompany claims that may have been scheduled on Schedules E/F of the Debtors' schedules.

| | | | | |
|---|---|---|---|---|
| Quality Care Associates, LLC ("Quality") | Garden State CarePoint Health Hudson HUMC **Total** | $32.5 million 27.8 million $1.3 million $735,000 **62.3 million** | ($171.8 million) | ($109.5 million) |
| Sequoia BMC Holdco, LLC ("Sequioa") | None | None | $0.39 million | ($0.39 million) |

See Docket Nos. 351, 358, 361, 354, 357, 347, 362, 363.

36.     Additionally, with respect to substantive consolidation, the Plan Proponents do not describe or show cause for the substantive consolidation of the Debtors' estates, nor do they provide sufficient information to determine whether the estates should be substantively consolidated in accordance with In re Owens Corning, 419 F.3d 195 (3d Cir. 2005); see also In re Woodbridge Grp. of Companies, LLC, 592 B.R. 761, 775 (Bankr. D. Del. 2018). The Plan also fails to describe any potential risks or consequences as a result of the proposed substantive consolidation.

37.     Lastly, there is no disclosure of the amount and terms and conditions of the HRH Exit Facility. Leaving aside feasibility issues, the amount of the HRH Exit Facility is critical information for all unsecured creditors to determine their prospects of recovery from the Litigation Trust.

38.     The Motion should be denied until the forgoing disclosure infirmities are corrected.

**B.  The Plan is Patently Unconfirmable**

39.     Even if the above infirmities are corrected, the Motion should be denied because the Plan is patently unconfirmable. If a plan is patently unconfirmable on its face, any application to approve the disclosure statement must be denied. See In re Am. Capital Equip., LLC, 688 F.3d 145, 154 (3d Cir. 2012) ("Courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and

rejections and a contested confirmation hearing.") (internal quotations and citations omitted); see also In re Quigley Co., 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) (citing In re Beyond.com Corp., 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003)); In re 266 Washington Assocs., 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation.").

40.     In fact, if the Plan on its face cannot be confirmed, approval of the Disclosure Statement must be denied in order to prevent the diminution of estate assets that would result from the expense of soliciting votes and seeking confirmation on a unconfirmable plan. See, e.g., In re Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the court will not subject the estate to the expense of soliciting votes and seeking confirmation"). The Plan Proponents have stated at nearly every hearing that the Debtors lack sufficient resources to continue operating in chapter 11 for an extended period.[20] Clearly, starting down a path to a failed plan is not an efficient use of the Debtors' admitted limited resources.

41.     As set forth above, the Prior Owners invested millions of dollars in the CarePoint Hospitals between 2008 and 2022 and also, in 2019, through Maple, made the Maple Loans to facilitate a sale process. When that process was not successful, the Prior Owners contributed the CarePoint Hospitals to CarePoint. Additionally, the Prior Owners donated to CarePoint their interest in the real estate in northern New Jersey where Christ Opco is located, with the entire land valued at $135 million in 2012.

42.     Maple has not been paid any interest since July 2022, or any principal, on account of the Maple Loans. Despite the foregoing, the Plan Proponents are proposing, without

---

[20]     Maple notes, however, that creditors e little insight into the Debtors' post-petition operations as the Debtors did not file required monthly operating reports in these cases until less than 24 hours prior to the deadline to object to the Motion.

justification, to strip Maple of the Maple Undisputed Liens, including the Maple Senior Liens, and

pay Maple nothing on account of the Maple Undisputed Claims or the Maple CSA Claims.

43.    The proposed mistreatment of the Maple Undisputed Claims and the Maple CSA

Claims violates numerous provisions of the Bankruptcy Code, including sections 1129(a)(1),

(a)(3), (a)(7), (b)(1), and (b)(2). Specifically:

    a.    11 U.S.C. § 1129(a)(1). The Plan fails to comply with numerous provisions of the Bankruptcy Code including:

        i.    11 U.S.C. § 506(a). The Plan impermissibly strips Maple of the Maple Undisputed Liens without a valuation hearing. See In re Lewisberry Partners, LLC, 664 B.R. 398, 401 (Bankr. E.D. Pa. 2024) ("Valuation of secured property may be critical for plan confirmation in determining whether a claim is impaired or whether a class is being treated fairly and equitably").

        ii.    11 U.S.C. § 1122(a). There is no basis for separately classifying the Maple Undisputed Unsecured Claim (including the Maple Deficiency Claim) from the General Unsecured Claims. Assuming the Maple Undisputed Secured Claim has no value (which is not the case), the Maple Undisputed Unsecured Claim would be $63.2 million. Maple would therefore be one of the Debtors' largest unsecured creditors, making it highly unlikely that a class of general unsecured creditors would approve a plan that is not supported by Maple.

        iii.    11 U.S.C. § 1123(a)(4). A plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986). The Plan Proponents separate classification of Maple Undisputed Unsecured Claims, and their treatment of such claims as compared to General Unsecured Claims, clearly violates section 1123(a)(4).

    b.    11 U.S.C. § 1129(a)(3). "The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001). The Plan was not proposed in good faith, as there is no justification for: (i) disregarding the Maple Undisputed Liens, and not paying Maple on account of the Maple Undisputed Claims or the Maple CSA Claims; or (ii) substantive consolidation.

c.   11 U.S.C. § 1129(a)(7). The Plan fails to provide Maple with a greater recovery than it would receive pursuant to a chapter 7 liquidation. The Debtors did not file the Liquidation Analysis with the Plan and do not intend to do so until January 31, 2025, only seven days prior to the proposed objection deadline. Maple would receive a greater recovery if the Debtors were to liquidate under chapter 7 of the Bankruptcy Code.

d.   11 U.S.C. § 1129(b)(1). Section 1129(b)(1) of the Bankruptcy Code provides that to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired class. 11 U.S.C. § 1129(b)(1).

"Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." In re Armstrong World Indus., Inc., 348 B.R. 111, 122 (D. Del. 2006). It is the Plan Proponents' burden to prove that the plan does not discriminate unfairly. Id. Under Section 1129(b)(1) of the Bankruptcy Code, a plan discriminates unfairly when it treats similarly situated classes differently without a reasonable basis for the disparate treatment. See Armstrong, 348 B.R. at 121. Despite the undisputed nature of the Maple Undisputed Claims, the Plan Proponents propose to pay Maple zero, despite other similarly situated creditors, namely Other Secured Claims and General Unsecured Claims, receiving a distribution under the Plan. Because the Plan is not fair or equitable with respect the Maple Undisputed Claims and discriminates unfairly against Maple, the Plan cannot be crammed down on Maple under section 1129(b)(1) of the Bankruptcy Code.

e.   11 U.S.C. § 1129(b)(2). The Plan impermissibly seeks to strip the Maple Undisputed Liens, in violation of sections 506(a) and 1129(b)(2) of the Bankruptcy Code. The Debtors do not provide any basis for the treatment of Maple's Secured Claims and have not commenced an adversary proceeding under Fed. R. Bankr. P. 7001(b) to determine the value of the Maple Undisputed Secured Claims. The Plan also violates: (i) section 1129(b)(2)(A) because the Maple Undisputed Liens are being extinguished for no consideration; and (ii) section 1129(b)(2)(B) by not paying anything to Maple on account of the Undisputed Maple Unsecured Claim. The Plan therefore cannot be crammed down on Maple under section 1129(b)(2) of the Bankruptcy Code.

44.     Despite the likelihood of it being one of the, if not the, Debtors' largest unsecured creditors (after taking into account the HRH Exit Facility).[21] Maple was not invited to participate in the mediation process or in the negotiations of the Plan Term Sheet, including the creation of the Litigation Trust Agreement and its powers and duties provisions set forth in Article IX.C and X of the Plan, or the Plan. As shall be set forth more fully in its objection to the Plan, Maple objects to HRH's control of the Litigation Trust as an *ex-officio* member of the Litigation Trust Oversight Committee and through its right to veto certain litigation. See Plan at Articles X.C and X.I.1. Maple also objects proposed waterfall set forth in Article X.I of the Plan.

45.     Lastly, the Plan provides that D&O Claims against the Debtors' Current D&O's should be evaluated by the independent Reorganization Committee. See Plan at Article IX.D. To the extent that claims against HRH have not been investigated, Maple also objects to HRH being a Released Party pending an investigation by the Reorganization Committee into its conduct with respect to Bayonne.

46.     Clearly, given the foregoing, the Plan is patently unconfirmable and the Motion must be denied.

## CONFIRMATION SCHEDULE

47.     The Confirmation Schedule does not allow for discovery, nor does it comply with Bankruptcy Rule 2002(b), which requires that the deadline to object to the Plan be at least 28 days' prior notice. The Confirmation Schedule is not close. Maple requests that such objection deadline be set at least 28 days after the deadline to serve the Solicitation Package and the Plan Supplement be filed at least 14 days before the Plan Objection Deadline.

---

[21]     The HRH Exit Facility will presumably be secured by liens on substantially all of the Reorganized Debtors' assets and will be paid which will be paid from the Reorganized Debtors' future operations. See Plan at Art. I.B, V.B.1.

## <u>RESERVATION OF RIGHTS</u>

48.    Maple expressly reserves the right to: (a) amend or supplement this Objection and otherwise take any additional or further action with respect to the subject matter hereof; (b) be heard before this Court to raise additional arguments or issues in connection therewith; and (c) seek discovery with respect to any issues implicated by the Plan. Maple further reserves its rights to make an 1111(b) election prior to any hearing on the Plan. Nothing herein is intended to nor shall be construed as a waiver or limitation of any of the rights or remedies of Maple with respect to the Plan, all of which are fully preserved.

## <u>CONCLUSION</u>

49.    A smoother path to an expedited emergence from bankruptcy exists. A plan that strictly complies with section 1129 of the Bankruptcy Code would facilitate such emergence. This Plan ignores section 1129 and therefore the Motion should be denied.

**WHEREFORE**, Maple requests that the Court deny the Motion and grant such other and further relief as the Court deems appropriate.

Dated:  January 15, 2025          **BIELLI & KLAUDER, LLC**

                                  */s/ David M. Klauder*
                                  David M. Klauder (No. 5769)
                                  1204 N. King Street
                                  Wilmington, DE 19801
                                  Telephone: (302) 803-4600
                                  dklauder@bk-legal.com

                                  -and-

                                  **LEVENFELD PEARLSTEIN, LLC**
                                  Harold D. Israel (admitted *pro hac vice*)
                                  Sean P. Williams (admitted *pro hac vice*)
                                  120 S. Riverside, Suite 1800
                                  Chicago, Illinois 60606
                                  Telephone: (312) 346-8380
                                  e-mail: hisrael@lplegal.com
                                  e-mail: swilliams@lplegal.com

                                  *Counsel to Maple Healthcare, LLC*