**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>CarePoint Health Systems, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12534 (JKS)<br><br>(Jointly Administered)<br><br>Re: D.I. 412 & 417 |

**OBJECTION OF CAREPOINT HEALTH CAPTIVE ASSSURANCE COMPANY, LLC TO MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT ON AN INTERIM BASIS; (II) SCHEDULING A COMBINED HEARING ON FINAL APPROVAL OF THE DISCLOSURE STATEMENT, PLAN CONFIRMATION AND DEADLINES RELATED THERETO; (III) APPROVING THE SOLICITATION, NOTICE AND TABULATION PROCEDURES AND FORMS RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

CarePoint Health Captive Assurance Company, LLC ("Captive Assurance") hereby objects (the "Objection") to the: (a) approval of the *Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* [D.I. 412] (the "Combined Disclosure Statement and Plan")[2]

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

[2] Capitalized terms used but not defined herein shall have the meaning given to such term in the Combined Disclosure Statement and Plan. Captive Assurance uses the terms "Plan" and "Disclosure Statement" to refer to each respective portion of the Combined Disclosure Statement and Plan.

for solicitation purposes and (b) *Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement, Plan Confirmation, and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and Forms Related Thereto; and (IV) Granting Related Relief* (the "Motion") [D.I. 417] filed by CarePoint Health Systems, Inc., *et al.*, the above-captioned debtors and debtors in possession (the "Debtors") and the Official Committee of Unsecured Creditors of CarePoint Health Systems, Inc. (the "Committee" and together with the Debtors, the "Plan Proponents"). In support of this Objection, Captive Assurance respectfully states as follows:

## INTRODUCTION

1.    Captive Assurance supports the Debtors' efforts to reorganize their business so that they can continue to provide critical care for patients in Hudson County, New Jersey. But those efforts must still comply with the Bankruptcy Code and respect the substantive and due process rights of creditors like Captive Assurance. Unfortunately, as currently constructed, the Combined Disclosure Statement and Plan violates the rights of Captive Assurance and other creditors and cannot be approved or confirmed.

2.    First, the Plan itself is patently unconfirmable because it (i) improperly classifies claims in an unlawful attempt to gerrymander an impaired accepting class, (ii) unfairly discriminates against Captive Assurance's claims and the claims of other creditors by offering them zero distribution while other general unsecured creditors receive a distribution, and (iii) substantively consolidates the Debtors' estates for voting and distribution purposes in contravention of controlling case law and the facts of these cases.

3. Second, even putting aside these fatal defects, the Disclosure Statement cannot be approved because it lacks adequate information needed for creditors to make an informed decision on whether the accept or reject the Plan. Among other defects, the Disclosure Statement contains no discussion of the problematic and impermissible provisions that render the Plan patently unconfirmable. It also contains no information for creditors to determine what they are receiving, when, and what contingencies exist. Without this basic information, creditors are left in the dark as to what they can expect on account of their claims.

4. The Court should not approve the Combined Disclosure Statement and Plan for any purposes, including solicitation, until the fatal Plan defects and disclosure issues discussed herein are addressed.

## BACKGROUND

**I.  Captive is a regulated insurer that holds nearly $20 million of undisputed general unsecured claims against the Debtors.**

5. Captive Assurance is a captive insurance company formed by the Debtors' Prior Owners to provide liability insurance to the Debtors' hospitals and physician groups. A captive insurer is an insurance company that is owned and controlled by its insureds. Many hospitals and physician groups establish captive insurers because the available insurance in the commercial marketplace is ill-suited to their needs or prohibitively expense. Using a captive insurer also provides other benefits, such as more direct access to reinsurance markets and more opportunities for insureds to improve claims handling and control.

6. As a captive insurer, Captive Assurance provided insurance to the Debtors' hospitals and physician groups while they were affiliated with Captive Assurance. Captive Assurance ceased writing new insurance for the Debtors' hospitals and physician groups after completion of donation of the hospitals to the Debtors by the Prior Owners because, as a result of

the donation, it ceased to be part of the same group of companies as the insureds. Captive Assurance's business today consists of administering claims under legacy policies issued to the Debtors.

7. As relevant here, Captive Assurance issued the following insurance policies to the Debtors' hospitals and physician groups:

| Debtor(s) | Policies |
|---|---|
| - Garden State Healthcare Associates, LLC<br>- New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group | - Policy #: MP-001-06 for policy period Sep 1, 2018 – Sep 1, 2019 ("MP-001-06")<br>- Policy #: MP-001-06 for policy period Sep 1, 2019 – Sep 1, 2020 ("MP-001-07")<br>- Policy #: MP-001-06 for policy period Sep 1, 2020 – Sep 1, 2021 ("MP-001-08")<br>- Policy #: MP-001-06 for policy period Sep 1, 2021 – Sep 1, 2022 ("MP-001-09")<br>- Policy #: MP-001-06 for policy period Sep 1, 2022 – Sep 1, 2023 ("MP-001-10") |
| - Hudson Hospital Opco LLC d/b/a CarePoint Health-Christ Hospital<br>- HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center<br>- IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center | - Healthcare Facility Professional Liability and Commercial General Liability Policy Number: CHCAC-PLGLSIR-2022-23<br>- Excess Liability Policy CHCAC-XSUMB-2022-23 |

8. Captive Assurance is regulated by the New Jersey Department of Banking and Insurance. Like a commercial insurer, Captive Assurance is subject to insurance regulatory requirements, including relating to capital and reserve needs. Regulations also require a captive insurer like Captive Assurance to submit a "Statement of Actuarial Opinion" by an independent actuary that typically opines on whether the captive insurer's financial statements for loss and loss adjustment expenses: (1) comply with New Jersey insurance laws; (2) conform to the Standards of Practice promulgated by the Actuarial Standards Board; and (3) reasonably provide for all unpaid loss adjustment expense obligations under the terms of its policies.

9.      Consistent with applicable regulations, Captive Assurance relied on independent auditors and actuarial calculations to set its premium rates for the Debtors.  For hospital policies, premium rates were set with reference to actuarial analyses, minimum risk transfer requirements, and broker input.  Physician premiums were set by reference to commercial insurance or reinsurance rates, adjusted over time to account for actual loss experience.  For both hospital and physician policies, reserves were set conservatively and booked to the high end.  Premiums were set at a high confidence level in consultation with reinsurers, brokers, and independent actuaries.

10.     The Debtors have not paid policy premiums to Captive Assurance for some time, despite Captive Assurance's repeated demands for payment, and now owe Captive Assurance more than $19 million as of the Petition Date.  Indeed, the Debtors' Schedules of Assets and Liabilities admit the substantial undisputed, fixed, and liquidated unsecured debts owing to Captive Assurance as follows:

| Debtor | Scheduled Claim Amount |
|---|---|
| Garden State Healthcare Associates, LLC | $14,521,632.56 |
| Hudson Hospital Opco LLC d/b/a CarePoint Health-Christ Hospital | $79,156.01 |
| HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center | $34,015.60 |
| IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center | $81,189.33 |
| New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group | $4,413,817.30 |
| **TOTAL:** | **$19,129,810.80** |

*See* D.I. 351; D.I. 375; D.I. 358; D.I. 361.  Though Captive Assurance's records reflect slightly different amounts owing for a total of $19,189,538.86,[3] there is no dispute that the Debtors owe Captive Assurance at least $19.129 million for unpaid policy premiums.

11.  The Debtors' failure to pay policy premiums has impaired Captive Assurance's financial condition and its ability to pay claims under the policies it issued to the Debtors.  As a result of the Debtors' nonpayment, Captive Assurance also has been unable to satisfy its own reinsurance premiums, leading the reinsurer to threaten to cancel the reinsurance.  Without payment from the Debtors or reinsurance, Captive Assurance lacks the ability to pay claims under the policies issued to the Debtors.  Consequently, claims that would otherwise be covered by the policies will not receive any coverage or payment, and instead must be asserted against, and paid by, the Debtors directly.

12.  Because the Debtors' nonpayment impaired Captive Assurance's financial condition, beginning in February 2024, Captive Assurance began regularly communicating with the New Jersey Department of Banking and Insurance ("DOBI") about Captive Assurance's lack of funding to pay claims.  Captive Assurance and DOBI worked constructively for the remainder of 2024 with the goal of identifying a sustainable path forward for Captive Assurance, which includes collecting the amounts due to it from the Debtors.  To that end, on March 14, 2024, Captive Assurance sent formal demand letters to each of its named insureds—the Debtors identified in the table above.  The Debtors never substantively responded to the demand letters and did not remit payment, and, as a result, Captive Assurance's financial condition deteriorated further.

---

[3]  Captive Assurance has not yet filed proofs of claims, and no claims bar date has been set in these cases.

13. On July 6, 2024, Captive Assurance sent a second set of demand letters to the insureds. The Debtors again failed to respond or issue payment.

**II.    The Debtors and the Committee propose the Combined Disclosure Statement and Plan that separately classifies and effectively disallows Captive Assurance's undisputed claims without payment.**

14. In December 2024, the Debtors, HRH, and the Committee participated in mediation with the stated goal of resolving open issues broadly related to the go-forward strategy of the Debtors and the plan for these chapter 11 cases. Captive Assurance was not invited to and did not participate in the mediation. The mediation resulted in an economic deal between the Debtors, HRH, and the Committee, ultimately culminating in the Combined Disclosure Statement and Plan. *See* Dec. 27, 2024 Hr'g Tr. at 5:13–21.

15. The Combined Disclosure Statement and Plan creates twelve classes of claims and interests. Relevant to this Objection, the Plan provides the following classification and treatment for Class 7 General Unsecured Claims, Class 8 Insured Claims, and Class 9 Prior Owner Claims:

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|---|---|---|---|---|---|
| 7 | General Unsecured Claims | On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the Litigation Trustee, as applicable, shall have agreed upon in writing to alternative treatment, each Holder of an Allowed General Unsecured Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed General Unsecured Claim, a Pro Rata beneficial interest in the Litigation Trust. | Impaired | Entitled to Vote | Estimated Amount: $[●]<br><br>Projected Recovery: [●]%-[●]% |

- 7 -

| 8 | Insured Claims | Holders of Insured Claims shall recover only from the proceeds of available insurance and shall not be entitled to any Distributions from the Reorganized Debtors or Litigation Trust. | Impaired | Entitled to Vote | Estimated Amount: $[●] Projected Recovery: TBD |
|---|---|---|---|---|---|
| 9 | Prior Owner Claims | Holders of Prior Owner Claims shall not receive or retain any property under the Plan on account of such Claims. | Impaired | Deemed to Reject | Estimated Amount: $[●] Projected Recovery: 0% |

Combined Plan and Disclosure Statement at 6–7.

16. "Prior Owners" is defined in the Plan to mean Vivek Garipalli, James Lawler, Jeffrey Mandler, any entities directly or indirectly owned or controlled by them or any of their related Persons, including without limitation, Strategic Ventures LLC, Pheasant Run Ventures, LLC, Oak Management, LLC, Willow Healthcare Services, LLC, Benego Ventures, LLC, JPL Healthcare Consulting Limited Liability Company and that certain Freehold Trust that is affiliated with Vivek Garipalli. *Id.* § 1.143.

17. Captive Assurance understands that its claims would be classified as Class 9 Prior Owner Claims because the foregoing individuals indirectly own Captive Assurance.

18. As shown in the table above, the Plan Proponents propose to effectively disallow and eliminate Prior Owner Claims without any distribution or payment: "Holders of Prior Owner Claims shall not receive or retain any property under the Plan on account of such Claims." *Id.* At 7. Holders of Prior Owner Claims are also disenfranchised and not permitted to vote on the Plan. *See id.*

19. The Disclosure Statement offers no explanation for separately classifying and treating Captive Assurance's more than $19 million in undisputed, general unsecured claims. It

similarly contains no discussion of any legal or factual basis that would support the effective disallowance of Captive Assurance's undisputed claims.

20. The Plan also provides for substantive consolidation of the Debtors' cases and estates for voting and distribution purposes. But the Disclosure Statement contains no discussion of the legal or factual bases for substantive consolidation, the alternatives to substantive consolidation, or the effects of substantive consolidation on creditor claims and recoveries.

## OBJECTION

### I. The Court should not approve the Disclosure Statement because the Plan it describes is patently unconfirmable.

21. The Court should not approve the Disclosure Statement because the Plan it describes is patently unconfirmable. The Third Circuit has held that "if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing." *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012). A disclosure statement describing a plan that cannot be confirmed cannot be approved, regardless of the amount of disclosure it contains. *See, e.g.*, *id.* at 154; *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 (3d Cir. 1993); *see also In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (denying approval of disclosure statement where plan could not be confirmed); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures.").

22. This rule has a commonsense purpose: Courts will not permit a bankruptcy estate to incur the costs of soliciting votes for a plan that, even if accepted by creditors, could never be

confirmed. *See, e.g.*, *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation.").

23. A plan is considered "patently unconfirmable" if (i) confirmation defects cannot be overcome by creditor voting results and (ii) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing. *Am. Capital Equip.*, 688 F.3d at 154–55.

24. The Plan is patently unconfirmable for at least three reasons: (i) the Plan improperly classifies claims in an unlawful attempt to gerrymander an impaired accepting class; (ii) the Plan unfairly discriminates against Prior Owner Claims by offering them zero distribution while other general unsecured creditors receive a distribution; and (iii) the Plan does not meet the high burden needed for substantive consolidation.

    **A.**    **The Plan improperly classifies claims in an unlawful attempt to gerrymander an impaired accepting class.**

25. The Plan is patently unconfirmable because it improperly classifies claims in an unlawful attempt to gerrymander an impaired accepting class. Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Although plan proponents have discretion to classify claims, the Third Circuit has recognized that the Bankruptcy Code does not allow a plan proponent complete freedom to place substantially similar claims in separate classes. *John Hancock*, 987 F.2d at 158. A classification scheme cannot be designed simply as "a method for circumventing the requirement set out in 11 U.S.C. §1129(a)(10)," *id.*, that "at least one class of claims that is impaired under the plan has

accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. §1129(a)(10).

26. The Plan's complex, twelve-class classification is improperly designed to gerrymander an impaired accepting class. Of the twelve classes, only four classes are impaired and entitled to vote: Class 1 HRH Claims, Class 2 Capitala Claims, Class 7 General Unsecured Claims, and Class 8 Insured Claims. Class 1 HRH Claims cannot serve as the Plan's impaired accepting class because HRH is an insider of the Debtors and therefore its vote cannot be counted for purposes of section 1129(a)(10)'s requirement of an impaired accepting class.[4] And, on information and belief, Capitala opposes the Plan as currently constructed; therefore, Class 2 Capitala Claims cannot be counted on to serve as the impaired accepting class.

27. Thus, the only classes that could serve as impaired accepting classes are Class 7 General Unsecured Claims and Class 8 Insured Claims. But nothing differentiates the general unsecured claims in those classes from the general unsecured claims in Class 5 Maple Unsecured Claims and Class 9 Prior Owner Claims. Yet, cognizant of the fact that the undisputed Maple Unsecured Claims and the Prior Owner Claims, which include Captive Assurance's undisputed claim of more than $19 million, would control the vote if classified with other general unsecured claims, the Plan Proponents separately classified these claims from Class 7 General Unsecured Claims to gerrymander an impaired accepting class.

---

[4] HRH is an insider of the Debtors. As defined in the Bankruptcy Code, the term "insider" includes an affiliate of the debtor or "or insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. § 101(31)(E) ("The term insider includes . . . (E) affiliate, or insider of an affiliate as if such affiliate were the debtor."). "Affiliate" is defined to include an "entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement." *Id.* § 101(2)(D). As the Debtors' *Motion to Authorize the Entry Into the Hospital Facilities Management Services Agreement; and Granting Related Relief* [D.I. 212] makes clear, HRH is currently managing the Debtors' business through an affiliate. Accordingly, HRH is an insider of the Debtors.

28. The Combined Disclosure Statement and Plan offer no other explanation for the Debtors' convoluted classification scheme, or why the Debtors did not simply opt for a straightforward "pot" plan where all unsecured creditors are classified and treated together. The only logical reason for the classification scheme is to gerrymander an impaired accepting class. This renders the Plan's classification scheme improper and the Plan itself patently unconfirmable.

B. **The Plan cannot be confirmed because it unfairly discriminates against Class 9 Prior Owner Claims.**

29. The Plan cannot be confirmed because it unfairly discriminates against Class 9 Prior Owner Claims by giving holders of unsecured claims in Class 9 zero distribution on account of their claims while providing for a distribution to Class 7 General Unsecured Claims. If a plan has been rejected by an impaired class, then the plan must meet the "cramdown" requirements of section 1129(b) of the Bankruptcy Code, including the requirement that the plan does not discriminate unfairly among classes of equal priority. 11 U.S.C. § 1129(b)(1). "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes. Thus, a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). The burden is upon the Debtors to prove that the Plan does not discriminate unfairly. *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 122 (D. Del. 2006); *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 853 (Bankr. S.D. Tex. 2001).

30. Class 9 Prior Owner Claims are impaired and not receiving or retaining property under the Plan, and are therefore deemed to reject the Plan, triggering section 1129(b)'s unfair discrimination requirement. The Plan unfairly discriminates against Class 9 Prior Owner Claims

because it offers discriminatory treatment as compared Class 7 General Unsecured Claims, a class of equal priority. While Class 7 General Unsecured Claims will receive "a Pro Rata beneficial interest in the Litigation Trust" established by the Plan, Class 9 Prior Owner Claims "shall not receive or retain any property under the Plan." The Plan Proponents offer no basis for this patently discriminatory treatment, and there is none. This unfair discrimination renders the Plan patently unconfirmable.

### C. The Plan is patently unconfirmable because it contemplates impermissible substantive consolidation of the Debtors' estates.

31. The Plan is also patently unconfirmable because it proposes impermissible substantive consolidation of the Debtors' estates for voting and distribution purposes. Substantive consolidation is "extreme (it may affect profoundly creditors' rights and recoveries) and imprecise" and, as a result, "should be rare and, in any event, one of last resort after considering and rejecting other remedies." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2007). A proponent of consolidation must establish that the entities (1) disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (2) post-petition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *Id.* at 199–200.

32. The Plan Proponents do not even attempt to meet their burden of showing the *Owens Corning* requirements for substantive consolidation. Indeed, they cannot. Throughout these chapter 11 cases, the Debtors have operated as separate entities and propose to continue doing so after their Plan becomes effective. Plan Art. IX.A. The Debtors' chapter 11 petitions list their number of creditors, estimated assets, and estimated liabilities on a non-consolidated basis. The Debtors each filed individual schedules of assets and liabilities and statements of financial affairs. Certain of the Debtors received separate, non-consolidated postpetition debtor-in-

possession financing.[5]  Indeed, as to Captive Assurance specifically, the Debtors maintained separate insurance policies and obligations with Captive Assurance for the various covered Debtor entities.  Thus, the Debtors cannot possibly maintain that their creditors "relied on the breakdown of entity borders and treated them as one legal entity" or that "their assets and liabilities are so scrambled that separating them is prohibitive." *Owens Corning*, 419 F.3d at 199–200.  The record of these cases completely belies any such an argument.  Accordingly, there is no basis for substantive consolidation, and the Plan that proposes substantive consolidation is therefore patently unconfirmable.[6]

## II.     The Disclosure Statement lacks adequate information.

33.     Even if the Plan was confirmable (it is not), the Court still should not approve the Disclosure Statement because it lacks adequate information for creditors to make an informed decision whether to accept or reject the Plan.  A disclosure statement must contain adequate information for a court to approve it. 11 U.S.C. § 1125(b).  Adequate information includes relevant information to allow "a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).  Appropriate disclosure by the plan proponent is vital to the plan process and the Debtors have an affirmative duty to provide a disclosure statement that contains complete and accurate information.  *See Krystal Cadillac-Oldsmobile GMC Truck, Inc.*

---

[5]  *See Interim Order (I) Authorizing Certain Debtors to Obtain Postpetition Financing from Bayonne Medical Center Opco, LLC and Granting Senior Security Interests and Superpriority Administrative Expense Status to The Lender; (II) Authorizing the Debtors' Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 119]; *Interim Order (A) Authorizing IJKG Opco, LLC and IJKG, LLC to Obtain Postpetition Financing, (B) Authorizing Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Modifying the Automatic Stay, (E) Authorizing Debtors to Enter into Agreements with Bayonne Medical Center Opco, LLC, (F) Granting Adequate Protection, (G) Scheduling a Final Hearing, and (H) Granting Related Relief* [D.I. 128]

[6]  The proposed substantive consolidation for voting purposes also appears designed to circumvent the requirement in this district that plan acceptance be determined on a "per debtor" rather than aggregate basis.  *See In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011) (holding that the Bankruptcy Code requires that plan acceptance be determined on a "per debtor," not "per plan" basis).

*v. General Motors Corp.*, 337 F.3d 314, 324 (3d Cir. 2003); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("Of prime importance in the reorganization process is the principle of disclosure."). "In short, a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

34. The Disclosure Statement lacks adequate information and fails to satisfy section 1125 of the Bankruptcy Code with respect to the material issues described below, among others. Among other defects, Disclosure Statement lacks information regarding:

> (a) <u>Separate classification and treatment, and substantive consolidation</u>. The Disclosure Statement is devoid of any discussion of the factual and legal bases for the separate classification and treatment of claims discussed above. It similarly lacks an adequate discussion of the factual or legal bases for substantive consolidation, the alternatives to substantive consolidation, and the effects of substantive consolidation on creditor claims and recoveries.
>
> (b) <u>Distributions</u>. The Disclosure Statement fails to inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution. In fact, the Disclosure

        Statement has blanks for the estimated recovery percentage of every voting class.

(c) <u>Claims pool</u>. The Disclosure Statement fails to inform creditors of the quantum of claims in the various classes, which will affect the amount of distributions. Again, the Disclosure Statement has blanks in place of an estimated amount of claims in every voting class. Moreover, there is no bar date set in these cases, and the Plan proposes to establish a bar date *after* confirmation and the effective date, so it is unclear how the Debtors can provide any reasonable estimate of distributions without knowing the quantum of claims.

(d) <u>Solicitation</u>. The Plan Proponents do not address how they can respect creditor voting rights and ensure that all creditors who are entitled to vote receive a ballot when no bar date has been set and the universe of creditors entitled to vote is still unknown.

(e) <u>Asset values</u>. The Disclosure Statement does not disclose the value of the assets available for distribution to creditors.

(f) <u>Releases of HRH and others</u>. The Plan proposes to release HRH from any claims and causes of action against it, but the Disclosure Statement lacks any disclosure about the claims being released, including the nature of the claims being released, their merit or value, what is being offered in exchange for the release, and whether there has been an independent investigation of the claims being released. This is particularly concerning because HRH wears many hats in these chapter 11 cases including: (i) the

    Debtors' prepetition lenders; (ii) the Debtors' DIP Lenders; (iii) a manager-operator of certain of the Debtors hospitals; and (iv) the ultimate purchaser of the Debtors' business through the proposed Plan.

(g)  <u>Control of the Litigation Trust</u>.  The Plan proposes to hand *de facto* control and consent rights over the Litigation Trust to HRH, overseen by a Litigation Trust Oversight Committee that is composed of members of the Creditors' Committee.  The Disclosure Statement contains no discussion of why HRH is being given these powers in the Litigation Trust, how it benefits creditors generally, and how creditors are protected.  The Disclosure Statement similarly contains no information about the selection process for, or qualifications of, members of the Litigation Trust Oversight Committee, or why membership in that committee was not the subject of an open and fair selection process.  Instead, the members of the Creditors' Committee seem to have entrenched themselves in this role without any semblance of an open process or creditor input.

(h)  <u>The Treatment of Insured Claims</u>.  The Disclosure Statement lacks adequate information for holders of Class 8 Insured Claims to make an informed vote on the Plan.  The Disclosure Statement simply provides that "holders of Insured Claims shall recover only from the proceeds of available insurance and shall not be entitled to any Distributions from the Reorganized Debtors or the Litigation Trust." Plan Art. I.B. Yet the Disclosure Statement does not provide creditors with: (i) a description of which, if any, policies would apply to particular claims; (ii) what proceeds are available, in general or for

      particular claims; (iii) whether the insurers are able to satisfy such claims; or (iv) whether the Debtors hold any applicable self-insured retention obligations and how such obligations would affect potential recoveries to claimants. As noted above, Captive Assurance has provided general liability and physician liability insurance to the Debtors through numerous policies. But Captive Assurance's financial condition has been impaired by the Debtors' refusal to pay premiums, and, as a result, Captive Assurance is unable to pay Insured Claims as they come due. To the extent any holders of Insured Claims would be covered by Captive Assurance's policies, those claimants cannot expect to receive any recovery from Captive Assurance. Yet the Disclosure Statement makes no mention of this, and as a result, does not provide adequate information for such claimants to make an informed vote on the Plan.

(i)     <u>The Effective Disallowance of Insured Claims</u>. As noted above, the Plan eliminates Insured Claimants' rights to recover directly from the Debtors' estates in favor of insurance coverage. This provision effectively disallows the so-called Insured Claims against the estates. The Plan Proponents provide no factual or legal justification for this effective disallowance of claims through the Plan and fail even to adequately inform creditors of this result.

(j)     <u>The HRH Exit Facility</u>. The Disclosure Statement contains no disclosure of the amount and terms and conditions of the HRH Exit Facility. Leaving aside feasibility issues, the amount of the HRH Exit Facility is critical

information for all unsecured creditors to determine their prospects of recovery.

35. Unless and until the foregoing deficiencies are addressed, the Disclosure Statement should not be approved.

## RESERVATION OF RIGHTS

36. Captive Assurance reserves and preserves all objections and rights in respect of the Plan and the treatment of its claims thereunder and in these cases.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Captive Assurance respectfully requests that the Court deny approval of the Combined Disclosure Statement and Plan, including for solicitation purposes, unless and until the issues discussed in this Objection are resolved.

| | |
|---|---|
| Dated: January 15, 2025<br>Wilmington, Delaware | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br><br>*/s/ Matthew B. Harvey*<br>Eric D. Schwartz (No. 3134)<br>Matthew B. Harvey (No. 5186)<br>Sophie Rogers Churchill (No. 6905)<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, DE 19899-1347<br>Telephone: (302) 658-9200<br>Facsimile: (302) 658-3989<br>Email: eschwartz@morrisnichols.com<br>         mharvey@morrisnichols.com<br>         srchurchill@morrisnichols.com<br><br>*Counsel to CarePoint Health Captive Assurance Company, LLC* |