**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| CarePoint Health Systems, Inc., *et al.*,[1] | Case No. 24-12534 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 412 & 417** |

**OBJECTION AND RESERVATION OF RIGHTS TO MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT ON AN INTERIM BASIS; (II) SCHEDULING A COMBINED HEARING ON FINAL APPROVAL OF THE DISCLOSURE STATEMENT, PLAN CONFIRMATION AND DEADLINES RELATED THERETO; (III) APPROVING THE SOLICITATION, NOTICE AND TABULATION PROCEDURES AND FORMS RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

Freehold Trust, Benego Ventures, LLC, Briar Hill Ventures, LLC, Pheasant Run Ventures, LLC, and Vivek Garipalli (collectively, the "Objectors") file this (i) objection (this "Objection") to the *Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement, Plan Confirmation, and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and Forms*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health CarePoint Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

*Related Thereto; and (IV) Granting Related Relief* (the "Motion") [Docket No. 417]  and to the

disclosures contained in the *Combined Disclosure Statement and Joint Chapter 11 Plan of*

*Reorganization* [Docket No. 412] (such disclosures, the "Disclosure Statement") and reservation

of rights with respect to the *Combined Disclosure Statement and Joint Chapter 11 Plan of*

*Reorganization*  (the "Combined Disclosure Statement and Plan" or the "Plan") filed by CarePoint

Health Systems, Inc., *et al.*, the above-captioned debtors and debtors-in-possession (the "Debtors")

and the Official Committee of Unsecured Creditors of CarePoint Health Systems, Inc. (the

"Committee" and together with the Debtors, the "Plan Proponents") and (ii) joinder to the

*Objection and Reservation of Rights with Respect to Motion of the Debtors and the Official*

*Committee of Unsecured Creditors for Entry of an Order (I) Approving the Disclosure Statement*

*on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure*

*Statement, Plan Confirmation and Deadlines Related Thereto; (III) Approving the Solicitation,*

*Notice and Tabulation Procedures and Forms Related Thereto; and (IV) Granting Related Relief*

(the "Maple Objection")[2] filed contemporaneously herewith.  In support of this Objection, the

Objectors fully adopt, and incorporate by reference, the Maple Objection, and in further support,

respectfully state as follows:

## PRELIMINARY STATEMENT

1.     The Objectors are sensitive to the paramount goals of safety and continuation of

patient care during these Chapter 11 cases.  Indeed, since acquiring the CarePoint Hospitals

(defined below) through separate bankruptcies, to the more recent donations and contributions of

membership interests and valuable land, the Objectors have carried on these goals, and invested

---

[2] Capitalized terms used but not defined herein shall have the meaning given to such term in the Plan or the Maple Objection, as applicable.

significant time, money and energy into the CarePoint Hospitals, to ensure continued, uninterrupted healthcare services.  Nevertheless, the Objectors have significant concerns with the proposed Plan, which they will raise in connection with confirmation.  At this time, the Objectors object to (i) the lack of adequate information in the Disclosure Statement, and (ii) if such is approved on an interim basis for solicitation (which it should not be), to the currently proposed Confirmation Schedule, which does not permit sufficient time for a fulsome process given the nature of the proposed Plan.

2.      First, the Disclosure Statement lacks adequate information necessary to apprise creditors of the reasoning behind, legality of, and risks related to a variety of aspects of the Plan, including, without limitation, the classification of Claims and Interests, the anticipated creditor recoveries, substantive consolidation, and the release and injunction provisions.  As described in more detail below, the Plan wipes out multiple Classes of Claims, including the Prior Owner Claims, while providing recovery to other creditors at the same priority level without any explanation.  The Disclosure Statement is also silent as to the Committee's determination – as a fiduciary to all unsecured creditors, including the Objectors – that the Plan's treatment and other provisions are fair, equitable, and appropriate.  The Plan additionally provides for substantive consolidation and broad releases without any analysis or justification.  The adequate information standard under the Bankruptcy Code demands that the Debtors clearly explain the reasoning that supports the recoveries provided to some, but not all unsecured creditors, the support for substantive consolidation and the releases, and the decision-making process leading up to the Plan Proponent's submission of the Plan in order to solicit votes thereon.

3.      Second, while the Objectors are not independently asserting all of their confirmation objections at this time, the Plan is not structured in a manner that permits a prompt

exit from Chapter 11.   Instead, the Plan will result in significant litigation that will be impossible on the proposed expedited timeline.  If the Plan Proponents are permitted to solicit the Combined Disclosure Statement and Plan (which they should not), the Confirmation Schedule must provide the minimum procedural safeguards for parties to object to confirmation of the Plan.

## BACKGROUND

### A.  The Objectors[3]

4.      As described in detail in the Maple Objection, certain of the Objectors are among the prior owners (together with the members and affiliated entities defined in the Plan, the "Prior Owners") of Debtors HUMC Opco, LLC d/b/a CarePoint Health – Hoboken University Medical Center ("HUMC") and Hudson Hospital Opco, LLC d/b/a CarePoint Health – Christ Hospital ("Christ").   The Prior Owners operated Christ between 2012-2022 and HUMC between 2011-2022. The Prior Owners also operated IJKG Opco LLC d/b/a CarePoint Health – Bayonne Medical Center ("IJKG Opco"), during the period 2008-2022. HUMC, Christ, and BMC are referred to collectively as the "CarePoint Hospitals."

5.      After acquiring the CarePoint Hospitals out of bankruptcies between 2008 and 2012, the Prior Owners invested millions of dollars in the CarePoint Hospitals to restore the CarePoint Hospitals to financial stability and service levels.  Later, through 2022, the Prior Owners invested millions more dollars to facilitate a sale process for the CarePoint Hospitals to achieve restored financial stability.   Specifically, Benego Ventures, LLC loaned (i) IJKG, LLC an aggregate amount of $10,480,000 pursuant to 18 separate promissory notes during the period

---

[3] The following is intended to provide a high-level summary of the underlying documents referenced herein and the facts involving the Objectors.  In the event of any inconsistencies between the summary contained herein and the terms of the documents, the terms of the documents control, and the Objectors reserve all rights in this respect.  For the avoidance of doubt, the Objectors explicitly reserve all rights to file claims against the Debtors and nothing herein shall constitute a waiver of such claims.

commencing on March 1, 2019, and ending on July 1, 2020, and (ii) HUMC Opco, LLC an amount equal to $320,000 pursuant to a promissory note on or about March 1, 2020 (together, the "Benego Notes"). In addition, during the period commencing on September 1, 2019 and ending on December 1, 2019, Pheasant Run Ventures, LLC made loans to HUMC Opco, LLC in an totaling approximately $2,482,764 (the "Pheasant Run Notes").

6. As described in the Maple Objection, when the sale process was not successful, the Prior Owners contributed the CarePoint Hospitals to the newly formed non-profit, CarePoint Health Systems, Inc. ("CarePoint"). To this end, as a significant financial boost to CarePoint moving forward, Prior Owners included their interest in approximately 12 acres of real estate in northern New Jersey as part of the donation. The donated land included the real estate where Christ is located as well as other mixed-use parcels, with the entire land valued at $135 million in 2012.

7. In addition, in the late spring of 2022, certain of the Objectors and CarePoint entered into, among other things, that certain *Donation Agreement* (together with all ancillary documents, the "Donation Agreement") with respect to such donation. Pursuant to the Donation Agreement and related agreements, the interests in Benego CarePoint LLC and Briar Hill CarePoint LLC owned by the Objectors were contributed to CarePoint. As described in more detail therein, CarePoint agreed to indemnify Freehold Trust, Benego Ventures, LLC, Briar Hill Ventures, LLC and certain of their affiliates (together, the "Assignor Parties"), among others, against losses and liabilities that such parties may incur based on the operation of CarePoint and its subsidiaries. The Donation Agreement additionally contains mutual releases between the Assignor Parties and CarePoint, for itself and on behalf of each of its affiliates. Indeed, and as described in further detail therein, CarePoint released the Assignor Parties from any future claims

and causes of action based on or related to the employment or engagement by any of the Assignor Parties in any position (including as a director, officer, manager, direct or indirect member, agent, representative or contractor), and the wind-up, liquidation, dissolution or cessation of CarePoint or any of its subsidiaries' business operations, should they occur.  Further, in consideration for the assignments provided for therein, the Donation Agreement includes an "enablement clause" that prevents both CarePoint and the Assignor Parties from permitting, assisting, or authorizing any other parties from commencing or instituting any action or cause of action concerning the releases contained therein.

8.      On November 4, 2022, approximately six months after entry into the Donation Agreement and when no Prior Owners were in control of the Debtors, certain of the Debtors reaffirmed their obligations to the Objectors (among others) and entered into that certain *Collateral Sharing Agreement*, as amended by that certain *First Amendment to the Collateral Sharing Agreement* dated as of October 15, 2024 (together, the "Collateral Sharing Agreement").  Under Collateral Sharing Agreement, proceeds derived from certain litigation matters identified therein were shared and to be distributed to the lender parties to the Collateral Sharing Agreement in accordance with the agreed upon waterfall, notwithstanding the security and lien priority otherwise set forth in the loan documents set forth with such lenders.  As described in the Collateral Sharing Agreement, Debtors Hudson, IJKG, LLC HUMC Opco, and CarePoint owe certain Objectors an aggregate amount of approximately $21,148,474 in accordance with the agreements set forth therein.  Additionally, the Collateral Sharing Agreement reaffirmed the Benego Notes and Pheasant Run Notes along with certain obligations pursuant to the Donation Agreement.

9.      On September 20, 2024, at the request of the Debtors, and presumably to facilitate the Debtors' reorganizational efforts, Sequoia Healthcare Services, LLC (the "Assignor") entered

into that certain *Assignment Agreement* (the "Assignment Agreement") with CarePoint.  Pursuant to the Assignment Agreement, Assignor, as the sole member of CarePoint Health Management Associates Intermediate Holdco, LLC (the direct or indirect sole member of CarePoint Health Management Associates, LLC d/b/a CarePoint Health and Quality Care Associates, LLC), assigned its membership interest (the "Membership Interest") to CarePoint. In exchange for the Membership Interest, and as described in more detail in the Assignment Agreement, CarePoint *again* agreed to release, among other parties, the Assignor, the Objectors and each of their respective affiliates, from any future claims and causes of action based on or related to the employment or engagement in any position (including as director, officer, manager, direct or indirect member, agent, representative or contractor) and the operations of the hospitals described therein.  The Assignment Agreement additionally provided an identical "enablement clause" to the one contained in the Donation Agreement, which prevents CarePoint from permitting, assisting, or authorizing any other parties from commencing or instituting any action or cause of action concerning the releases contained therein.

**B.  The Chapter 11 Cases**

10.     On November 3, 2024 (the "Petition Date"), all Debtors except IJKG Opco filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Also on the Petition Date, an involuntary petition for relief under chapter 11 was filed against IJKG Opco, and IJKG Opco consented to the requested relief.

11.     On November 19, 2024, the United States Trustee appointed the Committee [D.I. 157].

**C.  The Plan and Disclosure Statement**

12.     On December 30, 2024, the Debtors filed the *Notice of Filing Plan Term Sheet* [Docket No. 378] (the "Plan Term Sheet").  The Plan Term Sheet describes material terms to be included in a chapter 11 plan, which were reached during a mediation between the Debtors, the Committee, Bayonne Medical Center Opco, LLC, and Hudson Regional Hospitals, LLC.

13.     On January 8, 2025, the Plan Proponents filed the Combined Disclosure Statement and Plan and the Motion, which seeks interim approval of the Disclosure Statement in order to solicit votes thereon and approval of the Confirmation Schedule contained therein.

14.     The Court shortened the notice period for the hearing to consider interim approval of the Disclosure Statement, which is currently scheduled for January 17, 2025 at 10:00 a.m. (ET) (the "Interim Hearing").

15.     The Plan purports to provide for (i) the vesting of certain Litigation Claims, Litigation Trust Seed Money and other Litigation Trust Assets in a Litigation Trust created pursuant to the Plan, for the purpose of distribution to holders of only select Claims; (ii) the vesting of all of the Debtors' other assets in the Reorganized Debtors, except as otherwise provided in the Plan (including the HRH Transactions); (iii) the designation of a Litigation Trustee to, among other things, investigate, prosecute, litigate and/or settle the Litigation Claims, reconcile and make distributions with respect to Allowed Claims, and administer the Litigation Trust in an efficient manner; and (iv) a one hundred percent recovery for holders of Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed Other Secured Claims.

16.     The Plan classifies Claims in twelve (12) separate Classes for all purposes, including with respect to voting rights.  General Unsecured Claims are separately classified in Class 7, which is designated as impaired but entitled to vote on the Plan, with a projected recovery

of "To Be Determined." *See* Plan Art. I.B. Moreover, the Plan sweepingly defines "Prior Owner Claim" as "any Claim of any of the Prior Owners" and then sweepingly defines "Prior Owners" as three individuals and "any entities directly or indirectly owned or controlled by them or any of the related Persons . . ." *See* Plan Arts. 1.143-1.144.  The Plan classifies Prior Owner Claims in Class 9, which is designated as impaired and deemed to reject (and therefore not permitted to vote) with a projected recovery of 0%. *See id*.  The Plan does not clearly define what might be swept into Prior Owner Claim due to the open-ended Prior Owner definition, does not set forth a basis for classifying the Prior Owner Claims separately from the General Unsecured Claims and does not set forth any explanation or justification for providing no recovery on the Prior Owner Claims.

17.    By the Motion, the Plan Proponents additionally propose the Confirmation Schedule, which seeks an expedited timeline for confirmation of the Plan.  Specifically, there are only eighteen (18) calendar days (twelve (12) business days) between the proposed deadline to serve the Solicitation Package and the proposed Voting Deadline.  Under rule 2002(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Plan Proponents must provide, at a minimum, 28 days' notice for objections to the Plan.   If the Motion is approved at the Interim Hearing, the Confirmation Schedule contemplates a twenty-one (21) day notice period for objections to the final approval of the Disclosure Statement and confirmation of the Plan, which is not compliant with the Bankruptcy Rules.

## **OBJECTION**

18.  The Motion cannot be approved because (i) the Disclosure Statement fails to provide adequate information and (ii) it sets forth a timeline for confirmation of the Plan that does not comply with the Bankruptcy Rules and does not afford a fair process for testing confirmation of the Plan.

**A.  The Plan does not Contain "Adequate Information"**

19.      Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan.  11 U.S.C. § 1125.  The Bankruptcy Code defines "adequate information" as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan . . .

11 U.S.C. § 1125(a)(1).

20.      The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan.  *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988).  Indeed, Congress intended the disclosure statement "to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization."  *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance upon the disclosure statement by creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (The Bankruptcy Code "provides that acceptances or rejections of a reorganization plan can't be solicited without first giving the creditors or others so solicited a court approved disclosure statement, which provides 'adequate information.'").

10

21.     Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code alternatives…" *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

22.     Here, the Disclosure Statement fails to provide adequate information that would enable parties to make informed judgments on the Plan.  Specifically:

A.  The Disclosure Statement lacks any explanation or analysis for classifying the Prior Owner Claims in their own Class, separate from the General Unsecured Claims, and unfairly treating the Prior Owner Claims differently from the General Unsecured Claims;

B.  The Disclosure Statement provides no rationale for depriving the Prior Owners from voting on the Plan;

C.  The Disclosure Statement lacks information discussing Claims held by the Objectors pursuant to the Collateral Sharing Agreement and exactly such Claims would be considered "Prior Owner Claims";

D.  The Disclosure Statement lacks any information related to the Donation Agreement and is unclear as to the Plan's effect on indemnification of the Assignor Parties pursuant to such agreement, including with respect to the releases and the enablement clause contained therein.  As currently proposed, the Plan seemingly deprives the Assignor Parties of bargained-for indemnification rights under the Donation Agreement without any explanation or justification for doing so.  Worse, the Plan contemplates the enumerated Retained Causes of Action which includes claims and Causes of Action against the Prior Owners, are expressly preserved and for the Litigation Trust to pursue. This is inconsistent with the Donation Agreement, the Assignment Agreement and Article X.II.C of the Plan which otherwise preserves indemnification claims.  The Debtors should amend the Disclosure Statement to provide clear disclosures related to indemnification of the Prior Owners and the Donation Agreement, including, for the avoidance of doubt, the releases and indemnification rights afforded thereby;

E.  The Disclosure Statement lacks adequate information related to the proposed substantive consolidation.  As described above, the Objectors hold the Benego Notes and Pheasant Run Notes against separate Debtors, and Freehold Trust holds separate claims against separate Debtors, all acknowledged by the Collateral Sharing Agreement.  The Plan lacks any analysis with respect to whether the estates should be substantively consolidated in accordance with *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), and it fails to describe any

potential risks and consequences as a result of the proposed substantive consolidation;

F.    The Disclosure Statement must clearly lay out the releases provided in the Plan. The Plan proposes that the Reorganization Committee will continue to exist to evaluate the D&O Claims against the Current D&Os. *See* Plan Art. IX.D. It further provides that pending the result of the Reorganization Committee's investigation, certain claims against the Current D&Os may be pursued, the proceeds of which would constitute Litigation Claims. *Id*. Presumably, this means that any other claims against the Current D&Os will not be pursued, which is tantamount to an undisclosed debtor release. Moreover, the Plan currently contemplates that Current D&Os are Exculpated Parties. The Plan Proponents must provide further disclosure related to investigation and release process embedded in the Plan, instead of the current description, which is confusing and incomplete;

G.    The Disclosure Statement must provide additional information related to oversight of the Reorganization Committee and the disclosures it would make regarding its process and conclusions. Also, the Disclosure Statement should identify who is advising the Reorganization Committee, and whether the Reorganization Committee will retain counsel;

H.    The Disclosure Statement should further explain the decision-making process of the Plan Proponent's behind the classification and treatment of Claims, the justification for the Plan releases and substantive consolidation. This is especially so in light of the fact that the Plan proposes no recovery to the majority of the Classes of Claims but provides some recovery to General Unsecured Creditors in Class 7 and permits Other Interests in Class 12 to remain unimpaired;

I.    The Disclosure Statement describes certain risk factors, however, the section contains insufficient detail. For example, this section does not include the specific requirements to cram down both classes of secured and unsecured creditors, which the Debtors are seeking to do.

23.    Unless the Plan Proponents clearly and plainly explain the justifications for unfairly classifying the Classes of Claims and Interests, provide an analysis supporting same, and describe the risks to execution of the Plan, the Motion should not be approved.

**B.  The Confirmation Schedule Must Be Reasonable**

24.    The Objectors have long recognized that patient safety and continuity of care are critical, beginning with the acquisition of the CarePoint Hospitals out of their bankruptcies, and

later with his significant contributions in the Donation Agreement and most-recently, by agreeing to the Assignment Agreement. Nevertheless, the Plan Proponents' professed need for speed must account for the process required by the Bankruptcy Code and applicable rules to obtain the significant benefits afforded through a chapter 11 plan. This Court should not only require the Plan Proponents to meet the substantive requirements for confirmation but should also require a reasonable process for affected parties to test confirmability. The Plan Proponents' proposed 21-day process falls far short of any reasonable or fair process.

25. The Plan Proponents here have chosen to craft and propose a plan that raises numerous factual and legal issues, and now conveniently assert that it is paramount that affected parties and this Court to address such matters on an expedited basis. Indeed, the Plan is structured in such an obviously prejudicial manner – including its unfounded substantive consolidation, complicated classification scheme, and unfair treatment – that it seems intended to prevent a streamlined exit from Chapter 11. Nothing required the Plan Proponents to propose such a plan and they should not be permitted to force through an unfair plan without appropriate process. If the Debtors and Committee are concerned with quick emergence from Chapter 11, they should propose a straightforward Plan that treats all creditors equally and in accordance with the Bankruptcy Code.

26. As to the confirmation schedule, it must, at a minimum, comply with Bankruptcy Rule 2002(b), which requires the Plan Proponents provide 28 days' notice to all creditors to file objections to confirmation of the Plan. Currently, assuming the Motion is approved at or following the Interim Hearing (which it should not be), the Confirmation Schedule would only provide creditors with 21 days' notice to object to confirmation of the Plan.

27.     Yet even the minimum time afforded by the Bankruptcy Rules is not workable here where multiple parties will raise significant factual and legal objections to the Plan.  To appropriately test these issues, the Debtors must provide parties in interest with sufficient time for discovery and briefing.  The presently proposed Confirmation Schedule prevents this necessary work, is woefully inadequate and should be denied. Instead, if confirmation is to proceed, the Court should require the Plan Proponents set forth a reasonable schedule, with input from the Objectors and other interested parties.

## JOINDER AND RESERVATION OF RIGHTS

28.     The Objectors expressly join, and incorporate by reference, the Maple Objection including all facts and arguments set forth therein and reserve the right to: (a) amend or supplement this Objection and otherwise take any additional or further action with respect to the subject matter hereof; (b) be heard before this Court to raise additional arguments or issues in connection therewith; and (c) seek discovery with respect to any issues implicated by the Plan.  Nothing herein is intended to nor shall be construed as a waiver or limitation of any of the rights or remedies with respect to the Plan, all of which are fully preserved.

[*Remainder of page intentionally left blank*]

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Objectors respectfully request that the Court (i) deny approval of the Motion unless and until the Disclosure Statement provides adequate information, (ii) if confirmation is to proceed, order a reasonable schedule for prosecution of the Plan, and (iii) grant such other and further relief as the Court deems just and proper.

Dated: January 15, 2025
       Wilmington, Delaware

**WILSON SONSINI GOODRICH & ROSATI**

*/s/ Erin R. Fay*
Erin R. Fay (No. 5268)
Heather P. Lambert (No. 6923)
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 304-7600
E-mails: efay@wsgr.com
           hlambert@wsgr.com

*Counsel to the Objectors*