UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CAREPOINT HEALTH SYSTEMS, INC., *et al.*,[1]<br><br>            Debtors. | Chapter 11<br><br>Case Nos. 24-12534 (JKS), *et seq.*<br><br>(Jointly Administered) |

**OBJECTION AND RESERVATION OF RIGHTS WITH RESPECT TO MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT ON AN INTERIM BASIS; (II) SCHEDULING A COMBINED HEARING ON FINAL APPROVAL OF THE DISCLOSURE STATEMENT, PLAN CONFIRMATION AND DEADLINES RELATED THERETO; (III) APPROVING THE SOLICITATION, NOTICE AND TABULATION PROCEDURES AND FORMS RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

James P. Lawler ("Lawler"), JPL Healthcare Consulting Limited Liability Company ("JPL Healthcare"), Oak Management, LLC ("Oak Management"), Heights Healthcare Services Limited Liability Company ("Heights Healthcare"), and Willow Healthcare Services Limited Liability Company ("Willow Healthcare") (collectively, the "Objectors"), by and through their undersigned counsel, hereby file this objection and reservation of rights (the "Objection") to the (a) *Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

"Plan") [Dkt No. 412]² and (b) *Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement, Plan Confirmation, and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and Forms Related Thereto; and (IV) Granting Related Relief* (the "Motion") [Dkt No. 417] filed by CarePoint Health Systems, Inc., *et al.*, the above-captioned debtors and debtors-in-possession (the "Debtors") and the Official Committee of Unsecured Creditors of CarePoint Health Systems, Inc. (together with the Debtors, the "Plan Proponents"), and in support of the Objection respectfully state as follows:

## PRELIMINARY STATEMENT

1. There is no exception to the Bankruptcy Code's mandate that a disclosure statement contain adequate information sufficient to enable creditors to make an informed judgment about the chapter 11 plan it describes. See 11 U.S.C. § 1125(a)(1), (b). The information provided by the Plan Proponents in their submission is inadequate. Moreover, the inadequacy of that information is matched by the futility of the Plan Proponents' efforts to confirm a patently flawed Plan, which on its face violates numerous provisions of § 1129 of the Bankruptcy Code.

2. The Objectors have various and substantial claims against the Debtors that arise from certain agreements and obligations expressly referenced in the Plan. Among other things, the Plan separately classifies the claims of the Prior Owners, including the Objectors, without explanation. Any description of the nature or amount of the Prior Owner Claims also is omitted. What is clear is that the holders of such claims, including the Objectors, are disenfranchised, as

---

² Capitalized terms used but not defined herein shall have the meaning given to such term in the Plan.

4898-1129-1920.v1

they will receive no recovery under the Plan. There is no explanation why, notwithstanding the prior acknowledgment of certain of the Debtors of millions of dollars due to the Objectors. The allowed amount of other classes of claims similarly is missing, together with the projected recovery to those classes.

3. Simply put, in their haste to benefit HRH with an expedited confirmation process the Debtors have filed a skeletal Plan that lacks sufficient information regarding, among other things, (a) the nature, amount and classification of creditor claims; (b) the treatment of those claims; and (c) operating and other financial information necessary for creditors to evaluate the Plan. No cash flow projections have been provided; no "budget vs. actual" analysis of the Debtors' financial performance has been offered; and no claims analysis has been undertaken. Are the Debtors presently operating at a profit or loss? Will they be profitable in the future? These questions, among many others, are unanswered by the Plan.

4. While the Objectors appreciate the critical need to provide continued patient care to the communities served by the Debtor hospitals, the mechanism developed to do so must comply with the law and should not unfairly prejudice the creditors that have financially supported those same hospitals over many years. The Objectors join with and support the objections filed by other Prior Owners and Maple Healthcare, LLC (the "Maple Objection"), all of which demonstrate that the Court should not approve the Debtors' solicitation of the Plan in its current form.

## BACKGROUND

### A.    The CarePoint Hospitals

5. The Objectors are among the prior owners of Debtors HUMC Opco, LLC d/b/a CarePoint Health - Hoboken University Medical Center ("HUMC") and Hudson Hospital Opco,

4898-1129-1920.v1

LLC d/b/a CarePoint Health - Christ Hospital ("Hudson" or "Christ").  The Prior Owners owned Christ between 2012 and 2022, and HUMC between 2011 and 2022.  The Prior Owners also owned IJKG Opco LLC d/b/a CarePoint Health - Bayonne Medical Center ("IJKG Opco" or "Bayonne"), during the period 2008-2022.  HUMC, Christ, and Bayonne shall be referred to collectively as the "CarePoint Hospitals".

6. During the period between 2008 and 2012, the Prior Owners acquired, out of separate bankruptcy cases, each of the CarePoint Hospitals, who collectively did business as the CarePoint Health System.  Bayonne, HUMC, and Christ were each purchased as for-profit hospitals.  By assuming significant debt at their personal expense, the Prior Owners restored the CarePoint Hospitals to financial stability and reliable service levels, enabling them to provide high-quality medical care to countless patients while improving care for financially disadvantaged Medicare, Medicaid, and uninsured patients.

7. In fact, each CarePoint Hospital achieved, and exceeded, the seven-year requirement mandated by the State of New Jersey, when it issued its respective certificates of need, which proved to be even more critical throughout a global pandemic:  Bayonne served the community for over 16 years, HUMC for over 13 years, and Christ for over 12 years.

8. The Prior Owners invested millions of dollars in the CarePoint Hospitals between 2008 and 2022, and, in 2019, made millions in unsecured and subordinated arm's length loans to the CarePoint Hospitals to facilitate a sale process.  The terms and conditions of such secured loans were established by and set forth in loan documents drafted, and agreed to, by BRF Finance Co., LLC (the "Prior Senior Lender"), who was the CarePoint Hospitals' senior secured lender.  Maple Healthcare, LLC's ("Maple") rights were at all time subordinate to the Prior Senior Lender.  When the sale process was not successful, as set forth in the Plan at Article

4

III.A1-.2, the Prior Owners donated their interests in the CarePoint Hospitals to the newly formed non-profit CarePoint to enable the hospitals to access more state and federal resources.

9. As a significant financial boost to CarePoint moving forward, Prior Owners included their interest in approximately 12 acres of real estate in northern New Jersey as part of the donation. The donated land included the real estate where Christ is located as well as other mixed use parcels, with the entire land valued at $135 million in 2012. The foregoing transactions shall be referred to as the "Donation." The majority Prior Owner completed his donation in May 2022 providing CarePoint full control of the CarePoint Hospitals. The other Prior Owners completed their donations in September 2022 and December 2022.

10. The announcement of the completed transition of ownership to CarePoint noted that the Donation was made so that "the newly formed non-profit would continue to care for, sustain, and grow the hospital system to provide equitable care in Hudson County for many years to come."[3] Following the Donation, the Debtors' boards of directors (which did not include any of the Prior Owners and where Prior Owners had no direct or indirect influence or control over) had exclusive control over the CarePoint Hospitals.

11. On November 3, 2024, Christ and HUMC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Also on that date, an involuntary petition for relief under chapter 11 was filed against Bayonne, to which Bayonne eventually consented.

B. **The Prior Owners' Claims**

12. To keep the CarePoint Hospitals operating during the 2019 sale process, the Prior Owners, including the Objectors, made various and substantial loans and advance payments to the CarePoint Hospitals, totaling more than $4.6 million in principal amount. Yet, nowhere in

---

[3] *CarePoint health completes transition to non-profit entity* (2022) *PR Newswire*. Available at: https://www.prnewswire.com/news-releases/carepoint-health-completes-transition-to-non-profit-entity-301542712.html (Accessed: 10 January 2025).

the Plan or, for that matter, in the bankruptcy schedules of any of the 21 Debtors, is there any specific reference to the Objectors' indisputable claims.

13. The Objectors assert significant claims against the Debtors including for (i) demand notes; (ii) disbursements and advanced payments and (iii) indemnification rights and releases.

### i. Demand Notes

14. HUMC, Christ, Bayonne, Capitala Private Advisors, LLC, and Maple, among others, entered into a Collateral Sharing Agreement with certain of the Debtors dated as of November 4, 2022, as amended by that certain First Amendment to Collateral Sharing Agreement dated as of October 15, 2024 (the "Collateral Sharing Agreement"), whereby the proceeds derived from certain litigation matters identified in the Collateral Sharing Agreement were to be shared by and distributed to the lenders in accordance with the agreed upon waterfall, notwithstanding the security and lien priority otherwise set forth in the loan documents with such lenders. See Plan at Article III.A.3(iii).

15. In order to keep the CarePoint Hospitals operating during the 2019 sale process, JPL Healthcare, Oak Management, and Willow Healthcare made several critical loans to Bayonne and HUMC. In return, those lenders received demand promissory notes from Bayonne or HUMC. Schedule 1 of the Collateral Sharing Agreement contains a full list of "Noteholders" and a "Description of Notes."

16. Notably, Schedule 1 includes a chart of demand promissory notes delivered to JPL Healthcare (defined as the "JPL-Bayonne Parent Notes") in the total principal amount of $1,275,000. From March 2019 through July 2020, JPL Healthcare provided seventeen advanced payments to Bayonne relating to the JPL-Bayonne Parent Notes, each in the amount of $75,000.

17. Schedule 1 also makes reference to certain loans made by Oak Management (defined as the "Oak-HUMC Notes") to HUMC in the total principal amount of $310,344. From September through December 2019, Oak Management made six advanced payments to HUMC relating to the Oak-HUMC Notes.

18. In addition, Schedule 1 describes a certain loan made by Willow Healthcare to HUMC Opco (defined as the "Willow-HUMC Notes") in the total principal amount of $40,000. In March 2019, Oak Management provided the advanced payments to HUMC relating to the Willow-HUMC Notes.

19. Notwithstanding the Debtors' specific knowledge of the JP-Bayonne Parent Notes, the Oak-HUMC Notes, and the Willow-HUMC Notes (collectively, the "Demand Notes"), and the amounts due thereunder, there is no mention whatsoever of the Demand Notes in the Plan.[4]

        ii.        **Amounts Advanced by the Objectors**

20. In addition to the loans made by JPL Healthcare, Oak Management and Willow Healthcare for which the entities received the Demand Notes, Lawler personally made advanced payments for various obligations of the Debtors. Attached as Exhibit A to Schedule 1 of the Collateral Sharing Agreement is a summary of "Owner Debtholders" and "Owner Debt Facilities" that consist of advanced payments made by certain Prior Owners, including Lawler.

21. There are at least nine separate transactions (with descriptions) that summarize amounts advanced by Lawler, totaling just under $3 million.

22. Again, notwithstanding that several of the Debtors were parties and signatories to the Collateral Sharing Agreement and received millions of dollars in loans and advanced

---

[4] Curiously, nor is there any reference to the Demand Notes in the bankruptcy schedules filed by any of the Debtors.

payments from the Objectors and other Prior Owners, the Objectors are totally disenfranchised, and their claims are effectively ignored in the Plan.

### iii. Indemnification Rights and Releases

23. On August 12, 2022, JPL Healthcare, Heights Healthcare, and Willow Healthcare (collectively, the "Assignors") entered into a Donation Agreement with CarePoint (the "Assignee"). Prior to the execution of the Donation Agreement, each Assignor contributed its respective interests in Bayonne Intermediate Holdco, LLC ("Bayonne Holdco"), Hoboken Intermediate Holdco, LLC ("Hoboken Holdco") and Christ Intermediate Holdco, LLC ("Christ Holdco") to Evergreen Community Assets, LLC ("Evergreen"). Based on these contributions, Evergreen owned a 10% membership interest in each of Bayonne Holdco, Hoboken Holdco and Christ Holdco. Pursuant to the Donation Agreement, the Assignors assigned, contributed, transferred, and conveyed 100% of the membership interests in Evergreen to CarePoint.

24. In paragraph 4 of the Donation Agreement, CarePoint agreed to defend, indemnify and hold harmless the "Assignor Parties," which include the Objectors. In pertinent part, paragraph 4 reads as follows:

> (a) Assignee will defend, indemnify, and hold harmless the Assignor Parties (as defined below) from and against all losses, liabilities, and costs including, without limitation, reasonable attorneys' fees, expenses, penalties, judgments, claims and demands of every kind and character (collectively, "*Losses*") that the Assignor Parties may incur, suffer, or be required to pay arising out of, or based upon the business and operation of the Assignee and its subsidiaries (including, without limitation, the CarePoint Entities) on and after the Closing Date, provided however, that no indemnification shall be made for Assignor Released Claims (as defined below). "*Assignor Parties*" shall mean, collectively, the Assignor, James Lawler and their respective successors, assigns, officers, directors, managers, members, employees, trustees, beneficiaries, stockholders, representatives, predecessors, subsidiaries, affiliates and heirs, provided, however, that no CarePoint Entity shall be an Assignor Party.

25. In addition, pursuant to paragraph 5 of the Donation Agreement, CarePoint acknowledged separate indemnification rights in favor of the Objectors:

> 5. *Right to Indemnification*. Notwithstanding the foregoing and for the avoidance of doubt, the Assignee hereby agrees that (a) the indemnification rights granted to the Assignor or any other Assignor Party pursuant to (i) the limited liability company agreement or other corporate governing document of the CarePoint Entities (collectively, the "***CarePoint Governing Documents***"), and (ii) the limited liability company agreement of Evergreen dated as of May 4, 2022 (the "***Evergreen LLC Agreement***") shall not be waived and (b) the Assignor and the other Assignor Parties shall be entitled to any indemnification rights pursuant to any of the CarePoint Governing Documents and the Evergreen LLC Agreement to the fullest extent permitted thereto and Assignee shall not take any action to amend, modify, contest, or limit such rights.

26. Moreover, on September 20, 2024, at the request of the Debtors, and presumably to facilitate the Debtors' reorganizational efforts, Sequoia Healthcare Services, LLC (the "Sequoia Assignor") entered into that certain *Assignment Agreement* (the "Assignment Agreement") with CarePoint.  Pursuant to the Assignment Agreement, Sequoia Assignor, as the sole member of CarePoint Health Management Associates Intermediate Holdco, LLC (the sole member of Quality Care Associates, LLC), assigned its membership interest (the "Membership Interest") to CarePoint.  In exchange for the Membership Interest, and as described in more detail in the Assignment Agreement, CarePoint agreed to release, among other parties, the Sequoia Assignor, Sequoia Healthcare Services, LLC, Sunnyside Enterprises, LLC and James Lawler, from any future claims and causes of action based on or related to the employment or engagement in any position (including as director, officer, manager, direct or indirect member, agent, representative or contractor) and the operations of the hospitals described therein.  The Assignment Agreement additionally provided an identical "enablement clause" to the one contained in the Donation Agreement, which prevents CarePoint from permitting, assisting, or

authorizing any other parties from commencing or instituting any action or cause of action concerning the releases contained therein.

27. The Plan fails to provide any information regarding the indemnification rights of the Objectors, and unfairly treats the Objectors' claims arising from those rights.

**C. The Plan**

28. The Plan classifies Claims in twelve (12) separate Classes for all purposes, including with respect to voting rights. General Unsecured Claims are separately classified in Class 7, which is designated as impaired but entitled to vote on the Plan, with a projected recovery of "To Be Determined." See Plan Article I.B. Moreover, the Plan sweepingly defines "Prior Owner Claim" as "any Claim of any of the Prior Owners." See Plan Article I 1.143. The Plan classifies Prior Owner Claims in Class 9, which is designated as impaired and deemed to reject (and therefore not permitted to vote) with a projected recovery of 0%. See id. The Plan does not set forth a basis for classifying the Prior Owner Claims separately from the General Unsecured Claims nor does it set forth any explanation or justification for providing no recovery to the Prior Owners on account of the Prior Owner Claims.

29. The Plan fails to comply with the Bankruptcy Code. It wholly disregards the claims of the Objectors and the Debtors' corporate structure by, without explanation or legal justification, (a) separately classifying the Prior Owners' undisputed unsecured claims from other, similar general unsecured claims (see Plan at §§ V(B)(7) and § V(B)(9); (b) providing that the Prior Owners will receive no recovery on account of their claims (see Plan at Article V.A and V.B); and (c) substantively consolidating the Debtors' estates for voting and distribution purposes (though not with respect to the holders of most Secured Claims and their collateral). See Plan at Article IX.A.

4898-1129-1920.v1

**OBJECTION**

30. The Objectors object to the Motion because the Plan fails to provide adequate information regarding (a) the separate classification and treatment of the Prior Owners' undisputed claims, (b) the basis for (i) not making any distribution on the Prior Owners' undisputed claims; (ii) substantive consolidation of the 21 Debtors' estates; and (iii) the releases and injunctive provisions. Moreover, the Plan violates §§ 1129(a)(1), (a)(3), (a)(7), (b)(1) and (b)(2) of the Bankruptcy Code with respect to the Prior Owners' claims.

**A. The Plan Does Not Contain "Adequate Information"**

31. Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125; see also In re Quigley Co., 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). The Bankruptcy Code defines "adequate information" as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

32. The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan. See Century Glove, Inc. v. First Am. Bank, 860 F.2d 94 (3d Cir. 1988). Indeed, Congress intended the disclosure statement "to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization." In re Scioto Valley Mortg. Co., 88 B.R. 168, 170 (Bankr. S.D.

Ohio 1988); see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994) ("The Code obliges a Debtor to engage in full and fair disclosure."); In re Adelphia Commc'ns Corp., 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (the Bankruptcy Code "provides that acceptances or rejections of a reorganization plan can't be solicited without first giving the creditors or others so solicited a court approved disclosure statement, which provides 'adequate information.'").

33. The disclosure statement requirement of § 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996) (citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.), 848 F.2d 414, 417-18 (3d Cir. 1988)). "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." Oneida, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

34. Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code alternatives…." In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). Section 1125 of the Bankruptcy Code is biased towards more disclosure rather than less. See In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). "[T]he 'adequate information' requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors." Adelphia, 352 B.R. at 596 (citing Century Glove, Inc. v. First American Bank of New York, 860 F.2d 94, 100 (3d Cir. 1988)). "[O]nce the 'adequate disclosure' floor is satisfied, additional

information can go into a disclosure statement too, at least so long as the additional information is accurate and its inclusion is not misleading." Adelphia, 352 B.R. at 596-97.

35. The Plan fails the requisite disclosures on all accounts as the Plan Proponents do not disclose any rationale for:

  a. disenfranchising the Prior Owners notwithstanding that their claims are undisputed and indisputable;

  b. separately classifying the Prior Owners' claims from the General Unsecured Claims; and

  c. treating the Prior Owners' claims differently than General Unsecured Claims.

36. Additionally, with respect to substantive consolidation, the Plan Proponents do not describe or show cause for the substantive consolidation of the Debtors' estates, nor do they provide sufficient information to determine whether the estates should be substantively consolidated in accordance with In re Owens Corning, 419 F.3d 195 (3d Cir. 2005). See also In re Woodbridge Grp. of Companies, LLC, 592 B.R. 761, 775 (Bankr. D. Del. 2018). The Plan also fails to describe any potential risks or consequences as a result of the proposed substantive consolidation.

37. The Motion should be denied until the forgoing disclosure infirmities are corrected.

**B. The Plan Is Patently Unconfirmable**

38. Even if the above infirmities are corrected, the Motion should be denied because the Plan is patently unconfirmable. If a plan is patently unconfirmable on its face, any application to approve the disclosure statement must be denied. See In re Am. Capital Equip., LLC, 688 F.3d 145, 154 (3d Cir. 2012) ("Courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and

resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing.") (internal quotations and citations omitted); see also In re Quigley Co., 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) (citing In re Beyond.com Corp., 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003)); In re 266 Washington Assocs., 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation.").

39. In fact, if the Plan on its face cannot be confirmed, approval of the Disclosure Statement must be denied in order to prevent the diminution of estate assets that would result from the expense of soliciting votes and seeking confirmation of an unconfirmable plan. See, e.g., In re Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the court will not subject the estate to the expense of soliciting votes and seeking confirmation"). The Plan Proponents have stated at nearly every hearing that the Debtors lack sufficient resources to continue operating in chapter 11 for an extended period. Clearly, starting down a path to a failed plan is not an efficient use of the Debtors' admitted limited resources.

40. As set forth above, the Prior Owners invested millions of dollars in the CarePoint Hospitals between 2008 and 2022, including to facilitate a sale process. When that process was not successful, the Prior Owners donated their interests in the CarePoint Hospitals to CarePoint, together with their interest in the real estate where Christ is located, and did not receive any money or money's worth in exchange.

41. The proposed treatment of the Objectors' claims violates numerous provisions of the Bankruptcy Code, including sections 1129(a)(1), (a)(3), (b)(1), and (b)(2). Specifically:

14

a. <u>11 U.S.C. § 1129(a)(1)</u>. The Plan fails to comply with numerous provisions of the Bankruptcy Code including:

   i. <u>11 U.S.C. § 1122(a)</u>. There is no basis for separately classifying the Prior Owners' undisputed unsecured claims from the General Unsecured Claims.

   ii. <u>11 U.S.C. § 1123(a)(4)</u>. A plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." <u>In re Johns-Manville Corp.</u>, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986). Plan Proponents separate classification of the Prior Owners Claims, and its treatment of such claims as compared to General Unsecured Claims, clearly violates section 1123(a)(4).

b. <u>11 U.S.C. § 1129(a)(3)</u>. "The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." <u>In re Coram Healthcare Corp.</u>, 271 B.R. 228, 234 (Bankr. D. Del. 2001). The Plan was not proposed in good faith, as there is no justification for not paying a recovery on the Prior Owners Claims, substantive consolidation, or the proposed release and injunctive provisions.

c. <u>11 U.S.C. § 1129(b)(1)</u>. Section 1129(b)(1) of the Bankruptcy Code provides that to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired class. 11 U.S.C. § 1129(b)(1).

   "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes. It is the Debtors' burden to prove that the plan does not discriminate unfairly. <u>In re Armstrong World Indus., Inc.</u>, 348 B.R. 111, 122 (D. Del. 2006). Under Section 1129(b)(1) of the Bankruptcy Code, a plan discriminates unfairly when it treats similarly situated classes differently without a reasonable basis for the disparate treatment. <u>See Armstrong</u>, 348 B.R. at 121. Despite the undisputed nature of the Prior Owner Claims, the Plan Proponents propose to pay nothing to that class, despite other similarly situated creditors, namely General Unsecured Claims, receiving a distribution under the Plan. Because the Plan is not fair or equitable with respect to the Prior Owner Claims and discriminates unfairly against the Prior Owners, the Plan cannot be crammed down on the Prior Owners under section 1129(b)(1) of the Bankruptcy Code.

4898-1129-1920.v1

      d.      11 U.S.C. § 1129(b)(2). The Plan violates Bankruptcy Code section 1129(b)(2)(B) by not paying anything to the Objectors on account of the undisputed Prior Owners Claims, while paying other similarly situated creditors. The Plan therefore cannot be crammed down on the Prior Owners under section 1129(b)(2) of the Bankruptcy Code

42.    Given the foregoing, the Plan is patently unconfirmable and the Motion should be denied.

## CONFIRMATION SCHEDULE

43.    The Confirmation Schedule does not allow for discovery, nor does it comply with Bankruptcy Rule 2002(b), which requires that the deadline to object to the Plan be at least 28 days prior notice. The Objectors request that such objection deadline be set at least 28 days after the deadline to serve the Solicitation Package.

## RESERVATION OF RIGHTS

44.    The Objectors expressly join, and incorporate by reference, the Maple Objection including all facts and arguments set forth therein and reserve the right to: (a) amend or supplement this Objection and otherwise take any additional or further action with respect to the subject matter hereof; (b) be heard before this Court to raise additional arguments or issues in connection therewith; and (c) seek discovery with respect to any issues implicated by the Plan. Nothing herein is intended to nor shall be construed as a waiver or limitation of any of the rights or remedies of the Objectors with respect to the Plan, all of which are fully preserved.

Dated:  January 15, 2025                       Respectfully submitted,
          Wilmington, Delaware

                                                     /s/ Adam Hiller
                                             HILLER LAW, LLC
                                             Adam Hiller (DE No. 4105)
                                             300 Delaware Avenue, Suite 210, #227
                                             Wilmington, DE 19801
                                             Phone: (302) 442-7677
                                             *ahiller@adamhillerlaw.com*

-and-

**CHIESA SHAHINIAN & GIANTOMASI PC**
Sam Della Fera, Jr. (pro hac pending)
Thomas M. Walsh, Esq. (pro hac pending)
105 Eisenhower Parkway
Roseland, NJ 07052
Phone: (973) 530-1500
E-mail: sdellafera@csglaw.com
E-mail: twalsh@csglaw.com

*Attorneys for James P. Lawler, JPL Healthcare Consulting Limited Liability Company, Oak Management, LLC, Heights Healthcare Services Limited Liability Company and Willow Healthcare Services Limited Liability Company*