David N. Crapo, CIPP-US
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4523
Facsimile: (973) 639-6244
dcrapo@gibbonslaw.com
*Patient Care Ombudsman*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| In re:<br><br>CAREPOINT HEALTH SYSTEMS, INC., d/b/a JUST HEALTH FOUNDATION, *et al.*,[1]<br><br>Debtors and Debtors-in-Possession | Chapter 11<br><br>Case No. 24-12534-PB<br><br>**NO HEARING DATE** |
|---|---|

# INITIAL PATIENT CARE OMBUDSMAN REPORT

**SUBMITTED on January 24, 2024, by:**

**DAVID N. CRAPO, CIPP-US**

**PATIENT CARE OMBUDSMAN**

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint HealthBayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

## INTRODUCTION

This initial report of the Patient Care Ombudsman ("**PCO**") is issued pursuant to the author's appointment on November 25, 2024 as the PCO by the United States Trustee for Region ("**U.S. Trustee**") for debtors CarePoint Health Systems, Inc., d/b/a Just Health Foundation, *et al*. ("**Debtors**"). [Dkt. No. 185] The appointment arises under section 333 of the United States Bankruptcy Code (11 U.S.C. §§ 101, *et seq.*) ("**Bankruptcy Code**"), which provides for the appointment of a patient care ombudsman "to monitor the quality of patient care and to represent the interests of the patients of the health care business." The Debtors operate three hospitals, together with related neighborhood healthcare centers (collectively, "**Hospitals**") in Hudson County, New Jersey: (i) Bayonne Medical Center ("**Bayonne**"); (ii) Christ Hospital in Jersey City ("**Christ Hospital**"); and (iii) Hoboken University Medical Center ("**HUMC**"). The Debtors' operations, therefore, constitute "health care businesses" for purposes of the Bankruptcy Code. *See* 11 U.S.C. §101(27A). This report covers the period from the PCO's appointment through January 24, 2025 ("**First Reporting Period**").

The financial challenges the Debtors, particularly the Hospitals, faced in the run-up to bankruptcy are summarized in the *Declaration of Shamiq Syed in Support of First Day Pleadings* filed in the Debtor's bankruptcy cases. [Dkt. No. 23] Those financial challenges led to operational challenges and surveys by regulators, including the New Jersey Department of Health ("**NJDOH**") and the Centers for Medicare and Medicaid Services ("**CMS**"), and accreditors, including The Joint Commission ("**TJC**"). In February of 2024, NJDOH appointed Robert Iannaccone ("**Monitor**") to monitor operations at the three Hospitals. The Monitor has actively monitored the quality of healthcare at the Hospitals and continues in his role as of the date of this report.

Section 333(b)(1) of the Bankruptcy Code directs the PCO to "monitor the quality of patient care provided to patients of the [Hospitals]." To that end, the PCO is expressly authorized to interview patients and physicians. 11 U.S.C. § 333(b)(1). The PCO may also interview other Hospital staff, review Hospital records and inspect the Hospitals. During the First Reporting Period, in the performance of his duties, the PCO: (i) inspected the Hospitals and spoke with line staff during those inspections; (ii) reviewed documents and other information provided by the Debtors; and (iii) conferred on several occasions with the Monitor. This report sets forth in more detail below the actions taken by the PCO in the performance of his duties and the results of his investigation to date.

## REVIEW OF DOCUMENTS AND INFORMATION PROVIDED BY THE DEBTOR

**A.** **PCO Document Request**. On December 9, 2024, the PCO requested that the Debtors provide him with the following documents and information:

1. Quality Assurance and Risk Management. Relevant to his duty of monitoring the quality of patient care and safety, the PCO requested:

    a. The names of and the business contact information for the individuals responsible for quality assurance and/or risk assessment for both the Debtors as a group and for each of the Hospitals.

b. The identity of any committee or similar entity charged with responsibility for either or both of quality assurance and risk management for the Debtors as a whole or for one or more of the Hospitals.

c. Copies of the minutes of any meetings of any such committees or other similar entities, as well as any reports or other documents referenced therein or attached thereto for meetings held during the period beginning November 1, 2023 and continuing to date.

d. Copies of any policies, procedures or protocols related to quality assurance and risk management for any or all of the Hospitals that were in effect for any portion of the period beginning November 1, 2023 and continuing to date.

e. The identity of the core measurement indicators, factors and statistics the Debtors monitor to measure their compliance with policies, procedures and protocols related to quality assurance and risk management, including, but not limited to those relevant to: (i) heart failure; (ii) myocardial infarction; (iii) immunization; (iv) emergency department operations; (v) pneumonia; (vi) stroke treatment; (vii) stroke rehabilitation; (viii) venous thromboembolism prophylaxis; (ix) substance use disorder treatment (including detox, inpatient treatment and outpatient treatment); (x) physical and occupational therapy; (xi) infectious diseases (particularly, infection control); (xii) patient incidents (including falls and other injuries, medication errors and violence at the facilities); (xiii) food and nutrition (including food maintenance policies); (xiv) utilization rates; and (xv) clinician to patient ratios.

f. dashboards or similar methods of presentation and analysis of the Debtors' compliance with the core measure indicators, factors and statistics identified above,

2. <u>Human Resources</u> (medical, nursing, clinical and non-clinical). The following documents and information:

a. Documentation that each member of the medical, nursing and clinical staff at the Debtors' facilities are properly and currently licensed and have meet appropriate educational standards.

b. Copies of the current onboarding procedures for Medical, nursing, clinical and non-clinical staff).

c. Copies of current employee and staff handbooks.

d. Copies of current staff and employee training manuals.

e. Evidence that all medical, nursing, clinical and non-clinical staff have undergone any required criminal checks.

f. Documentation concerning current staff vacancies, the attempts made to fill those vacancies and any difficulties in filling those vacancies.

g. Documentation concerning staff turnover rates from January 1, 2024 to the present.

h. Documentation of any disciplinary issues involving medical, nursing, clinical or non-clinical staff from the period beginning January 1, 2024 and continuing to the present, including the nature of the issue and the resolution of the issues.

3. Equipment/Vendor Relationships. The following documents and information:

    a. Documentation for the period from January 1, 2023 to the present evidencing the timely completion of required inspections of equipment.

    b. Any reports on the condition of any equipment at the Debtor's facilities produced on or after January 1, 2024.

    c. Correspondence from any vendors putting any of the Debtors on COD status during the period from January 1, 2024 to the present.

    d. Correspondence from any vendors dated on or after January 1, 2024 evidencing a refusal to deal with the debtors.

    e. A list of significant medical equipment the Debtors are currently seeking to acquire or replace.

4. Nursing Staff. Documents and information, including:

    a. Any policies, procedures and protocols governing the nursing staff (particularly those setting forth the duties of nursing or nurse to patient ratios).

    b. Documents governing the administration of medication by nurses.

5. Laboratory Services. Documents and information, including:

a. Copies of policies, procedures and protocols governing the laboratories and laboratory services at the Debtor's facilities.

b. Documents evidencing controls currently in place to ensure the security of the lab facilities and specimens and the prevention of errors in testing, as well as documents evidencing the Debtors' compliance and non-compliance with those controls.

6. Pharmacy. Documents and information, including:

a. Copies of any policies, procedures and protocols currently in place that govern the Debtors' pharmacies.

b. Copies of controls currently in place to ensure the security of medications and the prevention of medication errors.

7. Infection Control. Documents and information, including:

a. Policies, procedures and protocols currently in place for preventing infections.

b. Any reports prepared on or after January 1, 2024 concerning the Debtors' compliance with those policies procedures and protocols.

8. Patient Transport. Documents and information, including:

a. Policies, procedures and protocols governing transport.

b. Documents evidencing compliance or the lack of compliance with those protocols.

c. Specific policies, procedures or protocols for vetting hospital porters and drivers.

9. Grievance/Complaints (Patients/Staff). Documents and information, including:

a. Policies, procedures and protocols currently in place for making and resolving complaints.

b. Any patient or staff complaints initiated on or after January 1, 2024, including the resolution of those complaints.

10. Medical Records. Documents and information, including:

a. Current policies, procedures and protocols relating to patient records, particularly their security, completeness and accuracy.

b. Documentation concerning the Debtors' compliance or non-compliance with those policies, procedures and protocols.

11. Information Technology. The Debtors' current information technology policies, procedures and protocols.

**B. CarePoint System-Wide Policies**. Because the PCO is charged with monitoring the quality of patient care and safety at the Hospitals, he focused on the Hospitals' attention to quality assurance and performance improvement issues. To that end the PCO reviewed: (1) Bayonne's Quality/Performance Improvement, Patient Safety and Risk Management Plans for 2024; (ii) Christ Hospital's Quality/Performance Improvement, Patient Safety and Risk Management Plans for 2024; and (iii) HUMC's Performance Improvement Plan for 2023-2024. The Plans substantially overlapped. They each contain a robust set of policies and procedures providing for: (i) the establishment of committees to monitor quality assurance and performance improvement efforts; (ii) a methodology for collecting and reporting the relevant data; (iii) a schedule of regular meetings by the committees to evaluate efforts at quality assurance and performance improvement; and (iv) methodologies for evaluating the performance of clinical staff at the Hospitals.

For each hospital the PCO also reviewed equipment needs reports, corrective service records, equipment inventories and proper maintenance compliance reports. Those reports indicated that the Debtors are: (i) aware of their equipment needs; (ii) properly maintain their equipment (and take it out of service pending repairs); and (iii) obtain necessary repairs to equipment. As evidence of the Debtor's diligence in properly managing its equipment, HUMC's equipment inventory identifies only 15 of more than 4,000 pieces of equipment as "non-compliant." Proper management compliance is high at all three Hospitals: (i) 98.35% (Bayonne); (ii) 96.02% (Christ Hospital); and 96.28% (HUMC). Requests for maintenance and service of equipment were timely completed at all three hospitals in 2024, with the average number of days for completion of such requests in 2024 being: (i) 2.4 (Bayonne); (ii) 2.7 (Christ Hospital); and (iii) 0.4 (HUMC).

The PCO reviewed the collective bargaining agreements to which the Hospitals are parties. The Debtors also provided the PCO with the following additional policy and procedure manuals applicable to all of the Hospitals:

1. Food safety program, including policies for: (i) preventive maintenance; (ii) refrigeration and freezer temperatures; and (iii) dispensing ice;

2. Laboratory policies including: (i) chemical hygiene plan criteria; (ii) incident and error reporting; (iii) employee competency evaluation; and (iv) quality control policies and procedures (set forth in a detailed manual);

3. Infection control;

4. Information technology;

5. Staffing ratio policies;

6. Sentinel events; and

7. Medical device reporting.

The Debtors' infection control policies are detailed and robust, addressing both disease and environmentally related threats. The manuals includes at least 30 parts and is grounded in CDC and TJC guidelines. The Debtors have been successful in implementing those policies. For example, handwashing at HUMC improved to 93% in 2024 at HUMC. Infection control is regularly addressed at meetings of the Hospitals' quality assurance and performance improvement committee meetings. Hospital-acquired infection rates have remained low.

The Debtors' information technology policies are similarly detailed and robust, reflecting the requirements of HIPAA, the HIPAA Privacy Rule and the HIPAA Security Rule. Consistent with recent settlement of HIPAA claims by the Office of Civil Rights of the U.S. Department of Health and Human Services, the sanctions and discipline policies are robust. With only one exception, the IT policies have been periodically reviewed to ensure that they reflect changes in law and in guidance issued by the United States Department of Health and Human Services ("**HHS**"). Security incidents appear to have been rare, with only 1 in 2024 that was the fault of a business associate. In 2023, two employees improperly accessed patient records; both employees were terminated. There appears to have been no harm to either patient resulting from the unauthorized access.

**C**. **Bayonne**. A review of the documents evidencing the communications between Bayonne and the NJDOH and TJC during 2023 and 2024 provided by the Debtors to the PCO reflect that Bayonne is in compliance with applicable regulations and remains accredited. Following a revisit survey conducted on September 19, 2024 and September 27, 2024 and by letter dated October 1, 2024, the NJDOH advised Bayonne that its facility was in substantial compliance with the Medicare Conditions of Participation. By letter dated March 25, 2024, TJC announced Bayonne's accreditation under its Hospital Accreditation Program, effective January 20, 2024, for up to 36 months.

In connection with his review of Bayonne's efforts at quality assurance and performance improvement, the PCO reviewed the minutes of meetings of Bayonne's Performance Improvement Committee held in 2023 and the first eleven months of 2024. Representatives of all units and departments at Bayonne attended the meetings. The meeting on January 16, 2024 focused on efforts being made to reducing patient falls, particularly for intoxicated patients, and infection control in the ICU. The March 12, 2024 meeting focused on further education of staff in certain areas. The April 9, 2024 meeting focused on short-staffing in the environmental services department. The meetings on May 14, 2024 and June 11, 2024 focused on Bayonne's performance with respect to Central Line-Associated Bloodstream Infections ("**CLABSIs**") and Catheter-Associated Urinary Tract Infections ("**CAUTIs**"). There were no CLABSI's at Bayonne in April, 2024, but there was at least one CAUTI. The goal was to reduce the rate of CAUTI infections to 0%. Bayonne was successful in that regard in May, 2024, when CLABSI

rates also remained 0%. Meetings held on July 9, 2024 and August 13, 2024 addressed performance improvement by Bayonne. Throughout 2024, Bayonne's Performance Improvement Committee addressed patient safety issues, establishing or adopting benchmarks. Although the benchmarks were not always met, there was improvement in Bayonne's performance. In sum, the minutes of the 2024 meetings of Bayonne's Performance Improvement Committee do not reflect a decline in the quality of patient care or safety at Bayonne.

To provide a more granular picture of its performance on benchmark metrics, Bayonne utilizes various dashboards. Bayonne's GWTG Stroke Dashboard contains seven benchmarks. During the first three quarters of 2024, Bayonne achieved all seven benchmarks, except for one benchmark in March. Dashboards for sepsis and outpatient Emergency Department ("**ED**") throughput provided benchmarks and percentages, but no reference to benchmark percentages or goals. As of September 30, 2024, there had been five patient falls at Bayonne during 2024, none of which resulted in injury to the patient. During the first three quarters of 2024, Bayonne terminated five employees, including one for a HIPAA violation. None of the terminations involved the mistreatment of a patient. Bayonne's infection control dashboard includes 16 benchmarks, which Bayonne met during the third quarter of 2024.

Additional information provided by Bayonne reflects that nurse staffing ratios meet regulatory requirements where applicable. Where such requirements are not applicable, nursing to patient ratios are in the middle range, not 1:1, but not 1:11. Bayonne has also taken an aggressive approach to getting doctors to complete medical records—suspension from privileges.

Bayonne received 22 formal complaints from patients during the first three quarters of 2024. Eleven were found to be unsubstantiated or otherwise without basis. On patient complained of disrespect on the part of a Bayonne employee and an error in a medication list. Another that an ED bay was not cleaned between patients. A third patient complained of receiving the wrong test results and rudeness on the part of an employee. A fourth patient complained of a long wait for obtaining assistance in toileting. A fifth complained of a nurse's error in hooking up an oxygen tank. None of the patients were harmed and the staff members involved were provided re-education. The remaining complaints alleged rudeness or poor communication skills on the part of a Bayonne employee, for which the employee was provided re-education.

**D. Christ Hospital**. A review of communications between Christ Hospital and the NJDOH and TJC during 2023 and 2024 that were provided by Christ Hospital reflect that Christ Hospital is in compliance with applicable regulations and remains accredited. By letter dated October 9, 2024 and following a survey conducted at Christ Hospital on June 24, 2024, the NDOH approved a Plan of Correction submitted by Christ Hospital and determined that Christ Hospital is in substantial compliance with New Jersey state licensure regulations. By letter dated January 8, 2024 following an unannounced full resurvey in October and November of 2023, TJC advised that Christ Hospital was accredited, effective October 7, 2023 for a period of up to 36 months.

The PCO reviewed the minutes of the meetings of Christ Hospital's Patient Safety Committee held during 2023 and 2023. As with the minutes of similar committees at Bayonne (discussed above) and HUMC (discussed below), the minutes reflect that Christ Hospital is

aware of patient care of safety issues and takes action to deal with them. The meeting in May, 2024 focused on medication incidents. Although the number of medication incidents had dropped, those which had the capacity to cause harm had not dropped as much as hoped. An investigation found that the limited reduction in such incidents largely reflected an anesthesia review. For doctors, the primary discrepancy was in documentation; for nurses it was in documenting wastage. An error in programming an IV pump was corrected before use on a patient. A nurse was re-educated on the need to record an operative report within 24 hours of the procedure. None of those incidents resulted in patient harm. An unexpected death in the detox use led to the re-education of nurses on physical rounding, as well as a policy of mandatory EKGs for detox patients who are at least 40 years old. The minutes of the August, 2024 meeting showed a slight increase in incidents between the first and second quarters of 2024, with a patient leaving against medical advice being the most commons. There were 23 patient falls recorded in the minutes, none of which resulted in patient harm or injury. The ongoing anesthesia review resulted in an elevated number of medication errors with potential to harm patients. They were caught before harm to any patients. The occurrence of a C-Diff infection led to reeducation of staff in hand hygiene. Christ Hospital was able to address workplace violence initiated against staff by patients or family through de-escalation techniques.

The PCO also reviewed the minutes of the meetings of Christ Hospital's Quality Assurance Committee held during 2023 and 2024. The March, 2024 meeting addressed the 98.4% staff influenza vaccine rate, as well as the success in addressing the incidence of pressure ulcers through increased staffing and increased enforcement of policies for turning and positioning patients to avoid such ulcers. The May, 2024 meeting minutes showed no changes in patient death rates and the improvement of meeting radiological benchmarks. The minutes also showed that there were 19 patient falls during the first quarter of 2024, all but one of which were unwitnessed, with no resulting injuries. The July, 2024 minutes reflected: (i) no change in mortality rates; (ii) continued attention to patient falls which had increased, but were less likely to happen at the change of shift than in the past; (iii) re-education of staff in escorting patients to the bathroom, where most falls occur, and supervising patients in the bathroom); and (iv) continued attention to suicide screening, including re-education of staff in one unit at Christ Hospital where screening rate had fallen to 87%. The October, 2024 meeting minutes focused on: (i) addressing fall risks among inebriated patients (triggered by two falls by such patients, which resulted in injury); and (ii) the need for more attention to be paid to assessing patients for malnutrition.

The PCO reviewed the minutes of the meetings of Christ Hospital's Infection Control Committee for 2024. The April 24, 2024 meeting addressed infection rates, which were low, but did not meet benchmarks. Christ Hospital is continuing to monitor the infection rate. Blood culture contamination rates remained below the 3% benchmark during the first and third quarters of 2024, although it spiked to 3.64% during the summer. Hand Hygiene remained high, but not perfect.

Like Bayonne, Christ Hospital utilizes dashboards to provide a more granular picture of HUMC's performance with respect to benchmarks.[2] A review of an audit on neuroscience case

[2] It bears noting that Christ Hospital began providing the PCO with the dashboards in December, 2024. Hence, the PCO does not have any information for December and does not have information for some benchmarks for October

reviews (primarily relating to stroke patients) provided by Christ Hospital revealed that in the substantial majority of cases, patients received appropriate testing and guidance upon discharge. The Core Measures Outcomes—Stroke Dashboard reflects that during the first three quarters of 2024, Christ Hospital met or exceeded six of eight primary benchmarks (including scoring 100% on five benchmarks) set by Nuance and TJC and almost met a seventh benchmark. In respect to only one benchmark was Christ Hospital's score significantly below the TJC benchmark, but not the Nuance benchmark. Christ Hospital's GWTG Stroke dashboard contains 14 benchmarks. Christ Hospital made a perfect score of 100% on six of the benchmarks for all months for which data was available. Christ Hospital made a perfect score of 100% on at least seven of ten months in 2024 for which data is available on six benchmarks and, with one exception, scored at least 85% of the remaining months. For one benchmark, Christ Hospital's score was 50%. For the remaining two benchmarks, Christ Hospital scored at least 75% during each month for which data was available. In sum, the stroke-related benchmarks do not reflect a decline in the quality of patient care or safety at Christ Hospital.

Christ Hospital's Improvement Metrics dashboard demonstrates compliance with 12 of 14 benchmarks. A score of 98% (out of 100%) precluded Christ Hospital's meeting the hand hygiene benchmark. A CLABSI infection in September precluded Christ Hospital's meeting the benchmark rate of 0.8 for such infections. A Clostridium Difficile infection in February did not preclude Christ Hospital from meeting the applicable benchmark.

Christ Hospital's Psychiatric and Behavioral Health Chart Review Dashboard reflects substantial compliance with benchmarks. The dashboard includes 48 benchmarks or core measurements. Achieving each benchmark requires a compliance score of 95%. Christ Hospital achieved 30 of those benchmarks during each of the first 3 quarters of 2024. Otherwise, Christ Hospital achieved scores of between 76% and 94%, with most (13) of the scores exceeding 85%. A Customer Satisfaction Dashboard (Mental and Behavioral Health) reflects high patient satisfaction with Christ Hospital.

During the first three quarters of 2024 Christ Hospital met the 15 core measurements or benchmarks set forth in its Operating Room Dashboard, with two exceptions. First, surgical cancellations the day of or the day before a surgical procedure exceeded those permitted by the benchmark. Second, in April, a patient returned to the operating room within 30 days of a prior surgery.

Christ Hospital's Chart Review Dashboard for the first 11 months of 2024 includes 44 benchmarks. Christ hospital achieved 32 of those benchmarks with scores of 100% for all 11 months. In more than half of the remaining cases, Christ Hospital achieved scores of between 90% and 97% compliance. In a little less than half of the remaining cases compliance scores were between 80% and 89%. The remaining scores were between 67% and 77%. In sum, the dashboard does not reflect a decline in the quality of patient care.

---

or November. The PCO will endeavor to obtain such information to be included in his next report. Additionally, as was the case with the dashboards provided by Bayonne and HUMC, the patient numbers for a given measure were very small. Hence, performance as to one or two patients could skew the measurement of compliance with benchmarks.

Christ Hospital's System Dashboard includes 30 benchmarks. During the first three quarters of 2024, Christ Hospital achieved 15 of those benchmarks each quarter with scores of 100%. Five of the benchmarks were achieved for two quarters, with Christ Hospital scoring at least 83% for the remaining quarter. The existence of two CLABSI infections and two CAUTI infections during 2024 precluded Christ Hospital's achievement of the respective benchmarks.[3] For a number of other benchmarks, it took only one patient to preclude Christ Hospital's achievement of the benchmark. Christ Hospital's patient satisfaction scores on this dashboard were tepid.

Christ Hospital's infection control dashboard shows that it generally achieved the applicable benchmarks in 2024. The grievance dashboard reflects a minimal amount of grievances in 2024. Christ Hospitals HIM dashboard concerning the timing of reporting reflects that Christ Hospital met or exceeded 6 out of 9 benchmarks, came close to meeting a 7th and needed to make more of an effort on the remaining two benchmarks.

Additional documents provided to the PCO reflect that Christ Hospital generally achieved the goals it set for itself. Glucometers are cleaned between use. During 2024 patient falls were below the national averaged, except for April. The dashboard for 15 categories of incidents reflects that, on an annualized basis, there are likely to be 1132 reportable incidents at Christ Hospital in 2024, a number that would be significantly below the numbers for 2023 (1361) and 2022 (1384). There are likely to be 33 reportable adverse medical reactions, which would be more than 2023, but less than 2022. Two staff members were dismissed during the first three quarters of 2025, neither for causing physical harm to a patient. Incidents of restraints of patients at Christ Hospital declined between January, 2024 and April, 2024 from 15 to 6. Two lawsuits were initiated against Christ Hospital in 2024, and there were five lawsuits pending against Christ Hospital as of September 30, 2024.

**E.** **HUMC**. A review of communications between HUMC and the NJDOH and TJC during 2023 and 2024 that were provided by HUMC reflect that HUMC is in compliance with applicable regulations and remains accredited. Following an investigation conducted on September 26, 2024 and by letter dated October 1, 2024, the NJDOH advised HUMC that no deficiencies were found. By letter dated February 24, 2024 following a survey on December 8, 2023, the NJDOH advised HUMC that NJDOH's acceptance of HUMC's plan of correction meant that HUMC was in substantial compliance with applicable federal regulations. By letter dated December 4, 2023, The Joint Commission advised HUMC that it was accredited, effective September 24, 2022, for up to 36 months, for all services surveyed under TJC's Comprehensive Accreditation Manual for Hospitals.

In connection with his review of HUMC's efforts at quality assurance and performance improvement, the PCO reviewed the minutes of HUMC's Quality Council Committee for meetings held in 2023 and 2024 (through October). The minutes outlined where HUMC exceeded performance benchmarks, as well as where it fell short. The minutes also outlined the efforts HUMC made to improve performance and the success of those efforts. The identified specific areas of concerns and achievable goals.

---

[3] Christ Hospital's Infection Control Dashboard reflects that there were no MRSA or C-Diff infections at the Hospital in 2024.

For example, the minutes for the March 26, 2024 meeting identified four goals that had been set concerning admission to and treatment by the Giant Steps behavioral and mental health program at HUMC. The minutes also show that HUMC met three of those goals and came very close to meeting the fourth. Similarly, the minutes identify a goal of processing pharmacy order within 15 minutes and demonstrate that HUMC met that goal. HUMC did not quite meet the goal of 100 percent medication cart accuracy, but met it 99% of the time. The minutes also reflect that there were no CLABSIs, CAUTIs or Clostridium Difficile infections ("**C-Diffs**") at HUMC during January and February of 2024. The minutes for the April 23, 2024 meeting reflect the limited success HUMC had in improving skin-to-skin performance between mothers and newborns and reducing caesarean-section births and the steps to be taken in meeting that goal. The minutes for the September 24, 2024 meeting reflected a minor increase in the rate of patient falls during 2024 and a plan to address the issue. What the minutes of the 2024 meetings of HUMC's Quality Counsel Committee do not demonstrate is a decline in the quality of patient care or safety.

Like Bayonne and Christ Hospital, HUMC utilizes dashboards to provide a more granular picture of HUMC's performance with respect to benchmarks.[4] The PCO reviewed dashboards provided by HUMC for 2023 and 2024. During the first 11 months of 2024, HUMC achieved three of the four benchmarks set for the ED, but lagged a few minutes behind the benchmark of getting patients to EKGs within 10 minutes of arrival. Similarly, HUMC met or came close to meeting Stroke Achievement Quality Measures during 2024 for almost all cases. HUMC came close to meeting all Employee Health Performance benchmarks. Food and nutrition benchmarks were achieved during the first three quarters of 2024. For the same period, HUMC met three of four benchmarks and met the fourth benchmark except for June, July and August. For the third quarter of 2024, HUMC met or came very close to meeting nine of the twelve benchmarks for in-house physical, occupational therapy and showed a general improvement over performance from 2023. HUMC determined why various benchmarks were missed (*e.g.*, staffing ratios and patterns), and developed a corrective action plan to improve performance. Again, a review of the dashboards provided by HUMC do not reflect a decline in the quality of patient care and safety during 2024.

## DECEMBER, 2024 FACILITY INSPECTIONS

The PCO inspected: (i) Bayonne on December 17, 2025; (ii) HUMC on December 18, 2025; and (iii) Christ Hospital on December 19, 2025.

**A**. **Observations Common to All Three Hospitals**. Generally, all facilities were clean, with expected wear and tear. Shower rooms and lavatories are kept clean. In various places, flooring showed significant wear and tear. For example flooring in common areas tended to be older and showing more wear and tear. It appears, however, that flooring is being replaced throughout the Hospitals. Indeed, some flooring (particularly in patient and treatment rooms)

---

[4] It bears noting that HUMC began providing the PCO with the dashboards in December, 2024. Hence, the PCO does not have any information for December and does not have information for some benchmarks for October or November. The PCO will endeavor to obtain such information to be included in his next report. Additionally, as was the case with the dashboards provided by Bayonne and Christ Hospital, the patient numbers for a given measure were very small. Hence, performance as to one or two patients could skew the measurement of compliance with benchmarks.

appeared very new. Treatment and patient rooms were sufficiently spacious to permit healthcare operations. Equipment in use appeared to be in working order. Treatment areas were adequately staffed, with the staff attentive to patient needs. Janitorial, housecleaning, utility supply and electrical equipment closets were kept locked when not in use. Translation machines were located throughout all three Hospitals.

**B**. **Bayonne Inspection:** The PCO was joined on his tour of Bayonne by: (i) the Chief Hospital Officer, Dr. Muhammed Zubair; (ii) the Chief Nursing Officer, Trina-Boyd Clyburn; and (iii) the Director of Quality Improvement, Patricia Awuah, who answered a number of the PCO's questions about operations, staffing and risk assessment at Bayonne. The PCO was advised that the staff at Bayonne, many of whom have worked for the hospital for a number of years, is committed to the Hospital's survival. Except for the one CAUTI referenced above, the PCO was advised that there had been no hospital-acquired infections at Bayonne during 2024. Bayonne was effectively addressing patient falls with bed alarms, yellow slippers that identify patients who are fall risks and having extra staff on rounds to ensure protocols are met.

The PCO was also advised about concerns that nurses preferred working on a per diem basis rather than as direct employees of Bayonne. Although those nurses did not receive benefits or paid time off, their hourly rates were higher than employed nurses. Because most of those nurses work full-time, *per diem* status can be quite lucrative. One of Bayonne's goals is to get the per diem nurses back on employee status, which would be less costly to Bayonne. Throughout his tour of Bayonne, the PCO spoke with unit directors and other staff at Bayonne about staffing and equipment issues. Generally, the staff advised the PCO that, notwithstanding past problems, staffing and equipment had become adequate by the time of the PCO's tour.

When the PCO arrived at Bayonne, the Hospital was commencing its morning rounds meeting. In attendance were case managers, nurses, residents, nutritionists, physical therapists, occupational therapists and two members of Bayonne's medical staff. At these meetings, the status of each patient are discussed. The PCO was advised that one important purpose of the morning rounds is to develop teamwork among clinical and non-clinical staff. The PCO was advised that BMC currently serves as just an acute care facility. Physical and occupational therapy is only available to prepare post-surgical patients to return home or to another healthcare setting. As of December 17, 2025, BMC's patient census was 42 in the medical-surgical units and 15 in the psychiatric/detox units.

The PCO's first stop at Bayonne was the Detox unit. The unit is licensed for 12 beds; the census at the time of the inspection was 11. The unit is kept locked and there were several notices at the door into the unit and around the unit reminding staff of elopement risks. The average length of stay is 5-7 days. Lavatories are kept locked when not in use. There is a spacious group/dining/activities room. The unit offers individual and group counseling. Counseling rooms are private and fairly well soundproofed. Two nurses are always on staff in the unit. Medications are kept locked in the nurses' station. Medications are dispensed at the nursing stations; patients are not permitted to bring medications back to their rooms. Although the janitorial and housekeeping closets are kept locked, the PCO noticed an unattended housecleaning cart in the unit during his inspection. Patients are screened before being admitted to the Detox unit, with acute cases being sent to a medical-surgical bed if necessary.

The PCO then toured the medical-surgical and telemetry units of Bayonne. The sixth floor unit is licensed for 40 patients; patient census was 18 on the date of the PCO's tour. The third floor unit is licensed for 36 patients, but is currently capped at 18 patients. There was only one patient to a room on the date of the PCO's inspection. However, patients can be assigned two to a room when necessary. The unit contains isolation rooms limited to one patient, which are equipped with sinks and extra supplies. Appropriate masking and gowning is required for entry into isolation rooms. There are also rooms equipped with negative pressure for patients in respiratory distress or suffering from infections. There were two patient rooms with special "contact" precautions, including special PPE kept outside the door and subject to a "don and doff rule." There were also enclosed disposal units for the PPE when it was doffed. The rooms housing patients who are particularly subject to falls are marked with the notice "Fall Risk." On the third floor, there is a four-bed "mini-ward" for patients particularly susceptible to falls. Bayonne staff keep that ward under constant observation. The third-floor medical-surgical unit provides limited infusion services for patients receiving chemotherapy, as well as a small (4-bed) dialysis unit, in which in-house patients are treated. Bayonne does not maintain an outpatient dialysis unit. There is also a specially equipped room for the treatment of infectious patients.

Bayonne maintains a Women's Health Pavilion providing outpatient treatment, including ultrasound, mammograms and bone density scans. There were no patients at the pavilion at the time of the PCO's tour. There are new machines for the ultrasound and mammogram. The Radiology Department has two CT-Scan machines, one of which was being serviced at the time of the PCO's tour and had been removed from service pending repairs. There are four X-ray Rooms, two of which ae in service. The Nuclear Medicine unit includes a CT-Scan and also provides ultrasound.

Bayonne's Intensive Care Unit has 18 single-occupancy rooms for patients; the patient census was 8 at the time of the PCO's visit. An intensivist is onsite 24 hours a day seven days a week. The ICU is staffed with one nurse for every two patients. The ICU staff conduct daily huddles concerning patients from Monday through Friday. Patient rounds are conducted seven days a week. Bayonne's Endoscopy/Colonoscopy Unit is in operation, is clean and well-stocked and was conducting procedures during the PCO's tour.

Bayonne's Laboratory is accredited by the College of American Pathology ("**CAP**"), with accreditation most recently affirmed in November, 2024. The Lab's director advised the PCO that, after a period of difficulties, the Lab's operations are "almost back to normal," with a financial plan that has made it easier to obtain supplies and to maintain necessary equipment. The Lab's director advised the PCO that staffing is adequate although he is looking to fill some vacancies.

Bayonne's security department is located in its Emergency Department. The ED contains 8 bays for critically ill or injured patients. One room is reserved for ED patients presenting with mental or behavioral health issues. Patients evidencing suicidal iterations are monitored 1:1. There is also a room reserved for pediatric patients. The ED has its own X-Ray room and is set up to provide hallway beds if necessary. There are triage and fast-track for critical patient policies in place.

Bayonne's Psychiatric Unit is licensed for 16 beds, all of which were occupied at the time of the PCO's visit. The unit is locked and licensed for voluntary admissions. The unit admits adults and takes an interdisciplinary approach to treatment. Average length of stay is 5-7 days. Medications are distributed at the nursing station, and patients may not bring their medications back to their rooms. The unit is ligature free and otherwise set up to minimize the possibility of patient self-harm or harm to other patients. There is a Dining/Activity/Community room. Therapy is provided on an individual and group basis.

Finally, the PCO visited Bayonne's Community Health Unit which provides various forms of outpatient treatment. At the time of the PCO's visit, the unit was closed for lunch.

**C. <u>HUMC Inspection</u>:** During his tour of HUMC, the PCO was accompanied by: (i) Dr. John Rimmer, then the Chief Medical Officer for the Hospitals; and (ii) Nicole Rosso, the Vice President for Patient Care Services and Chief Nursing Officer of HUMC. The PCO first visited HUMC's unit for treating youth in acute crisis ("**ACU**"). As a behavioral and health treatment facility, the ACU is a locked facility. Admission is generally voluntary. Patients have typically: (i) engaged in self-harm, harm to others or disruptive behaviors; (ii) suffered from suicidal ideation or psychosis; or (iii) have been abused. The ACU is not a detox facility and patient's whose primary diagnosis is substance use disorder are not admitted. Patients are cleared by HUMC's admissions department. The ACU takes an interdisciplinary approach to treatment, with activities therapists, social workers and counsellors. In cases in which the patient has been abused before admission, the ACU works with Child Protective Services. The average length of stay is seven days.

ACU staff advised the PCO that supplies and staffing were adequate, with special praise going to the nursing staff. The ACU is restraints-free, with the staff trained in de-escalation protocols. Seclusion is used only as a last resort. According to ACU staff, violence is rare and typically not physical. The ACU follows the same protocols for securing and dispensing medications as those followed at Bayonne. Similarly, the same protocols for keeping certain areas locked are followed by the ACU. The ACU follows The Joint Commission rules for patient safety in mental and behavioral health facilities, including: (i) rules prohibiting the presence of anything that could be as a ligature; (ii) the use of plastic instead of harder materials for furnishings; and (iii) the minimization of furnishings in the unit. The ACU has been decorated with bright colors and themes to provide a less institutional atmosphere for patients.

HUMC's Gastroenterology Unit has a sufficient number of beds for the population HUMC serves. The X-ray room in the unit is lead lined. The unit's manager advised the PCO that supplies were adequate. HUMC's Same-Day Surgery Unit was clean and spacious. Patient rooms/bays housed only one patient each. Negative pressure rooms were available for patients needing them.

The PCO visited HUMC's Transitional Care Unit ("**TCU**"). The TCU provides post-acute care for patients who have had surgery at HUMC, including physical and occupational therapy, speech therapy, hydration therapy and antibiotics therapy. The average length of stay is eight to ten days. The TCU is licensed for 15 beds; the unit census on the day of the PCO's visit

was 12. The TCU is licensed as a skilled nursing facility and, according to staff, abides by the rules governing such facilities of the NJDOH and the Centers for Medicare and Medicaid Services. According to TCU staff, there has been no problem obtaining necessary supplies because of the bankruptcy; nor has the bankruptcy inhibited the TCU's ability to maintain adequate staffing. The TCU includes a dining/activities room and an exercise therapy gym, both of which were in use at the time of the PCO's tour. Rooms are either single or double occupancy. Rooms housing patients who are fall risks are noted as such.

The PCO visited HUMC's medical-surgical units. One such unit, an overflow unit, was not being used at the time of the PCO's visit. The medical-surgical units contain the Ryan White HIV lab, which contains examination rooms and a room for phlebotomy. The PCO inspected the Orthopedic Supply Room, which was clean, well-stocked and is kept locked if no one needs to be in the room. HUMC follows the same rules for securing medications as are followed at Bayonne, except that patient receive medication from the nurses in their patient rooms. Negative pressure rooms are available for patients needing them. The Infusion Center was clean and spacious and, according to HUMC staff is being considered as a potential growth area. A separate telemetry unit contained private and double occupancy room, with isolation rooms as necessary. The monitoring equipment was functioning. Rooms housing patients who were special fall risks were noted. The staff were present and attentive to patients.

The PCO visited HUMC's Mother and Child Unit ("**MCU**"). HUMC staff acknowledges that the pediatric component of the MCU is not modern. For example it is not equipped with heart monitors. Children are treated in the for conditions like asthma, anemia, nephritis, urinary tract infections. The pediatric component of the MCU contains 19 bays or rooms, including an isolation room. A pediatrician is available at all times. The PC includes a playroom and a formula room. Parents may stay overnight with their children. HUMC's Labor and Delivery component of the MCU contains 7 single-occupancy rooms. The newborn child stays with the mother. There is no nursery. A neonatologist is always available within thirty minutes. The neonatology unit was clean and the equipment appeared functional. MCU staff advised the PCO that the bankruptcy filing had not negatively impacted the availability of supplies, equipment or staffing. As to equipment, emergency access to original equipment manufacturers is available.

The PCO's visit to HUMC's Pharmacy Department revealed a facility that is kept locked and is well organized. The PCO found the staff to be knowledgeable and attentive to patients. The PCO was advised of the multiple checks in place to ensure that the correct medication is administered to the correct patient in the correct dose. Pharmacy staff also demonstrated to the PCO the special protections in place to ensure the security of narcotics stored in the Pharmacy.

The Intensive Care Unit at HUMC is being upgraded but was fully operational with a patient census of three at the time of the PCO's tour. The ICU contained its own medication room which was kept locked and appeared fully stocked with a pyxus distribution machine in place. An intensivist is on site at all times. The ICU also contains its own lab.

The PCO visited HUMC's Geriatric Psychiatric Unit ("**GPU**"). The GPU contains 17 beds; the rooms are mostly double occupancy. The GPU complies with various accreditation and regulatory requirements to minimize harm to patients. For example, the GPU is ligature

free. Patients are checked on every 15 minutes The nurses are assisted by Certified Nursing Assistants. Therapy is provided in individual and group settings by counsellors, social workers and psychiatrists. A team approach is taken to treatment. Patients can participate in therapeutic activities. The average length of stay is seven days. There has been no recent violence in the unit; all staff are trained in de-escalation techniques. The unit is locked both at the entry point and in internal areas as well.

HUMC's Emergency Department contains a trauma unit that was very clean on the day of the PCO's visit. The trauma unit treats high acuity patients. The ED also contains behavioral calming rooms. They are isolation rooms equipped with cameras for patient supervision and equipment and supplies for medical emergencies. In other words, like Bayonne, HUMC appears determined to avoid parking patients with mental or behavioral issues in the ED for lengthy periods of time. Patients awaiting involuntary commitment are transferred to patient rooms for care pending transfer to an appropriate facility. The ED is an accredited stroke stabilization and treatment center and contains a CT Scan. The ED also contains: (i) an X-Ray machine; (ii) a special room for infants needing incubators; and (iii) a special room for victims of sexual assault. HUMC's Security Department is located in the ED.

**D. <u>Christ Hospital</u>:** Christ Hospital's Chief Hospital Officer, Marie Duffy, accompanied the PCO on his tour of the Hospital. The PCO first toured Christ Hospital's Behavioral Health Unit. Security for the unit was good; the unit is locked. The group therapy room and the Social Work Office are kept locked when not in use. So too are the rooms for independent treatment sessions. Treatment sessions, whether group or individual, are kept secure. The unit takes an interdisciplinary approach to therapy, with staff running therapy sessions. Environmental services, soiled utility and supply closets are kept locked when not in use. The PCO was advised that Christ Hospital tries to avoid using seclusion on behavioral health and psychiatric patients. However, there is a seclusion room that is kept locked, is clean and spacious and equipped with observation cameras. Patients in the seclusion room receive one-on-one observation by staff. Patients' rooms were clean and spacious. For security reasons, as little as possible is kept in the rooms. Patient belongings not kept in patient rooms are kept secure in a closet dedicated to that purpose. The unit's day room is always staffed and is spacious and clean, although the floor shows significant wear and tear. The unit's dining room had been freshly cleaned shortly before the PCO's tour, with the smell of a disinfectant still in evidence. Bathrooms were clean and of adequate size. They are kept locked when not in use, and patients are supervised when using them. The unit's pantry is stocked with snacks for patients, although access is limited to staff who bring the snacks to patients. The staff, and not the patients operate the laundry room. Medications are kept secure, and a pyxus system is used to ensure both the security and the appropriate administration of medications. As additional security and patient protections, patients must have a badge scanned to receive medications. Nurses distribute medications at the nurse's station. Staff in the unit confirmed adequate staffing and supplies and were attentive to the patients. At the time of the PCO's tour, the Behavioral Health Unit had been approved for admitting patients on an involuntary basis beginning January, 2025, but was only admitting patients on a voluntary basis.

Christ Hospital's transitional care, or step-down, unit was under renovation and scheduled to reopen in the near future. A skilled nursing facility formerly located at Christ

Hospital has been closed. Like the labs at Bayonne and HUMC, the lab at Christ Hospital was clean, well-organized and well stocked. Staff advised the PCO of the measures taken to maintain the security of medications and the administration of medications in the appropriate dose to the correct patient. During the PCO's tour of the Graduate Medical Education Department, Dr. Duffy described in detail the graduate medical education program at Christ Hospital. There are 36 medical residents at the hospital including surgical residents and residents holding gastroenterology fellowships.

On the day of the PCO's tour, the patient census at Christ Hospital's Medical Surgical Unit was 12. Patient rooms were spacious, clean and well-equipped. Medications were kept secure, with only authorized personnel having access to medications. Medications requiring refrigeration were kept in locked refrigerators, which are checked on every shift to ensure adequate cooling. The pyxus system is used to ensure the security of medications and to maximize the administration of the correct medication in the correct dose to the correct patient. Laundry, supply and housekeeping closets are kept locked when not in use.

Christ Hospital's Intensive Care Unit was adequately staffed. Medications are kept in or just outside of the nursing stations, but are kept locked up. There is adequate space to properly treat patients The nursing stations are constantly staffed so that not having the medications in a locked room does not appear to undermine the security of the medications. Like its ICU, Christ Hospital's same-day surgery unit (including both pre-operative and treatment rooms) was spacious, clean and well stocked. The same was true of Christ Hospital's Post-Acute Care Unit. The Pathology and Laboratory Unit was well-organized and appeared to be well-stocked. Similarly, Christ Hospital's Cardiac Catheter and Cardiac Rehabilitation units were clean, spacious and well-stocked. Christ Hospital's Emergency Department was clean and spacious. Medications were kept secure.

As of the date of the PCO's tour, Christ Hospital's Radiology Unit was increasing the service it offers after a period of limited services. The services offered include ultrasound, X-Ray, MRI and CT Scan. Staff in the Radiology Unit explained the equipment (including maintenance status) to the PCO and advised that staffing and supplies were adequate. Indeed, the unit was re-stocking the day of the PCO's tour.

## CONFERENCES WITH MONITOR

During the First Reporting Period, the PCO spoke with the Monitor on four occasions: (i) at the outset of the PCO's appointment on December 5, 2024; (ii) in a subsequent call on December 12, 2024; (iii) at Bayonne on December 17, 2024; and (iv) in a call on January 16, 2025 in response to a media report concerning the Debtors. The Monitor advised the PCO that he monitors the Hospitals in real time and is present at least one of the Hospitals on a daily basis. He attends the Hospitals' quality assurance and patient safety meetings. According to the Monitor those meetings have been effective at each of the Hospitals. Early in his appointment, the Monitor shut down certain programs at the Hospitals for which the Debtors lacked the necessary staff and supplies. Most of those programs were reinstated as financing became available for the necessary staffing and supplies.

According to the Monitor, the Debtors' bankruptcy filings were triggered by financial, managerial and governance issues. Quality of care issues did not push the Debtors into bankruptcy. On that account, the Monitor particularly praised the Chief Nursing Officers at the Hospitals. According to the Monitor, the Debtors are maintaining appropriate staffing ratios at their hospitals. The Monitor also advised that the Debtors did well on regulatory accreditation surveys in 2024, a fact confirmed by documentation the Debtors provided the PCO.

The Monitor advised the PCO that NJDOH monitors supplies at the Hospitals on a daily basis. The availability of supplies determines which procedures can be done and which cannot be done. There is a biomedical equipment call once a week. The Monitor advised that staffing is adequate, but that turnover was high until recently but that other hospital systems are seeking to hire employees of the Debtors. It, therefore, behooves the PCO to monitor staffing ratios carefully as the bankruptcy case progresses.

Per the monitor, the maintenance status of Equipment is monitored through Safety Logs. The Monitor advises, the situation concerning equipment has improved at the Debtors' hospitals since his appointment. At the time of the Monitor's appointment , there was a need to step up maintenance of equipment. Now any equipment actually in use is properly maintained, a fact confirmed by the equipment maintenance documentation provided to the PCO by the Debtors. By way of example, the Monitor advised that the Debtors have been able to bring Robotic surgical procedures back on line because necessary equipment has been obtained and existing equipment has received appropriate maintenance. Similarly, a new pump has just been installed at HUMC to improve temperature controls, although HUMC took initiative to protect patients even before the installation. The Debtors (as well as their potential purchaser) are aware that certain equipment still needs to be replaced. However, HUMC had already taken the initiative to protect patients. The Debtors own a standby ambulance service to transport patients as necessary to receive services at another site.

The Monitor has found that the Debtors keep accurate information concerning falls and hospital-acquired infection rates. He characterized those rates as good. The Debtors have sufficient non-clinical staff. They are competent and do their jobs. According to the Monitor, there is no problem with violence at the hospitals. It is a rarity in the Emergency Departments and most likely to occur in the mental and behavioral health units. However, the PCO was advised by clinical staff in those units that violence is rare and almost never extends beyond verbal abuse. The Monitor was not aware of any reports of violence in 2025.

The Monitor, on his own initiative, contacted the PCO about two patient incidents at HUMC. On December 12, 2024, the Monitor advised the PCO about a patient suicide. The patient had entered the hospital indicating suicidal ideations. Consideration was being made about whether the patient should be transferred to a facility for involuntary commitment. The patient left HUMC against medical advice and committed suicide. The incident was reported to NJDOH, which investigated. HUMC also investigated and HUMC staff was re-trained on the applicable policies. In connection with the second incident, a minor patient was sent home to a potentially abusive situation. Again, HUMC investigated and re-educated the applicable employees.

On January 15, 2025, the PCO read a media report stating that the Debtors were laying off staff and cancelling accrued paid time off. The PCO reached out to the Monitor and the Debtors about the report. Then next day the Monitor advised the PCO that the layoffs were part of a right-sizing certain units at the hospital that were overstaffed. The Debtors provided information confirming that the layoffs did not affect clinical staff. As to the cancellation of the accrued PTO, the Monitor advised that the Debtors had not managed the accrual of PTO in the past and needed to do so in light of the fact that the potential purchaser of the Debtors would not agree to assume liability for the accrued PTO.

## FINDINGS

**Finding #1:** **The PCO has not received any information indicating that quality of care provided to the Debtor's patients (including patient safety) is not acceptable and is currently declining or is otherwise being materially compromised, but reserves making an actual finding in that regard pending the receipt of: (i) additional information to be requested from the Debtor; (ii) the completion of the PCO's inspections of the Hospitals; and (iii) the planned interviews of patients and staff.**

**Finding #2:** **The oversight and supervision provided by the management of the hospitals, the diligence and experience of the Monitor, the attentiveness and loyalty of the Debtors' clinical staff will likely uncover quality of care deficits if they arise. However, the PCO will continue monitor the situation at the hospitals.**

As noted above, particularly through their quality assurance and performance improvement programs, the Debtors exercises significant oversight over the operations of the Hospitals and diligently evaluate those operations to identify areas requiring improvement. The Monitor's active involvement in Hospital operations provides another effective layer of oversight. Notwithstanding the bankruptcy filings, clinical staff have remained focused on their work. Under the circumstances, it is likely that the Debtors or the Monitor will uncover any deficits in patient care and safety and remedy those deficits. Nevertheless, the PCO will continue to monitor the situation through: (i) inspecting those portions of the hospitals not inspected in December; (ii) interviewing clinical staff and patients; (iii) identifying gaps in the information he has received to date and requesting any missing information; and (iv) continued communications with the Monitor.

**Finding #3:** **Following the PCO's completion of the tasks he outlined in Finding #2 above and until a plan of reorganization is confirmed in the Debtors' bankruptcy Case, receipt by the PCO of bi-weekly reports from the Debtors containing information particularly relevant to patient care and safety will provide a reasonable basis to monitor whether the quality of care (including patient**

**safety) provided by the Hospitals is declining or otherwise materially compromised.**

During February, the PCO will complete his inspections of the hospitals, interview clinical staff at the hospitals, determine any gaps in the information provided by the Debtors to date and obtain any missing information. The PCO will also maintain regular contact with the Monitor. After the completion of those tasks, the PCO will request from the Debtor bi-weekly reports of information particularly relevant to the quality of patient care and safety. Until guided otherwise by the Court, the PCO will continue to monitor all information provided and make immediate inquiry into any item or potential issue that may come to his attention regarding the quality of patient care rendered by the Hospitals to their patients.

## CONCLUSION

An analysis of multiple sources of information regarding the current performance of the Hospitals and their structures, policies and procedures reveals healthcare facilities that continue to provide the same level of patient care and safety it historically provided since before the Petition Date. Moreover, that level of patient care and safety is adequate and stable.

Several factors likely to result in the maintenance of the current level of patient care and safety became evident to the PCO as a result of: (i) his tour of the Hospitals, (ii) his discussions with of management, staff and the Monitor; (iii) his review of performance information provided by the Debtors; (v) the cleanliness and demonstrated maintenance of the Hospitals and their equipment and (vii) the financing made available in connection with the bankruptcy. The Debtors' senior management, the Monitor and the clinical staff emphasized in their discussions with the PCO the dedication, attentiveness and the hard work of staff members working directly with the Debtors' patients. The loyalty of the Debtors' staff is underscored by the long tenure of many staff members.

Additionally, adequate systems are in place to monitor the quality of patient care and safety at the Hospitals to respond to shortcomings. The minutes of the quality assurance and performance committee meetings discussed above reveal that the Debtors are generally on top of the patient care and safety issues and respond to them promptly. The Debtors also enjoy the benefit of a loyal and competent workforce who see their primary focus as the care and safety of their patients. The loyalty and competence of the workforce should serve as a break against a sudden decline in the quality of patient care and safety, as well as an expeditious source of notice of any problems.

Because patient care and safety is not likely to be compromised in the immediate to mid-term future, other than having the PCO perform the services receive the information outlined above, the PCO does not at this point recommend any remedial action or external intervention at this time regarding additional monitoring of clinical or administrative matters at the Hospitals.

Respectfully submitted to the Court on January 24, 2025 by:

/s/ David N. Crapo
David N. Crapo, Esq.
Patient Care Ombudsman
Gibbons P.C.
Newark, NJ