# EXHIBIT D

(Form of the Capitala Exit Facility Credit Agreement)

**THIS FORM OF CAPITALA EXIT FACILITY CREDIT AGREEMENT HAS BEEN PREPARED BY THE DEBTORS, HAS NOT BEEN AGREED TO BY CAPITALA OR ANY OTHER SENIOR SECURED PARTY AND REMAINS SUBJECT TO NEGOTIATIONS WITH THE SENIOR SECURED PARTIES, AND THE REVIEW AND APPROVAL OF THE SENIOR SECURED PARTIES, IN ALL RESPECTS.**

## LOAN AND SECURITY AGREEMENT
## (CAPITALA EXIT FACILITY)

**Dated as of March [__], 2025**

**by and among**

**HUDSON HOSPITAL OPCO, LLC, and**
**HUMC OPCO, LLC,**
**as Borrowers,**

**THE OTHER BORROWERS FROM TIME TO TIME PARTY HERETO,**

**HUMC HOLDCO, LLC,**
**as a Credit Party**

**THE SUBSIDIARY GUARANTORS PARTY HERETO,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**

**and**

**CAPITALA PRIVATE ADVISORS, LLC,**
**as the Agent**

## TABLE OF CONTENTS

Page

I.      DEFINITIONS ................................................................................................................ 2
        1.1      General Terms ................................................................................................ 2
        1.2      Definitions ...................................................................................................... 3
        1.3      Rates ............................................................................................................ 28

II.     TERM LOAN FACILITIES AND PAYMENTS AND PREPAYMENTS ................................ 29
        2.1      Term Loan Facility ....................................................................................... 29
        2.2      Term Loan Disbursements ........................................................................... 29
        2.3      Repayment and Prepayments; Promise to Pay; Manner of Payment ............ 29
        2.4      Application of Payments and Proceeds ......................................................... 32
        2.5      Payments by the Agent ................................................................................. 33
        2.6      Evidence of Loans ....................................................................................... 33

III.    INTEREST AND FEES ................................................................................................. 34
        3.1      Interest on the Loans .................................................................................... 34
        3.2      Default Rate of Interest ................................................................................ 34
        3.3      Maximum Lawful Rate .................................................................................. 34
        3.4      Fees ............................................................................................................. 35
        3.5      Payment of Fees Generally ........................................................................... 35
        3.6      Computation of Interest and Fees ................................................................ 35
        3.7      Benchmark Replacement .............................................................................. 35

IV.     COLLATERAL ........................................................................................................... 36
        4.1      Security Interest; Collateral .......................................................................... 36
        4.2      Power of Attorney ........................................................................................ 37
        4.3      Defense of Collateral; Transferability of Collateral ....................................... 38
        4.4      Further Assurances ....................................................................................... 38

V.      ADMINISTRATION AND MAINTENANCE OF COLLATERAL .................................... 39
        5.1      Collections and Cash Management ................................................................ 39
        5.2      Accounts ...................................................................................................... 40
        5.3      Healthcare .................................................................................................... 40
        5.4      Medicare and Medicaid Account Debtors and Third-Party Payor Information .......... 41
        5.5      Collateral Administration .............................................................................. 41

VI.     CONDITIONS PRECEDENT ....................................................................................... 42
        6.1      Conditions to Closing ................................................................................... 42

VII.    REPRESENTATIONS AND WARRANTIES ................................................................... 44
        7.1      Existence, Qualification and Power ............................................................... 44
        7.2      Authorization; No Contravention; Other Consents; Binding Effect ............... 45
        7.3      Subsidiaries, Capitalization and Ownership Interests ..................................... 45
        7.4      Properties ..................................................................................................... 45
        7.5      Other Agreements ........................................................................................ 46
        7.6      Litigation ..................................................................................................... 46
        7.7      Environmental Matters ................................................................................. 46
        7.8      Potential Tax Liability; Tax Returns; Governmental Reports ......................... 47

i

|       |      |                                                                                  |    |
|-------|------|----------------------------------------------------------------------------------|----|
|       | 7.9  | Financial Statements and Reports                                                 | 47 |
|       | 7.10 | Compliance with Law                                                              | 48 |
|       | 7.11 | Intellectual Property                                                            | 49 |
|       | 7.12 | Licenses and Permits; Labor Matters                                              | 50 |
|       | 7.13 | No Default                                                                       | 50 |
|       | 7.14 | Disclosure                                                                       | 50 |
|       | 7.15 | Existing Indebtedness; Investments, Guarantees and Material Contracts            | 51 |
|       | 7.16 | Other Agreements                                                                 | 51 |
|       | 7.17 | Insurance                                                                        | 51 |
|       | 7.18 | Names; Location of Offices, Records and Collateral                               | 52 |
|       | 7.19 | Lien Perfection and Priority                                                     | 52 |
|       | 7.20 | Investment Company Act                                                           | 52 |
|       | 7.21 | Regulations T, U and X                                                           | 52 |
|       | 7.22 | OFAC and Anti-Terrorism Regulations                                              | 52 |
|       | 7.23 | Healthcare Laws                                                                  | 53 |
|       | 7.24 | Solvency; Fraudulent Conveyance                                                  | 55 |
|       | 7.25 | Holding Company                                                                  | 56 |
|       | 7.26 | No Brokers                                                                        | 56 |
|       | 7.27 | Survival                                                                          | 56 |
| VIII. |      | AFFIRMATIVE COVENANTS                                                             | 56 |
|       | 8.1  | Financial Statements, Financial Reports, Approved Budget and Other Information    | 56 |
|       | 8.2  | Conduct of Business and Maintenance of Existence and Assets                      | 60 |
|       | 8.3  | Compliance with Legal and Other Obligations                                      | 60 |
|       | 8.4  | Insurance                                                                        | 61 |
|       | 8.5  | True Books                                                                        | 62 |
|       | 8.6  | Inspections; Periodic Audits and Reappraisals                                    | 62 |
|       | 8.7  | Further Assurances; Post-Closing                                                 | 62 |
|       | 8.8  | Use of Proceeds                                                                  | 63 |
|       | 8.9  | Taxes and Other Charges                                                          | 63 |
|       | 8.10 | Payroll Taxes                                                                     | 64 |
|       | 8.11 | New Subsidiaries                                                                 | 64 |
| IX.   |      | NEGATIVE COVENANTS                                                                | 65 |
|       | 9.1  | Budget Covenants and Cure Right                                                  | 65 |
|       | 9.2  | Permitted Indebtedness                                                           | 66 |
|       | 9.3  | Permitted Liens                                                                  | 66 |
|       | 9.4  | Investments; New Facilities or Collateral; Subsidiaries                          | 66 |
|       | 9.5  | Dividends; Redemptions                                                           | 67 |
|       | 9.6  | Transactions with Affiliates                                                     | 67 |
|       | 9.7  | Charter Documents: Fiscal Year; Fundamental Changes                             | 67 |
|       | 9.8  | Truth of Statements                                                             | 68 |
|       | 9.9  | IRS Form 8821                                                                    | 68 |
|       | 9.10 | Transfer of Assets                                                              | 68 |
|       | 9.11 | OFAC                                                                             | 68 |
|       | 9.12 | Payroll Accounts                                                                | 68 |
|       | 9.13 | Payment of Permitted Subordinated Debt                                          | 68 |
|       | 9.14 | Burdensome Agreements                                                           | 69 |
| X.    |      | EVENTS OF DEFAULT                                                                | 69 |

XI.    RIGHTS AND REMEDIES AFTER DEFAULT ................................................................ 72
       11.1    Rights and Remedies ................................................................................ 72
       11.2    Rights of Agent to Appoint Receiver ....................................................... 73
       11.3    Rights and Remedies not Exclusive ......................................................... 73
       11.4    Standards for Exercising Remedies ........................................................... 74

XII.   WAIVERS AND JUDICIAL PROCEEDINGS ............................................................... 74
       12.1    Waivers ................................................................................................... 74
       12.2    Delay; No Waiver of Defaults .................................................................. 75
       12.3    Jury Waiver ............................................................................................. 75
       12.4    Cooperation in Discovery and Litigation ................................................. 75

XIII.  SURVIVAL ............................................................................................................. 75

XIV.   THE AGENT ........................................................................................................... 75
       14.1    Appointment and Authority ..................................................................... 75
       14.2    Rights as a Lender ................................................................................... 76
       14.3    Exculpatory Provisions ............................................................................ 76
       14.4    Reliance by Agent ................................................................................... 77
       14.5    Delegation of Duties ................................................................................ 77
       14.6    Resignation of Agent ............................................................................... 77
       14.7    Non-Reliance on Agent and Other Lenders .............................................. 78
       14.8    Agent May File Proofs of Claim .............................................................. 78
       14.9    Collateral and Guaranty Matters .............................................................. 79
       14.10   Notice of Transfer ................................................................................... 79
       14.11   Reports and Financial Statements ............................................................ 79
       14.12   Agency for Perfection .............................................................................. 80
       14.13   Indemnification of Agent ......................................................................... 80
       14.14   Relation among Lenders ........................................................................... 80

XV.    MISCELLANEOUS .................................................................................................. 80
       15.1    Amendments; Waivers .............................................................................. 80
       15.2    Governing Law; Jurisdiction; Service of Process; Venue .......................... 81
       15.3    Successors and Assigns ............................................................................ 81
       15.4    Application of Payments .......................................................................... 83
       15.5    Indemnity ................................................................................................ 83
       15.6    Notice ..................................................................................................... 84
       15.7    Severability; Captions; Counterparts; Facsimile Signatures ...................... 84
       15.8    Expenses ................................................................................................. 84
       15.9    Entire Agreement ..................................................................................... 85
       15.10   Agent Approvals ...................................................................................... 85
       15.11   Confidentiality and Publicity .................................................................... 85
       15.12   Release .................................................................................................... 85
       15.13   Replacement of Lenders ........................................................................... 86
       15.14   Concerning Joint and Several Liability of the Borrowers .......................... 86
       15.15   Administrative Borrower ........................................................................... 89
       15.16   Controlling Agreements ............................................................................ 89
       15.17   [Reserved] ............................................................................................... 89

EXHIBITS:

Exhibit A        Compliance Certificate
Exhibit B        Initial Approved Budget
Exhibit C        Solvency Certificate
Exhibit D        Assignment and Assumption
Exhibit E        KPI Report
Exhibit F        Borrowing Base Certificate
Exhibit G        Cash Flow Report

SCHEDULES:

Schedule 2.1         Commitments
Schedule 4.1         Commercial Tort Claims
Schedule 5.3(b)      Third Party Payors
Schedule 7.2         Governmental/Third Party Approvals
Schedule 7.3         Subsidiaries, Capitalization and Ownership Interests
Schedule 7.4(a)      Owned/Leased Real Property
Schedule 7.4(b)      Deposit Accounts and Investment Accounts
Schedule 7.5         Agreements with Affiliates
Schedule 7.6         Litigation
Schedule 7.8         Tax Matters
Schedule 7.11        Intellectual Property
Schedule 7.12(b)     Labor Matters
Schedule 7.15        Material Contracts
Schedule 7.15(a)     Indebtedness Maturing during the Term
Schedule 7.16        Stockholder Agreements
Schedule 7.17        Insurance
Schedule 7.18(a)     Certain Information Regarding Credit Parties
Schedule 7.18(b)     Chief Executive Offices; Collateral Locations
Schedule 7.18(c)     Medicare Accounts
Schedule 7.23(c)     Certain Healthcare Notices
Schedule 8.7         Post-Closing Items
Schedule 9.2         Existing Indebtedness
Schedule 9.3         Permitted Liens
Schedule 9.14        Burdensome Agreements

**LOAN AND SECURITY AGREEMENT (CAPITALA EXIT FACILITY)**

This **LOAN AND SECURITY AGREEMENT (CAPITALA EXIT FACILITY)** (this "**Agreement**"), is entered into as of March [__], 2025, by and among **HUDSON HOSPITAL OPCO, LLC**, a Delaware limited liability company ("**Christ Opco**"), **HUMC OPCO, LLC**, a Delaware limited liability company ("**HUMC Opco**", and collectively with Christ Opco and any other Person which, on or subsequent to the Closing Date, agrees in writing to join this Agreement as a "Borrower" hereunder pursuant to a joinder agreement in form and substance satisfactory to Agent, herein called, the "**Borrowers**" and each individually a "**Borrower**"), **HUMC HOLDCO, LLC**, a New Jersey limited liability company ("**HUMC Parent**") as a Credit Party (as defined below) hereunder, the Guarantors party hereto, the lenders from time to time party hereto (each a "**Lender**" and collectively, the "**Lenders**") and **CAPITALA PRIVATE ADVISORS, LLC,** a Delaware limited liability company, as administrative agent and collateral agent (in such capacities, the "**Agent**").

**WHEREAS**, on November 3, 2024, the Credit Parties and certain of their affiliates filed voluntary petitions for relief under title 11 of chapter 11 of the United States Code, Section 101 et. seq. (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") commencing chapter 11 cases jointly administered under the caption *In re CarePoint Health Systems, Inc. d/b/a Just Health Foundation*, Case No. 24-12534 (JKS) (the "**Chapter 11 Cases**").

**WHEREAS**¸ the Debtors and the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases filed that certain *[Fourth] Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* at [D.I. 551] with the Bankruptcy Court (as amended, restated or modified from time to time, the "**Bankruptcy Plan**").

**WHEREAS**, on March [__], 2025, the Bankruptcy Court entered that certain [Confirmation Order Title] at [D.I. [__]] confirming the Bankruptcy Plan and approving the disclosure statement contained therein on a final basis (the "**Confirmation Order**").

**WHEREAS**, in accordance with the Bankruptcy Plan and the Confirmation Order, on the date hereof, certain corporate restructuring events and asset transfer transaction have been consummated pursuant to which the Credit Parties and their Affiliates have been reorganized, as more fully set forth in the Bankruptcy Plan (the "**Restructuring and Asset Transfer Transactions**").

**WHEREAS**, the Borrowers have requested that the Lenders agree to, substantially concurrently with the consummation of the Bankruptcy Plan and the Restructuring and Asset Transfer Transactions, convert all of the Obligations under and as defined in (a) the HUMC Loan Agreement and HUMC Loan Documents and (b) the Christ Loan Agreement and Christ Loan Documents (each as defined herein) (collectively, the "**Converted Obligations**"), in each case other than those Obligations that shall be paid in cash on the date of consummation of the Bankruptcy Plan under the terms thereof, into a term loan facility in an initial principal amount equal to $[____] on the terms and conditions set forth herein.

**WHEREAS**, the Lenders are willing to do so on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, and intending to be legally bound, the parties hereto hereby agree as follows:

## I.      DEFINITIONS

1.1     General Terms.

(a)      *Interpretative Provisions*.  All capitalized terms used which are not specifically defined herein shall have meanings provided in Article 9 of the UCC to the extent the same are used or defined therein.  Unless otherwise specified herein, any agreement, contract or instrument referred to herein shall mean such agreement, contract or instrument as modified, amended, restated or supplemented from time to time.  Unless otherwise specified, as used in the Loan Documents or in any certificate, report, instrument or other document made or delivered pursuant to any of the Loan Documents, all accounting terms not defined in this Agreement shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).  The terms "herein", "hereof" and similar terms refer to this Agreement as a whole.  In the computation of periods of time from a specified date to a later specified date in any Loan Document, the terms "from" means "from and including" and the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including." In any other case, the term "including" when used in any Loan Document means "including without limitation." The term "documents" means all writings, however evidenced and whether in physical or electronic form, including all documents, instruments, agreements, notices, demands, certificates, forms, financial statements, opinions and reports.  The term "incur" means incur, create, make, issue, assume or otherwise become directly or indirectly liable in respect of or responsible for, in each case whether directly or indirectly, and the terms "incurrence" and "incurred" and similar derivatives shall have correlative meanings.  Unless otherwise expressly indicated, the meaning of any term defined (including by reference) in any Loan Document shall be equally applicable to both the singular and plural forms of such term.

(b)      *Contracts*.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(c)      *Financial Calculations; Accounting Changes.*  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).  In the event that any Accounting Change (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then Borrowers and the Agent agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating Borrowers' financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made.  Until such time as such an amendment shall have been executed and delivered by Borrowers, the applicable Lenders and Agent, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.

(d)      *Divisions*.  For all purposes under the Loan Documents, in connection with any Division: (i) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (ii) if any new Person comes into existence, such new Person shall be deemed

to have been organized on the first date of its existence by the holders of its Capital Stock at such time. Any reference in this Agreement to a combination, merger, consolidation, disposition, dissolution, liquidation or transfer shall be deemed to apply to a Division (or the unwinding of such a Division) as if it were a combination, merger, consolidation, disposition, dissolution, transfer or similar term, as applicable, to or with a separate Person. Any Division of a Person shall constitute a separate Person hereunder (and each Division of any Person that is a Subsidiary, Borrower, joint venture or any other like term shall also constitute such a Person or entity).

      1.2    <u>Definitions</u>.  As used in this Agreement, the following terms shall have the meanings set forth below:

      "**Account Debtor**" shall mean "account debtor" as defined in Section 9-102 of the UCC.

      "**Accounting Change**" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the U.S. Securities and Exchange Commission.

      "**Accounts**" shall mean "accounts" as defined in Section 9-102 of the UCC (including Health Care Insurance Receivables).

      "**Actual Cash Receipts**" shall mean the sum of all cash receipts received by the Borrowers (excluding, for the avoidance of doubt, any Loans under this Agreement) during the relevant period of determination, as determined in a manner consistent with the Approved Budget.

      "**Actual Disbursement Amount**" shall mean the sum of all disbursements, expenses and payments made by the Borrowers during the relevant period of determination, as determined in a manner consistent with the Approved Budget.

      "**Actual Net Cash Flow**" shall mean, for and calculated as of the end of the relevant period of determination, the sum of (a) the Actual Cash Receipts for the relevant period of determination, *minus* (b) the Actual Disbursement Amount for the relevant period of determination.

      "**Administrative Borrower**" shall have the meaning given to such term in <u>Section 15.15</u>.

      "**Affiliate**" shall mean, as to any Person (a) any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) any other Person who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in <u>clause (a)</u> above with respect to such Person, (c) any other Person which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of five percent or more of any class of the outstanding voting stock, securities or other equity or ownership interests of such Person, and (d) in the case such Person is an individual, any other Person who is an immediate family member, spouse or lineal descendant of such Person or any Affiliate of such Person.  For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.  Notwithstanding the foregoing, (x) each Credit Party shall be deemed to be an "Affiliate" of each other Credit Party and the direct and indirect Subsidiaries of each Credit Party, and (y) neither Agent nor any Lender shall be deemed to be an "Affiliate" of any Credit Party or any of their respective direct or indirect Subsidiaries.

"**Agent**" shall mean Capitala in its capacity as the administrative agent and collateral agent under this Agreement or any other Loan Document, or any of its successors or assigns.

"**Agreement**" shall have the meaning given to such term in the Preamble to this Agreement.

"**Approved Budget**" shall mean the budget prepared by the Borrowers in the form of Exhibit C and initially furnished to the Agent on the Closing Date and which is approved by, and in form and substance satisfactory to, the Agent, as the same may be updated, modified or supplemented from time to time as provided in Section 8.1(d).

"**Approved Budget Variance Report**" shall mean a weekly report (a) provided by the Administrative Borrower to the Agent (i) showing, in each case, by line item the Actual Disbursement Amount, the Actual Cash Receipts, Actual Net Cash Flow for the Prior Week, the Cumulative Four-Week Period and the Cumulative Period, noting therein all variances, on a line-item and cumulative basis, from the amounts set forth for such period in the Approved Budget, and shall include explanations for all material variances (including whether such variance is permanent in nature or timing related) and (ii) an analysis certified by the chief financial officer of the Administrative Borrower demonstrating that (A) the Borrowers are in compliance with the covenants set forth in Section 9.1(a) and Section 9.1(b) (including the requirement that all vendor payables are being paid in accordance with the Approved Budget and also including, in each case, computations in reasonable detail satisfactory to the Required Lenders in support thereof), and (B) all rent payable by the Borrowers is paid current in the ordinary course of business. The Approved Budget Variance Report shall be in a form, and shall contain supporting information, satisfactory to the Agent.

"**Approved Fund**" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required hereunder), and accepted by the Agent, in form acceptable to the Agent substantially in the form of Exhibit E hereto.

"**Bankruptcy Code**" shall have the meaning assigned in the Recitals.

"**Bankruptcy Court**" shall have the meaning assigned in the Recitals.

"**Bankruptcy Plan**" shall have the meaning assigned in the Recitals.

"**Benchmark**" means, initially, Term SOFR; provided that if a Benchmark Transition Event has occurred with respect to Term SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.7.

"**Benchmark Replacement**" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Agent for the applicable Benchmark Replacement Date:

      (a)      the sum of (i) Daily Simple SOFR and (ii) 0.10% (10 basis points); or

      (b)      the sum of: (i) the alternate benchmark rate that has been selected by the Agent in consultation with the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

      If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.  If the Benchmark Replacement as determined pursuant to clause (b) above would be greater than the Benchmark Replacement as in effect on the Benchmark Replacement Date (determined as of such date), then the Borrower's consent shall be required with respect to the alternate benchmark rate selected by the Agent.

      "**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

      "**Benchmark Replacement Date**" means a date and time determined by the Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

      (a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide tenors equal the length of an Interest Period hereunder in respect of such Benchmark (or such component thereof); or

      (b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any available tenors equal the length of an Interest Period hereunder in respect of such Benchmark (or such component thereof) continues to be provided on such date.

      For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current available tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide tenors equal the length of an Interest Period hereunder in respect of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such tenors in respect of such Benchmark (or such component thereof);

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide tenors equal the length of an Interest Period hereunder in respect of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such tenors in respect of such Benchmark (or such component thereof); or

(c)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that tenors equal the length of an Interest Period hereunder in respect of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current tenor of such Benchmark (or the published component used in the calculation thereof).

"**Blocked Accounts**" shall have the meaning given to such term in Section 5.1(b).

"**Board Observers**" has the meaning set forth in Section 8.12.

"**Borrower**" and "**Borrowers**" shall have the meaning assigned to such terms in the Preamble to this Agreement.

"**Borrowing Base**" shall mean, as of any date of determination, an amount equal to $[_____] less the aggregate amount of prepayments on the Loans made pursuant to Section 2.3(c)(v) hereof in respect of any Eligible Account Shortfall.

"**Borrowing Base Certificate**" shall have the meaning given to such term in Section 8.1(d)(iii).

"**Budgeted Cash Receipts**" shall mean the sum of the line items contained in the Approved Budget under the heading "Total Receipts" for the relevant period of determination.

6

"**Budgeted Disbursement Amount**" shall mean the sum of the line items contained in the Approved Budget under the heading "Total Disbursements" for the relevant period of determination.

"**Budgeted Net Cash Flow**" shall mean, for and as of the end of the relevant period of determination, the sum of (a) the Budgeted Cash Receipts for the relevant period of determination, *minus* (b) the Actual Disbursement Amount for the relevant period of determination, which corresponds to the amount contained in the Approved Budget under the heading "Net Cash Flow – Before Financing Activities" for the relevant period of determination.

"**Business Day**" shall mean any day that is not a Saturday, Sunday or other day on which the commercial banks in New York City are authorized or required by law to remain closed.

"**Capital Expenditures**" shall mean, for any Fiscal Year, the sum (without duplication) of all expenditures (whether paid in cash or accrued as liabilities) during the Fiscal Year that are or should be treated as capital expenditures under GAAP.

"**Capital Lease**" shall mean, as to any Person, a lease of any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" in accordance with GAAP.

"**Capital Stock**" shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"**Capitala**" shall mean Capitala Private Advisors, LLC, a Delaware limited liability company or any of its Affiliates that is a Lender hereunder from time to time.

"**Capitalized Lease Obligations**" shall mean all obligations of any Person under Capital Leases, in each case, taken at the amount thereof accounted for as a liability in accordance with GAAP.

"**Cash Equivalents**" shall mean, as of any date of determination, (a) securities issued, or directly and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than six months from the date of acquisition, (b) U.S. dollar denominated time deposits, certificates of deposit and bankers' acceptances of (i) any domestic commercial bank of recognized standing having capital and surplus in excess of $500,000,000, or (ii) any bank (or the parent company of such bank) whose short-term commercial paper rating from Standard & Poor's Ratings Services ("**S&P**") is at least A-2 or the equivalent thereof or from Moody's Investors Service, Inc. ("**Moody's**") is at least P-2 or the equivalent thereof in each case with maturities of not more than six months from the date of acquisition (any bank meeting the qualifications specified in clauses (b)(i) or (ii), an "**Approved Bank**"), (c) repurchase obligations with a term of not more than seven (7) days for underlying securities of the types described in clause (a) above, entered into with any Approved Bank, (d) commercial paper issued by any Approved Bank or by the parent company of any Approved Bank and commercial paper issued by, or guaranteed by, any industrial or financial company with a short-term commercial paper rating of at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's, or guaranteed by any industrial company with a long term unsecured debt rating of at least A or A2, or the equivalent of each thereof, from S&P or Moody's, as the case may be, and in each case maturing within six months after the date of acquisition, and (e) investments in money market funds substantially all of whose assets are comprised of securities of the type described in clauses (a) through (d) above.

7

"**Cash Flow Report**" shall mean the cash flow report, substantially in the form of <u>Exhibit H</u>, or such other form as may be approved by the Agent.

"**Cash Receipts**" shall have the meaning given to such term in <u>Section 5.1(c)</u>.

"**Certificates, Licenses and Accreditation**" shall have the meaning given to such term in <u>Section 7.23(c)(i)</u>.

"**CHAMPVA**" shall mean, collectively, the Civilian Health and Medical Program of the Department of Veteran Affairs, a program of medical benefits covering retirees and dependents of former members of the armed services administered by the United States Department of Veteran Affairs, and all law, rules, regulations, manuals, orders, guidelines or requirements pertaining to the program, as may be amended, supplemented or otherwise modified from time to time.

"**Change of Control**" shall mean the occurrence of any of the following: (a) CHS fails to (i) own and control, directly or indirectly, equity securities representing more than fifty percent (50%) of the voting interests of Borrower on a fully-diluted basis (taking into account all such voting or other securities that any Person has the right to acquire pursuant to any option or other right), (ii) have the ability to elect (either through securities ownership or contractual voting or proxy rights), a majority of the board, managers or other governing body of each Borrower, or (iii) maintain and preserve its not for profit status, (b) (i) HUMC Parent ceases to own directly at least seventy-five percent (75%) of the voting and economic Capital Stock of HUMC Opco, (ii) HUMC Opco ceases to own directly or indirectly at least one-hundred percent (100%) of the economic and voting Capital Stock of each of its Subsidiaries, (iii) Christ Parent ceases to own directly at least seventy-five percent (75%) of the voting and economic Capital Stock of Christ Opco, (iv) Christ Opco ceases to own directly or indirectly at least one-hundred percent (100%) of the economic and voting Capital Stock of each of its Subsidiaries (c) a direct or indirect sale, transfer or other conveyance or disposition, in any single transaction or series of transactions, of all or substantially all of the properties or assets of the Credit Parties (or any of them), (d) the initial public offering of Capital Stock of either Parent or the Borrowers or the distribution of any Capital Stock of any Parent or the Borrowers by means of an effective registration statement under the Securities Act of 1933, or (e) the replacement of a majority of the board of directors (or similar body) of any Parent or any Borrower over a one-year period from the directors who constituted the board of directors (or similar body) of such Person at the beginning of such period and such replacements shall not have been approved by a vote of at least a majority of the board of directors (or similar body) of such Person then still in office who either are members of such board of directors (or similar body) at the beginning of such period or whose election as a member of such board of directors (or similar body) was previously so approved.

"**Chapter 11 Cases**" shall have the meaning assigned in the Recitals.

"**Chattel Paper**" shall mean "chattel paper" as defined in Section 9-102 of the UCC, whether tangible or electronic.

"**CHMA**" shall mean CarePoint Health Management Associates, LLC, a New Jersey limited liability company.

"**Christ Lease Agreement**" means that certain Lease Agreement, dated as of December 27, 2022, by and between J.C. Opco, LLC, as lessor, and Christ Opco, as lessee.

"**Christ Lease Documents**" shall mean the Christ Lease Agreement and each other agreement, instrument, document and certificate delivered in respect of or relating to the obligations arising under the Christ Lease Agreement.

8

"**Christ Lessor**" shall mean J.C. Opco, LLC, a New Jersey limited liability company.

"**Christ Loan Agreement**" means that certain Loan and Security Agreement, dated as of November 4, 2022, by and among Christ Opco, the other borrowers from time to time party thereto, the lenders from time to time party thereto, and Capitala, in its capacities as administrative agent and collateral agent for the lenders, as amended by that certain First Amendment to Loan and Security Agreement, dated as of February 8, 2023, and as further amended, restated, supplemented or otherwise modified from time to time.

"**Christ Loan Documents**" the "Loan Documents" as defined in the Christ Loan Agreement.

"**Christ Opco**" shall have the meaning given to such term in the Preamble to this Agreement.

"**Christ Parent**" shall mean CH Hudson Holdco, LLC, a Delaware limited liability company.

"**CHS**" shall mean CarePoint Health Systems Inc., a New Jersey non-profit corporation.

"**Closing Date**" shall mean March [__], 2025.

"**Closing**" shall mean the satisfaction, or written waiver by Agent, of all of the conditions precedent set forth in this Agreement required to be satisfied prior to the consummation of the Transactions contemplated hereby.

"**CMS**" shall mean the Centers for Medicare and Medicaid Services, formerly known as the Health Care Financing Administration or HCFA.

"**Code**" shall mean the Internal Revenue Code.

"**Collateral**" shall mean all personal and fixture property of every kind and nature of each Credit Party, including:

      (i)      Accounts (including Health Care Insurance Receivables);

      (ii)      Documents;

      (iii)      Chattel Paper;

      (iv)      Commercial Tort Claims, including those described on Schedule 4.1;

      (v)      Deposit Accounts;

      (vi)      General Intangibles (including Payment Intangibles and Software);

      (vii)      Goods (including Equipment, Inventory and Fixtures and all accessions and attachments thereto);

      (viii)      Instruments;

      (ix)      Investment Property;

9

(x)    Letter-of-Credit Rights;

(xi)    Supporting Obligations;

(xii)    Intellectual Property;

(xiii)    money, rights to the payment of money, insurance claims and proceeds;

(xiv)    the claims and causes of action set forth on Schedule 7.6 hereto;

(xv)    all books and records relating to the foregoing; and

(xvi)    all proceeds and products of the foregoing.

"**Collateral Access Agreement**" shall mean a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any Borrower's books and records, Equipment, Inventory or other Collateral and waiving (or subordinating) any such Person's statutory or common law liens and rights in the Collateral, in each case, in form and substance reasonably satisfactory to the Agent.

"**Commercial Tort Claims**" shall mean "Commercial Tort Claims" as defined in Section 9-102 of the UCC.

"**Commitment**" shall mean any or all of the Term Loan Commitments.

"**Compliance Certificate**" shall have the meaning given to such term in Section 8.1(c).

"**Compliance Program**" shall have the meaning given to such term in Section 7.23(e).

"**Concentration Account**" shall mean a depository account maintained by the Agent or an affiliate of the Agent at such bank as the Agent may communicate to the Borrower in writing from time to time.

"**Confirmation Order**" shall have the meaning assigned in the Recitals.

"**Conforming Changes**" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, and other technical, administrative or operational matters) that the Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

10

"**Control Agreement**" shall mean, with respect to any Deposit Account, securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance reasonably satisfactory to the Agent, among the Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the applicable Borrower maintaining such account or owning such entitlement or contract, effective to grant "control" (within the meaning of Articles 8 and 9 under the applicable UCC) over such account to the Agent.

"**Converted Obligations**" shall have the meaning assigned in the Recitals.

"**Corporate Authority Documents**" shall mean, for any Person (i) a copy of the certificate of incorporation or formation (or other like organizational document) certified as of a date satisfactory to the Agent by the applicable Governmental Authority of the jurisdiction of incorporation or organization of such Person, (ii) a copy of the bylaws or similar organizational documents, certified by the corporate secretary or assistant secretary of such Person, (iii) an original certificate of good standing as of a date satisfactory to the Agent issued by the applicable Governmental Authority of the jurisdiction of incorporation or organization of such Person and of every other jurisdiction in which such Person has an office or conducts business or is otherwise required to be in good standing, and (iv) copies of the resolutions of the board of directors or managers (or other applicable governing body) and, if required, stockholders, members or other equity owners authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party, certified by a Responsible Officer of such Person.

"**Credit Party**" means each Borrower and each Guarantor; and "**Credit Parties**" means all such Persons, collectively.

"**Cumulative Four-Week Period**" shall mean the four-week period up to and through the Saturday of the most recent week then ended, or if a four-week period has not then elapsed from the Closing Date, such shorter period since the Closing Date through the Saturday of the most recent week then ended.

"**Cumulative Period**" shall mean the period from the Closing Date through the Saturday of the most recent week ended.

"**Cure Amount**" shall have the meaning given to such term in Section 9.1(d).

"**Cure Period**" shall have the meaning given to such term in Section 9.1(d).

"**Cure Right**" shall have the meaning given to such term in Section 9.1(d).

"**Daily Simple SOFR**" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Agent in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Agent decides that any such convention is not administratively feasible for the Agent, then the Agent may establish another convention in its reasonable discretion.

"**Debtor Relief Law**" shall mean, collectively, the Bankruptcy Code of the United States of America and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally, as amended and in effect from time to time.

"**Default**" shall mean any event, fact, circumstance or condition that, with the giving of applicable notice or passage of time or both, would constitute or be or result in an Event of Default.

"**Default Rate**" shall mean, at any time, with respect to any Loan or any other monetary Obligation, a rate per annum equal to the rate otherwise applicable thereto, plus two percent (2.00%) per annum.

"**Deposit Accounts**" shall mean "deposit accounts" as defined in Section 9-102 of the UCC.

"**Distribution**" shall mean any direct or indirect dividend, distribution or other payment of any kind or character (whether in cash, securities or other property) in respect of or in exchange for any equity interests or on account of any return of capital, or any option, warrant or other right to acquire any such dividend, distribution or other payment.

"**Division**" shall mean, in reference to any Person which is an entity, the division of such Person into two (2) or more separate Persons with the dividing Person either continuing or terminating its existence as part of the division including as contemplated under Section 18-217 of the Delaware Limited Liability Company Act for limited liability companies formed under Delaware law or any analogous action taken pursuant to any applicable law with respect to any corporation, limited liability company, partnership or other entity.  The word "**Divide**", when capitalized shall have correlative meaning.

"**Documents**" shall mean "documents" as defined in Section 9-102 of the UCC.

"**Dollars**" and the sign "**$**" each mean the lawful money of the United States of America.

"**Eligible Account Shortfall**" shall have the meaning given to such term in Section 9.1(c).

"**Eligible Accounts**" shall mean those accounts receivable created by the Borrower in the ordinary course of its business, arising from the Borrower's rendition of Services and which are considered by the Agent, in its commercially reasonable judgment, to be eligible.  Without limiting the generality of the foregoing, the following Accounts shall not be considered eligible:

(a)     such Accounts that are not subject to a valid perfected first priority security interest in favor of Agent;

(b)     such Accounts (other than any Eligible Unbilled Account) that are not evidenced by an invoice, statement or other documentary evidence satisfactory to Agent;

(c)     such Accounts or any portion thereof (in which case only such portion shall not be an Eligible Account) that is payable by a beneficiary, recipient or subscriber individually and not directly by a Third Party Payor acceptable to Agent;

(d)     such Account that arises out of Services rendered or a sale or lease made to, or out of any other transaction between any Borrower and one or more Affiliates of such Borrower;

(e)     such Account that remains unpaid for longer than two hundred seventy (270) days after the applicable Services have been rendered;

(f)     all Accounts owed by any particular Account Debtor or its Affiliates, if more than fifty percent of the aggregate balance of all such Accounts owing from such Account Debtor and its Affiliates remain unpaid for longer than two hundred seventy (270) days after the applicable Services have been rendered;

12

(g)     all Accounts owed by any particular Account Debtor or its Affiliates, if thirty-five percent or more of all such Accounts are deemed not to be Eligible Accounts for any reason hereunder (which percentage may, in Agent's sole discretion, be increased or decreased);

(i)     any covenant, agreement, representation or warranty contained in any Loan Document with respect to such Account has been breached and remains uncured and only to the extent thereof;

(j)     all Accounts where the Account Debtor for such Account has commenced a voluntary case under any Debtor Relief Law or has made an assignment for the benefit of creditors, or a decree or order for relief has been entered by a court having jurisdiction in respect of such Account Debtor in an involuntary case under any Debtor Relief Law, or any other petition or application for relief under any Debtor Relief Law has been filed against such Account Debtor, or such Account Debtor has failed, suspended business, ceased to be Solvent, called a meeting of its creditors, or has consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs;

(k)     all Accounts where the applicable Account Debtor for such Account is any Governmental Authority (including CMS);

(l)     all Accounts subject to any offset, credit (including any resource or other income credit or offset) deduction, defense, discount, chargeback, freight claim, allowance, adjustment, dispute or counterclaim, or is contingent in any respect or for any reason, and only to the extent thereof;

(m)     all Accounts where there is any agreement with an Account Debtor for any deduction from such Account, except for discounts or allowances made in the ordinary course of business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each invoice related thereto, such that only the discounted amount of such Account after giving effect to such discounts and allowances shall be considered an Eligible Account;

(n)     all Accounts where there has occurred any return, rejection or repossession of goods or Services related to such Account, but only to the extent thereof;

(o)     all Accounts which are not payable to the Borrower;

(p)     all Accounts where the Borrower has agreed to accept or has accepted any non-cash payment for such Account;

(q)     all Accounts arising from the performance of Services, if such Services have not been actually performed or the Services were undertaken in violation of any law; or

(r)     all Accounts which fail to meet such other specifications and requirements which may from time to time be established by Agent or is not otherwise satisfactory to Agent, as determined in Agent's sole discretion.

"**Eligible Assignee**" shall mean with respect to any Term Loan Commitment or Term Loan, a Person that is (i) a Lender, an Affiliate of such Lender or Approved Fund with respect to such Lender; (ii) any other entity approved in writing by the Agent.  Notwithstanding the foregoing, in no event shall an "Eligible Assignee" include (w) any Credit Party or any Subsidiary of any Credit Party, (x) any natural Person, (y) any holder of any Permitted Subordinated Debt, or (z) any Affiliate of any of the foregoing Persons in clauses (w) through (y).

"**Eligible Unbilled Account**" means an Account that otherwise constitutes an Eligible Account, except for which an invoice with respect to such Account has not been sent to the applicable third party Account Debtor, provided that such Account shall cease to constitute an Eligible Unbilled Account if an invoice with respect to such Account has not been sent to the applicable Account Debtor within fifteen (15) days following the discharge date of patient.

"**Environmental Laws**" shall mean any and all laws, rules, orders, regulations, statutes, ordinances, guidelines, codes, decrees, or other legally enforceable requirements of the United States, or any state, local, municipal, or other governmental authority, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment, or protection of human health or employee health and safety (as affected by the environment or by any substance the exposure to which is reasonably suspected of causing harm to human health), as has been, is now, or may at any time hereafter be, in effect.

"**Equipment**" shall mean "equipment" as defined in Section 9-102 of the UCC.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) under common control with any Credit Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" shall mean (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for thirty (30) day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Code), the failure to make by its due date any minimum required contribution or any required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by any Credit Party or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan in each case resulting in liability to any Credit Party or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which would reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on any Credit Party or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of any Credit Party or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any material liability therefor, or the receipt by any Credit Party or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on any Credit Party or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Plan; (ix) receipt from the IRS of written notice of the failure of any Pension Plan intended to be qualified under Section 401(a) of the Code to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any such plan to qualify for exemption from taxation under Section 501(a) of the Code; or (x) the imposition of a lien pursuant to Section 430(k) of the Code or pursuant to Section 303(k) or 4068 of ERISA or any violation of

14

Section 436 of the Code or Section 206(g) of ERISA.

"**Event of Default**" shall mean the occurrence of any event set forth in <u>Article X</u>.

"**Excluded Property**" shall mean the following:

(a)    any permit, license, instrument, lease or any contractual obligation entered into by any Credit Party (i) that prohibits or requires the consent of any Person (other than any Credit Party or any Affiliate thereof), which consent has not been obtained, as a condition to the creation by such Credit Party of a security interest on any right, title or interest in such permit, license, instrument, lease or contractual obligation or (ii) to the extent that any applicable law prohibits the creation of a security interest in such permit, license, instrument, lease or contractual obligation, (in each case, other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law or principles of equity, in each case, to the extent applicable);

(b)    any lease (including any lease of real estate), license or other agreement or contract or any property subject to a purchase money security interest, Capital Lease or similar arrangement permitted under the Loan Documents to the extent and for so long as the creation of a security interest therein or thereon would violate or invalidate such lease, license or agreement or contract or purchase money security interest, Capital Lease or similar arrangement or create a right of termination in favor of any other party thereto (other than any Credit Party or Affiliate thereof) (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law or principles of equity, in each case, to the extent applicable);

<u>provided</u>, <u>however</u>, that "Excluded Property" shall not include the right to receive any proceeds arising therefrom or any other rights referred to in Sections 9-406(f), 9-407(a) or 9-408(a) of the UCC or any proceeds, substitutions or replacements of any Excluded Property (unless such proceeds, substitutions or replacements would otherwise constitute Excluded Property).

"**Extraordinary Receipt**" shall mean any cash received by or paid to or for the account of any Person not in the ordinary course of business, including (a) pension plan reversions, (b) proceeds of insurance (including any representations and warranty insurance), (c) condemnation awards (and payments in lieu thereof), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than, for the avoidance of doubt, judgments, proceeds of settlement or other consideration arising from collection actions with respect to Accounts undertaken in the ordinary course of business), (e) [Reserved], and (f) any purchase price adjustments in connection with any purchase agreement; it being understood that in no event shall cash collateral returned to the Credit Parties by letter of credit issuers in connection with the reduction, replacement or cancellation of any letter of credit, or a reduction in the amount of cash collateral required to be maintained with respect to any letter of credit constitute an Extraordinary Receipt.

"**Federal and State Fraud and Abuse Laws**" shall include, but not be limited to, the Federal Anti-Kickback Statute, the Stark Law, the Civil False Claims Act as set forth at 31 U.S.C. §3729 et seq., the Civil Monetary Penalties Law as set forth at 42 U.S.C. §1320 a-7a, the anti-fraud provisions within HIPAA, as well as any other federal or state laws (whether criminal, civil or administrative) addressing fraud and abuse related to the provision of or billing related to health care goods and services.

"**Federal Anti-Kickback Statute**" shall mean 42 U.S.C. §1320 a-7b and any regulations promulgated thereunder.

"**Federal Healthcare Program**" shall be as defined in 42 U.S.C. §1320a-7b(f).

"**Fiscal Year**" means a Fiscal Year of the Borrowers, ending on December 31 of each calendar year.

"**Fixtures**" shall mean "fixtures" as defined in Section 9-102 of the UCC.

"**Floor**" means a rate of interest equal to 3.00% per annum.

"**GAAP**" shall mean generally accepted accounting principles in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**General Intangibles**" shall mean "general intangibles" as defined in Section 9-102 of the UCC.

"**Goods**" shall mean "goods" as defined in Section 9-102 of the UCC.

"**Governmental Authority**" shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

"**Guarantor**" shall mean, collectively and each individually, all existing and future direct and indirect subsidiaries of each Borrower, and all other guarantors of the Obligations from time to time or any part thereof.

"**Health Care Insurance Receivables**" shall mean "health care insurance receivables" as defined in Section 9-102 of the UCC.

"**Healthcare Laws**" shall mean all applicable statutes, laws, ordinances, rules and regulations of any Governmental Authority with respect to regulatory matters relating to the operation of hospitals or other healthcare operations of the Credit Parties, in each case as may be amended from time to time, including without limitation; (i) the Federal Medicare and Medicaid statutes (set forth generally at 42 U.S.C. §§ 1395 and 1396 et seq., respectively); (ii) the Federal CHAMPUS/TRICARE statutes (set forth generally at 10 U.S.C. §§ 1071-1106), (iii) the CHAMPVA statutes (set forth generally at 38 U.S.C. § 1713), (iv) Federal and State Fraud and Abuse Laws, (v) Federal anti-assignment laws (including but not limited to anti-assignment provisions set forth at 42 U.S.C. §§ 1395g(c), 1395u(b)(6), 1396a(a)(32), 32 C.F.R. 199.7(j), and 42 C.F.R. §§ 424.73, 424.80, 447.10); (vi) HIPAA; (vii) the Controlled Substances Act and all applicable requirements, regulations and guidances issued thereunder by the United States Department of Justice Drug Enforcement Administration; (viii) quality, safety and accreditation standards of applicable Governmental Authorities; all applicable licensure laws and regulations, including all such laws pertaining to Permits; (ix) all applicable professional standards regulating healthcare providers, healthcare professionals, healthcare facilities or mental health treatment centers; each of (i) through (ix) as may be amended from time to time.

16

"**Healthcare Professional**" shall mean health care professionals employed by, or independent contractors to, the Credit Party who provide professional healthcare services to hospitals or other healthcare operations of the Credit Parties' business.

"**HIPAA**" shall mean the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191) and the regulations promulgated thereunder as amended by the Health Information Technology for Economic and Clinical Health Act (Title XII) of the American Recovery and Reinvestment Act of 2009 (the "HITECH Act") and security and data breach notification regulations.

"**Hospital**" shall mean, individually or collectively, the hospitals located at (a) 176 Palisade Avenue, Jersey City, New Jersey 07306, known as CarePoint Health – Christ Hospital and which is operated by Christ Opco and (b) 308 Willow Ave, Hoboken, NJ 07030, known as CarePoint Health – Hoboken University Medical Center.

"**HRH**" means, collectively, Hudson Regional Hospitals, LLC, 29 E. 29 Street Holdings, LLC, Bayonne Medical Center Opco LLC and each of their Affiliates.

"**HRH Facility**" means, collectively, that certain [insert HRH Facility Description], and the other "Loan Documents" as defined thereunder, each as amended, restated, supplemented or otherwise modified from time to time.

"**HRH Subordination Agreement**" means that certain Subordination and Intercreditor Agreement, dated as of the Closing Date, by and among Agent, HRH, the Credit Parties, and the Affiliates of the Credit Parties party thereto as "Company Parties".

"**HUMC Loan Agreement**" that certain Amended and Restated Loan and Security Agreement, dated as of August 8, 2019, by and among HUMC Opco, HUMC Parent, the lenders from time to time party thereto, and Capitala, in its capacity as administrative agent and collateral agent for the lenders, mended, restated, supplemented or otherwise modified from time to time.

"**HUMC Loan Documents**" the "Loan Documents" as defined in the HUMC Loan Agreement.

"**HUMC Opco**" shall have the meaning given to such term in the Preamble to this Agreement.

"**HUMC Parent**" shall have the meaning assigned in the Preamble to this Agreement.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit or bankers acceptances, (c) all Capitalized Lease Obligations, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person or its Subsidiaries, irrespective of whether such obligation or liability is assumed, (e) all obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and not outstanding more than one hundred and eighty (180) calendar days after the date such payable was created or such longer period contemplated in any Vendor Payables Arrangement applicable to such payable), (f) all net obligations owing to counterparties under any hedging or swap agreements, (g) all obligations with respect to redeemable Capital Stock or repurchase obligations under any Capital Stock issued by such Person, (h) the present value of future rental payments under all synthetic leases and the principal amount outstanding under any off-balance sheet loan or similar off-balance sheet financing product, and (i) any obligation guaranteeing or intended to guarantee (whether directly or

17

indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of <u>clauses (a)</u> through <u>(h)</u> above.

"**Indemnified Persons**" shall have the meaning given to such term in <u>Section 15.5.</u>

"**Instrument**" shall mean "instrument" as defined in Section 9-102 of the UCC.

"**Insured Event**" shall have the meaning given to such term in <u>Section 15.5.</u>

"**Insurer**" shall mean a Person that insures another Person against any costs incurred in the receipt by such other Person of Services, or that has an agreement with any Credit Party to compensate it for providing Services to such Person.

"**Intellectual Property**" shall mean any and all worldwide industrial, proprietary, and intellectual property rights (including all common law and statutory rights, registrations and applications therefor, and renewals, extensions, and restorations thereof, as applicable), of every kind and nature, whether existing now or in the future, including but not limited to: (a) trademarks, service marks, corporate names, trade names, trade dress, slogans, brand names, designs and logos, including all applications and registrations related to the foregoing, together with the goodwill of the business connected with the use of, and symbolized by, the foregoing; (b) copyrights or similar rights in works of authorship, including all applications and registrations related to the foregoing, works of authorship, files, data, databases, algorithms, firmware, software, code, programming, and documentation; (c) trade secrets, confidential information, proprietary information, inventions, discoveries, concepts, designs, technology, formulae, algorithms, know-how, techniques, prototypes, specifications, materials, compositions, devices, methods, procedures, processes, ideas, improvements and compilations of information (whether or not patentable and whether or not reduced to practice); (d) patents, patent rights and patent applications, including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof; (e) internet domain names, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media companies and the content found thereon and related thereto, and URLs; (f) licenses to the foregoing; (g) all contents, embodiments, adaptations, derivations, improvements, and versions of the foregoing, and the unencumbered right to exercise such rights in all media and by any manner or means, whether now or hereafter devised; (h) any and all royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (i) any and all claims and causes of action with respect to any of the foregoing, including all rights to and claims for damages, restitution and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach or default, with the right to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

"**Interest Payment Date**" shall mean the last Business Day of each fiscal quarter and on the Maturity Date.

"**Interest Period**" means each period commencing on the first day of each calendar month through the last day of such calendar month; <u>provided</u>, that the first Interest Period hereunder shall be a period commencing on the Closing Date through November 30, 2022.

"**Inventory**" shall mean "inventory" as defined in Section 9-102 of the UCC.

"**Investment Property**" shall mean "investment property" as defined in Section 9-102 of the UCC.

"**KPI Report**" shall mean the key performance indicator report, substantially in the form

18

of Exhibit F, or such other form as may be approved by the Agent.

"**Labor Contracts**" shall have the meaning given to such term in Section 7.12(c).

"**Lender**" or "**Lenders**" shall have the meaning assigned to such terms in the Preamble to this Agreement and shall include each Person who becomes a transferee, successor or assign of any Lender.

"**Letter-of-Credit Rights**" shall mean "letter-of-credit rights" as defined in Section 9-102 of the UCC.

"**Liability Event**" shall mean any event, fact, condition or circumstance or series thereof (a) in or for which any Credit Party becomes liable or otherwise responsible for any amount owed or owing to any Medicaid, Medicare or CHAMPUS/TRICARE program by a provider under common ownership with such Credit Party or any provider owned by such Credit Party pursuant to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority after the failure of any such provider to pay any such amount when owed or owing in excess of $50,000, (b) in which Medicaid, Medicare or CHAMPUS/TRICARE payments to any Credit Party is lawfully set-off against payments to such Credit Party to satisfy any liability of or for any amounts owed or owing to any Medicaid, Medicare or CHAMPUS/TRICARE program by a provider under common ownership with such Credit Party or any provider owned by such Credit Party pursuant to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority in excess of $50,000, or (c) any of the foregoing under clauses (a) or (b) in each case pursuant to statutory or regulatory provisions that are similar to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority referenced in clauses (a) and (b) above or successor provisions thereto.

"**Lien**" shall mean any mortgage, pledge, security interest, encumbrance, restriction, lien or charge of any kind (including any agreement to give any of the foregoing, any consignment, conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes.

"**Loan**" or "**Loans**" shall mean, individually and collectively, all loans and other advances made by the Lenders under this Agreement, including the Term Loans.  Any amounts paid by the Agent or the Lenders on behalf of any Borrower under any Loan Document shall be a Loan for purposes of this Agreement.

"**Loan Documents**" shall mean, collectively and each individually, this Agreement, the Notes, the Approved Budget, each Approved Budget Variance Report, each Compliance Certificate, the Solvency Certificate, the Closing Certificate, each Borrowing Base Certificate, the HRH Subordination Agreement, the MSO Pledge Agreement and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to, or on behalf of, the Agent and/or the Lenders in connection with this Agreement or the Loans, as the same may be amended, modified or supplemented from time to time.

"**Major Casualty Proceeds**" means (a) the aggregate insurance proceeds received in cash in connection with one or more related events under any property insurance policy or business interruption insurance policy or (b) any award or other compensation received in cash with respect to any eminent domain, condemnation of property or similar proceedings (or any transfer or disposition of property in lieu of condemnation), if the amount of such aggregate insurance proceeds or award or other compensation exceeds $100,000, in each case, less (i) any out-of-pocket fees, costs and expenses reasonably incurred by a Credit Party or any Subsidiary in connection therewith, (ii) the amount of any Indebtedness secured by a Lien on the related asset and discharged from the proceeds of such event, (iii) any taxes paid or reasonably

19

estimated by the applicable Credit Party or any of its Subsidiaries to be payable by such Person as a consequence of such event (<u>provided</u>, that if the actual amount of taxes actually paid is less than the estimated amount, the difference shall immediately constitute Major Casualty Proceeds) and (iv) the amount of any reserve established in accordance with GAAP (<u>provided</u> that such reserved amounts shall be Major Casualty Proceeds to the extent and at the time of any reversal (without the satisfaction of any applicable liabilities in a corresponding amount) of any such reserve).

"**Management or Service Fee**" shall mean any management, service or related or similar fee paid by any Credit Party to any Person with respect to any facility owned, operated or leased by such Credit Party.

"**Management Services Agreement**" shall mean, that certain Management Services Agreement, dated as of October 9, 2024, by and among the Credit Parties and their Affiliates party thereto, the other Captive Practices party thereto, and HRH, as amended, restated, supplemented or otherwise modified from time to time.

"**Material Adverse Change**" shall mean any event, condition or circumstance or set of events, conditions or circumstances or any change(s) which (i) has, had or would reasonably be likely to have any adverse effect upon or change in the validity or enforceability of any Loan Document, (ii) has been or would reasonably be expected to be materially adverse to the value of any material portion of the Collateral, or to the priority of Agent's security interest in any portion of the Collateral, (iii) has been or would reasonably be expected to be materially adverse to the business, operations, prospects, properties, assets, liabilities or financial condition of any Credit Party, or (iv) has impaired or would reasonably be likely to materially impair the ability of the Credit Parties to pay any portion of the Obligations or otherwise perform the Obligations or to consummate the transactions under the Loan Documents executed by such Person.

"**Material Contract**" shall mean, with respect to any Credit Party or any Subsidiary of a Credit Party, (a) any document or agreement relating to or evidencing Indebtedness in a principal amount exceeding $250,000, (b) the Management Services Agreement, (c) each Christ Lease Document, and (d) each other contract, license, or instrument to which such Person is a party (or is otherwise bound) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to result in a Material Adverse Change.

"**Materials of Environmental Concern**" shall mean any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity, and any other substances or forces of any kind, whether or not any such substance or force is defined as hazardous or toxic under any Environmental Law, that is regulated pursuant to or would reasonably be expected to give rise to liability under any Environmental Law.

"**Maturity Date**" shall mean the earliest to occur of (a) September [▮], 2025,[1] and (b) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) in accordance with Article X.

"**Medicaid**" shall mean, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§l396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, authoritative manuals, orders, authoritative guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended,

---

[1] NTD:  To be 6 months from the Effective Date.

supplemented or otherwise modified from time to time.

"**Medicaid Certification**" shall mean certification of a facility by CMS or a state agency or entity under contract with CMS that such healthcare facility fully complies with all conditions for such facility's participation in Medicaid.

"**Medicaid Provider Agreement**" shall mean an agreement entered into between a state agency or other entity administering Medicaid in such state and a health care facility or physician under which the health care facility or physician agrees to provide services or merchandise for Medicaid patients.

"**Medicaid/Medicare Account Debtor**" shall mean any Account Debtor which is (i) the United States of America acting under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including, without limitation, TRICARE (f/k/a CHAMPUS), (ii) any state or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act or any other state health care program, or (iii) any agent, carrier, administrator or intermediary for any of the foregoing.

"**Medicaid/Medicare Receipts Account**" shall mean each Deposit Account of the Credit Parties in which proceeds from any Medicaid/Medicare Account Debtor or otherwise due under any Medicaid Provider Agreement, Medicare Provider Agreement, or other Medical Reimbursement Program are initially deposited, provided that, in each case, such accounts shall only contain the proceeds received by the Credit Parties from any Medicare Provider Agreement, Medicaid Provider Agreement or other similar Medical Reimbursement Program.

"**Medical Reimbursement Programs**" shall mean the Medicare, Medicaid, CHAMPUS / TRICARE or CHAMPVA programs and any other health care programs operated by or financed in whole or in part by any foreign or domestic federal, state or local government and any other non-government funded third party payor programs.

"**Medicare**" shall mean, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, authoritative manuals, orders or authoritative guidelines (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"**Medicare Certification**" shall mean certification of a facility by CMS or a state agency or entity under contract with CMS that such healthcare facility fully complies with all conditions for such facility's participation in Medicare.

"**Medicare Provider Agreement**" shall mean an agreement entered into between a state agency or other entity administering Medicare in such state and a health care facility or physician under which the health care facility or physician agrees to provide services or merchandise for Medicare patients.

"**MSO**" shall have the meaning provided to such term in the Bankruptcy Plan.

"**MSO Pledge Agreement**" means that certain [MSO Pledge Agreement], dated as of the Closing Date, pursuant to which the Agent, for the benefit of the Lenders, receives a pledge and grant of a first-priority lien on the management fees payable under the Management Services Agreement (excluding, for the avoidance of doubt, amounts in respect of out-of-pocket expense reimbursement).

"**Multiemployer Plan**" shall mean any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Credit Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six (6) years, has made or been obligated to make any contributions.

"**Multiple Employer Plan**" shall mean a Pension Plan which has two or more contributing sponsors (including any Credit Party or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"**Net Cash Proceeds**" shall mean, (a) with respect to any sale, lease, transfer or other disposition of assets by any Person or any Extraordinary Receipt, the amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person in connection therewith after deducting therefrom (i) the amount of any Permitted Indebtedness secured by any Permitted Lien on such property which is required to be, and is, repaid in connection therewith, (ii) reasonable expenses related thereto incurred by such Person in connection therewith, (iii) transfer taxes paid to any taxing authorities by such Person in connection therewith, (iv) net income taxes to be paid in connection with such disposition, and (v) with respect to any lease, the cost of any tenant improvements paid by any Credit Party in connection therewith, and (b) with respect to the incurrence or issuance of any Indebtedness by the Credit Parties or any of their Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Credit Party or such Subsidiary in connection therewith.

"**Non-Consenting Lender**" shall have the meaning given to such term in Section 15.1(c).

"**Non-Wholly Owned Subsidiary**" means any direct or indirect Subsidiary of a Borrower which is not a Wholly Owned Subsidiary of such Borrower.

"**Note**" or "**Notes**" shall mean any promissory note or notes issued pursuant to Section 2.6, each in form and substance reasonably acceptable to Agent.

"**Obligations**" shall mean all present and future obligations, Indebtedness and liabilities of the Credit Parties to Agent or any Lender at any time and from time to time of every kind, nature and description (including, without limitation, with respect to any Loan), whether direct or indirect, secured or unsecured, joint and several, absolute or contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, (whether or not evidenced by a Note), including, without limitation, all principal, interest, applicable fees, charges and expenses, premiums, and all amounts paid or advanced by the Agent on behalf of or for the benefit of any Credit Party for any reason at any time, including in each case obligations of performance as well as obligations of payment and interest that accrue after the commencement of any proceeding under any Debtor Relief Law by or against any such Person, regardless of whether claims with respect thereto are allowed in such proceeding under Debtor Relief Laws.

"**OFAC**" shall mean the U.S. Department of Treasury's Office of Foreign Asset Control.

"**OIG**" shall mean the Office of Inspector General of the U.S. Department of Health and Human Services.

"**Paid in Full**" and "**Payment in Full**" mean, with respect to the Obligations, all amounts owing with respect thereto (including any interest accruing thereon after the commencement of any proceeding under any Debtor Relief Law by or against any Credit Party, whether or not allowed as a claim

against such Credit Party in such proceeding, but excluding contingent obligations as to which no claim has been asserted in writing), have been fully, finally and completely paid in cash.  No Loans shall be deemed to have been paid in full until all commitments related to such Loans have expired or been terminated.

"**Parent**" means, individually and collectively, HUMC Parent and Christ Parent.

"**Participant**" shall have the meaning given to such term in Section 15.3(d).

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

"**Payment Intangible**" shall mean "payment intangible" as defined in Section 9-102 of the UCC.

"**Pension Plan**" means any employee pension benefit plan (including a Multiemployer Plan or Multiple Employer Plan) within the meaning of Section 3(2) of ERISA.

"**Periodic Term SOFR Determination Day**" has the meaning specified in the definition of "Term SOFR".

"**Permit**" shall mean collectively all licenses, leases, powers, permits, franchises, certificates, authorizations, approvals, certificates of need, provider numbers and other rights.

"**Permitted Indebtedness**" shall mean any of the following:

(a)	Indebtedness under the Loan Documents;

(b)	any Indebtedness set forth on Schedule 9.2;

(c)	Capitalized Lease Obligations incurred after the Closing Date and Indebtedness incurred to purchase Goods and secured by purchase money Liens constituting Permitted Liens, provided that the aggregate amount thereof outstanding at any time shall not exceed $10,000,000 (exclusive of Capitalized Lease Obligations arising under the Christ Lease Agreement);

(d)	(i) any account payable to a trade creditor and current operating expenses (other than for borrowed money) which are not outstanding more than one hundred and eighty (180) calendar days after the date such payable or operating expense was created or incurred or such longer period contemplated in any Vendor Payables Arrangement applicable to such payable or more than 30 days from the due date, in each case, incurred in the ordinary course of business and paid within such time period, unless the same are being contested in good faith by appropriate and lawful proceedings (which proceedings have the effect of preventing the forfeiture or sale of any property or assets) and with respect to which adequate reserves are being maintained by such Person in accordance with GAAP to the reasonable satisfaction of the Agent and (ii) [Reserved];

(e)	unsecured Indebtedness incurred in the ordinary course of business and not exceeding $250,000 at any time outstanding, so long as such Indebtedness is subordinated in right of repayment and remedies to all of the Obligations and to all of the Agent's rights and is otherwise on terms satisfactory to the Agent;

(f)	Permitted Subordinated Debt;

23

(g)    Indebtedness in respect of reimbursement obligations in favor of any issuer of letters of credit issued for the account of the Borrowers and their Subsidiaries in an aggregate amount at any time outstanding not to exceed the lesser of (i) $4,000,000 (or such greater amount as the Agent may approve in writing in its sole discretion) and (ii) 105% of the aggregate stated amount of all such outstanding letters of credit;

(h)    [Reserved];

(i)    [Reserved];

(j)    [Reserved];

(k)    [Reserved];

(l)    [Reserved]; and

(m)    [Reserved].

"**Permitted Liens**" shall mean any of the following:

(a)    Liens under the Loan Documents or otherwise arising in favor of the Agent;

(b)    Liens imposed by law for taxes (other than payroll taxes), assessments or charges of any Governmental Authority for claims not yet due or which are being contested in good faith by appropriate and lawful proceedings (which proceedings have the effect of preventing the forfeiture or sale of any property or assets subject to any such Lien) and with respect to which adequate reserves are being maintained by such Person in accordance with GAAP to the reasonable satisfaction of the Agent;

(c)    (i) statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen (provided that any such Person holding such Lien has executed a Collateral Access Agreement in form and substance satisfactory to the Agent), and (ii) other Liens imposed by law or that arise by operation of law in the ordinary course of business from the date of creation thereof, in each case only for amounts not yet due or which are being contested in good faith by appropriate and lawful proceedings (which proceedings have the effect of preventing the forfeiture or sale of any property or assets) and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the reasonable satisfaction of the Agent;

(d)    Liens (i) incurred or deposits made in the ordinary course of business (including, without limitation, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations (other than any Lien imposed by ERISA), or (ii) arising as a result of progress payments under government contracts;

(e)    purchase money Liens securing Permitted Indebtedness of the type described in clause (c) of the definition of "Permitted Indebtedness"; provided that (i) such Lien attaches to the property financed by such Indebtedness concurrently or within 90 days after the acquisition thereof, and (ii) such Lien does not at any time encumber any property other than the property financed by such Indebtedness;

(f)    Liens set forth on Schedule 7.4(b) and Schedule 9.3;

(g)    Liens on cash posted as cash collateral in favor of any issuer of letters of credit issued for the account of the Borrowers or their Subsidiaries securing reimbursement obligations permitted under clause (g) of the definition of Permitted Indebtedness, including Liens evidenced by pledge agreements and control agreements relating to such cash collateral; provided that the amount of cash collateral subject to such Liens shall not exceed the amount of reimbursement obligations permitted to be incurred under clause (g) of the definition of Permitted Indebtedness;

(h)    Liens on the Collateral in favor of HRH pursuant to the HRH Facility, so long as such Liens are subject to the HRH Subordination Agreement;

(i)    [reserved];

(j)    Liens arising from precautionary UCC filings relating to operating leases;

(k)    to the extent constituting Liens, licenses, sublicenses, leases or subleases granted in the ordinary course of business with respect to real property;

(l)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(m)    Liens arising by virtue of statutory or common law provisions relating to banker's Liens, Liens in favor of securities intermediaries, rights of set off or similar rights and remedies with respect to deposit accounts or securities accounts or other funds or assets maintained with depository institutions and securities intermediaries;

(n)    any interest or title of a lessor, sublessor, licensor or sublicensor under leases, subleases, licenses or sublicenses (including software and other technology licenses) entered into by any Borrower or any of their respective Subsidiaries in the ordinary course of business;

(o)    easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of any Borrower or any of their respective Subsidiaries;

(p)    [Reserved]; and

(q)    [Reserved].

"**Permitted Subordinated Debt**" shall mean (a) Indebtedness arising under the HRH Facility in an aggregate principal amount not to exceed the amount permitted by the HRH Subordination Agreement including extensions and refinances thereof to the extent permitted by the HRH Subordination Agreement; and (b) any other Indebtedness incurred by any Credit Party that is subordinated to the Obligations on terms satisfactory to the Agent pursuant to a written agreement approved by the Agent in writing.

"**Permitted Tax Distributions**" shall mean (a) "Tax Distributions" (as defined in that certain Second Amendment to Operating Agreement of the Christ Opco, as amended, restated, supplemented, or otherwise modified from time to time), to the extent permitted by Section 4.3 of the Second Amendment to Operating Agreement of Christ Opco as in effect on the date hereof, and (b) shall mean "Tax Distributions" (as defined in that certain Limited Liability Company Agreement of HUMC Opco, dated as of March 1, 2012, as amended, restated, supplemented, or otherwise modified from time to

25

time), to the extent permitted by Section 5.3 of the HUMC Opco Operating Agreement as in effect on the date hereof.

"**Person**" shall mean an individual, a partnership, a corporation, a limited liability company, a business trust, a joint stock company, a trust, an unincorporated association, a joint venture, a Governmental Authority or any other entity of whatever nature.

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 307 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Prior Week**" shall mean, as of any date of determination, the immediately preceding week ended on a Saturday and commencing on the prior Sunday.

"**Receipt**" shall have the meaning given to such term in Section 15.6.

"**Register**" shall have the meaning given to such term in Section 2.6(b).

"**Released Parties**" shall have the meaning given to such term in Section 15.12.

"**Releasing Parties**" shall have the meaning given to such term in Section 15.12.

"**Relevant Governmental Body**" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"**Reports**" shall have the meaning given to such term in Section 14.11(a).

"**Required Lenders**" shall mean, (a) Capitala, for so long as it is a Lender, and (b) Lenders holding more than 50% of the aggregate outstanding principal amount of the Term Loans.

"**Responsible Officer**" shall mean the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of the Borrower or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of the Borrower as an authorized signatory of any certificate or other document to be delivered hereunder.  Any document delivered hereunder that is signed by a Responsible Officer of the Borrower shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Borrower.

"**Restricted Persons**" means, collectively, (a) each Non-Wholly Owned Subsidiary, and (b) each Person, other than a Subsidiary, in which any Credit Party or any of its direct or indirect Subsidiaries owns directly or indirectly any Capital Stock (including any joint venture).

"**Restructuring and Asset Transfer Transactions**" shall have the meaning assigned in the Recitals.

"**Services**" shall mean medical and health care services provided to a Person, including, but not limited to, medical and health care services which are covered by a policy of insurance issued by an Insurer, physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home health care services, residential

and out-patient behavioral healthcare services.

"**Software**" shall mean "software" as defined in Section 9-102 of the UCC.

"**Solvency Certificate**" shall mean a Solvency Certificate substantially in the form of Exhibit D.

"**Solvent**" shall mean, with respect to any Person as of any date of determination, that, on and as of such date, such Person has the ability to continue as a going concern.

"**Specified Cash Contribution**" shall have the meaning given to such term in Section 9.1(d).

"**Subordination Agreement**" shall mean, collectively and each individually, any subordination agreements to which the Agent and other service providers or creditors of any Borrower are a party and which are in form and substance reasonably satisfactory to the Agent, including, without limitation, the HRH Subordination Agreement.

"**Subordination Provisions**" shall have the meaning given to such term in clause (q) of Article X.

"**Subsidiary**" shall mean, (i) as to any Credit Party, any Person in which more than fifty percent of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Credit Party or one or more of its Subsidiaries, and (ii) as to any other Person, any Person in which more than fifty percent of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Person or by one or more of such Person's Subsidiaries.

"**Supporting Obligations**" shall mean "supporting obligations" as defined in Section 9-102 of the UCC.

"**Term**" shall mean the period commencing on the Closing Date and ending on the Maturity Date.

"**Term Loan**" or "**Term Loans**" shall mean, individually and collectively, all loans and other advances made by the Lenders pursuant to Section **Error! Reference source not found.**.

"**Term Loan Commitment**" shall have the meaning set forth in Section 2.1(a).

"**Term SOFR**" means, for any Interest Period, the greater of (a) 3.00% per annum and (b) the sum of (i) forward-looking term rate based on SOFR (the "**Term SOFR Reference Rate**") for a tenor of 1 month on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator plus (ii) 0.10% (10 basis points); provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government

Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.  The Agent's determination of the Term SOFR shall, absent manifest error, be presumed correct.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Agent in its reasonable discretion).

"**Third Party Payor**" means (a) a commercial medical insurance company, health maintenance organization, professional provider organization or other third party payor that reimburses providers for Medical Services provided to individual patients, (b) a nonprofit medical insurance company (such as the Blue Cross, Blue Shield entities), and (c) a government Account Debtor making payments under a Medical Reimbursement Program.

"**Transactions**" shall mean, collectively, (a) the execution and delivery by the Credit Parties and the other parties thereto of the Loan Documents to which they are a party and the making of the Term Loans on the Closing Date, and (b) the payment of fees and expenses in connection with the foregoing.

"**UCC**" shall mean the Uniform Commercial Code as in effect in the State of New York from time to time; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, to the extent the law of any other state or other jurisdiction applies to the attachment, perfection, priority or enforcement of any Lien granted to the Agent in any of the Collateral, "UCC" means the Uniform Commercial Code as in effect in such other state or jurisdiction for purposes of the provisions hereof relating to such attachment, perfection, priority or enforcement of a Lien in such Collateral.  To the extent this Agreement defines the term "Collateral" by reference to terms used in the UCC, each of such terms shall have the broadest meaning given to such terms under the UCC as in effect in any state or other jurisdiction.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"**Vendor Payables Arrangement**" shall mean a written or verbal agreement with a trade creditor, whether in the form of a note or other agreement, providing for extended payment terms, which written or verbal agreement shall be on terms satisfactory to the Agent.

"**Wholly Owned Subsidiary**" means any direct or indirect Subsidiary of a Borrower, all of the Capital Stock of which is owned by such Borrower directly and/or through other Wholly Owned Subsidiaries of such Borrower.

1.3    Rates.  The Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to Term SOFR or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Agent and its affiliates or other related entities may engage in transactions that affect the calculation of Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The

Agent may select information sources or services in its reasonable discretion to ascertain Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## II.    TERM LOAN FACILITIES AND PAYMENTS AND PREPAYMENTS

2.1    <u>Term Loan Facility</u>.

(a)    *The Term Loans.*  Upon the terms and subject to the conditions set forth herein, and in reliance upon the representations and warranties of the Credit Parties contained herein, each Lender, severally and not jointly with any other Lender, agrees that all of the Converted Obligations held by it immediately prior to the effectiveness of the Bankruptcy Plan on the Closing Date shall be converted on a dollar-for-dollar basis to a term loan to the Borrowers hereunder, in the amount set forth opposite such Lender's name in <u>Schedule 2.01(a)</u> under the heading "Loan Commitments" (such commitments, the "**Term Loan Commitments**").  The Term Loan Commitments on the Closing Date (immediately prior to such conversion) are $[_____].  The Term Loan Commitments shall expire upon the conversion of the Converted Obligations into the Term Loans by the Lenders.  Once repaid, whether such payment is voluntary, scheduled or mandatory, no portion of the Term Loans may be reborrowed.

(b)    *Several Liability*. The obligations of the Lenders under this Agreement (including pursuant to this <u>Section 2.1</u>) to make Loans are several and not joint.

(c)    Notwithstanding anything to the contrary herein or in any Loan Document, in any case, (x) the aggregate principal amount of deemed borrowing of Term Loans hereunder shall not exceed such Lender's portion of the Term Loan Commitment then in effect and (y) the aggregate amount of all Term Loans of all Lenders converted under this <u>Section 2.1</u> shall not exceed the Term Loan Commitment.

2.2    <u>Term Loan Disbursements</u>.  The disbursement of the Term Loans shall be a deemed disbursement that shall effectuate a cashless conversion of the Converted Obligations into the Obligations.

2.3    <u>Repayment and Prepayments; Promise to Pay; Manner of Payment</u>.

(a)    *Repayments*.

(i)    All of the Obligations (including all accrued and unpaid interest and fees) shall be due and payable in full in cash, if not earlier in accordance with this Agreement, on the Maturity Date.

(ii)    All repayments pursuant to this <u>Section 2.3</u> shall be made without premium or penalty.

(b)    *Optional Prepayments*.

(i)    The Borrowers may, upon irrevocable notice from the Administrative Borrower to the Agent, from time to time voluntarily prepay Term Loans in whole or in part; <u>provided</u> that (x) such notice must be received by the Agent not later than 2:00 p.m., three (3) Business Days prior to the date of such prepayment and (y) such prepayment shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof (or, if less, the remaining outstanding principal amount of the Term

Loans, as applicable).  For the avoidance of doubt, the limitations set forth in clause (y) of the preceding sentence apply only to voluntary prepayments, and not to mandatory prepayments required to be made pursuant to Section 2.3(c).

(ii)    Each notice of prepayment shall specify the prepayment date and the principal amount of the Term Loans (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrowers to prepay the Term Loans (or portion thereof) by the amount stated therein on the date stated therein; provided, however, that if such prepayment is for all of the then outstanding Term Loans, then the Borrowers may revoke such notice and/or extend the prepayment date by not more than five Business Days upon prior written notice to the Agent of such revocation or extension no later than 2:00 p.m., on the date of such prepayment.  All prepayments under this Section 2.3(b) shall be without premium or penalty (except as set forth herein).  All prepayments under this Section 2.3(b) shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(iii)    [Reserved].

(c)    *Mandatory Prepayments*.  There shall become due and payable and Borrowers shall prepay the Term Loans in the following amounts and at the following times, and, in each case, subject to Section 2.3(c)(x):

(i)    Casualty and Other Insurance Proceeds.  Within five (5) Business Days after any Credit Party or any Subsidiary (or Agent as loss payee or assignee) receives any Major Casualty Proceeds, an amount equal to one hundred percent (100%) of such Major Casualty Proceeds; provided that so long as no Default or Event of Default has occurred and is continuing on the date such Credit Party or any of its Subsidiaries receives such Major Casualty Proceeds and at all times thereafter until such time as such amounts have been reinvested as described below, the recipient (other than Agent) of any Major Casualty Proceeds may (i) reinvest the amount of any such Major Casualty Proceeds within one hundred eighty (180) days of the receipt thereof or (ii) enter into a binding commitment within one hundred eighty (180) days of the receipt thereof and, in such event, reinvest such Major Casualty Proceeds within three hundred sixty-five (365) days after receipt thereof, in each case, in replacement assets of a kind then used or usable in the business of such recipient; provided that such replacement assets may consist of Inventory solely to the extent that the Major Casualty Proceeds consist of proceeds of Inventory; provided, that if the recipient does not intend to fully reinvest such Major Casualty Proceeds, or if the time periods set forth in this sentence expire without such recipient having reinvested such Major Casualty Proceeds, Borrowers shall prepay the Term Loans in an amount equal to such Major Casualty Proceeds (to the extent not reinvested or intended to be reinvested within such time period).

(ii)    Debt and Equity Proceeds.  Within two (2) Business Days (or immediately in the case of any incurrence of any Indebtedness that is not Permitted Indebtedness) after (x) any Credit Party or any Subsidiary receives the proceeds from the incurrence of Indebtedness (other than proceeds from the incurrence of Permitted Indebtedness), Borrowers shall prepay the Term Loans in an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such incurrence, and (y) any Credit Party or any Subsidiary of any Credit Party receives proceeds (i) from the issuance of Capital Stock or (ii) from a public offering of Capital Stock pursuant to a registration statement filed with the Securities and Exchange Commission or any successor or similar Governmental Authority, Borrowers shall prepay the Term Loans in an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such issuance or sale.

(iii)    Disposition Proceeds.  Within two (2) Business Days after any Credit Party or any Subsidiary receives the proceeds of any sale or other disposition (including pursuant to a sale and leaseback transaction) of any Collateral, except for sales and other dispositions permitted under Section 9.10(a) or Section 9.10(b), Borrowers shall prepay the Term Loans in an amount equal to one hundred

30

percent (100%) of the Net Cash Proceeds of such sale or other disposition; provided, that no such prepayment shall be required unless and until the aggregate Net Cash Proceeds received during any Fiscal Year from such sales and other dispositions exceed $100,000 (in which case all Net Cash Proceeds in excess of such amount shall be used to make prepayments pursuant to this Section 2.3(c)), and provided, that so long as no Default or Event of Default has occurred and is continuing on the date such Credit Party or any of its Subsidiaries receives such Net Cash Proceeds and at all times thereafter until such time as such amounts have been reinvested as described below, the recipient of such Net Cash Proceeds may (i) reinvest the amount of such Net Cash Proceeds within ninety (90) days of the receipt thereof, or (ii) enter into a binding commitment within ninety (90) days of the receipt thereof and, in such event, reinvest such Net Cash Proceeds within one hundred and eighty (180) days after receipt thereof, in each case, in replacement assets (other than Inventory) of a kind then used or usable in the business of such recipient.  If the recipient does not intend to fully reinvest such Net Cash Proceeds, or if the time periods set forth in the immediately preceding sentence expire without such recipient having reinvested such Net Cash Proceeds, Borrowers shall prepay the Term Loans in an amount equal to such Net Cash Proceeds (to the extent not reinvested or intended to be reinvested within such time period).

(iv)     Extraordinary Receipts.  Within two (2) Business Days of the receipt by any Credit Party or any Subsidiary of any Extraordinary Receipt, an amount equal to the Net Cash Proceeds of such Extraordinary Receipt.

(v)     Eligible Account Shortfall.  Within seven (7) calendar days of the occurrence of an Eligible Account Shortfall, an amount sufficient to eliminate such Eligible Account Shortfall.

(vi)     Change of Control.  Concurrently upon occurrence of a Change of Control, an amount equal to all of the outstanding Obligations.

(vii)     [Reserved].

(viii)     [Reserved].

(ix)     Affiliate Indebtedness Payments.  Immediately upon the occurrence of a payment or prepayment contemplated in clause (v) of Article X hereof, an amount equal to all of the outstanding Obligations.

(x)     General Provisions.  The Administrative Borrower shall provide the Agent with a written notice of any prepayment required under this Section 2.3(c), at least two (2) Business Days prior to such prepayment, with such notice including the date and amount of such prepayment.  The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's pro rata share of such prepayment.  Each Lender may reject all or part of its pro rata share of such prepayment by providing written notice to the Agent no later than the date of such prepayment as set forth in the applicable notice of prepayment; provided that if a Lender fails to deliver such rejection notice to the Agent within the time frame specified above, such failure will be deemed an acceptance by such Lender of its pro rata share of such mandatory prepayment.

(d)     *Promise to Pay*.  The Borrowers absolutely and unconditionally promise to pay principal, interest and all other Obligations payable hereunder, or under any other Loan Document, without any defense, right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupment, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements.  All payments to be made by Credit Parties under any Loan Document, including payments of principal and interest made

31

hereunder and pursuant to any other Loan Document, and all fees, expenses, indemnities and reimbursements, shall be made without setoff or counterclaim.

(e)     *Manner of Payment*.  All payments made by the Borrowers, shall be made (i) to the Agent, for the account of the respective Lenders to which such payment is owed and (ii) only by wire transfer on the date when due in Dollars, in immediately available funds to such account as may be indicated in writing by the Agent to the Borrowers from time to time.  Any such payment received after 2:00 p.m. on the date when due shall be deemed received on the following Business Day. Whenever any payment hereunder shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and fees, as the case may be.

(f)     *Application of Payments*.  All payments made pursuant to this Section 2.3 shall be applied in the manner set forth in Section 2.4.

2.4     Application of Payments and Proceeds.

(a)     Application of Payments and Proceeds Generally. Subject to Section 2.4(b), all payments received by the Agent and all proceeds or Net Cash Proceeds (as applicable) of Collateral received by the Agent or realized on account of the Collateral (whether pursuant to Article V or arising from realization on Collateral, setoff or otherwise), shall be allocated in the order set forth below:

(i)     *first*, to that portion of the Obligations constituting fees, expenses, indemnities and other amounts including (x) fees, expenses, indemnities and other amounts accrued after the commencement of any proceeding under any Debtor Relief Laws, whether or not allowed in such proceeding under any Debtor Relief Laws, and (y) fees, charges and disbursements of counsel to the Agent;

(ii)     *second*, to that portion of the Obligations constituting accrued and unpaid interest on the Term Loans;

(iii)     *third*, to that portion of the Obligations constituting unpaid principal of the Term Loans;

(iv)     *fourth*, to any other Obligations owing in respect of the Term Loans;

(v)     *fifth*, to any other outstanding Obligations; and

(vi)     *sixth*, the balance, if any, after all of the Obligations have been Paid in Full, to the Borrowers or as otherwise required by applicable law.

Amounts shall be applied to each category of Obligations set forth above until such Obligations are Paid in Full and then to the next category.  If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Obligations in the category.  The Borrowers shall be liable for any deficiency if such payments or proceeds of Collateral are insufficient to cause all Obligations to be Paid in Full.

(b)     Post-Default Application of Payments and Proceeds. After the occurrence and during the continuance of any Default or Event of Default, all payments received by the Agent and all proceeds or Net Cash Proceeds (as applicable) of Collateral received by the Agent or realized on account of the Collateral (whether pursuant to Article V or arising from realization on Collateral, setoff or otherwise), may, in the discretion of the Agent, be allocated in the order set forth below.  Notwithstanding

anything in this Agreement to the contrary, after the Obligations have been accelerated pursuant to <u>Article X</u> (so long as such acceleration has not been rescinded), all payments received by the Agent and all proceeds or Net Cash Proceeds (as applicable) of Collateral received by the Agent or realized on account of the Collateral (whether pursuant to <u>Article V</u> or arising from realization on Collateral, setoff or otherwise) shall be applied in the order set forth below:

(i)    *first*, to that portion of the Obligations constituting fees, expenses, indemnities and other amounts including (x) fees, expenses, indemnities and other amounts accrued after the commencement of any proceeding under any Debtor Relief Laws, whether or not allowed in such proceeding under any Debtor Relief Laws, and (y) fees, charges and disbursements of counsel to the Agent;

(ii)    *second*, to that portion of the Obligations constituting accrued and unpaid interest on the Term Loans;

(iii)    *third*, to that portion of the Obligations constituting unpaid principal of the Term Loans;

(iv)    *fourth*, to any other Obligations owing in respect of the Term Loans;

(v)    *fifth*, to any other outstanding Obligations; and

(vi)    *sixth*, the balance, if any, after all of the Obligations have been Paid in Full, to the Borrowers or as otherwise required by applicable law.

Amounts shall be applied to each category of Obligations set forth above until such Obligations are Paid in Full and then to the next category. If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Obligations in the category. The Borrowers shall be liable for any deficiency if such payments or proceeds of Collateral are insufficient to cause all Obligations to be Paid in Full.

2.5    <u>Payments by the Agent</u>. If the Borrowers fail to make any payment required under any Loan Document as and when due and within any applicable grace period, the Agent may make such payment, which payment shall be a Loan as of the date such payment is due, and the Borrowers irrevocably authorize disbursement of any such funds to the Agent by way of direct payment of the relevant amount. No payment or prepayment of any amount by the Agent or any other Person shall entitle any Person to be subrogated to the rights of the Agent under any Loan Document unless and until all of the Obligations have been fully performed, Paid in Full, and this Agreement has been terminated. Any sums expended by the Agent as a result of any Borrower's failure to pay, perform or comply with any Loan Document or any of the Obligations may be charged to that Borrowers' account as a Loan.

2.6    <u>Evidence of Loans</u>.

(a)    The Agent shall maintain, in accordance with its usual practice, electronic or written records evidencing the Indebtedness and Obligations to the Lenders resulting from each Loan made by the Lenders from time to time, including without limitation, the amounts of principal and interest payable and paid to the Lenders from time to time under this Agreement.

(b)    The entries made in the electronic or written records maintained pursuant to <u>Section 2.6(a)</u> (the "**Register**") shall be prima facie evidence of the existence and amounts of the Obligations and Indebtedness therein recorded, absent fraud or manifest error; <u>provided</u>, <u>however</u>, that the failure of the Agent to maintain such records or any error therein shall not in any manner affect the joint and several obligations of Borrowers to repay the Loans or Obligations in accordance with their terms.

33

(c)    The Borrowers agree that:

(i)    upon written notice by any Lender to the Administrative Borrower that a Note or other evidence of Indebtedness is requested by such Lender to evidence the Loans and other Obligations owing or payable to, or to be made by, such Lender, the Borrowers shall promptly (and in any event within three (3) Business Days of any such request) execute and deliver to such Lender an appropriate Note or Notes; and

(ii)    all references to Notes in the Loan Documents shall mean the Notes, if any, to the extent issued (and not returned to the Borrowers for cancellation) hereunder, as the same may be amended, modified, divided, supplemented or restated from time to time.

## III.    INTEREST AND FEES

3.1    <u>Interest on the Loans</u>.

(a)    *Interest on the Term Loans*.  Subject to <u>Section 3.2</u> and <u>3.3</u>, the Term Loans shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the sum of Term SOFR for such Interest Period <u>plus</u> eight percent (8.00%) per annum.  As soon as practicable after each determination of Term SOFR on a Periodic Term SOFR Determination Day, the Agent shall determine (which determination shall, absent demonstrable error, be final, conclusive and binding upon all parties) the interest rate that shall apply for the applicable Interest Period and shall promptly give notice thereof (in writing) to the Agent, Borrower and each Lender.  In connection with the use or administration of Term SOFR, the Agent, in consultation with the Borrower, will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Agent will promptly notify the Administrative Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

(b)    *Interest Payments*.  Subject to <u>Section 3.2</u>, interest on outstanding Term Loans shall be due and payable in arrears on each Interest Payment Date, and at such other times as may be specified in this Agreement.  Accrued and unpaid interest on past due amounts (including interest on Loans that remain outstanding after the Maturity Date and interest on past due interest) shall be due and payable on demand.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

3.2    <u>Default Rate of Interest</u>.  At the election of the Agent or the Required Lenders while any Event of Default exists (or automatically while any Event of Default under <u>clause (h)</u> or <u>clause (i)</u> of <u>Article X</u> exists), the Obligations owing to the Agent or any Lender shall bear interest at the Default Rate, which Default Rate shall continue post-judgment and subsequent to the date that the provisions of any applicable Debtor Relief Law are exercised by or against a Credit Party.  All such interest shall be payable on demand.

3.3    <u>Maximum Lawful Rate</u>.  In no event shall interest, charges or other amounts that are contracted for, charged or received by any Lender pursuant to any Loan Documents for the use, forbearance or detention of money hereunder and that are deemed interest under applicable law ("**interest**") exceed the highest rate permissible under applicable law ("**maximum rate**").  If, in any month, any interest rate, absent the foregoing limitation, would have exceeded the maximum rate, then the interest rate for that month shall be the maximum rate and, if in a future month, that interest rate would otherwise be less than the maximum rate, then the rate shall remain at the maximum rate until the amount of interest actually paid equals the amount of interest which would have accrued if it had not been limited by the maximum rate.  If, upon the

Payment in Full of the Obligations, the total amount of interest actually paid under the Loan Documents is less than the total amount of interest that would, but for this Section 3.3, have accrued under the Loan Documents, then the Borrowers shall, to the extent permitted by applicable law, pay to the applicable Lender(s) (a) the lesser of (i) the amount of interest that would have been charged if the maximum rate had been in effect at all times, or (ii) the amount of interest that would have accrued had the interest rate otherwise set forth in the Loan Documents been in effect, minus (b) the amount of interest actually paid under the Loan Documents. If a court of competent jurisdiction determines that any Lender has received interest in excess of the maximum amount allowed under applicable law, such excess shall be deemed received on account of, and shall automatically be applied to reduce, Obligations other than interest (regardless of any erroneous application thereof by such Lender), and upon the Payment in Full of the Obligations, any balance shall be refunded to the Borrowers. In determining whether any excess interest has been charged or received by any Lender, all interest at any time charged or received from the Borrowers in connection with the Loan Documents shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of the Obligations.

3.4     Fees.

(a)     [Reserved].

(b)     [Reserved].

3.5     Payment of Fees Generally. Other than as provided in Section 3.4(b), all fees shall be paid on the dates due, in immediately available funds, to the Agent. Once due, all fees shall be fully earned and, once paid, shall not be refundable under any circumstances.

3.6     Computation of Interest and Fees. All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each outstanding Loan beginning, and including the day, such Loan is made and until (but not including) the day on which such Loan (or such portion thereof) is paid; provided that any Loan that is repaid on the same day on which it is made shall bear interest for one day. Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

3.7     Benchmark Replacement.

(a)     Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

35

(b)    In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    The Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  Any determination, decision or election that may be made by the Agent or, if applicable, any Lender (or group of Lenders) pursuant to this <u>Section 3.7</u>, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 3.7</u>.

## IV.    COLLATERAL

4.1    <u>Security Interest; Collateral</u>.

(a)    *Grant of Security Interest*.  To secure the payment and performance in full of the Obligations, each Credit Party hereby grants to the Agent a continuing security interest in and Lien upon, and pledges and assigns to the Agent, all of its right, title and interest in and to the Collateral, wherever located, whether now owned or hereafter acquired or arising.  Notwithstanding anything to the contrary contained in the definition of Collateral, the security interest created by this Agreement shall not extend to, and the term "Collateral" shall not include, any Excluded Property and the Credit Parties shall from time to time at the request of the Agent give written notice to the Agent identifying in reasonable detail the Excluded Property and shall provide to the Agent such other information regarding the Excluded Property as the Agent may request.  If and when any property or interest in property shall cease to be Excluded Property, a Lien on and security interest in such property or interest in property shall be granted immediately and automatically therein, without any further action by any Person.  Furthermore: (i) each Credit Party shall remain liable under the contracts and agreements included in or otherwise giving rise to the Collateral to the extent set forth therein and shall perform all of its respective duties and obligations thereunder to the same extent as if this Agreement or the other Loan Documents had not been executed; (ii) the exercise by the Agent of any of the rights under this Agreement or the other Loan Documents shall not release any Credit Party from any of its respective duties or obligations to the parties under such contracts and agreements; (iii) the Agent shall have no obligation or liability under such contracts and agreements by reason of this Agreement or the other Loan Documents, nor shall the Agent be obligated to perform any of the obligations or duties of any Credit Party thereunder or to take any action to collect or enforce any claim for payment assigned under this Agreement or the other Loan Documents; and (iv) the Agent shall have no liability in contract or tort for any Credit Party's acts or omissions.

(b)    *Authorization of File Financing Statements, Etc*.  Each Credit Party hereby irrevocably authorizes the Agent at any time and from time to time to authenticate and file in any relevant jurisdiction necessary to perfect or maintain Agent's perfection in the Collateral, any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including a description of the Collateral as "all assets of the debtor, wherever located, whether now owned or hereafter acquired or arising, and all products and proceeds for the foregoing" (or words of similar effect), or as otherwise may be required under applicable law.  Each Credit Party agrees to provide all information necessary to make the filings described in preceding sentence to the Agent promptly upon

reasonable request.  Each Credit Party hereby ratifies its authorization for the Agent to have filed in any UCC jurisdiction any initial financing statements or amendments thereto relating to the Collateral, if filed prior to the date hereof.

(c)    *Intellectual Property Filings*.  Each Credit Party hereby further authorizes the Agent to file filings with the United States Patent and Trademark Office and United States Copyright Office (or any successor office or any similar office in any other country) or other necessary documents for the purpose of perfecting, recording, confirming, continuing, enforcing, protecting or otherwise evidencing the security interest granted by such Credit Party hereunder in any Intellectual Property, without the signature of such Credit Party, and naming such Credit Party, as debtor, and the Agent, as secured party.

(d)    *Commercial Tort Claims*.  If any Credit Party shall at any time hold or acquire a Commercial Tort Claim, the Credit Parties shall notify the Agent in writing, no later than ten (10) Business Days after acquiring such claim, signed by the Credit Parties of the particulars of such Commercial Tort Claim and grant to the Agent in such written notice a security interest in such Commercial Tort Claim and in the proceeds thereof, all upon the terms of this Agreement, with such written notice to be in form and substance satisfactory to the Agent.  Such written notice, upon delivery thereof to the Agent, shall be deemed to supplement Schedule 4.1.

(e)    *Letter-of-Credit Rights*.  If any Credit Party is at any time a beneficiary under a letter of credit now or hereafter issued in favor of such Credit Party with an aggregate stated amount of $50,000 or more, such Credit Party shall promptly notify the Agent thereof and such Credit Party shall, at the request of the Agent, pursuant to an agreement in form and substance satisfactory to the Agent, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Agent of, and to pay to the Agent, the proceeds of, any drawing under the letter of credit or (ii) arrange for the Agent to become the beneficiary of such letter of credit, with the Agent agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied as provided in this Agreement.

(f)    *Possessory Collateral*.  Promptly, but in any event no later than ten (10) Business Days after any Credit Party's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including any tangible Chattel Paper and any Investment Property consisting of certificated securities, such Credit Party shall deliver the original thereof to the Agent together with an appropriate endorsement or other specific evidence of assignment thereof to the Agent (in form and substance acceptable to the Agent).

(g)    *Government Receivables*.  At the request of the Agent, each Credit Party shall promptly deliver to the Agent executed assignment agreements, together with forms of notice of assignment, in respect of each of its government contracts that are not subject to an anti-assignment provision to the extent necessary to protect the Agent's Lien and security interest in, and rights and remedies with respect to, such government contracts under the Federal Assignment of Claims Act, the UCC or other applicable law and promptly deliver to the Agent, appropriately endorsed, any Instrument or tangible Chattel Paper connected with any receivable arising out of any such government contracts between any Credit Party and any Governmental Authority.  At the time of delivery of any such assignment agreements and notices of assignment, the applicable Credit Party shall also deliver to the Agent contact information for the contracting officers on each such government contract and such other information requested by the Agent that is required to be delivered for any contract between such Credit Party and any applicable Governmental Authority in order for such Credit Party to assign its right to payment of receivables thereunder to the Agent pursuant to the Federal Assignment of Claims Act, the UCC or other applicable law.

4.2    Power of Attorney.

37

(a)     Each Credit Party hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of such Credit Party or in the Agent's own name, for the purpose of carrying out the terms of this Agreement and the grant of the security interests hereunder and under the other Loan Documents, and without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of such Credit Party (without requiring the Agent to act as such, and without notice to or assent by such Credit Party) to do the following: (i) upon the occurrence and during the continuance of an Event of Default, to receive, open and dispose of all mail addressed to such Credit Party and to endorse the name of such Credit Party upon any and all checks, drafts, money orders, and other instruments for the payment of money that are payable to such Credit Party and constitute collections on its or their Accounts; (ii) execute in the name of such Credit Party any financing statements, schedules, assignments, instruments, documents, and statements that it is or they are obligated to give Agent under any of the Loan Documents; and (iii) do such other and further acts and deeds in the name of such Credit Party that Agent may deem necessary or desirable to enforce any Account or other Collateral or to perfect Agent's security interest or Lien in any Collateral.  In addition, if any Credit Party breaches its obligation hereunder to direct payments of Accounts or the proceeds of any other Collateral to the appropriate Blocked Account, the Agent, as the irrevocably made, constituted and appointed true and lawful attorney for the Credit Parties pursuant to this paragraph, may, by the signature or other act of any of Agent's officers or authorized signatories (without requiring any of them to do so), direct any federal, state or private payor or fiscal intermediary to pay proceeds of Accounts or any other Collateral to the appropriate Blocked Account.

(b)     To the extent permitted by law, each Credit Party hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  This power of attorney is a power coupled with an interest and is irrevocable.

(c)     The powers conferred on the Agent pursuant to this Section 4.2 are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers.  The Agent shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to any Credit Party for any act or failure to act, except for the Agent's own gross negligence or willful misconduct.

4.3     Defense of Collateral; Transferability of Collateral.  Each Credit Party is as of the date hereof, and, as to Collateral acquired by it from time to time after the date hereof, such Credit Party will be, the sole direct and beneficial owner of all Collateral pledged by it hereunder free from any Lien or other right, title or interest of any Person other than the Liens and security interest created by this Agreement and Permitted Liens.  Each Credit Party shall, at its own cost and expense, defend title to the Collateral pledged by it hereunder and the security interest therein and Lien thereon granted to the Agent and the priority thereof against all claims and demands of all Persons, at its own cost and expense, at any time claiming any interest therein adverse to the Agent other than Permitted Liens.  There is no agreement, and no Credit Party, nor any of their Subsidiaries, shall enter into any agreement or take any other action, that would restrict the transferability of any of the Collateral or otherwise impair or conflict with such Credit Parties' obligations or the rights of the Agent hereunder.

4.4     Further Assurances.  The Credit Parties agree, upon written request of the Agent, to take any and all other actions as the Agent may reasonably determine to be necessary or appropriate for the attachment or perfection, or the maintenance of the first priority security interest of, and for the ability of the Agent to enforce, the Agent's security interest in any and all of the Collateral, including (a) executing, obtaining, delivering, filing, registering and recording any and all financing statements, continuation statements, stock powers, instruments and other documents, or causing the execution, filing, registration, recording or delivery of any and all of the foregoing, that are necessary or required under law or otherwise

38

or reasonably requested by the Agent to be executed, filed, registered, obtained, delivered or recorded to create, maintain, perfect, preserve, validate or otherwise protect the pledge of the Collateral to the Agent and the Agent's perfected first priority Lien on the Collateral (and the Credit Parties irrevocably grant the Agent the right, at the Agent's option, to file any or all of the foregoing), (b) without limiting Section 4.1(f), complying with any provision of any statute, regulation or treaty of any Governmental Authority as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Agent to enforce, the Agent's security interest in such Collateral, and (c) obtaining governmental and other third party waivers, consents and approvals in form and substance reasonably satisfactory to the Agent, including any consent of any licensor, lessor or other Person obligated on Collateral and any party or parties whose consent is required for the security interest of the Agent to attach under Section 4.1(a).

## V.    ADMINISTRATION AND MAINTENANCE OF COLLATERAL

5.1    Collections and Cash Management.

(a)    The Credit Parties and their Subsidiaries shall establish and maintain cash management arrangements and procedures, including deposit account concentration arrangements, satisfactory to the Agent.

(b)    To the extent not previously delivered to the Agent, each Credit Party shall within thirty (30) days after the Closing Date (as such date may be extended by the Agent in writing in its sole discretion), enter into, and cause each depository bank, securities intermediary or other financial institution to enter into, Control Agreements with respect to each of the Deposit Accounts or securities accounts of such Credit Party (collectively, the "**Blocked Accounts**").

(c)    Each Credit Party covenants that it shall cause, and each Control Agreement with respect to a Deposit Account entered into by a Credit Party shall require, after delivery of a direction notice from the Agent to the applicable financial institution, the ACH or wire transfer on each Business Day of all available cash receipts (the "**Cash Receipts**") to the Concentration Account, from:

(i)    the sale or other disposition of Collateral;

(ii)    all proceeds of collections of Accounts;

(iii)    all Net Cash Proceeds on account of any mandatory prepayments made pursuant to Section 2.3(c); and

(iv)    each Blocked Account (including all cash deposited therein from each Deposit Account).

If any cash or Cash Equivalents owned by any Credit Party are deposited to any account, or held or invested in any manner, otherwise than in a Blocked Account that is subject to a Control Agreement (or a Deposit Account which is swept daily to a Blocked Account that is subject to a Control Agreement) or the Concentration Account, then (a) the Credit Parties shall cause all funds in such accounts or so held or so invested to be transferred with such frequency as may be required by the Agent in its sole discretion to a Blocked Account that is subject to a Control Agreement (or a Deposit Account which is swept daily to a Blocked Account that is subject to a Control Agreement), provided that, with respect to any Medicaid/Medicare Receipts Account, the Credit Parties shall (within thirty (30) days after the Closing Date (as such date may be extended by the Agent in writing in its sole discretion)) cause such Medicaid/Medicare Receipts Account to be subject to a written agreement, in form and substance reasonably satisfactory to the Agent, providing for, among other things, a standing order requiring all funds

39

in such Medicaid/Medicare Receipts Account to be transferred on each Business Day to a Blocked Account that is subject to a Control Agreement, or (b) the Agent may require the applicable Credit Party to close such account (other than any Medicaid/Medicare Receipts Account) and have all funds therein transferred to a Blocked Account that is subject to a Control Agreement, and all future deposits made to a Blocked Account that is subject to a Control Agreement.

(d)     The Credit Parties may open or close Deposit Accounts or securities accounts or Blocked Accounts subject, in the case of Blocked Accounts, to the execution and delivery to the Agent of appropriate Control Agreements (unless expressly waived by the Agent) consistent with the provisions of this Section 5.1 and otherwise reasonably satisfactory to the Agent.  The Credit Parties shall furnish the Agent with five (5) Business Days' prior written notice of their intention to open or close a Medicaid/Medicare Receipts Account.  Promptly upon the request of the Agent from time to time, the Credit Parties shall deliver to the Agent an update to Schedule 7.4(b).

(e)     The Concentration Account shall at all times be under the sole dominion and control of the Agent.  Each Borrower hereby acknowledges and agrees that (i) such Credit Party has no right of withdrawal from the Concentration Account, (ii) the funds on deposit in the Concentration Account shall at all times continue to be collateral security for all of the Obligations, and (iii) the funds on deposit in the Concentration Account shall be applied as provided in this Agreement or as otherwise directed by the Agent.

5.2     Accounts.

(a)     In determining which Accounts are Eligible Accounts, Agent may rely on all statements and representations made by the Credit Parties with respect to any Account (including, without limitation, as set forth in the Borrowing Base Certificate).  Unless otherwise indicated in writing to Lender, each Account of each Borrower (i) is genuine and in all respects what it purports to be and is not evidenced by a judgment, (ii) arises out of a completed, bona fide sale and delivery of goods or rendering of Services by the Borrower in the ordinary course of business and in accordance with the terms and conditions of all purchase orders, contracts, certifications, participations, certificates of need and other documents relating thereto or forming a part of the contract between the Borrower and the Account Debtor, (iii) is for a liquidated amount maturing as stated in a claim or invoice covering such sale of goods or rendering of Services, a copy of which has been furnished or is available to Lender, (iv) together with Agent's security interest therein and Liens thereon, is not and will not be in the future (by voluntary act or omission by any Borrower), subject to any offset, lien, deduction, defense, dispute, counterclaim or other adverse condition, is absolutely owing to the Borrower and is not contingent in any respect or for any reason (except Accounts owed or owing by Medicaid/Medicare Account Debtors that may be subject to offset or deduction under applicable law), and (v) has been billed and forwarded to the Account Debtor for payment in accordance with applicable laws (except in the case of any Eligible Unbilled Accounts) and is in compliance and conformance with any requisite procedures, requirements and regulations governing payment by such Account Debtor with respect to such Account, and, if due from a Medicaid/Medicare Account Debtor, is properly payable directly to the Borrower.

5.3     Healthcare.

(a)     Each Credit Party has (i) obtained from the Medicare program, approval to receive the provider numbers which will permit each Credit Party to bill the Medicare program with respect to covered services rendered to patients insured under the Medicare program, (ii) applied for from the applicable Medicaid programs, approval to receive the provider numbers/in-patient service contracts which will permit each Credit Party to bill the Medicaid program with respect to covered services rendered to patients insured under the Medicaid programs, and (iii) applied for from the CHAMPUS/TRICARE

40

program, approval to receive the provider numbers which will permit each Credit Party to bill the CHAMPUS/TRICARE program with respect to covered services rendered to patients insured under the CHAMPUS/TRICARE program.  Each Credit Party is in compliance with the conditions of participation in the Medicare, Medicaid and CHAMPUS/TRICARE programs.

(b)    As of the Closing Date, Credit Parties have third party contracts with each of the third-party payors listed on Schedule 5.3(b) (unless noted otherwise), which constitutes (as indicated) each of the payors representing at least five percent (5%) of the Credit Parties' historic third-party payor cash receipts for the twelve month period ended December 31, 2021.

5.4    Medicare and Medicaid Account Debtors and Third-Party Payor Information.  The Credit Parties (a) shall maintain applicable Medicare and Medicaid provider numbers, (b) shall maintain applicable CHAMPUS/TRICARE provider numbers, (c) shall have filed with Medicare and Medicaid all reassignment of benefit notices for payments for Services rendered by employee physicians at the Hospital, and (d) to the extent any Credit Party shall enter into any other arrangements with non-governmental third-party payors, shall use commercially reasonable efforts to enter into agreements with such third-party payors in form and substance reasonably satisfactory to the Agent.

5.5    Collateral Administration.

(a)    All Collateral (except Deposit Accounts) will at all times be kept by Credit Parties at the locations set forth on Schedule 7.18(b) and shall not, without thirty calendar days prior written notice to Agent, be moved therefrom, and in any case shall not be moved outside the continental United States.

(b)    The Credit Parties shall keep accurate and complete records of their Accounts and all payments and collections thereon and shall submit such records to the Agent on such periodic bases as the Agent may request.

(c)    Whether or not an Event of Default has occurred, any of the Agent's officers, employees, representatives or agents shall have the right, upon reasonable prior notice and during normal business hours, in the name of Agent, any designee of the Agent or the Credit Parties, to verify the validity, amount or any other matter relating to any Collateral.  The Credit Parties shall cooperate with the Agent in an effort to facilitate and promptly conclude such verification process.

(d)    Each Credit Party shall endeavor in the first instance to make collection of its Accounts for the Agent.  The Agent shall have the right at all times after the occurrence and during the continuance of an Event of Default to notify (i) Account Debtors owing Accounts to the Credit Parties other than Medicaid/Medicare Account Debtors that their Accounts have been assigned to the Agent and to collect such Accounts directly in its own name and to charge reasonable collection costs and expenses, including reasonable attorney's fees, to the Credit Parties, and (ii) Medicaid/Medicare Account Debtors that the Credit Parties have waived any and all defenses and counterclaims they may have or could interpose in any such action or procedure brought by the Agent to obtain a court order recognizing the collateral assignment or security interest and Lien of the Agent in and to any Account or other Collateral and that the Agent is seeking or may seek to obtain a court order recognizing the collateral assignment or security interest and Lien of the Agent in and to all Accounts and other Collateral payable by Medicaid/Medicare Account Debtors.

(e)    As and when determined by the Agent in its discretion, the Agent will perform the searches described in clauses (i) and (ii) below against the Credit Parties (the results of which are to be consistent with Credit Party's representations and warranties under this Agreement), all at the Credit Parties' expense: (i) UCC searches with the Secretary of State of the jurisdiction of organization of the

Credit Parties and the Secretary of State and local filing offices of each jurisdiction where the Credit Parties maintain their respective executive offices, a place of business or assets; and (ii) judgment, federal, state and local tax lien searches, in each jurisdiction searched under clause (i) above.

(f)     Each Credit Party shall do anything further that may be lawfully required by the Agent to create and perfect the Agent's Lien on any Collateral and effectuate the intentions of the Loan Documents.

## VI.     CONDITIONS PRECEDENT

6.1     Conditions to Closing.  The obligations of the Lenders to consummate the transactions contemplated herein and to make the Term Loans on the Closing Date are subject to the satisfaction, in the sole judgment of the Agent, of the following:

(a)     the Credit Parties shall have delivered to the Agent (i) the Loan Documents to which any Credit Party is a party, each duly executed by a Responsible Officer of the Credit Party and the other parties thereto, (ii) [Reserved], (iii) the initial Approved Budget, and (iv) (A) a draft of the unissued audited annual consolidated and consolidating financial statements of the Credit Parties for the Credit Parties' prepared for the most recently ended Fiscal Year, including notes thereto, consisting of a balance sheet at the end of such completed Fiscal Year and the related statements of income, retained earnings, cash flows and owner's equity for such completed Fiscal Year, which financial statements shall be prepared in accordance with GAAP consistently applied with prior periods prepared by an independent certified public accounting firm reasonably satisfactory to the Agent; and (B) unaudited consolidated and consolidating financial statements of the Credit Parties and their respective Subsidiaries consisting of a balance sheet and statements of income, retained earnings, cash flows and owner's equity for the period from the beginning of the current Fiscal Year through the end of the most recently ended calendar month, which financial statements shall be prepared in accordance with GAAP consistently applied with prior periods;

(b)     the Agent shall have received (i) a report of Uniform Commercial Code financing statement, tax and judgment lien searches performed with respect to Credit Parties in each jurisdiction determined by the Agent in its sole discretion, and such report shall show no Liens on the Collateral (other than Permitted Liens), (ii) each document (including, without limitation, any Uniform Commercial Code financing statement) required by any Loan Document or under law or requested by the Agent to be filed, registered or recorded to create in favor of Agent, a perfected first priority security interest upon the Collateral, and (iii) evidence of each such filing, registration or recordation and of the payment by the Credit Parties of any necessary fee, tax or expense relating thereto, in each case, in form and substance reasonably satisfactory to the Agent;

(c)     the Agent shall have received (i) the Corporate Authority Documents of the Credit Parties, all in form and substance acceptable to Agent, and (ii) a certificate of the corporate secretary or assistant secretary of each Credit Party, dated as of the Closing Date, certifying as to the incumbency and signature of the Persons executing the Loan Documents, in form and substance acceptable to the Agent;

(d)     the Agent shall have received (i) a Solvency Certificate duly completed and certified by a Responsible Officer of the Administrative Borrower; (ii) a Borrowing Base Certificate as of the Closing Date, duly completed and certified by a Responsible Officer of the Administrative Borrower; and (iii) an officer's certificate, duly completed and certified by a Responsible Officer of the Administrative Borrower (the "Closing Certificate"), certifying that:

(i)     each of the representation and warranties made by the Credit Parties in or pursuant to this Agreement, or under the other Loan Documents or which are contained in any certificate,

document or financial or other statement furnished in connection herewith, shall be true and correct in all respects as of the Closing Date;

(ii)    no Default or Event of Default on the Closing Date shall occur as a result of the Transactions contemplated herein or the deemed funding of the Term Loans on the Closing Date;

(iii)    since the date of the most recent financial statements submitted to the Agent (whether on or prior to the Closing Date), there has not occurred any Material Adverse Change or Liability Event or, to any Credit Party's knowledge, any other event or condition that could reasonably be expected to result in a Material Adverse Change or result in a Liability Event; and

(iv)    the conditions set forth in this Article VI have been satisfied and attaching such Material Contracts and other documents as the Agent may reasonably require, in each case, in form and substance reasonably satisfactory to the Agent;

(e)    the Agent shall have received information and responses to its due diligence requests, and completed examinations related to the Collateral, the financial statements and the books, records, business, obligations, financial condition and operational state of each Credit Party and any other information reasonably requested by the Agent, and all such information and responses as well as the results of such examinations shall demonstrate to the Agent's satisfaction that (i) each Credit Party's operations comply, in all respects deemed material by the Agent, in its sole judgment, with all applicable federal, state, foreign and local laws, statutes and regulations, (ii) each Credit Party's operations are not the subject of any governmental investigation, evaluation or any remedial action which could result in any expenditure or liability deemed material by the Agent, in its sole judgment, and (iii) each Credit Party has no liability (whether contingent or otherwise) that is deemed material by the Agent, in its sole judgment;

(f)    the Agent shall have received a duly executed MSO Pledge Agreement, which shall be in form and substance satisfactory to the Agent, and the Agent shall have evidence, satisfactory to the Agent, that the MSO grants the Agent, for the benefit of the Lenders, a first-priority perfected lien on the management fees payable under the Management Services Agreement (excluding, for the avoidance of doubt, amounts in respect of out-of-pocket expense reimbursement).

(g)    the Agent and each Lender shall have received all fees, charges and expenses payable to the Agent and Lenders on or prior to the Closing Date pursuant to the Loan Documents;

(h)    the Agent shall have received such consents, approvals and agreements from such third parties as the Agent shall determine are necessary or desirable with respect to (i) the Loan Documents and the transactions contemplated thereby (including the Transactions), and (ii) claims against any Credit Party or the Collateral, all in form and substance reasonably satisfactory to the Agent;

(i)    the Credit Parties shall be in compliance with Section 8.4, and the Agent shall have received copies of all insurance policies or binders, certificates of all insurance policies of the Credit Parties confirming that they are in effect and that the premiums due and owing with respect thereto have been paid and endorsements of such policies issued by the applicable Insurers naming the Agent as lender's loss payee or additional insured, as appropriate, and providing the Agent with right to receive notice of cancellation of any such policy;

(j)    all corporate and other proceedings, documents, instruments and other legal matters in connection with the transactions contemplated by the Loan Documents (including, but not limited to, the Transactions and those other transactions relating to corporate and capital structure of the Credit Parties) shall be satisfactory to the Agent;

(k)      the Confirmation Order shall have been entered by the Bankruptcy Court;

(l)      the "Effective Date" as defined in the Bankruptcy Plan shall have occurred or shall occur substantially contemporaneously with the effectiveness of this Agreement;

(m)      [reserved];

(n)      Agent and Lenders shall have received, not later than five (5) days prior to the Closing Date, all documentation and other information required pursuant to their respective policies and by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the Patriot Act, to the extent such information has been requested prior to the Closing Date, and in each case, the results of the applicable Patriot Act and OFAC searches with respect to the Credit Parties and their Subsidiaries shall be satisfactory to Agent and Lenders;

(o)      there shall be no action, suit, proceeding or investigation pending or threatened, in any court or before any Governmental Authority that relates to the Credit Parties in respect of the Transactions, the Term Loans or the Transactions contemplated hereby, or that is reasonably likely of having a material adverse effect on the business, operations, properties, prospects or condition (financial or otherwise) of the Credit Parties;

(p)      [reserved];

(q)      the Agent shall have received executed copies of the HRH Facility and the executed version of the HRH Subordination Agreement; and

(r)      the Agent shall have received such other documents, certificates, information or legal opinions as the Agent may reasonably request, all in form and substance reasonably satisfactory to the Agent.

Without limiting the generality of the provisions of Section 14.3(f), for purposes of determining compliance with the conditions specified in Section 6.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

## VII.    REPRESENTATIONS AND WARRANTIES

To induce the Agent and the Lenders to enter into this Agreement and make the Loans and to otherwise extend credit, the Credit Parties, jointly and severally, make the following representations and warranties:

7.1    Existence, Qualification and Power.  Each Credit Party is duly organized or formed, validly existing and in good standing under the laws of its state of organization or formation.  Each Credit Party (a) has all requisite corporate or entity power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the Loan Documents, (b) is duly qualified to conduct business in every jurisdiction in which failure so to qualify could reasonably be expected to result in a Material Adverse Change, and (c) has (and, with respect to any Loan Documents executed prior to the date hereof, had at the time of execution and delivery thereof) all requisite power and authority (i) to execute, deliver and perform the Loan Documents to which it is a party, (ii) to borrow hereunder, (iii) to consummate the transactions contemplated under the Loan Documents, and (iv) to grant, re-grant, or

reaffirm the Liens in the Collateral pursuant to the Loan Documents to which it is a party.

7.2     <u>Authorization; No Contravention; Other Consents; Binding Effect</u>.  The execution, delivery and performance by each Credit Party of the Loan Documents to which it is or is to be a party, and the consummation of the transactions contemplated thereby (including the Transactions), (a) have been duly authorized by all requisite action of each such Credit Party and have been duly executed and delivered by or on behalf of each such Credit Party; (b) do not violate any provisions of (i) applicable law, statute, rule, regulation, ordinance or tariff, (ii) any order of any Governmental Authority binding on any such Person or any of their respective properties, or (iii) the certificate of formation or incorporation or operating agreement or by-laws (or any other equivalent governing agreement or document) of any such Credit Party, or any agreement between any such Credit Party and its respective stockholders, members, partners or equity owners or among any such stockholders, members, partners or equity owners; (c) are not in conflict with, and do not result in a breach or default of or constitute an event of default, or an event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in a conflict, breach, default or event of default under, any indenture, agreement or other instrument to which any such Person is a party, or by which the properties or assets of such Credit Party are bound; (d) have not and will not result in the creation or imposition of any Lien (other than Liens in favor of the Agent under the Loan Documents) of any nature upon any of the properties or assets of any such Credit Party; and (e) except as set forth on <u>Schedule 7.2</u>, do not require the consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or any other Person.  When executed and delivered, each of the Loan Documents to which any Credit Party is a party constitutes or will constitute the legal, valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and to general principles of equity, whether such enforceability is considered in a proceeding at law or in equity.

7.3     <u>Subsidiaries, Capitalization and Ownership Interests</u>.  Except as set forth on <u>Schedule 7.3</u>, no Credit Party has any Subsidiaries.  As of the Closing Date, <u>Schedule 7.3</u> states the authorized and issued capitalization of each Credit Party, the number and class of equity securities and/or ownership, voting or partnership interests issued and outstanding of each Credit Party and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing).  With respect to the ownership or partnership interests of any Credit Party that is a limited partnership or a limited liability company, such interests are not certificated or held in a securities account, and the documents relating to such interests do not expressly state that the interests are governed by Article 8 of the UCC. The outstanding equity securities and/or ownership, voting or partnership interests of each Credit Party has been duly authorized and validly issued and are fully paid and non-assessable.  As of the Closing Date, each Person listed on <u>Schedule 7.3</u> owns beneficially and of record all the equity securities and/or ownership, voting or partnership interests it is listed as owning free and clear of any Liens other than Liens created by the Loan Documents and Permitted Liens.  <u>Schedule 7.3</u> sets forth a complete and accurate list of the directors, members, managers and/or partners of each Credit Party as of the Closing Date. Except as listed on <u>Schedule 7.3</u>, no Credit Party owns an interest in, participates in or engages in any joint venture, partnership or similar arrangements with any Person.

7.4     <u>Properties</u>.  Each Credit Party is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its properties and assets, including the Collateral, whether personal or real, subject to no Liens of any kind, except for Permitted Liens.  As of the Closing Date, <u>Schedule 7.4(a)</u> lists all real properties (including street address, county and state) owned or leased by or to, and all other material assets or property that are leased or licensed by, any Credit Party.  Each Credit Party enjoys peaceful and undisturbed possession under all leases that are necessary for the operation of such properties and assets, and all such leases are valid and subsisting and in full force and effect.  As of the Closing Date, <u>Schedule 7.4(b)</u> lists all Deposit Accounts and securities accounts that are maintained by the Credit Parties,

and such schedule specifically identifies each Medicaid/Medicare Receipts Account and sets forth, with respect to each depository bank or securities intermediary (i) the name and address of such Person; and (ii) the account number(s) maintained with such Person.  All such Deposit Accounts and securities accounts are subject to no Liens of any kind other than Permitted Liens.

7.5     <u>Other Agreements</u>.  No Credit Party is (a) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would affect its ability to execute and deliver, or perform under, any Loan Document or to pay the Obligations, (b) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which it is a party or to which any of its properties or assets are subject, which default, individually or in the aggregate with any other such defaults, could reasonably be expected to result in a Material Adverse Change; (c) a party or subject to any agreement, document or instrument with respect to, or obligation to pay any, Management or Service Fee with respect to, the ownership, operation, leasing or performance of any of its business or any facility except for the Management Services Agreement; or (d) a party to any contract with any Affiliate other than as set forth on <u>Schedule 7.5</u>.

7.6     <u>Litigation</u>.  There is no action, suit, proceeding or investigation pending or, to the knowledge of any Credit Party, threatened against any Credit Party (a) that challenges the validity of any of the Loan Documents, or to enjoin the right of any Credit Party to enter into any Loan Document or to consummate the transactions contemplated thereby (including the Transactions), (b) that would reasonably be likely to be or have, either individually or in the aggregate, any Material Adverse Change, or (c) that would reasonably be likely to result in any Change of Control.  No Credit Party is a party or subject to any order, writ, injunction, judgment or decree of any Governmental Authority.  Except as set forth on <u>Schedule 7.6</u>, there is no action, suit, proceeding or investigation initiated by any Credit Party or Affiliate of a Credit Party currently pending.

7.7     <u>Environmental Matters</u>.  Except for exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change:

(a)     Each Credit Party: (i) is, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws; (ii) hold all environmental Permits (each of which is in full force and effect) required for any of their current or intended operations or for any property owned, leased, or otherwise operated by any of them; (iii) are, and within the period of all applicable statutes of limitation have been, in compliance with all of their environmental Permits; and (iv) reasonably believe that: (A) each of their environmental Permits will be timely renewed and complied with, without material expense; (B) any additional environmental Permits that may be required of any of them will be timely obtained and complied with, without material expense; and (C) compliance with any Environmental Law that is or is expected to become applicable to any of them will be timely attained and maintained, without material expense.

(b)     Except for Materials of Environmental Concern used in the ordinary course of the Credit Parties' business in accordance with applicable Environmental Laws, to the knowledge of each Credit Party, no Materials of Environmental Concern (i) are present at, on, under, in, or about any real property now owned, leased or operated by any Credit Party, or (ii) were present at any formerly owned, leased or operated property during the period of such ownership, lease or operation by any Credit Party or (iii) are present at any other location (including, without limitation, any location to which Materials of Environmental Concern have been sent for re-use or recycling or for treatment, storage, or disposal) which, in the case of any of <u>clauses (i)</u>, <u>(ii)</u> or <u>(iii)</u>, would reasonably be expected to (A) give rise to liability of any Credit Party under any applicable Environmental Law or otherwise result in costs to any Credit Party, (B) interfere with the continued operations of any Credit Party, or (C) impair the fair saleable value of any real

property owned or leased by any Credit Party.  For purposes of <u>Article X</u>, each of the foregoing representations and warranties in this <u>Section 7.7(b)</u> that are qualified by the knowledge of each Credit Party shall be deemed not to be so qualified.

(c)     There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law to which any Credit Party is, or to the knowledge of any Credit Party will be, named as a party that is pending or, to the knowledge of any Credit Party, threatened.

(d)     No Credit Party, nor any of its Subsidiaries, has received any written request for information, or been notified that it is a potentially responsible party under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or with respect to any Materials of Environmental Concern.

(e)     No Credit Party, nor any of its Subsidiaries, has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

(f)     No Credit Party, nor any of its Subsidiaries, has assumed or retained, by contract or operation of law, any liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or with respect to any Material of Environmental Concern.

7.8     <u>Potential Tax Liability; Tax Returns; Governmental Reports</u>.

(a)     Except as set forth on <u>Schedule 7.8</u>, no Credit Party (i) has received any oral or written communication from any taxing authority with respect to any investigation or assessment relating to Credit Party directly, or relating to any consolidated tax return which was filed on behalf of such Credit Party, (ii) is aware of any year which remains open pending tax examination or audit by any taxing authority, and (iii) is aware of any information that could give rise to any tax liability or assessment.

(b)     Each Credit Party (i) has filed all federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by such Credit Party, and (ii) has paid all taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment related taxes, in each case that are due and payable, except only for items that such Credit Party is currently contesting in good faith by appropriate and lawful proceedings (which proceedings have the effect of preventing the forfeiture or sale of any property or assets) and with respect to which adequate reserves are being maintained by such Person in accordance with GAAP to the reasonable satisfaction of the Agent.

7.9     <u>Financial Statements and Reports</u>.

(a)     All financial statements and financial information relating to Credit Parties that have been or may hereafter be delivered to the Agent by the Credit Parties are accurate and complete in all material respects and in the case of statements and information hereafter delivered to the Agent, shall be prepared in accordance with GAAP consistently applied.  The Credit Parties have no material obligations or liabilities of any kind not disclosed in such financial statements or in any other financial information delivered to the Agent.

(b)     The initial Approved Budget is attached to this Agreement as <u>Exhibit C</u>, which was furnished to the Agent on or prior to the Closing Date, and each subsequent Approved Budget delivered

47

in accordance with <u>Section 8.1(d)</u>, has been prepared in good faith, with due care and based upon assumptions the Credit Parties believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget.  To the knowledge of the Credit Parties, as of the Closing Date, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget.

(c)    Since the date of the most recent financial statements submitted to the Agent (whether on or prior to the Closing Date or pursuant to <u>Section 8.1</u>), there has not occurred any Material Adverse Change or Liability Event or, to any Credit Party's knowledge, any other event or condition that could reasonably be expected to have a Material Adverse Change or result in a Liability Event.

7.10    <u>Compliance with Law</u>.

(a)    Without limiting the provisions of <u>Section 7.23</u>, each Credit Party has been and is currently in compliance with, and is presently taking and will continue to take all actions necessary to assure that it shall, on or before each applicable compliance date and continuously thereafter, be in compliance with, HIPAA, except where noncompliance could not reasonably be expected to result in a Material Adverse Change including but not limited to having written agreements in effect as required by HIPAA with all of its Business Associates (as defined by HIPAA).  No Credit Party is subject to, and would not reasonably be expected to become subject to, any civil or criminal penalty or any investigation, claim or process or data breach with regard to HIPAA. Each Credit Party and each Subsidiary of each Credit Party has developed and has implemented policies and procedures and training programs to facilitate compliance with HIPAA and have performed a thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity and availability of electronic Protected Health Information (as defined by HIPAA) held by each Credit Party and each Subsidiary of a Credit Party in accordance with 45 C.F.R. § 164.308(a)(1)(ii)(A). No Credit Party and no Subsidiary of a Credit Party has received notice of complaints or investigations from any Governmental Authority regarding their respective uses or disclosure of individually identifiable health-related information.   With regard to individually identifiable health information, each Credit Party and each Subsidiary of a Credit Party has no knowledge of any non-permitted use or disclosure, breach of a Business Associate or confidentiality agreement, security incident (other than immaterial incidents that did not result in a disclosure of Protected Health Information) or breach (each as determined by reference to HIPAA or applicable state law) by, or involving the systems of, any Credit Party or any Subsidiary of a Credit Party or by any employee, contractor, or agent thereof.  Each Credit Party and each Subsidiary of a Credit Party is, and at all times has been, in compliance with all applicable Healthcare Laws related to reporting to individuals, the media, any Governmental Authority, or others, as applicable, breaches involving individually identifiable information, data loss, or identity theft.  No Credit Party has received any notice from any Governmental Authority that such Governmental Authority has imposed or intends to impose any enforcement actions, fines or penalties for any failure or alleged failure to comply with HIPAA or its implementing regulations.

(b)    Each Credit Party (i) is in compliance with all laws, statutes, rules, regulations, ordinances and tariffs of any Governmental Authority applicable to such Credit Party and such Credit Party's business, assets or operations, including, without limitation, ERISA and Healthcare Laws (as further described in (and without limiting the provisions of) <u>Section 7.23</u>), and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except for such events of noncompliance or violations that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

(c)    No Credit Party has (i) engaged in any Prohibited Transactions as defined in Section 406 of ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder, (ii) failed to meet any applicable minimum funding requirements under Section 302 of ERISA in respect of its plans and no funding requirements have been postponed or

delayed, (iii) any knowledge of any event or occurrence which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Title IV of ERISA to terminate any of the employee benefit plans, (iv) any fiduciary responsibility under ERISA for investments with respect to any plan existing for the benefit of Persons other than its employees or former employees, or (v) withdrawn, completely or partially, from any multi-employer pension plans so as to incur liability under the Multi-Employer Pension Plan Amendments of 1980. With respect to each Credit Party, there exists no event described in Section 4043 of ERISA, excluding Subsections 4043(b)(2) and 4043(b)(3) thereof, for which the required thirty (30) day notice period has not been waived.

(d)     Each Pension Plan is in compliance in all material respects with the applicable provisions or ERISA, the Code and other federal or state laws. Each Pension Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that the form of such plan is qualified under Section 401(a) of the Code and that the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code. Nothing has occurred which could reasonably be expected to result in the loss of such tax qualified status. No ERISA Event has occurred in the last six (6) years. No Credit Party nor any ERISA Affiliate has incurred in the last seven (7) years or reasonably expects to incur any liability under Title IV of ERISA.

(e)     Each Credit Party has maintained in all material respects all records required to be maintained by the Joint Commission on Accreditation of Healthcare Organizations, the Food and Drug Administration, Drug Enforcement Agency and State Boards of Pharmacy and the federal and state Medicare and Medicaid programs as required by the Healthcare Laws and, to the best knowledge of each Credit Party, there are no presently existing circumstances which likely would result in material violations of the Healthcare Laws.

(f)     No Credit Party (i) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such Person in any manner that violates such Section 2, or (iii) is a Person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other OFAC regulation or executive order.

(g)     Each Credit Party is in compliance, in all material respects, with the Patriot Act.

(h)     No Credit Party has received any notice that it is not in compliance in any respect with any of the foregoing representations.

7.11    Intellectual Property.  Schedule 7.11 sets forth, as of the Closing Date, all (a) Intellectual Property registrations and applications owned by the Credit Parties (including the Credit Party which owned each such Intellectual Property) and (b) Intellectual Property licenses either from or to any Credit Party (excluding shrink wrap, click through, browse wrap or commercial off-the-shelf software licensed in the ordinary course of business to Credit Parties pursuant to standard licensing terms which has not been modified or customized by a third party for the Credit Parties). With respect to each Intellectual Property owned by a Credit Party and set forth on Schedule 7.11, the Credit Party set forth on Schedule 7.11 as the owner thereof owns all right, title and interest in, to and under such Intellectual Property, subject only to any Intellectual Property licenses set forth on Schedule 7.11. Each Credit Party owns, or has valid licenses or sufficient rights to use, all Intellectual Property that is material to the operation of the business of such Credit Party (including without limitation the Intellectual Property listed on Schedule 7.11). To the knowledge of each Credit Party, (a) the conduct of business and use of Intellectual Property by each Credit Party does not materially infringe, misappropriate, dilute or violate any Intellectual Property owned by any

49

other Person, (b) no Person has challenged the use, validity or effectiveness of or contested any right, title or interest of any of the Credit Parties in any material Intellectual Property, and (c) no Person has or current is materially infringing, misappropriating, diluting or violating any Intellectual Property owned by any Credit Party. None of the material Intellectual Property owned by the Credit Parties is licensed to any Person except as licensed in the ordinary course of business.

      7.12    <u>Licenses and Permits; Labor Matters</u>.

      (a)    Each Credit Party is in compliance with and has all Permits necessary or required by applicable law or Governmental Authority for the operation of its businesses as currently conducted, except where noncompliance or the absence of which could not reasonably be expected to result in a Material Adverse Change. All of the foregoing are in full force and effect and not in known conflict with the rights of others. No Credit Party is (i) in breach of or default under the provisions of any of the foregoing, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a conflict, breach, default or event of default under, any of the foregoing which, if not remedied within any applicable grace or cure period could reasonably be expected to result in a Material Adverse Change, or (ii) a party to or subject to any agreement, instrument or restriction that is so unusual or burdensome that it might have a Material Adverse Change. Each Credit Party has obtained, and currently has, all Permits necessary in the generation of each Account of such Credit Party.

      (b)    There are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Credit Party, threatened) against or involving any Credit Party or any Subsidiary of any Credit Party, except for those that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change. Except as set forth in <u>Schedule 7.12(b)</u>, as of the Closing Date, (i) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Credit Party or any Subsidiary of any Credit Party, (ii) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Credit Party or any Subsidiary of any Credit Party and (iii) no such representative has sought certification or recognition with respect to any employee of any Credit Party or any Subsidiary of any Credit Party.

      (c)    Each Credit Party and each of its Subsidiaries is in compliance in all material respects with all employment agreements, employment contracts, collective bargaining agreements and other agreements among any such Credit Party or any of its Subsidiaries and its employees (collectively, "**Labor Contracts**") and all applicable federal, state and local labor and employment laws including those related to equal employment opportunity and affirmative action, labor relations, minimum wage, overtime, child labor, medical insurance continuation, worker adjustment and relocation notices, immigration controls and worker and unemployment compensation. There are no outstanding grievances, arbitration awards or appeals therefrom arising out of the Labor Contracts. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any Labor Contract to which any Credit Party or any of its Subsidiaries is bound.

      7.13    <u>No Default</u>. There does not exist any Default or Event of Default (for the avoidance of doubt, as each such term is defined in this Agreement).

      7.14    <u>Disclosure</u>. No Loan Document, nor any other agreement, document, certificate, or statement furnished to the Agent by or on behalf of any Credit Party in connection with any transactions contemplated by the Loan Documents (including the Transactions), nor any representation or warranty made by any Credit Party in any Loan Document contains any untrue statement of material fact or omits to state any fact necessary to make the statements therein not materially misleading. There is no fact known to any Credit Party which has not been disclosed to the Agent in writing which could reasonably be expected

to result in a Material Adverse Change.  All financial forecasts and projections delivered to Agent and/or Lenders have been prepared on the basis of the assumptions stated therein.  Such forecasts and projections represent Credit Parties' good faith estimate of future financial performance and such assumptions were believed by Credit Parties to be fair and reasonable in light of then-current business conditions as of the date made (or, with respect to forecasts and projections made before the Closing Date, as of the Closing Date) (it being understood and agreed by Agent and the Lenders that projections are not to be viewed as facts or a guarantee of financial performance, are subject to significant uncertainties and contingencies many of which are beyond the Credit Parties' control, that the actual results during the period or periods covered by such projections may differ from the projected results and that such differences may be material).

      7.15    <u>Existing Indebtedness; Investments, Guarantees and Material Contracts</u>.

      (a)    Except as expressly permitted by <u>Section 9.2</u> on the Closing Date, no Credit Party nor any Subsidiary of a Credit Party (i) has any outstanding Indebtedness other than Permitted Indebtedness, (ii) is subject or party to any mortgage, note, indenture, indemnity or guarantee of, with respect to or evidencing any Indebtedness of any other Person other than Permitted Indebtedness.  <u>Schedule 7.15(a)</u> sets forth all Indebtedness of a Credit Party or a Subsidiary of a Credit Party with a scheduled maturity date during the Term, and identifies such scheduled maturity date.  No Credit Party nor any Subsidiary of a Credit Party has any existing accrued and unpaid Indebtedness owing to any Governmental Authority or any other governmental payor.

      (b)    Except as expressly permitted by <u>Section 9.2</u> or <u>Section 9.3</u>, no Credit Party nor any Subsidiary of a Credit Party owns or holds any equity or long-term debt investments in, or has any outstanding advances to or any outstanding guarantees for the obligations of, or any outstanding borrowings from, any Person.

      (c)    Each Credit Party and each Subsidiary of a Credit Party has performed all material obligations required to be performed by such Person pursuant to or in connection with any Material Contract, and there has occurred no breach, default or event of default under any Material Contract or any fact, circumstance, condition or event which, with the giving of notice or passage of time or both, would constitute or result in a breach, default or event of default under any Material Contract.  Except as set forth on <u>Schedule 7.15</u>, no Restricted Person is party to any Material Contract.

      7.16    <u>Other Agreements</u>.  Except as set forth on <u>Schedule 7.16</u>, (i) there are no existing or proposed agreements, arrangements, understandings or transactions between any Credit Party or any Subsidiary of a Credit Party and any of such Person's officers, members, managers, directors, stockholders, partners, other interest holders, employees or Affiliates or any members of their respective immediate families, (ii) none of the foregoing Persons are directly or indirectly, indebted to or have any direct or indirect ownership, partnership or voting interest in, to such Credit Party's knowledge, any Affiliate of such Credit Party or any Person that competes with such Credit Party (except that any such Persons may own stock in, but not exceeding two percent (2.00%) of the outstanding capital stock of, any publicly traded company that may compete with such Credit Party), (iii) no director or officer of any Credit Party or any Subsidiary of a Credit Party has received any compensation of any kind in consideration or otherwise of such Credit Party or any of its Subsidiaries entering into this Agreement, and (iv) neither the Agent, any Lender nor any of their Affiliates has paid or offered to pay any compensation to any director or officer of any Credit Party in consideration of such Credit Party entering into the Loan Documents.

      7.17    <u>Insurance</u>.  The Credit Parties have in full force and effect such insurance policies as are customary in its industry and as may be required pursuant to <u>Section 8.4</u> hereof.  All such insurance policies are listed and described on <u>Schedule 7.17</u>.

7.18    Names; Location of Offices, Records and Collateral.

(a)    Schedule 7.18(a) sets forth, in each case as of the Closing Date, each Credit Party's legal name as it appears in official filings in its jurisdiction of organization or formation, its state of organization or formation, organization type, organization number, if any, issued by its state of organization or formation, its federal employer identification number and the location of such Credit Party's chief executive office, and such Schedule 7.18(a) also sets forth all jurisdictions of organization or formation and legal names of such Credit Party and all locations of such Credit Party's chief executive office for the five (5) years preceding the Closing Date.  Each Credit Party is the sole owner of all of its names listed on Schedule 7.18(a), and any and all business done and invoices issued in such names are such Credit Party's sales, business and invoices.  Each trade name of any respective Credit Party represents a division or trading style of such Credit Party.

(b)    Each Credit Party maintains its places of business and chief executive offices only at the locations set forth on Schedule 7.18(b), and all Accounts of such Credit Party arise, originate and are located, and all of the Collateral and all books and records in connection therewith or in any way relating thereto or evidence the Collateral are located and shall be only, in and at such locations.  All of the Collateral is located only in the continental United States.

(c)    There are no facts, events or occurrences which in any way impair the validity or enforceability thereof or tend to reduce the amount payable thereunder from the face amount of the claim or invoice and statements delivered to the Agent with respect thereto.  To the best of the Credit Parties' knowledge, (i) the Account Debtor thereunder had the capacity to contract at the time any contract or other document giving rise thereto was executed, and (ii) such Account Debtor is Solvent.  Each Credit Party has obtained and currently have all Permits necessary in the generation of each Account of such Credit Party and Borrowers have disclosed on Schedule 7.18(c) the amount of all Accounts of any Borrower for which Medicare is the Account Debtor and for which payment has been denied and subsequently appealed pursuant to the procedure described in the definition of Eligible Accounts hereof, and Borrowers are pursuing all available appeals in respect of such Accounts.

7.19    Lien Perfection and Priority.  Upon the execution and delivery of the Loan Documents, and upon the proper filing of the necessary financing statements and proper delivery of the necessary stock certificates and other possessory collateral, together with appropriate instruments or transfer, and without any further action, the Agent will have a good, valid and first priority Lien and security interest in the Collateral, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person, except for Permitted Liens.  No financing statement relating to any of the Collateral is on file in any public office, except those (a) on behalf of the Agent, and (b) in connection with Permitted Liens.

7.20    Investment Company Act.  No Credit Party is required to register as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

7.21    Regulations T, U and X.  No Credit Party is engaged in the business of extending credit for the purpose of purchasing or carrying any "margin stock" or "margin security" (within the meaning of Regulations T, U or X issued by the Board of Governors of the Federal Reserve System), and no proceeds of the Loans will be used to purchase or carry any margin stock or margin security or to extend credit to others for the purpose of purchasing or carrying any margin stock or margin security.

7.22    OFAC and Anti-Terrorism Regulations.

(a)    No Credit Party (i) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking

Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such Person in any manner that violates Section 2 of such executive order, or (iii) is a Person on the list of Specially Designated Nationals and Blocked Persons or is in violation of the limitations or prohibitions under any other OFAC regulation or executive order.

(b)     No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(c)     Each Credit Party acknowledges by executing this Agreement that Agent has notified such Credit Party that, pursuant to the requirements of the Patriot Act, the Agent and Lenders are required to obtain, verify and record such information as may be necessary to identify the Credit Party (including, without limitation) the name and address of such Credit Party, in accordance with the Patriot Act.

7.23     Healthcare Laws.

(a)     *Compliance with Healthcare Laws*. Each Credit Party and each Subsidiary of each Credit Party is in compliance in all material respects with all applicable Healthcare Laws.  None of the Credit Parties or any Subsidiary, nor to the knowledge of any Credit Parties, any director, officer, agent, employee, or other person acting on behalf of any Credit Parties or any Subsidiary, has taken any action, directly or indirectly, that would result in a violation of applicable Healthcare Laws.  The Credit Parties and each of their Subsidiaries has instituted and will continue to maintain policies and procedures designed to promote compliance with applicable Healthcare Laws.

(b)     *Fraud and Abuse*.   Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Change, none of any Credit Party, any Subsidiary of any Credit Party or any of their respective officers or directors has engaged in any activities that are prohibited under any Federal and State Fraud and Abuse Laws. No Credit Party or any of its Subsidiaries, nor, to the knowledge of the Credit Parties, any officer, affiliate or managing employee of the Credit Party or any of its Subsidiaries directly or indirectly, has (i) given any gift or gratuitous payment of any kind, nature or description (whether in money, property or services) in material violation of any applicable Healthcare Law or (ii) made any payment to any person with the intention that any part of such payment would be in material violation of any applicable Healthcare Law. To the knowledge of the Credit Parties, as of the Closing Date no person has filed or has threatened in writing to file against a Credit Party an action under any federal or state whistleblower statute related to alleged noncompliance with applicable Healthcare Laws.

(c)     *Permits, Licensing and Accreditation*.

(i)     Without limiting the generality of Section 7.12, each of the Credit Parties and their Subsidiaries has, to the extent applicable: (i) obtained (or been duly assigned) all Permits and certificates of need or determinations of need as required by the relevant state Governmental Authority for the acquisition, construction, expansion of, investment in or operation of its businesses, properties and assets, each as currently operated; (ii) obtained and maintains in good standing all material Permits; (iii) obtained and maintains accreditation from all generally recognized accrediting agencies to the extent required by applicable law or the terms of the Medical Reimbursement Programs in which such Credit

Parties and their Subsidiaries participate; (iv) entered into and maintains in good standing its Medicare Provider Agreements and, to the extent applicable, and Medicaid Provider Agreements; and (v) ensured that all such material Permits, accreditations, and Medicare and Medicaid Provider Agreements associated with Medical Reimbursement Programs in which such Credit Parties and their Subsidiaries participate (collectively, "**Certificates, Licenses and Accreditation**") are in full force and effect on the date hereof and have not been revoked or suspended or otherwise limited, nor, to any Credit Party's knowledge, is any such revocation, suspension or limitation threatened nor does any basis exist for any such revocation, suspension or limitation.  To the knowledge of the Credit Parties, no event has occurred or other fact exists with respect to the Certificates, Licenses and Accreditation that allows, or after notice or lapse of time or both, would allow, revocation, suspension, restriction, limitation or termination of any of the Certificates, Licenses and Accreditation.  Except as set forth on Schedule 7.23(c), no notice from any Governmental Authority in respect to the revocation, suspension, restriction, limitation or termination of any Certificates, Licenses and Accreditation has been delivered, issued, or proposed or threatened to the Credit Parties in writing.

(ii)    Each Credit Party is duly licensed, and has ensured that all Healthcare Professionals are duly licensed, by each state, state agency, commission or other Governmental Authority having jurisdiction over the provision of such services by such Person in the locations where the Credit Parties and their Subsidiaries conduct business, to the extent such licensing is required to enable such Person to provide the professional services provided by such Person and otherwise as is necessary to enable the Credit Parties and their Subsidiaries to operate as currently operated and as contemplated to be operated.

(d)    *Reimbursement from Medical Reimbursement Programs*.  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Change, with respect to Credit Party and any Subsidiary of the Credit Party, to the extent applicable: (i) each has the requisite provider number or other authorization to bill each Medical Reimbursement Program to which such Credit Party and any Subsidiary of the Credit Party, to the extent applicable, currently bills or submits claims; (ii) each has timely filed all reports required to be filed in connection with applicable Medicare and Medicaid programs and due on or before the date hereof, and all required reports and administrative forms and filings are true and complete; (iii) to the knowledge of the Credit Parties, there are no claims, actions, proceedings or appeals pending (and neither any Credit Party nor any of their Subsidiaries has made any filing that would result in any claims, actions or appeals) before any Governmental Authority with respect to any Medicare or Medicaid cost reports or claims filed by any Credit Party or any of their Subsidiaries on or before the date hereof, or with respect to any adjustments, denials, recoupments or disallowances by any intermediary, carrier, other insurer, commission, board or agency in connection with any cost reports or claims or relating to compliance by any Credit Party with any Healthcare Laws; (iv) no validation review, survey, inspection, audit, investigation or program integrity review related to any Credit Party or any Subsidiary has been conducted by any Governmental Authority or government contractor in connection with the Medicaid programs, and no such reviews are scheduled, pending or, threatened in writing against or affecting any Credit Party or any Subsidiary; and (v) each has timely filed all reports, data and other information required by any other Governmental Authority with authority to regulate any Credit Party or any Subsidiary or its business in any manner.  Credit Party has paid all undisputed refunds, overpayments, discounts and adjustments of which the Credit Party has knowledge that are due with respect to any such report or billing, and there is no pending or, to the knowledge of the Credit Party, threatened appeal, adjustment, challenge, audit (including written notice of an intent to audit), inquiry or litigation by any Medical Reimbursement Program with respect to any such report or billing. Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Change, neither the Credit Parties nor their Subsidiaries have: (i) submitted to any Medical Reimbursement Program any false, fraudulent, abusive or improper claim for payment, (ii) billed any Medical Reimbursement Program for any service not rendered as claimed, or (iii) received and retained any payment or reimbursement from any Medical Reimbursement Program in excess of the proper amount allowed by applicable law and applicable

contracts or agreements with the Medical Reimbursement Program.

(e)    *Compliance Program with Healthcare Laws*.  As of the Closing Date, each Credit Party and its Subsidiaries shall have a compliance program that complies in all material respects with applicable Healthcare Laws and is designed to promote compliance in all material respects with applicable Healthcare Laws and ethical standards, to improve the quality and performance of operations, and to detect, prevent, and address violations of legal or ethical standards applicable to its operations (the "**Compliance Program**").  Each Credit Party and its Subsidiaries are, and have been engaged in activities to monitor and maintain compliance in all material respects with the terms of its Compliance Program.  No Credit Party or any of its Subsidiaries has received any complaints from employees, independent contractors, vendors, physicians or any other Person that would indicate that any Credit Party or any Subsidiary has violated in any material respect any Health Care Law.

(f)    *Investigations; Exclusion*.  During the past seven (7) years there has not been, and to the knowledge of the Credit Parties, there is not currently, any action, suit, litigation, proceeding or investigation initiated or threatened by any Governmental Authority against any Credit Party, any Subsidiary of any Credit Party, or any owner, officer, director, partner, managing employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in any Credit Party or any Subsidiary of any Credit Party currently pending or threatened, including without limitation any action, suit, proceeding, litigation or investigation involving any alleged violation of any Health Care Laws.  No Credit Party and no Subsidiary of any Credit Party, nor any owner, officer, director, partner, managing employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in any Credit Party or any Subsidiary of any Credit Party, nor any Healthcare Professional has been (or, has been threatened in writing to be) (i) excluded from any Medical Reimbursement Programs in which such Credit Parties or their Subsidiaries participate pursuant to 42 U.S.C. § 1320a-7 and related regulations, (ii) debarred, disqualified, suspended or excluded from participation in any Medical Reimbursement Program in which such Credit Parties or their Subsidiaries participate or is listed on the General Services Administration list of excluded parties, nor is any such debarment, disqualification, suspension or exclusion threatened in writing or pending.  No Credit Party or any of its Subsidiaries is a party to a corporate integrity agreement or deferred prosecution agreement with the OIG.

(g)    *Corporate Practice of Medicine*.  There is no pending or, to the knowledge of the Credit Party, threatened, litigation, proceeding (in law or in equity) or, to the knowledge of the Credit Party, governmental or other investigation before any Governmental Authority alleging that the business of any Credit Party, any Subsidiary of any Credit Party or any Healthcare Professional violates applicable state laws and orders regarding (i) the organization or ownership of Persons that employ health care professionals, (ii) the manner in which physicians may split or share with non-physicians, including management service organizations, fees generated from the provision of professional services, (iii) the unauthorized or unlicensed practice of medicine by Persons not wholly-owned by doctors, and (iv) the enforcement of non-competition covenants entered into by health care professionals.

7.24    Solvency; Fraudulent Conveyance.

(a)    Each Credit Party is, individually and together with its Subsidiaries on a consolidated basis, Solvent.

(b)    No transfer of property is being made by any Credit Party and no obligation is being incurred by any Credit Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay or defraud either present or future creditors of such Credit Party.

7.25 <u>Holding Company</u>.  No Parent engages in any material business activity other than the activities permitted under <u>clause (t)</u> of <u>Article X</u>.

7.26 <u>No Brokers</u>.  None of the Credit Parties has dealt with any broker, investment banker, agent or other Person (except for the Agent, the Lenders and any Affiliate of the foregoing) who may be entitled to any commission or compensation in connection with the Loan Documents, the Loans or a transaction under or pursuant to this Agreement or the other Loan Documents.

7.27 <u>Survival</u>.  Credit Parties make the representations and warranties contained herein with the knowledge and intention that the Agent and Lenders are relying and will rely thereon.  All such representations and warranties will be made and shall be deemed to be made on the Closing Date. All representations and warranties contained herein survive the execution and delivery of this Agreement and the making of the Loans.

## VIII.   AFFIRMATIVE COVENANTS

Each Credit Party, jointly and severally, covenants and agrees that, until all of the Obligations have been fully performed and Paid in Full, and this Agreement has terminated:

8.1 <u>Financial Statements, Financial Reports, Approved Budget and Other Information</u>.

(a) *Financial Reports*.  The Borrowers shall furnish to the Agent (i) as soon as available and in any event within (i) one hundred twenty (120) calendar days after the end of each applicable Fiscal Year of Borrowers, for each Fiscal Year, audited annual consolidated and consolidating financial statements of Borrowers, including the notes thereto, consisting of a consolidated and consolidating balance sheet at the end of such completed Fiscal Year and the related consolidated and consolidating statements of income, retained earnings, cash flows and owners' equity for such completed Fiscal Year, which financial statements shall be prepared and certified without qualification by an independent certified public accounting firm satisfactory to the Agent and accompanied by related management letters, if available; and (ii) as soon as available and in any event within thirty (30) calendar days after the end of each calendar month, unaudited consolidated and consolidating financial statements of Borrowers consisting of (A) detailed reconciliations of all transfers to and from Affiliates of the Borrowers during the immediately preceding calendar month, Capital Expenditures made during such immediately preceding calendar month and all debt service payments made during such immediately preceding calendar month; (B) a balance sheet and statements of income, retained earnings, transfers cash flows and owners' equity, each as of the end of the immediately preceding calendar month; and (C) a management report describing the operations and financial condition of each Parent and its Subsidiaries for the month covered by such financial statements and the portion of the current Fiscal Year then elapsed.  All such financial statements shall be prepared in accordance with GAAP consistently applied with prior periods.

(b) *KPI Report*.  The Borrowers shall furnish to the Agent, together with the monthly financial statements required to be delivered pursuant to <u>Section 8.1(a)(ii)</u>, a KPI Report (substantially in the form set forth in <u>Exhibit F</u> hereto) duly completed and certified by certified by a Responsible Officer of the Administrative Borrower and detailing to the reasonable satisfaction of the Agent such key performance indicators as are reasonably requested by the Agent from time to time and which are reported in a manner consistent with past practice of the Credit Parties and any information related to actual results, budgets, forecasts and key performance indicators given to the board of directors (or comparably governing body) of any Credit Party at regularly scheduled board of directors (or comparably governing body) meetings.

56

(c)     *Compliance Certificate*.  With each such delivery of financial statements pursuant to <u>Section 8.1(a)</u>, the Credit Parties shall also deliver a certificate duly completed and certified by certified by a Responsible Officer of the Administrative Borrower in substantially the form of <u>Exhibit B</u> (a "**Compliance Certificate**") (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto; (ii) certifying the accuracy and completeness of each Approved Budget Variance Report and Borrowing Base Certificate delivered during the period elapsed since the last Compliance Certificate delivery; and (iii) attaching (x) a capitalization table of each Credit Party, together with a list of all Affiliates of each Credit Party each in form and substance reasonably acceptable to the Agent, and (y) a description of all intercompany Indebtedness by and between any Credit Party and any Affiliates of any Credit Party as of such date in form and substance reasonably acceptable to the Agent.

(d)     *Approved Budget; Borrowing Base Certificate*.

(i)     The Approved Budget shall be updated, modified or supplemented by the Administrative Borrower with the written consent of the Agent, and upon the request of the Agent from time to time, but in any event (unless otherwise agreed by the Agent) the Approved Budget shall be updated by the Administrative Borrower not less than one time in each four (4) consecutive week period, and each such updated, modified or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Agent in its sole discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; <u>provided</u>, <u>however</u>, that in the event the Agent and the Administrative Borrower cannot agree as to an updated, modified or supplemented budget, the prior Approved Budget shall continue in effect, and such disagreement shall give rise to an Event of Default once the period covered by the prior Approved Budget has terminated.  Each Approved Budget delivered to the Agent shall be accompanied by such supporting documentation as reasonably requested by the Agent.  Each Approved Budget shall be prepared in good faith, with due care and based upon assumptions which the Credit Parties believe to be reasonable.

(ii)     The Administrative Borrower shall deliver to the Agent, not later than 5:00 p.m., on Wednesday of each week (commencing with the first such day of the first full calendar week following the Closing Date), an Approved Budget Variance Report, prepared by the Administrative Borrower through the last day of the Prior Week, the Cumulative Four-Week Period and the Cumulative Period, together with (A) a list of all currently existing and proposed Vendor Payables Arrangements and, if available, the proposed documentation with respect to such Vendor Payables Arrangements, (B) a weekly Cash Flow Report (substantially in the form set forth in <u>Exhibit H</u> hereto) detailing (1) the status of all payments, denials and appeals of all Medicare and Medicaid Accounts, (2) a sales and collection report and Accounts (including Health Care Insurance Receivables and other accounts receivable) and accounts payable aging schedule, including a report of sales, credits issued and collections received, all such reports showing a reconciliation to the amounts reported in the Approved Budget Variance Report for the immediately prior week, and (3) such other information as is reasonably requested by Agent from time to time.  The Agent (A) may assume that the Credit Parties will comply with the Approved Budget, (B) shall have no duty to monitor such compliance, and (C) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to the Agent are estimates only, and the Credit Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document.

(iii)    *Borrowing Base Certificate.*  The Administrative Borrower shall deliver to the Agent, not later than 5:00 p.m. on Wednesday of each week (commencing with the first such day of the first full calendar week following the Closing Date), a certificate duly completed and certified by certified by a Responsible Officer of the Administrative Borrower in substantially the form of Exhibit G (a "**Borrowing Base Certificate**"), setting forth computations in reasonable detail satisfactory to the Required Lenders demonstrating compliance with the covenants contained in Section 9.1(c) and detailing (1) all Eligible Accounts through the last day of the Prior Week; and (2) a list of all Accounts (including Health Care Insurance Receivables) of each Borrower which have become ineligible during the Cumulative Four-Week Period because they fall within one of the specified categories of ineligibility set forth in the definition of Eligible Accounts.

(e)    *Other Materials.*  The Credit Parties shall furnish to the Agent as soon as available, and in any event within ten (10) calendar days after the preparation or issuance thereof or at such other time as set forth below: (i) copies of such financial statements (other than those required to be delivered pursuant to Section 8.1(a)) prepared by, for or on behalf of the Credit Parties and any other notes, reports and other materials related thereto, including, without limitation, any pro forma financial statements, (ii) any reports, returns, information, notices and other materials that any Credit Party shall send to its stockholders, members, partners or other equity owners at any time, (iii) all Federal Healthcare Program cost reports and other documents and materials filed by any Credit Party and any other reports, materials or other information regarding or otherwise relating to any Federal Healthcare Program prepared by, for or on behalf of any Credit Party, (iv) any other reports, materials or other information regarding or otherwise relating to any Federal Healthcare Program prepared by, for, or on behalf of, any Credit Party or any of its Subsidiaries, including, without limitation, (A) copies of licenses and permits required by any applicable federal, state, foreign or local law, statute ordinance or regulation or Governmental Authority for the operation of its business, (B) Medicare and Medicaid provider numbers and agreements, (C) state surveys pertaining to any healthcare facility operated or owned or leased by any Credit Party or any of its Affiliates or Subsidiaries, (D) participating agreements relating to medical plans, (v) promptly after the same are filed, copies of all periodic or special reports which such Person may make to, or file with any Governmental Authority, including, for avoidance of doubt, any Governmental Authority with oversight or other responsibility for enforcement of Healthcare Laws; (vi) promptly upon receipt thereof, copies of any reports submitted to any Credit Party by its independent accountants in connection with any interim audit of the books of such Person or any of its Affiliates and copies of each management control letter provided by such independent accountants, (vii) within fifteen (15) calendar days after the execution thereof, a copy of any contracts with the federal government or with a Governmental Authority in the State of New York, (viii) a report showing a reconciliation of Capital Expenditures to changes in property, plant and equipment and investments, (ix) promptly, upon the request of the Required Lenders (but not more than once per fiscal quarter), the Borrowers shall be available for a conference call with the Lenders to provide business and financial updates with respect to the Credit Parties and their Subsidiaries; (x) promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Credit Party or any of its Subsidiaries with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of the Securities and Exchange Commission, or with any national securities exchange, or distributed to its shareholders, as the case may be; (xi) promptly after the receipt thereof by any Credit Party, or any of their respective Subsidiaries, a copy of any "management letter" received by any such Person from its certified public accountants and the management's response thereto; (xii) promptly after the request by the Agent or any Lender, all documentation and other information that the Agent or such Lender, as applicable, reasonably requests in order to comply with its ongoing obligations under their respective policies and by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the Patriot Act; and (xiii) such additional information, documents, statements, reports and other materials as Agent may reasonably request from a credit or security perspective or otherwise from time to time.

58

(f)     *Notices*.  The Credit Parties shall promptly, and in any event within two (2) calendar days after any Credit Party or any Responsible Officer of any Credit Party obtains knowledge thereof, notify the Agent in writing of (i) any pending or threatened litigation, suit, investigation, arbitration, dispute resolution proceeding or administrative proceeding brought or initiated by any Credit Party or otherwise affecting or involving or relating to any Credit Party or any of its property or assets to the extent (A) the amount in controversy exceeds $100,000, or (B) to the extent any of the foregoing seeks injunctive relief; (ii) any Default or Event of Default, which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto; (iii) any other development, event, fact, circumstance or condition that would reasonably be expected to result in a Material Adverse Change, in each case describing the nature and status thereof and the action proposed to be taken with respect thereto, (iv) any notice received by any Credit Party from any payor of a claim, suit or other action such payor has, claims or has filed against any Credit Party; (v) any matter(s) affecting the value, enforceability or collectability of any of the Collateral, including, without limitation, claims or disputes in the amount of $50,000 or more, singly or in the aggregate, in existence at any one time; (vi) any notice of default given by any Credit Party by any other lender of any Credit Party or any counterparty to a Material Contract and shall furnish to the Agent a copy of such notice, (vii) receipt of any notice or request from any Governmental Authority or governmental payor regarding any liability or claim of liability which exceeds $50,000; (viii) receipt of any notice by any Credit Party regarding termination of any manager of any facility owned, operated or leased by any Credit Party; (ix) if any Account becomes evidenced or secured by an Instrument or Chattel Paper; (x) the receipt by any Credit Party of any notice, correspondence, subpoena, civil investigative demand, or document or record request from any Governmental Authority relating to any violation, possible violation, or inquiry or investigation of any kind or nature concerning compliance by any Credit Party with Healthcare Laws; (xi) the voluntary disclosure by any Credit Party or any Subsidiary of any Credit Party to the OIG, any Federal Healthcare Program (including to any intermediary, carrier or contractor of such Federal Healthcare Program), of an actual or potential overpayment matter involving the submission of claims to a Medical Reimbursement Program in an amount greater than $250,000; (xii) any pending, threatened or actual investigation or survey of any Credit Party, its directors, officers or managing employees by any Federal Healthcare Program, or any other third party payor programs, (xiii) any Credit Party becoming a party to a Corporate Integrity Agreement with the OIG, (xiv) any Credit Party becoming subject to reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (xv) any Credit Party becoming the subject of any Federal Healthcare Program investigation conducted by any federal or state enforcement agency; (xvi) any Credit Party becoming a defendant in any qui tam/False Claims Act litigation; (xvii) any Credit Party being served with or received any search warrant, subpoena, civil investigative demand or contact letter by or from any Governmental Authority relating to an investigation; (xviii) any Credit Party becoming subject to any written complaint filed with or submitted to any Governmental Authority having jurisdiction over such Credit Party or filed with or submitted to such Credit Party pursuant to such Credit Party's policies relating to the filing or submissions of such types of complaints, from employees, independent contractors, vendors, physicians, or any other person that would indicate that such Credit Party has violated any law, regulation or law; (ixx) any actual, pending or threatened strikes, lockouts or slowdowns against any Credit Party or any Subsidiary or of any labor controversy threatening to result in any of the forgoing; (xx) receipt by any Credit Party or any Subsidiary of any Credit Party of any notice or communication from an accrediting organization that such Person is in danger of losing its accreditation due to a failure to comply with a plan of correction; or (xxi) any change in Healthcare Laws that could reasonably be expected to have a Material Adverse Change or which could materially adversely affect the most recent budget and projections of the Credit Party delivered pursuant to <u>Section 8.1(h)</u>.

(g)     *Consents*.  The Credit Parties shall obtain and deliver from time to time all required consents, approvals and agreements from such third parties as Agent shall determine are necessary or desirable in its reasonable discretion, each of which must be satisfactory to the Agent in its reasonable discretion, with respect to (i) the Loan Documents and the transactions contemplated thereby (including the

Transactions), (ii) claims against any Credit Party or the Collateral, and/or (iii) any agreements, consents, documents or instruments to which any Credit Party is a party or by which any properties or assets of any Credit Party or any of the Collateral is or are bound or subject, including, without limitation, Collateral Access Agreements.

(h)     *Operating Budget.*  The Credit Parties shall furnish to the Agent on or prior to the Closing Date and for each Fiscal Year thereafter not less than sixty (60) calendar days prior to the commencement of such Fiscal Year, consolidated and consolidating month by month projected operating budgets, annual projections, profit and loss statements, balance sheets and cash flow reports of and for Credit Parties for such upcoming Fiscal Year (including an income statement for each month and a balance sheet as at the end of the last month in each fiscal quarter), in each case prepared in accordance with GAAP consistently applied with prior periods.

(i)     *Parents / CHS Financial Statements.*  The Credit Parties (or each Parent and CHS on behalf of the Credit Parties) shall furnish to the Agent as soon as available and in any event within 120 calendar days after the end of each Fiscal Year of each Parent and CHS, unaudited annual consolidated and consolidating financial statements of each Parent and CHS, consisting of a consolidated and consolidating balance sheet at the end of such completed Fiscal Year and the related consolidated and consolidating statements of income, retained earnings, cash flows and owners' equity for such completed Fiscal Year.

8.2     <u>Conduct of Business and Maintenance of Existence and Assets</u>.  Each Credit Party shall (a) conduct its business in accordance with good business practices customary to the industry; (b) engage principally in the same or similar lines of business substantially as heretofore conducted immediately prior to the Closing Date; (c) collect its Accounts in the ordinary course of business; (d) maintain all of its material properties, assets and equipment used in its business in good repair, working order and condition (normal wear and tear excepted and except as may be disposed of in the ordinary course of business and in accordance with the terms of the Loan Documents and otherwise as determined by such Credit Party using commercially reasonable business judgment); (e) from time to time to make all necessary or desirable repairs, renewals and replacements thereof, as determined by such Credit Party using commercially reasonable business judgment, (f) maintain and keep in full force and effect its existence and all material Permits and qualifications to do business and good standing in each jurisdiction in which the ownership or lease of property or the nature of its business makes such Permits or qualification necessary and in which failure to maintain such Permits or qualification could reasonably be expected to result in a Material Adverse Change; (g) remain in good standing and maintain operations in all jurisdictions in which currently located; and (h) with respect to Intellectual Property material to the operation of the business of such Credit Party, (i) protect, defend, enforce and maintain such Intellectual Property owned by such Credit Party and maintain Intellectual Property licenses, (ii) promptly advise Agent in writing of any known material infringement by any Person or loss of rights in such Intellectual Property, and (iii) not allow any such Intellectual Property owned by such Credit Party to be abandoned, forfeited or dedicated to the public.

8.3     <u>Compliance with Legal and Other Obligations</u>.  Each Credit Party shall (a) comply with all laws, statutes, rules, regulations, ordinances and tariffs of all Governmental Authorities applicable to it or its business, assets or operations, including applicable Healthcare Laws, except where noncompliance could not reasonably be expected to result in a Material Adverse Change; (b) pay all taxes, assessments, fees, governmental charges, claims for labor, supplies, rent and all other obligations or liabilities of any kind as and when due, except to the extent (i) any such failure to pay, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, (ii) such liabilities relate to trade payables constituting Permitted Indebtedness pursuant to <u>clause (d)</u> of such term, or (iii) such liabilities are being contested in good faith by appropriate and lawful proceedings (which proceedings have the effect of preventing the forfeiture or sale of any property or assets) and with respect to which adequate reserves are being maintained by such Person in accordance with GAAP to the reasonable satisfaction of the Agent; (c)

perform in accordance with its terms each contract, agreement or other arrangement to which it is a party or by which it or any of the Collateral is bound, except where the failure to comply, pay or perform, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change; (d) maintain and comply with all Permits necessary to conduct its business and comply with any new or additional requirements that may be imposed on it or its business, except where the absence of such Permit or noncompliance, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change; and (e) properly file all Federal Healthcare Program cost reports. Each Credit Party and its Subsidiaries shall continue to maintain the Compliance Program in full force and effect, including without limitation engaging in activities designed to monitor and maintain compliance in all material respects with the terms of the Compliance Program and applicable law, each as amended from time to time. Without limiting the foregoing, each Credit Party is, and while this Agreement shall remain in effect shall remain, qualified for participation in Federal Healthcare Programs; each Credit Party has, and while this Agreement shall remain in effect shall maintain, a current and valid provider contract with such programs; each Credit Party is, and while this Agreement shall remain in effect shall remain, in compliance with the conditions of participation in such Federal Healthcare Programs; and each Credit Party has, and while this Agreement shall remain in effect shall maintain, all approvals or qualification necessary for capital reimbursement for any facility operated by such Credit Party. While this Agreement shall remain in effect, all billing practices of the Credit Parties with respect to any facility operated by any Credit Party and all Medical Reimbursement Programs, including Federal Healthcare Programs, shall remain in compliance with all applicable laws, regulations and policies of such Medical Reimbursement Programs except where noncompliance could not reasonably be expected to result in a Material Adverse Change.

8.4     Insurance.

(a)     Each Credit Party shall, and shall cause each of its Subsidiaries to (a) keep all of its insurable properties and assets adequately insured in all material respects against losses, damages and hazards as are customarily insured against by businesses engaging in similar activities or owning similar assets or properties and at least the minimum amount required by applicable law, including, without limitation, medical malpractice and professional liability insurance, as applicable; and maintain general public liability insurance at all times against liability on account of damage to persons and property having such limits, deductibles, exclusions and co-insurance and other provisions as are customary for a business engaged in activities similar to those of Borrowers; and (b) maintain, and will cause each Subsidiary to maintain, (i) casualty insurance on all real and personal property on an all risks basis (including the perils of flood and quake), covering the repair and replacement cost of all such property and coverage for business interruption and public liability insurance (including products/completed operations liability coverage) in each case of the kinds customarily carried or maintained by Persons of established reputation engaged in similar businesses and in amounts reasonably acceptable to Agent (but not less than the amounts in place as of the Closing Date) and (ii) such other insurance coverage in such amounts and with respect to such risks as Agent may reasonably request if Agent determines in good faith that there has been a material increase in Credit Parties' risk profile from that in effect on the Closing Date. All such insurance shall be provided by insurers having an A.M. Best policyholders rating reasonably acceptable to Agent (it being agreed that the insurers of the Credit Parties on the Closing Date are acceptable).

(b)     Each Credit Party shall, and shall cause each of its Subsidiaries to cause Agent to be named as an additional insured, assignee and loss payee (which shall include, as applicable, identification as mortgagee), as applicable, on each insurance policy required to be maintained by a Credit Party pursuant to this Section 8.4 pursuant to customary endorsements in form and substance reasonably acceptable to Agent. The Borrowers will deliver to Agent and Lenders (i) on or prior to the Closing Date (and prior to each anniversary thereof), a current certificate from Credit Parties' insurance broker dated such date showing the amount of coverage as of such date, and that such policies include effective waivers (whether under the terms of any such policy or otherwise) by the insurer of all claims for insurance premiums against

61

all loss payees and additional insureds and all rights of subrogation against all loss payees and additional insureds, and that if all or any part of such policy is canceled, terminated or expires, the insurer will forthwith give notice thereof to each additional insured, assignee and loss payee and that no cancellation, reduction in amount or material change in coverage thereof shall be effective until at least thirty (30) days after receipt by each additional insured, assignee and loss payee of written notice thereof, (ii) on an annual basis, and upon the request of any Lender through Agent from time to time, full information as to the insurance carried, (iii) within five (5) Business Days of receipt of notice from any insurer, a copy of any notice of cancellation, nonrenewal or material change in coverage from that existing on the date of this Agreement, and (iv) forthwith, notice of any cancellation or nonrenewal of coverage by any Credit Party or any of its Subsidiaries.

(c)     In the event any Credit Party fails to provide Agent with evidence of the insurance coverage required by this Agreement within five (5) Business Days of receiving a written request thereof from Agent, Agent may purchase insurance at Credit Parties' expense to protect the Agent's interests in the Collateral. This insurance may, but need not, protect any Credit Party's interests. The coverage purchased by Agent may not pay any claim made by a Credit Party or any claim that is made against a Credit Party in connection with the Collateral. Credit Parties may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that Credit Parties have obtained insurance as required by this Agreement. If Agent purchases insurance for the Collateral, Credit Parties will be responsible for the costs of that insurance to the fullest extent provided by law including interest and other charges imposed by Agent in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance that Credit Parties are able to obtain on their own.

8.5     <u>True Books</u>. Each Credit Party shall (a) keep true, complete and accurate books of record and account in accordance with commercially reasonable business practices in which true and correct entries are made of all of its and their dealings and transactions in all material respects; and (b) set up and maintain on its books such reserves as may be required by GAAP with respect to doubtful accounts and all taxes, assessments, charges, levies and claims and with respect to its business, and include such reserves in its quarterly as well as year-end financial statements.

8.6     <u>Inspections; Periodic Audits and Reappraisals</u>. Each Credit Party shall permit the representatives of Agent, at the expense of the Credit Parties, from time to time during normal business hours upon reasonable prior notice, to (a) visit and inspect any of its offices or properties or any other place where Collateral is located to inspect the Collateral and/or to examine or audit all of its books of account, records, reports and other papers, (b) make copies and extracts therefrom, and (c) discuss its business, operations, prospects, properties, assets, liabilities, condition and/or Accounts and Inventory with its officers and independent public accountants (and by this provision such officers and accountants arc authorized to discuss the foregoing). So long as no Default or Event of Default then exists, such visits, inspections, examinations, audits and discussions shall be conducted by the Agent at such times and in such manner so as to avoid interference in the conduct of the Credit Parties' business to the extent reasonably practicable. The Agent is also authorized, from time to time to conduct or obtain, at the Credit Parties' expense, but not more frequently than annually (so long as no Default or Event of Default exists, in which case such limit shall not apply), updated audits and/or appraisals of Inventory by appraisers acceptable to the Agent in its discretion. The Credit Parties agree to pay and reimburse Agent for all actual costs and reasonable expenses incurred by the Agent and/or its Affiliates in connection with such visits, inspections, examinations, audits and appraisals.

8.7     <u>Further Assurances; Post-Closing</u>. At the Credit Parties' cost and expense, each Credit Party shall (a) within five (5) Business Days after the Agent's written request, take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments,

instructions or documents as the Agent may reasonably request with respect to the purposes, terms and conditions of the Loan Documents and the consummation of the transactions contemplated thereby (including the Transactions), whether before, at or after the performance or consummation of the Transactions contemplated hereby or the occurrence of any Default or Event of Default; (b) without limiting and notwithstanding any other provision of any Loan Document, execute and deliver, or cause to be executed and delivered, such agreements and documents, and take or cause to be taken such actions, and otherwise perform, observe and comply with such obligations, as are set forth on Schedule 8.7; and (c) upon the exercise by the Agent or any of its Affiliates of any power, right, privilege or remedy pursuant to any Loan Document or under applicable law or at equity which requires any consent, approval, registration, qualification or authorization of any Governmental Authority, execute and deliver, or cause the execution and delivery of, all applications, certificates, instruments and other documents that may be so required for such consent, approval, registration, qualification or authorization.  Without limiting the foregoing, upon the exercise by the Agent or any of its Affiliates of any right or remedy under any Loan Document which requires any consent, approval or registration with, consent, qualification or authorization by, any Person, each Credit Party shall execute and deliver, or cause the execution and delivery of, all applications, certificates, instruments and other documents that the Agent or its Affiliate may be required to obtain for such consent, approval, registration, qualification or authorization.

8.8    Use of Proceeds.  The Borrowers shall use the proceeds of the Loans only as follows: (a) on the Closing Date to pay fees and expenses in connection with the Transactions, and (b) on or after the Closing Date, to finance the Borrowers' working capital requirements and for any other lawful purpose permitted under this Agreement.

8.9    Taxes and Other Charges.

(a)    All payments and reimbursements to the Agent and Lenders made under any Loan Document shall be free and clear of and without deduction for all taxes, levies, imposts, deductions, assessments, charges or withholdings, and all liabilities with respect thereto of any nature whatsoever, excluding taxes to the extent imposed on the Agent's or any Lender's net income.  If any Credit Party shall be required by law to deduct any such amounts from or in respect of any sum payable under any Loan Document to the Agent or any Lender, then the sum payable to the Agent or such Lender shall be increased as may be necessary so that, after making all required deductions, the Agent or such Lender receives an amount equal to the sum it would have received had no such deductions been made.  Notwithstanding any other provision of any Loan Document, if at any time after the Closing (i) any change in any existing law, regulation, treaty or directive or in the interpretation or application thereof, (ii) any new law, regulation, treaty or directive enacted or any interpretation or application thereof, or (iii) compliance by the Agent or any Lender with any request or directive (whether or not having the force of law) from any Governmental Authority: (A) subjects the Agent or such Lender to any tax, levy, impost, deduction, assessment, charge or withholding of any kind whatsoever with respect to any Loan Document, or changes the basis of taxation of payments to the Agent or such Lender of any amount payable thereunder (except for net income taxes, or franchise taxes imposed in lieu of net income taxes, imposed generally by federal, state or local taxing authorities with respect to interest or commitment fees or other fees payable hereunder or changes in the rate of tax on the overall net income of the Agent or such Lender), or (B) imposes on the Agent or any Lender any other condition or increased cost in connection with the transactions contemplated thereby or participations therein; and the result of any of the foregoing is to increase the cost to the Agent or such Lender of making or continuing any Loan hereunder or to reduce any amount receivable hereunder, then, in any such case, the Credit Parties shall promptly, and in any event within ten (10) Business Days of the Credit Parties' receipt of notice from the Lender, pay to the Lender any additional amounts necessary to compensate the Agent or such Lender, on an after-tax basis, for such additional cost or reduced amount as determined by the Lender.  If the Lender becomes entitled to claim any additional amounts pursuant to this Section 8.9 it shall promptly notify the Credit Parties of the event by reason of which the Agent or any

Lender has become so entitled, and each such notice of additional amounts payable pursuant to this <u>Section 8.9</u> submitted by the Agent or any Lender to the Credit Parties shall, absent manifest error, be final, conclusive and binding for all purposes.

(b)      The Credit Parties shall promptly, and in any event within five (5) Business Days after any Credit Party or any Responsible Officer of any Credit Party obtains knowledge thereof, notify the Agent in writing of any oral or written communication from any taxing authority or otherwise with respect to any (i) tax investigations, relating to any Credit Party directly, or relating to any consolidated tax return which was filed on behalf of such Credit Party, (ii) notices of tax assessment or possible tax assessment, (iii) years that are designated open pending tax examination or audit, and (iv) information that could give rise to any tax liability or assessment.

8.10    <u>Payroll Taxes</u>.  Without limiting or being limited by any other provision of any Loan Document, the Credit Parties at all times shall retain and use Kronos Incorporated or another Person acceptable to the Agent to process, manage and pay its payroll taxes and shall cause to be delivered to Agent within ten calendar days after the end of each calendar month a report of its payroll taxes for the immediately preceding calendar month and evidence of payment thereof.

8.11    <u>New Subsidiaries</u>.  If at any time after the Closing Date any Credit Party shall form or acquire any new Subsidiary, such Credit Party shall promptly, and in any event not later than fifteen (15) calendar days after the creation or acquisition of such Subsidiary, execute, and cause such new Subsidiary to execute, and deliver to Agent such joinder agreements and amendments to this Agreement and the other Loan Documents, including executing and delivering allonges and/or endorsements, as appropriate, to any Notes to the extent issued hereunder in form and substance satisfactory to the Agent and providing such other documentation as the Agent may reasonably request, including, without limitation, UCC searches, as applicable, and filings, legal opinions and corporate authorization documentation, and to take such other actions in each case as Agent deems necessary or advisable to (a) join and make such new Subsidiary the Borrower hereunder and thereunder, subject to all the rights and benefits and obligations and burdens of the Borrower hereunder, and (b) grant to the Agent a perfected first priority security interest in the Collateral subject to no Liens other than the Permitted Liens.

8.12    <u>Board Observation Rights</u>.  Each Credit Party and any Subsidiary thereof shall allow two individuals designated by Agent, to attend and participate in all meetings and other activities of the board of directors (or comparably governing body) of each Credit Party and Subsidiary thereof (whether in person or by telephone), including all committees and sub committees thereof (collectively the "**Board Observers**").  Agent shall have the right to change the identity of any Board Observer designated by it at any time and from time to time by notice to Administrative Borrower.  Each Board Observer so appointed shall serve in that capacity until he or she resigns or is removed, and no other Person shall be entitled to remove such Board Observer except Agent.  Each Credit Party and Subsidiary thereof shall (a) give Agent notice of all such meetings, at the same time as furnished to the members of the applicable board of directors (or comparably governing body) of such Credit Party or any of its Subsidiaries thereof and such meetings shall occur at least four times per calendar year (with at least one of such meetings being held in person), (b) provide each Board Observer all notices, documents and information furnished to the members of the board of directors (or comparably governing body) of such Credit Party or any of its Subsidiaries thereof, whether at or in anticipation of a meeting, an action by written consent or otherwise, at the same time furnished to the members of such board of directors (or comparably governing body), (c) notify each Board Observer, and permit such Board Observer to participate by telephone or in person in, emergency meetings of such board of directors (or comparably governing body), (d) hold not less than four (4) board of directors (or comparably governing body) meetings per year, with not less than one (1) such meeting being held in person; and (e) provide such Board Observer copies of the minutes of all such meetings at the time such minutes are furnished to the members of the board of directors (or comparably governing body); <u>provided</u>

64

such Board Observer shall not be entitled to receive materials relating to, or be in attendance for any discussions relating to, topics to the extent such board of directors (or comparably governing body) determines in good faith that receipt of such materials, or such attendance, by Agent would jeopardize the attorney-client privilege applicable to such materials or discussions or to the extent the information being discussed at such meeting or disclosed in such materials directly relates to any of any Credit Party's strategy, negotiating positions or similar matters directly relating to Agent or directly relating to any refinancing or replacement of the Term Loans.  The Credit Parties shall reimburse Agent for reasonable and customary out of pocket expenses incurred by the Board Observers in attending any in-person board of directors (or comparably governing body) meetings or committee meetings.

## IX.    NEGATIVE COVENANTS

Each Credit Party, jointly and severally, covenants and agrees that, until all of the Obligations have been fully performed and Paid in Full, and this Agreement has terminated:

9.1    Budget Covenants and Cure Right.

(a)    *Minimum Net Cash Flow*.  Commencing with the first full calendar week following the Closing Date and for each calendar week thereafter, the Credit Parties shall not permit the Actual Net Cash Flow, for and calculated as of the end of any Cumulative Four-Week Period, to be less than 75% of the Budgeted Net Cash Flow for such Cumulative Four-Week Period, with all vendor payables paid in accordance with the Approved Budget and all rent paid current in the ordinary course of business.

(b)    *Minimum Disbursement Amount*.  Commencing with the first full calendar week following the Closing Date and for each calendar week thereafter, the Credit Parties shall not permit the Actual Disbursement Amount, for and calculated as of the end of any Cumulative Four-Week Period, to be less than 90% of the Budgeted Disbursement Amount for such Cumulative Four-Week Period.

(c)    *Minimum Eligible Accounts*.  Commencing with the first full calendar week following the Closing Date and for each calendar week thereafter, if at any time, the Borrowing Base shall exceed the sum of the aggregate amount of Eligible Accounts, the Borrowers shall make a prepayment in respect of the Term Loans pursuant to and in accordance with Section 2.3(c)(v) hereof, in an amount sufficient to eliminate such Eligible Account Shortfall.  For purposes of this Agreement, the amount, if any, by which the Borrowing Base exceeds the aggregate amount of Eligible Accounts shall be referred to herein as an "**Eligible Account Shortfall**".

(d)    *Budget Covenant Cure Right*.  Notwithstanding any provision to the contrary set forth in Article X or Article XI, in the event that the Borrowers fail to comply with the covenant set forth in Section 9.1(a) for and calculated as of the end of any Cumulative Four-Week Period, until the end of the third Business Day after the day on which the Approved Budget Variance Report in respect of such Cumulative Four-Week Period is required to be delivered pursuant to Section 8.1(d) (such three (3) Business Day period, the "**Cure Period**"), the Borrowers shall have the right (the "**Cure Right**") to receive (directly or indirectly) cash contributions on terms satisfactory to the Agent in its sole discretion from their respective equity holders and such equity holders respective Affiliates or proceeds of unsecured loans specifically made in connection with the exercise of the Cure Right which are subordinated to the Obligations on terms satisfactory to the Agent in its sole discretion (collectively, a "**Specified Cash Contribution**"), which Specified Cash Contribution shall be included in the calculation of Actual Cash Receipts solely for purposes of determining compliance with the covenant set forth in 9.1(a) for and calculated as of the end of such Cumulative Four-Week Period and for subsequent Cumulative Four-Week Periods that include the date on which the Specified Cash Contribution is received, and not for any other purpose under this Agreement; provided that any Specified Cash Contribution received in connection with

the exercise of the Cure Right shall not exceed the applicable Cure Amount.  As used herein, the term "**Cure Amount**" shall, with respect to any Cumulative Four-Week Period, equal an amount which, if it were deemed to increase the Actual Cash Receipts for the applicable Cumulative Four-Week Period, would result in the Borrowers being in pro forma compliance with the covenant set forth in 9.1(a) for and calculated as of the end of such Cumulative Four-Week Period.  If, after giving effect to an exercise of the Cure Right as described in this 9.1(d), the Borrowers are in compliance with the set forth in 9.1(a) for and calculated as of the end of the applicable Cumulative Four-Week Period, then the Borrowers shall be deemed to have cured the corresponding Events of Default on the date the proceeds of the applicable Specified Cash Contribution are received by the Borrowers.  So long as the Borrowers are otherwise entitled to exercise the Cure Right pursuant to the terms and provisions of this 9.1(d), and are able to cure the applicable Events of Default caused by the failure to comply with 9.1(a) for and calculated as of the end of the applicable Cumulative Four-Week Period by exercising such Cure Right, the Agent shall not exercise any remedy (including acceleration) under the Loan Documents or applicable law based on the Borrowers' failure to comply with 9.1(a) for and calculated as of the end of the applicable Cumulative Four-Week Period until after the expiration of the applicable Cure Period, unless the Agent has received a written notice from any Borrower or any of the Borrowers' equity holders that the Cure Right will not be exercised in respect of any such Default or Event of Default caused by the failure to comply with 9.1(a).

9.2    Permitted Indebtedness.  No Credit Party, nor any of their Subsidiaries, shall create, incur, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness.  No Credit Party, nor any of their Subsidiaries, shall make prepayments on any existing or future Indebtedness to any Person other than with respect to the Obligations or to the extent specifically permitted by this Agreement.  For the avoidance of doubt, under no circumstances shall any Indebtedness, the incurrence or suffering to exist of which is prohibited by Section 9.6, be Permitted Indebtedness or otherwise permitted by this Section 9.2.

9.3    Permitted Liens.  No Credit Party, nor any of their Subsidiaries, shall create, incur, assume or suffer to exist any Lien upon, in or against, or pledge of, any of the Collateral or any of its other properties or assets, whether now owned or hereafter acquired, except Permitted Liens.  For the avoidance of doubt, under no circumstances shall any Lien, the creation, incurrence, assumption or suffering to exist of which is prohibited by Section 9.6, be a Permitted Lien or otherwise permitted by this Section 9.3.

9.4    Investments; New Facilities or Collateral; Subsidiaries.  No Credit Party, nor any of their Subsidiaries, shall, directly or indirectly, (a) purchase, own, hold, invest in, contribute capital to, or otherwise acquire obligations or equity interests or debt or other securities of, or any other interest in, or all or substantially all of the assets of, any Person (including any Restricted Person), other than as in existence at Closing and as set forth on Schedule 7.3; or (b) except as permitted by Section 9.6(a), make or permit to exist any loans, advances, capital contributions or guarantees to or for the benefit of any Person or assume, guarantee, endorse, contingently agree to purchase or otherwise become liable for or upon or incur any obligation of any Person (other than those created by the Loan Documents and Permitted Indebtedness and other than (i) trade credit extended in the ordinary course of business, (ii) advances for business travel and similar temporary advances made in the ordinary course of business to officers, directors and employees, (iii) investments in Cash Equivalents and (iv) the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business).  For the avoidance of doubt, under no circumstances shall any investment or other transaction otherwise permitted by this Section, the making or suffering to exist of which is prohibited by Section 9.6, be permitted by this Section 9.4.  No Credit Party, nor any of their Subsidiaries, shall, directly or indirectly, purchase, own, operate, hold, invest in or otherwise acquire any facility, property or assets or any Collateral that is not located at the locations set forth on Schedule 7.18(b), unless such Credit Party shall provide to the Agent at least thirty (30) Business Days prior written notice.  No Credit Party, nor any of their Subsidiaries, shall have any Subsidiaries other than those Subsidiaries, if any, existing at Closing and set forth on Schedule 7.3, unless such Credit Party and new Subsidiary fully complies with Section 8.11.

9.5     Dividends; Redemptions.  No Credit Party, nor any of their Subsidiaries, shall (a) declare, pay or make any Distribution, (b) apply any of its funds, property or assets to the acquisition, redemption or other retirement of any Capital Stock, (c) otherwise make any payments or Distributions to any stockholder, member, partner or other equity owner in such Person's capacity as such, or (d) make any payment of any Management or Service Fee; provided that, notwithstanding the foregoing, each Borrower may make Permitted Tax Distributions.

9.6     Transactions with Affiliates.  No Credit Party, nor any of their Subsidiaries, shall enter into or consummate any transaction of any kind with any of its Affiliates other than: (a) salary, bonus, employee stock option and other compensation and employment arrangements with directors or officers in the ordinary course of business, provided that no payment of any bonus shall be permitted if a Default or Event of Default has occurred and is continuing or would arise therefrom; (b) Distributions permitted pursuant to Section 9.5; (c) the making of payments permitted under and pursuant to a written agreement entered into by and between a Credit Party and one or more of its Affiliates that both (i) reflects and constitutes a transaction on overall terms at least as favorable to such Credit Party as would be the case in an arm's-length transaction between unrelated parties of equal bargaining power, and (ii) is subject to such terms and conditions as are reasonably acceptable to Agent and (d) [reserved].  Notwithstanding anything to the contrary set forth in this Agreement or in any other Loan Documents, without the express prior written consent of the Agent, which may be withheld or delayed in the reasonable discretion of the Agent, no Credit Party nor any of their respective Subsidiaries may enter into or permit to exist any transaction or agreement (a) pursuant to which it becomes a party to any mortgage, note, indenture or guarantee evidencing any Indebtedness of any of its Affiliates (which is not also a Credit Party) or otherwise to become responsible or liable, as a guarantor, surety or otherwise, pursuant to agreement for any Indebtedness of any such Affiliates; or (b) which is outside of the ordinary course of business and results in (i) the amount of any account payable of any Credit Party or any of their respective Subsidiaries payable to any of their respective Affiliates (which is not also a Credit Party) exceeding the corresponding amount for such payable as set forth on the balance sheet delivered to the Agent on the Closing Date; and (ii) the amount of any account receivable of any Credit Party or any of their respective Subsidiaries payable by any of their respective Affiliates (which is not also a Credit Party) to be less than the corresponding amount for such payable as set forth on the balance sheet delivered to the Agent on the Closing Date (unless the reduction of such receivable is caused by a corresponding payment made to such Credit Party or Subsidiary in cash). Notwithstanding anything to the contrary set forth herein, for purposes of this Section 9.6, each Restricted Person shall be deemed to be an Affiliate of the Credit Parties and their Subsidiaries.

9.7     Charter Documents: Fiscal Year; Fundamental Changes.  No Credit Party, nor any of their Subsidiaries, shall (a) amend, modify, restate or change its certificate of incorporation or formation or bylaws or operating agreement or similar charter documents, (b) amend, modify, restate or change any Material Contract or waive any Credit Party's rights under any Material Contract, in each case, in a manner adverse to any Credit Party, the Agent or any Lender, as determined by the Agent at its reasonable discretion, (c) change its Fiscal Year, (d) amend, alter or suspend or terminate or make provisional in any material way, any material Permit without the prior written consent of the Agent, which consent shall not be unreasonably withheld, (e) wind up, liquidate, dissolve, merge, consolidate with or into another Person (in each case, voluntarily or involuntarily) or commence or suffer any proceedings seeking or that would result in any of the foregoing, (f) use any proceeds of any Loan for "purchasing" or "carrying" "margin stock" as defined in Regulations U, T or X of the Board of Governors of the Federal Reserve System, or (g) without providing at least thirty (30) calendar days prior written notice to the Agent and receiving a written acknowledgment from the Agent that all actions required by the Agent, including those required to continue the perfection of the Agent's Liens in the Collateral, have been completed, change (i) its name, (ii) its organizational structure, including, without limitation, by way of a combination, merger, consolidation, disposition, dissolution, liquidation or transfer, (iii) its jurisdiction or organization or formation, (iv) the location of its chief executive office, or (v) its organizational identification number

issued by its jurisdiction of organization or formation, if it has one.

9.8     Truth of Statements.  No Credit Party, nor any of their Subsidiaries or Affiliates, shall furnish to Agent any certificate or other document that contains any untrue statement of a material fact or that omits to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

9.9     IRS Form 8821. No Credit Party, nor any of their Subsidiaries, shall alter, amend, restate, or otherwise modify, or withdraw, terminate or re-file the IRS Form 8821 required to be delivered pursuant to the Conditions to Closing in Section 6.1 hereof.

9.10     Transfer of Assets.  Notwithstanding any other provision of this Agreement or any other Loan Document, no Credit Party, nor any of their Subsidiaries, shall, nor shall any Credit Party permit any of its Subsidiaries to, sell, lease, transfer, assign or otherwise dispose of any interest in any properties or assets (other than obsolete fixed assets or excess fixed assets no longer needed in the conduct of the business in the ordinary course of business and sales of Inventory in the ordinary course of business), or agree to do any of the foregoing at any future time, except that:

(a)     a Credit Party may lease or sublease (as lessor or sub-lessor) real or personal property pursuant to a true lease not constituting Indebtedness and not entered into as part of a sale and leaseback transaction, in each case, in the ordinary course of business and which could not reasonably be expected to result in a Material Adverse Change;

(b)     a Credit Party may license or sublicense Intellectual Property on a nonexclusive basis to third parties in the ordinary course of business, provided that such licenses or sublicenses shall not interfere with the business or other operations of such Credit Party and that such Credit Party's rights, title and/or interest in or to such Intellectual Property and interests therein are pledged to Agent as further security for the Obligations and included as part of the Collateral; and

(c)     a Credit Party may consummate such other sales or dispositions of property or assets (including any sale or transfer or disposition of all or any part of its assets and, thereupon and within one year thereafter rent or lease the assets so sold or transferred) only to the extent prior written notice has been given to Agent and to the extent Agent has given its prior written consent thereto, subject in each case to such conditions as may be set forth in such consent.

9.11     OFAC.  No Credit Party nor any Subsidiary of any Credit Party (a) will be or become a Person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079(2001)), (b) will engage in any dealings or transactions prohibited by Section 2 of such executive order, or otherwise be associated with any such Person in any manner that violates Section 2 of such executive order, or (c) otherwise will become a Person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other OFAC regulation or executive order.

9.12     Payroll Accounts.  No Credit Party, nor any of their Subsidiaries, shall maintain a greater balance in any payroll account than is necessary to support such Credit Party's current payroll and payroll for one additional payroll cycle (bi-monthly or weekly as applicable).

9.13     Payment of Permitted Subordinated Debt. No Credit Party, nor any of their Subsidiaries, shall (i) make any prepayment of any part or all of any Permitted Subordinated Debt, (ii) repurchase, redeem or retire any instrument evidencing any such Permitted Subordinated Debt prior to maturity, or (iii) enter

into any agreement (oral or written) which could in any way be construed to amend, modify, alter or terminate any one or more instruments or agreements evidencing or relating to any Permitted Subordinated Debt. Notwithstanding the foregoing, so long as no Default or Event of Default shall have occurred and be continuing or would arise therefrom, the Credit Parties may make payments on Permitted Subordinated Debt to the extent contemplated to be paid in the Approved Budget and to the extent permitted to be paid pursuant to the applicable Subordination Agreement.

      9.14    <u>Burdensome Agreements</u>.  Except for any contractual obligation in effect on and as of the Closing Date and disclosed on <u>Schedule 9.14</u>, no Credit Party, nor any of their respective Subsidiaries, shall enter into or permit to exist any contractual obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Credit Party or any of their respective Subsidiaries to make or pay any Distributions to any Credit Party or to otherwise transfer property to or invest in any Credit Party, (ii) of any Subsidiary of any Credit Party to guarantee the Obligations, (iii) of any Credit Party or any of their respective Subsidiaries to make or pay any Permitted Tax Distributions; (iv) of any Subsidiary to make or repay loans to a Credit Party, or (v) of the Credit Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; <u>provided</u>, <u>however</u>, that this <u>clause (v)</u> shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under <u>clauses (c)</u> of the definition of Permitted Indebtedness, or in connection with Liens permitted under <u>clauses (e)</u> of the definition of Permitted Liens, in any case, solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

      9.15    <u>[Reserved]</u>.

      9.16    <u>HRH</u>.  No Borrower will amend or modify the HRH Facility except as permitted by the HRH Subordination Agreement.  No Borrower will pay, prepay, redeem, refund, refinance or exchange any obligations (whether principal, interest, fees or otherwise) under the HRH Facility except to the extent permitted by the HRH Subordination Agreement.

## X.    EVENTS OF DEFAULT

      The occurrence of any one or more of the following shall constitute an "**Event of Default**":

      (a)    any Credit Party shall fail to pay any amount on the Obligations when due (whether on any payment date, at maturity, by reason of acceleration, by notice of intention to prepay, by required prepayment or otherwise); or

      (b)    any representation, statement or warranty made or deemed made by any Credit Party in any Loan Document or in any other certificate, document, report or opinion delivered in conjunction with any Loan Document, shall not be true and correct in all material respects or shall have been false or misleading in any material respect on the date when made or deemed to have been made (except to the extent already qualified by materiality, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect); or

      (c)    any Credit Party shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in, any of <u>Section 8.1</u>, <u>8.2</u>, <u>8.4</u>, <u>8.6</u>, <u>8.7</u>, <u>8.8</u> or <u>8.11</u>, any Section of <u>Article IX</u>; or

      (d)    any Credit Party shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in, any Loan Document (not

specified in clause (a) or (c) of this Article X) and such violation, breach, default or failure shall not be cured within the earliest of (i) the applicable period set forth in the applicable Loan Document, and (ii) fifteen (15) calendar days after the occurrence of such violation, breach, default or failure, with such fifteen (15) calendar day cure period commencing upon the earlier of (x) Receipt by such Credit Party of written notice of such breach, default, violation or failure, and (y) the time at which such Credit Party or any Responsible Officer thereof knew or became aware, or should have known or been aware, of such failure, violation, breach or default, but, in each case of clause (i) and (ii) above, no Loans will be made during the applicable cure period; or

(e)      (i) any of the Loan Documents ceases to be in full force and effect, or (ii) any Lien created thereunder ceases to constitute a valid perfected first priority Lien on the Collateral in accordance with the terms thereof, or the Agent ceases to have a valid perfected first priority security interest in any of the Collateral or any securities pledged to the Agent pursuant to the Loan Documents; provided that, with respect to non-material breaches or violations that constitute Events of Default under clause (ii) of this Article X(e), there shall be a three (3) Business Day cure period commencing from the earlier of (A) Receipt by the applicable Person of written notice of such breach or violation or of any event, fact or circumstance constituting or resulting in any of the foregoing, and (B) the time at which such Person or any Responsible Officer thereof knew or became aware, or should have known or been aware, of such breach or violation and resulting Event of Default or of any event, fact or circumstance constituting or resulting in any of the foregoing; or

(f)      one or more judgments, tax judgments, decrees, arbitrations or other binding award is rendered against any Credit Party, or any of their Subsidiaries, in an amount in excess of $100,000 individually or $500,000 in the aggregate, which is/are not satisfied, stayed, vacated or discharged of record within thirty (30) calendar days of being rendered, but no Loans will be made before the judgment is stayed, vacated or discharged; or

(g)      (i) any default occurs, which is not cured within any applicable grace period or otherwise waived by the applicable counterparty, (x) in the payment when due of any amount with respect to any Indebtedness (other than the Obligations) of any Credit Party, or any of their Subsidiaries, having an aggregate principal balance of at least $250,000, or (y) in the performance, observance or fulfillment of any provision contained in any agreement, contract, document or instrument to which any Credit Party, or any of their Subsidiaries, is a party or to which any of their properties or assets are subject or bound and relating any Indebtedness having an aggregate principal balance of at least $250,000 and such default continues for more than any applicable grace period or permits the holder of any such Indebtedness to accelerate the maturity thereof, or (ii) any Indebtedness of any Credit Party, or any of their Subsidiaries having an aggregate principal balance of at least $250,000 is declared to be due and payable or is required to be repaid (other than by a regularly scheduled payment), repurchased, defeased or redeemed prior to the stated maturity thereof, or there occurs an event which, with the giving of notice or lapse of time, or both, would cause any such obligation to become, or allow any such obligation to be declared to be, due and payable prior to the stated maturity thereof; or

(h)      any Credit Party, or any Subsidiary of a Credit Party, shall (i) be unable, or shall admit in writing its inability, to pay substantially all of its debts generally as they become due (including the Obligations hereunder), (ii) make a general assignment for the benefit of its creditors, (iii) commence, or consent to, a proceeding for the appointment of a receiver, trustee, liquidator or conservator of itself or of the whole or any substantial part of its property, or (iv) file a petition seeking reorganization or liquidation or similar relief under any Debtor Relief Law; or

(i)      (i) a court of competent jurisdiction shall (A) enter an order, judgment or decree appointing a custodian, receiver, trustee, liquidator or conservator of any Credit Party, or any of their

Subsidiaries, or the whole or any substantial part of any such Person's properties, which shall continue unstayed and in effect for a period of sixty calendar days, (B) shall approve a petition filed against any Credit Party, or any of their Subsidiaries, seeking reorganization, liquidation or similar relief under the any Debtor Relief Law, which is not dismissed within sixty (60) calendar days or, (C) under the provisions of any Debtor Relief Law, assume custody or control of any Credit Party, or any of their Subsidiaries, or of the whole or any substantial part of any such Person's properties, which is not irrevocably relinquished within sixty (60) calendar days, or (ii) there is commenced against any Credit Party, or any of their Subsidiaries, any proceeding or petition seeking reorganization, liquidation or similar relief under any Debtor Relief Law and either (A) any such proceeding or petition is not unconditionally dismissed within sixty (60) calendar days after the date of commencement, or (B) such Credit Party, or Subsidiary of the Credit Party, takes any action to indicate its approval of or consent to any such proceeding or petition, but no Loans will be made before any such order, judgment or decree described above is stayed, vacated or discharged, any such petition described above is dismissed, or any such custody or control described above is relinquished; or

(j)        (i) any Change of Control occurs or any agreement to cause or that may result in any such Change of Control is entered into, (ii) any Material Adverse Change occurs or is reasonably expected to occur, (iii) any Liability Event occurs or is reasonably expected to occur, or (iv) any Credit Party ceases any material portion of its business operations as conducted as of the Closing Date; or

(k)        the Agent receives any indication or evidence that (i) a Credit Party, or any Subsidiary of a Credit Party, may have directly or indirectly been engaged in any type of activity, which, in the Agent's reasonable judgment, might result in forfeiture of any property to any Governmental Authority which shall have continued unremedied for a period of ten (10) calendar days after written notice from the Agent (but no Loans will be made before any such activity ceases) or (ii) a Credit Party or any of its Subsidiaries, directors or senior officers is criminally indicted or convicted under any law that could lead to a forfeiture of any Collateral; or

(l)        uninsured damage to, or loss, theft or destruction of, any portion of the Collateral occurs that exceeds $125,000 in the aggregate; or

(m)        the issuance of any process for levy, attachment or garnishment or execution upon or prior to any judgment against any Credit Party, any Subsidiary of a Credit Party, or any of its property or assets exceeds $125,000 in the aggregate; or

(n)        the loss, suspension or revocation of, or failure to renew, any license or Permit now held or hereafter acquired by any Credit Party, in each case, if such loss, suspension, revocation or failure to renew, individually or in the aggregate, could reasonably be expected to have a Material Adverse Change; or

(o)        any Credit Party, or any Subsidiary of a Credit Party, shall be suspended or excluded from (i) any Medicaid Provider Agreement, Medicaid Certification, Medicare Provider Agreement, Medicare Certification or (ii) any Medical Reimbursement Program, where such exclusion or suspension arises from fraud or other claims or allegations that, in each case (in the case of the immediately preceding clauses (i) and (ii)), could reasonably be expected to have a Material Adverse Change; or

(p)        (i) any default or event of default shall have occurred and be continuing under the Christ Lease Documents; or (ii) Christ Lessor shall commence, or provide any notice of its intent to take, any enforcement action with respect to any default under the Christ Lease Documents, including, without limitation, the termination of the Christ Lease Agreement;

71

(q)      (i) any of the subordination, standstill, payover and insolvency related provisions of any of the Permitted Subordinated Debt (the "**Subordination Provisions**") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Permitted Subordinated Debt; or (ii) any Credit Party or any holder of such Permitted Subordinated Debt shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Agent, or (C) that all payments of principal of or premium and interest on the applicable Permitted Subordinated Debt, or realized from the liquidation of any property of any Credit Party, shall be subject to any of the Subordination Provisions; or

(r)      Christ Lessor shall commence, or provide any notice of its intent to take, any action resulting in the termination of the Christ Lease Agreement; or

(s)      CHS shall not be the holder, directly or indirectly, of a majority of the interests in the Borrowers;

(t)      any Parent engages in any material business activity other than (i) the ownership of the Capital Stock of the applicable Borrower(s), (ii) the taking of actions expressly permitted by the Loan Documents to which it is a party, (iii) performance of its obligations under Loan Documents to which it is a party, (iv) activities and contractual rights incidental to the maintenance of its legal existence (including, without limitation, the ability to incur fees, costs and expenses necessary to such maintenance), (v) participating in tax, accounting and other administrative matters as a member of a consolidated group of companies, (vi) holding any cash or property received in connection with Distributions permitted under Section 9.5 pending application thereof, (vii) providing indemnification to officers, directors and employees and (viii) activities incidental to the businesses or activities described in the foregoing clauses (i) through (vii); or

(u)      the occurrence of any ERISA Event; or

(v)      any Affiliate of any Borrower shall (i) make any prepayment or other payment outside the course of ordinary terms in respect of Indebtedness owed to any Person who is an Affiliate of the Borrower, or (ii) amend or otherwise modify the terms of such Indebtedness without the consent of the Agent.

Upon the occurrence of an Event of Default, notwithstanding any other provision of any Loan Document, the Agent may, without notice or demand, do any of the following: (i) terminate the Lenders' obligations to make Loans hereunder, whereupon the same shall immediately terminate and all or any of the Loans and/or Notes, all interest thereon and all other Obligations shall automatically, without any further action by the Agent, be due and payable immediately (except in the case of an Event of Default under clause (h) or clause (i) of Article X, in which event all of the foregoing shall automatically and without further act by the Agent be due and payable), and (ii) prohibit any action permitted to be taken under Article IX, in each case without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Credit Party.

## XI.      RIGHTS AND REMEDIES AFTER DEFAULT

11.1      Rights and Remedies.

(a)      In addition to the acceleration provisions set forth in Article X above, upon the occurrence and continuation of an Event of Default, the Agent shall have the right to exercise any and all rights, options and remedies provided for in any Loan Document, under the UCC or at law or in equity,

including the right to (i) at Credit Parties' expense, require that all or any part of the Collateral be assembled and made available to the Agent at any place designated by the Agent, (ii) reduce or otherwise change any lending commitment hereunder, (iii) assess the Default Rate of interest, and/or (iv) relinquish or abandon any Collateral or securities pledged or any Lien thereon.  Notwithstanding any provision of any Loan Document, the Agent, in its sole discretion, shall have the right, at any time that the Credit Parties fail to do so, and from time to time, without prior notice, to: (i) obtain insurance covering any of the Collateral to the extent required hereunder; (ii) pay for the performance of any of Obligations; (iii) discharge taxes or Liens on any of the Collateral that are in violation of any Loan document unless Credit Parties are in good faith with due diligence by appropriate proceedings contesting those items; and (iv) pay for the maintenance and preservation of the Collateral.  Such expenses and advances shall be added to the Obligations until reimbursed to the Agent and shall be secured by the Collateral, and such payments by the Agent shall not be construed as a waiver by the Agent of any Event of Default or any other rights or remedies of the Agent. Each Borrower hereby waives any and all rights that they may have to a judicial hearing in advance of the enforcement of any of the Agent's rights and remedies hereunder, including, without limitation, its right following the occurrence of an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

(b)     Each Borrower agrees that notice received by it at least ten (10) calendar days before the time of any intended public sale, or the time after which any private sale or other disposition of Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition.  If permitted by applicable law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by the Agent without prior notice to the Credit Parties. At any sale or disposition of Collateral or securities pledged, the Agent may (to the extent permitted by applicable law) purchase all or any part thereof free from any right of redemption by the Credit Parties which right is hereby waived and released. Each Credit Party covenants and agrees not to, and not to permit or cause any of their Subsidiaries to, interfere with or impose any obstacle to the Agent's exercise of its rights and remedies with respect to the Collateral.  The Agent, in dealing with or disposing of the Collateral or any part thereof, shall not be required to give priority or preference to any item of Collateral or otherwise to marshal assets or to take possession or sell any Collateral with judicial process.

11.2     <u>Rights of Agent to Appoint Receiver</u>.  Without limiting and in addition to any other rights, options and remedies the Agent has under the Loan Documents, the UCC, at law or in equity, upon the occurrence and continuation of an Event of Default, Agent shall have the right to apply for and have a receiver appointed by a court of competent jurisdiction in any action taken by the Agent to enforce its rights and remedies in order to manage, protect, preserve, sell or dispose the Collateral and continue the operation of the business of the Credit Parties and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership including the compensation of the receiver and to the payments as aforesaid until a sale or other disposition of such Collateral shall be finally made and consummated.  To the extent not prohibited by applicable law, each Borrower hereby irrevocably consents to and waives any right to object to or otherwise contest the appointment of a receiver as provided above.  Each Credit Party (i) grants such waiver and consent knowingly after having discussed the implications thereof with counsel, (ii) acknowledges that (A) the uncontested right to have a receiver appointed for the foregoing purposes is considered essential by Agent in connection with the enforcement of its rights and remedies hereunder and under the other Loan Documents and (B) the availability of such appointment as a remedy under the foregoing circumstances was a material factor in inducing the Agent to make the Loans to such Credit Party and (iii) to the extent not prohibited by applicable law, agrees to enter into any and all stipulations in any legal actions, or agreements or other instruments required or reasonably appropriate in connection with the foregoing, and to cooperate fully with the Agent in connection with the assumption and exercise of control by any receiver over all or any portion of the Collateral.

11.3     <u>Rights and Remedies not Exclusive</u>.  The Agent shall have the right in its sole discretion

to determine which rights, Liens and remedies the Agent may at any time pursue, relinquish, subordinate or modify, and such determination will not in any way modify or affect any of the Agent's rights, Liens or remedies under any Loan Document, applicable law or equity.  The enumeration of any rights and remedies in any Loan Document is not intended to be exhaustive, and all rights and remedies of Agent described in any Loan Document are cumulative and are not alternative to or exclusive of any other rights or remedies which Agent otherwise may have.  The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

11.4    <u>Standards for Exercising Remedies</u>.  To the extent that applicable law imposes duties on Agent to exercise remedies in a commercially reasonably manner, each Borrower hereby acknowledges and agrees that it is not commercially unreasonable for Agent (a) to fail to incur expenses reasonably deemed significant by Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third-party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove Liens against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of: Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as the Credit Parties, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure Agent against risks of loss, collection or disposition of Collateral or to provide to the Agent a guaranteed return from the collection or disposition of Collateral or (1) to the extent deemed appropriate by the Agent, to obtain the services of brokers, investment bankers, consultants or other professionals to assist Agent in the collection or disposition of any of the Collateral.  Each Credit Party further acknowledges that the purpose of this <u>Section 11.4</u> is to provide non-exhaustive indications of what acts or omissions by the Agent would not be commercially unreasonable in the Agent's exercise of remedies against the Collateral and that other acts or omissions by the Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this <u>Section 11.4</u>. Without limitation upon the foregoing, nothing contained in this <u>Section 11.4</u> shall be construed to grant any rights to any Credit Party or to impose any duties upon the Agent that would not have been granted or imposed by this Agreement or by applicable law in the absence of this <u>Section 11.4</u>.

## XII.    WAIVERS AND JUDICIAL PROCEEDINGS

12.1    <u>Waivers</u>.  Except as expressly provided for herein, each Borrower hereby waives setoff, counterclaim, demand, presentment, protest, all defenses with respect to any and all instruments and all notices and demands of any description, and the pleading of any statute of limitations as a defense to any demand under any Loan Document.  Each Borrower hereby waives any and all defenses and counterclaims they may have or could interpose in any action or procedure brought by Agent to obtain an order of court recognizing the assignment of, or Lien of the Agent in and to, any Collateral, whether or not payable by a Medicaid/Medicare Account Debtor.  With respect to any action hereunder, the Agent conclusively may rely upon, and shall incur no liability to any Credit Party in acting upon, any request or other communication that the Agent reasonably believes to have been given or made by a person authorized on any Credit Party's behalf, whether or not such person is listed on the incumbency certificate delivered pursuant to <u>Section 6.1</u>. In each such case, each Borrower hereby waives the right to dispute the Agent's action based upon such

request or other communication, absent manifest error.

      12.2   <u>Delay; No Waiver of Defaults</u>.  No course of action or dealing, renewal, release or extension of any provision of any Loan Document, or single or partial exercise of any such provision, or delay, failure or omission on Agent's pail in enforcing any such provision shall affect the liability of any Credit Party or operate as a waiver of such provision or affect the liability of such Credit Party or preclude any other or further exercise of such provision.  No waiver by any party to any Loan Document of any one or more defaults by any other party in the performance of any of the provisions of any Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver. Notwithstanding any other provision of any Loan Document, by completing the Closing under this Agreement and/or by making Loans, the Agent does not waive any breach of any representation or warranty under any Loan Document, and all of the Agent's claims and rights resulting from any such breach or misrepresentation are specifically reserved.

      12.3   <u>Jury Waiver</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

      12.4   <u>Cooperation in Discovery and Litigation</u>.  In any litigation, arbitration or other dispute resolution proceeding relating to any Loan Document, each Credit Party waives any and all defenses, objections and counterclaims it may have or could interpose with respect to (a) any of its directors, officers, employees or agents being deemed to be employees or managing agents of such Credit Party for purposes of all applicable law or court rules regarding the production of witnesses by notice for testimony (whether in a deposition, at trial or otherwise), (b) the Agent's counsel examining any such individuals as if under cross-examination and using any discovery deposition of any of them as if it were an evidence deposition, and (c) using all commercially reasonable efforts to produce in any such dispute resolution proceeding, at the time and in the manner requested by Agent, all Persons, documents (whether in tangible, electronic or other form) and other things under its control and relating to the dispute.

## XIII.  SURVIVAL

      13.1   <u>Survival</u>.  This Agreement shall continue in full force and effect until the Obligations have been fully performed and are Paid in Full.  All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by Credit Parties in any Loan Document shall survive the execution and delivery of the Loan Documents, the Closing, the making of the Loans and any termination of this Agreement until all Obligations are fully performed and indefeasibly Paid in Full. The obligations and provisions of <u>Sections 3.4</u>, <u>12.1</u>, <u>12.3</u>, <u>12.4</u>, <u>13.1</u>, <u>15.1</u>, 15.5, <u>15.8</u> and <u>15.11</u> shall survive termination of the Loan Documents and any payment, in full or in part, of the Obligations.

## XIV.  THE AGENT

      14.1   <u>Appointment and Authority</u>.  Each of the Lenders hereby irrevocably appoints Capitala to

act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Credit Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

14.2    <u>Rights as a Lender</u>.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Credit Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

14.3    <u>Exculpatory Provisions</u>.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u> that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Credit Parties or any of their Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

(d)    The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Section 15.3</u> and <u>Article XI</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(e)    The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless and until Agent shall have received written notice from a Lender or the Administrative Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders.  Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Agent and the Lenders.  In no event shall the Agent be required to

comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

(f)    The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Loan Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

14.4    Reliance by Agent.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  The Agent may consult with legal counsel (who may be counsel for any Credit Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

14.5    Delegation of Duties.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Agent.  The Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Affiliates of the Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

14.6    Resignation of Agent.  The Agent may at any time give written notice of its resignation to the Lenders and the Administrative Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Administrative Borrower, to appoint a successor.  If no such successor shall have been so appointed by the Required Lenders, as applicable, and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent; provided that if the Agent shall notify the Administrative Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the applicable Lenders appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring

77

Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Credit Parties to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Administrative Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and 15.5 and 15.8 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them (i) while the retiring Agent was acting as Agent hereunder and (ii) after such resignation, for as long as any of them continues to act in any capacity hereunder or under any other Loan Document, including (a) acting as collateral agent or otherwise holding any collateral security on behalf of the Lenders and (b) in respect of any actions taken in connection with transferring the agency to a successor Agent.

14.7     Non-Reliance on Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Except as provided in Section 14.11, the Agent shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of any Credit Party that may come into the possession of the Agent.

14.8     Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Credit Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agent and their respective agents and counsel and all other amounts due the Lenders and the Agent under Section 3.4, 3.5 and 15.8) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

(c)     and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due to the Agent under Section 3.4, 3.5 and 15.8.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

14.9    Collateral and Guaranty Matters.  The Lenders irrevocably authorize the Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the applicable Lenders in accordance with Section 15.1; and

(b)    to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (e) of the definition of Permitted Liens.

Upon request by the Agent at any time, the applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property.  In each case as specified in this Section 14.9, the Agent will, at the Credit Parties' expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Loan Documents or to subordinate its interest in such item, in each case in accordance with the terms of the Loan Documents and this Section 14.9.

14.10    Notice of Transfer.  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 15.3.

14.11    Reports and Financial Statements.  By signing this Agreement, each Lender:

(a)    is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all financial statements required to be delivered by the Credit Parties (collectively, the "**Reports**");

(b)    expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Credit Parties and will rely significantly upon the Credit Parties' books and records, as well as on representations of the Credit Parties' personnel;

(d)    agrees to keep all Reports confidential in accordance with the provisions of Section 15.11 hereof; and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Loans that the indemnifying Lender has made or may make to the Credit Parties, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender

preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

14.12    <u>Agency for Perfection</u>.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law of the United States can be perfected only by possession.  Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

14.13    <u>Indemnification of Agent</u>.  Without limiting the obligations of the Credit Parties hereunder, the Lenders hereby agree to indemnify the Agent and any of its Affiliate, as the case may be, on a ratable basis, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent and its Affiliates in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent and its Affiliates in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's and its Affiliates' gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

14.14    <u>Relation among Lenders</u>.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

## XV.    MISCELLANEOUS

15.1    <u>Amendments; Waivers</u>.

(a)    Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrowers and the Required Lenders; <u>provided</u>, <u>however</u>, that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest or fees on any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan, without the prior written consent of each Lender directly adversely affected thereby, (ii) increase or extend any Commitment or decrease or extend the date for payment of any fees of any Lender without the prior written consent of such Lender, (iii) amend or modify the pro rata requirements of <u>Section 2.4</u>, the provisions of <u>Section 15.3</u> or the provisions of this Section or release all or substantially all of the Collateral, without the prior written consent of each Lender or (iv) reduce the percentage contained in the definition of the term "Required Lenders" without the prior written consent of each Lender (it being understood that with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Commitments on the date hereof); <u>provided further</u> that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent hereunder or under any other Loan Document without the prior written consent of the Agent.

(b)    Notwithstanding the foregoing, the Agent and the Administrative Borrower may amend any Loan Document to (i) extend the Maturity Date by a period not exceed six (6) months beyond the Maturity Date as in effect on the Closing Date and/or (ii) correct administrative errors or omissions, or to effect administrative changes that are not adverse to any Lender.

Notwithstanding anything to the contrary contained herein, any such amendment pursuant to this <u>Section 15.1(b)</u> shall become effective without any further consent of any other party to such Loan Document.

(c)     If any applicable Lender does not consent (a "**Non-Consenting Lender**") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) and that has been approved by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), then the Credit Parties may replace such Non-Consenting Lender in accordance with <u>Section 15.13</u>; <u>provided</u> that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Administrative Borrower to be made pursuant to this paragraph).

15.2     <u>Governing Law; Jurisdiction; Service of Process; Venue</u>.  The Loan Documents shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to its choice of law provisions (other than Section 5-1401 of the New York General Obligations Law). Any judicial proceeding against the Credit Parties with respect to the Obligations, any Loan Document or any related agreement may be brought in any federal or state court of competent jurisdiction located in the State of New York. By execution and delivery of each Loan Document to which it is a party, each Credit Party (a) accepts the non-exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any judgment rendered thereby, (b) waives personal service of process, (c) agrees that service of process upon it may be made by certified or registered mail, return receipt requested, pursuant to <u>Section 15.5</u>, and (d) waives any objection to personal jurisdiction and venue of any action instituted hereunder and agrees not to assert any defense based on lack of jurisdiction, venue or convenience.  Nothing shall affect the right of the Agent to serve process in any manner permitted by law or shall limit the right of the Agent to bring proceedings against the Credit Parties in the courts of any other jurisdiction having jurisdiction, including any jurisdiction in which Collateral is located for purposes of exercising rights and remedies with respect to such Collateral.  Any judicial proceedings against the Agent involving, directly or indirectly, the Obligations, any Loan Document or any related agreement shall be brought only in a federal or state court located in the State of New York. All parties acknowledge that they participated in the negotiation and drafting of this Agreement, that the parties were represented by counsel of their choice in connection with the negotiation and drafting of this Agreement, that the parties to this Agreement are sophisticated parties entering into a commercial transaction, and that, accordingly, no party shall move or petition a court construing this Agreement to construe it more stringently against one party than against any other.

15.3     <u>Successors and Assigns</u>.

(a)     *Successors and Assigns Generally.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Credit Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of <u>Section 15.3(b)</u>, or (ii) by way of participation in accordance with the provisions of subsection <u>Section 15.3(d)</u>. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Affiliates of the Agent and each Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

81

(b)     *Assignments by Lenders*.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans) at the time owing to it; provided that (in each case with respect to any Loans or Commitments) any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in subsection (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if a "Trade Date" is specified in the Assignment and Assumption, as of such Trade Date, shall not be less than $1,000,000, unless the Agent otherwise consents in writing.

(ii)     Proportionate Amounts.  Any partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(c)     *Assignment and Assumption*.  The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  Subject to acceptance and recording thereof by the Agent, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 8.9 and 15.8 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Credit Parties (at their expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 15.3(d).

(d)     *Participations.*  Any Lender may at any time, without the consent of, or notice to, the Credit Parties or the Agent, sell participations to any Person (other than a natural person or the Credit Parties or any of the Credit Parties' Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of

such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Credit Parties, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 15.11 as if such Participant was a Lender hereunder.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 15.1 that affects such Participant. The Credit Parties agree that each Participant shall be entitled to the benefits of Section 8.9 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 15.3(b).

(e)     *Electronic Execution of Assignments*. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

15.4    Application of Payments. To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other Person under any Debtor Relief Law, common law or equitable cause or any other law, then the Obligations intended to be satisfied by such payment shall be revived and shall continue as if such payment had not been received by the Agent. Any payments with respect to the Obligations received shall be credited and applied in such manner and order as the Agent shall decide in its sole discretion.

15.5    Indemnity. Each Credit Party jointly and severally shall indemnify the Agent, each Lender, their Affiliates and its and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "**Indemnified Persons**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel, allocable costs of in-house counsel, and in-house diligence fees and expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any Loan Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing results directly from the gross negligence or willful misconduct of such Indemnified Person as determined by a final non-appealable judgment entered by a court of competent jurisdiction. If any Indemnified Person uses in-house counsel for any purpose for which any Credit Party is responsible to pay or indemnify, each Credit Party expressly agrees that its indemnification obligations include reasonable charges for the costs allocable for such work of such in-house counsel. The Agent and each Lender agrees to give the Credit Parties reasonable notice of any event of which the Agent or such Lender becomes aware for which indemnification may be required under this Section 15.5, and the Agent or such Lender may elect (but is not obligated) to direct the defense thereof; provided that the selection of counsel shall be subject to the Credit Parties'

consent, which consent shall not be unreasonably withheld or delayed. Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral. Notwithstanding the foregoing, if any Insurer agrees to undertake the defense of an event (an "**Insured Event**"), the Agent or such Lender agrees not to exercise its right to select counsel to defend the event if that would cause the Credit Parties' insurer to deny coverage; provided, however, that the Agent or such Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense. To the extent that the Agent or any Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that any Credit Party has paid to the Agent or such Lender pursuant to the indemnity set forth in this Section 15.5, then the Agent or such Lender shall promptly pay to such Credit Party the amount of such recovery.

15.6     Notice. Any notice or request under any Loan Document shall be given to any party to this Agreement at such party's address set forth beneath its signature on the signature page to this Agreement, or at such other address as such party may hereafter specify in a notice given in the manner required under this Section 15.6. Any notice or request hereunder shall be given only by, and shall be deemed to have been received upon (each, a "**Receipt**"): (i) registered or certified mail, return receipt requested, on the date on which received as indicated in such return receipt, (ii) delivery by a nationally recognized overnight courier, one (1) Business Day after deposit with such courier, (iii) facsimile transmission, upon sender's receipt of confirmation of proper transmission, as applicable, or (iv) e-mail, upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement).

15.7     Severability; Captions; Counterparts; Facsimile Signatures. If any provision of any Loan Document is adjudicated to be invalid under applicable laws or regulations, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of the Loan Documents which shall be given effect so far as possible. The captions in the Loan Documents are intended for convenience and reference only and shall not affect the meaning or interpretation of the Loan Documents. The Loan Documents may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same instrument) and by facsimile or other electronic transmission (e.g., ".pdf"), which facsimile or electronic signatures shall be effective as delivery of a manually executed counterparts. Each party to this Agreement agrees that it will be bound by its own facsimile or electronic signature and that it accepts the facsimile or electronic signature of each other party. Notwithstanding anything to the contrary in this Section 15.7, the Agent may require that the Credit Parties deliver original executed counterpart signature pages to any Loan Document.

15.8     Expenses. The Credit Parties shall jointly and severally pay all costs and expenses incurred by the Agent, each Lender and each of their respective Affiliates (including, but not limited to, (w) the reasonable fees, charges, and disbursements of counsel thereto, (x) the reasonable fees, charges, and disbursements of any other outside consultants therefor, other professionals and advisors retained thereby, and any Board Observers, as applicable, (y) all documentation and diligence fees and expenses, and (z) all search, audit, appraisal, recording, and filing fees and expenses) (a) in any effort to enforce, protect or collect payment of any Obligation or to enforce any Loan Document or any related agreement, document or instrument, (b) in connection with the Transactions and entering into, negotiating, preparing, reviewing and executing the Loan Documents and/or any related agreements, documents or instruments, (c) arising in any way out of administration of the Obligations, (d) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on the Agent's Liens in any of the Collateral or securities pledged under the Loan Documents, whether through judicial proceedings or otherwise, (e) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Agent's transactions with any Credit Party, (f) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any Loan

Document and any related agreement, document or instrument, (g) in connection with any meetings held in accordance with Section 8.12 and any inspections or visits made in accordance with Section 8.6, and/or (h) in connection with any workout, modification, restatement, supplement, amendment, waiver or extension of any Loan Document and/or any related agreement, document or instrument (whether or not the Transactions contemplated hereby or thereby shall be consummated). All of the foregoing shall be charged to the Credit Parties' account and shall be part of the Obligations, whether arising before or after the Maturity Date. If the Agent or any of its Affiliates uses in-house counsel for any purpose under any Loan Document for which the Credit Parties are responsible to pay or indemnify, the Credit Parties expressly agree that their Obligations include reasonable charges for such work commensurate with the allocable costs of such in-house counsel.

15.9    Entire Agreement.  This Agreement and the other Loan Documents to which any Credit Party is a party constitutes the entire agreement between the Credit Parties, the Agent and the Lenders with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, if any, relating to the subject matter hereof or thereof. Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof.

15.10    Agent Approvals.  Unless expressly provided herein to the contrary, any approval, consent, waiver or satisfaction of Agent with respect to any matter that is subject of any Loan Document may be granted or withheld by the Agent in its sole and absolute discretion.

15.11    Confidentiality and Publicity.

(a)    Each Credit Party agrees, and agrees to cause each of their Affiliates, (i) not to transmit or disclose provisions of any Loan Document to any Person (other than to the Credit Parties' advisors, owners and officers, each on a need-to-know basis, or as otherwise may be required by law) without Agent's prior written consent, (ii) to inform all Persons of the confidential nature of the Loan Documents and to direct them not to disclose the same to any other Person and to require each of them to be bound by these provisions.  Each Credit Party agrees to submit to the Agent and/or any Lender, as applicable, and the Agent and/or such Lender, as applicable, reserves the right to review and approve all materials that such Credit Party or any of their Affiliates prepares that contain the Agent and/or such Lender's name, as applicable, or describe or refer to any Loan Document, any of the terms thereof or any of the transactions contemplated thereby (including the Transactions).  No Credit Party, nor any of their Subsidiaries, shall use the Agent or any Lender's name (or the name of any of the Lender's Affiliates) in connection with any of its business operations, including without limitation, advertising, marketing or press releases or such other similar purposes, without the Agent or such Lender's, as applicable, prior written consent.  Nothing contained in any Loan Document is intended to permit or authorize any Credit Party to contract on behalf of the Agent or any Lender.

(b)    Each Credit Party hereby agrees that the Agent and Lenders or any Affiliate of the Agent or Lenders may (i) disclose a general description of transactions arising under the Loan Documents for advertising, marketing or other similar purposes, (ii) use the Credit Parties' names, logos or other indicia germane to such parties in connection with such advertising, marketing or other similar purposes and (iii) disclose any and all information concerning the Loan Documents, as well as any information regarding the Credit Parties and their operations, received by the Agent or Lenders in connection with the Loan Documents to its lenders or funding or financing sources.

15.12    Release.  Notwithstanding any other provision of any Loan Document, each Credit Party voluntarily, knowingly, unconditionally and irrevocably, with specific and express intent, for and on behalf of itself, its managers, members, directors, officers, employees, stockholders, Affiliates, agents,

representatives, accountants, attorneys, successors and assigns and their respective Affiliates (collectively, the "**Releasing Parties**"), hereby fully and completely releases and forever discharges the Indemnified Persons and any other Person or Insurer which may be responsible or liable for the acts or omissions of any of the Indemnified Persons, or who may be liable for the injury or damage resulting therefrom (collectively, with the Indemnified Persons, the "**Released Parties**"), of and from any and all actions, causes of action, damages, claims, obligations, liabilities, costs, expenses and demands of any kind whatsoever, at law or in equity, matured or unmatured, vested or contingent, that any of the Releasing Parties has against any of the Released Parties as of the Closing Date. Each Credit Party acknowledges that the foregoing release is a material inducement to each Lender's decision to extend to the Credit Parties the Loans and any other financial accommodations hereunder and the Agent's decision to act as administrative agent and collateral agent under the Loan Documents and has been relied upon by the Agent and each Lender in entering into the proposed transactions.

15.13    <u>Replacement of Lenders</u>.  If any Lender is a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 15.3</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that:

(a)    the Borrowers shall have paid to the Agent the assignment fee specified in <u>Section 15.3(b)</u>;

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts); and

(c)    such assignment does not conflict with applicable laws.

(d)    A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

15.14    <u>Concerning Joint and Several Liability of the Borrowers</u>.

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agent and the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each other Borrower to accept joint and several liability for the Obligations.

(b)    Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this <u>Section 15.14</u>), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms

86

thereof, then in each such event any other Borrower will make such payment with respect to, or perform, such Obligation.

(d)        The Obligations of each Borrower under the provisions of this <u>Section 15.14</u> constitute the full recourse Obligations of such Borrower enforceable against such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or the other Loan Documents or any other circumstance whatsoever as to any other Borrower.

(e)        Except as otherwise expressly provided herein, each Borrower hereby waives promptness, diligence, presentment, demand, protest, notice of acceptance of its joint and several liability, notice of occurrence of any Default or Event of Default (except to the extent notice is expressly required to be given pursuant to the terms of this Agreement or any of the other Loan Documents), or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by the Agent or under or in respect of any of the Obligations hereunder, any requirement of diligence and, generally, all demands, notices and other formalities of every kind in connection with this Agreement and the other Loan Documents. Each Borrower hereby waives all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, any right to require the marshaling of assets of the Borrowers and any other entity or Person primarily or secondarily liable with respect to any of the Obligations, and all suretyship defenses generally.  Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment, or place or manner for payment, compromise, refinancing, consolidation or renewals of any of the Obligations hereunder, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement and the other Loan Documents, any and all other indulgences whatsoever by the Agent in respect of any of the Obligations hereunder, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of such Obligations or the addition, substitution or release, in whole or in part, of any Borrower or any other entity or Person primarily or secondarily liable for any Obligation.  Such Borrower further agrees that its Obligations shall not be released or discharged, in whole or in part, or otherwise affected by the adequacy of any rights which the Agent may have against any collateral security or other means of obtaining repayment of any of the Obligations, the impairment of any collateral security securing the Obligations, including, without limitation, the failure to protect or preserve any rights which Agent may have in such collateral security or the substitution, exchange, surrender, release, loss or destruction of any such collateral security, any other act or omission which might in any manner or to any extent vary the risk of such Borrower, or otherwise operate as a release or discharge of such Borrower, all of which may be done without notice to such Borrower; <u>provided</u>, <u>however</u>, that the foregoing shall in no way be deemed to create commercially unreasonable standards as to the Agent's duties as secured party under the Loan Documents (as such rights and duties are set forth therein).  If for any reason any Borrower has no legal existence or is under no legal obligation to discharge any of the Obligations, or if any of the Obligations have become irrecoverable from any Borrower by reason of any other Borrower's insolvency, bankruptcy or reorganization or by other operation of law or for any reason, this Agreement and the other Loan Documents to which it is a party shall nevertheless be binding on such Borrower to the same extent as if such Borrower at ˉallˉ times had been the sole obligor on such Obligations.  Without limiting the generality of the foregoing, each Borrower (if more than one) assents to any other action or delay in acting or failure to act on the part of Agent, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder which might, but for the provisions of this <u>Section 15.14</u>, afford grounds for terminating, discharging or relieving such Borrower, in whole or in part, from any of its obligations under this <u>Section 15.14</u>, it being the intention of the Borrowers that, so long as any of the Obligations hereunder remain unsatisfied, the obligations of each Borrower under this <u>Section 15.14</u> shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this <u>Section 15.14</u> shall not be diminished or rendered unenforceable

by any winding up, reorganization, amalgamation, arrangement, liquidation, reconstruction or similar proceeding with respect to any reconstruction or similar proceeding with respect to any other Borrower, the Agent or any Lender.  The joint and several liability of each Borrower hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, ownership, membership, constitution or place of formation of any Borrower, the Agent or any Lender.  Each Borrower acknowledges and confirms that it has established its own adequate means of obtaining from each other Borrower on a continuing basis all information desired by such Borrower concerning the financial condition of each other Borrower and that each such Borrower will look to each other Borrower and not to the Agent or any Lender for such Borrower to keep adequately informed of changes in each of the other Borrower's respective financial conditions.

(f)     Each Borrower acknowledges that all or any portion of the Obligations may now or hereafter be secured by a Lien or Liens upon real property evidenced by certain documents including deeds of trust and assignments of rents.  Agent may, pursuant to the terms of said real property security documents and applicable law, foreclose under all or any portion of one or more of said Liens by means of judicial or non-judicial sale or sales.  Each Borrower agrees that the Agent may exercise whatever rights and remedies it may have with respect to said real property security, all without affecting the liability of such Borrower hereunder, except to the extent Agent realizes payment by such action or proceeding.  No election to proceed in one form of action or against any party, or on any obligation shall constitute a waiver of the Agent's right to proceed in any other form of action or against such Borrower or any other Borrower or other Person, or diminish the liability of such Borrower, or affect the right of Agent to proceed against such Borrower for any deficiency, except to the extent Agent realizes payment by such action, notwithstanding the effect of such action upon such Borrower's rights of subrogation, reimbursement or indemnity, if any, against any other Borrower or any other Person.

(g)     The provisions of this Section 15.14 are made for the benefit of the Agent and its successors and assigns, and may be enforced by it or them from time to time against any or all of the Borrowers as often as occasion therefore may arise and without requirement on the part of the Agent or such successor or assign first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 15.14 shall remain in effect until all of the Obligations shall have been Paid in Full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the˙ Obligations, is rescinded or must otherwise be restored or returned by Agent upon the insolvency, bankruptcy or reorganization of any of the Borrowers, or otherwise, the provisions of this Section 15.14 will forthwith be reinstated in effect, as though such payment had not been made.

(h)     Each Borrower hereby agrees that it will not enforce any of its rights of reimbursement, contribution, subrogation or the like against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agent with respect to any of the Obligations or any collateral security therefore until such time as all of the Obligations have been Paid in Full. Any claim which any Borrower may have against any other Borrower with respect to any payments to Agent hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment to the prior Payment in Full of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be Paid in Full before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(i)     Each Borrower hereby agrees that the payment of any amounts due with respect to

88

the indebtedness owing by any Borrower to any Borrower is hereby subordinated to the prior Payment in Full of the Obligations.  Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been Paid in Full.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent and be paid over to the Agent to be applied to repay the Obligations.

15.15   Administrative Borrower.  Each Credit Party hereby irrevocably appoints [HUMC] Opco (the "**Administrative Borrower**") as its agent to act as specified in the Loan Documents and Administrative Borrower hereby accepts such appointment.  Each Credit Party hereby irrevocably authorizes and directs Administrative Borrower to take on its behalf all actions required of such Person under the Loan Documents, and to exercise all powers and to perform all duties of such Person thereunder, including, without limitation: (i) to submit and receive all certificates, notices, elections and communications and (ii) to receive and disburse the proceeds of Loans.  Any of the foregoing taken or received by Administrative Borrower on behalf of any Credit Party shall be deemed for all purposes to have been taken or received by such Credit Party and shall be binding on such Person to the same extent as if directly taken or received by such Credit Party.  Notwithstanding anything to the contrary contained herein, the Agent may at any time elect to disburse the proceeds of Loans directly to the accounts of any Credit Party.

15.16   Controlling Agreements.  In the event of any inconsistency between this Agreement and any other Loan Documents, the terms of this Agreement shall control.

15.17   [Reserved].

[Signature Pages Follow]