**EXHIBIT E**

(Form of the HRH Exit Facility Credit Agreement)

THIS FORM OF EXIT FACILITY CREDIT AGREEMENT IS A DRAFT WHICH HAS NOT BEEN AGREED TO BY HRH AND REMAINS SUBJECT TO NEGOTIATIONS AND THE REVIEW AND APPROVAL OF THE PARTIES IN ALL RESPECTS.

*MB draft 02.20.2025*

## EXIT FACILITY CREDIT AND SECURITY AGREEMENT

This **EXIT FACILITY CREDIT AND SECURITY AGREEMENT** (this "**Agreement**") dated as of March [•], 2025, is entered into among **CAREPOINT HEALTH SYSTEMS INC.** ("**CHS**"), a New Jersey nonprofit corporation; **HUMC OPCO LLC** ("**HUMC OPCO**"), a Delaware limited liability company; and **HUDSON HOSPITAL OPCO, LLC** ("**CHRIST OPCO**"), a Delaware limited liability company (CHS, HUMC Opco and Christ Opco are collectively referred to herein as the "**Borrowers**"), and **BAYONNE MEDICAL CENTER OPCO, LLC** (the "**Lender**"), a New Jersey limited liability company.

## RECITALS

**WHEREAS**, on November 3, 2024, the Borrowers along with certain of their respective Affiliates filed petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), as debtors and debtors-in-possession in cases jointly administered as In re CarePoint Health Systems Inc. d/b/a Just Health Foundation, et al. (Case No. 24-12534) (the "**Bankruptcy Cases**");

**WHEREAS**, on October 31, 2024, in anticipation of the Bankruptcy Cases, the Lender and the Borrowers entered into that certain Super Priority Debtor-In-Possession Credit and Security Agreement (the "**Existing DIP Agreement**"), pursuant to which the Lender agreed to provide to the Borrowers a super priority senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $25,000,000.00 (all such outstanding principal, together with all accrued and unpaid interest, premium, fees and other charges under the Existing DIP Agreement, the "**DIP Loans**") to provide the Borrowers and certain of their respective Affiliates with the funds necessary to meet their working capital needs and other expenses in connection with the Bankruptcy Cases;

**WHEREAS**, on February 24, 2025, the Borrowers filed that certain Fourth Amended Combined Plan of Reorganization (collectively with all exhibits, supplements, appendices, and schedules thereto, as amended pursuant to one or more plan supplements filed prior to the Effective Date as confirmed by the Bankruptcy Court, the "**Plan of Reorganization**") for the Bankruptcy Cases, proposing to reorganize their financial affairs and exit bankruptcy;

**WHEREAS**, pursuant to the Plan of Reorganization, the Borrowers have requested that the Lender extend exit financing to the Borrowers to facilitate their reorganization and emergence from bankruptcy;

**WHEREAS**, as approved by the [Final Order Approving the Combined Disclosure Statement and Joint Chapter 11 Plan Of Reorganization [Docket No. ____]] entered by the Bankruptcy Court (the "**Confirmation Order**") on March [___], 2025 (the "**Effective Date**"), pursuant to the Plan of Reorganization, the Borrowers and Lenders have agreed that (i) all Allowed HRH Claims (including, without limitation, the DIP Loans and the other loans, debts, obligations and liabilities owed by the Borrowers or their Affiliates to the Lender and its Affiliates as set forth in the Plan of Reorganization) in aggregate principal amount of [_____] DOLLARS $[_____] will be converted hereby into a term loan owed by the Borrowers to the Lender hereunder (the "**Roll-Up Loan**"), (ii) the Existing DIP Agreement, except for those provisions contained therein which relate to the grant

of Liens and security interests to the Lender and all of the Lender's rights and remedies with respect thereto, will be superseded and replaced in its entirety by this Agreement, and (iii) the Lender will provide a "new money" term loan to Borrowers in aggregate principal amount of [_____] DOLLARS $[_____] (the "**<u>New Money Loan</u>**" and, together with the Roll-Up Loan, the "**<u>Exit Loans</u>**"), in an aggregate principal amount of Exit Loans of [_____] DOLLARS $[_____] to be outstanding on the Closing Date pursuant to Plan of Reorganization (the "**<u>Exit Facility</u>**");

**WHEREAS**, pursuant to the Plan of Reorganization and the Confirmation Order, to secure the Obligations of the Borrowers to the Lender under this Agreement, the Borrowers will grant to the Lender valid, perfected and enforceable first priority Liens on substantially all assets of the Borrowers, senior to all other security interests in the Collateral, provided that such Liens shall be subordinated to the Allowed Capitala Liens on the Collateral as of the Effective Date pursuant to the Intercreditor Agreement, which such Liens in favor of the Lender are a material and necessary condition of the Lender's willingness to provide the Exit Loans contemplated herein; and

**WHEREAS**, Lender is willing to make the Exit Facility available to the Borrowers upon the terms and subject to the conditions set forth herein.

**AGREEMENT**

In consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, Borrowers and Lender hereby agree as follows:

## I.    DEFINITIONS

### 1.1    General Terms

For purposes of this Agreement, in addition to the definitions above and elsewhere in this Agreement, the terms listed below shall have the meanings set forth. All capitalized terms used which are not specifically defined shall have meanings provided in Article 9 of the UCC to the extent the same are used or defined therein. Unless otherwise specified herein, any agreement or contract referred to herein shall mean such agreement as modified, amended or supplemented from time to time. Unless otherwise specified, as used in the Loan Documents or in any certificate, report, instrument or other document made or delivered pursuant to any of the Loan Documents, all accounting terms not defined elsewhere in this Agreement shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of Borrowers delivered to Lender on or prior to the Closing Date.

### 1.2    Specific Terms

"**<u>Account Debtor</u>**" shall mean "account debtor," as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

"**<u>Accounts</u>**" shall mean all of Borrowers' (i) accounts (as that term is defined in the UCC), (ii) payment intangibles (as that term is defined in the UCC), and (iii) all other rights of payment, collection

2

or reimbursement (whether owed directly to Borrowers or assigned to Borrowers by a patient or other third party), whenever due, that arose out of, or will arise out of, the rendering of services, the provision of room, board or other daily living assistance, or the sale, assignment, lease or license of Equipment, prosthetics, pharmaceutical or other goods, whether before or after the date of this Agreement and including, without limitation, all of Borrowers' rights of payment, collection or reimbursement with respect to such services from any insurer, federal or state government agency or other third party; whether billed on a fee for service, monthly per patient capitation charge or any other basis, whether or not the accounts, payment intangibles, or rights of payment, collection or reimbursement have been invoiced or billed, written off, partially paid, currently assigned to collection agencies or other third party service vendors. Without limiting the foregoing, Accounts shall also include all monies due or to become due to Borrowers and obligations to Borrowers in any form (whether arising in connection with contracts, contract rights, instruments, or chattel paper), in each case whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"**Accrediting Organization**" shall mean any Person from which a Borrowers has received an accreditation as of the Closing Date or thereafter.

"**Affiliate**" shall mean, as to any Person, any other Person (i) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (ii) who is a director or officer (A) of such Person, (B) of any Subsidiary of such Person, or (C) of any Person described in clause (i) above with respect to such Person, (iii) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of ten percent (10%) or more of any class of the outstanding voting stock, securities or other equity or ownership interests of such Person and (iv) any spouses, parents, descendants and siblings of any of the Persons described in clauses (i), (ii) and (iii) above. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the administrative management or policies (even without the power to direct or cause the direction of the clinical/medical management or policies), whether through ownership of securities or other interests, by contract or otherwise.

"**Allowed Capitala Liens**" shall mean the valid, properly perfected, first priority Liens on the Collateral in favor of Capitala securing the Allowed Capitala Obligations existing as of the Effective Date as set forth in the Plan of Reorganization.

"**Allowed Capitala Obligations**" shall mean the obligations due and owing to Capitala under the Capitala Loan Documents existing as of the Effective Date as set forth in the Plan of Reorganization.

"**Allowed HRH Claims**" shall mean all "Allowed" "HRH Claims," as such terms are defined in the Plan of Reorganization.

"**Applicable Rate**" shall mean FIFTEEN PERCENT (15.0%) per annum or the Default Rate, if applicable.

3

"**Bankruptcy Cases**" has the meaning set forth in the Recitals to this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the Recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the Recitals to this Agreement.

"**Bayonne Opco**" means IJKG Opco, LLC d/b/a CarePoint Health – Bayonne Medical Center, a New Jersey limited liability company.

"**Books and Records**" shall mean Borrowers' books and records specifically relating to Accounts, including, but not limited to, ledgers, records indicating, summarizing, or evidencing Borrowers' Accounts and all computer programs, disc or tape files, printouts, runs, and other computer prepared information with respect to the foregoing and any software necessary to operate the same.

"**Borrowing**" or "**Borrowings**" shall mean the borrowing by the Borrowers of the Exit Loans on the Closing Date.

"**Business Day**" shall mean any day other than a Saturday, Sunday, or other day on which the Federal Reserve or banks in the State of New York or New Jersey are permitted to be closed.

"**Capitala**" shall mean Capitala Private Advisors, LLC and its Affiliates, successors and assigns.

"**Capitala Security Agreements**" shall mean those certain security agreements, and related agreements, by and among Capitala, as lender or collateral agent, and any of the Borrowers, as borrowers, pursuant to which any of the Borrowers granted Capitala the Allowed Capitala Liens, together with any and all documents, instruments, Control Agreements, and filings granting, recording or perfecting the Allowed Capitala Liens, in each case as in effect as of the Effective Date.

"**Capitala Loan Documents**" shall mean (i) that certain Capitala Exit Facility Credit Agreement, by and among the Borrowers and certain of their respective Affiliates that are party thereto, as borrowers, Capitala, as administrative agent and collateral agent, and the lenders that are party thereto, dated as of February [____], 2025. (ii) the Capitala Security Agreements and (iii) all documents ancillary to or executed in connection with any of the foregoing, in each case, as in effect as of the Effective Date.

"**Capital Lease**" shall mean, as to any Person, a lease or any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" of such Person in accordance with GAAP.

"**Capitalized Lease Obligations**" shall mean all obligations of any Person under Capital Leases, in each case, taken at the amount thereof accounted for as a liability in accordance with GAAP.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9601 *et seq.*, as the same may be amended from time to time.

"**Change of Control**" shall mean any of the following: (i) the occurrence of a merger, consolidation, reorganization, recapitalization or share or interest exchange, sale or transfer or any other transaction or series of transactions as a result of which the owners, directly or indirectly, of a majority of any Borrower's voting stock or voting power as of the date hereof cease to be entitled to control the company, or (ii) the resignation, termination, replacement, death, disability or any other event the result of which is results in the change of a majority of the members of the Board of Trustees of CarePoint, unless, (a) in the case of a replacement of the majority of the members of the Board of Trustees, such replacement trustees are reasonably acceptable to Lender, or (b) in all other cases such replacement trustees are reasonably satisfactory to Lender are identified and engaged within thirty (30) calendar days following such event, or (iii) the sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of Borrowers' assets to, or a consolidation or merger with or into, any other Person, other than any such transaction where immediately thereafter the surviving Person is a direct or indirect Subsidiary of Borrowers.

"**Christ Hospital**" shall mean that certain hospital facility located in Jersey City, New Jersey owned by Christ Opco.

"**Closing**" shall mean the date of the Borrowing under the Exit Facility.

"**Closing Date**" shall mean the date the Closing occurs.

"**Collateral**" shall mean, collectively and each individually, all collateral or security identified in Section 2.7, together with any additional collateral or security now or hereafter granted to Lender by Borrowers pursuant to a Loan Document, but excluding any Excluded Collateral.

"**Collateral Surrender Agreement**" means that certain Collateral Surrender and Operations Transfer Agreement, dated as of October 9, 2024, as amended as of the Effective Date pursuant to the Plan of Reorganization, by and among, on the one hand, the Borrowers' Affiliates Bayonne Opco and IJKG, LLC, a New Jersey limited liability company, and, on the other hand, Hudson Regional Hospitals, LLC, d/b/a Bayonne Medical Center, a New Jersey limited liability company and Affiliate of the Lender.

"**Confirmation Order**" has the meaning set forth in the Recitals to this Agreement.

"**Control Agreements**" shall mean any deposit account control agreement, securities account control agreement, commodity account control agreement, account instructions and service agreement or similar agreements on financial Accounts of the Borrowers.

"**Debtor Relief Law**" shall mean, collectively, the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally, as amended from time to time.

"**Default Rate**" shall mean three percent THREE PERCENT (3.0%) above the per annum rate otherwise applicable.

"**Distribution**" shall mean (a) any dividend or other distribution (whether in cash, securities or other property) on any equity interest in the Borrowers (except those payable solely in its equity interests of the same class), (b) any payment by the Borrowers on account of (i) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any equity interests in the Borrowers or any claim respecting the purchase or sale of any equity interest in the Borrowers, or (ii) any option, warrant or other right to acquire any equity interests in the Borrowers, and (c) any loan or advance to an Affiliate of the Borrowers.

"**DIP Loans**" has the meaning set forth in the Recitals to this Agreement.

"**Dollars**" or "**$**" shall mean the lawful and freely-transferrable currency of the United States of America.

"**Effective Date**" has the meaning set forth in the Recitals to this Agreement.

"**Environmental Laws**" shall mean all federal, state, local, and foreign laws now or hereafter in effect relating to pollution or protection of the environment, including laws relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, removal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes, and any and all regulations, notices, or demand letters issued, entered, promulgated, or approved thereunder.

"**Equipment**" shall mean "equipment" as defined in Article 9 of the UCC.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**Existing DIP Agreement**" has the meaning set forth in the Recitals to this Agreement.

"**Exit Facility**" has the meaning set forth in the Recitals to this Agreement.

"**Exit Loans**" has the meaning set forth in the Recitals to this Agreement.

"**Excluded Collateral**" means "Litigation Claims" as such term is defined in the Plan of Reorganization.

"**Event of Default**" shall mean the occurrence of any event set forth in Article VIII.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America in effect from time to time as consistently applied by Borrowers.

"**Governmental Authority**" shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the

6

United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

"**Governmental Deposit Account**" shall mean a deposit account established and maintained in Borrowers' name, which is used to collect payments with respect to Borrowers' Governmental Receivables.

"**Governmental Receivable**" shall mean any Account which is the obligation of the United States of America, or any State or Territory of the United States of America, and the District of Columbia, or any of their respective agencies, whether under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including, without limitation, TRICARE (formerly known as CHAMPUS) and CHAMPVA and whether or not the Account is the primary obligation of such government or agency.

"**Hazardous Substances**" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which is prohibited by any Environmental Laws; any contaminant, pollutant, waste or substance that is likely to cause immediately or at some future time harm or degradation to the surrounding environment or risk to human health; toxic mold, any substance that requires special handling; and any other material or substance now or in the future defined, classified or listed as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant", "radioactive", "dangerous" or other words of similar import within the meaning of any Environmental Law, including: (a) any "hazardous substance" defined as such in (or for purposes of) CERCLA, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (b) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (c) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (d) any petroleum or petroleum by-products, including crude oil or any fraction thereof; (e) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (f) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (g) any toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls ("**PCB's**"), flammable explosives, radioactive materials, infectious substances, materials containing lead-based paint or raw materials which include hazardous constituents); and (h) any other toxic substance or contaminant that is subject to any Environmental Laws or other past or present requirement of any Governmental Authority. Notwithstanding the foregoing, Hazardous Substances shall not include substances in kinds and amounts commonly used in the operation of businesses of similar kind and nature to the business engaged in by Borrowers in accordance with all applicable Laws (including, but not limited to, Environmental Laws) and prudent business management practices and in a manner that does not result in any contamination of all or any portion of properties utilized by Borrowers.

"**Hazardous Substances Contamination**" shall mean contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other elements on or of the relevant property by Hazardous Substances, or any derivatives thereof, or on or of any other property as a result of Hazardous Substances, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

4904-1495-3993, v. 10
#124847153v2

"**Healthcare Laws**" shall mean all applicable Laws relating to the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical or senior housing facilities (such as, but not limited to, nursing homes, skilled nursing facilities, rehabilitation hospitals, intermediate care facilities and adult care facilities), patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, Equipment, personnel, operating policies, fee splitting, including, without limitation, (a) all federal and state fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(6)), the Stark Law (42 U.S.C. §1395nn), the civil False Claims Act (31 U.S.C. §3729 et seq.), (b) TRICARE, (c) HIPAA, (d) Medicare, (e) Medicaid, (f) the Patient Protection and Affordable Care Act (P.L. 111-1468), (g) The Health Care and Education Reconciliation Act of 2010 (P.L. 111-152), (h) quality, safety and accreditation standards and requirements of all applicable state laws or regulatory bodies, (i) all laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, and (j) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (j) as may be amended from time to time.

"**Healthcare Permit**" shall mean a Permit (a) issued or required under Healthcare Laws applicable to the business of Borrowers or any of their Subsidiaries or necessary in the possession, ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of goods or services under Healthcare Laws applicable to the business of Borrowers or any of their Subsidiaries, or (b) issued or required under Healthcare Laws applicable to the ownership or operation of any business location of Borrowers.

"**HIPAA**" shall mean the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**HIPAA Compliant**" shall mean that the applicable Person is in compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and is not and could not reasonably be expected to become the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could result in any of the foregoing or that could reasonably be expected to adversely affect such Person's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by such Person of the provisions of HIPAA.

"**Hoboken Facility**" shall mean that certain hospital facility located in Hoboken, New Jersey owned or operated by HUMC Opco.

"**Indebtedness**" of a Person shall mean at any date, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid on a timely basis and in the ordinary course of business, (iv) all Capital Leases of such Person, (v) all obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (vi) all equity securities of such Person subject to repurchase or redemption other than at the sole option of such Person, (vii) all obligations secured by a Lien on any

8

asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (viii) "earnouts," purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts, (ix) all Indebtedness of others guaranteed by such Person, (x) off-balance sheet liabilities and/or pension plan or multiemployer plan liabilities of such Person, and (xi) obligations arising under non-compete agreements.

"**Indemnified Persons**" shall have the meaning assigned to the term in <u>Section 13.4</u>.

"**Intellectual Property**" shall mean, with respect to any Person, all patents, patent applications and like protections, including improvements divisions, continuation, renewals, reissues, extensions and continuations in part of the same, trademarks, trade names, trade styles, trade dress, service marks, logos and other business identifiers and, to the extent permitted under applicable Law, any applications therefor, whether registered or not, and the goodwill of the business of such Person connected with and symbolized thereby, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative works, whether published or unpublished, technology, know-how and processes, operating manuals, trade secrets, computer hardware and software, rights to unpatented inventions and all applications and licenses therefor, used in or necessary for the conduct of business by such Person and all claims for damages by way of any past, present or future infringement of any of the foregoing.

"**Intercreditor Agreement**" shall mean that certain Intercreditor Agreement, dated October 31, 2024 (as amended and in effect as of the Effective Date) by and among the Borrowers, the Lender and Capitala, providing, among other things, that the Liens and Obligations under this Agreement shall be subordinated to the Allowed Capitala Liens and the Allowed Capitala Obligations secured thereby, subject to the terms set forth therein, as described in the Plan of Reorganization.

"**Laws**" shall mean any and all federal, state, provincial, territorial, municipal, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, codes, injunctions, permits, governmental agreements and governmental restrictions, whether now or hereafter in effect, which are applicable to Borrowers in any particular circumstance. "Laws" includes, without limitation, Environmental Laws.

"**Liability Event**" shall mean any event, fact, condition or circumstance or series thereof (i) in or for which Borrowers becomes liable or otherwise responsible for any amount owed or owing to any Medicaid or Medicare program by a provider under common ownership with Borrowers or any provider owned by Borrowers pursuant to any applicable Law after the failure of any such provider to pay any such amount when owed or owing, (ii) in which Medicaid or Medicare payments to Borrowers are lawfully set-off against payments to Borrowers to satisfy any liability of or for any amounts owed or owing to any Medicaid or Medicare program by Borrowers, a provider under common ownership with Borrowers, or any provider owned by Borrowers pursuant to any applicable Law, or (iii) any of the foregoing under clauses (i) or (ii) in each case pursuant to statutory or regulatory provisions that are similar to any applicable Law. Notwithstanding the foregoing, a "Liability Event" shall not exist unless it could reasonably be expected to have a Material Adverse Effect.

"**Lien**" shall mean any mortgage, pledge, security interest, encumbrance, restriction, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other

title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes. For the purposes of this Agreement and the other Loan Documents, any Borrowers or any Subsidiary shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"**Litigation Trust Agreement**" has the meaning given to such term in the Plan of Reorganization.

"**Loan**" or "**Loans**" shall mean, individually and collectively, the aggregate Exit Loans made under the Exit Facility pursuant to <u>Section 2.1(a)</u> (consisting of, for the avoidance of doubt, the New Money Loan and Roll-Up Loan).

"**Loan Documents**" shall mean, collectively and each individually, this Agreement, any documents that provide, as security for all or any portion of the Obligations, a Lien on any assets in favor of Lender, the Intercreditor Agreement, the Plan of Reorganization, the Confirmation Order, any Control Agreement, any Uniform Commercial Code financing statements and all other agreements, documents, certificates or instruments necessary to create or perfect the Liens in the Collateral, and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Lender in connection with any of the foregoing or the Exit Loans, as the same may be amended, modified or supplemented from time to time; all of which shall be in form and substance acceptable to Lender in its Permitted Discretion.

"**Management Agreements**" shall mean (i) that certain Hospital Facilities Management Services Agreement, dated as of November 27, 2024, as amended as of the Effective Date pursuant to the Plan of Reorganization, by and among the Borrowers and Hudson Regional Hospitals, LLC, as manager, and (ii) that certain Management Services Agreement, dated as of October 9, 2024, as amended as of the Effective Date pursuant to the Plan of Reorganization, by and among CHS, HUMC Opco, Christ Opco, McCabe Ambulance Service, Inc., Garden State Healthcare Associates, LLC, New Jersey Medical and Health Associates, LLC, Hudson Regional Hospitals, LLC, d/b/a Bayonne Medical Center, NJMHMC, LLC d/b/a Hudson Regional Hospital, 29 E 29 Street Holdings, LLC, NJBMCH, Inc., and Hudson Regional Management, LLC, as manager.

"**Material Adverse Effect**" or "**Material Adverse Change**" shall mean any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, which results, directly or indirectly in (a) a material adverse change in, or a material adverse effect upon, any of (i) the Borrowers' condition (financial or otherwise), assets, liabilities (actual or contingent), operations or results of operations, business, properties or prospects, (ii) the rights and remedies of Lender under any Loan Document, or the ability of any Borrower to perform any of its obligations under any Loan Document to which it is a party, (iii) the legality, validity or enforceability of any Loan Document, (iv) the existence, perfection or priority of any Lien granted in any Loan Document, (v) the value of any material Collateral; or (vi) the use or scope of any Healthcare Permits; (b) a material impairment to the likelihood that Borrowers' accounts receivable in general will be collected and paid in the ordinary course of business of Borrowers and upon the same schedule and

with the same frequency as Borrowers' recent collections history; or (c) the imposition of a material fine against or the creation of any material liability of Borrowers to any Governmental Authority that is not subject to a Permitted Contest.

"**Material Contracts**" shall have the meaning set forth in <u>Section 5.23</u>.

"**Maturity Date**" shall mean the earliest to occur of (i) sixty (60) months from the Closing Date; and (ii) the date on which the Exit Loans are accelerated upon an Event of Default pursuant to the terms hereof.

"**Maximum Amount**" shall mean the maximum principal amount that may be outstanding hereunder at any time, which amount shall be [_____] DOLLARS ($[_____]).

"**Medicaid**" shall mean that certain program of medical assistance, funded jointly by the federal government and the states, for impoverished individuals who are aged, blind and/or disabled, and/or members of families with dependent children, which program is more fully described in Title XIX of the Social Security Act (42 U.S.C. §§ 1396 *et seq.*) and the regulations promulgated thereunder, or any successor program.

"**Medicaid/Medicare Account Debtor**" shall mean any Account Debtor which is (i) the United States of America acting under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including, without limitation, TRICARE and CHAMPVA, (ii) any state or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act or any other state healthcare program, or (iii) any agent, carrier, administrator or intermediary for any of the foregoing.

"**Medicaid Pending**" shall mean that an application for Medicaid payment on behalf of a patient has not yet been approved by Medicaid.

"**Medicaid Program**" shall mean a medical assistance program administered by a state agency and approved by the Federal Centers for Medicare and Medicaid Services (formerly the federal Health Care Financing Administration) pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. 1396 et seq.

"**Medicare**" shall mean that certain federal program providing health insurance for eligible elderly and other individuals, under which physicians, hospitals, skilled nursing homes, home health care and other providers are paid for certain covered services they provide to the beneficiaries of such program, which program is more fully described in Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 *et seq.*) and the regulations promulgated thereunder, or any successor program.

"**New Money Loan**" has the meaning set forth in the Recitals to this Agreement.

"**NJDOH Loan Agreement**" means that certain loan agreement, dated as of February [13], 2024, by and between the New Jersey Department of Health, as lender, and [CHS], as borrower, as in effect as of the Effective Date.

4904-1495-3993, v. 10
#124847153v2

"**NJDOH Secured Claims**" has the meaning given to such term in the Plan of Reorganization.

"**Obligations**" shall mean all present and future obligations, Indebtedness and liabilities of any Borrower at any time and from time to time of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute and contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, under any of the Loan Documents or under applicable Law, and all renewals and extensions thereof, or any part thereof, including, without limitation, the aggregate principal amount of the Exit Loans, together with accrued and unpaid interest, all applicable fees, charges and expenses and/or all amounts paid or advanced by Lender on behalf of or for the benefit of Borrowers for any reason at any time.

"**Organizational Documents**" shall mean, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement), including any and all shareholder agreements or voting agreements relating to the capital stock or other equity interests of such Person.

"**Permit**" shall mean all Borrowers' governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals required under applicable Law and required for Borrowers to carry on its business as now conducted, including, without limitation, Healthcare Permits.

"**Permitted Contest**" shall mean, with respect to any tax obligation or other obligation allegedly or potentially owing from Borrowers or their respective Subsidiaries to any governmental tax authority or other third party, a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made on Borrowers' books and records and financial statements; provided, however, that (a) compliance with the obligation that is the subject of such contest is effectively stayed during such challenge; (b) Borrowers' and their Subsidiaries' title to, and its right to use, the Collateral is not adversely affected thereby and Lender's Lien and priority on the Collateral are not adversely affected, altered or impaired thereby; (c) Borrowers have given prior written notice to Lender of Borrowers' or their Subsidiaries' intent to so contest the obligation; (d) the Collateral or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Borrowers or their Subsidiaries; (e) Borrowers have given Lender notice of the commencement of such contest and upon request by Lender, from time to time, notice of the status of such contest by Borrowers and/or confirmation of the continuing satisfaction of this definition; (f) a final determination of such contest could not result in Lender's Lien and its priority on the Collateral being adversely affected, altered or impaired; and (g) upon a final determination of such contest, Borrowers and their Subsidiaries shall promptly comply with the requirements thereof.

"**Permitted Discretion**" shall mean a determination or judgment made by Lender in good faith in the exercise of its reasonable business judgment.

"**Permitted Indebtedness**" shall mean: (i) Indebtedness under the Loan Documents, (ii) to the extent constituting Indebtedness and subject to the Intercreditor Agreement, the Allowed Capitala Obligations, (iii) any Indebtedness existing on the Closing Date that is subordinated in priority and right of repayment and remedies to all of the Obligations and to all of Lender's rights hereunder pursuant to the Plan of Reorganization, (iv) Indebtedness constituting the NJDOH Secured Claims in aggregate principal amount not to exceed $200,000.00 at any time outstanding, (v) Capitalized Lease Obligations incurred after the Closing Date and secured only by the Equipment being leased pursuant to such Capitalized Lease Obligations; (v) a purchase-money obligation, as defined in Section 9-103(a) of the UCC, (vi) accounts payable to trade creditors and current operating expenses incurred in the ordinary course of business and paid on a timely basis; (vii) borrowings incurred in the ordinary course of business; provided, however, that such Indebtedness shall be on an unsecured basis, subordinated in right of repayment and remedies to all of the Obligations and to all of the Lender's rights and in form and substance satisfactory to the Lender; (viii) Indebtedness in the form of insurance premiums financed through the applicable insurance company; and (ix) any other Indebtedness to which the Lender may expressly consent in writing prior to its incurrence, which consent shall be in the sole discretion of the Lender.

"**Permitted Liens**" shall mean: (i) deposits or pledges of cash to secure obligations under worker's compensation, social security or similar Laws, or under unemployment insurance (but excluding Liens arising under ERISA, or, with respect to any Pension Plan or Multiemployer Plan, the Code) pertaining to Borrowers' or their Subsidiaries' employees, if any; (ii) deposits or pledges of cash to secure bids, tenders, contracts (other than contracts for the payment of money or the deferred purchase price of property or services), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the ordinary course of business; (iii) carrier's, warehousemen's, mechanic's, workmen's, materialmen's or other like Liens on Collateral, other than Accounts, arising in the ordinary course of business with respect to obligations which are not due, or which are being contested pursuant to a Permitted Contest; (iv) Liens on Collateral, other than Accounts, for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or the subject of a Permitted Contest; (v) Liens and encumbrances in favor of Lender under the Loan Documents; (vi) the Allowed Capitala Liens subject to the Intercreditor Agreement; (vii) any Lien on any Equipment securing Indebtedness permitted under subpart (v) of the definition of Permitted Indebtedness, provided, however, that such Lien attaches concurrently with or within twenty (20) calendar days after the acquisition thereof, (viii) Liens securing NJDOH Secured Claims in aggregate principal amount not to exceed $200,00.00 at any time outstanding, and (ix) any other Liens to which Lender may expressly consent in writing, which consent shall be in the sole discretion of Lender.

"**Permitted Modifications**" shall mean (i) such amendments or other modifications to Borrowers' or any of their Subsidiaries' Organizational Documents as are required under this Agreement or by applicable Law and fully disclosed to Lender within thirty (30) calendar days after such amendments or modifications have become effective, and (ii) such amendments or modifications to Borrowers' or any of their Subsidiaries' Organizational Documents (other than those involving a change in the name of Borrowers or Subsidiary or involving a reorganization of Borrowers or Subsidiary under the laws of a different jurisdiction) that would not adversely affect the rights and

interests of the Lender and fully disclosed to Lender within thirty (30) calendar days after such amendments or modifications have become effective.

"**Person**" shall mean any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority or any other entity of whatever nature.

"**Plan of Reorganization**" has the meaning set forth in the Recitals to this Agreement.

"**Related Property**" shall mean, with respect to each Account, the following: (i) all records of any nature evidencing or related to the Account, including contracts, invoices, charges slips, credit memoranda, notes and other instruments and other documents, books, records and other information (including, without limitation, computer data) (ii) all security interests or Liens and property subject thereto from time to time purporting to secure payment of such Account, whether pursuant to the contract related to such Account or otherwise, including all rights of stoppage in transit, replevin, reclamation, supporting obligations and letter of credit rights (as such terms are defined in the Uniform Commercial Code), and all claims of Lien filed or held by the Borrowers on personal property; (iii) all rights to any goods whose sale gave rise to such Account, including returned or repossessed goods; (iv) all instruments, documents, chattel paper and general intangibles (each as defined in the Uniform Commercial Code) arising from, related to or evidencing such Account; (v) all UCC financing statements covering any Collateral securing payment of such Account; (vi) all guaranties and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Account whether pursuant to the contract related to such Account or otherwise; and (vii) all proceeds and amounts received or receivable arising from any of the foregoing.

"**Roll-Up Loan**" has the meaning set forth in the Recitals to this Agreement.

"**Subsidiary**" shall mean (i) as to a Borrower, any Person in which more than fifty percent (50%) of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Borrower through one or more of its Subsidiaries, and (ii) as to any other Person, any Person in which more than fifty percent (50%) of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Person through one or more of such Person's Subsidiaries. Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of Borrowers.

"**Third Party Payor**" shall mean Medicare, Medicaid, TRICARE, and other state or federal health care program, Blue Cross and/or Blue Shield, private insurers, managed care plans and any other Person or entity which presently or in the future maintains Third Party Payor Programs.

"**Third Party Payor Programs**" shall mean all payment and reimbursement programs, sponsored by a Third Party Payor, in which Borrowers participates.

"**TRICARE**" shall mean the program administered pursuant to 10 U.S.C. Section 1071 et. seq), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

4904-1495-3993, v. 10
#124847153v2

"**UCC**" and "**Uniform Commercial Code**" shall mean the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**United States**" and "**U.S.**" shall mean the United States of America.

### 1.3    Other Definitional and Interpretative Provisions

References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits", or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided.  Any term defined herein may be used in the singular or plural. "Include", "includes" and "including" shall be deemed to be followed by "without limitation".  Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person.  References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively.  Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.  Unless otherwise specified herein, all amounts shall be calculated in Dollars.  References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations.  All amounts used for purposes of financial calculations required to be made herein shall be without duplication.  References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States.  References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto.  As used in this Agreement, the meaning of the term "material" or the phrase "in all material respects" is intended to refer to an act, omission, violation or condition which reflects or could reasonably be expected to result in a Material Adverse Effect.  References to capitalized terms that are not defined herein, but are defined in the UCC, shall have the meanings given them in the UCC.  All references herein to times of day shall be references to daylight or standard time, as applicable, in New York City.

## II.    THE EXIT FACILITY, PAYMENT AND INTEREST

### 2.1    Borrowings

(a)    Subject to the provisions of this Agreement, including but not limited to the satisfaction of the conditions set forth in Section 4.1, Lender and Borrowers agree that on the Closing Date, (i) the Allowed HRH Claims (including, without limitation, the DIP Loans and the other Obligations and liabilities owed by the Borrowers or their Affiliates to the Lender and its Affiliates as set forth in the Plan of Reorganization) shall be converted into the Roll-Up Loan owed by the Borrowers to Lender hereunder and (ii) Lender shall make available to the Borrowers under the Exit Facility the New Money Loan (collectively, clauses (i) and (ii) are referred to herein as the "**Exit Loans**"), in an aggregate principal amount not to exceed the Maximum Amount.

(b)    On the Closing Date, Borrowers authorize Lender to disburse the proceeds of the New Money Loan to the account(s) as set forth on Schedule 2.1 via federal funds wire transfer; provided, however, subject to Section 2.3, if any amounts are then due to Lender on account of any interest, fees or expense reimbursements pursuant to the Loan Documents, the Plan of Reorganization or the Confirmation Order at the time such Borrowing is made, Lender is authorized (but not

4904-1495-3993, v. 10
#124847153v2

required) to reduce the proceeds to Borrowers with respect to such Borrowing by the amount of such interest, fees or expense reimbursements and to retain such amounts as payment of such interest, fees or expense reimbursements.  It is understood and agreed that Lender shall have no responsibility for the application of proceeds disbursed pursuant to Schedule 2.1.

(c)     Borrowers may, from time to time, repay or prepay all or part of the outstanding Exit Loans, accompanied by accrued and unpaid interest on the principal amount to be prepaid to the date of payment, but otherwise without premium or penalty.  Any amounts paid or prepaid in respect of the Exit Loans may not be reborrowed.

**2.2     Evidence of Obligations; Maturity**

(a)     Lender shall maintain, in accordance with its usual practice, electronic or written records evidencing the outstanding Obligations to Lender, including, without limitation, the amounts of principal, interest, fees and other amounts payable and paid to Lender from time to time under this Agreement.

(b)     The entries made in the electronic or written records maintained pursuant to Section 2.2(a) above shall be prima facie evidence of the existence and amounts of the Obligations therein recorded absent manifest and demonstrable error; provided, however, that the failure of the Lender to maintain such records or any error therein shall not in any manner affect the obligations of the Borrowers to repay the Obligations in accordance with their terms.  Subject to the foregoing, Borrowings under the Exit Facility may also be evidenced by a promissory note, in form acceptable to Lender, payable to the order of Lender, duly executed and delivered by Borrowers and dated as of the date hereof, evidencing the aggregate indebtedness of Borrowers to Lender resulting from Borrowings under the Exit Facility, from time to time.  Lender hereby is authorized, but is not obligated, to enter the amount of Borrowing under the Exit Facility and the amount of each payment or prepayment principal or interest thereon in the appropriate spaces on the reverse of or on an attachment to the promissory note.  Lender may account to Borrowers from time to time with a statement of Borrowings under the Exit Facility, the amounts outstanding hereunder, and charges and payments made pursuant to this Agreement, and in the absence of manifest and demonstrable error, such accounting rendered by Lender shall be deemed final, binding and conclusive unless Lender is notified by Borrowers in writing to the contrary within thirty (30) calendar days of receipt of each accounting, which notice shall be deemed an objection only to items specifically objected to therein.

(c)     All Obligations outstanding hereunder shall be unconditionally due and payable in full in immediately available funds by Borrowers, on a joint and several basis, if not earlier in accordance with this Agreement, the Plan of Reorganization or the Confirmation Order, on the Maturity Date.

**2.3     Interest**

Interest shall accrue on the principal amount of Exit Loans outstanding hereunder at a rate per annum equal to the Applicable Rate calculated on the basis of a 360-day year and adjusted for the actual number of days elapsed in each interest calculation period. From the Effective Date until the later of: (i) twenty-four (24) months following the Closing Date or (ii) the satisfaction of all Allowed Capitala Obligations (the "**PIK Period**"), all accrued interest on the Exit Loans shall be capitalized

into the Obligations and shall be added to the principal balance of the Exit Loans and shall accrue interest at the Applicable Rate under this Agreement. Following the completion of the PIK Period, Borrower shall make monthly payments of principal and interest on the Obligations, amortized on a fifteen (15) year period, no later than the first date of each calendar month thereafter until the Maturity Date. On the Maturity Date, Borrowers shall pay all accrued and outstanding interest, principal and any other amounts under the Obligations.

### 2.4    Reserved

### 2.5    Cash Management and Control Agreements

Schedule 2.5 identifies each of Borrowers' deposit accounts, the depository bank at which such accounts are maintained, the type of Control Agreements on such accounts (if any), and any secured party with any interest under such Control Agreements (if any), which shall be subordinated to the Liens and interest of Lender except to the extent (i) set forth in the Intercreditor Agreement with respect to the Allowed Capitala Liens or (ii) constituting Excluded Collateral.

### 2.6    Promise to Pay; Manner of Payment

Borrowers promise, on a joint and several basis, to pay principal, interest and all other Obligations and amounts payable hereunder, or under any other Loan Document, without any right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupments, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements.  Subject to Section 2.3, all payments in respect of interest, principal, fees or other Obligations shall be made by Borrowers as and when due directly by Borrowers to Lender by wire transfer, without offset or deduction for counterclaim, in Dollars, in immediately available funds to such account as may be indicated in writing by Lender to Borrowers.  Any payment received after 4:00 p.m. on the date when due shall be deemed received on the following Business Day.  Whenever any payment hereunder shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and/or fees, as the case may be.

### 2.7    Grant of Security Interest; Collateral

(a)    To secure the payment and performance of the Obligations, each of Borrowers hereby grants to Lender a valid, binding, continuing and enforceable first priority senior security interest in and Lien upon, and pledges to Lender, all of its right, title and interest in and to the following, whether now owned or hereafter created, acquired or arising, wherever located, but excluding the Excluded Collateral (collectively and each individually, the "**Collateral**"):

(i)    all Accounts (including health-care insurance receivables) and Related Property and all accounts receivable and notes receivable, both billed and unbilled (including, without limitation, amounts due from Medicaid and Medicare or any other Third Party Payor Program);

17

(ii)     all of Borrowers' deposit accounts, including the Governmental Deposit Account;

(iii)    all Books and Records, whether or not related to any Collateral;

(iv)    all other personal property and fixtures of Borrowers of every kind and nature, including all goods, Inventory, Equipment, furniture, fixtures, General Intangibles (including, without limitation, payment intangibles and software), chattel paper (whether tangible or electronic), supporting obligations, investment property, financial assets, documents, instruments (including any promissory notes), securities, securities accounts, contract rights or rights to payment of money, leases, Permits, license agreements, franchise agreements, rights of recovery and rights of setoff, clawback, disgorgement, and recoupment of any kind (including rights to insurance proceeds and rights under and pursuant to all warranties (including guarantees of third parties), representations, and guaranties made by suppliers of services, products, materials, or equipment, or components thereof), accrued or unaccrued, that have arisen or may arise out of or inure to the benefit of Borrowers (or any of them) or any of their respective Affiliates (as related to the Hoboken Facility or Christ Hospital), including under the Material Contracts, stock and other equity in direct and indirect Subsidiaries, machinery, cash, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), all prepaid expenses, credits, advance payments, deposits, charges, sums, and fees, security deposits, cash equivalents and other amounts comprising the same, Intellectual Property, copyrights, trademarks, patents, and tradestyles;

(v)     commercial tort claims, any other pending or potential affirmative claims (including inchoate or contingent claims), fiduciary duty breach claims, grounds for litigation, actionable rights, causes of action, and other avoidance actions, suits, proceedings or other affirmative actions of the Borrowers arising after the Effective Date to the fullest extent permitted by applicable Law;

(vi)    all Contracts, including, without limitation, all Material Contracts, Third Party Payor participation agreements (including its Medicare provider numbers);

(vii)   all tax assets (including duty and tax refunds and prepayments);

(viii)  all goodwill, going concern value and any other intangible assets generated by or related to the Hoboken Facility or Christ Hospital;

(ix)    all leasehold interests in the real property; and

(x)     any and all claims, rights, proceeds, product, offspring, rents and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

(b)     The Liens, lien priority, administrative priorities and other rights and remedies granted to Lender in this Agreement and the other Loan Documents shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by Borrowers

18

(pursuant to the Plan of Reorganization, the Confirmation Order or otherwise), or by any other act or omission whatsoever until the full performance and irrevocable payment in full in cash of the Obligations and termination of this Agreement.

**2.8    Collateral Administration**

(a)    All Collateral will at all times be kept by Borrowers at the locations set forth on Schedule 5.17 hereto and shall not, without concurrent written notice to the Lender, be moved therefrom and in any case shall not be located (as that term is used in Section 9-301(2) of the UCC) outside the continental United States.

(b)    Borrowers shall adhere to the terms of this Agreement, the other Loan Documents and the Capitala Security Agreements and all Collateral shall be maintained subject to the terms thereof and hereof.

(c)    In the event that the Allowed Capitala Obligations are satisfied prior to repayment of the Exit Loans, the Borrowers shall have no objection to Lender's replacement of Capitala as the secured party under the Capitala Security Agreements.

(d)    In the event that the Allowed Capitala Liens are successfully challenged by any Person for any reason, and Capitala is deemed to not have Allowed Capitala Liens with respect to any Borrower, or any Collateral that it currently asserts an interest in, such challenge shall have no effect on the extent, validity, priority or perfection of the Lender's Liens created by this Agreement.

(e)    As and when determined by Lender in its Permitted Discretion, Lender shall have the right to perform the searches described in clauses (i) and (ii) below against Borrowers (the results of which are to be consistent with Borrowers' representations and warranties under this Agreement), at Borrowers' reasonable expense: (i) UCC searches with the Secretary of State and any other state, municipal or local filing offices of each jurisdiction where Borrowers maintains its respective executive offices, place(s) of business, assets or any Collateral or in which it is organized, registered or authorized to conduct business; and (ii) bankruptcy, judgment, federal, state and local tax and administrative lien, judgement and litigation searches, in each jurisdiction in which such actions, or Liens, may be recorded.

(f)    Borrowers shall promptly advise the Lender upon any Borrower becoming aware that they have any interests in any commercial tort claim commenced following the Effective Date, which such notice shall include descriptions of the events and circumstances giving rise to such commercial tort claim and the dates such events and circumstances occurred, the potential defendants with respect such commercial tort claim and any court proceedings that have been instituted with respect to such commercial tort claims, and Borrowers shall, with respect to any such commercial tort claim, immediately execute and deliver to the Lender or otherwise authenticate such documents as the Lender shall request, and otherwise take all necessary action, to perfect, preserve or protect the first priority Liens, rights and remedies of the Lender with respect to any such commercial tort claim.

(g)    Borrowers shall furnish to the Lender from time to time any statements and schedules further identifying or describing the Collateral and any other information, reports or evidence concerning the Collateral as the Lender may request from time to time, including statements, notices

or schedules identifying, in reasonable detail, the Excluded Collateral and shall provide to the Lender such other information regarding the Excluded Collateral as the Lender may request in its Permitted Discretion.

**2.9    Filings; Perfection**

(a)    Each Borrower hereby irrevocably authorizes the Lender, at any time and from time to time, to file, in any relevant jurisdiction, any and all financing statements (including fixture filings) and amendments, restatements and supplements thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including (i) whether such Borrower is an organization, the type of organization and, if required, any organizational identification number issued to such Borrower, (ii) any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest and Liens granted by such Borrower hereunder, without the signature of such Borrower where permitted by law, including the filing of a financing statement describing the Collateral as "all assets" or "all personal property" of such Borrower or words of similar effect or as being of an equal or lesser scope or with greater detail and (iii) in the case of a financing statement filed as a fixture filing or covering other similar Collateral, a sufficient description of the real property to which such Collateral relates. Each Borrower agrees to provide all information described in the immediately preceding sentence to the Lender promptly upon request by the Lender.

(b)    Each Borrower hereby ratifies its authorization for the Lender to have filed, in any relevant jurisdiction, any initial financing statements or amendments thereto relating to the Collateral if filed prior to the date hereof.

(c)    Each Borrower hereby further authorizes the Lender to file, with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any United States state or other country), this Agreement and any other Loan Document for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest and Liens on Intellectual Property granted by such Borrower hereunder, without the signature of such Borrower where permitted by law, and naming such Borrower as debtor, and the Lender as secured party.

(d)    Each Borrower shall take all commercially reasonable efforts to obtain, with respect to each location where such Borrower maintains any Collateral, a bailee letter and/or landlord access agreement, as applicable, and obtain a bailee letter, landlord access agreement and/or landlord's lien waiver, as applicable, from all such bailees and landlords, as applicable, who from time to time have possession of Collateral if requested by the Lender.

(e)    Each Borrower hereby further authorizes the Lender, at any time and from time to time, with respect to motor vehicles, to file, in any relevant jurisdiction with the registrar of motor vehicles or other appropriate Governmental Authority in such jurisdiction, an application or other document requesting the notation or other indication of the security interest and Liens created hereunder on such certificate of title.

(f)     The security interests and Liens granted to the Lender above or under the Plan of Reorganization and the Confirmation Order shall be valid, perfected, binding, continuing and enforceable first priority security interests and Liens; provided that the relative priorities and rights of the Lender and Capitala in respect of the Collateral subject to the Allowed Capitala Liens shall be set forth in the Intercreditor Agreement.

### 2.10    Further Assurances; Reports

(a)     Each Borrower shall take such further actions, and execute and/or deliver to the Lender such additional financing statements, amendments, assignments, agreements, supplements, powers and instruments, as the Lender may, in its reasonable judgment, deem reasonably necessary or appropriate in order to create or maintain the validity, perfection or priority of and protect any security interest and Liens granted or purported to be granted in the Collateral as provided herein and the rights and interests granted to the Lender hereunder, and enable the Lender to exercise and enforce its rights, powers and remedies hereunder with respect to any Collateral, including the filing of any financing statements, continuation statements and other documents under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interest and Liens created hereby, the filing of any Loan Document or other document or instrument with the United States Patent and Trademark Office and the United States Copyright Office and the execution and delivery of Control Agreements, all in form reasonably satisfactory to the Lender and in such offices wherever required by law to perfect, continue and maintain the validity, enforceability and priority of the security interest and Liens in the Collateral as provided herein and to preserve the other rights and interests granted to the Lender hereunder, as against third parties, with respect to the Collateral.  Without limiting the generality of the foregoing, but subject to applicable Law, each Borrower shall make, execute, endorse, acknowledge, file or refile and/or deliver to the Lender, from time to time upon reasonable request by the Lender, such lists, schedules, descriptions and designations of the Collateral, statements, copies of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments as the Lender shall reasonably request in its sole discretion. If an Event of Default has occurred or is continuing, the Lender may institute and maintain, in its own name or in the name of any Borrower, such suits and proceedings as the Lender may deem reasonably necessary, expedient or desirable to prevent any impairment of the security interest or Lien in or the perfection thereof in the Collateral.  All of the foregoing shall be at the sole cost and expense of the Borrowers, jointly and severally.

(b)     Within thirty (30) calendar days after the end of each fiscal quarter following the Closing Date, the Borrower shall furnish the Lender with a report listing for such quarter:

21

(i)        any Subsidiary formed or acquired by any Borrower;

(ii)        any certificated securities, uncertificated securities, other equity interests or Indebtedness not held in an Account acquired by any Borrower;

(iii)       any change in name or jurisdiction of organization of any Borrower, whether or not permitted by the Loan Documents;

(iv)       any new location of Inventory or Equipment of any Borrower;

(v)        all Promissory Notes, Instruments or Chattel Paper received by any Borrower;

(vi)       any securities account, commodities account, deposit account or Governmental Deposit Account opened by any Borrower;

(vii)      all applications for and registration received by any Borrower in respect of any Intellectual Property;

(vii)      any letter of credit rights acquired by any Borrower;

(viii)     any commercial tort claims, other pending or potential affirmative claims (including inchoate or contingent claims), causes of action, rights of recovery and rights of setoff, clawback, disgorgement, and recoupment of any kind (including rights to insurance proceeds and rights under and pursuant to all warranties (including guarantees of third parties), representations, and guaranties made by suppliers of services, products, materials, or equipment, or components thereof), accrued or unaccrued, that have arisen or may arise out of or inure to the benefit of Borrowers (or any of them) or any of their respective Affiliates (as related to the Hoboken Facility or Christ Hospital), including under the Material Contracts, and other avoidance actions, suits, proceedings or other affirmative actions acquired by any Borrower; and

(ix)       any motor vehicles acquired by any Borrower.

**2.11    Governmental Deposit Account**.

(a)      Each Borrower shall deposit all Governmental Receivables and all proceeds thereof in the Governmental Deposit Account, which shall, on or prior to the Closing Date, be subject to a Deposit Account Instructions and Services Agreement ("**DAISA**") in form and substance satisfactory to the Lender and which shall specify that all available funds and proceeds in such Governmental Deposit Account shall be swept, on a daily basis, to a deposit account maintained at a financial institution satisfactory to the Lender in its Permitted Discretion and subject to a Control Agreement in favor of Lender. No Borrower may, and each Borrower shall instruct any financial institution with which such Governmental Deposit Account is established not to, commingle in such Governmental Deposit Account proceeds of accounts from non-governmental authorities or any non-governmental payor. Subject to the terms and provisions of the DAISA, no Borrower may withdraw any amounts from any Governmental Deposit Account, nor may any Borrower change the procedures or sweep instructions under any DAISA or any other agreement relating to, or affecting, the Governmental Deposit Account. Any change to or termination of any DAISA and any new directions to any financial institution relating to, or affecting, the Governmental Deposit Account must be approved in writing

in advance by the Lender in its Permitted Discretion.  Failure to comply with any of the provisions of this <u>Section 2.11</u> shall constitute an Event of Default.

(b)     Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Lender a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to the Governmental Deposit Account or any Governmental Receivables in violation of any applicable Law.

### 2.12    Other Covenants Regarding Collateral

(a)     The Borrowers, jointly and severally, at their own cost and expense, defend title to the Collateral and the first priority security interest and Liens granted to the Lender with respect thereto against all claims and demands of all Persons at any time claiming any interest therein adverse to the Lender other than Permitted Liens. Except as expressly permitted by this Agreement or any other Loan Document, there is no agreement, order, judgment or decree, and no Borrower shall enter into any agreement or take any other action, that could restrict the transferability of any of the Collateral or otherwise impair or conflict with such Borrower's obligations or the rights of the Lender hereunder.

(b)     No Borrower shall execute, authorize or permit to be filed in any recording office any financing statement or other instrument similar in effect covering all or any part of the Collateral or listing such Borrower as debtor with respect to all or any part of the Collateral, except financing statements and other instruments filed in respect of Permitted Liens.

(c)     In the event that the Lender desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals, authorizations, waivers, orders, licenses, Permits or consents of any Governmental Authority or any other Person therefor (including, without limitation, Healthcare Regulatory Consents), then, upon the request of the Lender, such Borrower agrees to assist the Lender in obtaining as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

### 2.13    Setoff Rights

During the continuance of any Event of Default, Lender is hereby authorized by Borrowers at any time or from time to time, with reasonably prompt subsequent notice to Borrowers (any prior or contemporaneous notice being hereby expressly waived) to set off, appropriate and apply, any and all (a) balances held by Lender or any of Lender's Affiliates for the account of Borrowers or any of their Subsidiaries (regardless of whether such balances are then due to Borrowers or their Subsidiaries), and (b) other property at any time held or owing by Lender to or for the credit or for the account of Borrowers or any of their Subsidiaries, against and on account of any of the Obligations.

### 2.14    Joint and Several Liability.

Each Borrower acknowledges, agrees, represents and warrants the following:

(a)     <u>Inducement</u>.  The Lender has been induced to make the Loans to the Borrowers in part based upon the assurances by each Borrower that such Borrower desires that the Obligations

under the Loan Documents be honored and enforced as separate obligations of such Borrower, should the Lender desire to do so.

(b)    <u>Combined Liability</u>.  Notwithstanding the foregoing, Borrowers shall be jointly and severally liable to the Lender for the Exit Loans and the other Obligations, including indemnities, and the Lender may at its option in its sole discretion enforce the entire amount of the Exit Loans and the other Obligations against any one or more Borrowers.

(c)    <u>Separate Exercise of Remedies</u>.  The Lender may exercise remedies against each Borrower and its property or assets separately, whether or not the Lender exercises remedies against any other Borrower or its property or assets.  The Lender may enforce the Obligations on one or more Borrower without enforcing any other Borrower and vice versa.  Any failure or inability of the Lender to enforce the Obligations on one or more Borrower shall not in any way limit the Lender's right to enforce the Obligations on any other Borrower.

## III.    FEES AND OTHER CHARGES

### 3.1    Reserved

### 3.2    Lender's Professional Fees

Borrowers shall be responsible for the payment of all reasonable fees and expenses of the Lender incurred in connection with origination, management, monitoring, and enforcement of the Exit Loans, which shall be added to the principal balance of any outstanding Borrowings as and when due and payable pursuant to <u>Section 2.1</u>.

### 3.3    Reserved

### 3.4    Computation of Fees; Lawful Limits

All fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed in each calculation period, as applicable.  In no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the interest and other charges paid or agreed to be paid to Lender for the use, forbearance or detention of money hereunder exceed the maximum rate permissible under applicable Law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.  If, due to any circumstance whatsoever, fulfillment of any provision hereof, at the time performance of such provision shall be due, shall exceed any such limit, then, the obligation to be so fulfilled shall be reduced to such lawful limit, and, if Lender shall have received interest or any other charges of any kind which might be deemed to be interest under applicable Law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges hereunder, then to unpaid principal balance owed by Borrowers hereunder, and if the then remaining excess interest is greater than the previously unpaid principal balance, Lender shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.  The terms and provisions of this <u>Section 3.4</u> shall control to the extent any other provision of any Loan Document is inconsistent herewith.

**3.5     Default Rate of Interest**

Upon the occurrence and during the continuation of an Event of Default, the Default Rate shall apply, in addition to any other specific charges provided for herein for noncompliance with specific provisions of this Agreement.

## IV.     CONDITIONS PRECEDENT

**4.1     Conditions to Closing and Borrowings**

The obligations of Lender to consummate the transactions contemplated herein on the Closing Date, and any Borrowing under the Exit Facility, are subject to the satisfaction, in the sole discretion of Lender, of the following conditions precedent:

(a)     The Bankruptcy Court shall have confirmed the Plan of Reorganization and entered the Confirmation Order, in form acceptable to the Lender, and the Plan of Reorganization and Confirmation Order shall be in full force and effect as of the Closing Date and shall have been vacated, reversed, modified, amended, challenged or stayed in any manner or subject to stay, challenge, motion or appeal;

(b)     Lender shall have received satisfactory evidence that each document (including any Uniform Commercial Code financing statements) required by this Agreement or any Loan Document or any requirement of Law or requested by Lender to be filed, registered, or recorded in order to create in favor of Lender a continuing, valid, binding, enforceable, and properly perfected first priority senior Lien on the Collateral, prior and superior in right to any other Person (other than with respect to Permitted Liens), shall be in proper form for filing, registration, and recording;

(c)     The Obligations are secured by continuing, valid, binding, enforceable, and properly perfected first priority senior Liens upon all of Borrowers' now existing or hereinafter acquired tangible and intangible assets (other than Excluded Collateral) on terms and conditions acceptable to Lender, and Lender shall have continuing valid, binding, enforceable, and properly perfected first priority senior Liens on the Collateral;

(d)     Borrowers and Lender shall have executed and delivered this Agreement;

(e)     Lender, Borrowers, and Capitala, shall have entered into the Intercreditor Agreement, the Intercreditor Agreement shall be the legal, valid, and binding obligation of each party thereto, enforceable against each such party in accordance with its terms, and Capitala and the Borrowers are then and have always been in full and continuous compliance with the Intercreditor Agreement and have committed any breach or default thereunder;

(f)     Borrowers shall have executed and delivered to Lender an IRS Form 8821 in form acceptable to Lender;

(g)     Lender shall have received (i) copies of all insurance policies required by <u>Section 6.5</u>, (ii) a copy of the declarations page for such insurance policies and (iii) certificates of insurance

confirming that the Lender has been named as sole beneficiary, loss payee or additional insured, as appropriate;

(h)     Borrowers shall have provided Lender with all information (including, without limitation, user identifications and passwords) necessary for Lender to have online access to view all information regarding all of Borrowers' bank and other accounts (including, without limitation, the Governmental Deposit Account);

(i)     No Event of Default shall have occurred and be continuing, or no Event of Default would exist after Lender's disbursement of the New Money Loan or upon the Borrowing of the Exit Loans;

(j)     Each of the representations and warranties made by Borrowers under this Agreement shall be accurate in all respects on and as of the date the Borrowing is requested as if made on and as of such date, before and after giving effect to such Borrowing;

(k)     No event shall have occurred which has had or could reasonably be expected to have a Material Adverse Effect;

(l)     Immediately after giving effect to the requested Borrowing, the aggregate outstanding principal amount of Borrowings under the Exit Facility shall not exceed the Maximum Amount;

(m)     The Management Agreements shall have been executed and delivered by the Borrowers and their Affiliates that are signatory thereto to Lender or its Affiliates, shall be legal, valid, and binding obligation of each Borrower and such Affiliates, enforceable against each the Borrowers or such Affiliates in accordance with their terms, and the Borrowers and such Affiliates are then and have always been in full and continuous compliance with the Management Agreements and have committed any breach or default thereunder;

(n)     Lender shall have received, at least three (3) Business Days prior to the Closing Date, all requested documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act;

(o)     Lender shall have received all fees, charges, expenses and other amounts due and payable to Lender on or prior to the Closing Date pursuant to the Loan Documents, the Plan of Reorganization and the Confirmation Order;

(p)     Borrowers and their Affiliates shall have duly performed and complied with all agreements, covenants, and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date and shall not have been any defaults hereunder or thereunder;

(q)     Lender shall have received a certificate, dated the Closing Date, and signed by an authorized officer of the Borrowers, that each of the conditions set forth in this Section 4.1 have been satisfied;

(r)       Lender shall have received a certificate of the chief executive officer, president or comparable executive officer of each Borrower certifying that attached thereto are true and complete copies of all resolutions adopted by the Board of Trustees, the board of managers or comparable executive managing body of each Borrower authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby;

(s)       Lender shall have received a certificate of the chief executive officer, president or comparable executive officer of each Borrower certifying the names and signatures of the Persons authorized to execute on behalf of each entity comprising Borrowers on this Agreement, and the other documents to be delivered hereunder and thereunder;

(t)       The Lender shall have received results of recent lien searches in each of the jurisdictions where the Borrowers are organized or incorporated and the Collateral is located, and such searches confirm the first priority of the Liens in favor of the Lender and reveal no Liens on any of the Collateral, except for Permitted Liens or discharged or subordinated on or prior to the Closing Date pursuant to documentation satisfactory to the Lender in its Permitted Discretion;

(u)       Lender shall have received satisfactory projections of the Borrowers through the Maturity Date and such other documents, certificates, information as Lender may request, all in form and substance satisfactory to Lender;

(v)       No claims, lawsuits, audits, legal/administrative actions, arbitrations, proceedings, disputes, controversies, notices, inquiries, demands, orders, causes of action, summons, subpoena, complaints, criminal prosecutions, sanctions, governmental or other examinations or investigations, hearings, or administrative or other proceedings, whether at law or in equity, in connection with the Bankruptcy Cases or otherwise, shall have been commenced against Lender or Borrowers which could prevent, condition or delay the Closing.  No injunction or restraining order shall have been issued and be in effect, which restrains or prohibits any transaction contemplated hereby;

(w)       Lender shall have received satisfactory evidence that all Liens and security interests granted by the Borrowers in respect of the NJDOH Secured Claims or the NJDOH Loan Agreement have been subordinated to the Liens and security interests granted by the Borrowers to the Lenders hereunder;

(x)       Lender shall have received correct and complete copies of each of the following documents, agreements and other deliverables and satisfactory evidence that each such document, agreement and other deliverable has been duly executed and delivered by Borrowers or their respective Affiliates, as applicable, and constitute legal, valid and binding obligations of Borrowers or their respective Affiliates, as applicable, and no breach, default or event of default exists or has existed thereunder:

4904-1495-3993, v. 10
#124847153v2

(i)     The Plan of Reorganization and all schedules, exhibits, attachments, addendums, supplements, amendments, modifications, substitutions or restatements thereof or thereto;

(ii)    The Confirmation Order;

(iii)   The Management Agreements;

(iv)    The Capitala Loan Documents;

(v)     The NJDOH Loan Agreement;

(vi)    The Litigation Trust Agreement;

(vii)   The Collateral Surrender Agreement;

(viii)  all other documents, agreements and other deliverables required to be delivered to Lender or its Affiliates by Borrowers or their Affiliates, as applicable, on the "Effective Date" (as defined in the Collateral Surrender Agreement) pursuant to the Collateral Surrender Agreement;

(ix)    [_____]; and

(x)     all other documents, agreements and other deliverables required to be delivered to Lender or its Affiliates by Borrowers or their Affiliates, as applicable, pursuant to the Loan Documents, the Plan of Reorganization and the Confirmation Order; and

(y)     Lender shall have received such other documents, certificates, information as Lender reasonably may request, all in form and substance reasonably satisfactory to Lender.

## 4.2    Waivers of Conditions to Borrowings

A waiver of any of the foregoing conditions to a Borrowing or the making of a Borrowing by Lender notwithstanding the failure of any of the foregoing conditions to be met as of the date of such Borrowing shall not be deemed to constitute a waiver by Lender of any such conditions with respect to any future Borrowing.

## V.    REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to advance funds to Borrowers, Borrowers jointly and severally represent and warrant as of the Effective Date, the date hereof, and the Closing Date, as follows:

## 5.1    Organization and Authority

Each of Borrowers is an entity of the type specified on Schedule 5.3, is duly organized, validly existing and in good standing under the laws of the jurisdiction specified on Schedule 5.3 and no other jurisdiction, and (i) has all requisite corporate or other organizational power and authority to

28

own its properties and assets and to carry on its business as now being conducted and as contemplated in the Loan Documents, (ii) is duly qualified to do business in every jurisdiction in which failure so to qualify could reasonably be expected to have a Material Adverse Effect, and (iii) has requisite power and authority (A) to execute, deliver and perform the Loan Documents to which it is a party and all amendments thereto, (B) to borrow hereunder, (C) to consummate the transactions contemplated under the Loan Documents, and (D) to grant the Liens with regard to the Collateral pursuant to the Loan Documents to which it is a party.

## 5.2    Loan Documents

The execution, delivery and performance by Borrowers of the Loan Documents to which they are a party, and the consummation of the transactions contemplated thereby, including the grants of Liens and security interests in the Collateral, (i) have been duly authorized by all requisite action of the Bankruptcy Court or the Borrowers and have been duly executed and delivered by or on behalf of Borrowers; and (ii) do not violate any provisions of (A) applicable Law, (B) any order of any Governmental Authority binding on Borrowers or any of Borrowers' properties the effect of which could reasonably be expected to have a Material Adverse Effect, or (C) the certificate of formation or incorporation or bylaws (or any other equivalent governing agreement or document) of Borrowers, or any agreement between Borrowers and its shareholders, members, partners or equity owners or among any such shareholders, members, partners or equity owners. When executed and delivered, each of the Loan Documents to which each Borrowers is a party will constitute the legal, valid and binding obligation of Borrowers, enforceable against Borrowers in accordance with its terms.

## 5.3    Subsidiaries, Capitalization and Ownership Interests

Borrowers have no Subsidiaries except as listed on Schedule 5.3. Schedule 5.3 also states the authorized and issued capitalization of Borrowers, the number and class of equity securities and/or ownership, voting or partnership interests issued and outstanding of Borrowers and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing). The outstanding equity securities and/or ownership, voting or partnership interests of Borrowers have been duly authorized and validly issued and are fully paid and nonassessable, and each Person listed on Schedule 5.3 owns beneficially and of record all of the equity securities and/or ownership, voting or membership interests it is listed as owning free and clear of any Liens other than Permitted Liens. Except as listed on Schedule 5.3, Borrowers do not own an interest in or participate or engages in any joint venture, partnership or similar arrangement with any Person.

## 5.4    Properties

Except as disclosed on Schedule 5.4, each of Borrowers (i) is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its material properties and assets, including the Collateral, whether personal or real, subject to no transfer restrictions or Liens of any kind except for Permitted Liens, and (ii) is in compliance in all material respects with each lease to which it is a party or otherwise bound except for such noncompliance as would not reasonably be expected to have a Material Adverse Effect. Schedule 5.4 lists all real properties (and their locations) owned or leased by or to the Borrowers. Borrowers enjoy peaceful and undisturbed possession under all such leases and such leases are all the leases necessary for the operation of such properties and assets, are valid and subsisting and are in full force and effect.

### 5.5     Other Agreements

Borrowers are not (i) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would materially adversely affect their ability to execute and deliver, or perform under, any Loan Document or to pay the Obligations, or (ii) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which they are a party or to which any of their properties or assets are subject, which default, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both; would constitute or result in a conflict, breach, default or event of default under, any of the foregoing which, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect.

### 5.6     Litigation

Except as disclosed on Schedule 5.6, there is no action, suit, proceeding or investigation pending or, to Borrowers' knowledge, threatened against Borrowers that (i) could reasonably be expected to affect the validity of any of the Loan Documents or the right of Borrowers to enter into any Loan Document or to consummate the transactions contemplated thereby or (ii) could reasonably be expected to be or have, either individually or in the aggregate, any Material Adverse Change or Material Adverse Effect.  Borrowers are not party or subject to any order, writ, injunction, judgment or decree of any Governmental Authority that could reasonably be expected to have a Material Adverse Effect, except as so identified in Schedule 5.6.

### 5.7     Labor Matters

There are no strikes, slowdowns, work stoppages, lockouts, grievances, other collective bargaining or labor related disputes pending or, to Borrowers' knowledge, threatened against Borrowers.  All payments due from Borrowers, or for which any claim may be made against any of them, on account of wages and employee and retiree health and welfare insurance and other benefits have been paid or accrued as a liability on its books, as the case may be.  The provisions of any collective agreement are consistent with applicable industry standards respecting wage rates, benefits and working rules.  Borrowers are not in breach of any provision of any collective agreement to which they are a party.  The consummation of the transactions contemplated by the Loan Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which it is a party or by which it is bound.

### 5.8     Tax Returns, Governmental Reports

Except as disclosed in the Bankruptcy Cases, Borrowers (i) have filed all material federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by Borrowers, and (ii) have paid all taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment related taxes, in each case that are due and payable.

### 5.9    Financial Statements and Reports

All financial information and statements relating to Borrowers that has been or may hereafter be delivered to Lender by Borrowers is accurate and complete in all material respects and has been prepared in accordance with GAAP consistently applied with prior periods. Borrowers do not have any material obligations or liabilities of any kind not disclosed in such financial information or statements or the Bankruptcy Cases, and since the date of the most recent financial statements submitted to Lender, there has not occurred any Material Adverse Change, Material Adverse Effect, Liability Event or, to Borrowers' knowledge, any other event or condition that could reasonably be expected to have a Material Adverse Effect or Liability Event.

### 5.10    Compliance with Law

Each of Borrowers (i) is in substantial compliance with all Laws applicable to its business, assets or operations, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except where noncompliance or violation would not reasonably be expected to have a Material Adverse Effect. There is no event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in any noncompliance with, or any violation of, any of the foregoing, in each case except where noncompliance or violation would not reasonably be expected to have a Material Adverse Effect. Borrowers have not received any notice that Borrowers are not in compliance in any respect with any of the requirements of any of the foregoing.

### 5.11    Intellectual Property

Borrowers owns, licenses to use, or otherwise have the right to use, all Intellectual Property that is material to the condition (financial or other), business or operations of Borrowers, except as would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, Borrowers are the sole and exclusive owner of the entire and unencumbered right, title and interest in and to each such registered Intellectual Property (or application therefor) purported to be owned by such Borrowers, free and clear of any Liens (except for Permitted Liens) or licenses in favor of third parties or agreements or covenants not to sue such third parties for infringement. All registered Intellectual Property of Borrowers is duly and properly registered, filed or issued in the appropriate office and jurisdictions for such registrations, filings or issuances, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. To Borrowers' knowledge, it conducts its business without infringement or claim of infringement of any Intellectual Property rights of others and there is no infringement or claim of infringement by others of any Intellectual Property rights of Borrowers, which infringement or claim of infringement could reasonably be expected to have a Material Adverse Effect.

### 5.12    Licenses and Permits

Without limitation of anything contained in Section 5.20: Borrowers are in substantial compliance with and have all Permits necessary or required by applicable Law or Governmental Authority for the operation of their businesses except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Effect. All of the foregoing are in full force and effect and not in known conflict with the rights of others except where the failure to be in

compliance would not reasonably be expected to have a Material Adverse Effect. Borrowers are not (i) in breach of or default under the provisions of any of the foregoing, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a conflict, breach, default or Event of Default under, any of the foregoing which, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect, (ii) a party to or subject to any agreement, instrument or restriction that is so unusual or burdensome that it might have a Material Adverse Effect.

### 5.13    Disclosure

No Loan Document nor any other agreement, document, certificate, or statement furnished to Lender by or on behalf of Borrowers in connection with the transactions contemplated by the Loan Documents, when taken as a whole knowingly contains any untrue statement of material fact or omits to state any fact necessary to make the statements therein not materially misleading in light of current circumstances. All financial projections delivered to Lender by Borrowers have been prepared on the basis of the assumptions stated therein. Such projections represent Borrowers' best estimate of Borrowers' future financial performance and such assumptions are believed by Borrowers to be fair and reasonable in light of current business conditions.

### 5.14    Existing Indebtedness; Investments, Guarantees and Certain Contracts

Except as permitted by the Loan Documents, each Borrower (i) has no outstanding Indebtedness other than Permitted Indebtedness, (ii) is not subject or party to any mortgage, note, indenture, indemnity or guarantee of, with respect to or evidencing any Indebtedness of any other Person other than in connection with a Permitted Lien, or (iii) does not own or hold any equity or long-term debt investments in, and does not have any outstanding advances to or any outstanding guarantees for the obligations of, or any outstanding borrowings from, any Person. Borrowers have performed all material obligations required to be performed by Borrowers pursuant to or in connection with their respective outstanding Indebtedness and the items permitted by the Loan Documents and there has occurred no breach, default or event of default under any document evidencing any such items or any fact, circumstance, condition or event which, with the giving of notice or passage of time or both, would constitute or result in a breach, default or event of default thereunder.

### 5.15    Agreements with Affiliates

Except for transactions permitted under Section 7.6, there are no existing or proposed material agreements, arrangements, understandings or transactions between Borrowers and any of its officers, members, managers, directors, stockholders, partners, other interest holders, employees or Affiliates or any members of their respective immediate families, other than the management services agreement described in clause (ii) in the definition of "Management Agreements."

### 5.16    Insurance

Borrowers has in full force and effect such insurance policies as are customary in its industry and as may be required pursuant to Section 6.5. All such insurance policies as in force on the date of this Agreement are listed and described on Schedule 5.16.

4904-1495-3993, v. 10
#124847153v2

### 5.17    Names, Location of Offices, Records and Collateral

During the preceding five years, Borrowers has not conducted business under or used any name (whether corporate, partnership or assumed) other than as shown on Schedule 5.17A. Each Borrower is the sole owner of all of its names listed on Schedule 5.17A, and any and all business done and invoices issued in such names are such Borrower's sales, business and invoices. Borrowers maintain their places of business and chief executive offices only at the locations set forth on Schedule 5.17B. Schedule 5.17B also identifies all of the addresses (including warehouses) at which any of the Collateral is located or Books and Records of Borrowers regarding any Collateral are kept and identifying which Collateral and which Books and Records are kept at each location, the nature of such location (e.g., leased business location operated by Borrowers, third party warehouse, consignment location, processor location, etc.) and the name and address of the third party owning and/or operating such location. No Collateral and no Books and Records in connection therewith or in any way relating thereto or that evidence the Collateral are located at any other location. All of the Collateral is and shall remain located (as that term is used in Section 9-301(2) of the UCC) only in the continental United States.

### 5.18    Non-Subordination

(a)    The Obligations are not subordinated in any way to any other obligations of the Borrowers or to the rights of any other Person.

(b)    The security interests granted in this Agreement will, on the Closing Date, be continuing, valid, binding, enforceable, and properly perfected first priority senior secured security interest prior to all other interests and Liens with respect to the Collateral.

### 5.19    Reserved

### 5.20    Healthcare Law Compliance Representations

To induce Lender to enter into this Agreement and to make credit accommodations contemplated hereby, Borrowers hereby represents and warrants that all of the information set forth in Schedule 5.20 is true, complete and correct, and that, except as disclosed in Schedule 5.20, the following statements are true, complete and correct:

(a)    Healthcare Permits. Each Borrower has (i) each Healthcare Permit and other rights from, and has made all declarations and filings with, all applicable Governmental Authorities, all self-regulatory authorities and all courts and other tribunals necessary to engage in the ownership, management and operation of its assets and business, and (ii) no knowledge that any Governmental Authority is considering limiting, suspending or revoking any such Healthcare Permit. All such Healthcare Permits are valid and in full force and effect and Borrowers are in compliance with the terms and conditions of all such Healthcare Permits.

(b)    Specific Licensing. The Borrowers' healthcare facilities are duly licensed under the applicable Laws of the state where each such facility is located. The licensed bed or unit capacity of each such facility is shown on Schedule 5.20. Borrowers have not granted to any third party the right to reduce the number of licensed beds, persons served or units in any of the health care facilities

operated by Borrowers or the right to apply for approval to move any and all of the licensed beds, persons served or units to any other location and there are no proceedings or contemplated to reduce the number of licensed beds, persons served or units.

(c)    <u>Operating Leases</u>.  The Borrowers' operating leases have been approved by all necessary Governmental Authorities.  Under applicable Healthcare Laws in the states in which the Borrowers are located, the reimbursement rate of the Borrowers under applicable Third Party Payor participation agreements is not affected by the rental rates under any such leases.  The rentals provided for under the leases comply with all applicable Healthcare Laws and do not exceed the sums permitted to be paid under applicable Healthcare Laws.

(d)    <u>Reserved</u>.

(e)    <u>Accreditation</u>.  Borrowers have received and maintain accreditation in good standing and without impairment by all applicable Accrediting Organizations, to the extent required by law (including any equivalent regulation) or the terms of the operating leases.

(f)    <u>Participation Agreements/Provider Status/Cost Reports</u>.    There is no investigation, audit, claim review, or other action pending or, to the knowledge of Borrowers, threatened which could result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Third Party Payor participation agreement or provider number or other Healthcare Permit or result in Borrowers' exclusion from any Third Party Payor Program, nor have Borrowers or any Third Party Payor Program made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit, nor have Borrowers made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit, nor is there any action pending or threatened to impose material intermediate or alternative sanctions with respect to the Borrowers' facilities.  The Borrowers, and, to the knowledge of the Borrowers, its contractors, have properly and legally billed all intermediaries and Third Party Payors for services rendered and have maintained their records to reflect such billing practices.  No funds relating to Borrowers are now, or, to the knowledge of Borrowers will be, withheld by any Third Party Payor. Borrowers has the requisite participation agreement or provider number or other Healthcare Permit to bill the Medicare program and the respective Medicaid programs in the state or states in which Borrowers operate (to the extent Borrowers participate in the Medicare or Medicaid program in such state or states) and all other Third Party Payor Programs (including, without limitation, Medicare) which have historically accounted for any portion of the revenues of the facilities.  All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by the Borrowers are and will be materially accurate and complete and have not been and will not be misleading in any material respects.  No cost reports remain "open" or unsettled and there are no current, pending or outstanding Medicare, Medicaid or other Third Party Payor Program reimbursement audits or appeals pending with respect to the Borrowers.

(g)    <u>No Violation of Healthcare Laws</u>.  None of Borrowers is in violation of any Healthcare Laws, except where any such violation would not have a Material Adverse Effect. Borrowers are HIPAA Compliant.

(h)    <u>Proceedings</u>.  None of Borrowers is subject to any proceeding, suit or, to Borrowers' knowledge, investigation by any federal, state or local government or quasi-governmental

body, agency, board or authority or any other administrative or investigative body (including the Office of the Inspector General of the United States Department of Health and Human Services): (i) which may result in the imposition of a fine, alternative, interim or final sanction, a lower reimbursement rate for services rendered to eligible patients which has not been provided for on its financial statements, or which would have a Material Adverse Effect on Borrowers or the operation of their business; (ii) which could result in the revocation, transfer, surrender, suspension or other impairment of the operating certificate, provider agreement or Healthcare Permits; (iii) which pertains to or requests any voluntary disclosure pertaining to a potential overpayment matter involving the submission of claims to such payor by Borrower; or (iv) which pertains to any state or federal Medicare or Medicaid cost reports or claims filed by Borrowers (including, without limitation, any reimbursement audits), or any disallowance by any commission, board or agency in connection with any audit of such cost reports.

(i)    Hill Burton.  Except for Governmental Receivables, Borrowers are not nor will be participants in any federal program whereby any federal, state or local government or quasi-governmental body, agency, board or other authority may have the right to recover funds by reason of the withholding from federal funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.).

## 5.21    Reliance on Representations; Survival

Borrowers makes the representations and warranties contained herein with the knowledge and intention that Lender is relying and will rely thereon.  All such representations and warranties will survive the execution and delivery of this Agreement and the making of the Borrowings under the Exit Facility.  No investigation or inquiry made by or on behalf of Lender nor knowledge by Lender which is in any fashion inconsistent with the representations and warranties contained herein, shall in any way (i) affect or lessen the representations and warranties made and entered into by the Borrowers hereunder, or (ii) reduce or in any way affect Lender's rights with respect to a breach of such representations and warranties.

## 5.22    Compliance with Environmental Requirements; No Hazardous Substances

(a)    Borrowers has no knowledge of (i) the presence of any Hazardous Substance on any of the real property where Borrowers conducts operations or has its personal property, (ii) any on site spills, releases, discharges, disposal or storage of Hazardous Substances that have occurred or are presently occurring on any of such real property or where any Collateral is located, or (iii) any spills, releases, discharges or disposal of Hazardous Substances that have occurred or are presently occurring on any other real property as a result of the conduct, action or activities of Borrowers.

(b)    No property now owned or leased by Borrowers is on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of federal, state or local enforcement actions or, to the knowledge of Borrowers, other investigations which may lead to claims against Borrowers for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, without limitation, claims under CERCLA;

For purposes of this Section 5.22, Borrowers shall be deemed to include any business or business entity (including a corporation) that is, in whole or in part, a predecessor of Borrowers.

### 5.23   Material Contracts

Except for the Organizational Documents, the Management Agreements, the Loan Documents, the Capitala Loan Documents, the Collateral Surrender Agreement, the Litigation Trust Agreement, and the other agreements set forth on Schedule 5.23 (collectively with the Organizational Documents, the "**Material Contracts**"), there are no (a) employment agreements covering the management of any Borrowers, (b) collective bargaining agreements or other similar labor agreements covering any employees of Borrowers, (c) agreements for managerial, consulting or similar services to which a Borrower is a party or by which it is bound, (d) agreements regarding Borrowers, its assets or operations or any investment therein to which any of its equity holders is a party or by which it is bound, (e) real estate leases, Intellectual Property licenses or other lease or license agreements to which a Borrower is a party, either as lessor or lessee, or as licensor or licensee (other than licenses arising from the purchase of "off the shelf" products), (f) customer, distribution, marketing or supply agreements to which a Borrower is a party, in each case with respect to the preceding clauses (a) through (f) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to result in a Material Adverse Change, (g) partnership agreements to which a Borrower is a general partner or joint venture agreements to which Borrower is a party, or (h) any other agreements or instruments to which a Borrower is a party, and the breach, nonperformance or cancellation of which, or the failure of which to renew, could reasonably be expected to have a Material Adverse Effect.   Schedule 5.23 sets forth the Management Agreements and, with respect to each real estate lease agreement to which a Borrower is a party (as a lessee), the address of the subject property and the annual rental (or, where applicable, a general description of the method of computing the annual rental).   The consummation of the transactions contemplated by the Loan Documents will not give rise to a right of termination in favor of any party to any Material Contract (other than Borrower), except for such Material Contracts the noncompliance with which would not reasonably be expected to have a Material Adverse Effect.

### 5.24   Third-Party Payor Billing Numbers

The numbers under which the Borrowers bills Third-Party Payors are listed on Schedule 5.24 and all such billing numbers have been issued to Borrowers and not to any Affiliate of Borrowers and not to any unaffiliated third party; and Borrowers has not allowed any Person that is not a Borrowers hereunder to use such billing numbers for any purpose.

### 5.25   Plan of Reorganization; Confirmation Order

Each of the Plan of Reorganization and the Confirmation Order is in full force and effect and are not subject to a pending appeal, motion for leave to appeal, or other proceeding to set aside such orders and have not been reversed, modified, stayed or vacated absent Lender's written consent.

### 5.26   Liens

(a)      Each Borrower has fee simple title to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its Collateral, and none of such property is subject to any Lien, claim, option or right of others, except for the security interest granted to the

Lender and Permitted Liens.  No Person, other than the Lender, has control or possession of all or any part of the Collateral, except as expressly permitted herein.

(b)    This Agreement is effective to create, and creates, in favor of the Lender, a legal, valid, continuing, and enforceable first priority security interest in the Collateral.  The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule 5.26.  Upon such filings or the obtaining of "control" (as defined in the Uniform Commercial Code), the Lender will have a perfected first priority Lien on, and security interest in, to and under all right, title, and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording, or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the Uniform Commercial Code) or by obtaining control, under the Uniform Commercial Code (in effect on the date this representation is made) in each case prior and superior in right to any other Person, except for Permitted Liens.

## VI.    AFFIRMATIVE COVENANTS

The Borrowers covenant and agree that, until full performance and satisfaction, and payment in full in cash, of all the Obligations (other than indemnity obligations with respect to which no claim has been made) and termination of this Agreement:

### 6.1    Financial Statements, Reports and Other Information

(a)    Financial Reports.  Borrowers shall furnish to Lender (i) as soon as available and in any event within one hundred twenty (120) calendar days after the end of each fiscal year of Borrowers, annual consolidated and consolidating financial statements of Borrowers, including the notes thereto, consisting of a consolidated and consolidating balance sheet at the end of such completed fiscal year and the related consolidated and consolidating statements of income, retained earnings, cash flows and owners' equity for such completed fiscal year, reviewed by an accounting firm acceptable to Lender, and (ii) within thirty (30) calendar days after the end of each calendar month, unaudited consolidated and consolidating financial statements of Borrowers consisting of a balance sheet and statements of income, retained earnings, cash flows and owners' equity as of the end of such calendar month.  All such financial statements shall be prepared in accordance with GAAP consistently applied with prior periods.

(b)    Accounts Receivable Aging Schedules.  Borrowers shall furnish to Lender as soon as available, and in any event within ten (10) calendar days after the end of each calendar month, detailed accounts receivable and accounts payable aging schedules as of the end of such month, in a form satisfactory to Lender.

(c)    Forms 941.  Within thirty (30) calendar days following the end of each calendar quarter, Borrowers shall furnish Lender with a copy of all IRS Forms 941 required to be filed by Borrowers with respect to the quarter then ended.

(d)    Other Materials.  Borrowers shall furnish to Lender as soon as available, and in any event within fifteen (15) calendar days after the preparation or issuance thereof or at such other time as set forth below:

4904-1495-3993, v. 10
#124847153v2

(i)    *Cost Reports.* All Medicare and Medicaid cost reports and other document and materials filed by or on behalf of Borrowers and any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for or on behalf of Borrower;

(ii)    *Medicare/Medicaid Documents.* Any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for, or on behalf of, Borrowers or any of their Subsidiaries, including, without limitation, (A) copies of licenses and permits required by any applicable federal, state, foreign or local law, statute ordinance or regulation or Governmental Authority for the operation of its business, (B) Medicaid or Medicare provider numbers and agreements, (C) state surveys, (D) participating agreements relating to medical plans and (E) copies of all Medicare or Medicaid surveys, or other surveys or reviews conducted by any government health plan or other accreditation entity;

(iii)    *Monthly Reports.* Within ten (10) calendar days after the end of each calendar month for such month, (A) a report of the status of all payments, denials and appeals of all Medicaid and/or Medicare Accounts, (B) a sales and collection report (including credits issued) in a form satisfactory to Lender, all such reports showing a reconciliation to the amounts reported in the monthly financial statements, and (C) a report of census and occupancy percentage;

(iv)    *Insurance Renewals.* Prior to the expiration date of each of the insurance policies required to be maintained pursuant to Section 6.5, proof of the renewal of each such insurance policy together with copies of the declarations page for each such renewed policy;

(v)    *Accountants Communications.* Promptly upon receipt thereof, copies of any reports submitted to Borrowers by its independent accountants in connection with any interim audit of the books of Borrowers and copies of each management control letter provided by such independent accountants;

(vi)    *Documents Requested by Lender.* Such additional information, documents, statements, reports and other materials as Lender may reasonably request from a credit or security perspective or otherwise from time to time, including, but not limited to, periodic receivable and payable aging reports, payroll tax information, dilution analyses, origination reports and default/charge off reports.

(e)    Notices. Borrowers shall promptly, and in any event within five (5) Business Days after Borrowers or any officer of Borrowers obtains knowledge thereof, notify Lender in writing of (i) any pending litigation, suit, investigation, arbitration, formal dispute resolution proceeding or administrative proceeding brought against or initiated by Borrowers or otherwise affecting or involving or relating to Borrowers or any of their material property or assets, (ii) any Event of Default, which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto, (iii) any other development, event, fact, circumstance or condition that could reasonably be expected to have a Material Adverse Effect, in each case describing the nature and status thereof and the action proposed to be taken with respect thereto, (iv) any matter(s) affecting the value, enforceability or collectability of any of the Collateral, (v) receipt of any notice or request from any Governmental Authority or governmental payor

regarding any liability or claim of liability outside the ordinary course of business, or (vi) termination of any executive manager of any facility owned, operated or leased by Borrowers.

(f)    <u>Consents</u>.  Borrowers shall obtain and deliver from time to time all required consents, approvals and agreements from such third parties as Lender shall determine are necessary or desirable in its Permitted Discretion (as communicated to Borrowers by written notice) for the protection of its Collateral and that are reasonably satisfactory to Lender with respect to the Loan Documents and the transactions contemplated thereby or any of the Collateral.

(g)    <u>Reserved</u>.

(h)    <u>Healthcare Notices</u>.  Borrowers shall notify Lender within three (3) Business Days following the occurrence of any facts, events or circumstances known to Borrowers, whether threatened, existing or pending, that would make any of the representations and warranties contained in <u>Section 5.20</u> untrue, incomplete or incorrect (together with such supporting data and information as shall be necessary to fully explain to Lender the scope and nature of the fact, event or circumstance).

(i)    <u>Notices with respect to Management Agreements</u>.   In connection with the Management Agreements, Borrowers shall:

(i)    notify Lender within one (1) Business Day of any default, event of default, or alleged default or event of default thereunder; and

(ii)    notify Lender within one (1) Business Day of any termination or purported termination thereof.

(j)    <u>Notices with Respect to Operating Leases</u>.   In connection with the Borrowers' operating leases, Borrowers shall:

(i) notify Lender within one (1) Business Day of any default, event of default, or alleged default or event of default thereunder;

(ii) Lender within one (1) Business Day of any termination thereof; and

(iii) at Lender's request, provide Lender with evidence satisfactory to Lender of Borrowers' payment of all rent due under all such leases on a monthly basis within one (1) Business Day of such payment.

**6.2    Payment of Obligation**

Borrowers (i) will pay and discharge, on a timely basis as and when due, all of their respective obligations and liabilities, except for such obligations and/or liabilities (a) that may be the subject of a Permitted Contest, and (b) the nonpayment or nondischarge of which could not reasonably be expected to have a Material Adverse Effect or result in a Lien against any Collateral, except for Permitted Liens, (ii) without limiting anything contained in the foregoing clause (i), pay all amounts due and owing in respect of taxes (including without limitation, payroll and withholdings tax liabilities) on a timely basis as and when due, and in any case prior to the date on which any fine,

penalty, interest, late charge or loss may be added thereto for nonpayment thereof, (iii) will maintain, and cause each Subsidiary to maintain, in accordance with GAAP, appropriate reserves for the accrual of all of their respective obligations and liabilities, and (iv) will not breach or permit any Subsidiary to breach, or permit to exist any default under, the terms of any lease, commitment, contract, instrument or obligation to which it is a party, or by which its properties or assets are bound.  Notwithstanding the foregoing, Borrowers shall make full and timely payment in cash of the principal of and interest on the Exit Loans, Borrowings and all other Obligations when due and payable.

**6.3     Conduct of Business and Maintenance of Existence and Assets**

Each of the Borrowers shall (i) engage principally in the same or similar lines of business substantially as heretofore conducted, (ii) collect its Accounts in the ordinary course of business, (iii) maintain all of its material properties, assets and Equipment used or useful in its business in good repair, working order and condition (normal wear and tear excepted and except as may be disposed of in the ordinary course of business and in accordance with the terms of the Loan Documents), (iv) from time to time make all necessary or desirable repairs, renewals and replacements thereof, as determined by Borrowers using commercially reasonable business judgment (v) preserve, maintain and keep in full force and effect its existence, except (vi) preserve, maintain and keep in full force and effect, in good standing, and free from restrictions, probations, conditions or known conflicts which would materially impair the Borrowers' business, all qualifications to do business in each jurisdiction in which the ownership or lease of property or the nature of its business makes such qualification necessary, and (vii) preserve, maintain and keep in full force and effect all Healthcare Permits necessary under Healthcare Laws to continue to receive reimbursement under all Third Party Payor Programs in which Borrowers participate as of the date of this Agreement.

**6.4     Compliance with Legal, Tax and Other Obligations**

Each of Borrowers shall (i) substantially comply with Laws applicable to it or its business, assets or operations, (ii) pay all taxes, assessments, fees, governmental charges, claims for labor, supplies, rent and all other obligations or liabilities of any kind, as and when due and payable, except liabilities being contested in a Permitted Contest; however, all payroll taxes payable in connection with each payroll shall be paid or funds shall set aside in a reserve in an amount adequate to pay all such payroll taxes contemporaneously with the payment of such payroll, and (iii) perform in accordance with its terms each contract, agreement or other arrangement to which it is a party or by which it or any of the Collateral is bound, except where the failure to comply with any of the foregoing provisions of this <u>Section 6.4</u> could reasonably be expected to have a Material Adverse Effect.

**6.5     Insurance**

(a)     Each of Borrowers shall (i) keep all of its insurable properties and assets adequately insured in all material respects against losses, damages and hazards as are customarily insured against by businesses engaging in similar activities or owning similar assets or properties and at least the minimum amount required by applicable Law, including, without limitation, medical malpractice and professional liability insurance, as applicable; (ii) maintain business interruption insurance, (iii) maintain general public liability insurance at all times against liability on account of damage to persons and property having such limits, deductibles, exclusions and co-insurance and other provisions as are customary for a business engaged in activities similar to those of Borrowers; and (iv) maintain

insurance under all applicable workers' compensation laws. All of the insurance policies referenced above shall be (x) satisfactory in form and substance to Lender in its Permitted Discretion and (y) placed with insurers having an A.M. Best policyholder rating acceptable to Lender in its Permitted Discretion. Borrowers agree that they shall not alter, amend, modify or cancel their insurance policies without thirty (30) Business Days prior written notice to Lender unless such alteration, amendment, modification or cancellation, shall be in compliance with the requirements set forth above. The insurance policies referenced in clauses (i) and (ii) shall name Lender as a lender's loss payee thereunder. The insurance policies referenced in clause (iii) shall name Lender as an additional insured thereunder.

(b)     **Warning. In the event Borrowers fails to provide Lender with evidence of the insurance coverage required by this Agreement, Lender may purchase insurance at Borrowers' expense to protect Lender's interests in the Collateral. This insurance may, but need not, protect Borrowers' interests.** The coverage purchased by Lender may not pay any claim made by Borrowers or any claim that is made against Borrowers in connection with the Collateral. Borrowers may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrowers have obtained insurance as required by this Agreement. If Lender purchases insurance for the Collateral, Borrowers will be responsible for the costs of that insurance to the fullest extent provided by law, including interest and other charges imposed by Lender in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance Borrowers are able to obtain on their own.

### 6.6     True Books

Borrowers shall (i) keep true, complete and accurate books of record and accounts in accordance with commercially reasonable business practices in which true and correct entries are made of all of their dealings and transactions in all material respects; and (ii) set up and maintain on their books such reserves as may be required by GAAP with respect to doubtful accounts and all taxes, assessments, charges, levies and claims and with respect to their business, and include such reserves in its quarterly as well as year-end financial statements.

### 6.7     Inspection; Period Audits

Borrowers shall permit the representatives of Lender, from time to time during normal business hours, upon reasonable notice, but no more than once in any twelve (12) month period absent an Event of Default, to (i) visit and inspect any of their offices or properties or any other place where Collateral is located to inspect the Collateral and/or to examine or audit all of Borrowers' books of account, records, reports and other papers, (ii) make copies and extracts therefrom, and (iii) discuss Borrowers' business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with Borrowers' officers, managers, and independent public accountants (the performance of the foregoing activities is referred to herein as a "**site audit**"). In addition, Lender may conduct "desk audits" of Borrowers at Lender's offices no more frequently than monthly by (i) reviewing and inspecting such books and records of Borrowers as Lender may require Borrowers to transmit to Lender, and (ii) discussing Borrowers' business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with Borrowers' officers, managers and independent public accountants. Each of Borrowers' officers, managers and accountants are authorized to discuss any

41

matter relating to the foregoing with Lender at any time. At the completion of each site audit, Borrowers shall pay Lender an audit fee of $1,200.00 per auditor per day (provided, however, Lender shall utilize the services of only one auditor per day for its site audits) and Borrowers shall reimburse Lender for all site audit-related out-of-pocket expenses. Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, there shall be no restrictions on the number of auditors that Lender may use or number of times that Lender may perform the activities described in this Section 6.7 nor shall Lender be required to give prior notice to Borrowers of any visit to inspect the Borrowers' books and records or to discuss any matter with Borrowers' officers, managers or independent public accountants.

**6.8    Further Assurances; Post Closing.**

(a)    At Borrowers' cost and expense, Borrowers shall (i) within three (3) Business Days after Lender's reasonable request, take such further actions, and duly execute and deliver such further agreements, assignments, instructions or documents and do such further acts and things as may be necessary or proper in the Permitted Discretion of Lender to carry out more effectively the provisions and purposes of this Agreement and the Loan Documents, (ii) upon the exercise by Lender or any of its Affiliates of any power, right, privilege or remedy pursuant to any Loan Documents or under applicable Law or at equity which requires any consent, approval, registration, qualification or authorization of any Person, including without limitation a Governmental Authority, execute and deliver, or cause the execution and delivery of, all applications, certificates, instruments and other documents that Lender or its Affiliate may be required to obtain for such consent, approval, registration, qualification or authorization, and (iii) promptly upon the request of the Lender, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgement, filing, or recordation thereof, (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register, and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignments, transfers, certificates, assurances, and other instruments as the Lender may require from time to time in order to carry out more effectively the purposes of the Loan Documents, and (c) to the fullest extent permitted by applicable Law, subject Borrowers' properties, assets, rights, or interests to the Liens now or hereafter intended to be covered by this Agreement and the other Loan Documents, perfect and maintain the validity, effectiveness and priority of the Liens intended to be created under this Agreement and the other Loan Documents, and assure, convey, grant, assign, transfer, preserve, protect, and confirm more effectively to the Lender, the rights granted or now or hereafter intended to be granted to the Lender under any Loan Document or under any other instruments executed in connection with any Loan Document to which Borrowers are or are to be party.

**6.9    Payment of Indebtedness**

Except as otherwise prescribed in the Loan Documents, Borrowers shall pay, discharge or otherwise satisfy as and when due all of their material Indebtedness in the ordinary course of business, except when the amount or validity thereof is being contested in a Permitted Contest.

4904-1495-3993, v. 10
#124847153v2

### 6.10    Lien Terminations

If Liens other than Permitted Liens exist, Borrowers immediately shall take, execute and deliver all actions, documents and instruments necessary to release and terminate such Liens.

### 6.11    Use of Proceeds

Borrowers shall use the proceeds of Exit Loans solely for (a) transaction fees incurred by the Borrowers in connection with the Loan Documents, (b) repayment to Lender of all outstanding principal, accrued and unpaid interest, and all applicable fees, charges and expenses and/or all amounts due to Lender under the Existing DIP Agreement and this Agreement, and (c) for working capital needs of the Hoboken Facility and Christ Hospital. No portion of the proceeds of the Exit Loans will be used for working capital needs or other costs of operations or fees or expenses of any Affiliates of the Borrowers, including, without limitation, Bayonne Opco or administration of its bankruptcy case, or for family, personal or household use, or for any purpose prohibited by the Plan of Reorganization or the Confirmation Order or the Bankruptcy Code or any other order of the Bankruptcy Court.

### 6.12    Collateral Documents; Security Interest in Collateral

In addition to, and not in derogation of, the other covenants and agreements set forth in this Agreement (including, without limitation, Sections 2.9, 2.10(a) and 2.12), at the request of Lender, Borrowers shall defend the Collateral and Lender's, and Capitala's to the extent of the Allowed Capitala Liens, perfected first priority Liens thereon against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Lender, and pay all costs and expenses (including, without limitation, in-house documentation and diligence fees and legal expenses and attorneys' fees and expenses) in connection with such defense, which may at Lender's discretion be added to the Obligations and increase the principal amount outstanding hereunder.

### 6.13    Taxes and Other Charges

All payments and reimbursements to Lender made under any Loan Document shall be free and clear of and without deduction for all taxes, levies, imposts, deductions, assessments, charges or withholdings, and all liabilities with respect thereto of any nature whatsoever, excluding taxes to the extent imposed on Lender's net income. If Borrowers shall be required by law to deduct any such amounts from or in respect of any sum payable under any Loan Document to Lender, then the sum payable to Lender shall be increased as may be necessary so that, after making all required deductions, Lender receives an amount equal to the sum it would have received had no such deductions been made. Notwithstanding any other provision of any Loan Document, if at any time after the Closing (i) any change in any existing law, regulation, treaty or directive or in the interpretation or application thereof, (ii) any new law, regulation, treaty or directive (whether or not having the force of law) from any Governmental Authority (A) subjects Lender to any tax, levy, impost, deduction, assessment, charge or withholding of any kind whatsoever with respect to any Loan Document, or changes the basis of taxation of payments to Lender of any amount payable thereunder (except for net income taxes, or franchise taxes imposed in lieu of net income taxes, imposed generally by federal, state or local taxing authorities with respect to interest or facility fees or other fees payable hereunder or changes in the rate of tax on the overall net income of Lender), or (B) imposes on Lender any other

4904-1495-3993, v. 10
#124847153v2

condition or increased cost in connection with the transactions contemplated thereby or participations therein; and the result of any of the foregoing is to increase the cost to Lender of making or continuing any Exit Loan hereunder or to reduce any amount receivable hereunder, then, in any such case, Borrowers shall promptly pay to Lender any additional amounts necessary to compensate Lender, on an after-tax basis, for such additional cost or reduced amount as determined by Lender.  If Lender becomes entitled to claim any additional amounts pursuant to this Section 6.13 it shall promptly notify Borrowers of the event by reason of which Lender has become so entitled, and each such notice of additional amounts payable pursuant to this Section 6.13 submitted by Lender to Borrowers shall, absent manifest error, be final, conclusive and binding for all purposes.  For purposes of this Section 6.13, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in any applicable Law", regardless of the date enacted, adopted or issued.

**6.14    Additional Collateral; Etc.**

(a)    With respect to any property or asset acquired after the Closing Date by any Borrower, promptly, and in any event within five (5) Business Days of acquiring such property:

(i)    execute and deliver to the Lender such supplements or amendments to this Agreement or such other documents as the Lender deems necessary or advisable to grant to the Lender a security interest in such property; and

(ii)    take all actions necessary or advisable to grant to the Lender a perfected first priority security interest in such property, including the filing of UCC-1 financing statements in such jurisdictions as may be required by this Agreement or by law or as may be requested by the Lender.

(b)    With respect to any fee interest in any real property acquired after the Closing Date by any Borrower, promptly, and in any event within thirty (30) calendar days of acquiring an interest in such property:

(i)    deliver, upon the request of the Lender, title reports, surveys, and engineering, soils, and other reports, and environmental assessment reports, each in scope, form, and substance satisfactory to the Lender;

(ii)    execute and deliver a first priority Mortgage, in favor of the Lender with (x) title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Lender) as well as a current ALTA survey thereof, together with a surveyor's certificate and (y) any landlord consents or estoppels reasonably deemed necessary or advisable by the Lender in

4904-1495-3993, v. 10
#124847153v2

connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Lender; and

(iii)    if requested by the Lender, deliver to the Lender legal opinions relating to the matters described above, which opinions shall be in form and substance satisfactory to the Lender.

(c)    With respect to any new Subsidiary created or acquired after the Closing Date by any Borrower, promptly, and in any event within five (5) Business Days of the creation or acquisition of such Subsidiary:

(i)    execute and deliver to the Lender such supplements or amendments to any Loan Document as the Lender deems necessary or advisable to grant to the Lender a perfected first priority security interest in the equity interests of such new Subsidiary that are owned by any Borrower;

(ii)    deliver to the Lender the certificates representing such equity interests, together with undated stock powers, in blank, executed by a duly authorized officer of the relevant Borrower;

(iii)    cause such new Subsidiary (A) to become a guarantor to Borrowers' Obligations under this Agreement and (B) to take all actions necessary or desirable to grant to the Lender a perfected first priority security interest in the Collateral described herein with respect to such new Subsidiary, including the filing of UCC-1 financing statements in such jurisdictions as may be required by this Agreement or by law or as may be requested by the Lender;

(iv)    if requested by the Lender, deliver to the Lender a secretary's certificate of such Subsidiary with charter documents, by-laws, and appropriate resolutions attached; and

(v)    if requested by the Lender, deliver to the Lender legal opinions relating to the matters described above, which opinions shall be in form and substance satisfactory to the Lender.

**6.15    Hazardous Substances**

(a)    If any release or disposal of Hazardous Substances shall occur or shall have occurred on any real property or any other assets of Borrowers, Borrowers will cause the prompt containment and removal of such Hazardous Substances and the remediation of such real property or other assets as is necessary to comply with all Environmental Laws and to preserve the value of such real property or other assets.

(b)    Borrowers will provide Lender within thirty (30) calendar days after written demand therefor with a bond, letter of credit or similar financial assurance evidencing to the reasonable satisfaction of Lender that sufficient funds are available to pay the cost of removing, treating and disposing of any Hazardous Substances or Hazardous Substances Contamination and discharging any assessment which may be established on any property as a result thereof, such demand to be made, if at all, upon Lender's reasonable business determination that the failure to remove, treat or dispose of

45

any Hazardous Substances or Hazardous Substances Contamination, or the failure to discharge any such assessment could reasonably be expected to have a Material Adverse Effect.

**6.16    Reserved**

**6.17    Healthcare Operations**

(a)    Borrowers will:

(i)    timely file or cause to be timely filed (after giving effect to any extension duly obtained), all notifications, reports, submissions, Permit renewals and reports (other than cost reports as provided in <u>Section 6.17(a)(ii)</u> below) of every kind whatsoever required by Healthcare Laws (which reports will be materially accurate and complete in all respects and not misleading in any respect and shall not remain open or unsettled); and

(ii)    timely file or cause to be timely filed (after giving effect to any extension duly obtained), all cost reports required by Healthcare Laws, which reports shall be materially accurate and complete in all respects and not misleading in any material respect and which shall not remain open or unsettled, except in accordance with applicable settlement appeals procedures that are timely and diligently pursued and except for any processing delays of any Governmental Authority.

(b)    Borrowers will maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of their businesses, all Healthcare Permits necessary under Healthcare Laws to carry on the business of Borrowers as it is conducted on the Closing Date.

(c)    Borrowers will not suffer or permit to occur any of the following:

(i)    any transfer of a Healthcare Permit or rights thereunder to any Person (other than Borrowers or Lender) or to any location other than a location approved by Lender in writing;

(ii)    any pledge or hypothecation of any Healthcare Permit as collateral security for any Indebtedness other than Indebtedness to Lender;

(iii)    any rescission, withdrawal, revocation, amendment or modification of or other alteration to the nature, tenor or scope of any Healthcare Permit without Lender's prior written consent, including, without limitation, (A) any change to the authorized units/beds and persons served capacity and/or the number of units/beds and persons served approved by the applicable Governmental Authority, and (B) any transfer all or any part of the authorized units or beds to another site or location;

(iv)    any voluntary transfer of any resident to any other facility, unless such transfer is at the request of the resident (without economic incentives being given to the resident by an Affiliate of Borrower) or its payor or is for reasons relating to non-payment or the health, required level of medical care or safety of the resident to be transferred; or

(v)     any fact, event or circumstance for which notice to Lender is required under Sections 5.20 and 6.1(h).

(d)     Borrowers will maintain a corporate health care regulatory compliance program.

(e)     Borrowers will at all times be HIPAA Compliant.

(f)     If the Borrowers' facilities are currently accredited by an Accrediting Organization, Borrowers will (i) maintain such accreditation in good standing and without limitation or impairment, (ii) promptly submit to the Accrediting Organization a plan of correction for any deficiencies listed on any accreditation survey report, and (iii) cure all such deficiencies within such time frame as is necessary to preserve and maintain in good standing and without limitation or impairment such accreditation.

## VII.   NEGATIVE COVENANTS

The Borrowers covenant and agree that, until full performance and satisfaction, and payment in full in cash, of all the Obligations (other than indemnity obligations with respect to which no claim has been made) and termination of this Agreement:

### 7.1   Financial Covenants

Borrowers shall not violate the financial and loan covenants set forth on Annex II to this Agreement, which is incorporated herein and made a part hereof.

### 7.2   No Indebtedness Other Than Permitted Indebtedness

Borrowers will not, and will not permit any Subsidiary to, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except for Permitted Indebtedness, and Borrowers will not, and will not permit any Subsidiary to, directly or indirectly, may incur any Indebtedness secured by the Collateral except as permitted in Section 7.3.

### 7.3   No Liens Other Than Permitted Liens

Borrowers shall not create, incur, assume or suffer to exist any Lien upon, in or against, or pledge of, any of the Collateral or any of its properties or assets or any of its shares, securities or other equity or ownership or partnership interests, whether now owned or hereafter acquired, except Permitted Liens.  No Borrower shall sell, offer to sell, dispose of, convey, assign or otherwise transfer, or grant any option with respect to any of the Collateral pledged by it hereunder or any interest therein, except for Permitted Liens.

### 7.4   Investments, New Facilities or Collateral; Subsidiaries

Borrowers, directly or indirectly, shall not purchase, own, hold, invest in or otherwise acquire obligations or stock or securities of, or any other interest in, or all or substantially all of the

assets of, any Person or any joint venture whether by merger, consolidation, outright purchase or otherwise. Borrowers, directly or indirectly, shall not purchase, own, operate, hold, invest in or otherwise acquire any facility, property or assets or any Collateral that is not located at the locations set forth on Schedule 5.17B. Borrowers shall have no Subsidiaries other than such Subsidiaries existing at Closing.

### 7.5    Prohibited Payments

Borrowers shall not make any Distributions.

### 7.6    Transactions with Affiliates

Borrowers shall not enter into or consummate any transactions of any kind with any of its Affiliates other than: (i) salary, bonus, employee stock option and other compensation to and employment arrangements with directors, officers or employees in the ordinary course of business, provided, that no payment of any bonus shall be permitted if an Event of Default has occurred and is continuing or would be caused by or result from such payment, (ii) transactions with Lender or any Affiliate of Lender, and (iii) payments (other than those referenced in cause (i) above) permitted under and pursuant to written agreements entered into by and between Borrowers and one or more of its Affiliates that (A) both reflect and constitute transactions on overall terms at least as favorable to Borrowers as would be the case in an arm's-length transaction between unrelated parties of equal bargaining power, (B) do not grant a security interest in the Collateral to any Affiliate of Borrowers, and (C) contain payment obligations, if any, that are subordinate to the Obligations, provided, that notwithstanding the foregoing Borrowers shall not enter into, consummate, or perform with respect to any transactions or agreement pursuant to which they become a party to any mortgage, note, indenture or guarantee evidencing any Indebtedness of any of their Affiliates or otherwise to become responsible or liable, as a guarantor, surety or otherwise, pursuant to an agreement for any Indebtedness of any such Affiliate other than Permitted Indebtedness.

### 7.7    Organizational Documents; Fiscal Year; Dissolution; Use of Proceeds

Each Borrower shall not (i) change its name, state of formation, or amend, modify, restate or change its certificate of incorporation or formation or bylaws or similar charter documents in a manner that would be materially adverse to Lender and, in any event, without five (5) calendar days' notice to Lender, (ii) change its fiscal year, (iii) amend, alter or suspend or terminate or make provisional in any material way, any Permit without the prior written consent of Lender, (iv) wind up, liquidate or dissolve (voluntarily or involuntarily) or commence or suffer any proceedings seeking to wind up, liquidate or dissolve or that would result in any of the foregoing, or (v) use any proceeds of any Borrowing for "purchasing" or "carrying" "margin stock" as defined in Regulations U, T or X of the Board of Governors of the Federal Reserve System.

### 7.8    Asset Sales

Borrowers shall not, without the prior written approval of Lender, directly or indirectly sell, convey, transfer, assign, license, lease (that has the effect of a disposition) or otherwise dispose of (including, without limitation, any merger or consolidation or upon any condemnation, eminent domain or similar proceedings) to any Person, in one transaction or a series of related transactions,

any assets of Borrowers which constitute substantially all of an operating unit of Borrowers or any other assets (including without limitation Intellectual Property) of Borrowers outside of the ordinary course of business.  Borrowers shall not, directly or indirectly, transfer or assign any contract, patient relationship, or other business relationship, or right to provide services, goods, room or board to any Affiliate of Borrowers.  Borrowers shall not let any contract, patient relationship, or other business relationship be terminated or expire if at any time following such termination or expiration, such contract, patient relationship or other business relationship is reinstated with any Affiliate of Borrower.

### 7.9    Management

Borrowers shall not pay any compensation or other amounts to senior management of Borrowers in excess of such amounts as in effect as of the Closing Date without Lender's prior written consent within its Permitted Discretion.

### 7.10    Restrictive Agreements

Borrowers will not, and will not permit any Subsidiary to, directly or indirectly enter into or assume any agreement (other than the Loan Documents, the Capitala Loan Documents and any agreements for purchase money debt permitted under clause (v) of the definition of Permitted Indebtedness) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired.

### 7.11    Modifications of Certain Agreements

Other than with respect to Permitted Modifications, Borrowers will not, and will not permit any Subsidiary to, directly or indirectly, amend, terminate or otherwise modify any Material Contract or the Management Agreement without Lender's prior written consent (which Lender may give or withhold in Lender's sole discretion).

### 7.12    Reserved

### 7.13    Deposit Accounts

Borrowers shall not make any changes to their deposit accounts (including the Governmental Deposit Account), or establish new deposit accounts.

### 7.14    Truth of Statements

Borrowers shall not furnish to Lender any certificate or other document that contains any untrue statement of a material fact or that omits to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

4904-1495-3993, v. 10
#124847153v2

**7.15    IRS Form 8821**

Borrowers shall not materially alter, amend, restate, or otherwise modify, or withdraw, terminate or re-file any IRS Form 8821 required to be delivered pursuant to the conditions precedent in Section 4.1.

**7.16    Third Party Payor Programs**

None of the Borrowers, shall, other than in the ordinary course of Borrowers' business, change the terms of any Third Party Payor Programs or its normal billing payment and reimbursement policies and procedures with respect thereto (including, without limitation, the amount and timing of finance charges, fees and write-offs) without prior written notice of such change to Lender.  Borrowers shall provide to Lender, upon request, an accurate, complete and current list of all participation agreements with Third Party Payors with respect to the business of Borrowers. Borrowers shall not fail to comply with all requirements, contracts, conditions and stipulations applicable to Borrowers in order to maintain in good standing and without default or limitation all such participation agreements.

**7.17    Filing of Motions and Applications**

The Borrowers shall not, without the prior written consent of the Lender, apply to the Bankruptcy Court for authority to (i) take any action that is prohibited by the terms of any of the Loan Documents, or (ii) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Plan of Reorganization and the Confirmation Order.

**7.18    Confirmation Order.**

Borrowers shall not seek, consent to or suffer to exist at any time any modification, stay, challenge, appeal, vacation or amendment of or to the Plan of Reorganization or the Confirmation Order, except for modifications and amendments joined in or agreed to in writing by Lender, which such agreement may be withheld, delayed, conditioned or denied by Lender in its Permitted Discretion.

## VIII.    EVENTS OF DEFAULT

**8.1    Events of Default.**

The occurrence of any one or more of the following shall constitute an "**Event of Default**:"

(a)    Borrowers shall fail to pay any amount on the Obligations or provided for in any Loan Document when due and such failure shall not be cured within three (3) calendar days after notice thereof to Borrowers (whether on any payment date, at maturity, by reason or acceleration, or otherwise);

50

(b)        Any representation, statement or warranty made or deemed made by Borrowers in any Loan Document or in any other certificate, document, report or opinion delivered in conjunction with any Loan Document to which it is a party, (i) shall not be true and correct in all material respects, or (ii) shall have been false or misleading in any material respect on the date when made or deemed to have been made (except to the extent already qualified by materiality, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect);

(c)        Borrowers or any other party thereto other than Lender shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in any Loan Document and such violation, breach, default or failure shall not be cured within the applicable period set forth in the applicable Loan Document; provided that, with respect to the affirmative covenants set forth in Article VI (other than Sections 6.2, 6.3(i) and (ii), 6.9, 6.11, 6.16 and 6.17 for which there shall be no cure period), there shall be a fifteen (15) calendar day cure period commencing from the earlier of (i) receipt by such Person of written notice of such breach, default, violation or failure, and (ii) the time at which such Person or any officer thereof knew or became aware, or should have known or been aware, of such failure, violation, breach or default; provided further, that, with respect to the covenant set forth in Section 2.11, there shall be no cure period;

(d)        Any of the Loan Documents ceases to be in full force and effect, or any Lien created thereunder ceases to constitute a valid, binding, continuing, enforceable, and properly perfected first priority Lien on the Collateral, or Lender ceases to have a valid perfected first priority security interest in any material portion of the Collateral;

(e)        Reserved;

(f)        One or more judgments or decrees is rendered against Borrowers in an amount in excess of $100,000.00 individually or $300,000.00 in the aggregate at one time outstanding, which is/are not satisfied, stayed, bonded, vacated or discharged of record within thirty (30) calendar days of being rendered;

(g)        Any default occurs, which is not cured within any applicable grace period or cure period or waived, (i) in the payment of any amount with respect to any Indebtedness (other than the Obligations) of Borrowers in excess of $50,000 which shall have continued unremedied for a period of five (5) calendar days after the earlier of (x) receipt by Borrowers of written notice of such default and (y) the time at which Borrowers knew or became aware, or should have known or been aware, of such default, or (ii) in the performance, observance or fulfillment of any provision contained in any agreement, contract, document or instrument to which a Borrower is a party or to which any of their properties or assets are subject or bound under or pursuant to which any Indebtedness was issued, created, assumed, guaranteed or secured, including, without limitation, under the Capitala Loan Documents, the Collateral Surrender Agreement, or the Litigation Trust Agreement, and such Default continues for more than any applicable grace period or permits the holder of any Indebtedness to accelerate the maturity thereof;

(h)        Any Indebtedness of any of Borrowers is declared to be due and payable in full or is required to be prepaid (other than by a regularly scheduled payment) prior to the stated maturity thereof;

(i)        (i) Any Change of Control occurs or any agreement or commitment to cause or that may result in any such Change of Control is entered into, (ii) any Material Adverse Effect or Material Adverse Change occurs, (iii) any Liability Event occurs, or (iv) Borrowers cease any material portion of their business operations as currently conducted;

(j)        Borrowers or any of their Affiliates fails to be in full and continuous compliance with the Management Agreements or any other documents, agreements and other deliverables described or contemplated therein, and all covenants, conditions and other terms of each of the foregoing, or any breach, default or event of default under any of the foregoing exists or has existed;

(k)        Lender receives any indication or evidence that Borrowers may have directly or indirectly been engaged in any type of activity which, in Lender's judgment, might result in forfeiture of any property to a Governmental Authority which shall have continued unremedied for a period of ten (10) calendar days after written notice from Lender;

(l)        The Closing (as such term is defined in the Collateral Surrender Agreement) does not occur by the Drop-Dead Date (as such term is defined in the Collateral Surrender Agreement) or if any of the conditions set forth in Section 7.01 of the Collateral Surrender Agreement shall not have been fulfilled on or before the Drop-Dead Date;

(m)        Borrowers or any of their Affiliates fails to comply with any term, covenant, condition or agreement contained in the Plan of Reorganization or the Confirmation Order;

(n)        Borrowers or any of their Affiliates files any application or pleading with the Bankruptcy Court or otherwise consents to any matters set forth above that would constitute an Event of Default (unless the Lender consents to such filing or consent in its Permitted Discretion).

(o)        The entry of an order granting liens or claims that are senior or pari passu to the Liens granted in favor of Lender under the Loan Documents, except the Allowed Capitala Liens on the Collateral to the extent expressly permitted hereunder and under the Intercreditor Agreement;

(p)        The Borrowers shall assert that any of the Liens securing the Obligations are invalid or subordinate to any other Liens, or any such Liens granted to the Lender shall be determined to be invalid or subordinate to any other Liens;

(q)        Any report is filed by a patient care ombudsman or state long-term care ombudsman in the Bankruptcy Cases indicating that patient care at the Hoboken Facility or Christ Hospital has significantly declined or has been materially compromised;

(r)        From and after the date of entry thereof, the Plan of Reorganization or the Confirmation Order approving this Agreement and the Exit Facility shall cease to be in full force and effect; or

(s)

(i)        Any of the Borrowers commences any case, proceeding, or other action under any existing or future Debtor Relief Law, seeking (A) to have an order for relief entered with respect

to it, or (B) to adjudicate it as bankrupt or insolvent, or (C) reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts, or (D) appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets or (E) makes a general assignment for the benefit of its creditors;

(ii)    There is commenced against any Borrower in a court of competent jurisdiction any case, proceeding, or other action of a nature referred to in clause (i) above which (x) results in the entry of an order for relief or any such adjudication or appointment or (y) remains undismissed, undischarged, unstayed, or unbonded for seven (7) Business Days;

(iii)    There is commenced against any Borrower any case, proceeding, or other action seeking issuance of a warrant of attachment, execution, or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which has not been vacated, discharged, stayed, or bonded pending appeal within seven (7) Business Days from the entry thereof;

(iv)    Any Borrower is generally not, or is unable to, or admits in writing its inability to, pay its debts as they become due; or

(v)    Any Borrower takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above.

## 8.2    Acceleration and Suspension or Termination of Commitments

Upon the occurrence of an Event of Default and after expiration of any applicable cure period, notwithstanding any other provision of any Loan Documents, Lender may by notice to Borrowers (i) terminate the Lender's obligations under this Agreement and/or (ii) by notice to Borrowers declare all or any portion of the Obligations to be due and payable immediately.

## IX.    RIGHTS AND REMEDIES AFTER DEFAULT

### 9.1    Rights and Remedies

(a)    In addition to the acceleration provisions set forth in Article VIII above, upon the occurrence and continuation of an Event of Default and after any applicable cure period, Lender shall have the right to exercise any and all rights, options and remedies provided for in any Loan Document, under the UCC or at law or in equity, including, without limitation, the right to (i) apply any property of Borrowers received or held by Lender to reduce the Obligations in such manner as Lender may deem advisable, (ii) foreclose the Liens created under the Loan Documents, (iii) realize upon, take possession of and/or sell any Collateral or securities pledged with or without judicial process, (iv) exercise all rights and powers with respect to the Collateral as Borrowers might exercise (other than with respect to Collateral consisting of Accounts owed or owing by Medicaid/Medicare Account Debtors absent a court order or compliance with applicable Law), (v) collect and send notices regarding the Collateral with or without judicial process, (vi) at Borrowers' expense, require that all or any part of the Collateral be assembled and made available to Lender at any reasonable place designated by Lender, (vii) reduce or otherwise change the Maximum Amount, (viii) engage, on behalf of Borrowers, a third party to service and collect Borrowers' receivables, including billing and rebilling Third Party Payors as well as the patients to the extent of their obligations thereunder, and/or (ix)

53

relinquish or abandon any Collateral or securities pledged or any Lien thereon. If either any Event of Default shall have occurred or an Event of Default is continuing, the Lender may exercise, without any other notice to or demand upon Borrowers, in addition to the other rights and remedies provided for herein or in any other Loan Document or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) or applicable law and also may, without the need for seeking judicial relief, notify account debtors and other persons obligated to Borrowers to remit to the Lender any and all payments payable, due or owing, or that may become payable due or owing to the Lender, on account of any accounts, chattel paper, general intangible, instrument or other Collateral (including, without limitation, the accounts receivable and health care accounts receivable). As an inducement for the Lender to enter into the Exit Facility, Borrowers have executed the form of notice to account debtors attached hereto as <u>Exhibit A</u>, which form the Lender may send to any and all accounts debtors it deems desirable. Borrowers shall cooperate with the Lender's efforts as aforesaid, and shall not challenge or otherwise oppose the Lender's efforts. Notwithstanding any provision of any Loan Document, Lender, in its Permitted Discretion, shall have the right, at any time that Borrowers fail to do so, and from time to time, without prior notice, to: (A) obtain insurance covering any of the Collateral to the extent required hereunder; (B) pay for the performance of any Obligations; (C) discharge taxes or liens on any of the Collateral that are in violation of any Loan Document unless Borrowers are in good faith with due diligence by appropriate proceedings contesting those items; and (D) pay for the maintenance and preservation of the Collateral. Such expenses and Borrowings shall be added to the Obligations and increase the principal amount outstanding hereunder, until reimbursed to Lender and shall be secured by the Collateral, and such payments by Lender shall not be construed as a waiver by Lender of any Event of Default or any other rights or remedies of Lender.

(b) Borrowers agree that notice received at least five (5) calendar days before the time of any intended public sale, or the time after which any private sale or other disposition of Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable Law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to Borrowers. At any sale or disposition of Collateral or securities pledged, Lender may (to the extent permitted by applicable Law) purchase all or any part thereof free from any right of redemption by Borrowers which right is hereby waived and released. Borrowers covenant and agree not to, and not to permit or cause any of their Subsidiaries to, interfere with or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral. Lender, in dealing with or disposing of the Collateral or any part thereof, shall not be required to give priority or preference to any item of Collateral or otherwise to marshal assets or to take possession or sell any Collateral with judicial process.

## 9.2    Application of Proceeds

In addition to any other rights, options and remedies Lender has under the Loan Documents, the UCC, at law or in equity, any amounts received on account of the Obligations and all dividends, interest, rents, issues, profits, fees, revenues, income and other proceeds collected or received from collecting, holding, managing, renting, selling, or otherwise disposing of all or any part of the Collateral or any proceeds thereof upon exercise of its remedies hereunder shall be applied by Lender in the following order of priority, subject to the Intercreditor Agreement:

first, to the payment of that portion of the Obligations constituting out-of-pocket costs and expenses of such collection, storage, lease, holding, operation, management, sale, disposition or delivery and of conducting Borrowers' business and of maintenance, repairs, replacements, alterations, additions and improvements of or to the Collateral, and to the payment of all sums which Lender may be required or may elect to pay, if any, for taxes, assessments, insurance and other charges upon the Collateral or part thereof, and all other payments that Lender may be required or authorized to make under any provision of this Agreement (including, without limitation, in each such case, in-house documentation and diligence fees and legal expenses, search, audit, recording, professional and filing fees and expenses and attorneys' fees and all expenses, expert witness fees, liabilities and Borrowings made or incurred in connection therewith;

second, to the payment of that portion of the Obligations consisting of Allowed HRH Claims against Christ Opco and HUMC Opco up to an aggregate amount of THIRTY FIVE MILLION DOLLAS ($35,000,000.00]);

third, to the payment of any and all other Obligations,

fourth, after all of the Obligations to Lender have been indefeasibly paid in full, to the satisfaction of Indebtedness secured by any valid subordinate security interest of record in the Collateral if written notification of demand therefor is received before distribution of the proceeds is completed, provided, that, if requested by Lender, the holder of a subordinate security interest shall furnish reasonable proof of its interest, and unless it does so, Lender need not address its claims; and

last, to the payment of any surplus then remaining to Borrowers, unless otherwise provided by law or directed by a court of competent jurisdiction, provided that Borrowers shall be liable for any deficiency if such proceeds are insufficient to satisfy the Obligations or any of the other items referred to in this Section 9.2.

**9.3    Reserved**

**9.4    Application of Payments Following Default**

Following the occurrence and continuance of an Event of Default, Lender may, notwithstanding Section 9.2, apply any and all payments received by Lender in respect of the Obligations, and any and all proceeds of Collateral received by Lender, in such order as Lender may from time to time elect, subject to the Intercreditor Agreement.

**9.5    Reserved**

**9.6    Rights and Remedies not Exclusive**

Lender shall have the right in accordance with the terms hereof, in its Permitted Discretion, to determine which rights, Liens and/or remedies Lender may at any time pursue, relinquish, subordinate or modify, and such determination will not in any way modify or affect any of Lender's rights, Liens or remedies under any Loan Document, applicable Law or equity. The enumeration of any rights and remedies in any Loan Document is not intended to be exhaustive, and all rights and remedies of Lender described in any Loan Document are cumulative and are not

alternative to or exclusive of any other rights or remedies which Lender otherwise may have.  The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

## X.    WAIVERS AND JUDICIAL PROCEEDINGS

### 10.1    Waivers

Except as expressly provided for herein, Borrowers hereby waive setoff, counterclaim, demand, presentment, protest, all defenses with respect to any and all instruments and all notices and demands of any description, and the pleading of any statute of limitations as a defense to any demand under any Loan Document.  Borrowers hereby waive any and all defenses and counterclaims they may have or could interpose in any action or procedure brought by Lender to obtain an order of court recognizing the assignment of, or Lien of Lender in and to, any Collateral, whether or not payable by a Medicaid/Medicare Account Debtor.  With respect to any action hereunder, Lender conclusively may rely upon, and shall incur no liability to Borrowers in acting upon, any request or other communication that Lender reasonably believes to have been given or made by a Person authorized on Borrowers' behalf, whether or not such Person is listed on the incumbency certificate delivered pursuant to Section 4.1.  In each such case, Borrowers hereby waive the right to dispute Lender's action based upon such request or other communication, absent manifest error.

### 10.2    Delay; No Waiver or Defaults

No course of action or dealing, renewal, release or extension of any provisions of any Loan Document, or single or partial exercise of any such provision, or delay, failure or omission on Lender's part in enforcing any such provision shall affect the liability of Borrowers or operate as a waiver of such provision or affect the liability of Borrowers or preclude any other or further exercise of such provision.  No waiver by any party to any Loan Document of any one or more defaults by any other party in the performance of any of the provisions of any Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver.  Notwithstanding any other provision of any Loan Document, by completing the Closing under this Agreement and/or by making Borrowings, Lender does not waive any breach of any representation or warranty of under any Loan Document, and all of Lender's claims and rights resulting from any such breach or misrepresentation are specifically reserved.

### 10.3    Jury Waiver

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL

4904-1495-3993, v. 10
#124847153v2

COUNTERPART OR A COPY OF THIS <u>SECTION 10.3</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

**10.4    Cooperation in Discovery and Litigation**

In any litigation, arbitration or other dispute resolution proceeding relating to any Loan Document, Borrowers waives any and all defenses, objections and counterclaims it may have or could interpose with respect to (i) any of its directors, officers, employees or agents being deemed to be employees or managing agents of Borrowers for purposes of all applicable Law or court rules regarding the production of witnesses by notice for testimony (whether in a deposition, at trial or otherwise), (ii) Lender's counsel examining any such individuals as if under cross-examination and using any discovery deposition of any of them as if it were an evidence deposition, and/or (iii) using all efforts to produce in any such dispute resolution proceeding, at the time and in the manner requested by Lender, all Persons, documents (whether in tangible, electronic or other form) and/or other things under its control and relating to the dispute.

## XI.    RESERVED

**11.1    Reserved**

## XII.    RESERVED

**12.1    Reserved**

## XIII.    MISCELLANEOUS

**13.1    Governing Law; Jurisdiction; Service of Process; Venue**

The Loan Documents shall be governed by and construed in accordance with the internal substantive laws of the State of New Jersey without giving effect to its choice of law provisions.

THE PARTIES AGREE THAT, AT ALL TIMES FROM AND FOLLOWING THE EFFECTIVE DATE OF THE PLAN OF REORGANIZATION, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL ACTIONS AND OTHER MATTERS RELATING TO (A) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY DOCUMENT EXECUTED OR DELIVERED PURSUANT HERETO; (B) THE COLLATERAL; AND (C) THE BORROWERS' OBLIGATIONS SURVIVING EFFECTIVE DATE, AND EACH SUCH PARTY EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION, INCLUDING FOLLOWING THE EFFECTIVE DATE OF THE PLAN OF REORGANIZATION. THE PARTIES SHALL JOINTLY REQUEST THAT THE BANKRUPTCY COURT RESERVE SUCH JURISDICTION POST-CONFIRMATION OF THE PLAN OF REORGANIZATION.

By execution and delivery of each Loan Document to which it is a party, each of the Borrowers and Lender (i) accepts the exclusive jurisdiction of the aforesaid court and irrevocably agrees to be

bound by any judgment rendered thereby, (ii) waives personal service of process, (iii) agrees that service of process upon it may be made by certified or registered mail, return receipt requested, pursuant to Section 13.5, (iv) waives any objection to jurisdiction and venue of any action instituted hereunder and agrees not to assert any defense based on lack of jurisdiction, venue or convenience, and (v) agrees that these Exit Loans were made in New Jersey, that Lender has accepted in New Jersey the Loan Documents executed by Borrowers and has disbursed Borrowings under the Loan Documents in New Jersey. Nothing shall affect the right of Lender to serve process in any manner permitted by law. All parties acknowledge that they participated in the negotiation and drafting of this Agreement and that, accordingly, no party shall move or petition a court construing this Agreement to construe it more stringently against one party than against any other.

FOR ANY ACTION OR MATTER NOT COVERED BY THE FOREGOING PARAGRAPHS, OR IF THE BANKRUPTCY COURT DOES NOT RESERVE OR DECLINES TO EXERCISE SUCH JURISDICTION, THEN EACH PARTY IRREVOCABLY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE SUPERIOR COURT OF THE STATE OF NEW JERSEY IN HUDSON COUNTY FOR ANY ACTION OR MATTER ARISING OUT OF OR BASED UPON THIS AGREEMENT OR ANY DOCUMENTS EXECUTED OR DOCUMENTS PURSUANT HERETO OR THE TRANSACTIONS CONTEMPLATED HEREUNDER OR THEREUNDER AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN SUCH COURT. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

### 13.2    Binding Effect of Loan Documents

The Loan Documents shall inure to the benefit of Lender, its assignees, and all future holders of the Obligations and/or any of the Collateral, and each of their respective successors and assigns. Each Loan Document shall be binding upon the Persons other than Lender that are parties thereto and their respective successors and assigns, and no such Person may assign, delegate or transfer any Loan Document or any of its rights or obligations thereunder without the prior written consent of Lender. No rights are intended to be created under any Loan Document for the benefit of any Person who is not a party to such Loan Document. Nothing contained in any Loan Document shall be construed as a delegation to Lender of any other Person's duty of performance. BORROWERS ACKNOWLEDGE AND AGREE THAT LENDER AT ANY TIME AND FROM TIME TO TIME MAY (I) DIVIDE AND RESTATE ANY NOTE, AND/OR (II) SELL, ASSIGN OR GRANT PARTICIPATING INTERESTS IN OR TRANSFER ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER ANY LOAN DOCUMENT, THE OBLIGATIONS AND/OR THE COLLATERAL TO OTHER PERSONS (EACH SUCH TRANSFEREE, ASSIGNEE OR PURCHASER, A "**TRANSFEREE**"). In the event Lender desires to amend or amend and restate any of the Loan Documents to add customary administrative agent or collateral agent provisions in connection with any such sale, assignment, grant or transfer, Borrowers shall not unreasonably withhold or delay their consent to such amendments or amendment and restatements.

4904-1495-3993, v. 10
#124847153v2

### 13.3 Revival of Obligations

To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other Person under any Debtor Relief Law, common law or equitable cause or any other law, then the Obligations intended to be satisfied by such payment (whether or not previously terminated) shall be revived and shall continue as if such payment had not been received by Lender.  Any payments received with respect to such revived Obligations shall be credited and applied in such manner and order, as Lender shall decide in its Permitted Discretion.

### 13.4 Indemnity

Borrowers shall indemnify Lender, its Affiliates and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "**Indemnified Persons**") from and against any and all liability, obligations, losses, damages, penalties, actions, judgments, suits, reasonable out-of-pocket costs, expenses and disbursements of any kind of nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel, reasonable expert witness fees, and reasonable in-house documentation and diligence fees and reasonable legal expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any way relating to any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any Loan Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing (i) arises out of the gross negligence or willful misconduct of any Indemnified Person as determined by final order of a court of competent jurisdiction or (ii) arises out of a dispute between or among any Indemnified Persons. If any Indemnified Person uses in-house counsel for any purpose for which Borrowers are responsible to pay or indemnify, Borrowers expressly agree that their indemnification obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by Indemnified Person in its Permitted Discretion for the work performed.  Lender agrees to give Borrowers reasonable notice, if legally permitted,  of any event of which Lender becomes aware for which indemnification may be required under this <u>Section 13.4</u>, and Lender may elect (but is not obligated) to direct the defense thereof, <u>provided</u> that the selection of counsel shall be subject to Borrowers' consent which consent shall not be unreasonably withheld or delayed.  Any Indemnified Person may in its reasonable discretion, take such actions, as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral.  Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "**Insured Event**"), Lender agrees not to exercise its right to select counsel to defend the event if that would cause Borrowers' insurer to deny coverage; <u>provided</u>, <u>however</u>, that Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense.  To the extent that Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that Borrowers paid to Lender pursuant to the indemnity set forth in this <u>Section 13.4</u>, then Lender shall promptly pay to Borrowers the amount of such recovery.

**13.5    Notice**

Any notice or request under any Loan Document shall be given to any party to this Agreement at such party's address set forth beneath its signature on the signature page to this Agreement, or at such other address as such party may hereafter specify in a notice given in the manner required under this <u>Section 13.5</u>.  Any notice or request hereunder shall be given only by, and shall be deemed to have been received upon: (i) registered or certified mail, return receipt requested, on the date on which such received as indicated in such return receipt, (ii) delivery by a nationally recognized overnight courier, one (1) Business Day after deposit with such courier, or (iii) .pdf or other electronic or digital transmission, in each case upon telephone or further electronic communication from the recipient acknowledging receipt (whether automatic or manual from recipient), as applicable.

**13.6    Severability; Captions; Counterparts; Facsimile Signatures**

If any provision of any Loan Document is adjudicated to be invalid under applicable Laws, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of the Loan Documents which shall be given effect so far as possible.  The captions in the Loan Documents are intended for convenience and reference only and shall not affect the meaning or interpretation of the Loan Documents.  The Loan Documents may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same instrument) and by facsimile, pdf or other transmission, and such facsimile signatures shall be considered original executed counterparts.  Each party to this Agreement agrees that it will be bound by its own electronic signature and that it accepts the electronic signature of each other party.

**13.7    Expenses**

Borrowers shall pay, whether or not the Closing occurs, all usual and customary costs and expenses incurred by Lender and/or its Affiliates, including, without limitation, reasonable documentation and diligence fees and reasonable expenses, all search, audit, appraisal, reasonable recording professional and filing fees and expenses and all other actual reasonable out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and audit expenses), and reasonable attorneys' fees and expenses, incurred (i) in any effort to enforce, protect or collect payment of any Obligation or to enforce any Loan Document or any related agreement, document or instruments (ii) in connection with entering into, negotiating, preparing, reviewing and executing the Loan Documents and/or any related agreements, documents or instruments, (iii) arising in any way out of administration of the Obligations, (iv) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on Lender's Liens in any of the Collateral or securities pledged under the Loan Documents, whether through judicial proceedings or otherwise, (v) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Lender's transactions with Borrowers, (vi) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any Loan Document and any related agreement, document or instrument, (vii) in connection with any modification, restatement, supplement, amendment, waiver or extension of any Loan Document and/or any related agreement, document or instrument and/or (viii) in connection with all actions, visits, audits and inspections undertaken by Lender or its Affiliates pursuant to the Loan Documents, subject to the provisions of <u>Section 6.7</u>.  In addition, Borrowers shall pay Lender a wire fee of $25.00 with respect to each domestic wire transfer of funds by Lender to or for the benefit of

Borrowers. All of the foregoing shall be charged to Borrowers' account and shall be part of the Obligations. If Lender or any of its Affiliates uses in-house counsel for any purpose under any Loan Document for which Borrowers is responsible to pay or indemnify, Borrowers expressly agrees that its Obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by Lender or such Affiliate in its Permitted Discretion for the work performed. Without limiting the foregoing, Borrowers shall pay all taxes (other than taxes based upon or measured by Lender's income or revenues or any personal property tax), if any, in connection with the transactions contemplated by this Agreement and the Loan Documents and the filing and/or recording of any documents and/or financing statements.

### 13.8   Entire Agreement

The Plan of Reorganization, this Agreement and the other Loan Documents to which Borrowers is a party constitute the entire agreement between Borrowers and Lender with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, if any, relating to the subject matter hereof or thereof. Any promises, representations, warranties or guarantees not herein contained and hereafter made shall have no force and effect unless in writing signed by Borrowers and Lender, provided, however, additional covenants, representations, warranties and guarantees will be enforceable if executed by the party against whom enforcement is sought. No provision of this Agreement may be changed, modified, amended, restated, waived, supplemented, discharged, canceled or terminated orally or by any course of dealing or in any other manner other than by an agreement in writing signed by Lender and Borrowers. Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof. Any schedule may be amended from time to time by the Borrowers with the consent of the Lender, which consent shall not be unreasonably withheld, if the revised schedule does not evidence any violation of the covenants in Articles VI or VII.

### 13.9   Lender Approvals

Any approval, consent, waiver or satisfaction of Lender with respect to any matter that is subject of any Loan Document (i) shall not be effective unless it is in writing and (ii) unless expressly provided herein to the contrary, may be granted or withheld by Lender in its sole discretion.

### 13.10   USA Patriot Act

Borrowers shall not (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Lender from making any Borrowing or extension of credit to Borrowers or from otherwise conducting business with Borrowers, or (b) fail to provide documentary and other evidence of Borrowers' or its corporate officers' identities as may be requested by Lender at any time to enable Lender to verify Borrowers' identity or to comply with any applicable Laws, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. §5318. Lender hereby notifies Borrowers that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record certain information and documentation that identifies Borrowers, which information includes the name and address of Borrowers and such other information that will allow Lender to identify Borrowers in accordance with the USA Patriot Act.

### 13.11  Survival

All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by Borrowers in any Loan Document shall survive the execution and delivery of the Loan Documents, the Closing, the making of the Borrowings and any termination of this Agreement until all Obligations (other than indemnity obligations with respect to which no claim has been made) are fully performed and indefeasibly paid in full in cash.  Notwithstanding the foregoing sentence of this Section 11.2, the obligations and provisions of Sections 10.1, 10.4, 13.1, 13.3, 13.4, 13.7 and 13.12 shall survive termination of the Loan Documents and any payment, in full or in part, of the then-outstanding Obligations.

### 13.12  Assignments

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that Borrowers may not assign or otherwise transfer or delegate any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment, transfer or delegation by the Borrowers without such consent shall be null and void).  In no event may Borrowers, or any of their respective Affiliates, assign or otherwise transfer or delegate any of its rights or obligations hereunder to BMC Hospital, LLC d/b/a Surgicore Surgical Centers or "Surgicore" or any of its Affiliates or Subsidiaries or their respective owners, officer, managers, directors, employees, independent contractors, agents and representatives, including, without limitation, Feliks Kogan, Wayne Hatami and Vijayant Singh, M.D. or any Person in which any of them directly or indirectly has any ownership, beneficial or other interest or with which any of them is associated or affiliated in any matter.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Lender's Affiliates and it directors, officers, employees, partners, agents, trustees, administrators, managers, advisors, and representatives of it and its Affiliates) any legal or equitable right, remedy, or claim under or by reason of this Agreement.

(b)    The Lender may, at any time, without the consent of the Borrowers, assign this Agreement and/or any of its rights or obligations hereunder to one or more Persons of Lender's choosing.  Subject to notification of an assignment, the assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of the Lender under this Agreement, and the Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of the Lender's rights and obligations under this Agreement, the Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 13.4).  Borrowers hereby agree to execute any amendment and any other document that may be necessary to effectuate such an assignment, including an amendment to this Agreement to provide for multiple Lenders and an administrative agent to act on behalf of such Lenders.

### 13.13  Stipulation of Harm

Borrowers agree that per se irreparable damage would occur if any provision of this Agreement or any other Loan Documents were not performed in accordance with the terms hereof and that each of the Lender and its Affiliates shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.  Without limiting

4904-1495-3993, v. 10
#124847153v2

the generality of the foregoing, in the event of a breach of any term or provision contained in this Agreement by Borrowers, Borrowers agree that there shall be no adequate remedy at law for the Lender or its Affiliates arising from such breach; accordingly, and in addition to any other rights, remedies or damages available to the Lender and its Affiliates at law or in equity, the Lender and its Affiliates shall be entitled to such temporary, preliminary and permanent injunctive relief as shall be necessary or appropriate to prevent or restrain any such breach or threatened breach, without the necessity of proving damages, without prejudice to any other remedies the Lender and its Affiliates or their respective successors or assignees may have at law or in equity, and without obligation to post any security in connection therewith. Additionally, the Lender and its Affiliates shall be entitled to, and Borrowers shall, jointly and severally, pay, all attorneys' fees and other legal fees, professional/expert fees, collections costs and court, arbitration or mediation costs and expenses of the Lender and its Affiliates arising from any breach of this Agreement or any other Loan Document by Borrowers. All rights and remedies of the Lender and its Affiliates under this Agreement and the other Loan Documents are cumulative and not exclusive or alternative and may be enforced simultaneously or selectively (without waiver of such rights).

**13.14  Headings**

The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

## [SIGNATURES APPEAR ON THE FOLLOWING PAGES]

**IN WITNESS WHEREOF**, each of the parties has duly executed this Exit Facility Credit and Security Agreement as of the date first written above.

**BORROWERS:**

**CAREPOINT HEALTH SYSTEMS INC.**

By: _____
    Name:
    Title:

**HUMC OPCO LLC**

By: _____
    Name:
    Title:

**HUDSON HOSPITAL OPCO, LLC**

By: _____
    Name:
    Title:

<u>Address for Notices to Borrowers:</u>
CarePoint Health Systems, Inc.
308 Willow Avenue
Hoboken, NJ 07030
Attention: Shamiq Syed, CFO
Email:  Shamiq.syed@carepointhealth.org

With a copy to (which shall not constitute notice):

Dilworth Paxson LLP
800 King Street – Suite 202
Wilmington, DE 19801
Telephone: (302) 571-9800
Attention: Peter C. Hughes, Esq.
Email: phughes@dilworthlaw.com

*[Signature Page to Exit Facility Credit and Security Agreement]*

LENDER:

**BAYONNE MEDICAL CENTER OPCO, LLC**

By: _____
     Name:  Yan Moshe
     Title:    Manager

Address for Notice:
Bayonne Medical Center Opco, LLC
C/o:   Hudson Regional Hospital
Attn:  Yan Moshe
        Chairman of the Board
        Harry G. Kapralos, Esq.
        Chief Legal Officer and Compliance Officer
        55 Meadowlands Parkway
        Secaucus, New Jersey 07094

With a copy to (which shall not constitute notice):

        Mandelbaum Barrett PC
        3 Becker Farm Road
        Suite 105
        Roseland, New Jersey 07068
        Attn:   Mohamed H. Nabulsi, Esq.

*[Signature Page to Exit Facility Credit and Security Agreement]*

**ANNEXES**

Annex I  Financial and Loan Covenants

**EXHIBIT A**

Form of Notice to Account Debtors

**SCHEDULES**

Schedule 2.4        -        Borrowers' Account for Funding Wires
Schedule 2.5        -        Borrowers' Deposit Accounts
Schedule 5.3        -        Organizational Information
Schedule 5.4        -        Real Property Owned or Leased
Schedule 5.6        -        Litigation
Schedule 5.16       -        Insurance
Schedule 5.11       -        Intellectual Property
Schedule 5.17A      -        Corporate Names
Schedule 5.17B      -        Business and Collateral Locations
Schedule 5.20       -        Exceptions to Healthcare Law Compliance Representations
Schedule 5.23       -        Material Contracts
Schedule 5.24       -        Third-Party Payor Billing Numbers
Schedule 5.26       -        Lien Filing Offices
Schedule 7.3        -        Liens

# ANNEX I

## FINANCIAL AND LOAN COVENANTS

1)     **Current Ratio**

At the end of each calendar month, Borrowers' ratio of current assets (determined in accordance with GAAP) to current liabilities (also determined in accordance with GAAP) shall not be less than 1.5 to 1.0; <u>provided</u> that, (A) Accounts receivable by Borrowers from any Affiliate of Borrowers shall not be included in the calculation of current assets, (B) Accounts payable by Borrowers to any Affiliate of Borrowers shall not be included in the calculation of current liabilities, and (C) the Exit Facility shall be included in the calculation of current liabilities.

2)     **Debt Service Coverage Ratio**

Borrowers shall maintain on a consolidated basis at all times a Debt Service Coverage Ratio of at least 1.40 to 1.00.

"**<u>Debt Service Coverage Ratio</u>**" shall mean (i) Net Operating Income of Borrowers divided by (ii) Debt Service of Borrowers.

"**<u>Net Operating Income</u>**" shall mean aggregate gross operating income from the operation of the Borrowers' businesses after deducting aggregate expenses incurred in connection with the operation of Borrowers' businesses (before payment or provision for interest and other fixed charges, income taxes, and depreciation, amortization, and other non-cash expenses), all as determined in accordance with GAAP.

"**<u>Debt Service</u>**" shall mean the sum of all payments on account of principal, interest, fees and charges due and payable to Lender under this Agreement and, to the extent required pursuant to the Confirmation Order, due and payable to any Person on account of any Indebtedness existing as of the Closing Date.

3)     **Minimum Liquidity**

Borrowers shall maintain on a consolidated basis at all times unrestricted cash on hand in an aggregate amount of not less than $1,000,000.00.

4)     **Capital Expenditures Limitation**

Borrowers shall not make or permit to be incurred Capital Expenditures exceeding $750,000.00 in the aggregate in any month without prior written consent of the Lender.

"**<u>Capital Expenditures</u>**" shall mean with respect to any Person expenditures (whether paid in cash or accrued as liabilities and including all amounts expended or capitalized under Capital Leases) for the acquisition or leasing of fixed or capital assets or additions to property or Equipment (including replacements, capitalized repairs and improvements) which should be capitalized on the balance sheet of such Person in accordance with GAAP.

**EXHIBIT A**
**FORM OF NOTICE TO ACCOUNT DEBTORS**

Name of Account Debtor
Address
City, State Zip Code

Attention: Legal and Finance

RE:    N.J. U.C.C. Law § 9-607(a)(1) and N.J. U.C.C. Law § 9-609(a)(1) NOTICE OF ASSIGNMENT; [BORROWER'S NAME]; TIN: [BORROWER'S TIN];  NPI: [BORROWER'S NPI]

Dear Sir/Madam:

    **BAYONNE MEDICAL CENTER OPCO, LLC** (the "**Secured Party**") is a secured creditor to [BORROWER'S NAME] TIN: _____, [ADDRESS], [CITY], [STATE] [ZIP CODE] ("**Borrower**"). Accounts/Accounts receivable owing or that may, from time-to-time, become owing by you, to Debtor ("**Accounts/Accounts Receivable**") are among the Collateral assigned by Borrower to Secured Party under a loan and security agreement dated February [INSERT DATE], 2025, between Secured Party and Borrower. Borrower is now in default with respect to its obligations to the Secured Party. A copy of the Filed UCC Financing Statement has been enclosed herewith for your reference. The attorney-in-fact appointment and security agreement are available for your inspection.

    The purpose of this letter is to notify you that, pursuant to N.J. U.C.C. Law § 9-607(a)(1) and N.J. U.C.C. Law § 9-609(a)(1), you are hereby directly to remit payment of all Accounts/Accounts Receivable directly to the Secured Party, at: c/o: **BAYONNE MEDICAL CENTER OPCO, LLC**, 55 Meadowlands Parkway, Secaucus, New Jersey 07094.

Dated:


**BAYONNE MEDICAL CENTER OPCO, LLC**

By:_____
    Name:
    Title:

Approved by:

[BORROWER]

By:_____
    Name:
    Title:

SCHEDULE 2.4

Borrowers' Account for Funding Wires

Bank:                    [        ]
Account Name:            [        ]
Account Number:          [        ]
Routing Number:          [        ]

SCHEDULE 2.5

Borrowers' Deposit Accounts

[ ]

SCHEDULE 5.3

Organizational Information

Borrowers:

1.  CAREPOINT HEALTH SYSTEMS INC., a New Jersey nonprofit corporation;
2.  HUMC OPCO LLC, a Delaware limited liability company; and
3.  HUDSON HOSPITAL OPCO, LLC, a Delaware limited liability company

Subsidiaries:


The number and class of equity securities issued and outstanding of Borrowers and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing) are as follows:

| Beneficial Owner | Shares/Membership Interests |
|---|---|
|  |  |
|  |  |

SCHEDULE 5.4

Real Property Owned or Leased

SCHEDULE 5.6

Litigation

SCHEDULE 5.11

Intellectual Property

SCHEDULE 5.16

Insurance

See attached certificates of insurance and endorsements

SCHEDULE 5.17A

Corporate Names

SCHEDULE 5.17B

Business and Collateral Locations

SCHEDULE 5.20

Exceptions to Healthcare Law Compliance Representations

SCHEDULE 5.23

Material Contracts

SCHEDULE 5.24

Third-Party Payor Billing Numbers

SCHEDULE 5.26

Lien Filing Offices

SCHEDULE 7.3

Liens