**EXHIBIT H**

(Declaration of Shamiq Syed in Support of the Plan's Limited Proposed Substantive Consolidation)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CarePoint Health Systems Inc. d/b/a Just Health Foundation, *et al.*[1] | Case No. 24-12534 (JKS) |
| | (Jointly Administered) |
| Debtors. | |

## DECLARATION OF SHAMIQ SYED REGARDING SUBSTANTIVE CONSOLIDATION

I, Shamiq Syed, hereby declare (this "Declaration") under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1.      I am the Chief Financial Officer ("CFO") of CarePoint Health Systems, Inc. ("CarePoint") and each of the above-captioned debtors (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I joined the Debtors in 2024 and, prior to serving as CFO, I served as Senior Director at Ankura Consulting Group, LLC ("Ankura") in their Turnaround & Restructuring practice.  I have served as CFO of the Debtors since July 15, 2024.

2.      On November 3, 2024 (the "Petition Date"), each of the Debtors, except IJKG Opco, LLC ("IJKG Opco"), filed a voluntary petition for relief under chapter 11 of title 11 of the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063).  The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030

United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (this "Court").

3.      On the Petition Date: (i) three creditors of IJKG Opco – 29 E 29 Street Holdings, LLC, Bayonne Medical Center Opco, LLC, and Peter Wong, MD – filed an involuntary petition against IJKG Opco under Chapter 11 of the Bankruptcy Code, and (ii) IJKG Opco filed an answer consenting to the relief requested in the involuntary petition. An order for relief was entered by the Court as to IJKG Opco on November 6, 2024.

4.      On January 24, 2025, the Debtors and the Official Committee of Unsecured Creditors (together, the "Plan Proponents") filed the *Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (the "Plan")[2] [D.I. 551].

5.      As CFO of the Debtors, I was involved in the development and formulation of the Plan.  Further, as CFO of the Debtors, and as a result of my work with Ankura prior to joining the Debtors, I have substantial knowledge regarding the Debtors' financial affairs, estates, books and records, and operations.

6.      I understand that the Plan provides for limited substantive consolidation of the Debtors' bankruptcy estates for purposes of voting and distribution only. [*See* D.I. 551, pp. 51-53]. For the reasons set forth in this Declaration, it is my opinion, as CFO of the Debtors, that the proposed limited substantive consolidation is warranted and appropriate due to, among other things: (i) the integrated and entangled nature of the Debtors' finances and operations and the fact that the Debtors held themselves out to their creditors as a single consolidated enterprise; (ii) the lack of funding to attempt to unscramble the Debtors' assets and liabilities or to prepare, confirm and administer twenty-one (21) separate chapter 11 plans; (iii) the unfeasibility of allocating the

---

[2] Capitalized terms not defined herein shall have the meanings given to them in the Plan.

12942760

Litigation Trust Seed Money (defined below) and the proceeds of Litigation Claims (the primary source of potential recoveries to general unsecured creditors under the Plan) on a Debtor-by-Debtor basis; and (iv) the lack of prejudice to any party in interest, as more fully set forth below.

A.    **The Proposed Limited Substantive Consolidation is an Integral Component of an Arms'-Length, Multi-Party, Mediated Settlement that Enables the Continuation of Critical Acute Healthcare Services for the Benefit of the Hudson County Community and Maximizes Creditor Recoveries.**

7.    In an effort to consensually address numerous disputes related to, *inter alia*, the DIP Motions, the Collateral Surrender Motion, the MSA Motion, and the Hospital Facilities Management Motion, the Debtors, the UCC, HRH and numerous other significant stakeholders participated in multi-day mediation proceedings before the Honorable Michael B. Kaplan, Chief Judge of the United States Bankruptcy Court for the District of New Jersey.

8.    Such efforts culminated in the Plan, which provides for, *inter alia*: (i) the continuation of the Debtors' hospital operations for the benefit of Hudson County citizens; (ii) an open, value-maximizing sale process; (iii) the payment of all of the Debtors' outstanding withholding tax obligations; (iv) a projected distribution to general unsecured creditors (who otherwise would likely receive no recovery, as explained below); and (v) the Debtors' emergence from bankruptcy in an expedited fashion.

9.    The proposed limited substantive consolidation upon which the Plan is premised is a bedrock component of the consensual resolution negotiated during the mediation and essential to bring these Chapter 11 Cases to a swift, value-maximizing conclusion.

10.    First, neither HRH nor any other party has agreed to fund (nor is there funding available for) the preparation, solicitation, confirmation and administration of twenty-one (21) separate chapter 11 plans for the Debtors. The deadline for the submission of bids for a potential Alternative Transaction has passed and no Alternative Transaction proposals have been submitted.

3

12942760

11.     Second, absent the mediated resolution set forth in the Plan, general unsecured creditors would receive *no recovery* in these Chapter 11 Cases because all distributable value would go towards repaying the secured claims of HRH and Capitala, and other secured claims to the extent allowed.  By way of example, attached hereto as **Exhibit A** are Debtor-by-Debtor liquidation analyses for the principal operating Debtors: (i) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center, (ii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital, (iii) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center, (iv) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group, and (v) Garden State Healthcare Associates, LLC. These liquidation analyses demonstrate that general unsecured creditors of each of these Debtors would receive no recoveries in the absence of the settlement with HRH embodied in the Plan.

12.     I further understand that DIP financings and prepetition secured loans must typically be repaid in full before general unsecured creditors realize any recovery in a chapter 11 case.  However, under the Plan: (i) the secured debt of HRH and Capitala will be "rolled" into new exit financing facilities (which will *not* be paid from Estate assets), and (ii) HRH has agreed to provide $3,500,000 (the "Litigation Trust Seed Money") to the Litigation Trust to investigate, prosecute and monetize the Litigation Claims, the proceeds of which will be used to fund the recoveries of Class 7 General Unsecured Creditors. Absent the mediated settlements embodied in the Plan, no Litigation Trust Seed Money or Litigation Claim proceeds would be available for distribution to general unsecured creditors.

13.     Third: (i) the Litigation Claims (and their proceeds) – the primary source of recoveries for general unsecured creditors under the Plan – cannot be fairly or reasonably allocated

12942760

on a Debtor-by-Debtor basis, and (ii) the Litigation Trust Seed Money was provided for the *collective* benefit of general unsecured creditors (and not allocated on a Debtor-by-Debtor basis).

14.     As discussed further below, I believe the proposed limited substantive consolidation set forth in the Plan is in the best interests of the Debtors and their creditors and prejudices no one.

**B.    The Debtors Disregarded Corporate Separateness, Held Themselves Out to the Public as an Integrated, Consolidated Enterprise Under the Name and Brand "CarePoint Health", and Creditors Dealt with the Debtors as a Single Enterprise.**

15.     The Debtors often operated and held themselves out to the public as an integrated, consolidated enterprise for numerous reasons, including to maximize efficiencies, minimize costs, further brand recognition throughout Hudson County, negotiate cost savings, and out of economic necessity.

16.     <u>Intercompany Transfers to Support Operations</u>. Each Debtor acted in a coordinated fashion to support the operations of the consolidated enterprise, including (a) the Debtors' hospitals: (i) Bayonne Medical Center, (ii) Christ Hospital, and (iii) Hoboken University Medical Center (the "<u>Hospitals</u>"); and (b) the Debtors' practice groups: (i) Garden State Healthcare Associates, LLC, (ii) New Jersey Medical and Health Associates, and (iii) Quality Care Associates (collectively, the "<u>Practice Groups</u>").

17.     Given the Debtors' severe liquidity constraints, the Debtors systematically and routinely transferred funds amongst themselves on an *ad hoc* basis to cover shortfalls faced by any given Debtor at any particular time, without any expectation or ability to repay such obligations.[3]

18.     For instance, because the Hospitals had different payroll schedules, on a weekly

---

[3] There were no agreements governing the Debtors' intercompany transactions and such obligations had no maturity date, demonstrating that such obligations were simply book-keeping entries, with no reasonable expectation of repayment.

12942760

basis, the Debtors would conduct an analysis to determine which Hospitals needed cash infusions to satisfy their payroll obligations. The intercompany transfers made to satisfy the Debtors' payroll obligations were recorded only from an accounting standpoint, with no expectation of repayment.

19.     Likewise, because the Debtors' Practice Groups operated at a loss, they required consistent cash infusions from other Debtors to satisfy their financial obligations. Attached hereto as **Exhibit B** is a summary of the Practice Groups' annual gross cash burn since 2015.

20.     The Debtors' payment of vendors was also based on the Hospitals' and Practice Groups' day-to-day requirements and funding needs and the overriding goal of patient health and safety, without regard to where the funds used to pay any particular vendor originated. For example, although a vendor may have invoiced a specific Debtor, such invoice was paid using funds from whichever Debtor entity (or entities) had excess cash at that particular time. Attached hereto as **Exhibit C** is a summary of intercompany transfers the Debtors made during the month of October 2024, which is representative of and demonstrates the Debtors' historical intercompany transfer practices.

21.     The Debtors similarly treated supplies, equipment, inventory and employees as fungible assets that were transferred amongst the Debtors on an as-needed basis to best serve their *collective* needs. Although the Debtors maintained records of such intercompany transfers, the Debtors never had any intent or ability to repay the resulting intercompany obligations.[4] Effectively, the Debtors' collective assets were used interchangeably to satisfy creditor claims, with the goal of keeping the Hospitals operational so they could continue treating patients for as long as possible.

22.     <u>Cost Savings/Synergies</u>. Operating a hospital is expensive and requires the

---

[4] The Debtors recently amended their Schedules to reflect the value of these intercompany balances as of the Petition Date. [D.I. 560-570, 621-627].

purchase of massive quantities of medical supplies. By coordinating orders and operating on a consolidated basis, the Debtors were able to minimize expenses and seamlessly share resources across the Hospitals, including supplies, equipment, inventory and employees. Moreover, while a particular service line operating in isolation in a single hospital may not be profitable, due to a lack of adequate demand, such a service line can be economically viable across three hospitals. By pooling resources and operating on a consolidated, coordinated basis, the Debtors incurred lower overall costs, maximized efficiencies and ensured the highest level of patient care possible.

23.    <u>Management/Governance</u>. Each Debtor is owned, directly or indirectly, by CarePoint or controlled by the same management team. The Debtors have a single, central management team – led by CEO, Dr. Achintya Moulick, and me, along with a staff of other health care and financial professionals – and CarePoint has a single Board of Trustees, which makes decisions on behalf of all Debtor entities. The Debtors' accounting, finance, legal, human resources, marketing, IT resources, and negotiation of various contracts are also centralized and serve all Debtor entities on a consolidated basis.

24.    <u>Branding/Trade Names</u>. All Debtor entities operate under the CarePoint brand and are marketed as a single, integrated health system. All branding, marketing and customer interactions are conducted with the CarePoint name, without distinguishing between corporate entities. In addition, the Debtors' corporate logo and email signature blocks (example below) list all three hospitals and are not individualized by Debtor entity.



25.    <u>Cash Management System</u>.   The Debtors use a centralized cash management system to create efficiencies in collecting, transferring, and disbursing funds generated by their

operations through numerous bank accounts (the "<u>Cash Management System</u>"). The Cash Management System facilitates cash monitoring, forecasting, and reporting across all Debtor entities, enabling the central management team to maintain control over the bank accounts of each Debtor entity.  Although each Debtor performs functions that are integral to the Debtors' overall operations, not all Debtor entities generate their own cash flow.  Thus, the Cash Management System provides the mechanism for cash to flow among the Debtors so that operations may be maintained and carried out efficiently. The Cash Management System is tailored to meet the Debtors' operating needs and allows the Debtors to control and monitor the collection and disbursement of funds, ensure cash availability and liquidity, comply with the requirements of the Debtors' financing agreements, meet state licensing requirements, and reduce administrative expenses and other costs by facilitating the movement of funds across the Debtors as necessary. The Cash Management System is an interwoven system designed to operate across all Debtor entities.  Use of the Cash Management System was approved by the Court.  [D.I. 243].

26.    <u>MSO</u>. The Debtors shared certain expenses using a managed services organization, CarePoint Health Management Associates, LLC d/b/a CarePoint Health (the "<u>MSO</u>"). The MSO serves as a representative of all of the Debtors in their dealings with a substantial number of vendors. Although the operating entity Debtors are all beneficiaries of such services and are allocated their appropriate expenses, the MSO is the party directly responsible for satisfying any financial obligations. For example, as illustrated on **<u>Exhibit D</u>**, some of the Debtors' more significant vendors were paid through the MSO, including a revenue cycle manager, professionals and certain suppliers. Typically, the operating entity Debtors fund the MSO entity with cash evenly, but if there are any cash shortfalls at one operating entity, the others will fund the necessary

amount to the MSO entity. In effect, payments by the MSO are made from whichever Debtors have funds on hand when needed on an *ad hoc* basis.

27.    <u>Secured Debt</u>. The Debtors' secured lenders generally treated the Debtors as a consolidated unit. Certain of the Debtors regularly agreed to be jointly and severally liable for various obligations across Debtor entities, including the debtor-in-possession financing agreements used in these Chapter 11 Cases. Although accurate records are maintained for cash transferred among the Debtors, the Debtors' debt structure is highly interrelated and interwoven across the Debtor entities because of daily payment needs and decisions. For example, multiple Debtors guaranteed certain tranches of debt and cross-collateralized such debt, including between operating and holding entities. In addition, in one instance, even where formal guarantees did not exist, Debtor Garden State Healthcare Associates, LLC agreed, in section 3.4 of a Promissory note in favor of Strategic Ventures LLC, dated December 27, 2022, as follows:

> CarePoint Health Systems, Inc., a New Jersey nonprofit corporation ("<u>CarePoint</u>") and CarePoint Health Management Associates, LLC shall each cause their respective controlled affiliates to make any payments under this Note that [Garden State] fails to pay in accordance with the terms hereof. In addition, CarePoint shall use its commercially reasonable efforts to obtain the necessary consents from the senior lenders of Hudson Hospital Opco, LLC to permit Hudson Hospital Opco, LLC to guarantee [Garden State's] obligations hereunder.

28.    <u>Insurance/Benefits/System-Wide Expenses</u>. The Debtors routinely paid insurance, employee benefits and other system-wide expenses on a consolidated basis and then arbitrarily allocated those expenses across Debtor entities, without a true separation of financial obligations.

29.    In sum, the Debtors regularly held themselves out to the public and creditors as an integrated, consolidated enterprise consisting of three hospitals under the brand name "CarePoint Health," and many creditors dealt with the Debtors as a single enterprise.

12942760

**C.      There is No Funding Available for the Debtors to Unscramble Their Assets and Liabilities or Confirm and Administer Separate Plans.**

30.      I understand that substantive consolidation is generally appropriate when multiple debtors' assets and liabilities are "hopelessly commingled" and attempting to unscramble the debtors' assets and liabilities is not feasible and would harm all creditors.

31.      Here, I believe the proposed limited substantive consolidation under the Plan is necessary and appropriate because of the Debtors' lack of funding to unscramble their assets and liabilities or confirm and administer twenty-one (21) separate plans, the Debtors' inability to satisfy pre- and post-petition intercompany obligations, and the practical impossibility of fairly allocating the Litigation Trust Seed Money or the proceeds of Litigation Claims on a Debtor-by-Debtor basis.[5]

32.      Given the Debtors' extensive commingling of assets and liabilities (*e.g.*, by transferring funds, supplies, equipment, inventory and employees based on exigent circumstances, without any expectation or intent of repayment) and their lack of any funding to attempt to unscramble their assets and liabilities (including attempting to allocate the Litigation Trust Seed Money and Litigation Claim proceeds with any level of precision), the Debtors have concluded that the Plan represents the only viable and equitable path forward.

33.      In addition to the foregoing, I believe the limited substantive consolidation of the Debtors' assets and liabilities under the Plan is appropriate for the following reasons:

- The Debtors' pooling of assets and *ad hoc* use of funds to satisfy liabilities on an as-needed basis presents compelling circumstances sufficient to overcome the general expectation that entity separateness will be recognized;

---

[5] Illustrative of the challenges of allocating Litigation Claim proceeds on a Debtor-by-Debtor basis is the fact that Capitala received $18.5 million from a prepetition settlement agreement among the Debtors and Aetna [*see* D.I. 23, ¶ 28] and such settlement amount was not allocated on a Debtor-by-Debtor basis.

12942760

- Limited substantive consolidation would address harms *caused by the Debtors* who commingled their assets in an effort to keep the Hospitals afloat for the benefit of their patients (rather than harms *caused by creditors*);

- Limited substantive consolidation would accomplish more than "mere administrative convenience" because: (i) the Debtors lack funding to unscramble their assets and liabilities, (ii) it is not feasible to allocate the Litigation Trust Seed Money and the proceeds of Litigation Claims on a Debtor-by-Debtor basis, and (iii) in the absence of the mediated settlement embodied in the Plan that is premised on limited substantive consolidation, the Litigation Trust Seed Money and the proceeds of Litigation Claims would not even be available for distribution to general unsecured creditors;

- Although substantive consolidation is an "extreme" and "imprecise" remedy, limited substantive consolidation is necessary here because otherwise there would be no funding to confirm and administer a plan for each Debtor entity and the Debtors would likely be unable to successfully emerge from bankruptcy (harming all creditors); and

- Limited substantive consolidation is being used defensively to maximize creditor recoveries and remedy harms caused by the Debtors' entangled affairs, rather than offensively to disadvantage creditors.

34.    As demonstrated herein, the Debtors lack the financial resources necessary to attempt to unscramble their assets and liabilities and propose and implement standalone plans for each of the Debtors. Accordingly, the limited substantive consolidation provided in the Plan is the only viable alternative for the Debtors to confirm a chapter 11 plan.

**D.    Limited Substantive Consolidation is in the Best Interest of All Creditors and Prejudices No One.**

35.    Absent the mediated resolution providing for limited substantive consolidation of the Debtors' Estates, general unsecured creditors would receive no recovery in these Chapter 11 Cases. By contrast, the Plan provides for HRH and Capitala to receive exit financing facilities (which will become obligations of the post-emergence Debtors and not the Debtors' Estates), enabling general unsecured creditors to receive recoveries from the Litigation Trust Seed Money and the proceeds of Litigation Claims.

36.    The only Class that is affected by the limited substantive consolidation contemplated by the Plan is Class 7 General Unsecured Claims. Absent the limited substantive

11

consolidation, this Class would receive nothing under theoretical separate plans for each Debtor. At the same time, the Plan does not adversely affect the rights of secured creditors, whose claims are treated under the Plan in accordance with the provisions of the Bankruptcy Code.

37.     The Debtors have therefore concluded, and I agree, that the proposed limited substantive consolidation under the Plan offers the most effective and efficient available remedy to equitably treat their creditors in a manner that provides general unsecured creditors with an opportunity to maximize recoveries, while not prejudicing the rights of any other creditors.

38.     In sum, I believe the proposed limited substantive consolidation under the Plan is the best available alternative in these Chapter 11 Cases due to: (i) the integrated and entangled nature of the Debtors' finances and operations and the fact that the Debtors often held themselves out to their creditors as a single consolidated enterprise; (ii) the lack of funding to attempt to unscramble the Debtors' assets and liabilities or to prepare, confirm and administer separate chapter 11 plans; (iii) the practical impossibility of allocating the Litigation Trust Seed Money and the proceeds of Litigation Claims on a Debtor-by-Debtor basis; (iv) the lack of prejudice to any party in interest, while providing recoveries to general unsecured creditors; and (v) it enables the Debtors to promptly emerge from bankruptcy and continue delivering much needed acute healthcare services to the Hudson County community.

For all the foregoing reasons, I firmly believe that the Plan's proposed limited substantive consolidation for voting and distribution purposes should be approved.

I declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 20, 2025                     _/s/ Shamiq Syed_____
                                             By: Shamiq Syed
                                             Chief Financial Officer
                                             CarePoint Health Systems, Inc. *et al.*

12

12942760

**Exhibit A**

13

## Hudson Hospital Opco LLC d/b/a CarePoint Health-Christ Hospital

*Chapter 7 Liquidation Analysis Scenario*

| | Hudson Hospital Opco LLC d/b/a CarePoint Health-Christ Hospital | | | | |
| --- | --- | --- | --- | --- | --- |
| | Asset Value / | Recovery Range (%) | | Recovery Range | |
| | Claim Amt. | Low | High | Low | High |
| **I. SOURCES OF RECOVERY** | | | | | |
| Cash and Cash Equivalents | $1,121 | 100% | 100% | $1,121 | $1,121 |
| Accounts Receivable, net | 35,303,660 | 8% | 20% | 2,975,520 | 6,976,839 |
| *Less Than 90 Days, net* | *9,157,181* | *27%* | *58%* | *2,493,495* | *5,319,221* |
| *Over 90 Days, net* | *26,146,480* | *2%* | *6%* | *482,025* | *1,657,618* |
| Deposits And Prepayments | 238,892 | 0% | 5% | - | 11,945 |
| Inventory | 4,283,000 | 10% | 25% | 428,300 | 1,070,750 |
| Machinery, Equipment and Vehicles | 4,413,955 | 0% | 10% | - | 441,395 |
| Office Furniture, Fixtures and Equipment | 12,667,922 | 0% | 5% | - | 633,396 |
| Real Property | 2,653,446 | 0% | 0% | - | - |
| Plan of Reorganization Cash Funding | - | n/a | n/a | - | - |
| Causes of Action | - | n/a | n/a | - | - |
| Est. Value of Distribution To Beneficiaries of Lit. Trust | - | n/a | n/a | - | - |
| **Total Value For Distribution** | **$59,561,996** | **6%** | **15%** | **$3,404,941** | **$9,135,446** |
| (-) Chapter 7 Trustee Fees | n/a | n/a | n/a | ($102,148) | ($274,063) |
| (-) Chapter 7 Professional Fees | n/a | n/a | n/a | (177,754) | (66,252) |
| (-) Wind-Down Costs | n/a | n/a | n/a | (3,125,039) | (3,066,252) |
| **Wind-Down and Other Costs** | | | | **($3,404,941)** | **($3,406,567)** |
| **Cash Proceeds Available For Carve Out Claims** | | | | **$0** | **$5,728,879** |
| - | DIP Carve Out Claims | $212,500 | 0% | 100% | $0 | $212,500 |
| **Cash Proceeds Available For Superpriority DIP Claims** | | | | **$0** | **$5,516,379** |
| Class 1 | HRH Secured Claims | $25,750,000 | 0% | 18% | $0 | $4,635,439 |
| Class 2 | Capitala Claims | $4,893,648 | 0% | 18% | $0 | $880,940 |
| **Cash Proceeds Available For Secured Claims** | | | | **$0** | **$0** |
| Class 3 | Capitala Specialty Lending Claims | $55,000,000 | 0% | 0% | $0 | $0 |
| Class 4 | Maple Secured Claims | $34,751,366 | 0% | 0% | $0 | $0 |
| Class 6 | Other Secured Claims | $33,333 | 0% | 0% | $0 | $0 |
| Class 13 | NJDOH Secured Claims | $10,625,000 | 0% | 0% | $0 | $0 |
| **Cash Proceeds Available For Administrative and Priority Claims** | | | | **$0** | **$0** |
| - | Administrative Expense Claims | $20,113,102 | 0% | 0% | $0 | $0 |
| - | Priority Claims | $12,453,036 | 0% | 0% | $0 | $0 |
| **Cash Proceeds Available For Unsecured Claims** | | | | **$0** | **$0** |
| Class 7 | General Unsecured Claims | $166,982,046 | 0% | 0% | $0 | $0 |

*Note:*    *Accounts Receivable recovery ranges are shown net of collection fees of 15% and 5% in the Low and High Recovery scenarios, respectively*

## HUMCO Opco LLC d/b/a CarePoint Health-Hoboken University Medical Center
*Chapter 7 Liquidation Analysis Scenario*

| | Asset Value / Claim Amt. | Recovery Range (%) Low | Recovery Range (%) High | Recovery Range Low | Recovery Range High |
|---|---|---|---|---|---|
| **I. SOURCES OF RECOVERY** | | | | | |
| Cash and Cash Equivalents | $44,571 | 100% | 100% | $44,571 | $44,571 |
| Accounts Receivable, net | 36,916,357 | 13% | 29% | 4,719,322 | 10,626,323 |
| *Less Than 90 Days, net* | *15,253,402* | *27%* | *58%* | *4,187,617* | *8,874,222* |
| *Over 90 Days, net* | *21,662,955* | *2%* | *8%* | *531,705* | *1,752,101* |
| Deposits And Prepayments | 1,047,521 | 0% | 5% | - | 52,376 |
| Inventory | 3,106,000 | 10% | 25% | 310,600 | 776,500 |
| Machinery, Equipment and Vehicles | 3,576,322 | 0% | 10% | - | 357,632 |
| Office Furniture, Fixtures and Equipment | 85,583 | 0% | 5% | - | 4,279 |
| Real Property | 11,762,343 | 0% | 0% | - | - |
| Plan of Reorganization Cash Funding | - | n/a | n/a | - | - |
| Causes of Action | - | n/a | n/a | - | - |
| Est. Value of Distribution To Beneficiaries of Lit. Trust | - | n/a | n/a | - | - |
| **Total Value For Distribution** | **$56,538,697** | **9%** | **21%** | **$5,074,493** | **$11,861,682** |
| (-) Chapter 7 Trustee Fees | n/a | n/a | n/a | ($152,235) | ($355,850) |
| (-) Chapter 7 Professional Fees | n/a | n/a | n/a | (230,800) | (98,737) |
| (-) Wind-Down Costs | n/a | n/a | n/a | (4,691,459) | (3,098,737) |
| **Wind-Down and Other Costs** | | | | **($5,074,493)** | **($3,553,325)** |
| **Cash Proceeds Available For Carve Out Claims** | | | | **$0** | **$8,308,356** |
| - | DIP Carve Out Claims | $212,500 | 0% | 100% | $0 | $212,500 |
| **Cash Proceeds Available For Superpriority DIP Claims** | | | | **$0** | **$8,095,856** |
| Class 1 | HRH Secured Claims | $25,750,000 | 0% | 20% | $0 | $5,138,844 |
| Class 2 | Capitala Claims | $14,817,161 | 0% | 20% | $0 | $2,957,013 |
| **Cash Proceeds Available For Secured Claims** | | | | **$0** | **$0** |
| Class 3 | Capitala Specialty Lending Claims | $55,000,000 | 0% | 0% | $0 | $0 |
| Class 6 | Other Secured Claims | $33,333 | 0% | 0% | $0 | $0 |
| Class 13 | NJDOH Secured Claims | $10,625,000 | 0% | 0% | $0 | $0 |
| **Cash Proceeds Available For Administrative and Priority Claims** | | | | **$0** | **$0** |
| - | Administrative Expense Claims | $23,573,731 | 0% | 0% | $0 | $0 |
| - | Priority Claims | $12,855,348 | 0% | 0% | $0 | $0 |
| **Cash Proceeds Available For Unsecured Claims** | | | | **$0** | **$0** |
| Class 5 | Maple Unsecured Claims | $14,902,959 | 0% | 0% | $0 | $0 |
| Class 7 | General Unsecured Claims | $139,881,892 | 0% | 0% | $0 | $0 |

*Note:    Accounts Receivable recovery ranges are shown net of collection fees of 15% and 5% in the Low and High Recovery scenarios, respectively*

## IJKG Opco, LLC d/b/a CarePoint Health-Bayonne Medical Center
*Chapter 7 Liquidation Analysis Scenario*

| | IJKG Opco, LLC d/b/a CarePoint Health-Bayonne Medical Center | | | | |
|---|---|---|---|---|---|
| | Asset Value / Claim Amt. | Recovery Range (%) | | Recovery Range | |
| | | Low | High | Low | High |
| **I. SOURCES OF RECOVERY** | | | | | |
| Cash and Cash Equivalents | $42,656 | 100% | 100% | $42,656 | $42,656 |
| Accounts Receivable, net | 28,587,500 | 12% | 26% | 3,311,410 | 7,532,619 |
| *Less Than 90 Days, net* | *10,611,478* | *28%* | *59%* | *2,933,988* | *6,215,498* |
| *Over 90 Days, net* | *17,976,023* | *2%* | *7%* | *377,422* | *1,317,121* |
| Deposits And Prepayments | 394,923 | 0% | 5% | - | 19,746 |
| Inventory | 3,637,000 | 10% | 25% | 363,700 | 909,250 |
| Machinery, Equipment and Vehicles | 2,267,855 | 0% | 10% | - | 226,786 |
| Office Furniture, Fixtures and Equipment | 5,064,222 | 0% | 5% | - | 253,211 |
| Real Property | 955,701 | 0% | 0% | - | - |
| Plan of Reorganization Cash Funding | - | n/a | n/a | - | - |
| Causes of Action | - | n/a | n/a | - | - |
| Est. Value of Distribution To Beneficiaries of Lit. Trust | - | n/a | n/a | - | - |
| **Total Value For Distribution** | **$40,949,858** | **9%** | **22%** | **$3,717,766** | **$8,984,268** |
| (-) Chapter 7 Trustee Fees | n/a | n/a | n/a | ($111,533) | ($269,528) |
| (-) Chapter 7 Professional Fees | n/a | n/a | n/a | (174,812) | (72,339) |
| (-) Wind-Down Costs | n/a | n/a | n/a | (3,431,421) | (3,072,339) |
| **Wind-Down and Other Costs** | | | | **($3,717,766)** | **($3,414,206)** |
| **Cash Proceeds Available For Carve Out Claims** | | | | **$0** | **$5,570,062** |
| - DIP Carve Out Claims | $1,045,000 | 0% | 100% | $0 | $1,045,000 |
| **Cash Proceeds Available For Superpriority DIP Claims** | | | | **$0** | **$4,525,062** |
| Class 1 HRH Secured Claims | $84,603,224 | 0% | 5% | $0 | $4,525,062 |
| **Cash Proceeds Available For Secured Claims** | | | | **$0** | **$0** |
| Class 3 Capitala Specialty Lending Claims | $55,000,000 | 0% | 0% | $0 | $0 |
| Class 4 Maple Secured Claims | $13,506,773 | 0% | 0% | $0 | $0 |
| Class 6 Other Secured Claims | $33,333 | 0% | 0% | $0 | $0 |
| Class 13 NJDOH Secured Claims | $10,625,000 | 0% | 0% | $0 | $0 |
| **Cash Proceeds Available For Administrative and Priority Claims** | | | | **$0** | **$0** |
| - Administrative Expense Claims | $16,645,224 | 0% | 0% | $0 | $0 |
| - Priority Claims | $9,467,662 | 0% | 0% | $0 | $0 |
| **Cash Proceeds Available For Unsecured Claims** | | | | **$0** | **$0** |
| Class 5 Maple Unsecured Claims | $1,605,845 | 0% | 0% | $0 | $0 |
| Class 7 General Unsecured Claims | $200,959,274 | 0% | 0% | $0 | $0 |

*Note:    Accounts Receivable recovery ranges are shown net of collection fees of 15% and 5% in the Low and High Recovery scenarios, respectively*

# Garden State Healthcare Associates, LLC
*Chapter 7 Liquidation Analysis Scenario*

| | | Garden State Healthcare Associates, LLC | | | |
|---|---|---|---|---|---|
| | Asset Value / | Recovery Range (%) | | Recovery Range | |
| | Claim Amt. | Low | High | Low | High |
| **I. SOURCES OF RECOVERY** | | | | | |
| Cash and Cash Equivalents | $10,878 | 100% | 100% | $10,878 | $10,878 |
| Accounts Receivable, net | 1,393,901 | 8% | 24% | 106,382 | 330,427 |
| Deposits And Prepayments | 227,744 | 0% | 5% | - | 11,387 |
| Inventory | - | 10% | 25% | - | - |
| Machinery, Equipment and Vehicles | - | 0% | 10% | - | - |
| Office Furniture, Fixtures and Equipment | - | 0% | 5% | - | - |
| Real Property | - | 0% | 0% | - | - |
| Plan of Reorganization Cash Funding | - | n/a | n/a | - | - |
| Causes of Action | - | n/a | n/a | - | - |
| Est. Value of Distribution To Beneficiaries of Lit. Trust | - | n/a | n/a | - | - |
| **Total Value For Distribution** | **$1,632,523** | **7%** | **22%** | **$117,260** | **$352,693** |
| (-) Chapter 7 Trustee Fees | n/a | n/a | n/a | ($3,518) | ($10,581) |
| (-) Chapter 7 Professional Fees | n/a | n/a | n/a | (6,863) | (2,282) |
| (-) Wind-Down Costs | n/a | n/a | n/a | (6,863) | (2,282) |
| **Wind-Down and Other Costs** | | | | **($17,243)** | **($15,144)** |
| **Cash Proceeds Available For Secured Claims** | | | | **$100,017** | **$337,549** |
| | | | | | |
| Class 4 | Maple Secured Claims | $13,506,773 | 1% | 2% | $100,017 | $337,549 |
| Class 14 | Strategic Ventures Secured Claims | $10,000,000 | 0% | 0% | $0 | $0 |
| **Cash Proceeds Available For Administrative Claims** | | | | **$0** | **$0** |
| - | Administrative Claims | $12,580,280 | 0% | 0% | $0 | $0 |
| **Cash Proceeds Available For Unsecured Claims** | | | | **$0** | **$0** |
| Class 7 | General Unsecured Claims | $44,458,842 | 0% | 0% | $0 | $0 |

*Note:    Accounts Receivable recovery ranges are shown net of collection fees of 15% and 5% in the Low and High Recovery scenarios, respectively*

# New Jersey Medical and Health Associates

*Chapter 7 Liquidation Analysis Scenario*

| | Asset Value / Claim Amt. | Recovery Range (%) | | Recovery Range | |
|---|---|---|---|---|---|
| **New Jersey Medical and Health Associates** | | | | | |
| | | Low | High | Low | High |
| **I. SOURCES OF RECOVERY** | | | | | |
| Cash and Cash Equivalents | $4,273 | 100% | 100% | $4,273 | $4,273 |
| Accounts Receivable, net | 927,436 | 8% | 24% | 72,375 | 223,370 |
| Deposits And Prepayments | 295,462 | 0% | 5% | - | 14,773 |
| Inventory | - | 10% | 25% | - | - |
| Machinery, Equipment and Vehicles | 23,539 | 0% | 10% | - | 2,354 |
| Office Furniture, Fixtures and Equipment | 43,363 | 0% | 5% | - | 2,168 |
| Real Property | 234,981 | 0% | 0% | - | - |
| Plan of Reorganization Cash Funding | - | n/a | n/a | - | - |
| Causes of Action | - | n/a | n/a | - | - |
| Est. Value of Distribution To Beneficiaries of Lit. Trust | - | n/a | n/a | - | - |
| **Total Value For Distribution** | **$1,529,054** | **5%** | **16%** | **$76,648** | **$246,938** |
| (-) Chapter 7 Trustee Fees | n/a | n/a | n/a | ($2,299) | ($7,408) |
| (-) Chapter 7 Professional Fees | n/a | n/a | n/a | (4,805) | (1,491) |
| (-) Wind-Down Costs | n/a | n/a | n/a | (4,805) | (1,491) |
| **Wind-Down and Other Costs** | | | | **($11,909)** | **($10,391)** |
| **Cash Proceeds Available For Secured Claims** | | | | **$64,739** | **$236,547** |
| | | | | | |
| Class 4 | Maple Secured Claims | $13,506,773 | 0% | 2% | $64,739 | $236,547 |
| Class 14 | Strategic Ventures Secured Claims | $0 | n/a | n/a | $0 | $0 |
| **Cash Proceeds Available For Administrative and Priority Claims** | | | | **$0** | **$0** |
| - | Administrative Claims | $4,776,808 | 0% | 0% | $0 | $0 |
| - | Priority Claims | $935 | 0% | 0% | $0 | $0 |
| **Cash Proceeds Available For Unsecured Claims** | | | | **$0** | **$0** |
| Class 7 | General Unsecured Claims | $20,906,970 | 0% | 0% | $0 | $0 |

*Note:          Accounts Receivable recovery ranges are shown net of collection fees of 15% and 5% in the Low and High Recovery scenarios, respectively*

**<u>Exhibit B</u>**

12942760

# Medical Practice Group Cash Burn

*Historical Cash Burn*

## The Medical Practice Groups[1] have burned approximately $50mm <u>per year</u> ($490mm) since 2015

♦ Other debtor entities, primarily the operating entities, have funded approximately $50mm <u>per year</u> to cover the cash burn and provide the Medical Practice Group with sufficient liquidity to make payroll and vendor payments



**MEDICAL PRACTICE GROUP CASH BURN AND INTERCOMPANY FUNDING**

**Funding From Other Entities**

**Medical Practice Group Net Cash Flow**

*Note:*     Amounts shown in millions
            2024 period is through August 2024
            Net Cash Flow reflects (i) Third Party Practice Cash Receipts, minus (ii) Payroll & Benefits + Accounts Payable Payments
*(1)*       Reflects (i) Garden State Healthcare Associates, LLC, (ii) New Jersey Medical and Health Associates and (iii) Quality Care Associates, LLC

2

## Exhibit C

# Cash Intercompany Activity

## *October 2024 Monthly Activity*

**The Debtors engaged in 128 intercompany transfers in the month of October, totaling ~$18.4mm**



**OCTOBER 2024 INTERCOMPANY CASH TRANSFERS**

*Note:*  *Amounts shown in thousands*

# Non-Cash Intercompany Activity

## *October 2024 Monthly Activity*

## Debtor entities share certain personnel and make certain payments on behalf of other entities

♦ For example, intercompany lab-related expenses are paid by Christ and then allocated to other entities based on predetermined allocated percentages

♦ However, allocation to other entities is **only** done for accounting purposes and cash payment for such expenses are never explicitly made by the entity to whom the expense was allocated

♦ Additionally, certain personnel also are paid from Hoboken and allocated back to Christ and Bayonne - cash does not change hands on account of these allocations



### LAB-RELATED INTERCOMPANY CHARGES

$110.4

$10.9 (Benefits)

$54.6 (Salaries)

$65.7

$44.9 (Lab Supplies)

$44.7

Total Paid by Christ on Behalf of HUMC & BMC | Amount Allocated to HUMC | Amount Allocated to BMC



### OTHER PERSONNEL INTERCOMPANY CHARGES

$32.3

$16.1

$16.1

Paid by HUMC on Behalf of Christ and BMC | Allocated to Christ | Allocated to BMC

*Note:*    *Amounts shown in thousands*

6

# Intercompany Funding

## Visual Display – October 2024 Intercompany Transactions



Note:      Amounts shown in thousands
(1)        Consists of Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates

7

## Exhibit D

# 2024 Top 15 MSO Level Expenses
## *October 2024 YTD*

**Payroll and the revenue cycle management account for the most MSO level expenses through October 2024 YTD**

| # | Vendor | Category | Description | Amount |
|---|--------|----------|-------------|--------|
| 1 | MSO Payroll | Payroll | *Payroll for management, back office and other system-level support employees - inclusive of salaries, sick pay, PTO, etc.* | 15,025,713 |
| 2 | R1 RCM Holdco, Inc. | Vendors | *Revenue cycle management company serving all three hospitals, billed and paid at MSO-level* | 4,561,560 |
| 3 | Dilworth Paxson LLP | Professional Fees | *Legal counsel to the Debtors* | 2,480,570 |
| 4 | Ankura Consulting Group LLC | Professional Fees | *Finanical advisor to the Debtors* | 1,656,443 |
| 5 | Mazuma Capital | Rent, Maintenance, Repairs | *Equipment leasing and finance company* | 1,008,000 |
| 6 | Cerecore | Professional Fees | *Healthcare IT consulting services* | 844,688 |
| 7 | Tellennium | Utilities | *Telecom expense management company* | 821,055 |
| 8 | 3M Healthcare | Vendors | *Provider of medical supplies, infection prevention products, and healthcare technologies and solutions for DRG Coding and Assignment* | 731,037 |
| 9 | American Express | Vendors | *Provider of credit cards, banking, and payment solutions* | 610,605 |
| 10 | Infinitt North America | Vendors | *Enterprise imaging and PACS (Picture Archiving and Communication Systems) solutions provider* | 590,106 |
| 11 | Krishna & Rama Billing | Vendors | *Revenue cycle management company serving all three hospitals, billed and paid at MSO-level* | 572,792 |
| 12 | CVS-Caremark | Policy Fringe Benefits | *Pharmacy benefits management for prescription drug plans* | 569,966 |
| 13 | Microsoft Corporation | Vendors | *Software solutions and computer supplies* | 562,739 |
| 14 | ASC Rev Manage and Consulting LLC | Professional Fees, Purchase Services | *Consulting and administrative services  for workers comp and nofault billings and follow-ups* | 544,369 |
| 15 | UKG Kronos Systems LLC | Professional Fees, Purchase Services | *Workforce management and HR software solutions provider* | 494,776 |

|  |  |  |
|---|---|---|
| **Subtotal: Top 15** | **$** | **31,074,418** |
| (+) Remaining Vendor Payments |  | 7,234,033 |
| **Total YTD MSO Vendor Payments** | **$** | **38,308,451** |

*Note:*     Amounts shown in actuals

9