# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| CarePoint Health Systems, Inc. *et al.*,[1] | : | Case No. 24-12534 (JKS) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : | **Re: D.I. 551, 730** |

## OBJECTION TO FOURTH AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF REORGANIZATION

Maple Healthcare, LLC ("Maple") files this objection (the "Objection") with respect to the *Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (the "Plan")[2] [Docket No. 551] filed by CarePoint Health Systems, Inc., *et al.*, the above-captioned debtors and debtors-in-possession (the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee," and collectively with the Debtors, the "Plan Proponents"). For its Objection, Maple respectfully states as follows:

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

[2]     Capitalized terms used but not defined herein shall have the meaning given to such term in the Plan.

## PRELIMINARY STATEMENT

1.      One of the bedrock principles of the Bankruptcy Code is that under a chapter 11 plan, a secured creditor must either be paid in full, receive its collateral or be provided the indubitable equivalent of its collateral. The Plan fails to provide Maple with any of the foregoing on account of its secured claims, thus the Plan cannot be confirmed over Maple's objection under sections 1123(a)(4), 1129(a)(7) and 1129(b) of the Bankruptcy Code.

2.      Another bedrock principle of bankruptcy is that general unsecured creditors must be treated similarly. The Plan also fails in this regard as general unsecured creditors (besides Maple and the Prior Owners) are to receive a beneficial interest in the Litigation Trust, while Maple is slated to receive nothing on account of its unsecured claims, meaning once again that the Plan cannot be confirmed over Maple's objection under sections 1123(a)(4), 1129(a)(7) and 1129(b) of the Bankruptcy Code.

3.      There are no exceptions to these bedrock principles; compliance is mandated, *not* aspirational. Moreover, the Plan also perplexingly fails to separately classify each of Maple's secured claims while separately classifying its unsecured claims in a thinly veiled attempt by the Plan Proponents to improperly gerrymander an accepting class of impaired creditors by classifying similar claims separately (and improperly shifting the burden to a creditor such as Maple to prevail on its classification objection in order to be treated as a general unsecured creditor). The law, however, is clear: the fact that there may be a future objection to Maple's unsecured claim, or future litigation against Maple, does *not* justify its separate classification. In fact, separate classification is not warranted even if there were pending claim objections or litigation. In short, the Plan is riddled with flaws: (i) Maple's secured claims are not separately classified; (ii) its general unsecured claims are not classified with all other general unsecured claims, both in

contravention to section 1122 of the Bankruptcy Code; and (iii) the Plan Proponents impermissibly condition Maple's distribution on account of the Maple Unsecured Claims on prevailing on this Objection.

4.      Maple (and the Prior Owners) maintain their desire that the CarePoint Hospitals continue to serve the residents of Hudson County. This is best evidenced by their actions by not just contributing ownership of the hospitals, but also contributing, arguably, the most valuable real estate in all of Jersey City to provide the Debtors a financial boost. Maple (and the Prior Owners) are very concerned, based upon the projections in the Plan Supplment (and corresponding lack of support for such projections), that the Debtors will remain highly leveraged and could land once again in bankruptcy court.  Lastly, Maple (and the Prior Owners) are extraordinarily troubled by the proposed release of HRH which has the effect of permanently removing the extremely valuable Jersey City real estate transferred to HRH days before Petition Date from benefiting Hudson and HUMC going forward.

5.      Ironically, most of the Plan's deficiencies with respect to Maple are easily curable. Leaving aside substantive consolidation and the impermissible releases, the Plan Proponents need only turn over Maple's collateral to it (or provide Maple the indubitable equivalent of such claims) and classify its unsecured claims with General Unsecured Claims, both as required by the Bankruptcy Code.

6.      Instead, the Plan Proponents ask this Court to defy Congress, binding legal precedent and create exceptions to the plain language of the Bankruptcy Code where none exist, squandering precious Bankruptcy Estate resources on a Plan that is so obviously doomed to failure. Mere need alone, no matter how altruistic it purports to be, does not give Debtors carte blanche to abandon bedrock principals of bankruptcy law and trample the express rights of creditors, both

secured and unsecured. There is no precedent for the Plan Proponents' abrogation of the Bankruptcy Code by separately classifying the Maple Unsecured Claims, and paying no distribution to Maple, simply because there is the possibility, regardless of how remote, that such claim could eventually be subordinated or recharacterized, especially in light of the Debtors' repeated admissions, through the Maple Stipulation and elsewhere, that they have no claims against Maple.

7.      The absurdity of the Plan Proponents' position of relying on potential future claims as a lever to trample over Maple's rights as a secured creditor—including first liens on the assets of Garden State and New Jersey Medical --is punctuated by their temerity in cavalierly publishing a laundry list of meritless Alleged Claims (as defined in Exhibit A to the Maple Second Supplemental Objection) against the Prior Owners (*not* Maple), even though the Committee has not conducted any investigation despite being in place for over three months. Stated again -- the only basis for the glaring mistreatment of Maple is not on account of *its* alleged misconduct, but rather the possible (but still uninvestigated) misconduct of its owners, hardly a basis to subordinate, avoid, or otherwise recharacterize Maple's claims. The notion that these purely speculative future Alleged Claims would even be proffered as a bases to trample Maple's current and express rights as a creditor strains the limits of good faith legal advocacy.

8.      Worse, through the meritless allegations against the Prior Owners, the Plan Proponents may have eviscerated what is claimed to be one of the Debtors' most valuable assets, a private antitrust cause of action pending in the United States District Court of New Jersey, in which HRH is expressly described as a co-conspirator. These allegations call into question not merely the motives behind the flawed Plan, but also the feasibility of the Plan under section 1129(a)(11) of the Bankruptcy Code and whether millions of dollars should be entrusted to the

Litigation Trust over which HRH is slated to have substantial influence, to pursue what is sure to be frivolous litigation, rather than focusing on the anticompetitive conduct of other area hospitals. This is particularly so where, as set forth in the Maple Objections, any claims against the Prior Owners have been released, or are barred by applicable statute of limitations, collateral estoppel, or res judicata. This scheme is exactly the type of scheme that section 1129(a)(11) of the Bankruptcy Code is designed to prevent.

9.      In addition, the Plan rests tenuously on the substantive consolidation of Debtors that have operated as separate entities for years, as evidenced by their separate loan agreements, financial statements, Interim DIP Orders (and budgets), schedules, and monthly operating reports. There are no "eggs" to "unscramble" (Debtors' words) and therefore no basis to substantively consolidate the Debtors for voting or distribution purposes. Without substantive consolidation, the Plan cannot be confirmed under section 1129(a)(10) of the Bankruptcy Code on a "per debtor" basis as required by this Court as there will be no accepting impaired class of creditors for Garden State, New Jersey Medical, and perhaps other Debtors.

10.      Lastly, the Plan Proponents have introduced no evidence to support the release of HRH, despite pending allegations of wrongdoing *by the Debtors* against HRH. Depositions taken of the Debtors' and the Committee's designated representatives confirmed that neither has done anything to investigate the merits and value of the claims against HRH that are being released, a stunning admission under these circumstances.

11.      As set forth more fully below, because the Plan violates sections 1122, 1123(a)(4), 1129(a)(1), (3), (7), (10), and (11) and 1129(b) of the Bankruptcy Code, confirmation must be denied.

## **BACKGROUND**

**A. The CarePoint Hospitals, the Bankruptcy Filing and Maple's Claims**

12.     The members or their affiliated entities of Maple are prior owners (the "Prior Owners") of HUMC Opco, LLC d/b/a CarePoint Health – Hoboken University Medical Center ("HUMC Opco") and Hudson Hospital Opco, LLC d/b/a CarePoint Health – Christ Hospital ("Hudson"). The Prior Owners owned Christ Hospital between 2012-2022 and HUMC between 2011-2022. The Prior Owners also owned IJKG Opco LLC /d/b/a CarePoint Health – Bayonne Medical Center ("Bayonne Opco") during the period 2008-2022. HUMC Opco, Christ Opco, and Bayonne Opco shall be referred to collectively as the "CarePoint Hospitals." Each were operated as independent entities.

13.     On November 3, 2024, Hudson and HUMC Opco filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Also on November 3, 2024, an involuntary petition for relief under chapter 11 of the Bankruptcy Code was filed against Bayonne Opco, to which Bayonne Opco consented to the requested relief.

14.     As set forth in the Maple Objections[3] (Maple hereby incorporates the statements and arguments made in the Maple Objections as if fully set forth herein), the Prior Owners rescued

---

[3]     "Maple Objections" means (i) *Objection and Reservation of Rights with Respect to Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement, Plan Confirmation, and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and Forms Related Thereto; and (IV) Granting Related Relief* (the "Maple Objection") [Docket No. 462] on January 15, 2025; (ii) *Supplemental Objection and Reservation of Rights with Respect to Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement, Plan Confirmation, and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and Forms Related Thereto; and (IV) Granting Related Relief* (the "Maple Supplemental Objection") [Docket No. 507] on January 17, 2025; and (iii) *Second Supplemental Objection and Reservation of Rights with Respect to Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement, Plan Confirmation, and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and Forms Related Thereto; and (IV) Granting Related Relief* (the "Maple Second Supplemental Objection") on January 22, 2025 [Docket No. 532].

the CarePoint Hospitals out of bankruptcy, then invested millions of dollars in the CarePoint Hospitals between 2008 and 2022, and then in 2019, also made millions in unsecured and subordinated loans to the CarePoint Hospitals to facilitate a sale process. See Maple Objection at ¶¶ 15-16. Notably, these loans were negotiated at arms' length, as the terms and conditions of such secured loans were established by and set forth in loan documents drafted, and agreed to, by BRF Finance Co., LLC, who was the CarePoint Hospitals' senior secured lender.

15.    Pursuant to that certain *Stipulation Allowing Maple's Claims Without the Need for Maple to File a Proof of Claim* (the "Maple Stipulation") [Docket No. 758], the Debtors have stipulated and agreed that Maple has the following undisputed claims ("Maple Undisputed Obligations") against the following Debtors:[4]

| Debtor | Maple Secured Claim | | Maple Unsecured Claim | |
|---|---|---|---|---|
| HUMC Opco | $ | 0.00 | $ | 14,902,959.00 |
| Hudson | $ | 34,751,366.00 | $ | 0.00 |
| Garden State | $ | 13,506,773.00 | $ | 0.00 |
| Bayonne Opco | $ | 13,506,773.00 | $ | 0.00 |
| New Jersey Medical | $ | 13,506,773.00 | $ | 0.00 |

16.    While payment of the Maple Undisputed Obligations are the subject of several subordination agreements (see Hudson-HUMC DIP Order at ¶ F(g)(i)-(ii); Bayonne Interim DIP Order at ¶ E(i), Schedule 2), Maple has a first priority lien on the assets of the First Lien Debtors (New Jersey Medical and Garden State). See Docket Nos. 622, 627; Maple Objections; see also Exhibit A attached hereto (Debtors, in a postpetition letter (the "Strategic Letter") to counsel for

---

[4]    A detailed description of the Maple Undisputed Obligations is set forth in the Maple Objection. Capitalized terms not defined herein or in the Plan shall have the meaning set forth in the Maple Objections.

Strategic Ventures, LLC, state that Maple "**holds a first (1st) position lien over all of the assets of Garden State** . . .") (emphasis added).

17.     The Debtors have vacillated greatly as to the value of the assets of the First Lien Debtors:[5]

| Garden State Healthcare Associates, LLC (Assets) | | | | |
|---|---|---|---|---|
| Schedules | Accounts Receivable | Intercompany Receivables | Other Assets | Total Assets |
| Original Schedules Docket No. 351 | $ 7,616,769.41 | $ 117,351,510.52 | $ 238,622.42 | $ 125,206,902.35 |
| Amended Schedules Docket No. 622 | $ 1,446,405.00 | $ 36,762,936.67 | $ 249,070.50 | $ 38,458,412.17 |
| **DIFFERENCE** | $ (6,170,364.41) | $ (80,588,573.85) | $ 10,448.08 | $ (86,748,490.18) |

| Garden State Healthcare Associates, LLC (Liabilities) | | | | |
|---|---|---|---|---|
| Schedules | Secured Claims | Unsecured Claims | Total Liabilities | Net Assets (Liabilities) |
| Original Schedules Docket No. 351 | $ 13,506,773.00 | $ 21,200,852.19 | $ 34,707,625.19 | $ 90,499,277.16 |
| Amended Schedules Docket No. 622 | $ 13,506,773.00 | $ 24,614,352.19 | $ 38,121,125.19 | $ 337,286.98 |
| **DIFFERENCE** | $ - | $ 3,413,500.00 | $ 3,413,500.00 | $ (90,161,990.18) |

| New Jersey Medical and Health Associates (Assets) | | | | |
|---|---|---|---|---|
| Schedules | Accounts Receivable | Intercompany Receivables | Other Assets | Total Assets |
| Original Schedules Docket No. 361 | $ 5,132,239.23 | $ 36,795,760.97 | $ 601,617.76 | $ 42,529,617.96 |
| Amended Schedules Docket No. 627 | $ 1,309,257.00 | $ 1,342,090.30 | $ 614,654.99 | $ 3,266,002.29 |
| **DIFFERENCE** | $ (3,822,982.23) | $ (35,453,670.67) | $ 13,037.23 | $ (39,263,615.67) |

---

[5]     See also Garden State November Monthly Operating Report [Docket No. 583] (showing total assets in the amount of $101,069,494); New Jersey Medical November Monthly Operating Report [Docket No. 584] (showing total assets in the amount of $36,557,785).

| New Jersey Medical and Health Associates (Liabilities) | | | | |
|---|---|---|---|---|
| Schedules | Secured Claims | Unsecured Claims | Total Liabilities | Net Assets (Liabilities) |
| Original Schedules Docket No. 361 | $ 13,506,773.00 | $ 7,811,064.37 | $ 21,317,837.37 | $ 21,211,780.59 |
| Amended Schedules Docket No. 627 | $ 13,506,773.00 | $ 35,329,670.00 | $ 48,836,443.00 | $ (45,570,440.71) |
| **DIFFERENCE** | $ - | $ 27,518,605.63 | $ 27,518,605.63 | $ (66,782,221.30) |

18.    In the *Declaration of Shamiq Syed Regarding Substantive Consolidation* ("Syed SC Declaration") [Docket No. 730-8], the Debtors nakedly state that the value of the First Lien Debtors' assets are as follows:

| Debtor | Low | High |
|---|---|---|
| Garden State | $117,260 | $352,693 |
| New Jersey Medical | $76,648 | $246,938 |
| **Total** | $113,908 | $599,631 |

Syed SC Declaration at ¶ 11, Liquidation Analysis.

19.    Further, based on Garden State's November monthly operating report, Garden State collected over $4.45 million of prepetition accounts receivable pledged to Maple. Docket No. 583. Similarly, based on New Jersey Medical's November operating report, New Jersey Medical collected over $1.18 million of prepetition accounts receivable pledged to Maple. Docket No. 584; see also Transcript of February 27, 2025 Deposition of Shamiq Syed (a copy of which is attached hereto as Exhibit B) ("Syed Dep. Tr.") at 90:15-92:15; 100:2-102:1 (Debtors' CFO acknowledging that post-petition accounts receivable collection were collections of prepetition receivable) 113:19-117:25 (admitting that prepetition receivables used to repay intercompany transfers of DIP loans). None of these receivables, however, secure the Bayonne DIP Interim Order and thus the use of these collected receivables represents a diminution in value of Maple's cash collateral of approximately $5.5 million. Bayonne Interim DIP Order at ¶ 3(a) (The Bayonne Debtors (IJKG Opco, LLC and IJKG LLC) are the borrowers under the Bayonne DIP loan). This amount has

increased (and continues to increase) but Maple cannot determine the total amount because the Debtors have failed to file their December and January monthly operating reports, which should give the Court great pause with respect to the rushed nature of these confirmation proceedings. Maple reserves its rights under the Bayonne Interim DIP Order for payment of its superpriority adequate protection claim under section 507(b) of the Bankruptcy Code.

20.     The Syed SC Declaration provides no basis or assumptions for the estimated recoveries or its projections. Moreover, the Debtors have not provided any explanation for the decline in value of the First Lien Debtors' assets between the original schedules and November monthly operating reports, on the one hand, and the amended schedules, on the other, that, barring substantive consolidation, effectively strips Maple of virtually all of its first lien collateral.

21.     The Plan Supplement contains no detail of the underlying assumptions used to value the accounts receivable, including: (a) identity of the payors; (b) accounts receivable aging; (c) the basis for determining the collectability percentage. Simply put, the Plan Proponents have provided no justification for, apparently, reallocating the First Lien Debtors' assets to other Debtors.

**B.  The Plan**

22.     On January 8, 2025, the Debtors filed the *Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (the "Initial Plan") [Docket No. 412]. Though the Initial Plan has gone through many iterations, one thing has remained consistent, the Plan Proponents propose, without justification, to pay Maple nothing on account of the Maple Undisputed Obligations or as one of the CSA Secured Creditors (as defined herein). See, e.g., Initial Plan at § I.B.4-5; Docket No. 497 (the "First Amended Plan") at § I.B.4-5; Docket No. 522 (the "Second Amended Plan")

at § I.B.4-5; Docket No. 538 (the "<u>Third Amended Plan</u>") at § I.B.4-5; Docket No. 551(the "<u>Plan</u>")

at § I.B.4-5.

23.     The current Plan provides as follows with respect to Maple Undisputed Claims:

| Class | Classification | Treatment | Projected Recovery |
|---|---|---|---|
| Class 4 – Maple Secured Claims | Maple Secured Claims | In accordance with section 1129(b)(2)(A) | $0 |
| Class 5 – Maple Unsecured Claims | Maple Unsecured Claims | Holders of Maple Unsecured Claims shall not receive or retain any property under the Plan on account of such Claims. *provided*, *however*, that in the event any Holder of a Maple Unsecured Claim objects to its proposed treatment under the Plan and such objection is sustained by the Court, such Holder of an Allowed Maple Unsecured Claim shall be treated as a Class 7 General Unsecured Claim. | $0 |

24.    Lastly, Plan Proponents propose to impermissibly strip the secured creditors that are parties to the Collateral Sharing Agreement (collectively, including Maple, the "CSA Secured Creditors") of their liens (the "CSA Liens") on the proceeds of the causes of action (the "Pledged CSA Causes of Action") pledged by the Debtors a party to the Collateral Sharing Agreement (the "CSA Debtors") to the CSA Secured Creditors by transferring such causes of action to the Litigation Trust Assets "free and clear of all Claims, Liens, and other interests," including the CSA Liens See Plan at Article X.C.[6]   The Pledged CSA Causes of Action, however, cannot be transferred to the Litigation Trust unless they remain subject to the liens of the CSA Secured Creditors. The claims of the CSA Secured Creditors under the Collateral Sharing Agreement shall be referred to collectively as the "Secured CSA Claims."

---

[6]    The defined term "Litigation Claims" include the Pledged CSA Causes of Action. Plan at Article II.1.108

**<u>OBJECTION</u>**

25.     Confirmation of the Plan must be denied because it does not comply with the

Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code and was not proposed

in good faith as required by section 1129(a)(3) of the Bankruptcy Code, because:

    a.     The Maple Secured Claims are not separately classified as required by section 1122 of the Bankruptcy Code, depriving Maple of its rights against the property of the First Lien Debtors and the CSA Debtors;

    b.     The Maple Unsecured Claims are: (i) improperly classified separately from the General Unsecured Claims to create an accepting impaired class of creditors of general unsecured creditors, in contravention to section 1122 of the Bankruptcy Code; and (ii) not treated similarly to the clams of General Unsecured Creditors as required by section 1123(a)(4) of the Bankruptcy Code;

    c.     The Plan does not satisfy the best interests test of section 1129(a)(7) of the Bankruptcy Code because Maple would recover more in a case under chapter 7 of the Bankruptcy Code;

    d.     The Plan is not feasible as required by section 1129(a)(11) of the Bankruptcy Code because the alleged claims against the Prior Owners have no merit;

    e.     The Plan violates section 1129(b)(2)(A) of the Bankruptcy Code by stripping Maple of its liens without a valuation hearing required under section 506(a) of the Bankruptcy Code or providing Maple with the indubitable equivalent;

    f.     By failing to provide a distribution to Maple, the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code because it unfairly discriminates against Maple and is otherwise not fair and equitable;

    g.     The Plan Proponents failed to show cause for the substantive consolidation as required by <u>In re Owens Corning</u>, 419 F.3d 195 (3d Cir. 2005); <u>see</u> <u>also</u> <u>In re Woodbridge Grp. of Companies, LLC</u>, 592 B.R. 761, 775 (Bankr. D. Del. 2018); and failed to satisfy section 1129(a)(10) of the Bankruptcy Code on a per debtor basis as required by <u>In re Trib. Co.</u>, 464 B.R. 126 (Bankr. D. Del.); and

    h.     The Plan releases are not permitted under <u>In re Cont'l Airlines</u>, 203 F.3d 203, 214 (3d Cir. 2000).

## A. The Plan Violates Sections 1129(a)(1) and (3) of the Bankruptcy Code

26.     The Plan does not comply with "the applicable provisions of" the Bankruptcy Code, as required by Section 1129(a)(1) of the Bankruptcy Code as it violates sections 1122, 1123(a)(4), 1129(a)(7), (10) and (11) and 1129(b) of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1); In re TCI 2 Holdings, LLC, 428 B.R. 117, 132 (Bankr. D.N.J. 2010) (the legislative history reflects that section 1129(a) encompasses "the applicable provisions of chapter 11 such as section 1122 and 1123, governing classification and contents of plan.").

27.     Similarly, the Plan was not proposed in good faith and not by any means forbidden by law, as required by section 1129(a)(3) of the Bankruptcy Code. 11 U.S.C. § 1129(a)(3). Good faith requires that a plan provide a basis for expecting that a reorganization can be affected with results consistent with the objectives and purposes of the Bankruptcy Code. In re Zenith Electronics Corp., 241 B.R. 92, 107 (Bankr. D. Del. 1999) (quoting In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988)). In determining whether the good faith requirement has been satisfied, the Court must evaluate whether the plan provides a fundamental fairness in dealing with creditors. In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001) (citing In re American Family Enterprises, 256 B.R. 377, 401 (D.N.J. 2000)); see also In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 fn. 5 (3d Cir. 1986) (the good faith requirements of the Bankruptcy Code "prevents a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11"). The Plan is fundamentally unfair and was not filed in good faith, as it strips Maple of its liens and claims on account of the Maple Secured Claims and the Secured CSA Claims, and also impermissibly classifies the Maple Unsecured Claims separately from the General Unsecured Claims and treats them differently from the General Unsecured Claims.

**B. Maple's Secured and Unsecured Claims are Improperly Classified**

28.     Section 1122(a) of the Bankruptcy Code provides, in relevant part, that: "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). "The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class…" Matter of Jersey City Medical Ctr., 817 F.2d 1055, 1060 (3d Cir. 1987). "A proper determination of whether claims are 'substantially similar' focuses on the nature of the claims" In re Coram Healthcare Corp., 315 B.R. 321, 349 (Bankr. D. Del. 2004) (emphasis added). "A proper determination of what claims are 'substantially similar' focuses on the legal attributes of the claims, not who holds them." Id. at 350. "[T]his determination must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed and treatment of claims under the plan." John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Assocs., 987 F.2d 154, 159 (3d Cir. 1993) (emphasis added).

29.     While "[s]ection 1122(a) does not expressly provide that 'substantially similar' claims may not be placed in separate classes…it seems clear that the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes." Id. at 158. Instead, "the classification of the claims or interests must be reasonable." Id. (citing Jersey City Medical Ctr., 817 F.2d at 1061).

30.     Initially, section 1122 of the Bankruptcy Code requires separate classification of each Maple Secured Claim. See, e.g., In re Cooper, 147 B.R. 678, 682 (Bankr. D.N.J. 1992) ("It has been specifically provided in several cases that improvement in the position of secured creditors would not be permitted in the substantive consolidations in question…The court can consolidate estates as to unsecured claims without consolidating as to secured claims; a secured

creditor with a consensual lien is only entitled to such collateral as it bargained for") (internal citations omitted). The purpose of classifying secured claims separately is to recognize that the collateral securing a secured claim may be distinct for each secured claim. Id. In this case, separate classification is required to recognize Maple's security interest in property of each of the First Lien Debtors.[7]

31.    Next, the Plan Proponents impermissibly classify the Maple Unsecured Claims in its own class, on the grounds that, Maple is a "former insider" and "because there is a basis on which the Litigation Trustee may subordinate or disallow such claims based on prepetition actions of Maple and the Prior Owners." Interrogatory Response No. 9.[8]  Neither of these are bases for separate classification.

32.    First, "insider status alone is insufficient to support separate classification" from other unsecured claims, much less *former* insider status. In re Heritage Org., L.L.C., 375 B.R. 230, 301 fn 90 (Bankr. N.D. Tex. 2007); see also In re Frascella Enters., Inc., 360 B.R. 435, 443 (Bankr. E.D. Pa. 2007) ("There is no per se requirement that unsecured insider claims be separately classified from other unsecured claims. Insider status alone does not make a claim dissimilar"); In re United Marine, Inc., 197 B.R. 942, 949 (Bankr. S.D. Fla. 1996) (same); In re Austin Ocala Ltd., 152 B.R. 773, 775 (Bankr. M.D. Fla. 1993) ("The claims of trade creditors, [certain other creditors,] and the insiders are all substantially similar -- pure general unsecured claims and should be classified accordingly. The Debtor has not demonstrated any justification for separate

---

[7]    Notwithstanding that the Plan is a proposed substantive consolidation plan, substantive consolidation will not affect the rights of secured creditors. Plan at § IX.A.1 ("The limited deemed substantive consolidation effected pursuant to this Article IX.A of the Plan and the Confirmation Order (i) shall not affect the rights of any holder of a Secured Claim with respect to the collateral securing such Claim").

[8]    On February 13, 2025, the Debtors served their Responses to Maple Healthcare, LLC's First Set of Interrogatories to Debtors in Connection with Plan Confirmation (the "Interrogatory Reponses," attached hereto as Exhibit C).

classification of these substantially similar claims"). The Plan Proponents' proposed classification of Maple's claims on account of Maple's equity owners being considered "former insiders" is therefore prohibited by section 1122(a) of the Bankruptcy Code.

33.    Next, the existence of potential litigation claims is not a basis for separately classifying the Maple Unsecured Clams. See In re Frascella Enters., 360 B.R. at 444 ("[W]hile the claims would properly be classified separately had they been subordinated…[t]hat remedy requires the commencement of an adversary proceeding which has not been pursued…"); In re Boston Harbor Marina Co., 157 B.R. 726, 793 (Bankr. D. Mass. 1993) (overruling the debtor's argument that the subordinated nature of a claim justified its separate classification where there was "no order equitably subordinating [creditor's] claim" and separately noting that subordination required an "adversary proceeding requesting such an order").

34.    No adversary proceeding has been filed against Maple and, of course, there is no order equitably subordinating its claims. In fact, as the Debtors admit in the Maple Stipulation and the Strategic Letter, the opposite is the case. See also January 17, 2025 Transcript of Proceedings ("DS Transcript," relevant portions of which are attached hereto as Exhibit D) Transcript at 22:6-14 ("I can tell you from our perspective that the prior owners did exactly what they said they did. They donated their interests at our suggestion. **It was Dr. [Moulick's] idea**. **He said these things have to be a nonprofit. He went to them and he got them to donate their interests and they did that. In exchange for that, they got a release**. So the debtor has not brought any claims against any of the Prior Owners or Maple or anybody else") (emphasis added).[9]  Indeed, even after the Prior Owners donated their interest in the hospitals, and independent management enjoyed total

---

[9]        As set forth in the Maple Second Supplemental Objection, the Debtors have twice released Maple from any and all claims related to the Donation. Maple Second Supplemental Objection at ¶¶ 12-17.

control over the operations of the hospitals for over two and half years thereafter, Debtors again released their claims against the Prior Owners.

35.     The Committee, the other Plan Proponent, has not even commenced an investigation of the Donation. Thus, wholly apart from the Debtors' multiple releases of claims executed in favor of Maple and the Prior Owners, the Plan Proponents have offered no evidence, let alone a preponderance of evidence, to indicate that they can remotely meet the high standard to prove equitable subordination,[10] debt recharacterization,[11] or otherwise disallow Maple's claims. See, e.g., In re Opus E., LLC, 528 B.R. 30, 105 (Bankr. D. Del. 2015) ("The proponent of equitable subordination has the initial burden of presenting evidence of unfair conduct by a preponderance of the evidence"); In re SubMicron Sys. Corp., 291 B.R. 314, 325 (D. Del. 2003) (holding that plaintiff did not prove "by a preponderance of the evidence" that certain debts should be recharacterized as equity). In any event, there are no allegations of wrongdoing against Maple and the Plan Proponents cannot attribute any wrongdoing to Maple.

36.     Compounding any efforts to equitably subordinate or recharacterize the Maple Undisputed Claims is that the Debtors do not dispute the Maple Undisputed Claims. See Maple Stipulation. Alternatively, separate classification of the Maple Unsecured Claim from the General

---

[10]     Equitable subordination is an "extraordinary remedy which is applied sparingly" and the Plan Proponents cannot meet their burden of proving its applicability. In re Optim Energy, LLC, 527 B.R. 169, 175 (D. Del. 2015). There is no evidence suggesting that Maple engaged in inequitable conduct or any other conduct that resulted in injury to creditors. See In re Zohar III, Corp., 639 B.R. 73, 90 (Bankr. D. Del.), aff'd, 620 F. Supp. 3d 147 (D. Del. 2022) (setting forth the elements of equitable subordination); see also Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692 (5th Cir. 1977). The opposite is the case. The Maple loans enabled the Debtors to remain open when they were financially strapped. See Maple Objections.

[11]     The Maple Undisputed Claims cannot be recharacterized as they were clearly designated as loans (most of which are secured) made at a time when the Debtors were adequately capitalized and were able to obtain outside financing, they were not subordinated to the claims of general unsecured creditors, had a fixed maturity date and schedule of payments, had fixed rate of interest and interest was paid (at least in the beginning), and the Maple-Hudson Loans and the Maple-Bayonne Loans contained market terms negotiated by a third party senior lender. See, e.g., In re Furniture Factory Ultimate Holding, L.P., No. 20-12816 (JKS), 2023 WL 5662747, at *22 (Bankr. D. Del. Aug. 31, 2023) (setting forth multi-factor test to determine whether a debt should be recharacterized as equity).

Unsecured Creditors would not be justified even if there was an objection to any of its claims. See In re Congoleum Corp., 362 B.R. 198, 203 (Bankr. D.N.J. 2007) (court holding that the fact that the debtors may object to a claim is not enough to be considered "compelling justification" to separately classify certain claims); In re Paolini, 312 B.R. 295, 314 (Bankr. E.D.Va. 2004) ("[The] existence of a dispute over claim validity does not support a separate classification."); In re ARN Ltd. Limited P'ship, 140 B.R. 5, 13 (Bankr. D.D.C. 1992) ("That the claims are disputed, however, is not a justification for the discriminatory treatment"). The potential of litigation does not justify separate classification and neither does the existence of pending litigation against a creditor. In re Curtis Ctr. Ltd. P'ship, 195 B.R. 631, 642 (Bankr. E.D. Pa. 1996) (noting that separate classification was not appropriate, "simply because [creditor's] unsecured deficiency claim is the subject of pending litigation").

37.    Finally, the Plan Proponents' separate classification of the Maple Unsecured Claims is plainly an effort to gerrymander an affirmative vote in favor of the Plan, thus is wholly inappropriate. In re Mallinckrodt PLC, 639 B.R. 837, 857 (Bankr. D. Del. 2022) (there is "one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan") (citing In re Greystone III Joint Venture, 995 F.2d 1274, 1279 (5th Cir. 1991)).

38.    The sum of the Maple Deficiency Claim and the HUMC Obligations, combined with the claims of the Captive and the Prior Owners, are likely sufficient to preclude the General Unsecured Creditors from being an accepting impaired class under the Plan. The typical reasons for separate classification (i.e. business justifications or separate legal rights against guarantors) are not present in this case. The Plan Proponents' separate classification of the Maple Deficiency

Claim to create an accepting impaired class violates section 1129(a)(3) of the Bankruptcy Code. In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001) ("The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code").

39.     These allegations of gerrymandering are not mere speculation, as certain parties in interest (most notably HRH) have effectively admitted to attempting to engineer an accepting class by placing the New Jersey Department of Health ("DOH") in its own class, to ensure an impaired, accepting class of creditors. See Exhibit E (e-mail correspondence between DOH and HRH, noting that "the Debtors will have a hard time finding an impaired class of claims to vote in favor of the Plan" and that the Plan Proponents "floated the concept of placing DOH in a separate class…" to artificially obtain acceptance of the Plan).

40.     There is no precedent or other rationale for: (i) not separately classifying the Maple Secured Claims; (ii) not classifying the Secured CSA Claims; and (ii) not classifying the Maple Unsecured Claims with all General Unsecured Claims. Confirmation of the Plan must therefore be denied.

### C. Paying Nothing to Maple on account of the Maple Undisputed Claims and the CSA Secured Claims Violates Section 1123(a)(4)

41.     Section 1123(a)(4) provides that a plan must "provide the same treatment for each claim…in a particular class, unless the holder of a particular claim…agrees to a less favorable treatment of such particular claim…" 11 U.S.C. § 1123(a)(4). This requirement has been interpreted to mean that similarly situated claims must receive the same treatment under a plan. See, e.g., In re Combustion Eng'g, Inc., 391 F. 3d 190, 239 (3d Cir 2004). This provision "furthers the policy of 'equality of distribution among creditors' by requiring that a plan of reorganization

provide similar treatment to similarly situated claims." Id. Moreover, section 1129(b) of the Bankruptcy Code requires that if similarly situated claims are classified separately, that the Plan not "unfairly discriminate" against a dissenting class of creditors. 11 U.S.C. § 1129(b); see also In re New Century TRS Holdings, Inc., 407 B.R. 576, 592 (D. Del. 2009) (holding that "if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable" and denying the plan based on disparate treatment among similarly situated creditors). The Plan improperly treats both the Maple Secured Claims and Maple Unsecured Claims, thus violates these provisions of the Bankruptcy Code and the underlying policy.

42.    As set forth below, wholly contradicting sections 506(a) and 1129(b), the Plan provides for no recovery on account of the Maple Secured Claims or the Secured CSA Claims and does not propose to turn over the collateral securing Maple's claims or provide it the indubitable equivalent of such collateral. The Plan also provides for a zero recovery for the Maple Unsecured Claims, despite General Unsecured Claims receiving a *pro rata* interest in the Litigation Trust, violating section 1123(a)(4) of the Bankruptcy Code's requirement that similarly situated creditors receive the same treatment.

43.    Worse, as further set forth below, the Plan Proponents, without any legal justification, propose that Maple will receive nothing under the Plan on account of the Maple Unsecured Claims, unless Maple successfully objects to its classification and treatment under the Plan. This impermissible burden shifting is inappropriate, unprecedented, and directly at odds with the Bankruptcy Code. Confirmation must therefore be denied.

**D.   The Plan Fails to Meet the Best Interests Test**

44.     The Plan also fails to meet the best interests test under section 1129(a)(7) of the

Bankruptcy Code. Section 1129(a)(7) of the Bankruptcy Code provides that the Plan may not be

confirmed, unless:

> (A) each holder of a claim or interest of such class—
>
> > (i) has accepted the plan; or
> >
> > (ii) will receive or retain under the plan on account of such
> > claim or interest property of a value, as of the effective date
> > of the plan, that is not less than the amount that such holder
> > would so receive or retain if the debtor were liquidated under
> > chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7).

45.     "The best interests test focuses on individual dissenting creditors rather than classes

of claims." In re G-I Holdings Inc., 420 B.R. 216, 265 (D.N.J. 2009). "Under the best interests

test, the Court 'must find that each [non-accepting] creditor will receive or retain value that is not

less than the amount he would receive if the debtor were liquidated.'" Id. (quoting Bank of Am.

Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 440 (1999)).

46.     The Plan Supplement makes it quite clear that Maple would receive more in

connection with the Maple Secured Claims if the Debtors were liquidated under chapter 7, because

Maple has a first priority lien on the assets of the First Lien Debtors, including accounts receivable.

Syed SC Declaration at ¶ 11, Liquidation Analysis; See also Strategic Letter; Docket Nos. 622

(Garden State amended schedules), 627 (New Jersey Medical amended schedules). Similarly,

Maple would be entitled to recovery on account of the Secured CSA Claims in a chapter 7 case.

47.     As set forth above, the First Lien Debtors' schedules were recently amended,

including with respect to intercompany claims, to significantly decrease the assets available to

Maple by $125 million. Maple reserves its right to dispute the basis of Debtors' reallocation of

intercompany claims. To the extent substantive consolidation is appropriate, Maple reserves all rights to seek a substantive consolidation protocol. See, e.g., In re New Century TRS Holdings, Inc., 407 B.R. 576, 583 (D. Del. 2009). Regardless, Maple would recover more in a chapter 7 liquidation with respect to the Maple Secured Claims and the Secured CSA Claims.

48.    Similarly, Maple would receive a greater recovery in a chapter 7 liquidation than it will under the Plan with respect to the Maple Unsecured Claims. Maple's proposed recovery under the Plan is $0. In a chapter 7 liquidation, Maple would be classified with all other General Unsecured Creditors and would share *pro rata* in any unsecured creditor recoveries. The Plan therefore plainly fails the "best interests" test and cannot be confirmed.

### E.  The Plan is not Feasible as Required by Section 1129(a)(11)

49.    Section 1129(a)(11) of the Bankruptcy Code "requires courts to determine whether the Plan is feasible and has a reasonable likelihood of success." In re G--1 Holdings, Inc., 420 B.R. 216, 267 (D.N.J. 2009) (citing In re Am. Family Enters., 256 B.R. 377, 404 (D.N.J. 2000)). The purpose of section 1129(a)(11) is to "prevent confirmation of visionary schemes which promise creditors more under a proposed plan than that which the debtor can possibly attain after confirmation." Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments), 195 B.R. 294, 304 (D.N.J. 1996) (internal quotations and citations omitted).

50.    In determining feasibility, a bankruptcy court must find that the proposed plan is workable and has a reasonable prospect for success. See, e.g., In re M & S Assocs., Ltd., 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992). "The plan proponent bears the burden of proving that the plan is feasible, within the meaning of Section 1129(a)(11) by a preponderance of the evidence." In re Mallinckrodt PLC, 639 B.R. 837, 894 (Bankr. D. Del. 2022). The factors that a court may consider include: any other related matter which "determines the prospects of a sufficiently successful

operation to enable performance of the provisions of the plan." <u>In re Greate Bay Hotel & Casino, Inc.</u>, 251 B.R. 213, 226-27 (Bankr. D.N.J. 2000).

51.    Distributions to unsecured creditors appear be predicated on causes of action against the Prior Owners. As set forth in the Maple Second Supplemental Objection (including the Maple Statement), the Plan Proponents clearly orchestrated a process to target the Prior Owners based on unsubstantiated accusations. For example, the Plan Proponents cite selectively to portions of the 2019 of the CarePoint Hospitals by the State of New Jersey, Commission of Investigation ("<u>SCI</u>"). Plan at § III.B.1. However, the Plan Proponents conveniently fail to disclose that SCI did not actually find any wrongdoing on the part of the Prior Owners and instead stated that the CarePoint Hospitals "could have closed if not for the actions, including investments and assumption of pre-existing liabilities, by the CarePoint Health hospitals' ownership in acquiring and improving the hospitals." Maple Second Supplemental Objection at ¶ 12. More importantly, in the more than five years that followed, NJDOH did not commence any investigation or find wrongdoing stemming from such report. Candidly, the ship has sailed with respect to conduct that predates the investigation. Two separate cases related to payments to the Prior Owners have each been dismissed, raising both the specter of claim preclusion and fact that any surviving claim would be time barred.[12] <u>Id</u>. With respect to any allegations that the Debtors did not receive value in exchange for the releases in 2022, independent valuation reports provided to the Committee

---

[12]    See <u>HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC</u>, No. CV 2019-0972-KSJM, 2022 WL 3010640, at *10-15 (Del. Ch. July 29, 2022) (dismissing claims by an entity associated with Avery Eisenreich for breach of fiduciary duty, corporate waste, and fraud against the Prior Owners, alleging that they were wrongfully paid "fictious management fees and allocations"; claims were barred by the doctrine of laches, because the management fees arose from management agreements that were executed in 2012); <u>29 E 29 St. Holdings, LLC v. IJKG Opco, LLC, C.A</u>. No. 2020-0480-KSJM, at 18 19, 51, 54-55, 63 (Del. Ch. Apr. 26, 2023) (transcript) (dismissing claims by an entities associated with HRH sought to recover management fees from the Prior Owners under various theories, including corporate veil piercing, unjust enrichment, and conversion; court also rejected plaintiffs' argument that they had alleged management fees were "excessive" on grounds that there were no allegations sufficient to even state a claim in that regard).

clearly demonstrate that the Debtors received value in excess of $203 million in the Donation for the Freehold Entities alone, rendering musings about avoidance of the releases utterly baseless. See Maple Statement, Exhibits 1-4.

52.    Not only are the allegations against the Prior Owners untrue, but they are also wholly contradicted by the Debtors' own words in litigation captioned *CarePoint Health Systems, et. al. v. RWJ Barnabas Health Inc* ("RWJB"), Case No. 22-cv-05421 (D.N.J.) (the "RWJB Litigation") so as to undermine a "major asset" of the Debtors' estates. See RWJB Docket No. 171) (January 15, 2025 letter from the Debtors informing the court that the RWJB Litigation that such litigation "has been identified as one of the major assets of the bankruptcy estate").

53.    On September 6, 2022, the Debtors commenced the RWJB Litigation. See https://www.njspotlightnews.org/wp-content/uploads/sites/123/2022/09/Carepoint-Complaint.pdf (the "RWJB Complaint"). In the RWJB Complaint, the Debtors, in a private anti-trust litigation against RWJB shortly after the Donations closed, alleged that RWJB was conspiring to drive CarePoint out of business, including colluding with Avery Eisenreich and Yan Moshe, the owner of HRH.

> o   "RWJ's conspirators include real estate players Avery Eisenreich ("Eisenreich") and Yan Moshe ("Moshe") whose sole goals are profit and greed and who have little interest in safety net hospitals." See RWJB Complaint at ¶5.

> o   "[Eisenreich] has transacted in property under the hospitals in Hoboken and Bayonne with conspirators Medical Properties Trust ("MPT") and HRH without review by the New Jersey Department of Health ("NJDOH"). These dubious land transactions have been used to undermine CarePoint and create uncertainty among its employees." See RWJB Complaint at ¶7.

54.    Completely contrary to the Plan Proponents Allegations (as defined in the Maple Statement), the Debtors extensively praise the Prior Owners (referred to as the Founders) in the RWJB Complaint:

o   "After buying the Hospitals' assets, the **Founders invested time, labor, and capital to improve the Hospitals' physical plants, equipment, and finances**, as well as the overall quality of healthcare services provided by the Hospitals. **Under the Founders' leadership** and with the incredible support of all the physicians, nurses and staff, **the Hospitals became leading acute health care service facilities in Hudson County and the State of New Jersey**." See RWJB Complaint at ¶48 (emphasis added).

o   "In addition to demonstrably improving health care for New Jersey residents, the **Founders' efforts to rescue the Hospitals from bankruptcy have saved thousands of jobs and generated substantial economic benefits to Hudson County** and, more generally, to the State of New Jersey. The Founders' efforts to revitalize the economic health of the Hospitals generated huge economic benefits to Hudson County and the State. CarePoint Hospitals create a significant positive economic impact for New Jersey in terms of both in-state operating expenditures of hundreds of millions of dollars annually (e.g. $384 million in 2014) and significant capital expenditures (e.g. $177.8 million for the years 2014-2017)." (and then setting forth numbers for all of the jobs they saved and economic impact they made). See RWJB Complaint at ¶49 (emphasis added)

o   "Most recently CarePoint's leadership team transitioned the CarePoint Hospitals' ownership to a new non-profit entity, CarePoint Health Systems Inc. Operating under physician leadership, this transition was a move lauded by the communities which the Hospitals serve. Currently, the CarePoint Nonprofit is the ultimate owner of ninety percent (90%) of the interests in the holding companies that control the CarePoint Hospitals. **Unless they are destroyed by the unlawful and predatory conduct of RWJ and others (which is the subject of this and other litigation),** CarePoint's three hospitals will continue to operate in their current form and will be controlled by the CarePoint Nonprofit. CarePoint's top priority is to work collaboratively with the Hudson County community to maintain critical health care for those who need it most and bring world class specialty care to the Hudson County community through partnerships with top-flight medical systems in the region." (and then providing examples of praise for the decision to make the donation)." See RWJB Complaint at ¶51 (emphasis added)

55.     By shamelessly reversing themselves and making the Plan Proponent Allegations, the Plan Proponents may have provided RWJB with critical defenses to the RWJB Complaint, devaluing that otherwise "major asset." Given that the Plan Proponents are now less likely to recover from RWJB and will likely never recover anything from the Prior Owners, confirmation of the Plan should be denied as the type of illusory plan that section 1129(a)(11) of the Bankruptcy

Code is designed to prevent as General Unsecured Creditors are unlikely to obtain any recovery from the Litigation Trust.

**F.  The Plan Cannot be Crammed Down Against Maple**

      **i.**      **The Treatment of the Maple Secured Claims is not "Fair and Equitable" as Required by Section 1129(b)(2)(A) of the Bankruptcy Code**

56.      The Plan is not "fair and equitable" with respect to the Maple Secured Claims. While the Plan Proponents claim that the Maple Secured Claims will be treated in accordance with section 1129(b) of the Bankruptcy Code, this is not the case.

57.      Section 1129(b)(2)(A) provides that in order to meet the "fair and equitable" standard, Maple must: (a) retain the Maple Liens and the CSA Liens; (b) receive cash on account of the Maple Secured Claims and the CSA Secured Claims; or (c) receive the indubitable equivalent on account of the Maple Secured Claims and the CSA Secured Claims. 11 U.S.C. § 1129(b)(2)(A). The Plan proposes none of these. See Plan at § I.B.4. First, the Plan does not permit Maple to retain its liens. Instead, the Plan, without legal justification, strips Maple of the Maple Liens and the CSA Liens and transfers its collateral to HRH. See Transcript of February 28, 2025 Deposition of Adam Rosen (Committee's financial advisor) (relevant portions of which are attached hereto as Exhibit F) ("Rosen Dep. Tr.") at 42:12-42:14 ("my assumption is that those assets … would go with the reorganized debtors"); 43:7-10; (same); 45:22-24 ("my understanding is that the lien would be released and would not attach to those accounts receivable of the reorganized debtor").

58.      Second, as Mr. Rosen repeatedly testified, the Plan Proponents fail to pay Maple cash on account of the Maple Secured Claims or the CSA Secured Claims, instead proposing to pay nothing on account of such claims. Id. at 42:15-16 (receivables "would not be monetized and

distributed pursuant to the waterfall");43:9-11 (receivables would be "collected and used in the operations by the reorganized debtors"); 56:13-24 (same); 162:1-9)(same).

59.     Lastly, the Plan also fails to provide Maple the "indubitable equivalent" of the Maple Secured Claim or the CSA Secured Claims. The Third Circuit defines "indubitable equivalent" as follows:

> Indubitable means "not open to question or doubt," Webster's Third New Int'l Dictionary 1154 (1971), while equivalent means one that is "equal in force or amount" or "equal in value". The Code fixes the relevant "value" as that of the collateral.

In re Philadelphia Newspapers, LLC, 599 F.3d 298, 310 (3d Cir. 2010), as amended (May 7, 2010) (internal citations omitted). By not providing Maple the value of its collateral, the collateral itself, or retention of the Maple Liens or the CSA Liens, the Plan violates section 1129(b)(2)(A)(iii) of the Bankruptcy Code and must therefore be denied. See, e.g., In re Pennave Properties Assocs., 165 B.R. 793, 796 (E.D. Pa. 1994) (holding that a plan was fair and equitable and provided a secured creditor the "indubitable equivalent" where "the Plan provided for the return of" its collateral).

60.     There is no justification for failing to turn over the Maple-Hudson Collateral and Maple-Bayonne Collateral (collectively, the "Maple Collateral") to Maple. While likely far greater, the Maple Collateral with respect to the First Lien Debtors clearly has some value.[13] See Syed SC Declaration at ¶ 11, Exhibit A thereto. That value belongs solely to Maple. There is similarly no basis for transferring the Pledged CSA Causes of Action to the Litigation Trust free and clear of the CSA Liens without providing the CSA Secured Creditors the indubitable equivalent of the CSA Liens. See, e.g., In re Fleming, No. 6:17-BK-19513-MW, 2020 WL

---

[13]     Maple further notes that these assets were not pledged to secure the loans made under either of the Interim DIP Orders.

1170722, at *5 (B.A.P. 9th Cir. Mar. 10, 2020) ("Treatment under any of the three clauses in § 1129(b)(2)(A) requires payment in full of the allowed secured claim") (citing 7 COLLIER ON BANKRUPTCY ¶ 1129.04 [2] (Alan N. Resnick & Henry J. Sommer, eds. 16th ed. rev. 2019)).

61.    The Plan also violates section 506(a) of the Bankruptcy Code, which requires that the Maple Secured Claims and the Secured CSA Claims "be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1). Moreover, section 506(a) "requires that collateral be valued" as of the confirmation date. In re Heritage Highgate, Inc., 679 F.3d 132, 140, 143 fn 9 (3d Cir. 2012) ("Where, as here, the purpose of the valuation is to determine the treatment of a claim by a plan, the values determined at the § 506(a) hearing must be compatible with the values that will prevail on the confirmation date…"). To date, there has been no valuation of the accounts (see Syed Dep. Tr. at 103:12-23 (no third party retained to value accounts receivable)) although Ankura was recently hired to perform such valuation. Syed Dep. Tr. at 125:8–22. Ankura, however, did not start the valuation process until the week of February 24, and the Debtors do not know when it will be complete. Id. at 125:24–126:4. Thus, as of the date hereof, neither the Debtors nor HRH have any idea of the value of the Maple Collateral.[14]

62.    Based on the Maple Stipulation, the Maple Liens are to be given "prima facie effect" as to their validity and amount under section 506(a). Heritage Highgate, 679 F.3d at 140 ("It is only fair, then, that the party seeking to negate the presumptively valid amount of a secured

---

[14]    See Transcript of February 27, 2025 Deposition of Nizar Kifaieh, M.D (HRH CEO) (relevant portions attached hereto as Exhibit G) ("Kifaieh Dep. Tr.") at 16:13-26:6 (testimony that HRH does not know value of accounts receivable because of numerous changes in billing companies and failure to timely file claims); Syed Dep. Tr. at 40:21-48;19 (discussing numerous changes to the Debtors' billing companies); 146:1-23 (discussing the methodology for arriving at liquidation value of receivables).

claim—and thereby affect the rights of a creditor—bear the initial burden."). Only after the Debtors

provide "sufficient evidence" that Maple's claim is overvalued, does the burden shift to Maple. Id.

63.     While the Debtors' CFO and HRH's CEO have both admitted that Maple Collateral

has value[15], the Plan does not provide for a valuation hearing, nor do the Plan Proponents even

attempt to value the Maple Collateral or the Pledged CSA Causes of Action. Instead, they allege

nothing more than there are alleged prior perfected liens and purport to justify the treatment

because Maple's owners are potential future litigation targets. See Interrogatory Response 13.[16]

First, this is flat-out wrong--there are no prior perfected liens with respect to the First Lien Debtors

(see Schedule D, Docket Nos. 351, 563, 622 (Garden State); Schedule D, Docket Nos. 361, 569,

627 (New Jersey Medical)) or the CSA Secured Claims (except as provided in the Collateral

Sharing Agreement). Second, section 1129(b) contains no exceptions for potential targets of future

litigation. Without a proper valuation, the Plan Proponents cannot justify valuing the Maple

Collateral and the Pledged CSA Causes of Action at $0 for plan confirmation purposes.

64.     Consequently, the Plan does not comply with section 1129(a)(1) of the Bankruptcy

Code and cannot be crammed down over the Maple Secured Claims.

---

[15]     See Syed Dep. Tr. at Syed Dep. 98:5–23 (accounts receivable "is the only true [] valuable asset that these hospitals own"); 114:5-12 and 116:14-20 (Maple recovery on New Jersey Medical Claims is potentially $2. 0 million); Syed Dep. Tr. at 18:18-19:4 (Q: why don't you just turn over the AR to Maple and Garden State? A: Because Carepoint can use every dollar. We're very significantly still insolvent.  We need the money to keep the hospital open); see also Kifaieh Dep. Tr. at 26:7-17 (Q: Do you know what is happening to the AR under the Plan… A: It's being used to run the hospitals).

[16]     Interrogatory No. 13. Set forth the legal and factual bases for the projected recovery of the Maple Secured Claims in the [Plan]. Response: The Debtors estimate the expected recovery for Maple Secured Claims to be zero based on (a) the existence of prior perfected liens on the collateral securing the Maple Secured Claims with respect to multiple debtors and (b) the expectation of the Unsecured Creditors' Committee that the Litigation Trustee will successfully subordinate or defend against such claims based on improper prepetition transactions with Maple.

ii.    **The Plan Unfairly Discriminates Against the Maple Unsecured Claims**

65.    The Plan also unfairly discriminates against Maple with respect to the Maple Unsecured Claims. Section 1129(b)(1) provides that the Plan may be confirmed "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

66.    While "unfair discrimination" is not defined in the Bankruptcy Code, "[g]enerally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." In re Armstrong World Industries, Inc., 348 B.R. 111, 121 (D. Del. 2006) (citing In the Matter of Johns-Mansville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)). "Thus a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." In re 222 Liberty Assocs., 108 B.R. 971, 991 (Bankr. E.D. Pa. 1990) (quoting Johns-Mansville Corp., 68 B.R. at 636). However, this is exactly what the Plan seeks to do with respect to Maple.

67.    Courts employ various tests to determine whether a plan unfairly discriminates against a dissenting class. However, "[t]he hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination." In re Trib. Media Co., 587 B.R. 606, 617 (D. Del. 2018), aff'd sub nom. In re Trib. Co., 972 F.3d 228 (3d Cir. 2020) (quoting In the Matter of Lernout & Hauspie Speech Products, N.V., 301 B.R. 651, 660 (Bankr. D. Del. 2003)).

68.    The Third Circuit previously endorsed a bankruptcy court's employment of the "Markell test," which provides that:

> A rebuttable presumption of unfair discrimination exists when there is (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the

31

dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

In re Mallinckrodt PLC, 639 B.R. 837, 898 (Bankr. D. Del. 2022) (quoting In re Trib. Co., 972 F.3d 228, 241 (3d Cir. 2020)).

69.    If a presumption of unfair discrimination arises, in order to rebut that presumption, the Plan Proponents must show that "outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain." In re Armstrong World Indus., Inc., 348 B.R. 111, 121 (D. Del. 2006) (quoting In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)).

70.    The Plan unfairly discriminates against the Maple Unsecured Claims, as it provides for no recovery to Maple without legal justification for doing so. Instead, the Debtors note that, "[t]he treatment for the Maple Unsecured Claims is for no recovery, unless an objection to such treatment is sustained by the Bankruptcy Court, in which case the claim will be treated as a General Unsecured Claim." Interrogatory Response No. 11. Candidly, it is difficult to fathom a clearer example of unfair discrimination. There is no precedent whatsoever for shifting the burden to Maple with respect to the classification and treatment of its claim to Maple. Quite the contrary, the burden lies with the Plan Proponents. In re Diocese of Camden, New Jersey, 653 B.R. 309, 335 (Bankr. D.N.J. 2023) (the debtors have the burden of proof to establish by a "preponderance of the evidence" that classification and treatment of each class is warranted). The Plan Proponents do not come remotely close to satisfying this burden.

71.    Further, each element of the Markell test supports a presumption of unfair discrimination against Maple. Maple is entitled to vote on the Plan pursuant to the Maple

Stipulation and will vote to reject the Plan. Moreover, there is another class of unsecured claims with the same priority, Class 7 General Unsecured Creditors, which will receive a distribution (a *pro rata* beneficial interest in the Litigation Trust), while Maple will receive nothing under the Plan.

72.     The Plan Proponents have failed to advance a valid, or any, basis to rebut this presumption of discrimination against Maple and, indeed, the Interrogatory Responses do not indicate any valid basis. Further, none of the General Unsecured Creditors, who would benefit from this discrimination, have infused new value into the reorganization, nor is there any special relationship to the reorganization that would necessitate the proposed discrimination against Maple. See, e.g., In re Crosscreek Apartments, Ltd., 213 B.R. 521, 538 (Bankr. E.D. Tenn. 1997) (noting that the plan proponent failed to: (a) articulate "a rational basis for the discrimination against [creditor's] deficiency claim and in favor of the general unsecured creditors" and (b) demonstrate "that the disparity in payment between the two unsecured classes is essential for the debtor's reorganization").

73.     Lastly, there is no basis alleged by the Plan Proponents or any basis to assume that Maple would collect less on the Maple Unsecured Claims than General Unsecured Creditors outside of bankruptcy.

74.     The Plan therefore cannot be crammed down under section 1129(b) of the Bankruptcy Code because the Debtors are unfairly discriminating against Maple by proposing a $0 recovery on account of the Maple Unsecured Claims.

**G. Substantive Consolidation is Inappropriate, and the Debtor Cannot Meet the Confirmation Standards "Per Debtor," in violation of section 1129(a)(10) of the Bankruptcy Code**

75.     The Plan provides for the deemed substantive consolidation of the Debtors for "purposes of voting and Distribution only." Plan at § III.E. The Plan Proponents have the burden

of proving that the Debtors "disregarded their corporate separateness 'so significantly' that 'their creditors relied on the breakdown of entity borders and treated them as one legal entity.'" In re HH Liquidation, LLC, 590 B.R. 211, 257 (Bankr. D. Del. 2018) (quoting In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005)). Even if the Plan Proponents met their burden, which they have not, substantive consolidation is still inappropriate if it can be demonstrated that "creditors did actually rely on the Debtors' corporate separateness and would be adversely affected by substantive consolidation." HH Liquidation, 590 B.R. at 257.

76.    The Debtors fail on all accounts. Here, creditors relied on the Debtors' corporate separateness. Mr. Syed misleadingly states that secured lenders "generally treated the Debtors as a consolidated unit." Syed SC Declaration at ¶ 27. This is not the case. First, and most obviously, two of the Debtors are not-for-profit entities, while one is a for-profit entity which, itself, should preclude substantive consolidation. Next, secured creditors expressly treated the Debtors separately, as there are two separate sets of loan documents evidencing the Maple Secured Claims (as well as the Capitala Claims), one set executed by Hudson, and the other executed by Bayonne Opco, Garden State and New Jersey. Bayonne Interim DIP Order at ¶ E(i), Schedule 2; Hudson-HUMC Interim DIP Order at ¶ F(a). There is also separate collateral securing the Maple-Bayonne Loans and the Maple-Hudson Loans. Bayonne Interim DIP Order at ¶ E(i), Schedule 2; Hudson-HUMC Interim DIP Order at ¶ F(f). Only HUMC is liable for the HUMC Obligations. Hudson-HUMC Interim DIP Order at ¶ F(a)(i). And, of course, there are two Interim DIP Orders, each with different borrowers and budgets, demonstrating that the DIP Lenders treated the Debtors as separate entities. See Hudson-HUMC Interim DIP Order at ¶ 4 (the "Debtor Borrowers" are defined as CarePoint Health Systems Inc., HUMC Opco LLC and Hudson Hospital Opco, LLC); Bayonne Interim DIP Order ("Bayonne Debtors" is defined as IJKG Opco LLC and IJKG, LLC).

Lastly, each Debtor filed its own sets of schedules and monthly operating reports, also proving that the Debtors operated as distinct entities.

77.   While substantive consolidation may be appropriate where the Debtors "assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors," that is not the case here. In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005). As set forth in Exhibit C to the Syed SC Declaration, the Debtors can clearly account and have consistently accounted for and delineated each intercompany transfer made by the Debtors, have allocated system-related expenses ratably among the Debtors, and have precisely recorded the separate assets and liabilities of each Debtor. Syed Dep. Tr. at 192:6-11 (intercompany transfers recorded "to the penny') and 71:19-72:23 (all intercompany transactions are recorded in respective Debtor's books and records). The assets are therefore not "so scrambled" or inseparable, such that substantive consolidation is required. It bears repeating that substantive consolidation is "extreme," "should be rare and, in any event, one of last resort after considering and rejecting other remedies." Owens Corning, 419 F.3d at 211. As the Syed SC Declaration reflects, Debtors labor under the misconception that substantive consolidation is required where affiliated debtors engage in systematic intercompany transfers, which would effectively put all debtors in a position to engineer substantive consolidation, defying Owens Corning and its progeny.

78.   The Debtors' reliance on the scope of the loan guaranty as a basis for justifying substantive consolidation is ridiculous. First, there would be no reason for a guaranty if the Debtors were not separate entities and were all treated as a single, unified entity. Given that guarantees are a fixture of corporate America, all debtors could claim substantive consolidation if the mere execution of a loan guaranty that were the test for substantive consolidation (which, of course, it

is not). Instead, guarantees are a form of credit enhancement to allow borrowers to reduce their borrowing costs.

79.    Mr. Syed also cavalierly claims that substantive consolidation "prejudices no one." Syed SC Declaration at ¶ 14. Mr. Syed is simply wrong. As the only secured lender with respect to the First Lien Debtors, Maple would be heavily prejudiced by substantive consolidation. Maple is being deprived of its collateral and the Maple Deficiency Claim will (at best) be classified with all other General Unsecured Creditors, severely limiting Maple's recovery under the Plan. Whether by design or oversight, it is quite clear that substantive consolidation would substantially prejudice Maple.

80.    Lastly, without substantive consolidation, the Debtors cannot meet the requirements of section 1129(a)(10) of the Bankruptcy Code, which provides that "at least one class of claims that is impaired under the plan has accepted the plan." 11 U.S.C. § 1129(a)(10). In Delaware, section 1129(a)(10) requires that this test be applied on a per debtor basis. In re Trib. Co., 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("[A]bsent substantive consolidation or consent, [section 1129(a)(10)] must be satisfied by each debtor in a joint plan."); see also In re JER/Jameson Mezz Borrower II, LLC, 461 B.R. 293, 303 (Bankr. D. Del. 2011) (noting that in the absence of substantive consolidation that case would be dismissed because debtors did "not have any chance of confirming a plan" under section 1129(a)(10)).

81.    Maple is the largest secured *and* unsecured creditor of the First Lien Debtors. If properly classified, neither First Lien Debtor will be able to confirm its Plan if Maple rejects the Plan. Similarly, assuming the Maple Secured Claims are valued at $0, its deficiency claim makes it one of the largest unsecured creditors of Bayonne Opco and Hudson. It is also one of the larger

creditors of HUMC. Combined with the likely rejection of the Plan by the Freehold Entities,[17] the

Lawler Entities,[18] and Strategic Ventures, LLC, it is unlikely the Plan can be confirmed with

respect to *any* of the hospital debtors. Thus, it is clear that Plan Proponents' substantive

consolidation proposal is yet another clear attempt to gerrymander an accepting class of creditors

to avoid the "per debtor" requirement in <u>Tribune</u> that must not be condoned. Without substantive

consolidation, the Debtors will be unable to satisfy the requirements of section 1129(a)(10),

compelling denial of confirmation of the Plan.

82.    For the foregoing reasons, and those set forth by CarePoint Health Captive

Assurance Company, LLC in its *Objection to Final Approval and Confirmation of the Fourth*

*Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (the

"<u>Captive Objection</u>"), substantive consolidation should be denied and confirmation denied with

respect to each Debtor in which an impaired class does not vote to accept the Plan.

### H.  The Proposed Plan Releases are Inappropriate

83.    The Plan's proposed releases of third parties, including HRH, are inappropriate

under the circumstances, and render the Plan patently unconfirmable.[19]

84.    "Courts have identified five factors that are relevant in determining whether to

approve a debtor's releases." <u>In re Hercules Offshore, Inc.</u>, 565 B.R. 732, 755 (Bankr. D. Del.

2016) (citing <u>In re Wash. Mut., Inc.</u>, 442 B.R. at 346; In re Zenith Elecs. Corp., 241 B.R. 92,110

---

[17]    The "Freehold Entities" are: Freehold Trust, Benego Ventures, LLC, Briar Hill Ventures, LLC, Pheasant Run Ventures, LLC, and Vivek Garipalli.

[18]    The "Lawler Entities" are: James P. Lawler, JPL Healthcare Consulting Limited Liability Company, Oak Management, LLC, Heights Healthcare Services Limited Liability Company, and Willow Healthcare Services Limited Liability Company.

[19]    Maple incorporates the Captive Objection, as if fully set forth herein with respect to the Plan releases.

(Bankr.D.Del.1999). Although the factors "are neither exclusive nor conjunctive requirements," they "provide guidance in the Court's determination of fairness" and "form the foundation for such an analysis, with due consideration of other factors that may be relevant to [the] case." Hercules Offshore, 565 B.R. at 755 (quoting Wash. Mut., 442 B.R. at 346-47). These factors require consideration of (1) whether there is an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) whether there is a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) whether there is an overwhelming acceptance of the plan and release by creditors and interest holders; and (5) whether the plan provides for payment of all or substantially all of the claims of creditors and interest holders. Id.

85.    As set forth in the Captive Objection, which is incorporated herein, there is no evidence that the claims against HRH have been investigated (let alone adequately investigated).[20] There is also no evidence that there is an identity of interest between the Debtors and any of the Released Parties such that a suit against any of the Released Parties will deplete the estates' resources. Moreover, with respect to HRH, it did not guarantee the Debtors' prepetition debt such that a claim against HRH would be likely to result in a claim for contribution or subrogation against the Debtors—to the contrary, HRH is the Debtors' prepetition and DIP lender.

86.    Further, none of the other relevant factors support the proposed releases. HRH is not making a substantial contribution to the Debtors' reorganization when considered in light of the Debtors' outstanding debt, and such contribution is to be used to finance the Litigation Trust, not to pay creditors' claims. In fact, HRH is already in line to receive well more than 100% of the

---

[20]    See Syed Dep. Tr: at 154:15–155:18; Transcript of February 28, 2025 Deposition of Debra White (Committee Chair) (relevant portion attached hereto as Exhibit H) at 45:4-13 (Q: Do you know whether the committee…conducted any investigation into the claims or causes of action against HRH?  A: I do not recall) and 68:8-24 (same)).

value of its claim, even before considering the added value of the sweep release of claims against it and its current and future affiliates. The notion that creditors will overwhelmingly vote to accept the Plan is a pipedream, as creditor recoveries will likely be very low, given the weakness of the causes of action being transferred to the Litigation Trust.

87.     Lastly, if the Plan is confirmed, Maple (or the Captive), as two of the largest unsecured creditors should be appointed to the Litigation Trust Oversight Committee to assure that the Litigation Trust is fulfilling its fiduciary duty to *all* unsecured creditors as opposed to acting as a shill for HRH.

## RESERVATION OF RIGHTS AND JOINDER

88.     Nothing contained herein shall constitute a waiver of any rights or remedies of Maple under the Bankruptcy Code or applicable law, including, without limitation, the right to: (i) amend, modify, or supplement this Objection, or (ii) raise any other additional arguments at a later date, including in connection with the Confirmation Hearing.

89.     Maple hereby incorporates the arguments of other parties that object to the Plan to the extent not inconsistent with this Objection.

## CONCLUSION

90.     The Plan Proponents' effort to blatantly rewrite the Bankruptcy Code must not be condoned. Consequently, confirmation must be denied because the Plan and the Plan Proponents violate the plain language of sections 1122, 1123(a)(4), 1129(a)(1), and (7) and 1129(b) of the Bankruptcy Code, and otherwise violates sections 1129(a)(3), (10), and (11) of the Bankruptcy Code.

**WHEREFORE**, Maple requests that the Court deny the Plan and grant such other and further relief as the Court deems appropriate.

Dated:  March 4, 2025

**BIELLI & KLAUDER, LLC**

*/s/ David M. Klauder*
David M. Klauder (No. 5769)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
dklauder@bk-legal.com

-and-

**LEVENFELD PEARLSTEIN, LLC**
Harold D. Israel (admitted *pro hac vice*)
Sean P. Williams (admitted *pro hac vice*)
George J. Spathis (admitted *pro hac vice*)
120 S. Riverside, Suite 1800
Chicago, Illinois 60606
Telephone: (312) 346-8380
e-mail: hisrael@lplegal.com
e-mail: swilliams@lplegal.com
e-mail: gspathis@lplegal.com

*Co-Counsel to Maple Healthcare, LLC*