**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CarePoint Health Systems Inc. d/b/a Just Health Foundation, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12534 (JKS)<br><br>(Jointly Administered) |

**DECLARATION OF SHAMIQ SYED IN SUPPORT OF CONFIRMATION**

I, Shamiq Syed, hereby declare (this "Declaration") under penalty of perjury that the following is true to the best of my knowledge, information and belief:

**A.     Background**

1. I am the Chief Financial Officer ("CFO") of CarePoint Health Systems, Inc. ("CarePoint") and each of the above-captioned debtors (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I joined the Debtors in 2024 and, prior to serving as CFO, I served as Senior Director at Ankura Consulting Group, LLC ("Ankura") in their Turnaround & Restructuring practice. I have served as CFO of the Debtors since July 15, 2024.

2. On November 3, 2024 (the "Petition Date"), each of the Debtors, except IJKG Opco, LLC ("IJKG Opco"), filed a voluntary petition for relief under chapter 11 of title 11 of the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030

United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (this "Court").

3. On the Petition Date: (i) three creditors of IJKG Opco – 29 E 29 Street Holdings, LLC, Bayonne Medical Center Opco, LLC, and Peter Wong, MD – filed an involuntary petition against IJKG Opco under Chapter 11 of the Bankruptcy Code, and (ii) IJKG Opco filed an answer consenting to the relief requested in the involuntary petition. An order for relief was entered by the Court as to IJKG Opco on November 6, 2024.

4. On March 6, 2025, the Debtors and the Official Committee of Unsecured Creditors (together, the "Plan Proponents") filed the *Fifth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (the "Plan")[2] [D.I. 856].

5. As CFO of the Debtors, I was involved in the development and formulation of the Plan. Further, as CFO of the Debtors, and as a result of my work with Ankura prior to joining the Debtors, I have substantial knowledge regarding the Debtors' financial affairs, estates, books and records, and operations.

6. Throughout these Chapter 11 Cases, the Debtors, the Debtors' senior management, and the Debtors' professionals have upheld their fiduciary duties and worked tirelessly for the benefit of the Debtors' stakeholders and the communities they serve to bring these Chapter 11 Cases to an equitable and value-maximizing conclusion.

**B.    Best Interests of Creditors**

7. On January 24, 2025, the Plan Proponents filed a consolidated liquidation analysis of the Debtors. [D.I. 551-2]. On February 20, 2025, the Plan Proponents filed Debtor-by-Debtor liquidation analyses for the principal operating Debtors: (i) IJKG Opco LLC d/b/a CarePoint

---

[2] Capitalized terms not defined herein shall have the meanings given to them in the Plan.

Health-Bayonne Medical Center ("IJKG Opco"), (ii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital ("Hudson Hospital Opco"), (iii) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center ("HUMCO Opco"), (iv) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group ("NJMHA"), and (v) Garden State Healthcare Associates, LLC ("Garden State") (collectively, the "Liquidation Analysis"). [D.I. 730-8].

8. The Liquidation Analysis was prepared with the assistance of Province, LLC ("Province"), financial advisor for the Committee, based on information provided by the Debtors. I reviewed and discussed the key line items contained in the Liquidation Analysis with several employees of the Debtors in order to determine the appropriate assumptions used to calculate the range of potential realizable value. I worked with Province to incorporate the assumptions into the final version of the Liquidation Analysis which is attached to the Plan Supplement. I have substantial knowledge of the Liquidation Analysis through my involvement in its preparation. To the best of my knowledge, the Liquidation Analysis is accurate.

9. The Debtors considered whether a meaningful liquidation analysis could be prepared for each Debtor. However, not every Debtor had cash, accounts receivable, or debt incurred by that specific entity. After review of the data for each Debtor, the Plan Proponents determined that, for many of the Debtor entities, a liquidation analysis would not be useful. Accordingly, the Liquidation Analysis includes only the liquidation analyses of Debtors that included cash or accounts receivable.

10. The Liquidation Analysis summarizes the Plan Proponents' best estimate of recoveries by the Holders of all Claims and Interests if these Chapter 11 Cases were converted to chapter 7 cases. The Liquidation Analysis demonstrates that general unsecured creditors of each

3

of these Debtors would receive no recoveries in the absence of the settlement with HRH and the Committee embodied in the Plan.  As set forth in the Liquidation Analysis, if the Chapter 11 Cases were converted to chapter 7 cases, holders of General Unsecured Claims would likely not receive any financial recovery.  Further, the Debtors would incur additional costs of a chapter 7 trustee, which would reduce any potential distributions to Allowed Impaired Claims on a dollar-for-dollar basis. In addition, in a chapter 7 scenario, it is unclear whether a chapter 7 trustee would be able to pursue and appropriately maximize the value of the Litigation Claims, as such Litigation Claims are only available for the benefit of unsecured creditors (Classes 5, 7 and 9) based on the Plan Proponents' negotiations with HRH and Capitala. A chapter 7 trustee would not only lack funding to pursue Litigation Claims (*i.e.*, the Litigation Trust Seed Money), but any such Litigation Claims might also be subject to prior Liens, absent the concessions agreed to by HRH and Capitala.

11. The Liquidation Analysis includes a note explaining that "Accounts Receivable recovery ranges are shown net of collection fees of 15% and 5% in the Low and High Recovery scenarios, respectively." [D.I. 730-8, pp. 15-19].  This note is based on the historic accounts receivable collection rates of the Debtors.  This note is also based on the assumption that, if a chapter 7 trustee were appointed, there would be significant deterioration of accounts receivable in the time between a chapter 7 trustee being appointed and working on the accounts receivable claims, based on the age of the existing claims and the type of payor claims that exist.  Accordingly, I believe the Liquidation Analysis includes an accurate assumption of the recovery rate of accounts receivable were a chapter 7 trustee appointed in these Chapter 11 Cases.

12. NJMHA and Garden State (collectively, the "Practice Groups") are two medical practice groups comprised of physicians who are affiliated with the Debtors.  NJMHA and Garden State are not profitable entities on an ongoing basis.  IJKG Opco, Hudson Hospital Opco, and

HUMCO Opco (collectively, the "Hospitals") subsidized NJMHA and Garden State through intercompany transfers. The Practice Groups operate at a loss and require significant cash infusions from other Debtors, namely the Hospitals, to satisfy their ongoing financial obligations. The Practice Groups have burned approximately $50,000,000.00 per year since 2015, totaling $490,000,000.00 in that period.

13. The Liquidation Analysis demonstrates that the best interests test is satisfied as to each Holder of an Impaired Claim or Interest. Absent the mediated resolution set forth in the Plan, all distributable value would go towards repaying the secured claims of HRH and Capitala, and the claims of other secured creditors to the extent allowed. Under the Plan, in contrast: (a) the secured debt of HRH and Capitala will be deferred and "rolled" into new exit financing facilities, which will not be paid from Estate assets; (b) HRH has agreed to provide the $3,500,000 in Litigation Trust Seed Money to Litigation Trust to investigate, prosecute and monetize the Litigation Claims; and (c) unsecured creditors with Allowed Claims in Classes 5, 7 and 9 are projected to receive a recovery on their claims from the proceeds of such Litigation Claims.

14. In a chapter 7 scenario, it is unclear whether a chapter 7 trustee would be able to pursue and appropriately maximize the value of the Litigation Claims, as such Litigation Claims are only available for the benefit of unsecured creditors (Classes 5, 7 and 9) based on the Plan Proponents' negotiations with HRH and Capitala. A chapter 7 trustee would not only lack funding to pursue Litigation Claims (*i.e.*, the Litigation Trust Seed Money), but any such Litigation Claims might also be subject to prior Liens, absent the concessions agreed to by HRH and Capitala.

15. Accordingly, the Plan provides for a greater recovery to the Holders of all Claims and Interests than a chapter 7 liquidation.

**C.    Plan Projections**

#124894389v2
12992915 v4
#124894389v4

16. On February 20, 2025, the Plan Proponents filed consolidated plan projections for the Debtors (the "Plan Projections"). [D.I. 730-7].

17. The Plan Projections were prepared by the Debtors, with the assistance of their advisors, Ankura Consulting Group, LLC. I have substantial knowledge of the Plan Projections through my involvement in the preparation of the Plan Projections.

18. The Plan Projections assume returning to 2022 levels of volumes across the hospital system for 2025. These volume levels have already been historically achieved by the system. The return to 2022 levels of volume and patient revenue per case driven by: (i) reopening of all service lines, (ii) no ambulance diversion due to lack of supplies or physicians, (iii) full year of consistent revenue cycle collections resulting in a normalized payment-to-charge ratio, and (iv) re-hiring terminated physicians and improvements in Medical Group to bring back referral volume. Performance of the hospital system is assumed to improve year-over-year in the forecasted periods due to (i) reopening all service lines; (ii) recovering lost volumes; (iii) stabilizing revenue cycle; (iv) negotiating improved payor contracts; (v) consolidating vendor / supplies spend across the system; (vi) having a shared MSO across four hospitals; and (vii) rebranding of the hospitals to capture commercial patients.

19. The Plan Projections rely on certain assumptions included therein, including that HRH will provide certain funding in fiscal years 2025, 2026, and 2027. [D.I. 730-7, p. 4]. HRH and the Debtors will continue to operate under the unified management system enshrined in the Management Services Agreement [D.I. 19-3] and Hospital Facilities Management Services Agreement [D.I. 212-2]. The unified and integrated management of Hudson Regional Hospital, Bayonne Medical Center, Christ Hospital, and Hoboken University Medical Center will enable coordinated administrative services, improved vendor relations, and streamlined purchasing and

6

financial systems that will strengthen the financial health of the Debtors.

20. The Plan Projections demonstrate that the Debtors are well-positioned to service their ordinary course obligations and successfully operate their businesses on a going-forward basis. As discussed, the unified and integrated management of Hudson Regional Hospital, Bayonne Medical Center, Christ Hospital, and Hoboken University Medical Center will allow the Debtors to meet their ordinary course obligations and successfully operate their businesses because of the coordinated administrative services, improved vendor relations, and streamlined purchasing and financial systems.

21. Based upon the Plan Projections, the Debtors are not likely to need further financial reorganization following the confirmation of the Plan. Accordingly, the Plan is feasible.

**D.**     **Treatment of Maple Secured Claims**

22. The Plan provides each Holder of an Allowed Maple Secured Claim arising under the Bayonne/Maple Loan Agreement, the Christ/Maple Loan Agreement, or the Collateral Sharing Agreement, as applicable, shall receive from the Reorganized Debtors, among other treatment alternatives, (i) cash equal to the unpaid portion of the Allowed Maple Secured Claim, or (ii) the retention of its liens and deferred cash payments having a present value at least equal to the amount of such Allowed Maple Secured Claim as of the Effective Date.

        a.     <u>Maple Secured Claim - Christ/Maple Loan Agreement</u>

23. Given the value of the assets constituting collateral under the Christ/Maple Loan Agreement and the amount of senior claims of other creditors secured by such collateral, the Debtors believe that there is no reasonable scenario in which Maple could be Allowed a Secured Claim relating to such collateral. To the extent any such Claim is Allowed, it will be paid in accordance with the terms of the Plan.

b. <u>Maple Secured Claim - Bayonne/Maple Loan Agreement</u>

24. To the extent Allowed, the Debtors intend to satisfy any Maple Secured Claim arising under the Bayonne/Maple Loan Agreement relating to the net realizable value of the accounts receivable of Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates, LLC as of the Petition Date, by Maple (i) retaining its liens securing such Allowed Maple Secured Claim, and (ii) receiving deferred cash payments from the Reorganized Debtors of a present value at least equal to the amount of such Allowed Maple Secured Claim as of the Effective Date. If the Class 4 Maple Secured Claim is treated pursuant to such terms, the Allowed Maple Secured Claim shall be paid in equal installments over a three year period with interest at SOFR plus 2%. The Plan Projections include sufficient cash flow for the Reorganized Debtors to accommodate any such debt service.

c. <u>Maple Secured Claim - Collateral Sharing Agreement</u>

25. To the extent Allowed, each Maple Secured Claim arising under the Collateral Sharing Agreement will receive payment from the Litigation Trust in accordance with Maple's rights under the Collateral Sharing Agreement, without prejudice to Litigation Trustee's rights, claims, defenses and remedies with respect to the Collateral Sharing Agreement and the ability to challenge, object to or otherwise contest Maple's security interest and other rights thereunder.

**E.      Other Confirmation Requirements**

a. <u>Feasibility</u>

26. On or around the Effective Date, the Reorganized Debtors will enter into the HRH Exit Facility. The Debtors, the Committee, and HRH negotiated the HRH Exit Facility, through which HRH will provide to certain of the Debtors a credit facility. The HRH Exit Facility Credit Agreement will provide new money sufficient to satisfy Allowed Administrative Expense Claims

8

and Allowed Priority Claims in connection with, and pursuant to, the Plan. The HRH Exit Facility satisfies certain of HRH's claims such that no Litigation Trust Assets shall be used to pay the Allowed HRH Claims (other than certain proceeds of Litigation Claims, as explained in the Plan). This ensures Holders of Claims in Class 7 receive recoveries on account of Litigation Claims and Avoidance Actions.

27. Based upon the Plan Projections, the Debtors are not likely to need further financial reorganization following the confirmation of the Plan. Accordingly, the Plan is feasible.

      b. Classification of Claims and Interests

28. I believe each Class of Claims or Interests under the Plan contains only Claims or Interests that are substantially similar to each other in nature and priority. In addition, I believe valid business and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan.

29. Secured claims, unsecured claims and interests have been separately classified as a reflection of their unique factual circumstances and because I understand that such claims and interests are entitled to different priorities under the Bankruptcy Code. In particular, (1) HRH Claims, Capitala Claims, Capitala Specialty Lending Claim, Maple Secured Claims, Other Secured Claims, NJDOH Secured Claims and Strategic Ventures Secured Claims have been separately classified based on their different collateral packages and respective priorities, (2) Maple Unsecured Claims, General Unsecured Claims and Prior Owner Claims have been separately classified based on, among other things, (a) whether a particular Claim Holder (i) has an ongoing business relationship with the Debtors or provides goods and services necessary for the Debtors' continued operations, and (ii) is a former insider of the Debtors, and (b) whether a particular Claim

may be a subordinated claim; and (3) different classes of interests are separately classified based on whether such interests are in for-profit or not-for-profit Debtor entities.

30. I believe the Classes under the Plan are reasonable and appropriate and none were established with the intent to create an impaired accepting class.

      c. <u>Provisions Regarding Selection of Directors and Officers</u>

31. I believe that (i) the continued service of the members of the Debtors' Board after the Effective Date, subject to expiry of terms/appointments and re-elections, (ii) the anticipated appointment of Yan Moshe as Chairman of the Board, (iii) the continued service of Dr. Moulick as CEO of the Debtors until the MSO is formed, (iv) my continued service as CFO of the Debtors, (v) the selection of the Litigation Trustee by the Committee, in consultation with the Debtors and HRH and subject to HRH's approval, (vi) the selection of the five members of the Litigation Trust Oversight Committee by the Committee, and (vii) HRH's service as an *ex-officio* member of the Litigation Trust Oversight Committee, are all consistent with the interests of Holders of Claims and Interests and public policy, including because (a) they are among the parties most familiar with the Debtors' operations, finances and prospects, as well as the facts and circumstances of these Chapter 11 Cases; (b) they are all highly-experienced and committed to the successful continued operations of the Debtors' hospitals for the benefit of the Hudson County community; and (c) they have strong interests in maximizing the value of the Debtors' estates.

      d. <u>Assumption/Rejection of Executory Contracts and Leases</u>

32. I believe the Debtors have exercised sound business judgment in identifying the executory contracts and unexpired leases to be assumed and rejected pursuant to the Plan. In particular, the Debtors have determined (a) to assume those contracts and leases that are necessary (i) for the Reorganized Debtors to carry out their duties under the Plan or beneficial to their

10

continued operations, (ii) to consummate the HRH Transactions, and/or (iii) to maximize the value of the Debtors' estates; and (b) to reject those contract and leases that are no longer necessary and that would be a burden on the estates.

    e. <u>Debtor Releases, Exculpations, Limitations of Liability and Injunction</u>

  33. I believe the release, exculpation, limitation of liability and injunction provisions are proper because, among other things, they are necessary to bringing these Chapter 11 Cases to conclusion and securing support for the Plan, and they are supported by the Debtors' creditors as demonstrated by the voting results.

    f. <u>Proposal of the Plan in Good Faith</u>

  34. I believe the Plan Proponents have proposed the Plan in good faith and with the goal of maximizing stakeholder recoveries and allowing the Debtors' healthcare operations to continue for the benefit of Hudson County residents (a goal that I understand is consistent with the objectives and purposes of the Bankruptcy Code).

  35. The Plan is the product of extensive, arms'-length negotiations with key case constituencies – including a multi-day mediation before the Honorable Michael B. Kaplan, Chief Judge of the United States Bankruptcy Court for the District of New Jersey.

  36. Absent the mediated resolutions set forth in the Plan, Holders of unsecured claims would likely receive *no recovery* in these Chapter 11 Cases because all distributable value would go towards repaying the secured claims of HRH and Capitala, and other secured claims, to the extent allowed. Under the Plan, in contrast: (a) the secured debt of HRH and Capitala will be "rolled" into new exit financing facilities (which will *not* be paid from Estate assets); and (b) HRH has agreed to provide the Litigation Trust Seed Money to the Litigation Trust, to investigate, prosecute and monetize the Litigation Claims, the proceeds of which will be used to fund the

11

recoveries to Holders of Allowed Claims in Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims) and Class 9 (Prior Owner Claims).

37. I believe that throughout these cases, the Debtors, the Debtors' Reorganization Committee, the Debtors' senior management, the Committee, and their respective professionals, have upheld their fiduciary duties and worked tirelessly for the benefit of the Debtors' stakeholders and the communities they serve to bring these Chapter 11 Cases to an equitable and value-maximizing conclusion.

    g. <u>Domestic Support Obligations</u>

38. The Debtors have no domestic support obligations and are not individuals.

    h. <u>The Plan Does Not Unfairly Discriminate</u>

39. I believe the Plan does not "discriminate unfairly" with respect to the Rejecting Classes because the classes are comprised of dissimilar claims and interests and there is strong justification for any disparate treatment. For instance, different Classes of Secured Claims have been separately classified and are given their specific treatment based on their different collateral packages and respective priorities. Likewise, although Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims) and Class 9 (Prior Owner Claims) have been separately classified (because the claims of former owners generally arose when they were in control of the Debtors and are materially different in nature than ordinary non-insider trade claims), all three Classes are receiving the exact same rights to recovery under the Plan. Lastly, different Classes of Interests are separately classified based on whether such Interests are in for-profit or not-for-profit Debtor entities or whether the respective entity's ultimate parent is a not-for-profit entity.

      i. <u>Principal Purpose of the Plan</u>

40.    The principal purpose of the Plan is not for the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

41.    This Declaration may be amended or supplemented prior to or at the confirmation hearing as necessary.

Dated: March 7, 2025

*/s/ Shamiq Syed*
By: Shamiq Syed
Chief Financial Officer
CarePoint Health Systems, Inc. *et al.*