# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| CarePoint Health Systems Inc. d/b/a Just Health Foundation, *et al.*,[1] | Case No. 24-12534 (JKS) |
| Debtors. | (Jointly Administered) |

## PLAN PROPONENTS' MEMORANDUM OF LAW (I) IN SUPPORT OF CONFIRMATION OF FIFTH AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF REORGANIZATION; AND (II) IN RESPONSE TO CONFIRMATION OBJECTIONS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); and (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

FACTS ...................................................................................................................5

THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER
SECTION 1129 OF THE BANKRUPTCY CODE...................................................5

I.     Section 1129(a)(1): The Plan Complies with Applicable
Bankruptcy Code Provisions.................................................................6

       A.     The Plan Satisfies the Classification Requirements of
Bankruptcy Code Section 1122 .................................................6

       B.     The Plan Complies with Bankruptcy Code Section 1123(a) ...........9

       C.     The Plan Complies with Bankruptcy Code Section 1123(b).........14

       D.     Bankruptcy Code Section 1123(c) is Inapplicable........................22

       E.     The Plan Complies with Bankruptcy Code Section 1123(d).........22

II.     Section 1129(a)(2): The Plan Proponents Have Complied with the
Applicable Provisions of the Bankruptcy Code.........................................23

III.     Section 1129(a)(3): The Plan Has Been Proposed in Good Faith
and Not by Any Means Forbidden by Law................................................24

IV.     Section 1129(a)(4): The Plan Provides that Professional Fees and
Expenses Are Subject to Court Approval ..................................................26

V.     Section 1129(a)(5): The Plan Proponents Have Disclosed All
Necessary Information Regarding Directors, Officers, and Insiders.........26

VI.     Section 1129(a)(6): The Plan Does Not Contain Any Rate Changes
Subject to the Jurisdiction of Any Governmental Regulatory
Commission .............................................................................................28

VII.     Section 1129(a)(7): The Plan Is in the Best Interest of Creditors..............28

VIII.     Section 1129(a)(8): The Plan Can Be Confirmed Notwithstanding
the Requirements of Bankruptcy Code Section 1129(a)(8)......................32

IX.     Section 1129(a)(9): The Plan Provides for Payment in Full of All
Allowed Administrative Expense Claims, Professional Fee Claims
and Priority Tax Claims............................................................................33

X.     Section 1129(a)(10): At Least One Class of Impaired Claims Has
Accepted the Plan ...................................................................................34

XI.     Section 1129(a)(11): Feasibility ...............................................................35

XII.     Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid........37

XIII.     Sections 1129(a)(13) Through 1129(a)(15) Do Not Apply to the
Plan .........................................................................................................37

XIV.   Transfers of Property Made in Accordance with Non-Bankruptcy Law (§ 1129(a)(16)).......................................................................37

XV.   The Plan Satisfies Bankruptcy Code Section 1129(b)'s "Cram Down" Requirements...............................................................37

      A.   The Plan Does Not Unfairly Discriminate....................................38

      B.   The Plan Is Fair and Equitable......................................................40

XVI.   The Requirements of Sections 1129(c), (d), and (e) of the Bankruptcy Code are Satisfied or Inapplicable ..........................................43

RESPONSES TO PLAN OBJECTIONS..................................................................44

I.   Limited Substantive Consolidation is Appropriate....................................44

      A.   The Proposed Limited Substantive Consolidation is an Integral Component of an Arms'-Length, Multi-Party, Mediated Settlement that Enables the Continuation of Critical Acute Healthcare Services for the Benefit of the Hudson County Community and Maximizes Creditor Recoveries.......................................................................................46

      B.   The Debtors Disregarded Corporate Separateness, Held Themselves Out to the Public as an Integrated, Consolidated Enterprise Under the Name and Brand "CarePoint Health", and Creditors Dealt with the Debtors as a Single Enterprise.....................................................................47

      C.   There is No Funding Available for the Debtors to Unscramble Their Assets and Liabilities or Confirm and Administer Separate Plans. .........................................................52

      D.   Limited Substantive Consolidation is in the Best Interest of All Creditors and Prejudices No One............................................54

II.   The Other Plan Objections Should be Overruled. ....................................55

THE PLAN MODIFICATIONS DO NOT REQUIRE RE-SOLICITATION ..............................55

CONCLUSION...........................................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 11,111, Inc.*,
    117 B.R. 471 (Bankr. D. Minn. 1990) ....................................................................35

*In re Abeinsa Holding, Inc.*,
    562 B.R. 265 (Bankr. D. Del. 2016) ........................................................................8

*In re ADPT DFW Holdings, LLC*,
    574 B.R. 87 (Bankr. N.D. Tex. 2017)...............................................................39, 45

*In re Armstrong World Indus., Inc.*,
    348 B.R. 136 (Bankr. D. Del. 2006) ........................................................................7

*In re Armstrong World Indus., Inc.*,
    432 F.3d 507 (3d Cir. 2005)...................................................................................33

*In re Barney & Carey Co.*,
    170 B.R. 17 (Bankr. D. Mass. 1994) ......................................................................33

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990) ......................................................................34

*In re Chateaugay Corp.*,
    177 B.R. 176 (S.D.N.Y. 1995)..................................................................................7

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
    280 F.3d 648 (6th Cir. 2002) ...................................................................................7

*In re Coastal Broad. Sys.*,
    570 Fed. App'x 188 (3d Cir. 2014).........................................................................7

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ........................................................................7

*In re Deep River Warehouse, Inc.*,
    No. 04-52749, 2005 WL 2319201 (Bankr. M.D.N.C. Sept. 22, 2005)....................7

*In re Drexel Burnham Lambert Grp.*,
    960 F.2d 285 (2d Cir. 1992)...................................................................................20

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...............................................................46, 48

i

*In re Dura Auto. Sys., Inc.*,
    379 B.R. 257 (Bankr. D. Del. 2007) ....................................................33

*In re G–1 Holdings Inc.*,
    420 B.R. 216 (D.N.J. 2009) ..............................................................31

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ....................................................34

*In re Havre Aerie #166 Eagles*,
    2013 Bankr. LEXIS 1200 (Bankr. D. Mon. 2013)...................................36

*In re Hercules Offshore, Inc.*,
    565 B.R. 732 (Bankr. D. Del. 2016) ....................................................17

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ...............................................16, 19

*In re Jersey City Medical Center*,
    817 F.2d 1055 (3d Cir. 1987)...........................................................7, 8

*John Hancock Hut Life Ins. Co. v. Route 37 Business Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)................................................................7

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd* in part, *rev'd* in part on other
    grounds, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *In re Johns-Manville Corp.*, 843
    F.2d 636 (2d Cir. 1988)...................................................................34

*In re LeBlanc*,
    622 F.2d 872 C.B.C. 436 (5th Cir. 1980) ............................................35

*In re Lernout & Hauspie Speech Prods., N. V.*,
    301 B.R. 651 (D. Del. 2003).........................................................33, 34

*Lisanti Foods, Inc. v. Lubetkin (In re Lisanti Foods, Inc.)*,
    329 B.R. 491 (D.N.J. 2005) ..............................................................23

*In re Long Ridge Road Operating Company, II, LLC*,
    No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ................17

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994).................................................16

*In re NH Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) ....................................................22

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) ................................................................6, 7

*In re Owens Corning*,
   419 F.3d 195 (3d Cir. 2005)...................................................................37, 38

*In re PPI Enters. (U.S.), Inc.*,
   228 B.R. 339 (Bankr. D. Del. 1998) .................................................................22

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968)..................................................................................16

*In re Prussia Assocs.*,
   322 B.R. 572 (Bankr. E.D. Pa. 2005) ...............................................................31

*In re PTL Holdings LLC*,
   No. 11-12676 (BLS), 2011 Bankr. LEXIS 4436 (Bankr. D. Del. Nov. 10,
   2011) ................................................................................................19

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)...................................................................19, 21

*In re Resorts Int'l, Inc.*,
   145 B.R. 412 (Bankr. D.N.J. 1990) ................................................................23

*In re Rubicon U.S. REIT, Inc.*,
   434 B.R. 168 (Bankr. D. Del. 2010) ...............................................................34

*In re S B Bldg. Assocs. Ltd. P'ship*,
   621 B.R. 330 (Bankr. D.N.J. 2020) ................................................................16

*In re Sea Garden Motel & Apartments*,
   195 B.R. 294 (D.N.J. 1996) ......................................................................31

*Sec. Farms v. Gen. Teamsters (In re Gen. Teamsters)*,
   265 F.3d 869 (9th Cir. 2001) .....................................................................36

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
   872 F.2d 36 (3d Cir. 1989)........................................................................14

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) ...............................................................16

*Su v. Offshore Grp. Invest. Ltd. (In re Vantage Drilling Int'l)*,
   603 B.R. 538 (D. Del. 2019)......................................................................17

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ................................................................16

*In re Tribune Co.*,
  464 B.R 126 (Bankr. D. Del. 2011). ...................................................................19, 31

*In re Tribune Co.*,
  476 B.R. 843 (Bankr. D. Del. 2012) ..........................................................................7

*In re Tribune Co.*,
  972 F.3d 228 (3d Cir. 2020).............................................................................34, 35

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013).......................................................................................7

*In re Wabash Valley Power Ass'n*,
  72 F.3d 1305 (7th Cir. 1996) ...................................................................................36

*In re Walker*,
  165 B.R. 994 (E.D. Va. 1994).................................................................................31

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ...........................................................16, 17, 19

*In re WebSci Technologies, Inc.*,
  234 Fed. Appx. 26 (3d Cir.2007)..............................................................................16

*In re Whittaker Memorial Hosp. Ass'n*,
  149 B.R. 812 (Bankr. E.D. Pa. 1993) ......................................................................36

*In re Woodbridge Grp. Cos., LLC*,
  592 B.R. 761 (Bankr. D. Del. 2018).........................................................................46

*In re WorldCom, Inc.*
  2003 Bankr. LEXIS 1401 (S.D.N.Y. 2003)...............................................................46

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ....................................................................16, 17

**Statutes**

11 U.S.C. § 1122(a) .......................................................................................................7

11 U.S.C. § 1123(b)(3)(B) ............................................................................................15

11 U.S.C. § 1129(a) ..................................................................................................6, 33

11 U.S.C. § 1129(a)(7)(A)(ii) ......................................................................................25

11 U.S.C. § 1129(a)(13)................................................................................................32

11 U.S.C. § 1129(a)(14)................................................................................................32

iv

11 U.S.C. § 1129(a)(15)............................................................................................32

11 U.S.C. § 1129(b)(1) ...........................................................................................33

11 U.S.C. § 1129(b)(2)(A)-(C) ..............................................................................36

28 U.S.C. § 1930....................................................................................................32

12961575

The Debtors and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the "Plan Proponents") submit this Memorandum of Law (the "Memorandum") in support of confirmation of the *Fifth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (including all exhibits thereto and as amended, supplemented, or otherwise modified, from time to time, the "Combined Disclosure Statement and Plan" or the "Plan",[2] and the disclosures contained therein, the "Disclosure Statement"). In further support of confirmation of the Plan, the Plan Proponents rely on the *Declaration of Shamiq Syed in Support of the Plan's Limited Proposed Substantive Consolidation* [Docket No. 730-8] (the "Declaration in Support of Substantive Consolidation"), filed as part of the Plan Supplement, the *Declaration of Shamiq Syed in Support of Confirmation of the Fifth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (the "Confirmation Declaration"), the *Declaration of the Honorable Kevin Gross (Ret.) in Support of the Proposed Plan* (the "Declaration of Judge Gross (Ret.)"), the *Declaration of Debbie White, RN in Support of the Proposed Plan* (the "Committee Declaration"), and the *Declaration of Emily Young of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on the Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (the "Voting Declaration") (collectively, the "Supporting Declarations"), filed substantially contemporaneously herewith:

## PRELIMINARY STATEMENT

1.      The Plan represents the culmination of the Plan Proponents' around-the-clock efforts and extensive negotiations with diverse constituencies – including multi-day mediation proceedings before the Honorable Michael B. Kaplan, Chief Judge of the United States Bankruptcy Court for the District of New Jersey – to consummate a value-maximizing restructuring that keeps three (3) critical healthcare facilities operational for the benefit of the residents of Hudson County.

---

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

2.      The Plan provides for: (a) the satisfaction of all Allowed Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and Priority Non-Tax Claims consistent with section 1129 of the Bankruptcy Code; (b) an estimated 100% recovery to Holders of HRH Claims, Capitala Claims and Other Secured Claims; (c) the payment of all of the Debtors' outstanding withholding tax obligations; (d) a projected distribution to holders of unsecured Allowed Claims in Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims) and Class 9 (Prior Owner Claims) (who otherwise would likely receive no recovery, as explained below); and (e) the Debtors' emergence from bankruptcy in an expedited fashion.

3.      Absent the mediated resolutions set forth in the Plan, unsecured creditors would likely receive *no recovery* in these Chapter 11 Cases because all distributable value would go towards repaying the secured claims of HRH and Capitala, and other secured claims, to the extent allowed. Under the Plan, in contrast: (a) the secured debt of Capitala and the tens of millions of dollars in debtor-in-possession financing provided by HRH will be deferred and "rolled" into new exit financing facilities (critically which will *not* be paid from Estate assets); and (b) HRH has agreed to provide $3,500,000 (the "Litigation Trust Seed Money") to the Litigation Trust to investigate, prosecute and monetize the Litigation Claims, the proceeds of which will be used to fund recoveries for Holders of Allowed Claims in Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims), and Class 9 (Prior Owner Claims).[3]

4.      Following entry of the Order approving the Disclosure Statement on an interim basis [Docket No. 555] (the "Solicitation Procedures Order"), the Plan Proponents solicited votes on the Plan from all Creditors entitled to vote. The deadline to vote has passed and, as evidenced by the Voting Declaration and discussed herein, the Plan received requisite creditor support for confirmation. The following table summarizes the voting results as set forth in the Voting Declaration:

---

[3]      The Plan has been amended to provide that Allowed Claims in Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims), and Class 9 (Prior Owner Claims) are all entitled to receive the same *pro rata* distributions from the Litigation Trust.

2

| VOTING CLASS | TOTAL BALLOTS COUNTED | | | | Class Voting Result |
| | ACCEPT | | REJECT | | |
| | AMOUNT | NUMBER | AMOUNT | NUMBER | |
|---|---|---|---|---|---|
| **Class 1** HRH Claims | 100% ($110,300,000.00) | 100% (1) | 0% ($0.00) | 0% ($0.00) | Accept |
| **Class 2** Capitala Claims | 100% ($19,710,808.62) | 100% (6) | 0% ($0.00) | 0% ($0.00) | Accept |
| **Class 3** Capital Specialty Lending Claims | 100% ($35,805,850.01) | 100% (5) | 0% ($0.00) | 0% ($0.00) | Accept |
| **Class 4** Maple Secured Claims | 0% ($0) | 0% ($0) | 100% ($48,258,139.00) | 100% (1) | Reject |
| **Class 5** Maple Unsecured Claims | 0% ($0) | 0% ($0) | 100% ($14,902,959.00) | 100% (1) | Reject |
| **Class 7** General Unsecured Claims | 80.91% ($85,646,679.10) | 89.41% (152) | 19.09% ($20,209,934.93)[4] | 10.59% (18) | Accept |
| **Class 8** Insured Claims | 100% ($2.00) | 100% (1) | 0% ($0.00) | 0% ($0.00) | Accept |
| **Class 9** Prior Owner Claims | 0% ($0) | 0% ($0) | 100% ($39,404,955.60) | 100% (8) | Reject |
| **Class 13** NJDOH Secured Claims | 100% ($10,625,000.00) | 100% (1) | 0% ($0.00) | 0% ($0.00) | Accept |
| **Class 14** Strategic Ventures Secured Claims | 0% ($0) | 0% ($0) | 100% ($10,000,000.00) | 100% (1) | Reject |

---

[4] Of the $20,209,934.93 aggregate amount of rejecting Class 7 votes, Captive Assurance's rejecting vote represents nearly 95% ($19,129,810.80).

12961575

5.      As the foregoing demonstrates, the Plan has nearly universal support from *all* creditor constituencies – with the notable exception of the Prior Owners and their affiliated entities (*i.e.*, Maple, Captive Assurance and Strategic Ventures), who oppose confirmation of the Plan – notwithstanding their stated concern that the Debtors must "continue serving their communities" and "provide critical care for patients" – even though their objections, if granted, would likely result in (a) conversion and the shuttering of the hospitals; and (b) *all* unsecured creditors (including the Prior Owners and their affiliated entities) receiving no recoveries. The Plan Proponents respectfully submit that the Prior Owners' parochial interests should not supplant the interests of the Debtors' patients, employees, business partners, creditors and the communities they serve who all stand to benefit if the Plan is confirmed and the Debtors' swiftly emerge from bankruptcy.

6.      Also reflective of the broad support for the Plan is the fact that, in cases of this magnitude, scope and complexity, approximately twenty-two parties filed plan objections (many of which are highly limited objections or reservations of rights):[5]

| | |
|---|---|
| 750 Park LLC, CH Castle LLC, J.C. Opco, LLC and SB Hoboken Propco, LLC [Docket No. 769] | Resolute Perioperative Services, LLC [Docket No. 776] |
| Health Professionals and Allied Employees [Docket No. 777] | District 1199J NUHHCE FSCME AFL-CIO [Docket No. 778] |
| Sodexo Operations, LLC [Docket No. 779] | 750 Park LLC, CH Castle LLC, J.C. Opco, LLC and SB Hoboken Propco [Docket No. 780] |
| Access Information Management Corporation [Docket No. 782] | Med One Capital Funding, LLC and Mazuma Capital Corp. [Docket No. 784] |
| VRC Companies, LLC [Docket No. 785] | Horizon Health Care Services, Inc. and Affiliates [Docket No. 787] |
| JNESO, District Council 1 IUOE AFL-CIO [Docket No. 788] | United States Trustee [Docket No. 795] |
| Saint Peter's University Hospital [Docket No. 804] | Strategic Ventures LLC ("Strategic Ventures") [Docket No. 806] (the "Strategic Ventures Objection") |
| Cure Objection to Schedule of Assumed Executory Contracts and Unexpired Leases [Docket No. 818] | Maple Healthcare, LLC ("Maple") [Docket No. 819] (the "Maple Objection") |

---

[5]      Cure objections, to the extent not resolved will not go forward at the confirmation hearing and will be scheduled for separate hearings.

12961575

| Committee of Interns and Residents, SEIU [Docket No. 821] | CarePoint Health Captive Assurance Company, LLC ("Captive Assurance") [Docket No. 822] (the "Captive Objection") |
|---|---|
| James P. Lawler, JPL Healthcare Consulting LLC, Oak Management, LLC, Heights Healthcare Services LLC, and Willow Healthcare Services, LLC (the "Lawler Entities") [Docket No. 823] (the "Lawler Objection") | Freehold Trust, Benego Ventures, LLC, Briar Hills Ventures, LLC, Pheasant Run Ventures, LLC and Vivek Garipalli (the "Freehold Entities") [Docket No. 824] (the "Freehold Objection") |
| Dr. Vijayant Singh, in his Capacity as Relator [Docket Nos. 834 and 836] | County of Hudson [Docket No. 836] |

7.     The Plan Proponents' responses to the foregoing objections are set forth herein and in **Exhibit A** attached hereto. As explained herein, none of the issues raised in these objections are legitimate impediments to confirmation of the Plan.

8.     As evidenced by the Liquidation Analysis, the Supporting Declarations, and the discussion in the Disclosure Statement, the Plan meets all of the statutory requirements for confirmation contained in the Bankruptcy Code.  Further, the Plan represents the best possible outcome under the circumstances of these Chapter 11 Cases for all parties in interest, the communities served by the Debtors' operations as well as the continuity of healthcare for the residents of Hudson County.

9.     For all these reasons, and those set forth below and in the Supporting Declarations, the Plan Proponents respectfully submit that the Plan should be confirmed.

## FACTS

10.     Pertinent facts relating to these Chapter 11 Cases and the Plan are set forth in the Combined Disclosure Statement and Plan, the Plan Supplement, and the Supporting Declarations, which are incorporated herein by reference.

## THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE

11.     "For the court to confirm a plan, the plan proponents must establish by a preponderance of the evidence that the plan satisfies each of the requirements of 11 U.S.C. §

5

1129(a)."[6] Through this Memorandum, the record of these Chapter 11 Cases, the Supporting Declarations, and any additional evidence that may be presented at the Confirmation Hearing, the Plan Proponents will demonstrate, by a preponderance of the evidence, that all applicable subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan. Accordingly, the Court should confirm the Plan.

## I.    Section 1129(a)(1): The Plan Complies with Applicable Bankruptcy Code Provisions

12.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) indicates that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing the classification of claims and contents of a Chapter 11 plan, respectively.[7] As demonstrated below, the Plan complies with the requirements of sections 1122 and 1123, and all other applicable provisions of the Bankruptcy Code.

### A.    The Plan Satisfies the Classification Requirements of Bankruptcy Code Section 1122

13.    Section 1122 provides that the claims or interests within a given class must be "substantially similar." 11 U.S.C. § 1122(a). Section 1122, however, does not require that all substantially similar claims or equity interests be classified together.[8] Instead, the case law is

---

[6]    *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) (citing *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006), and *In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 158 (Bankr. D. Del. 2008)).

[7]    H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963; *see also Nutritional Sourcing*, 398 B.R. at 824.

[8]    *See In re Jersey City Medical Center*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) ("The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes . . . Accordingly, we agree with the general view which permits the grouping of similar claims in different classes."); *In re Tribune Co.*, 476 B.R. 843, 854-55 (Bankr. D. Del. 2012) ("Section 1122(a) is mandatory in one respect: only substantially similar claims may be classified together. Yet, Section 1122(a) is permissive is this respect: it does not provide that all similar claims must be placed in the same class"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004) ("Section 1122 of the Code provides that claims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes. In fact, the Third Circuit has approved separate classification of unsecured claims.") (citation omitted); *accord Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 661 (6th Cir. 2002) ("Section 1122(a) does not demand that all similar claims

6

clear that similar claims – which courts have interpreted "as a reflection of the legal attributes of the claims"[9] – may be classified separately, provided there is a reasonable basis for the separate classification.[10] Courts are afforded broad discretion in approving a plan proponent's classification structure considering the specific facts of each case.[11]

14.    Here, the Plan designates the following fourteen Classes: Class 1 (HRH Claims), Class 2 (Capitala Claims), Class 3 (Capitala Specialty Lending Claims), Class 4 (Maple Secured Claims),  Class 5 (Maple Unsecured Claims), Class 6 (Other Secured Claims), Class 7 (General Unsecured Claims), Class 8 (Insured Claims), Class 9 (Prior Owner Claims), Class 10 (Intercompany Claims), Class 11 (Bayonne Interests), Class 12 (Other Interests), Class 13 (NJDOH Secured Claims), and Class 14 (Strategic Ventures Secured Claims). *See* Plan Art. V.A. Classes 1–10 and 13–14 constitute Classes of Claims and Classes 11–12 constitute Classes of Interests. *Id.*

15.    The Plan's classification structure complies with section 1122 because each Class of Claims or Interests contains only Claims or Interests that are substantially similar in nature and priority to the other Claims or Interests within such Class and dissimilar Claims or Interests

---

be in the same class. To the contrary, the bankruptcy court has substantial discretion to place similar claims in different classes.") (citation omitted).

[9]    *In re Tribune Co.*, 476 B.R. at 855 (internal quotation marks omitted), cited with approval, *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013).

[10]    *See, e.g.*, *In re Coastal Broad. Sys.*, 570 Fed. App'x 188, 193 (3d Cir. 2014) ("Although not explicit in § 1122, a corollary to that rule is that the 'grouping of similar claims in different classes' is permitted so long as the classification is 'reasonable'"); *John Hancock Hut Life Ins. Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 158-59 (3d Cir. 1993) (separate classification of similar claims is permissible where the classification scheme is reasonable); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159-60 (Bankr. D. Del. 2006) (separate classification is permissible when a reasonable basis exists for the classification structure); *In re Tribune Co.*, 476 B.R. at 856-57 (separate classification appropriate where reasonable); *In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 2319201, at *6 (Bankr. M.D.N.C. Sept. 22, 2005) (separate classification of similar claims is permissible where "a legitimate (*i.e.*, non-manipulative) business reason exists to justify the separate classification of claims"); *In re Chateaugay Corp.*, 177 B.R. 176, 186-87 (S.D.N.Y. 1995) (concluding separate classification of similar claims was appropriate where a business reason justified the classification scheme).

[11]    *See, e.g.*, *In re Jersey City Med. Cfr.*, 817 F.2d at 1060-61 (observing that "Congress intended to afford bankruptcy judges broad discretion [under section 1122] to decide the propriety of plans in light of the facts of each case").

12961575

have not been placed in the same Class. In addition, valid business, legal and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan.[12] *See* Confirmation Declaration ¶ 28; *see also* Declaration of Judge Gross (Ret.) ¶ 12. For instance, secured claims, unsecured claims and interests have been separately classified because such claims and interests are entitled to a different priority under the Bankruptcy Code. Likewise, the different classes of secured claims, unsecured claims and interests have been separately classified as a reflection of their unique legal rights and factual circumstances.[13] For example, (1) HRH Claims, Capitala Claims, Capitala Specialty Lending Claim, Maple Secured Claims, Other Secured Claims NJDOH Secured Claims and Strategic Ventures Secured Claims have been separately classified based on their different collateral packages and respective priorities; (2) Maple Unsecured Claims, General Unsecured Claims and Prior Owner Claims have been separately classified based on, among other things, (a) whether a particular Claim Holder (i) has an ongoing business relationship with the Debtors or provides goods and services necessary for the Debtors' continued operations,[14] and (ii) is a former insider of the Debtors,[15] and (b) whether a particular Claim may be a subordinated claim;[16] and (3) different classes of

---

[12]    *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 274 (Bankr. D. Del. 2016) ("The Debtors' classification scheme is neither arbitrary nor fraudulent. It is reasonable for the Debtors to place claims related to significant, on-going litigation in a separate class").

[13]    *Id* at 274-75 (classification scheme appropriate when there were reasonable differences between the classes).

[14]    *See, e.g., In re Coram Healthcare Corp.*, 315 B.R. 321, 350-51 (Bankr. D. Del. 2004) (unsecured noteholders "represent a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case"); *In re Tribune Co.*, 476 B.R. at 857 (reasonable to separately classify senior noteholders from other parent claims and for such classes to have "a separate voice"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (D. Del. 2006) (reasonable to separately classify personal injury claims and general unsecured claims despite equal priority status); *In re Jersey City Medical Center*, 817 F.2d 1055 (3d Cir. 1987) (approving classification scheme that created three (3) impaired classes of unsecured claims); *see also generally* COLLIER ON BANKRUPTCY ¶ 1122.03[1] (16ᵗʰ ed.) ("Since Congress intended that the proponent of a plan have the flexibility to separately classify certain general unsecured claims . . . the argument that all claims of the same legal nature must be included within one class is not persuasive.")

[15]    *See In re 11,111, Inc.*, 117 B.R. 471 (D. Minn. 1990) (approving as reasonably separate classification of claims of corporate insiders from those of other general unsecured claims); *In re LeBlanc*, 622 F.2d 872, 879, 23 C.B.C. 436 (5th Cir. 1980) (upholding plan which separately classified unsecured trade claims and unsecured insider claims).

interests are separately classified based on whether such interests are in for-profit or not-for-profit Debtor entities. *See* Confirmation Declaration ¶ 29; *see also* Declaration of Judge Gross (Ret.) ¶ 12. These are reasonable and appropriate classes under the Plan, none of which was established with the intent to create an impaired accepting class. *See* Confirmation Declaration ¶ 30.

16.     The Freehold Entities, the Lawler Entities and Maple argue that Class 9 (Prior Owner Claims) and Class 5 (Maple Unsecured Claims) are separately classified from Class 7 (General Unsecured Claims) in an improper attempt to "gerrymander" an impaired accepting Class. *See* Lawler Objection, ¶ 15; Freehold Objection ¶ 24; Maple Objection ¶ 3. This argument lacks merit because (a) the claims of Maple and the Former Owners were classified separately because such claims generally arose when such parties were in control of the Debtors and are materially different in nature than ordinary non-insider trade creditors; *see* Declaration of Judge Gross (Ret.) ¶12; and (b) the Plan has five (5) impaired accepting (non-insider) classes (and would have four (4) impaired accepting classes *even if* all unsecured claims were classified together and that class voted against the Plan). *See* Voting Declaration. Moreover, the Plan has been amended to now provide that to the extent Allowed, all Class 9 and Class 5 Claims are entitled to the same treatment as Class 7 Claims. *See* Plan Art. V.B.

17.     Accordingly, the classification of Claims and Interests under the Plan satisfies Bankruptcy Code section 1122.

**B.    The Plan Complies with Bankruptcy Code Section 1123(a)**

18.     Section 1123(a) sets forth eight requirements for the contents of a Chapter 11 plan. 11 U.S.C. § 1123(a). As shown below, the Plan complies with each of these requirements, to the extent applicable.

**(a)     Section 1123(a)(1): Designation of Classes of Claims and Interests**

---

[16]     *In re LightSquared Inc.*, 513 B.R. 56, 84 (Bankr. S.D.N.Y. 2014) ("a claim reflects more than a dollar amount on a proof of claim; it reflects a bundle of rights and remedies that are wielded by the holder of the claim. Accordingly, both the nature and the identity of the claimant may be relevant in the context of separate classification.").

19.     Section 1123(a)(1) requires that a Chapter 11 plan designate classes of claims and interests, subject to section 1122 of the Bankruptcy Code. As discussed above, in addition to Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and Priority Non-Tax Claims, the Plan designates twelve Classes of Claims and two Classes of Interests, subject to section 1122 of the Bankruptcy Code. *See* Plan Art. V.A. Thus, the Plan satisfies the requirement of Bankruptcy Code section 1123(a)(1).

### (b)     Section 1123(a)(2): Classes that Are Not Impaired by the Plan

20.     Section 1123(a)(2) requires that a Chapter 11 plan specify which classes of claims or interests are unimpaired under such plan. The Plan specifies that Class 6 (Other Secured Claims) and Class 12 (Other Interests) are Unimpaired under the Plan. *See* Plan Art. V.A. Thus, the Plan satisfies the requirement of Bankruptcy Code section 1123(a)(2).

### (c)     Section 1123(a)(3): Treatment of Classes Impaired by the Plan

21.     Section 1123(a)(3) requires that a Chapter 11 plan specify how the classes of claims or interests that are impaired under such plan will be treated. The Plan designates Class 1 (HRH Claims), Class 2 (Capitala Claims), Class 3 (Capitala Specialty Lending Claims), Class 4 (Maple Secured Claims),  Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims), Class 8 (Insured Claims), Class 9 (Prior Owner Claims), Class 10 (Intercompany Claims), Class 11 (Bayonne Interests), Class 13 (NJDOH Secured Claims), and Class 14 (Strategic Ventures Secured Claims) as Impaired and specifies the treatment of Claims and Interests in such Classes. *See* Plan Art. V.A. Thus, the Plan satisfies the requirement of Bankruptcy Code section 1123(a)(3).

### (d)     Section 1123(a)(4): Equal Treatment Within Each Class

22.     Section 1123(a)(4) requires that a Chapter 11 plan provide the same treatment for each claim or interest within a particular class unless the holder of a claim or interest agrees to receive less favorable treatment than other class members. Pursuant to the Plan, the treatment of each Claim against or Interest in the Debtors, in each respective Class, is the same as the treatment of each other Claim or Interest in such Class, unless a particular Holder has agreed to

10

receive less favorable treatment than other members in such Class. *See* Plan Art. V.B.1-14. Thus, the Plan satisfies the requirement of section 1123(a)(4) of the Bankruptcy Code.

23.     The Freehold Entities and Maple argue that the Plan violates Section 1123(a)(4) of the Bankruptcy Code because the Class 9 (Prior Owner Claims) and Class 5 (Maple Unsecured Claims) are, by their legal nature, General Unsecured Claims, that should be included in, and treated the same as, Class 7 and, therefore, the disparate treatment of such claims is in violation of section 1123(a)(4). *See* Freehold Objection ¶ 26; Maple Objection ¶ 4.2. Maple also argues that the proposed treatment of Class 4 (Maple Secured Claims) violates Section 1123(a)(4) of the Bankruptcy Code. These objections should be overruled because (a) to the extent Allowed, all Class 9 and Class 5 Claims are now entitled to the same treatment as Class 7 Claims; *see* Plan Art. V.B; (b) Class 4 (Maple Secured Claims) are treated in accordance with section 1129(b)(2); and (c) section 1123(a)(4) only prohibits different treatment of claims or interests *within a particular class. See* 11 U.S.C. § 1123(a)(4).

### (e)     Section 1123(a)(5): Adequate Means for Implementation

24.     Section 1123(a)(5) of the Bankruptcy Code requires that a Chapter 11 plan provide "adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5). Article IX of the Plan describes the means for implementation of the Plan through, among other things (a) the deemed limited substantive consolidation of the Debtors solely for purposes of voting and distribution; (b) the consummation of the HRH Transactions; (c) the vesting of all property of the Debtors' estates (other than the Litigation Trust Assets) in the Reorganized Debtors; (d) the continuation of operations at the Debtors' healthcare facilities; (e) the establishment of the Litigation Trust and the vesting of the Litigation Trust Assets, including the Litigation Trust Seed Money, in the Litigation Trust; (f) the appointment of the Litigation Trustee and the Litigation Trust Oversight Committee; (g) the evaluation by the Debtors' independent Reorganization Committee of potential D&O Claims against the Debtors' Current D&Os based upon information provided by all interested parties, including the Committee, the Litigation Trustee, and management; and (h) the making of Distributions to Creditors in accordance with

11

the Plan. *See* Plan Art. IX. Thus, the Plan satisfies the requirement of section 1123(a)(5) of the Bankruptcy Code.

> **(f)        Section 1123(a)(6): Prohibitions on Issuance of Non-Voting Securities**

25.        The Plan does not provide for the issuance of any non-voting equity securities of any corporation or the Reorganized Debtors. Thus, to the extent applicable, section 1123(a)(6) of the Bankruptcy Code is satisfied.

> **(g)        Section 1123(a)(7): Provisions Regarding Directors and Officers**

26.        Section 1123(a)(7) requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7).

27.        Here, Article IX.I of the Plan provides that the Board that existed pre-petition is expected to continue after the Effective Date, subject to expiry of terms/appointments and re-elections. During the Chapter 11 Cases, the Board added three new directors and appointed those new directors to the Reorganization Committee, which oversees the Debtors' reorganization efforts. These new directors are expected to be phased out after the Reorganization Committee issues the D&O Report and disputes, if any, regarding the D&O Report are consensually resolved or decided by the Court in accordance with the Plan. Other than the phase out of the new directors, there is no change in the Board anticipated, subject to expiry of terms/appointments and re-elections. On the Effective Date, it is anticipated that Yan Moshe, the principal of HRH, will become Chairman of the Board.

28.        Additionally, pursuant to Article IX.I.2 of the Plan, the current CEO of the Debtors, Dr. Moulick, will remain the CEO of the Reorganized Debtors, until the newly-formed MSO, which will be owned 50%-50% by CarePoint and HRH, is formed. Once implemented after the bankruptcy, Dr. Moulick will resign as the CEO of the Reorganized Debtors and be employed by the MSO at his existing salary of $1.75 million per year. Dr. Nizar Kifaieh will

become the CEO of the Reorganized Debtors. Shamiq Syed will remain the CFO of the Reorganized Debtors at his existing salary.

29.     In addition, the identities of the Litigation Trustee and the members of the Litigation Trust Oversight Committee have been disclosed as part of the Plan Supplement. The initial Litigation Trustee was selected by the Committee, in consultation with the Debtors and HRH and subject to HRH's approval, with compensation terms disclosed in the Plan Supplement. Any successor Litigation Trustee will be appointed pursuant to the Litigation Trust Agreement. The five members of the Litigation Trust Oversight Committee were selected by the Committee, and HRH is serving as an *ex-officio* member, with their expense reimbursement rights disclosed in the Plan Supplement. Any successor member of the Litigation Trust Oversight Committee will be appointed pursuant to the Litigation Trust Agreement.

30.     Captive Assurance argues the Plan violates section 1123(a)(7) because "the Committee itself was not involved in the selection of the Litigation Trustee or the Litigation Trust Oversight Committee." Captive Objection ¶ 83.  Captive Assurance is wrong.  To the contrary, after careful consideration and deliberation, at a duly commenced Committee meeting, where a quorum of Committee members and counsel were present, the Committee members considered, voted on, and approved the selection of the Litigation Trustee and were afforded the opportunity to serve on the Litigation Trust Oversight Committee. *See* Committee Declaration ¶¶ 7-8.

31.     The selection of the foregoing parties is consistent with the interests of Holders of Claims and Interests and public policy, including because (a) they are among the parties most familiar with the Debtors' operations, finances and prospects, as well as the facts and circumstances of these Chapter 11 Cases; (b) they are all highly-experienced and committed to the successful continued operations of the Debtors' hospitals for the benefit of the Hudson County community; and (c) they have strong interests in maximizing the value of the Debtors' estates (including diligently reviewing the validity of, and considering appropriate objections to,

claims filed in the Chapter 11 Cases, and investigating, pursuing and monetizing the Litigation Claims). *See* Confirmation Declaration ¶ 31.

32.     Accordingly, the Plan's provisions related to the selection of directors, officers, and trustees are consistent with the interests of Holders of Claims and with public policy, thus satisfying the requirement of section 1123(a)(7) of the Bankruptcy Code.

### (h)     Section 1123(a)(8): Provisions Regarding Treatment of Earnings and Future Income

33.     Section 1123(a)(8) applies to cases where the debtor is an individual and, accordingly, is inapplicable to the Debtors and the Plan.

### C.     The Plan Complies with Bankruptcy Code Section 1123(b)

34.     Section 1123(b) sets forth various permissive provisions that may be incorporated into a Chapter 11 plan. Among other things, section 1123(b) provides that a plan may (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption, rejection or assignment of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to a debtor or its estate or the retention and enforcement by the debtor or a representative of the estate appointed for such purpose, of any such claim or interest; (d) provide for the sale of all or substantially all of the property of the estate; (e) modify the rights of holders of secured claims or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and (f) include any other appropriate provision not inconsistent with the applicable provisions of Title 11.

### (a)     Impairment/Unimpairment of Claims and Interests

35.     Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." As discussed above, Claims and Interests in Classes 1—5, 7—11, and 13—14 are Impaired under the Plan and Claims and Interests in Classes 6 and 12 are Unimpaired under the Plan. Thus, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### (b)     Assumption/Rejection of Executory Contracts and Leases

36.     Section 1123(b)(2) allows a Chapter 11 plan to provide for the assumption, rejection, or assignment of executory contracts and unexpired leases. Article XII of the Plan generally provides for the rejection of all executory contracts and unexpired leases of the Debtors, subject to certain specified exceptions, including, without limitation, (a) executory contracts and unexpired leases contemplated by the HRH Transactions; (b) insurance policies; and (c) executory contracts or unexpired leases identified in the Plan Supplement as executory contracts or unexpired leases to be assumed. *See* Plan Art. XII.A.

37.     Assumption or rejection of an executory contract or unexpired lease of a debtor is generally subject to judicial review under the business judgment standard."[17] This standard is generally satisfied when a debtor determines that assumption or rejection will benefit the estate.[18] Here, the Debtors have exercised sound business judgment in identifying the executory contracts and unexpired leases to be assumed and rejected pursuant to the Plan. In particular, the Debtors have determined (a) to assume those contracts and leases that are necessary (i) for the Reorganized Debtors to carry out their duties under the Plan or beneficial to their continued operations, (ii) to consummate the HRH Transactions, and/or (iii) to maximize the value of the Debtors' estates; and (b) to reject those contract and leases that are no longer necessary and that would be a burden on the estates. *See* Confirmation Declaration ¶ 32.

38.     The treatment of executory contracts and unexpired leases under the Plan is thus consistent with section 1123(b)(2) of the Bankruptcy Code. Accordingly, the Plan Proponents respectfully request that the Court approve the assumptions, assignments and rejections in accordance with the Plan and the Plan Supplement.

(c)     **Compromises and Settlements Under and in Connection with the Plan**

39.     Section 1123(b)(3) allows a Plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate" or "the retention and enforcement

---

[17]     *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).

[18]     *See, e.g. id.*

15

by the debtor, the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."

(i) <u>Compromises and Settlements</u>

40. As permitted by section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan reflects and incorporates several settlements and compromises. The compromises and settlements pursuant to and in connection with the Plan are fair, reasonable, and in the best interests of the Debtors and their estates, *inter alia*, for the reasons detailed in the Combined Disclosure Statement and Plan.

(ii) <u>Causes of Action</u>

41. Section 1123(b)(3)(B) states that a plan may "provide for . . .  the retention and enforcement . . . by a representative of the estate appointed for such purpose, of any . . . claim or interest [belonging to the debtor or to the estate]." The Plan provides that the Litigation Trust will have the exclusive right and authority to investigate, commence, pursue and/or settle any and all Litigation Claims, subject to the terms of the Plan and the Litigation Trust Agreement. *See* Plan Art. IX.C&P. These provisions of the Plan are expressly authorized and consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

**(d) Debtor Releases, Exculpations, Limitations of Liability and Injunction**

42. As is customary, the Plan includes release, exculpation, limitation of liability and injunction provisions. *See* Plan Art. XIV.D-F. These discretionary provisions are proper because, among other things, they are necessary to bringing these Chapter 11 Cases to conclusion, securing necessary support for the Plan, are supported by the Debtors' creditors as demonstrated by the voting results, and are consistent with the Bankruptcy Code and applicable precedent.  *See* Confirmation Declaration ¶ 33.

(i) <u>Debtor Releases</u>

43. The Debtor Releases are a vital component of the Plan, a sound exercise of the Debtors' business judgment, and should be approved. The release provisions are narrowly tailored and do not include so-called "third-party" or "non-debtor" releases that would release

16

anyone from claims that could not be asserted on behalf of the Debtors or their estates. Notably, the Plan does not currently provide releases for the Debtors' Current D&Os.[19]

44.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a Chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[20] A debtor may release claims under section 1123(b)(3)(A) "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[21]

45.     Courts in this Circuit generally analyze the so-called *Zenith* or *Master Mortgage* factors when determining the propriety of a debtor release.[22] The analysis includes an inquiry into whether there is (1) identity of interest between the debtor and non-debtor; (2) contribution to the plan by the non-debtor; (3) the necessity of the release to the plan; (4) overwhelming

---

[19]     Rather, as explained in Article IX.D of the Plan, D&O Claims against the Debtors' Current D&Os shall be evaluated by the independent Reorganization Committee based upon information provided by all interested parties, including the Committee, the Litigation Trustee (which will conduct an investigation after the Effective Date to determine if any such claims exist and present the results of such investigation to the Reorganization Committee), and management. Upon the receipt of all relevant information, the Reorganization Committee shall give all such parties an opportunity to be heard to discuss whether viable claims exist and should be pursued against the Current D&Os.  To the extent any claims against the Current D&Os are pursued, such claims and proceeds thereof shall constitute Litigation Claims.

[20]     *See In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 380 (Bankr. D.N.J. 2020) (The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3)). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (citation omitted); *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."). Additionally, the Third Circuit has held that, to approve a settlement pursuant to Rule 9019, the court must balance: "'(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.'" *In re WebSci Technologies, Inc.*, 234 Fed. Appx. 26, 29 (3d Cir.2007) (quoting *In re Martin*, 91 F.3d 389, 393 (3d Cir.1996)). In addition, the court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, i.e., the parties who did not settle.").

[21]     *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

[22]     *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *see also In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).

acceptance of the plan and release by creditors and interest holders; and (5) payment of all or substantially all of the claims of the creditors and interest holders.[23] These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[24] The Debtor Releases satisfy applicable standards and should be approved.

46.     *First*, an identity of interest exists between the Debtors and the parties to be released. Each of the Released Parties, as a significant stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and each would have been highly unlikely to support the Plan without the Debtor Releases. The Debtor Releases provide needed finality, are the product of arm's length negotiations – including multi-day mediation proceedings before the Honorable Michael B. Kaplan, Chief Judge of the United States Bankruptcy Court for the District of New Jersey – and will enable the Plan Proponents to consummate the Plan; therefore, the inclusion of the Debtor Releases inures to the benefit of all of the Debtors' stakeholders.

47.     *Second*, the substantial contributions of the Released Parties are evident. As courts in this jurisdiction have recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's reorganization.[25] Each of the Released Parties played an integral role in

---

[23]     *See In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110 and *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 937).

[24]     *In re Wash. Mut., Inc.*, 442 B.R. at 346 (citing *In re Master Mortg.*, 168 B.R. at 935).

[25]     *See In re Long Ridge Road Operating Company, II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014) (non-debtor party had substantially contributed by providing financial support, without which, the plan would not be feasible); *Su v. Offshore Grp. Invest. Ltd. (In re Vantage Drilling Int'l)*, 603 B.R. 538, 548 n.5 (D. Del. 2019) ("[A] person receiving a release generally must have provided something of value in return, such as by . . . facilitating the debtor's reorganization."); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring and (b) plan sponsor funded the plan and agreed to compromise its claim); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 758–60 (Bankr. D. Del. 2016) (holding that a release of the debtors' officers, directors, and professionals was appropriate where the record reflected an "intensive and thoughtful effort by management and the Special Committee," with the advice and assistance of its hired professionals, "to respond to the market challenges" and who "chose the option that they believed would conserve the value of the [e]states and maximize recovery for all stakeholders, including equity holders.").

12961575

the formulation of the Plan and contributed to the Plan by expending significant time and resources analyzing and negotiating the terms thereof. In addition, the Plan Proponents believe that the Debtors' continued operations and proposed recoveries to creditors under the Plan would not be possible without HRH's and Capitala's financing and concessions, including, but not limited to, the DIP Financing, HRH's and Capitala's agreement to have their claims satisfied through the HRH Exit Facility and the Capitala Exit Facility such that no estate assets will be used to pay such claims, and Holders of Allowed Claims in Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims), and Class 9 (Prior Owner Claims) will be eligible to receive recoveries through the proceeds of Litigation Claims and Avoidance Actions. Without the foregoing financing and concessions (among others), the projected recoveries under the Plan with respect to Holders of Allowed Claims in Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims), and Class 9 (Prior Owner Claims) would be unavailable. *See* Declaration of Judge Gross (Ret.) ¶ 6.

48.    Moreover, because of the Debtors' inability to satisfy their obligations under their post-petition financing arrangements in accordance with the terms thereof, the Debtors would be in default of their obligations upon the maturity of those loans. *See Super Priority Senior Secured Debtor-in-Possession Credit and Security Agreement* [Docket No. 10-2]; *Debtor-in-Possession Loan and Security Agreement* [Docket No. 11-2]. Accordingly, absent HRH's willingness to defer and roll those obligations into their exit facility (and assume potential risk of nonpayment) that will be paid over time, these Chapter 11 Cases would likely have to be converted to ones under chapter 7 and the hospitals would have to shut down to the detriment of thousands of employees and creditors and hundreds of thousands of residents of Hudson County.

49.    In addition, although the Plan generally provides that HRH will have an Allowed claim in the approximate estimated amount of $110 million, the aggregate contribution of HRH to the Debtors' Chapter 11 Cases actually approximates $131 million. *See Declaration of Angela Murdock-Ridley* ¶ 17**.** Put simply, HRH has made a substantial contribution that benefited the Debtors' estates and their stakeholder and is entitled to a Debtor release.

50.     *Third*, the Debtor Releases are essential to the success of the Plan. Absent the Debtor Releases, the Released Parties would not have agreed to support the Plan, provide continued financing and the Plan would not exist at all.  The Plan Proponents submit that it would be an anomaly and unreasonable to preserve claims against HRH at the same time that HRH has and will provide funding essential to continued operations. As described above, each of the Released Parties contributed substantial value to these Chapter 11 Cases and did so with the understanding that they would receive releases from the Debtors. In the absence of the support of the Released Parties, the Plan Proponents would not be in a position to confirm the Plan, continue their operations in the ordinary course, the Debtors would not be poised to emerge from bankruptcy, the Debtors' creditors would likely receive little to no recovery on their claims, and the communities the Debtors serve would be at risk of losing the Debtors' hospitals. The Debtor Releases are therefore essential to the Plan. *See* Declaration of Judge Gross (Ret.) ¶ 8.

51.     *Fourth*, as evidenced by the Voting Declaration, the Debtor Releases have been accepted by the overwhelming majority of the Debtors creditors (including Classes 1, 2, 3, 6, 7, 8, 12 and 13).  In contrast, three parties – Captive Assurance, Maple and Strategic Ventures – oppose the Debtor Releases on the asserted grounds that: (a) HRH is providing no consideration; and (b) no evidence supports of the release because they were not adequately investigated. Neither contention has merit. The Reorganization Committee specifically considered the HRH releases as part of the Plan and concluded that such releases were warranted and appropriate because, *inter alia*: (a) "HRH is an essential DIP lender, providing millions of dollars of desperately needed capital" to the Debtors; and (b) "any claims against HRH [are] completely speculative and did not outweigh the need for immediate DIP and exit funding to keep the hospitals alive for the communities that they serve." *See* Declaration of Judge Gross (Ret.) ¶ 14.

52.     *Fifth*, the Plan provides meaningful recoveries to creditors in exchange for, among other things, the Debtors' release of certain claims. The Plan has been carefully crafted to maximize value, given the circumstances, and – as demonstrated by the Liquidation Analysis –

12961575

the estimated ranges of recoveries for creditors are materially higher under the Plan than they would have been in a Chapter 7 liquidation scenario.

53.     For the reasons set forth above, in the Confirmation Declaration and the Combined Disclosure Statement and Plan, the Debtor Releases satisfy applicable standards and should be approved.

(ii)     <u>Exculpation and Limitation of Liability</u>

54.     The exculpation and limitation of liability provision in the Plan is also appropriate and should be approved. This provision is subject to a standard carve out for acts or omissions constituting fraud, gross negligence or willful misconduct by an Exculpated Party as determined by a Final Order. *See* Art. XIV.E. Moreover, the Third Circuit Court of Appeals has recognized that a Chapter 11 plan may provide for broad exculpation of liability in favor of estate fiduciaries in connection with their implementation of a debtor's exit from bankruptcy.[26] Indeed, section 1125(e) of the Bankruptcy Code provides for the exculpation of liability for actions taken in connection with the solicitation of a plan or the making of distributions thereunder. *See* 11 U.S.C. § 1125(e). Accordingly, numerous courts in this and other districts have upheld exculpation provisions that protect parties from acts or omissions related to the debtors' restructuring efforts and/or the pursuit, confirmation, and consummation of a Chapter 11 plan.[27]

55.     The exculpation and limitation of liability provision contained in Article XIV.E of the Plan is consistent with the foregoing standards and should be approved. The Exculpated Parties have participated in good faith in formulating and negotiating the Plan, and they are entitled to protection from exposure to claims against them relating to their participation in the

---

[26]     *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (approving a plan with an exculpation provision that protected the debtors, creditor representatives, and the committee as well as their professionals and agents from liability to holders of claims or equity interest for acts or omissions in connection with, related to, or arising out of, the bankruptcy cases, the pursuit of confirmation of the plan, or any distributions to be made thereunder).

[27]     *See*, *e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (approving plan's exculpation clauses); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (same); *In re Tribune Co.*, 464 B.R. at 189 (same); *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 Bankr. LEXIS 4436, at *38 (Bankr. D. Del. Nov. 10, 2011) (same).

21

Chapter 11 Cases, consistent with section 1125(e) of the Bankruptcy Code. *See* 11 U.S.C. § 1125(e).

(iii)    <u>Injunction</u>

56.    The injunction provision contained in Article XIV.F of the Plan is limited in scope to prevent any interference by third parties with the use and distribution of the Debtors' assets in the manner contemplated by the Plan and to implement the release and exculpation and limitation of liability provisions of the Plan.  The injunction provision is a key provision of the Plan because it enforces terms that are critically important to the Plan.[28] As such, the Plan Proponents respectfully submit that the injunction provision is appropriate.

57.    In sum, the Plan Proponents submit that the discretionary provisions of the Plan are consistent with and permissible under section 1123(b) of the Bankruptcy Code.

**D.    Bankruptcy Code Section 1123(c) is Inapplicable**

58.    Section 1123(c) applies to cases where the debtor is an individual and, accordingly, is inapplicable to the Debtors and the Plan.

**E.    The Plan Complies with Bankruptcy Code Section 1123(d)**

59.    Section 1123(d) provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."

60.    The Plan complies with section 1123(d) of the Bankruptcy Code. The Plan provides for the satisfaction of monetary defaults under each executory contract and unexpired lease to be assumed under the Plan by payment of the default amount, if any. The Debtors have designated proposed Cure amounts in the *Schedule of Assumed Executory Contracts and Unexpired Leases* [*see* Docket Nos. 730-6 and 768] (the "<u>Assumption Notice</u>") for all counterparties to executory contracts and unexpired leases to be assumed as set forth in the Plan. Article XII.B of the Plan sets forth procedures for contract counterparties to follow in the event

---

[28]    *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992) (holding that a court may approve injunction provision where such provision "plays an important part in the debtor's reorganization plan.").

22

that they dispute the proposed Cure amounts. In the event of any such dispute, the Cure payments required by section 356(b)(1) of the Bankruptcy Code shall be made following either (a) the entry of a Final Order or Orders resolving the dispute and approving the assumption, or (b) the settlement of the dispute between the parties, which may be entered into without further Order of the Court; *provided, that* in connection with a dispute regarding a Cure amount, the Debtors (a) will pay the undisputed Cure amount, if any, on the Effective Date, to the counterparty to the Executory Contract or Unexpired Lease, and (b) shall place an amount equal to the disputed portion of such Cure amount in cash in a segregated account pending resolution of the applicable cure dispute.  Upon resolution of the applicable cure dispute, the Debtors shall pay any remaining amount due to the applicable counterparty.

61.     Accordingly, the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code.

62.     In light of the foregoing, and because the Plan fully complies with sections 1122 and 1123 of the Bankruptcy Code, the Plan Proponents submit that the Plan fully satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

## II.     Section 1129(a)(2): The Plan Proponents Have Complied with the Applicable Provisions of the Bankruptcy Code

63.     The proponent of a plan must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). Whereas section 1129(a)(1) of the Bankruptcy Code focuses on the form and content of a plan itself, section 1129(a)(2) is concerned with the activities of the plan proponent.[29] In determining whether the plan proponent has complied with this section, courts focus on whether the proponent has adhered to the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.[30]

---

[29]     *See* 7 Richard Levin & Henry J. Sommer, Collier on Bankruptcy ¶ 1129.02[2] (16th ed. rev. 2018).

[30]     *See*, *e.g.*, *In re PWS Holding Corp.*, 228 F.3d at 248.

64.     The Plan Proponents have complied with all disclosure and solicitation requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Procedures Order governing notice, disclosure, and solicitation in connection with the Combined Disclosure Statement and Plan. The Combined Disclosure Statement and Plan, the Ballots, the Confirmation Hearing Notice, and all other related documents were distributed to parties in accordance with the Solicitation Procedures Order and as described in the Voting Declaration. *See* Certificates of Service at Docket Nos. 651 and 652. In addition to the foregoing, the Plan Proponents also have complied with all Orders of the Court entered during the pendency of these Chapter 11 Cases. Accordingly, the requirement of section 1129(a)(2) of the Bankruptcy Code has been satisfied.

**III.     Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law**

65.     Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." Good faith is generally interpreted to mean that there exists a reasonable likelihood that the "plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[31] Good faith is to be viewed in light of the particular facts and circumstances of the case.[32]

66.     The Plan Proponents have proposed the Plan in good faith and with the goal of maximizing stakeholder recoveries and allowing the Debtors' healthcare operations to continue for the benefit of Hudson County residents (a goal consistent with the objectives and purposes of the Bankruptcy Code). *See* Confirmation Declaration ¶ 34; *see also* Declaration of Judge Gross (Ret.) ¶¶ 10, 15. The Plan is the product of extensive, arms'-length negotiations with key case constituencies – including a multi-day mediation before the Honorable Michael B. Kaplan, Chief Judge of the United States Bankruptcy Court for the District of New Jersey. *See* Confirmation

---

[31]     *Id.* at 242 (internal quotation marks and citation omitted).

[32]     *See, e.g.*, *In re NH Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002); *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998).

24

Declaration ¶ 35.

67.    In addition, the Plan has been subject to the oversight, comment, and approval of the Debtors' independent Reorganization Committee – consisting of the Honorable Judith Fitzgerald (Ret.), the Honorable Kevin Gross (Ret.), and Clifford A. Zucker. *See* Declaration of Judge Gross (Ret.) ¶¶ 4, 11.

68.    Absent the mediated resolutions set forth in the Plan, Holders of unsecured claims would likely receive *no recovery* in these Chapter 11 Cases because all distributable value would go towards repaying the secured claims of HRH and Capitala, and other secured claims, to the extent allowed. Under the Plan, in contrast: (a) the secured debt of HRH and Capitala will be "rolled" into new exit financing facilities (which will *not* be paid from Estate assets); and (b) HRH has agreed to provide the Litigation Trust Seed Money to the Litigation Trust, to investigate, prosecute and monetize the Litigation Claims, the proceeds of which will be used to fund the recoveries to Holders of Allowed Claims in Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims) and Class 9 (Prior Owner Claims). *See* Confirmation Declaration ¶ 36; *See* Declaration of Judge Gross (Ret.) ¶ 6.

69.    Certain objectors point to the proposed Debtor release of HRH as alleged evidence of a lack of good faith. But such releases were a critical component of the mediated settlement – and satisfy applicable standards (as discussed above)[33] – and without agreeing to grant such releases: (a) the Debtors would lack funding to continue operations, and (b) unsecured creditors (including Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims) and Class 9 (Prior Owner Claims) would likely receive no recoveries in these Chapter 11 Cases.  *See* Declaration of Judge Gross (Ret.) ¶¶ 6, 8.

70.    Throughout these cases, the Debtors, the Debtors' Reorganization Committee, the Debtors' senior management, the Committee, and their respective professionals, have upheld their fiduciary duties and worked tirelessly for the benefit of the Debtors' stakeholders and the

---

[33]    Notably, the U.S. Trustee has not objected to the proposed Debtor Releases.

communities they serve to bring these Chapter 11 Cases to an equitable and value-maximizing conclusion. *See* Confirmation Declaration ¶ 37. Accordingly, section 1129(a)(3) of the Bankruptcy Code has been satisfied.

## IV.    Section 1129(a)(4): The Plan Provides that Professional Fees and Expenses Are Subject to Court Approval

71.    Section 1129(a)(4) of the Bankruptcy Code requires that any payments by a debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case," either be approved by, or subject to approval of, the court as reasonable. 11 U.S.C. § 1129(a)(4). Section 1129(a)(4) has been construed to require that all payments on account of professional fees and expenses from estate assets be subject to bankruptcy court review and approval.[34]

72.    In accordance with section 1129(a)(4) of the Bankruptcy Code, no payments will be made on account of Professional Fee Claims from the Debtors' estates other than payments that are authorized by Order of the Court. Pursuant to the Plan, all final requests for payment of Professional Fee Claims must be filed with the Court and served upon all parties required to receive notice within forty-five (45) days after the Effective Date, and such Professional Fee Claims are payable only to the extent approved by the Court. *See* Art.IV.D.1. Accordingly, the requirement of section 1129(a)(4) of the Bankruptcy Code has been satisfied.

## V.    Section 1129(a)(5): The Plan Proponents Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders

73.    Section 1129(a)(5) of the Bankruptcy Code requires (a) that the proponent of a plan disclose the identity and affiliations of the proposed directors, officers, or voting trustees of the debtors, an affiliate of a debtor participating in a joint plan with a debtor, or a successor to the debtor under the plan; (b) that the appointment or continuance of such individuals be consistent with the interests of creditors and equity security holders and with public policy; and

---

[34]    *See, e.g.*, *Lisanti Foods, Inc. v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 476 (Bankr. D.N.J. 1990).

12961575

(c) that there be disclosure of the identity and nature of the compensation of any insiders to be retained or employed by the reorganized debtors.

74.     The Plan provides that the Board that existed prepetition is expected to continue after the Effective Date, subject to expiry of terms/appointments and re-elections. During the Chapter 11 Cases, the Board added three new directors and appointed those directors to the Reorganization Committee, which oversees the Debtors' reorganization efforts. These directors are expected to be phased out after the Reorganization Committee issues the D&O Report and disputes, if any, regarding the D&O Report are consensually resolved or decided by the Court in accordance with the Plan. Other than the phase out of the new directors, there is no change in the Board anticipated, subject to expiry of terms/appointments and re-elections. On the Effective Date, it is anticipated that Yan Moshe, the principal of HRH, will become Chairman of the Board.

75.     The current CEO of the Debtors, Dr. Moulick, will remain the CEO of the Reorganized Debtors, until the newly-formed MSO, which will be owned 50%-50% by CarePoint and HRH, is formed. Once implemented after the bankruptcy, Dr. Moulick will resign as the CEO of the Reorganized Debtors and be employed by the MSO at his existing salary of $1.75 million per year. Dr. Nizar Kifaieh will become the CEO of the Reorganized Debtors. Shamiq Syed will remain the CFO of the Reorganized Debtors at his existing salary.

76.     The identities of the Litigation Trustee and the members of the Litigation Trust Oversight Committee have been disclosed as part of the Plan Supplement. The initial Litigation Trustee was selected by the Committee, in consultation with the Debtors and HRH and subject to HRH's approval, with compensation terms disclosed in the Plan Supplement. Any successor Litigation Trustee will be appointed pursuant to the Litigation Trust Agreement. The five members of the Litigation Trust Oversight Committee were selected by the Committee, and HRH is serving as an *ex-officio* member, with their expense reimbursement rights disclosed in the Plan Supplement. Any successor member of the Litigation Trust Oversight Committee will be appointed pursuant to the Litigation Trust Agreement.

12961575

77. The selection of the foregoing parties is consistent with the interests of Holders of Claims and Interests and public policy, including because: (a) they are among the parties most familiar with the Debtors' operations, finances and prospects, as well as the facts and circumstances of these Chapter 11 Cases; (b) they are all highly-experienced and committed to the successful continued operations of the Debtors' hospitals for the benefit of the Hudson County community; and (c) they have strong interests in maximizing the value of the Debtors' estates (including diligently reviewing the validity of, and considering appropriate objections to, claims filed in the Chapter 11 Cases and investigating, pursuing and monetizing the Litigation Claims). *See* Confirmation Declaration ¶ 31.

78. Accordingly, the requirements of section 1129(a)(5) of the Bankruptcy Code have been satisfied.

## VI. Section 1129(a)(6): The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission

79. Section 1129(a)(6) of the Bankruptcy Code requires that any governmental regulatory commission having jurisdiction over the rates charged by the debtor in the operation of its business approve any rate change provided for in a Chapter 11 plan. *See* 11 U.S.C. § 1129(a)(6). The Plan does not provide for any rate changes and the Debtors are not subject to any such regulation. Therefore, section 1129(a)(6) is inapplicable.

## VII. Section 1129(a)(7): The Plan Is in the Best Interest of Creditors

80. Section 1129(a)(7) of the Bankruptcy Code requires that holders of impaired claims or interests which do not vote to accept a Chapter 11 plan "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of [the Bankruptcy Code] on such date." 11 U.S.C. § 1129(a)(7)(A)(ii). Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests test." This test focuses on individual creditors' claims rather than on classes of claims.[35]

---

[35]    *See Bank of Am. Nat'l Trust & Sav. Ass 'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

28

Thus, through the "best interest of creditors" test of section 1129(a)(7), the Bankruptcy Code protects non-consenting members of impaired classes by ensuring that each dissenting member of the impaired class receives at least what the dissenting member would receive if the debtor were instead liquidated under Chapter 7 of the Bankruptcy Code.

81.     As illustrated in the Liquidation Analysis attached to the Plan (and the supplemental liquidation analysis attached to the Declaration in Support of Substantive Consolidation [Docket No. 730-8]), the best interests test is satisfied as to each Holder of an Impaired Claim or Interest. Absent the mediated resolution set forth in the Plan, all distributable value would go towards repaying the secured claims of HRH and Capitala, and the claims of other secured creditors to the extent allowed. Under the Plan, in contrast: (a) the secured debt of HRH and Capitala will be deferred and "rolled" into new exit financing facilities (which will *not* be paid from Estate assets); (b) HRH has agreed to provide the $3,500,000 in Litigation Trust Seed Money to the Litigation Trust to investigate, prosecute and monetize the Litigation Claims; and (c) unsecured creditors with Allowed Claims in Classes 5, 7 and 9 are projected to receive a recovery on their claims from the proceeds of such Litigation Claims.

82.     In a Chapter 7 scenario, it is unclear whether a Chapter 7 trustee would be able to pursue and appropriately maximize the value of the Litigation Claims, as such Litigation Claims are only available for the benefit of unsecured creditors (Classes 5, 7 and 9) based on the Plan Proponents' negotiations with HRH and Capitala. A Chapter 7 trustee would not only lack funding to pursue Litigation Claims (*i.e.*, the Litigation Trust Seed Money), but any such Litigation Claims might also be subject to prior Liens, absent the concessions agreed to by HRH and Capitala. *See* Confirmation Declaration ¶ 14.

83.     In addition, a Chapter 7 liquidation scenario would entail additional costs and expenses, including the compensation of counsel and other professionals retained by the Chapter 7 trustee and costs and expenses incurred as a result of the inefficiencies associated with replacing existing management and professionals in a Chapter 7 case.

84.     Conversion would also likely create various asset and liability allocation and intercompany reconciliation issues (which could ultimately adversely affect the net proceeds available for distribution to creditors) and entail significant delay to liquidate the Debtors' assets and make distributions. Moreover, a Chapter 7 trustee would be entitled to statutory fees relating to the distribution of any monetized assets. Accordingly, a portion of any funds available for Distribution to creditors, would instead be paid to a Chapter 7 trustee.

85.     Lastly, holders of Impaired Claims – as well as the Hudson County community as a whole – will benefit from the continued operation of the Debtors' three hospitals, as opposed to closure under Chapter 7.

86.     Maple, Strategic Ventures and Captive Assurance argue that the Plan violates section 1129(a)(7) of the Bankruptcy Code. These objections should be overruled.

87.     Maple argues that it would receive a greater recovery in a Chapter 7 liquidation on account of its Maple Secured Claims and Maple Unsecured Claims.  *See* Maple Objection ¶¶ 44-48. Maple is wrong because: (a) Maple Secured Claims are treated under the Plan in accordance with the requirements of the Bankruptcy Code and would fare no better in a Chapter 7 liquidation,[36] and (b) Allowed Maple Unsecured Claims are projected to receive a recovery under the Plan (*see* Plan Art.V.B.5); in contrast, such claims would receive *no recovery* in a Chapter 7 liquidation. In addition, the Plan now provides that, notwithstanding anything in the Plan to the contrary, the transfer of the Litigation Claims that are subject to the Collateral Sharing Agreement to the Litigation Trust shall be without prejudice to the right of Maple to continue to assert a security interest in such Litigation Claims. *See* Plan Art. IX.C. Thus, Maple retains whatever security interest it may have in Litigation Claims under the Collateral Sharing

---

[36]     Specifically, any allowed Maple Secured Claim will receive (i) cash equal to the unpaid portion of the Allowed Maple Secured Claim, (ii) the collateral securing such Allowed Maple Secured Claim, (iii) the indubitable equivalent of such Allowed Maple Secured Claim, (iv) the retention of its liens securing such Allowed Maple Secured Claim and deferred cash payments having a present value at least equal to the amount of such Allowed Maple Secured Claim as of the Effective Date, or (v) such other treatment as to which such Holder and the Reorganized Debtors agree in writing. *See* Plan Art. V.B.4.

12961575

Agreement, without prejudice to the rights of the Litigation Trustee to challenge, object to or otherwise contest any such security interest.

88.     Strategic Ventures argues that it would fare better in a Chapter 7 liquidation, absent the proposed limited substantive consolidation because: (a) it would have claims against three separate obligors, and (b) as a creditor of Garden State, it would benefit from Garden State's estate-based claims and causes of action. *See* Strategic Objection ¶¶ 132-133. However, in reality, absent the proposed limited substantive consolidation and the mediated resolutions embodied in the Plan, the Liquidation Analysis demonstrates that Strategic Ventures would not receive any recovery on account of its unsecured claims.  Importantly, there would be no funding to collect the receivables subject to the claims of Strategic Ventures and no showing how the receivables could be collected in a manner consistent with 42 U.S.C § 1396 as governmental health care receivables are expressly prohibited by statute from being assigned.  Without the Debtors' provider numbers and bank account, it would be difficult for Strategic Ventures (or any creditor) to collect government accounts receivable. *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 350 (7th Cir. 2004); *East Boston Neighborhood Health Ctr. Vs. Chittenden Trust Co.*, 242 B.R. 562, 573 (Bankr. Mass. 1999)(federal anti-assignment statutes each operates by prohibiting the governmental insurer itself from making payments under its program to anyone other than the service provider).

89.     Captive Assurance argues section 1129(a)(7) is not satisfied because "[t]he Plan Proponents rely on liquidation analyses that are unsupported by reliable, verifiable data or disclosed assumptions." Captive Objection ¶ 79. Captive's self-serving allegations should be given no weight.  The Debtors are prepared and intend to offer evidence at the Confirmation Hearing that the Liquidation Analysis is supported by reliable data and assumptions.

90.     For all of these reasons, the Plan Proponents believe that the anticipated recoveries under the Plan offer greater or equal recoveries to Holders of Claims in Impaired Classes than would be available to them in a Chapter 7 liquidation and, accordingly, the requirements of section 1129(a)(7) of the Bankruptcy Code have been satisfied.

31

**VIII.    Section 1129(a)(8): The Plan Can Be Confirmed Notwithstanding the Requirements of Bankruptcy Code Section 1129(a)(8)**

91.     Section 1129(a)(8) requires that each class of impaired claims or interests accepts the plan. 11 U.S.C. § 1129(a)(8) ("With respect to each class of claims or interests — (A) such class has accepted the plan; or (B) such class is not impaired under the plan."). If any class of claims or interests rejects the plan or is deemed to have rejected the plan, the plan must satisfy the "cramdown" requirements with respect to such claims or interests.

92.     As set forth above, Holders of Claims in Classes 6 and 12 are Unimpaired under the Plan and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have voted to accept the Plan. Accordingly, the requirements of section 1129(a)(8) have been satisfied as to each of these Unimpaired Classes.

93.     As reflected in the Voting Declaration, the Plan has been accepted by Holders of Claims in Impaired Classes 1, 2, 3, 7, 8 and 13 holding in excess of two-thirds in amount and one-half in number. Specifically, as indicated in the Voting Declaration, (a) Class 1 voted to accept the Plan by 100% in amount and 100% in number; (b) Class 2 voted to accept the Plan by 100% in amount and 100% in number; (c) Class 3 voted to accept the Plan by 100% in amount and 100% in number; (d) Class 7 voted to accept the Plan by 80.91% in amount and 89.41% in number; (e) Class 8 voted to accept the Plan by 100% in amount and 100% in number; and (f) Class 13 voted to accept the Plan by 100% in amount and 100% in number. Accordingly, as to these Impaired and accepting Classes, the requirements of section 1129(a)(8) likewise have been satisfied.

94.     However, because Classes 10 and 11 are deemed to reject the Plan and Classes 4, 5, 9 and 14 voted against the Plan (the "Rejecting Classes"), the Plan Proponents do not satisfy section 1129(a)(8) of the Bankruptcy Code. Notwithstanding the Rejecting Classes, the Plan Proponents still satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code because, as discussed below, the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes. Because the Plan satisfies the cramdown requirements, in

32

addition to the remainder of section 1129's requirements, as set forth herein, the Court should confirm the Plan.

IX.    **Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Administrative Expense Claims, Professional Fee Claims and Priority Tax Claims**

95.    Section 1129(a)(9) of the Bankruptcy Code requires that entities holding allowed claims entitled to priority under section 507(a)(1)-(8) of the Bankruptcy Code receive specified cash payments under a plan. Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) requires a plan to provide as follows:

A.    with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

B.    with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of [the Bankruptcy Code], each holder of a claim of such class will receive –

i.    if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

ii.    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

C.    with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive on account of such claim regular installment payments in cash –

i.    of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

ii.    over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

iii.    in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

D.    with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim

33

will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

96.     Here, the Plan provides the treatment required by section 1129(a)(9) for each of the various Claims specified in sections 507(a)(1)—(8) of the Bankruptcy Code. Specifically, (a) Article IV.A of the Plan provides that, unless otherwise agreed, each Holder of an Allowed Administrative Expense Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Expense Claim;[37] (b) Article IV.B of the Plan provides that, unless otherwise agreed, each Holder of an Allowed Priority Tax Claim will receive either: (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim from the Administrative Expense Claims Reserve; or (ii) regular installment payments in Cash from the Reorganized Debtors, consistent with Bankruptcy Code section 1129(a)(9)(C);[38] (c) Article IV.C of the Plan provides that each Holder of an Allowed Priority Non-Tax Claim shall receive, on account of, in exchange for, and in full satisfaction of such Allowed Priority Non-Tax Claim either: (i) Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim from the Administrative Expense Claims Reserve, or (ii) such other treatment as to which such Holder and the Litigation Trustee shall have agreed upon in writing;[39] and (d) Article IX.L.2 of the Plan provides that all Allowed Professional Fee Claims shall be paid by the Reorganized Debtors from the Professional Fee Reserve within two business days after each such Professional Fee Claim becomes an Allowed Claim, upon entry of a Final Order allowing such Claim. Accordingly, the requirements of section 1129(a)(9) of the Bankruptcy Code have been satisfied.

**X.     Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan**

---

[37]     Alternatively, all Allowed Administrative Expense Claims, excluding Professional Fee Claims, may be assumed by the Reorganized Debtors and paid in the ordinary course.

[38]     Alternatively, all Allowed Priority Tax Claims may be assumed by the Reorganized Debtors and paid in the ordinary course.

[39]     Alternatively, all Allowed Priority Non-Tax Claims may be assumed by the Reorganized Debtors and paid in the ordinary course.

12961575

97.     Section 1129(a)(10) requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." The term "insider" generally includes (a) entities that own twenty percent (20%) or more of the outstanding voting securities of the debtor; (b) directors of the debtor; (c) officers of the debtor; (d) persons in control of the debtor; (e) a partnership in which the debtor is a general partner; (f) a general partner of the debtor; or (g) a relative of a general partner, director, officer, or person in control of the debtor. As set forth above and in the Voting Declaration, Classes 2, 3, 7, 8 and 13 are Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider.[40] Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code has been satisfied.

98.     Captive Assurance and Strategic Ventures argue that the Plan does not satisfy section 1129(a)(10) of the Bankruptcy Code because *In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011) requires that "a joint chapter 11 plan of multiple related debtors must achieve an impaired accepting class at each debtor to be confirmed." *See* Captive Objection ¶ 80; Strategic Objection ¶ 134-136. However, *Tribune* is clear that any "per debtor" impaired accepting class requirement does *not* apply to a plan that contemplates substantive consolidation. *In re Tribune Co.*, 464 B.R. at 142 ("I find nothing ambiguous in the language of §1129(a)(10), which, *absent substantive consolidation* or consent, must be satisfied by each debtor in a joint plan.") (Emphasis added).  Accordingly, the Captive Objection should be overruled.

## XI.     Section 1129(a)(11): Feasibility

99.     Section 1129(a)(11) of the Bankruptcy Code requires that:

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

100.     There is a relatively low threshold of proof necessary to satisfy the feasibility

---

[40]     Class 1 also voted to accept the Plan.

requirement.[41] The Court need not require a guarantee of success to find that the Plan is feasible.[42] Rather, the Court must merely find that the "plan offers a reasonable expectation of success . . ."[43]

101.    Here, the Plan is feasible. On the Effective Date, the Debtors expect: (a) to have sufficient funds – from, *inter alia*, cash on hand, cash from operations, and the available liquidity from the HRH Exit Facility and the Capitala Exit Facility – to make all required distributions under the Plan; (b) for those Reorganized Debtors which are continuing in business to be well-positioned to service their ordinary course obligations and successfully operate their businesses on a go-forward basis (including, based upon, among other things, substantial management and operational changes made by HRH since the Petition Date to reduce expenses and increase revenue); and (c) for the Litigation Trustee to have funding necessary to prosecute and potentially monetize Litigation Claims for the benefit of the Litigation Trust Beneficiaries. Based on the Debtors' improved balance sheet and the expected efficiencies and synergies to result from the operation of a four-hospital system, the Plan will provide the Reorganized Debtors with a manageable liquidity profile and an improved ability to hit operational targets.

102.    Maple argues that the Plan is not feasible because the potential claims against the Prior Owners allegedly lack merit. *See* Maple Objection ¶ 25. The Plan Proponents vehemently disagree. Regardless, claims against the Prior Owners are not the only Litigation Claims being transferred to the Litigation Trust, and the Plan is clearly feasible for the reasons stated above.

---

[41]    *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility.") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), overruled in part on other grounds, 464 B.R. 208 (Bankr. D. Del. 2011).

[42]    *In re Walker*, 165 B.R. 994, 1004 (E.D. Va. 1994) (the "plan must present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.").

[43]    *See, e.g.*, *In re G–1 Holdings Inc.*, 420 B.R. 216, 267 (D.N.J. 2009) ("[T]he key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed.") (citing In re U.S. Truck Co., 47 B.R. 932, 944 (E.D. Mich. 1985)).

Whether or not the claims against the Prior Owners will ultimately be successful is irrelevant to the feasibility of the Plan.

103.     Accordingly, the Plan is feasible as proposed and the requirement of section 1129(a)(11) of the Bankruptcy Code has been satisfied.

## XII.    Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid

104.     Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12). In accordance with section 1129(a)(12), Article XVII.C of the Plan provides for the payment of all Statutory Fees accruing before and after the Effective Date.   *See* Plan Art. XVII.C. Accordingly, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

## XIII.    Sections 1129(a)(13) Through 1129(a)(15) Do Not Apply to the Plan

105.     Sections 1129(a)(13)—(16) of the Bankruptcy Code are inapplicable to the Debtors and the Plan, as the Debtors (a) do not provide "retiree benefits" as defined in section 1114 of the Bankruptcy Code (see 11 U.S.C. § 1129(a)(13)); (b) have no domestic support obligations (see 11 U.S.C. § 1129(a)(14)); and (c) are not individuals (see 11 U.S.C. § 1129(a)(15)).

## XIV.    Transfers of Property Made in Accordance with Non-Bankruptcy Law (§ 1129(a)(16)).

106.     Bankruptcy Code section 1129(a)(16) requires that "[a]ll transfers of property under the plan [] be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust." To the extent applicable, section 1129(a)(16) is satisfied because any transfers of property under the Plan shall be made in accordance with applicable nonbankruptcy law.

## XV.    The Plan Satisfies Bankruptcy Code Section 1129(b)'s "Cram Down" Requirements

107.    Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a Chapter 11 plan in circumstances when not all impaired classes of claims and equity interests vote to accept that plan. This mechanism is known colloquially as "cram down."

108.    Specifically, section 1129(b)(1) provides, in pertinent part, that:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

109.    Thus, under section 1129(b) of the Bankruptcy Code, the Court may "cram down" a plan as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to impaired classes that did not vote to accept the plan.[44]

110.    Here, as noted above, the Rejecting Classes either voted to reject the Plan or are deemed to reject the Plan. Accordingly, the Plan Proponents invoke section 1129(b) to "cram down" the Plan with respect to the Rejecting Classes.

## A.    The Plan Does Not Unfairly Discriminate

111.    The unfair discrimination standard of section 1129(b) of the Bankruptcy Code requires that a Chapter 11 plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly-situated classes.[45] Generally a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar classes are treated differently without a reasonable basis for the disparate treatment.[46] Accordingly, as between two classes of claims or

---

[44]    *See, e.g., In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005); *In re Dura Auto. Sys., Inc.*, 379 B.R. 257, 271-72 (Bankr. D. Del. 2007); *In re Lernout & Hauspie Speech Prods., N. V.*, 301 B.R. 651, 660 (D. Del. 2003).

[45]    *See, e.g., In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass. 1994).

[46]    *See, e.g., In re Rubicon U.S. REIT, Inc.*, 434 B.R. 168, 175 (Bankr. D. Del. 2010) (courts generally look to whether "[v]alid business, factual, and legal reasons exist for separately classifying the various Classes of Claims

12961575

two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests,[47] or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[48]

112.    Here, the Plan does not "discriminate unfairly" with respect to the Rejecting Classes because the classes are comprised of dissimilar claims and interests and there is strong justification for any disparate treatment. For instance, different Classes of Secured Claims have been separately classified and are given their specific treatment based on their different collateral packages and respective priorities. Likewise, although Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims) and Class 9 (Prior Owner Claims) have been separately classified (because the claims of former owners generally arose when they were in control of the Debtors and are materially different in nature than ordinary non-insider trade claims), all three Classes are receiving the *exact same* rights to recovery under the Plan. Lastly, different Classes of Interests are separately classified based on whether such Interests are in for-profit or not-for-profit Debtor entities or whether the respective entity's ultimate parent is a not-for-profit entity. *See* Confirmation Declaration ¶ 29.

113.    Maple, the Lawler Entities, the Freehold Entities, and Strategic Ventures object to the Plan on the grounds of unfair discrimination. However, such objections are now moot and should be overruled because the Plan expressly provides that any holder of an Allowed Class 5 Maple Unsecured Claims or an Allowed Class 9 Prior Owner Claim will receive "the same distributions on a Pro Rata basis as Holders of Allowed General Unsecured Claims in Class 7." *See* Plan Art. V.B. 5 and 9.  In other words, all of these classes of unsecured creditors are receiving the exact same rights to recovery under the Plan. Thus, the Plan does not "discriminate

---

and Equity Interests created under the Plan."); *In re Lernout*, 301 B.R. at 660 ("The hallmarks of the various [unfair discrimination] tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.").

[47]    *See*, *e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd* in part, *rev'd* in part on other grounds, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[48]    *See*, *e.g.*, *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

unfairly" with respect to any impaired Classes of Claims or Interests under the Plan that did not accept the Plan.[49]

**B.     The Plan Is Fair and Equitable**

114.     Section 1129(b)(2) defines the phrase "fair and equitable" as to impaired classes of secured creditors, unsecured creditors, and equity interest holders as follows:

> As to secured creditors: Either: (i) the secured creditor retains its lien and receives deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; (ii) the underlying collateral is sold with the secured creditor's liens to attach to the proceeds of such sale; or (iii) the secured creditor will realize the "indubitable equivalent" of its secured claim.

> As to unsecured creditors: Either (i) each impaired unsecured creditor receives or retains under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior will not receive or retain any property under the plan on account of their claims or interests.

> As to equity interest holders: Either (i) each holder of an interest will receive or retain under the plan property of a value, as of the effective date of the plan, equal to the greatest of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of the interest, or (ii) the holder of any interest that is junior to the non-accepting class will not receive or retain any property under the plan on account of their its interest.

11 U.S.C. § 1129(b)(2)(A)-(C).[50] These provisions, *inter alia*, codify the so-called "absolute priority rule," which mandates that if the holders of claims in a particular class receive less than full value for their claims, no holders of claims or interests in a junior class may receive or retain any property under the plan. The corollary to the absolute priority rule is that no senior classes

---

[49]     *See In re Tribune Co.*, 972 F.3d 228 (3d Cir. 2020) ("to presume unfair discrimination, there must be 'a materially lower' percentage recovery for the dissenting class."); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231–32 (Bankr. D.N.J. 2000) (4% difference in recovery not unfairly discriminatory).

[50]     *See also 203 N. LaSalle*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

may receive greater than a 100% recovery on their claims.

115.    In the instant case, the "fair and equitable" requirement is satisfied as to each of the Rejecting Classes.

116.    With respect to Class 4 (Maple Secured Claims), each Holder of an Allowed Maple Secured Claim shall receive: (i) cash equal to the unpaid portion of the Allowed Maple Secured Claim, (ii) the collateral securing such Allowed Maple Secured Claim, (iii) the indubitable equivalent of such Allowed Maple Secured Claim, (iv) the retention of its liens securing such Allowed Maple Secured Claim and deferred cash payments having a present value at least equal to the amount of such Allowed Maple Secured Claim as of the Effective Date, or (v) such other treatment as to which such Holder and the Reorganized Debtors agree in writing. Thus, the Plan satisfies the requirements of section 1129(b)(2)(A) as to Maple. In addition, the Plan now provides that, notwithstanding anything in the Plan to the contrary, the transfer of the Litigation Claims that are subject to the Collateral Sharing Agreement to the Litigation Trust shall be without prejudice to the right of Maple to continue to assert a security interest in such Litigation Claims. *See* Plan Art. IX.C. Thus, Maple retains whatever security interest it may have in Litigation Claims under the Collateral Sharing Agreement, without prejudice to the rights of the Litigation Trustee to challenge, object to, or otherwise contest, any such security interest.

117.    With respect to Class 14 (Strategic Ventures Secured Claims) each Holder of an Allowed Strategic Ventures Secured Claim shall receive: (i) cash equal to the unpaid portion of the Allowed Strategic Ventures Secured Claim, (ii) the collateral securing such Allowed Strategic Ventures Secured Claim, (iii) the indubitable equivalent of such Allowed Strategic Ventures Secured Claim, or (iv) such other treatment as to which such Holder and the Reorganized Debtors agree in writing. Thus, the Plan satisfies the requirements of section 1129(b)(2)(A) as to Strategic Ventures.

118.    With respect to each rejecting Class of unsecured Claims: (i) no Claims or Interests junior to such Class will receive a monetary distribution or retain any economic benefit under the Plan on account of such junior Claims or Interests, and (ii) no Holder of a Claim senior

41

to such Class will receive more than payment in full on account of its Claim. Thus, the Plan

satisfies the requirements of section 1129(b)(2)(B) as to each Class of unsecured Claims.

119. Strategic Ventures and Captive Assurance have asserted that the Plan violates the

absolute priority rule because HRH is purportedly being paid "more than in full" *See*, *e.g.*,

Strategic Ventures Objection ¶¶ 97-99; Captive Objection ¶¶63-66. This objection should be

overruled. Although the Plan generally provides that HRH will have an Allowed claim in the

approximate estimated amount of $110 million, subject to final reconciliation, the aggregate

contribution of HRH to the Debtors' Chapter 11 Cases actually approximates $131 million. *See*

*Declaration of Angela Murdock-Ridley* ¶ 17.

120. Strategic Ventures also argues that the Plan "violates the absolute priority rule

because it does not pay creditors in full and provides 'property' to holders of 'Other Interests'

under the Plan 'on account of' their existing equity interests in certain of the Debtors." *See*

Strategic Ventures Objection ¶ 96. This objection should be overruled. First, as Strategic Ventures

acknowledges, courts have ruled that the absolute priority rule does not apply to non-profit entities.

*Id.* p. 30, n. 8.[51] Indeed, no Holder of an Other Interest is receiving a monetary distribution or other

economic benefit on account of such Other Interest. Thus, the absolute priority rule is inapplicable

with respect to those entities.

121. Moreover, even if the absolute priority rule applies to certain of the Debtors that

are technically for-profit entities, such as Garden State Healthcare Associates, LLC and CarePoint

Health Management Associates, LLC, against which Strategic Ventures has alleged claims, courts

---

[51] *See*, *e.g.*, *Sec. Farms v. Gen. Teamsters (In re Gen. Teamsters)*, 265 F.3d 869, 873 (9th Cir. 2001) ("The absolute priority rule is generally applied to for-profit corporations facing bankruptcy, where an equity owner seeks to retain property, often represented by stock."); *In re Wabash Valley Power Ass'n*, 72 F.3d 1305, 1314 (7th Cir. 1996) (court rejected absolute priority rule objection because members did not improperly retain property on account of either their patronage capital accounts or control over cooperative. The court found that the claims of members for patronage capital accounts were not equity interests because control alone without share of profits was not an equity interest); *In re Whittaker Memorial Hosp. Ass'n*, 149 B.R. 812 (Bankr. E.D. Pa. 1993) (plan did not violate the absolute priority rule although class VII creditor would not be paid in full and junior class (class VIII) retained control of the reorganized debtor but no distribution was being made to junior class."); *In re Havre Aerie #166 Eagles*, 2013 Bankr. LEXIS 1200, *42 (Bankr. D. Mon. 2013) ("this Court overrules [the] objection based on the absolute priority rule because the evidence shows that the Debtor is a non-profit and no evidence exists of present ownership or interests in the organization's profit other than the Debtor.").

have recognized a "new value exception" to the absolute priority rule, which allows junior interests to receive property, not "on account of" their interests, but in exchange for some other value.[52] To invoke the new value exception, the contribution must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value or interest received.[53]

122.    Pursuant to the Plan, CarePoint, shall retain its direct and indirect equity interests that constitute Other Interests in the Debtors.  The Other Interests retained by CarePoint shall include, but are not limited to, its direct and indirect equity interests in Garden State Healthcare Associates, LLC, New Jersey Medical and Health Associates, LLC and Quality Care Associates, LLC (collectively, the "Medical Practice Group"). CarePoint shall retain these Other Interests in exchange for, among other things, causing various Debtors that are directly or indirectly owned or controlled by CarePoint to agree to receive no recovery on account of their Intercompany Claims against the Medical Practice Group, notwithstanding that such Debtors have funded more than $50 million per year since 2015 to cover the cash burn of the Medical Practice Group and provide it with sufficient liquidity to satisfy payroll obligations and payments to vendors.  Thus, CarePoint (which is a non-profit entity) is providing substantial new value in money's worth necessary for a successful reorganization of the Debtors in return for keeping its equity interests (with negative economic value) in place. The new value exception to the absolute priority rule is therefore satisfied by the Plan.

123.    Thus, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims or Interests under the Plan that did not accept the Plan.

## XVI.  The Requirements of Section 1129(c), (d), and (e) of the Bankruptcy Code are Satisfied or Inapplicable

---

[52]    *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 277 (Bankr. D. Del. 2016) (citation omitted).

[53]    *Id.*; *In re Brown*, 498 B.R. 486, 497 (Bankr. E.D. Pa. 2013).

12961575

124.    The Plan is the only plan on file in the Chapter 11 Cases and, as such, section 1129(c) of the Bankruptcy Code is satisfied. The "principal purpose of the Plan is [not] the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933," *see* Confirmation Declaration ¶ 40, and no party in interest has alleged otherwise. Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable. Finally, these Chapter 11 Cases are not "small business cases" and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

## RESPONSES TO PLAN OBJECTIONS

### I.    Limited Substantive Consolidation is Appropriate

125.    The Plan calls for limited substantive consolidation for purposes of voting and distribution only. For the reasons set forth below, any objection to the proposed limited substantive consolidation should be overruled.

126.    The facts and circumstances of these Chapter 11 Cases unequivocally establish that the limited proposed substantive consolidation is warranted, necessary and appropriate under *In re Owens Corning*, 419 F.3d 195, 210-11 (3d Cir. 2005) and its progeny.

127.    In *Owens Corning*, the United States Court of Appeals for the Third Circuit adopted an intentionally open-ended, equitable inquiry to determine when substantive consolidation is appropriate. *Id.* In particular, the Third Circuit identified the following five overarching principles that should underpin such analysis:

(i)     Limiting the cross-creep of liability by respecting entity separateness is a 'fundamental ground rule.'  As a result, the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.

(ii)    The harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness.  Harms caused by creditors typically are remedied by provisions found in the Bankruptcy Code (*e.g.*, fraudulent transfers, §§ 548 and 544(b)(1), and equitable subordination, §510(c)).

(iii)   Mere benefit to the administration of the case (for example, allowing a

44

court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

(iv)    Indeed, because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this 'rough justice' remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).

(v)    While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).

*Id.* at 211.

128.    After identifying these key principles, the Third Circuit concluded:

The upshot is this. In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that: (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, __*or*__ (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Id.* (emphasis added).

129.    Here, as explained below, the proposed limited substantive consolidation is warranted and appropriate due to, among other things: (i) the integrated and entangled nature of the Debtors' finances and operations and the fact that the Debtors often held themselves out to their creditors as a single consolidated enterprise; (ii) the lack of funding to attempt to unscramble the Debtors' assets and liabilities or to prepare, confirm and administer twenty-one (21) separate Chapter 11 plans; (iii) the unfeasibility of allocating the Litigation Trust Seed Money and the proceeds of Litigation Claims (the primary source of potential recoveries to general unsecured creditors under the Plan) on a Debtor-by-Debtor basis; and (iv) the lack of prejudice to any party in interest.[54] *See* Declaration in Support of Substantive Consolidation ¶ 6.

---

[54]    *See, e.g.*, *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 103-04 (Bankr. N.D. Tex. 2017) ("the fact that distributions for general unsecured creditors and equity interest holders will be ***based on recoveries from litigation claims*** is a significant reason why the Debtors decided to request that these estates be substantively consolidated.

A.    **The Proposed Limited Substantive Consolidation is an Integral Component of an Arms'-Length, Multi-Party, Mediated Settlement that Enables the Continuation of Critical Acute Healthcare Services for the Benefit of the Hudson County Community and Maximizes Creditor Recoveries.**

130.    In an effort to consensually address numerous disputes related to, *inter alia*, the DIP Motions, the Collateral Surrender Motion, the MSA Motion, and the Hospital Facilities Management Motion, the Debtors, the Committee, HRH and numerous other significant stakeholders participated in multi-day mediation proceedings. *Id.* at ¶ 7.

131.    Such efforts culminated in the Plan, which provides for, *inter alia*: (i) the continuation of the Debtors' hospital operations for the benefit of Hudson County citizens; (ii) an open, value-maximizing sale process; (iii) the payment of all of the Debtors' outstanding withholding tax obligations; (iv) a projected distribution to general unsecured creditors (who otherwise would likely receive no recovery); and (v) the Debtors' emergence from bankruptcy in an expedited fashion. *Id.* at ¶ 8.

132.    The proposed limited substantive consolidation upon which the Plan is premised is a bedrock component of the consensual resolution negotiated during the mediation and essential to bring these Chapter 11 Cases to a swift, value-maximizing conclusion. *Id.* at ¶ 9.

133.    First, neither HRH nor any other party has agreed to fund (nor is there funding available for) the preparation, solicitation, confirmation and administration of twenty-one (21) separate Chapter 11 plans for the Debtors. The deadline for the submission of bids for a potential Alternative Transaction has long passed and no Alternative Transaction proposals were submitted. *Id.* at ¶ 10.

134.    Second, absent the mediated resolution set forth in the Plan, general unsecured creditors would receive no recovery in these Chapter 11 Cases because all distributable value

Specifically, as a result of the postpetition analysis and investigation of potential causes of action that the Debtors and Creditors' Committee conducted, the Debtors determined that a number of significant causes of action (a) were jointly owned by all of the Debtors, or (b) would be difficult to allocate between estates. Because of the foregoing factors, the court believes that substantive consolidation will achieve a fair and equitable result for all creditors and equity interest holders of the Debtors and will enable the assets of the Debtors to be administered in an efficient manner. If the estates are not substantively consolidated, the time and expense to allocate assets and liabilities between estates will be enormous.") (emphasis in original).

46

would go towards repaying the secured claims of HRH and Capitala, and other secured claims to the extent allowed. *Id.* at ¶ 11.

135.    In contrast, under the Plan: (i) the secured debt of HRH and Capitala will be deferred and "rolled" into new exit financing facilities (which will not be paid from Estate assets), and (ii) HRH has agreed to provide the Litigation Trust Seed Money to the Litigation Trust to investigate, prosecute and monetize the Litigation Claims, the proceeds of which will be used to fund recoveries for Class 7 General Unsecured Creditors. Absent the mediated settlements embodied in the Plan, no Litigation Trust Seed Money or Litigation Claim proceeds would be available for distribution to general unsecured creditors. *Id.* at ¶ 12.

136.    Third, the Litigation Claims (and their proceeds) – the primary source of recoveries for general unsecured creditors under the Plan – cannot be fairly or reasonably allocated on a Debtor-by-Debtor basis, and the Litigation Trust Seed Money was provided for the collective benefit of general unsecured creditors (and not allocated on a Debtor-by-Debtor basis). *Id.* at ¶ 13.

137.    For these reasons and those that follow, the proposed limited substantive consolidation set forth in the Plan is in the best interests of the Debtors and their creditors and prejudices no one. *Id.* at ¶ 14.

**B.    The Debtors Disregarded Corporate Separateness, Held Themselves Out to the Public as an Integrated, Consolidated Enterprise Under the Name and Brand "CarePoint Health", and Creditors Dealt with the Debtors as a Single Enterprise.**

138.    The Debtors often operated and held themselves out to the public as an integrated, consolidated enterprise for numerous reasons, including to maximize efficiencies, minimize costs, further brand recognition throughout Hudson County, negotiate cost savings, and out of economic necessity. *Id.* at ¶ 15.

139.    <u>Intercompany Transfers to Support Operations</u>. Each Debtor acted in a coordinated fashion to support the operations of the consolidated enterprise, including (a) the

47

Debtors' hospitals: (i) Bayonne Medical Center, (ii) Christ Hospital, and (iii) Hoboken University Medical Center (the "Hospitals"); and (b) the Debtors' practice groups: (i) Garden State Healthcare Associates, LLC, (ii) New Jersey Medical and Health Associates, and (iii) Quality Care Associates (collectively, the "Practice Groups"). *Id.* at ¶ 16.

140.    Given the Debtors' severe liquidity constraints, the Debtors systematically and routinely transferred funds amongst themselves on an *ad hoc* basis to cover shortfalls faced by any given Debtor at any particular time, without any expectation or ability to repay such obligations.[55] *Id.* at ¶ 17.

141.    For instance, because the Hospitals had different payroll schedules, on a weekly basis, the Debtors would conduct an analysis to determine which Hospitals needed cash infusions to satisfy their payroll obligations. The intercompany transfers made to satisfy the Debtors' payroll obligations were recorded only from an accounting standpoint, with no expectation of repayment. *Id.* at ¶ 18.

142.    Likewise, because the Debtors' Practice Groups operated at a loss, they required consistent cash infusions from other Debtors to satisfy their financial obligations. *Id.* at ¶ 19.

143.    The Debtors' payment of vendors was also based on the Hospitals' and Practice Groups' day-to-day requirements and funding needs and the overriding goal of patient health and safety, without regard to where the funds used to pay any particular vendor originated. For example, although a vendor may have invoiced a specific Debtor, such invoice was paid using funds from whichever Debtor entity (or entities) had excess cash at that particular time. *Id.* at ¶ 20.

144.    The Debtors similarly treated supplies, equipment, inventory and employees as fungible assets that were transferred amongst the Debtors on an as-needed basis to best serve their *collective* needs. Although the Debtors maintained records of such intercompany transfers,

---

[55]    There were no agreements governing the Debtors' intercompany transactions and such obligations had no maturity date, demonstrating that such obligations were simply book-keeping entries, with no reasonable expectation of repayment.

the Debtors never had any intent or ability to repay the resulting intercompany obligations.[56]
Effectively, the Debtors' collective assets were used interchangeably to satisfy creditor claims,
with the goal of keeping the Hospitals operational so they could continue treating patients for as
long as possible. *Id.* at ¶ 21.

145.    Cost Savings/Synergies. Operating a hospital is expensive and requires the
purchase of massive quantities of medical supplies. By coordinating orders and operating on a
consolidated basis, the Debtors were able to minimize expenses and seamlessly share resources
across the Hospitals, including supplies, equipment, inventory and employees. Moreover, while a
particular service line operating in isolation in a single hospital may not be profitable, due to a
lack of adequate demand, such a service line can be economically viable across three hospitals.
By pooling resources and operating on a consolidated, coordinated basis, the Debtors incurred
lower overall costs, maximized efficiencies and ensured the highest level of patient care possible.
*Id.* at ¶ 22.

146.    Management/Governance. Each Debtor is owned, directly or indirectly, by
CarePoint or controlled by the same management team. The Debtors have a single, central
management team – led by CEO, Dr. Achintya Moulick, and CFO, Shamiq Syed, along with a
staff of other health care and financial professionals – and CarePoint has a single Board of
Trustees, which makes decisions on behalf of all Debtor entities. The Debtors' accounting,
finance, legal, human resources, marketing, IT resources, and negotiation of various contracts are
also centralized and serve all Debtor entities on a consolidated basis. *Id.* at ¶ 23.

147.    Branding/Trade Names. All Debtor entities operate under the CarePoint brand and
are marketed as a single, integrated health system. All branding, marketing and customer
interactions are conducted with the CarePoint name, without distinguishing between corporate

---

[56]    The Debtors recently amended their Schedules to reflect the value of these intercompany balances as of the
Petition Date. [Docket Nos. 560-570, 621-627].

entities. In addition, the Debtors' corporate logo and email signature blocks (example below) list all three hospitals and are not individualized by Debtor entity.[57] *Id.* at ¶ 24.



148.    <u>Cash Management System</u>.  The Debtors use a centralized cash management system to create efficiencies in collecting, transferring, and disbursing funds generated by their operations through numerous bank accounts (the "<u>Cash Management System</u>"). The Cash Management System facilitates cash monitoring, forecasting, and reporting across all Debtor entities, enabling the central management team to maintain control over the bank accounts of each Debtor entity. Although each Debtor performs functions that are integral to the Debtors' overall operations, not all Debtor entities generate their own cash flow. Thus, the Cash Management System provides the mechanism for cash to flow among the Debtors so that operations may be maintained and carried out efficiently. The Cash Management System is tailored to meet the Debtors' operating needs and allows the Debtors to control and monitor the collection and disbursement of funds, ensure cash availability and liquidity, comply with the requirements of the Debtors' financing agreements, meet state licensing requirements, and reduce administrative expenses and other costs by facilitating the movement of funds across the Debtors as necessary.  The Cash Management System is an interwoven system designed to operate across all Debtor entities.  *Id.* at ¶ 25. Continued use of the Cash Management System was approved by the Court.  [Docket No. 243].

149.    <u>MSO</u>. The Debtors share certain expenses using a managed services organization, CarePoint Health Management Associates, LLC d/b/a CarePoint Health (the "<u>MSO</u>"). The MSO serves as a representative of all of the Debtors in their dealings with a substantial number of vendors. Although the operating entity Debtors are all beneficiaries of such services and are

---

[57]    *See* https://carepointhealth.org/about/ ("At CarePoint Health, we've combined the resources of three area hospitals – Bayonne Medical Center, Christ Hospital in Jersey City and Hoboken University Medical Center").

allocated their appropriate expenses, the MSO is the party directly responsible for satisfying any financial obligations. For example, some of the Debtors' more significant vendors were paid through the MSO, including a revenue cycle manager, professionals and certain suppliers. Typically, the operating entity Debtors fund the MSO entity with cash evenly, but if there are any cash shortfalls at one operating entity, the others will fund the necessary amount to the MSO entity. In effect, payments by the MSO are made from whichever Debtors have funds on hand when needed on an ad hoc basis. *Id.* at ¶ 26.

150.    <u>Secured Debt</u>. The Debtors' secured lenders generally treated the Debtors as a consolidated unit. Certain of the Debtors regularly agreed to be jointly and severally liable for various obligations across Debtor entities, including the debtor-in-possession financing agreements used in these Chapter 11 Cases.  Although accurate records are maintained for cash transferred among the Debtors, the Debtors' debt structure is highly interrelated and interwoven across the Debtor entities because of daily payment needs and decisions. For example, multiple Debtors guaranteed certain tranches of debt and cross-collateralized such debt, including between operating and holding entities. In addition, in one instance, even where formal guarantees did not exist, Debtor Garden State Healthcare Associates, LLC agreed, in section 3.4 of a Promissory note in favor of Strategic Ventures LLC, dated December 27, 2022, as follows:

> CarePoint Health Systems, Inc., a New Jersey nonprofit
> corporation ("<u>CarePoint</u>") and CarePoint Health Management
> Associates, LLC shall each cause their respective controlled
> affiliates to make any payments under this Note that [Garden State]
> fails to pay in accordance with the terms hereof. In addition,
> CarePoint shall use its commercially reasonable efforts to obtain
> the necessary consents from the senior lenders of Hudson Hospital
> Opco, LLC to permit Hudson Hospital Opco, LLC to guarantee
> [Garden State's] obligations hereunder.

*Id.* at ¶ 27.

151.    <u>Insurance/Benefits/System-Wide Expenses</u>. The Debtors routinely paid insurance, employee benefits and other system-wide expenses on a consolidated basis and then arbitrarily

51

allocated those expenses across Debtor entities, without a true separation of financial obligations. *Id.* at ¶ 28.

152.    In sum, the Debtors regularly held themselves out to the public and creditors as an integrated, consolidated enterprise consisting of three hospitals under the brand name "CarePoint Health," and many creditors dealt with the Debtors as a single enterprise.[58] *Id.* at ¶ 29.

### C.    There is No Funding Available for the Debtors to Unscramble Their Assets and Liabilities or Confirm and Administer Separate Plans.

153.    The proposed limited substantive consolidation under the Plan is also necessary and appropriate because of the Debtors' lack of funding to unscramble their assets and liabilities or confirm and administer twenty-one (21) separate plans, the Debtors' inability to satisfy pre- and post-petition intercompany obligations, and the practical impossibility of fairly allocating the Litigation Trust Seed Money or the proceeds of Litigation Claims on a Debtor-by-Debtor basis.[59] *Id.* at ¶ 31.

154.    Given the Debtors' extensive commingling of assets and liabilities (*e.g.*, by transferring funds, supplies, equipment, inventory and employees based on exigent

---

[58]    *See Lisanti v. Lubetkin (In re Lisanti* Foods*, Inc.*), 2006 U.S. Dist. LEXIS 76844, *26-*27 (D.N.J. 2006) ("Mr. Katz testified, based on numerous conversations with creditors, that each of the creditors dealt with the debtors on a combined basis where the financial risk was predicated on the total of the three entities. They did not render credit to each individual debtor, but rather as a combined entity. Similarly, Mr. Lubetkin stated, in a sworn affidavit, that 'creditors treated the Debtors as a single entity and relied on the Debtors as a whole when determining whether to extend credit.'" In terms of objective reliance, the "evidence show[ed] that all three Debtors had the same officers, directors and shareholders. They conducted virtually identical business operation under very similar names, and used the same general methods of operation. They performed all of their accounting fundings from one centralized location (New Jersey), and the substantial bulk of their administrative stay worked out of New Jersey. Given these facts, it was entirely reasonable for the creditors to rely on the Debtors' unity.") (internal quotations omitted).

[59]    *See*, *e.g.*, *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 103-04 (Bankr. N.D. Tex. 2017) ("the fact that distributions for general unsecured creditors and equity interest holders will be **based on recoveries from litigation claims** is a significant reason why the Debtors decided to request that these estates be substantively consolidated. Specifically, as a result of the postpetition analysis and investigation of potential causes of action that the Debtors and Creditors' Committee conducted, the Debtors determined that a number of significant causes of action (a) were jointly owned by all of the Debtors, or (b) would be difficult to allocate between estates. Because of the foregoing factors, the court believes that substantive consolidation will achieve a fair and equitable result for all creditors and equity interest holders of the Debtors and will enable the assets of the Debtors to be administered in an efficient manner. If the estates are not substantively consolidated, the time and expense to allocate assets and liabilities between estates will be enormous.") (Emphasis in original).

52

circumstances, without any expectation or intent of repayment) and their lack of any funding to attempt to unscramble their assets and liabilities (including attempting to allocate the Litigation Trust Seed Money and Litigation Claim proceeds with any level of precision), the Debtors have concluded that the Plan represents the only viable and equitable path forward.[60] *Id.* at ¶ 32.

155.    In addition to the foregoing, the proposed limited substantive consolidation of the Debtors' assets and liabilities under the Plan is appropriate for the following reasons:

- The Debtors' pooling of assets and *ad hoc* use of funds to satisfy liabilities on an as-needed basis presents compelling circumstances sufficient to overcome the general expectation that entity separateness will be recognized;

- Limited substantive consolidation would address harms *caused by the Debtors* who commingled their assets in an effort to keep the Hospitals afloat for the benefit of their patients (rather than harms *caused by creditors*);

- Limited substantive consolidation would accomplish more than "mere administrative convenience" because: (i) the Debtors lack funding to unscramble their assets and liabilities, (ii) it is not feasible to allocate the Litigation Trust Seed Money and the proceeds of Litigation Claims on a Debtor-by-Debtor basis, and (iii) in the absence of the mediated settlement embodied in the Plan that is premised on limited substantive consolidation, the Litigation Trust Seed Money and the proceeds of Litigation Claims would not even be available for distribution to general unsecured creditors;[61]

---

[60]    *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 766 (Bankr. S.D.N.Y. 1992) ("The myriad of issues . . . that are resolved by the substantive consolidation and other Plan provisions would delay reorganization and distributions to Creditors for an indefinite period absent such consolidations. For example, substantial Claims in excess of $25 billion were filed against the Debtors jointly and severally. Establishing to whom actual liability, if any, should be allocated would be a herculean task consuming years of costly professional services, thereby draining significant amounts of value from the Debtor's estates. The reorganization effort will be obstructed perhaps irreparably and certainly to the detriment of most if not all creditors of the Debtors by an effort to tease apart pieces of an integrated whole."); *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, *110-11 (S.D.N.Y. 2003) ("The cost of disentangling the estates, if it ever could be accomplished, is not simply the out-of-pocket expenses to pay the accountants, lawyers and other professionals, who would have to reconstruct years of financial data and litigate significant intercreditor disputes . . . It also includes the enormous employee resources that would have to be devoted to the effort, detracting from business operations, as well [as] the incalculable diminution of enterprise value that likely would result from a protracted chapter 11 case.").

[61]    *See, e.g., In re Woodbridge Grp. Cos., LLC*, 592 B.R. 761, 774 (Bankr. D. Del. 2018) ("The settlement is not merely an administrative convenience. There are complex multi-layered issues involving the intercompany liens that the parties have carefully and vigorously negotiated. . . [T]he absence of a settlement would result in lengthy and expensive litigation on a variety of fronts that would eat up the successful litigants' ability to recover on their claims . . . The myriad of complex issues described in the Disclosure Statement could take years and millions of dollars to litigate to finality. . . The Debtors aptly described the potential effect of the litigation in their motion: 'During the time in which the litigation wars would be fought and additional professional fees would be incurred, the innocent victims of Shapiro's scheme would very likely have to sit and wait for a final resolution of the various

12961575

- Although substantive consolidation is an "extreme" and "imprecise" remedy, limited substantive consolidation is necessary here because otherwise there would be no funding to confirm and administer a plan for each Debtor entity and the Debtors would likely be unable to successfully emerge from bankruptcy (harming all creditors); and

- Limited substantive consolidation is being used defensively to maximize creditor recoveries and remedy harms caused by the Debtors' entangled affairs, rather than offensively to disadvantage creditors.

156.    The Debtors lack the financial resources necessary to attempt to unscramble their assets and liabilities and propose and implement standalone plans for each of the Debtors. Accordingly, the limited substantive consolidation provided in the Plan is the only viable alternative for the Debtors to confirm a Chapter 11 plan. *Id.* at ¶ 34; *see also* Declaration of Judge Gross (Ret.) ¶ 13.

**D.    Limited Substantive Consolidation is in the Best Interest of All Creditors and Prejudices No One.**

157.    Absent the mediated resolution providing for limited substantive consolidation of the Debtors' estates, general unsecured creditors would receive no recovery in these Chapter 11 Cases. By contrast, the Plan provides for HRH and Capitala to receive exit financing facilities (which will become obligations of the post-emergence Debtors and not the Debtors' estates), enabling general unsecured creditors to receive recoveries from the Litigation Trust Seed Money and the proceeds of Litigation Claims. *Id.* at ¶ 35.

158.    The only Class that is affected by the limited substantive consolidation contemplated by the Plan is Class 7 General Unsecured Claims. Absent the limited substantive consolidation, this Class would receive nothing under theoretical separate plans for each Debtor.

---

issues through the judicial process. Given the binary nature of many of the disputes and the distributional implication of those disputes, there would not be a clear path whereby interim distributions could be made to any given Creditor. This could leave Creditors who are retired, elderly, or otherwise in need of timely liquidity sources without an accessible or economical way to recover something on their investment . . . [T]he Plan Settlement Elements disentangle the Debtors and their Estate from these many disputes in one fell swoop, thereby removing the need for the Estates to incur any additional costs, while eliminating the risk that each group of the different stakeholders could face if any particular issue were to be resolved adversely to the group's position.'").

12961575

At the same time, the Plan does not adversely affect the rights of secured creditors, whose claims are treated under the Plan in accordance with the provisions of the Bankruptcy Code. *Id.* at ¶ 36.

159.    The Plan Proponents have therefore concluded that the proposed limited substantive consolidation under the Plan offers the most effective and efficient available remedy to equitably treat creditors in a manner that provides general unsecured creditors with an opportunity to maximize recoveries, while not prejudicing the rights of any other creditors. [62] *Id.* at ¶ 37.

160.    As such, the Court should approve the proposed limited substantive consolidation. *See* Declaration of Judge Gross (Ret.) ¶ 15.

## II.    The Other Plan Objections Should be Overruled.

161.    In addition to the arguments set forth above, all of the filed objections to confirmation of the Plan are listed and addressed in the summary chart attached hereto as **Exhibit A**.  The Plan Proponents respectfully submit that all of the objections should be overruled for the reasons set forth above and the additional reasons set forth in the "Plan Proponents' Response" column set forth in **Exhibit A**.

### THE PLAN MODIFICATIONS DO NOT REQUIRE RE-SOLICITATION

162.    The Plan Proponents made certain modifications to the Plan subsequent to solicitation of the Plan.

163.    Sections 1127(c) and (f)(2) of the Bankruptcy Code generally require that all modifications of a plan comply with section 1125 of the Bankruptcy Code. *See* 11 U.S.C. § 1127(c) and (f)(2). Courts have found that section 1125 requires additional disclosure following solicitation of a plan only when, and to the extent, the proposed plan modifications "materially

---

[62]    *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 766-67 (Bankr. S.D.N.Y. 1992) ("Without consolidation, no reorganized entity will emerge, thus thwarting a primary goal of the Bankruptcy Code – rehabilitation and reorganization. The emergenc[e] of the reorganized Debtors . . . will also maximize distributions to Creditors by realizing increased recoveries on certain illiquid but strategic assets of the Debtors. Rather than some Creditors inexplicably receiving recoveries, and other Creditors and Equity Interest holders receiving no recoveries at all, substantive consolidation . . . is a large step toward another primary goal of the Bankruptcy Code – equality of distribution.").

and adversely impact[] parties who previously voted for the plan." *In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988).

164.    Bankruptcy Rule 3019 expressly allows a court to deem a plan modification accepted by all parties that have previously voted in favor of a plan when the modification does not materially and adversely change such party's treatment. *See* Bankruptcy Rule 3019; *In re Am. Solar King Corp.*, 90 B.R. at 824-25.

165.    Additionally, courts have found that any plan modification must be adverse and material before parties will be permitted to change their previous acceptance of the plan. *See Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1117-18 (11th Cir. 2006) (stating that "the bankruptcy court may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way that claim or interest holder is treated."); *In re Am. Solar King Corp.*, 90 B.R. at 826 (stating that "if a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well."); *In re Mount Vernon Plaza Cmty. Urban Redevelopment Corp., I*, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (holding that Bankruptcy Rule 3019 applies where proposed plan modifications did not "negatively affect[] the repayment of creditors, the length of the Plan, or the protected property interests of parties in interest.").

166.    The Plan Proponents submit that the requirements of section 1127 of Bankruptcy Code and Bankruptcy Rule 3019 are satisfied and request that the Court find that the modified Plan is deemed accepted by all creditors who have previously voted to accept the Plan. The modifications to the Plan that were made subsequent to solicitation are not adverse to any party in interest and do not adversely affect the treatment of any Claim, as reflected in the redline of the Plan filed with the Court. Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code and do not require the re-solicitation of any Class of Claims under section 1126 of the Bankruptcy Code.

## CONCLUSION

The Plan complies with and satisfies all applicable requirements of section 1129 of the Bankruptcy Code. Therefore, the Plan Proponents respectfully request that the Court (i) confirm the Plan, and (ii) grant the Plan Proponents such other and further relief as is just and proper.

Dated: March 7, 2025
Wilmington, Delaware

/s/ Peter C. Hughes
**DILWORTH PAXSON LLP**
Peter C. Hughes, Esq. (Bar No. 4180)
800 King Street – Suite 202
Wilmington, DE 19801
Telephone: (302) 571-9800

-and-

**DILWORTH PAXSON LLP**
Lawrence G. McMichael, Esq. (*pro hac vice*)
Peter C. Hughes, Esq.
Anne M. Aaronson, Esq. (*pro hac vice*)
Jack Small, Esq. (*pro hac vice*)
1650 Market St., Suite 1200
Philadelphia, PA 19103
Telephone: (215) 575-7000

*Counsel to the Debtors*

/s/ Colin R. Robinson
**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler, Esq. (Bar No. 4142)
James E. O'Neill, Esq. (Bar No. 4042)
Colin R. Robinson (Bar No, 5524)
919 N. Market Street, 17th Floor
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100

-and-

**SILLS CUMMIS & GROSS, P.C.**
Andrew Sherman, Esq. (*pro hac vice*)
Boris Mankovetskiy, Esq. (*pro hac vice*)
One Riverfront Plaza
Newark, NJ 07102
Telephone: (973) 643-7000

*Counsel to the Official Committee
of Unsecured Creditors*

12961575