## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| CarePoint Health Systems Inc. d/b/a Just Health Foundation, *et al.*,[1] | Case No. 24-12534 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 551, 730** |

### OBJECTION OF CAREPOINT HEALTH CAPTIVE ASSURANCE COMPANY, LLC TO FINAL APPROVAL AND CONFIRMATION OF THE FOURTH AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF REORGANIZATION

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Eric D. Schwartz (No. 3134)
Matthew B. Harvey (No. 5186)
Sophie Rogers Churchill (No. 6905)
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Email:  eschwartz@morrisnichols.com
       mharvey@morrisnichols.com
       srchurchill@morrisnichols.com

*Counsel to CarePoint Health Captive Assurance Company, LLC*

March 4, 2025

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

# TABLE OF CONTENTS

**Introduction** ………………………………………………………………………….. 1

**Background** ………………………………………………………………………..…….5

I.      Captive Assurance holds undisputed unsecured claims totaling at least $19,129,810. ........ 3

II.     HRH has been on a years-long campaign to gain control over the Debtors' hospitals.......... 4

III.    Left with no options, the Debtors are forced to file these chapter 11 cases for the benefit of HRH. ……………………………………………………………………………………...9

IV.   The Plan represents the culmination of HRH's efforts to enrich itself at the expense of the Debtors and their creditors..........................................................................................................11

   A.  The Plan inflates HRH's claim without basis...................................................................11

   B.  The Plan provides numerous recoveries to HRH over and above its Allowed Claim. .... 13

   C.  HRH is being released under the Plan without any investigation and for no additional consideration. ........................................................................................................................ 14

   D.  The Plan contains insufficient means for pursuing an "Alternative Transaction." ......... 16

V.    The Plan proposes "deemed" substantive consolidation despite the Debtors at all times maintaining separateness both pre- and post-confirmation. ........................................................ 17

VI.   The value of the Debtors' assets, and the related Liquidation Analyses, are an unreliable moving target. ............................................................................................................................... 18

VII.  The Committee's and the Debtors' Rule 30(b)(6) representative could not explain the selection process the Litigation Trustee or Litigation Trust Oversight Committee. ..................... 23

Objection…………………………………………………………………………………….. 28

I.     The Plan violates numerous provisions of the Bankruptcy Code and is unconfirmable. .... 26

   A. The Plan Proponents cannot carry their burden to approve the release of the HRH Released Parties........................................................................................................................ 26

      1. The Plan Proponents lack any evidence in support of the release. ........................... 26

      2. HRH is providing no consideration for the release.................................................. 28

   B. The Plan violates the absolute priority rule and unfairly enriches HRH by providing HRH with recoveries exceeding 100% of its allowed claims........................................................ 29

   C. The Plan's "deemed" substantive consolidation fails as a matter of law and is supported by the facts............................................................................................................................. 30

      1. "Deemed" substantive consolidation is prohibited in the Third Circuit without consent. ....................................................................................................................... 30

      2. The facts do not support any form of substantive consolidation. ............................. 33

D. The Plan Proponents cannot meet their burden to show that the Plan satisfies section 1129(a)(7)'s "best interest of creditors test." ......................................................................... 34

E. The Plan disenfranchises creditors in violation of section 1129(a)(10) of the Bankruptcy Code ...................................................................................................................................... 35

F. The selection of the Litigation Trustee and Litigation Trust Oversight Committee, and the Litigation Trust's governance, violate section 1123(a)(7) of the Bankruptcy Code. ............ 36

G. The Plan is not proposed in good faith. .......................................................................... 37

II.    The Disclosure Statement lacks adequate information and cannot be approved on a final basis. ....................................................................................................................................... 40

**Reservation of Rights** ......................................................................................................... 42

**Conclusion** ........................................................................................................................... 42

## INTRODUCTION

1.      Captive Assurance generally supports the Debtors' efforts to reorganize their business so that they can continue to provide critical care for patients in Hudson County, New Jersey.  But those efforts must still comply with the substantive and procedural requirements of the Bankruptcy Code, Bankruptcy Rules, and applicable law.  Unfortunately, as currently proposed, the Plan is fatally flawed and cannot be confirmed, and the Disclosure Statement lacks adequate information and cannot be approved on a final basis.

2.      The Plan is premised on an insider release of HRH and its affiliated entities and persons, but there is a complete lack of evidence to support the release.  Neither the Debtors nor the Committee conducted any investigation to support the HRH release.  Binding case law makes clear that the Court is required to "apprise [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated," *see Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), including by "assess[ing] and balanc[ing] the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal," *see Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  With the Debtors and the Committee unable to present any evidence to aid the Court in this determination, the release simply cannot be approved, dooming the Plan from the start.  There also is no consideration to support the release.

3.      The Plan is likewise flawed for the economic consideration it gives HRH—consideration far in excess of HRH's already inflated claim amount.  In addition to providing HRH with a 100 percent return on its $110 million Allowed Claim in the form of a dollar-for-dollar Exit Facility, the Plan also hands HRH the Bayonne Hospital—worth $32.7 million according to the

parties' agreement—in a credit bid, but with no corresponding reduction of HRH's claim. HRH also receives exclusive rights under a 10-year Management Services Agreement with a revenue stream of $210 million and the exclusive option to purchase Christ and Hoboken Hospitals. Again, none of this reduces or offsets HRH's claim. HRH is sharing substantially in the proceeds of litigation claims—again with no offset or deduction against its $110 million Allowed Claim. HRH's recovery above 100 percent of its claim violates the Bankruptcy Code's absolute priority rule and renders the Plan unconfirmable.

4.      The Plan's "deemed" substantive consolidation further precludes confirmation. The Third Circuit has prohibited the "deemed" consolidation the Plan Proponents seek here, finding that it is impermissible even where evidence supports consolidation. And, moreover, the facts of this case do not even support substantive consolidation, including because the Debtors have always maintained appropriate separateness and intend to continue to do so post-confirmation. Similarly, the Plan's consolidation of classes for voting violates the "per debtor" plan confirmation requirement long applied in this district and therefore cannot be approved.

5.      The Plan Proponents also cannot meet their burden to satisfy the "best interests" of creditors test because the data on which they rely is incomplete and unreliable and has not been produced or explained in discovery.

6.      Even if the Plan could be confirmed (it cannot), creditors are not sufficiently represented and protected by the Litigation Trust established under the Plan. There is no evidence that the Litigation Trust's fiduciaries were properly selected and will be properly overseen. These issues will need to be addressed in any Litigation Trust established under this Plan or a future plan so as to assure active, engaged fiduciaries are both selecting the Litigation Trustee and its oversight committee, as well as conducting the business of the Litigation Trust.

7.     For these and other reasons discussed herein, the Plan cannot be found to be proposed in good faith.  Though the Debtors' goal to save their hospitals is a noble one, the manner in which the Plan and the Plan Proponents deal with HRH and other creditors does not constitute good faith and should not be endorsed by this or any Court.

8.     Finally, as will become clear from reading the many issues with the Plan, the Disclosure Statement that describes the Plan is inadequate, omits material information available to the Debtors, and cannot be approved on a final basis.

## BACKGROUND

**I.     Captive Assurance holds undisputed unsecured claims totaling at least $19,129,810.**

9.     Captive Assurance is a captive insurance company formed by the Debtors' Prior Owners to provide liability insurance to the Debtors' hospitals and physician groups.  Captive Assurance holds allowed, undisputed, fixed, and liquidated unsecured claims for unpaid insurance premiums totaling at least $19,129,810.80.

10.     The Debtors scheduled the following claims for Captive Assurance:

| Debtor (Schedules Docket Item No.) | Scheduled Claim Amount |
|---|---|
| Garden State Healthcare Associates, LLC (D.I. 351) | $14,521,632.56 |
| Hudson Hospital Opco LLC d/b/a CarePoint Health-Christ Hospital (D.I. 354) | $79,156.01 |
| HUMCO Opco LLC d/b/a CarePoint Health-Hoboken University Medical Center (D.I. 357) | $34,015.60 |
| IJKG Opco, LLC d/b/a CarePoint Health-Bayonne Medical Center (D.I. 358) | $81,189.33 |
| New Jersey Medical and Health Associates (D.I. 361) | $4,413,817.30 |
| **TOTAL:** | **$19,129,810.80** |

Each claim is scheduled as undisputed, noncontingent, and in liquidated amount.  Accordingly, each claim is an "Allowed Claim" within the meaning of the Bankruptcy Rules and the Plan.  *See*

3

Fed. R. Bankr. P. 3003(b)(1) ("An entry on the schedule of liabilities filed under § 521(a)(1)(B)(i) is prima facie evidence of the validity and the amount of a creditor's claim—except for a claim scheduled as disputed, contingent, or unliquidated.  Filing a proof of claim is unnecessary except as provided in (c)(2) [of this rule]."); Plan § 1.8 ("Allowed Claim" means a Claim or any portion thereof . . . (b) that has been Scheduled as a liquidated, non-contingent, and undisputed Claim in an amount greater than zero in the Schedules, and the Schedules have not been amended with respect to such Claim on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Court[.]").[2]

11.     Additional detail regarding Captive Assurance and its claim is found in   the *Objection of CarePoint Health Captive Assurance Company, LLC to Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement, Plan Confirmation and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and Forms Related Thereto; and (IV) Granting Related Relief* (D.I. 466), and incorporated herein by reference.

## II.     HRH has been on a years-long campaign to gain control over the Debtors' hospitals.

12.     HRH has engaged in a years-long, multi-faceted campaign to gain control over the Debtors' hospitals, including acquiring the land on which they sit to exert leverage over the Debtors and leave them with no options but to transfer ownership and control to HRH and accede to HRH's unreasonable terms.  HRH's conduct has been the subject of lawsuits, including a 2022 antitrust

---

[2]    The bar date for filing proofs of claims in these cases has not yet passed.  Captive Assurance reserves the right to file one or more proofs of claim.

lawsuit in which the Debtors accused HRH of engaging in a years-long conspiracy with others to destroy or devalue the Debtors' business.

13.    As HRH's President and Chief Executive Officer, Dr. Nizar Kifaieh, testified, HRH made it clear by the end of 2019 or early 2020 that it wanted to acquire Bayonne Hospital from the Debtors' prior owners.  Kifaieh Dep. 34:17–25, Dec. 6, 2024 (testifying that HRH "made it very clear" in "the beginning of 2020, end of 2019" that it wished to acquire Bayonne Hospital), **Ex. A**.  Consistent with that aim, HRH reached a hand-shake agreement with the prior owners to acquire Bayonne Hospital.  *Id.* 35:2–4; 195:4–9.  HRH also put in an offer for all three of the Debtors' hospitals in May 2020.  *Id.* 197:2–4 ("I remember putting in the offer for all three hospitals.  It was on May 22, 2020, because it was my birthday.").  But the Prior Owners ultimately did not sell to HRH, opting instead to enter into an agreement with another party for management rights of Bayonne Hospital.  *Id.* at 35:1–5.

14.    Unable to purchase Bayonne Hospital, HRH instead shifted to acquiring the land on which Bayonne Hospital sits and then suing to enforce transfer restrictions and alleged latent defaults under the lease in an effort to gain control over Bayonne Hospital and exert leverage over the Debtors.  In June 2020, the next month after its offer to acquire Bayonne Hospital was rejected, HRH purchased the land on which Bayonne Hospital sits.  *See* Kifaieh Dep. 88:16–21, Feb. 27, 2025, **Ex. B**.  HRH purchased the land knowing that there were alleged existing defaults under which it could immediately sue the Debtors.  *See id.* at 90:8–22.  HRH then immediately commenced a lawsuit against Bayonne Hospital to enforce the terms of the lease, at least as it read them.  *Id.* 89:2-11. ("Q. When was that lawsuit commenced?  A.  As soon as we took over.  As soon as we acquired the land, when we closed on the land.  I believe maybe June or July of 2020.").

Even though HRH acknowledge that the Debtors were current on their $800,000 monthly rent, HRH sued to recover "assessment fees" it alleged were due under the lease. *See id.* 88:2–91:11.

15.    The Debtors fought the lawsuit for years, but ultimately faced a default judgment due to the inability to adequately defend the suit in light of the Debtors' deteriorating financial condition in late 2024.  In October 2024, the Debtors consented to entry of an order giving HRH a judgment in the range of $24,000,000 to $32,000,000.  The judgment was entered on the eve of and in express contemplation of bankruptcy, and during the period to avoid preferential and fraudulent transfers.  *See* Consent Order for Foreclosure of Sec. Ints. and Surrender of Prop., Reversion of Operating License, Possession & Entry of Final Judgment ¶ 2, *29 E 29 Street Holdings, LLC v. IJKG Opco, LLC*, C.A. No. 2020-0480-KSJM (Del. Ch. Oct. 18, 2024) ¶ 2 (contemplating that the judgment would be enforced in a bankruptcy proceeding), **Ex. C**.  The judgment also contained declaratory relief effectively ceding control of Bayonne Hospital to HRH, including possession of Bayonne Hospital, foreclosure and surrender of Bayonne Hospital's operating license and related permits and approvals to HRH, and transfer of management of Bayonne Hospital to HRH.  *Id.* ¶ 4.   HRH's conduct was not limited to the Bayonne Hospital land and lease.  For example, HRH also sued to block the transfer of Bayonne Hospital's "certificate of need" to another party as part of its efforts to gain control of Bayonne Hospital.  Kifaieh Dep. 199:15–201:17, Dec. 6, 2024, **Ex. A**.

16.    In response to HRH's conduct, the Debtors named HRH as a co-conspirator in an antitrust lawsuit brought by the Debtors alleging "a years-long systematic effort" to destroy the Debtors' business and "monopolize the provision of general acute care hospital services and related health care services in northern New Jersey." *See* Third Amended Complaint and Jury Demand ¶ 1, *CarePoint Health Systems Inc. v. RWJ Barnabas Health, Inc.*, No. 2:22-cv-05421 (D.N.J.

Feb. 8, 2023), **Ex. D**.  As the Debtors allege in their complaint, the defendant in that lawsuit, RWJ

Barnabas, was aided by HRH, HRH's owner, Yan Moshe, and HRH's President and CEO, Dr.

Nizar Kifaieh.  *See id.* ¶ 8 ("RWJ's conspirators have included real estate players Avery Eisenreich

("Eisenreich") and Yan Moshe ("Moshe") whose interests are unrelated to those of safety net

hospitals and providing accessible healthcare to the community.  These conspirators have faced

numerous legal challenges including insurance fraud allegations against Moshe's facilities, and

RICO complaints against Moshe and Nizar Kifaieh ("Kifaieh") and a recent weapons-related

federal investigation within Moshe-controlled and Kifaieh-run Hudson Regional Hospital

("HRH").").

17.    As the complaint explains, "HRH and its principals, while not defendants in this

litigation, were intimately involved with Eisenreich and Manigan in efforts to advance RWJ's goals

including controlling the real estate under the Hospitals, decimating CarePoint financially, and

poaching CarePoint doctors."  *Id.* at 8, n.2.  Consistent with HRH's efforts to obtain Bayonne

Hospital's land and lease, the Debtors' complaint alleges that HRH conspired with others to control

the real property on which the hospitals sit, and "[t]hrough controlling the land under the hospitals,

the property owner was able, at times, to have "veto power" over any hospital operator it did not

like – thereby controlling not only the real estate, but also the hospitals themselves."  *Id.* ¶ 11.

According to the complaint, HRH allegedly colluded with others "in an effort to close down

Bayonne Medical to boost HRH's same-day surgery practice" and aid other co-conspirators'

businesses, including by eliminating competition from Bayonne.  *Id.* ¶ 21.  The intent of these

efforts, the Debtors alleged, was to "bankrupt CarePoint."  *Id.* at 34–38.

18.    The Debtors' complaint sets forth HRH's 2020 dealings with the Debtors in respect

of acquiring Bayonne Hospital:

HRH's real motivation in making hollow offers to CarePoint that knowingly did not meet CarePoint's requirements, and then to sabotage BMC's acquisition of Bayonne Medical through an 11th hour land transaction with Eisenreich, was pure greed to own the market for same day surgery in Hudson County, preferably at its existing Secaucus facility.

Upon information and belief, the plan was for HRH, in collusion with Eisenreich and RWJ – and now with control of the land – to feign interest in the hospital and delay closing so that Bayonne Medical would become insolvent and be forced to close. Strategically, it was the intention of RWJ, Eisenreich and HRH to cause further financial distress to Bayonne Medical, as the specter of bankruptcy causes staff and doctor defection, a freeze on programmatic growth and expansion of other services and offerings. Further, patients are reluctant to seek care at a facility they believe is "going out of business."

Eisenreich and Moshe planned that, once the hospital closed, they would repurpose the building as Eisenreich's next skilled nursing facility ("SNF") and HRH would hire the surgeons then doing cases at Bayonne Medical to further expand HRH's same day surgery programs at HRH's Secaucus facility.

Such a plan served to benefit Eisenreich, Moshe, HRH and RWJ. Eisenreich could expand his SNF empire with Moshe, HRH would eliminate surgery center competition, and RWJ would eliminate Bayonne Medical as a competitor, as SNF does not provide inpatient GAC services.

*Id.* ¶¶ 114–118 (paragraph numbers omitted).  The Debtors sought, among other relief, substantial damages and an injunction preventing the defendant and its co-conspirators, including HRH, from continuing their unlawful conduct.  *Id.* at 56–57.  The lawsuit remains pending.

19.    As part of its efforts, HRH also acquired an option to purchase the land on which Christ Hospital sits—an option that belonged to the Debtors until the eve of bankruptcy when the Debtors allowed it to expire, and HRH immediately scooped it up.  Christ Hospital sits on a 12-acre parcel of otherwise undeveloped land with unrestricted views of New York City.  The Christ Hospital land has been appraised at approximately $150 million as of 2021, although the Debtors

have heard that the land could be worth over $200 million if developed.  *See* Cushman & Wakefield of Connecticut, Inc., Appraisal of Real Property 4 [HRH Plan042598] (2021), **Ex. E**; Syed Dep. 67:14–68:9, Dec. 5, 2024, **Ex. F**.  Under their lease, the Debtors had an option to purchase the land from the landlord for approximately $52 million.  Syed Dep. 64:4–16, Dec. 5, 2024, **Ex. F**.  Faced with liquidity constraints, however, the Debtors negotiated with HRH and ultimately reached an agreement that HRH would front the funds to exercise the purchase option and rezone and develop the land into a revenue-generating enterprise, while the Debtors continued to lease the property for the operation of Christ Hospital rent-free.  *See id.* at 62:1–66:16.  After negotiating a purchase option agreement with the Debtors, HRH abandoned the agreement and instead negotiated a deal directly with the landlord, which effectively eliminated any opportunity for the Debtors to benefit from the purchase option in their lease and the upside value of the land, that could be worth as much as $150–$200 million.  *See id.* at 73:4–75:19.  According to the Debtors, HRH paid just $67 million for the land option.  *See id.* at 75:10–19.

III.    **Left with no options, the Debtors are forced to file these chapter 11 cases for the benefit of HRH.**

20.    Weighed down by HRH's and its alleged co-conspirators' efforts, the Debtors were forced to seek bankruptcy protection.  So complete was HRH's control over the Debtors by this point, and with the Debtors' alternatives foreclosed by HRH's conduct, the Debtors were forced to immediately seek unprecedented first-day relief to hand over control of their properties and operations to HRH.

21.    As to Bayonne Hospital, the Debtors sought, among other relief: (i) surrender of the Bayonne Hospital to HRH; (ii) granting HRH exclusive operating rights over Bayonne Hospital; and (iii) approving a private sale of Bayonne Hospital's assets to HRH.  *See* Mot. of Debtors IJKG Opco, LLC and IKJG, LLC for Entry of (A) An Interim Order Approving Collateral

Surrender and Operations Transfer Agreement to Allow *Inter Alia*, Interim Hospital Operations, (B) A Final Order Approving a Private Sale of All or Substantially All Assets of IJKG Opco, LLC and IJKG, LLC and (C) Granting Related Relief ¶ 22, Nov. 4, 2024, D.I. 18. Much of this relief was proposed to be immediate and irreversible, including because HRH sought to bind the Debtors to a complete "no shop" provision, prohibiting the Debtors from entertaining or seeking a competing transaction. *Id.* ¶ 22(d). Likewise, as to Christ and Hoboken Hospitals, the Debtors sought immediate relief to perform under and then assume a management services agreement with HRH to manage those hospitals, without a competitive process for those valuable rights. *See id.* ¶¶ 31–36 (explaining that the property had not been marketed since 2020). Fortunately, given their unprecedented nature, the Court did not approve the motions.

22. The Debtors then subsequently filed a motion in December 2024 to seek approval of another management services agreement with HRH—this time for a four-hospital system comprising the Debtors' three hospitals and HRH's existing hospital—effectively conceding that the cases would result in the Debtors' handing the hospitals to HRH, despite any potential future alternative transaction process. *See* Mot. of the Debtors for an Order (I) Authorizing the Entry into the Hospital Facilities Management Services Agreement, and (II) Granting Related Relief ¶¶ 9–10 (explaining the Debtors' intention to "surrender" Bayonne Hospital to HRH in order to create a four-hospital healthcare system named "Hudson Health System"). That MSA includes a $1.75 million monthly management fee over a term of 10 years (totaling $210 million in management fees) and would grant HRH "exclusive and irrevocable rights and options to purchase" Christ and Hoboken Hospitals from the Debtors (in addition to the collateral surrender and private sale of Hoboken Hospital to HRH). *See id.* ¶ 15(c)–(d). That motion and MSA also has not been approved, and the relief has instead been folded into the Plan.

**IV.   The Plan represents the culmination of HRH's efforts to enrich itself at the expense of the Debtors and their creditors.**

23.     The Plan is the capstone of HRH's efforts to extract as much value as possible from the Debtors and their other creditors, including by inflating its claim, receiving multiple recoveries in addition to its Allowed Claim, and extracting a release for itself and its affiliates for no additional consideration and without any evidence of an investigation.  The Plan also provides no meaningful opportunity for any competing transaction.

**A.      The Plan inflates HRH's claim without basis.**

24.     The Plan, as originally filed, set HRH's Allowed Claim at $88 million and provided no calculation of the claim.   Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization Art. V.A, Jan. 8, 2025, D.I. 412.  As currently proposed, the Plan now sets HRH's Allowed Claim at an inflated figure of at least $110 million, again providing no calculation of the claim.  *See* Plan at 4; *see also* Plan § 1.190 ("[T]he HRH Claims shall be deemed Allowed in the approximate estimated amount of $110 million for all purposes under the Plan, subject to final reconciliation as shall be set forth in the HRH Exit Facility Credit Agreement and except as provided in Article IX.C of the Plan.").

25.     HRH's corporate representative, Dr. Kifaieh, testified that HRH expected the claim to be even higher than $110 million.  Kifaieh Dep. 59:2–14, Feb. 27, 2025 ("I do believe the number is even higher now . . . I don't know the updated number, but it's way more than $110 million), **Ex. B**.  While Dr. Kifaieh stated his belief that the claim now exceeds $110 million, he was unable to provide details of the calculation of the claim, despite being offered as HRH's Rule 30(b)(6) corporate representative in a deposition that included the following topic: "HRH's claims against the Debtors, including their amount, priority, the Debtors against which the claims exist, and the property securing HRH's claims."  CarePoint Health Captive Assurance Company, LLC's

Amended Notice of Dep. of Hudson Regional Hospitals, LLC, Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030, Feb. 27, 2025, D.I. 763 (Topic No. 6); *see also* Kifaieh Dep. 12:7–13:19, Feb. 27, 2025 (Dr. Kifaieh testifying that he did nothing specific to prepare to answer questions about HRH's claims or financial information despite those issues being within the knowledge of HRH through HRH's Chief Financial Officer), **Ex. B**; Kifaieh Dep. 59:6–12, Feb. 27, 2025 (Dr. Kifaieh testifying he did not know the exact number of HRH's claim and referring to the Chief Financial Officer for details of HRH's claims), **Ex. B**.

26. The parties' interrogatory responses are similarly lacking. The Debtors, HRH, and the Committee each failed to substantively respond to interrogatories seeking details on HRH's claims. *See* Debtors' Answer to CarePoint Health Captive Assurance Company, LLC's First Set of Interrogatories to Debtors in Connection with Plan Confirmation and Final Approval of the Disclosure Statement, Feb. 13, 2025 (Response Nos. 16–19) ("[T]he Debtors respond that this Interrogatory is properly directed to HRH, not the Debtors."), **Ex. G**; Responses and Objections of the Official Committee of Unsecured Creditors to CarePoint Health Captive Assurance Company, LLC's First Set of Interrogatories to the Official Committee of Unsecured Creditors in Connection with Plan Confirmation, Feb. 13, 2025 (Response Nos. 6–7) (directing Captive Assurance to review the First Day Declaration and the DIP Motions), **Ex. H**. The Committee alone provided a mathematical computation of the components of HRH's claims, without backup, but referred Captive Assurance to HRH for information about the basis for the claims—and HRH failed to substantively answer similar interrogatories. Hudson Regional Hospital's Objections and Responses to CarePoint Health Captive Assurance Company, LLC's (I) First Set of Requests for Production of Documents in Connection with Plan Confirmation and (II) First Set of Interrogatories in Connection with Plan Confirmation (Response Nos. 3–7) (directing Captive

Assurance to review the DIP Motions and responding that "non-privileged documents responsive to this Interrogatory, to the extent in the possession of HRH, shall be produced"), **Ex. I**.

27.    The Plan also appears to assume that HRH has claims against all the Debtors and that its claims are secured by all the Debtors' assets, including because the Plan allows HRH to receive those assets or their benefit for no additional consideration.  But HRH only has claims and liens against the specific hospital Debtors, and lacks claims and liens against other Debtors, such as the physician group Debtors, Garden State Healthcare Associates, LLC, and New Jersey Medical and Health Associates.  Again, Captive Assurance sought clarifying information through interrogatories, but no party substantively answered those interrogatories.

**B.    The Plan provides numerous recoveries to HRH over and above its Allowed Claim.**

28.    In addition to inflating HRH's Allowed Claim, the Plan provides additional recoveries to HRH on account of its Allowed Claim on top of the $110 million Exit Facility.

29.    First, the Plan provides that HRH's $110 million Allowed Claim is satisfied in full through conversion to an Exit Facility that is to be repaid with interest by the Reorganized Debtors from operations over a five-year term.  *See* Plan at 4 (providing for 100 percent recovery in the form of the Exit Facility).

30.    Second, the Plan provides that HRH is acquiring Bayonne Hospital as part of a credit bid or collateral surrender in the amount of $32,741,612.  *See* Plan at 88–89.  Ordinarily, a credit bid or collateral surrender operates to reduce the amount of the overall Allowed Claim, but that is not the case here.  Instead, HRH's claim remains at approximately $110 million.  Rosen Dep. 141:4–142:23, Feb. 28, 2025, **Ex. J**.

31.    Third, HRH is acquiring the exclusive rights under the MSA, with monthly payments over 10 years totaling $210 million, plus the exclusive, irrevocable option to purchase

Christ and Hoboken Hospitals.  *See* Plan Art. IX.B (granting HRH all rights under the MSA); Hospital Facilities Management Services Agreement §§ 4.1, 5.1, Dec. 1, 2024, D.I. 212-2 (providing for a $1.75 million management fee and a term of ten years).  Again, there is no reduction or offset of HRH's Allowed Claim on account of these valuable rights.  Kifaieh Dep. 83:14–84:24, February 27, 2025, **Ex. B**.

32.     Fourth, HRH is given substantial economic interests in the Litigation Trust on account of its claims, including the first $5 million after general unsecured claimants receive a 10% of recovery (not to exceed $15 million), and then 35% of all net recoveries thereafter for all claims other than Avoidance Actions.  *See* Plan at 86.  And, for Avoidance Actions, once general unsecured claimants receive a 40% recovery, HRH will receive 35% of net proceeds of Avoidance Actions as well.  *See id.*  Yet again, there is no apparent reduction or offset against HRH's other recoveries.  Kifaieh Dep. 82:16–83:13, Feb. 27, 2025, **Ex. B**.

**C.     HRH is being released under the Plan without any investigation and for no additional consideration.**

33.     In addition to its various recoveries, HRH and its affiliates and related persons and entities are receiving releases under the Plan.  The Plan defines "Released Parties" to include (collectively referred to herein as the "HRH Released Parties"):

> HRH, including its affiliates, subsidiaries and designees, including without limitation 29 E. 29 Street Holdings, LLC, NJMHMC LLC d/b/a Hudson Regional Hospital, the DIP Lender, the newly-formed management services organization who shall administer the four hospital system as contemplated by the MSA, and their respective former, present and future owners, officers, directors, managers, employees, independent contractors, attorneys, agents and representatives)

Plan § 1.160.  But HRH is offering no additional consideration for this release, and discovery has made clear that neither the Debtors nor the Committee can offer any evidence that they conducted

14

any investigation of potential claims or causes of action against the HRH Released Parties—despite the Debtors' prior allegations against HRH and its affiliates.

34.     The Debtors have admitted that they have done no formal investigation of HRH or the HRH Released Parties.[3]  Syed Dep. 154:4–155:18, Feb. 27, 2025, **Ex. K**.  And the Plan expressly provides that the Committee's counsel has done no investigation of the Released Parties under the Plan: "Counsel for the UCC has not conducted an investigation of claims against any of the Released Parties . . . including the release of potential Avoidance Actions with respect to the Outstanding Judgment and the termination of the Bayonne Lease."  Plan at 116–17.  While the Committee claimed in interrogatory responses to have "conducted both formal and informal discovery concerning potential Claims or Causes of Action against HRH," it failed to answer any questions about that investigation.  *See* Responses and Objections of the Official Committee of Unsecured Creditors to CarePoint Health Captive Assurance Company, LLC's First Set of Interrogatories to the Official Committee of Unsecured Creditors in Connection with Plan Confirmation, Feb. 13, 2025 (Response No. 2), **Ex. H**.  Moreover, on the topic of "[t]he Committee's investigation into potential claims and causes of action against HRH . . . including any of [its] affiliates, owners, or representatives," the Committee's Rule 30(b)(6) designee testified that she could not recall whether the Committee had investigated HRH, had not seen any investigative report, analysis or other document about any investigation of HRH, and was not aware whether any such document existed.   White Dep. 45:4–47:11, Feb. 28, 2025, **Ex. M**.

---

[3]   The Restructuring Committee was not asked to investigate, and did not investigate, claims or causes of action against HRH.  *See* Zucker Dep. 27:3–17, Feb. 26, 2025 ("Q: So am I understanding your prior testimony correctly that the Reorg Committee has done no investigation of any of the parties that are included in this list of released parties [in the Plan]? A: Correct. Q: And did I also understand you, that the Restructuring Committee has received no finding that it [] would be expected to review in relation to potential causes of action against any of these released parties? A: That is correct.").  Such investigations are arguably not within the Restructuring Committee's mandate.  *See* Resolutions of the Board of Trustees of CarePoint Health Systems Inc., Dec. 20, 2024 (resolving that "the Restructuring Committee shall supervise and control all restructuring activities in connection with the Bankruptcy Cases"), **Ex. L**.

Accordingly, there is no evidence of any investigation of claims and causes of action against the HRH Released Parties.

  **D.**  **The Plan contains insufficient means for pursuing an "Alternative Transaction."**

  35.  Though the Plan facially contains a process for the Debtors to pursue an "Alternative Transaction," that process is deficient and unfairly tilted in HRH's favor. The Alternative Transaction process provided a 21-day window in which competing bids could be submitted. But this time is unreasonably short, and there was effectively no marketing process, including because neither the Debtors nor the Committee employ an investment banker in this case. A member of the Debtors' Restructuring Committee with over 30 years of restructuring experience, could not recall a single instance of a case with such a short transaction process. Zucker Dep. 33:22–34:3, Feb. 26, 2025, **Ex. N**. Rightly so, because it is simply unprecedented in this district.

  36.  The process was further unfairly tilted toward HRH because any Alternative Transaction was required to pay HRH in full on account of its inflated and unsubstantiated $110 million claim. *See* Plan at 5 ("Notwithstanding anything contained herein, in the event that an Alternative Transaction is consummated, the Allowed HRH Claims shall be paid in full upon the closing of the Alternative Transaction."). An Alternative Transaction also required a minimum $1 million overbid to account for an unapproved $1 million breakup fee to HRH. And the Debtors and the Committee waived their rights to contest HRH's right to credit bid its inflated claim, and possibly even to contest further inflation of the claim in HRH's discretion. *See id.* at 89 ("If there is competitive bidding, HRH has the right to seek to augment its credit bid by the Outstanding Judgment, outstanding operations/management fees, all amounts incurred, advanced, assumed or

paid for or on behalf of the Debtors and other amounts or consideration, and neither the Debtors nor the UCC will oppose HRH's augmented credit bid.").

**V.    The Plan proposes "deemed" substantive consolidation despite the Debtors at all times maintaining separateness both pre- and post-confirmation.**

37.    The Plan proposes "deemed" substantive consolidation of the Debtors' estates for voting and distribution purposes, despite the Debtors making clear that they maintain separate corporate existences and are able to distinguish their assets and liabilities from one other.  Among other things, the Debtors filed separate Schedules of Assets and Liabilities and Statements of Financial Affairs and have filed separate monthly operating reports.  The Debtors' cash management motion made clear that they "maintain records of all transfers and can ascertain, trace and account for all Intercompany Transfers and will continue to do so during these Chapter 11 Cases."  Mot. of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtors' Cash Management System and Existing Bank Accounts, (II) Authorizing Continued Intercompany Transfers Among Debtor Entities and (III) Granting Related Relief ¶ 17, Nov. 4, 2024, D.I. 7.

38.    The Debtors also have separate secured creditors with separate collateral.  *See* Mot. of CarePoint Health Systems, Inc. for Entry of Interim and Final Orders: (I) Authorizing Debtors to Obtain Temporary and Permanent Post-Petition Financing from Bayonne Medical Center Opco, LLC Pursuant to Sections 363 and 364 of the Bankruptcy Code; (II) Granting Administrative Priority Claims to DIP Lender Pursuant to Section 364 of the Bankruptcy Code; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay to Implement the Terms of the DIP Order; and (V) Authorizing Debtors to Use Cash Collateral, Nov. 4, 2024, D.I. 10 (seeking approval of DIP financing for Debtor CarePoint Health Systems, Inc. only); Mot. of IJKG Opco, LLC and IJKG, LLC for Entry of Interim and Final Orders: (I) Authorizing IJKG Opco, LLC and

IJKG, LLC to Obtain Temporary and Permanent Post-Petition Financing from Bayonne Medical Center Opco, LLC Pursuant to Sections 363 and 364 of the Bankruptcy Code; (II) Granting Administrative Priority Claims to DIP Lender Pursuant to Section 364 of the Bankrupty Code; (III) Modifying the Automatic Stay to Implement the Terms of the DIP Order; and (IV) Authorizing the Use of Cash Collateral, Nov. 4, 2024, D.I. 11 (seeking approval of DIP financing for Debtors IJKG Opco, LLC and IJKG, LLC only).

39.     The Debtors also file separate tax returns.  Syed Dep. 166:6–10, Feb. 27, 2025, **Ex. K**.  The Debtors even have different organizational and tax structures among themselves, with some Debtors being organized and taxed as for-profit entities and others organized and taxed as nonprofits.

40.     Moreover, despite the "deemed" substantive consolidation, the Plan makes clear that the Debtors are in fact separate, distinguishable entities and will maintain their separate corporate existence post-emergence.  For example, in the same section announcing deemed substantive consolidation, the Plan states that "each Debtor shall continue to exist as a separate entity, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective formation documents in effect before the Effective Date."  Plan at 53*; see also* Plan at 84 (providing similar language) & 90 (providing for continued, separate corporate existence of each of the Debtors).

**VI.     The value of the Debtors' assets, and the related Liquidation Analyses, are an unreliable moving target.**

41.     The Debtors have restated the value of key estate assets available to satisfy creditor claims in a manner that suggests that the Debtors' facts and underlying assumptions are unreliable, including through amendments to their schedules of assets and liabilities to reduce available assets at Garden State Health Care Associates, LLC ("Garden State"), and New Jersey Medical and

Health Associates ("New Jersey Medical"), where Captive Assurance holds its largest claims.  The Plan Proponents refused to substantively respond to interrogatories inquiring about the value of the Debtors' accounts receivable and intercompany receivables.  *See* Debtors' Answer to CarePoint Health Captive Assurance Company, LLC's First Set of Interrogatories to Debtors in Connection with Plan Confirmation and Final Approval of the Disclosure Statement, Feb. 13, 2025 (Response Nos. 1–3), **Ex. G**.  And none of the Rule 30(b)(6) witnesses that Captive Assurance deposed for the Debtors, the Committee, or HRH could describe even an estimate of the value of the Debtors' accounts receivable.  Yet Mr. Syed testified that the accounts receivable "is the only true [] valuable asset that these hospitals own."  Syed Dep. 98:5–23, Feb. 27, 2025, **Ex. K**.  Accordingly, Captive Assurance and other objecting parties have sought to clarify exactly what value can be attributed to the accounts receivable; without this information it is impossible for the Plan Proponents to perform a true "best interests" analysis.  But the more discovery Captive Assurance took on this topic, the murkier the responses became.

42.     The Debtors filed their schedules of assets and liabilities on December 23, 2024.  Most of Captive Assurance's Allowed Claims sit at Garden State and New Jersey Medical, which, according to the initial schedules filed by the Debtors, appeared capable of paying their debts in full or in material part (including Captive Assurance's general unsecured claims).  Garden State disclosed approximately $125 million of assets and approximately $35 million of liabilities, *see* D.I. 351, while New Jersey Medical disclosed approximately $42 million of assets and $21 million of liabilities, *see* D.I. 361.  Based on these numbers, Captive Assurance objected to conditional approval of the Disclosure Statement on the basis, among other things, that the proposed substantive consolidation harmed creditors with structurally superior claims like Captive Assurance.  *See* Obj. of CarePoint Health Captive Assurance Company, LLC, to Mot. of the

Debtors and the Official Committee of Unsecured Creditors for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement, Plan Confirmation, and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and Forms Related Thereto; and (IV) Granting Related Relief, Jan. 15, 2025, D.I. 466.

43.    The Court held a preliminary hearing on January 17, where Captive Assurance again argued that substantive consolidation is neither permissible under Third Circuit law nor appropriate in these cases where certain creditors have structural superiority.  The Court continued the hearing to January 23.  On January 22, in apparent response to Captive Assurance's arguments, the Debtors filed amended schedules reflecting an approximately $87 million reduction of assets at Garden State and an approximately $39 million reduction of assets at New Jersey Medical, both based on reducing the amount of available accounts receivable.  *See* Amended Schedules of Assets and Liabilities for Garden State Healthcare Associates, LLC, *In re Garden State Healthcare Assocs., LLC*, Case No. 24-12543, Jan. 22, 2025, D.I. 9; Amended Schedules of Assets and Liabilities for New Jersey Medical and Health Assocs., *In re N.J. Med. And Health Assocs.*, Case No. 24-12552, Jan. 22, 2025, D.I. 6.  Nearly a month after the Schedules were filed, but immediately after Captive Assurance objected to approval of the Disclosure Statement, the Debtors updated their books as of the Petition Date such that Captive Assurance's claims were no longer in the money.

44.    Captive Assurance asked the Debtors directly in interrogatories to identify the accounts receivable owed to certain Debtors and each intercompany receivable owed to certain Debtors.  In response, the Debtors directed Captive Assurance to "see Debtors' books and records produced herewith."  *See* Debtors' Answer to CarePoint Health Captive Assurance Company,

LLC's First Set of Interrogatories to Debtors in Connection[] with Plan Confirmation and Final Approval of the Disclosure Statement, Feb. 13, 2025 (Response Nos. 2–3), **Ex. G**.  Unfortunately, the Debtors did not produce documents "as they are kept in the usual course of business" or "organize and label them according to the categories in the request."  Fed. R. Civ. P. 34(b)(2)(E). As a result, Captive Assurance was required to sift through over 46,000 documents produced in no discernable order and with no direction as to how to find or identify responsive documents. Captive Assurance could not find clear answers to the simple questions posed in its interrogatories.

45.    At depositions, Captive Assurance continued to attempt to find a reliable value of the accounts receivable.  The Debtors' Rule 30(b)(6) representative testified that, in response to the objections and discovery requests being filed in these cases, the Debtors' counsel hired Ankura to value the Debtors' accounts receivable.  Syed Dep. 125:8–22, Feb. 27, 2025, **Ex. K**.  However, Ankura did not start the process of valuing the accounts receivable until the week of February 24, and the Debtors do not know when it will be complete.  *Id.* at 125:24–126:4.  Thus, at this time, the value of the Debtors' accounts receivable—the only real value in the estates according to the Debtors—is unknown.   And, in any event, whatever values have been provided in the Debtors' Schedules and the liquidation analyses filed in connection with the Plan may be revised with yet further new information.

46.    The Debtors' inability to reliably value key assets renders the Debtors' liquidation analyses unreliable.  As a threshold matter, Captive Assurance asked the Debtors and the Committee in interrogatories for a description of the data and underlying assumptions used to prepare the liquidation analyses.  The Debtors responded that "the liquidation analyses were completed by the financial advisor for the Unsecured Creditors' Committee with information provided by the Debtors."  Debtors' Answer to CarePoint Health Captive Assurance Company,

LLC's First Set of Interrogatories to Debtors in Connection with Plan Confirmation and Final Approval of the Disclosure Statement, Feb. 13, 2025 (Response No. 4), **Ex. G**.  The Committee objected to the interrogatory and declined to respond.  In effect, the Debtors told Captive Assurance to look to the Committee, and the Committee refused to respond.  Captive Assurance therefore noticed depositions for the Debtors under Rule 30(b)(6) and a representative of Province, LLC, the Committee's financial advisor.  Mr. Rosen confirmed in his deposition that Province prepared the liquidation analyses but "relied entirely" on receiving the underlying data and assumptions from the Debtors.  Rosen Dep. 57:10–60:9, **Ex. J**.  Mr. Rosen has no independent knowledge of the value of assets as set out in the liquidation analyses that he and his team prepared.  *Id.* at 75:23–77:1.

47.    The Debtors attached a consolidated liquidation analysis to the Plan which reflects $179,156,914 of accounts receivable on a consolidated basis.  *See* D.I. 551-2.  In the Plan Supplement, the Debtors attached de-consolidated liquidation analyses for five of twenty-one debtors, which reflect a total accounts receivable line item of $103,128,854 when summed—a nearly $76 million difference from the prior liquidation analysis.  *See* D.I. 730-8 at 15–19.

48.    Mr. Rosen testified that the difference is attributable to two primary updates that were made from the liquidation analysis filed with the Plan to the liquidation analyses filed with the Plan Supplement.  Rosen Dep. 77:2–87:24 (walking through the difference between the accounts receivable listed in each of the liquidation analyses), **Ex. J**.  First, the liquidation analyses provided in the Plan Supplement were calculated using different data than the Plan's consolidated liquidation analysis.  *Id.* at 77:19–81:8 ("[T]he Debtors provided updated accounts receivable numbers. . . . This version that was filed as part of the fourth amended plan used accounts receivable form the Debtors' schedules of assets and liabilities.  The accounts receivable in [the

Plan Supplement liquidation analyses] were as of, I believe, November 30th."). Second, the Debtors listed gross accounts receivable in the Plan's liquidation analysis (showing recoveries to creditors under the chapter 11 plan), without accounting for whether the accounts receivable are billable or collectible. *Id.* at 81:9–88:3. The de-consolidated liquidation analyses in the Plan Supplement, however, calculate accounts receivable using a two-step netting process for unbillable and uncollectible accounts receivable. *Id.* The two sets of liquidation analyses therefore do not provide creditors with an accurate apples-to-apples comparison.

49.    Aside from the obvious accounts receivable issues, the liquidation analyses have other defects, as well. First, the Plan's liquidation analysis shows no recovery to Classes 13 or 14. *See* D.I. 551-2. However, the Plan indicates that Class 13 claims will receive $200,000 in five annual installments. *See* Plan at 4. As a result, the waterfall fails to account for a $200,000 allowed claim. Second, the Plan's liquidation analysis lists the recovery range on Causes of Action as "TBD" in the chapter 11 scenario and "$0" in the chapter 7 scenario. *See* D.I. 551-2. Captive Assurance asked Mr. Rosen why Province assumed that estate causes of action would be worthless in the hands of a chapter 7 trustee—who would have a financial incentive to pursue such causes of action. Mr. Rosen did not know. Rosen Dep. 102:12–105:22, Feb. 28, 2025, **Ex. J**. Conversely, in the chapter 11 scenario, the liquidation analysis shows that beneficiaries of the Litigation Trust will receive between $1.25 and $2.5 million. *See* D.I. 551-2. When asked what the basis for that projected recovery is, Mr. Rosen did not know. Rosen Dep. 111:19–112:19, Feb. 28, 2025, **Ex. J**.

50.    Put simply, the Debtors' liquidation analyses, appear at best unreliable.

**VII.    The Committee's and the Debtors' Rule 30(b)(6) representative could not explain the selection process the Litigation Trustee or Litigation Trust Oversight Committee.**

51.    For the Committee's and the Debtor's Rule 30(b)(6) depositions, noticed topics included "[t]he Litigation Trust and its governance." But neither the Committee's nor the Debtor's

Rule 30(b)(6) deponents could provide any insight into the Litigation Trust or its governance, including how the proposed Litigation Trustee or the Oversight Committee was selected, or even their identities.  The Debtor's representative, Mr. Syed, had limited knowledge and information about the process, and could not name the Litigation Trustee or any member of the Oversight Committee.  Syed Dep. 155:23–157:14, Feb. 27, 2025, **Ex. K**.

52.    The Committees' representative knew even less.  Among other things:

- She was unaware that the Plan establishes a Litigation Trust: "Q. Do you understand that the plan proposes to establish a litigation trust? A. I don't." White Dep. 34:2–4, Feb. 28, 2025, **Ex. M**.

- She did not know the identity of the Litigation Trustee: "Q. If I represent to you that the plan creates a litigation trust, do you know who has been identified as the trustee of that litigation trust? . . . A. I don't know." *Id.* 34:5–13.

- She had no knowledge as to how the Litigation Trustee was selected: "Q.  So if you don't know who the litigation -- the trustee of the litigation trust is, do you have any knowledge as to how the litigation trustee was selected?  A. No." *Id.* 34:15–19.

- She had no knowledge as to who participated in negotiations regarding the selection of the Litigation Trustee: "Q.  And so I assume then you don't have any knowledge about who participated in any negotiations about the identity or selection of the litigation trustee?  A.  That's correct." *Id.* 34:20–24.

- She had never heard of the Litigation Trust Oversight Committee: "Q.  Have you ever heard of the concept of an oversight committee for the litigation trustee?  A. No." *Id.* 36:6–9.

Most troubling, the witness had no knowledge of the proposed members of the Litigation Trust Oversight Committee, *despite herself being named as a member of the committee.  Compare id.* ("Q. Just to clarify, since you have no knowledge of the concept or the existence of an oversight committee for the litigation trust, I assume you have no knowledge of -- to the members of that oversight committee?  A.  No." *with* Form of Litigation Trust Agreement, Schedule 1, Feb. 20, 2025, D.I. 730-1 (identifying Health Professionals & Allied Employees AFT-AFL/CIO and its representative Debbie White among the "Members of the Litigation Trust Oversight Committee").

## OBJECTION

53.     The Plan is fatally flawed and cannot be confirmed for at least seven reasons: (a) the Plan Proponents cannot satisfy their burden to approve the release of the HRH Released Parties; (b) the Plan violates the absolute priority rule and unfairly enriches HRH by providing HRH with recoveries exceeding 100 percent of its Allowed Claims; (c) the Plan's "deemed" substantive consolidation is prohibited as a matter of law and also unsupported by the facts; (d) the Plan Proponents have not proven that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code's "best interest of creditors" test; (e) the Plan disenfranchises creditors in violation of section 1129(a)(10) of the Bankruptcy Code; (f) the selection process and individuals chosen for the Litigation Trustee and Litigation Trustee Oversight Committee positions violates section 1123(a)(7) of the Bankruptcy Code; and (g) the Plan is not proposed in good faith.

54.     The Disclosure Statement also cannot be approved on a final basis because it lacks adequate information, including because it fails to disclose the material facts surrounding HRH and the possible claims against it as discussed herein.

I.      **The Plan violates numerous provisions of the Bankruptcy Code and is unconfirmable.**

   A.      **The Plan Proponents cannot carry their burden to approve the release of the HRH Released Parties.**

55.     The Plan proponents cannot carry their burden to approve the release of the HRH Released Parties, including because there is no evidence regarding the claims being released, their potential value, the probability of success in litigation, or any other fact relevant to the claims. Additionally, HRH is providing no consideration for the release.

            1.      **The Plan Proponents lack any evidence in support of the release.**

56.     As this Court recently recognized, under section 1123(b)(3)(A) of the Bankruptcy Code, "a chapter 11 plan may provide for the "'settlement or adjustment of any claim or interest belonging to the debtor or to the estate.'" *In re Alecto Healthcare Services, LLC*, 2024 WL 1208355, at *6 (Bankr. D. Del. Mar. 20, 2024) (Stickles, J.).  When reviewing a proposed plan release, the Court must determine "if the released claims fall into the lowest point of reasonableness for a settlement." *Id.*  This requires consideration of the familiar "*Martin* factors." *See id.* (*citing Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996)).  In particular, "[w]hen determining whether to approve a settlement, the bankruptcy court should consider: (1) the probability of success in the litigation; (2) the complexity, expense, and delay of the litigation involved; (3) the possible difficulties in collection; and (4) the paramount interests of creditors." *Id.* (internal citations omitted).

*57.*     As the Supreme Court has long recognized, "[t]here can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised [herself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

"Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Id.* "This particular process of bankruptcy court approval requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Martin*, 91 F.3d at 393. Courts also apply a higher level of scrutiny to insider settlements, like the one proposed in this case. *See, e.g.*, *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 493, 497 (Bankr. S.D.N.Y. 1991) ("We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable.").

58.     The court must decline to approve the settlement when there is a lack of evidence in support of the *Martin* factors, such as a lack of evidence of the value of the claim being settled or released. For example, this Court previously declined to approve a proposed settlement where the debtors "provided little information as to the specifics of the Actions to provide a basis for evaluating the strengths and weaknesses of the litigation*." In re Spansion, Inc.*, 2009 WL 1531788, at *7 (Bankr. D. Del. June 2, 2009) (Carey, J.) (declining to approve the settlement because "there is not enough evidence before me to conclude whether the proposed settlement amount is within the 'range of reasonableness'"). In contrast, in *Alecto*, this Court approved an insider release based on an extensive evidentiary record and testimony presented by the Debtors' independent director that detailed his investigative findings and valuation of the claims. *See Alecto*, 2024 WL 1208355 at *6–11.

59.     The Plan Proponents have no evidence to support the insider release of the HRH Released Parties.  As discussed above, neither the Debtors nor the Committee conducted any investigation of claims and causes of action against the HRH Released Parties.  Thus, the Plan Proponents have no evidence to present the Court regarding the specific claims and causes of action being released, including their nature, their merits, their value, the probability of success, their collectability, or any other fact relevant to the Court's consideration.  Without any evidence regarding the claims being released, the Plan Proponents cannot meet their burden to support the release, and the release must be denied.

**2.     HRH is providing no consideration for the release.**

60.     Although unnecessary to consider given the lack of evidence to support the release, it also cannot be approved because there is no consideration given for the release.  Though the Plan Proponents appear to assert that the release is part of global settlement with HRH, HRH is providing no consideration for the release.  HRH is not reducing its claim in exchange for the release; rather, as discussed further below, HRH is in fact slated to recover in excess of the allowed amount of its claims.  And though HRH is providing new money exit funding and seed money for the Litigation Trust, both of those loans are to be repaid in full, with interest.

61.     Nor can HRH be said to be contributing claims or causes of action to the Litigation Trust.  HRH lacks a lien on Avoidance Actions, so they are not HRH's collateral to contribute.  And HRH's claims on any other causes of action are being satisfied in full through the Exit Facility, so it lacks economic interest in those claims and therefore sacrifices nothing to "contribute" them to the Litigation Trust.

62.     This stands in contrast to the settlements this Court usually sees where a creditor, in exchange for a release, contributes value either in the form of a material reduction in its claims, new cash consideration (that is not separately being repaid), release of liens on assets (such as

28

causes of action), or a combination of the foregoing.  HRH is contributing nothing for the release, providing another basis to deny it.

> **B.**   **The Plan violates the absolute priority rule and unfairly enriches HRH by providing HRH with recoveries exceeding 100% of its allowed claims.**

63.    The Debtors' plan is a cramdown plan and therefore must satisfy the requirements of section 1129(b), including the requirement that the plan be "fair and equitable."  Section 1129(b)(1)'s "fair and equitable" requirement invokes the "absolute priority rule." *In re Armstrong World Industries, Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) ("The issues in this case require us to examine the "fair and equitable" requirement for a cram down, which invokes the absolute priority rule.").  In its most basic invocation, the absolute priority rule mandates that no junior class of creditors can recover on their claims unless all classes of senior creditors either consent or are paid in full.  *See id.* at 513.  But a "corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001).

64.    The corollary to the absolute priority rule is violated in this case.  As summarized above, HRH is recovering far more than the amount of its Allowed Claims.  The Plan provides that HRH will receive at least the following value on account of its Allowed Claim: (i) an Exit Facility equal to the face amount of its Allowed Claim (*i.e.*, $110 million) to be repaid over five years with interest; (ii) ownership of Bayonne Hospital through a credit bid of $32.7 million without offset or reduction against its $110 million Allowed Claim; (iii) an MSA with a revenue stream of $210 million over 10 years plus the option to purchase Christ and Hoboken Hospitals; and (iv) significant shares of the Litigation Trust's recoveries, including $5 million of the first $20 million of net recoveries, and 35% of net recoveries thereafter.

65.     But the first of these distributions—the dollar-for-dollar Exit Facility—represents full payment of HRH's claim.  The Plan explicitly provides that the Exit Facility represents a 100% recovery on HRH's $110 million Allowed Claim.  Accordingly, the additional value that HRH is permitted to receive in excess of its $110 million Allowed Claim violates the absolute priority rule.

66.     Simple math shows how HRH recovers more than in full.  In addition to its $110 million Exit Facility, HRH receives the Bayonne Hospital, which the parties value at $32.7 million under the Plan.  That places HRH's recovery at $142.7 million because there is no offset or reduction of the $110 million Allowed Claim.  HRH's recovery is further augmented by the rights it receives under the MSA, which should be calculated to at least the net present value of HRH's expected profit margin on $210 million of monthly payments over 10 years, plus the value of the purchase option for Christ and Hoboken Hospitals.  Likewise, HRH further augments its recovery through the Litigation Trust sharing mechanism, which also must be added to HRH's recovery at a net present value.  However measured, it is clear that the Plan allows HRH to recover value far in excess of its Allowed Claim.  This violates the absolute priority rule and requires that confirmation be denied.

**C.      The Plan's "deemed" substantive consolidation fails as a matter of law and is supported by the facts.**

67.     The Plan also fails because it proposes a "deemed" substantive consolidation that is prohibited by binding Third Circuit precedent and, in any event, the substantive consolidation is unsupported by the facts.

**1.      "Deemed" substantive consolidation is prohibited in the Third Circuit without consent.**

68.     The Third Circuit has described substantive consolidation as an "extreme" and "imprecise" remedy that "should be rare and, in any event, one of last resorts after considering and rejecting other remedies."  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).   Substantive

consolidation is a "construct of federal common law [which] emanates from equity" and "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased)." *Id*. at 199–200. Because of its extreme nature, the remedy is only available if the proponents of substantive consolidation adduce sufficient evidence "concerning the entities for whom substantive consolidation is sought" to prove "that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id*. at 211. Moreover, the Third Circuit expressly rejected the concept of "deemed" substantive consolidation. *Id*. at 216.

69.      In *Owens Corning,* eighteen affiliated debtors proposed a chapter 11 plan that was "predicated on obtaining 'substantive consolidation' of the Debtors along with three non-Debtor [] subsidiaries . . . [in] a form of what is known as a 'deemed consolidation,' under which a consolidation is deemed to exist for purposes of valuing and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it . . . [but] 'not result in the merger of or the transfer or commingling of any assets of any of the Debtors or Non–Debtor Subsidiaries, . . . [which] will continue to be owned by the respective Debtors or Non–Debtors.'" *Id.* at 202 (footnotes omitted for clarity). The Third Circuit described the "deemed" substantive consolidation as the "the flaw most fatal to the Plan Proponents' proposal." *Id.* at 216. And it went on to hold that even had the plan proponents presented "meaningful evidence" in support of substantive consolidation (they had not), their plan would still have failed because "deemed" consolidation "fails even to qualify for consideration." *Id.* As the Third Circuit explained, "deemed" substantive consolidation is impermissible because:

31

> If Debtors' corporate and financial structure was such a sham before the filing of the motion to consolidate, then how is it that post the Plan's effective date this structure stays largely undisturbed, with the Debtors reaping all the liability-limiting, tax and regulatory benefits achieved by forming subsidiaries in the first place?  In effect, the Plan Proponents seek to remake substantive consolidation not as a remedy, but rather a stratagem to "deem" separate resources reallocated to [the Debtors] to strip the [objectors] of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by the [objectors].  Such "deemed" schemes we deem not Hoyle.

*Id*.  Yet this form of prohibited "deemed" substantive consolidation is precisely what is presented by the Plan Proponents in these cases.

70.     The Plan Proponents, for the benefit of the Debtors' insider HRH, are looking to preserve "all the liability-limiting, tax and regulatory benefits" of the Debtors' corporate structure while stripping creditors of their rights.  While the Debtors argue in the Plan that there is no harm to general unsecured creditors because they are "out of the money," that misses the point completely, because the Third Circuit has prohibited deemed substantive consolidation, *even where* the plan's proponents otherwise satisfy the standards set forth in *Owens Corning*.

71.     Moreover, "deemed" substantive consolidation has other deleterious effects, including but not limited to:

- Eliminating each creditor's debtor-by-debtor voting rights as recognized by this Court in *In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011).

- Eliminating the rights of creditors with claims against multiple debtors, or structurally superior debtors, as against other, otherwise similarly situated, creditors without such structural superiority or multiple sources of recovery.

- Facilitating a violation of the absolute priority rule embodied in section 1129(b) by permitting a debtor to retain its equity interest in a subsidiary debtor when unsecured creditors are not being paid in full.

- Comingling causes of actions of debtors that are clearly and unambiguously the property of a particular debtor-plaintiff and thereby permitting creditors the ability to participate in a recovery on account of a harm that such creditors

might not have suffered, while diluting the recoveries for creditors that were harmed by the conduct giving rise to the cause of action.

72.    The Plan's "deemed" substantive consolidation without consent is prohibited by binding Third Circuit precedent and requires denying confirmation of the Plan.

### 2.    The facts do not support any form of substantive consolidation.

73.    Even if substantive consolidation ("deemed" or otherwise) was possible here, the facts presented by the Plan Proponents do not come close to presenting the type of evidence necessary to prove "that (i) prepetition [the Debtors] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Owens Corning*, 419 F.3d at 211.

74.    As to the first possible basis—disregarded entity separateness on a prepetition basis—all the objective evidence supports a finding that the Debtors have at all times maintained appropriate levels of entity separateness.  Among other things, the Debtors maintained separate books and records, tracked intercompany transactions to the penny, filed separate Schedules and Statements, and filed separate tax returns.  The Debtors also had different landlords and different secured creditors with different, non-overlapping collateral packages.  The list of contracts attached to the Plan Supplement further evidences that each Debtor maintained dozens or hundreds of separate contracts.  All the "evidence" to the contrary cited by Mr. Syed in his declaration is nothing more than a recitation of things like routine centralized management and decision making and shared services common among large enterprises with multiple entities engaged in similar lines of business.  If the facts in Mr. Syed's declaration were sufficient, then virtually every multi-debtor enterprise would be a candidate for substantive consolidation.  Moreover, Mr. Syed offers no evidence that creditors actually relied on any "breakdown of entity borders"—nor could he.

75. The second possible basis—postpetition scrambled assets and liabilities—is even less persuasive. Again, the Debtors maintain separate books and records, filed separate Schedules and Statements, file separate monthly operating reports, and maintain meticulous records of intercompany transactions to the penny. They also were able to file separate liquidation analyses when required by the Court. And, perhaps most damning of all to the Plan Proponents' case, the Debtors in fact will remain as separate entities post-confirmation, belying any argument that it is not practicable or possible to separate them as entities.

76. At bottom, the Plan Proponent's argument in this case amounts to the same argument that was rejected by the Third Circuit in *Owens Corning*. In that case, as here, the plan proponents asserted difficulties and costs absent consolidation and efficiencies and savings that would be afforded by consolidation. The Third Circuit flatly rejected these costs and benefits as a basis for substantive consolidation, finding that "they are simply not enough to establish that substantive consolidation is warranted." *Id.* at 214.

77. For these reasons, this Court should not permit any form of substantive consolidation, and confirmation of the Plan as currently presented must be denied.

**D.  The Plan Proponents cannot meet their burden to show that the Plan satisfies section 1129(a)(7)'s "best interest of creditors test."**

78. The Plan Proponents must demonstrate that the Plan satisfies section 1129(a)(7)'s "best interests of creditors test." Section 1129(a)(7) of the Bankruptcy Code provides that the Plan may not be confirmed unless each holder of a claim or interest that has not accepted the plan "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7). "The best interests test focuses on individual dissenting creditors rather than classes

34

of claims." *In re G-I Holdings Inc.*, 420 B.R. 216, 265 (D.N.J. 2009). "Under the best interests

test, the Court 'must find that each [non-accepting] creditor will receive or retain value that is not

less than the amount he would receive if the debtor were liquidated.'" *Id.* (quoting *Bank of Am.

Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 440 (1999)). "The proponent of

the plan bears the burden of showing that the best interest of creditors has been satisfied." *In re

Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003).

79.     The Plan Proponents cannot meet their burden under section 1129(a)(7). The Plan

Proponents rely on liquidation analyses that are unsupported by reliable, verifiable data or

disclosed assumptions. Throughout Plan discovery, the Plan Proponents were unable or unwilling

to identify the data underlying their analyses or the assumptions made in the analyses. They cannot

now rely on those analyses to satisfy their burden at confirmation.

### E.     The Plan disenfranchises creditors in violation of section 1129(a)(10) of the Bankruptcy Code.

80.     Section 1129(a)(10) of the Bankruptcy Code requires that "if a class of claims is

impaired under the plan, at least one class of claims that is impaired under the plan has accepted

the plan, determined without including any acceptance of the plan by any insider." Courts in this

district, beginning with Judge Carey in *In re Tribune Co.*, 464 B.R. 126, 182 (Bankr. D. Del. 2011),

have uniformly interpreted this requirement to be measured on a "per debtor" rather than "per

plan" basis, such that a joint chapter 11 plan of multiple related debtors must achieve an impaired

accepting class at each debtor to be confirmed. *See also, e.g.*, *In re JER/Jameson Mezz Borrower

II, LLC*, 461 B.R. 293 (Bankr. D. Del. 2011) (citing *Tribune* for the proposition that "there must

be a consenting class for each individual debtor in a joint plan for it to be confirmed").

81.     The Plan Proponents have violated this principle by collapsing voting across

multiple debtors. This disenfranchises and dilutes the voting rights on the Plan or Plans for the

Debtor or Debtors against which they hold claims, while impermissibly allowing creditors that do not hold claims to dilute the vote of creditors who do hold claims against those Debtors. As in *Tribune*, the Plan Proponents efforts to sidestep creditors' voting rights and the requirements of section 1129(a)(10) must be rejected.

      **F.**      **The selection of the Litigation Trustee and Litigation Trust Oversight Committee, and the Litigation Trust's governance, violate section 1123(a)(7) of the Bankruptcy Code.**

      82.      Section 1123(a)(7) of the Bankruptcy Code provides, as a mandatory requirement for a plan, that the plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). The manner in which the Litigation Trustee and the Litigation Trust Oversight Committee were selected in these cases is not "consistent with the interests of creditors."

      83.      The Plan provides that the Litigation Trustee that the "Litigation Trust Oversight Committee shall be selected by the UCC, in consultation with the Debtors and HRH. HRH shall have the right to consent to the selection of the Litigating Trustee, such consent not to be unreasonably withheld." Plan § 1.119. The Plan similarly provides that the Litigation Trust Oversight Committee members will be "designated by the UCC." Plan at 97. But that is not, in fact, what happened here. Instead, the testimony of the Committee's chairperson and Rule 30(b)(6) representative on the topic of the Litigation Trust and its governance reveals that the Committee itself was not involved in the selection of the Litigation Trustee or the Litigation Trust Oversight Committee. Indeed, the Committee's witness could not even name the Litigation Trustee or any member of the Litigation Trust Oversight Committee purportedly selected by the Committee, *despite herself being named as a member of the Litigation Trust Oversight Committee.* The

Debtors' Rule 30(b)(6) representative similarly could not name the Litigation Trustee or any member of the Litigation Trust Oversight Committee.

84.     The testimony reveals that the fiduciaries who were tasked with selecting the Litigation Trustee and Litigation Trust Oversight Committee members were apparently not involved in those decisions.  If the Plan is to be confirmed (it cannot be in present form), then the selection of the Litigation Trustee and Litigation Trust Oversight Committee needs to be examined and reopened, including for consideration and participation by other creditors.  But as currently proposed, the selection is a result of a faulty or nonexistent process in which no fiduciary apparently had any knowledge or say; this requires the selections to be rejected.

      **G.**    **The Plan is not proposed in good faith.**

85.     Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  Good faith requires that a plan provide a basis for expecting that a reorganization can be affected with results consistent with the objectives and purposes of the Bankruptcy Code.  *In re Zenith Electronics Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) (quoting *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988)).  In determining whether the good faith requirement has been satisfied, the Court must evaluate whether the plan provides a fundamental fairness in dealing with creditors.  *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) (citing *In re American Family Enterprises*, 256 B.R. 377, 401 (D.N.J. 2000)); *see also In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 fn. 5 (3d Cir. 1986) (the good faith requirements of the Bankruptcy Code "prevents a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11").

86.     The cumulative issues with this Plan demonstrate that it does not meet the "good faith" requirement of section 1129(a)(3).  The Plan Proponents could have proposed a plan that simply dealt with creditors fairly and even-handedly by preserving claims against parties where

there has been no investigation to support a release, respecting the absolute priority rule, respecting creditors' bargained-for rights to obtain recoveries from the respective Debtors with whom they dealt, providing creditors with at least the recoveries they are entitled to in a liquidation (and providing adequate, reliable information to substantiate the recovery analysis), respecting creditor voting rights, and employing a sound process to select the successive fiduciaries for creditors.

87.     The Plan Proponents failed to propose such a plan.  Instead, the Plan they proposed releases HRH, an insider, with no investigation and without consideration.  The Plan also enriches HRH with an inflated, unsubstantiated claim and distribution entitlements far in excess of even its inflated claim value.  The Plan further eliminates creditors' bargained-for rights with an impermissible and unsupported "deemed" substantive consolidation.  As proposed, the Plan is fundamentally unfair.

88.     Seemingly aware that their unfair Plan would not be well-received by creditors such that they could obtain votes in the requisite majorities, the Plan Proponents also set about gerrymandering additional classes (and disregarding "per debtor" voting rights).  The Plan Term Sheet filed on December 30, 2024, had six classes of creditors, including a single class of unsecured claims.  But when the Plan was first filed just nine days later on January 8, 2025, the Plan Proponents had increased that number to twelve classes, and eventually fourteen in the Plan as currently proposed.  The Plan Proponents have not identified any sound justifications for the additional separate classifications.

89.     Rather, the only real evidence that Captive Assurance has seen for the additional separate classifications appears to directly demonstrate improper gerrymandering, rather than legitimate classification efforts.  When it became apparent to the Plan Proponents and HRH that they would have difficulty achieving an impaired, accepting class as required by section

1129(a)(10), the Plan Proponents set out to gerrymander a friendly, impaired accepting class, as evidenced by the following January 20, 2025 email produced in discovery by HRH, recounting an entreaty the Plan Proponents made to creditor New Jersey Department of Health to provide it special treatment in exchange for separate classification and an accepting vote:

> Under the Bankruptcy Code, a debtor cannot confirm a chapter 11 plan unless, among other things, at least one class of "impaired" claims votes in favor of the plan. What became apparent during the arguments on Friday is that the Debtors will have a hard time finding an impaired class of claims to vote in favor of the Plan. Assuming that is true, the Debtors cannot, as a matter of law, confirm a plan in these cases, which will result in a liquidation of the hospitals.
>
> In light of the foregoing, both HRH and the Committee/Debtors reached out to me this weekend and floated the concept of placing DOH in a separate class with respect to its $10.6M emergency loan claim and proposing to pay DOH something on account of that claim (HRH suggested $200K over S years). The thought would be that (i) DOH's claim can be separately classified from other unsecured claims because facially it is a secured claim and (ii) DOH would vote in favor of the Plan.
>
> I have a call with the attorney maybe at 11:00 AM. If you have any concerns about this possible path please let me know. After this morning's call I will send you an update. Important that we keep the path of keeping these hospitals open moving.

Email from Robert Iannaccone, N.J. Dep't of Health, to Nizar Kifaieh, President and CEO, Hudson Regional Hospital (Jan. 20, 2025), **Ex. O**.  HRH's principle responded, seemingly confirming that requested classification change would be made, adding that: "This is critical for us." *Id.*

90.    In the second amended version of the Plan filed the next day, January 21, 2025, the class that the Plan Proponents conspired to gerrymander was added as Class 13 – NJDOH Secured Claims. *See* D.I. 522.  And, despite the Plan Proponents styling the claim as "secured" (presumably to support separate classification), the Debtors' Rule 30(b)(6) representative acknowledged that the claim appeared to be unsecured. *See* Syed Dep. 143:24–144:6, Feb. 28, 2025, **Ex. K**.  Indeed,

even the email in which the scheme is concocted notes that the claim is only "facially" a secured claim, suggesting that it is in fact unsecured. The Plan Proponents' gerrymandering precludes a good faith finding.

91.     The Plan's insufficient "Alternative Transaction" process that all but precluded even the prospect of competing bids also precludes a good faith finding. The lack of marketing, the lack of an investment banker to market, the unreasonably short time frame, the artificial barriers to competing bids (including payment in full of HRH's inflated, unsubstantiated $110 million claims and an unapproved break-up fee as part of a topping bid), and the evidence that HRH exerted undue influence or pressure in the lead up to the bankruptcy to foreclose alternatives (including through the Consent Judgment and acquisition of the ), all mean that there is simply an insufficient basis on which the Court can conclude that HRH is paying fair value for the Debtors' assets. *Cf. In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986).

92.     For all the reasons, the Plan does not meet the "good faith" requirement of section 1129(a)(3), requiring that confirmation be denied.

## II.    The Disclosure Statement lacks adequate information and cannot be approved on a final basis.

93.     The Disclosure Statement in this case should not be approved on a final basis. A disclosure statement must contain adequate information for a court to approve it. 11 U.S.C. § 1125(b). Adequate information includes relevant information to allow "a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). Appropriate disclosure by the plan proponent is vital to the plan process, and the Plan Proponents have an affirmative duty to provide a disclosure statement that contains complete and accurate information. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 324 (3d Cir. 2003); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417

(3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("Of prime importance in the reorganization process is the principle of disclosure.").  "In short, a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

94.     For many of the same reasons that the Plan is unconfirmable, the Disclosure Statement also lacks adequate information.  For example, the Disclosure Statement lacks any disclosure about the potential claims or causes of action that exist against HRH and that are being released under the Plan without investigation, despite the Debtors being in possession of substantial information about possible claims against HRH, as evidenced by, among other things, their pending antitrust lawsuit.  All that information is wholly absent from the Disclosure Statement, despite it clearly being a material consideration for creditors in whether to support a release of the HRH Release Parties.

95.     For these reasons, the Court should also deny approval of the Disclosure Statement on a final basis.

## **RESERVATION OF RIGHTS**

96.     Captive Assurance files this objection under compulsion of the expedited schedule in these cases.  Captive Assurance's due process rights and ability to prosecute its objections in these cases have been hampered by the Plan Proponents' and HRH's shirking of their discovery

obligations, including by failing to produce adequate privilege logs (or any privilege log in the case of the Debtors and HRH), failing to adequately prepare Rule 30(b)(6) designees for depositions, and failing to timely identify evidence and witnesses they intend to use in support of confirmation.  Accordingly, Captive Assurance reserves all rights to supplement or amend this objection, to file additional objections, and to seek to adjourn the confirmation hearing should the circumstances so require.

## **CONCLUSION**

97.    For foregoing reasons, the Court should deny confirmation of the Plan and final approval of the Disclosure Statement.

Dated: March 4, 2025
    Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew B. Harvey*
Eric D. Schwartz (No. 3134)
Matthew B. Harvey (No. 5186)
Sophie Rogers Churchill (No. 6905)
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone:  (302) 658-9200
Email:   eschwartz@morrisnichols.com
      mharvey@morrisnichols.com
      srchurchill@morrisnichols.com

*Counsel to CarePoint Health Captive Assurance Company, LLC*