David N. Crapo, CIPP-US
GIBBONS  P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone:  (973) 596-4523
Facsimile:  (973) 639-6244
dcrapo@gibbonslaw.com
*Patient Care Ombudsman*

**UNITED STATES BANKRUPTCY COURT
FOR THE  DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CAREPOINT HEALTH SYSTEMS, INC., d/b/a JUST HEALTH FOUNDATION, *et al.*,[1] | Case No. 24-12534-PB |
| | **NO HEARING DATE** |
| Debtors and Debtors-in-Possession | |

**SECOND PATIENT CARE OMBUDSMAN REPORT**

**SUBMITTED on March 31, 2025, by:**

**DAVID N. CRAPO, CIPP-US**

**PATIENT CARE OMBUDSMAN**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint HealthBayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

# INTRODUCTION

This second report ("**Second Report**") of the Patient Care Ombudsman ("**PCO**") is issued pursuant to the author's appointment on November 25, 2024 as the PCO by the United States Trustee for Region ("**U.S. Trustee**") for debtors CarePoint Health Systems, Inc., d/b/a Just Health Foundation, *et al.* ("**Debtors**"). [Dkt. No. 185] The appointment arises under section 333 of the United States Bankruptcy Code (11 U.S.C. §§ 101, *et seq.*) ("**Bankruptcy Code**"), which provides for the appointment of a patient care ombudsman "to monitor the quality of patient care and to represent the interests of the patients of the health care business." The Debtors operate three hospitals, together with related neighborhood healthcare centers (collectively, "**Hospitals**") in Hudson County, New Jersey: (i) Bayonne Medical Center ("**Bayonne**"); (ii) Christ Hospital in Jersey City ("**Christ Hospital**"); and (iii) Hoboken University Medical Center ("**HUMC**"). The Debtors' operations, therefore, constitute "health care businesses" for purposes of the Bankruptcy Code. *See* 11 U.S.C. §101(27A). The PCO filed his Initial Patient Care Ombudsman Report ("**First Report**"), which covered the period from the date of his appointment to January 24, 2025 ("**First Reporting Period**"). This Report covers the period from January 25, 2025 through March 31, 2025 ("**Second Reporting Period**").

The financial challenges the Debtors, particularly the Hospitals, faced in the run-up to bankruptcy are summarized in the *Declaration of Shamiq Syed in Support of First Day Pleadings* filed in the Debtor's bankruptcy cases. [Dkt. No. 23] Those financial challenges led to operational challenges and surveys by regulators, including the New Jersey Department of Health ("**NJDOH**") and the Centers for Medicare and Medicaid Services ("**CMS**"), and accreditors, including The Joint Commission ("**TJC**"). In February of 2024, NJDOH appointed Robert Iannaccone ("**Monitor**") to monitor operations at the three Hospitals. The Monitor has actively monitored the quality of healthcare at the Hospitals and continues in his role as of the date of this report.

Section 333(b)(1) of the Bankruptcy Code directs the PCO to "monitor the quality of patient care provided to patients of the [Hospitals]." To that end, the PCO is expressly authorized to interview patients and physicians. 11 U.S.C. § 333(b)(1). The PCO may also interview other Hospital staff, review Hospital records and inspect the Hospitals. During the First Reporting Period, in the performance of his duties, the PCO: (i) inspected the Hospitals and spoke with line staff during those inspections; (ii) conducted an extensive review of documents and other information provided by the Debtors; and (iii) conferred on several occasions with the Monitor. In doing so, the PCO found that the Hospitals were operating safely and there was no indication of a material decline in patient care and safety during the bankruptcy case. During the Second Reporting Period, the PCO: (i) addressed and reviewed litigation against the Debtors; and (ii) reviewed contracts being rejected by the Debtor to ensure that patient care and safety were not being adversely impacted. This report sets forth in more detail below the actions taken by the PCO in the performance of his duties and the results of his investigation to date.

## ADDITIONAL DOCUMENTS AND INFORMATION
## TO BE PROVIDED BY THE DEBTOR

On December 9, 2024, the PCO requested that the Debtors provide him with extensive documents and information, which they did. Because the PCO's request came as early in the

case as it did, little information of the information he received related to the post-petition period. With the passage of an additional 60 days since the last report, the PCO will request dashboards setting forth clinical information for the post-petition period. The PCO's review of those dashboards will be included in his next PCO report.

## CONFERENCES WITH MONITOR

During the Second Reporting Period, the PCO continued to confer with the Monitor, primarily about litigation against the Debtors and contracts being rejected.

The PCO focused particular attention on litigation against the Debtors after reviewing the motion of a patient and her husband for relief from the automatic stay to proceed with litigation up to judgment, with collection being limited to insurance proceeds. The patient alleged that HUMC, through its employees and medical staff, were negligent in connection with the delivery of her child on March 5, 2023, which resulted in a stillbirth. On February 5, 2025 the PCO participated in a conference call with the Monitor, Robert Foley and Lorraine DeIudiabus, the Risk Manager for HUMC and Bayonne. The circumstances surrounding the delivery were discussed in detail, as was the root cause analysis conducted by HUMC after the delivery. The root cause analysis addressed, *inter alia*: (i) staffing; (ii) communications between HUMC and the patient; (iii) the available information; (iv) the competencies of the staff involved; (v) the credentials of the staff involved; (vi) the equipment involved in the delivery and (vii) the systems and processes in place. HUMC concluded that the delivery ended in an unfortunate incident that could not have been predicted given the facts. Ms. DeIudiabus advised that there have been no deaths or injuries in childbirth at any of the Hospitals since the stillbirth in 2023.

Subsequent to the February 5, 2025 telephone conference, the PCO spoke with Margaret Casey, the Risk Manager for Christ Hospital. She confirmed that there had been no deaths or injuries in childbirth at Christ Hospital. The Monitor provided the PCO with a log of open litigation matters against the Debtors. The log reflects that 23 lawsuits asserting tort claims remain pending against the Debtors. Of those lawsuits, seventeen assert medical practice claims and six assert general liability "slip-and-fall" claims. Five of the malpractice claims were filed in 2024, as compared to eight filed in 2023. None have been filed in 2025. The recent history of litigation, therefore, does not evidence a decline in the quality of patient care or safety.

During the Second Reporting Period, the PCO monitored the Debtors' rejection of contracts. The Debtors filed three motions to reject what it had determined to be burdensome contracts. Many of those contracts directly addressed patient care or safety. The PCO was concerned that patient care and safety not be compromised through the rejection of necessary contracts.

On February 25, 2025, the PCO spoke with: (i) the Monitor; (ii) Shamiq Syed, the Chief Financial Officer of CarePoint Health; (iii) Angela Ridley, the Chief Financial Officer of Hudson Regional Medical Center; and (iv) Jonathan Goldstein, the Chief Supply Chain Officer of CarePoint Health, about the contracts the Debtors sought to reject. In one case, a contract was erroneously placed on the rejection list and was moved to the list of contracts to be assumed. Because the Debtors are reducing their reliance on locum tenens nurses, some contracts with staffing agencies are to be rejected. In a number of cases, the Debtors have not done business for

some time (sometimes as long as a year) with the counterparties on contracts they sought to reject.  In some cases, the Debtors were careful not to burn bridges with former contract counterparties to ensure that future contracts with those vendors would be possible should doing so become necessary in the future.  Some of the contracts to be rejected had previously expired under their own terms.  Included in this group of contracts were contracts that had been superseded by a new contract with the same vendor, which was being assumed.  In some cases, the Debtors had switched vendors, obviating the need to maintain certain contracts with existing vendors.  The Debtors' representatives acknowledged to the PCO that many of the contracts being rejected were legacy contracts from prior years when the Debtors had not managed their contracts well.  In other words, the proposed rejection of contacts was very much an operation to clean up the Debtors' universe of contracts.  In any event, the Debtors' rejection of contracts did not give rise to the potential for a compromise of the quality of patient care and safety at the Hospitals.

**Finding #1:** **The PCO has not received any information indicating that quality of care provided to the Debtor's patients (including patient safety) is not acceptable and is currently declining or is otherwise being materially compromised, but reserves making an actual finding in that regard pending the receipt of: (i) additional information in the form of dashboards to be requested from the Debtor; (ii) the PCO's inspections of the Hospitals' operating theatres and kitchens; and, especially if the confirmation process is delayed, (iii) the interviews of patients and staff.**

**Finding #2:** **The oversight and supervision provided by the management of the Hospitals, the diligence and experience of the Monitor, the attentiveness and loyalty of the Debtors' clinical staff  will likely uncover quality of care deficits if they arise.  However, the PCO will continue monitor the situation at the hospitals, in particular by the review of the dashboards the Debtors use to monitor the quality of the services they provide.**

As noted above, particularly through their quality assurance and performance improvement programs, the Debtors exercise significant oversight over the operations of the Hospitals and diligently evaluate those operations to identify areas requiring improvement.  The Monitor's active involvement in Hospital operations provides another effective layer of oversight.  Notwithstanding the bankruptcy filings, clinical staff have remained focused on their work.  Under the circumstances, it is likely that the Debtors or the Monitor will uncover any deficits in patient care and safety and remedy those deficits.  Nevertheless, the PCO will continue to monitor the situation through: (i) inspecting those portions of the hospitals not inspected in December; (ii) interviewing clinical staff and patients, particularly if the confirmation process in the Debtors' bankruptcy cases is further delayed; (iii) identifying gaps in the information he has received to date and requesting any missing information; and (iv) continued communications with the Monitor.

**Finding #3:** Following the PCO's completion of the tasks he outlined in Finding #2 above and until a plan of reorganization is confirmed in the Debtors' bankruptcy Case, receipt by the PCO of regular reports from the Debtors in the form of dashboards containing information particularly relevant to patient care and safety will provide a reasonable basis to monitor whether the quality of care (including patient safety) provided by the Hospitals is declining or otherwise materially compromised.

During April, the PCO will complete his inspections of the hospitals, interview clinical staff at the hospitals, determine any gaps in the information provided by the Debtors to date and obtain any missing information. The PCO will also maintain regular contact with the Monitor. The PCO will also request from the Debtor regular dashboard reports of information particularly relevant to the quality of patient care and safety. Until guided otherwise by the Court, the PCO will continue to monitor all information provided and make immediate inquiry into any item or potential issue that may come to his attention regarding the quality of patient care rendered by the Hospitals to their patients.

## CONCLUSION

An analysis of multiple sources of information regarding the current performance of the Hospitals and their structures, policies and procedures reveals healthcare facilities that continue to provide the same level of patient care and safety it historically provided in the run-up to their bankruptcy filings. Moreover, that level of patient care and safety is adequate and stable.

Several factors likely to result in the maintenance of the current level of patient care and safety became evident to the PCO as a result of: (i) his tour of the Hospitals, (ii) his discussions with of management, staff and the Monitor; (iii) his review of performance information provided by the Debtors; (v) the cleanliness and demonstrated maintenance of the Hospitals and their equipment and (vii) the financing made available in connection with their bankruptcy cases. The Debtors' senior management, the Monitor and the clinical staff emphasized in their discussions with the PCO the dedication, attentiveness and the hard work of staff members working directly with the Debtors' patients. The loyalty of the Debtors' staff is underscored by the long tenure of many staff members.

Additionally, adequate systems are in place to monitor the quality of patient care and safety at the Hospitals to respond to shortcomings. The minutes of the quality assurance and performance committee meetings discussed in the First Report reveal that the Debtors are generally on top of the patient care and safety issues and respond to them promptly. The Debtors also enjoy the benefit of a loyal and competent workforce who see their primary focus as the care and safety of their patients. The loyalty and competence of the workforce should serve as a break against a sudden decline in the quality of patient care and safety, as well as an expeditious source of notice of any problems.

      Because patient care and safety is not likely to be compromised in the immediate to mid-term future, other than having the PCO perform the services receive the information outlined above, the PCO does not at this point recommend any remedial action or external intervention at this time regarding additional monitoring of clinical or administrative matters at the Hospitals.

                            Respectfully submitted to the Court on March 31, 2025 by:

                            <u>/s/ David N. Crapo</u>
                            David N. Crapo, Esq.
                            Patient Care Ombudsman
                            Gibbons P.C.
                            Newark, NJ