**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CarePoint Health Systems Inc. d/b/a Just Health Foundation, *et al.* | Case No. 24-12534 (JKS) |
| Debtors. | (Jointly Administered) |

**SEVENTH AMENDED COMBINED DISCLOSURE STATEMENT AND**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION**
<u>AS MODIFIED AS OF APRIL 15, 2025</u>

**DILWORTH PAXSON LLP**
Peter C. Hughes, Esq. (Bar No. 4180)
800 King Street – Suite 202
Wilmington, DE 19801
Telephone: (302) 571-9800
Email: phughes@dilworthlaw.com

-and-

**DILWORTH PAXSON LLP**
Lawrence C. McMichael, Esq. (*pro hac vice*)
Peter C. Hughes, Esq.
Anne M. Aaronson, Esq. (*pro hac vice*)
Jack Small, Esq. (*pro hac vice*)
1650 Market St., Suite 1200
Philadelphia, PA 19103
Telephone: (215) 575-7000
Email: lmcmichael@dilworthlaw.com
          phughes@dilworthlaw.com
          aaaronson@dilworthlaw.com
          jsmall@dilworthlaw.com

*Counsel to the Debtors and*
*Debtors-in-Possession*

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler, Esq. (Bar No. 4142)
James E. O'Neill, Esq. (Bar No. 4042)
Colin R. Robinson (Bar No, 5524)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Email: bsandler@pszjlaw.com
          joneill@pszjlaw.com
          crobinson@pszjlaw.com

**SILLS CUMMIS & GROSS, P.C.**
Andrew Sherman, Esq. (*pro hac vice*)
Boris Mankovetskiy, Esq. (*pro hac vice*)
One Riverfront Plaza
Newark, NJ 07102
Telephone: (973) 643-7000
Email: asherman@sillscummis.com
          bmankovetskiy@sillscummis.com

*Counsel to the Official Committee*
*of Unsecured Creditors*

Dated: April ~~9~~15, 2025

# **TABLE OF CONTENTS**

Article I. INTRODUCTION ................................................................................................. 3

    A.     Overview ................................................................................................. 3

    B.     Summary of Treatment of Claims and Interests ............................... 3

Article II. DEFINITIONS, RULES OF INTERPRETATION AND CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW ................................................ 12

    A.     Definitions ............................................................................................ 12

    B.     Rules of Interpretation and Construction ......................................... 31

    C.     Computation of Time .......................................................................... 32

    D.     Governing Law ..................................................................................... 32

Article III. BACKGROUND AND DISCLOSURES ....................................................... 32

    A.     General Background ............................................................................. 32

    B.     Circumstances Giving Rise to the Chapter 11 Cases ........................ 42

    C.     The Chapter 11 Cases .......................................................................... 45

    D.     Releases and Exculpation .................................................................... 52

    E.     ~~Deemed~~ Substantive Consolidation for Limited Purposes ............. 54

    F.     Treatment of Other Interests Under the Plan .................................. 56

Article IV. TREATMENT AND ALLOWANCE OF UNCLASSIFIED CLAIMS ........ 56

    A.     Administrative Expense Claims .......................................................... 56

    B.     Priority Tax Claims .............................................................................. 57

    C.     Priority Non-Tax Claims ..................................................................... 57

    D.     Professional Fee Claims ...................................................................... 58

Article V. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ... 58

    A.     Classification of Claims and Interests ............................................... 58

    B.     Treatment of Claims and Interests .................................................... 60

C.    Special Provision Governing Unimpaired Claims ................................................ 66

D.    Nonconsensual Confirmation ............................................................................. 66

E.    Allowed Claims ................................................................................................. 66

Article VI. CONFIRMATION AND VOTING PROCEDURES ...................................... 67

A.    Confirmation Procedure .................................................................................... 67

B.    Statutory Requirements for Confirmation .......................................................... 68

C.    Acceptance or Rejection of the Plan .................................................................. 72

D.    Voting Procedures ............................................................................................. 73

Article VII. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ..... 75

A.    General Bankruptcy Law and Plan Considerations ............................................ 75

B.    Risks Associated with Forward Looking Statements ........................................... 78

C.    Alternatives to Confirmation and Consummation of the Plan ............................. 78

Article VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ........................... 79

A.    Overview .......................................................................................................... 79

B.    Tax Consequences to U.S. Holders of Certain Allowed Claims .......................... 81

C.    Tax Consequences to Non-U.S. Holders of Certain Allowed Claims ................... 82

D.    Matters Related to the Disputed Claims Reserve ............................................... 84

E.    Tax Consequences in Relation to the Litigation Trust ........................................ 85

F.    Information Reporting and Back-Up Withholding .............................................. 86

Article IX. MEANS FOR IMPLEMENTATION OF THE PLAN .................................... 87

A.    ~~Deemed~~ Substantive Consolidation for Limited Purposes ............................ 87

B.    The HRH Transactions ..................................................................................... 88

C.    Litigation Claims .............................................................................................. 89

D.    Reorganization Committee Evaluation of Potential Claims Against Current D&Os
      91

ii

E.      Potential Alternative Transactions ................................................. 91

F.      Sources of Consideration for Plan Distributions ............................ 93

G.      The Litigation Trust ...................................................................... 93

H.      Corporate Action .......................................................................... 94

I.      Directors and Officers of the Reorganized Debtors ....................... 95

J.      Books and Records ........................................................................ 96

K.      UCC Dissolution ........................................................................... 96

L.      Accounts and Reserves .................................................................. 96

M.      Exemption from Certain Transfer Taxes ........................................ 98

N.      Vesting of Assets in the Reorganized Debtors ............................... 98

O.      Applicability of Bankruptcy Code Sections 1145 and 1125(e) ...... 98

P.      Preservation of Litigation Claims .................................................. 99

Q.      Provider Agreements ..................................................................... 101

R.      Establishment of Claims Bar Dates ............................................... 101

S.      HRH Entity Absolute Subordination ............................................. 102

Article X. PROVISIONS REGARDING THE LITIGATION TRUST ................................ 102

A.      Establishment and Administration of the Litigation Trust ............. 102

B.      The Litigation Trust Oversight Committee .................................... 102

C.      Litigation Trust Assets .................................................................. 102

D.      Other Funds to be Transferred to the Litigation Trust ................... 103

E.      Litigation Trust Distributions and Expenses .................................. 103

F.      Appointment of the Litigation Trustee .......................................... 103

G.      Litigation Trust Beneficiaries ....................................................... 104

H.      Litigation Trust Interests .............................................................. 104

I.      Certain Powers and Duties of the Litigation Trust and Litigation Trustee ......... 105

0

#124965664v1

Article XI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................ 107

    A.    Distributions on Allowed Claims ..................................................................... 107

    B.    Disbursing Agent ........................................................................................... 108

    C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ....... 108

    D.    Timing of Distributions .................................................................................. 109

    E.    Means of Cash Payment ........................................................................... ~~110~~109

    F.    Interest on Claims .......................................................................................... 110

    G.    No Creditor to Receive More than Payment in Full ......................................... 110

    H.    Disallowance of Untimely Claims .................................................................. 110

    I.    Claims Paid or Payable by Third Parties ........................................................ 110

    J.    Withholding and Reporting Requirements ...................................................... 111

    K.    Setoffs ........................................................................................................... 112

    L.    Procedure for Treating and Resolving Disputed, Contingent, and/or Unliquidated Claims ........................................................................................................... 112

Article XII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .. 114

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ....... 114

    B.    Cure Amounts for Assumed Contracts ........................................................... 115

    C.    Rejection Claims Bar Date ............................................................................. 116

    D.    Indemnification and Reimbursement .............................................................. 117

    E.    Continuation of Insurance Policies ................................................................. 117

Article XIII. CONDITIONS PRECEDENT TO CONFIRMATION AND  CONSUMMATION OF THE PLAN ....................................................................................................... 118

    A.    Conditions Precedent to Confirmation ........................................................... 118

    B.    Conditions Precedent to Effective Date .......................................................... 118

    C.    Establishing the Effective Date ...................................................................... 119

    D.    Waiver of Conditions .................................................................................... 120

0

#124965664v1

| | | | |
|---|---|---|---|
| | E. | Consequences of Non-Occurrence of Effective Date | 120 |
| Article XIV. | | EFFECTS OF CONFIRMATION | 120 |
| | A. | Compromise and Settlement of Claims and Controversies | 120 |
| | B. | Binding Effect | 120 |
| | C. | Discharge of the Debtors | 121 |
| | D. | Debtor Releases | 121 |
| | E. | Exculpation and Limitation of Liability | 122 |
| | F. | Injunction | ~~122~~123 |
| Article XV. | | RETENTION OF JURISDICTION | 123 |
| | A. | Retention of Jurisdiction | 123 |
| | B. | Retention of Non-Exclusive Jurisdiction by the Court | 125 |
| | C. | Alternative Jurisdiction | 125 |
| | D. | Failure of Court to Exercise Jurisdiction | 126 |
| Article XVI. | | MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN | 126 |
| | A. | Modifications and Amendments | 126 |
| | B. | Effect of Confirmation on Modifications | 126 |
| | C. | Revocation or Withdrawal of the Plan | 126 |
| Article XVII. | | MISCELLANEOUS PROVISIONS | 127 |
| | A. | Terminations of Injunctions or Stays | 127 |
| | B. | Severability of Provisions | 127 |
| | C. | Payment of Statutory Fees | 127 |
| | D. | Service of Documents | 127 |
| | E. | 2002 Service List | 128 |
| | F. | Filing of Additional Documents | 129 |
| | G. | Plan Supplement(s) | 129 |

0

#124965664v1

H.      Votes Solicited in Good Faith ........................................................................... 129

I.      Closing of Chapter 11 Cases ............................................................................. 129

J.      No Admissions .................................................................................................. 129

K.      Inconsistency ................................................................................................ ~~129~~130

L.      Request for Expedited Determination of Taxes ............................................. 130

M.      Reservation of Rights ...................................................................................... 130

0

#124965664v1

## DISCLAIMERS

THIS COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS CERTAIN SUMMARIES OF CERTAIN STATUTORY PROVISIONS AND CERTAIN DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN THAT MAY BE ATTACHED AND ARE INCORPORATED BY REFERENCE AND DESCRIBES CERTAIN EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THIS INFORMATION IS FAIR AND ACCURATE, THIS INFORMATION IS QUALIFIED IN ITS ENTIRETY TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  THE TERMS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN GOVERN TO THE EXTENT OF ANY INCONSISTENCY WITH ANY OTHER DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE DOCUMENTS RELATED THERETO, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED HEREIN OR ATTACHED HERETO ARE MADE AS OF THE DATE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS ANOTHER TIME IS SPECIFIED.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION, AND BELIEF. THERE CAN BE NO ASSURANCES THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.  THE PLAN PROPONENTS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  THE DELIVERY OF THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE ~~DEEMED OR~~ CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.  EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND IN THE RELATED EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES OR ANY OTHER JURISDICTION.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTIONS 1123 AND 1125 AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION, NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. NO OTHER GOVERNMENTAL OR OTHER REGULATORY AUTHORITY HAS PASSED

ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, NOTHING STATED HEREIN SHALL BE ~~DEEMED OR~~ CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR ~~BE DEEMED~~ CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS AND INVOLVE MATERIAL RISKS AND UNCERTAINTIES THAT ARE SUBJECT TO CHANGE BASED ON A NUMBER OF FACTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES AND THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE BASED UPON THE ANALYSES PERFORMED BY THE PLAN PROPONENTS AND THEIR ADVISORS. ALTHOUGH THE PLAN PROPONENTS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE PLAN PROPONENTS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF SUCH PROJECTED RECOVERIES.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

IF YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN. PRIOR TO DECIDING WHETHER OR HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM THAT IS ENTITLED TO VOTE SHOULD CAREFULLY REVIEW ALL OF THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

> **THE PLAN PROPONENTS AND HUDSON REGIONAL HOSPITALS, LLC SUPPORT CONFIRMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN AND RECOMMEND ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

## ARTICLE I.
## INTRODUCTION

### A.    Overview[1]

The Debtors and the Official Committee of Unsecured Creditors (the "<u>UCC</u>" and together with the Debtors, the "<u>Plan Proponents</u>") hereby propose the Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization (the disclosure statement portion hereof, the "<u>Disclosure Statement</u>" and the chapter 11 plan portion hereof, the "<u>Plan</u>", as the same may be subsequently modified, amended, or supplemented from time to time), pursuant to Bankruptcy Code sections 1125 and 1129.[2]  The Plan Proponents are the proponents of the Plan within the meaning of Bankruptcy Code section 1129.

The Plan Proponents submit the Disclosure Statement pursuant to Bankruptcy Code section 1125 to Holders of Claims against and Interests in the Debtors in connection with (i) solicitation of acceptances of the Plan; and (ii) the hearing to consider approval of the Disclosure Statement.  The Disclosure Statement contains, among other things, a discussion of the Debtors' history, business operations, events leading to the filing of the Chapter 11 Cases, significant events that have occurred during the Chapter 11 Cases, certain risk factors, and a discussion of certain other related matters. The Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan in order for their votes to be counted.

The Plan constitutes a joint chapter 11 plan of reorganization for the Debtors. Except as otherwise provided by Order of the Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable.  The Plan provides that, upon the Effective Date, the Litigation Trust Assets will be transferred to the Litigation Trust.  The Litigation Trust Assets will be administered and distributed as soon as practicable pursuant to the terms of the Plan and the Litigation Trust Agreement.

Subject to the restrictions on modifications set forth in Bankruptcy Code section 1127 of and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XVI hereof, the Plan Proponents expressly reserve the right to alter, amend, or modify the Plan, one or more times, before its substantial Consummation.

### B.    Summary of Treatment of Claims and Interests

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

---

[1]    Capitalized terms not defined in this introduction shall have the same meanings set forth in Article II.A hereof.

[2]    Copies of all Filings in the Chapter 11 Cases (as defined herein) can be obtained and viewed free of charge at the following web address:  https://dm.epiq11.com/case/carepoint/info.

#124965664v1

The classification and treatment of Claims against the Debtors pursuant to the Plan is as set forth below and as further detailed in Article V hereof:[3]

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|-------|------------------|-----------|--------|---------------|---------------------------------------------------------------|
| 1 | HRH Claims | On, or as soon as reasonably practicable after the Effective Date, HRH shall receive on account of its Allowed HRH Claims, the HRH Exit Facility. No Litigation Trust Assets shall be used to pay the Allowed HRH Claims (other than certain proceeds of Litigation Claims as set forth herein), which claims will be treated as an HRH Exit Facility, which will be paid from the Reorganized Debtors' future | Impaired | Entitled to Vote | <u>Estimated Amount</u>: $110 million <br><br> <u>Projected Recovery</u>: 100% |

---

[3] The information set forth herein is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process. Actual recoveries may widely vary within these ranges and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distributions received by Holders of Allowed Claims. The projected recoveries are based on information available as of the date hereof and reflect estimates as of the date hereof only. The reconciliation of Claims remains ongoing, which may impact the estimated amounts and projected recoveries reflected above. In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Plan Proponents make no representation as to the accuracy of these recovery estimates. The Plan Proponents reserve the right, but expressly disclaim any obligation, to update any estimates or assumptions after the date hereof on any basis.

#124965664v1

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|---|---|---|---|---|---|
| | | operations. For the avoidance of doubt, the HRH Claims are ~~deemed~~ Allowed in the approximate estimated amount of $110 million for all purposes under the Plan, subject to final reconciliation as shall be set forth in the HRH Exit Facility Credit Agreement and except as provided in Article IX.C of the Plan. For the avoidance of doubt, nothing herein grants HRH more rights for purposes of credit bidding than as set forth in Article IX.E.<br><br>Notwithstanding anything contained herein, in the event that an Alternative Transaction is consummated, the Allowed HRH Claims shall be paid in full upon the closing of the Alternative Transaction. | | | |
| 2 | Capitala Claims | On, or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Capitala Claim shall receive, on account of its Allowed Capitala Claims, its Pro Rata share of the Capitala Exit Facility, which will provide for the Holder to retain its liens, or be granted replacements liens, and be paid deferred cash payments consistent with section 1129(b)(2)(A) or otherwise realize the indubitable equivalent of its Claim, unless agreed otherwise by the Plan | Impaired | Entitled to Vote | <u>Estimated Amount</u>: $19.7 million<br><br><u>Projected Recovery</u>: 100% |

#124965664v1

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|---|---|---|---|---|---|
| | | Proponents and such Holder. In addition, the four-hospital MSO and Manager (as defined in the MSA) would grant Capitala a first-priority lien on the management fee under 6.01(a) of the MSA[4] to which it is entitled under the four-hospital system management agreement. For avoidance of doubt the lien does not attach to out-of-pocket costs owing to the MSO.<br><br>No Holder of any Allowed Capitala Claim shall receive any Distributions under the Plan, other than rights provided under the Capitala Exit Facility and, to the extent applicable, pursuant to Article XIII.B.10. No Litigation Trust Assets shall be used to pay the Allowed Capitala Claims. | | | |
| 3 | Capitala Specialty Lending | On, or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed | Impaired | Entitled to Vote | Estimated Amount: $55 million<br><br>Projected Recovery: 0% |

---

[4]    Section 6.01(a) of the MSA provides as follows: "On account of each Service Recipient that is a Hospital, the documented, direct costs of the Manager plus a reasonable overhead markup in an amount equal to TWENTY PERCENT (20.0%) of such costs in the aggregate per-Hospital of one hundred thousand dollars ($100,000.00) to one hundred and fifty thousand dollars ($150,000.00) per month, as determined by the Manager in consultation with the applicable Service Recipient."

#124965664v1

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|---|---|---|---|---|---|
| | Claims | Capitala Specialty Lending Claim shall, on account of its Allowed Capitala Specialty Lending Claim, retain all of its rights, claims, and interests in and under the Sequoia Credit Agreement and all related instruments, documents and agreements; *provided, however*, that (a) each such Holder's right to proceeds of Litigation Claims shall be subject to <u>Article IX.C</u> hereof, and (b) no such Holder shall accept any payment from a Debtor or Reorganized Debtor on account of its Allowed Capitala Specialty Lending Claim until the payment in full of (i) all obligations under the Capitala Exit Facility and (ii) all obligations under the HRH Exit Facility; *provided, further*, for the avoidance of doubt, nothing in this Plan subordinates or otherwise adversely impacts any right or claim Capitala Specialty Lending or any other Holder of Allowed Capitala Specialty Claims may have (x) against any Person who is not a Debtor in connection with the Sequoia Credit Agreement, any of the instruments, documents or agreements related thereto or any obligations thereunder, or (y) against any asset of a Person who is not a Debtor that secures the obligations under the Sequoia Credit Agreement or | | | |

#124965664v1

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|---|---|---|---|---|---|
| | | any of the instruments, documents or agreements related thereto. | | | |
| 4 | Maple Secured Claims | On, or as soon as reasonably practicable after the later of the Effective Date and the date each Maple Secured Claim is Allowed, to the extent not otherwise paid pursuant to another Court order, each Holder of a Maple Secured Claim shall receive from the Reorganized Debtors, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Maple Secured Claim, (i) cash equal to the unpaid portion of the Allowed Maple Secured Claim, (ii) the collateral securing such Allowed Maple Secured Claim, (iii) the indubitable equivalent of such Allowed Maple Secured Claim, (iv) the retention of its liens securing such Allowed Maple Secured Claim and deferred cash payments having a present value at least equal to the amount of such Allowed Maple Secured Claim as of the Effective Date, or (v) such other treatment as to which such Holder and the Reorganized Debtors agree in writing. | Impaired | Entitled to Vote | Estimated Amount: $48.2 million  Projected Recovery: 0% |
| 5 | Maple Unsecured | To the extent a Maple Unsecured Claim is Allowed, the Holder of | Impaired | Entitled to Vote | Estimated Amount: |

8

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|---|---|---|---|---|---|
| | Claims | such Allowed Maple Unsecured Claim shall receive the same distributions on a Pro Rata basis as Holders of Allowed General Unsecured Claims in Class 7. | | | $16.5 million<br><br>Projected Recovery: 0% |
| 6 | Other Secured Claims | On, or as soon as reasonably practicable after the later of the Effective Date and the date each Other Secured Claim is Allowed, to the extent not otherwise paid pursuant to another Court order, each Holder of an Allowed Other Secured Claim shall receive from the Reorganized Debtors, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Other Secured Claim, (i) cash equal to the unpaid portion of the Allowed Other Secured Claim, (ii) the collateral securing such Allowed Other Secured Claim, (iii) the indubitable equivalent of such Allowed Other Secured Claim, or (iv) such other treatment as to which such Holder and the Reorganized Debtors agree in writing. | Unimpaired | Deemed to Accept | Estimated Amount: $100,000<br><br>Projected Recovery: 100% |
| 7 | General Unsecured Claims | On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the | Impaired | Entitled to Vote | Estimated Amount: $162 million[5] |

---

[5] This estimate does not include unsecured deficiency claims as a result of application of section 506(a) of the Bankruptcy Code or rejection damages claims.

9

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|-------|------------------|-----------|--------|---------------|----------------------------------------------------------------|
| | | Litigation Trustee, as applicable, shall have agreed upon in writing to alternative treatment, each Holder of an Allowed General Unsecured Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed General Unsecured Claim, a Pro Rata beneficial interest in the Litigation Trust. | | | <u>Projected Recovery</u>: 1%-2% |
| 8 | Insured Claims | Holders of Insured Claims shall recover only from the proceeds of available insurance and shall not be entitled to any distributions from the Debtors, Reorganized Debtors, or Litigation Trust. For the avoidance of any doubt and notwithstanding any other provision of the Plan, Holders of any Claims arising under the PMA Large Deductible Workers' Compensation Program shall recover only from the proceeds of available insurance including any and all amounts within the applicable deductible limits of those policies with said deductible amount to be paid by /reimbursed to PMA using any cash collateral, escrow or security held by PMA under its Deductible Reimbursement and Security Agreements with | Impaired | Entitled to Vote | <u>Estimated Amount</u>: TBD<br><br><u>Projected Recovery</u>: TBD |

10

#124965664v1

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|---|---|---|---|---|---|
| | | Debtors bearing Account number ending 9647. | | | |
| 9 | Prior Owner Claims | To the extent a Prior Owner Claim is Allowed, the Holder of such Allowed Prior Owner Claim shall receive the same distributions on a Pro Rata basis as Holders of Allowed General Unsecured Claims in Class 7. | Impaired | Entitled to Vote | <u>Estimated Amount</u>: $39 million <br><br> <u>Projected Recovery</u>: 0% |
| 10 | Intercompany Claims[6] | Holders of Intercompany Claims shall receive no recovery under the Plan as a result of the ~~deemed~~ substantive consolidation of the Debtors' Estates for purposes of voting and Distribution. | Impaired | Deemed to Reject | <u>Estimated Amount</u>: $101.8 million <br><br> <u>Projected Recovery</u>: 0% |
| 11 | Bayonne Interests | Bayonne Interests shall be cancelled by the Reorganized Debtors on the later of: (a) the date that is thirty (30) days after the last applicable provider agreement is transferred to the entity designated as the new operator of the assets of Bayonne, or (b) twenty four (24) | Impaired | Deemed to Reject | N/A |

---

[6] For the avoidance of doubt, any and all rights, claims and causes of action of: (a) ~~Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates, LLC~~<u>the Practice Groups</u> against any of the Debtors, <u>including without limitation any objection of such parties to the Debtors' proposed cure amounts,</u> and/or (b) any of the Debtors against ~~Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates, LLC~~<u>the Practice Groups</u>, are expressly reserved and preserved.

#124965664v1

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|---|---|---|---|---|---|
| | | months after the Effective Date, and Holders of Bayonne Interests shall not receive or retain any property under the Plan on account of such Bayonne Interests. | | | |
| 12 | Other Interests | Other Interests shall be unaffected by the Plan and the Holders thereof shall retain all legal, equitable and contractual rights to which such Interests are otherwise entitled. | Unimpaired | Deemed to Accept | N/A |
| 13 | NJDOH Secured Claims | Holders of Allowed NJDOH Secured Claims shall be paid $200,000, in five (5) annual installments of $40,000, payable on each anniversary of the Effective Date. | Impaired | Entitled to Vote | <u>Estimated Amount</u>: $10.6 million<br><br><u>Projected Recovery</u>: 2% |
| 14 | Strategic Ventures Secured Claims | On, or as soon as reasonably practicable after the later of the Effective Date and the date each Strategic Ventures Secured Claim is Allowed, to the extent not otherwise paid pursuant to another Court order, each Holder of a Strategic Ventures Secured Claim shall receive from the Reorganized Debtors, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Strategic Ventures Secured Claim, (i) cash equal to the unpaid portion of the Allowed | Impaired | Entitled to Vote | <u>Estimated Amount</u>: $10 million<br><br><u>Projected Recovery</u>: 0% |

12

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Projected Recovery |
|---|---|---|---|---|---|
| | | Strategic Ventures Secured Claim, (ii) the collateral securing such Allowed Strategic Ventures Secured Claim, (iii) the indubitable equivalent of such Allowed Strategic Ventures Secured Claim, or (iv) such other treatment as to which such Holder and the Reorganized Debtors agree in writing. | | | |

In the event the Plan is not confirmed and the Chapter 11 Cases are dismissed or the cases of the for-profit Debtors are converted to cases under chapter 7 of the Bankruptcy Code, the settlements provided for herein will be void and the projected recoveries set forth above will not be available.

Therefore, in the Plan Proponents' view, the Plan offers Holders of Allowed Claims the best opportunity to maximize value for recovery purposes and is therefore in the best interests of all creditors. Accordingly, the Plan Proponents urge the Holders of HRH Claims, Capitala Claims, General Unsecured Claims and Insured Claims to vote to accept the Plan.

## ARTICLE II.
## DEFINITIONS, RULES OF INTERPRETATION AND CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    **Definitions**

For purposes of the Combined Disclosure Statement and Plan, except as expressly provided herein or unless the context otherwise requires, all capitalized terms not otherwise defined herein shall have the meanings ascribed to them in this Article II.

1.1    **"Accounts Receivable"** means the Debtors' accounts receivable that have yet to be collected and converted to Cash as of the Effective Date. For avoidance of doubt, this definition includes health care claims as well as rebate and credit card receivables.

1.2    **"Administrative and Priority Claims Estimate"** means, as of the Effective Date, the estimated amount, exclusive of Professional Fee Claims, of all unpaid Claims that will

13

be Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims.

1.3    **"Administrative Expense Claim"** means a Claim against the Debtors or their Estates for costs or expenses of administration of the Estate pursuant to Bankruptcy Code sections 364(c)(1), 503(b), 503(c), 507(b), or 1114(e)(2), including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the business of the Debtors; (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code sections 330(a) or 331, including Professional Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. sections 1911-1930.

1.4    **"Administrative Expense Claims Bar Date"** means the deadline for filing requests for payment of Administrative Expense Claims (other than a Professional Fee Claim or any Statutory Fees), which shall be 30 days after the Effective Date, unless otherwise ordered by the Court; *provided that* Professional Fee Claims shall be subject to the Professional Fee Claims Bar Date; *provided further* that the deadline to File Administrative Expense Claims pursuant to section 503(b)(9) of the Bankruptcy Code was established and shall be governed by the Bar Date Order.

1.5    **"Administrative Expense Claims Reserve"** means the reserve of Cash funded by the Debtors and maintained by Litigation Trust for the benefit of Holders of Allowed Administrative Expense Claims (except Professional Fee Claims) and Allowed Priority Claims in an amount equal to the Administrative and Priority Claims Estimate.

1.6    **"Affiliate"** shall have the meaning set forth in Bankruptcy Code section 101(2).[2]

1.7    "**Allowed**" means, when used in reference to a Claim or Interest within a particular Class, an Allowed Claim or Interest in the specified Class or of a specified type.

1.8    **"Allowed Claim"** means a Claim or any portion thereof (a) that has been allowed by a Final Order of the Court, (b) that has been Scheduled as a liquidated, non-contingent, and undisputed Claim in an amount greater than zero in the Schedules, and the Schedules have not been amended with respect to such Claim on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Court, (c) that is the subject of a timely Filed Proof of Claim and either (i) no objection to its allowance has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Court or (ii) any objection to its allowance has been settled, waived through payment or withdrawn, or has been denied by a Final Order, or (d) that is expressly allowed in a liquidated amount (x) in the Plan or (y) after the Effective Date, by the Litigation Trustee in writing; *provided, however*, that with respect to an Administrative Expense Claim, "Allowed Claim" means an Administrative Expense Claim as to which a timely written request for payment has been filed

---

[2]    ~~Notwithstanding anything to the contrary herein and for the avoidance of doubt, Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates, LLC shall not be deemed Affiliates of the Debtors for purposes of the Plan.~~

#124965664v1

with the Court or, if after the Effective Date, with the Claims and Noticing Agent (https://dm.epiq11.com/case/carepoint/claims), by the Administrative Expense Claims Bar Date and as to which (a) the Debtors or the Litigation Trustee, as applicable, or any other party-in-interest (x) has not Filed an objection on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Court or (y) has interposed a timely objection and such objection has been settled, waived through payment or withdrawn, or has been denied by Final Order, or (b) after the Effective Date, the Litigation Trustee has expressly allowed in a liquidated amount in writing.  For purposes of computing Distributions under the Plan, a Claim that has been ~~deemed~~ "Allowed" shall not include interest, fees, costs, or charges on such Claim from and after the Petition Date, except as provided in Bankruptcy Code section 506(b) or as otherwise expressly set forth in the Plan.

1.9    **"Alternative Transaction"** has the meaning set forth in Article IX.E hereof.

1.10    **"Amended Schedules Bar Date"** has the meaning set forth in the Bar Date Order.

1.11    **"Assets"** means all of the assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estates pursuant to Bankruptcy Code section 541, Cash, Causes of Action, Accounts Receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and the proceeds of all of the foregoing.

1.12    **"Avoidance Actions"** means any and all Causes of Action of the Debtors arising under chapter 5 of the Bankruptcy Code, including, without limitation, sections 544, 545, 547, 548, 549, and 550 thereof, and/or similar state law Causes of Action.

1.13    **"Ballot"** means the applicable form or forms of ballot(s) distributed to each Holder of an Impaired Claim entitled to vote on the Plan on which the Holder indicates either acceptance or rejection of the Plan.

1.14    **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

1.15    **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, and the Local Rules, as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

1.16    **"Bar Date Order"** means the *Order (I) Establishing Deadlines for the Filing of Proofs of Claim; (II) Approving the Form and Manner of Notice Thereof; and (III) Granting Related Relief* [D.I. 688].

1.17    **"Bayonne"** means Bayonne Medical Center.

1.18    **"Bayonne DIP Credit Agreement"** means that certain Debtor-in-Possession Loan and Security Agreement among Bayonne Opco and IJKG, as loan parties, and DIP Lender, as lender, dated as of October 9, 2024.

**1.19** "**Bayonne Interests**" means all Interests in Debtors Benego CarePoint LLC, Evergreen Community Assets, LLC, Bayonne Intermediate Holdco, LLC, Sequoia BMC Holdco, LLC, IJKG, LLC, and IJKG Opco LLC.

**1.20** "**Bayonne Opco**" means IJKG Opco LLC d/b/a CarePoint Health – Bayonne Medical Center.

**1.21** "**Bayonne/Maple Loan Agreement**" is defined in Article III.A.3.ii hereof.

**1.22** "**Books and Records**" means any and all books and records of the Debtors, including any and all documents and any and all computer generated or computer-maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in the possession of third parties, wherever located.

**1.23** "**Business Day**" means any day other than a Saturday, Sunday, or any legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

**1.24** "**Capitala**" means Capitala Private Advisors, LLC.

**1.25** "**Capitala Claims**" means all Claims of (a) the lenders and agents under the Christ/Capitala Loan Agreement, and (b) the lenders and agents under the Hoboken/Capitala Loan Agreement.

**1.26** "**Capitala Exit Facility**" means a new credit facility provided to the Debtors pursuant to the Capitala Exit Facility Credit Agreement and related agreements and documents.

**1.27** "**Capitala Exit Facility Credit Agreement**" means a credit agreement by and among certain of the Debtors, Capitala, as administrative agent and collateral agent, and the lenders party thereto, in form and substance acceptable to HRH, Capitala, the Debtors and the UCC, a preliminary draft of which will be filed with the Plan Supplement. Certain principal terms of the Capitala Exit Facility Credit Agreement include the following: (i) Principal: outstanding amount of the Capitala Claims as of the Effective Date, including all accrued interest and unpaid fees calculated as of the Effective Date; (ii) Interest: SOFR + 8%; (iii) Term: will mature six (6) months from the Effective Date; (iv) Security: secured by first priority liens on (A) all assets of Reorganized HUMC Opco, Reorganized Christ Opco, and Reorganized HUMC Holdco, LLC and (B) a first-priority lien on all management fees payable to the MSO and Manager (excluding any amounts payable in respect of out-of-pocket expense reimbursements); (v) Lien Priority: liens will be senior to the HRH Exit Facility pursuant to the HRH Entity Absolute Subordination and the Capitala/HRH Exit Intercreditor Agreement; (vi) Payments: interest only, paid in cash quarterly with all principal and all remaining accrued and unpaid interest and fees due upon maturity; (vii) Defaults: customary defaults to be agreed upon among the Capitala Senior Secured Parties, the Debtors, and the DIP Lender; (viii) financial covenants to be reasonably agreed among the Capitala Senior Secured Parties, the Debtors, and the DIP Lender; and (ix) other customary covenants and representations and warranties to be agreed among the Selling Lenders, the Debtors, and the DIP Lender.

#124965664v1

**1.28** **"Capitala/HRH Exit Intercreditor Agreement"** means an intercreditor agreement to be executed among Capitala, in its capacity as administrative agent and collateral agent under the Capitala Exit Facility Credit Agreement, and HRH, the DIP Lender, and each other holder of an HRH Claim to further document the HRH Entity Absolute Subordination.

**1.29** **"Capitala Senior Secured Party"** means the "Senior Secured Parties" as defined in the Christ/HUMC Interim DIP Order.

**1.30** **"Capitala Specialty Lending"** means Capitala Specialty Lending Corp.

**1.31** **"Capitala Specialty Lending Claims"** means all Claims of the lenders and agents under the Sequoia Credit Agreement.

**1.32** **"CarePoint"** means CarePoint Health Systems, Inc.

**1.33** **"Cash"** means legal tender of the United States of America and equivalents thereof.

**1.34** **"Causes of Action"** means any and all claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and Claims, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, through and including the Effective Date, that the Debtors and/or the Estates may hold against any Person or Entity.

**1.35** **"Chapter 11 Cases"** means the chapter 11 cases of the Debtors, which are jointly administered under case number 24-12534 (JKS) in the Court.

**1.36** **"Christ Hospital"** means Christ Hospital in Jersey City.

**1.37** **"Christ Opco"** means Hudson Hospital Opco LLC d/b/a CarePoint Health – Christ Hospital.

**1.38** **"Christ/Capitala Loan Agreement"** is defined in Article III.A.3.i hereof.

**1.39** **"Christ/HUMC DIP Credit Agreement"** means that certain Super Priority Senior Secured Debtor-in-Possession Credit and Security Agreement among CarePoint, HUMC Opco and Christ Opco, as borrowers, and DIP Lender, as lender, dated as of October 31, 2024.

**1.40** **"Christ/HUMC Interim DIP Order"** is defined in Article III.C.2 hereof.

**1.41** **"Christ/Maple Loan Agreement"** is defined in Article III.A.3.ii hereof.

#124965664v1

**1.42** "**Claim**" means a claim against the Debtors, whether or not asserted, as such term is defined in Bankruptcy Code section 101(5).

**1.43** "**Claims and Noticing Agent**" means Epiq Corporate Restructuring, LLC or any successor thereto.

**1.44** "**Claims Objection Deadline**" means the last day for filing objections to Claims, Proofs of Claim and Administrative Expense Claims (other than Disallowed Claims for which no objection or request for estimation is required), which day shall be 180 days after the Effective Date; *provided*, *however*, that the period of time for filing objections to Claims and Administrative Expense Claims shall automatically renew for successive periods of 180 days until the earlier of (i) the date upon which all Claims and Administrative Expense Claims have been Allowed or Disallowed, or (ii) the date fixed by the Court upon motion of the Litigation Trustee, a Holder of a Claim, or another party in interest.

**1.45** "**Class**" means each category or group of Holders of Claims or Interests that has been designated as a class in Article V hereof.

**1.46** "**Clerk**" means the clerk of the Court.

**1.47** "**Collateral Sharing Agreement**" is defined in Article III.A.3.iv hereof.

**1.48** "**Collateral Surrender Agreement**" means the Collateral Surrender and Operations Transfer Agreement, as amended hereby, dated as of October 9, 2024.

**1.49** "**Collateral Surrender Motion**" means the *Motion of Debtors IJKG Opco, LLC and IJKG, LLC for Entry of (A) an Interim Order Approving Collateral Surrender and Operations Transfer Agreement to Allow Inter Alia, Interim Hospital Operations, (B) a Final Order Approving a Private Sale of All or Substantially All Assets of IJKG Opco, LLC and IJKG, LLC and (C) Granting Related Relief* [D.I. 18].

**1.50** "**Combined Disclosure Statement and Plan**" means this seventh amended combined disclosure statement and chapter 11 plan of reorganization, as modified as of April 15, 2025, including, without limitation, the Disclosure Statement, the Plan, the Plan Supplement(s), all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time in accordance with the terms hereof.

**1.51** "**Confirmation**" means the entry of the Confirmation Order, subject to all conditions specified in Article XIII.A having been satisfied or waived pursuant to Article XIII.D.

**1.52** "**Confirmation Date**" means the date of entry of the Confirmation Order on the Docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

**1.53** "**Confirmation Hearing**" means the hearing(s) held by the Court to consider confirmation of the Plan pursuant to Bankruptcy Code section 1129, as such hearing may be adjourned or continued from time to time.

#124965664v1

**1.54** "**Confirmation Hearing Notice**" shall have the meaning set forth in Article VI.D hereof.

**1.55** "**Confirmation Order**" means the order of the Court confirming the Plan pursuant to Bankruptcy Code section 1129.

**1.56** "**Consummation**" means the occurrence of the Effective Date.

**1.57** "**Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases, or such other court as may have jurisdiction over the Chapter 11 Cases.

**1.58** "**Creditor**" means any Person or Entity that is the Holder of a Claim against the Debtors.

**1.59** "**Cure**" means the cure amount which is payable with respect to any Executory Contract or Unexpired Lease which is assumed by the Debtors.

**1.60** "**Current D&Os**" means the Debtors' current officers, directors, trustees and/or managers serving on the Effective Date.

**1.61** "**Debtor Releases**" shall have the meaning set forth in Article III.D hereof.

**1.62** "**Debtors**" means CarePoint Health Systems Inc. d/b/a Just Health Foundation and its affiliated debtors and debtors-in-possession in the Chapter 11 Cases other than (i) Garden State Healthcare Associates, LLC and (ii) New Jersey Medical and Health Associates, LLC.

**1.63** "**Delaware Action**" shall have the meaning set forth in Article III.D hereof.

**1.64** "**DIP Lender**" means Bayonne Medical Center Opco, LLC.

**1.65** "**DIP Lender Claims**" means all claims of the DIP Lender under the Christ/HUMC DIP Credit Agreement and the Bayonne DIP Credit Agreement.

**1.66** "**Disallowed**" means, when used in reference to a Claim or Interest within a particular Class, a Disallowed Claim or Interest in the specified Class or of a specified type.

**1.67** "**Disallowed Claim**" means a Claim or any portion thereof that (a) has been disallowed by a Final Order, (b) is Scheduled at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been Filed by the General Claims Bar Date or ~~deemed~~ timely Filed with the Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, (c) is not Scheduled, and as to which (i) no Proof of Claim has been Filed by the General Claims Bar Date or ~~deemed~~ timely Filed with the Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, or (ii) no request for payment of an Administrative Expense Claim has been filed by the Administrative Expense Claims Bar Date or ~~deemed~~ timely filed pursuant to either the Bankruptcy Code or any Final Order or under

19

applicable law, or (d) after the Effective Date, has been disallowed in a written agreement by and between the Litigation Trustee and the Holder of such Claim.

1.68   **"Disbursing Agent"** means the Litigation Trustee; *provided,* that the Litigation Trustee may, in its discretion, retain a third party to act as Disbursing Agent.

1.69   **"Disputed Claim"** means a Claim or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, that (a) has not been Scheduled by the Debtors or has been Scheduled as unknown, contingent, unliquidated, disputed, or at zero, whether or not such Claim is the subject of a proof of Claim; (b) is the subject of a proof of Claim that differs in nature, amount or priority from the Schedules (except to the extent that the Litigation Trustee elects, in its discretion, to treat the Claim asserted in such proof of Claim as an Allowed Claim); or (c) is the subject of an objection interposed by the Claims Objection Deadline or such other time period fixed by the Court, which has not been withdrawn or overruled by a Final Order; *provided, however*, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or Disallowed Claim.

1.70   **"Disputed Claim Amount"** means (a) if a liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim, (i) the liquidated amount set forth in the Proof of Claim relating to a Disputed Claim; (ii) an amount agreed to by the Reorganized Debtors or the Litigation Trustee, as applicable, and the Holder of such Disputed Claim; or (iii) if a request for estimation is Filed by any party, the amount at which such Claim is estimated by the Court; (b) if no liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim, (i) an amount agreed to by the Reorganized Debtors or the Litigation Trustee, as applicable, and the Holder of such Disputed Claim or (ii) the amount estimated by the Court with respect to such Disputed Claim; or (c) if the Claim is a Disallowed Claim, zero.

1.71   **"Disputed Claims Reserve"** means the reserve established and maintained by the Litigation Trust pursuant to and in accordance with the terms of the Litigation Trust Agreement for the payment of Disputed Claims that become Allowed Claims after the Effective Date.  The Disputed Claims Reserve need not be maintained by the Litigation Trust in a segregated account.

1.72   **"Distribution"** means any distribution to be made by the Disbursing Agent in accordance with the Plan of, as the case may be: (a) Cash or (b) any other consideration or residual value distributed to Holders of Allowed Claims under the terms and provisions of the Plan.

1.73   **"Distribution Date"** means any date on which a Distribution is made to Holders of Allowed Claims under the Plan, or as otherwise agreed.  The first Distributions shall occur on or as soon as practicable after the Effective Date or as otherwise determined by the Litigation Trustee.  To the extent subsequent Distributions are necessary, such subsequent Distributions shall occur as soon after the first Distribution Date as the Litigation Trustee shall determine in accordance with the Litigation Trust Agreement.

1.74   **"Distribution Record Date"** means the record date for the purpose of determining Holders of Allowed Claims entitled to receive Distributions under the Plan on

20

account of Allowed Claims, which date shall be the Confirmation Date or such other date designated in the Confirmation Order or any subsequent Court order.

**1.75** **"Docket"** means the docket in the Chapter 11 Cases maintained by the Clerk.

**1.76** **"D&O Claims"** means any and all rights and Causes of Action arising under state or federal law against the Current D&Os (subject to Article IX.D of the Plan) and/or the Debtors' former officers, directors, trustees and/or managers, including, but not limited to, claims for breach of fiduciary duty, and the proceeds of any such rights and claims, including from insurance policies associated therewith; *provided, however,* that any claims or Causes of Action against the Current D&Os shall be treated as set forth herein.

**1.77** **"Effective Date"** means the first Business Day on which all conditions to the Consummation of the Plan set forth in Article XIII.B have been satisfied or waived in accordance with Article XIII.D.

**1.78** **"Entity"** means an entity as defined in Bankruptcy Code section 101(15).

**1.79** **"Epiq"** means Epiq Corporate Restructuring, LLC.

**1.80** **"Estates"** means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to Bankruptcy Code section 541.

**1.81** **"Exculpated Parties"** means, collectively, and in each case in its capacity as such: (a) the Reorganization Committee and the Current D&Os, solely with respect to their post-petition conduct; (b) the UCC, its Professionals and its members (solely in their capacity as such); and (c) any retained Professional of the Debtors whose retention was approved by the Court.

**1.82** **"Executory Contract"** means a contract to which any of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.83** **"Exhibit"** means an exhibit attached to the Combined Disclosure Statement and Plan.

**1.84** **"Face Amount"** means (a) when used in referenced to a Disputed Claim or Disallowed Claim, the Disputed Claim Amount; and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

**1.85** **"File"**, **"Filed"**, or **"Filing"** means, file, filed, or filing with the Court or its authorized designee in the Chapter 11 Cases.

**1.86** **"Final Fee Applications"** shall have the meaning set forth in Article IV.D hereof.

**1.87** **"Final Order"** means an Order of the Court (a) as to which the time to appeal, petition for certiorari, or move for reargument, rehearing, or new trial has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument, rehearing, or new trial shall then be pending; (b) as to which any right to appeal, petition for certiorari, reargue,

21

rehear, or retry shall have been waived in writing; or (c) in the event that an appeal, writ of certiorari, reargument, rehearing, or new trial has been sought, as to which (i) such order of the Court shall have been affirmed by the highest court to which such order is appealed; (ii) certiorari has been denied as to such order; or (iii) reargument or rehearing or new trial from such order shall have been denied, and the time to take any further appeal, petition for certiorari, or move for reargument, rehearing, or new trial shall have expired without such actions having been taken.

**1.88**    "**General Claims Bar Date**" means the deadline for non-Governmental Units to File Proofs of Claim for Claims arising before the Petition Date, established as March 14, 2025 at 5:00 p.m. (Eastern Time) pursuant to the Bar Date Order.

**1.89**    "**General Unsecured Claim**" means any Claim against the Debtors that (a) is unpaid as of the Effective Date and (b) arose or is ~~deemed~~determined by the Bankruptcy Code or Court, as the case may be, to have arisen before the Petition Date and that is not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, HRH Claim, Capitala Claim, Capitala Specialty Lending Claim, Maple Secured Claim, Maple Unsecured Claim, Other Secured Claim, Insured Claim, Prior Owner Claim, Intercompany Claim, NJDOH Secured Claim or Strategic Ventures Secured Claim. For the avoidance of doubt, any Allowed Claim of CarePoint Health Captive Assurance Company, LLC will be treated as a General Unsecured Claim.

**1.90**    "**Governmental Claims Bar Date**" means the deadline for Governmental Units to File Proofs of Claim for Claims arising before the Petition Date, established as May 2, 2025 at 5:00 p.m. (Eastern Time) pursuant to the Bar Date Order.

**1.91**    "**Governmental Unit**" shall have the meaning set forth in Bankruptcy Code section 101(27).

**1.92**    "**Hoboken/Capitala Loan Agreement**" is defined in Article III.A.3.i hereof.

**1.93**    "**HRH**" means Hudson Regional Hospitals, LLC.

**1.94**    "**HRH Claims**" means all Claims of HRH, the DIP Lender, 29 E. 29 Street Holdings, LLC, and any of their Affiliates, whether arising before or after the Petition Date, including, without limitation, the DIP Lender Claims, the Outstanding Judgment, Administrative Expense Claims (including liabilities incurred by HRH in managing/operating Bayonne, HUMC, or Christ Hospital, including in the form of equipment and other lease/acquisitions, or service/maintenance agreements), and any unsecured claims of such parties, and unpaid fees for HRH's management/operations of Bayonne, HUMC or Christ Hospital pursuant to the Collateral Surrender Agreement, the Hospital Facilities MSA and the MSA; *provided*, *however*, that the HRH Claims shall be ~~deemed~~ Allowed in the approximate estimated amount of $110 million for all purposes under the Plan, subject to final reconciliation as shall be set forth in the HRH Exit Facility Credit Agreement and except as provided in Article IX.C of the Plan.

**1.95**    "**HRH Entity Absolute Subordination**" has the meaning set forth in the HRH Subordination Stipulation.

22

**1.96** "**HRH Exit Facility**" means a new credit facility provided to certain of the Debtors pursuant to the HRH Exit Facility Credit Agreement and related agreements and documents. The HRH Exit Facility shall be junior and subordinate to the Capitala Exit Facility in liens and right of payment pursuant and subject to this Plan, the HRH Entity Absolute Subordination and the Capitala/HRH Exit Intercreditor Agreement.

**1.97** "**HRH Exit Facility Credit Agreement**" means a credit agreement by and among, certain of the Debtors and HRH or its designee, in form and substance acceptable to HRH, the Debtors and the UCC. It will provide "new money" sufficient to satisfy Allowed Administrative Expense Claims and Allowed Priority Claims in connection with, and pursuant to, the Plan, and working capital of the borrowers thereunder following approval of the Plan, and contain standard covenants and events of default substantially similar to those contained in the existing Christ/ HUMC DIP Credit Agreement. The HRH Exit Facility Credit Agreement shall be junior and subordinate to the Capitala Exit Facility Credit Agreement in liens and right of payment pursuant and subject to this Plan, the HRH Entity Absolute Subordination and the Capitala/HRH Exit Intercreditor Agreement.

**1.98** "**HRH Subordination Stipulation**" means the *Stipulation Regarding the Relative Priority of the Claims and Liens of HRH Entities and Certain of the Senior Secured Prepetition Facilities* [D.I. 798], as approved by the Court pursuant to the *Agreed Order Approving Stipulation Regarding the Relative Priority of the Claims and Liens of HRH Entities and Certain of the Senior Secured Prepetition Facilities* [D.I. 810].

**1.99** "**HRH Transactions**" means the transactions contemplated by, collectively, the Collateral Surrender Agreement, the Hospital Facilities MSA and the MSA.

**1.100** "**Holder**" means a Person or Entity who is the beneficial holder of any Claim or Interest.

**1.101** "**Hospital Facilities Management Motion**" means the *Motion of the Debtors for an Order (I) Authorizing the Entry Into the Hospital Facilities Management Services Agreement, and (II) Granting Related Relief* [D.I. 212].

**1.102** "**Hospital Facilities MSA**" means the Hospital Facilities Management Services Agreement, dated November 27, 2024.

**1.103** "**Hospitals**" means Bayonne, Christ Hospital and HUMC.

**1.104** "**HUMC**" means Hoboken University Medical Center.

**1.105** "**HUMC Opco**" means HUMC Opco LLC d/b/a CarePoint Health – Hoboken University Medical Center.

**1.106** "**Impaired**" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of Bankruptcy Code section 1124.

**1.107** "**Impaired Class**" means a Class of Claims or Interests that is Impaired.

#124965664v1

**1.108** "**Insurance Policies**" means any and all insurance policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provisions of insurance entered into by or issued to or for the benefit of, at any time, the Debtors or their predecessors (including, for the avoidance of doubt, any such policies, agreements, or other documents that have been paid in full).

**1.109** "**Insured Claim**" means a Claim that arises from personal injury, medical malpractice, or wrongful death (including slip-and-fall and medical malpractice claims) and that is covered by the terms of one or more Insurance Policies, or for which a Debtor is entitled to indemnification, reimbursement, contribution or other payment under one or more Insurance Policies; *provided*, *however*, that all claims for any deductible or self-insured retention obligations of the Debtors shall be treated as General Unsecured Claims (to the extent Allowed).

**1.110** "**Intercompany Claim**" means any Claim held by a Debtor against another Debtor, including, without limitation, (a) any account reflecting intercompany book entries with respect to another Debtor; (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor; and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor.

**1.111** "**Interest**" means the legal interests, equitable interests, contractual interests, equity interests, ownership interests, or other rights of any Person or Entity in the Debtors, including all partnership interests, limited liability company or membership interests, rights, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest in the Debtors, subscription rights and liquidation preferences, and commitments of any character whatsoever relating to any such equity or ownership interests or obligating the Debtors to issue, transfer, or sell any interests whether or not certificated, transferable, voting, or denominated security.

**1.112** "**Interim DIP Orders**" is defined in Article III.C.2 hereof.

**1.113** "**Internal Revenue Code**" shall have the meaning set forth in Article VIII.A hereof.

**1.114** "**Liabilities**" means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

**1.115** "**Lien**" shall have the meaning set forth in Bankruptcy Code section 101(37).

**1.116** "**Liquidation Analysis**" means the hypothetical chapter 7 liquidation analysis attached hereto as **Exhibit B**.

**1.117** "**Litigation Claims**" means any and all claims and Causes of Action (known or unknown) that the Debtors or their Estates have or may have through the Effective Date, including, without limitation: (i) the right to object to, challenge or otherwise contest any

24

Claims; (ii) all Avoidance Actions; (iii) all tort claims and D&O Claims; (iv) all claims and Causes of Action of any kind or nature arising under state or federal law against any of the Debtors' consultants, managers, advisors, auditors or other professionals (current or past) relating to services rendered before the Petition Date; (v) all claims, Causes of Action, and other rights (including rights to challenge any asserted Lien) of any kind or nature against any Creditor asserting a Secured Claim in these Chapter 11 Cases other than the Liens and Claims of HRH, the Capitala Senior Secured Parties, or any of their respective Affiliates/subsidiaries; (vi) all legal and equitable defenses against any Claim or Causes of Action asserted against the Debtors; (vii) all claims and Causes of Action of any kind or nature arising under state or federal law arising under a theory of negligence, professional negligence, and/or malpractice; (viii) all claims and Causes of Action of any kind or nature arising under state or federal law based upon the formation and capitalization of the Debtors; (ix) all claims and Causes of Action of any kind or nature arising from the payment and/or repayment of claims by and/or to any current or former affiliate of any Debtor herein; (x) all claims and Causes of Action of any kind or nature against any current or former owners and/or managers of the Debtors and their respective affiliates and related persons; (xi) claims under any Insurance Policies applicable to the Debtors arising on or before the Petition Date (subject to the property and casualty exclusion described below); *provided*, *however*, that the foregoing shall not include any cross-claims, counterclaims or third-party claims involving alleged joint tortfeasors; (xii) all claims or Causes of Action of any kind or nature arising under any federal and/or state antitrust laws; and (xiii) all lawsuits or Causes of Action against Aetna, Cigna, their respective affiliates, or other insurers, including any pending or future litigation against such parties, or other claims of similar kind or nature, arising on or before November 3, 2023. For the avoidance of doubt, the Litigation Claims shall not include any claims or Causes of Action released or exculpated under the Plan. Notwithstanding any other provisions of the Plan, Litigation Claims exclude: (a) all claims and Causes of Action relating to assumed liabilities, critical vendors, accounts receivable, health care claims, rebate and credit card receivables; (b) claims and Causes of Action arising from HRH's management or operations of the facilities; (c) claims under any property or casualty Insurance Policies of the Debtors; (d) ordinary course claims submitted to insurance companies, independent dispute resolution, litigation or arbitration proceedings against insurance companies or intermediaries, or "out of network transparency act" or "no surprises act" claims or Causes of Action; and (e) claims or causes of action personal to HRH or its subsidiaries or Affiliates, including without limitation, 29 E. 29 Street Holdings, LLC and the DIP Lender.

**1.118  "Litigation Trust"** means the trust established on the Effective Date for the purposes of, among other things, investigating, prosecuting and/or settling Litigation Claims; liquidating the Debtors' remaining litigation assets, including any Causes of Action, and distributing the proceeds as required under the Plan and the Litigation Trust Agreement. With respect to any action required or permitted to be taken by the Litigation Trust, the term includes the Litigation Trustee or any other Person or Entity authorized to take such action in accordance with the Litigation Trust Agreement.

**1.119  "Litigation Trust Account"** means the bank account created pursuant to Article IX.L.1 hereof.

**1.120  "Litigation Trust Agreement"** means the agreement, in form and substance acceptable to the UCC, establishing the Litigation Trust in conformity with the provisions of the

Plan approved in the Confirmation Order, and entered into by the Debtors, on behalf of the Litigation Trust Beneficiaries, and the Litigation Trustee on or prior to the Effective Date pursuant to the terms of the Plan.  A copy of the Litigation Trust Agreement shall be Filed with the Plan Supplement.

1.121  "**Litigation Trust Assets**" means, all assets held from time to time by the Litigation Trust, including, without limitation: (a) the Litigation Trust Seed Money; (b) the Litigation Claims and proceeds therefrom, subject to the provisions herein governing the allocation of such proceeds; and (c) the Administrative Expense Claims Reserve.

1.122  "**Litigation Trust Beneficiaries**" means HRH and Holders of Allowed General Unsecured Claims.

1.123  "**Litigation Trust Expenses**" means the fees, expenses, costs or other obligations incurred, payable or owed by the Litigation Trust (including, but not limited to, fees, costs, and expenses of the Litigation Trustee, and the fees, costs and expenses of professionals or other Persons retained by the Litigation Trustee) in connection with carrying out the duties and responsibilities set forth in the Litigation Trust Agreement and the Plan.

1.124  "**Litigation Trust Interests**" means the uncertificated beneficial interests in the Litigation Trust representing the right of Holders of Allowed General Unsecured Claims and HRH, to receive Distributions from the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement.

1.125  "**Litigation Trust Oversight Committee**" shall have the meaning set forth in Article X.B hereof.

1.126  "**Litigation Trust Proceeds**" means the Cash or other proceeds generated by the Litigation Trust after the Effective Date of the Plan, including, without limitation, recoveries on account of Litigation Claims.

1.127  "**Litigation Trust Seed Money**" means $3,500,000, which HRH shall either: (a) transfer to the Litigation Trust on the Effective Date; or (b) provide by line of credit to fund the Litigation Trust, in accordance with the Litigation Trust Agreement.

1.128  "**Litigation Trustee**" means Paul Navid of Province, LLC or such other Person as determined by the UCC, in consultation with the Debtors and HRH. HRH shall have the right to approve the Litigation Trustee, such approval not to be unreasonably withheld.  The identity of the Litigation Trustee shall also be disclosed in the Plan Supplement.

1.129  "**Local Rules**" means the Local Rules for the United States Bankruptcy Court for the District of Delaware.

1.130  "**Maple**" means Maple Healthcare, LLC.

1.131  "**Maple Secured Claims**" means all Claims of Maple (i) as administrative agent and collateral agent for (a) the lenders under the Bayonne/Maple Loan Agreement, and (b) the

26

lenders under the Christ/Maple Loan Agreement, and (ii) arising under the Collateral Sharing Agreement, in each case, to the extent such claims are Secured Claims.

1.132 "**Maple Unsecured Claims**" means all Claims of Maple that are not Maple Secured Claims, including, without limitation, any Claims under unsecured promissory notes issued by any of the Debtors and any unsecured deficiency claim that Maple may assert.

1.133 "**Mediator**" means the Honorable Michael B. Kaplan (United States Bankruptcy Court, District of New Jersey).

1.134 "**MSA**" means the Management Services Agreement dated October 9, 2024.

1.135 "**MSA Motion**" means the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Assumption of Management Services Agreement, (II) Scheduling a Final Hearing, and (III) Granting Related Relief* [D.I. 19].

1.136 "**MSO**" shall have the meaning set forth in Article IX.I.2 hereof.

1.137 "**NJDOH**" means the New Jersey Department of Health.

1.138 "**NJDOH Loan Agreement**" is defined in Article III.A.3.iii hereof.

1.139 "**NJDOH Secured Claims**" means any Secured Claim held by the NJDOH.

1.140 "**Non-U.S. Holder**" shall have the meaning set forth in Article VIII.A hereof.

1.141 "**Notice Parties**" shall have the meaning set forth in Article VI.A hereof.

1.142 "**Objection(s)**" means any objection, application, motion, complaint, or other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim).

1.143 "**Official Bankruptcy Forms**" means the Official Bankruptcy Forms, prescribed by the Judicial Conference of the United States, the observance and use of which is required pursuant to Bankruptcy Rule 9009, as such forms may be amended, revised, or supplemented from time to time.

1.144 "**Order**" means an order or judgment of the Court as entered on the Docket.

1.145 "**Other Interests**" means all Interests in the Debtors other than Bayonne Interests.

1.146 "**Other Secured Claim**" means an Allowed Secured Claim arising prior to the Petition Date against any of the Debtors, other than HRH Claims, Capitala Claims, Capitala Specialty Lending Claims, Maple Secured Claims, Maple Unsecured Claims, Prior Owner Claims, NJDOH Secured Claims or Strategic Ventures Secured Claims. Signature RX Investments, LLC ("Signature RX") asserts that it is a secured creditor of certain of the Debtors,

27

pursuant to an Agreement for Sale of Rejected Accounts, dated as of January 17, 2024, between Signature RX and CarePoint, HUMC Opco and others. The Plan Proponents assert that Signature RX does not hold Allowed Secured Claims because the claims of creditors (including without limitation the DIP Lender) with asserted security interests in the collateral allegedly securing Signature RX's claim exceed the value of such collateral. To the extent that it is determined pursuant to a Final Order of the Court that Signature RX holds: (a) an Allowed Secured Claim, such claim shall be included in Class 6 (Other Secured Claims), or (b) an Allowed General Unsecured Claim, such claim shall be included in Class 7 (General Unsecured Claims).

**1.147** "**Outstanding Judgment**" means the *Consent Order for Foreclosure of Security Interests and Surrender of Property, Reversion of Operating License, Possession and Entry of Final Judgment*, entered in the Delaware Action on or around October 18, 2024.

**1.148** "**PCO**" means David N. Crapo, the Debtors' patient care ombudsman, appointed by the U.S. Trustee as of November 25, 2024 [D.I. 194], or any successor thereto.

**1.149** "**Person**" shall have the meaning set forth in Bankruptcy Code section 101(41).

**1.150** "**Petition Date**" means November 3, 2024.

**1.151** "**Plan Supplement**" means the documents, schedules, and any exhibits Filed in connection with the Plan, as amended, supplemented or modified from time to time, including, but not limited to, (a) the form of the Litigation Trust Agreement; (b) notice of the identity of the Litigation Trustee; (c) a schedule, to be agreed upon by the Debtors, the UCC, and HRH, providing for the payment of certain employee Claims in excess of the priority cap under sections 507(a)(4)-(5) of the Bankruptcy Code; (d) the form of the Capitala Exit Facility Credit Agreement; (e) the form of the HRH Exit Facility Credit Agreement; (f) the Schedule of Rejected Executory Contracts and Unexpired Leases; (g) Plan projections, which shall include a balance sheet as of the Effective Date, and three (3) years of cash flow projections from the Effective Date; and (h) a declaration of Shamiq Syed in support of the Plan's limited proposed substantive consolidation.

**1.152** "**Plan Supplement Filing Date**" means February 20, 2025.

**1.153** "**Plan Term Sheet**" means that certain Preliminary Plan Term Sheet agreed to by and among the Debtors, the UCC, HRH and the DIP Lender [D.I. 378].

**1.154** "**PMA Large Deductible Workers' Compensation Program**" means six (6) Workers' Compensation and Employer's Liability Insurance Policies issued by Pennsylvania Manufacturers' Association Insurance Company ("PMA") to Debtors bearing Account number ending 9647 with effective dates beginning July 27, 2019 to July 27, 2020 and issued annually thereafter up to and including the current in-force policy with effective dates of July 27, 2024 to July 27, 2025, written under Large Deductible Endorsements and corresponding annual Deductible Reimbursement and Security Agreements requiring a Loss Deposit Fund and cash collateral security as briefly described in Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Their Insurance Policies Entered Into Prepetition and Pay Prepetition Obligations in Respect Thereof, (B) Honor Prepetition Premium Financing Agreement, and (C) Renew Insurance Premium Financing Agreement in the Ordinary Course of

28

Business; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief [D.I.13, D.I.84, D.I 245].

**1.155** "**Practice Groups**" means Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates, LLC.

**1.156** ~~1.155~~ "**Priority Claims**" means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

**1.157** ~~1.156~~ "**Priority Non-Tax Claim**" means a Claim that is accorded priority in right of payment under Bankruptcy Code section 507, other than a Priority Tax Claim or an Administrative Expense Claim.

**1.158** ~~1.157~~ "**Priority Tax Claim**" means a Claim that is entitled to priority under Bankruptcy Code section 507(a)(8).

**1.159** ~~1.158~~ "**Prior Owners**" means Vivek Garipalli, James Lawler, Jeffrey Mandler, any entities directly or indirectly owned or controlled by them or any of their related Persons, including without limitation, Strategic Ventures LLC, Pheasant Run Ventures, LLC, Oak Management, LLC, Heights Healthcare Services LLC, Willow Healthcare Services, LLC, Benego Ventures, LLC, Briar Hill Ventures, LLC, JPL Healthcare Consulting LLC and that certain Freehold Trust that is affiliated with Vivek Garipalli; *provided*, *however*, that CarePoint Health Captive Assurance Company, LLC shall *not* ~~be deemed~~constitute a Prior Owner.

**1.160** ~~1.159~~ "**Prior Owner Claim**" means any Claim of any of the Prior Owners.

**1.161** ~~1.160~~ "**Professional**" means any professional Person employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, 363, or 1103 pursuant to an Order of the Court and to be compensated for services rendered pursuant to Bankruptcy Code sections 327, 328, 329, 330, or 331.

**1.162** ~~1.161~~ "**Professional Fee Claim**" means a Claim of a Professional pursuant to Bankruptcy Code sections 327, 328, 330, 331, or 503(b) for compensation or reimbursement of costs and expenses relating to services performed on or after the Petition Date and prior to and including the Effective Date.

**1.163** ~~1.162~~ "**Professional Fee Claims Bar Date**" means the deadline for Filing all applications for Professional Fee Claims, which shall be 45 days after the Effective Date.

**1.164** ~~1.163~~ "**Professional Fee Claims Objection Deadline**" shall have the meaning set forth in Article IV.D hereof.

**1.165** ~~1.164~~ "**Professional Fee Estimate**" means (a) with respect to any Professional, a good-faith estimate of such Professional's anticipated accrued, unpaid Professional Fee Claims as of the Effective Date to be provided by each Professional in writing to the Plan Proponents prior to the commencement of the Confirmation Hearing, or in the absence of such a writing, to

be prepared by the Plan Proponents, and (b) collectively, the sum of all individual Professional Fee Estimates.

**1.166** ~~1.165~~ "**Professional Fee Reserve**" means the reserve of Cash funded by the Debtors and maintained by the Reorganized Debtors for the benefit of Holders of Allowed Professional Fee Claims in an amount equal to the Professional Fee Estimate.

**1.167** ~~1.166~~ "**Proof of Claim**" means the proof of claim that must be Filed before the General Claims Bar Date, the Governmental Claims Bar Date, the Administrative Expense Claims Bar Date, or the Rejection Claims Bar Date, as applicable, which term shall include a request for payment of an Administrative Expense Claim.

**1.168** ~~1.167~~ "**Pro Rata**" means, at any time, the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class, unless the Plan provides otherwise.

**1.169** ~~1.168~~ "**Rejection Claims Bar Date**" means the deadline to File a Proof of Claim for damages relating to the rejection of an Executory Contract or Unexpired Lease, as set forth in the Bar Date Order, which is the later of (i) the General Claims Bar Date, (ii) the Governmental Claims Bar Date, if applicable, (iii) 5:00 p.m. (Eastern Time) on the date that is twenty-one (21) days after the entry of an order approving the rejection of the Executory Contract or Unexpired Lease, or (iv) any other date set by an order of the Court; *provided*, *however*, the Rejection Claims Bar Date shall be thirty (30) days after the Effective Date with respect to Executory Contracts or Unexpired Leases rejected pursuant to the Plan.

**1.170** ~~1.169~~ "**Released Parties**" means, collectively, the following Entities, each in their capacity as such: (a) HRH, including its affiliates, subsidiaries and designees, including without limitation 29 E. 29 Street Holdings, LLC, NJMHMC LLC d/b/a Hudson Regional Hospital, the DIP Lender, the newly-formed management services organization who shall administer the four-hospital system as contemplated by the MSA, and their respective former, present and future owners, officers, directors, managers, employees, independent contractors, attorneys, agents and representatives); (b) the UCC, its Professionals and its members (only in their capacity as such); (c) the Reorganization Committee and the Debtors' Professionals whose retention was approved by the Court; and (d) each Capitala Senior Secured Party, including their respective former, present and future owners, officers, directors, managers, employees, independent contractors, attorneys, agents and representatives. For the avoidance of doubt, and notwithstanding anything to the contrary herein, all potential claims against the Debtors' Current D&Os, including, without limitation, Dr. Achintya A. Moulick are subject to and shall be addressed consistent with Article IX.D. of the Plan and such parties are not Released Parties as defined herein.

**1.171** ~~1.170~~ "**Reorganization Committee**" means the Debtors' independent reorganization committee, consisting of the Honorable Judith Fitzgerald (Ret.), the Honorable Kevin Gross (Ret.), and Clifford A. Zucker, who are authorized to, *inter alia*, oversee and

#124965664v1

control the Debtors' restructuring process and evaluate the proposed transactions with HRH, as well as any proposed Alternative Transaction.

**1.172** ~~1.171~~ "**Reorganized Debtors**" means the Debtors, or any successor or assign thereto, in the form of a corporation, limited liability company, partnership, not-for-profit entity, or other form, as the case may be, on and after the Effective Date.

**1.173** ~~1.172~~ "**Schedule of Rejected Executory Contracts and Unexpired Leases**" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, if any, as set forth and as amended, modified or supplemented from time to time in the Plan Supplement.

**1.174** ~~1.173~~ "**Scheduled**" means, with respect to any Claim, the status and amount, if any, of that Claim as set forth in the Schedules.

**1.175** ~~1.174~~ "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors on December 23, 2024 [D.I. 341-363], as such schedules and statements have been or may be supplemented or amended from time to time in accordance with Bankruptcy Rule 1009 or any orders of the Court.

**1.176** ~~1.175~~ "**Secured Claim**" means a Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Court, or that is subject to a valid right of setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the Holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or as Allowed pursuant to the Plan as an Other Secured Claim.

**1.177** ~~1.176~~ "**Sequoia Credit Agreement**" means that certain Credit Agreement, dated as of August 21, 2018, as amended, restated, supplemented or otherwise modified from time to time, between Sequoia Healthcare Management, LLC, CarePoint Health Management Associates Intermediate Holdco, LLC, Bayonne Intermediate Holdco, LLC, Hoboken Intermediate Holdco, LLC, Christ Intermediate Holdco, LLC, the guarantors party thereto, the lenders from time to time party thereto, and Capitala Specialty Lending as administrative agent and collateral agent.

**1.178** ~~1.177~~ "**Solicitation Procedures Order**" means the *Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement, Plan Confirmation and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and Forms Related Thereto; and (IV) Granting Related Relief* [D.I. 555].

**1.179** ~~1.178~~ "**Statutory Fees**" means any fees due and payable pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States Code to the extent applicable.

**1.180** ~~1.179~~ "**Strategic Ventures**" means Strategic Ventures LLC.

31

**1.181** ~~1.180~~ "**Strategic Ventures Secured Claims**" means any Secured Claims of Strategic Ventures.

**1.182** ~~1.181~~ "**SV Note**" means that certain Promissory Note executed by Debtor Garden State Healthcare Associates, LLC in favor of Strategic Ventures dated as of December 27, 2022.

**1.183** ~~1.182~~ "**Treasury Regulations**" shall have the meaning set forth in Article VIII.A hereof.

**1.184** ~~1.183~~ "**UCC**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee as of November 19, 2024 [D.I. 157].

**1.185** ~~1.184~~ "**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

**1.186** ~~1.185~~ "**Unclaimed Distribution Deadline**" means 90 days from the date the Litigation Trustee makes a Distribution of Cash or other property under the Plan to a Holder of an Allowed Claim.

**1.187** ~~1.186~~ "**Unexpired Lease(s)**" means an unexpired lease to which a Debtor is party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.188** ~~1.187~~ "**Unimpaired**" means, when used in reference to a Claim, an Interest or a Class, a Claim, an Interest or a Class that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.189** ~~1.188~~ "**U.S. Holder**" shall have the meaning set forth in Article VIII.A hereof.

**1.190** ~~1.189~~ "**U.S. Trustee**" means the Office of the United States Trustee for Region 3.

**1.191** ~~1.190~~ "**Voting Classes**" means Class 1 (HRH Claims), Class 2 (Capitala Claims), Class 3 (Capitala Specialty Lending Claims), Class 4 (Maple Secured Claims), Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims), Class 8 (Insured Claims), Class 9 (Prior Owner Claims), Class 13 (NJDOH Secured Claims) and Class 14 (Strategic Ventures Secured Claims).

**1.192** ~~1.191~~ "**Voting Deadline**" means March 3, 2025 at 4:00 p.m. (Eastern Prevailing Time), the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted, as set forth by the Solicitation Procedures Order.

## B.    Rules of Interpretation and Construction

For purposes of this Combined Disclosure Statement and Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or

#124965664v1

substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Combined Disclosure Statement and Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Combined Disclosure Statement and Plan in its entirety rather than to a particular portion of the Combined Disclosure Statement and Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Combined Disclosure Statement and Plan; (9) unless otherwise specified herein, the rules of construction set forth in Bankruptcy Code section 102 shall apply; (10) all references to "D.I." or docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Court's CM/ECF system; (11) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (12) any effectuating provisions shall be interpreted in such a manner as is consistent with the overall purpose and intent of the Combined Disclosure Statement and Plan; (13) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (14) all references herein to consent, acceptance, or approval shall ~~be deemed to~~ include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (15) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

## C.     Computation of Time

In computing any period of time prescribed or allowed by the Combined Disclosure Statement and Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) and except as otherwise provided herein or therein, the laws of (i) the State of Delaware shall govern the construction and implementation of the Combined Disclosure Statement and Plan and any agreements, documents and instruments executed in connection with the Combined Disclosure Statement and Plan and (ii) the state of incorporation of the Debtors shall govern corporate governance matters with respect to the Debtors, in either case without giving effect to the principles of conflicts of law thereof.

#124965664v1

# ARTICLE III.
## BACKGROUND AND DISCLOSURES[37]

### A.    General Background

### 1.    Overview and Corporate Ownership Structure

CarePoint oversees the operations and combined resources of three hospitals and related neighborhood health centers located in Hudson County, New Jersey—Bayonne, Christ Hospital and HUMC. Christ Hospital and HUMC are "safety net" hospitals serving a large underprivileged community. All three hospitals are committed to one mission - treating patients with compassion and leading with innovation to improve the health of the communities in which they serve. The amount of free and inadequately reimbursed services provided to these underprivileged communities is the main driver of CarePoint's financial distress. This inadequately compensated care, along with significant increases of post-pandemic costs of personnel and supplies, have compounded the losses.

The CarePoint Hospitals have numerous significant creditors and landlords. Prior to the Petition Date, CarePoint and its legal team spent several years shopping for buyers and then many months negotiating a comprehensive solution to the financial issues confronting CarePoint. CarePoint commenced these bankruptcy cases in order to implement a proposed solution to the Debtors' financial issues and resolve CarePoint's unsustainable level of accumulated debt.

Among other things, involuntary Debtor Bayonne Opco[48] negotiated three comprehensive agreements with HRH that provide for the transfer of Bayonne to HRH. An affiliate of HRH, 29 E 29 Street Holdings LLC ("HRH Bayonne Landlord"), is the landlord at Bayonne Medical Center. The Bayonne lease was in default and was terminated prepetition, and the Delaware Chancery Court entered a default judgment and consent judgment in favor of HRH Bayonne Landlord in that certain litigation, captioned 29 E. 29 Street Holdings, LLC; NJMHMC LLC d/b/a Hudson Regional Hospital, and NJBMCH, INC. v. IJKG Opco, LLC and IJKG, LLC, Case No. 2020-0480-KSJM (the "Delaware Action"). The Debtors' agreements with HRH also provided for DIP financing for Bayonne Opco and an eventual, coordinated four hospital system operated/managed by HRH at the end of these Chapter 11 Cases.

In addition to the HRH agreements, CarePoint brought in a midwestern based hospital operator, Insight Management and Consulting Services, Inc. ("Insight"), to operate its hospitals. Insight arranged prepetition interim funding and deferred management fees to assist CarePoint in its turnaround. Although Insight served as the manager of the Christ Hospital and HUMC prior to the Petition Date, HRH, through an affiliate, agreed to provide DIP financing for those

---

[37] Statements in this Article III, including, without limitation, with respect to the Debtors' background, prepetition events, and the Debtors' reasons for filing the Chapter 11 Cases, are based upon the Debtors' characterization of the relevant facts and prior representations in these Chapter 11 Cases. Nothing in this Article III or the exhibits referenced therein shall bind the UCC or the Litigation Trustee or be construed to constitute an admission of any fact or waiver of any right by the UCC or the Litigation Trustee, including for the purposes of any Litigation Claims preserved under the Plan, or be construed to have any adverse estoppel effect.

[48] Bayonne Opco's Chapter 11 Case was filed involuntarily due to the lack of required consent of a 9.9% minority shareholder.

hospitals in the form of a $25 million DIP loan agreement and began operating/managing these hospitals, as well as Bayonne, beginning on the Petition Date. The DIP loan was intended to allow CarePoint to operate Christ Hospital and HUMC during the Chapter 11 Cases and allow it to cure and assume the real estate leases for those two hospitals.

Prior to the Petition Date, CarePoint briefly changed its management structure. Dr. Achintya Moulick stepped down as CEO and Dr. Jawad Shah was appointed as CEO with the approval of the majority of the Board. Dr. Shah is also the CEO of Insight. On October 27, 2024, Dr. Shah resigned as CEO and on October 28, 2024, the CarePoint board unanimously reappointed Dr. Moulick to that role. Dr. Moulick has served as the chairman of the board of CarePoint without interruption through these transitions. The CarePoint board also elected the mayors of the cities of Hoboken and Jersey City to the board to assure vigorous community representation. Other community representatives, including a representative of city of Bayonne, remain on the board.

CarePoint is a New Jersey non-profit corporation. It is a holding company with no employees or operations and is the direct or indirect owner of either the majority or 100% of the interests of each of the following operating companies:

(a) HUMC Opco operates HUMC, a licensed 348 bed acute care facility that provides inpatient and outpatient services. HUMC was acquired out of bankruptcy through an asset purchase agreement in 2011. On April 1, 2022, the majority member of Hoboken Intermediate Holdco, LLC (then the direct parent of HUMC Holdco, LLC, the direct parent of HUMC Opco), donated its equity in Hoboken Intermediate Holdco, LLC to Benego CarePoint LLC, a subsidiary of CarePoint ("Benego"). On May 4, 2022, a minority owner in Hoboken Intermediate Holdco, LLC assigned its membership interest to Evergreen Community Assets, LLC, a subsidiary of CarePoint ("Evergreen"). On December 27, 2022, the remaining minority member of Hoboken Intermediate Holdco, LLC assigned its membership interest in Hoboken Intermediate Holdco, LLC directly to CarePoint. CarePoint is now the beneficial owner of 100% of the membership interests in HUMC Opco.

(b) Bayonne Opco, which is an involuntary Debtor due to lack of consent of a 9.9% minority shareholder, operates Bayonne, a licensed 278 bed acute care facility that provides inpatient and outpatient services. Upon the acquisition of Bayonne out of bankruptcy through an asset purchase agreement by Debtor IJKG, LLC ("IJKG"), Bayonne Opco was formed to facilitate the operations of Bayonne. IJKG was the sole member and manager of Bayonne Opco. Effective October 27, 2020, IJKG sold a 9.9% membership interest in Bayonne Opco to BMC Hospital, LLC. On April 1, 2022, the majority member of Bayonne Intermediate Holdco, LLC, the sole member of Sequoia BMC Holdco, LLC, then the majority member of IJKG, contributed its membership interest in Bayonne Intermediate Holdco, LLC to Benego. On May 4, 2022, a minority member of Bayonne Intermediate Holdco, LLC assigned all of its membership interest in Bayonne Intermediate Holdco, LLC to Evergreen. On December 27, 2022, the remaining non-CarePoint minority member in Bayonne Intermediate Holdco, LLC assigned all of its membership interest in Bayonne Intermediate Holdco, LLC to CarePoint. On October 18, 2024, the minority members of IJKG assigned all of their membership interests in IJKG to Sequoia BMC Holdco,

35

LLC. As a result of the foregoing transactions, CarePoint is the beneficial owner of 90.1% of the membership interests in Bayonne Opco. Due to IJKG Opco's material uncured defaults under its lease, the lease has terminated. IJKG Opco remains a holdover tenant pursuant to a tenancy-at-will.

(c) Christ Opco operates Christ Hospital, a 349-bed acute care facility that provides inpatient and outpatient services. Christ Hospital was acquired out of bankruptcy through an asset purchase agreement in 2012. On April 1, 2022, the majority member of Christ Intermediate Holdco, LLC, the sole member of Hudson Hospital Holdco, LLC, then the majority member of CH Hudson Holdco, LLC, the direct parent of Christ Opco, contributed its membership interest in Christ Intermediate Holdco, LLC to Briar Hill CarePoint LLC, a subsidiary of CarePoint. On May 4, 2022, a minority member of Christ Intermediate Holdco, LLC contributed all of its membership interests in Christ Intermediate Holdco, LLC to Evergreen. Prior to December 27, 2022, the remaining non-CarePoint minority members of Christ Intermediate Holdco, LLC assigned all of its membership interests in Christ Intermediate Holdco, LLC to CarePoint. On December 27, 2022, the minority member in CH Hudson Holdco, LLC, the direct parent of Christ Opco, assigned all of its membership interests in CH Hudson Holdco, LLC to CarePoint. As a result of the foregoing transactions, CarePoint is the beneficial owner of 100% of the membership interests in Christ Opco.

CarePoint now owns 100% of the ownership interests in HUMC Opco and Christ Opco through a series of entities and owns approximately 90.1% of the ownership interests in Bayonne Opco. All three Hospitals are affiliated by common ownership of the nonprofit parent. A chart depicting CarePoint's corporate ownership as of the Petition Date is attached as **Exhibit A**.

CarePoint, HUMC Opco and Christ Opco are not for profit entities under section 501(c)(3) of the Internal Revenue Code. Bayonne Opco, because of the minority 9.9% ownership of BMC Hospital, LLC, and due to its formation under the New Jersey Revised Uniform Limited Liability Company Act, remains a for profit entity. Christ Opco and HUMC Opco are presently considered "disregarded entities" for tax and nonprofit status purposes.

In addition to Bayonne, Christ Hospital and HUMC, the Debtors operate neighborhood health centers in their service areas. These neighborhood health centers care for more than 20,000 patients annually. Many patients are children and expecting mothers. They also train dozens of physicians annually, the majority of whom remain local following graduation to serve the community.

CarePoint is led by CEO Achintya Moulick, MD, MBA. Dr. Moulick is a clinical, business, and thought leader in the healthcare industry. A neonatal cardiac surgeon by training with expertise in congenital and acquired heart disease, he has led hospitals and hospital programs for 20 years, as Executive Director, Chairman in Cardiovascular Surgery, Chief Medical Officer, and Chief Executive Officer.

As explained more fully below, the CarePoint system treats a disproportionately large number of uninsured and undocumented patients who are generally admitted through the emergency department. The funding received by CarePoint from the State of New Jersey is and

36

has been inadequate to sustain operations given the patient mix of the Hospitals. As a result, CarePoint has accumulated significant trade debt (approximately $165 million in the aggregate as of the Petition Date) that it has been unable to pay, resulting in one or more of the Debtors being named as a defendant in approximately 55 lawsuits pending as of the Petition Date.

The Chapter 11 Cases were filed to provide the Debtors an opportunity to accomplish a restructuring by, *inter alia*, (a) staying the multiple pending collection actions, (b) resolving significant Debtor claims against certain insurance carriers, (c) rejecting unfavorable contracts or leases where necessary to efficiently streamline the Debtors' operations, and (d) giving the Debtors breathing room to effectuate the prepetition restructuring arrangements that were already underway and to implement them through a plan of reorganization.

### 2.    Corporate History and Business Operations

Originally, the Hospitals were for profit entities which operated out of network with insurance care providers and were owned by certain entities affiliated with the Prior Owners. CarePoint was formed and received its non-profit status in November 2021. The transfer of the for-profit ownership of the Hospitals was completed by the end of 2022 and was approved by the State of New Jersey on March 20, 2023, for Bayonne and HUMC, followed by Christ Hospital on April 17, 2023.

The CarePoint Hospitals were at the forefront of providing care in Hudson County during the COVID-19 pandemic. The Hospitals continued to operate without interruption of services during CarePoint's transition to non-profit. But the continued care of the underprivileged, many of whom are uninsured or undocumented, presented mounting financial strain on the system. The post COVID inflation in hospital expenditures, particularly drugs and staffing costs added to the Hospital's issues. During this time, the Hospitals received insufficient post-COVID New Jersey state funding designated to states by the federal government under the American Rescue Plans Act meant for businesses affected by the pandemic and incremental costs associated with it, and insufficient FEMA funds from the federal government. CarePoint and its Hospitals continued to serve the people of Hudson County, providing excellent healthcare, at the expense of its balance sheet. The resulting accumulation of debt ultimately became unmanageable.

### 3.    Prepetition Capital Structure

The Debtors' capital structure is comprised of senior secured debt held by non-insiders Capitala and other lenders, former insider subordinated secured debt held by Maple,[59] and emergency loans made by the NJDOH, the obligations to each of which are described in greater detail for each of the Hospitals below.

### i.    Capitala Secured Debt Obligations

HUMC Opco entered into an Amended and Restated Loan and Security Agreement dated as of August 8, 2019 (as amended from time to time and most recently by that certain Fourteenth Amendment to Amended and Restated Loan and Security Agreement and Waiver dated as of

---

[59] Maple is owned by the individual owners of certain of the Prior Owners

#124965664v1

November 4, 2022) (the "Hoboken/Capitala Loan Agreement"), with Capitala, as administrative and collateral agent, and the other lender parties thereto (collectively, the "Hoboken/Capitala Lenders"), pursuant to which HUMC Opco obtained a term loan facility in the aggregate principal amount of $30 million (the "Hoboken/Capitala Loan"), of which approximately $14.8 million was paid down. The maturity date of the term loan facility was November 4, 2023. The Hoboken/Capitala Loan is secured by a first priority lien on all assets[610] of HUMC Opco and its parent company, HUMC Holdco, LLC, in accordance with that certain Subordination Agreement dated as of August 8, 2019, with Capitala and Maple. As of the Petition Date, approximately $14,817,161 of principal remained outstanding under the Hoboken/Capitala Loan.

Christ Opco entered into a Loan and Security Agreement dated as of November 4, 2022 (the "Christ/Capitala Loan Agreement"), with Capitala, as administrative and collateral agent, and the other lender parties thereto (collectively, the "Christ/Capitala Lenders"), pursuant to which Christ Opco obtained a term loan facility in the aggregate principal amount of $7,000,000 (the "Initial Christ/Capitala Loan"). Christ Opco entered into a First Amendment to Loan and Security Agreement dated as of February 8, 2023, with the Christ/Capitala Lenders, pursuant to which Christ Opco obtained an additional term loan facility in the aggregate principal amount of $2,180,000 (the "Additional Christ/Capitala Loan" and together with the Initial Christ/Capitala Loan, the "Christ/Capitala Loan"). The maturity date of both term loan facilities under the Christ/Capitala Loan was November 4, 2023. The Christ/Capitala Loan is secured by a first priority lien on all assets[711] of Christ Opco, in accordance with that certain Subordination and Intercreditor Agreement dated as of November 4, 2022, with Capitala and Maple. As of the Petition Date, approximately $4,893,648 of principal remained outstanding under the Christ/Capitala Loan.

Bayonne Opco entered into a Loan and Security Agreement dated as of November 4, 2022 (the "Bayonne/Capitala Loan Agreement"), with Capitala, as administrative and collateral agent, and the other lender parties thereto (collectively, the "Bayonne/Capitala Lenders"), pursuant to which Bayonne obtained a term loan facility in the aggregate principal amount of $3,000,000 (the "Initial Bayonne/Capitala Loan"). Bayonne Opco entered into a First Amendment to Loan and Security Agreement dated as of February 8, 2023, with the Bayonne/Capitala Lenders, pursuant to which Bayonne obtained an additional term loan facility in the aggregate principal amount of $3,120,000 (the "Additional Bayonne/Capitala Loan" and together with the Initial Bayonne/Capitala Loan, the "Bayonne/Capitala Loan"). The maturity date of both term loan facilities under the Bayonne/Capitala Loan was November 4, 2023. The Bayonne/Capitala Loan is secured by a first priority lien[812] on all accounts, "Other Accounts" (as defined in the Bayonne/Capitala Loan Agreement), deposit accounts, all books and records of the

---

[610] Pursuant to an Amended and Restated Intercreditor Agreement dated as of August 8, 2019, the lessor of the property on which HUMC is located has priority over the Hoboken/Capitala Lenders regarding certain collateral of HUMC Opco specifically set forth therein.

[711] Pursuant to (i) a Lease Agreement among Christ Opco, CH 750 Park LLC, and CH Castle LLC dated as of December 27, 2022; and (ii) a Lease Agreement between Christ Opco and J.C. Opco, LLC dated as of December 27, 2022, the landlord's lien on Christ Opco's licenses under each lease is subordinate to the Christ/Capitala Lenders' security interest.

[812] Pursuant to that certain Lease Agreement between Bayonne Opco and MPT of Bayonne, LLC, dated as of February 4, 2011, the lessor of the property on which Bayonne is located has priority over the Bayonne/Capitala Lenders regarding certain collateral of Bayonne Opco.

foregoing and all proceeds and products of the foregoing, of Bayonne Opco, in accordance with that certain Subordination and Intercreditor Agreement dated as of November 4, 2022, with Capitala and Maple. As of the Petition Date, approximately $7 million remained outstanding under the Bayonne/Capitala Loan. On or about October 21, 2024, the DIP Lender purchased all of Capitala's rights under the Bayonne/Capitala Loan.

In addition to the loan facilities described above, Debtors Carepoint Health Management Associates Intermediate Holdco, LLC, Bayonne Intermediate Holdco, LLC, Hoboken Intermediate Holdco, LLC and Christ Intermediate Holdco, LLC, and non-Debtor Sequoia Healthcare Management, LLC, entered into the Sequoia Credit Agreement, as borrowers, with the lenders party thereto and Capitala Specialty Lending, an affiliate of Capitala, as administrative and collateral agent for the lenders party thereto, which provided for term loan facilities in the aggregate principal amount of $50,000,000.  This holding company loan is known as the "Sequoia Loan".  As of the Petition Date, the outstanding principal balance owed under the Sequoia Loan was approximately $35,805,000.

### ii.    Maple Secured Debt Obligations

Christ Opco entered into an Amended and Restated Loan and Security Agreement dated as of June 26, 2019 (as amended from time to time and most recently by that certain Third Amendment to Forbearance Agreement and Amendment to Amended and Restated Loan and Security Agreement dated as of November 4, 2022) (the "Christ/Maple Loan Agreement") with Maple, pursuant to which Christ Opco obtained a term loan facility in the aggregate principal amount of $17,951,721 (the "Christ/Maple Loan"). The Christ/Maple Loan has matured, and Maple agreed to forbear from exercising rights and remedies in respect of certain defaults under the Christ/Maple Loan until November 4, 2023. Maple has continued to forbear since then. The Christ/Maple Loan is secured by a lien on all assets of Christ Opco, subordinate to the lien of Capitala. As of the Petition Date, approximately $34,751,366 remained outstanding under the Christ /Maple Loan.

Bayonne Opco, Garden State Healthcare Associates, LLC, and New Jersey Medical and Health Associates, LLC, entered into an Amended and Restated Loan and Security Agreement dated as of June 26, 2019 (as amended from time to time and most recently by a Forbearance Fifth Extension Agreement and Third Amendment to Amended and Restated Loan and Security Agreement dated as of November 4, 2022) (the "Bayonne/Maple Loan Agreement") with Maple, pursuant to which Bayonne Opco and the other borrower parties thereto obtained a term loan facility in the aggregate principal amount of $10,067,955 (the "Bayonne/Maple Loan"). The Bayonne/Maple Loan has matured, and Maple agreed to forbear from exercising rights and remedies in respect of certain defaults under the Bayonne/Maple Loan until November 4, 2023. Maple has continued to forbear since then. The Bayonne/Maple Loan is secured by a lien on all assets[913] of Bayonne and the other borrower parties thereto, subordinate to the lien of Capitala.

---

[913] Pursuant to a Second Amended and Restated Intercreditor Agreement dated as of June 26, 2019, the lessor of the property on which Bayonne Medical Center is located has priority over Maple regarding certain collateral of Bayonne Opco specifically set forth therein.

#124965664v1

As of the Petition Date, approximately $13,506,773 remained outstanding under the Bayonne/Maple Loan.

### iii.    NJDOH Emergency Loans

On or around February 13, 2024, CarePoint and the NJDOH entered into a Loan Agreement, which was subsequently modified (as modified, the "NJDOH Loan Agreement"), whereby the NJDOH agreed to loan and make available to CarePoint emergency funds for use by CarePoint to maintain its day-to-day operations. As of the Petition Date, the NJDOH had loaned the Debtors approximately $10,625,000 under the NJDOH Loan Agreement, which obligations are secured by an asserted lien against each of the facilities of CarePoint, Christ Opco, Bayonne Opco and HUMC Opco pursuant to N.J. Stat. § 26:2H-16.

### iv.    Collateral Sharing Arrangement

HUMC Opco, Christ Opco, Bayonne Opco, Capitala, and Maple, among others, entered into a Collateral Sharing Agreement dated as of November 4, 2022, as amended by that certain First Amendment to Collateral Sharing Agreement dated as of October 15, 2024 (the "Collateral Sharing Agreement"), whereby the proceeds derived from certain litigation matters identified in the Collateral Sharing Agreement were shared and to be distributed to the lender parties to the Collateral Sharing Agreement in accordance with a recently revised distribution waterfall, notwithstanding the security and lien priority otherwise set forth in the loan documents with such lenders. Approximately $18,500,000 was paid to Capitala in the week prior to the Petition Date pursuant to the Collateral Sharing Agreement in partial satisfaction of its indebtedness. This payment derived from a prepetition settlement of litigation with Aetna on which Capitala had liens and was a precondition to Capitala's consent to the *pari passu* first lien required by the DIP Lender to HUMC Opco and Christ Opco. The principal debt balances owed to Capitala as of the Petition Date set forth above reflect this payment.

### v.    Prepetition Unsecured Debt Obligations

#### (a)    Maple Unsecured Debt Obligations

On June 1, 2019, HUMC Opco entered into a Demand Promissory Note payable to Maple in the aggregate principal amount of $3,706,553. On July 25, 2019, HUMC Opco entered into (i) an Amended and Restated Demand Promissory Note payable to Maple in the aggregate principal amount of $646,723.50; and (ii) an Amended and Restated Demand Promissory Note payable to Maple in the aggregate principal amount of $4,353,276.50. These three notes are subordinate to the Hoboken/Capitala Loan pursuant to that certain Subordination Agreement dated as of August 8, 2019, with Capitala. As of the Petition Date, approximately $14,902,959 remained outstanding under the three notes.

#### (b)    Non-Maple Former Owners Unsecured Debt Obligations

Certain non-Maple former owners of the Debtors assert certain additional unsecured debt obligations owed by the Hospitals to certain of the Prior Owners pursuant to notes payable by HUMC Opco and additional unsecured amounts due from HUMC Opco, Christ Opco and Bayonne Opco pursuant to the Collateral Sharing Agreement, including without limitation,

#124965664v1

amounts asserted to be due from CarePoint and CarePoint Health Management Associates, LLC pursuant to the SV Note. For instance, certain Prior Owners assert that: (a) between March 2019 and July 2020, IJKG, LLC enter into 18 demand promissory notes payable to Benego Ventures, LLC in the total principal total amount of $10,480,00; (b) Benego Ventures, LLC made certain loans to HUMC Opco in the total principal amount of $320,000; (c) Pheasant Run Ventures, LLC made certain loans to HUMC Opco in the total principal amount of $2,482,764; (d) from September through December 2019, Pheasant Run Ventures, LLC made six loans to HUMC Opco; (e) between March 2019 and July 2020, IJKG, LLC enter into 17 demand promissory notes payable to JPL Healthcare Consulting, LLC in the total principal amount of $1,275,000; (f) Oak Management, LLC made certain loans to HUMC Opco in the total principal amount of $310,344; (g) from September through December 2019, Oak Management, LLC made six loans to HUMC Opco; (h) Willow Healthcare Services LLC made a loan to HUMC Opco in the total principal amount of $40,000; (i) in March 2019, Oak Management, LLC provided a loan to HUMC; and (j) Vivek Garipalli and James Lawler personally made advanced payments for various obligations of the Debtors consisting of at least 15 separate transactions, in the total amount of $21,148,474 and $2,998,803, respectively. The Plan Proponents have not yet confirmed or validated these assertions.

### (c)    County Option Unsecured Debt Obligations

The Hospitals are participants in a "County Option Program" managed by the New Jersey Department of Human Services. The County Option Program supports local hospitals and ensures that they continue to provide necessary services to low-income residents. The legislation, which limits eligibility to certain counties and delineates criteria for eligibility, (1) provides for increased financial resources through the Medicaid program, and (2) provides participating counties with new fiscal resources. Eligible hospitals fund amounts determined by the legislation to the County Option Program. CarePoint has been unable to satisfy its payment obligations in connection with the County Option Program over the four quarters prior to the Petition Date. As of the Petition Date, CarePoint owed the County Option Program $15,710,447.

### (d)    Other Unsecured Debt Obligations

District 1199J-New Jersey Health Care Employers Pension Plan. HUMC Opco and its parent, HUMC Holdco, LLC, entered into a Promissory Note dated as of November 4, 2011, payable to District 1199J-New Jersey Health Care Employers Pension Plan in the aggregate principal amount of $750,000. As of the Petition Date, approximately $1,038,000 remained outstanding under this Promissory Note.

Optum Inc. Advance. Optum, Inc. ("Optum") is a third-party insurance payor that pays the Debtors for services provided to Optum's beneficiaries. Optum was the victim of a cyber-attack and, after the attack, was unable to access their billing systems to receive, process, and pay claims to healthcare providers. As such, Optum advanced the Debtors approximately $28 million, which was later subject to a reconciliation between Optum and the Debtors. The reconciliation process was not complete as of the Petition Date.

Merchant Cash Advance Loans. Beginning in January 2024, CarePoint borrowed funds under certain merchant cash advance loans ("MCA") at high interest rates. Insight entered a

Management Services Agreement (the "Insight MSA") with CarePoint in April 2024 and, in exchange for the Insight MSA, took additional MCA loans out to refinance the initial MCA loans off CarePoint's books. CarePoint is not aware of any MCA loans remaining on its books. CarePoint believes the MCA loans have balances remaining which have been assumed by Insight and that CarePoint is not responsible for the repayment of these loans.

### vi.    CarePoint's Other Prepetition Obligations

<u>Guaranty Obligations</u>

On November 4, 2022, CarePoint, HUMC Opco, Christ Opco and Bayonne Opco each entered into a Limited Non-Recourse Guaranty Agreement (collectively, the "Guaranties") in connection with the Sequoia Loan. The Guaranties are limited to each guarantor's right, title and interest in the litigation matters set forth in Schedule 1 of the Collateral Sharing Agreement.

Additionally, on August 22, 2022, HUMC Opco entered into a further Limited Non-Recourse Guaranty Agreement in connection with the Intermediate Holdco Loan, such guaranty being limited to $5,000,000 with sole collection recourse under HUMC Opco's interest in that certain Services Agreement dated as of July 20, 2022 (as amended from time to time) with Bayonne Opco.

<u>Real Property Lease Obligations</u>

The Debtors do not own any real estate, as the real property on which each of HUMC, Bayonne and Christ Hospital operate is leased.

HUMC Opco is lessee under a Lease Agreement dated as of November 4, 2011 (as amended from time to time and most recently by that certain Third Amendment to Lease Agreement dated as of December 27, 2022) with SB Hoboken Propco, LLC as lessor (the "Hoboken Lease"), regarding the property on which HUMC Opco operates. The term of the Hoboken Lease is for ten (10) years from December 27, 2022, subject to an extension option for HUMC Opco for an additional ten (10) year term. The Hoboken Lease is secured by certain assets of HUMC Opco under a Security Agreement, subject to the lien priority set forth in an Amended and Restated Intercreditor Agreement dated as of August 8, 2019, between the lessor and the Hoboken/Capitala Lenders. As of the Petition Date, the rent due under the Hoboken Lease was one month in arrears. The Hoboken Lease requires that HUMC Opco obtain the landlord's consent before entering into any management agreement with any third party as well as upon the change of ownership/control of HUMC Opco.

Christ Opco is lessee under (i) a Lease Agreement with CH 750 Park LLC and CH Castle LLC dated as of December 27, 2022; and (ii) a Lease Agreement with J.C. Opco, LLC dated as of December 27, 2022 (collectively, the "Christ Hospital Lease"), regarding the property on which Christ Opco operates. The term of the Christ Hospital Lease commences on December 27, 2022, and ends on December 31, 2032, subject to an extension option for Christ Opco for an additional ten (10) year term. (Christ Opco's obligations under the Christ Hospital Lease are referred to herein as the "Real Property Lease Obligations"). The Christ Hospital Lease is secured by a landlord's lien on Christ Opco's licenses, which is subordinate in priority to the Christ/Capitala Lenders' security interest in Christ Opco's assets. As of the Petition Date, the

#124965664v1

rent due under the Christ Hospital Lease was one month in arrears. The Christ Hospital Lease requires that Christ Opco obtain the landlord's consent before entering into any management agreement with any third party as well as upon the change of ownership/control of Christ Opco.

The Lease Agreement with CH 750 Park LLC and CH Castle LLC (the "Park/Castle Lease"), which encompasses the real estate on which Christ Hospital is located and certain of the adjacent parcels, contains a purchase option in favor of Christ Opco, to acquire the real estate that is the subject of the Park/Castle Lease, provided that (i) certain events of default have not occurred under the Park/Castle Lease, the J.C. Opco Lease or the Hoboken Lease (which is with a related party lessor to the lessors at Christ Hospital), and (ii) certain breaches under the Agreement of Purchase and Sale in connection with the Christ Hospital Real Estate Sale, have not occurred prior to the closing of the property acquisition by exercising the option (the "Purchase Option"). Because of certain prepetition defaults in the Real Property Lease Obligations, the Purchase Option is no longer in effect. HRH has advised the Debtors that on or about October 29, 2024, it entered into an option agreement with respect to the real estate on which Christ Hospital is located.

Bayonne Opco is lessee under a Lease Agreement dated as of February 4, 2011, originally with MPT of Bayonne, LLC and now with 29 E 29th Street Holdings, LLC, as successor to MPT of Bayonne, LLC (the "Bayonne Lease"), regarding the property on which Bayonne Opco operates. The term of the Bayonne Lease is for fifteen (15) years from February 4, 2011, subject to extension options for Bayonne Opco for six (6) additional periods of five (5) years each. The Bayonne Lease is secured by certain assets of Bayonne Opco under a Security Agreement dated as of February 4, 2011, subject to the lien priority set forth in a Second Amended and Restated Intercreditor Agreement dated as of June 26, 2019, between the lessor and Maple. As of the Petition Date, the Bayonne Lease had been terminated due to prepetition defaults, with Bayonne Opco continuing to occupy the premises pursuant to an at-will tenancy. As of the Petition Date, the Delaware Chancery Court had entered default and consent judgments in favor of 29 E 29th Street Holdings, LLC.

## B.   Circumstances Giving Rise to the Chapter 11 Cases

As a system of two safety net hospitals and Bayonne, CarePoint and its Hospitals have struggled to meet expenses and service their debts for several years and have taken steps to best maintain operations to serve the Hudson County community. Nevertheless, financial and liquidity challenges of the Hospitals, largely resulting from unreimbursed COVID-19 expenditures, including nurse agency costs, and the nature of the population served by the Hospitals, continue to plague the Hospitals, requiring formal restructuring in Chapter 11.[14] A summary of the circumstances giving rise to the Chapter 11 Cases follows below.

---

[14] Certain of the Debtors, Achintya A. Moulick, M.D., and William D. Pelino are defendants in the pending *qui tam* action commenced on November 5, 2021, in the United States District Court for the District of New Jersey, Civil Action No. 2:21-cv-19788-MEF-AME, commenced by Vijayant Singh, M.D., in his capacity as relator, asserting damages that may exceed $150 million arising from asserted improper receipt and unlawful retention of Provider Relief Fund Targeted Distribution payments to hospitals in COVID-19 high impact areas that were distributed by the United States in the spring and summer of 2020.

1.      **Activities of Prior Owners**

The Plan Proponents assert that, after acquiring the Hospitals from prior bankruptcies, the Prior Owners allegedly engaged in various transactions involving affiliates and related entities, which may give rise to claims and Causes of Action under state and federal law. Certain of these transactions to be investigated, include transactions (*i.e.*, management fees, allocation and other related party payments) subject to a 2019 report of the New Jersey Commission of Investigations. In addition, certain transactions and conduct relating to the contemplated, but not consummated sale(s) or other disposition of certain of the Debtors' assets may give rise to claims or Causes of Action under state and federal law. In 2022, certain of the Prior Owners donated their interests in certain of the Debtors and were granted releases and indemnification rights in connection therewith. The Plan Proponents may investigate these actions, and claims and Causes of Action may be asserted under applicable state and federal law.

The Prior Owners disagree with and strenuously dispute the foregoing allegations. *See* Maple's Objections to the Approval of the Disclosure Statement at Docket Nos. 462, 507 and 532. Nothing herein limits any potential claims or Causes of Action that may be asserted or any applicable defenses. All of the parties' rights, remedies and defenses related to the conduct of the Prior Owners and any Affiliates thereof are expressly reserved and preserved, including, without limitation, any rights of the Prior Owners to seek indemnification. Certain of the Prior Owners assert that they have been granted indemnification rights and releases pursuant to the following documents: (i) that certain *Donation Agreement* by and among Vivek Garipalli, certain related entities and CarePoint; (ii) that certain *Donation Agreement* by and among JPL Healthcare, Heights Healthcare, Willow Healthcare and CarePoint; (iii) that certain *Assignment Agreement* by and between Sequoia Healthcare Services, LLC and CarePoint; and (iv) that certain *Charitable Donation Agreement* by and among Jeffrey Mandler, Strategic Ventures, and CarePoint dated as of December 27, 2022.

2.      **Christ Hospital Sale-Leaseback Transaction**

On December 27, 2022, Hudson Hospital Propco, LLC ("Hudson Propco"), the owner of the real estate on which Christ Hospital is located, and then lessor of the Christ Hospital real estate to Hudson Opco, entered into an Agreement of Purchase and Sale with J.C. Opco, LLC, CH 750 Park LLC and CH Castle LLC (collectively, the "Buyer") whereby Hudson Propco sold the Christ Hospital real estate to the Buyer (the "Christ Hospital Real Estate Sale"). At the closing of the Christ Hospital Real Estate Sale, the then mortgage lender on the Christ Hospital real estate, Signature Bank, whose credit facility was then in default and under lender forbearance, was paid off in full with sale proceeds from the transaction. The balance of the proceeds were used to subsidize CarePoint operations.

3.      **Christ Hospital Real Estate Sale – Equity Transfers**

Prior to the closing of the Christ Hospital Real Estate Sale, CarePoint then possessed an indirect 75% majority ownership interest, and J.C. Opco, LLC possessed an indirect 25% ownership interest, respectively, in Hudson Propco and Christ Opco. Concurrently with the Christ Hospital Real Estate Sale, J.C. Opco, LLC donated its ownership interest to CarePoint,

44

resulting in the CarePoint non-profit being the one hundred percent (100%) owner of Hudson Propco and Opco.

### 4.      Charity Care, Uninsured Volumes and Reimbursement Issues

An increasing volume of patients served by the Hospitals are charity care or uninsured patients. This cohort of patients represents patients who have not yet complied with the Medicaid or a charity application process. Moreover, charity care distributions received by the Hospitals for 2023 were based on 2019 data; however, the 2023 actual charity care expenditures significantly increased due to a higher proportion of charity care patients as well as the inflationary increases in the costs and expenses for health care labor and supplies.

In addition, the marginal payment the Hospitals traditionally receive from patients who are partially approved for charity care are historically not collected nor collectible considering the demographic of the population that is served by the Hospitals. The ability to collect, year-over-year, from self-pay patients was 11.60% in 2019, 16.95% in 2020, 20.20% in 2021, and 15.75% in 2022.

CarePoint and its Hospitals have seen more than 57,000 uninsured patients in the Hospitals' emergency departments, 41,000 uninsured patients in CarePoint's neighborhood health centers, and more than 12,000 homeless patients in the years preceding these Chapter 11 Cases. CarePoint and its Hospitals also saw charity care patients outside their service areas, who were directed to the Hospitals.

Among other challenges, the Debtors encountered systematic inadequate levels of reimbursement rates from non-governmental insurers including, without limitation, Horizon New Jersey, notwithstanding the Debtors' numerous efforts to address these issues with such insurers, including through obtaining in-network status and partnerships with Columbia Presbyterian and others.

### 5.      Other Costs and Expenses

The Hospitals are also experiencing a higher acuity of care, requiring a longer period of hospital stay, which can yield a higher reimbursement for the Hospitals; however, the cost of care is exponentially higher with more severe conditions.

Expenses are rising across the board, exacerbated by inflation increases and supply chain issues. The Hospitals face increasing costs for labor, drugs, purchased services, personal protective equipment and other medical and safety supplies needed to care for the acuity of the patients. Nationally, total expenses per hospital discharge are up 15% compared to pre-pandemic levels. Drug costs have seen the largest increase - up by 24%.

These costs are not unique to CarePoint and its Hospitals. Indeed, increased costs have resulted in half of acute care hospitals in the United States ending 2022 with negative margins. According to the American Hospital Association (2022), the cost of labor, including nursing, is up by 19.1%, supplies are up by 20.6%, and drug costs sharply increased by 36.9%. To exemplify this crisis, CarePoint spent over $20 million in agency nursing and other personnel costs each year post pandemic prior to the Petition Date, and more than $70 million on hard costs

45

of charity care patients in the post-pandemic period. To confound inflationary pressures, as Covid is no longer driving hospital visits or admissions, patient volumes in acute care are down year-over-year in critical revenue-producing service lines. Together, this has created a perfect storm of higher costs with diminished revenue, and CarePoint will require additional State and charitable support to maintain sustainability.

The financial impact of the pandemic has negatively impacted the ability of CarePoint and its Hospitals to service its debt from 2021 to the present day. During that time, CarePoint has sought assistance from the State of New Jersey in the form of additional funding. While the NJDOH extended emergency loans to the Debtors in amounts exceeding $10.6 million and made several advances of charity care payments to the Debtors, and while the Debtors received payments under The New Jersey County Option Hospital Fee Program in the amount of $4.2 million, despite having failed to pay the quarterly fee required for receipt of such payments since fiscal year 2024, such assistance proved to be inadequate to prevent the commencement of these Chapter 11 Cases. The Debtors' unpaid $5 million quarterly fee are subject to a tentative settlement with the County of Hudson, which is subject to approval by the State of New Jersey and the Court.

Due to these varied issues, CarePoint and the Hospitals have been operating very leanly over the past several years, minimizing administrative teams and positions as much as possible to focus resources on the best possible patient care. CarePoint also instituted a number of cost-cutting measures at the Hospitals to improve service line efficiencies in the delivery of healthcare, improve supply chain challenges and renegotiate vendor contracts. CarePoint regularly reviews its service lines to optimize revenue, rethinking its business medical plan. The Debtors believe that these initiatives, along with significant and strategic downsizing, will support the growth of the Hospitals and stabilize cash flow going forward as CarePoint and the Hospitals restructure in Chapter 11.

## C.    The Chapter 11 Cases

The following is a brief description of certain material events that have occurred during the Chapter 11 Cases to date. The pleadings and Orders referenced herein can be viewed free of charge at https://dm.epiq11.com/case/carepoint/info.

### 1.    First-Day Relief

On the Petition Date, all Debtors – except Bayonne Opco – filed voluntary chapter 11 petitions, and an involuntary chapter 11 case was commenced against Bayonne Opco.[15] The Debtors continue to operate their business and manage their assets and affairs as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108. On the Petition Date, the Debtors also Filed pleadings seeking certain "first day" relief, including the following:

---

[15] On November 6, 2024, the Court entered an order for relief with respect to Bayonne Opco's consent to the commencement of its involuntary chapter 11 case. On November 19, 2024, the Court ordered Bayonne Opco's case to be jointly administered with those of the other Debtors [D.I. 147].

- *Motion of the Debtors for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases* [D.I. 4], by which the Debtors sought joint administration of the Chapter 11 Cases. On November 6, 2024, the Court entered an Order granting joint administration of the Chapter 11 Cases [D.I. 80]; which order was subsequently amended on November 19, 2024 [D.I. 147].

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors and (II) Establishing Patient Notice Procedures* [D.I. 5], by which the Debtors sought authority to file a single, consolidated top 30 creditor list and establish patient notice procedures.  On November 7, 2024, the Court entered an interim order granting the requested relief.  *See* D.I. 103.  On December 6, 2024, the Court entered a final order granting the relief requested.

- *Motion for Interim and Final Orders Approving Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Applicable Privacy Rules* [D.I. 6], by which the Debtors sought authority to establish certain procedures to maintain the confidentiality of patient information, as required by the Health Insurance Portability and Accountability Act of 1996.  On November 7, 2024, the Court entered an interim order granting the requested relief [D.I. 102]. On December 6, 2024, the Court entered a final order granting the requested relief [D.I. 252].

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtors' Cash Management System and Existing Bank Accounts, (II) Authorizing Continued Intercompany Transfers Among Debtor Entities and (III) Granting Related Relief* [D.I. 7], by which the Debtors sought authority to, among other things, continue to operate their existing cash management system.  On November 6, 2024, the Court entered an interim order authorizing the requested relief [D.I. 83]. On December 6, 2024, the Court entered a final order authorizing the requested relief [D.I. 243].

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief* [D.I. 8], by which the Debtors sought authority to, among other things, establish procedures for resolving issues with utility providers. On November 8, 2024, the Court entered an order authorizing the requested relief on an interim basis [D.I. 125].  On December 6, 2024, the Court entered an order authorizing the requested relief on a final basis [D.I. 244].

- *Motion for Interim and Final (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and (II) Granting Related Relief* [D.I. 9], by which the Debtors sought authority to pay prepetition taxes.  On December 6, 2024, the Court entered an order authorizing the requested relief on a final basis [D.I. 253].

47

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefit Programs; and (II) Granting Related Relief* [D.I. 12], by which the Debtors sought authority to, among other things, pay prepetition wages and benefits to their employees. On November 6, 2024, the Court entered an order authorizing the requested relief on an interim basis [D.I. 82]. On December 6, 2024, the Court entered an order authorizing the requested relief on a final basis [D.I. 249].

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Their Insurance Policies Entered Into Prepetition and Pay Prepetition Obligations in Respect Thereof, (B) Honor Prepetition Premium Financing Agreement, and (C) Renew Insurance Premium Financing Agreement in the Ordinary Course of Business; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief* [D.I. 13], by which the Debtors sought authority to, among other things, maintain existing insurance policies and pay obligations related thereto. On November 6, 2024, the Court entered an order authorizing the requested relief on an interim basis [D.I. 84]. On December 6, 2024, the Court entered an Order authorizing the requested relief on a final basis [D.I. 245].

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Patient Care Vendors and (II) Granting Related Relief* [D.I. 14], by which the Debtors sought authority to pay certain allowed prepetition claims of patient care vendors in the ordinary course of business. On November 8, 2024, the Court entered an order authorizing the requested relief on an interim basis [D.I. 126]. On December 6, 2024, the court entered an order authorizing the requested relief on a final basis [D.I. 247].

- *Application of Debtors for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent to the Debtors and (II) Granting Related Relief* [D.I. 22], by which the Debtors sought authorization to retain and employ Epiq as its claims and noticing agent in the Chapter 11 Cases. On November 6, 2024, the Court entered an order approving the Debtors' retention of Epiq [D.I. 85].

In support of the foregoing, the Debtors Filed the *Declaration of Shamiq Syed in Support of Chapter 11 Pleadings* [D.I. 23]. Mr. Syed is the Debtors' CFO.

### 2.    DIP Financing

On the Petition Date, the Debtors filed the *Motion of CarePoint Health Systems, Inc. for Entry of Interim and Final Orders: (I) Authorizing Debtors to Obtain Temporary and Permanent Post-Petition Financing From Bayonne Medical Center Opco, LLC Pursuant to Sections 363*

48

*and 364 of the Bankruptcy Code; (II) Granting Administrative Priority Claims to DIP Lender Pursuant to Section 364 of the Bankruptcy Code; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay to Implement the Terms of the DIP Order; and (V) Authorizing Debtors to Use Cash Collateral* [D.I. 10] (the "Christ/HUMC DIP Motion").

By the Christ/HUMC DIP Motion, CarePoint, HUMC Opco and Christ Opco (collectively, the "Christ/HUMC Borrowers") sought approval to (a) obtain post-petition financing from the DIP Lender in the maximum principal amount of $25,000,000, with up to $10 million available upon interim approval, on a senior secured, priming, superpriority basis (the "Christ/HUMC DIP Facility") pursuant to the Christ/HUMC DIP Credit Agreement; (b) use the cash collateral of the Christ/HUMC Borrowers' prepetition lenders; and (c) grant adequate protection to the Christ/HUMC Borrowers' prepetition lenders for the priming of their prepetition liens and the Debtors' use of their cash collateral.

On the Petition Date, the Debtors also filed the *Motion of IJKG Opco, LLC and IJKG, LLC for Entry of Interim and Final Orders: (I) Authorizing IJKG Opco, LLC and IJKG, LLC to Obtain Temporary and Permanent Post-Petition Financing From Bayonne Medical Center Opco, LLC Pursuant to Sections 363 and 364 of the Bankruptcy Code; (II) Granting Administrative Priority Claims to DIP Lender Pursuant to Section 364 of the Bankruptcy Code; (III) Modifying the Automatic Stay to Implement the Terms of the DIP Order; and (IV) Authorizing the Use of Cash Collateral* [D.I. 11], as amended by the amendment filed at D.I. 68 (the "Bayonne DIP Motion" and, together with the Christ/HUMC DIP Motion, the "DIP Motions").

By the Bayonne DIP Motion, Bayonne Opco and IJKG (together, the "Bayonne Debtors") sought approval to (a) obtain post-petition financing from the DIP Lender in an aggregate amount of up to $42 million, with up to $17,280,000 available upon interim approval, on a senior secured, priming, superpriority basis (the "Bayonne DIP Facility" and, together with the Christ/HUMC DIP Facility, the "DIP Facilities") pursuant to the Bayonne DIP Credit Agreement, consisting of (i) a new money loan in an aggregate principal amount not to exceed $42,000,000, and (ii) a roll-up of (a) $7,000,000 of prepetition debt that the DIP Lender acquired prepetition from Capitala and (b) a range of between $24,000,000 and $32,000,000 of debt arising from a consent judgment entered shortly before the Petition Date (the "Outstanding Judgment")[1216] owed to the HRH Bayonne Landlord, on a dollar-for-dollar basis; (b) use the cash

---

[1216] The Outstanding Judgment may be greater than $32 million. The term "Outstanding Judgment" is defined in Section 1.01 of the Bayonne DIP Credit Agreement by reference to the Collateral Surrender Agreement, where such term is defined to mean as follows:

"all damages, losses, costs and expenses, including without limitation, professional (legal, accounting and consultant fees) and expert fees, and other amounts that have been claimed or could have been claimed or prayed for by the Landlord from Bayonne under the Delaware Action, as determined by the Bankruptcy Court within a range between $24.0 million to $32.0 million, provided that, if the Interim Orders Contingency has not occurred by October 31, 2024, then the "low-end" and "high-end" of the foregoing stipulated amounts shall increase by $1.2 million on November 1, 2024 and an additional $1.2 million on the first day of each subsequent calendar month until the Interim Orders Contingency shall have occurred. For the avoidance of any doubt, the Outstanding Judgment shall include, without limitation, all amounts and categories of amounts the Landlord has or could have claimed/prayed for in the Delaware Action, including, without limitation, arrears/defaults in the Base Rent, Additional Charges, default, escalated or holdover rent, Impositions,

collateral of the Bayonne Debtors' prepetition lenders; and (c) grant adequate protection to the Bayonne Debtors' prepetition lenders for the priming of their prepetition liens and the Debtors' use of their cash collateral.

On November 8, 2024, the Court entered orders granting the Christ/HUMC DIP Motion on an interim basis [D.I. 119] (the "Christ/HUMC Interim DIP Order") and the Bayonne DIP Motion on an interim basis [D.I. 128] (the "Bayonne Interim DIP Order" and, together with the Christ/HUMC Interim DIP Order, the "Interim DIP Orders").

On December 10, 2024, the Court entered the *Order Authorizing Further Debtor-In-Possession Financing on an Interim Basis* [D.I. 275], which, among other things, modified the Interim DIP Orders to authorize the Debtors to borrow additional funds in the amount of up to (i) $2 million for the Christ/HUMC Borrowers and (ii) $1 million for the Bayonne Debtors, respectively, through and including December 17, 2024.

On December 26, 2024, the Court entered a further *Order Authorizing Further Debtor-In-Possession Financing on an Interim Basis* [D.I. 367] (the "December 26 Interim DIP Order"), which, among other things, modified the Interim DIP Orders to authorize the Debtors to borrow additional funds in the amount of up to (i) $9.5 million for the Christ/HUMC Borrowers and (ii) $5.5 million for the Bayonne Debtors, respectively, through and including January 8, 2025, in accordance with a revised budget attached thereto as Exhibit A. The December 26 Interim DIP Order further provided that the Interim DIP Orders were clarified or modified as follows:

    a.    The "Interim Financing Period" in paragraph 2 of the Bayonne Interim DIP Order shall mean "the period commencing November 7, 2024 through and including the date of the Final Hearing as set forth in Section 6 of [the Bayonne Interim DIP Order]";

    b.    The reference to "existing equipment liens" in paragraph 7(b) of the Bayonne Interim DIP Order shall mean "existing equipment liens that are senior to the prepetition liens of the Pre-Petition Secured Parties under applicable law";

    c.    The first line of paragraph 11 of the Christ/HUMC Interim DIP Order is modified to clarify that the "DIP Liens" as defined therein are "Effective as of November 7, 2024 . . ."; and

    d.    The third "provided further" clause in paragraph 11 of the Christ/HUMC Interim DIP Order shall be modified to say: "*provided, further*, that the DIP Lender's liens on and security interests in the DIP Collateral shall be subject to equipment liens that are senior to the prepetition liens of the Prepetition Secured Parties under applicable law and the cash collateral liens of IDB Bank or its affiliates

---

insurance premiums, expenses, taxes, insurance, water, utilities, landscape, maintenance, HVAC, trash removal, fees, and other expenses, interest, penalties, and other amounts, including attorneys' fees, owed by IJKG Opco and its Affiliates under any Lease Document, as of the date on which the Interim Orders Contingency has occurred."

#124965664v1

including, without limitation, their liens on any of the Debtors' accounts identified in the Debtors' cash management motion [D.I. 7] (collectively, the "IDB Collateral")."

The Plan Proponents anticipate that there will be a further extension of the term of the DIP Facilities through the Effective Date of the Plan.

### 3.      Collateral Surrender Motion [D.I. 18]

On November 4, 2024, the Debtors Filed the Collateral Surrender Motion. By the Collateral Surrender Motion, the Bayonne Debtors seek to: (a) allow HRH to operate the Bayonne Medical Center, and (b) sell substantially all their assets to HRH in a private *sale*, pursuant to the Collateral Surrender Agreement.

### 4.      MSA Motion [D.I. 19]

On November 4, 2024, the Debtors Filed the MSA Motion. By the MSA Motion, the Debtors sought to assume the MSA, under which: (i) Hudson Regional Management, LLC (an entity co-owned by an HRH-entity and CarePoint) will provide administrative oversight services to the Debtors' and HRH's hospitals.

### 5.      Hospital Facilities Management Motion [D.I. 212]

On December 1, 2024, the Debtors Filed the Hospital Facilities Management Motion.  By the Hospital Facilities Management Motion, the Debtors sought to enter into the Hospital Facilities MSA, under which HRH will provide management services to HUMC and Christ Hospital in exchange for: (i) a $1.75 million monthly fee; and (ii) an exclusive option to purchase all tangible and intangible assets related to the hospitals' operations.

### 6.      Retention of Debtors' Professionals

#### i.      Epiq Corporate Restructuring, LLC

On November 18, 2024, the Debtors Filed the *Application of the Debtors for Authority to Retain and Employ Epiq Corporate Restructuring, LLC as Administrative Advisor* [D.I. 144]. On December 13, 2024, the Court entered an amended Order approving the Debtors' retention of Epiq [D.I. 288].

#### ii.      Dilworth Paxson LLP ("Dilworth")

On November 4, 2024, the Debtors Filed the *Application of the Debtors for Entry of an Order (I) Authorizing the Debtors to Retain and Employ Dilworth Paxson LLP as Counsel, Effective as of the Petition Date, and (II) Granting Related Relief* [D.I. 36].  On November 19, 2024, Dilworth filed a supplemental declaration in support of its retention application [D.I. 151]. On December 7, 2024, Dilworth filed a second supplemental declaration in support of its retention application [D.I. 254]. On December 10, 2024, the Court entered an order authorizing the Debtors' employment of Dilworth as its counsel [D.I. 271].

#124965664v1

### iii.    Ankura Consulting Group, LLC ("Ankura")

On November 13, 2024, the Debtors Filed the *Application of the Debtors for Entry of an Order (I) Authorizing the Debtors to Retain Ankura Consulting Group, LLC as Financial Advisor to the Debtors, Effective as of the Petition Date and (II) Granting Related Relief* [D.I. 132]. On December 9, 2024, Ankura Filed a supplemental declaration in support of its retention application [D.I. 256]. On December 10, 2024, the Court entered an Order approving the Debtors' employment of Ankura Consulting Group, LLC as its financial advisor. *See* D.I. 269.

### iv.    Ordinary Course Professionals

On November 19, 2024, the Debtors Filed the *Motion of the Debtors for the Entry of an Order (I) Authorizing the Debtors to Retain, Employ and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [D.I. 160] (the "OCP Application"). On December 4, 2024, the U.S. Trustee filed an objection to such retention [D.I. 220]. On December 18, 2024, the Court entered an Order granting the OCP Application. *See* D.I. 325.

### 7.    Appointment of PCO and UCC

### i.    PCO

On November 20, 2023, the Court entered an Order directing the appointment of a patient care ombudsman. *See* D.I. 162. On November 25, 2024, the U.S. Trustee appointed David Crapo as the Debtors' PCO. *See* D.I. 194.

### ii.    UCC

On November 19, 2024, the U.S. Trustee appointed the UCC pursuant to Bankruptcy Code section 1102(a). *See* D.I. 157. On December 17, 2024, the UCC filed the *Application for Order, Pursuant to 11 U.S.C. §§ 328, and 1103, Fed. R. Bankr. P. 2014, and Local Rule 2014-1, Authorizing and Approving the Employment and Retention of Pachulski Stang Ziehl & Jones LLP as Co-Counsel to the Official Committee of Unsecured Creditors of CarePoint Health Systems Inc. d/b/a Just Health Foundation, et al. Nunc Pro Tunc to November 20, 2024* [D.I. 317] (the "Pachulski Application"); and the *Application to Retain and Employ Sills Cummis & Gross P.C. as Attorneys for the Official Committee of Unsecured Creditors of CarePoint Health Systems Inc. d/b/a Just Health Foundation, et al., to November 20, 2024* [D.I. 318] (the "Sills Application"). On January 3, 2025, the Court entered orders granting the Pachulski Application and the Sills Application. *See* D.I. 391-392.

### 8.    Claims Process and Bar Dates

### i.    Section 341(a) Meeting of Creditors

On December 13, 2024, the U.S. Trustee presided over a meeting of creditors in the Chapter 11 Cases pursuant to Bankruptcy Code section 341(a).

### ii.      Schedules and Statements

On November 5, 2024, the Debtors filed the *Motion of Debtors for Entry of an Order Extending the Time Within Which Debtors Must Filed Their Schedules of Assets and Liabilities and Statements of Financial Affairs* [D.I. 58] (the "Schedule Extension Motion"). On December 6, 2024, the Court entered an order granting the Schedule Extension Motion [D.I. 242].  On December 23, 2024, the Debtors filed their Schedules. Certain Schedules were subsequently amended by the Debtors.

### iii.      Claims Bar Dates

On February 12, 2025, the Court entered the Bar Date Order, establishing the General Claims Bar Date, the Governmental Claims Bar Date, the Rejection Claims Bar Date, and the Amended Schedules Bar Date.

The Combined Disclosure Statement and Plan establishes the Administrative Expense Claims Bar Date and the Professional Fee Claims Bar Date as set forth in Articles IV.A. and IV.D hereof. Such deadlines will also be set forth in the notice of Effective Date.

### 9.      Chapter 11 Trustee Motion

On December 9, 2024, the U.S. Trustee filed a motion to appoint a chapter 11 trustee, or, in the alternative, converting the cases to chapter 7 cases [D.I. 267] (the "Chapter 11 Trustee Motion").  A hearing on the Chapter 11 Trustee Motion is currently scheduled for March 11, 2025 at 10:00 a.m.

### 10.      Mediation and the Plan Term Sheet

On December 18 and 19, 2024, the Debtors, the UCC, HRH and others participated in mediation proceedings with the Mediator in an effort to consensually address disputes related to the DIP Motions, the Collateral Surrender Motion, the MSA Motion, and the Hospital Facilities Management Motion. Such negotiations bore fruit and resulted in the Plan Term Sheet and ultimately this Combined Disclosure Statement and Plan, which provides for: (i) the continuation of the Debtors' hospital operations for the benefit of Hudson County citizens, (ii) a value-maximizing alternative transaction process, (iii) the payment of all outstanding withholding tax obligations, and (iv) the Debtors' emergence from bankruptcy in a matter of weeks. Under the Plan Term Sheet, the Debtors and UCC agreed to seek a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan, and they agreed to support the Plan Term Sheet and all transactions thereunder in all respects.

### 11.      HRH Entity Absolute Subordination

In order to resolve the objections of Capitala and Capitala Specialty Lending to this Combined Disclosure Statement and Plan and secure the support of the Capitala Senior Secured Parties for confirmation, Capitala, Capitala Specialty Lending, the Plan Proponents, and HRH engaged in good-faith, arms-length negotiations that resulted in an agreed resolution that was first read into the record at the hearing before the court on January 23, 2025, and later documented by the HRH Subordination Stipulation.  Pursuant to the HRH Subordination

#124965664v1

Stipulation, HRH, the DIP Lender, 29 E. 29 Street Holdings, LLC and each of their affiliates agreed to subordinate their claims and liens, including without limitation under the HRH Exit Facility, to the claims and liens of the Capitala Senior Secured Parties in respect of the Capitala/HUMC Loan Agreement, the Capitala/Christ Loan Agreement and the Capitala Exit Facility as and to the extent provided by the HRH Entity Absolute Subordination.

**D.    Releases and Exculpation**

**1.    Proposed Releases & Exculpation**

The Plan proposes for the Debtors _– but not the Practice Groups –_ to release the Released Parties as set forth in Article XIV.D (the "Debtor Releases") and to exculpate the Exculpated Parties as set forth in Article XIV.E hereof.  In addition to the Debtors Releases of the Released Parties and the exculpation of the Exculpated Parties, the Plan proposes an injunction against bringing Claims and Causes of Action from which the Released Parties were released or the Exculpated Parties were exculpated.

**2.    Governing Standard for Approval**

The Bankruptcy Code supports the inclusion of debtor releases in a chapter 11 plan. Section 1123(b)(3)(A) of the Bankruptcy Code states that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3).  A debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citation omitted). In evaluating the propriety of a debtor release, courts in the Third Circuit often consider whether: (i) the released party has made a substantial contribution to the debtor's reorganization; (ii) the release is essential to the debtor's reorganization; (iii) a substantial majority of creditors support the release; (iv) there is an identity of interest between the debtor and the released party; and (v) a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release. *See*, *e.g.*, *Zenith Elecs. Corp.*, 241 B.R 92, 110 (Bankr. D. Del. 1999) (citation omitted).  Not all factors must be satisfied for a court to approve a debtor release.  *See In re Wash, Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness") (internal citation omitted).

As will be set forth in greater detail in the Plan Proponents' pleadings in support of confirmation of the Plan, the Plan Proponents believe the proposed Debtor Releases satisfy applicable standards because they are a valid exercise of the Debtors' business judgment, are fair, reasonable and in the best interests of the Debtors' estates, the product of arm's-length negotiations, and were critical to obtaining support for the Plan.

The Plan Proponents believe that the proposed recoveries set forth herein would not be possible without HRH's concessions to date, including, but not limited to, HRH's agreement to have its claims satisfied through the HRH Exit Facility, such that no Litigation Trust Assets shall be used to pay the Allowed HRH Claims (other than certain proceeds of Litigation Claims) and to ensure that Holders of Claims in Class 7 (General Unsecured Claims) receive recoveries on

54

account of Litigation Claims and Avoidance Actions. Without the foregoing concessions (among others) by HRH, the projected recoveries set forth herein with respect to Holders of Claims in Class 7 (General Unsecured Claims) would decrease to such Holders' detriment.

Moreover, the Plan Proponents believe that the Debtor Releases are essential to the Debtors' restructuring efforts, in part because they are critical to maintaining HRH's support for the Plan.  Upon information and belief, HRH would decline to support the Plan and would not provide any concessions for the benefit of unsecured creditors without the inclusion of the Debtor Releases, due to concerns about the deleterious effects threatened or actual litigation could have on the ability of the Debtors to emerge from bankruptcy and execute their business plans post-emergence, further illustrating their essential nature.

Finally, the Plan Proponents believe that the Debtor Releases and exculpation provisions contained in Article XIV.D and Article XIV.E, are narrowly tailored and appropriate given the facts and circumstances of the Chapter 11 Cases and that Holders of Claims in Voting Classes will likely vote to accept the Plan. Notably, the Plan does not currently provide releases for the Debtors' Current D&Os. Rather as explained in Article IX.D, D&O Claims against the Current D&Os shall be evaluated by the independent Reorganization Committee based upon information provided by all interested parties, including the UCC, the Litigation Trustee, and management. Upon their receipt of all relevant information, the Reorganization Committee shall give all such parties an opportunity to be heard to discuss whether viable claims exist and should be pursued against the Current D&Os.  Promptly thereafter, the Reorganization Committee shall provide to all parties a written determination, consistent with the Debtors' fiduciary duties to their creditors, whether any such claims exist and should be pursued, identifying the factual and legal predicates for the Reorganization Committee's decisions, which shall be final. All statutory common law immunities, including those arising under New Jersey statutes, shall remain in full force and effect. To the extent any claims against the Current D&Os are pursued, such claims and proceeds thereof shall constitute Litigation Claims.

For all the foregoing reasons, and as will be set forth in detail the Plan Proponents' pleadings in support of confirmation of the Plan, the Plan Proponents submit that the Debtor Releases are narrowly tailored, necessary to the Debtors' successful reorganization, and appropriate under the circumstances.

**E.    ~~Deemed~~ Substantive Consolidation for Limited Purposes**

As set forth in Article IX.A herein, the Plan contemplates and is predicated upon entry of an order substantively consolidating the Debtors' Estates and Chapter 11 Cases for purposes of voting and Distribution only.

In function, substantive consolidation treats separate legal entities as if they were ~~deemed~~ merged into a single survivor left with all cumulative assets and liabilities (except for inter-entity liabilities, which are erased).  The result is that claims of creditors against separate debtors are ~~deemed~~ converted into claims against a single consolidated debtor solely for purposes of voting and distributions under the chapter 11 plan.

55

If substantive consolidation – for the limited purposes of voting and distribution – is authorized by this Court through the Confirmation Order, on the Effective Date, (a) all assets and liabilities of the Debtors will be ~~deemed~~ merged or treated as if they were single pool of assets for the limited purposes of voting and distribution under the Plan; (b) any guarantee of an obligation of a Debtor by another Debtor will be ~~deemed~~ eliminated; (c) each Claim Scheduled, Filed or to be Filed against any Debtor will be ~~deemed~~considered Filed only against CarePoint and will ~~be deemed~~constitute a single Claim against and a single obligation of CarePoint; and (d) any joint or several liability of the Debtors will ~~be deemed~~constitute one obligation of CarePoint. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment, or performance made by one Debtor as to the obligations of another Debtor will be ~~deemed~~ released and of no further force and effect.

As will be set forth in greater detail in the Debtors' pleadings in support of confirmation of the Plan and, if necessary, through testimony at the Confirmation Hearing, the Debtors believe that substantive consolidation for the limited purposes described herein is merited here because, among other things:

(i)    the Debtors are interrelated and operated as a consolidated enterprise, including through use of a centralized cash management system, by making policy and management decisions from their corporate headquarters and through common directors and officers, by agreeing to be jointly and severally liable for various obligations or serving as guarantors for one another, and by publicly touting the integrated nature of their operations on their website and in their corporate logo;[~~13~~17] and

(ii)   the benefits of consolidation for the limited Plan purposes described herein outweighs the harm, if any, to creditors, particularly given the size of the Intercompany Claims. The Debtors systematically transferred funds to and from each other in order to cover shortfalls at any given Debtor at any given time, without any reasonable prospect of repayment of such transfers.[~~14~~18] The only Class to be affected by the limited consolidation contemplated by the Plan is Class 7 General Unsecured Claims. The sole source of recovery for Class 7 General Unsecured Claims is the net proceeds of Litigation Claims, which include D&O Claims, claims against the Debtors' Prior Owners, claims against the Debtors' insurers and an antitrust lawsuit, among many others. The Debtors have director and officer insurance liability policies that have approximately $40 million in total limits and any recovery on account of the D&O Claims will be a significant asset of the Litigation Trust. Given the breadth and nature of such Litigation Claims, many of which are jointly owned by the Debtors' Estates, it is

---

[~~13~~17]    *See* https://carepointhealth.org/about/ ("At CarePoint Health, we've combined the resources of three area hospitals – Bayonne Medical Center, Christ Hospital in Jersey City and Hoboken University Medical Center").

[~~14~~18]    The Debtors are reviewing and may amend their Schedules to reflect the value of intercompany balances to further substantiate the lack of adverse impact on creditor recoveries based on the proposed ~~deemed~~ substantive consolidation for limited Plan purposes.

not reasonably possible or practicable to allocate the proceeds of such Litigation Claims on a Debtor-by-Debtor basis.[19] Indicative of the difficulties in allocating the proceeds of Litigation Claims, among other things, is the fact that, prior to the Petition Date, the Debtors reached a settlement agreement with an insurer for a confidential single sum certain.  The settlement proceeds were allocated by a senior secured creditor *in its discretion*.  Any Holders of allowed Secured Claims are unaffected by the limited consolidation for Plan purposes herein because the Holders of Secured Claims against the Debtors' assets are unaffected by the limited consolidation under the Plan because their liens and security interests encumbering specific collateral of specific Debtors are not affected by such limited consolidation for Plan purposes.

Therefore, the Plan Proponents submit that substantive consolidation for the limited purposes described herein is an appropriate remedy here and will further establish the need for its application in their pleadings in support of confirmation of the Plan. For the avoidance of doubt, except as otherwise provided herein, after the Effective Date, each Debtor shall continue to exist as a separate entity, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective formation documents in effect before the Effective Date.

## F.    Treatment of Other Interests Under the Plan

Pursuant to the Plan, CarePoint, shall retain its direct and indirect equity interests that constitute Other Interests in the Debtors. For the avoidance of doubt, CarePoint's indirect equity interests in ~~Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates, LLC~~the Practice Groups are not affected by the Plan as such entities are not Debtors under the Plan and the Plan does not treat any Claims against or Interests in such entities.

**ARTICLE IV.**
**TREATMENT AND ALLOWANCE OF UNCLASSIFIED CLAIMS**

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article V hereof.

---

[19] *See, e.g.*, *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 103-04 (Bankr. N.D. Tex. 2017) ("the fact that distributions for general unsecured creditors and equity interest holders will be ***based on recoveries from litigation claims*** is a significant reason why the Debtors decided to request that these estates be substantively consolidated. Specifically, as a result of the postpetition analysis and investigation of potential causes of action that the Debtors and Creditors' Committee conducted, the Debtors determined that a number of significant causes of action (a) were jointly owned by all of the Debtors, or (b) would be difficult to allocate between estates. Because of the foregoing factors, the court believes that substantive consolidation will achieve a fair and equitable result for all creditors and equity interest holders of the Debtors and will enable the assets of the Debtors to be administered in an efficient manner. If the estates are not substantively consolidated, the time and expense to allocate assets and liabilities between estates will be enormous") (emphasis in original).

#124965664v1

## A.    Administrative Expense Claims

Unless a holder agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (including all Professional Fee Claims) shall be paid in full in cash on the later of (a) the Effective Date, or (b) the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon as reasonably practicable thereafter, from the Administrative Expense Claims Reserve. Alternatively, all Allowed Administrative Expense Claims, excluding Professional Fee Claims, may be assumed by the Reorganized Debtors and paid in the ordinary course.

Objections to Administrative Expense Claims (other than Professional Fee Claims) must be Filed and served on the Debtors, the Litigation Trust and the requesting party by the Claims Objection Deadline. Allowed Professional Fee Claims shall be paid from the Professional Fee Reserve pursuant to Article IX.L.2 hereof.

Requests for payment of Administrative Expense Claims (other than Professional Fee Claims and the Claims of Governmental Units arising under Bankruptcy Code section 503(b)(1)(B), (C) or (D)) must be filed with the Claims and Noticing Agent (https://dm.epiq11.com/case/carepoint/claims) and served on the Reorganized Debtors and the Litigation Trustee no later than the Administrative Expense Claims Bar Date. Unless otherwise Ordered by the Court, Holders of Administrative Expense Claims (other than the Holders of Professional Fee Claims and the Claims of Governmental Units arising under Bankruptcy Code section 503(b)(1)(B), (C) or (D)) that do not comply with the provisions set forth herein for the allowance and payment thereof on or before the Administrative Expense Claims Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtors, their Estates, the Litigation Trust or any of their assets.

Unless the Litigation Trust, the Reorganized Debtors or any other party-in-interest objects to an Administrative Expense Claim by the Claims Objection Deadline, such Administrative Expense Claim shall be ~~deemed~~ Allowed in the amount requested. In the event that the Litigation Trust, the Reorganized Debtors, or any other party-in-interest objects to an Administrative Expense Claim, the Court shall determine the Allowed amount of such Administrative Expense Claim.

Notwithstanding the foregoing or anything to the contrary herein, to the extent that Maple is granted an Allowed Administrative Expense Claim arising under sections 503(b) and 507(b) of the Bankruptcy Code from any diminution in the value of any interest of Maple secured by a lien on property of the Debtors from and after the Petition Date through the Effective Date, as determined by agreement of the Plan Proponents and Maple or ordered by the Court, such Allowed Administrative Expense Claim shall be paid by the Reorganized Debtors in full in Cash on the Effective Date.

## B.    Priority Tax Claims

Unless a Holder agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive on the later of (a) the Effective Date and (b) the date on which such Claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter), (i) Cash

58

equal to the unpaid portion of such Allowed Priority Tax Claim from the Administrative Expense Claims Reserve, (ii) regular installment payments in Cash from the Reorganized Debtors, consistent with Bankruptcy Code section 1129(a)(9)(C), or (iii) such other treatment as to which such Holder and the Litigation Trustee or the Reorganized Debtors, as applicable, shall have agreed upon in writing. Alternatively, all Allowed Priority Tax Claims may be assumed by the Reorganized Debtors and paid in the ordinary course.

Notwithstanding the foregoing or anything to the contrary herein, all Claims arising from the Debtors' failure to pay prepetition payroll taxes shall be paid by the Reorganized Debtors from their operations subsequent to the Effective Date subject to section 1129(a)(9)(C) of the Bankruptcy Code. The unpaid prepetition payroll taxes of the Debtors and the proposed repayment thereof are described in more detail in the *Declaration of Shamiq Syed Regarding Motion of the United States Trustee* [D.I. 397].

## C.    Priority Non-Tax Claims

On, or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall receive, on account of, in exchange for, and in full satisfaction of such Allowed Priority Non-Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim from the Administrative Expense Claims Reserve, or (ii) such other treatment as to which such Holder and the Litigation Trustee shall have agreed upon in writing. Alternatively, all Allowed Priority Non-Tax Claims may be assumed by the Reorganized Debtors and paid in the ordinary course.

As will be set forth in the Plan Supplement, the Claims of certain employees for amounts in excess of the priority cap under sections 507(a)(4)-(5) of the Bankruptcy Code will be paid (or non-impaired). Notwithstanding anything to the contrary herein, all Claims of employees employed as of the Effective Date shall either be satisfied in full or assumed by the Reorganized Debtors and satisfied in the ordinary course of business. The individual employees and the applicable amounts subject to payment will be subject to a reconciliation process among the Reorganized Debtors, HRH and the Litigation Trustee. To the extent any dispute arises amongst such parties and/or the applicable claimant and cannot be consensually resolved, such dispute shall be determined by the Court.

## D.    Professional Fee Claims

### 1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims (the "Final Fee Applications") may be made any time after the Confirmation Date but shall be Filed no later than the Professional Fee Claims Bar Date. Objections, if any, to Final Fee Applications of such Professionals must be Filed and served on the Litigation Trust, the Reorganized Debtors, the requesting Professional, and the U.S. Trustee no later than 21 days from the date on which each such Final Fee Application is Filed (the "Professional Fee Claim Objection Deadline"). After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court, the Allowed amounts of such Professional Fee Claims shall be determined by the Court.

59

### 2.      Post-Effective Date Fees and Expenses

The Professionals employed by the Debtors and the UCC shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, relating to the preparation, filing, and prosecution of Final Fee Applications.  Any time or expenses incurred in the preparation, filing, and prosecution of Final Fee Applications shall be subject to approval of the Court.

Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the Litigation Trust Agreement, the Litigation Trustee may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to, or action, Order, or approval of, the Court.

## ARTICLE V.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.      Classification of Claims and Interests

The Plan is premised upon the ~~deemed~~ substantive consolidation of the Debtors, as set forth in more detail below, for the limited purposes of voting, determining which Claims and Interests have accepted the Plan, confirmation of the Plan, and the resultant treatment of Claims and Interests and Distributions under the terms of the Plan. Accordingly, the Plan shall serve as a motion for entry of a Court order approving the ~~deemed~~ substantive consolidation of the Debtors for such limited purposes.

Pursuant to Bankruptcy Code sections 1122 and 1123(a)(1), all Claims against and Interests in the Debtors (except for the Claims addressed in Article IV hereof) are classified for the purposes of voting and Distribution under the Plan as set forth below. A Claim or an Interest shall be ~~deemed~~ classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be ~~deemed~~ classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  A Claim is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.  Except as otherwise specifically provided for herein, in the Confirmation Order, any other Order of the Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Bankruptcy Code section 1129(a)(10) shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Plan Proponents may seek Confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to any rejecting Class of Claims or Interests.

#124965664v1

All Claims and Interests (other than Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims) are placed in the Classes set forth below.  The following chart provides a summary of treatment of each Class of Claims and Interests (other than Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims) and an estimate of the recoveries of each Class.[~~16~~20]  The treatment provided in this chart is for informational and illustrative purposes only and is qualified in its entirety by Article V hereof.[~~17~~21]

| Class | Claim / Interest | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims | Projected Recovery |
|---|---|---|---|---|---|
| 1 | HRH Claims | Impaired | Entitled to Vote | $110.3 million | 100% |
| 2 | Capitala Claims | Impaired | Entitled to Vote | $19.7 million | 100% |
| 3 | Capitala Specialty Lending Claims | Impaired | Entitled to Vote | $55 million | 0% |
| 4 | Maple Secured Claims | Impaired | Entitled to Vote | $48.2 million | 0% |
| 5 | Maple Unsecured Claims | Impaired | Entitled to Vote | $16.5 million | 0% |
| 6 | Other Secured Claims | Unimpaired | Deemed to Accept | $100,000 | 100% |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote | $162 million[22] | 1%-2% |

[~~16~~20]    These amounts represent estimated Allowed Claims and do not represent amounts actually asserted by Creditors in Proofs of Claim or otherwise.  The Debtors have not completed their analysis of Claims in the Chapter 11 Cases and the claims bar dates have not passed.  Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time.  Rather, the actual amount of the Allowed Claims may be higher or lower than estimated.

[~~17~~21]  The information reflected below is also subject to material change based on certain contingencies, including those related to the Claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distributions received by Holders of Allowed Claims.  The projected recoveries are based on information available as of the date hereof and reflect estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Plan Proponents make no representation as to the accuracy of these recovery estimates.  The Plan Proponents expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

[22]    This estimate does not include unsecured deficiency claims as a result of application of section 506(a) of the Bankruptcy Code or rejection damages claims.

#124965664v1

| Class | Claim / Interest | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims | Projected Recovery |
|---|---|---|---|---|---|
| 8 | Insured Claims | Impaired | Entitled to Vote | TBD | TBD |
| 9 | Prior Owner Claims | Impaired | Entitled to Vote | $39 million | 0% |
| 10 | Intercompany Claims | Impaired | Deemed to Reject | $101 million | 0% |
| 11 | Bayonne Interests | Impaired | Deemed to Reject | N/A | N/A |
| 12 | Other Interests | Unimpaired | Deemed to Accept | N/A | N/A |
| 13 | NJDOH Secured Claims | Impaired | Entitled to Vote | $10.6 million | 2% |
| 14 | Strategic Ventures Secured Claims | Impaired | Entitled to Vote | $10 million | 0% |

## B.     Treatment of Claims and Interests

### 1.     Class 1: HRH Claims

(a)     <u>Classification</u>: Class 1 consists of all HRH Claims.

(b)     <u>Treatment</u>: On, or as soon as reasonably practicable after the Effective Date, HRH shall receive on account of its Allowed HRH Claims, the HRH Exit Facility. No Litigation Trust Assets shall be used to pay the Allowed HRH Claims (other than certain proceeds of Litigation Claims as set forth herein), which claims will be treated as an HRH Exit Facility, which will be paid from the Reorganized Debtors' future operations. Notwithstanding anything contained herein, in the event that an Alternative Transaction is consummated, the HRH Claims shall be paid in full upon the closing of the Alternative Transaction. For the avoidance of doubt, the HRH Claims are ~~deemed~~ Allowed in the approximate estimated amount of $110 million for all purposes under the Plan, subject to final reconciliation as shall be set forth in the HRH Exit Facility Credit Agreement and except as provided in Article IX.C of the Plan. For the avoidance of doubt, nothing herein grants HRH more rights for purposes of credit bidding than as set forth in Article IX.E.

(c)     <u>Voting</u>: Class 1 is Impaired. Holders of the HRH Claims in Class 1 are entitled to vote to accept or reject the Plan.

#124965664v1

2. **Class 2: Capitala Claims**

(a) <u>Classification</u>: Class 2 consists of all Capitala Claims.

(b) <u>Treatment</u>:  On, or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Capitala Claim shall receive, on account of its Allowed Capitala Claims, its Pro Rata share of the Capitala Exit Facility, which will provide for the Holder to retain its liens, or be granted replacements liens, and be paid deferred cash payments consistent with section 1129(b)(2)(A) or otherwise realize the indubitable equivalent of its Claim, unless agreed otherwise by the Plan Proponents and such Holder. In addition, in exchange for the Holders of Allowed Capitala Claims releasing their liens on that certain Litigation Claim against Cigna, the four-hospital MSO and Manager (as defined in the MSA) would grant Capitala a first-priority lien on the management fee under 6.01(a) of the MSA[23] to which it is entitled under the four-hospital system management agreement.    For avoidance of doubt the lien does not attach to out-of-pocket costs owing to the MSO. No Holder of any Allowed Capitala Claim shall receive any Distributions under the Plan, other than rights provided under the Capitala Exit Facility and, to the extent applicable, pursuant to <u>Article XIII.B.10</u>. No Litigation Trust Assets shall be used to pay the Allowed Capitala Claims.

(c) <u>Voting</u>: Class 2 is Impaired. Holders of Capitala Claims in Class 2 are entitled to vote to accept or reject the Plan.

3. **Class 3: Capitala Specialty Lending Claims**

(a) <u>Classification</u>: Class 3 consists of all Capitala Specialty Lending Claims.

(b) <u>Treatment</u>:  On, or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Capitala Specialty Lending Claim shall, on account of its Allowed Capitala Specialty Lending Claim, retain all of its rights, claims, and interests in and under the Sequoia Credit Agreement and all related instruments, documents and agreements; *provided*, *however*, that (a) each such Holder's right to proceeds of Litigation Claims shall be subject to <u>Article IX.C</u> hereof, and  (b) no such Holder shall accept any payment from a Debtor or Reorganized Debtor on account of its Allowed Capitala Specialty Lending Claim until the payment in full of (i) all obligations under the Capitala Exit Facility and (ii) all obligations under the HRH Exit Facility; *provided, further*, for the avoidance of

---

[23] Section  6.01(a) of the MSA provides as follows: "On account of each Service Recipient that is a Hospital, the documented, direct costs of the Manager plus a reasonable overhead markup in an amount equal to TWENTY PERCENT (20.0%) of such costs in the aggregate per-Hospital of one hundred thousand dollars ($100,000.00) to one hundred and fifty thousand dollars ($150,000.00) per month, as determined by the Manager in consultation with the applicable Service Recipient."

doubt, nothing in this Plan subordinates or otherwise adversely impacts any right or claim Capitala Specialty Lending or any other Holder of Allowed Capitala Specialty Claims may have (x) against any Person who is not a Debtor in connection with the Sequoia Credit Agreement, any of the instruments, documents or agreements related thereto or any obligations thereunder, or (y) against any asset of a Person who is not a Debtor that secures the obligations under the Sequoia Credit Agreement or any of the instruments, documents or agreements related thereto.

(c)    <u>Voting</u>: Class 3 is Impaired. Holders of Capitala Specialty Lending Claims in Class 3 are entitled to vote to accept or reject the Plan.

**4.    Class 4: Maple Secured Claims**

(a)    <u>Classification</u>: Class 4 consists of all Maple Secured Claims.

(b)    <u>Treatment</u>: On, or as soon as reasonably practicable after the later of the Effective Date and the date each Maple Secured Claim is Allowed, to the extent not otherwise paid pursuant to another Court order, each Holder of an Allowed Maple Secured Claim shall receive from the Reorganized Debtors, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Maple Secured Claim, (i) cash equal to the unpaid portion of the Allowed Maple Secured Claim, (ii) the collateral securing such Allowed Maple Secured Claim, (iii) the indubitable equivalent of such Allowed Maple Secured Claim, (iv) the retention of its liens securing such Allowed Maple Secured Claim and deferred cash payments having a present value at least equal to the amount of such Allowed Maple Secured Claim as of the Effective Date, or (v) such other treatment as to which such Holder and the Reorganized Debtors agree in writing.

(c)    <u>Voting</u>:  Class 4 is Impaired. Holders of Maple Secured Claims in Class 4 are entitled to vote to accept or reject the Plan.

**5.    Class 5: Maple Unsecured Claims**

(a)    <u>Classification</u>: Class 5 consists of all Maple Unsecured Claims.

(b)    <u>Treatment</u>: To the extent a Maple Unsecured Claim is Allowed, the Holder of such Allowed Maple Unsecured Claim shall receive the same distributions on a Pro Rata basis as Holders of Allowed General Unsecured Claims in Class 7.

(c)    <u>Voting</u>: Class 5 is Impaired. Holders of Maple Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

#124965664v1

6.      **Class 6: Other Secured Claims**

      (a)      <u>Classification</u>: Class 6 consists of all Other Secured Claims.

      (b)      <u>Treatment</u>: On, or as soon as reasonably practicable after the later of the Effective Date and the date each Other Secured Claim is Allowed, to the extent not otherwise paid pursuant to another Court order, each Holder of an Allowed Other Secured Claim shall receive from the Reorganized Debtors, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Other Secured Claim, (i) cash equal to the unpaid portion of the Allowed Other Secured Claim, (ii) the collateral securing such Allowed Other Secured Claim, (iii) the indubitable equivalent of such Allowed Other Secured Claim, or (iv) such other treatment as to which such Holder and the Reorganized Debtors agree to in writing.

      (c)      <u>Voting</u>: Class 6 is Unimpaired and, therefore, Holders of Claims in Class 6 are conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Holders of Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7.      **Class 7: General Unsecured Claims**

      (a)      <u>Classification</u>:  Class 7 consists of all General Unsecured Claims.

      (b)      <u>Treatment</u>: On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the Litigation Trustee, as applicable, shall have agreed upon in writing to alternative treatment, each Holder of an Allowed General Unsecured Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed General Unsecured Claim, a Pro Rata beneficial interest in the Litigation Trust.

      (c)      <u>Voting</u>:  Class 7 is Impaired. Holders of Claims in Class 7 are entitled to vote to accept or reject the Plan.

8.      **Class 8: Insured Claims**

      (a)      <u>Classification</u>: Class 8 consists of all Insured Claims.

      (b)      <u>Treatment</u>: Holders of Insured Claims shall recover only from the proceeds of available insurance and shall not be entitled to any distributions from the Debtors, Reorganized Debtors, or Litigation Trust. For the avoidance of any doubt and notwithstanding any other provision of the Plan, Holders of any Claims arising under the PMA Large Deductible Workers' Compensation Program shall recover only from the proceeds of available insurance including any and all amounts within the applicable deductible limits of those policies with said deductible amount to be paid

by /reimbursed to PMA using any cash collateral, escrow or security held by PMA under its Deductible Reimbursement and Security Agreements with Debtors bearing Account number ending 9647 as described above.

(c)    <u>Voting</u>: Class 8 is Impaired. Holders of Claims in Class 8 are entitled to vote to accept or reject the Plan.

**9.    Class 9: Prior Owner Claims**

(a)    <u>Classification</u>: Class 9 consists of all Prior Owner Claims; *provided*, *however*, that Class 9 shall not include any Strategic Venture Secured Claims.

(b)    <u>Treatment</u>: To the extent a Prior Owner Claim is Allowed, the Holder of such Allowed Prior Owner Claim shall receive the same distributions on a Pro Rata basis as Holders of Allowed General Unsecured Claims in Class 7.

(c)    <u>Voting</u>: Class 9 is Impaired. Holders of Prior Owner Claims in Class 9 are entitled to vote to accept or reject the Plan.

**10.    Class 10: Intercompany Claims**

(a)    <u>Classification</u>:  Class 10 consists of all Intercompany Claims.

(b)    <u>Treatment</u>: Holders of Intercompany Claims shall receive no recovery under the Plan as a result of the ~~deemed~~ substantive consolidation of the Debtors' Estates for purposes of voting and Distribution. [24]

(c)    <u>Voting</u>: Class 10 is Impaired. Holders of Intercompany Claims are deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**11.    Class 11: Bayonne Interests**

(a)    <u>Classification</u>:  Class 11 consists of all Bayonne Interests.

(b)    <u>Treatment</u>: Bayonne Interests shall be cancelled by the Reorganized Debtors on the later of: (a) the date that is thirty (30) days after the last applicable provider agreement is transferred to the entity designated as the new operator of the assets of Bayonne, or (b) twenty four (24) months after the Effective Date, and Holders of Bayonne Interests shall not

---

[24]    For the avoidance of doubt, any and all rights, claims and causes of action of: (a) ~~Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates, LLC~~<u>the Practice Groups</u> against any of the Debtors, <u>including without limitation any objection of such parties to the Debtors' proposed cure amounts,</u> and/or (b) any of the Debtors against ~~Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates, LLC~~<u>the Practice Groups</u>, are expressly reserved and preserved.

66

receive or retain any property under the Plan on account of such Bayonne Interests.

(c)    <u>Voting</u>: Class 11 is Impaired. Holders of Bayonne Interests are deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**12.    Class 12: Other Interests**

(a)    <u>Classification</u>:  Class 12 consists of all Other Interests.

(b)    <u>Treatment</u>: Other Interests shall be unaffected by the Plan and the Holders thereof shall retain all legal, equitable and contractual rights to which such Interests are otherwise entitled.

(c)    <u>Voting</u>: Class 12 is Unimpaired and, therefore, Holders of Claims in Class 12 are conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Holders of Claims in Class 12 are not entitled to vote to accept or reject the Plan.

**13.    Class 13: NJDOH Secured Claims**

(a)    <u>Classification</u>:  Class 13 consists of all NJDOH Secured Claims.

(b)    <u>Treatment</u>: Holders of Allowed NJDOH Secured Claims shall be paid $200,000, in five (5) annual installments of $40,000, payable on each anniversary of the Effective Date.

(c)    <u>Voting</u>: Class 13 is Impaired. Holders of NJDOH Secured Claims in Class 13 are entitled to vote to accept or reject the Plan.

**14.    Class 14: Strategic Ventures Secured Claims**

(d)    <u>Classification</u>: Class 14 consists of all Strategic Ventures Secured Claims.

(e)    <u>Treatment</u>:  On, or as soon as reasonably practicable after the later of the Effective Date and the date each Strategic Ventures Secured Claim is Allowed, to the extent not otherwise paid pursuant to another Court order, each Holder of a Strategic Ventures Secured Claim shall receive from the Reorganized Debtors, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Strategic Ventures Secured Claim, (i) cash equal to the unpaid portion of the Allowed Strategic Ventures Secured Claim, (ii) the collateral securing such Allowed Strategic Ventures Secured Claim, (iii) the indubitable equivalent of such Allowed Strategic Ventures Secured Claim, or (iv) such other treatment as to which such Holder and the Reorganized Debtors agree in writing.

#124965664v1

(f)    <u>Voting</u>:   Class 14 is Impaired. Holders of Strategic Ventures Secured Claims in Class 14 are entitled to vote to accept or reject the Plan.

## C.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, the Confirmation Order, any other Order of the Court, or any document or agreement enforceable pursuant to the terms of the Plan, nothing shall affect the rights and defenses, both legal and equitable, of the Debtors, the Reorganized Debtors, the Litigation Trustee and/or the Litigation Trust with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

## D.    Nonconsensual Confirmation

With respect to Impaired Classes that are deemed to reject the Plan, the Plan Proponents intend to request that the Court confirm the Plan pursuant to Bankruptcy Code section 1129(b) notwithstanding the deemed rejection of the Plan by such Classes.  If any other Impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in Bankruptcy Code section 1126, the Plan Proponents reserve the right to amend the Plan or to undertake to have the Court confirm the Plan under Bankruptcy Code section 1129(b) with respect to such Class as well, or both.

## E.    Allowed Claims

Notwithstanding any provision herein to the contrary, the Disbursing Agent shall only make Distributions to Holders of Allowed Claims. No Holder of a Disputed Claim shall receive any Distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim. The Litigation Trustee may, in its discretion, withhold Distributions otherwise due hereunder to any Holder until the Claims Objection Deadline, to enable a timely objection thereto to be Filed.  Any Holder of a Claim that becomes an Allowed Claim after the Effective Date shall receive its Distribution in accordance with the terms and provisions of the Plan and/or the Litigation Trust Agreement, as applicable.

## ARTICLE VI.
## CONFIRMATION AND VOTING PROCEDURES

## A.    Confirmation Procedure

### 1.    Confirmation Hearing

On January 24, 2025, the Court entered the Solicitation Procedures Order, authorizing the Plan Proponents to solicit acceptances of the Plan.   The Confirmation Hearing has been scheduled to commence on **<u>March 11, 2025 at 10:00 a.m. (Eastern Prevailing Time)</u>** to consider confirmation of the Plan pursuant to Bankruptcy Code section 1129. The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Plan Proponents in open court of the adjourned date(s) at the Confirmation Hearing or any continued hearing or as indicated in any notice Filed with the Court.

The Confirmation Hearing will be held in person before the Honorable J. Kate Stickles at the United States Bankruptcy Court for the District of Delaware, 5th Floor Courtroom #6, 824 North Market Street, Wilmington, DE 19801.

### 2.      Procedure for Objections

Any objection to confirmation of the Plan must (a) be made in writing; (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (c) state the name and address of the objecting party and the nature and amount of any Claim or Interest asserted by such party against the Debtors, their Estates, or their property; (d) state with particularity the legal and factual bases and nature of any objection to confirmation of the Plan; (e) be Filed with the Court, and served upon the following parties (collectively, the "Notice Parties"): (i) CarePoint Health Systems, Inc., 308 Willow Avenue, Hoboken, NJ 07030 (Attn: Shamiq Syed (Shamiq.Syed@CarePointhealth.org)); (ii) counsel to the Debtors, Dilworth Paxson LLP, (x) 800 King Street – Suite 202, Wilmington, DE 19801 (Attn: Peter C. Hughes (phughes@dilworthlaw.com)), and (y) 1650 Market St., Suite 1200, Philadelphia, PA 19103 (Attn: Lawrence G. McMichael (lmcmichael@dilworthlaw.com)); (iii) counsel for Hudson Regional Hospitals, LLC, Mandelbaum Barrett PC, 3 Becker Farm Road, Suite 105, Roseland, NJ 07068 (Attn: Mohamed Nabulsi (mnabulsi@mblawfirm.com) and Vincent Roldan (vroldan@mblawfirm.com)); (iv) counsel for the UCC, (A) Sills Cummis & Gross P.C., The Legal Center, One Riverfront Plaza, Newark, NJ 07102 (Attn: Andrew H. Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com)), and (B) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801) (Attn: Bradford Sandler (bsandler@pszjlaw.com), James O'Neill (joneill@pszjlaw.com), and Colin Robinson (crobinson@pszjlaw.com)); and (v) Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE, 19801, Attn: Jane M. Leamy (Jane.M.Leamy@usdoj.gov), so as to be received on or before **February 28, 2025 at 4:00 p.m. (Eastern Prevailing Time)**. **Unless an objection is timely Filed and served, it may not be considered by the Court at the Confirmation Hearing.**

## B.      Statutory Requirements for Confirmation

### 1.      General Requirements

The Court will confirm the Plan only if it meets all the applicable requirements of Bankruptcy Code section 1129, as discussed herein. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against and be "fair and equitable" with respect to such Class; and (b) must be feasible. The Court must also find that (a) the Plan has classified Claims and Interests in a permissible manner; (b) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

#124965664v1

### 2.    Classification of Claims and Interests

Bankruptcy Code section 1123 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with Bankruptcy Code section 1123, Article V of the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which, pursuant to Bankruptcy Code section 1123(a)(1), need not be and have not been classified). A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Plan is also required, under Bankruptcy Code section 1122, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class. In accordance with Bankruptcy Code section 1122, the Plan creates separate Classes to deal respectively with secured Claims, unsecured Claims, and Intercompany Claims. The Plan Proponents believe that the Plan's classifications place substantially similar Claims or Interests in the same Class and thus, meet the requirements of Bankruptcy Code section 1122.[25]

The Bankruptcy Code also requires that a plan provide the same treatment for each Claim or Interest of a particular Class unless a Holder agrees to a less favorable treatment of its Claim or Interest.  The Plan Proponents believe that the Plan complies with such standard. If the Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

### 3.    Confirmation Pursuant to Bankruptcy Code Sections 1129(a)(10) and 1129(b)

In the event that any impaired class of claims or interests does not accept a plan, a plan proponent nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in Bankruptcy Code section 1129(b).  Bankruptcy Code section 1129(b) requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

---

[25]    It is possible that a Holder of a Claim or Interest may challenge the classification of Claims or Interests and that the Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Plan Proponents intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

#124965664v1

Because Class 10 (Intercompany Claims) and Class 11 (Bayonne Interests) are deemed to reject the Plan, the Plan Proponents shall (a) seek Confirmation of the Plan from the Court by employing the "cramdown" procedures set forth in Bankruptcy Code section 1129(b) and/or (b) modify the Plan in accordance with Article XVI.A hereof. The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Exhibit or schedule, including to amend or modify the Plan or such Exhibits or schedules to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

The Plan Proponents believe that the requirements of Bankruptcy Code section 1129(b) are satisfied. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists; courts typically examine the facts and circumstances of each particular case to determine whether unfair discrimination exists. At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without sufficient justifications for doing so. The Plan Proponents believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, except where there is sufficient justification for different treatment. Accordingly, the Plan Proponents believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

- Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value at least equal to the amount of its allowed secured claim as of the effective date, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

- Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value as of the effective date equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan on account of such junior claim or interest.

- Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any Interest that is junior to such non-accepting class will not receive or retain any property under the plan on account of such junior interest.

The Plan Proponents believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

### 4.    Best Interests of Creditors Test and Liquidation Analysis

### i.    Best Interests of Creditors Test

Even if a plan is accepted by the Holders of each Class of Claims and Interests, the "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from the debtor's assets if the Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

To make these findings, the Court must (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Cases were converted to a chapter 7 case and the Assets of the Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

The Plan Proponents believe that in a chapter 7 liquidation, there would be additional costs and expenses that would be incurred as a result of the inefficiencies associated with replacing existing management and professionals in a chapter 7 case. Moreover, it is unclear whether a chapter 7 trustee could pursue and appropriately maximize the value of the Litigation Claims, as such Litigation Claims are only available for the benefit of general unsecured creditors based on the Plan Proponents' negotiations with HRH.  A Chapter 7 trustee would not only lack funding to pursue Litigation Claims (*i.e.*, the Litigation Trust Seed Money), but any such Litigation Claims may also be subject to Liens, absent the concessions agreed to by HRH. Furthermore, holders of Impaired Claims, as well as the community as a whole, will benefit from the continued operation of the three hospitals, as opposed to closure under chapter 7. Accordingly, the Plan Proponents believe that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available to them in a chapter 7 liquidation. The Plan Proponents have provided a liquidation analysis, attached hereto as **Exhibit B**, demonstrating the satisfaction of

#124965664v1

the so-called "best interests" test. The Plan Proponents' advisors prepared the liquidation analysis on consolidated basis and do not believe a liquidation analysis on an individual basis is required because there will likely be no distributable assets in a chapter 7 liquidation scenario, after payment of DIP obligations, prepetition senior and other secured debt, super-priority administrative claims, administrative costs and closure costs. Accordingly, the Debtors believe that the "best interests" test promulgated by Bankruptcy Code section 1129 is satisfied.

### ii.   Liquidation Analysis

The Plan Proponents believe that Consummation of the Plan is more beneficial to the Holders of Claims than a liquidation under chapter 7.

In a chapter 7 liquidation, Holders of General Unsecured Claims are unlikely to receive any recovery. Moreover, costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of counsel and other professionals retained by the chapter 7 trustee, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants that are allowed in the chapter 7 case), litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases. In addition, a chapter 7 trustee would be entitled to statutory fees relating to the Distribution of the Debtors' already monetized assets. Accordingly, a portion of the cash currently available for Distribution to Litigation Trust Beneficiaries, would instead be paid to a chapter 7 trustee. Lastly, it is unclear whether a chapter 7 trustee could pursue and appropriately maximize the value of the Litigation Claims, as such Litigation Claims are only available for the benefit of general unsecured creditors based on the Plan Proponents' negotiations with HRH. A Chapter 7 trustee would not only lack funding to pursue Litigation Claims (*i.e.*, the Litigation Trust Seed Money), but any such Litigation Claims may also be subject to Liens, absent the concessions agreed to by HRH.

The Plan Proponents, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, that summarizes the Plan Proponents' best estimate of recoveries by Holders of Claims and Interests if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. As set forth in the Liquidation Analysis, if the Chapter 11 Cases were to be converted to chapter 7 cases, Holders of General Unsecured Claims would likely not receive any recovery, and the Debtors would incur the additional costs of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the chapter 7 trustee. These costs would reduce potential distribution to Allowed Impaired Claims on a dollar-for-dollar basis. Conversion also would likely entail significant delay to liquidate the Debtors' assets and make distributions, if any, to unsecured creditors. Accordingly, the Plan Proponents believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases.

### 5.   Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). There is a relatively low threshold of proof necessary to satisfy the feasibility requirements. *See*,

73

*e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), overruled in part on other grounds, 464 B.R. 208 (Bankr. D. Del. 2011). Here, the Plan Proponents believe that the Plan is feasible as will be demonstrated by the Debtors at the Confirmation Hearing. Upon the Effective Date, the Plan Proponents expect: (i) sufficient funds to exist to make all required distributions under the Plan, (ii) for those Reorganized Debtors, which are continuing in business, to be well-positioned to service their ordinary course obligations and successfully operate their businesses on a go-forward basis based upon, among other things, substantial management and operational changes made by HRH since the Petition Date to reduce expenses and increase revenue, and (iii) for the Litigation Trustee to have the ability to prosecute and potentially monetize Litigation Claims for the benefit of Litigation Trust Beneficiaries. Therefore, the Plan Proponents believe that the Plan meets the feasibility requirements of the Bankruptcy Code. The Plan Supplement will include projections further demonstrating the feasibility of the Plan.

## C.     Acceptance or Rejection of the Plan

### 1.     Presumed Acceptances by Vacant Classes

Any Class or sub-Class of Claims that is not occupied as of the date of the Combined Hearing by at least one Allowed Claim, or at least one Claim temporarily Allowed under Bankruptcy Rule 3018, shall not be included for purposes of (a) voting on the acceptance or rejection of the Plan and (b) determining acceptance or rejection of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

### 2.     Classes Deemed to Accept Plan

Pursuant to Bankruptcy Code section 1126(f), only the Holders of Claims or Interests in Classes Impaired by the Plan and receiving a payment or Distribution under the Plan may vote on the Plan. Class 6 (Other Secured Claims) and Class 12 (Other Interests) are Unimpaired by the Plan.    Therefore, under Bankruptcy Code section 1126(f), such Holders are conclusively presumed to accept the Plan and the votes of Holders of such Claims or Interests shall not be solicited.

### 3.     Classes Deemed to Reject Plan

Pursuant to Bankruptcy Code section 1124, a Class of Claims or Interests may be Impaired if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Interests treated in such Class. Holders of Claims or Interests in Class 10 (Intercompany Claims) and Class 11 (Bayonne Interests) are not entitled to receive or retain any property under the Plan. Under Bankruptcy Code section 1126(g), such Holders are deemed to reject the Plan, and the votes of such Holders shall not be solicited.

74

4.     **Impaired Classes of Claims Entitled to Vote**

Because Claims in Class 1 (HRH Claims), Class 2 (Capitala Claims), Class 3 (Capitala Specialty Lending Claims), Class 4 (Maple Secured Claims), Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims), Class 8 (Insured Claims), Class 9 (Prior Owner Claims), Class 13 (NJDOH Secured Claims), and Class 14 (Strategic Ventures Secured Claims) are Impaired under the Plan and Holders of such Claims may receive or retain property under the Plan, Holders of Claims in such Classes are entitled to vote and shall be solicited with respect to the Plan. **ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 1 (HRH CLAIMS), CLASS 2 (CAPITALA CLAIMS), CLASS 4 (MAPLE SECURED CLAIMS), CLASS 5 (MAPLE UNSECURED CLAIMS), CLASS 7 (GENERAL UNSECURED CLAIMS), CLASS 8 (INSURED CLAIMS), CLASS 9 (PRIOR OWNER CLAIMS), CLASS 13 (NJDOH SECURED CLAIMS), AND CLASS 14 (STRATEGIC VENTURES SECURED CLAIMS).**

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and at least two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. At least one Impaired Class of Creditors, excluding the votes of Insiders, must actually vote to accept the Plan.

D.     **Voting Procedures**

1.     **Eligibility to Vote on the Plan**

Except as provided in the Solicitation Procedures Order or otherwise ordered by the Court, only Holders of Claims in Class 1 (HRH Claims) Class 2 (Capitala Claims), Class 3 (Capitala Specialty Lending Claims), Class 4 (Maple Secured Claims), Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims), Class 8 (Insured Claims), Class 9 (Prior Owner Claims), Class 13 (NJDOH Secured Claims) and Class 14 (Strategic Ventures Secured Claims) as of January 23, 2025 may vote on the Plan. Further, subject to the specific tabulation procedures that were set forth in and approved by the Solicitation Procedures Order, in order to vote on the Plan, you generally must hold a Claim in the Voting Classes that (i) to the extent a Proof of Claim has been filed, is not the subject of a pending Claim Objection or (ii) to the extent a Proof of Claim has not been filed, is listed in the Debtors' Schedules as not disputed, contingent, or unliquidated, or be the Holder of a Claim in such Classes that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a). **IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU WILL RECEIVE A BALLOT AND ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY SUBMIT YOUR BALLOT BEFORE THE VOTING DEADLINE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

2.     **Solicitation Packages and Notice**

All Holders of Allowed Claims in the Voting Classes will receive (a) notice of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>") setting forth: (i) the deadline to vote

on the Plan, (ii) the deadline to object to confirmation of the Plan, (iii) procedures for filing objections and responses to confirmation of the Plan, and (iv) the time, date, and place of the Confirmation Hearing; and (b) a form of ballot.  Holders of Allowed Claims in Class 7 (General Unsecured Claims) and Class 8 (Insured Claims) will also receive a letter from the UCC providing its recommendation with respect to the Plan.   All other Creditors and parties-in-interest not entitled to vote on the Plan will receive the Confirmation Hearing Notice.

**IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY (A) EMAILING CAREPOINTINFO@EPIQGLOBAL.COM, (B) CALLING (888) 884-7843 (TOLL-FREE) OR (503) 610-4421 (INTERNATIONAL OR CANADA), OR (C) WRITING TO THE FOLLOWING ADDRESS: CAREPOINT HEALTH SYSTEMS INC., D/B/A JUST HEALTH FOUNDATION, C/O EPIQ BALLOT PROCESSING, 10300 SW ALLEN BLVD, BEAVERTON, OR 97005.**

**THE CLAIMS AND NOTICING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.  IF YOU BELIEVE YOU REQUIRE LEGAL ADVICE, YOU SHOULD CONSULT WITH AN ATTORNEY.**

3.      **Voting Deadlines**

In order for your Ballot to count, you must either (a) complete an electronic ballot at http://dm.epiq11.com/carepoint or (b) complete, date, sign, and deliver by: (i) first class mail, to the following address: CarePoint Health Systems, Inc. d/b/a Just Health Foundation, c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422, or (ii) by hand delivery or overnight mail to the following address: CarePoint Health Systems Inc. d/b/a Just Health Foundation, c/o Epiq Ballot Processing, 10300 SW Allen Blvd. Beaverton, OR 97005. **BALLOTS SENT BY FACSIMILE TRANSMISSION OR E-MAIL ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

Ballots must be submitted electronically, or the Claims and Noticing Agent must physically receive original ballots by mail or overnight delivery, on or before **March 3, 2025 at 4:00 p.m. (Eastern Prevailing Time)**.  Subject to the tabulation procedures approved by the Solicitation Procedures Order, you may not change your vote once a ballot is submitted electronically or once the Claims and Noticing Agent receives your original paper ballot.

Subject to the tabulation procedures approved by the Solicitation Procedures Order, any ballot that is timely and properly submitted electronically or received physically will be counted ~~and will be deemed to be cast~~ as an acceptance, rejection or abstention, as the case may be, of the Plan.

## ARTICLE VII.
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.   THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION

**A.    General Bankruptcy Law and Plan Considerations**

**1.    The Plan May Not be Accepted**

The Plan Proponents can make no assurances that the requisite acceptances to the Plan will be received, and the Plan Proponents may need to obtain acceptances to an alternative plan, or otherwise, may liquidate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Holders of Allowed Claims as those proposed in the Plan.

**2.    The Plan May Not be Confirmed**

Even if the Plan Proponents receive the requisite acceptances, there is no assurance that the Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Court determined that the Plan and the balloting procedures and results were appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Allowed Claims ultimately would receive with respect to their Claims in a subsequent plan.

**3.    Distributions to Holders of Allowed Claims Under the Plan May be Inconsistent with Projections**

Projected Distributions are based upon good faith estimates of the total amount of Claims and Interests ultimately Allowed and the assets available for Distribution. There can be no assurance that the estimated Claim amounts set forth in herein are correct. These estimates are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the assets available for Distribution may differ from current estimates due to, among other things, the successful prosecution and liquidation of the Litigation Claims. If the total amount of Allowed Claims in a Class is higher than estimated, or

77

the funds available for Distribution to such Class are lower than estimated, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

4.     **The Disposition of the Litigation Claims May Impact Unsecured Creditor Recoveries**

Depending on any defenses or counterclaims set forth by the counterparties involved with any Litigation Claims and the resolution of any appeal(s), the anticipated proceeds associated with the Litigation Claims and available to unsecured creditors may be impacted.

5.     **Objections to Classifications of Claims**

The Plan Proponents believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponents would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is ~~deemed~~determined to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. For instance, if any Holder of a Maple Unsecured Claim or a Prior Owner Claim objects to its proposed treatment under the Plan and such objection is sustained by the Court, such Holder could be treated as a Class 7 General Unsecured Claim, which could adversely affect the recoveries of other Holders of Class 7 General Unsecured Claims. There can be no assurance that the Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Plan Proponents will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately ~~deemed~~determined to be a member.  The Plan Proponents believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Plan Proponents believe that the Plan complies with the requirement of equal treatment.  To the extent that the Court finds that the Plan does not satisfy such requirement, the Court could deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

6.      **Failure to Consummate the Plan**

Article XIII of the Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date hereof, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Court.  Further, if the Plan is confirmed, there can be no assurance that the Plan will go effective.

7.      ~~**Deemed**~~ **Substantive Consolidation May Not be Approved**

Article IX.A of the Plan seeks substantive consolidation of the Debtors' assets and liabilities for the limited purposes of voting and Distribution, given the factors set forth in Article III.E above, including but not limited to the interrelated nature of the Debtors' business, the harm to creditors that may result absent such consolidation and the difficulty of allocating the proceeds of Litigation Claims on a Debtor-by-Debtor basis. However, certain creditors may object to the limited substantive consolidation of the Debtors' Estates for these purposes, which may negatively impact creditor recoveries.

8.      **Releases, Exculpation, and Injunction Provisions May Not be Approved**

Article XIV of the Plan contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and Consummation of the Plan will affect any Claim, Interest, right, or action with regard to the Debtors and certain third parties.

9.      **The Debtors' Liquidity May be Exhausted and No Alternative Financing May be Obtained Before the Effective Date**

The Debtors do not currently have sufficient cash on hand or access to financing to fund the Chapter 11 Cases beyond approximately March 14, 2025.  In the event the Plan is not confirmed before the Debtors' liquidity is exhausted and the Debtors are unable to obtain alternative financing, creditor recoveries may be materially adversely affected.

10.     **Regulatory Approvals Necessary to Consummate the Plan, the HRH Transactions or any Alternative Transaction May Not be Obtained or May be Delayed**

The Debtors operate in a highly regulated industry, subject to numerous governmental and regulatory authorities. In the event that any governmental or regulatory approvals necessary to consummate the Plan, the HRH Transactions or any Alternative Transaction are not obtained or are delayed, the Debtors may be unable to consummate the Plan and creditor recoveries may be materially adversely affected.

#124965664v1

11.     **HRH May Default on its DIP Facility Obligations or its Obligations Under the Plan**

HRH may default or otherwise fail to perform its DIP Facility obligations or its obligations under the Plan.  In either such scenario, the Debtors may be unable to consummate the Plan and creditor recoveries may be materially adversely affected.

**THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

There can be no assurance that the releases, exculpation, and injunction provisions, as provided in Article XIV.D, Article XIV.E, and Article XIV.F hereof, will be granted. Failure of the Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

**B.     Risks Associated with Forward Looking Statements**

The financial information contained in this Combined Disclosure Statement and Plan has not been audited.  In preparing this Combined Disclosure Statement and Plan, the Plan Proponents relied on financial data derived from the Debtors' Books and Records that was available at the time of such preparation. Although the Plan Proponents have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Combined Disclosure Statement and Plan, and while the Plan Proponents believe that such financial information fairly reflects the financial condition of the Debtors, the Plan Proponents are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**C.     Alternatives to Confirmation and Consummation of the Plan**

The Plan Proponents believe that the Plan affords the Holders of Claims the potential for a better realization on the Debtors' assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders. If, however, the Plan is not confirmed, the theoretical alternatives include (i) formulation of a plan or plans of liquidation under chapter 11, or (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

1.     **Alternative Plan(s) of Liquidation**

If the requisite acceptances are not received or if the Plan is not confirmed, the Plan Proponents could attempt to formulate and propose a plan or plans of liquidation.  With respect to an alternative liquidation plan, the Plan Proponents have explored various other alternatives in connection with the development and formulation of the Plan.  The Plan Proponents believe that the Plan enables the Litigation Trust Beneficiaries to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

#124965664v1

###### 2.    Liquidation under Chapter 7

If the Plan is not confirmed, the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code (voluntary by any Debtor which is a non-profit entity and voluntarily or involuntarily by any Debtor which is a for-profit entity). A chapter 7 would result in the closure of three hospitals, which would be catastrophic to the community.  Further, in a case under chapter 7 of the Bankruptcy Code, a trustee would be appointed to promptly liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the Litigation Trust Beneficiaries. The Plan Proponents believe that in a liquidation under chapter 7 of the Bankruptcy Code, before creditors received any distributions, additional administrative expenses would likely be required in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, which could cause a substantial diminution in the value of the estate.  The assets available for distribution to the Litigation Trust Beneficiaries would be reduced by such additional expenses. Further, it is unclear whether a chapter 7 trustee could pursue and appropriately maximize the value of the Litigation Claims, as such Litigation Claims are only available for the benefit of general unsecured creditors based on the Plan Proponents' negotiations with HRH.  A Chapter 7 trustee would not only lack funding to pursue Litigation Claims (*i.e.*, the Litigation Trust Seed Money), but any such Litigation Claims may also be subject to Liens, absent the concessions agreed to by HRH. Therefore, the Plan Proponents believe that the Plan enables the Litigation Trust Beneficiaries to realize the greatest possible value under the circumstances, and that, as compared to a chapter 7 liquidation, provides the best opportunity for unsecured creditor recoveries.

## ARTICLE VIII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A.    Overview

The following discussion is a summary of certain material U.S. federal income tax consequences of the Plan to the Debtors and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote on the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations promulgated and proposed thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect.  No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the Internal Revenue Service with respect to any of the issues discussed below.  The discussion below is not binding upon the Internal Revenue Service or the courts. No assurance can be given that the Internal Revenue Service would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to

81

address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Internal Revenue Code, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, certain former citizens or long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, retirement plans, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such a Claim only as a "capital asset" (within the meaning of section 1221 of the Internal Revenue Code). This summary also assumes that the Claims against the Debtors will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Internal Revenue Code (and thus are not subject to withholding under the Foreign Investment in Real Property Tax Act). This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the Internal Revenue Code) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes, or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other passthrough entity for U.S. federal income tax purposes). In the case of a Holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership. If you are a partner (or other beneficial owner) of a partnership (or other entity treated as a partnership or other pass-through entity) that is, or will be, a Holder of a Claim, then you should consult your own tax advisors.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES**

**ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO YOU. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.    Tax Consequences to U.S. Holders of Certain Allowed Claims**

**1.    Gain or Loss Recognition**

A U.S. Holder of Allowed Claims that receives Cash will be treated as receiving payment in a taxable exchange under section 1001 of the Internal Revenue Code.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest or original issue discount ("OID"), each U.S. Holder of such Claims should recognize gain or loss equal to the difference between the (a) sum of the Cash received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the Internal Revenue Code.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

**2.    Accrued Interest**

A portion of the payment received by Holders of Allowed Claims may be attributable to accrued interest on such Claims or OID. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the payment does not fully satisfy all principal and interest on Allowed Claims, the extent to which payment will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed General Unsecured Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan may be binding for U.S. federal income tax purposes, but certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal. Thus, the Internal Revenue Service could take the position that the payment received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

#124965664v1

### 3.    Market Discount

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claim (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

## C.    Tax Consequences to Non-U.S. Holders of Certain Allowed Claims

The following discussion includes only certain U.S. federal income tax consequences of the payments to Non-U.S. Holders for Claims. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the payments to such Non-U.S. Holder.

Whether a Non-U.S. Holder realizes gain or loss on the payment of a Claim and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### 1.    Gain or Loss Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the exchange occurs or who otherwise meets the so-called "substantial presence test" under Section 7701(b)(3) of the Internal Revenue Code, or (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the
United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or

84

exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's gains allocable to U.S. sources exceed losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. To claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.    Accrued Interest

The United States generally imposes a 30% U.S. federal withholding tax on payments of interest to Non-U.S. Holders. Subject to the discussion below of an interest effectively connected with the conduct of a trade or business within the United State, a Non-U.S. Holder will not be subject to the 30% U.S. federal withholding tax with respect to payments of interest on the notes, provided that:

(a)    it does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote;

(b)    it is not a "controlled foreign corporation" with respect to which we are, directly or indirectly, a "related person"; and

(c)    it provides its name and address, and certify, under penalties of perjury, that it is not a U.S. person (on a properly executed IRS Form W-8BEN or W- 8BEN-E (or other applicable form)), or it holds its notes through certain foreign intermediaries and the foreign intermediaries satisfy the certification requirements of applicable Treasury Regulations.

If you cannot satisfy the requirements described above, you will be subject to the 30% U.S. federal withholding tax with respect to payments of interest on the notes, unless you provide us (or other applicable withholding agent) with a properly executed IRS Form W-8BEN or W-8BEN-E or other applicable form claiming an exemption from or reduction in withholding under the benefit of an applicable U.S. income tax treaty.

If such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively

85

connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

### 3.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of interest on certain types of obligations. FATCA withholding may apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. U.S. Holders that hold Claims through foreign financial institutions and Non-U.S. Holders are encouraged to consult their tax advisors regarding the possible implications of these rules on their Claim.

### D.    Matters Related to the Disputed Claims Reserve

The Litigation Trustee may create a reserve for Disputed Claims, which may be treated as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections). In general, property that is subject to disputed ownership fund treatment is subject to taxation within the fund (either at C-corporation or trust rates, depending on the nature of the assets held by the fund). Under disputed ownership fund treatment, a separate federal income tax return would be filed with the IRS for the reserve for Disputed Claims with respect to any income attributable to the account, and any taxes imposed on the reserve for Disputed Claims or its assets shall be paid out of the assets of the reserve.

Although not free from doubt, U.S. Holders should not recognize any gain or loss when amounts are set aside in the reserve for Disputed Claims but should recognize gain or loss in an amount equal to: (i) the amount of Cash actually distributed to such U.S. Holder from the reserve, less (ii) the U.S. Holder's adjusted tax basis of its Claim when and to the extent Cash is actually distributed to such U.S. Holder. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. It is possible that the recognition of any loss realized by a U.S. Holder may be deferred until the reserve for Disputed Claims has made all payments to Holders of Disputed Claims. U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such Holders in respect of their Claims due to the receipt of cash in a taxable year subsequent to the taxable year in which the reserve is established. The discussion herein assumes that the installment method does not apply.

The timing of the inclusion of income may be subject to alteration for accrual method U.S. Holders that prepare "applicable financial statements" (as defined in Section 451 of the Internal Revenue Code), which may require the inclusion of income no later than the time such amounts are reflected on such financial statement.

86

E.      **Tax Consequences in Relation to the Litigation Trust**

As of the Effective Date, the Litigation Trust will be established for the benefit of the Holders of certain Allowed Claims. The tax consequences of the Plan in relation to the Litigation Trust and the Beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Litigation Trust (other than taxable income allocable to the Litigation Trust's claims reserves) among Holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Litigation Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust.  Similarly, taxable loss of the Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties as to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

For federal income tax purposes, it is intended that the Litigation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code. The Internal Revenue Service, in Revenue Procedure 94–45, 1994.28 I.R.B. 124, sets forth the general criteria for obtaining an Internal Revenue Service ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Litigation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties to the Litigation Trust (including, without limitation, the Debtors, the Litigation Trustee, and the holders of beneficial interests in the Litigation Trust) will be required to treat the transfer of the Litigation Trust Assets to the Litigation Trust as (1) a transfer of the Litigation Trust Assets (subject to any obligations relating to those assets) directly to the holders of Allowed Claims receiving interests in the Litigation Trust (other than to the extent any of the Litigation Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such holders to the Litigation Trust of the Litigation Trust Assets in exchange for interests in the Litigation Trust. Accordingly, except in the event of contrary definitive guidance, holders of Allowed Claims receiving interests in the Litigation Trust (*i.e.*, the beneficiaries of the Litigation Trust) would be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets transferred to the Litigation Trust (other than such Litigation Trust Assets as are allocable to Disputed Claims).

#124965664v1

While the following discussion assumes that the Litigation Trust will be treated as a liquidating trust for federal income tax purposes, no ruling has been requested from the Internal Revenue Service concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the Internal Revenue Service would not take a contrary position to the classification of the Litigation Trust as a grantor trust. If the Internal Revenue Service were to successfully challenge such classification, the federal income tax consequences to the Litigation Trust and the Beneficiaries thereof could materially vary from those discussed herein.

The Litigation Trustee shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the Litigation Trust. All Litigation Trust Assets held by the Litigation Trust on the Effective Date shall be ~~deemed~~considered for federal income tax purposes to have been distributed by the Debtors on a Pro Rata basis to Holders of Allowed HRH Claims and Allowed General Unsecured Claims, as applicable, and then contributed by such Holders to the Litigation Trust in exchange for the Litigation Trust Interests. Thus, such Holders (and any subsequent holders of interests in the Litigation Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Litigation Trust for all federal income tax purposes. Accordingly, each Holder of Litigation Trust Interests will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Litigation Trust.

The Litigation Trustee shall be responsible for filing any required federal, state, and local tax returns for the Litigation Trust. The Litigation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Litigation Trust shall be subject to any such withholding and reporting requirements. The Litigation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, Litigation Trust Beneficiaries complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Litigation Trust Beneficiary. Notwithstanding any other provision of the Plan, (a) each Litigation Trust Beneficiary that is to receive a Distribution from the Litigation Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Litigation Trust Beneficiary under the Plan unless and until such Litigation Trust Beneficiary has made arrangements satisfactory to the Litigation Trustee to allow it to comply with its tax withholding and reporting requirements.  Any property to be distributed by the Litigation Trust or the Litigation Trustee, as applicable, shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution to be held by the Litigation Trust or the Litigation Trustee, as applicable, until such time as the Litigation Trust or the Litigation Trustee, as applicable, is satisfied with the Litigation Trust Beneficiary's arrangements for any withholding tax obligations.

## F.    Information Reporting and Back-Up Withholding

Information reporting requirements may apply to payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to payments made pursuant to the Plan unless that

Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

The Reorganized Debtors and/or the Litigation Trustee, or the applicable agent, will withhold all amounts required by law to be withheld from payments and comply with all applicable information reporting requirements.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE IX.
## MEANS FOR IMPLEMENTATION OF THE PLAN

In addition to the provisions set forth elsewhere in the Combined Disclosure Statement and Plan, the following shall constitute the means for implementation of the Plan:

**A.**     ~~Deemed~~ **Substantive Consolidation for Limited Purposes**

**1.**     ~~Deemed~~ **Consolidation of the Chapter 11 Estates for Limited Purposes**

On the Effective Date, (i) any obligation of a Debtor and any guarantee thereof by any other Debtor shall ~~be deemed to be~~constitute one single obligation, and any such guarantee shall be eliminated, (ii) each Claim filed or to be filed against more than one Debtor shall be ~~deemed~~considered filed only against one consolidated Debtor and shall ~~be deemed~~constitute a single Claim against and a single obligation of the Debtors, and (iii) any joint or several liability of the Debtors shall be ~~deemed~~ one obligation of the Debtors. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment performance made by one Debtor as to the obligations of another Debtor shall be released and of no further force and effect.

The limited ~~deemed~~ substantive consolidation effected pursuant to this Article IX.A of the Plan and the Confirmation Order (i) shall not affect the rights of any holder of a Secured Claim with respect to the collateral securing such Claim and (ii) shall not~~, and shall not be deemed to,~~ prejudice the Litigation Claims, which shall survive entry of the Confirmation Order (subject to the releases set forth in Article XIV.D of the Plan) as if there had been no ~~deemed~~ substantive consolidation. For the avoidance of doubt, except as otherwise provided herein, after the Effective Date, each Debtor shall continue to exist as a separate entity, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective formation documents in effect before the Effective Date.

In the event the Court authorizes the Plan Proponents to substantively consolidate less than all of the Estates: (a) the Plan shall be treated as a separate plan for each Debtor not substantively consolidated and (b) the Plan Proponents shall not be required to resolicit votes with respect to the Plan.

### 2.    ~~Deemed~~ Substantive Consolidation Order

The Plan shall serve as~~, and shall be deemed to be,~~ a motion for entry of an order substantively consolidating the Chapter 11 Cases for the limited purposes of voting and Distribution.  If no objection to ~~deemed~~ substantive consolidation is timely filed and served by any holder of an Impaired Claim on or before the deadline to object to the confirmation of the Plan, or such other date as may be fixed by the Court and the Plan Proponents meet their burden of introducing evidence to establish that ~~deemed~~ substantive consolidation is merited under the standards of applicable bankruptcy law, the Confirmation Order, which shall ~~be deemed to~~ substantively consolidate the Debtors for the limited purposes of voting and Distribution, may be entered by the Court.  If any such objections are timely filed and served, a hearing with respect to the limited requested ~~deemed~~ substantive consolidation and the objections thereto shall be scheduled by the Court, which hearing shall coincide with the Confirmation Hearing.

### B.    The HRH Transactions

Subject to the potential consummation of an Alternative Transaction (described below), on the Effective Date, and except as otherwise modified herein: (i) the assets of Bayonne (other than any Litigation Claims) shall be transferred to HRH as set forth in and pursuant to the Collateral Surrender Agreement, and HRH shall be granted all rights under the Collateral Surrender Agreement;[26] (ii) HRH shall be granted the right to operate and manage Christ Hospital and HUMC as set forth in and pursuant to the Hospital Facilities MSA; and (iii) HRH shall be granted all rights under the MSA.

On the Effective Date, and as set forth in the Litigation Trust Agreement, HRH shall either transfer or provide a line of credit for the Litigation Trust Seed Money, in the amount of

---

[26]    BMC Hospital, LLC asserts that it has a right of first refusal with respect to any proposed sale of Bayonne Opco's assets, pursuant to Bayonne Opco's amended operating agreement. All rights, remedies and defenses of BMC Hospital, LLC, the Plan Proponents, and HRH with respect to such asserted right of first refusal are expressly reserved and preserved and will be address in connection with the Confirmation Hearing to the extent any dispute is not consensually resolved.

$3,500,000, to fund the Litigation Trust, secured by a first lien to the extent of the Litigation Trust Seed Money on the proceeds of the Litigation Claims. The Litigation Trustee shall have the sole and absolute discretion to determine whether to require the transfer of the Litigation Seed Trust Money at inception of the Litigation Trust or to allow a line of credit to access the Litigation Trust Seed Money. The Litigation Trust Seed Money shall bear interest at the rate of eighteen percent (18%) per annum compounded annually. The foregoing shall constitute HRH's sole monetary obligation to the Litigation Trust. The Litigation Trust Seed Money, or any portion thereof, may be prepaid by the Litigation Trustee at any time without payment of any penalty or premium of any kind.

HRH shall provide a commitment for the funds necessary to confirm and consummate the Plan, including the Litigation Trust Seed Money, not later than ten (10) calendar days prior to the scheduled confirmation hearing.

In the event that HRH fails to fund any portion of the Litigation Trust Seed Money within the one (1) business day after demand therefor, the Committee, the Litigation Trustee and/or any of the Parties may immediately contact the Mediator, who will be authorized to assist in resolving the dispute. If the Parties are unable to resolve the dispute in mediation, the Committee, the Litigation Trustee and/or any of the Parties may seek an emergency hearing with the Court, and none of the Parties may oppose, contest, or object to the hearing of such dispute on shortened notice; *provided* that all of the Parties' rights, remedies and defenses are otherwise preserved.

HRH shall be entitled to designate any third party to satisfy any portion or all of its obligations under, or allow a third party to join or grant such party participation rights with respect to, its existing or future DIP financings, as long as none of the transactions contemplated hereby are adversely affected, impeded or impaired in any manner and no estate assets are used to pay the Allowed claims of HRH or any such third party.

As set forth herein, the Plan contemplates providing HRH various consent and consultation rights and an *ex-officio* role on the Litigation Trust Oversight Committee. For the avoidance of doubt, in the event the HRH Transactions are not consummated or approved by the Court, all such provisions regarding HRH's consent and consultation rights and *ex-officio* role on the Litigation Trust Oversight Committee and all obligations of HRH with respect to the Litigation Trust shall be null and void, notwithstanding anything to the contrary herein. In such scenario, the requisite Plan modifications will be set forth in the Plan Supplement.

## C.    Litigation Claims

The Litigation Trust shall have the exclusive right and authority to investigate, commence, pursue and/or settle any Litigation Claims, with the net proceeds of such Litigation Claims to be distributed in accordance with the Plan and Litigation Trust Agreement.

The net proceeds of Litigation Claims (excluding Avoidance Action proceeds) shall first be paid to HRH until the Litigation Trust Seed Money is repaid to HRH, together with accrued interest as provided above. Thereafter, an amount equal to 100% of the net proceeds of Litigation Claims (excluding Avoidance Action proceeds) will belong to the Litigation Trust, until

91

sufficient funds are available to provide a 10% recovery to holders of Allowed General Unsecured Claims, *provided*, *however*, that such net proceeds shall not exceed $15 million. Thereafter, the next $5 million of net proceeds of Litigation Claims (excluding Avoidance Action proceeds) shall be paid to HRH. Thereafter, all remaining net proceeds of Litigation Claims (excluding Avoidance Action proceeds) shall be subject to a 65%-35% sharing arrangement between the holders of Allowed General Unsecured Claims, on the one hand, and HRH, on the other hand, until such time as all obligations under the HRH Exit Facility (including the Outstanding Judgment) are satisfied in full; *provided*, *however,* and notwithstanding anything to the contrary herein or in any document related to the Plan, that if there is a *bona fide* dispute as to whether the obligations under the HRH Exit Facility are satisfied in full through allocation of net proceeds of Litigation Claims, the amount of the Allowed HRH Claim shall be determined by agreement of HRH, the Reorganized Debtors, and the Litigation Trustee, or, in the event the parties cannot reach a consensual agreement, by Order of the Court. Thereafter, all net proceeds of Litigation Claims (excluding Avoidance Action proceeds) shall be paid to the Litigation Trust, until all Allowed General Unsecured Claims are paid in full. Upon the payment in full of all Allowed General unsecured Claims, all proceeds of Litigation Claims that would have been paid to the holders of Allowed General Unsecured Claims in this Article IX.C but for the payment in full thereof shall be paid to the Holders of Allowed Capitala Specialty Claims until all Allowed Capitala Specialty Claims are paid in full. For the avoidance of doubt, "net proceeds" shall exclude any professional fees/costs incurred and paid by the Litigation Trust in connection with the prosecution of any Litigation Claims, but shall include such professional fees/costs as may be awarded as part of the applicable judgment to be paid by a defendant or other third party.

Notwithstanding anything herein to the contrary and to avoid doubt, all proceeds of Avoidance Action actions shall belong to the Litigation Trust to be distributed to holders of Allowed General Unsecured Claims; *provided*, *however*, that if and when holders of Allowed General Unsecured Claims obtain a total forty percent (40%) recovery on account of Allowed General Unsecured Claims, then thereafter, all remaining net proceeds of Litigation Claims (specifically including Avoidance Action proceeds) shall be subject to a 65%-35% sharing arrangement between the holders of Allowed General Unsecured Claims on the one hand and HRH on the other hand; *provided*, *further*, upon the payment in full of Allowed General Unsecured Claims, all proceeds of Litigation Claims that would have been paid to the holders of Allowed General Unsecured Claims under this Article IX.C but for the payment in full thereof shall be paid to the Holders of Allowed Capitala Specialty Claims until all Allowed Capitala Specialty Claims are paid in full.

Notwithstanding anything herein to the contrary and to avoid doubt, Holders of Allowed Capitala Specialty Claims shall not receive any distribution or payment from any assets of the Litigation Trust other than the net proceeds of Litigation Claims after the payment in full of all Allowed General Unsecured Claims.

Notwithstanding anything herein to the contrary and to avoid doubt, HRH shall not share in any net proceeds of Litigation Claims after such time as all obligations under the HRH Exit Facility are satisfied in full. Once all obligations under the HRH Exit Facility are satisfied in full,

any and all rights of HRH to receive any share of net proceeds of Litigation Claims shall terminate.

The Debtors and HRH shall reasonably cooperate with the Litigation Trustee in the pursuit of the Litigation Claims.

**The Combined Disclosure Statement and Plan shall be interpreted so as to afford, for the benefit of all Holders of Allowed Claims, the greatest opportunity for maximum recovery by the Litigation Trustee on the Litigation Trust Assets and proceeds thereof, Litigation Claims and proceeds thereof, and rights in and proceeds of any applicable Insurance Policies without prejudice to the rights, if any, of any other party to such proceeds. The proceeds of Litigation Claims are material to the implementation of the Plan and maximization of recoveries to Creditors**.

## D.    Reorganization Committee Evaluation of Potential Claims Against Current D&Os

D&O Claims against the Debtors' Current D&Os shall be evaluated by the independent Reorganization Committee based upon information provided by all interested parties, including the UCC, the Litigation Trustee (which will conduct an investigation after the Effective Date to determine if any such claims exist and present the results of such investigation to the Reorganization Committee), and management. Upon their receipt of all relevant information, the Reorganization Committee shall give all such parties an opportunity to be heard to discuss whether viable claims exist and should be pursued against the Current D&Os.

No later than one hundred twenty (120) days after the Effective Date, the Reorganization Committee shall file with the Court a written determination (the "D&O Report"), consistent with the Debtors' fiduciary duties to their creditors, whether any such claims exist and should be pursued, and identifying the factual and legal predicates for the Reorganization Committee's decisions. Any party-in-interest may object to or otherwise challenge the D&O Report, subject to the following procedures:

    a.   Any objection or challenge to the D&O Report must be filed and served on the Plan Proponents no later than twenty-one (21) calendar days after the D&O Report is filed with the Court.

    b.   The Plan Proponents shall have twenty-one (21) days after service of any such objection to the D&O Report to file an opposition or response.

    c.   Any disputes that are not consensually resolved shall be decided by the Court.

Subject to resolution by the Court of any disputes regarding the D&O Report, the decision of the Reorganization Committee will be final and binding as to the Debtors, HRH and the Litigation Trustee, but will not be binding on any other party in interest.

All statutory common law immunities, including those arising under New Jersey statutes, shall remain in full force and effect. To the extent any claims against the Current D&Os are pursued, such claims and proceeds thereof shall constitute Litigation Claims. The Reorganization

#124965664v1

Committee shall not have any liability for its evaluation and decision regarding such claims. The Reorganization Committee shall continue to exist after the Effective Date for the purpose of undertaking this evaluation and decision.

**E.     Potential Alternative Transactions**

In accordance with the terms hereof, a third party may seek to overbid the proposed HRH Transactions (an "Alternative Transaction"). Any bid for a proposed Alternative Transaction must be submitted no later than the date that is twenty-one (21) calendar days after conditional approval of the Disclosure Statement (the "Bid Deadline"), with time being of the essence, such that no bids received after the Bid Deadline may be considered, except as otherwise ordered by the Court.

If the Debtors receive a qualified bid before the Bid Deadline, the Debtors shall immediately forward such bid to the Reorganization Committee, the UCC and HRH. Any bidder may reach out directly to the Reorganization Committee to discuss any potential bid.  Upon timely receipt of a qualified bid, the Reorganization Committee, in consultation with the UCC, will consider the proposed Alternative Transaction. Nothing herein prohibits the consideration of any and all bids for any or all asset of any or all of the Debtors, in whatever form.  The Reorganization Committee and the Debtors, in consultation with the UCC, will consider any and all such bids, consistent with their fiduciary duties. When determining whether a bid is higher or better, the Reorganization Committee shall consider, among other things, the qualifications of the bidder (as set forth herein), the impact on employees, the number or percentage of employees to be retained post-closing, employee claims against Debtors, the ability of the bidder to continue to own/operate Bayonne, Christ Hospital, and HUMC as part of the same system, and collective bargaining agreements.

Any proposed Alternative Transaction must be proposed by a qualified bidder and shall be in an amount at least $1 million higher than HRH's credit bid (discussed below) to take into consideration the payment of a $1 million break-up fee, due and payable to HRH, subject to Court approval, in the event of a closing of an Alternative Transaction regarding Bayonne to an alternative bidder. Additional bid increments shall be determined by the Reorganization Committee, as ordered by the Court.   A qualified bidder shall be determined by the Reorganization Committee, in consultation with the UCC,[27] and shall be a person demonstrating: (i) the financial wherewithal to consummate any proposed transaction, (ii) its ability to achieve and secure regulatory approvals and comply with the NJDOH certificate of need and licensure statutes and regulations, including the transfer of ownership requirements, as well as the Community Health Care Asset Protection Act, (iii) its ability to secure all contractual approvals to which the Debtors/their successors are subject, (iv) its agreement and wherewithal to either assume or pay off, at closing, all overpayments owed by Bayonne Medical Center to Medicare, Medicaid and their MCOs/HMOs and other government health care programs, and (v) to the extent any assets to be acquired are subject to an existing dispute or litigation, its source of litigation funding, funding of these Chapter 11 Cases necessary to consummate the contemplated Alternative Transaction, and a reasonable likelihood of success on the merits in such litigation.

---

[27] HRH shall have the right to contest or otherwise challenge the determination of a qualified bid, if any.

#124965664v1

In addition, each bid must state the bidder's intent regarding the treatment and retention of employees of the Debtors, the treatment of the Debtor's collective bargaining agreements with its various labor unions, including the Committee of Interns and Residents, including whether the bidder will provide for the assumption of those collective bargaining agreements and all attendant obligations.

For the avoidance of doubt, HRH shall be ~~deemed~~ a qualified bidder. If one or more additional qualified bids are received by the Bid Deadline, the Plan Proponents shall: (i) within two days, file with the Court a notice summarizing the qualified bids received; and (ii) conduct an auction, which shall take place six days after Bid Deadline, at the offices of co-Counsel to the UCC, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801. At the conclusion of the auction, the Debtors (by and through the Reorganization Committee), in consultation with the UCC, will select the highest or best bid for some or all of the Debtors' assets and will file a notice of successful bidder no later than the first Business Day following the conclusion of the auction. The Plan Proponents will seek approval of such proposed transaction at the Confirmation Hearing, pursuant to an amended Plan if necessary.

HRH will have the right to credit bid with regard to the Bayonne transaction. Such credit bid may include: (i) the prepetition first lien debt (approximated to be $8 million, plus interest) acquired from Capitala, (ii) amounts advanced under the Bayonne DIP (approximated to be $21 million through February 1, 2025, plus interest), (iii) any amounts actually paid or advanced for supplies, equipment, personnel and other items and services, (iv) operations/management fees in a minimum approximate amount of $3,741,612; and (v) lease arrears such that the total of (i) – (v) above shall approximate a credit bid of $32,741,612 as of December 18, 2024, it being understood and agreed the foregoing amounts will be updated at the time the need for a credit bid becomes ripe.

If there is competitive bidding, HRH has the right to seek to augment its credit bid by the Outstanding Judgment, outstanding operations/management fees, all amounts incurred, advanced, assumed or paid for or on behalf of the Debtors and other amounts or consideration, and neither the Debtors nor the UCC will oppose HRH's augmented credit bid. Nothing herein shall prejudice or otherwise waive the legal rights of any person not a Party hereto to object to any terms of the Plan or alternative process described herein. Further, nothing herein shall impede or impair the Debtors' ability to perform their fiduciary obligations.

For the avoidance of doubt, Section 2.05(a) of the Collateral Surrender Agreement is stricken from the Collateral Surrender Agreement and the "Transaction Consideration" under the Collateral Surrender Agreement shall be the credit bid of HRH described above.

Notwithstanding the foregoing or anything to the contrary herein, (i) the Allowed HRH Claims shall be ~~deemed~~ partially satisfied by a credit bid with regard to the Bayonne transaction in the amount of $32,741,612, which amount shall constitute the "Transaction Consideration" under the Collateral Surrender Agreement, and (ii) HRH shall not be entitled to receive a recovery of more than 100% of the Allowed HRH Claims.

**F.** **Sources of Consideration for Plan Distributions**

The Debtors' and/or Reorganized Debtors' Cash on hand and other Assets and the Litigation Trust Assets shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims provided pursuant to the Plan and subject to the terms provided herein.

**G.** **The Litigation Trust**

On or prior to the Effective Date, the Debtors shall enter into the Litigation Trust Agreement, in form and substance acceptable to the UCC, to establish the Litigation Trust for the purposes of investigating, prosecuting, or settling the Litigation Claims; liquidating the Litigation Trust Assets and distributing the proceeds as required under the Plan and Litigation Trust Agreement. HRH shall have the right to consent to the Litigation Trust Agreement, such consent shall not be unreasonably withheld. To the extent of any dispute regarding the proposed Litigation Trust Agreement, such dispute shall be determined by the Court.

As further described in Article X hereof, on or before the Effective Date, the Debtors and the Litigation Trustee shall sign the Litigation Trust Agreement and take all other steps necessary to establish the Litigation Trust. On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors will transfer to the Litigation Trust all of their rights, title, and interests in the Litigation Trust Assets. The Litigation Trustee shall accept all Litigation Trust Assets on behalf of the Litigation Trust Beneficiaries, and be authorized to obtain, collect, seek the turnover of, liquidate, and collect all of the Litigation Trust Assets not in its possession or control. The Litigation Trust will then be created and effective without any further action by the Court or any Person or Entity as of the Effective Date.

HRH shall be a beneficiary of the Litigation Trust and be entitled to the same rights, benefits and protections of each other beneficiary of the Litigation Trust.

**H.** **Corporate Action**

**1.** **Continued Corporate Existence**

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date, as a separate corporation, limited liability company, partnership, not-for-profit entity, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, not-for-profit entity, or other form as entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are ~~deemed to be~~ amended pursuant to the Plan and require no further action or approval.

### 2. Cancellation of Old Securities and Agreements

Except as otherwise provided in the Combined Disclosure Statement and Plan, and in any contract, instrument, or other agreement or document created in connection with the Combined Disclosure Statement and Plan, or otherwise as set forth in the HRH Transactions, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article XI hereof, any promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, other than a Claim that is being reinstated and rendered Unimpaired, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Interests shall be ~~deemed~~ canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtors under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be discharged.  The holders of or parties to such canceled notes, share certificates and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.  For the avoidance of doubt, this Article IX.H.2 shall not apply to the Practice Groups or their creditors (solely in their capacities as creditors of the Practice Groups and not in their capacities as creditors of the Debtors).

### 3. No Further Action

On the Effective Date, all matters and actions provided for under the Combined Disclosure Statement and Plan that would otherwise require approval of the directors and officers, or members, managers, or shareholders of the Debtors shall ~~be deemed to have been~~ hereby be authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the directors and officers, members, managers, or shareholders of the Debtors.

### 4. Effectuating Documents

The Reorganized Debtors and the Litigation Trustee acting pursuant to the terms and conditions of the Litigation Trust Agreement, as applicable, shall be authorized to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## I. Directors and Officers of the Reorganized Debtors

### 1. Directors/Trustees of CarePoint

CarePoint is a New Jersey not-for-profit corporation and continues to be governed by a board of directors (who are sometimes referred to as trustees).  The Board that existed pre-petition is expected to continue after the Effective Date, subject to expiry of terms/appointments and re-elections. During the Chapter 11 Cases, the Board added three new directors and appointed those new directors to the Reorganization Committee, which oversees the Debtors' reorganization efforts.  Those new directors are the Honorable Judith Fitzgerald (Ret.), the Honorable Kevin Gross (Ret.), and Clifford A. Zucker of FTI Consulting.  Those new

97

directors are expected to be phased out after the Reorganization Committee issues the D&O Report and any disputes (if any) regarding the D&O Report are consensually resolved or decided by the Court in accordance with Article IX.D hereof. Other than the phase out of the new directors, there is no change in the Board anticipated, subject to expiry of terms/appointments and re-elections. On the Effective Date, it is anticipated that Yan Moshe, the principal of HRH, will become Chairman of the Board.

### 2. Officers

Dr. Moulick was and remains CEO of the Debtors. Prior to the Petition Date, the Debtors entered into the MSA with HRH to create an affiliation among the Debtors' Hospitals and HRH's hospital at Secaucus. Under the MSA, the four affiliated hospitals remain independently owned and operated but agree to share services where it is appropriate and efficient to do so. Such shared services include, purchasing, negotiation of payer rates, and management of the residency programs. These shared services (which are specified in detail in the MSA, which is filed on the docket at D.I. 19) are provided by a newly-formed master service organization ("MSO"). The MSO will be owned 50%-50% by CarePoint and HRH. Once implemented after the bankruptcy, Dr. Moulick will resign as the CEO of the reorganized Debtors and be employed by the MSO at his existing salary of $1.75 million per year. Dr. Nizar Kifaieh will become CEO of the Reorganized Debtors.

Shamiq Syed will remain the CFO of the Reorganized Debtors at his existing salary. Richard Sarli, the Senior Vice President of Finance, has separated from CarePoint and will not be employed by the Reorganized Debtors.

## J. Books and Records

On or before the Effective Date, the Debtors shall transfer their Books and Records that relate to the operation of the Litigation Trust or the Litigation Trust Assets to the Litigation Trust. As soon as practicable after the Litigation Trust makes the final Distribution under the Plan and the Litigation Trust Agreement and has complied with and fulfilled its obligations under the Plan, the Litigation Trustee shall be free, in its discretion, to abandon, destroy, or otherwise dispose of the books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other or further Court Order. For the avoidance of doubt, nothing herein impairs or adversely affects the rights of ~~Garden State Healthcare Associates, LLC and/or New Jersey Medical and Health Associates, LLC~~the Practice Groups with regard to their respective books and records and all ~~such~~their respective books and records shall be preserved and all their rights are expressly reserved and preserved.

## K. UCC Dissolution

The UCC shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Bankruptcy Code section 1103 and shall perform such other duties as it may have been assigned by the Court prior to the Effective Date. Upon the occurrence of the Effective Date, the UCC shall dissolve automatically, whereupon their members, professionals, and agents shall be discharged and released from any duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to

(i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) prosecuting applications for payment of fees and reimbursement of expenses of its Professionals or attending to any other issues related to applications for payment of fees and reimbursement of expenses of its Professionals, (iii) any motions or motions for other actions seeking enforcement of implementation of the provisions of the Plan, and (iv) prosecuting or participating in any appeal of the Confirmation Order or any request for reconsideration thereof.

## L.    Accounts and Reserves

### 1.    Litigation Trust Account

On or prior to the Effective Date, the Litigation Trust Account will be established and maintained in one or more federally insured domestic banks in the name of the Litigation Trust. Cash deposited in the Litigation Trust Account will be invested, held and used solely as provided in the Litigation Trust Agreement. The Litigation Trustee is authorized to establish additional Litigation Trust Accounts after the Effective Date, consistent with the terms of the Litigation Trust Agreement.

After the funding of the Litigation Trust Account on the Effective Date, the Litigation Trust Account will be funded, as applicable, by Cash proceeds obtained through prosecution or settlement of the Litigation Claims, by additional draws of the Litigation Trust Seed Money, if applicable, or otherwise in accordance with the Plan and Litigation Trust Agreement.

Upon obtaining an order of the Court authorizing final Distribution and/or closure of the Debtors' Chapter 11 Cases, any funds remaining in the Litigation Trust Account shall be distributed in accordance with the Plan and the applicable Litigation Trust Agreement, and the Litigation Trust Account may be closed.

### 2.    Professional Fee Reserve

As soon as practicable after Confirmation and not later than the Effective Date, the Debtors or Reorganized Debtors shall set aside Cash in the Amount of the Professional Fee Estimate, which Cash shall be used to fund the Professional Fee Reserve. The Professional Fee Reserve shall be maintained by the Reorganized Debtors in trust for the Professionals, shall not be considered property of the Reorganized Debtors, and shall be used solely to pay the Allowed Professional Fee Claims. The Reorganized Debtors shall segregate and shall not commingle the Cash held in the Professional Fee Reserve.  The Reorganized Debtors shall pay each Professional Fee Claim within two business days after such Professional Fee Claim becomes an Allowed Claim, upon entry of a Final Order allowing such Claim.

Once all Allowed Professional Fee Claims have been paid in full, any excess Cash remaining in the Professional Fee Reserve shall be released from trust and available for use by the Reorganized Debtors. To the extent that the Professional Fee Reserve is not sufficient to satisfy in full all Allowed Professional Fee Claims, such Allowed Claims shall nevertheless be paid in full by the Reorganized Debtors.

#124965664v1

Only Professionals employed in the Chapter 11 Cases by the Debtors, the UCC or the PCO shall be entitled to payment from the Professional Fee Reserve.

### 3.    Administrative Expense Claims Reserve

On or before the Effective Date, the Debtors shall transfer to the Litigation Trust Cash in the Amount of the Administrative and Priority Claims Estimate, which Cash shall be used by the Litigation Trustee to fund the Administrative Expense Claims Reserve.  The Cash so transferred shall not be used for any purpose other than to pay Allowed Administrative Expense Claims (except Professional Fee Claims, which shall be paid from the Professional Fee Reserve) and Allowed Priority Claims.

The Litigation Trustee shall pay each Administrative Expense Claim (except Professional Fee Claims, which shall be paid from the Professional Fee Reserve) and Priority Claim from the Administrative Expense Claims Reserve on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim.  After all Administrative Expense Claims (except Professional Fee Claims) and Priority Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Litigation Trustee, any remaining Cash in the Administrative Expense Claims Reserve shall be transferred to the Reorganized Debtors. To the extent that the Administrative Expense Claims Reserve is not sufficient to satisfy in full all Allowed Administrative Expense Claims (except Professional Fee Claims, which shall be paid from the Professional Fee Reserve) and Priority Claims, such Allowed Claims shall nevertheless be paid in full by the Reorganized Debtors.

### 4.    Other Reserves

The Reorganized Debtors or Litigation Trust, as applicable, shall establish and administer any other necessary reserves that may be required under the Plan or Litigation Trust Agreement, including the Disputed Claims Reserve.

## M.    Exemption from Certain Transfer Taxes

Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant hereto shall not be subject to any stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, personal property tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be ~~deemed~~interpreted to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming and assigning any contract, lease or sublease; (3) any transaction authorized by the Plan; (4) any sale of an asset by the Litigation Trustee in furtherance of the Plan; and (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan.

**N.      Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan, the Litigation Trust Agreement, or in any agreement, instrument, or other document incorporated into the Plan or the Plan Supplement (including the HRH Transactions), on the Effective Date, pursuant to section 1141 of the Bankruptcy Code, all property of the Debtors' Estates other than the Litigation Trust Assets shall vest in the Reorganized Debtors, free and clear of all Claims, Liens encumbrances and interests. From and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and use, acquire and dispose of property without supervision by the Court and free of any restrictions on of the Bankruptcy Code, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

**O.      Applicability of Bankruptcy Code Sections 1145 and 1125(e)**

Under Bankruptcy Code section 1145, the issuance of any securities under the Plan (if applicable) shall be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities. If the Reorganized Debtors or Litigation Trustee determines, with the advice of counsel, that the Litigation Trust or the Reorganized Debtors are required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, in connection with the distribution of any securities, then the Litigation Trustee shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the SEC.

**P.      Preservation of Litigation Claims**

In accordance with Bankruptcy Code section 1123(b), the Litigation Trust shall retain and may enforce all rights to commence and pursue, as appropriate, the Litigation Claims, and the Litigation Trust's rights to commence, prosecute, or settle such Litigation Claims shall be preserved notwithstanding the occurrence of the Effective Date.

Notwithstanding anything to the contrary in any prior orders of the Court, including, without limitation, the Interim DIP Orders, the deadline for the Litigation Trustee to assert or commence any Litigation Claim, including, without limitation, any challenge or objection of any kind or nature to the amount, validity, extent, priority or perfection of any claims, liens or security interests asserted by any party other than the Released Parties, including, without limitation, Maple, the Prior Owners, and CarePoint Health Captive Assurance Company, LLC, shall be governed by sections 108 and 546 of the Bankruptcy Code and otherwise applicable law.

The Litigation Trust may pursue such Litigation Claims, as appropriate, in accordance with the best interests of the Litigation Trust Beneficiaries. No Person or Entity may rely on the absence of a specific reference in the Combined Disclosure Statement and Plan to any Litigation Claims against them as any indication that the Litigation Trust shall not pursue any and all available Litigation Claims against them. Unless any Litigation Claims are expressly waived, relinquished, exculpated, released, compromised, or settled in the Combined Disclosure Statement and Plan or other Court Order, the Litigation Trust expressly reserves all such Litigation Claims for later adjudication, and, therefore, no preclusion doctrine, including the

#124965664v1

doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppels (judicial, equitable, or otherwise), or laches, shall apply to such Litigation Claims as a consequence of the Confirmation or Consummation.

Except as provided in Article XIV hereof, nothing contained herein shall be deemedconstitute a waiver or relinquishment of any claims or Causes of Action of the Debtors or the Estates or any Litigation Claims that are not settled with respect to Allowed Claims or specifically waived or relinquished hereunder (collectively, along with the proceeds thereof, the "Retained Causes of Action"). The Retained Causes of Action preserved hereunder include, without limitation, the following claims, rights, or other Causes of Action:

(i)      claims and Causes of Action (including, but not limited to, tort claims and D&O Claims), against any other party not expressly released or enjoined under this Plan;

(ii)     Avoidance Actions, including, without limitation, against recipients of transfers disclosed in the Debtors' Schedules during the 90-day period and/or one-year period preceding the Petition Date, as applicable;

(iii)    relating to pending litigation, including, without limitation, the suits, administrative proceedings, executions, garnishments, and attachments listed in the Debtors' Schedules;

(iv)     claims and Causes of Action against the Prior Owners or any former owner or Person in control of the Debtors, including, without limitation, claims and Causes of Action based on preferential or fraudulent transfers, equitable subordination, recharacterization, improper dividends, pre-Petition Date operations or mismanagement, or any other misconduct;

(v)      claims and Causes of Action against any of the Debtors' former professionals, consultants or any other advisors who are not expressly released pursuant to the Plan;

(vi)     D&O Claims arising from prepetition operations, mismanagement or breach of any applicable fiduciary duty or law, including, without limitation failure to remit payroll, withholding, trust fund, or other taxes;

(vii)    against vendors, suppliers of goods or services (including attorneys, accountants, consultants, or other professional service providers), utilities, contract counterparties, and other parties for, including but not limited to: (A) services rendered; (B) over- and under-payments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, setoff, or recoupment; (C) failure to fully perform or to condition performance on additional requirements under contracts with the Debtor; (D) wrongful or improper termination, suspension of services, or supply of goods, or failure to meet other contractual or regulatory obligation; (E) indemnification and/or warranty claims; or (F) turnover Causes of Action arising under §§ 542 or 543;

102

(viii)   against health plans, payors, and other related providers;

(ix)    related to third-party non-Debtor's violations of antitrust, unfair competition, or similar laws, including for the avoidance of doubt, any claims or Causes of Action against RJW Barnabas and any of its Affiliates or subsidiaries;

(x)     against landlords or lessors, including, without limitation, for erroneous charges, overpayments, returns of security deposits, indemnification, or for environmental claims;

(xi)    arising against current or former tenants or lessees, including, without limitation, for non-payment of rent, damages, and holdover proceedings;

(xii)   arising from damage to the Debtors' property;

(xiii)  relating to claims, rights, or other Causes of Action the Debtors may have to interplead third parties in actions commenced against the Debtors;

(xiv)   for collection of a debt or other amount owed to the Debtors;

(xv)    all Litigation Claims;

(xvi)   all rights and claims arising under sections 506(c) and 552(b) of the Bankruptcy Code;

(xvii)  all rights under the equitable doctrine of marshalling or any similar remedy or doctrine with respect to collateral; and

(xviii) against insurance carriers, reinsurance carriers, underwriters, surety bond issuers or other related or similar parties relating to coverage, indemnity, contribution, reimbursement, or other matters.

**Except as otherwise expressly provided in the Plan, any and all claims and Causes of Action of the Debtors and the Estates are preserved under the Plan.**

**This Plan shall be interpreted so as to afford, for the benefit of all Holders of Allowed Claims, the greatest opportunity for maximum recovery by the Litigation Trustee on the Litigation Trust Assets and proceeds thereof, Litigation Claim (including, but not limited to, D&O Claims, tort claims and Avoidance Actions) and proceeds thereof, and rights in and proceeds of any applicable Insurance Policies.  The proceeds of Litigation Claims (including, but not limited to, D&O Claims, tort claims and Avoidance Actions) are material to the implementation of this Plan and the recoveries to Creditors**.

**Q.     Provider Agreements**

On the Effective Date, all of the Debtors' Medicare and Medicaid provider agreements relating to Christ Hospital and HUMC shall be assumed by the Reorganized Debtors and the

#124965664v1

Reorganized Debtors shall be solely responsible for any claims or financial obligations arising thereunder and the Litigation Trust shall have no responsibility for any claims or financial obligations arising thereunder. On or as soon as practicable after the Effective Date, all of the Debtors' Medicare and Medicaid provider agreements relating to Bayonne shall be transferred to HRH or its Affiliates and HRH or its Affiliates shall be solely responsible for any claims or financial obligations arising thereunder and the Litigation Trust shall have no responsibility for any claims or financial obligations arising thereunder.

**R.    Establishment of Claims Bar Dates**

**1.    The General Claims Bar Date and Governmental Claims Bar Date**

The deadlines for Governmental Units and non-Governmental Units to file Proofs of Claim against any Debtor for Claims arising before the Petition Date were established in the Bar Date Order. The General Claims Bar Date and Governmental Claims Bar Date shall apply to all Claims against any of the Debtors that arose before the Petition Date, including, but not limited to, Claims against the Debtors arising under section 503(b)(9) of the Bankruptcy Code.

**2.    The Administrative Expense Claims Bar Date**

The deadline for any Creditor to file requests for payment of Administrative Expense Claims (other than a Professional Fee Claim or any Statutory Fees) shall be 30 days after the Effective Date; provided that Professional Fee Claims shall be subject to the Professional Fee Claims Bar Date.

**S.    HRH Entity Absolute Subordination**

Notwithstanding anything to the contrary, the terms of the HRH Subordination Stipulation and HRH Entity Absolute Subordination are incorporated into the Plan and shall remain binding in all respects from and after the Effective Date.

**ARTICLE X.**
**PROVISIONS REGARDING THE LITIGATION TRUST**

**A.    Establishment and Administration of the Litigation Trust**

On the Effective Date, the Debtors and the Litigation Trustee shall sign the Litigation Trust Agreement and, in its capacity as such, the Litigation Trustee shall accept all Litigation Trust Assets on behalf of the Litigation Trust Beneficiaries, and be authorized to obtain, collect, seek the turnover of, liquidate, and collect all of the Litigation Trust Assets not in its possession or control. The Litigation Trust will then be created and effective without any further action by the Court or any Person or Entity as of the Effective Date.

The Litigation Trust shall be established for the primary purposes of liquidating the Litigation Trust Assets and making Distributions in accordance with the Plan and the Litigation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business,

104

except only in the event and to the extent necessary to, and consistent with, the liquidating purpose of the Litigation Trust.

## B.      The Litigation Trust Oversight Committee

The Litigation Trust shall be overseen by a five-member oversight committee (the "Litigation Trust Oversight Committee"), consisting of five (5) members designated by the UCC. The Litigation Trust Oversight Committee shall oversee the Litigation Trust and the Litigation Trustee, as set forth herein and in the Litigation Trust Agreement. The Litigation Trustee shall report to the Litigation Trust Oversight Committee from time to time. HRH shall be an *ex-officio* member of the Litigation Trust Oversight Committee to provide usual and customary communication and participation to be agreed upon with the Litigation Trustee to include rights to attend meetings, conferences, receive contemporaneous communications, be a part of deliberations and receive notice, subject to a recusal policy for all members of the Litigation Trust Oversight Committee.

## C.      Litigation Trust Assets

On the Effective Date,  the Reorganized Debtors shall transfer and assign to the Litigation Trust all of their right, title, and interest in and to all of the Litigation Trust Assets and in accordance with Bankruptcy Code section 1141, all such assets shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, and other interests, subject only to the interests of the Litigation Trust Beneficiaries in the Litigation Trust Assets and the Litigation Trust Expenses, as set forth in the Plan and the Litigation Trust Agreement; *provided*, *however*, that notwithstanding anything in the Plan to the contrary, the transfer of the Litigation Claims that are subject to the Collateral Sharing Agreement to the Litigation Trust shall be without prejudice to the right of Maple to continue to assert a security interest in such Litigation Claims and without prejudice to the rights of the Litigation Trustee to challenge, object to or otherwise contest any such security interest, and all of the Litigation Trustee's rights, claims, defenses and remedies with respect to the Collateral Sharing Agreement or otherwise are expressly reserved and preserved.  After such transfer, the Debtors shall not have any interest in or with respect to the Litigation Trust Assets.

On the Effective Date, in connection with the transfer and assignment of the rights, claims, and Causes of Action that constitute Litigation Trust Assets to the Litigation Trust, any attorney-client privilege, work-product doctrine, or other privilege or immunity attaching to any documents or communications (whether written, electronic, or oral) transferred to, or otherwise acquired by, the Litigation Trust pursuant to the terms of the Plan or otherwise shall vest in the Litigation Trustee and the representatives of the Litigation Trust, and the Litigation Trustee shall be authorized to take any actions to the extent necessary to effectuate the transfer of such privileges and rights attendant thereto. The Litigation Trustee's receipt of all such privileges shall not operate as a waiver of any other privileges or immunities possessed or retained by the Debtors. The Litigation Trustee's disclosure of any privileged documents or information to the members of the Litigation Trust Oversight Committee or any *ex-officio* members of the Litigation Trust Oversight Committee in connection with their duties under the Plan or the

#124965664v1

Litigation Trust Agreement shall not result in any waiver of such privileged documents, communications or information.

**D.      Other Funds to be Transferred to the Litigation Trust**

Pursuant to Article IX.L.3 hereof, on or before the Effective Date, in the event that the Reorganized Debtors elect not to assume Allowed Administrative Expense Claims and Allowed Priority Claims, the Debtors shall transfer from the proceeds of the HRH Exit Facility Cash in the amount of the Administrative and Priority Claims Estimate, which Cash shall be used by the Litigation Trustee to fund the Administrative Expense Claims Reserve. The Debtors shall not transfer proceeds of the collateral of any secured party to the Litigation Trust or otherwise distribute such proceeds to Holders of General Unsecured Claims absent further order of the Court or agreement of the parties.

**E.      Litigation Trust Distributions and Expenses**

Distributions from the Litigation Trust shall be made from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement. Such Distributions shall be made after paying, reserving against, or satisfying, among other things, the operating and administrative expenses of the Litigation Trust, including but not limited to all costs, expenses, and obligations incurred by the Litigation Trustee (or professionals who may be employed by the Litigation Trustee in administering the Litigation Trust) in carrying out their responsibilities to the Litigation Trust under the Litigation Trust Agreement, or in any manner connected, incidental, or related thereto.  For the avoidance of doubt, the Litigation Trust Expenses shall be paid from the Litigation Trust Assets.

**F.      Appointment of the Litigation Trustee**

The identity of the Litigation Trustee shall be disclosed in the Plan Supplement, and shall be selected by the UCC, in consultation with the Debtors and HRH.  HRH shall have the right to consent to the selection of the Litigating Trustee, such consent not to be unreasonably withheld. To the extent of any dispute regarding the selection of the Litigation Trustee, such dispute shall be determined by the Court. The appointment of the Litigation Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.  The Litigation Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and Litigation Trust Agreement.

The Litigation Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court. The Litigation Trustee shall only be removed upon a Final Order of the Court determining that the Litigation Trustee engaged in gross negligence or willful misconduct. On the Effective Date, all Litigation Trust Beneficiaries of the Litigation Trust shall be ~~deemed to have ratified and become~~ bound by the terms and conditions of the Litigation Trust Agreement. In the event that the Litigation Trustee resigns or is removed, terminated, or otherwise unable to serve as Litigation Trustee, then successors shall be appointed as set forth in the Litigation Trust Agreement.  Any successor Litigation Trustee appointed shall be bound by and comply with the terms of the Plan, the Confirmation Order, and the Litigation Trust Agreement.

Following the Effective Date, the Litigation Trustee shall also be, and shall enjoy the powers of, the Debtors' authorized representative for all purposes, including, without limitation, Bankruptcy Code section 1123.  No further proof of such power shall be necessary or required.

## G.    Litigation Trust Beneficiaries

Holders of HRH Claims and General Unsecured Claims entitled to receive Distributions pursuant to the terms of the Plan, whether or not such Claims are Allowed as of the Effective Date, shall be the Litigation Trust Beneficiaries and shall be bound by the Litigation Trust Agreement.

## H.    Litigation Trust Interests

On the Effective Date, each Holder of an Allowed HRH Claim and Allowed General Unsecured Claim shall, by operation of the Plan, receive its Pro Rata share of the Litigation Trust Interests, as set forth in Article V above.  Litigation Trust Interests shall be reserved for Holders of Disputed General Unsecured Claims and issued by the Litigation Trust to, and held by the Litigation Trustee in, the Disputed Claims Reserve pending allowance or disallowance of such Claims. No other entity shall have any interest, legal, beneficial or otherwise, in the Litigation Trust Assets upon the assignment and transfer of such assets to the Litigation Trust.

The Litigation Trust Interests shall be uncertificated and shall be nontransferable except upon death of the Holder or by operation of law.  Holders of Litigation Trust Interests, in such capacity, shall have no voting rights with respect to such interests.

As set forth in the Litigation Trust Agreement, Distributions from the Litigation Trust on account of Litigation Trust Interests shall be made from the Litigation Trust Assets and Litigation Trust Proceeds after paying, reserving against or satisfying, among other things, the operating and administrative expenses of the Litigation Trust, including but not limited to all costs, expenses and obligations incurred by the Litigation Trustee (or professionals who may be employed by the Litigation Trustee in administering the Litigation Trust) in carrying out their responsibilities under the Litigation Trust Agreement, or in any manner connected, incidental or related thereto.

#124965664v1

## I.    Certain Powers and Duties of the Litigation Trust and Litigation Trustee

### 1.    Powers and Duties of the Litigation Trust

The Litigation Trustee shall ~~be deemed~~constitute the Estates' representative in accordance with Bankruptcy Code section 1123 and shall have all the rights and powers set forth in the Litigation Trust Agreement, including, without limitation, the powers of a trustee under Bankruptcy Code sections 704 and 1106 and Bankruptcy Rule 2004, in addition to any powers granted by law or conferred to it by any other provision of the Plan, including without limitation any set forth herein; *provided, however*, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Litigation Trustee to act as specifically authorized by any other provision of the Plan, the Litigation Trust Agreement, and/or any applicable law, and to act in such manner as the Litigation Trustee may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Litigation Trustee or provided herein, to conserve and protect the Litigation Trust and the Litigation Trust Assets, or to confer on the Litigation Trust Beneficiaries the benefits intended to be conferred upon them by the Plan.

The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include the authority, power, and responsibility, among other things, to, subject to the terms of the Litigation Trust Agreement, (a) receive, manage, invest, supervise, and protect Litigation Trust Assets; (b) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Litigation Trust Agreement; (c) pay taxes or other obligations incurred by the Litigation Trust and issue to employees or other Persons, and/or file with the appropriate Governmental Units, applicable tax and wage returns and forms; (d) investigate, prosecute, settle, abandon, or compromise any Litigation Claims without any further notice to or action, order, or approval by the Court; (e) resolve issues involving Claims and Interests in accordance with the Plan, including the power to object to Claims against the Debtors, and to subordinate and recharacterize Claims by objection, motion, or adversary proceeding against the Debtors without any further notice to or action, order or approval by the Court; (f) investigate, prosecute, settle, abandon, or compromise any Litigation Claims without further notice to or action, order, or approval by the Court; (g) resolve all Disputed Claims and any Claim Objections pending as of the Effective Date and, without Court approval, settle, compromise, withdraw, or resolve in any manner such Disputed Claims and Claim Objections; (h) prosecute any Objections to Claims and Disputed Claims that the Litigation Trustee deems appropriate and, without Court approval, settle, compromise, withdraw, or resolve in any manner such objections; (i) make Distributions from the Litigation Trust to Holders of Allowed Claims as provided for in the Plan and the Litigation Trust Agreement; (j) establish and administer any necessary reserves that may be required, including the Disputed Claims Reserve and the Administrative Expense Claims Reserve; (k) employ and compensate counsel or other advisors to assist in the performance of its duties, which counsel may include any counsel who has represented the UCC during the pendency of the Chapter 11 Cases, *provided, however*, that any such compensation shall be made only out of the Litigation Trust Assets and Litigation Trust Proceeds; (l) file all necessary federal, state and local tax returns of the Litigation Trust; (m) undertake all administrative functions of the Chapter 11 Cases; and (n) take such other action as may be vested in or assumed by the Litigation Trustee consistent with the Plan, the Litigation Trust Agreement, and any

#124965664v1

applicable Orders of the Court, or as may be necessary and proper to carry out the provisions of the Plan.

The Litigation Trust Agreement will provide that decisions regarding the prosecution, compromise, defense of counterclaims, third-party claims or cross-claims, abandonment and/or settlement of any Cause of Action that seeks recovery (or defense – but not including general unsecured claims) or is otherwise reasonably valued at, equal to, or greater than $1,000,000 or settlement of any Disputed Claim where the amount in dispute is equal to or greater than $1,000,000 shall require HRH's consent, such consent not to be unreasonably withheld.  The Litigation Trust Agreement will also provide that, to the extent that any proposed settlement may bind, or affect the continued operations of the Debtors or their assets, HRH shall have approval rights to address such issues or concerns, such approval not to be unreasonably withheld.  To the extent of any dispute regarding HRH's consent rights as aforesaid, such dispute shall be determined by the Court (or the Mediator, if the parties then agree in writing to the extent applicable).

The Litigation Trust Agreement may establish certain powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Litigation Trust as a liquidating trust for United States federal income tax purposes.

The Litigation Trustee has full authority to take any steps necessary to administer the Litigation Trust Agreement, including without limitation, the duty and obligation to liquidate Litigation Trust Assets, to make Distributions therefrom in accordance with the provisions of the Plan and to pursue, settle or abandon any Litigation Claims, all in accordance with the Litigation Trust Agreement.

For the avoidance of doubt, upon the occurrence of the Effective Date, the Litigation Trustee shall automatically be granted, have, and be vested with exclusive standing and authority to: (i) bring and prosecute any Litigation Claims in a court of competent jurisdiction in the name of the Litigation Trust or in the name of the applicable Debtors as the Estates' representative in accordance with section 1123 of the Bankruptcy Code (whichever the Litigation Trustee may determine is most favorable to maximizing recoveries for the benefit of Litigation Trust Beneficiaries), notwithstanding any anti-assignment provisions under otherwise applicable law; and (ii) negotiate, settle, waive, or otherwise resolve any Litigation Claims. The Litigation Trustee shall have the right to freely amend the named plaintiff in any lawsuits asserting Litigation Claims if the Litigation Trustee determines that such amendment is necessary to maximize recoveries for the benefit of Litigation Trust Beneficiaries.

For the further avoidance of doubt, upon the Effective Date, the Litigation Trustee shall automatically be: (a) deemed constitute a representative of the Debtors and the Estates with respect to all Litigation Claims and any related Insurance Policies; and (b) be granted and have the right to control any and all privileges and protections on behalf of the Debtors, the UCC and the Estates with respect to all Litigation Claims.

2.      **Books and Records**

On the Effective Date, the Litigation Trust shall: (a) take possession of all books, records, and files of the Debtors and the Estates that relate to the operation and business of the Litigation Trust or the Litigation Trust Assets; and (b) provide for the retention and storage of such books, records, and files until such time as the Litigation Trustee determines, in accordance with the Litigation Trust Agreement, that retention of same is no longer necessary or beneficial.

3.      **Investments of Cash**

The Litigation Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code section 345 or in other prudent investments, *provided, however*, that such investments are permitted to be made by a Litigation Trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

4.      **Term of the Litigation Trust**

The Litigation Trust will terminate on the earlier of the: (a) final liquidation, administration, and Distribution of the Litigation Trust Assets in accordance with the terms of the Plan and the Litigation Trust Agreement, and its full performance of all other duties and functions as set forth in the Plan or the Litigation Trust Agreement; and (b) the fifth anniversary of the Effective Date. Notwithstanding the foregoing, multiple fixed term extensions can be obtained so long as Court approval is obtained within six months before or after the expiration of the term of the Litigation Trust and each extended term, in the discretion of the Litigation Trustee.  Notwithstanding any such termination, the Litigation Trustee shall have the power to: (a) take all actions necessary to its full performance of all duties and functions as set forth in the Plan or the Litigation Trust Agreement, including without limitation, the authority, power, and responsibility to investigate, prosecute to Final Order, litigate, settle, abandon or compromise any Litigation Claims without further notice to or action, order, or approval of the Court; and (b) seek to obtain a *nunc pro tunc* extension of the term of the Litigation Trust. For the avoidance of doubt, the Litigation Claims shall survive any termination of the Litigation Trust and shall remain unaffected by any termination of the Litigation Trust and may be pursued and prosecuted through Final Order during any period of winding up the Litigation Trust, as set forth in the Litigation Trust Agreement. After (a) the final Distributions pursuant to the Plan, (b) the filing by or on behalf of the Litigation Trust of a certification of dissolution with the Court, and (c) any other action ~~deemed~~considered appropriate by the Litigation Trustee, the Litigation Trust shall be ~~deemed~~ dissolved for all purposes without the necessity for any other or further actions.

## ARTICLE XI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      **Distributions on Allowed Claims**

Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date or become Allowed Claims thereafter, other than Class 6 or Class 2 Claims, shall be made by the Disbursing Agent pursuant to the terms and conditions of the Plan and the

Litigation Trust Agreement.  Notwithstanding any other provision of the Plan to the contrary, no Distribution shall be made on account of any Allowed Claim or portion thereof that (1) has been satisfied after the Petition Date; (2) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a Proof of Claim has not been timely Filed; or (3) is evidenced by a Proof of Claim that has been amended by a subsequently Filed Proof of Claim.

## B.  Disbursing Agent

The Disbursing Agent shall make all Distributions, other than those to Class 6 or Class 2 Claims, required under the Plan, subject to the terms and provisions of the Plan and the Litigation Trust Agreement.  If the Disbursing Agent is an independent third party designated to serve in such capacity, such Disbursing Agent shall receive, without further Court approval, reasonable compensation from the Debtors for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses.  No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties. The Disbursing Agent shall be authorized and directed to rely upon the Debtors' Books and Records and the Debtors' and Litigation Trust's representatives and professionals in determining Allowed Claims entitled to Distributions under the Plan in accordance with the terms and conditions of the Plan.

## C.  Delivery of Distributions and Undeliverable or Unclaimed Distributions

### 1.  Delivery of Distributions in General

Distributions to Holders of Allowed Claims shall be made (a) at the addresses set forth on the Proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, after sufficient evidence of such addresses as may be requested by the Disbursing Agent is provided, (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address, (d) at the addresses set forth in the other records of the Debtors or the Disbursing Agent at the time of the Distribution, or (e) in the case of the Holder of a Claim that is governed by an agreement and is administered by an agent or servicer, at the addresses contained in the official records of such agent or servicer.

In making Distributions under the Plan, the Disbursing Agent may rely upon the accuracy of the claims register maintained by the Claims and Noticing Agent in the Chapter 11 Cases, as modified by any Final Order of the Court disallowing Claims in whole or in part.

### 2.  Undeliverable Distributions

If a Distribution to any Holder of an Allowed Claim is returned as "undeliverable" or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address and such Holder provides sufficient evidence of such address as may be requested by the Disbursing Agent, at which time all missed Distributions shall be made to such Holder without interest, subject to the time limitations set forth below. Undeliverable Distributions shall remain in the possession of

111

the Litigation Trustee until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution. Nothing contained in the Combined Disclosure Statement and Plan or the Litigation Trust Agreement shall require the Debtors, the Litigation Trust, the Litigation Trustee, or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### 3. Unclaimed Distributions

Any Cash or other property to be distributed under the Plan shall revert to the Litigation Trustee and/or the Litigation Trust, as applicable, if it is not claimed by the Entity on or before the Unclaimed Distribution Deadline. If such Cash or other property is not claimed on or before the Unclaimed Distribution Deadline, the Distribution made to such Entity shall be ~~deemed to be~~ reduced to zero.

In the case of undeliverable or Unclaimed Distributions on account of Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims, any Cash otherwise reserved for undeliverable or Unclaimed Distributions shall revert to the Administrative Expense Claims Reserve. In the case of undeliverable or Unclaimed Distributions on account of Litigation Trust Interests, any Cash otherwise reserved for undeliverable or Unclaimed Distributions shall revert to the Litigation Trust, and all title to and all beneficial interests in the Litigation Trust Assets represented by any such undeliverable Distributions shall revert to and/or remain in the Litigation Trust and shall be distributed in accordance with the Litigation Trust Agreement and the Plan. The reversion of such Cash to the Administrative Expense Claims Reserve or the Litigation Trust, as applicable, shall be free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be treated in accordance with the terms of the Plan and the Litigation Trust Agreement.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or Unclaimed Distribution within 90 days after the date such Distribution was made shall ~~be deemed to have forfeited~~ forfeit its Claim for such undeliverable or Unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or Unclaimed Distribution against the Reorganized Debtors, the Debtors, their Estates, the Litigation Trustee, the Litigation Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its or their property.

If there is any residual unclaimed property at the time of dissolution of the Litigation Trust, such residual unclaimed property shall be available for a subsequent Distribution on a Pro Rata basis to other Litigation Trust Beneficiaries or donated to a charitable organization at the sole discretion of the Litigation Trust or the Litigation Trustee, as applicable.

### D. Timing of Distributions

Unless otherwise provided herein, on each Distribution Date, each Litigation Trust Beneficiary shall receive such Distributions in accordance with Article XI hereof. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be ~~deemed~~ considered to have been

112

completed as of the required date.  The Litigation Trustee shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Effective Date.

## E.    Means of Cash Payment

Cash payments made pursuant to the Plan shall be in U.S. dollars and shall be made at the option and in the sole discretion of the Disbursing Agent by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Disbursing Agent.  In the case of foreign creditors, Cash payments may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular jurisdiction; *provided* that the Disbursing Agent receives a signed receipt or otherwise verifiable record of any such Cash payment.

## F.    Interest on Claims

Unless otherwise specifically provided for in the Plan, or the Confirmation Order, or required by applicable law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim. Except as otherwise specifically provided for in the Plan, or the Confirmation Order, or required by applicable law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

## G.    No Creditor to Receive More than Payment in Full

Notwithstanding any other provision hereof, no Holder of a Claim shall receive more than full payment of its applicable Allowed Claim, including any interest, costs or fees that may be payable with respect thereto under or pursuant to the Plan.

## H.    Disallowance of Untimely Claims

Any Claim for which a bar date has been established that is not timely Filed or otherwise asserted as directed on or before the applicable bar date shall: (a) be forever Disallowed, barred, and expunged in its entirety; and (b) not be enforceable against the Debtors, the Estates, the Litigation Trust, and/or the Litigation Trustee, all without further notice to any party, or action, approval, or order of the Court, irrespective of whether such Claim was Filed prior to, on, or following the Confirmation Date.  Except as otherwise agreed by the Litigation Trustee, any and all Holders of Claims for which a bar date has been established that is not timely Filed or otherwise asserted as directed on or before the applicable bar date shall not be treated as Creditors for purposes of voting and distribution pursuant to Bankruptcy Rule 3003(c)(2).

## I.    <u>Claims Paid or Payable by Third Parties</u>

### 1.    <u>Claims Paid by Third Parties</u>

A Claim shall be reduced in full, and such Claim shall be Disallowed without a Claim Objection having to be Filed and without further notice to any party, or action, approval, or order of the Court, to the extent that the Holder of such Claim received payment in full on account of

#124965664v1

such Claim from a party that is not the Debtors, the Estates, the Litigation Trust, or the Litigation Trustee.  To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not the Debtors, the Estates, the Litigation Trust, or the Litigation Trustee on account of such Claim, such Holder shall, within two weeks of such Holder's receipt thereof, repay the Distribution to the Reorganized Debtors or the Litigation Trust, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim determined as of the date of any such Distribution under the Plan.  The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Reorganized Debtors or the Litigation Trustee, as applicable, annualized interest at the federal judgment rate on such amount owed for each day after the two-week grace period specified above until the amount is repaid.

2.    <u>Claims Payable by Third Parties</u>

No Distribution shall be made on account of an Allowed Claim that is payable by a party that is not the Debtors, the Estates, the Litigation Trust, or the Litigation Trustee, including pursuant to any insurance policy, until the Holder of such Allowed Claim has exhausted all remedies with respect to such third party or insurance policy. To the extent that one or more of the Debtors' insurers or another third party agrees to satisfy in full or in part an Allowed Claim, then immediately upon such agreement, the applicable portion of such Claim may be Disallowed and expunged without a Claim Objection having to be Filed and without further notice to any party, or action, approval or order of the Court.  Unless and until the Holder of a Claim that is payable by a party that is not the Debtors, the Estates, the Litigation Trust, or the Litigation Trustee exhausts all remedies with respect to such third party of insurance policy, such Claim shall be ~~deemed~~ estimated at zero dollars ($0) for all purposes of the Plan and Litigation Trust Agreement without further notice to any party, or action, approval or order of the Court.

**J.    <u>Withholding and Reporting Requirements</u>**

In accordance with Bankruptcy Code section 346 and in connection with the Plan and all Distributions hereunder, the Disbursing Agent shall, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority.  The Disbursing Agent shall be authorized to take any and all actions necessary and appropriate to comply with such requirements.

All Distributions hereunder shall be subject to withholding and reporting requirements. As a condition of making any Distribution under the Plan, each Person and Entity holding an Allowed Claim is required to provide any information necessary in writing, including returning W-9 statements, to effect the necessary information reporting and withholding of applicable taxes with respect to Distributions to be made under the Plan as the Disbursing Agent may request.   The Disbursing Agent shall be entitled in its sole discretion to withhold any Distributions to a Holder of an Allowed Claim who fails to provide tax identification or social security information within the timeframe requested in writing by the Disbursing Agent to such Holder of an Allowed Claim, which timeframe shall not be less than 30 days.  **Unless the Litigation Trustee agrees otherwise in its sole discretion, all Distributions to any Holder of an Allowed Claim that fails to timely respond to a request for tax information ~~deemed~~<span style="color:blue">considered</span> necessary or appropriate by the Litigation Trustee shall be waived and**

114

forfeited and the applicable Claim shall be ~~deemed~~ Disallowed without notice or further order of the Court.

Notwithstanding any other provision of the Plan, each Person and Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such Distribution.

## K.    Setoffs

Subject to the terms and conditions of the Litigation Trust Agreement, the Debtors, the Reorganized Debtors and/or the Litigation Trust may, but shall not be required to, set off against any Claim and the payments or other Distributions to be made under the Plan on account of the Claim, claims of any nature whatsoever that the Debtors may have against the Holder thereof, *provided* that any such right of setoff that is exercised shall be allocated, first, to the principal amount of the related Claim, and thereafter to any interest portion thereof, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors and/or the Litigation Trust of any such claim that the Debtors may have against such Holder.

## L.    Procedure for Treating and Resolving Disputed, Contingent, and/or Unliquidated Claims

### 1.    Objection Deadline; Prosecution of Objections

Except as set forth in the Plan with respect to Professional Fee Claims and Administrative Expense Claims, all objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline.

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Litigation Trustee shall have the authority to: (a) File, withdraw or litigate to judgment Objections to and requests for estimation of Claims *provided*, *however*, that such actions where the amount in dispute is or is otherwise reasonably valued at equal to or greater than $1,000,000 shall require HRH's consent, such consent not to be unreasonably withheld; (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Court *provided*, *however*, that such actions where the amount in dispute is or is otherwise reasonably valued at equal to or greater than $1,000,000 shall require HRH's consent, such consent not to be unreasonably withheld; and (c) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court; *provided, however*, that the objection to and settlement of Professional Fee Claims shall not be subject to this Article XI.LL, but rather shall be governed by Article IV.D hereof.  In the event that any Objection Filed by the Debtors remains pending as of the Effective Date, the Litigation Trustee shall be ~~deemed~~ substituted for the Debtors, as applicable, as the objecting party, in his or her sole discretion.

The Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any Objection to such Claim or during the appeal relating to such Objection.  In the event that the Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for

#124965664v1

purposes of Distributions), and the Litigation Trustee may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

The Litigation Trust shall be entitled to assert all of the Debtors' rights, claims, defenses, offsets, rights of recoupment, setoffs, rights of disallowance, subrogation, recharacterization and/or equitable subordination and counter-claims with respect to Claims, subject to HRH's consent rights as set forth above.

### 2.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan or the Litigation Trust Agreement, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

To the extent that a Claim is not a Disputed Claim but is held by a Holder that is or may be liable to the Debtors or the Litigation Trust on account of a Cause of Action, no payments or Distributions shall be made with respect to all or any portion of such Claim unless and until such Claim and liability have been settled or withdrawn or have been determined by Final Order of the Court, administrative tribunal, or such other court having jurisdiction over the matter.

### 3.    Disputed Claims Reserve

On the Distribution Date, the Litigation Trust shall withhold on a Pro Rata basis from property that would otherwise be distributed to Holders of Claims entitled to Distributions under the Plan on such date, in a separate Disputed Claims Reserve, such amounts or property as may be necessary to equal one hundred percent (100%) of Distributions to which Holders of such Disputed Claims would be entitled under the Plan if such Disputed Claims were allowed in their Disputed Claim Amount.  The Litigation Trust may request, if necessary, estimation for any Disputed Claim that is contingent or unliquidated, or for which the Litigation Trust determines to reserve less than the face amount.  If the Litigation Trust elects not to request such an estimation from the Court with respect to a Disputed Claim that is contingent or unliquidated, the Litigation Trust shall withhold the applicable Disputed Claims Reserve based upon the good faith estimate of the amount of such Claim by the Litigation Trust.  If practicable, the Litigation Trust shall invest any Cash that is withheld as the Disputed Claims Reserve in an appropriate manner to ensure the safety of the investment, in accordance with the Litigation Trust Agreement.  Nothing in the Plan or the Litigation Trust Agreement shall ~~be deemed to~~ entitle the Holder of a Disputed Claim to postpetition interest on such Claim, however.

### 4.    Distributions After Allowance

Payments and Distributions to Holders of Disputed Claims that ultimately become Allowed Claims shall be made in accordance with provisions of the Plan and the Litigation Trust Agreement that govern Distributions to Holders of Allowed Claims.

116

### 5.      De Minimis Interim Distributions

The Litigation Trust shall not be required to make any interim distributions to Holders of Allowed Claims aggregating less than $100.00; *provided, however*, that Holders of Allowed Claims shall be entitled to final distributions regardless of their amount.  Cash that otherwise would be payable under the Plan to Holders of Litigation Trust Interests but for this Article XI.L.5 shall remain Litigation Trust Assets to be used in accordance with the Litigation Trust Agreement.  Cash that otherwise would be payable under the Plan to Holders of Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims but for this Article XI.L.5 shall remain in the Administrative Expense Claims Reserve.

### 6.      Fractional Dollars

Notwithstanding any other provision of the Plan, the Disbursing Agent shall not be required to make Distributions or payments of fractions of dollars.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

### 7.      Allocation of Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### 8.      Distribution Record Date

The Disbursing Agent shall have no obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on the Distribution Record Date.  Instead, the Disbursing Agent shall be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims register or the Debtors' Books and Records, as applicable, as of the close of business on the Distribution Record Date.

## ARTICLE XII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Assumption and Rejection of Executory Contracts and Unexpired Leases

The Plan provides for the rejection of those contracts listed on the Schedule of Rejected Executory Contracts and Unexpired Leases.

Further, except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases to which any Debtor is a party shall be ~~deemed~~ automatically rejected by the Debtors as of the Effective Date, unless such contract or lease (1) previously has

been assumed or rejected by the applicable Debtor; (2) expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume or reject pending before the Court as of the Confirmation Date; (4) is identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed; (5) is an Insurance Policy; or (6) is contemplated by the HRH Transactions; *provided*, *however*, that nothing contained in the Plan shall constitute an admission by a Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or its successors and assigns has any liability thereunder; *provided further*, that the Debtors reserve their rights, at any time before the Confirmation Date, to assume any Executory Contract or Unexpired Lease that was not already rejected prior to the Confirmation Date.  Entry of the Confirmation Order shall constitute an Order of the Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Combined Disclosure Statement and Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Confirmation Order, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Combined Disclosure Statement and Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Combined Disclosure Statement and Plan or by Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor party thereto in accordance with its terms, except as such terms may have been modified by the provisions of the Combined Disclosure Statement and Plan or any Order of the Court authorizing and providing for its assumption. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Combined Disclosure Statement and Plan restricts or prevents, or purports to restrict or prevent, or is breached ~~or deemed breached~~ by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be ~~deemed~~effectively modified such that the transactions contemplated by the Combined Disclosure Statement and Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Any Executory Contract or Unexpired Lease which is identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed is subject to assignment to a third party, with the identity of such third party to be set forth in writing and noticed to counterparties on or before the Effective Date of the Plan.

Confirmation of the Plan shall be subject to assumption, renegotiation and/or rejection of applicable labor agreements.  To the extent that any labor agreement is sought to be rejected, the Debtors and HRH (to the extent applicable) shall comply with section 1113 of the Bankruptcy Code.

Notwithstanding any other provisions herein, the Collective Bargaining Agreement Between Christ Hospital and the Committee of Interns and Residents/SEIU (the "Christ Hospital CBA") and the Collective Bargaining Agreement Between Hoboken University Medical Center and the Committee of Interns and Residents/SEIU (the "HUMC CBA") shall be assumed and assigned to the Reorganized Debtors as of the Effective Date. The cure amounts, if any, related to the assumption and assignment of the Christ Hospital and HUMC CBAs shall be paid by the Debtors or Reorganized Debtors, as applicable, in full in the ordinary course of business.

The rejection of any Executory Contracts shall not impact the continued existence of the Reorganization Committee after the Effective Date for purposes of evaluating claims against Current D&Os.

## B.    Cure Amounts for Assumed Contracts

For each Executory Contract or Unexpired Lease identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed, the Plan Supplement shall identify the amounts proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty as the Cure amount for such Executory Contract or Unexpired Lease.

In the event of a dispute regarding: (i) the Cure amount; (ii) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to the assumption, the Cure payments required by section 356(b)(1) of the Bankruptcy Code shall be made following either (1) the entry of a Final Order or orders resolving the dispute and approving the assumption or (2) the settlement of the dispute between the parties which may be entered into without further Order of the Court; *provided, that* in connection with a dispute regarding the Cure amount, the Debtors (i) will pay the undisputed Cure amount, if any, on the Effective Date, to the counterparty to the Executory Contract or Unexpired Lease and (ii) shall place an amount equal to the disputed portion of such Cure amount in cash in a segregated account pending resolution of the applicable cure dispute.  Upon resolution of the applicable cure dispute, the Debtors shall pay any remaining amount due to the applicable counterparty.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related Cure amount must be filed, served, and actually received by the Debtors no later than seven days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or Cure amount will conclusively be deemedfound to have assented to such assumption or assumption and assignment and Cure amount.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure.

If the Debtors are unable to resolve a dispute regarding the assumption or assumption and assignment or the Cure prior to the Confirmation Hearing, such dispute may be scheduled to be heard by the Court after the Confirmation Hearing; *provided, that* the Reorganized Debtors may settle any dispute after the Effective Date without any further notice to any party or any action, order, or approval of the Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Combined Disclosure Statement and Plan or otherwise and full payment of any applicable Cure pursuant to this Article XII.B shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease

that has been assumed shall be ~~deemed~~ disallowed and expunged, without further notice to or action, order, or approval of the Court.

**C.      Rejection Claims Bar Date**

If the rejection of an Executory Contract or Unexpired Lease pursuant to Article XII.A above gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Litigation Trust, the Litigation Trustee, or their respective successors or assets, unless a Proof of Claim is Filed with the Claims and Noticing Agent and served on counsel for the Debtors and the Litigation Trust by the Rejection Claims Bar Date, which is thirty (30) days after the Effective Date with respect to Executory Contracts or Unexpired Leases rejected pursuant to the Plan. Any Proofs of Claim not Filed and served by the Rejection Claims Bar Date will be forever barred from assertion against the Debtors, their Estates, the Litigation Trust, the Litigation Trustee, or their respective successors or assets.  Unless otherwise Ordered by the Court, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as Class 7 (General Unsecured Claims) under the Plan.

**D.      Indemnification and Reimbursement**

The Debtors and/or the Reorganized Debtors, as applicable, shall indemnify their current and former employees with respect to any liability to such employees arising from any failure of the Debtors to pay state or federal payroll taxes.  Further, any obligations of the Debtors pursuant to their organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Person pursuant to the Debtors' operating agreements, bylaws, policy of providing employee indemnification, applicable state law or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtors shall survive confirmation of the Plan and except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; *provided, however*, that all related monetary obligations, other than those related to payroll taxes, shall be limited solely to available insurance coverage and neither the Debtors, their estates, the Litigation Trust, the Litigation Trustee, nor any of their respective assets shall be liable for any such obligations, except for the Debtors' obligations with respect to indemnification regarding payroll taxes.  This provision for indemnification obligations shall not apply to or cover any Claims, suits or actions against a Person that result in a final order determining that such covered person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

**E.      Continuation of Insurance Policies**

Notwithstanding anything to the contrary herein, all Insurance Policies in effect as of the Effective Date shall remain in full force and effect in accordance with their terms on and after the Effective Date and shall not be ~~deemed~~ rejected pursuant to the Plan. The Reorganized

Debtors shall pay any premiums necessary to maintain such Insurance Policies and may not terminate any such Insurance Policies without the consent of the Litigation Trustee.

Confirmation and effectiveness of the Plan will not discharge, impair, or otherwise modify any rights of the Debtors, the Estates, the Litigation Trust, the Litigation Trustee, or any other beneficiary under the Insurance Policies. On the Effective Date, the Insurance Policies and the proceeds thereof (subject in all cases to the terms of the Insurance Policies or the rights of any other beneficiaries therein) shall automatically vest in the Reorganized Debtors and/or the Litigation Trust, as applicable. For the avoidance of doubt, the Insurance Policies are not Executory Contracts and are neither assumed nor rejected under the Plan.

The Confirmation Order shall constitute a determination that no default by the Debtors exists with respect to any of the Insurance Policies and that nothing in any prior order, any prior agreements, or this Plan shall be construed or applied to modify, impair, or otherwise affect the enforceability of the Insurance Policies or any coverage thereunder with regard to any Causes of Action (including, but not limited to, the Litigation Claims, D&O Claims and tort claims), or claims, interests, or rights of the Debtors, the Estates, the Litigation Trustee, or the Litigation Trust. The Plan shall be liberally construed to protect the interests of all Creditors in all Causes of Action (including, but not limited to, Litigation Claims, D&O Claims and tort claims), and to limit any Claims against the Estate.

Nothing in this Plan shall diminish, impair, or otherwise affect (i) rights of the Debtors' current or former directors, officers, trustees, managers, or any other Person covered under the Insurance Policies, or (ii) payments from the proceeds or the enforceability of any Insurance Policies that may cover (a) claims by the Debtors, or (b) claims against the Debtors or covered Persons thereunder.

**ARTICLE XIII.**
**CONDITIONS PRECEDENT TO CONFIRMATION AND**
**CONSUMMATION OF THE PLAN**

**A.      Conditions Precedent to Confirmation**

The following are conditions precedent to confirmation of the Plan, each of which must be satisfied:

1.      The Combined Disclosure Statement and Plan, Plan Supplement(s), the Confirmation Order, and any other related definitive documents shall be in form and substance reasonably acceptable to the Plan Proponents and HRH. Any dispute regarding the definitive documents shall be determined by the Mediator.

2.      The Professional Fee Reserve account shall be funded in the amount of the Professional Fee Estimate.

3.      HRH (or its designee) will have provided a commitment for the funds necessary to confirm and consummate the Plan; and

121

4.      The Confirmation Order shall have been entered by the Court.

**B.      Conditions Precedent to Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived:

1.      All conditions precedent to Confirmation of the Plan shall have either been satisfied or waived.

2.      The Solicitation Procedures Order and the Confirmation Order shall not have been stayed, vacated, or reversed and shall have become a Final Order.

3.      The Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless the Plan Proponents and HRH have provided written consent to such material amendment, alteration, or modification.

4.      All authorizations, consents, regulatory approvals, rulings, or documents necessary to implement and effectuate the Plan have been obtained.

5.      All definitive documents shall, where applicable, have been executed and remain in full force and effect.

6.      The Litigation Trust Seed Money shall have been provided to the Litigation Trustee or the Litigation Trustee shall have otherwise agreed to the funding of the Litigation Trust Seed Money from HRH.

7.      The Litigation Trust Agreement shall have been executed and the Litigation Trustee and the Litigation Trust Oversight Committee shall have been appointed.

8.      The Administrative Expense Claims Reserve shall have been funded in Cash in full, unless the Debtors assume responsibility for Allowed Administrative Expense Claims and Allowed Priority Claims as set forth herein.

9.      The Professional Fee Reserve shall have been funded in Cash in full.

10.     All reasonable, documented, and out-of-pocket fees, costs and expenses incurred by the Capitala Senior Secured Parties in connection with the Chapter 11 Cases through the Effective Date shall have been fully reimbursed by the Debtors and/or the Reorganized Debtors.

11.     The Litigation Trust shall have been established and the Litigation Claims shall have been transferred to and vested in the Litigation Trust free and clear of all Claims and Liens, except as specifically provided in the Plan and the Litigation Trust Agreement.

#124965664v1

12.     All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable.

## C.    Establishing the Effective Date

The calendar date to serve as the Effective Date shall be a Business Day of, on, or promptly following the satisfaction or waiver of all conditions to the Effective Date, which date will be selected by the Debtors.  On or within two Business Days of the Effective Date, the Debtors shall File and serve a notice of occurrence of the Effective Date.  Such notice shall contain, among other things, notice of the Administrative Expense Claims Bar Date, the Professional Fee Claims Bar Date, and the Rejection Claims Bar Date with respect to Executory Contracts or Unexpired Leases rejected pursuant to the Plan.

## D.    Waiver of Conditions

Each of the conditions to Confirmation and the occurrence of the Effective Date set forth in Article XIII hereof may be waived in whole or in part by unanimous agreement of the Plan Proponents, without any other notice to other parties-in-interest or the Court. The failure to satisfy or waive any condition to Confirmation or the occurrence of the Effective Date may be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of any party to exercise any of its foregoing rights shall not be ~~deemed~~ a waiver of any of its other rights, and each such right shall be ~~deemed~~ an ongoing right that may be asserted thereby at any time.

## E.    Consequences of Non-Occurrence of Effective Date

If the Effective Date does not occur within 90 days following the Confirmation Date, or by such later date after notice and hearing, as is proposed by the Debtors, then upon motion by the Debtors and upon notice to such parties-in-interest as the Court may direct, (i) the Plan shall be null and void in all respects; (ii) any settlement of Claims shall be null and void without further order of the Court; and (iii) the time within which the Debtors may assume and assign or reject all Executory Contracts shall be extended for a period of 30 days after such motion is granted.

**ARTICLE XIV.**
**EFFECTS OF CONFIRMATION**

## A.    Compromise and Settlement of Claims and Controversies

Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019 and in consideration for the classification, Distributions, releases, and other benefits provided pursuant to the Combined Disclosure Statement and Plan, on the Effective Date, the provisions of the Combined Disclosure Statement and Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Combined Disclosure Statement and Plan or relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest, or any Distribution to be made on account of such Claim or Interest. The entry of the Confirmation Order shall

123

constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

## B.    Binding Effect

The Combined Disclosure Statement and Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, whether or not such Holders shall receive or retain any property or interest in property under the Combined Disclosure Statement and Plan, and their respective successors and assigns, including, but not limited to, the Litigation Trust and all other parties-in-interest in the Chapter 11 Cases.

## C.    Discharge of the Debtors

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims, Interests, and causes of action in or against any Debtor, its assets or property of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, contingent or noncontingent, or liquidated or unliquidated, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Interests or causes of action, that arose or accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such Claim, debt, right, cause of action or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

## D.    Debtor Releases

**Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, their Estates, and the Debtors' current Affiliates (except, for the avoidance of doubt, the Practice Groups), successors and assigns, including any successor to the Debtors or any Estate representative appointed or selected pursuant to Bankruptcy Code section 1123(b)(3), including the Litigation Trustee, shall ~~be deemed to~~ forever release, waive, and discharge each of the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' operations, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or**

124

the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, or the Combined Disclosure Statement and Plan, and the administration, formulation, preparation, dissemination, solicitation, negotiation, consummation, and implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date. For the avoidance of doubt, nothing herein shall constitute ~~or be deemed~~ a release by any Prior Owner. **For the avoidance of doubt, the Practice Groups are not granting Debtor Releases and any rights, claims and causes of action of the Practice Groups and their creditors (solely in their capacities as creditors of the Practice Groups and not in their capacities as creditors of the Debtors) are not prejudiced in any way by this Article XIV.D.**

Counsel for the Debtors has been involved in all restructuring efforts for at least two years prior to the Petition Date and is aware of no claims against any Current D&Os. Nevertheless, the Plan contemplates that the Litigation Trustee will conduct an investigation to determine if any such claims exist. The results of the Litigation Trustee's investigation will be presented to the Reorganization Committee, which will evaluate the findings and recommendations presented and make a written determination in the form of the D&O Report as to whether any such alleged claims should be brought in accordance with Article IX.D hereof. Subject to resolution of any disputes regarding the D&O Report in accordance with Article IX.D hereof, the decision of the Reorganization Committee will be final and binding as to the Debtors, HRH and the Litigation Trustee, but will not be binding on any other party in interest. Any party-in-interest may object to the Reorganization Committee's D&O Report in accordance with and subject to Article IX.D hereof.

Counsel for the UCC has not conducted an investigation of claims against any of the Released Parties, but the proposed releases were a critical component of the mediated resolution that undergirds the Plan, including the release of potential Avoidance Actions with respect to the Outstanding Judgment and the termination of the Bayonne Lease.

## E.    Exculpation and Limitation of Liability

**Except as otherwise specifically provided herein, the Exculpated Parties shall not have or incur, and are hereby released and exculpated from, any liability, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively in law or equity, to any Holder of a Claim or an Interest, or any other party-in-interest, or any of their respective members, directors, officers, managers, trustees, employees, advisors, attorneys, professionals, agents, partners, stockholders or Affiliates (except, for the avoidance of doubt, the Practice Groups), or any**

#124965664v1

of their respective successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Combined Disclosure Statement and Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct  (in each case as determined by a Final Order entered by a court of competent jurisdiction), and such parties in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Combined Disclosure Statement and Plan. For the avoidance of doubt, nothing contained in this paragraph shall exculpate acts or omissions prior to the Petition Date or post-Effective Date. **For the avoidance of doubt, the Practice Groups are not exculpating any parties and any rights, claims and causes of action of the Practice Groups and their creditors (solely in their capacities as creditors of the Practice Groups and not in their capacities as creditors of the Debtors) are not prejudiced in any way by this Article XIV.E.**

F.    **Injunction**

Effective as of the Effective Date, all Persons and Entities that hold, have held, or may hold a claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, or liability of any nature whatsoever, that is released, exculpated, compromised, or settled pursuant to this Combined Disclosure Statement and Plan, shall be permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions (other than actions to enforce any rights or obligations under the Combined Disclosure Statement and Plan): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum against or affecting the Debtors, the Litigation Trust, or any of their respective property; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order against the Debtors, the Litigation Trust, or any of their respective property; (iii) creating, perfecting, or in any way enforcing in any manner, directly or indirectly, any encumbrance or Lien of any kind against the Debtors, the Litigation Trust, or any of their respective property; (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtors, the Litigation Trust, or any of their respective property, except with respect to any right of setoff asserted prior to the entry of the Confirmation Order, whether asserted in a Proof of Claim or otherwise, or as otherwise contemplated, impaired, or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Combined Disclosure Statement and Plan; and (vi) prosecuting or otherwise asserting (A) any Claim or Interest, including any right, claim, or Cause of Action released pursuant to the Plan, (B) any form of objection to any Claim that is Allowed by the Plan and Confirmation Order, or (C) Avoidance Actions against any Holder of a Claim that is Allowed or any Avoidance Action released by the Plan.   Additionally, unless otherwise explicitly stated in the Combined Disclosure

126

**Statement and Plan, in furtherance of the releases granted by the Plan or Confirmation Order, the injunction contemplated by this paragraph shall prohibit the assertion against the Litigation Trust and the Litigation Trustee of all Claims or Interests, if any, related to the Debtors.**

## ARTICLE XV.
## RETENTION OF JURISDICTION

**A.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, following the Effective Date, the Court shall retain such jurisdiction over the Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of the Combined Disclosure Statement and Plan are carried out.  The Court shall have exclusive jurisdiction of all matters arising out of the Chapter 11 Cases and the Combined Disclosure Statement and Plan pursuant to, and for the purposes of, Bankruptcy Code sections 105(a) and 1142 and for, among other things, the following purposes:

1.      To the extent not otherwise determined by the Combined Disclosure Statement and Plan, to determine (a) the allowance, classification, or priority of Claims upon objection by any party-in-interest entitled to File an objection, or (b) the validity, extent, priority, and nonavoidability of consensual and nonconsensual Liens and other encumbrances against assets of the Estates, the Debtors, or the Litigation Trust;

2.      To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Combined Disclosure Statement and Plan or its execution or implementation by any Person or Entity, to construe and to take any other action to enforce and execute the Combined Disclosure Statement and Plan, the Confirmation Order, or any other order of the Court, to issue such orders as may be necessary for the implementation, execution, performance, and Consummation of the Combined Disclosure Statement and Plan and all matters referred to herein, and to determine all matters that may be pending before the Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person or Entity;

3.      To protect the assets or property of the Estates, the Debtors, or the Litigation Trust, including Causes of Action, from claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens or other encumbrances on any assets of the Estates, the Debtors, or the Litigation Trust;

4.      To determine any and all applications for allowance of Professional Fee Claims;

5.      To determine any Priority Tax Claims, Priority Non-Tax Claims, or Administrative Expense Claims entitled to priority under Bankruptcy Code section 507(a);

6.      To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

127

7.      To resolve any dispute arising under or related to the implementation, execution, Consummation, or interpretation of the Combined Disclosure Statement and Plan and the making of Distributions hereunder;

8.      To modify the Combined Disclosure Statement and Plan under Bankruptcy Code section 1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Combined Disclosure Statement and Plan or the Confirmation Order so as to carry out their intent and purposes;

9.      To issue such orders in aid of Consummation of the Combined Disclosure Statement and Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person or Entity, to the full extent authorized by the Bankruptcy Code;

10.     To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

11.     To determine any and all motions related to the rejection, assumption, or assignment of Executory Contracts or Unexpired Leases or determine any issues arising from the ~~deemed~~ rejection of Executory Contracts and Unexpired Leases set forth in Article XII.A hereof;

12.     Except as otherwise provided herein, to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases;

13.     To enter a final decree closing the Chapter 11 Cases;

14.     To hear and determine any tax disputes concerning the Debtors and to determine and declare any tax effects under the Plan; *provided, however*, that nothing herein shall be construed to confer jurisdiction upon the Court to make determinations as to federal tax liabilities and federal tax treatment, except as provided under 11 U.S.C. § 505;

15.     To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases has been closed);

16.     To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date Order, the General Claims Bar Date, the Governmental Claims Bar Date, the Rejection Claims Bar Date, the Administrative Expense Claims Bar Date, the Professional Fee Claims Bar Date, and/or the Confirmation Hearing for the purpose of determining whether a Claim, or Interest is released, satisfied and/or enjoined hereunder or for any other purpose;

17.     To ensure that Distributions are accomplished pursuant to the provisions of the Plan and the Litigation Trust Agreement;

18.     To determine any other matters that may arise in connection with or related to the Combined Disclosure Statement and Plan, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Combined Disclosure Statement and Plan; and

19.     To hear any other matter not inconsistent with the Bankruptcy Code.

## B.     Retention of Non-Exclusive Jurisdiction by the Court

Notwithstanding anything else in the Combined Disclosure Statement and Plan, the Court shall retain non-exclusive jurisdiction over all Litigation Claims prosecuted by the Litigation Trust.

## C.     Alternative Jurisdiction

In the event that the Court is without jurisdiction to resolve any matter, then the District Court or such other administrative tribunal or court of competent jurisdiction shall hear and determine such matter. If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.

## D.     Failure of Court to Exercise Jurisdiction

If the Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article XV.A hereof, the provisions of Article XV.A hereof shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XVI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A.     Modifications and Amendments

Alterations, amendments, or modifications of the Combined Disclosure Statement and Plan may be proposed in writing by the Plan Proponents, at any time before the Confirmation Date; *provided that* the Combined Disclosure Statement and Plan, as altered, amended or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123, and the Plan Proponents shall have complied with Bankruptcy Code section 1125. Additionally, after the Confirmation Date and prior to substantial Consummation of the Plan, the Plan Proponents may, under Bankruptcy Code section 1127(b), institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Combined Disclosure Statement and Plan or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Combined Disclosure Statement and Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Combined Disclosure Statement and Plan; *provided, however,* that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Court.

129

**B.**     **Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**C.**     **Revocation or Withdrawal of the Plan**

The Plan Proponents reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or Consummation of the Plan does not occur, then (1) the Plan shall be null and void in all respects, (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be ~~deemed~~ null and void, and (3) nothing contained in the Plan, and no acts taken in preparation for Consummation of the Plan, shall (i) constitute ~~or be deemed to constitute~~ a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person or Entity, (ii) prejudice in any manner the rights of the Plan Proponents or any other Person or Entity, or (iii) constitute an admission of any sort by the Plan Proponents or any other Person or Entity.

**ARTICLE XVII.**
**MISCELLANEOUS PROVISIONS**

**A.**     **Terminations of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**B.**     **Severability of Provisions**

If, prior to Confirmation, any term or provision of the Combined Disclosure Statement and Plan is held by the Court to be invalid, void, or unenforceable, then the Court, at the request of the Plan Proponents, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Combined Disclosure Statement and Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Combined Disclosure Statement and Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. For the avoidance of doubt, this Article XVII.B shall not apply to the Practice Groups.

130

## C.    Payment of Statutory Fees

All Statutory Fees payable prior to the Effective Date shall be paid by the Debtors or Reorganized Debtors on or as soon as practicable after the Effective Date.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date and until each Reorganized Debtor's Chapter 11 Case is closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code (i) the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports for each of the Reorganized Debtors (whose Chapter 11 Case has not been closed, dismissed or converted) when they become due and pay any applicable Statutory Fees to the Office of the U.S. Trustee notwithstanding the ~~deemed~~limited substantive consolidation of the Debtors provided for in the Plan, and (ii) the Litigation Trustee shall file with the Bankruptcy Court UST Form 11-PCR reports for the Litigation Trust when they become due and pay any applicable Statutory Fees to the Office of the U.S. Trustee. The Litigation Trustee shall reasonably cooperate with the Reorganized Debtors to provide information relating to the Litigation Trust necessary for the Reorganized Debtors to prepare UST Form 11-PCR reports. The U.S. Trustee shall not be required to File a request for payment of the Statutory Fees, which shall ~~be deemed~~constitute an Administrative Expense Claim against the Debtors and their Estates.

## D.    Service of Documents

All notices, requests and demands to or upon the Debtors, the Litigation Trust and/or the Litigation Trustee, as applicable, to be effective shall be in writing and, unless otherwise expressly provided herein, shall be (a) in writing; (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission; (c) ~~deemed to have been~~ duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed; and (d) addressed as follows:

| Entity | Contact Information |
|--------|---------------------|
| Debtors | CarePoint Health Systems, Inc., 308 Willow Avenue, Hoboken, NJ 07030 Attn: Shamiq Syed<br><br>With a copy to<br><br>Dilworth Paxson LLP 800 King Street – Suite 202, Wilmington, DE 19801 Attn: Peter C. Hughes (phughes@dilworthlaw.com)<br><br>Dilworth Paxson LLP 1650 Market St., Suite 1200, Philadelphia, PA 19102 Attn: Lawrence McMichael (lmcmichael@dilworthlaw.com) |
| Litigation Trustee | Province, LLC |

#124965664v1

| Entity | Contact Information |
|---|---|
| | 11111 Santa Monica Blvd. Suite 525<br>Los Angeles, CA 90025<br>Attn: Paul Navid (PNavid@provincefirm.com)<br><br>With a copy to<br>Sills Cummis & Gross P.C.,<br>One Riverfront Plaza,<br>Newark, NJ 07102<br>Attn: Andrew H. Sherman<br>(asherman@sillscummis.com) and Boris Mankovetskiy<br>(bmankovetskiy@sillscummis.com) |

**E.    2002 Service List**

After the Effective Date, any Entities or Persons that want to continue to receive notice in these Chapter 11 Cases must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002 no later than thirty days after the Effective Date; *provided, however*, that the U.S. Trustee shall be excused from this requirement and shall remain on the Bankruptcy Rule 2002 service list. To the extent a renewed request is not timely Filed with the Court, the Debtors and the Litigation Trustee are authorized to limit notice and not include such Entities or Persons on any post-Effective Date Bankruptcy Rule 2002 service list.

**F.    Filing of Additional Documents**

On or before substantial consummation of the Plan, the Plan Proponents shall File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**G.    Plan Supplement(s)**

Exhibits to the Combined Disclosure Statement and Plan not attached hereto shall be Filed in one or more Plan Supplements by the Plan Supplement Filing Date.  Any Plan Supplement (and amendments thereto) Filed by the Plan Proponents shall ~~be deemed~~constitute an integral part of the Combined Disclosure Statement and Plan and shall be incorporated by reference as if fully set forth herein.  Substantially contemporaneously with their Filing, the Plan Supplements may be viewed at the case website (https://dm.epiq11.com/case/carepoint/info) or the Court's website (https://ecf.deb.uscourts.gov/).  Unless otherwise ordered by the Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Combined Disclosure Statement and Plan that does not constitute the Plan Supplement, the Plan Supplement shall control.  The documents considered in the Plan Supplement are an integral part of the Combined Disclosure Statement and Plan and shall be ~~deemed~~ approved by the Court pursuant to the Confirmation Order.

132

**H.**     **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Plan Proponents will be ~~deemed~~conclusively found to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), the Plan Proponents and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be ~~deemed~~conclusively found to have participated in good faith and in compliance with the Bankruptcy Code and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

**I.**     **Closing of Chapter 11 Cases**

The Reorganized Debtors and the Litigation Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with the Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

**J.**     **No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Combined Disclosure Statement and Plan shall ~~be deemed as~~constitute an admission by any Entity with respect to any matter set forth herein.

**K.**     **Inconsistency**

In the event of any inconsistency among the Combined Disclosure Statement and Plan and any other instrument or document created or executed pursuant to the Combined Disclosure Statement and Plan, the provisions of the Combined Disclosure Statement and Plan shall govern.

**L.**     **Request for Expedited Determination of Taxes**

The Reorganized Debtors, the Litigation Trust, and the Litigation Trustee, as applicable, shall have the right to request an expedited determination under Bankruptcy Code section 505(b) with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**M.**     **Reservation of Rights**

Except as expressly set forth herein, the Combined Disclosure Statement and Plan shall have no force or effect unless the Court shall enter the Confirmation Order. None of the Filing of the Combined Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Plan Proponents with respect to the Combined Disclosure Statement and Plan shall be or shall ~~be deemed to be~~constitute an admission or waiver of any rights of the Plan Proponents, Holders of Claims or Interests before the Effective Date.

*[Remainder of Page Intentionally Left Blank]*

Dated:  April 915, 2025

Respectfully submitted,

CAREPOINT HEALTH SYSTEMS, INC. on behalf of itself
and each of the Debtors

By:     */s/ Shamiq Syed*_____
            Shamiq Syed
            Chief Financial Officer

## Exhibit A

**Corporate Ownership Chart**

**Exhibit B**

**Liquidation Analysis**

| Summary report: Litera Compare for Word 11.1.0.69 Document comparison done on 4/15/2025 4:29:56 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** CarePoint- 7th Amended Combined Plan_DS .docx | |
| **Modified filename:** CarePoint- 7th Amended Combined Plan_DS as modified (final)_(124965664.1).docx | |
| **Changes:** | |
| Add | 152 |
| Delete | 178 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 330 |