## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CarePoint Health Systems Inc. d/b/a Just Health Foundation, *et al.*,[1] | Case No. 24-12534 (JKS) |
| Debtors. | (Jointly Administered) |
|  | **Re: D.I. 555 and 1154** |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING SEVENTH AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF REORGANIZATION AS MODIFIED AS OF APRIL 15, 2025

Upon consideration of the *Seventh Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization as Modified as of April 15, 2025* [D.I. 1154] (annexed hereto as **Exhibit A**, including all exhibits thereto and as amended, supplemented or otherwise modified from time to time, the "Combined Disclosure Statement and Plan" or the "Plan", and the disclosures contained therein, the "Disclosure Statement")[2] proposed by the Debtors[3] and the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); and (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Combined Disclosure Statement and Plan.

[3] For the avoidance of doubt, the term "Debtors", as used in the Plan and this Confirmation Order (defined below), means CarePoint Health Systems Inc. d/b/a Just Health Foundation and its affiliated debtors and debtors-in-possession in the Chapter 11 Cases other than (i) Garden State Healthcare Associates, LLC and (ii) New Jersey Medical and Health Associates, LLC (the "Practice Groups").

official committee of unsecured creditors (the "<u>Committee</u>," and together with the Debtors, the "<u>Plan Proponents</u>") in the above-captioned jointly administered chapter 11 cases (the "<u>Chapter 11 Cases</u>"); and this Court having approved the Disclosure Statement as containing adequate information on an interim basis and the Plan Proponents' solicitation of acceptances of the Plan by order dated January 24, 2025 [D.I. 555] (the "<u>Solicitation Procedures Order</u>"); and the Debtors having filed the Plan Supplement on February 20, 2025 [D.I. 730]; and upon the affidavits of service filed reflecting compliance with the notice and solicitation requirements of the Solicitation Procedures Order [D.I. 619, 651, and 652] (the "<u>Affidavits of Service</u>"); and upon the *Notice of (A) Interim Approval of the Disclosure Statement and (B) Combined Hearing to Consider Final Approval of the Disclosure Statement and Confirmation of the Plan and the Objection Deadline Related Thereto* [D.I. 556] (the "<u>Confirmation Hearing Notice</u>"); and upon the *Declaration of Shamiq Syed in Support of the Plan's Limited Proposed Substantive Consolidation* [D.I. 730-8], filed with the Court on February 20, 2025 as part of the Plan Supplement; and upon the *Declaration of Emily Young of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on the Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* [D.I. 867], filed with the Court on March 6, 2025 (the "<u>Voting Declaration</u>"); and upon the *Declaration of Shamiq Syed in Support of Confirmation* [D.I. 880] (the "<u>Confirmation Declaration</u>"), the *Declaration of Debbie White, RN in Support of the Proposed Plan* [D.I. 876], and the testimony of Mr. Kevin Gross in support of the Plan given at the Confirmation Hearing, and upon the *Declaration of Angela Murdock-Ridley* [D.I. 884] filed on March 7, 2025; and upon the *Declaration of Shamiq Syed in Further Support of Confirmation* [D.I. 1086] filed on April 4, 2025; and upon the *Supplemental Declaration of Emily Young of Epiq Corporate Restructuring, LLC Regarding Voting and*

2

*Tabulation of Ballots Cast on the Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* [D.I. 1087] filed on April 5, 2025; and upon the *Plan Proponents' Memorandum of Law (I) in Support of Confirmation of Fifth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization and (II) in Response to Confirmation Objections* [D.I. 883], filed with the Court on March 6, 2025; and any objections to the Plan having been resolved or overruled by the Court pursuant to this order (the "Confirmation Order"); and a hearing having been held with respect to approval of the Disclosure Statement on a final basis and confirmation of the Plan on March 12th through March 14th 2025 and on April 10th, 2025 (the "Confirmation Hearing"); and upon the evidence adduced and proffered and the arguments of counsel made at the Confirmation Hearing; and the Court having reviewed all documents filed in connection with Confirmation and having heard all parties desiring to be heard; and upon the complete record of these Chapter 11 Cases; and after due deliberation and consideration of all of the foregoing; and sufficient cause appearing therefor; the Court hereby makes the following:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.      Findings of Fact and Conclusions of Law. The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record of the Confirmation Hearing, constitute this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to these proceedings pursuant to Bankruptcy Rules 7052 and 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      Jurisdiction and Venue. The Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the*

*United States District Court for the District of Delaware*, dated as of February 29, 2012. Venue of these proceedings and the Chapter 11 Cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Approval of the Disclosure Statement on a final basis and Confirmation of the Plan are core proceedings pursuant to 28 U.S.C. § 157(b)(2) and this Court may enter a final order with respect thereto under Article III of the United States Constitution.

C.       Chapter 11 Petitions. On November 3, 2024 (the "Petition Date"), each of the Debtors except for IJKG Opco LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court, and an involuntary petition was filed against IJKG Opco LLC, commencing these Chapter 11 Cases. On the same date, IJKG Opco LLC filed an answer to the involuntary petition [Case No. 24-12551; D.I. 2], and on November 6, 2024, the Court entered an Order for Relief with respect to IJKG Opco LLC [Case No. 24-12551; D.I. 9]. The Debtors are proper debtors under section 109 of the Bankruptcy Code and, together with the Committee, proper proponents of the Plan under section 1121(a) of the Bankruptcy Code. The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

D.       Judicial Notice. The Court takes judicial notice of the docket in these Chapter 11 Cases maintained by the clerk of the Court or its duly appointed agent.

E.       Plan Supplement. The Plan Supplement complies with the terms of the Plan, and the filing and notice of the Plan Supplement was appropriate and complied with the requirements of the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice of the Plan Supplement is or shall be required. It is acknowledged that the form of the Capitala Exit Facility Credit Agreement and the HRH Exit

4

#124965334v1

Facility Credit Agreement (collectively, the "Exit Facility Credit Agreements") and the related

agreements and documents remain under negotiation, shall be finalized as a condition to the

Effective Date, and the Capitala Exit Facility Credit Agreement shall in all events contain the

material terms set forth in the Plan's definition of "Capitala Exit Facility Credit Agreement".

The final form of the Capitala Exit Facility Credit Agreement and the related agreements and

documents shall be in form and substance acceptable to HRH, Capitala, the Plan Proponents and

the U.S. Trustee, and HRH, Capitala, the Plan Proponents and the U.S. Trustee reserve all of

their respective rights to review, comment and accept the Capitala Exit Facility Credit

Agreement and the related agreements and documents.  In addition, the Plan Proponents are

authorized to modify the Plan Supplement documents following entry of this Confirmation Order

as may be necessary to effectuate the Plan or this Confirmation Order in a manner consistent

with the Plan, this Confirmation Order, or applicable law.

  F. <u>Exit Facilities</u>. The Capitala Exit Facility, Capitala Exit Facility Credit

Agreement, HRH Exit Facility, and HRH Exit Facility Credit Agreements are essential elements

of the Plan and reflect the Debtors' exercise of their business judgment consistent with their

fiduciary duties, and entry into the Exit Facility Credit Agreements is in the best interests of the

Debtors, their Estates, and all Holders of Claims and Interests, and is necessary and appropriate

for consummation of the Plan and the operations of the Reorganized Debtors.

  G. <u>Notice of Transmittal and Mailing of Materials</u>. As is evidenced by the Voting

Declaration and the Affidavits of Service, the transmittal and service of the Combined Disclosure

Statement and Plan, the ballots for voting on the Plan (the "<u>Ballots</u>"), and Confirmation Hearing

Notice were adequate and sufficient under the circumstances, and all parties required to be given

notice of the Confirmation Hearing (including the deadline for filing and serving objections to

Confirmation of the Plan) were given due, proper, timely, and adequate notice in accordance with the Solicitation Procedures Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and all parties in interest had an opportunity to appear and be heard with respect thereto. No other or further notice is required.

H.    <u>Voting</u>. The procedures by which the Ballots for acceptance or rejection of the Plan were distributed and tabulated were fair, properly conducted, and complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, applicable non-bankruptcy law, the Plan, and the Solicitation Procedures Order.

I.    <u>Bankruptcy Rule 3016</u>. In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Plan Proponents as the plan proponents. The filing of the Combined Disclosure Statement and Plan with the clerk of the Court satisfied Bankruptcy Rule 3016(b). The Combined Disclosure Statement and Plan describe in specific and conspicuous language all acts and actions to be enjoined and identify the Persons and Entities that would be subject to injunctions. Bankruptcy Rule 3016(c) is therefore satisfied.

J.    <u>Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. As set forth below, the Plan complies with all applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

K.    <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>. The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code. In addition to Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and Priority Non-Tax Claims, which need not be classified, the Plan designates fourteen (14) different Classes of Claims and Interests. The Claims or Interests placed in each Class are substantially similar to

6

other Claims or Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan. Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

L.      <u>Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>. Article V of the Plan specifies that Class 6 (Other Secured Claims) and Class 12 (Other Interests) are Unimpaired under the Plan. Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

M.      <u>Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>. Article V of the Plan designates Class 1 (HRH Claims), Class 2 (Capitala Claims), Class 3 (Capitala Specialty Lending Claims), Class 4 (Maple Secured Claims),  Class 5 (Maple Unsecured Claims), Class 7 (General Unsecured Claims), Class 8 (Insured Claims), Class 9 (Prior Owner Claims), Class 10 (Intercompany Claims), Class 11 (Bayonne Interests), Class 13 (NJDOH Secured Claims), and Class 14 (Strategic Ventures Secured Claims) as Impaired and specifies the treatment of Claims and Interests in such Classes. Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

N.      <u>No Discrimination (11 U.S.C. § 1123(2)(4))</u>. The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest. Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

O.      <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>. The Plan and the additional documents included in the Plan Supplement provide adequate and proper means for the Plan's implementation. Thus, the requirement of section 1123(a)(5) of the Bankruptcy Code is satisfied.

P.      <u>Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6))</u>. The Plan does not provide for the issuance of any non-voting equity securities of any corporation or the

#124965334v1

Reorganized Debtors. Thus, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

Q.    <u>Selection of Officers and Directors (11 U.S.C. § 1123(a)(7))</u>. Article IX.I of the Plan provides that the board of directors of CarePoint (the "<u>Board</u>") that existed pre-petition is expected to continue to be the Board after the Effective Date of the Plan, subject to expiry of terms/appointments and re-elections. During these Chapter 11 Cases, the Board added three new directors and appointed those new directors to the Reorganization Committee, which oversees the Debtors' reorganization efforts. These new directors are expected to be phased out after the Reorganization Committee issues the D&O Report and any disputes (if any) regarding the D&O Report are consensually resolved or decided by the Court in accordance with Article IX.D of the Plan. Other than the phase out of the new directors, there is no change in the Board anticipated. On the Effective Date, it is anticipated that Yan Moshe, the principal of HRH, will become Chairman of the Board. Additionally, pursuant to Article IX.I.2 of the Plan, the current CEO of the Debtors, Dr. Moulick, will remain the CEO of the Reorganized Debtors, until a newly formed MSO is formed. Once the MSO is formed, Dr. Moulick will resign as the CEO of the Reorganized Debtors and Dr. Nizar Kifaieh will become the CEO of the Reorganized Debtors. Shamiq Syed will remain the CFO of the Reorganized Debtors. These selections and disclosures are consistent with the interests of creditors and Holders of Interests and with public policy as they ensure continuity of the operations of the Reorganized Debtors. Therefore, the requirement of section 1123(a)(7) of the Bankruptcy Code is satisfied.

R.    <u>Additional Plan Provisions (11 U.S.C. § 1123(b))</u>. The Plan's other provisions are appropriate, in the best interests of the Debtors and their Estates, and consistent with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules:

#124965334v1

i.      Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)). The Debtors have exercised reasonable business judgment in determining to assume or reject, as the case may be, certain executory contracts and unexpired leases under the terms of the Plan and this Confirmation Order, and such assumptions and rejections, as applicable, are justified and appropriate in these Chapter 11 Cases.

ii.      Preservation of Causes of Action and Litigation Claims (11 U.S.C. § 1123(b)(3). Consistent with section 1123(b)(3) of the Bankruptcy Code, (i) all Causes of Action of the Debtors or their Estates other than Litigation Claims are retained and preserved for enforcement by the Reorganized Debtors, and (ii) all Litigation Claims are transferred to, retained and preserved for enforcement by the Litigation Trust and Litigation Trustee.

iii.      Compromises and Settlements Under the Plan (11 U.S.C. § 1123(b)(3) & (b)(6)). The provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan. The compromise or settlement of all such Claims, Interests, and controversies is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

iv.      Substantive Consolidation for Limited Purposes (11 U.S.C. §§ 105(a) and 1123(b)(6)). The Plan Proponents have met their burden of introducing evidence to establish that that substantive consolidation of the Debtors' Estates for the limited purposes of voting on, confirmation of, and Distributions under the Plan is appropriate.

v.      Releases, Exculpations, and Injunctions (11 U.S.C. § 1123(b)(6)). The releases, exculpations, and injunctions provided in the Plan are (i) within the jurisdiction and power of the Court under 28 U.S.C. § 1334; (ii) integral elements of the transactions incorporated into the Plan and inextricably bound with the other provisions of the Plan; (iii) in

9

exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims; (iv) in the best interests of the Debtors and the Estates; (v) fair, equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; (vii) a bar to the Debtors, Reorganized Debtors or Litigation Trustee asserting any released claim against any of the Released Parties; and (viii) otherwise consistent with sections 105, 524, 1123, 1129, 1141, and other applicable provisions of the Bankruptcy Code and other applicable law.[4]

S.        Plan Proponents' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)). Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Plan Proponents have complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Procedures Order governing notice, disclosure, and solicitation in connection with the Combined Disclosure Statement and Plan, the Plan Supplement, and all other matters considered by the Court in connection with the Chapter 11 Cases.

T.        Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)). The Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation. The Plan is the result of extensive, good faith, arms'-length negotiations among the Debtors, the Committee, and other key stakeholders, and is supported by

---

[4] For the avoidance of doubt, any and all rights, claims and causes of action of: (a) the Practice Groups against any of the Debtors, including without limitation any objection of such parties to the Debtors' proposed cure amounts, and/or (b) any of the Debtors against the Practice Groups, are expressly reserved and preserved.

#124965334v1

Creditors and other parties in interest in the Chapter 11 Cases. The Plan promotes the objectives and purposes of the Bankruptcy Code by providing a reorganization of the Debtors while simultaneously providing for distributions to Holders of Allowed Claims against the Debtors. The Plan enables equality of distribution to Holders of Allowed Claims and a speedy yet efficient reorganization.

U.      Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). The procedures set forth in the Plan for the Court's approval of the fees, costs, and expenses to be paid in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, satisfy the objectives of, and comply with, section 1129(a)(4) of the Bankruptcy Code.

V.      Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)). Article IX.I of the Plan provides that the Board that existed pre-petition is expected to continue to be the Board after the Effective Date of the Plan, subject to expiry of terms/appointments and re-elections. During these Chapter 11 Cases, the Board added three new directors and appointed those new directors to the Reorganization Committee, which oversees the Debtors' reorganization efforts.  These new directors are expected to be phased out after the Reorganization Committee issues the D&O Report and any disputes (if any) regarding the D&O Report are consensually resolved or decided by the Court in accordance with Article IX.D of the Plan. On the Effective Date, it is anticipated that Yan Moshe, the principal of HRH, will become Chairman of the Board. Additionally, pursuant to Article IX.I.2 of the Plan, the current CEO of the Debtors, Dr. Moulick, will remain the CEO of the Reorganized Debtors, until a newly formed MSO is formed. Once the MSO is formed, Dr. Moulick will resign as the CEO of the Reorganized Debtors and Dr. Nizar Kifaieh will become the CEO of the Reorganized Debtors. Shamiq Syed will remain the CFO of the

11

Reorganized Debtors. The appointment to, or continuance in, such offices of such individuals is consistent with the interests of the Debtors' creditors and Holders of Interests and with public policy. Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

W.     No Rate Changes (11 U.S.C. § 1129(a)(6)). The Plan does not provide for any rate change that requires regulatory approval. Section 1129(a)(6) of the Bankruptcy Code is thus not applicable.

X.     Best Interests of Holders of Claims and Interests (11 U.S.C. § 1129(a)(7)). The "best interests" test under section 1129(a)(7) of the Bankruptcy Code is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Interest in such Impaired Classes either has voted to accept the Plan or will receive or retain property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. More specifically, the liquidation analysis attached as Exhibit B to the Combined Disclosure Statement and Plan, the Confirmation Declaration, and all other applicable evidence proffered or adduced at the Confirmation Hearing (i) are reasonable, persuasive, and credible; (ii) are based on reasonable and sound methodologies and assumptions; (iii) provide a reasonable estimate of the liquidation values of the Debtors upon hypothetical conversion to cases under chapter 7 of the Bankruptcy Code; and (iv) establish that each Holder of a Claim or Interest in the Impaired Classes will receive or retain, on account of such Claim or Interest, property under the Plan of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Y.     Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)). Other Secured Claims in Class 6 and Other Interests in Class 12 are Unimpaired under the Plan. The Holders of Claims in

Class 6 (Other Secured Claims) and Interests in Class 12 (Other Interests) are deemed to accept the Plan. The Holders of Claims in Class 1 (HRH Claims), Class 2 (Capitala Claims), Class 3 (Capitala Specialty Lending Claims), Class 7 (General Unsecured Claims), Class 8 (Insured Claims), and Class 13 (NJDOH Secured Claims) have voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 10 (Intercompany Claims) and Class 11 (Bayonne Interests) are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. In addition, Class 4 (Maple Secured Claims), Class 5 (Maple Unsecured Claims), Class 9 (Prior Owner Claims), and Class 14 (Strategic Ventures Secured Claims) have voted to reject the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been and cannot be satisfied as to those rejecting Classes. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b) of the Bankruptcy Code, as set forth below.

Z.       Treatment of Administrative Expense Claims, Professional Fee Claims and Priority Tax Claims (11 U.S.C. § 1129(a)(9)). The treatment of Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and Priority Non-Tax Claims pursuant to Article IV of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

AA.       Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)). Class 2 (Capitala Claims), Class 3 (Capitala Specialty Lending Claims), Class 7 (General Unsecured Claims), Class 8 (Insured Claims), and Class 13 (NJDOH Secured Claims) are each an Impaired Class of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any Insider. Therefore, section 1129(a)(10) of the Bankruptcy Code is satisfied.

BB.       Feasibility (11 U.S.C. § 1129(a)(11)). The evidence provided in support of Confirmation establishes that the Plan is feasible because (i) sufficient funds exist for the

Debtors, Reorganized Debtors and/or the Litigation Trust to make all required distributions under the Plan, (ii) the Reorganized Debtors will be well-positioned to service their ordinary course obligations and successfully operate their businesses on a go-forward basis based upon, among other things, the projections included in the Plan Supplement, and (iii) the Litigation Trustee will have funding and the ability to prosecute and potentially monetize Litigation Claims for the benefit of the Litigation Trust Beneficiaries. Furthermore, reasonable, persuasive, and credible evidence proffered or adduced at or prior to the Confirmation Hearing establishes that the Plan is feasible. Confirmation of the Plan is not likely to be followed by the liquidation (except as otherwise provided in the Plan) or need for further financial reorganization of the Debtors. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

CC.     Payment of Fees (11 U.S.C. § 1129(a)(12)). The Plan requires that all fees payable under 28 U.S.C. § 1930 have been paid or will be paid pursuant to Article XVII.C of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code.

DD.     Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(15)). Sections 1129(a)(14)-(15) of the Bankruptcy Code are inapplicable as the Debtors (i) have no domestic support obligations (§ 1129(a)(14)), and (ii) are not individuals (§ 1129(a)(15)).

EE.     Transfers of Property—Sections 1129(a)(16). All transfers of property contemplated by the Plan comply with applicable nonbankruptcy law governing transfers of property by a corporation or trust that is not a moneyed, business, or commercial trust, thereby satisfying section 1129(a)(16) of the Bankruptcy Code.

FF.     No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. § 1129(b)). The treatment of Claims and Interests in Classes 10 (Intercompany Claims) and 11 (Bayonne Interests), which are deemed to have rejected the Plan, and Claims in Class 4 (Maple Secured

14

Claims), Class 5 (Maple Unsecured Claims), Class 9 (Prior Owner Claims), and Class 14

(Strategic Ventures Secured Claims), which voted to reject the Plan, does not discriminate

unfairly and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy Code. There is

no Class of Claims or Interests junior to the Holders of Claims or Interests in Class 5 (Maple

Unsecured Claims), Class 9 (Prior Owner Claims), Class 10 (Intercompany Claims), and Class

11 (Bayonne Interests) that will receive or retain property under the Plan on account of their

Claims or Interests. The treatment of Claims in Class 4 (Maple Secured Claims) and Class 14

(Strategic Ventures Secured Claims) does not discriminate unfairly and is fair and equitable

pursuant to section 1129(b)(1) of the Bankruptcy Code. Accordingly, the Plan does not violate

the absolute priority rule, does not discriminate unfairly, and is fair and equitable with respect to

each Class that rejected or is deemed to have rejected the Plan. Thus, the Plan satisfies the

requirements of section 1129(b) of the Bankruptcy Code.

GG.    <u>Only One Plan (11 U.S.C. § 1129(c))</u>. The Plan is the only chapter 11 plan

proposed in the Chapter 11 Cases, and section 1129(c) of the Bankruptcy Code is therefore

satisfied.

HH.    <u>Principal Purpose (11 U.S.C. § 1129(d))</u>. The principal purpose of the Plan is

neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities

Act of 1933, and no governmental unit has objected to the Confirmation of the Plan on any such

grounds.  Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

II.    <u>Satisfaction of Confirmation Requirements</u>. Based upon the foregoing, the Plan

Proponents have met their burden of proving the elements of sections 1129(a) and (b) of the

Bankruptcy Code by a preponderance of the evidence, the Plan satisfies all the requirements for

#124965334v1

Confirmation set forth in section 1129 of the Bankruptcy Code, and the Plan should be confirmed.

JJ.     <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>. The Plan Proponents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Solicitation Procedures Order in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation and injunction provisions set forth in Article XIV of the Plan.

KK.     <u>Executory Contracts and Unexpired Leases</u>. The Debtors have exercised reasonable business judgment in determining whether to assume or reject their executory contracts and unexpired leases pursuant to Article XII of the Plan. Each assumption or rejection of an executory contract or unexpired lease pursuant to Article XII of the Plan shall be legal, valid, and binding upon the Reorganized Debtors or the Litigation Trust, as applicable, and all non-debtor parties (and their assignees or successors) to such executory contracts or unexpired leases, all to the same extent as if such assumption or rejection had been effectuated pursuant to an order of the Court entered before Confirmation under section 365 of the Bankruptcy Code.

LL.     <u>Cure and Adequate Assurance</u>. The Debtors have (a) cured, or provided adequate assurance that the Reorganized Debtors, as applicable, will promptly cure, all defaults (if any) under or relating to each of the executory contracts and unexpired leases that is being assumed pursuant to the Plan and (b) provided adequate assurance of future performance regarding the executory contracts and unexpired leases that are being assumed pursuant to the Plan, *provided*,

#124965334v1

*however*, that with respect to all counter-parties who have filed a timely objection to such cure amount or adequate assurance, the Court shall make a determination at a subsequent hearing regarding such cure amount and whether the Debtors have provided adequate assurance of future performance and all of the rights of the counter-parties shall be reserved and preserved pending that determination.

MM.    <u>Retention of Jurisdiction</u>. The Court retains jurisdiction and power over the matters set forth in Article XV of the Plan.

NN.    <u>Intentionally Omitted</u>.

OO.    <u>Intentionally Omitted</u>.

PP.    <u>Fact Findings With Respect to Alternative Transaction</u>. The Solicitation Procedures Order and the Plan set forth certain procedures for submission of bids by any party that proposes an Alternative Transaction under the Plan (the "<u>Alternative Transaction Procedures</u>").  The Debtors and their professionals marketed their assets appropriately and conducted the marketing and sale process in accordance with the Alternative Transaction Procedures in good faith without collusion.

QQ.    The marketing process set forth in the Alternative Transaction Procedures and the Solicitation Procedures Order was fair in substance and procedure and afforded a full and fair opportunity for any party to make a higher or otherwise better offer to propose an Alternative Transaction. Based upon the record of these proceedings, all creditors of the Debtors, other parties in interest in the Chapter 11 Cases, and all prospective bidders have been afforded a reasonable and fair opportunity to propose an Alternative Transaction.  The Debtors received no qualified bids for an Alternative Transaction other than the existing qualified bid of HRH.

RR.    <u>Good Faith</u>.  The Collateral Surrender Agreement was negotiated by the Debtors and HRH and its respective agents and representatives, in good faith, at arms' length, and without collusion or fraud. The terms and conditions of the Collateral Surrender Agreement are fair and reasonable, and the transactions contemplated therein, is in the best interest of the Debtors, their estates, creditors, interest holders and other parties in interest. HRH is a "good faith purchaser" entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code and any other applicable bankruptcy or non-bankruptcy law with respect to the Collateral Surrender Agreement.

SS.    <u>Fair Consideration</u>.  The consideration provided by HRH to the Debtors under the Collateral Surrender Agreement (i) is fair and reasonable, (ii) is the highest or best offer, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession or the District of Columbia.

TT.    <u>Strategic Ventures Term Sheet</u>.  As set forth on the record, Strategic Ventures LLC ("<u>Strategic Ventures</u>") agreed to withdraw the *Objection of Strategic Ventures LLC to Final Approval and Confirmation of Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* [D.I. 857] based on the terms and conditions set forth in the term sheet attached hereto as **<u>Exhibit C</u>** (the "<u>Strategic Ventures Term Sheet</u>").  The Debtors shall honor the terms of the Strategic Ventures Term Sheet with respect to Strategic Ventures after the entry of this Confirmation Order. The parties do not request approval of and the Court does not approve the Strategic Ventures Term Sheet and the Court shall not retain jurisdiction over any disputes relating thereto.

18

Based on the foregoing findings, and on the record made before the Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

**Confirmation of the Plan**

1.      The Plan, as and to the extent modified by this Confirmation Order, is **APPROVED** and **CONFIRMED** pursuant to section 1129 of the Bankruptcy Code.

2.      Each provision of the Plan is authorized and approved and shall have the same validity, binding effect, and enforceability as every other provision of the Plan. The terms of the Plan, as previously modified and as modified by any modifications made by this Confirmation Order, are incorporated by reference into and are an integral part of this Confirmation Order. The failure specifically to describe, include, or refer to any particular article, section, part, or provision of the Plan, the Plan Supplement, or any related document in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, part, or provision, and the Plan, the Plan Supplement, and all related documents are approved and confirmed in their entirety.

3.      Any resolutions of objections to Confirmation of the Plan explained on the record at the Confirmation Hearing are hereby incorporated by reference. All unresolved objections, statements, joinders, comments, and reservations of rights in opposition to or inconsistent with the Plan have been fully considered by the Court and are hereby **DENIED** and **OVERRULED** with prejudice on the merits and in their entirety. All withdrawn objections are withdrawn with prejudice. The record of the Confirmation Hearing is hereby closed and such evidentiary record shall not be amended, modified, or supplemented.

**Discharge of the Debtors**

4.      Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims, Interests, and causes of action in or against any Debtor, its assets or property of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, contingent or noncontingent, or liquidated or unliquidated, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Interests or causes of action, that arose or accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such Claim, debt, right, cause of action or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.[5]

**Compromises and Settlements Under the Plan**

5.      Notwithstanding anything to the contrary in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, Distributions, releases, and other benefits provided pursuant to the Plan, on the Effective Date, the releases in Articles XIV.D and XIV.E of the Plan, the HRH Subordination Stipulation, the HRH Entity Absolute Subordination, and the settlements set forth herein in paragraphs 66-80 of

---

[5]   For the avoidance of doubt, any and all rights, claims and causes of action of: (a) Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates, LLC against any of the Debtors, and/or (b) any of the Debtors against Garden State Healthcare Associates, LLC and New Jersey Medical and Health Associates, LLC, are expressly reserved and preserved.

this Confirmation Order shall each constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan or relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest, or any Distribution to be made on account of such Claim or Interest. All compromises and settlements set forth in the Plan and in this Confirmation Order are approved in all respects as good faith, fair, reasonable, and equitable compromises and settlements pursuant to Bankruptcy Rule 9019(a) and sections 105(a), 1123(a)(5), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code.

### Classification and Treatment

6.      The Plan's classification scheme is approved. The classifications set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall modify or otherwise affect, the actual classification of such Claims under the Plan for Distribution purposes; (c) may not be relied on by any Holder of a Claim as representing the actual classification of such Claim under the Plan for Distribution purposes; and (d) shall not be binding on the Debtors, the Estates, or the Litigation Trust except for voting purposes.

### Authorization to Implement the Plan

7.      On the Effective Date, the certificates of incorporation, bylaws, operating agreements, and articles of organization, as applicable, of all the Debtors shall hereby be amended to the extent necessary to carry out the provisions of the Plan. The entry of this Confirmation Order shall constitute authorization for the Reorganized Debtors and the Litigation Trustee, as applicable, to take or cause to be taken all actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on, and after the Effective

#124965334v1

Date and all such actions taken or caused to be taken shall hereby be authorized and approved by the Court without further approval, act, or action under any applicable law, order, rule, or regulation.

8.     To the extent allowable under applicable law, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan or the Plan Supplement.

9.     Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan or made in connection therewith shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a). Upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. The Court shall retain specific jurisdiction with respect to these matters.

10.     The issuance of the Litigation Trust Interests in accordance with the Plan is approved. The Litigation Trust is authorized, without further approval of this Court or any other Person or Entity, to take such actions and to perform such acts as may be necessary, desirable, or appropriate to implement the issuance of the Litigation Trust Interests in accordance with the Plan.

#124965334v1

11.     Intentionally omitted.

**Enforceability of the Plan and Plan Supplement**

12.     Pursuant to sections 1123(a), 1141(a), and 1142 of the Bankruptcy Code, the Plan

and all Plan-related documents (including the Litigation Trust Agreement and Plan Supplement,

as the same may be amended consistent with the terms of the Plan) shall be, and hereby are,

valid, binding, and enforceable.  Subject to the terms of the Plan, upon the occurrence of the

Effective Date, the Plan and the Plan Supplement (as the same may be amended consistent with

the terms of the Plan) shall be immediately effective and enforceable binding on the Debtors, all

Creditors and Holders of Interests, and all other Persons in accordance with their respective

terms.

13.     The form of the Exit Facility Credit Agreements and the related agreements shall

be finalized as a condition to the Effective Date, and the Capitala Exit Facility Credit Agreement

shall in all events contain the material terms set forth in the Plan's definition of "Capitala Exit

Facility Credit Agreement".  The final form of the Capitala Exit Facility Credit Agreement and

the related agreements and documents shall be in form and substance acceptable to HRH,

Capitala and the Plan Proponents, and HRH, Capitala and the Plan Proponents reserve all of their

respective rights to review, comment and accept the Capitala Exit Facility Credit Agreement and

the related agreements and documents. In addition, the Plan Proponents are authorized to make

non-material modifications to the Plan Supplement documents following entry of this

Confirmation Order as may be necessary to effectuate the Plan or this Confirmation Order in a

manner consistent with the Plan, this Confirmation Order, or applicable law.

**Exit Facilities**

14.     On or around the Effective Date, the Debtors or the Reorganized Debtors, as

applicable are hereby authorized to enter into, execute, and deliver the Exit Facility Credit

23

Agreements and pay any and all applicable fees and expenses due in connection with the Exit Facility Credit Agreements. The Court hereby (a) authorizes entry into the Capitala Exit Facility and HRH Exit Facility, and all transactions contemplated thereby and therein, and all actions taken or to be taken, all undertakings made or to be made, and obligations incurred or to be incurred by the Debtors and the Reorganized Debtors, as applicable, in connection therewith, including the payment of all fees and expenses, losses, damages, indemnities and other amounts provided for by the Exit Facility Credit Agreements, (b) authorizes the Debtors and the Reorganized Debtors, as applicable, without further notice to or action, order or approval of this Court and without the need for any further corporate or shareholder action, to enter into and/or fully perform their obligations under the Exit Facility Credit Agreements, including, without limitation, the payment of all fees and expenses in connection therewith, and (c) approves, pursuant to sections 105(a), 363(b), 503(b)(1), and 507(a)(2) of the Bankruptcy Code, all fees, costs, obligations, and expenses paid by the Debtors or to be paid by the Reorganized Debtors in connection with the Exit Facility Credit Agreements, as applicable.

15.     Upon the Effective Date, the Exit Facility Credit Agreements shall constitute a legal, valid, binding, and authorized debt obligation of each of the applicable Reorganized Debtors, and the terms and provisions set forth in the Exit Facility Credit Agreements shall be enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Credit Agreements have been extended in good faith, for legitimate business purposes, are reasonable, are for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder, shall not be subject to challenge, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers, fraudulent

24

conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  Notwithstanding the foregoing and for the avoidance of doubt: (a) the HRH Exit Facility shall be junior and subordinate to the Capitala Exit Facility in liens and right of payment pursuant and subject to the Plan, the HRH Entity Absolute Subordination and the Capitala/HRH Exit Intercreditor Agreement; and (b) the terms of the HRH Subordination Stipulation and HRH Entity Absolute Subordination are and shall remain binding in all respects, including after the Effective Date.

16.    On the Effective Date, all of the liens, mortgages, deeds of trust, pledges, and other security interests to be granted in accordance with the Exit Facility Credit Agreements (a) shall hereby be granted, (b) shall be legal, binding and enforceable liens on, and security interests in, the applicable collateral granted thereunder in accordance with the terms of the Exit Facility Credit Agreements, (c) shall hereby be automatically perfected and non-avoidable on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Credit Agreements, (d) shall not be subject to avoidance, recharacterization or equitable subordination for any purposes whatsoever and (e) shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

17.    Without in any way limiting the automatically effective perfection as set forth herein, the Debtors and the Reorganized Debtors, as applicable, and the secured parties (and their designees and agents) under the Exit Facility Credit Agreements are hereby authorized to make all filings and recordings, and to obtain all governmental approvals and consents to evidence, establish, continue, and perfect all such liens, mortgages, deeds of trust and other security interests under the provisions of the applicable state, federal, or other law that would be

25

applicable in the absence of the Plan and this Confirmation Order and shall thereafter cooperate to make any such filings and recordings. To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder has filed or recorded publicly any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors, the Reorganized Debtors, and/or the collateral agent or administrative agent, as applicable, with respect to the Capitala Exit Facility or HRH Exit Facility that are necessary to release and/or extinguish such liens and security interests.

### Continued Existence of the Debtors and Vesting of Assets

18.      On and after the Effective Date, subject to the requirements of the Plan, each of the Debtors shall continue to exist after the Effective Date, as a separate corporation, limited liability company, partnership, not-for-profit entity, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, not-for-profit entity, or other form as entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are amended pursuant to the Plan and require no further action or approval. Except as otherwise provided in the Plan, in any agreement, instrument, or other document incorporated in, or entered into, in connection with, or pursuant to the Plan or the Confirmation Order, on the Effective Date, all Litigation Trust Assets will vest in the Litigation Trust, free and clear of all Liens, Claims, charges, or other encumbrances;

26

*provided*, *however*, that notwithstanding anything in this Confirmation Order or the Plan to the contrary, the transfer of the Litigation Claims that are subject to the Collateral Sharing Agreement to the Litigation Trust shall be without prejudice to the right of Maple Healthcare, LLC ("Maple") to continue to assert a security interest in such Litigation Claims and without prejudice to the rights of the Litigation Trustee to challenge, object to or otherwise contest any such security interest, and all of the Litigation Trustee's rights, claims, defenses and remedies with respect to the Collateral Sharing Agreement or otherwise are expressly reserved and preserved.

19.     Except as otherwise provided in the Plan, the Litigation Trust Agreement, or in any agreement, instrument, or other document incorporated into the Plan or the Plan Supplement (including the HRH Transactions), on the Effective Date, pursuant to section 1141 of the Bankruptcy Code, all property of the Debtors' Estates other than the Litigation Trust Assets (which shall vest in the Litigation Trust) shall vest in the Reorganized Debtors, free and clear of all Claims, Liens encumbrances and interests. From and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and use, acquire and dispose of property without supervision by the Court and free of any restrictions on of the Bankruptcy Code, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

### Substantive Consolidation for Limited Purposes

20.     The substantive consolidation of the Debtors' Estates for the limited purposes of voting on, confirmation of, and Distributions under the Plan is appropriate and is hereby approved.

21.     On the Effective Date, (i) all assets and liabilities of the Debtors will be merged or treated as if they were a single pool of assets and a single pool of liabilities for the limited

27

purpose of Distributions under the Plan; (ii) any obligation of a Debtor and any guarantee thereof by any other Debtor shall constitute one single obligation, and any such guarantee shall be eliminated, (iii) each Claim filed or to be filed against more than one Debtor shall be considered filed only against one consolidated Debtor and shall constitute a single Claim against and a single obligation of the Debtors, and (iv) any joint or several liability of the Debtors shall constitute one obligation of the Debtors. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment performance made by one Debtor as to the obligations of another Debtor shall be released and of no further force and effect.

22.    The limited substantive consolidation effected pursuant to Article IX.A of the Plan shall not affect the rights of any holder of a Secured Claim with respect to the collateral securing such Claim, and shall not prejudice the Litigation Claims, which shall survive entry of the Confirmation Order (subject to the releases set forth in Article XIV.D of the Plan) as if there had been no limited substantive consolidation. For the avoidance of doubt, except as otherwise provided in the Plan, after the Effective Date, each Debtor shall continue to exist as a separate entity, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective formation documents in effect before the Effective Date.

### The HRH Transactions

23.    On the Effective Date, in accordance with the Plan, (i) the assets of Bayonne (other than any Litigation Claims) shall be transferred to HRH as set forth in and pursuant to the Collateral Surrender Agreement, and HRH shall be granted all rights under the Collateral Surrender Agreement; (ii)  Debtors are authorized to enter into the Hospital Facilities MSA and HRH shall be granted the right to operate and manage Christ Hospital and HUMC as set forth in

28

and pursuant to the Hospital Facilities MSA; and (iii) the MSA is assumed by the Debtors, and HRH shall be granted all rights under the MSA.

24.    HRH is a good faith purchaser under the Collateral Surrender Agreement and is hereby granted and entitled to all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.

25.    <u>Free and clear transfer</u>.  Effective as of the Closing (as defined in the Collateral Surrender Agreement), the surrender of collateral under the Collateral Surrender Agreement in accordance with its terms shall constitute a legal, valid and effective transfer of the assets transferred thereunder, and shall vest HRH with all right, title, and interest in the assets transferred thereunder, free and clear of all claims and Encumbrances other than Permitted Encumbrances (as those terms are defined in the Collateral Surrender Agreement) pursuant to section 363(f) of the Bankruptcy Code, and the assumption of any Assumed Liabilities (defined in the Collateral Surrender Agreement) by HRH constitutes a legal, valid, and effective assignment and delegation of any and all obligations, liabilities, and claims in respect thereof to HRH.

26.    <u>No successor liability</u>.  Except as is expressly set forth in the Collateral Surrender Agreement, HRH and its affiliates, predecessors, successors, assigns, members, partners, directors, officers, principals, agents and shareholders (or equivalent) are not and shall not be considered (i) a "successor" in any respect to the Debtors and their estates as a result of the transactions contemplated by the Collateral Surrender Agreement or any other event occurring in the Chapter 11 Cases under any theory of law or equity, (ii) to have, de facto or otherwise, merged, or consolidated with or into the Debtors or their estates, (iii) to have a common identity

with the Debtors, (iv) to have a continuity of enterprise with the Debtors, or (v) to be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.

27.     On or before the Effective Date, in accordance with the Plan, HRH shall either transfer or provide a line of credit for the Litigation Trust Seed Money, in the amount of $3,500,000, to fund the Litigation Trust, secured by a first lien to the extent of the Litigation Trust Seed Money on the proceeds of the Litigation Claims.  In accordance with the Plan, the Litigation Trustee shall have the sole and absolute discretion to determine whether to require the transfer of the Litigation Seed Trust Money at inception of the Litigation Trust or to allow a line of credit to access the Litigation Trust Seed Money. The Litigation Trust Seed Money shall bear interest at the rate of eighteen percent (18%) per annum compounded annually. The Litigation Trust Seed Money, or any portion thereof, may be prepaid by the Litigation Trustee at any time without payment of any penalty or premium of any kind.

28.     Notwithstanding any other provisions of the Plan, the Plan Supplement or this Confirmation Order, HRH shall provide sufficient funding under the HRH Exit Facility to pay all Allowed Administrative Expense Claims of IJKG which have not been satisfied by the Effective Date, and such Allowed Administrative Expense Claims shall be paid in the ordinary course of business.

### The Litigation Trust and Litigation Trustee

29.     The Litigation Trust Agreement, substantially in the form filed with the Plan Supplement, as such Plan Supplement may be amended in accordance with the Plan, is hereby approved.

30.     The appointment of Paul Navid of Province, LLC as the Litigation Trustee is hereby approved. The Litigation Trustee shall be compensated in the manner set forth in and consistent with the Litigation Trust Agreement.

#124965334v1

31.    The appointment of the members and *ex-officio* member of the Litigation Trust

Oversight Committee as listed on <u>Schedule 1</u> to the Litigation Trust Agreement is hereby

approved.  The Litigation Trust Oversight Committee shall have all powers, rights, duties, and

protections afforded to the Litigation Trust Oversight Committee under the Plan and the

Litigation Trust Agreement.

32.    On the Effective Date, the Litigation Trust shall be established pursuant to the

Litigation Trust Agreement for the primary purposes of investigating, prosecuting, or settling the

Litigation Claims, liquidating the Litigation Trust Assets, and making Distributions in

accordance with the Plan and the Litigation Trust Agreement. The Litigation Trust shall have the

exclusive right and authority to investigate, commence, pursue and/or settle any Litigation

Claims, with the net proceeds of such Litigation Claims to be distributed in accordance with the

Plan and Litigation Trust Agreement.

33.    On the Effective Date, and in accordance with and pursuant to the terms of the

Plan, the Reorganized Debtors shall transfer and assign to the Litigation Trust all of their right,

title, and interest in and to all of the Litigation Trust Assets and all such assets shall

automatically vest in the Litigation Trust free and clear of all Claims, Liens, and other interests;

*provided*, *however*, that notwithstanding anything in this Confirmation Order or the Plan to the

contrary, the transfer of the Litigation Claims that are subject to the Collateral Sharing

Agreement to the Litigation Trust shall be without prejudice to the right of Maple Healthcare,

LLC to continue to assert a security interest in such Litigation Claims and without prejudice to

the rights of the Litigation Trustee to challenge, object to or otherwise contest any such security

interest, and all of the Litigation Trustee's rights, claims, defenses and remedies with respect to

the Collateral Sharing Agreement or otherwise are expressly reserved and preserved. The

Litigation Trustee shall accept all Litigation Trust Assets on behalf of the Litigation Trust Beneficiaries, and be authorized to obtain, collect, seek the turnover of, liquidate, and collect all of the Litigation Trust Assets not in its possession or control.

34.     The Litigation Trust will be managed and administered by the Litigation Trustee, subject to the oversight of the Litigation Trust Oversight Committee in accordance with the terms of the Plan and the Litigation Trust Agreement, without need for any other notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.

35.     The Litigation Trustee shall constitute the Estates' representative in accordance with section 1123 of the Bankruptcy Code. The Litigation Trustee shall have all powers, rights, duties, and protections set forth in the Plan and the Litigation Trust Agreement, including, without limitation, the powers set forth in Article X.I.1 of the Plan and the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, in addition to any powers granted by law or conferred to it by any other provision of the Plan. The Litigation Trust shall have the power to conduct investigations pursuant to Bankruptcy Rule 2004 and such power shall continue until dissolution of the Litigation Trust.

### Preservation of Causes of Action and Litigation Claims

36.     In accordance with the Plan, (i) all Causes of Action of the Debtors or their Estates other than Litigation Claims are retained and preserved for enforcement by the Reorganized Debtors, and (ii) subject to Maple's rights regarding the Collateral Sharing Agreement set forth herein, all Litigation Claims are transferred to, retained and preserved for enforcement by the Litigation Trust and Litigation Trustee. All of the Litigation Trustee's rights, claims, defenses and remedies with respect to the Collateral Sharing Agreement or otherwise are expressly reserved and preserved. No Entity or Person may rely on the absence of a specific

32

reference in the Plan to any Causes of Action, Avoidance Actions or Litigation Claims against them as any indication that the Reorganized Debtors or Litigation Trust, as applicable, will not pursue any and all available Causes of Action, Avoidance Actions or Litigation Claims against such Entity or Person. The Debtors, the Reorganized Debtors and the Litigation Trust expressly reserve all rights to prosecute any and all Causes of Action, Avoidance Actions or Litigation Claims, as applicable, against any Person other than the Released Parties, in accordance with the Plan.

37.     The deadline for the Litigation Trustee to assert or commence any Litigation Claim against any party, including, without limitation, Maple, the Prior Owners, and CarePoint Health Captive Assurance Company, LLC, shall be governed by sections 108 and 546 of the Bankruptcy Code and otherwise applicable law; *provided*, *however*, that any objection to the amount, validity, extent, priority or perfection of any Claims, liens or security interests asserted by any party, other than the Released Parties, shall be subject to the Claims Objection Deadline.

## Executory Contracts and Unexpired Leases

38.     Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, each of the Executory Contracts and Unexpired Leases to which any Debtor is a party shall be automatically rejected by the Debtors effective as of the Effective Date, unless such contract or lease (1) previously has been assumed or rejected by the applicable Debtor; (2) expired or terminated pursuant to its own terms; (3) was the subject of a motion to assume or reject pending before the Court as of the Confirmation Date; (4) is identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed; (5) is an Insurance Policy; or (6) is contemplated by the HRH Transactions.

#124965334v1

39.     For the avoidance of doubt, the executory contracts and unexpired leases that are being assumed pursuant to the Plan are listed in the Sixth Amended Exhibit F to Plan Supplement, Schedule of Rejected Contracts and Unexpired Leases at D.I. 1122.

40.     All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan, if any, must be filed within thirty (30) days after the Effective Date. Any such Claims arising from the rejection of Executory Contracts or Unexpired Leases that are not timely filed will be forever disallowed, barred, and unenforceable, and Persons holding such Claims will not receive and shall be barred from receiving any Distributions on account of such untimely Claims.

41.     Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor party thereto in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any Order of the Court authorizing and providing for its assumption. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be hereby modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

42.     Any Executory Contract or Unexpired Lease which is identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed is subject to assignment

34

to a third party, with the identity of such third party to be set forth in writing and noticed to counterparties on or before the Effective Date of the Plan.

43.     In the event of a dispute regarding: (i) the Cure amount; (ii) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to the assumption, the Cure payments required by section 356(b)(1) of the Bankruptcy Code shall be made following either (1) the entry of a Final Order or orders resolving the dispute and approving the assumption or (2) the settlement of the dispute between the parties which may be entered into without further Order of the Court; *provided*, *that* in connection with a dispute regarding the Cure amount, the Debtors (i) will pay the undisputed Cure amount, if any, on the Effective Date, to the counterparty to the Executory Contract or Unexpired Lease and (ii) shall place an amount equal to the disputed portion of such Cure amount in cash in a segregated account pending resolution of the applicable cure dispute. Upon resolution of the applicable cure dispute, the Debtors or Reorganized Debtors shall pay any remaining amount due to the applicable counterparty.

44.     Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article XII.B of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed

shall be disallowed and expunged, without further notice to or action, order, or approval of the
Court.

## Continuation of Insurance Policies

45.    All Insurance Policies in effect as of the Effective Date shall remain in full force
and effect in accordance with their terms on and after the Effective Date and shall not be rejected
pursuant to the Plan. The Reorganized Debtors shall pay any premiums necessary to maintain
such Insurance Policies through the end of the policy period that applied as of the
Effective Date, and may not terminate any such Insurance Policies prior to the end of the policy
period that applied as of the Effective Date without the consent of the Litigation Trustee.

46.    Pursuant to Article XII.E. of the Plan, this Confirmation Order shall constitute a
determination that no default by the Debtors exists with respect to any of the Insurance Policies
and nothing in any prior order, any prior agreements, or the Plan shall be construed or applied to
modify, impair, or otherwise affect the enforceability of the Insurance Policies or any coverage
thereunder with regard to any Causes of Action (including, but not limited to, the Litigation
Claims, D&O Claims and tort claims), or claims, interests, or rights of the Debtors, the Estates,
the Litigation Trustee, or the Litigation Trust.

## Administrative Expense Claims Bar Date

47.    All requests for payment of Administrative Expense Claims (other than
Professional Fee Claims and the Claims of Governmental Units arising under section
503(b)(1)(B), (C) or (D) of the Bankruptcy Code) must be filed with the Claims and Noticing
Agent (https://dm.epiq11.com/case/carepoint/claims) and served on the Reorganized Debtors and
the Litigation Trustee no later than thirty (30) days after the Effective Date. Unless otherwise
Ordered by the Court, the failure to file a request for payment of an Administrative Expense
Claim on or before the Administrative Expense Claims Bar Date, or the failure to serve such

request timely and properly, shall result in the Administrative Expense Claim being forever barred and disallowed without further order of the Court.

## Professional Fee Claims

48.     All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 363, 503(b), or 1103 of the Bankruptcy Code must be made by application filed with the Court (each, a "Final Fee Application") and served on counsel to the Debtors, counsel to the Committee, counsel to the Litigation Trust, and the U.S. Trustee no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Court.

49.     All objections to the allowance of such Professional Fee Claims must be Filed and served on counsel to the Debtors, counsel to the Committee, counsel to the Litigation Trust, the U.S. Trustee, and the requesting Professional, within twenty-one (21) days after the date on which the applicable Final Fee Application was filed (or such longer period as may be allowed by order of the Court or by agreement of the requesting Professional).

50.     The Professional Fee Reserve shall be maintained by Dilworth Paxson LLP, counsel to the Debtors, in an IOLTA account. All Professional Fee Claims shall be paid from the Professional Fee Reserve to the extent approved by order of the Court within five (5) Business Days after entry of such order.

## Releases, Injunction, and Exculpation

51.     The discharge, release, injunction, exculpation and related provisions set forth in Article XIV of the Plan are hereby approved in their entirety.

52.     Discharge. Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective

37

Date, of all Claims, Interests, and causes of action in or against any Debtor, its assets or property

of any nature whatsoever, including any interest accrued on Claims from and after the Petition

Date, whether known or unknown, contingent or noncontingent, or liquidated or unliquidated,

regardless of whether any property shall have been distributed or retained pursuant to the Plan on

account of such Claims, Interests or causes of action, that arose or accrued before the Effective

Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy

Code, in each case whether or not: (1) a Proof of Claim based upon such Claim, debt, right,

cause of action or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy

Code; (2) a Claim or Interest based upon such debt or right is Allowed pursuant to section 502 of

the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.

53.     Debtor Releases. Effective as of the Effective Date, for good and valuable

consideration, the adequacy of which is hereby confirmed, the Debtors, their Estates, and the

Debtors' current Affiliates (except, for the avoidance of doubt, the Practice Groups), successors

and assigns, including any successor to the Debtors or any Estate representative appointed or

selected pursuant to Bankruptcy Code section 1123(b)(3), including the Litigation Trustee, shall

forever release, waive, and discharge each of the Released Parties from any Claim, Cause of

Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding,

suit, account, controversy, agreement, promise, right to legal remedies, right to equitable

remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or

hereinafter arising in law, equity, or otherwise, for any act or omission in connection with,

relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors'

operations, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any

security of the Debtors, the subject matter of, or the transactions or events giving rise to, any

#124965334v1

Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, or the Combined Disclosure Statement and Plan, and the administration, formulation, preparation, dissemination, solicitation, negotiation, consummation, and implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date. For the avoidance of doubt, nothing in the Plan shall constitute a release by any Prior Owner. For the avoidance of doubt, the Practice Groups are not granting Debtor Releases and any rights, claims and causes of action of the Practice Groups and their creditors (solely in their capacities as creditors of the Practice Groups and not in their capacities as creditors of the Debtors) are not prejudiced in any way by Article XIV.D of the Plan.

54.  <u>Exculpation and Limitation of Liability</u>. Effective as of the Effective Date, except as otherwise specifically provided in the Plan, the Exculpated Parties shall not have or incur, and are hereby released and exculpated from, any liability, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively in law or equity, to any Holder of a Claim or an Interest, or any other

party-in-interest, or any of their respective members, directors, officers, managers, trustees, employees, advisors, attorneys, professionals, agents, partners, stockholders or Affiliates (except, for the avoidance of doubt, the Practice Groups), or any of their respective successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Combined Disclosure Statement and Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct  (in each case as determined by a Final Order entered by a court of competent jurisdiction), and such parties in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Combined Disclosure Statement and Plan. For the avoidance of doubt, nothing contained in this paragraph shall exculpate acts or omissions prior to the Petition Date or post-Effective Date. For the avoidance of doubt, the Practice Groups are not exculpating any parties and the rights, claims and causes of action of the Practice Groups and their creditors (solely in their capacities as creditors of the Practice Groups and not in their capacities as creditors of the Debtors) are not prejudiced in any way by Article XIV.E of the Plan.

55.     <u>Injunction</u>. Effective as of the Effective Date, all Persons and Entities that hold, have held, or may hold a claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, or liability of any nature whatsoever, that is released, exculpated, compromised, or settled pursuant to the Combined Disclosure Statement and Plan, shall be permanently, forever and completely stayed, restrained,

prohibited, barred and enjoined from taking any of the following actions (other than actions to enforce any rights or obligations under the Combined Disclosure Statement and Plan): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum against or affecting the Debtors, the Litigation Trust, the Released Parties or any of their respective property; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order against the Debtors, the Litigation Trust, the Released Parties or any of their respective property; (iii) creating, perfecting, or in any way enforcing in any manner, directly or indirectly, any encumbrance or Lien of any kind against the Debtors, the Litigation Trust, the Released Parties or any of their respective property; (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtors, the Litigation Trust, the Released Parties or any of their respective property, except with respect to any right of setoff asserted prior to the entry of this Confirmation Order, whether asserted in a Proof of Claim or otherwise, or as otherwise contemplated, impaired, or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Combined Disclosure Statement and Plan; and (vi) prosecuting or otherwise asserting (A) any Claim or Interest, including any right, claim, or Cause of Action released pursuant to the Plan, (B) any form of objection to any Claim that is Allowed by the Plan and this Confirmation Order, or (C) Avoidance Actions against any Holder of a Claim that is Allowed or any Avoidance Action released by the Plan.  Additionally, unless otherwise explicitly stated in the Combined Disclosure Statement and Plan, in furtherance of the releases granted by the Plan or this Confirmation Order, the injunction contemplated by this paragraph shall prohibit the

41

assertion against the Litigation Trust and the Litigation Trustee of all Claims or Interests, if any, related to the Debtors.

### Payment of Statutory Fees

56.     All Statutory Fees payable prior to the Effective Date shall be paid by the Debtors or Reorganized Debtors by the Effective Date.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date and until each Reorganized Debtor's Chapter 11 Case is closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code (i) the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports for each of the Reorganized Debtors (whose Chapter 11 Case has not been closed, dismissed or converted) when they become due and pay any applicable Statutory Fees to the Office of the U.S. Trustee notwithstanding the limited substantive consolidation of the Debtors provided for in the Plan, and (ii) the Litigation Trustee shall file with the Bankruptcy Court UST Form 11-PCR reports for the Litigation Trust when they become due and pay any applicable Statutory Fees to the Office of the U.S. Trustee. The Litigation Trustee shall reasonably cooperate with the Reorganized Debtors to provide information relating to the Litigation Trust necessary for the Reorganized Debtors to prepare UST Form 11-PCR reports. The U.S. Trustee shall not be required to File a request for payment of the Statutory Fees, which shall constitute an Administrative Expense Claim against the Debtors and their Estates.

### Dissolution of the Committees

57.     Upon the occurrence of the Effective Date, the Committee shall dissolve solely as to the Debtors automatically, whereupon its members, professionals, and agents shall be discharged and released from any duties and responsibilities in the Chapter 11 Cases, solely as to the Debtors, and under the Bankruptcy Code, except with respect to (i) obligations arising under

42

confidentiality agreements, which shall remain in full force and effect, (ii) prosecuting applications for payment of fees and reimbursement of expenses of its Professionals or attending to any other issues related to applications for payment of fees and reimbursement of expenses of its Professionals, (iii) any motions or motions for other actions seeking enforcement of implementation of the provisions of the Plan, and (iv) prosecuting or participating in any appeal of the Confirmation Order or any request for reconsideration thereof. The Committees shall continue to remain in effect and perform its duties with respect to the Practice Groups.

### Notice of Entry of Confirmation Order and Effective Date

58.     Pursuant to Bankruptcy Rules 2002 and 3020(c), the Debtors and Litigation Trust are hereby authorized to serve a notice of: (a) entry of this Confirmation Order within forty-eight (48) hours after its entry; and (b) the occurrence of the Effective Date no later than five (5) Business Days after the Effective Date, on all Holders of Claims against or Interests in the Debtors. Such notice shall constitute good and sufficient notice of the entry of this Confirmation Order and of the relief granted herein, and of all related deadlines under the Plan, and no other or further notice need be given of entry of this Confirmation Order, the occurrence of the Effective Date, or the related deadlines under the Plan. Notice need not be given or served to any Entity for whom any prior notices sent during these Chapter 11 Cases have been returned as undeliverable unless the Debtors have been informed in writing by such Entity of that Entity's new address.

59.     Intentionally Omitted.

### Retention of Jurisdiction and Power

60.     Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Court shall retain jurisdiction and judicial power over all matters arising out of, or related to, these Chapter 11 Cases and the Plan to the fullest extent permitted by law, including jurisdiction over the matters set forth in Article XV of the Plan.

43

## Rules Governing Conflicts Between Documents

61.    The provisions of this Confirmation Order, including the findings of fact and conclusions of law set forth herein, and the provisions of the Combined Disclosure Statement and Plan are integrated with each other, non-severable, and mutually dependent unless expressly stated by further order of the Court. The provisions of the Combined Disclosure Statement and Plan, the Plan Supplement, and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purpose of each; *provided*, *however*, that if there is any direct conflict between the terms of the Combined Disclosure Statement and Plan or the Plan Supplement and the terms of this Confirmation Order that cannot be reconciled, then, solely to the extent of such conflict, the provisions of this Confirmation Order shall govern, control and take precedence.

## Extension of Injunctions and Stays

62.    All injunctions or stays in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise and extant on the Confirmation Date (excluding any injunctions or stays contained in or arising from the Plan or this Confirmation Order), shall remain in full force and effect through and inclusive of the Effective Date. All injunctions or stays contained in the Combined Disclosure Statement and Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

63.    Intentionally Omitted.

## Maple Diminution Claim

64.    Maple shall file a Diminution Motion (the "Maple Diminution Motion") seeking allowance of an asserted diminution in value claim arising under sections 503(b) and 507(b) of the Bankruptcy Code with respect to the Debtors (the "Maple Diminution Claim") by April 24, 2025 at 4:00 p.m., and the following deadlines shall apply with respect to such motion:

#124965334v1

| **Date** | **Event** |
| --- | --- |
| May 1, 2025 at 4:00 p.m. | Objections to the Maple Diminution Motion filed |
| May 8, 2025 at 4:00 p.m. | Maple reply filed |
| April 21, 2025 | Maple and Plan Proponents shall serve any written discovery requests |
| April 28, 2025 | Parties shall respond to written discovery requests and produce responsive documents |
| May 9, 2025 | Fact depositions shall be completed |
| May 13, 2025 | Maple shall designate an expert and deliver an expert report which includes the information set forth in F.R.C.P. 26(2)(B)(i)-(vi) |
| May 19, 2025 at 4:00 p.m. | Plan Proponents shall disclose a rebuttal expert and deliver an expert rebuttal report which includes the information set forth in F.R.C.P. 26(2)(B)(i)-(vi) |
| May 23, 2025 | Expert depositions shall be completed. |
| May 23, 2025 | The parties shall file a list of witnesses and exhibits and exchange copies of exhibits. |
| [May 28/29, 2025] | A hearing on the Maple Diminution Motion shall occur on [May 28/29, 2025] at _____ [a]m. |

Notwithstanding any other provisions of this Confirmation Order or the Plan, in the event the parties agree on terms regarding an escrow of funds pending a determination of the Maple Diminution Claim, (a) the deadlines set forth in this paragraph shall be modified as agreed by the parties or ordered by the Court, and (b) the Maple Diminution Claim shall be paid in full upon determination of the amount of such Claim.

## **Reservation of Rights for Maple Valuation Hearing**

65.    Maple reserves its rights to seek a valuation hearing with respect to its secured claims against Hudson Hospital Opco, LLC and all related rights, remedies, defenses and

#124965334v1

counterclaims of Maple, the Debtors, the Reorganized Debtors, the Estates, the Litigation Trust, the Litigation Trustee, HRH, and any other party in interest are fully reserved and preserved.

### Reservation of Rights for Signature Investments II LLC

66.    Signature Investments II LLC ("SIL") has filed proofs of claim against the Debtors numbered Claim No.10323 – 10326 (the "SIL POCs").  Subject to any subsequent objections thereto, the SIL POCs shall be classified as Class 6 Other Secured Claims under the Plan.  Notwithstanding anything contained in the Plan, Confirmation Order, and/or Disclosure Statement to the contrary, nothing therein or herein shall limit any arguments, rights or defenses SIL may have with respect to the SIL POCs, or in connection with any objections thereto, including SIL's right to argue that any property alleged to be collateral securing the SIL POCs was property actually purchased by SIL. All defenses, remedies, counterclaims and rights of the Debtors, the Reorganized Debtors, the Estates, the Litigation Trust, the Litigation Trustee, HRH and any other party in interest with respect to the SIL POCs are fully reserved and preserved.

### UnitedHealthcare

67.    With regard to each Executory Contract listed on the Plan Supplement [D.I. 730] by and between the Debtors and UnitedHealthcare Insurance Company ("UHIC") and each of its affiliates listed therein, including, but not limited to, Oxford Health Plans, LLC ("Oxford"), Oxford Health Plans (NJ), Inc. ("Oxford NJ"), AmeriChoice of New Jersey Inc. ("AmeriChoice"), Optum (United Behavioral Health) ("Optum"), and United Behavioral Health, Inc. ("UBH" and together with UHIC, Oxford, Oxford NJ, AmeriChoice, and Optum, "United"), and to the extent any further agreements are unknown and later discovered (the "United Agreements"), the Debtors shall provide forty-five (45) days' written notice to United prior to the rejection of any of the United Agreements, and to the extent that providing such notice requires the Debtors to assume or reject such United Agreements after the Effective Date, United

46

consents to an extension of up to sixty days after the Effective Date to do so.  The applicability

of the provisions of the Plan and this Confirmation Order that purport to enjoin United's right to

setoff overpayments owed to it pursuant to the United Agreements against any amounts

determined to be owed by United to the Debtors and/or the Litigation Trust, including any

objection of United to such provision(s), are expressly reserved and shall be adjourned to a later

hearing date along with United's objection to any cure amount due under the United

Agreements. The rights of the Debtors, the Reorganized Debtors, HRH, the Litigation Trust and

the Litigation Trustee to challenge any proposed setoff by United are expressly reserved and

preserved.

## Clarification as to Treatment of NJ Tax Claims

68.     The claims of the State of New Jersey, Department of Treasury, Division of

Taxation ("NJ Tax Claims", and the Division of Taxation being a "NJ Tax Claimant") that were

filed as secured claims are reclassified as Priority Tax Claims, and in accordance with Article

IV.B of the Plan shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy

Code.  NJ Tax Claims shall be paid in monthly installments, beginning on the Effective Date,

and shall be paid with post-petition interest at the statutory rate.   HRH, in its capacity as

manager of CarePoint, HUMC and Christ, shall use commercially reasonable efforts to cause

CarePoint, HUMC and Christ to file unfiled tax returns within one hundred twenty (120) days of

the Effective Date of the Plan.

## Retained Jurisdiction and Enforcement Remedies for Tax Claimants

69.     Notwithstanding anything in the Plan to the contrary, the Bankruptcy Court shall

not retain jurisdiction with respect to NJ Tax Claims except for (i) resolving the amount any NJ

Tax Claims arising prior to confirmation, and (ii) enforcing the discharge provisions of the

Plan.  A failure by the Reorganized Debtors to make a payment to holders of NJ Tax Claims

47

pursuant to the terms of the Plan shall be an event of default. If the Reorganized Debtors fail to cure an event of default as to Plan payments on the NJ Tax Claims within thirty days after receipt of written notice of default from the NJ Tax Claimant, then the NJ Tax Claimant may (a) enforce the entire amount of its claim immediately and without further approval or release from the Court; (b) exercise any and all rights and remedies such NJ Tax Claimant may have under applicable nonbankruptcy law; and/or (c) seek such relief as may be appropriate in this Court.

### IDB Bank Letters of Credit

70.     The Debtors acknowledge and agree that Israel Discount Bank of New York ("IDB") is the issuer of two letters of credit as follows: (i) a certain letter of credit dated October 29, 2019 issued to HUMC OpCo, LLC ("HUMC") for the benefit of SB Hoboken PropCo, LLC (as assignee of MPT of Hoboken TRS, LLC) in the amount of $4,946,209 (the "HUMC LC") which remains fully available as of the date hereof, and (ii) a certain letter of credit dated November 4, 2019 issued to IJKG OpCo, LLC ("IJKG") for the benefit of Hartford Fire Insurance Company in the amount of $1,550,000 (the "IJKG LC" and together with the HUMC Letter of Credit, the "LCs") which remains available in the amount of $441,130.44 as of the date hereof. The Debtors further acknowledge and agree that IDB holds a valid, perfected, first priority security interest in certain deposit accounts maintained at IDB by HUMC and IJKG to secure their respective obligations under the LCs (the "LC Cash Collateral Accounts"), which accounts contain funds in excess of the availability under the LCs to which they relate. The Debtors further acknowledge and agree that, notwithstanding the automatic stay applicable under section 362 of the Bankruptcy Code and any other provision in this Confirmation Order or the Plan, including without limitation any stay, release or injunction provisions hereunder or thereunder, IDB shall be permitted, on and after the Effective Date of the Plan, to (a) debit the LC Cash Collateral Accounts to compensate or reimburse IDB for (i) any draws on the LCs, (ii)

any standby commissions, fees, charges, interest and other expenses owing to IDB arising at any time prior to or after the Petition Date (including without limitation that certain standby commission invoice in the amount of $6,708.86 owing under the IJKG LC for the period from November 5, 2024 through November 4, 2025), and (iii) IDB's reasonable fees and expenses incurred in connection with the LCs and/or the Chapter 11 Cases (b) exercise any other rights or remedies available to IDB under the LCs (provided that IDB shall not terminate the LCs based on any default based solely on the filing or pendency of the Chapter 11 Cases or the insolvency or financial condition of the Debtors). IDB shall provide invoices or other documentation to the Debtors upon reasonable request as necessary to substantiate any amounts so debited, and the Debtors reserve all rights available to them under the LCs or applicable law except as specifically set forth herein.

### Committee of Interns and Residents/SEIU CBAs

71.    Notwithstanding anything to the contrary in the Plan [D.I. 856] or Plan Supplement [D.I. 730 and 769], the Collective Bargaining Agreement Between Christ Hospital and the Committee of Interns and Residents/SEIU (the "Christ Hospital CBA") and the Collective Bargaining Agreement Between Hoboken University Medical Center and the Committee of Interns and Residents/SEIU (the "HUMC CBA") shall be assumed and assigned to the Reorganized Debtors as of the Effective Date. The cure amounts, if any, related to the assumption and assignment of the Christ Hospital CBA and HUMC CBA shall be paid by the Debtors or Reorganized Debtors, as applicable, in full in the ordinary course of business.

### United States

72.    As to the United States, notwithstanding any provision in the Plan, the Plan Supplement, the Definitive Documents, this Confirmation Order or other related Plan documents (collectively, "Plan Documents"):

#124965334v1

i.      Nothing shall: (1) authorize the assumption, sale, assignment or other transfer of any federal (a) grants, (b) grant funds, (c) contracts, including but not limited to agreements, leases, awards, and task orders, (d) property, including but not limited to, any inventory, intellectual property and patents belonging to the United States or any of its agencies or components thereof, (e) certifications, (f) applications, (g) registrations, (h) billing numbers and other identifiers, including without limitation, national provider identifiers and provider transaction access numbers, (i) licenses, (j) permits, (k) covenants, (l) guarantees, (m) indemnifications, (n) data, (o) records, (p) payment obligations, or (q) any other interests belonging to the United States, including any of its agencies or components thereof (subsections (a) through (q) are collectively referred to as the "Federal Interests") without compliance by the Buyers and New Operators with all terms of the Federal Interests and with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts or to require the United States to novate, approve or otherwise consent to the sale, assumption, assignment or other transfer of any Federal Interests; (3) waive, alter or otherwise limit the United States' Federal Interests; (4) affect the setoff or recoupment rights of any federal governmental unit (as defined in 11 U.S.C. § 101(27)); (5) release, nullify, preclude or enjoin the enforcement of any federal police or regulatory power or any liability to a federal governmental unit that any entity would be subject to, except as allowed under 11 U.S.C. § 363(f); (6) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); or (7) expand the scope of 11 U.S.C. § 525.

ii.      The transfer of any Medicare provider agreements to the New Operators shall be approved on the terms herein pursuant to 11 U.S.C. § 365 and applicable non-bankruptcy law, including Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395 et.

#124965334v1

seq., all applicable Medicare regulations, and Medicare policies and procedures (together, "Medicare Program Law"). Further, (1) as a condition to Closing of the Transactions and transfer of the Medicare provider agreements to the New Operators, the Debtors shall be required to satisfy all Known Pre-Closing CMS Liabilities and Pre-Closing Monetary Penalties prior to or at the closing of the Sale (such that the Purchased Assets shall be transferred to the Buyers and New Operators free and clear of such liabilities to the extent satisfied), and (2) all other setoff and recoupment rights under Medicare Program Law relating to the Medicare provider agreements are reserved.

iii.    Nothing in the Plan Documents shall alter or diminish the successor liability of the New Operators for any unsatisfied liabilities under the Medicare provider agreements, including any unsatisfied Known Pre-Closing CMS Liabilities or any Known Pre-Closing Monetary Penalties.

iv.    Nothing in the Plan Documents shall limit, modify, or in any way affect the authority of the United States Secretary (the "Secretary") of the United States Department of Health and Human Services to regulate any New Operator's enrollment or participation as a Medicare provider (to the extent any New Operator or any other buyer of the Purchased Assets enrolls or participates as a Medicare provider) or the right and authority of the Secretary, the Centers for Medicare & Medicaid Services ("CMS") or its contractors to review, approve, deny, or pay Medicare claims in the ordinary course of business in accordance with Medicare Program Law.

### VRC Companies, LLC

73.    Notwithstanding 11 U.S.C. § 365(d)(2), anything else in the Plan or this Confirmation Order, the deadline for the Debtors (or their successors under the Plan) to assume

or reject the Master Service Agreement between VRC Companies, LLC and CarePoint Health Management Associates, LLC, dated October 25, 2022 (the "VRC Agreement"), is extended until the earlier of the Effective Date of the Plan or 60 days following the entry of this Confirmation Order.

## Sodexo Operations, LLC

74.     Notwithstanding anything to the contrary in this Confirmation Order or in any of the transaction documents contemplated by or executed in connection with implementation of the Plan, the Sodexo Property and Sodexo Proprietary Materials (as defined in the Sodexo Limited Objections) shall remain the property of Sodexo and shall not be transferred, conveyed or assigned by the Debtors to any party under the Plan since the Sodexo Property and Sodexo Proprietary Materials are not property of the Debtors' estates.  All rights and remedies of Sodexo with respect to assumption of contracts and potential cure amounts raised in the Sodexo Limited Confirmation and Cure Objection are hereby preserved to be addressed at a later date.

## Dr. Vijay Singh

75.     Nothing herein, in the Plan or in Adversary Proceeding 24-50296-JKS shall preclude Dr. Vijay Singh, in his capacity as Relator ("Dr. Singh"), from continuing the *qui tam* action pending in the United States District Court for the District of New Jersey, Civil Action No. 2:21-cv-19788-MEF-AME (the "Qui Tam Action") as against any non-debtor party after the Effective Date. All parties reserve the right to seek, defend or oppose any relief relating to Dr. Singh's claims against the Debtors in the Qui Tam Action, including seeking relief from the automatic stay. On or immediately after the Effective Date, the Reorganized Debtors and/or the Litigation Trustee shall file a stipulation of dismissal with the Court dismissing Dr. Singh from Adversary Proceeding 24-50296-JKS.

## Med One Capital Funding, LLC

76.     Notwithstanding any provision of this Confirmation Order or the Plan to the contrary: (i) all unexpired leases and/or executory contracts (collectively, the "Med One Agreements") between one or more of the Debtors and Med One Capital Funding, LLC ("Med One") will be rejected as of the Confirmation Date; (ii) there will be no priming liens that attach to the equipment that is the subject of the Med One Agreements (collectively, the "Med One Equipment") in favor of any other party, including, but not limited to, the DIP Lender, and none of the Med One Equipment will be transferred to any other party, including, but not limited to, HRH, whether pursuant to the DIP Motions, the Collateral Surrender Motion, the Plan, this Confirmation Order, or otherwise; (iii) the Debtors/Reorganized Debtors are required to cooperate with Med One in good faith and make reasonable arrangements to allow Med One to retake possession of the Med One Equipment within fourteen (14) days of the Confirmation Date (the "Discussion Period") (unless such period is extended by the written agreement between Med One and the Debtors/Reorganized Debtors); and for the avoidance of doubt, the automatic stay and any plan injunction/post-confirmation stays are modified to the extent necessary to facilitate and will not in any way hinder, prohibit, or prevent Med One from retaking possession of the Med One Equipment and thereafter dealing with the Med One Equipment as provided for by the Med One Agreements or as otherwise authorized and allowed by law; (iv) the Debtors and Med One shall continue during the Discussion Period (and if and as extended by the Parties) to negotiate in good faith for the purchase of any Med One Equipment prior to Med One retaking possession of the Med One Equipment; and (v) Med One will be entitled to assert any administrative expense claim(s) and rejection damages claim(s) against the Debtors and the Debtors' Estates, subject to any and all objections, defenses, remedies, counterclaims and rights of the Debtors, the Reorganized Debtors, the Estates, the Litigation Trust, the Litigation Trustee,

and any other party in interest, which objections, defenses, remedies, counterclaims and rights are fully reserved and preserved.

### Mazuma Capital Corp

77.     Notwithstanding any provision of this Confirmation Order or the Plan to the contrary: (i) all unexpired leases and/or executory contracts (collectively, the "Mazuma Agreements") between one or more of the Debtors and Mazuma Capital Corp ("Mazuma") will be assumed under 11 U.S.C. § 365 as of the Confirmation Date; (ii) the agreed-to cure amount for the assumption of the Mazuma Agreements as required by 11 U.S.C. § 365(b)(1) shall be $1,300,000.00 (the "Mazuma Cure Amount"); (iii) the Mazuma Cure Amount will be a post-confirmation obligation of the Debtors/Reorganized Debtors and payable to Mazuma in twenty (20) equal monthly installments in the amount of $65,000.00 each (individually, a "Cure Payment" and collectively, the "Cure Payments"); (iv) each monthly Cure Payment is due no later than the 10th day of each month starting on the first month after the Confirmation Date; (v) the failure of the Debtors/Reorganized Debtors to timely make a monthly Cure Payment, after notice thereof, and fifteen days after such notice, to make the payment, will constitute a default by the Debtors/Reorganized Debtors under the Mazuma Agreements, and Mazuma shall thereafter have, among all of its other rights and remedies under the Mazuma Agreements and the Plan, the right to retake the equipment that is the subject of the Mazuma Agreements; (vi) the Debtors and the Reorganized Debtors release Mazuma from any and all Causes of Action, including any Avoidance Action (and for the avoidance of doubt, those claims, Causes of Action and/or any Avoidance Action will not be transferred to any other party, including, without limitation, the Litigation Trustee), and Mazuma shall be entitled to recover its reasonable legal fees and costs against the Plaintiff to the extent Mazuma seeks to enforce the foregoing release in

a lawsuit brought by the Debtors, the Reorganized Debtors, the Litigation Trustee, or any chapter 7 trustee, and/or any successors and/or assigns of any of the foregoing; (vii) after the Mazuma Cure Amount has been paid in full the Reorganized Debtors shall have the right to purchase the equipment that is the subject of the Mazuma Agreements for $1.00 (provided, however, that the foregoing shall not in any way impact or impair the characterization or treatment of the Mazuma Agreements as true leases); and (viii) subject to and effective upon the payment of the Mazuma Cure Amount in full, Mazuma releases the Debtors, the Reorganized Debtors, the Litigation Trustee, and/or successors and/or assigns of any of the foregoing from any and all claims and/or Causes of Action in any way related to any prior Judgment Mazuma obtained against the Debtors arising out of the Mazuma Agreements except as set forth herein.

## Unions Settlement

78.     As read into the record at the Confirmation Hearing, in full and final resolution of: (i) the *Limited Objection and Reservation of Rights of Health Professionals and Allied Employees to the Confirmation of the Combine Plan and Disclosure Statement* [D.I. 777], filed by Health Professionals and Allied Employees, AFT/AFL-CIO ("HPAE"); (ii) the *Limited Objection and Reservation of Rights of District 1199J NUHHCE FSCME AFL-CIO to the Confirmation of the Combined Plan and Disclosure Statement* [D.I. 778], filed by District 1199J NUHHCE FSCME AFL-CIO ("1199J"); and (iii) the *Response and Limited Objection of JNESO, District Council 1 IUOE AFL-CIO, to Plan Proponents' Fourth Amended Joint Plan of Reorganization* [D.I. 788], filed by JNESO, District Council 1 IUOE AFL-CIO ("JNESO", and collectively with HPAE and 1199J, the "Unions"), the Unions, the Plan Proponents and HRH agree to the settlement terms set forth in the term sheet attached hereto as **Exhibit B** (the "Union

Term Sheet"), which Union Term Sheet is incorporated into this Confirmation Order and approved by the Court.

### Pennsylvania Manufacturers Association Insurance Company

79.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the terms of the stipulation entered into by and between the Debtors and Pennsylvania Manufacturers Association Insurance Company on March 6, 2025 as approved by the Court in the *Order Approving Stipulation by and Between the Debtors and Pennsylvania Manufacturers Association Insurance Company* on March 12, 2025 [D.I. 965] are binding and enforceable.

### Access Information Management Corporation

80.    In resolution of the *Objection of Access Information Management Corporation to Confirmation of Sixth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* [DI 1124], the Debtors shall, by April 15, 2025, provide definitive and irrevocable written direction to Access Information Management Corporation ("Access") with respect to the disposition of the documents and information being stored by Access for the Debtors (the "Access Stored Property") pursuant to the Access contracts Debtors seek to reject by its motion at Docket No. 708, including (i) identification of the Access Stored Property that Debtors have determined may be destroyed, and/or (ii) identification of the Access Stored Property that Debtors have determined they wish to have transferred and/or returned and identify the recipient of such Access Stored Property.  The Debtors have not sought relief under 11 U.S.C. 351 regarding the destruction of any records held by Access, and the provisions of this paragraph shall not be construed as authorizing any relief under 11 U.S.C. 351 regarding the destruction of any records held by Access.

57

## Exhibit A

**Seventh Amended Combined Disclosure Statement
and Joint Chapter 11 Plan of Reorganization as Modified as of April 15, 2025**

**Exhibit B**

**Union Term Sheet**

1) The union contracts are to be assumed, subject to the terms set forth below, through May 31, 2025. All union contracts to expire on May 31, 2025, notwithstanding anything therein to the contrary, subject to applicable law.

2) Beginning no later than April 15, 2025, the parties are to begin negotiations with respect to new collective bargaining agreements in good faith under normal labor law constructs.

3) JNESO to receive bonus pay payments totaling $250,000, to be paid over a period of nine months, beginning on June 1, 2025, with payments to be made in equal monthly installments. HRH to guarantee payments.

4) All unilateral termination of accrued employee benefits imposed by the Debtors during the course of their bankruptcy cases shall be reversed, effective immediately. The accrued benefits shall be reinstated in accordance with applicable collective bargaining agreements, and shall be limited to the approximate amounts set forth herein per union, and shall be subject to the reconciliation process set forth below (paragraph 7).

5) The claims of the unions on behalf of covered employees shall fall into the following categories, and shall be paid as follows:

   a) All claims related to contributions to either (a) unpaid 401k claims under an employee benefit plan or (b) unpaid severance claims shall be paid in full over a period of nine months, in equal monthly installments, beginning on June 1, 2025.

   All unpaid 401k claims and/or unpaid severance claims that are being restored and paid will be restored to the following approximate dollar amounts in total by Union:
   - JNESO - $1.5 million
   - HPAE - $890,000
   - 1199J - $600,000

   HRH to guarantee payments, subject to paragraph 7 herein.

   b) All priority PTO type claims under 11 U.S.C. § 507(a)(4) shall be assumed and capable of being used by employees in accordance with the applicable collective bargaining agreement, and shall not be convertible into cash, except for the following:

      i) Subject to the arbitration and grievance procedures set forth in the applicable CBAs, if an employee is terminated or laid off by its employer and the termination is without cause, thereby preventing that employee from being able to use his accrued PTO type claims, the employee shall be entitled to receive payment of 100% of that employee's remaining priority PTO type claims, paid over a period of nine months, in equal monthly installments, beginning on the date of termination.

      ii) However, if an employee voluntarily leaves the employ of the employer, the employee shall only be entitled to receive payment of 50% of that employee's remaining priority PTO type

claims, to be paid over a period of nine months, in equal monthly installments, beginning on the later of June 1, 2025, or the date that the employee leaves the employ of its employer.

iii) If the employee is terminated with cause, the employer shall not pay the employee any PTO type claims hereunder, under the CBA, or under 11 U.S.C. § 507(a)(4). However, the issues of (a) termination for cause and (b) whether the employee is entitled to receive his or her accrued PTO type claims shall be subject to the arbitration and grievance procedures set forth in the applicable CBAs, as well as New Jersey Wage & Hour laws.

iv) If the voluntary leave by an employee referenced herein is due to a "bona fide retirement," which term shall be agreed upon by the parties, and which bona fide retirement occurs within two years of the Effective Date, that employee shall be entitled to receive 100% of that employee's remaining priority PTO type claims, paid over a period of nine months, in equal monthly installments, beginning on the later of June 1, 2025 or the date that the employee retires.

All accrued priority PTO claims that are being restored will be restored to the following approximate dollar amounts in total by Union:
- JNESO - $900,000
- HPAE - $1.268mm
- 1199J - $1.267mm

HRH to guarantee all payments, subject to paragraph 7 herein.

c) All general unsecured (GUC) PTO type claims shall be assumed by the Debtors and capable of being used by employees in accordance with the applicable collective bargaining agreement, and shall not be convertible into cash, except for the following:

i) If an employee is terminated without cause or laid off by its employer, thereby preventing that employee from being able to use his/her accrued PTO type claims, the employee shall be entitled to receive payment of 50% of that employee's remaining GUC PTO type claims, paid over a period of nine months, in equal monthly installments, beginning on the date of termination or layoff.

ii) However, if an employee voluntarily leaves the employ of the employer, the employee shall only be entitled to receive payment of 35% of that employee's remaining GUC PTO type claims, to be paid over a period of nine months, in equal monthly installments, beginning on the later of June 1, 2025 or the date that the employee leaves the employ of its employer.

iii) If the employee is terminated with cause, the employer shall not pay the employee any GUC PTO type claims hereunder, under the CBA, or under 11 U.S.C § 507(a)(4). However, the issues of (a) termination for cause and (b) whether the employee is entitled to accrued GUC PTO type claims shall be subject to the arbitration and grievance procedures set forth in the applicable CBAs, as well as New Jersey Wage & Hour laws.

iv) If the voluntary leave by an employee is due to a "bona fide retirement," which term shall be agreed upon by the parties, which bona fide retirement occurs within two years of the Effective Date, that employee shall be entitled to receive 50% of that employee's GUC PTO type claims, paid over a period of nine months, in equal monthly installments, beginning on the later of June 1, 2025 or the date that the employee retires.

All accrued unsecured non-priority PTO claims that are being restored will be restored to the following approximate dollar amounts in total by Union:

- JNESO - $1.500mm
- HPAE - $3.283mm
- 1199J - $1.267mm

HRH to guarantee all payments, subject to paragraph 7.

6) The parties agree that, to the extent any employee seeks to use his/her accrued PTO type benefits, the employee shall be required to first request approval from his employer in writing in accordance with the procedure set forth in the respective collective bargaining agreement.  In considering any such request by an employee, the employer shall: (a) be required to act in good faith, (b) not unreasonably deny any such request by an employee, and (c) shall not be arbitrarily deny such request by an employee.

7) All claims asserted by unions shall be subject to reconciliation within a reasonable period of time, not to exceed 60 days, unless extended by the parties in writing or pursuant to an order of the Bankruptcy Court.  All disagreements of the parties with respect to claims shall be decided by the Bankruptcy Court, with a full reservation of all rights by the parties.

8) The agreement set forth herein is binding on the Debtors, HRH (as to its guaranty obligations) and the unions (and the unions' respective workers).  As manager of certain of the Debtors, HRH shall honor the terms of this agreement and terms of the CBA in good faith, provided that HRH shall not have any obligations hereunder (except as expressly stated herein) or under the CBA.

9) If Debtors breach their payment obligations hereunder, then, following written notice to Debtors and HRH, and Debtors' failure to cure such breach within ten (10) days after the receipt of date of such notice, HRH shall be immediately obligated to make the uncured defaulted payment(s) on Debtors' behalf.

10) The Unions shall immediately support the plan in all respects and withdraw all their objections thereto.

11) As to Bayonne, upon the final order of the Bankruptcy Court approving the sale and the closing of such sale, HRH shall be bound and liable to this agreement and assumed liabilities under the Bayonne CBA and herein, solely with respect to the obligations of Bayonne Medical Center hereunder as it relates to HPAE.

## **Exhibit C**

**Strategic Ventures Term Sheet**

## I.    TREATMENT OF CLAIMS OF MAPLE AND STRATEGIC VENTURES

1. Notwithstanding anything in this Confirmation Order or the Plan to the contrary, the treatment under the Plan of Class 4 Maple Secured Claims and Class 14 Strategic Ventures Secured Claims is hereby modified as follows:

   a. On the 1st day of each month following the Effective Date, the Reorganized Debtors shall make fifteen (15) payments to Maple pursuant to wire instructions to be provided by Maple's counsel, each in the amount of $100,000 (each, a "Post-Effective Date Payment"), for a total of $1,500,000 in Post-Effective Date Payments. HRH hereby absolutely, unconditionally and irrevocably guarantees, to and for the benefit of Maple, the Reorganized Debtors' full and prompt payment of each Post-Effective Date Payment. If Reorganized Debtors do not make any Post-Effective Date Payment by the fifth day of the applicable month after written notice from Maple and ten (10) days within which to cure such non-payment, HRH shall make such Post-Effective Date Payment or cause Reorganized Debtors to make such Post-Effective Date Payment, as if the obligation to make such Post-Effective Date Payment constituted the direct and primary obligation of HRH.

   b. Beginning on the Confirmation Date, Garden State Healthcare Associates, LLC ("Garden State") and New Jersey Medical and Health Associates, LLC d/b/a CarePoint Health Medical Group ("NJ Medical Group," and together with Garden State, the "Obligor Debtors")[6] shall, with the same level of care the Debtors will use with respect to accounts receivable of the Debtors that are not A/R Collateral, bill and collect all First-Tier A/R Collateral[7] and shall remit the Net First-Tier A/R Collections[8] to the Escrow Account on a weekly basis, which collections (i) shall be for the sole benefit of Maple and Strategic Ventures according to their respective priorities and (ii) shall not be subject to execution or garnishment.

   c. The Debtors will immediately cause each of Obligor Debtors to:

      i. Execute a billing services and collection agreement with Strategic Ventures and a third-party billing and collections agency (to be chosen by Strategic Ventures) (the "Collection Agent"), in a form acceptable to Strategic Ventures and the Obligor Debtors, for the purpose of billing and collecting

---

[6] Obligor Debtors includes Reorganized Garden State and Reorganized NJ Medical Group.

[7] "First-Tier A/R Collateral" means all outstanding accounts receivable of Obligor Debtors, and all charges (whether or not billed), for services rendered by the Obligor Debtors on or before the Petition Date; *provided, however*, that First-Tier A/R Collateral shall not include: (i) accounts receivable or charges (whether or not billed) for services rendered prior to February 1, 2024; (ii) accounts receivable or charges (whether or not billed) written off by the Obligor Debtors; and (iii) accounts receivable or charges (whether or not billed) that the Obligor Debtors reasonably determine to be uncollectable (to the extent not included in (i) or (ii)).

[8] "Net First-Tier A/R Collections" means all amounts collected by the Obligor Debtors on account of any First-Tier A/R *less* Collection Costs.

all Second-Tier A/R Collateral, which shall provide for payment to the Collection Agent of a percentage of Second-Tier A/R Collateral collected by the Collection Agent as the sole compensation payable to the Collection Agent (*i.e.*, the Collection Agent's compensation shall be solely from the applicable collections) or such other terms as are acceptable to Strategic Ventures and the Collection Agent; *provided that,* if Strategic Ventures agrees to payment terms with a Collection Agent other than on a contingency fee, the Obligor Debtors shall have no responsibility or liability for the payment of such compensation.[9]

    ii. Execute an escrow agreement (in a form acceptable to Strategic Ventures and the Obligor Debtors) (the "Escrow Agreement") with Strategic Ventures and Wilmington Trust, National Association, as escrow agent for the purpose of establishing an escrow account (the "Escrow Account")[10] to which all Net Second-Tier A/R Collections from the government and non-government lockbox accounts of Obligor Debtors (collectively, the "Lockbox Accounts")[11] will be swept on a weekly basis so that all Net Second-Tier A/R Collections[12] have been swept to the Escrow Account.

    iii. Execute a deposit account control agreement for non-government accounts receivable and a deposit account instructions and services agreement for government accounts receivable (in a form acceptable to Strategic Ventures and the Obligor Debtors) with Strategic Ventures and Maple, as the control/instructing parties, and the financial institution where the Lockbox Accounts are located, providing for an automatic, daily zero-balance sweep of the Lockbox Accounts to the Escrow Account.

d. All A/R Collateral deposited in any Lockbox Account from the Confirmation Date through the date the Escrow Agreement is fully executed shall be held in trust, for the benefit of Strategic Ventures and Maple, in the applicable Lockbox Account. Upon execution of the Escrow Agreement, all A/R Collateral in any Lockbox Account shall be immediately transferred in the form received to the Escrow Account.

---

[9] "Second-Tier A/R Collateral" means all outstanding accounts receivable of Obligor Debtors, and all charges (whether or not billed), for services rendered by the Obligor Debtors on or before the Petition Date that is not First-Tier A/R Collateral. "A/R Collateral" means, collectively, all First-Tier A/R Collateral and all Second-Tier A/R Collateral. For the avoidance of doubt, A/R Collateral includes charges on account of services rendered by the Obligor Debtors prior to or on the Petition Date regardless of (i) whether a claim has been submitted for such services or (ii) such amounts have been billed by the Obligor Debtors.

[10] The Escrow Account shall not be subject to execution or garnishment.

[11] The Obligor Debtors shall maintain the Lockbox Accounts at all times.

[12] "Net Second-Tier A/R Collections" means all amounts collected by the Obligor Debtors on account of any Second-Tier A/R Collateral *less* Collection Costs.

#124965334v1

e.  All Net First-Tier A/R Collections and Net Second-Tier A/R Collections deposited in the Escrow Account in excess of the difference between (i) $13,506,773 (the "Maple-Bayonne Allowed Secured Claim") and (ii) the amount paid to Maple on the principal amount of the Maple-Bayonne Allowed Secured Claim shall be paid to Strategic Ventures on account of its Allowed Strategic Ventures Secured Claim.

f.  Subject to execution of a business associate and confidentiality agreement (in the form acceptable by Obligor Debtors), the Obligor Debtors agree to provide Strategic Ventures, Maple, and the Collection Agent full access to any and all records and any other information or access required to collect the A/R Collateral.

g.  Upon any Obligor Debtor's receipt of collections on account of any Second-Tier A/R Collateral, such Obligor Debtor shall promptly remit the corresponding Net Second-Tier A/R Collections in the form received (whether or not received in the Lockbox Accounts) to the Escrow Account.

h.  The Obligor Debtors shall provide weekly reporting to Maple and Strategic Ventures with respect to the A/R Collateral, the Net First-Tier A/R Collections, the Net Second-Tier A/R Collections, and Collection Costs.[13]  The Obligor Debtors shall also provide monthly account statements for each of the Lockbox Accounts to Maple and Strategic Ventures.

i.  The Obligor Debtors will cooperate (at their expense, except to the extent of out-of-pocket, third-party costs) with Maple and Strategic Ventures and the Collection Agent with respect to the Net Second-Tier A/R Collections, including the delivery of data and information and the execution of documents reasonably requested to effectuate the Net Second-Tier A/R Collections.  Strategic Ventures and Maple shall be permitted to review all open and closed billings from January 1, 2020 through the Petition Date.

j.  As an affiliate of the owner of ten percent (10%) of the membership interests in Maple, Strategic Ventures shall be entitled to receive payment of an amount equal to ten percent (10%) of all amounts paid to Maple on account of the Net First-Tier A/R Collections and the Net Second-Tier A/R Collections.  Such amounts shall be paid directly to Strategic Ventures.  For the avoidance of doubt, such ten percent (10%) payments to Strategic Ventures shall be from the Net First-Tier A/R Collections and the Net Second-Tier A/R Collections, and shall not be an additional amount payable from the Obligor Debtors.  By way of illustration, ninety percent

---

[13] For purposes hereof, "Collection Costs" means all out-of-pocket, third-party billing and collection costs incurred by the Obligor Debtors solely to bill and collect the applicable accounts receivable, plus an amount equal to three percent (3%) of the collections from the First-Tier A/R Collateral for the Obligor Debtors' back-office services related to the billing and collection of such receivables.  In addition, the total Collection Costs (including the out-of-pocket, third-party billing and collection costs and the 3% internal cost) shall not exceed ten percent (10%).

(90%) of the Net First-Tier A/R Collections will be paid to Maple and ten percent (10%) will be paid to Strategic Ventures.

k.  To the extent that Maple has not been paid in full on account of the Allowed Maple-Bayonne Secured Claim, any deficiency shall be treated as a Maple Unsecured Claim and will receive the same treatment as General Unsecured Claims in Class 7.

l.  To the extent that Strategic Ventures has not been paid in full on account of the Allowed Strategic Ventures Secured Claim, any deficiency shall receive the same treatment as General Unsecured Claims in Class 7.

m.  All of Strategic Ventures' unsecured Claims against any Debtor will (subject to objection by the Litigation Trustee) receive the same treatment as General Unsecured Claims in Class 7.

n.  The Obligor Debtors make no representation or warranty regarding the A/R Collateral or the sufficiency or amount of proceeds thereof.

o.  The Ballot submitted by Strategic Ventures is hereby amended to reflect a vote to accept the Plan.

p.  The objection to Confirmation filed by Strategic Ventures is withdrawn.

q.  The foregoing is without prejudice to the rights of Maple and Strategic Ventures to assert any claims and cause of action against any non-debtors.  All such claims and causes of action are hereby preserved and are not affected by confirmation of the Plan or this Order.

r.  The foregoing is without prejudice to the rights of the Obligor Debtors and other Debtors to assert any claims, causes of action or defenses vis-à-vis Maple, all of which are hereby reserved.

s.  For the avoidance of doubt, except as expressly provided herein, the foregoing shall be effective on the Confirmation Date and shall not be dependent upon the occurrence of the Effective Date.

t.  For the avoidance of doubt, nothing herein shall constitute a release, waiver or limitation of the Litigation Trustee's rights to assert or commence any Litigation Claim, including, without limitation, any challenge or objection of any kind or nature to the amount, validity, extent, priority or perfection of any claims, liens or security interests asserted by any party; *provided*, *however*, that any recovery by the Litigation Trustee on account of any Litigation Claim, challenge, or objection of any kind asserted against Maple or Strategic Ventures relating to the A/R Collateral shall be contingent upon the Litigation Trustee paying all fees and expenses of Maple and Strategic Ventures incurred in reliance on this Order.

67