**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CarePoint Health Systems Inc. d/b/a Just Health Foundation, *et al.*,[1]<br><br>                Debtors. | Chapter 11<br>Bankr. Case No. 24-12534 (JKS)<br>(Jointly Administered)<br><br><br>**Hearing Date: July 11, 2025 at 11:00 a.m.**<br>**Objection Deadline: July 1, 2025 at 4:00 p.m.** |

## *AMENDED* MOTION OF VRC COMPANIES, LLC (I) REQUESTING ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. § 503(B)(1)(A) AND (II) REQUESTING AN ORDER DIRECTING THE DEBTORS TO COMPLY WITH 11 U.S.C. § 351 AS TO THE DISPOSAL OF PATIENT MEDICAL RECORDS

VRC Companies, LLC[2], a creditor in the above bankruptcy cases, through undersigned counsel, requests allowance and payment of an administrative expense under 11 U.S.C. §§ 503(b)(1)(A); and also requests that the Court direct the Debtors to address the disposal of their patient medical records, which VRC is storing, including compliance with 11 U.S.C. § 351 (the "**Amended Motion**"), and in support hereof, states:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Eve green Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health- Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

[2] Pursuant to Del. Bankr. L.R. 9013-1(f), VRC Companies, LLC does consent to the entry of final orders or judgments by the Court with respect to the Amended Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**JURISDICTION**

1.  The Court has jurisdiction over the subject matter of the Amended Motion pursuant to 28 U.S.C. §§ 157(b) and 1334(b) and the standing order of reference of the District Court. This is a core proceeding arising under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), that the Court has authority to hear and determine within the meaning of 28 U.S.C. § 157(b)(2)(8). The statutory predicate for the relief sought herein includes 11 U.S.C. §§ 503(b)(1)(A), and 507(a)(2), 503(b)(8) and 351.

**FACTUAL BACKGROUND**

**A. Prepetition Events**

2.  VRC provides document storage, computerization, retrieval, destruction and related services to its customers.

3.  The above-captioned debtors (the "**Debtors**") oversee the operations and combined resources of three hospitals and related neighborhood health centers located in Hudson County, New Jersey—Bayonne, Christ Hospital and HUMC.

4.  The Debtors are "health care businesses" within the meaning of 11 U.S.C. § 101(27A) and the Debtors' customers are "patients" within the meaning of 11 U.S.C. § 101(40A).

5.  Certain of the Debtors, and/or their predecessors, entered into a Storage and Service Agreement with Cityside Archives, LLC ("**Cityside**"), through its predecessor, Cityside Archives, LTD, effective March 1, 2016 (the "**Cityside Agreement**") whereby Cityside, a document storage and management provider, stored certain records ("**Stored Materials**") for Debtors. The Stored Materials comprise "patient records" within the meaning of 11 U.S.C. § 101(40B).

6. In or around May 2021, the Debtors expressed to Cityside an interest in having approximately 14,000 boxes of Stored Materials containing primarily of x-rayfilms ("**X-Ray Stored Materials**") permanently removed from Cityside's inventory, but the Parties failed to agree on the terms of such removal or of the subsequent storage of the Stored Materials stored by Debtors with Cityside other than the X-Ray Stored Materials (the "**Other Stored Materials**").

7. On or about August 11, 2021, Cityside sent Debtors a notice of default, alleging that, following the aforementioned disagreement regarding the removal of the X-Ray Stored Materials, Debtors were again in arrears on Cityside's duly invoiced charges for storage and services and in breach of the Cityside Agreement's exclusivity provision.

8. On or about September 22, 2021, by way of a Complaint, Cityside initiated an action against certain of the Debtors and/or their predecessors (the "**Defendants**") in the Superior Court of New Jersey for Middlesex County, filed under Docket No. MID-L-5553-21 ("**Action**"), asserting a number of causes of action, alleging that Defendants had breached the Cityside Agreement and defaulted thereunder, and seeking damages, including interest and legal fees totaling well in excess of $5,000,000.

9. Subsequently, VRC acquired Two-Twenty Records Management LLC, together with its wholly-owned subsidiary, Cityside.

10. VRC and the Defendants then entered into a Confidential Settlement Agreement and Release as of October 25, 2022 (the "**Settlement Agreement**"). A true and correct copy of the Settlement Agreement is attached as Exhibit "1" to the [SEALED] *Declaration of Thomas J. Seibert (I) In Support of the Limited Objection and Reservation of Rights of VRC Companies, LLC to Confirmation of the Debtors' Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization and Objection to Cure Claims, to Assumption and to Potential Rejection of*

*Executory Contract and (II) In Response to Plan Proponents' Memorandum of Law* (the "**Seibert Dec.**", D.I. 909; redacted public version at D.I. 980).

11. As provided in the Settlement Agreement, on or about October 25, 2022, VRC entered into a Master Service Agreement (with all addenda and amendments, the "**MSA**")[3] with Debtor CarePoint Health Management Associates, LLC ("**CarePoint Health**").  Exhibit "A" to the MSA sets forth the services to be delivered under the MSA.  Such services include, without limitation, records storage, records transportation (including priority and emergency delivery), document scanning, records retrieval, records induction, records destruction, repackaging, provision of storage boxes, provision of compliance reports and other related services.

12. The initial term of the MSA is 60 months (five years).  MSA § 1.0.  Hence, in the absence of renewal (which is automatic in the absence of advanced written notice), the MSA would expire by its terms on October 22, 2027.

13. The Stored Materials are believed to be comprised largely if not exclusively of patient medical records, which may include both medical information and credit card and related information. VRC believes those records contain personally identifiable information within the meaning of 11 U.S.C. § 101(41A) ("**PID**") as well as protected health information ("**PHI**") of Debtors' patients.  As of May, 2025, there were a total of approximately 57,390 cartons of the Debtors' records in the VRC's possession.

14. Because the Stored Materials are believed to contain PID and PHI, they must be maintained confidentially.  In addition, when such records are destroyed, they must be destroyed in a method that preserves confidentiality (*i.e.* shredding).  They cannot simply be

---

[3] The MSA is attached as Exhibit "2" to the Seibert Dec.

left on a curbside for the sanitation truck as this would plainly not maintain confidentiality of the records in accordance with Debtors' responsibilities.

15. Furthermore, destruction of the Stored Materials, should it be authorized, is a three-step process. First, the cartons must be identified and retrieved from storage. Second, the cartons must be palletized and moved to a location for destruction/removal. Finally, there is the actual process of destroying the Stored Materials in conformity with NAID® specifications or permanently removing them from storage.

16. Under the MSA, the cost of identifying the records and retrieving them from storage (the "**Access Out Retrieval Cost**") is $3.50 per carton, which, for 57,390 cartons, comes to **$200,865.00**.

17. Under the MSA, the cost of destroying the Stored Materials (or permanently removing such materials from storage) (the "**Destruction / Permanent Removal Charge**") is $4.95 per carton which, for 57,390 cartons, comes to **$284,080.50**.

18. Pending destruction or other legal disposition of the Stored Materials, there is a monthly charge for the storage for the Stored Materials of approximately $24,591.24 (the **"Monthly Storage Cost").**

19. Finally, there is a charge for pallets, estimated to be **$17,952.00** (the "**Pallet Charge**") based on 1,496 pallets at $12.00 per pallet.

20. These transactions are subject to sales tax of 6.625% in New Jersey, bringing the total to **$536,214.46** (the "**Total Final Cost**").[4]

---

[4] The Total Final Cost does *not* include any monthly storage costs.

**B. Postpetition Events**

21. On November 3, 2024 (the "**Petition Date**"), the Debtors filed their chapter 11 petitions with this Court. CarePoint Health is among the Debtors.

22. As of the Petition Date, there was $510,287.16 (the "**MSA Prepetition Claim Amount**") due and owing by Debtors to VRC under the MSA. This claim does *not* include rejection damages, amounts due as of the time of the Settlement Agreement, post-petition charges or the Total Final Cost.

23. Except as stated below, the Debtors did not pay any amounts due under the MSA following the Petition Date. As such, the Debtors have defaulted under the MSA.[5]

24. Under the terms of the Settlement Agreement, a default under the MSA voids the releases in the Settlement Agreement. Hence, due to the Debtors' default under the MSA, in addition to amounts due under the MSA, there is also more than $5,023,488.35 due and owing to VRC.

25. VRC continued to provide services to the Debtors after the Petition Date. The total amount outstanding for those post-petition services through February 28, 2025 was approximately $94,879.53. Charges continued to accrue under the MSA.

26. A summary of VRC's voluminous invoices as of that time is attached as **Exhibit "1"** hereto.

27. On December 23, 2024, the each of the Debtors filed its respective schedules and statements of financial affairs (collectively, the "**Schedules and SOFAs**"). The Schedules and SOFAs list certain VRC Companies as follows:

---

[5] The Debtors in fact defaulted under the MSA well before the Petition Date.

| Claimant | Debtor | Claim Amount |
|---|---|---|
| Cityside Archives | CarePoint Health | Schedule G |
| Vital Records Holdings, LLC | Hudson Hospital Opco, LLC | $132,415.06 |
| VRC | Hudson Hospital Opco, LLC | SOFA Q20 |

28. VRC's scheduled claim is a fraction of the actual MSA Prepetition Claim Amount.

29. On March 14, 2025, VRC filed its original *Motion of VRC Companies, LLC (I) Requesting Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and (II) Requesting an Order Directing the Debtors to Comply with 11 U.S.C. § 351 as to the Disposal of Patient Medical Records* (D.I. 989, the "**Original Motion**").

30. Following the filing of an objection and reply with respect to the Original Motion, the Debtors and VRC entered into a partial resolution of the issues raised in the Original Motion. That resolution was reflected in and approved by the Court in the *Order Regarding Motion of VRC Companies, LLC (I) Requesting Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and (II) Requesting an Order Directing the Debtors to Comply with 11 U.S.C. § 351 as to the Disposal of Patient Medical Records* (D.I. 1269, the "**Approval Order**").

31. Under the Approval Order, the Debtors agreed to pay, and VRC agreed to accept, $120,000 as a payment for all post-petition storage charges under the MSA through June 30, 2025. The Debtors have paid VRC that amount.

32. However, the Approval Order did not resolve the remaining issues in the Original Motion. In particular, the Approval Order did not resolve (without limitation):

7

      a. VRC's request that the Debtors comply with their obligations under 11 U.S.C. § 351 and otherwise provide VRC with direction as to what they intend to do with the Stored Materials;

      b. The payment of the Total Final Cost or any portion thereof; and

      c. Storage charges accruing after June 30, 2025.

33. By order dated April 17, 2025 (D.I. 1168, the "**Confirmation Order**"), this Court confirmed the Seventh Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization as Modified as of April 15, 2025 (the "**Plan**").

34. Paragraph 73 of the Confirmation Order provides "[n]otwithstanding 11 U.S.C. § 365(d)(2), anything else in the Plan or this Confirmation Order, the deadline for the Debtors (or their successors under the Plan) to assume or reject the Master Services Agreement between VRC Companies, LLC and CarePoint Health Management Associates, LLC, dated October 25, 2022 . . . is extended until the earlier of the Effective Date of the Plan or 60 days following the entry of this Confirmation Order."

35. The Effective Date of the Plan was May 22, 2025 (*see* Notice of Effective Date, D.I. 1285). As the Effective Date occurred before 60 days following entry of the Confirmation Order, the MSA, having not been assumed prior to that time, was deemed rejected as of the Effective Date.

36. In addition, the Notice of Effective Date states that all administrative expense claims must be filed by June 23, 2025.

37. Some of the administrative expense claims asserted herein are arguably contingent in nature. For example, if the Debtors were to pay the Total Final Cost for the retrieval and destruction/final removal of the Stored Materials promptly, then a significant

portion of the storage charges after June 30, 2025 through the end of the MSA's term would not be incurred.[6]

38.     Putting aside whether VRC was required to file this Amended Motion in light of the administrative claims bar date, the issues raised herein are ripe for adjudication.

39.     In particular, as of the date of the filing of this Amended Motion, the Debtors have not:

    a. Informed VRC what their final decision is as to disposition of the Stored Material; or

    b. Paid or offered to pay for the retrieval, destruction and/or final disposition of the Stored Material.

40.     As noted above, because the Stored Materials contain PHI and PID, it is probable that they must be maintained for a period of time.[7]  The Debtors appear to be of the opinion, however, that they do not need the Stored Materials.  At a bare minimum, if the Stored Materials are to be destroyed, this must be done in a manner to maintain confidentiality, typically shredding.

41.     VRC provided the Debtors with detailed inventories of the Stored Materials on or about May 5, 2025 so that the Debtors could make a final determination as to the disposition of the Stored Materials.  Nevertheless, at this time, the Debtors have not given VRC any

---

[6] Storage charges post June 30, 2025 would not be zero, however.  The process of retrieving and destroying or removing from storage tens of thousands of boxes of records is not something that can happen instantaneously.  It is likely to take several months to complete such a process.  Hence, even if Debtors pay the Total Final Cost, they would continue to incur some storage charges following June 30, 2025.

[7] The processing of Protected Health Information, a subset of individually identifiable health information, is also governed by Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (Pub. L. 104-191), the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), 45 C.F.R. § 164.504, and various regulations promulgated under those laws, including the Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules under the Health Information Technology for Economic and Clinical Health Act and the Genetic Information Nondiscrimination Act; Other Modifications to the HIPAA Rules (the "Omnibus Rule"), 78 Fed. Reg. 5566 (Jan. 25, 2013).

direction as to the final disposition of the Stored Materials other than to intimate that they may seek to abandon them. However, the Debtors have not filed an abandonment motion or otherwise taken any steps to abandon the Stored Materials.

## RELIEF REQUESTED AND REASONS THEREFOR

**A. The Debtors Should be Compelled to Comply with Section 351 of the Code (or Warrant that The Stored Materials are not Subject to any State or Federal Regulations)**

42. As noted above, and in the *Objection of Access Information Management Corporation to Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* at p. 2 n. 2 [D.I. 782], the Stored Materials, as patient medical records, are subject to myriad Federal and State regulations concerning their preservation, maintenance, confidentiality and destruction.

43. Section 351 of the Bankruptcy Code, however, permits a debtor-in-possession to dispose of patient medical records that it is required to maintain under applicable Federal or State law by notifying its patients of the intended disposition of the records. This section of the Code was added in 2005 as part of BAPCPA in conjunction with other provisions of the Code, including 11 U.S.C. § 503(b)(8), which provides that the cost of disposing of patient records is a cost of administration.[8]

---

[8] Administrative expenses include:

> (8) the actual, necessary costs and expenses of closing a health care business incurred by a trustee or by a Federal agency (as defined in section 551(1) of title 5) or a department or agency of a State or political subdivision thereof, including any cost or expense incurred—
> (A) in disposing of patient records in accordance with section 351; or
> (B) in connection with transferring patients from the health care business that is in the process of being closed to another health care business

11 U.S.C § 503

44. The Debtors have intimated that they have no use or continuing obligations with respect to the Stored Materials and that they therefore intend to abandon such materials.

45. As of the date of this Amended Motion, however, the Debtors have not sought to abandon the Stored Materials. Nor have the Debtors, as far as VRC is aware, endeavored to comply with their obligations under 11 U.S.C. § 351.

46. In any event, VRC would strenuously object to any effort by the Debtors to abandon the Stored Materials without at least paying for the proper and secure destruction of such materials. Sections 351 and 503(b)(8) would be rendered meaningless if a debtor or trustee could simply abandon patient medical records without paying for their proper disposition. And the confidentiality of patient records could be placed in jeopardy.

47. Permitting the Debtors to abandon the Stored Material without complying with section 351 and paying for the proper destruction of the records in accordance with section 503(b)(8) would place VRC in the untenable position of either having to destroy the Stored Materials itself, or to store such records indefinitely without any prospect of payment.

48. To the extent that it is the Debtors' position that the age or nature of the Stored Materials is such that the Debtors have no obligation to maintain such records, the Debtors need to make such representation to the Court and seek an order of the Court authorizing the proper destruction of the Stored Materials in accordance with applicable regulations and guidelines. This is not an obligation that the Debtors can foist upon VRC as a mere records custodian. VRC has no obligations to the Debtors' patients. While VRC can, of course, assist the Debtors in complying with their own records maintenance and confidentiality obligations, these obligations are ultimately obligations of the Debtors and not VRC.

**B. The Debtors Should be Compelled to Pay the Total Final Cost as Well as Continuing Storage Charges Following June 30, 2025**

49. Under § 503(b)(1)(A) of the Bankruptcy Code, "[a]n expense is administrative only if (1) it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, and (2) only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007); *see also In re Garden Ridge Corp.*, 321 B.R. 669, 676 (Bankr. D. Del. 2005) (citing *In re Waste Systems Int'l, Inc.*, 280 B.R. 824, 826 (Bankr. D. Del. 2002)). As to the second requirement, courts have held that an administrative expense payment should be afforded to those who either assist in the preservation and administration of the estate, or who aid the debtor's rehabilitation to the benefit of all creditors. *See In re Armorflite Precision, Inc.,* 43 B.R. 14 (Bankr. D. Me. 1984).

50. In the Third Circuit, section 503(b)(1)(A) "has been broadly interpreted to include 'actual, necessary costs and expenses' that benefit the debtor's estate both directly and indirectly." *Elsom v. Woodward & Lothrop, Inc.*, 1997 WL 476091, *3 (E.D. Pa. 1997) (citing, *In re B. Cohen and Sons Caterers, Inc.,* 143 B.R. 27, 28 (E.D. Pa. 1992)). The policy behind section 503(b) is to facilitate the rehabilitation of insolvent debtors by encouraging third parties to provide those debtors with necessary goods and services. *See In re B. Cohen and Sons Caterers, Inc.,* 143 B.R. at 28 (citations omitted).

51. Moreover, aa party providing goods or services under an executory contract is entitled to an administrative expense claim presumptively be valued at the contractual rate. As this Court has held:

> In the context of executory contracts, **a non-debtor party to an executory contract is entitled to administrative expenses equal to the value of any post-petition benefit conferred on the estate prior to assumption or**

12

> **rejection of that contract.** *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984); In re BCE W., L.P., 264 B.R. 578, 584 (B.A.P. 9th Cir. 2001).
>
> Administrative expenses are awarded to encourage parties to continue to do business with a debtor post-petition. *See In re Economy Lodging Sys., Inc.*, 234 B.R. 691 (B.A.P. 6th Cir. 1999); *see also Toma Steel Supply Inc. v. Transamerican Natural Gas Corp. (In re Transamerican Natural Gas Corp.)*, 978 F.2d 1409, 1420 (5th Cir. 1992) (stating that [*401] "the purpose of the priority treatment afforded by § 503 is to encourage third parties to provide necessary goods and services to the debtor-in-possession so that it can continue to conduct [**50] its business, thus generating funds from which prepetition creditors can be paid"). **In addition, the amount of an administrative expense claim will generally be calculated pursuant the parties' underlying contract or agreement.** *See In re Williams Contract Furniture, Inc.*, 148 B.R. 799, 804 (Bankr. W.D. Va. 1992). In this regard, the negotiated terms of the parties will be presumed to be the proper basis for the calculation of the administrative expense claim.

*Compass Bank v. N. Am. Petroleum Corp. USA (In re N. Am. Petroleum Corp. USA)*, 445 B.R. 382, 400-01 (Bankr. D. Del. 2011) (emphasis supplied); *accord In re DVI, Inc.,* 308 B.R. 703, 708 (Bankr. D. Del. 2004) ("As stated earlier, the amount of an administrative expense claim for rent is typically the fair market rental value of the Premises. *Zagata Fabricators,* 893 F.2d at 627. The contract rate is presumed to be the fair market value unless the presumption is rebutted. *ZB Company,* 302 B.R. at 319. Accordingly, DVI has the burden of showing why the contract rate was not the fair market value for the rental of the Premises. DVI has not offered any evidence to rebut the presumption."); *accord In re Thatcher Glass Corp.*, 59 B.R. 797, 799 (Bankr. D. Conn. 1986) (citing 3 Collier on Bankruptcy 1516) ("The *quantum* of allowance for use and occupation by the receiver or trustee is measured by 'the reasonable value of such use and enjoyment.' Ordinarily this will be the contractual rental, *pro rata temporis,* unless it is shown that the contractual rental itself is clearly unreasonable. There is a presumption to the effect that the contractually reserved rent is reasonable.'").

    52.    The case of *In re Patient Educ. Media*, 221 B.R. 97, 99 (Bankr. S.D.N.Y. 1998)

("*Patient Education*") is instructive. There, the debtor, a producer and distributor of healthcare related video tapes, entered into a production agreement under which debtor agreed to produce 75 video tapes and the counter-party, Sonalysis, would provide production services. Debtor required a custom-built set for the production of its videos, which was stored at Sonalysis's headquarters. Due to its size, the set remained on Sonalysis' premises even when debtor was not making videos. Debtor and Sonalysis entered into an oral agreement under which debtor would pay Sonalysis a weekly storage fee of $5,500 for each week that the set was not in use.

53. Debtor argued that it was not liable for the weekly storage charges because it was never able to sell the set and did not use it during the post-petition period. The Court rejected that argument, finding that debtor "continued to store its set on Sonalysts premises--and hence, Sonalysts continued to render performance--using the entire sound stage for that purpose." *In re Patient Educ. Media*, 221 B.R. at 102-03. The Court further held that the fact that the debtor was never able to sell the set was of no moment: "Just as the debtor in possession must still pay a trade vendor who provides inventory that cannot be sold, the debtor in possession must pay for the use of a nondebtor's property, even where the use turns out to be unprofitable." *In re Patient Educ. Media*, 221 B.R. at 103. Finally, the Court held that debtor had failed to rebut the presumption that the contract rate governed. Quoting Colliers, the Court held:

> Using reasonable rental value allows the court to apply an objective standard in determining the benefit to the estate. To use a different standard, such as the extent to which use of the property benefitted the estate, would be too subjective and would lead to different outcomes dependent on the success of the trustee's operation of the business.
>
> 4 Lawrence P. King, *et al., Collier on Bankruptcy* P 503.06[6][c][ii], at 503-39 (rev. 15th ed. 1998) ("*Collier*")(footnote omitted).

*In re Patient Educ. Media*, 221 B.R. at 104.

54. Moreover, as noted above, Congress has specifically directed that the costs of the destruction of patient medical records in connection with the closing of a health care business is a cost of administration under section 503(b)(8)(A). While the language of section 503(b)(8) appears to be limited to the "closing" of a healthcare business, it would make little sense if document destruction were deemed a cost of administration in a case without ongoing operations but not in a case *with* ongoing operations. *See generally In re IMG Healthcare, LLC*, No. 06-10059, 2008 Bankr. LEXIS 2092, at *6 (Bankr. E.D. La. July 8, 2008) ("The court approved as an administrative expense, a payment to Hunter in the amount of $ 39,567.21 by order dated February 7, 2007 (P-324) for Hunter's services to the debtor in destroying many of the debtor's medical records held by Hunter as well as payment of past due storage fees and a 'medical record transfer cost,' which was incurred when IMG moved the remainder of its records to a different storage facility.").

55. VRC, in continuing to store the Stored Materials on a post-petition basis under the MSA, is rendering ongoing benefit to the estate. Following June 30, 2025, the monthly storage charge for the Stored Materials will be $24,591.24. Unless and until the Debtors pay for the proper retrieval and destruction or removal of the Stored Materials, they should be compelled to pay the ongoing monthly storage charges.

56. In addition, if the Debtors decide to retrieve and destroy or finally remove the records, the Debtors would incur the Total Final Cost and should be compelled to pay same.

## RESERVATION OF RIGHTS

57. VRC expressly reserves the right to amend or supplement this Amended Motion with affidavits and other supporting documents and, if necessary, an evidentiary hearing, if a decision from the Court regarding the amount of VRC's administrative expense claim becomes

necessary. Moreover, nothing contained herein shall constitute a waiver of the VRC's right to file another Motion or amend this Motion, as necessary.

## NOTICE

58. Notice of this Amended Motion has been provided to (i) the Debtors; (i) counsel to the Debtors; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to the Debtors' DIP Lenders; (iv) counsel to the Office of the United States Trustee; and (v) all parties who have noted their appearances electronically pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. VRC submits that no further or other notice is required.

## CONCLUSION

59. VRC hereby asserts a claim for payment under 11 U.S.C. § 503(b)(1)(A) and 503(b)(8). Accordingly, VRC Companies, LLC respectfully requests allowance and payment of its administrative expense claim. VRC further requests that the Debtors be compelled to provide VRC direction as to the disposition of the Stored Materials and comply with their obligations under 11 U.S.C. § 351.

60. This request is filed without prejudice to any other claims VRC may have asserted, or may hereafter assert, against any of the Debtors in these consolidated cases.

WHEREFORE, VRC requests that the Court enter an Order: (i) allowing VRC an administrative expense claim for all post-petition amounts due under the MSA, and any other post-petition claims that may have or may hereafter arise or become known; (ii) requiring immediate payment of VRC's allowed administrative expense; (iii) directing the Debtors to decide what to do with the Stored Materials and ordering the Debtors to comply with section 351 and applicable non-bankruptcy law as to such Stored Materials; (iv) if the Debtors have no more need for the Stored Materials, directing the Debtors to pay the Total Final Cost so that the Records

may be properly retrieved and destroyed while maintaining confidentiality; and (v) granting such other and further relief in favor of VRC as the Court deems just and proper.

Dated: June 23, 2025

    Wilmington, Delaware

Respectfully submitted,

By: */s/ Christopher D. Loizides*
    Christopher D. Loizides, Esq. (No. 3968)
    LOIZIDES, P.A.
    Legal Arts Building
    1225 King Street, Suite 800
    Wilmington, Delaware 19801
    Telephone: (302) 654-0248
    Email: loizides@loizides.com

*Counsel to Movant VRC Companies, LLC*