## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CarePoint Health Systems Inc. d/b/a Just Health Foundation, *et al.,* | ) | Case No. 24-12534 (JKS) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |
| | ) | |
| Samuel E. Mapp, M.D., | ) | |
| | ) | |
| Movant, | ) | |
| | ) | **Obj. Deadline: July 22, 2025 at 4:00 p.m.** |
| v. | ) | **Hr'g Date: August 14, 2025 at 11:00 a.m.** |
| | ) | |
| Garden State Healthcare Associates, LLC; CarePoint Health Systems, Inc. d/b/a/ Just Health Foundation; IJKG Opco LLC d/b/a CarePoint Health - Bayonne Medical Center; Hudson Hospital Opco, LLC D/B/A CarePoint Health - Christ Hospital; and Humc Opco, LLC d/b/a CarePoint Health - Hoboken University Medical Center, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

### MOTION OF SAMUEL E. MAPP, M.D. FOR RETROACTIVE ANNULMENT AND PROSPECTIVE RELIEF FROM AUTOMATIC STAY AND INJUNCTIVE PROVISIONS OF DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Associates (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a/ CarePoint Health-Christ Hospital (0608); (xiv) HUMCO Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

COMES NOW, Samuel E. Mapp, M.D., individually, by and through his undersigned counsel, and hereby moves this Honorable Court for entry of an Order granting retroactive annulment of the automatic stay imposed by 11 U.S.C. § 362(a) and granting prospective relief from the automatic stay and the injunctive provisions of *Debtors' Joint Chapter 11 Plan of Reorganization* to allow him to liquidate his claims against the above-named respondent Debtors and Reorganized Debtors in the New Jersey State Court Action (defined below) and to pursue recovery from insurance policies and proceeds in the first instance (the "Motion").  In support of his Motion, Movant respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Movant grants his consent, pursuant to Del. Bankr. L.R. 9013-1(f), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments on the Motion consistent with Article III of the United States Constitution.

3.      Venue of this case and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief requested in this Motion are 11 U.S.C. § 105(a), 362(d), Fed. R. Bankr. P. 4001(a) and 9014, and Del. Bankr. L.R. 4001-1 and 9013-1.

## BACKGROUND[2]

5.      On November 3, 2024 (the "Petition Date"), all Debtors -- except IJKG Opco LLC

d/b/a CarePoint Health - Bayonne Medical Center ("Bayonne Opco") -- filed voluntary chapter 11

petitions, and an involuntary chapter 11 case was commenced against Bayonne Opco.[3]   On the

Petition Date, three (3) creditors of Bayonne Opco -- 29 E 29 Street Holdings, LLC, Bayonne

Medical Center Opco, LLC, and Peter Wong, MD -- filed an involuntary petition against Bayonne

Opco under Chapter 11 of the Bankruptcy Code.  On the Petition Date, Bayonne Opco filed an

answer consenting to the relief requested in the involuntary petition

6.      The Debtors thereafter continued to manage their business and properties as

debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On April 17, 2025, the Court entered the Confirmation Order [D.I. 1168]

confirming the *Seventh Amended Combined Disclosure Statement and Joint Chapter 11 Plan of

Reorganization as Modified as of April 15, 2025* [D.I. 1154] (the "Plan").

8.      Dr. Mapp had been employed by Christ Hospital approximately 22 years (from

early 2002 to March 21, 2024), under various ownership groups.  While CarePoint acquired Christ

Hospital in 2012, Dr. Mapp did not become employed under CarePoint's employment contract

until October 6, 2014, when he entered into that certain *Physician Per-Diem On-Call Employment

Agreement* with Garden State Healthcare Associates, LLC (the "Employment Agreement").  The

---

[2] The following is provided by way of general summary only.  For further description of the circumstances of the alleged wrongful termination of his employment, please see *Complaint and Jury Demand* filed November 27, 2024 in the New Jersey State Court Action (defined below), a copy of which is attached to the Affidavit of Diane E. Peyser, Esq. (hereinafter, the "Peyser Aff., at ¶ ___") as Exhibit A.  A copy of the Peyser Aff. is being filed contemporaneously herewith.

[3] On November 6, 2024, the Court entered an order for relief with respect to Bayonne Opco's consent to the commencement of its involuntary chapter 11 case.  On November 9, 2024, the Court ordered Bayonne Opco's case to be jointly administered with those of the other Debtors [D.I. 147].

Employment Agreement, which is incorporated herein by reference, contains a confidentiality clause and is not appended to the Peyser Affidavit because the Debtors should already be in possession of a copy of that agreement.

9.     The Employment Agreement contemplated that Dr. Mapp would render on-call surgical services at the Debtors' hospitals as follows:  In re IJKG Opco LLC d/b/a CarePoint Health - Bayonne Medical Center (Bayonne Opco); In re HUMC Opco, LLC d/b/a CarePoint Health - Hoboken University Medical Center; and In re Hudson Hospital Opco, LLC d/b/a CarePoint Health - Christ Hospital.

10.     Pre-petition, on or about December 23, 2023, Dr. Mapp's Employment Agreement was purportedly terminated unilaterally by CarePoint's then recently retained Chief Medical Officer, Defendant John Rimmer, D.O., with an effective post-petition termination date of March 21, 2024.  However, CarePoint stopped paying Dr. Mapp and terminated his malpractice coverage post-petition in the first or second week of January 2024, which prevented him from continuing to work for the hospital after that time.  Accordingly, Dr. Mapp's employment under CarePoint's contract, including his entitlement to employer-sponsored malpractice coverage, lasted approximately nine years.  Peyser Aff., at ¶ 4.

11.     A few weeks post-petition, on or about November 27, 2004, Dr. Mapp filed that certain *Complaint and Jury Demand* (the "Complaint") initiating a lawsuit in the Superior Court of New Jersey, Law Division, Docket No. HUD-L-0044501-24, styled *Mapp v. Garden State Healthcare Associates LLC d/b/a Garden State LLC, et al.* (the "New Jersey State Court Action") against, *inter alia*, the following debtors:  In re Garden State Healthcare Associates, LLC (Case Number 24-12543 (JKS)); In re CarePoint Health Systems, Inc. d/b/a Just Health Foundation (Case Number 24-12534 (JKS)); In re IJKG Opco LLC d/b/a CarePoint Health - Bayonne Medical

Center (Bayonne Opco) (Case Number 24-12551 (JKS)); In re Hudson Hospital Opco, LLC d/b/a

CarePoint Health - Christ Hospital (Case Number 24-12546 (JKS)); In re HUMC Opco, LLC d/b/a

CarePoint Health - Hoboken University Medical Center (Chapter 11 Case Number 24-12548

(JKS)) and the debtor's then current, and upon information and belief, now former, employee,

Defendant Rimmer.  Peyser Aff., at ¶ 5.

12.     The Complaint contains three counts and sounds in breach of contract, race

discrimination, and violation of the New Jersey Wage Payment Law.  A copy of the Complaint is

attached hereto as Exhibit A.  Peyser Aff., at ¶ 6.

13.     Pursuant to a demand made by Debtor's counsel invoking the automatic stay, Dr.

Mapp dismissed his Complaint (without prejudice).  Peyser Aff., at ¶ 7.

14.     By way of this Motion, Dr. Mapp seeks approval of the Court to reinstate his

Complaint and to prosecute the New Jersey State Court Action to verdict or other resolution.

15.     By way of general summary only, and subject to the contents of the Employment

Agreement and the Complaint, Dr. Mapp asserts his Claims on account of the following wrongful

conduct of Dr. Rimmer, who upon information and belief, was at all relevant times acting with the

course and scope of his employment and, therefore, liability for his wrongful conduct is imputed

to his employers pursuant to the doctrine of *Respondeat Superior*.  Peyser Aff., at ¶ 8.

16.     Specific acts that are illustrative of the discriminatory and hostile actions suffered

by Dr. Mapp over a period of four months at the hands of Dr. Rimmer include the following:

17.     Despite Dr. Mapp's nine years of exemplary service with CarePoint, during which

time he consistently received positive performance evaluations, Dr. Rimmer attempted to replace

him with lower-cost alternative personnel without adhering to the terms and provisions of Dr.

Mapp's Employment Agreement.[4]  Peyser Aff., at ¶ 8, bullet point 1.

18.    Dr. Rimmer attempted unilaterally to alter the terms of Dr. Mapp's Employment Agreement.  Peyser Aff., at ¶ 8, bullet point 2.

19.    Dr. Rimmer targeted Dr. Mapp's work schedule (imposing a reduction from 26 to 31 days per month with 24-hour on-call shifts every day to a maximum of 10 days per month) and compensation structure (imposing a reduction from $850 per day to $150 per day) under false pretenses and without being released from the non-compete provisions of his Employment Agreement.  Peyser Aff., at ¶ 8, bullet point 3.

20.    Dr. Rimmer uttered false accusations and pretextual criticism of Dr. Mapp's work performance.  Peyser Aff., at ¶ 8, bullet point 4.

21.     Dr. Rimmer, who, upon information and belief, is Caucasian, took racially discriminatory actions and made racially discriminatory comments relating to Dr. Mapp, who is African American, (and others), and otherwise perpetrated a hostile work environment towards Dr. Mapp.  Peyser Aff., at ¶ 8, bullet point 5.  See, for example:

- Peyser Aff. at Exhibit A at p.7, ¶¶ 45-6 (questionable hiring of Caucasian physician's assistant to take over Dr. Mapp's cases); p.8, ¶¶ 52-4 (Dr. Mapp's colleagues rally to his support; Dr. Rimmer is openly hostile to Dr. Mapp, including refusing to shake his hand at their first face-to-face meeting; Dr. Rimmer demonstrates his lack of knowledge relating to the amount Dr. Mapp's salary, which he severely overstated);

- *Id.*, at p.9, ¶¶ 56-61 (Dr. Rimmer engages in series of discriminatory and pretextual efforts to fire Dr. Mapp, including informing Dr. Mapp's long-time colleagues that they were no

---

[4] Upon information and belief, Dr. Rimmer has been summarily fired from his CMO position.  Dr. Mapp, on the other hand, has received word that his former position is being offered back to him.  Peyser Aff., at ¶ 8, bullet point 1, n.2.

longer permitted to work with him; Dr. Rimmer blamed Dr. Mapp for the hospital's financial woes; Dr. Mapps colleagues were angry that Dr. Rimmer was singling him out for discriminatory and harassing treatment; Dr. Mapp's colleagues refuse Dr. Rimmer's order to transfer their patients to a different hospital away from Dr. Mapp; Dr. Rimmer reveals the pretextual rationale underlying Dr. Mapp's employment termination (false budgetary concerns); Dr. Rimmer runs roughshod over Dr. Mapp's Employment Agreement and seeks to impose new economic terms on Dr. Mapp's employment in contravention of the terms and conditions of the Employment Agreement);

- *Id.*, at p.10, ¶¶ 62, 64-7 (Dr. Rimmer simply ignores the terms and conditions of Dr. Mapp's Employment Agreement although he was well-aware of its existence in order to carry out his discriminatory scheme; Dr. Rimmer falsely maligned Dr. Mapp's work performance; Dr. Rimmer cited false facts regarding Dr. Mapp's recordkeeping and services rendered; Dr. Rimmer treated Dr. Mapp disparately by requiring paperwork addenda not required of other physicians; Dr. Rimmer disparately required Dr. Mapp to submit his case logs although he never even read them);

- *Id.*, at p.11, ¶¶ 68-9 (Dr. Rimmer violated the terms and conditions of the Employment Agreement by attempting to impose an impermissible preapproval term; Dr. Rimmer falsely accused Dr. Mapp of refusing to provide assistance on a case when no such refusal took place – ever);

- *Id.*, at p.12, ¶ 79 (Dr. Rimmer falsely accused Dr. Mapp for not replying to emails despite Dr. Mapp having provided a timecard for a full call schedule in response to a specific false accusation);

- *Id.*, at p.13, ¶¶ 80-2 (calling the proverbial kettle black, Dr. Rimmer falsely accused Dr. Mapp of purportedly failing to return emails concluding "unfortunately if you don't return

emails, we assume you to not be interested in continuing employment or negotiating in good faith" when it was in fact Dr. Rimmer who was not interested in negotiating in good faith);

- *Id.*, at p.14, ¶¶ 76-8 (the CEO prior to Dr. Rimmer who was of Indian descent informed Dr. Mapp that Dr. Rimmer had exhibited racists behavior towards her even though she was his superior; Dr. Mapp's employment termination letter signed by Dr. Rimmer was presented on December 22, 2023, effective March 21, 2024);

- *Id.*, at p.15, ¶ 78-9 (although the Debtors had paid Dr. Mapp's malpractice insurance for the past nine years, during which time no malpractice claims were filed, Dr. Rimmer wrote the "OR" Director and the Chief of Surgery instructing them no longer to allow Dr. Mapp to assist unless he provided proof of his own malpractice insurance or that the physician he was assisting was otherwise covered; implying malpractice on the part of Dr. Mapp that would jeopardize the hospital's insurance coverage, Dr. Rimmer implemented a preapproval requirement without informing Dr. Mapp, leaving him to first learn of this purported requirement from his operating room subordinates); and

- *Id.*, at P.16, ¶ 83 (Dr. Rimmer bore racial animosity towards Dr. Mapp and treated him differently than non-African Americans).

22.    On or about March 13, 2025, Dr. Mapp timely filed a proof of claim against each Respondent.

23.    Because Dr. Mapp withdrew his Complaint shortly after the New Jersey State Court Action was filed, all discovery remains outstanding, including the identification of insurance coverage that may be applicable to his claims. Peyser Aff., at ¶ 10. Dr. Mapp reserves all rights as to the proceeds of any applicable primary, excess, or umbrella insurance policies and/or insurance type agreements owned by the Debtors.

## RELIEF REQUESTED; BASIS THEREFOR

24.     Movant hereby respectfully requests that this Court enter an order retroactively annulling the automatic stay so that he may re-institute the now dismissed New Jersey State Court Action with respect to the damages he suffered pre-petition, and further for prospective relief from the automatic stay as well as the injunctive provisions of the Plan so that he may liquidate his claims against Debtors and Reorganized Debtors via the New Jersey State Court Action and to pursue recovery for any judgment entered or settlement reached in his favor from any and all applicable insurance programs, policies, and proceeds that may be applicable to his claims in the first instance and then, as to any deficiency, against the Debtors' estates pursuant to further order of the Court.

### A.    The Automatic Stay

25.     Section 362(a) of the Bankruptcy Code provides:

> [A] petition filed under section 301 ... of this title ... operates as a stay, applicable to all entities, of—
> (1) the commencement or continuation, including the issuance of employment of process, of a judicial ... proceeding against the debtor that was or could have been commenced before the commencement of the case under this title ....

11 U.S.C. § 362(a).

26.     However, a party in interest may obtain relief from the automatic stay pursuant to Section 362 (d) of the Bankruptcy Code, which provides in pertinent part as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay ... for cause....

11 U.S.C. § 362(d).

27.     "Cause" is not defined by section 362(d)(1).  "Cause" is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay.  *In re The SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007).  A party opposing a request for relief from stay

bears the burden of proof on all issues other than a debtor's equity in property. 11 U.S.C. § 362(g); *see also In re Absenia Holding, Inc.*, 2016 WL 5867039 * 2, Carey, J. (Bankr. D. Del. October 6, 2016) ("Curiously, the cases considering such requests for relief tend toward asking the question: 'Why should the court lift the stay?' The statute, by its burden shifting, seems almost instead to ask, 'why shouldn't the stay be lifted?'"); *but see In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 718 (Bankr. D. Del. 1996) (Movant has the initial burden in proving a *prima facie* case of cause, which if proved, must be rebutted by the debtor if the stay is not to be lifted.).

28. Relief from stay motions are customarily evaluated under the three-factor test articulated in *In re Rexene Products Co.,* 141 B.R. 574, 576 (Bankr. D. Del. 1992) to determine whether:

> a) any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit,
> b) the hardship to the [non-bankrupt party] by maintenance of the stay considerably outweighs the hardship of the debtor, and
> c) the creditor has a probability of prevailing on the merits.

*Absenia Holding,* 2016 WL 5867039 * 2; *see also In re Tribune Co.*, 418 B.R. 116, 126 (Bankr. D. Del. 2009).

29. Courts often follow the logic of the intent behind § 362(d) in determining whether cause exists to lift the stay -- that it is often appropriate to allow litigation to proceed, if no prejudice befalls the estate, "in order to leave the parties to their chosen forum and to relieve the bankruptcy court from duties that may be handled elsewhere." *Tribune*, 418 B.R. at 126 (quoting legislative history of § 362(d)) (internal citations omitted).

B. **The Discharge Injunction**

30.     Movant also seeks relief from the discharge injunction and any other injunctive provisions contained in Debtors' Plan.

31.     Under § 105(a), "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the title."  11 U.S.C. § 105(a).  Moreover, section 1141, which is incorporated by reference under section 524, generally provides that a confirmed plan binds creditors and allows the discharge of certain debts of a Chapter 11 debtor. However, Fed. R. Bankr. P. 3020(d) retains the Court's jurisdiction following confirmation of a plan to "issue any other order necessary to administer the estate."  Consequently, courts have determined that these provisions, in combination, provide the necessary authority to impose and interpret injunctive and discharge provisions following confirmation of a plan.  *See In re Carematrix Corp.*, 306 B.R. 478, 485 (Bankr. D. Del. 2004); *In re Continental Airlines, Inc.*, 236 B.R. 318, 326-27 n.11 (Bankr. D. Del. 1999), *aff'd*, *In re Continental Airlines, Inc.*, 279 F.3d 226 (3d Cir. 2002).

32.     Similar to modification of the automatic stay under Section 362 of the Bankruptcy Code, a court may modify a plan's permanent injunction and discharge provisions for "good cause."  *See e.g.*, *In the Matter of Hendrix*, 986 F.2d 195, 198 (7th Cir. 1993) ("any court that issues an injunction can modify it for good cause on the motion of a person adversely affected by it.").  The analysis of "cause" under § 362(a) has been used in determining whether to alter such provisions. *See In the matter of Shondel*, 950 F.2d 1301, 1304 (7th Cir. 1991).

33.     Here, the facts weigh in Movants' favor on each of the three prongs evaluated under *Rexene Products*.

I.  **Under the _Rexene_ Analysis, Cause Exists to Grant Relief.**

    A.  **Considering Great Prejudice to Either the Movant or Debtors.**

34.     Here, consideration of the prejudice factor weighs in favor of granting relief from stay.  The traditional function of the automatic stay is to provide a "breathing spell" for the debtor. _In re 15375 Memorial Corp._, 382 B.R. 652, 687 (Bankr. D. Del. 2008), _rev'd on other grounds_, 400 B.R. 420 (D. Del. 2009).  Here, the Debtors' Plan has already been confirmed.  In effect, the Reorganized Debtors have emerged from bankruptcy.  No additional breathing spell could possibly be needed.

35.     Moreover, Movant's claim will need to be liquidated in some forum at some point in time before he can receive any compensation from the Debtors' and Reorganized Debtors' insurance coverage scheme on account of the damages he has suffered.  Generally, "debtor-defendants suffer little prejudice when they are sued by plaintiffs who seek nothing more than declarations of liability that can serve as a predicate for a recovery against insurers, sureties, or guarantors."  _In re Fernstrom Stor. and Van Co._, 938 F.2d 731 (7th Cir. 1991) quoted in _In re 15375 Memorial Corp._, 382 B.R. at 690.

    B.  **Considering the Hardship Movant Will Face if Relief is not Granted Compared to the Hardship Debtors Will Face if Relief is Granted.**

36.     Conversely, on the balancing-of-the-hardships factor, Movant will face substantial hardship if the stay were not lifted.  The Movant is a resident of Trenton, New Jersey.  Peyser Aff., at ¶ 11.  The incident took place in New Jersey.  _Id._  Most of the evidence and witnesses are located in New Jersey.  _Id._  No evidence or witness is located in Delaware.  _Id._  Movant alleges that the Debtor-Defendants are liable for his damages pursuant to New Jersey contract and/or statutory law.  _Id._

37.     Movant has invested his resources developing the New Jersey State Court Action,

Peyser Aff., at ¶ 12, and should be permitted to have his day in court in front of a local jury of his peers in the venue of plaintiff's choosing.  If he were forced to litigate his claims in Delaware, he would be forced to incur the increased expense of bringing his attorneys, witnesses, and physical evidence to Delaware.  Any witness located in New Jersey more than 100 miles from this Courthouse could not be compelled by subpoena to testify at any trial in Delaware.[5]

38.    Any trial conducted in Delaware would be before the District Court as the Bankruptcy Court does not hold jury trials.  The District Court, although capable, would be applying New Jersey contract and/or statutory law with which it, presumably, would be less familiar than the Superior Court of New Jersey, Law Division.  That Court routinely hears matters of this nature.  Peyser Aff., at ¶ 13.

39.    Here, judicial economy would be better served by granting the relief requested and allowing the Movant to prosecute his contract and/or statutory claims in his chosen forum.  *See In re The Conference of African Union First Colored Methodist Protestant Church*, 184 B.R. 207, 218 (Bankr. D. Del. 1995) ("[T]he existence of a more appropriate forum than the bankruptcy court is "cause" for relief under Code §362(d)(1)."); *In the Matter of Baker*, 75 B.R. 120, 121 (Bankr. D. Del. 1987) (granting relief from stay to permit Family Court to determine issues with which it had expertise).

40.    Moreover, as this Court explained in granting stay relief in *15375 Memorial*, a

---

[5] Fed. R. Civ. P. 45(b)(2) and (c)(3)(A)(ii), made applicable in cases under the Bankruptcy Code by Fed. R. Bankr. P. 9016.  The Committee Note to Rule 9016 states: "Although Rule 7004(d) authorizes nationwide service of process, Rule 45 F. R. Civ. P. limits the subpoena power to the judicial district and places outside the district which are within 100 miles of the place of the trial or hearing."

According to Google Maps, the driving distance from the Courthouse to Bayonne Medical Center is approximately 116.6 miles.  As the crow flies, the distance is approximately 98.92 miles.  From the Courthouse to Christ Hospital: the driving distance is approximately 129 miles, as the crow flies the distance is approximately 123 miles.  From the Courthouse to Hoboken Medical Center: the driving distance is approximately 129 miles, as the crow flies the distance is approximately 124 miles.

claimant under a liability policy will suffer prejudice from delay due to the "lost time value of money," as well as "the lapse of time in terms of its ability to effectively prosecute its claims. Witnesses and documents become unavailable." *15375 Memorial*, 382 B.R. at 690.

41.     If relief were not granted, Movant's hardship would be palpable.  However, if relief were granted, Debtors' and Reorganized Debtors' hardship would be insignificant.

### C.  Considering Movant's Probability of Success on the Merits.

42.     The final prong of the *Rexene Products'* analysis is satisfied by "even a slight probability of success on the merits ... in an appropriate case."  *In re Continental Airlines*, 152 B.R. 420, 425 (D. Del 1993).  While there was no time for Debtors or Reorganized Debtors to articulate their defenses before insisting that the New Jersey State Court Action be dismissed, it cannot not be said that the Complaint's 109 well-plead paragraphs alleging breach of contract, race discrimination, and violation of New Jersey's wage payment law, fail to state a well-established, long-standing, policy-driven pattern of similar conduct perpetrated by Debtors in the ordinary course of the operation of their business.  Moreover, Dr. Rimmer's summary dismissal and senior management's consideration toward offering Dr. Mapp his former position back are facts from which this Court could reasonably infer that Dr. Mapp's treatment as an employee and finally his termination at the hands of Dr. Zimmer were wrongful.  "Only strong defenses to [non-bankruptcy] court proceedings can prevent a bankruptcy court from granting relief from the stay in cases where ... the decision-making process should be relegated to bodies other than [the bankruptcy] court." *In re Fonseca v. Philadelphia Housing Authority*, 110 B.R. 191, 196 (Bankr. E.D. Pa. 1990).   At the very least, there can be no question that the New Jersey State Court Action presents triable factual issues.  *See In re Fernstrom Storage and Van Co.*, 938 F.2d 731, 736 (7th Cir. 1991) (the court lifted the automatic stay where underlying action was not frivolous); *In re Peterson*, 116

14

B.R. at 249 (the bankruptcy court will not "pre-try" the case; "all that is required is that the movant make more than a 'vague initial showing' that he can establish a prima facie case.").

43.     When analyzed under the *Rexene* factors, these facts demonstrate that cause exists to lift the stay.  *See Rexene Products*, 141 B.R. 574 at 576 (legislative history indicates "cause" may be established by single factor including to permit action to proceed in another tribunal).

## CONCLUSION

WHEREFORE, Dr. Mapp respectfully requests the entry of an Order, substantially in the form attached hereto as Exhibit 1, (i) retroactively annulling the automatic stay imposed by section 362(a) of the Bankruptcy Code to permit Movant to re-file the New Jersey State Court Action, (ii) granting prospective relief from the automatic stay and the injunctive provisions of the Plan to permit Dr. Mapp to liquidate his claim against the Debtors and Reorganized Debtors via the New Jersey State Court Action by way of judgment or other resolution so he can then collect from any available insurance belonging to the Debtors or Reorganized Debtors that is applicable to his claim in the first instance, and (iii) return to this Court to have any deficiency amount of that liquidated claim that is not covered by the Debtors' insurance allowed as a general unsecured claim with partial priority pursuant to Section 507(a)(4), and (iv) granting to Movant such other and further relief as is just and proper.

Date:   July 1, 2025
        Wilmington, DE

SULLIVAN · HAZELTINE · ALLINSON LLC


 */s/ E.E. Allinson III*
Elihu E. Allinson III (No. 3476)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
Email: zallinson@sha-llc.com

- and -

15

**DEUTSCH ATKINS & KLEINFELDT, P.C.**
Diane E. Peyser, Esq.
21 Main Street, Suite 352
Hackensack, NJ  07601
P: (201) 498-0900
F: (201) 498-0909

*Attorneys for Samuel E. Mapp, M.D.*