## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CAREPOINT HEALTH SYSTEMS INC. d/b/a JUST HEALTH FOUNDATION, *et al.*,[1] | Case No. 24-12534 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: August 14, 2025 at 11:00 a.m. (ET)** **Objection Deadline: August 7, 2025 at 4:00 p.m. (ET)** |

## VIJAYANT SINGH'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Vijayant Singh ("Dr. Singh" or "Movant"), by his undersigned counsel, hereby filed this

*Motion for Relief from the Automatic Stay* (the "Motion"), by and through which, Dr. Singh seeks

authority to resume and prosecute to conclusion the civil action against Debtors CarePoint Health

Systems Inc. d/b/a Just Health Foundation (the "Debtors"), in the United States District Court for

the District of New Jersey styled as *United States of America ex rel. Vijayant Singh, M.D. v.*

*Hudson Hospital Opco, LLC d/b/a Christ Hospital, Humc Opco, LLC d/b/a Hoboken University*

*Medical Center, IJKG Opco, LLC d/b/a Bayonne Medical Center, CarePoint Health Management*

*Associates, LLC, IJKG, LLC Achinty A. Moulick, M.D., and William D. Pelino*, No. 2:21-cv-19788

(the "New Jersey Action"), pursuant to an order substantially in the form attached hereto as

**Exhibit A** (the "Proposed Order"), and in support of the Motion, Dr. Singh states as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

## VENUE AND JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. § 1409(a). The statutory basis for the relief requested in this motion is 11 U.S.C. § 362.

## BACKGROUND

3.      Dr. Singh is a medical doctor who, on or about March 2012, started working for the Debtors CarePoint Health ("CarePoint") and Bayonne Medical Center ("Bayonne").[2]

4.      Dr. Singh excelled at his profession and was elevated to the Chief Hospital Executive for Bayonne and the system-wide Chief Medical Office for CarePoint.

5.      On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") (Pub. L. 116-136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the COVID-19 pandemic. The President subsequently signed into law the Paycheck Protection Program and Health Care Enhancement Act (the "PPPHCEA"), and the Coronavirus Response and Relief Supplemental Appropriations Act (the "CRRSA").

6.      The CARES Act, PPPHCEA, and the CRRSA collectively provided approximately $178 billion in relief funds to hospitals and other eligible healthcare providers responding to the COVID-19 pandemic (the "PRF Program").

7.      As part of the PRF Program, the Department of Health and Human Services ("HHS") allocated and distributed two rounds of Provider Relief Fund Targeted Distribution

---

[2] At all relevant times, Debtor CarePoint Health oversaw, administered, and directed the operations of Christ Hospital, Hoboken University Medical Center, and Bayonne Medical Center (collectively, the "CPH Hospitals").

payments ("PRF High Impact Payments") to eligible hospitals, including the Debtors. The amount of the payments were determined by multiplying the number of qualified patients[3] by a per patient rate established for each round. The per patient rate for the first round of PRF High Impact Payments was $76,975 and $50,000 for the second round.

8.      On or about March 18, 2020, the CPH Hospitals admitted their first COVID-19 patient and shortly thereafter CPH Hospitals submitted applications to the HHS for the first round of PRF High Impact Payments. On May 7, 2020, the CPH Hospitals received an aggregate amount of $76,649,625 in first round PRF High Impact Payments.

9.      On June 10, 2020, two days after HHS announced the second round application period was open, the CPH Hospitals submitted the required applications. On June 20, 2020, the CPH Hospitals received an aggregate amount of $51,012,529 in second round PRF High Impact Payments.

10.      In total the CPH Hospitals received approximately $127,662,154 in PRF High Impact Payments based on roughly 2,454 eligible patients.

11.      On or about August 4, 2020, Dr. Singh, after suspecting the CPH Hospitals had received overpayments of PRF High Impact Payments, together with three other Chief Medical Officers and a CarePoint IT professional, formed a task force to investigate the CPH Hospitals receipt of excessive PRF High Impacy Payments (the "Overpayment Task Force").

12.      The Overpayment Task Force concluded the CPH Hospitals had collectively received an overpayment of between approximately $55 to $60 million in PRF High Impact Payments based on the improper attribution of roughly 1,214 patients used to support the PRF

---

[3] According to the HHS, a qualified individual was simply a person who had been confirmed positive for COVID-19. *See First Amended Complaint*, 2:21-cv-19788 [Docket No. 15] at ¶ 84.

High Impact Payment applications who were not qualified. Specifically, the patients were not qualified because they lacked a confirmed positive COVID-19 test, or had not been admitted to the hospitals as inpatients, or both.

13.    On or about February 26, 2021, based on the Overpayment Task Force's findings, Dr. Singh prepared and submitted a formal risk assessment report with CarePoint's Chief Compliance Officer highlighting the CPH Hospitals had improperly received and were unlawfully retaining millions of dollars in excessive PRF High Impact Payments.

14.    The Debtors were slow to act upon Dr. Singh's report, but on June 26, 2021, Dr. Singh was interviewed by the Debtors general counsel as part of an internal investigation into the allegations in Dr. Singh's report. Dr. Singh reiterated what was in his report and demanded the overpaid funds be returned.

15.    Dr. Singh inquired multiple times after the interview with the Debtors' general counsel about the return on the overpaid funds but each time his inquiry was rebuffed.

16.    In the face of the Debtors obstinance and ongoing retaliation, on or about August 6, 2021, Dr. Singh terminated his employment with Debtors CarePoint and Bayonne after objecting to and opposing the Debtors' receipt and retention of approximately $55 to $60 million in unwarranted PRF High Impact Payments that were dispersed by the United States in the spring and summer of 2020.

17.    On August 11, 2023, Dr. Singh filed the *First Amended Complaint* (the "Complaint"), attached hereto as **Exhibit B**, thereby initiating the New Jersey Action. The case progressed, including surviving a motion to dismiss filed by the Debtors. Eventually, the parties submitted a joint discovery plan and on September 17, 2024, the New Jersey District Court entered a pretrial scheduling order. *See Joint Discovery Plan* and *Pretrial Scheduling Order* attached

hereto as **Exhibits C & D**, respectively. However, discovery stalled when Dr. Singh learned of the Debtors chapter 11 filing and as a result of the bankruptcy filing, the New Jersey Action was stayed.

18.    On November 3, 2024, (the "Petition Date") the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

19.    On November 6, 2024, the Court entered an *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 80].

20.    On January 8, 2025, the Debtors filed their *Combine Disclosure Statement and Joint Chapter 11 Plan of Reorganization* [Docket No. 412] (as further amended and supplemented, the "Plan").

21.    On December 13, 2024, the Debtors initiated an adversary proceeding (the "Adversary Proceeding") against Dr. Singh, among other individuals, when they filed their *Complaint Seeking Extension of the Automatic Stay Under 11 U.S.C. § 362(a) and For Injunctive Relief Pursuant to 11 U.S.C. § 105(a)* [Adv. Case No. 24-50296 Docket No. 1] (the "Adversary Complaint"). Through the Adversary Complaint the Debtors sought to extend the automatic stay to all named defendants in the Adversary Complaint and obtain injunctive relief.

22.    On December 24, 2024, the Debtors filed an *Amended Complaint Seeking Extension of the Automatic Stay Under 11 U.S.C. § 362(a) and for Injunctive Relief Pursuant to 11 U.S.C. § 105(a)* [Adv. Case No. 24-50296 Docket No. 4] (the "Amended Adversary Complaint").

23.    On February 20, 2025, in response to the Debtors Amended Adversary Complaint, Dr. Singh filed the *Answer of Vijayant Singh, In His Capacity, as Relator, to Amended Complaint*

*Seeking Extension of the Automatic Stay Under 11 U.S.C. § 362(a) and for Injunctive Relief Pursuant to 11 U.S.C. § 105(a)* [Adv. Case No. 24-50296 Docket No. 14] (the "Singh Answer").

24.    On April 17, 2025, the Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming Seventh Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization as Modified as of April 15, 2025* [Docket No. 1168]. The Plan became effective as of May 22, 2025.

25.    On June 4, 2025, the Debtors filed a *Certification of Counsel Regarding Stipulation By and Between the Debtors and Defendants Dismissing Adversary Proceeding* [Adv. Case No. 24-50296 Docket No. 18] (the "Certificate of Counsel") laying out an agreement reached between the Debtors and Defendants (collectively, the "Parties") to dismiss the adversary proceeding. The Parties agreed that once the Plan became effective the relief sought in the Amended Adversary Complaint was no longer needed.

26.    On June 5, 2025, the Court entered the *Order Approving Stipulation Dismissing Adversary Proceeding Against All Defendants* [Adv. Case No. 24-50296 Docket No. 19] which effectively dismissed and ended the Adversary Proceeding against the Defendants and Dr. Singh.

27.    Article XIV of the Plan, section F, provides for an injunction relating to the confirmation of the Plan that enjoins certain claims or interests in the Debtors, including commencing, conduction, or continuing any suit, action, or other proceeding against the Debtors and Litigation Trust (as defined in the Plan). *See* Plan Art. XIV-F at p. 123.

## ARGUMENT

28.    Section 362(d) of the Bankruptcy Code states, in pertinent part, as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –

6

>    (1) For cause, including the lack of adequate protection of an
>    interest in property of such party in interest;
>
>    (2) With respect to a stay of an act against property under
>    subsection (a) of this section, if –
>
>        (A) the debtor does not have equity in such property; and
>    (B) such property is not necessary to be effective reorganization
>    . . . .

11 U.S.C. § 362(d).

29.     Because the automatic stay is not meant to be indefinite or absolute, the Court has authority to grant relief from the stay in appropriate circumstances. *In re Rexene Prods., Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992). In circumstances such as those here, "it will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from any duties that may be handled elsewhere." *In re Tribune Co.*, 418 B.R. 116, 126 (Bankr. D. Del. 2009) (quoting legislative history of § 362(d)) (internal citations omitted).

30.     Section 362(d)(1) provides that the automatic stay may be lifted where "cause" exists. After a *prima facie* showing by a movant, the debtor has the burden of proving that a movant is not entitled to relief from the stay. *In re Rexene Prods., Co.*, 141 B.R. at 577; 11 U.S.C. § 362 (g).

31.     "Cause" is not defined in the Bankruptcy Code and must be determine on a case-by-case basis. *IBM v. Fernstrom Storage & Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991). Most courts employ an equitable balancing test to determine "cause." *Rexene Prods., Co.*, 141 B.R. at 576.

32.     Courts in this District rely upon Rexene's three-pronged balancing test to determine whether "cause" exists for granting relief from the automatic stay to continue litigation:

(a) any great prejudice to either the bankruptcy estate or the debtor will result,

(b) the hardship to the movant by maintenance of the stay considerably outweighs the hardship to the debtor, and

(c) the movant has a probability of prevailing on the merits.

*See In re Tribune Co.*, 418 B.R. at 126 (citing *Rexene Prods. Co.*, 141 B.R. at 576).

33.     Cause exists in this case to grant Dr. Singh relief from the automatic stay. First, there will be no prejudice to the Debtors or their bankruptcy estates. Dr. Singh's claim will need to be liquidated, and Dr. Singh does not believe it is likely that the Debtors' key personnel will be required to attend any potential depositions or trial in the New Jersey Action.

34.     Further, the hardship that will be suffered by Dr. Singh far outweighs any potential hardship to the Debtors if Dr. Singh is not granted relief from the automatic stay. Dr. Singh identified improper application of federal funds by the CPH Hospitals and informed the proper individuals up the Debtors chain of command but was rebuffed multiple times. As a result, Dr. Singh faced relentless retaliation which eventually led to his self-termination simply for performing necessary oversight of the CPH Hospitals practices during the COVID-19 pandemic. Even beyond the delay in Dr. Singh's right to receive a payment on account of the improper receipt of federal funds, any delay in the New Jersey Action necessarily runs the risk of witnesses' availability to testify.

35.     Dr. Singh and the United States have paid, and will continue to pay, an appreciable price as a direct result of the damage inflicted by the Debtors. The New Jersey Action commenced well before the Petition Date, and the parties investigated the matter. Further, formal discovery had just begun. Given the advance nature of the proceedings, failure to litigate the New Jersey

Action to conclusion may result in Dr. Singh and the United States not having an adequate remedy at law.

36.     Dr. Singh need only prove the third Rexene prong with a showing that is "very slight," *Rexene Prods.*, 141 B.R. at 578. "Only strong defenses to state court proceedings can prevent a bankruptcy court from granting relief from the stay in cases where . . . the decision-making process should be relegated to bodies other than this court." *Id.* (quoting *Fonseca v. Philadelphia Housing Authority*, 110 B.R. 191, 196 (Bankr. E.D. Pa. 1990)). The facts set forth in the Complaint provide sufficient probability to support the requested relief and damages award in favor of Dr. Singh. Dr. Singh did nothing to contribute to the Debtors improper application and retention of PRF High Impact Payments and in fact warned the Debtors multiple times the improper nature of the funds.

37.     By contrast, Debtors, through its agents and representatives, refused to return the PRF High Impact Payment even after learning they were improperly received. The Debtors were aware of the improper nature of the PRT High Impact Payments and the exposure the CHP Hospitals were subject too, and took no remedial measures, and, in fact, engaged in retaliatory behaviors toward Dr. Singh. Thus, no "strong defense" exists concerning liability in the matter. Accordingly, Dr. Singh submits the *Rexene* factors have been met, warranting relief from the automatic stay.

38.     Dr. Singh believes that relief granted in connection with this Motion will be consensual and will have no meaningful effect on the administration of these cases and the Debtors' assets. Therefore, Dr. Singh respectfully submits that any order granting this Motion should be effective immediately upon its entry, notwithstanding the fourteen (14) day stay contemplated in Fed. R. Bankr. P. 4001(a)(3).

**WHEREFORE**, Dr. Singh requests that this Court (i) enter an order, substantially in the form attached hereto as **Exhibit A**, lifting and modifying the automatic say set forth in 11 U.S.C. § 362(a); and (ii) grant Dr. Singh such further relief as this Court deems just and proper.

Dated: July 17, 2025
     Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Christopher M. Donnelly (DE Bar No. 7149)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
       cdonnelly@morrisjames.com

*Counsel to Vijayant Singh, M.D.*

17085127/1