**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAREPOINT HEALTH SYSTEMS, INC., | ) Case No. 24-12534 (JKS) |
| *et al.*, | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Trial Date: January 8, 2026, at 10:00 a.m.** |

**PRE-TRIAL STIPULATION AND ORDER WITH RESPECT TO
MOTION OF ACCESS INFORMATION MANAGEMENT CORPORATION
FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS**

Undersigned counsel for Access Information Management Corporation ("**Access**") and

Debtors CarePoint Health Systems, Inc., *et al.* ("**Debtors**" and together with Access, the

"**Parties**"), pursuant to Local Bankruptcy Rule 7016-2(d), hereby stipulate as follows:

**A.**     **Nature of the Action**

Pursuant to the *Motion of Access Information Management Corporation for Allowance and

Payment of Administrative Expense Claims* [Docket No. 1346] (the "**Admin Claim Motion**") filed

on June 13, 2025, Access seeks allowance and payment of administrative expense claims: (i) for

storage of Debtors' documents and information ("**Debtors' Information**"), and (ii) for services to

be provided by Access in connection with Debtors' request that Access transfer certain of Debtors'

Information to the Debtors and destroy the remainder.

Debtors submit that to the extent that the documentation and information in Access's

possession is subject to a contract to which one or more of the Debtors is a party, the Debtors

acknowledge that they have certain maintenance and destruction obligations under state and

federal law.  The Debtors deny any ownership of or obligation with respect to any and all

documents and information in Access's possession that are not subject to a contract to which one

or more of the Debtors is a party, including any contract to which a predecessor of a Debtor or other third party was a party and such contract was not expressly assumed and assigned to a Debtor or otherwise expressly accepted by a Debtor.

Access submits that the Debtors are the parties to and/or successors in interest to all of the Access Storage Contracts, which were provided to Debtors in February 2025 and referenced in pleadings throughout this matter and that Debtors had not acknowledged nor disputed that the Debtors were parties or successor in interest to any particular contract until the preparation of this Pre-Trial Stipulation.

On July 2, 2025, Debtors filed their *Objection of the Debtors to Motion of Access Information Management Corporation for Allowance and Payment of Administrative Expense Claims* [Docket No. 1386] ("**Debtors' Objection**").

On November 18, 2025, Debtors filed *Debtors' Second (Substantive) Omnibus Objection to Certain (I) Misclassified Claims, (II) Modified Claims, (III) Satisfied Claims, and (IV) Active Litigation Claims*: [Docket No. 1605] (as such relates to Access, the "**Second Access Admin Claim Objection**"). On December 8, 2025, Access filed its Objection [Docket No. 1637] to the Second Access Admin Claim Objection. As set forth in its Objection thereto, Access submits the Second Access Admin Claim Objection is duplicative of the contested matter created by the Debtors' Objection to the Access Admin Claim Motion. The Debtors deny that the Second Access Admin Claim Objection is duplicative of the contested matter created by the Debtors' Objection to the Access Admin Claim Motion but agree that, to the extent that identical issues are subject to the Access Admin Claim Motion and the Second Access Admin Claim Objection, the Debtors agree that such issues will be resolved as part of this contested matter.

**B.**    **Basis of Federal Jurisdiction**

The Access Admin Claim Motion and Debtors' Objection create a contested matter under Fed. R. Bankr. P. 9014. The Court's jurisdiction over the contested matter is pursuant to 28 U.S.C. § 1334, based on Debtors' commencement of the captioned bankruptcy cases on November 3, 2024 (the "**Petition Date**"); 28 U.S.C. § 157(a); and the Amended Standing Order of Reference of the United States District Court for the District of Delaware dated February 29, 2012.

**C.**    **Fed. R. Bankr. P. 7016(b)**

No motion has been filed with respect to Fed. R. Bankr. P. 7016(b). The Parties consent to the Court hearing and issuing final orders in connection with the Contested Matter.

**D.**    **Admitted Facts that Require No Proof**

***The Access Storage Contracts*:**

1.      As of the Petition Date, Debtors and Access were parties to certain executory contracts (the "**Access Storage Contracts**").

2.      The Access Storage Contracts, as asserted by Access, are identified on the Access Exhibit List attached as **Exhibit A** hereto.

3.      Access acquired all of the Access Storage Contracts other than the Triyam Contract (as defined below) from Allstate Business Archives, L.L.C. ("**Allstate**").

4.      In 2021, Access acquired Allstate's assets and became the successor in interest to Allstate with respect to the Access Storage Contracts other than the Triyam Contract.

5.      On April 19, 2021, Debtors entered into the certain Document Archive Contract with Triyam, Inc. (the "**Triyam Contract**"), for the use of archiving and document storage software.

6.      On March 11, 2024, Access acquired Triyam and became Triyam's successor in interest under the Triyam Contract.

7.      The Access Storage Contracts provide, inter alia, that in return for a monthly fee Access would (i) store Debtors' Information, and (ii) at least with respect to the Triyam Contract, provide archiving software support accessible by Debtors for them to monitor, access and retrieve Debtors' Information.

8.      Access stores approximately 100,000 "cubes" or boxes of material pursuant to the Access Storage Contracts, which is Debtors' material to the extent that a Debtor is a party to such Access Storage Contract.

9.      Each "cube" or box is approximately 1.2 cubic feet of volume.

10.     Debtors' Information that is stored pursuant to the Access Storage Contracts to which a Debtor is a party and/or successor in interest includes medical records for current and past patients ("**PHI**").

11.     Debtors contacted Access and obtained patient records from Debtors' Information at least in December 2023.

***Debtors' Obligations in Connection With Debtors' Information*:**

12.     Under federal and New Jersey state law, Debtors have obligations to retain some or all of Debtors' Information for applicable periods of time. *See* N.J.S.A. 26:8-5, N. J. Admin Code § 8:43G-15.2, 42 CFR § 482.24(b)(1).

13.     Under federal and New Jersey state law Debtors have duties of confidentiality with respect to Debtors' Information containing PHI. *See* 42 U.S.C. § 1320d-2, 45 CFR § 164.502. N.J. Admin. Code § 8:43G-4.1.

14.     Debtors owe the duty of confidentiality to their patients.

15.     The Access Storage Contracts do not impose upon Access any obligation to fulfill the duty of confidentiality Debtors owe to their patients.

16.     Nothing in the Access Storage Contracts permits the Debtors to shift their duty to maintain confidentiality of Debtors' Information to Access.

***Access' Motion to Compel and Related Proceedings*:**

17.     On December 17, 2024, 44 days after the Petition Date, Access filed its *Motion of Access Information Management Corporation (I) to Compel (A) Debtors' Assumption of Executory Contracts, or Alternatively, (B) Debtors to Provide Direction as Required by the Contracts and Applicable Law With Respect to the Continued Storage, Transfer, Destruction or Other Disposition of the Health Care Related Documents and Information Subject to the Contracts, (II) for Relief From the Automatic Stay, and (III) for Such Other Relief as is Necessary Under the Circumstances* [Docket No. 320] (the "**Access Motion to Compel**").

18.     On December 31, 2024, Debtors filed an objection to Access' Motion to Compel [Docket No. 361] (the "**Motion to Compel Objection**").

19.     In the Motion to Compel Objection Debtors made the following statements:

> Access also asserts that it is entitled to an administrative expense claim for post-petition services rendered pursuant to the Access Contracts. The Debtors do not object to payment of an administrative expense claim on a current basis.

*See* Motion to Compel Objection at ¶ 2

> The Debtors object to Access' attempt to force the Debtors to immediately reject or assume the Access Contracts because these Chapter 11 Cases are still in the early stages.

*See* Motion to Compel Objection at ¶ 3

> The Debtors are in the process of evaluating each and every executory contract, including the Access Contracts, to determine whether assumption or rejection of such executory contract is in the best interests of the Estates.

5

*See* Motion to Compel Objection at ¶ 4

> Forcing the Debtors to determine whether to accept or reject the Access Contracts immediately, less than two months after the Petition Date, is not justified.

*See* Motion to Compel Objection at ¶ 5

> The Debtors will work with Access to address all post-petition obligations and pay the post-petition amounts due. Accordingly, the potential harm to Access in maintaining the status quo and denying the Motion is low.

*See* Motion to Compel Objection at ¶ 25

20.    On January 10 and 14, 2025, Access through its counsel provided invoices and a claim summary to Debtors' counsel.

21.    The invoices and claim summary provided by Access to the Debtors on January 10 and 14, 2025, evidenced the post-petition storage fee amounts due in connection with the Access Storage Contracts for November and December 2024 and January 2025, in the aggregate amount of $231,451.26.

22.    The monthly storage fees under the Access Storage Contracts run at the rate of approximately $77,000.

23.    On January 27, 2025, Access through its counsel provided reports to Debtors' counsel with respect to the volume and characteristics of Debtors' Information being stored.

24.    Access provided reports to Debtors on January 27, 2025, to assist Debtors in their evaluation thereof and to make decisions with respect to the disposition of Debtors' Information.

25.    Debtors did not in the Motion to Compel Objection provide a timeline for their decision with respect to the continued storage or disposition of Debtors' Information.

26.    The Access Motion to Compel originally was set for hearing on January 7, 2025.

27.     The Access Motion to Compel was adjourned by agreement of the parties to the omnibus hearing set for February 12, 2025.

28.     A day prior to the February 12, 2025, hearing Debtors advised Access they intended to seek to reject the Access Storage Contracts.

29.     At the February 12, 2025, hearing Debtors advised the Court of their decision to reject the Access Storage Contracts.

30.     At the February 12, 2025 hearing the Parties advised the Court that Debtors and Access intended to engage in good faith discussion of issues attendant to the decision to reject, including disposition of Debtors' Information and Access' entitlement to administrative expense claims.

31.     The hearing on the Access Motion to Compel was adjourned by agreement of the Parties to the March 12, 2025, omnibus hearing date to the extent issues remained that could not be resolved by agreement.

***The Plan Confirmation Process and Rejection of the Access Storage Contracts*:**

32.     From January 8, 2025, through March 6, 2025, Debtors filed six plan iterations [Docket Nos. 412, 497, 522, 538, 551, and 856].

33.     On March 6, 2025, Debtors filed the *Fifth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* [Docket No. 856] (the "**Fifth Amended Plan**").

34.     Due to the coinciding pendency of the confirmation proceedings, the Access Motion to Compel was further adjourned by agreement of the Parties to the May 7, 2025, omnibus hearing date.

35.     On February 18, 2025, Debtors filed their motion [Docket No. 708] (the "**Rejection Motion**") seeking to reject the Access Storage Contracts.

36.     On February 28, 2025, Access filed an objection [Docket No. 783] to the Motion to Reject (the "**Rejection Motion Objection**").

37.     On February 28, 2025 Access filed an objection [Docket No. 782] to confirmation (the "**Confirmation Objection**," and together with the Rejection Motion Objection, the "**Access Objections**").

38.     Access raised issues in the Access Objections based on Access' continued storage of Debtors' Information and the need for Debtors to provide direction to Access with respect to the destruction, retention, or transfer of Debtors' Information.

39.     The Access Objections presumptively were resolved on March 14, 2025 – in the midst of the March 12 through 17, 2025, confirmation hearings in connection with the Fifth Amended Plan – by agreement on substantially identical language to be included in both a confirmation order and an order granting the Rejection Motion which provided, inter alia, for Debtors to provide direction to Access with respect to the destruction, transfer or other disposition of Debtors' Information by March 31, 2025 (the "**Access Language**").

40.     The confirmation hearing in connection with the Fifth Amended Plan concluded on or about March 17, 2025.

41.     The Access Language to be included in the proposed confirmation order with respect to the Fifth Amended Plan was:

> Provisions Relating to Access Information Management Corporation. In resolution of the Objection of Access Information Management Corporation to Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization [D.I. 782], the Debtors shall, no later than March 21, 2025, provide definitive and irrevocable written direction to Access Information Management Corporation ("Access") with respect to the

disposition of the documents and information being stored by Access for the Debtors (the "Access Stored Property") pursuant to contracts which Debtors seek to reject by its motion at Docket No. 708 either to (i) destroy some or all of the Access Stored Property and to specifically identify any of the Access Stored Property that Debtors want destroyed, and/or (ii) reasonably cooperate and assist Debtors with respect to the transfer and/or return of some or all of the Access Stored Property and to specifically identify any of the Access Stored Property that Debtors want transferred and/or returned. Nothing herein shall prejudice Access' request for allowance and payment of an administrative expense claim under sections 503 and 507 of the Bankruptcy Code as requested by its motion at Docket No. 320 as supplemented by Docket No. 781, and Access further reserves the right to assert an administrative expense claim under sections 503 and 507 of the Bankruptcy Code for the cost of the continued storage of the Access Stored Property and costs associated with the disposition of the Access Stored Property (collectively, the "Access Administrative Expense Claims"). The Debtors reserve their rights to object to allowance and payment of the Access Administrative Expense Claims. The Debtors and Access shall meet and confer in good faith with respect to the allowance and payment of the Access Administrative Expense Claims; and if agreement cannot be reached such issues will be presented to the Court for resolution at the next omnibus hearing date in these cases.

42.     A slightly modified version of the Access Language, modified to fit the context of the Rejection Motion, was included in the proposed order granting the Rejection Motion [Docket No. 1042] (the "**Proposed Rejection Order**").

43.     The Access language included in the Proposed Rejection Order was:

Provisions Relating to Access Information Management Corporation. In resolution of the Objection and Reservation of Rights of Access Information Management Corporation to Debtors' Second Omnibus Motion For Entry of an Order Pursuant to Sections 105(a) and 365(a) of the Bankruptcy Code Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases [D.I. 783], the Debtors shall, no later than March 31, 2025, provide definitive and irrevocable written direction to Access Information Management Corporation ("Access") with respect to the disposition of the documents and information being stored by Access for the Debtors (the "Access Stored Property") pursuant to contracts which Debtors seek to reject by its motion at Docket No. 708 either to (i) destroy some or all of the Access Stored Property and to specifically identify any of the Access Stored Property that Debtors want destroyed, and/or (ii) reasonably cooperate and assist Debtors with respect to the transfer and/or return of some or all of the Access Stored Property and to specifically identify any of the Access Stored Property that Debtors want transferred

and/or returned. With respect to any documents being destroyed, the Debtors will comply with applicable law regarding the method of destruction of said documents. Nothing herein shall prejudice Access' request for allowance and payment of an administrative expense claim under sections 503 and 507 of the Bankruptcy Code as requested by its motion at Docket No. 320 as supplemented by Docket No. 781, and Access further reserves the right to assert an administrative expense claim under sections 503 and 507 of the Bankruptcy Code for the cost of the continued storage of the Access Stored Property and costs associated with the disposition of the Access Stored Property (collectively, the "Access Administrative Expense Claims"). The Debtors reserve their rights to object to allowance and payment of the Access Administrative Expense Claims. The Debtors and Access shall meet and confer in good faith with respect to the allowance and payment of the Access Administrative Expense Claims; and if agreement cannot be reached such issues will be presented to the Court for resolution at the next omnibus hearing date in these cases. The Motion is granted as to Access, subject to the foregoing provisions of this paragraph.

44.    The Rejection Motion was set for hearing on April 1, 2025.

45.    At the April 1, 2025, hearing the Court announced that the Fifth Amended Plan did not meet all requirements for confirmation.

46.    During the April 1, 2025, hearing, the Court raised its concern about the possible impact of the Access Language on the Debtors' obligations under Section 351 of the Bankruptcy Code.

47.    Due to the Court's concern expressed at the April 1, 2025, hearing with respect to Section 351 of the Bankruptcy Code, the Access Storage Contracts were removed from the proposed order on the Rejection Motion.

48.    An order granting relief pursuant to the Rejection Motion, which did not include the Access Language or the Access Storage Contracts, was entered on April 7, 2025 [Docket No. 1092].

49.    Thereafter Debtors filed sixth and seventh amended plans; and, after further hearings, the Court on April 17, 2025, entered its confirmation order [Docket No. 1168] (the

"**Confirmation Order**") confirming the seventh amended plan [Docket No. 1154] (the "**Plan**").

50.     Access filed an objection to confirmation of the Plan on April 8, 2025 [Docket No. 1124].

51.     The Confirmation Order (submitted to the Court on April 15, 2025) included modified Access Language in resolution of Access' objection to confirmation (the "**Modified Access Language**").

52.     The Modified Access Language required Debtors to provide proper direction to Access with respect to the destruction, transfer or other disposition of Debtors' Information by April 15, 2025.

53.     The Modified Access Language was included in the Confirmation Order at Paragraph 80 as follows:

> In resolution of the Objection of Access Information Management Corporation to Confirmation of Sixth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization [DI 1124], the Debtors shall, by April 15, 2025, provide definitive and irrevocable written direction to Access Information Management Corporation ("Access") with respect to the disposition of the documents and information being stored by Access for the Debtors (the "Access Stored Property") pursuant to the Access contracts Debtors seek to reject by its motion at Docket No. 708, including (i) identification of the Access Stored Property that Debtors have determined may be destroyed, and/or (ii) identification of the Access Stored Property that Debtors have determined they wish to have transferred and/or returned and identify the recipient of such Access Stored Property. The Debtors have not sought relief under 11 U.S.C. 351 regarding the destruction of any records held by Access, and the provisions of this paragraph shall not be construed as authorizing any relief under 11 U.S.C. 351 regarding the destruction of any records held by Access.

54.     Because a motion seeking rejection of the Access Storage Contracts was pending as of the Plan Effective Date, the Access Storage Contracts were not deemed rejected by confirmation of the Plan.

55.     An order approving a stipulation between the Parties providing for the rejection of the Access Storage Contracts was entered on July 1, 2025 [Docket No. 1382].

56.     The Plan Effective Date occurred on May 22, 2025.

***Debtors' Directions to Access With Respect to Disposition of Debtors' Information*:**

57.     On April 15, 2025, Debtors, through counsel, provided a letter to Access' counsel directing the disposition of some, but not all of Debtors' Information.

58.     By e-mail dated April 23, 2025, Access advised Debtors they had not provided direction as to the entirety of Debtors' Information.

59.     Debtors, by their counsel's letter dated May 1, 2025, provided Access with direction ("**Debtors' May 1 Direction**") as to all the Debtors' Information pursuant to which Debtors requested that some of Debtors' Information be transferred to Debtors and for the destruction of the remainder.

60.     On May 8, 2025, Access advised Debtors of the cost of fulfilling Debtors' transfer and destruction directions with respect to Debtors' Information and requested payment of such amounts prior to fulfillment of such directions.

61.     On May 8, 2025, Access further advised Debtors it would seek administrative expense claim treatment of such amounts (along with the accrued and accruing post-bankruptcy storage costs) if not voluntarily paid by Debtors.

***Proper Destruction of Medical Records and Patient Care Information*:**

62.     Debtors' duty to maintain confidentiality of Debtors' Information that Debtors have directed Access to destroy cannot be discharged except by measures that preserve confidentiality—i.e., by shredding documents or properly destroying electronic media.

63.     Proper destruction involves a three-step process: (i) first, the material must be identified and the applicable boxes retrieved from storage, (ii) second, the retrieved boxes must be secured and moved to a location for destruction, and (iii) third, destruction of the material must be effected in conformity with National Association of Information Destruction (NAID®) specifications.

64.     NAID® is a certifying organization for the information destruction industry.

65.     NAID AAA Certification® verifies secure data destruction companies' compliance with data protection laws.

66.     Access is a member of NAID®.

67.     In connection with the destruction process, Access will remove box information from its systems and once the material is properly destroyed in accordance with NAID® specifications Access will provide a certificate of destruction to the owner of the material destroyed.

68.     If Debtors hired another vendor to destroy Debtors' Information, Access still would be required to appropriately retrieve and assemble Debtors' Information and make it available for destruction, for which a cost would be chargeable to Debtors under the Access Storage Contracts.

***Access' Claims as of December 31, 2025***:

69.     For the post-Petition Date period to December 31, 2025, the accrued storage fees for all information stored, as calculated by Access pursuant to the Access Storage Contracts, is $1,145,454.57.

70.     The fees calculated by Access with respect to the transfer and destruction of Debtors' Information pursuant to Debtors' May Direction are $46,166.67 and $1,106,518.75, respectively.

71.     As of December 31, 2025, the amount for which Access seeks allowance and payment as its Administrative Expense Claim is $2,284,504.38.

**E.    <u>Mixed Issues of Fact and Law that Remain to be Litigated</u>**

The following mixed issues of fact and law remain to be litigated:

1.     Whether the storage services provided by Access to the Debtors of the Debtors' information were obligations properly incurred by the Debtors post-Petition Date in connection with their obligations as debtors-in-possession of their estates;

2.     Whether the storage services provided by Access to the Debtors post-Petition Date and prior to the Debtors' May 1 Direction provided a benefit to the Debtors' estates;

3.     Whether Access is entitled to compensation for continued storage services provided to Debtors after the May 1 Direction through the date of trial.

4.     Whether the storage services provided by Access to the Debtors post-Petition Date and prior to the Effective Date of the Plan provided a benefit to the Debtors' estates;

4.     Whether the Bankruptcy Court has jurisdiction to award compensation to Access for storage services provided by Access after the Effective Date of the Plan and to compel Debtors to pay such compensation to Access;

5.     Whether the provision of document and information destruction services that Debtors, prior to the Plan Effective Date, requested of Access pursuant to orders of this Court requiring Debtors to make such direction to Access will, when performed by Access, provide a benefit to the Debtors' estates;

6.      Whether the provision of document and information transfer services that Debtors, prior to the Plan Effective Date, requested of Access pursuant to orders of this Court requiring Debtors to make such direction to Access will, when performed, provide a benefit to the Debtors' estates;

7.      Whether the storage, destruction and transfer rates under the Access Storage Contracts are consistent with the rates Access charges to other medical services providers that are its customers and otherwise in line with market rates for such services;

8.      Whether Debtors are parties by assignment and/or succession to the Access Storage Contracts and, thus, responsible to maintain and properly destroy the material subject to such Access Storage Contracts and;

9.      Whether Access may continue to charge storage fees to the Debtors subsequent to Debtors' May 1, 2025 Direction when the Access Storage Contracts provide, inter alia, that if the Debtor party to the contract fails to timely pay an invoice, on ten days' notice, Access may return the stored materials to the Debtor, sell the stored materials, destroy to stored materials without liability (upon 30 days' notice) and terminate the agreement and further provide, inter alia, that Access will destroy the stored materials at the Debtor party to the contract's direction but  do not require prepayment or payment in advance of such destruction or provide for Access to continue storing (or charging the Debtors storage fees) for the Debtors' Information after the Debtors direct Access to destroy the stored materials.

F.    **Exhibits**

1.      Access' Exhibit List is attached hereto as Exhibit A.

2.      Debtors' Exhibit List is attached hereto as Exhibit B.

G.    **Witnesses**

    1.    Access will call the following witnesses:

        a.    Mike Ader

        b.    Brian Greene

    2.    Debtors will call the following witnesses:

        a.    Shamiq Syed

        b.    Jonathan Goldstein

H.    **Access' Statement of Proof in Support of its Claims and Damages**

In their Objection to the Admin Claim Motion Debtors make three arguments, that:

    1.    "Access has failed to show the existence of any post-petition contracts with the Debtors. Access relies solely on the provisions of pre-petition contracts as the basis of its administrative expense claim and fails to adequately demonstrate any knowing acceptance by the Debtors of the benefits of the pre-petition contracts after the Petition Date."

    *See* Objection at ¶ 4 ("**Debtors' First Argument**").

    2.    "Second, Access has failed to show any benefit conferred upon the Debtors through its services which justify an administrative expense claim. The vast majority of records that Access stores are outdated records which the Debtors have not tried to access in years because the Debtors developed a more secure and cost-effective records storage system internally."

    *See* Objection at ¶ 5 ("**Debtors' Second Argument**").

    3.    "Third, Access has failed to demonstrate that its administrative expense claim is reasonable. Access is seeking priority payment of $1,776,893.76 based upon a "contract rate" derived from a contract that is not attached or even identified in the Motion. The basis of the calculations leading up to this staggering sum are not explained by Access. Access has failed to demonstrate that the rates it attempts to charge are reasonable."

*See* Objection at ¶ 6 ("**Debtors' Third Argument**").

## Access's Response:

None of these arguments has merit. Access intends to prove that Debtors accepted the benefits of the pre-petition contracts post-petition, that Access had a contractual obligation to store the documents for Debtors post-petition which conferred value on the Debtors' estates, and the rates charged by Access were negotiated by the parties and are consistent with market rates. Access further intends to prove that services it will provide to Debtors pursuant to Debtors; direction to Access pursuant to the Confirmation Order to transfer some of Debtors' Information and to destroy the rest will confer benefits on the Debtors' estates and that the rates for such services quoted by Access were negotiated by the parties and are consistent with market rates.

## Response to Debtors' First Argument

### Access Transacted Business With Debtors Post-Bankruptcy and Such Provided Benefits to Debtors' Estates

Section 503(b)(1) of the Bankruptcy Code provides that, "there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A). Section 503(b)(1)(A) "has been broadly interpreted to include 'actual, necessary costs and expenses' that benefit the debtor's estate both directly and indirectly." *Elsom v. Woodward & Lothrop, Inc*., 1997 WL 476091, *3 (E.D. Pa. 1997) (citing, *In re B. Cohen and Sons Caterers, Inc*., 143 B.R. 27, 28 (E.D. Pa. 1992)). This broad interpretation serves the policy behind section 503(b) to facilitate the rehabilitation of insolvent debtors by encouraging third parties to provide those debtors with necessary goods and services. *See In re B. Cohen and Sons Caterers, Inc*., 143 B.R. at 28 (citations omitted).

An administrative expense claim must be allowed when the claimant demonstrates (i) the claim arose from a transaction with or on account of consideration furnished to the debtor-in-possession, and (ii) the transaction or consideration benefitted the debtor-in-possession. *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 532–33 (3d Cir. 1999). *Accord*, *In re Mid Region Petroleum, Inc.*, 1 F.3d 1130, 1134 (10th Cir. 1993); *In re United Trucking Serv., Inc.*, 851 F.2d 159, 161 (6th Cir. 1988); *Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986); *In re Garden Ridge Corp.*, 321 B.R. 669, 676 (Bankr. D. Del. 2005) (quoting *In re Waste Systems Int'l, Inc.*, 280 B.R. 824, 826 (Bankr. D. Del. 2002)).

Administrative claims are available to post-petition creditors both to encourage creditors to cooperate with a debtor's reorganization efforts and maximize the value of the estate for the benefit of all creditors and also to avoid a debtor from being unjustly enriched by the services provided by the non-debtor contract party. *In re Continental Airlines, Inc.*, 146 B.R. 520, 526 (Bankr. D. Del. 1992); *In re Enron Corp.*, 279 B.R. 79, 85 (S.D.N.Y. Bankr. 2002). In *Continental Airlines* this Court stated:

> There are two policy concerns underlying the priority administrative expense claim. The first is practical: "By placing creditors who are entitled to payment of these administrative expenses first in line, sections 503 and 507 advance the estate's interest in survival above all other financial goals." *Zagata*, 893 F.2d at 627. The concern for the estate's survival is tempered by the equitable principal of unjust enrichment. "If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services...." *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984).

*Continental Airlines, Inc.*, 146 B.R. at 526.

Allowance of an administrative claim is warranted upon a debtor's election to receive benefits from or inducement of the other party to an executory contract to provide services thereunder, *In re Patient Educ. Media*, 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998) ("*Patient*

*Education"*); and a party that provides services pursuant to an executory contract is entitled to an administrative expense claim, at the contract rate, unless the presumption in favor of the contract rate is properly rebutted. *Compass Bank v. N. Am. Petroleum Corp. USA (In re N. Am. Petroleum Corp. USA)*, 445 B.R. 382, 400-01 (Bankr. D. Del. 2011) ("a non-debtor party to an executory contract is entitled to administrative expenses equal to the value of any post-petition benefit conferred on the estate . . . the negotiated terms of the parties will be presumed to be the proper basis for the calculation of the administrative expense claim"); *accord* In re DVI, Inc., 308 B.R. 703, 708 (Bankr. D. Del. 2004) ("DVI has the burden of showing why the contract rate was not the fair market value for the rental of the Premises. DVI has not offered any evidence to rebut the presumption.").

Access' storage services provided to the Debtors clearly provided a post-bankruptcy benefit to the Debtors and their estates and were a product of post-bankruptcy transactions with the Debtors. Debtors knowingly availed themselves of the benefits of the Access' services by continuing to store 100,000 boxes of Health Care Information on Access' premises after the Petition Date. Access' storage services allowed the Debtors the time they represented to this Court in their Motion to Compel Objection that they needed in order to determine what to do with their Health Care Information being stored by Access. Those services were induced and/or acquiesced in by the Debtors, post-bankruptcy, by their request for more time and their promise (albeit hollow) of payment for Access' post-bankruptcy services.

Access' services represent expenses that had to be incurred by the Debtors in connection with their reorganization efforts while they considered their record retention business needs and obligations under federal and state law. The storing of Debtors' property, giving Debtors the time

to assess and make responsible decisions with respect thereto, in the context of Debtors' record retention obligations under state and federal law, clearly provided a benefit to the Debtors' estates.

That a new written contract was not entered into by Access and the Debtors covering post-bankruptcy storage services is entirely irrelevant, as a party that provides services to a debtor post-bankruptcy pursuant to the terms of a pre-petition executory contract is entitled to allowance and payment of an administrative expense claim for such services. *See e.g., In re Goody's Family Clothing Inc.*, 401 B.R. 656, 671 (D. Del. 3009), *aff'd* 610 F.3d 812, 819 (3d Cir. 2010) (landlords entitled to payment of "stub-rent" for debtors' post-petition occupancy under pre-petition leases).

In *Goody's Family Clothing*, the court stated that "[t]o be eligible for administrative expense priority, a post-petition transaction need not involve the exchange of money or formation of a contract…Indeed, a claimant's performance of a pre-petition contract, and a debtor's acceptance of that performance, can establish a post-petition transaction. *Id.* (citing *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir. 1987).

In *Patient Education*, the debtor agreed to produce 75 video tapes with Sonalyst providing production services. The debtor required a custom-built set for the production, which was stored at Sonalysts' headquarters and remained there even when debtor was not making videos; with the debtor also agreeing to pay Sonalyst a weekly storage fee of $5,500 for each week the set was not in use. In determining the administrative claim to which Sonalyst was entitled, the court rejected the debtor's argument that it was not liable for the weekly storage charges because it was unable to sell the set and did not use it during the post-petition period, finding the debtor "continued to store its set on Sonalysts premises--and hence, Sonalyst continued to render performance." 221 B.R. at 102-03. The court further held that debtor's inability to sell the set was irrelevant, as "[j]ust as the debtor in possession must still pay a trade vendor who provides inventory that cannot be

sold, the debtor in possession must pay for the use of a non-debtor's property, even where the use

turns out to be unprofitable." 221 B.R. at 103. Finally, the court held that debtor had failed to

rebut the presumption that the contract rate governed. Quoting Colliers, the court held:

> Using reasonable rental value allows the court to apply an objective standard in determining the benefit to the estate. To use a different standard, such as the extent to which use of the property benefitted the estate, would be too subjective and would lead to different outcomes dependent on the success of the trustee's operation of the business.
>
> 4 Lawrence P. King, *et al., Collier on Bankruptcy* P 503.06[6][c][ii], at 503-39 (rev. 15th ed. 1998) ("*Collier*")(footnote omitted).

*Patient Education*, 221 B.R. at 104.

In continuing to store the Debtors' Health Care Information post-bankruptcy and in being

put into the position of providing other services, in connection with the transfer and destruction of

Health Care Information at the Debtors' direction, Access has both participated in post-bankruptcy

transactions with the Debtors and conferred benefits upon the Debtors and their estates, which has

been recognized by other courts as entitled to administrative expense claim treatment. *See In re*

*IMG Healthcare, LLC*, No. 06-10059, 2008 Bankr. LEXIS 2092, at *6 (Bankr. E.D. La. July 8,

2008) (Although not at issue in connection with its decision on a rejection damages claim by the

non-debtor storage service provider, the court noted that it had previously approved as an

administrative expense, "a payment to Hunter [for] past due storage fees").

### Response to Debtors' Second Argument

### *Access' Services Have Provided and Will Provide a Benefit to Debtors' Estates and Represent Post-Bankruptcy Transactions With the Debtors*

### *Access' Transfer Services Will be Beneficial to Debtors and Their Estates*

Access' actions in connection with the fulfillment of Debtors' direction to Access, as

required by the Plan, to transfer to Debtors certain of the Health Care Information that Access

21

continues to store also clearly will confer a benefit on the Debtors' estates and, obviously, is the product of a post-petition transaction with the Debtors.

The Debtors' direction to Access to transfer such material presumably was given because Debtors (or their successors) are required to retain and/or need such material in connection with the continuation of their (and/or their successors') health care business activities.

Thus, Access' actions, and the expenses it will incur, in connection with the transfer to Debtors of the Health Care Information Debtors have determined they need and/or are required to retain, will confer a benefit to Debtors and their estates. *See In re IMG Healthcare, LLC*, 2008 Bankr. LEXIS 2092, at *6 (Again, although not at issue in the decision, the court noted that it had previously approved as an administrative expense, "a 'medical record transfer cost,' which was incurred when IMG moved the remainder of its records to a different storage facility.").

***Access' Destruction-Related Services Will be Beneficial to Debtors and Their Estates***

Access' actions in connection with the destruction of Health Care Information also will confer a benefit on the Debtors' estates. The material that Debtors have requested be destroyed is the Debtors' property. the Debtors are required by the Bankruptcy Code to deal with all of their property – in a plan or otherwise as required by the Bankruptcy Code – in order to appropriately administer their estates.

Pursuant to the Access Language in the Confirmation Order Debtors made an appropriate provision for the disposition of their Health Care Information in connection with confirmation, inclusive of the possible destruction of such material. Debtors have determined that they no longer need or are not required by applicable law to retain certain of their Health Care Information and have, pursuant to the Plan, directed Access to destroy such material.

Access' involvement in that effort is not as a primary actor, as it is the Debtors' ultimate responsibility to destroy its Health Care Information and to see that such material is destroyed

properly. Debtors could have directed Access to transfer all the Health Care Information to the debtors and then Debtors could have destroyed what it had determined it no longer needed to retain, and borne the cost of such destruction. Access should not be required to bear the expense of this fundamental obligation of the Debtors.

Section 503(b)(8)(A) of the Bankruptcy Code provides that the costs attendant to the destruction of patient medical records in connection with the closing of a health care business is a cost of administration of an estate. 11 U.S.C. § 503(b)(8)(A). While section 503(b)(8) relates explicitly to the "closing" of a healthcare business, it would make little sense if document destruction in a case without ongoing operations was an administrative expense but is not in a case with ongoing operations. It also would make little sense to exclude from administrative expense claim treatment document destruction costs when a debtor, as part of a plan, transfers its active business operations to non-debtor entities; as here, in effect, a "closing" of the Debtors' health care business operations.

Other courts have approved document destruction costs as administrative expense claims. *See e.g., In re IMG Healthcare, LLC*, 2008 Bankr. LEXIS 2092, at *6 (Again, although not at issue in connection with its decision on a rejection damages claim by the non-debtor storage service provider, the court noted that it had previously approved as an administrative expense, "a payment to Hunter . . . for Hunter's services to the debtor in destroying many of the debtor's medical records held by Hunter").

**Response to Debtors' Third Argument**

**The Calculation of Access' Storage Fees and Disposition Expenses is Appropriate**

The storage, transfer and destruction fees and expenses set forth herein, for which Access seeks allowance and payment as administrative expense claims, have been calculated based on the rates for such services set forth in the Access Storage Contracts. Such rates are consistent with the

rates Access charges to other medical services providers that are its customers and otherwise in line with market rates for such services. Accordingly, Access should be allowed administrative expense claims in the amounts set forth herein, and as follows:

| | |
|---|---|
| Storage | $1,145,454.57 |
| Transfer | $46,166.67 |
| Destruction | $1,106,518.75 |
| **Total** | **$2,284,504.38** |

## Access' Response to Debtors' Post-Effective Date Jurisdiction Argument:[1]

Faced with an administrative bar date that expressly applied to *unliquidated, contingent and unmatured* administrative claims, Access timely file its Admin Claim Motion. As of the Effective Date of the Plan, the Access Storage Contracts had not yet been rejected, Access continued to store Debtors' Information, Debtors had provided the May 1 Direction (but had not funded such to ensure Access would be fairly compensated for its services) and Debtors continued to have obligations under section 351 of the Bankruptcy Code (which relate to the continued storing of PHI but with respect to which, and continuing to this day, Debtors have not attempted to comply). Access explicitly sought and reserved their rights with respect to storage fees after the Effective Date of the Plan and after the filing of the Access Admin Claim, but in their Admin Claim Objection Debtors did not raise any jurisdictional argument based the Plan Effective Date. They did so only on January 2, 2026, in connection with the preparation of this pre-trial stipulation and order; and, Access submits such argument has been waived.

---

[1] Debtors raised this same argument with respect to VRC, a company that also provided document storage to Debtors, which this court rejected for the reasons Access sets forth herein.

The argument also must be rejected on the merits. Section 1334 of Title 28 of the United States Code provides that District Courts have exclusive and original jurisdiction over bankruptcy "cases" and original, but non-exclusive jurisdiction over civil proceedings "arising under title 11", "arising in . . . cases under title 11" or "related to cases under title 11." 28 U.S.C. § 1334(a), (b). Proceedings that "arise under" title 11 "are matters invoking a substantive right created by the Bankruptcy Code." *Reese v. Pook & Pook, LLC,* 158 F. Supp. 3d 271, 284 (E.D. Pa. 2016) *quoting Carter v. Rodgers,* 220 F.3d 1249, 1253-54 (11th Cir. 2000). And "[t]he 'arising in a case under' category is generally thought to involve administrative-type matters, or as the ... court put it, 'matters that could arise only in bankruptcy.'" *Id.* In the post-confirmation context, proceedings that are "related to" a case under Title 11 are those that have a "close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 166-67 (3d Cir. 2004) ("*Resorts*").

Importantly, the landmark case of Resorts, circumscribing post-confirmation "related to" jurisdiction to those proceedings with a "close nexus" to the bankruptcy, does not apply to core proceedings. *In re Congoleum Corp.*, 149 F.4th 318, 328 (3d Cir. 2025) ("After a reorganization plan has been confirmed, bankruptcy courts have 'related to' jurisdiction only if the claim 'affect[s] an integral aspect of the bankruptcy process' such that 'there is a close nexus to the bankruptcy plan or proceeding.' No such requirement exists for core proceedings."); *accord Mesabi Metallics Co., LLC v. B. Riley FBR, Inc. (In re Essar Steel Minn., LLC)*, 47 F.4th 193, 198 (3d Cir. 2022) ("Riley contends Resorts' close nexus test governs here and disposes of this case. Yet that analytical tool does not extend to core proceedings.").

The Access Admin Claim Motion is subject to this Court's "arising under" and "arising in" jurisdiction. The motion itself directly relies on 11 U.S.C. § 503(b)(1)(A) and § 351 (as well as 11

U.S.C. § 503(b)(8)) for the relief sought. Access Admin Claim Motion at ¶¶ 33-34, 51. Hence, it seeks relief under provisions of the Bankruptcy Code. Such proceedings are subject to this Court's "arising under" jurisdiction. Administrative claim motions are subject to this Court's core authority under 28 U.S.C. § 157(b)(2)(A), (B), (O).

Although the Court need not reach the issue, even if it were to analyze jurisdiction under the more limited post-confirmation "related-to" rubric of *Resorts*, jurisdiction would still exist because this Court has "related to" jurisdiction over the Access Admin Claim Motion in view of the "close nexus" between that motion and the bankruptcy plan or proceeding. The Access Admin Claim Motion concerns pre-petition executory contracts that were rejected after the Effective Date of the Plan; concern exclusively Debtors' Information that was in Access' possession as of the Petition Date and the Effective Date; and involves PHI with respect to which Debtors have obligations of retention and confidentiality under applicable state and federal non-bankruptcy law and under section 351 of the Bankruptcy Code. Hence, there is a close nexus to the bankruptcy case. Moreover, given Debtors' obligations in respect of administrative expense claims and under section 351 of the Bankruptcy Code, resolution of the Access Admin Claim Motion will necessarily affect the Debtors' implementation of the Plan and their estates.

## I.    Debtors' Statement of their Defenses

The Debtors do not dispute that they are parties to certain contracts with Access; however, Debtors have no documentation or other information indicating that any of them are parties to 8 of the contracts included in the list alleged by Access, particularly Account Nos. 10494, 10098, 10565, 519, 588, 252, 897 and 10493, which contracts pre-date the Debtors' acquisition of its hospitals as well as to various other contracts originating prior to 2013 with Christ Hospital that were not expressly assumed as part of the Asset Purchase Agreement approved in Bankruptcy Case

No. 12-12906(MBK) in the United States Bankruptcy Court for the District of New Jersey and deemed rejected by confirmation of the Joint Plan of Liquidation in that case.  To the extent that information is stored by Access pursuant to those contracts to which the Debtors are not a party, and charges related to that information are included in Access' calculation of its asserted Administrative Claim, the Debtors' dispute any storage, maintenance or other obligation with respect to such information or ownership of such information and Access' Administrative Claim in that regard must be denied.

Pursuant to the language of the Access Storage Contracts, the Debtors dispute any obligation for storage costs after May 1, 2025, when the Debtors provided Debtors' May 1 Direction.  Access is contractually obligated to act in accordance with its customer's direction and cannot refuse to honor such direction and, instead, continue to claim ongoing storage charges are owed.

In the ordinary course of their business, the Debtors maintain and store medical records and solicit quotations and proposals from third parties to provide such services.  As of the Petition Date, the Debtors utilized the services of Access and VRC.  The rates charged by VRC, for less volume, and are significantly less than the rates charged by Access for similar services.  Post-petition, the Debtors contemplated changing their document maintenance supplier and sought and received a proposal from GRM.  The rates proposed by GRM were also lower than the rates charged by Access for similar services.  Accordingly, the Debtors assert that the contract rates charged by Access are above market and should not be applied to post-petition maintenance, storage and destruction costs because any benefit to the Debtors' estates provided by Access should not exceed market rates.  The excess rates are a detriment to the estate, requiring a diversion of excess assets to Access and diverting assets from a fair distribution to all creditors.  Every dollar

paid to Access in excess of market rates (or for the storage of records that are not the Debtors' responsibility because the Debtors are not parties to the contracts) reduces funds available for distribution to creditors or for ongoing operations of the Debtors and the Debtors do not receive reasonably equivalent value in exchange for rates to the extent that they are above market rate.

**J.**     <u>**Pleading Amendments**</u>

None

**K.**     <u>**Settlement Certification**</u>

The Parties certify that they have exchanged settlement proposals, but no agreement has been reached.

**L.**     <u>**Other Matters (Access Motion in Limine)**</u>

Debtors have indicated their intent to rely on a quote from GRM, a third-party document storage company, (the "**GRM Quote**") in an effort to establish the "market rate" for document storage and destruction costs. Access submits the GRM Quote should not be admitted into evidence and no testimony about the GRM Quote should be permitted. The GRM Quote and testimony about the GRM Quote is not admissible for several reasons including, without limitation: (i) Debtors have not as required by Federal Rule of Evidence 901 identified any witness to authenticate the GRM Quote, which is not self-authenticating under Rule 902, *Link v. Mercedes-Benz of N. Am. Inc.*, 788 F.2d 918 (3d Cir. 1986) (while burden is slight, a foundation from which fact-finder could infer that evidence is what proponent claims it to be is necessary), and (ii) the GRM Quote is hearsay and does not fall under any hearsay exception under Federal Rules of Evidence 803, 804 or 807.  Even if Debtors can overcome the evidentiary hurdles, the GRM Quote is unreliable as (x) it does not cover all of the services that Access would have to provide in order to destroy the Debtors' Health Care Information, (y) it is merely "based on estimate," and (z) it is

not, on its own, indicative of the market value for services relating to health care-related document destruction services in the Debtors' geographic location (which is the issue for which the Debtors seek to admit the GRM Quote).  Further, the issue with respect to what constitutes a market rate is a matter of lay or expert opinion testimony, but Debtors have not identified any witnesses with the requisite knowledge, experience or other capability to testify reliably with respect to market rates for document storage and destruction services in New Jersey, based on the GRM Quote or otherwise.  Indeed, a witness offering lay opinion testimony must have "personal knowledge" in order to offer such opinion, and Debtors have not identified any such witnesses in their discovery responses.  *See, e.g., In re Thompson*, 788 F.2d 560, 564 (9th Cir. 1986) (recognizing that bankruptcy judge may have rejected testimony regarding market rental rates because the "salesman was not an expert and was not familiar with all of the equipment involved in the case" and remanding for clarification).  Finally, as is apparent from the face of the document, the GRM Quote is no longer valid, as it is dated July 2, 2025, had a 45-day acceptance term, and, thus, by its terms expired on August 16, 2025. With respect to any proffered testimony about the GRM Quote, the GRM Quote is its own "best evidence" and any testimony about the GRM Quote in the absence of the GRM Quote as evidence would be inappropriate under Federal Rule of Evidence 1001-1008.

**Debtors' Response:**

The Debtors do not intend to introduce the GRM Quote for the truth of any fact or proof of market rate, only that the quote was received by the Debtors in the ordinary course of business and speaks for itself, just as the VRC contract speaks for itself and is received by and maintained by the Debtors in the ordinary course of business.

Dated: January 5, 2026

**SAUL EWING LLP**

By:     */s/ John D. Demmy*
        John D. Demmy (Bar No. 2802)
        Jennifer Morgan Becnel-Guzzo (Bar No. 4492)
        1201 N. Market Street, Suite 2300
        P.O. Box 1266
        Wilmington, DE 19899
        Telephone: (302) 421-6848
        Email: john.demmy@saul.com
                Jennifer.becnel-guzzo@saul.com

*Attorneys for Access Information Management Corporation*

**DILWORTH PAXSON LLP**

By:     */s/ Peter C. Hughes*
        Peter C. Hughes (I.D. No. 4180)
        800 King Street – Suite 202
        Wilmington, DE 19801
        Telephone: (302) 571-9800
        Facsimile:  (302) 351-8735

        -and-

        */s/ Anne M. Aaronson*
        Lawrence G. McMichael (Admitted *Pro Hac Vice*)
        Peter C. Hughes
        Anne M. Aaronson (Admitted *Pro Hac Vice*)
        Jack Small (Admitted *Pro Hac Vice*)
        1650 Market St., Suite 1200
        Philadelphia, PA 19103
        Telephone:  (215) 575-7000
        Facsimile:   (215) 754-4603

*Counsel for the Debtors*

**THIS ORDER SHALL CONTROL THE SUBSEQUENT COURSE OF THE ACTION UNLESS MODIFIED BY THE COURT TO PREVENT MANIFEST INJUSTICE.**

**SO ORDER THIS \_\_\_\_\_ day of January, 2026.**