**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE:<br><br>CAREPOINT HEALTH SYSTEMS INC. d/b/a JUST HEALTH FOUNDATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-12534 (JKS)<br><br>(Jointly Administered)<br><br>**Hearing Date: August 25, 2026 at 1:00 p.m. (ET)**<br><br>**Obj. Deadline: August 18, 2026 at 4:00 p.m. (ET)** |

**DEBTORS' (A) OBJECTION TO FME ENTITIES' MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THIS COURT'S ORDERS AND COMPELLING THE DEBTORS TO PAY THE FME ENTITIES' ALLOWED ADMINISTRATIVE EXPENSE CLAIMS, (II) HOLDING THE DEBTORS IN CIVIL CONTEMPT AND IMPOSING SANCTIONS FOR THEIR CONTINUED NONCOMPLIANCE, AND (III) GRANTING RELATED RELIEF, AND (B) CROSS-MOTION FOR TURNOVER AND SETOFF UNDER SECTIONS 542 AND 558 OF THE BANKRUPTCY CODE**

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Bayonne Intermediate Holdco, LLC (7716); (ii) Benego CarePoint, LLC (2199); (iii) Briar Hill CarePoint, LLC (iv) CarePoint Health Management Associates Intermediate Holdco, LLC (none); (v) CarePoint Health Management Associates, LLC d/b/a CarePoint Health (3478); (vi) CarePoint Health Systems, Inc. d/b/a Just Health Foundation (6996); (vii) CH Hudson Holdco, LLC (3376); (viii) Christ Intermediate Holdco, LLC (3376); (ix) Evergreen Community Assets (1726); (x) Garden State Healthcare Associates, LLC (4414); (xi) Hoboken Intermediate Holdco, LLC (2105); (xii) Hudson Hospital Holdco, LLC (3869); (xiii) Hudson Hospital Opco, LLC d/b/a CarePoint Health-Christ Hospital (0608); (xiv) HUMC Holdco, LLC (3488); (xv) HUMCO Opco, LLC d/b/a CarePoint Health-Hoboken University Medical Center (7328); (xvi) IJKG, LLC (7430); (xvii) Just Health MSO, LLC (1593); (xviii) New Jersey Medical and Health Associates d/b/a CarePoint Health Medical Group (0232); (xix) Quality Care Associates, LLC (4710); (xx) Sequoia BMC Holdco, LLC (9812); (xxi) IJKG Opco LLC d/b/a CarePoint Health-Bayonne Medical Center (2063). The address for CarePoint Health Systems Inc. is 308 Willow Avenue, Hoboken, NJ 07030.

CarePoint Health Systems Inc. d/b/a Just Health Foundation and its affiliated reorganized Debtors (the "Reorganized Debtors") hereby: (A) object (the "Objection") to the Motion of Bio-Medical Applications of New Jersey, Inc., Fresenius Medical Care Hoboken, LLC d/b/a Bio-Medical Applications of Hoboken, Fresenius Medical Care Bayonne, LLC, and Fresenius USA Marketing, Inc. (collectively, the "FME Entities") to (i) enforce this Court's orders and compelling the Reorganized Debtors to pay immediately the FME Entities' allowed administrative expense claims, (ii) holding the Debtors in civil contempt and imposing sanctions for continued noncompliance, and (iii) granting related relief (the "Motion to Compel") and (B) cross-move for turnover and to effect a setoff of amounts owed between the Reorganized Debtors and the FME Entities and their affiliates, with payment of the net balance owed by the them to the Reorganized Debtors (the "Cross-Motion").

In support of this Objection and Cross-Motion, the Reorganized Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1. The Reorganized Debtors agree with the FME Entities' statement of jurisdiction and venue to consider the Motion and Objection.

2. This Court has jurisdiction to consider the Cross-Motion pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The Reorganized Debtors consent to the entry of a final order by this Court in connection with the Objection and Cross-Motion.

5. The relief sought in the Cross-Motion is governed by Bankruptcy Code §§ 105(a), 503, 542, and 558, Fed. R. Bankr. P. 2002, 6003, and 6004.



#125779483v2

## BACKGROUND

6. At the time they initiated these Chapter 11 cases, the Reorganized Debtors owned and operated three safety net hospitals in underserved Hudson County, New Jersey. These Chapter 11 cases were initiated to best ensure their continued operations through the Chapter 11 restructuring process.

7. The instant dispute arises from the post-petition rejection of various prepetition contracts by and between the FME Entities and their affiliates and CarePoint Health Systems, Inc. and its affiliated debtors.

8. In their Chapter 11 cases, the Reorganized Debtors ultimately rejected all of their prepetition contracts and leases with the FME Entities and their affiliates after being unable to negotiate acceptable terms by which to continue their relationship.

9. A Chapter 11 plan was confirmed in these cases on April 17, 2025 [D.I. 1168].

10. Pursuant to the Chapter 11 plan, Hudson Regional Hospitals, LLC ("HRH") acquired the assets and operations of Reorganized Debtor IJKG Opco LLC through a Collateral Surrender and Operations Transfer Agreement (the "Bayonne Hospital Assets"), but not its liabilities, unless expressly assumed as part of the confirmed Chapter 11 plan. The other Reorganized Debtors reorganized through the confirmed Chapter 11 plan and are presently managed under a Management Services Agreement by HRH or one of its affiliates. Prior to their involvement with the Reorganized Debtors' restructuring efforts and following confirmation of the Chapter 11 plan, HRH also owned and operated a separate health care facility in Secaucus, New Jersey.

11. Prior to their Chapter 11 plan being confirmed, on February 18, 2025, the then Debtors filed their Second Omnibus Motion for an Order, Pursuant to Bankruptcy Code Sections 105(a) and 365(a), Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired

Leases [D.I. 708] (the "Second Rejection Motion") to reject various contracts involving the FME Entities and their affiliates.

12. The Second Rejection Motion was opposed by the FME Entities and, following several continuations during which the parties attempted to resolve their issues, on September 9, 2025, the Reorganized Debtors rejected all but two of their executory contracts and unexpired leases with the FME Entities and their affiliates. The remaining two executory contracts were identified as the Bayonne IPS Agreement and the Hoboken IPS Agreement (the "In-Patient Agreements"), which, at that time, the Reorganized Debtors had intended to assume, subject to further negotiations on the terms of assumption.

13. Of particular note, three of the rejected executory contracts were the Fresenius Medical Care Bayonne, LLC operating agreement, Fresenius Medical Care Hoboken, LLC operating agreement and the Fresenius Medical Care Jersey City, LLC operating agreement (together, the "JV Agreements"), pursuant to which CarePoint Health Systems, Inc. and certain of its affiliates were parties and joint venture Partner Entities and/or Integrated Parties with FME Entity Bio-Medical Applications of New Jersey, Inc. and/or one of its affiliates.

14. Following the September 9, 2025 hearing, on October 20, 2025, counsel for the Reorganized Debtors filed a Certification of Counsel re: Order Partially Resolving the Debtors' Second Omnibus Motion for an Order, Pursuant to Bankruptcy Code Sections 105(a) and 365(a), Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases, and the Fresenius Medical Entities' Objection Thereto [D.I. 1562]. The Certification of Counsel sought approval of a stipulation by the parties that the amounts owed for services provided post-petition and payable as administrative expenses through August 31, 2025 were $76,875 under the rejected M.R. and the M.A.F. Contracts, which amount was allowed as an administrative expense by order

of this Court on October 23, 2025. The M.R. and the M.A.F. Contracts govern services provided by Fresenius Medical Care Hoboken, LLC, involving Reorganized Debtors HUMC Opco, LLC, IJKG Opco, LLC and Hudson Hospital Opco, LLC under the JV Agreement for Fresenius Medical Care Hoboken, LLC.

15. No amounts were owed by the Reorganized Debtors to the FME Entities or their affiliates for post-petition services under any of the other rejected contracts; however, with respect to the JV Agreements, the parties provided that the buyout and noncompete provisions remained enforceable and subject to further negotiation between the parties. [October 20, 2025 Certification of Counsel, D.I. 1562].

16. The Reorganized Debtors believe that the value of the joint venture companies subject to the JV Agreements is approximately $7.5 million , as to which the Reorganized Debtors have been informed by the FME Entities that the value of their economic interest is $774,958 (the "Buyout"). The Reorganized Debtors do not dispute this amount.

17. By way of example, a true and correct copy of the Fresenius Medical Care Hoboken, LLC operating agreement is attached as **Exhibit A**. All three JV Agreements are materially identical. Among other provisions relating to the Buyout, the JV Agreements provide:

a. If an agreement between the parties shall terminate for any reason or not be renewed by the FME Entity, the FME Entity shall either exercise a purchase option or the JV shall be liquidated. [Sections 5.6; 7.1];

b. Upon a transfer of its interests to the FME Entity, the Partner Entity, Member and/or Integrated Party to the Agreement as the case may be shall deliver a Noncompetition Agreement (the "Noncompete") to the FME Entity [Section 5.6];

c. If the FME Entity does not exercise its purchase option, the JV shall be dissolved and assets liquidated [Section 5.6.4];

d. Only the Partner Entity and not any direct or indirect owner thereof is required to deliver a Noncompete [Sections 5.9, 7.1].

e. In the JV Agreement for Fresenius Medical Care Hoboken, LLC, HUMC Opco, LLC is designated as the Partner Entity and an initial member and IJKG Opco, LLC and Hudson Hospital Opco, LLC are Integrated Parties as described in section 5.8. The JV Agreements are integrated such that any FME Entity or Affiliate can purchase any and all CarePoint entities' membership interests under any or all of the JV Agreements. *Id.*

18. On October 9, 2025, the FME Entities and their affiliates filed a supplemental objection to the Debtors' intention to assume the In-Patient Agreements [D.I. 1555].

19. Because the parties were unable to reach agreement on the terms by which the In-Patient Agreements would be assumed, at the hearing on November 5, 2025, the Reorganized Debtors rejected those contracts as well. The Reorganized Debtors did not dispute the amounts that the FME Entities and their affiliates calculated to be owed by them through October 31, 2025 under those contracts.

20. The parties believed that they were close to a global resolution of all amounts owed between them under the various rejected contracts and the FME Entities wanted a date certain imposed for the payment of the administrative expense; therefore, the parties agreed to payment terms of 30 days from entry of the Court's order or such later time as the parties agreed, which was confirmed in the Certification of Counsel submitted by the FME Entities on November 7, 2025 [D.I. 1592]. The November 7, 2025 order of this Court following the submission of the

Certification of Counsel established the total outstanding post-petition amounts that the Reorganized Debtors owe to the FME Entities and their affiliates under the In-Patient Bayonne IPS Agreement at $137,684.03 and under the In-Patient Hoboken IPS Agreement at $290,618.09, payable within thirty days, unless otherwise agreed by the parties [D.I. 1593].

21. That Order also recited the parties' ongoing discussions regarding the Buyout and use of the anticipated resolution thereof as a means by which the administrative expenses owed to the FME Entities and their affiliates would be paid [D.I. 1593, paras. I and 3.a.]

22. Because the parties had not yet reached agreement on the terms of the Buyout under the JV Agreements, the parties stipulated to extend the administrative expense payment deadline under the prior orders of this Court to January 31, 2026, which was approved by this Court on November 26, 2025 [D.I. 1615-1].

23. In October of 2025, the FME Entities submitted a letter of intent to purchase the Reorganized Debtors' member interests under the JV Agreements and, as of the end of November, the FME Entities had prepared a draft agreement by which the parties would offset their obligations under the various rejected contracts and the FME Entities would satisfy the Buyout of the Reorganized Debtors' interests under the JV Agreements, the terms of which are confidential.

24. The Reorganized Debtors, as applicable, have agreed to provide the Noncompete agreements to the FME Entities as required by the JV Agreements, and the FME Entities have retrieved all of their machinery and equipment from the Reorganized Debtors' facilities.

25. Despite the parties' apparent agreement on the amounts owed between them under the various rejected executory contracts and leases and the FME Entities having recovered all of their equipment from the Reorganized Debtors' facilities, the FME Entities refuse to finalize the Buyout unless HRH also delivers a Noncompete agreement. HRH has never been a party to any

of the JV Agreements and did not assume any of the Reorganized Debtors' obligations under those rejected agreements in the confirmed Chapter 11 plan. It was not an Affiliate of any of the Reorganized Debtors during the term of the JV Agreements. HRH has been providing its own dialysis services at its Secaucus hospital for many years prior to its involvement with the Reorganized Debtors and its acquisition of the Bayonne Hospital Assets in these Chapter 11 cases. Applying the noncompetition provisions to HRH would require HRH to discontinue providing those services to its patients going forward – something HRH is not willing and has no obligation to do and over which the Reorganized Debtors have no control.

26. In addition, when the FME Entities removed their machinery and equipment from the Reorganized Debtors' facilities, an FME employee also removed five dialysis machines from Christ Hospital that belonged to Christ Hospital. This was brought to FME's attention and, upon information and belief, the employee is no longer employed by FME.

27. The five dialysis machines were subsequently returned to Christ Hospital; however, only two of the five machines were returned in working condition. The other three were in various stages of disassembly and no longer functioned. The replacement value of each machine, based on the Reorganized Debtors' market research and a quote received by the Reorganized Debtors is $59,000 – or $177,000 total for the three machines – as set forth in the quote attached as **Exhibit B**. To date, FME has not replaced the three machines nor compensated the Reorganized Debtors for their value.

28. As of the date of this Objection, the FME Entities hold administrative expense claims in the aggregate amount of $526,011.24 pursuant to prior orders of this Court and the FME Entities owe the Reorganized Debtors $774,958, based on their own calculations, for the Buyout or liquidation value of the joint venture companies, plus $177,000 for the three dialysis machines



#125779483v2

that were erroneously removed from Christ Hospital and returned disassembled and in non-working condition.

29. That the Reorganized Debtors have not paid the administrative expense claims to date is not the result of any disregard of prior orders of this Court or unjustified refusal on the Reorganized Debtors' part. The parties have been involved in ongoing discussions toward a global resolution of their mutual obligations and the FME Entities are well aware that these discussions are part and parcel to the payment of the administrative expense claims.

30. From the outset of the contract rejection process in these Chapter 11 cases, the parties were fully aware that the Reorganized Debtors intended to use the Buyout to satisfy the post-petition amounts owed to the FME Entities. Indeed, the Buyout was expressly referenced in the orders approving the rejection of the various executory contracts and leases between the parties and the Reorganized Debtors believed that the payment terms of those orders were reasonable given how close to a global resolution they believed the parties were at the time.

31. Because the FME Entities and their affiliates owe the Reorganized Debtors an amount that exceeds the amount of the administrative expense claims and are refusing to turnover the Buyout and have not yet replaced the damaged dialysis machines, the Reorganized Debtors are cross-moving for turnover and to effect a setoff of the amount of the administrative expense claims against the Buyout owed by the FME Entities under the JV Agreements, and for the value of the three damaged dialysis machines.

**RELIEF REQUESTED**

32. The Reorganized Debtors oppose the relief sought by the FME Entities in their Motion to compel payment of the $526,011.24 administrative expense claims, for contempt if such amount is not paid and for any further relief. By the Cross-Motion, the Reorganized Debtors seek turnover of the Buyout owed to them under the JV Agreements as well as payment of the value of



#125779483v2

the damaged dialysis machines belonging to Christ Hospital (or replacement thereof) and to offset the FME Entities' administrative expense claims against the amounts that the FME Entities and their affiliates owe to the Reorganized Debtors under the JV Agreements.

## BASIS FOR RELIEF

### A. <u>The Debtors Should Not Be Compelled to Pay Immediately</u>

33. None of the parties dispute that this Court has the authority to enforce its prior orders approving the rejection of the various executory contracts and leases between the parties or allowance of administrative expense claims in favor of the FME Entities. Those orders, however, also acknowledge the ongoing discussions among the parties regarding the Buyout and Noncompete provisions of the JV Agreements – which form the basis for the parties' prior agreement that the payment deadlines under the orders could be extended by agreement or order of this Court.

34. Throughout the litigation between the parties, negotiations remained ongoing toward a global resolution of the parties' obligations, with the parties nearing finalization of their discussions until the FME Entities added a requirement that HRH also be bound by the noncompetition provisions of the JV Agreements.

35. There is no requirement in those agreements or elsewhere that a nonparty to the JV Agreements agree to bind itself to provisions of the agreements that would significantly and negatively impact its own separate operations that existed and were ongoing well before HRH became involved with the Reorganized Debtors.

36. The Reorganized Debtors do not dispute that they are obligated to satisfy the administrative expense claims in the amount of $526,011.24.

37. However, the FME Entities present their Motion to Compel and seek immediate payment of the administrative claims with unclean hands given that their own unjustified conduct

has prevented the Reorganized Debtors from having the means to pay those claims. The Motion to Compel is nothing more than a litigation tactic being used by the FME Entities to gain a larger share of the regional dialysis services for themselves by insisting on extending the noncompetition provisions of the JV Agreements well beyond their scope.

38. This is not a situation where, as the FME Entities contend, "the Debtors have simply refused to pay the allowed administrative expense claims in blatant disregard for the three Court Orders." The Reorganized Debtors stand ready, willing and able to pay the allowed administrative expense claims from the Buyout owed to them by the FME Entities and have done everything that is required of them to achieve this result, including by not contesting any of the amounts that the FME Entities calculate to be owed under any of the rejected executory contracts and unexpired leases, agreeing with the FME Entities' calculation of the Buyout amount, and agreeing to be bound by the noncompetition provisions of the JV Agreements.

39. As safety net hospitals, the Reorganized Debtors do not have liquidity in excess of $500,000 to pull from operations and immediately pay the administrative claims owed to the FME Entities. It would be inequitable to require the Reorganized Debtors to divert that amount of cash to pay the administrative claims where the FME Entities admittedly owe the Reorganized Debtors $774,958 under the same rejected contracts, plus $177,000 for the value of the three damaged dialysis machines (or replacement thereof).

40. The Reorganized Debtors have been abiding by their noncompetition requirements post-rejection even though a final resolution of the parties' obligations has not yet been achieved. The Reorganized Debtors have agreed to the full amount asserted by the FME Entities as administrative claims under the rejected agreements and have agreed to allow the FME Entities to offset the full amount of those claims against the amounts owed by the FME Entities to the

Reorganized Debtors under the JV Agreements. By refusing to pay the Buyout or liquidation value of the joint venture companies to which the Reorganized Debtors are entitled despite the Reorganized Debtors' compliance with the noncompetition requirements, the FME Entities are effectively receiving the benefits of the rejected JV Agreements without satisfying their burdens and the Reorganized Debtors are suffering damage.

41. If the FME Entities do not purchase the Reorganized Debtors' interests under the JV Agreements, pursuant to the terms of those agreements, the joint venture companies must be dissolved and liquidated. Whether through the Buyout or a liquidation of those entities, the Reorganized Debtors are entitled to receive an amount well in excess of the administrative expenses owed to the FME Entities, which funds will be used to pay those obligations in full.

42. There is no basis whatsoever to require the Reorganized Debtors to come out of pocket to immediately pay the administrative expenses to the FME Entities, while the FME Entities avoid paying their own obligations under those same rejected contracts to the Reorganized Debtors.

**B. <u>There is no Noncompliance or Basis for Civil Contempt or the Imposition of Sanctions</u>**

43. As the FME Entities note, to establish civil contempt, the movant must show that "(1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." *Harris v. City of Philadelphia*, 47 F.3d 1311, 1326 (3d Cir. 1995) (citing *Roe v. Operation Rescue*, 919 F.2d 857, 871 (3d Cir. 1990)). Bankruptcy courts can impose civil contempt sanctions, applying an objective standard whereby contempt is appropriate where there is "no fair ground of doubt" whether conduct violates the order at issue. A party's subjective belief does not insulate it from contempt where its belief is objectively unreasonable. *Taggart v. Lorenzen*, 587 U.S. 554 (2019).

44. The requirements for civil contempt are absent here based on the facts and circumstances.

45. While the prior orders of this Court are valid and the parties subject to those orders knew of the orders, the facts and circumstances show that the Reorganized Debtors have not disobeyed those orders. At a minimum, there is "fair ground" of doubt and the Reorganized Debtors' actions are objectively reasonable given the parties' ongoing negotiations that were reflected in the orders and the stipulation extending the payment periods.

46. Even after the formal extension of the payment periods expired, negotiations remained on going, though acrimonious at times, as evidenced by the two notices of default sent by the FME Entities several months apart before the Motion to Compel was filed.

47. That the Reorganized Debtors "paid nothing" by the original deadlines or the formally extended deadline, was due to the parties' negotiations toward a global resolution of all of their obligations to and from each other, with the net payment to be made to the Reorganized Debtors. This has not yet occurred.

48. While the orders provided payment terms, they also recognized the negotiations between the parties regarding the Buyout that the Reorganized Debtors intend to use to pay the administrative expenses in full.

49. There is no evidence that the Reorganized Debtors have disobeyed the prior orders of this Court or that their conduct was not objectively reasonable given the facts and circumstances of these cases.

50. The FME Entities' reference to the Reorganized Debtors having paid and satisfied other administrative claim obligations while they owe administrative expense obligations to the FME Entities, referencing D.I. 11830, 11831 and 11832, is of no consequence. The Reorganized

Debtors are making payments in accordance with their confirmed Chapter 11 plan as they are able. These other payments are significantly distinguishable from the obligations owed to the FME Entities given that the FME Entities indisputably owe the Reorganized Debtors an amount far in excess of the amount of the administrative expenses and the parties have been engaged in ongoing discussions toward a global resolution of their mutual debts. There is no "unilateral decision to withhold payment to the FME Entities, despite the Court Orders, while otherwise carrying out their business."

51. The FME Entities should not be rewarded for feigning good faith negotiations with the Reorganized Debtors toward a global resolution, the terms of which are fully agreeable to the Reorganized Debtors, conditioning finalization of the resolution on HRH also delivering a Noncompete agreement, and claiming the Reorganized Debtors are disobeying Court orders when HRH refuses to provide a Noncompete under agreements to which it is not bound that will destroy a necessary component of its own business operations.

52. The JV Agreements between the parties have been rejected. Accordingly, the purpose of the joint venture companies no longer exists and the Reorganized Debtors are entitled to their economic benefit – either via the Buyout or liquidation of the companies as provided by the JV Agreements. In either case the amount owed to the Reorganized Debtors by the FME Entities significantly exceeds of the amount of the FME Entities' administrative expenses and will be used to pay those administrative expenses in full.

53. Civil contempt sanctions serve no purpose here other than to reward the FME Entities' litigation tactics and attempts to garner a larger share of the regional dialysis business for itself which is well outside of the scope of the JV Agreements.

## CONCLUSION

For the foregoing reasons, the Reorganized Debtors respectfully request that this Court enter an Order in the form attached as **Exhibit C**: (a) denying the Motion to Compel in its entirety; (b) requiring the FME Entities to pay to the Reorganized Debtors the buyout amount of $774,958, as calculated by the FME Entities, in exchange for the Reorganized Debtors who were bound by the noncompetition provisions of the JV Agreement delivering Noncompetition Agreements; (c) requiring the FME Entities to replace or pay the value of the three damaged dialysis machines to the Reorganized Debtors, being $177,000; and (d) granting such other and further relief as the Court deems just and proper.

## CROSS-MOTION

By this Cross-Motion, the Reorganized Debtors respectfully request entry of an order:

1. Sustaining their Objection to the Motion to Compel.

2. Ordering the FME Entities to turnover the Buyout (defined above) to the Reorganized Debtors pursuant to 11 U.S.C. § 542(b) and authorizing and approving the application of setoff pursuant to 11 U.S.C. § 558 against amounts payable to the FME Entities on account of their administrative expense claims in the amount of $556,011.24.

3. Ordering turnover from the FME Entities of the net amount of the Buyout ($118,946.76) plus $177,000 on account of the three damaged dialysis machines within thirty (30) days following the entry of an order approving this Cross-Motion.

4. Granting such other and further relief as the Court deems just and proper.

## STATEMENT OF FACTS

5. The Reorganized Debtors incorporate the Background set forth in opposition to the Motion to Compel as the Statement of Facts in support of the Cross-Motion.

## LEGAL STANDARD

6. Section 542 of the Bankruptcy Code requires entities in possession, custody or control of property that the trustee can use, sell or lease under section 363 of the Bankruptcy Code to turn that property over to the trustee and account for such property or the value thereof, unless the property is of inconsequential value or benefit to the estate. 11 U.S.C. § 542(a). Further, if an entity owes a debt that is property of the estate that is matured, it shall pay the debt to the trustee except to the extent that the debt may be offset against a claim against the debtor. 11 U.S.C. § 542(b).

7. Additionally, Section 558 of the Bankruptcy Code preserves to the estate "any defense available to the debtor as against any entity other than the estate, including… setoff." 11 U.S.C. § 558. The debtor or estate representative may assert setoff defensively against claims asserted against the estate. See *In re PSA, Inc.*, 277 B.R. 51 (Bankr. D. Del. 2002); *In re Papercraft Corp.*, 127 B.R. 346 (Bankr. W.D. Pa. 1991).

8. Setoff rights are created and governed by applicable nonbankruptcy law. *See In re PSA, Inc.*, 277 B.R. 51 (Bankr. D. Del. 2002). Here Delaware law applies to the JV Agreements.

9. The Delaware Superior Court has recognized the common law elements of set off in *US WorldMeds Partners*. That court noted that the debts must first arise from an independent transaction. "A set-off is a counterdemand which a defendant holds against a plaintiff, arising out of a transaction extrinsic of plaintiff's cause of action." *US WorldMeds Partners, LLC v. Supernus Pharmaceuticals, Inc*, 2026 WL 2098302, at *6 (Del. Super. Ct. June 5, 2026). Second, the obligation must be enforceable. "A contingent or unmatured obligation that is not presently enforceable cannot be the subject of set-off." *Id*. Third the claim must be for a liquidated or

calculable sum. "[T]here is no right to set-off of a possible unliquidated liability against a liquidated claim that is due and payable." *Id*. "Set-off is a mode of defense by which the defendant acknowledges the justice of the plaintiff's demand, but sets up a defense of his own against the plaintiff, to counterbalance it either in whole or in part." *Finger Lakes Cap. Partners, LLC v. Honeoye Lake Acquisition, LLC*, 151 A.3d 450, 453 (Del. 2016).

10. Since the various executory contracts and leases between the parties were rejected, the FME Entities and Reorganized Debtors have acknowledged that amounts are owed between them under the rejected agreements. The amounts owed by the Reorganized Debtors to the FME Entities were agreed upon by the parties and are set forth in the prior orders of this Court underlying the FME Entities' administrative expense claims. The Reorganized Debtors have also agreed with the FME Entities' calculation of the amounts due to the Reorganized Debtors under the JV Agreements. The FME Entities have also acknowledged their responsibility for replacing or reimbursing the value of the damaged dialysis machines to the Reorganized Debtors. For almost a year now, the parties have been negotiating a global resolution of their obligations to each other.

11. The Reorganized Debtors are complying with their noncompetition obligations under the JV Agreements in the interim and are entitled to turnover of the Buyout with which they intend to fully satisfy their administrative expense obligations.

## ARGUMENT

### A. Section 542 requires that the FME Entities Turnover the Buyout and the Value of the Damaged Dialysis Machines

12. As set forth above, under Section 542(b), an entity that owes a matured debt to the estate is obligated to pay the debt to the trustee, except to the extent that it can offset any claim against the debtor.

13. Under 11 U.S.C. § 542(b), an entity "that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order," must turn it over subject to any applicable offset under Section 553. *In re UD Dissolution Corp*., 629 B.R. 11, 38-39 (Bankr. D. Del. 2021). In *UD Dissolution*, the court dismissed the plaintiff's turnover claim for Earn-Out and Holdback consideration advanced under an acquisition agreement solely because the plaintiff's pleading showed that the amounts were contingent on a disputed breach theory, not because turnover was categorically unavailable for consideration owed under an agreement. *Id*. The court expressly recognized that a mature, undisputed debt remained subject to turnover "except[ to the extent that such debt may be offset under section 553." *Id*. at 39 (quoting 11 U.S.C. § 542(b)).

14. Here, by contrast, the amount owed to the Reorganized Debtors under the JV Agreements is matured and undisputed.

15. Under the JV Agreements, the Reorganized Debtors' breach of any of the JV Agreements gives any of the FME Entities, particularly Bio-Medical Applications of New Jersey, Inc. and/or any of its Affiliates, the option to purchase the member interests of any and all of the Reorganized Debtors and their Affiliates under any and all of the JV Agreements or, if they decline to do so, requires the dissolution or liquidation of the joint venture companies. *See* Exhibit A, Section 5.8.

16. In October of 2025, by letter of intent, the FME Entities stated their intention to purchase all of the Reorganized Debtors' member interests under the three JV Agreements.

17. There is no dispute between the parties that the Reorganized Debtors hold a 10% interest in the joint venture companies. The aggregate value of the Debtors' interest has been calculated by the FME Entities to be $774,958, which has been agreed upon by the Reorganized Debtors. The Reorganized Debtors have also committed to delivering Noncompetition

Agreements to the FME Entities in exchange for the Buyout and have been acting in accordance with the noncompetition provisions in the interim.

18. There is no question that the JV Agreements were rejected by the Reorganized Debtors, triggering the Buyout and noncompetition provisions of those agreements, and the Reorganized Debtors do not dispute the amount calculated by the FME Entities as being the purchase price of the Buyout. Accordingly, unlike the plaintiff in *UD Dissolution*¸ the Reorganized Debtors are entitled to turnover of the funds, less any amount properly subject to setoff under Section 553.

19. As all requirements for payment of the Buyout have matured, the debt owed by the FME Entities in the amount of $774,958 must be turned over to the Reorganized Debtors under Section 542(b) of the Bankruptcy Code.

20. In addition, the FME Entities acknowledge their responsibility to replace or compensate the Reorganized Debtors for the three damaged dialysis machines. The Reorganized Debtors received a quote of $59,000 per machine, for a total of $177,000, based on a recent solicitation. This obligation is matured as well and must be turned over by the FME Entities. *See* Exhibit B.

21. Because the Reorganized Debtors owe the administrative expenses to the FME Entities, the Reorganized Debtors anticipate and consent to the FME Entities applying the amount of the Buyout first to the full satisfaction of the administrative expenses. After applying the offset, the FME Entities are required by Section 542(b) to turnover to the Reorganized Debtors the net amount of $118,946.76 for the Buyout, plus $177,000 for the value of the damaged dialysis machines (or replace those machines).

### B. Section 558 Governs the Reorganized Debtors' Assertion of Setoff as a Defense to the FME Entities' Administrative Expense Payment Demand

22. The converse of the FME Entities' turnover obligations under Section 542 is the Reorganized Debtors' right to the defense of setoff under Section 558 of the Bankruptcy Code.

23. When the estate asserts setoff defensively under Section 558, the statute preserves the defense and eliminates the prepetition versus post-petition distinction that otherwise encumbers creditor setoff under Section 553. *See In re PSA, Inc.*, 277 B.R. 51, 53–55 (Bankr. D. Del. 2002) (recognizing the debtor's right to assert setoff as a defense under § 558 and explaining that the timing distinction is inapplicable to § 558 defenses); *In re Papercraft Corp.*, 127 B.R. 346, 351–53 (Bankr. W.D. Pa. 1991) (same). Accordingly, while the administrative expense obligations arose post-petition, whether the FME Entities' Buyout obligation is a prepetition obligation due to the rejection of the JV Agreements or a post-petition obligation, the Section 558 defense is available to fully satisfy the amount of the FME Entities' administrative expense claims.

24. A two-step approach applies to defensive setoff. First, the bankruptcy court determines whether a valid right of setoff exists under the applicable nonbankruptcy law. Second, if the right exists, the estate may assert it as a defense under § 558 to reduce or eliminate the amount payable on the opposing claim. *See PSA*, 277 B.R. at 53–55.

25. Here, the JV Agreements are governed by Delaware law.

26. Under Delaware law, setoff is required where the claim arises from a transaction independent of the cause of action, is matured and is for a liquidated or calculable sum. *See, US WorldMeds Partners, LLC v. Supernus Pharmaceuticals, Inc.*, 2026 WL 2098302, at *6 (Del. Super. Ct. June 5, 2026).

27. The administrative expense obligations arose under the rejected M.R. and M.A.F. contracts that involve services provided at the Hoboken joint venture company governed by the Fresenius Medical Care Hoboken, LLC JV Agreement. Accordingly, the Reorganized Debtors

submit that, at least as to the portion of the Buyout that relates to the parties' interests under Hoboken JV Agreement, the obligations are mutual. Because all of the JV Agreements are integrated, any of the FME Entities or their affiliates can elect to perform the Buyout and the Reorganized Debtors under all of the JV Agreements are bound by the Noncompete provisions in each, the Reorganized Debtors submit that mutuality exists between the administrative expense obligations and the Buyout of all three JV Agreements for purposes of Section 558.

28. The FME Entities have provided the Reorganized Debtors with an aggregate Buyout amount under the JV Agreements that the Reorganized Debtors do not dispute.

29. The Reorganized Debtors submit that, on the facts here, the elements of setoff under Section 558 are satisfied to allow the offset of the administrative expenses against the Buyout. The Reorganized Debtors hold readily ascertainable claims against the FME Entities for the economic value of their member interests arising under the JV Agreements and the FME Entities hold administrative expense claims arising under the M.R. and M.A.F. contracts serviced by the parties under the Hoboken JV Agreement.

**C. Equity and Efficiency Favor Recognizing the Estate's § 558 Defense and Denying or Deferring Immediate Payment**

30. Even apart from the legal entitlement to setoff, equitable considerations strongly support denial or deferral of the FME Entities' Motion to Compel pending the FME Entities' turnover of the Buyout.

31. Courts have emphasized that compelling payment to a creditor while forcing the estate to pursue separate litigation to collect its countervailing receivable is inefficient and inequitable. "The right of setoff (also called "offset") allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A. Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C.

§ 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (internal citations omitted).

32. Granting the FME Entities immediate payment would unnecessarily remove significant funds from the Reorganized Debtors that are needed for operations when, on net, the FME Entities and their affiliates are indebted to the estate, needlessly multiplying proceedings and collection efforts. Recognizing the Section 558 defense now prevents inequitable risk to the Reorganized Debtors' operations and promotes administrative efficiency. Because the FME Entities owe the Reorganized Debtors more than the amount of the administrative expenses, the FME Entities already hold the full satisfaction of the administrative expenses.

## RESERVATION OF RIGHTS

33. This Motion is filed without prejudice to, and with a full reservation of, all rights and remedies to which the Reorganized Debtors are entitled, at law or in equity.

## CONCLUSION

For the foregoing reasons, the Reorganized Debtors respectfully request that this Court enter an Order in the form attached as **Exhibit C**: (a) denying the Motion to Compel in its entirety; (b) requiring the FME Entities to pay to the Reorganized Debtors the buyout amount of $774,958 as calculated by the FME Entities, in exchange for the Reorganized Debtors who were bound by the noncompetition provisions of the JV Agreement delivering Noncompetition Agreements to the FME Entities; (c) requiring the FME Entities to replace or pay the value of the three damaged dialysis machines to the Reorganized Debtors, being $177,000; and (d) granting such other and further relief as the Court deems just and proper.

Dated: August 18, 2026

**DILWORTH PAXSON LLP**

/s/ Peter C. Hughes
Peter C. Hughes
800 N. King Street, Suite 202
Wilmington, DE 19801
Telephone: 302-571-9800
Facsimile: 302-571-8875
Email: phughes@dilworthlaw.com
And

/s/ Anne M. Aaronson
Lawrence G. McMichael (admitted *pro hac vice*)
Peter C. Hughes (DE 4180)
Anne M. Aaronson (admitted *pro hac vice*)
Jack Small (admitted *pro hac vice*)
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7000
Facsimile: (215) 754-4603
Email: lmcmichael@dilworthlaw.com
Email: phughes@dilworthlaw.com
Email: aaaronson@dilworthlaw.com
Email: jsmall@dilworthlaw.com
*Counsel for the Debtors*